JESSICA STEBBINS BINA
jessica.stebbinsbina@lw.com
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525

NICHOLAS J. BOYLE*
nicholas.boyle@lw.com
SARAH A. TOMKOWIAK*
sarah.tomkowiak@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200

Attorneys for Plaintiffs
* *Pro hac vice* pending

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC., | CASE NO.   2:20-cv-8819 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| COMMERCIAL REAL ESTATE EXCHANGE, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1      Plaintiffs CoStar Group, Inc. ("CoStar Group") and CoStar Realty

2 Information, Inc. ("CoStar Realty") (collectively, "CoStar"), by and through its

3 undersigned counsel, bring this Complaint against Commercial Real Estate

4 Exchange, Inc. ("CREXi") and allege as follows:

5 **PRELIMINARY STATEMENT**

6     1.    CoStar brings this suit to redress CREXi's flagrant and widespread

7 theft of CoStar's intellectual property and its unlawful scheme to build a

8 competing business on the back of that stolen content, and through the

9 unauthorized use of CoStar's services.

10     2.    CoStar is the nation's leading provider of commercial real estate

11 information, analytics, and online property marketplaces.  CoStar offers a

12 password-protected subscription service used by brokers and other entities that

13 require comprehensive commercial real estate data.  CoStar also owns a number of

14 digital marketplaces containing listings of real estate for sale and for lease.

15 CoStar's LoopNet.com website ("LoopNet") is the leading digital marketplace for

16 commercial real estate in the United States.  Every day buyers, sellers, lessors,

17 lessees, owners, and brokers access and use the marketplace at www.loopnet.com

18 in order to list, buy, sell, lease, rent, or browse commercial real estate.  In addition,

19 CoStar runs a commercial real estate auction platform, known as Ten-X.com

20 ("Ten-X").

21     3.    CREXi is attempting to build its own online commercial real estate

22 marketplace and auction platform by free-riding on CoStar's billions of dollars of

23 investments and the thirty-plus years of hard work by CoStar's employees.  CREXi

24 covertly harvests content, including broker directories, from CoStar's subscription

25 database without authorization by using passwords issued to other companies.

26 CREXi also accesses LoopNet on a systematic basis to steal content, including

27 property listing data, new listing alerts, and CoStar-copyrighted photographs, all in

28

breach of contract and in violation of state and federal law.[1]  After copying content from multiple CoStar sources, CREXi proudly and knowingly displays the stolen content on its rival platform, and tells the world that it is organically and rapidly growing a successful business.  Put simply, CREXi is ripping off CoStar, CoStar's employees, and CoStar's shareholders, and lying to its customers and the industry.

4.     CREXi's wrongdoing is remarkable in its scope.  User accounts and IP addresses affiliated with CREXi have impermissibly accessed LoopNet ***more than a million times***—at least—even though such high-volume competitor access is forbidden by CoStar's terms of use.  CREXi's unauthorized access continued even after CoStar implemented blocking technology and sent CREXi thousands of notices stating that its access was unauthorized.  Undeterred, CREXi switched IP addresses and continued using CoStar's services to build a competitive product, and continued harvesting CoStar's content on a wholesale basis.

5.     Indeed, based on a review of CREXi's website through July 30, 2020, CoStar has identified well over ***ten thousand*** copyrighted CoStar photographs, copied and displayed by CREXi without permission.  (To give a sense of the harm inflicted and scale of wrongdoing, recent federal judgments have placed a value of $50,000 on each CoStar image infringed.)  These photographs almost certainly constitute a mere fraction of the total infringement present in CREXi's systems, as CREXi's public facing website only displays photographs associated with listings CREXi has decided to publish.

6.     Although CREXi is a relative newcomer, it is large and well-funded, and could compete fairly with CoStar if it so chose.  CREXi has purportedly already raised $60 million, including a $30 million Series B funding announced in January 2020.  But CREXi has chosen to build out its business on the cheap by stealing from CoStar.

---

[1] For the avoidance of doubt, CoStar's allegations related to LoopNet in this case refer solely to CoStar's LoopNet marketplace and not to broker websites powered by CoStar's LoopLink product.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

7.     The rot permeates the company.  CREXi account executives, including Samuel Hamlin and Ross Padfield, obtained access to CoStar's password-protected database by using passwords issued to CoStar customers, and then downloaded CoStar's broker directories to build a clone directory on CREXi, using the stolen data to generate customer leads.  Meanwhile, CREXi's employees—as well as low-paid "researchers" in India working on CREXi's behalf—routinely access LoopNet.  Once there, CREXi copies CoStar's content, including copyrighted photographs, real estate listing data, and broker information, to populate its website.  Multiple CREXi managers and employees have even created LoopNet accounts, many using non-CREXi email addresses and pseudonyms to cover their tracks.  For example, Nick Hanna, CREXi's senior product manager, created a LoopNet account registered to "Hank Mardukus" at itsnotnick08@aol.com.  Hank Mardukas is a fictional character from the 2009 movie, "I Love You, Man."  The use of fake names helps CREXi employees make use of LoopNet, in violation of the terms of use barring competitive access, without being caught.

8.     Beyond the improper use of CoStar's subscription service to generate broker directories, and the direct theft of content from LoopNet, senior employees at CREXi unabashedly use LoopNet as a key tool to compete against CoStar.  Several CREXi employees have set up "saved searches" on LoopNet so that they receive an email notification at a non-CREXi address whenever LoopNet publishes a listing that matches their identified criteria.  For example, Michael Rosenfeld, a CREXi account executive for the mid-Atlantic region, has created saved searches that send notifications to "Mike Rose" at his personal gmail account whenever LoopNet posts certain property listings in that region.  CREXi is using the efforts of a competing online marketplace, LoopNet, in order to identify new listings to add to its site, rather than relying solely on its own efforts.

9.     CREXi's attempt to clone CoStar's business is brazen.  It has gone so far as to infringe CoStar's copyrighted photographs in the marketing materials it uses to promote itself.  Over the last several months, senior CREXi leadership—including Mr. Rosenfeld and Paul Cohen, CREXi's National Sales Director—have hosted a number of virtual presentations to introduce CREXi in markets across the country.  During the presentations, CREXi claims that it has more listings than its competitors, and purports to showcase its platform and display property listings.  What CREXi does not advertise, however, is that it is taking that listing content from CoStar.  Indeed, even the sample listings shown in these virtual marketing campaigns contain infringing content copied from CoStar.

10.    There is no question that CREXi knows that its conduct is wrongful.  It is widely known in the industry that CoStar does not permit competitors to piggyback on its business.  CoStar's subscription service is password-protected.  And CoStar has sent thousands of notices to CREXi specifically stating that it may not access LoopNet.  CREXi itself has admitted that it is *not* allowed to copy CoStar's listing content from LoopNet.  But the evidence shows that this is precisely what CREXi does.  CREXi accesses a property listing on CoStar's services.  Shortly thereafter, the same property listing is added *by CREXi* on its website with CoStar's copyrighted photographs.  And in order to hide its copying of CoStar images featured in those listings, CREXi appears to be cropping out the CoStar watermark from CoStar-copyrighted photographs before adding them to CREXi.  Even worse, CREXi often goes a step further and adds its own watermark to CoStar-copyrighted photographs, affirmatively passing them off as its own.

11.    There is also no question that CREXi itself uploads the stolen CoStar content, including copyrighted images, onto CREXi's site.  That is the reason CREXi harvests the content from LoopNet.  Indeed, in many cases, the listing brokers have never even heard of CREXi—they contact CoStar to ask why their listings are appearing on CREXi's site.  And even when CREXi does contact a

listing broker, CREXi offers to post the listing itself, without revealing its illicit source.

12.     As CREXi must know, CoStar has brought several successful lawsuits against rivals who seek to compete unfairly by covertly accessing CoStar's websites, copying listings, and stealing CoStar's copyrighted photographs.  Like CREXi, Xceligent, Inc. copied real estate listings, including CoStar's copyrighted images and other CoStar content, from LoopNet, and, like CREXi, used data from CoStar's password-protected subscription service to build and expand its rival business.  Also like CREXi, Xceligent ignored LoopNet's "access denied" notices and rotated the IP addresses that it used in order to circumvent CoStar's technological protections.  And, like CREXi, Xceligent utilized low-paid labor in India so that it could access LoopNet on the cheap and around the clock.  In a highly publicized lawsuit, CoStar sued Xceligent for copyright infringement and unfair competition, leading to a permanent injunction and a $500 million judgment, the largest in history for the infringement of copyrighted photographs.  That judgment valued each unlawfully copied real estate listing and each infringed CoStar image at $50,000.  CREXi was undeterred.  Instead, it simply adopted Xceligent's playbook.

13.     CREXi is a repeat offender.  CREXi's co-founder and CEO, Michael DeGiorgio, and co-founder, Luke Morris, both of whom previously worked for Ten-X—the commercial real estate auction site that is now part of CoStar—were caught red-handed with highly-confidential trade-secret customer lists they took from Ten-X to establish CREXi.  In 2016, a California state court entered a preliminary injunction prohibiting CREXi from using the customer lists that it had misappropriated from Ten-X.  To end the litigation, CREXi made a seven-figure damages payment, and Mr. DeGiorgio stated: "I regret my conduct at the time I departed Ten-X."  Clearly not.  Mr. DeGiorgio, CREXi, and its employees have continued to steal to get ahead, now on an even greater scale.

14.     As a consequence of CREXi's misconduct, CoStar is entitled to millions of dollars in damages as well as injunctive relief to prevent continued irreparable harm to its business.

## BACKGROUND

15.     Founded in 1987, CoStar employs more than four thousand people worldwide.  As a result of these employees' diligent efforts—and the investment of over $5 billion dollars over the last three decades—CoStar has developed the most comprehensive commercial real estate database in the world.  CoStar and its affiliates expend enormous time and resources to maintain the CoStar database, including averaging 24,000 thousand phone calls *per day* to brokers, owners, developers, and other real estate professionals, canvassing a half million properties per year nationwide, and taking nearly one million photographs annually.  CoStar's marketing research operations make millions of data changes to the CoStar database each day.  CoStar works continuously to verify that the data contained in its database are up-to-date and reliable.

16.     CoStar's database is the engine that drives CoStar's business, attracting paying subscribers, licensees, and users, and powering its various information services, analytical tools, and digital marketplaces, including LoopNet.

17.     CoStar offers a password-protected subscription service that brokers and other industry participants use to obtain comprehensive commercial real estate data, news, and analytics, as well as copyrighted photographs of commercial real estate properties.  Although CoStar licenses its copyrighted images, brokers and other CoStar customers are prohibited from providing those images to competitors.

18.     CoStar also owns and operates a number of digital marketplaces with listings of real estate for sale and for lease.  LoopNet is the nation's leading digital marketplace for commercial real estate.  Brokers use CoStar's marketplaces, including LoopNet, to market their listings, which in many cases include CoStar's copyrighted photographs.

19.     CoStar goes to significant lengths to protect the copyrighted photographs and data that it makes available.  For instance, use of both CoStar's subscription service and LoopNet are subject to binding terms of use that prohibit high-volume competitive use by rivals, such as CREXi, and any unauthorized copying of content.  This restriction is industry standard.

20.     CREXi was founded in 2015 by Michael DeGiorgio, Luke Morris, Erek Benz, and Ben Widhelm. The founders had all worked at Ten-X, the auction site that is now part of CoStar.  CREXi describes itself on its website as "a commercial real estate marketplace that simplifies transactions for brokers with a suite of easy-to-use tools to manage the entire process from listing to closing."  CREXi's website (www.crexi.com) allows users to view commercial real estate listings in markets across the country.  CREXi also runs an online auction marketplace, similar to Ten-X, and in its auction marketing materials trumpet over $100 billion dollars in closed deals.

21.     Outwardly, CREXi claims to be rapidly expanding under its own steam and gaining market share from rivals like LoopNet to become the biggest commercial real estate marketplace in the industry.  During recent marketing presentations, CREXi claimed that it was now the "number one commercial marketplace in the country," "really the place where all the listings are," and that it has "far more listings than the competitors out there."  CREXi proclaims in its marketing emails that it is already "the most active CRE platform," while simultaneously claiming to be "the fastest growing CRE marketplace."   And in a May 4, 2020 podcast, CREXi boasted that it is adding "thousands of properties a week" to its website with the goal of "building up the whole marketplace side of things."  Along similar lines, CREXi describes its recently-launched broker directory as "the only place" with "every commercial broker in the country."

22.     To the extent CREXi has grown in the past five years, purportedly to become "the number one" in the industry, it has not grown by investing the time

(decades) or money (billions) that CoStar has. Instead, CREXi's growth is attributable, at least in significant part, to free-riding on CoStar, by willfully and systematically accessing CoStar services without authorization, using them to compete against CoStar, and stealing CoStar's intellectual property.

23.    For instance, CREXi account executives unlawfully accessed CoStar's password-protected subscription database using log-in credentials they received while working at other companies who are CoStar clients. They did so in order to copy CoStar's data, including thousands of broker directory and property records from CoStar's systems. Upon information and belief, CREXi has used these directory records to build its rival directory and find potential customers for CREXi's marketplace.

24.    Sam Hamlin, for example, quit his job at Colliers in 2019, then joined CREXi as an account executive, but continued to use his Colliers account credentials without authorization to access CoStar's subscription service more than a hundred times, accumulating over fifty thousand product hits and downloading nearly four thousand CoStar Professional Directory records, which would assist in generating customer leads.

25.    This competitive access and use of unauthorized credentials is a breach of CoStar's Terms of Use, to which Mr. Hamlin (and fellow CREXi account executive Ross Padfield) agreed on behalf of CREXi. CREXi's disregard for CoStar's proprietary data fits a pattern: As noted above, CREXi made a seven-figure payment to Ten-X in 2017 after it had been caught misappropriating substantially similar confidential customer information.

26.    At the same time it was accessing CoStar's subscription service, CREXi has accessed LoopNet more than a million times—at least—in breach of binding terms and conditions. Once there, CREXi has copied, en masse, property listings containing CoStar's copyrighted photographs and proprietary content. CREXi IP addresses have continued to hit CoStar's marketplaces despite CoStar's

technological blocking efforts and repeated written notice—displayed to CREXi literally thousands of times—that such conduct is contractually prohibited.

27.     CREXi employees have also created accounts on LoopNet—often using non-CREXi email addresses and pseudonyms to mask their connection to their employer.  They set up "saved searches" to track when LoopNet adds property listings fitting specified criteria. When CREXi speaks of "building up the whole marketplace side of things," CREXi means that it is monitoring LoopNet for new listings to copy and pass off as the fruit of CREXi's own labor.

28.     CREXi often simply copies listings from LoopNet without any contact with the broker representing the listings.  Other times, CREXi contacts the listing broker and asks vaguely whether the broker would like the listing to appear for free on CREXi, without specifying where CREXi will obtain the relevant listing information.  CREXi then copies the listing from LoopNet, which is far cheaper, faster, and easier than generating a new property listing.

29.     For example, and as discussed in Section D.5, *infra*, on May 14, 2020, CREXi viewed a listing for an Alabama property on LoopNet, and the next day the same property appeared on CREXi with a CoStar copyrighted photograph:

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

## LoopNet Listing

## (accessed by CREXi on May 14, 2020)



## CREXi Listing

## (posted by CREXi on May 15, 2020)



LATHAM&WATKINS LLP
ATTORNEYS AT LAW

30.     Likewise, on May 15, 2020, CREXi viewed a LoopNet listing for a property in Nevada, and only three days later the same property appeared on CREXi with a CoStar copyrighted photograph:

### **LoopNet Listing**

(accessed by CREXi on May 15, 2020)



LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1

2 **CREXi Listing**

3 (posted by CREXi on May 18, 2020)



15     31.   Many brokers are not even aware that their listings appear on CREXi.

16 And even *if* CREXi had asked the brokers for permission to copy the listings from

17 LoopNet, brokers cannot provide permission to infringe CoStar's copyrighted

18 images, or to breach the terms and conditions applicable to CoStar's services,

19 which prohibit the type of high-volume competitive use seen here.  CREXi knows

20 this.  Indeed, as described in more detail below, when CREXi talks with brokers,

21 CREXi is careful not to mention LoopNet.  And if CoStar's site comes up in

22 conversation, CREXi maintains appearances and says that it may not copy from

23 LoopNet.  But behind closed doors, it does so anyway.

24     32.   Recognizing the unlawful nature of its scheme, CREXi has taken

25 numerous steps to attempt to conceal its actions.  These include rotating its IP

26 addresses to avoid technological blocking measures imposed by CoStar, using

27 passwords issued to other companies in order to access CoStar's subscription

28 service, and adopting fake identities when registering for accounts on LoopNet.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW

And in order to hide its copying of CoStar images, CREXi appears to be removing the CoStar watermark from CoStar copyrighted photographs before displaying the derivative work on CREXi, as seen here:

| **CoStar Copyrighted Photograph on LoopNet** | **CoStar Copyrighted Photograph on CREXi** |
|---|---|

 

 

 

33.     As if the removal of watermarks were not enough, CREXi cannot help but take credit in an even more explicit manner.  CREXi takes some of the CoStar-

copyrighted cropped images and adds its own CREXi watermark to them, as the examples below demonstrate:

| **CoStar Copyrighted Photograph on LoopNet** | **CoStar Copyrighted Photograph on CREXi** |
| :---: | :---: |

 

 

34.   However, CREXi is not always careful in making sure that CoStar's watermark has been removed before adding the CREXi watermark.  These images taken from CREXi's website show that CREXi's watermark even appears on images that still have the CoStar watermark:

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





LATHAM&WATKINS LLP
ATTORNEYS AT LAW



35.     CREXi's violations of law are willful, egregious, and in bad faith. CREXi's unlawful free-loading has harmed CoStar in ways that cannot be measured or remedied fully by monetary damages.  As a consequence of CREXi's unlawful and unfair conduct, CoStar is entitled to millions of dollars in damages as well as injunctive relief to prevent continued irreparable harm to its business.

## JURISDICTION AND VENUE

36.     This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, *et seq.* The Court has federal question jurisdiction over claims arising under those statutes pursuant to 28 U.S.C. §§ 1331 and 1338(a).  The Court has supplemental jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367 because these claims are so related to the federal-law claims that they form part of the same case or controversy.

37.     The Court has personal jurisdiction over CREXi because, among other reasons, CREXi is headquartered and has its principal place of business in Marina Del Ray, California.  The business transacted by CREXi bears a substantial nexus to CoStar's claims.  Through its acts, CREXi has invoked the benefits and

protections of California's laws and purposefully availed itself of the privilege of conducting activities with California.

38.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because CREXi resides in this judicial district, and a substantial part of the events or omissions giving rise to CoStar's claims occurred in this judicial district.

## THE PARTIES

39.     Plaintiff CoStar Group, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia, 20005.

40.     Plaintiff CoStar Realty Information, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia, 20005.  It is a wholly owned subsidiary of CoStar Group.

41.     Defendant CREXi is a corporation organized and existing under the laws of the state of Delaware with its principal place of business and corporate offices located at 4086 Del Rey Ave, Marina Del Rey, California, 90292.  CREXi's California Registration Statement lists its Entity Address as 13360 Beach Avenue, Marina Del Rey, CA 90292.

## FACTUAL ALLEGATIONS

**A.     CoStar Invests Significant Time and Money to Maintain the Nation's Most Comprehensive and Most Visited Commercial Real Estate Services**

42.     Like many innovative technology companies, CoStar's business began in its founder's basement with a simple idea: empower commercial real estate brokers with professionally researched, unbiased commercial property information. Since its founding, and as a result of investments in excess of $5 billion dollars and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

the efforts of thousands of employees, CoStar and its affiliates have become the leading provider of commercial real estate information.

43.    CoStar's core product is its subscription database of real estate information, which includes verified information about commercial real estate, integrated with millions of copyrighted photographs and other imagery.  The database is part of a suite of online services that include resources and tools for the real estate industry.  CoStar generates, updates, and curates the database's content at a cost of hundreds of millions of dollars each year.

44.    CoStar's marketing research team has more than 1,200 trained professionals who update, curate, and maintain the database every minute of every working day and beyond.  These marketing researchers make millions of changes to the database each year, canvass commercial real estate properties, and have taken, on average, over one million photographs annually in recent years.

45.    CoStar licenses its subscription database content for a monthly fee. Those fees, which vary according to the scope of access the user seeks, generate significant revenue for CoStar.

46.    CoStar provides this comprehensive commercial real estate intelligence to professionals throughout the economy, including real estate brokers and brokerage firms, owners and investors, property managers, lenders, developers, valuation professionals, as well as retailers, vendors, and corporations. The leading commercial real estate brokerages in the United States, as well as a significant number of smaller brokerages, property owners, banks, retailers, real estate investment trusts (REITs), and other professionals are subscribers.  For example, brokers and brokerages use CoStar in their day-to-day business to identify available spaces for lease and evaluate potential sales.  Pursuant to licenses, these users utilize CoStar's professional, copyrighted photographs to market their listings.

47.     Federal, state, and local government agencies rely on CoStar's data for a variety of purposes.  For example, government agencies use CoStar's data to value commercial properties for tax purposes.  CoStar's investment in accurate information also benefits the banking sector.  CoStar's forecasts, risk modeling, or advisory services are used by nearly all of the top twenty "Systemically Important Financial Institutions," as well as federal regulators involved in stress testing those banks.  CoStar's census of the commercial real estate environment and daily data updates allow these banks and regulators to better manage the systemic risks that led to the 2008 financial crisis, thereby benefitting the economy.

48.     CoStar's database powers digital marketplaces owned and operated by CoStar.  One such marketplace is LoopNet.  LoopNet is a digital platform where users can easily post and search commercial real estate listings.  LoopNet provides information on more than 650,000 for-lease and for-sale listings at any point in time and is a key revenue generator for CoStar.

49.     LoopNet is the most heavily trafficked commercial real estate marketplace, with more than seven million unique users per month.  LoopNet's users rely on the platform's content being up-to-date, unbiased, and trustworthy.

50.     Together, CoStar's subscription database, LoopNet, and CoStar's other digital marketplaces provide broad access to vast commercial real estate data, helping to level the playing field in a $43 trillion per year U.S. industry. Ultimately, CoStar's investment in its services provides enormous benefits to CoStar's customers, other participants in the commercial real estate market, and the economy at large.  CoStar delivers value not only by bringing together parties that are looking to transact, but also by ensuring the reliability of the information that is shared across its services.  By supplying comprehensive data to the marketplace, CoStar helps reduce transaction- and search-related costs, leading to efficiency gains that benefit potential buyers, sellers, lessees, and lessors, as well as third-party consumers of CoStar's information, such as banks and government

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

agencies.  And because one of the key drivers of CoStar's value is ensuring that its services are trusted and up-to-date, CoStar is incentivized to invest in creating and updating in real time a highly reliable database.

51.    The important role that CoStar plays in the commercial real estate market is demonstrated by the extent to which its users interact with its services. Each day, users conduct over nine million searches for commercial real estate using CoStar services.  CoStar estimates that its services play a part in supporting trillions of dollars of commercial real estate transactions in the United States each year.

52.    Although CoStar has a number of competitors in each of its businesses, including its digital marketplaces, it has fought to outwork and outperform the competition through constant innovation and reinvestment over three decades.  More than thirteen thousand CoStar researchers have contributed to the subscription database since its creation, adding millions of properties, shooting millions of professional photos and drone videos, and driving and flying millions of miles per year.

53.    The benefits that CoStar's services provide to its customers and the economy at large, and CoStar's ability to continue generating job opportunities, are a direct result of the company's relentless efforts to research, collect, and create proprietary content.  The protection of CoStar's intellectual property—and CoStar's ability to vindicate its rights therein—is therefore critically important.

**B.    CoStar Goes to Significant Lengths to Protect Its Intellectual Property**

54.    CoStar's intellectual property is at the root of the CoStar database and therefore is central to its business.  CoStar protects its intellectual property in three primary ways.  First, CoStar registers its photographs with the United States Copyright Office.  Second, users must assent to CoStar's binding terms in order to use any of the CoStar services.  Third, CoStar employs anti-piracy technology.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

### 1.    Copyright Protection

55.    A key element of CoStar's intellectual property is its repository of photographs of commercial real estate.  CoStar owns the largest library of commercial real estate images in the world, including millions of photographs of commercial real estate taken by professional photographers employed by CoStar.  As discussed above, these copyrighted photographs are used in CoStar's services, including its subscription database and LoopNet marketplace.

56.    As CoStar adds photographs to its services, it routinely registers them with the Copyright Office.  CoStar is currently registering tens of thousands of photographs per month.

57.    CoStar watermarks the images it owns with a logo in the bottom right hand corner, as shown in multiple examples above.  This watermark, which publicly identifies CoStar's ownership of the images and protects CoStar's property, constitutes copyright management information.

58.    CoStar watermarks its copyrighted photographs to police infringement and has used its watermarks to identify infringers in the past, including rivals such as Xceligent.  Moreover, the presence of watermarks helps law-abiding third parties, including other companies in the commercial real estate industry, recognize and remove infringing images.

59.    Users may provide their own photographs to CoStar for use on their listings in all CoStar services.  CoStar does not claim ownership or copyright in user-uploaded photos.

### 2.    Terms of Use Protection

60.    CoStar requires users of its services, including CoStar's subscription database and LoopNet, to agree to binding terms and conditions.

61.    Use of CoStar's website, including its subscription database, is subject to CoStar's Terms of Use ("CoStar's Terms of Use").  A genuine copy of CoStar's Terms of Use is attached hereto as **Exhibit A.**

62.     In order to log into the CoStar subscription database, users must enter their username and password on a login page.  Below the "Log In" button, users are reminded that "By clicking 'Log In', I accept CoStar's Terms of Use."  The text includes a conspicuous hyperlink to CoStar's Terms of Use:



63.     In addition, before users first log into CoStar's subscription database, CoStar sends them an email reminding them that their use of Costar's database is subject to CoStar's Terms of Use.  The email states, "Use is subject to the CoStar Terms of Use.  By logging in, you agree to be bound by such terms."

64.     Further, after initially logging into CoStar's database, users are periodically required to agree (again) to CoStar's Terms of Use.  Every 30 days, a pop-up window appears that displays CoStar's Terms of Use and requires the user to affirmatively agree to the terms before proceeding to the database.  Thus, for example, if a user has not logged into CoStar's database for 45 days, the next time the user logs in and tries to access information, the pop-up window will appear, and the user must re-accept the terms in order to gain access.  The text at the top of the pop-up window states: "YOUR USE OF THIS WEBSITE CONSTITUTES YOUR AGREEMENT TO BE BOUND BY THESE TERMS OF USE."  Users who decline are redirected to the homepage.

65.     CoStar's users are also reminded of their obligation to abide by CoStar's Terms of Use throughout their interactions with the database.  For

example, when a user attempts to export data from the database, text above the "Export" button informs users: "Exported data subject to restrictions.  See Terms of Use."  As with the login page, clicking the words "Terms of Use" displays CoStar's Terms of Use.

| Please select desired Export File Type | Microsoft Excel File |
|---|---|

*Exported data subject to restrictions. See Terms of Use*

| Export | Save | Delete | Cancel |

66.    Moreover, when users view results in the subscription database, the bottom of results pages advises: "By using this site, you agree to our Terms of Use."  This text also includes a hyperlink to CoStar's Terms of Use.

67.    As a result of these numerous and conspicuous notices, CREXi and its employees and agents are well aware that their use of CoStar's subscription database is subject to CoStar's Terms of Use.

68.    Likewise, CREXi and its employees and agents are aware that CoStar's Terms of Use form a binding contract.  CoStar's Terms of Use make clear that they form a binding contract, stating: "By accessing or using this Site (or any part thereof), you agree to be legally bound by the terms and conditions that follow . . . . They constitute a legal contract between you and CoStar . . . ."

69.    CoStar's Terms of Use, provided to and made available to users on multiple occasions as they interact with the database, provide that only "Authorized Users" may access CoStar's password protected services. "Authorized User" is defined as:

> [A]n individual (a) employed by a CoStar Client or an Exclusive Contractor (as defined below) of a CoStar Client at a site identified in the License Agreement, and (b) who is specified in the License Agreement as a user of a specific Passcode Protected Service and represented by the Client to be an employee or Exclusive Contractor

> of the Client. An "Exclusive Contractor" is defined as an individual person working solely for the CoStar Client and not another company with real estate information needs or for themselves and performing substantially the same services for such CoStar Client as an employee of such CoStar Client.

70.     Under CoStar's Terms of Use, an Authorized User "may not share his/her Passcodes with any other person, nor may an Authorized User allow any other person to use or have access to his/her Passcodes."

71.     Further, CoStar's Terms of Use expressly forbid competitors from accessing, using, or transmitting any portion of CoStar's content in the subscription database service:

> [Y]ou shall not . . . (2) Access or use any portion of the Product if you are a direct or indirect competitor of CoStar, nor shall you provide, disclose or transmit any portion of the Product to any direct or indirect competitor of CoStar (by way of example, a "direct or indirect competitor" of CoStar includes, but is not limited to, Internet listing services or other real estate information services and employees, independent contractors and agents of such services)

72.     In other words, an individual may not use CoStar log-in credentials obtained through a previous employer to access or use the CoStar subscription product once that person has left the employer (because they are no longer "employed by a CoStar Client") or if they are acting as a "direct or indirect competitor of CoStar" (even if also employed simultaneously by a CoStar Client). Nor may the person use those credentials (even of a current employer) at any time to "provide, disclose, or transmit" information to CoStar's competitors.

73.     Similarly, use of LoopNet is subject to LoopNet's Terms and Conditions ("LoopNet's Terms and Conditions").  A genuine copy of LoopNet's Terms and Conditions is attached hereto as **Exhibit B**.

74.     LoopNet's Terms and Conditions are available to all users and are accessible via a hyperlink displayed on the landing page and, as shown below, at the bottom of every subsequent page of LoopNet's website:



75.     As shown at Paragraph 84 below, users like CREXi that excessively access LoopNet are also served with notices that prominently state that use of LoopNet is subject to those terms and conditions, which again are hyperlinked.

76.     In addition, CoStar sends an email to users who sign up for a LoopNet account, as many CREXi executives have done, before they first log into their account, which also contains references to LoopNet's Terms and Conditions.

77.     Furthermore, in order to log into their LoopNet account, users must enter their username and password on a login page.  Below the "Log In" button, users are reminded that "By clicking 'Log In', I agree to LoopNet's Terms of Use."  The text includes a conspicuous hyperlink to the terms.



LATHAM&WATKINS LLP
ATTORNEYS AT LAW

78.     CREXi is well aware of LoopNet's Terms and Conditions.  As is standard in the industry, LoopNet's Terms and Conditions make clear that they form a binding contract with those who use the website, stating:  "By viewing, using or accessing the Service, You agree that these Terms and Conditions are a binding legal agreement between You and LoopNet."

79.     LoopNet's Terms and Conditions also expressly prohibit competitors from accessing and using the website.  Specifically, LoopNet's Terms and Conditions state, in part:

> No employee, independent contractor, agent, or affiliate of any competing real estate information, analytics or listings service is permitted to be a User or a Customer or to view, use, or access the LoopNet website without express written permission from LoopNet. By viewing, using, or accessing the Service, You represent and warrant that You are not a competitor of LoopNet, CoStar Realty Information, Inc. or any of its affiliates, including, without limitation, any company owned or operated by CoStar Group, Inc. (collectively, "LoopNet" or the "Company") or acting on behalf of a competitor of LoopNet in registering for or accessing the Service.

80.     LoopNet's Terms and Conditions also strictly prohibit competitive use of the LoopNet content, including reproducing any information copied from LoopNet:

> You . . . shall not use any information obtained from the Service for further distribution, publication, public display, or preparation of derivative works or facilitate any of these activities in any way. You shall not use or reproduce any Content that is obtained from the Service, or that is otherwise made available to You in the Service, for or in connection with any other listing service or device. You further shall not use the Service in any other manner for or in connection with any other listing service

or device. You shall not use the LoopNet Service as part
of any effort to compete with LoopNet, including,
without limitation, using the LoopNet Service to provide,
alone or in combination with any other product or
service, any database services to any third party or any
use that causes a reduction or loss from an existing or
potential LoopNet customer, nor shall You remove,
erase, or tamper with any copyright or other proprietary
notice printed or stamped on, affixed to, or encoded or
recorded in the LoopNet Service. You shall not use any
robot, spider or other automated process to submit
listings, monitor, data mine or copy LoopNet products,
services or information; decompile, decode or reverse
engineer LoopNet software; or use LoopNet products or
services in an unlawful manner, such as for offensive,
abusive, tortious, libelous, defamatory or other illegal
purposes.

81.    CoStar protects its intellectual property through binding terms and
conditions in part because the market for commercial real estate information is
intensely competitive.  Competitors to CoStar spring up on a regular basis, and
CoStar's terms and conditions help ensure that CoStar is able to protect the fruits
of its labors from unscrupulous competitors and continue to make the large
investments that benefit its customers.

82.    CoStar also separately licenses its copyrighted photographs and
content to commercial real estate brokerages for use on their own websites and in
their own marketing material subject to various contractual restrictions that, among
other things, preclude those brokerages from providing CoStar copyrighted
photographs or other CoStar-owned content to platforms that compete with CoStar.
Brokerages remain free to provide their own photographs and information to such
competing platforms.

### 3.      Technological Protection

83.      In addition to protecting its intellectual property through copyright registration and binding terms and conditions, CoStar takes technological steps to protect against unauthorized access to CoStar's services for competitive purposes.

84.      First, CoStar services, including LoopNet, employ an abuse monitor. If a single IP address views an excessive number of listings or executes an excessive number of searches on the site—consistent with data or content mining operations, automated bots, or other illegitimate users—that IP address is temporarily blocked from accessing the site.  On LoopNet, for example, if this abuse monitor is tripped, the user receives an unauthorized access notice, also known as an "Error & Abuse" notice.  The notice provides a conspicuous hyperlink to LoopNet's Terms and Conditions, and explains that use of LoopNet is subject to such terms, and that use that does not comply with the terms is unauthorized:



## Temporarily Blocked



You have exceeded the amount of activity allowed by LoopNet and are temporarily blocked. Your use of LoopNet is subject to LoopNet Terms. Any use that does not comply with the Terms is unauthorized

For any questions or if you believe this happened in error please contact us.
Customer support available hours: M-F 8:30AM-8:00PM EST



Contact us: (800) 613-1303

85.      Second, CoStar's services, including LoopNet, use firewall blocking, which enables CoStar to prevent certain IP addresses from accessing the content on CoStar's websites.  When this type of block is triggered, the user receives the following notice:

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

**Access Denied**

You do not have permission to access this site.

Reference ID: 18.755832b8.1576543074.4962de90

86.     CoStar services, including LoopNet, also employ third-party bot managers to identify and block bots, a type of automated software program, from accessing CoStar's services.

87.     Additionally, CoStar's services, including LoopNet, employ a number of other third-party protections to guard against improper use, including firewalls and IP reputation blocking, as well as anti-virus and anti-malware programs.

**C.     CREXi Has Grown at CoStar's Expense By Free-Riding on CoStar's Investment and Misappropriating CoStar Content**

88.     CREXi's business model is founded on adding large numbers of listings to its commercial real estate marketplace.  CREXi recognizes that having a large supply of listings allows it to attract buyers, sellers, and brokers, which in turn facilitates its ability to sell advertisements, conduct successful auctions, and generate revenue.  In a podcast interview on September 8, 2020, Eli Randel, CREXi's Chief Strategy Officer (and former Director of Capital Markets at Cohen Financial), explained why CREXi needs to collect and publish real estate listings: "[s]upply begets demand, and then the second half of that recipe or equation is that demand begets monetization.  So first and foremost, nobody wants to shop in an empty store, so you better stock the shelves with supply."

89.     CREXi touts both the volume of its listings vis-à-vis its competitors and its ability to add thousands of new listings each week.  For instance, in a May 4, 2020 podcast, Matthew Cors, CREXi's Regional Director for the Western United States Sales Team, represented that CREXi had "over 100,000 for-sale properties" and "over 200,000 for-lease properties" active on the CREXi website on that day, and that CREXi is adding "thousands of properties a week on here on both sides of the marketplace."  Mr. Cors stated that CREXi's "whole goal is to continue just building up the whole marketplace side of things."

90.     Similarly, during a May 15, 2020 virtual marketing event called, "The Baltimore Market Report," Paul Cohen, CREXi's National Sales Director, boasted that CREXi has "more listings in most markets across the USA" than CREXi's competitors, which include LoopNet.  And during a June 19, 2020 virtual marketing event called, "Welcome to CREXi: Richmond's New CRE Marketplace," Mr. Cohen claimed that CREXi was the "place where all the listings are."  That same day, during another virtual event, "Welcome to CREXi: Tampa's New CRE Marketplace," Mr. Cohen stated, "We have all the listings for the market—they're already in there."

91.     CREXi's purported meteoric rise to become the "place where all the listings are" on its face raises serious questions, given that it does not appear that CREXi has invested a fraction of the time or resources into developing its commercial real estate database that CoStar has.  For instance, CREXi employs approximately 150 individuals and has stated that it has raised "just under 60 million" dollars from investors.  By contrast, CoStar currently employs over four thousand individuals and invests hundreds of millions of dollars *annually* just to maintain its listings database.

92.     CREXi purports to have become the "number one commercial marketplace in the country," thereby displacing LoopNet.  What CREXi omits from its marketing materials, videos, and podcasts is that its purported expansion

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

and rapid accretion of market share is made possible not just by investing its own resources, but by repeatedly accessing CoStar's products and stealing CoStar's content.  Indeed, in the very promotional videos in which CREXi brags that it has more listings than its competitors, CREXI displays CoStar-copyrighted photographs in the listings it touts.  The screenshots below contain examples of the copyrighted photographs, along with an image of the CREXi presenter, Paul Cohen, in the top right corner of the first example:

### CREXi Marketing Video



### CoStar's Copyrighted Photograph



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### **CREXi Marketing Video**



### **CoStar's Copyrighted Photograph**



LATHAM&WATKINS LLP
ATTORNEYS AT LAW

93.     In other words, rather than making its own investments and competing fairly, CREXi is displaying and thereby infringing CoStar's intellectual property to market itself to brokers and claim superiority over CoStar.

94.     Copying and publishing content from CoStar makes it easier for CREXi to reach a critical mass of listings and thereby attract buyers, sellers, and brokers to its website.  This enables CREXi to sell advertisements in competition with CoStar—which diverts revenue streams and growth opportunities from CoStar and reduces CoStar's market share—all while avoiding the hard work and resources that CoStar has invested over the past three decades.

95.     CREXi knows that listings—and real estate images specifically—are critical to attracting users.  Indeed, as Eli Randel, CREXi's Chief Strategy Officer, has admitted, "images matter."  This helps explain why CREXi is infringing on such a widespread scale.  Rather than spend the time and effort to develop an image library on their own, CREXi steals CoStar's photographs and uses them to attract buyers, sellers, and brokers.  And in order to ensure that the buyers, sellers, and brokers attribute the high-quality images to CREXi's efforts, CREXi goes so far as to add its own watermark to some of those CoStar-copyrighted images.

96.     Brokers and other industry participants also readily rely on companies like CoStar and CREXi to provide "comps"—i.e., comparisons of similar properties in order to determine, for example, the market rate for rent.  The provision of comps is a much sought-after and highly valued service in the world of real estate.  CREXi places this valuable service behind a password as part of its subscription product.  Based upon publicly available information, CoStar has learned that CREXi is also using CoStar's copyrighted images in its comps product.  CREXi has not only piggybacked on CoStar to build out listings, but also to generate and sell comps.

97.     CREXi's misuse of CoStar products and misappropriation of CoStar intellectual property has also enabled CREXi's auction platform to grow at the

expense of, divert revenue from, and compete unfairly with Ten-X, now part of CoStar.  By stealing content from CoStar, including CoStar's copyrighted images, in order to attract potential buyers and other customers, CREXi is able to drive interest in its auctions and divert opportunities and income from one of its main rivals, Ten-X.  CREXi thereby dilutes Ten-X's market share through lost transaction opportunities and diminishes the value of Ten-X's auction business.

**D.      CREXi Is Repeatedly Accessing and Repackaging CoStar's Content to Unfairly Compete With CoStar, in Violation of the Terms of Use Associated with CoStar's Services**

98.     Although the full breadth of CREXi's unlawful misconduct cannot be known until discovery is complete, CoStar already has evidence that CREXi and its employees and agents are repeatedly accessing CoStar services—in direct violation of the services' respective terms of use—in order to access and steal vast quantities of copyrighted photographs and real estate information, for the purposes of repackaging and integrating that same information into CREXi's competing platform, and in order to build out its broker directory and customer lead lists.

**1.      CREXi Employees Unlawfully Access CoStar's Subscription Database Using Log-In Credentials Issued to Other Companies in Order to Obtain Content to Compete Against CoStar**

99.     CREXi routinely hires its employees from CoStar's customers.  Some CREXi employees, like Sam Hamlin, stop working for the CoStar customer, but take with them to CREXi, without permission, CoStar credentials issued under their ex-employer's CoStar license, in order to perform CREXi job duties.  In other instances, CREXi employees, like Ross Padfield, maintain their employment with the CoStar customer but use their employer's CoStar login credentials to benefit CREXi, again without authorization.

100.   Mr. Hamlin has worked at CREXi as an account executive since June 2019.  In November 2019, CoStar discovered that Mr. Hamlin was logging into CoStar's subscription database using credentials issued to Colliers International, his former employer, and a current CoStar client.  Mr. Hamlin had left Colliers months before, in May 2019.

101.   Between June 2019, when he joined CREXi, and November 2019, Mr. Hamlin used Colliers credentials to conduct more than a hundred sessions on CoStar's subscription database, logging *tens of thousands* of hits without authorization, including from CREXi IP addresses.  Some of Mr. Hamlin's logins were also from IP addresses used by one or more WeWork locations in New York City that were housing CREXi operations, further demonstrating that Mr. Hamlin was working on behalf of CREXi while abusing Colliers's CoStar license.  Several of the property listings that Mr. Hamlin viewed in CoStar subsequently began to appear on CREXi's website with CoStar's copyrighted photographs.

102.   After discovering Mr. Hamlin's misuse of Colliers's license and unauthorized access to the CoStar subscription database, CoStar terminated Mr. Hamlin's account on December 3, 2019.  Later that day, Mr. Hamlin called CoStar customer support, which informed him that he would need to speak with someone in CoStar's legal department.  He declined.  Instead, CoStar initiated several attempts to contact Mr. Hamlin to discuss his account status.  When CoStar finally connected with Mr. Hamlin and inquired about the status of his employment with Colliers, Mr. Hamlin abruptly hung up.

103.   Mr. Padfield, one of Mr. Hamlin's colleagues, has worked as a CREXi account executive since February 2020.  Mr. Padfield also simultaneously leads commercial brokerage efforts for Rubin [+] Morr at Douglas Elliman Real Estate.  Between April and June 2020, Mr. Padfield exported 1,561 broker directory records from the CoStar subscription database using his Douglas Elliman account.  As explained in Paragraph 65, before Mr. Padfield exported the data,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

CoStar reminded him that the exports were subject to CoStar's Terms of Use. Prior to joining CREXi, Mr. Padfield had *never* exported these types of records. Nearly all of the broker contacts he exported are located in South Florida, the market he covers in his role at CREXi.  Thus, it is clear that Mr. Padfield's access and downloading of these records was on behalf of CREXi.

104.   Between October and November 2019, during his time at CREXi, Mr. Hamlin also exported *thousands* of CoStar broker directory records for brokers across the country, after being reminded that exporting the data was subject to CoStar's Terms of Use.  Paul Cohen, CREXi's National Sales Director, subsequently boasted in a marketing video that CREXi had "created a broker directory with all brokers in America."  "Created" would appear to be a euphemism.

105.   Mr. Hamlin and Mr. Padfield were well aware of CoStar's Terms of Use when they made use of the CoStar database on behalf of CREXi, and agreed to be bound by those terms.  Indeed, they both affirmatively accepted the Terms. CoStar's records indicate that Mr. Hamlin last accepted the Terms on November 4, 2019, and Mr. Padfield accepted the Terms on September 20, 2020.  Those Terms provide that any user of the service "shall not: . . . (2) [a]ccess or use any portion of the Product if you are a direct or indirect competitor of CoStar, nor shall you provide, disclose or transmit any portion of the Product to any direct or indirect competitor of CoStar . . . ."

106.   As CREXi employees, working on behalf of CREXi, Mr. Hamlin and Mr. Padfield are both "direct or indirect competitor[s]" of CoStar.  CREXi thus violated CoStar's Terms of Use by accessing and using CoStar's subscription database though these employees for its benefit.

107.   Furthermore, CoStar's Terms of Use clearly state that an "authorized user" is an individual who is "employed by a CoStar Client."  Although both Mr. Hamlin and Mr. Padfield may have been authorized users while working for

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

CoStar clients, they were both unauthorized when using CoStar in furtherance of their CREXi work.  CREXi, through these employees, directly violated CoStar's Terms of Use provisions relating to authorized users.

108.   Mr. Hamlin's wrongdoing was not limited to misusing his former employer's credentials and mass downloading CoStar records to unfairly compete.  Once Mr. Hamlin joined CREXi, he shared the Colliers CoStar credentials with at least one senior colleague, Zachary Zlotnick, who at the time was the head of CREXi's New York office.  In doing so, Mr. Hamlin separately violated the strict prohibition on sharing passcodes contained in CoStar's Terms of Use.

**2.     CREXi Repeatedly Accesses LoopNet Using Multiple IP Addresses to Evade Anti-Piracy Efforts—Sometimes Using Fake Identities or Through Foreign Subcontractors—for Competitive Purposes**

109.   CREXi's unauthorized access is not limited to CoStar's subscription database.  Rather, direct evidence shows that CREXi employees also repeatedly access and use CoStar's LoopNet website for competitive purposes.  IP addresses and user accounts affiliated with CREXi have impermissibly accessed LoopNet more than a million times—at least.

110.   For example, Paul Cohen, CREXi's National Sales Director, immediately began accessing LoopNet after he joined CREXi.  He did so using a variety of IP addresses routed through third-party services—such as Hurricane Electric, Digital Ocean, LeaseWeb, and the aptly named "IPVanish"—which anonymized his activity.  Remarkably, just one month after joining CREXi, Mr. Cohen had accessed LoopNet using at least *eighty* different IP addresses and had already received more than *ninety* Error & Abuse notices from LoopNet blocking his access and reminding him that his use of LoopNet was subject to LoopNet's Terms and Conditions.  That initial activity set the course for Mr. Cohen's covert efforts to access LoopNet through today.  During the entirety of his time at CREXi,

he has accessed LoopNet using (at least) *more than two hundred* different IP addresses, most of which are associated with third party anonymizer services, including those reportedly associated with high levels of unlawful activity.

111.   CREXi employees also access LoopNet using IP addresses registered specifically to CREXi.  Just one such IP address, 76.81.37.146 (the "76. IP address"), accessed LoopNet in stunningly high volume.  After the 76. IP address first tripped the LoopNet abuse monitor, it was temporarily blocked from accessing LoopNet, and CoStar displayed the Error & Abuse notice described above.  The notice provides a hyperlink to LoopNet's Terms and Conditions and warns the user that use that does not comply with the terms of use is unauthorized.  Despite this warning, CREXi continued to access LoopNet.  Indeed, from January 1, 2019, through November 13, 2019, the 76. IP address registered *hundreds of thousands* of hits on LoopNet.

112.   On November 14, 2019, upon learning of this continued and repeated access, CoStar implemented a permanent LoopNet abuse monitor block on the 76. IP address, which again displayed the Error & Abuse notice.

113.   CREXi, yet again, was undeterred.  On November 14, 2019—the very same day that CoStar implemented the abuse monitor block on the 76. IP address—CREXi switched to using a variety of third-party IP addresses from LeaseWeb, one of the IP address anonymizers utilized by Mr. Cohen.  In the first month after CoStar implemented the block, CREXi logged hundreds of hits on the LoopNet website using the LeaseWeb IP addresses, despite knowing that such access was prohibited.  This tactic to circumvent blocking, known as "rotating" IP addresses, is a hallmark of online piracy.  Xceligent, for example, also rotated IP addresses as part of its unlawful scheme to harvest real estate listings and copyrighted images from CoStar.

114.   Meanwhile, CREXi continued periodically to test LoopNet's defenses by attempting to access LoopNet using the blocked 76. IP address.  Indeed, after

CoStar implemented the permanent LoopNet abuse monitor block on November 14, 2019, the 76. IP address triggered the Error & Abuse notice almost one thousand more times.  On December 16, 2019, CoStar implemented a permanent firewall block on CREXi's 76. IP address, which implements a wider block of CoStar's services.  This block generates an "Access Denied" message, as shown above at Paragraph 85.  The .76 address triggered four hundred such "Access Denied" notices.

115.   In response, CREXi simply stepped up its circumvention efforts. After CoStar had permanently blocked CREXi's 76. IP address at the firewall level, CREXi registered a new IP address, and continued accessing LoopNet without authorization.  This new address, 45.59.255.42 (the "45. IP address"), was registered to CREXi's headquarters at 4086 Del Rey Avenue, Marina Del Rey, California.  Between March 11 and August 12, 2020, the 45. IP address accumulated over *one hundred thousand* hits to LoopNet alone.

116.   The more than one million hits—at least—on LoopNet from CREXi IP addresses is just one of the indicia of CREXi's misuse of LoopNet and harvesting of LoopNet content.  In addition, several CREXi employees have registered for LoopNet accounts using thinly-veiled pseudonyms or personal email addresses.  Those CREXi employees accessed LoopNet on a regular basis, including, not coincidentally, prior to participating in public marketing videos in which they brag about the extent of CREXi's efforts to "build out" certain geographical markets.

117.   For instance, CREXi's mid-Atlantic account executive, Michael Rosenfeld, repeatedly visited LoopNet in June 2020 under the account name "Mike Rose" with the personal email address "rosenfeldm911@gmail.com."  He used the LoopNet website for competitive purposes, specifically to identify real estate listings in the mid-Atlantic area.  On June 19, 2020, Mr. Rosenfeld appeared in marketing videos focused on markets in that area, specifically Baltimore and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

Richmond.  In the Richmond presentation, Mr. Rosenfeld explained that CREXi's "Paul [Cohen], I, and a few others are building out the East Coast for CREXi."

118.   Unsurprisingly, therefore, Mr. Cohen also has and uses a LoopNet account registered to a non-CREXi email address: pcohen@cohenfinancial.com. Cohen Financial is a real estate capital services company whose leadership team includes Brent Hansen, a former executive at Xceligent who was instrumental in Xceligent's scheme to steal intellectual property from CoStar.[2]

119.   Cohen's current relationship with Cohen Financial is unclear, but in recent months he has been using his pcohen@cohenfinancial.com LoopNet account as part of his work for CREXi.  For example, Mr. Cohen accessed LoopNet on multiple occasions in late May 2020 to run searches for "for-sale" properties in Florida, North Carolina, and Ohio.  Shortly thereafter, in June 2020, Mr. Cohen appeared in several CREXi promotional videos boasting about CREXi's coverage in the same three states.  The Florida marketing video, described in Paragraph 92 above, contained multiple CoStar-copyrighted images.

120.   Similar to Rosenfeld and Cohen, CREXi's Sam Hamlin created a LoopNet account registered to "Sam H" with the personal email address sdhamlin08@yahoo.com.[3]  He did so on June 27, 2019, immediately after he began working at CREXi.  Like Mr. Rosenfeld and Mr. Cohen, Mr. Hamlin has used this account to access LoopNet listings.

121.   As well as registering LoopNet accounts to non-CREXi email addresses, CREXi employees also use fake identities.  For example, Nick Hanna,

---

[2]  According to a lawsuit filed by Xceligent's bankruptcy trustee, Hansen, who was Xceligent's Vice President of Marketing Research, "instruct[ed] Xceligent employees to use TOR browsers (which anonymize an Internet user) as part of the 'game plan to get Xceligent's [IP] address hidden in order that the [marketing researchers] can update listings' when rival Costar's website 'LoopNet blocked them.'"  Similarly, according to the Xceligent trustee, Hansen allegedly "worked directly with Xceligent's IT department to set up a VPN for [Xceligent's offshore] marketing researchers to use to circumvent CoStar's security and access CoStar websites."

[3]  Other CREXi employees to register for LoopNet accounts using personal email addresses include Courtney Gaylord, who registered using cgaylord11@yahoo.com.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

CREXi's senior product manager, signed up for two LoopNet accounts under false names.  One account is registered to "Hank Mardukous" at hankmardukus@gmail.com.  The other is registered to "Hank Mardukus" at itsnotnick08@aol.com.  Hank Mardukas is a fictional character from the 2009 movie, "I Love You, Man."  As another example, Mr. Zlotnick, the former head of CREXi's New York office, registered a LoopNet account under the name "Michael Korenthough" at zackdz11@gmail.com.

122.   One of the many ways in which CREXi executives use LoopNet for competitive purposes is to set up "saved searches" for property listings.  This enables CREXi to use LoopNet to identify new property listings as they come on the market, rather than spending time and money conducting their own research.  LoopNet allows users to save property search criteria, and new property listings that match the saved criteria automatically appear whenever the user logs into LoopNet.  Users can also opt to receive email notifications whenever LoopNet has new listings that fit the saved search criteria.

123.   For example, Mr. Rosenfeld (a.k.a. "Mike Rose"), the CREXi account executive for the mid-Atlantic region, has created a variety of saved searches for properties in the mid-Atlantic states of Delaware, Maryland, Virginia, and the District of Columbia.  He receives instant email notifications to his personal gmail account whenever new property listings matching his search criteria appear on LoopNet.

124.   Likewise, Mr. Cohen has created several saved searches on LoopNet, including properties for sale and for lease in Florida and Georgia.  Mr. Cohen also created a saved search for industrial properties for lease in all states, and he receives instant notifications to his pcohen@cohenfinancial.com email address whenever new property listings matching the search criteria are added to LoopNet.

125.   Similarly, Mr. Hamlin has created saved searches for LoopNet property listings across the northeast United States, including Connecticut, Maine,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

New Hampshire, New Jersey, Rhode Island, and Vermont, consistent with CREXi's national expansion efforts.

126.   The use of LoopNet to compete against LoopNet is not confined to CREXi senior managers and employees.  CREXi also accesses LoopNet through an Indian BPO, or business process outsourcing, contractor called Arcgate.  Arcgate describes its services as "data collection & cleansing [and] data enrichment."  Arcgate employees apparently specialize in "Data Mining & Data Analysis" and data "cleaning."  CoStar has identified at least ten Arcgate employees associated with CREXi.

127.   CREXi's use of an Indian contractor that accesses LoopNet and "collect[s]" and "clean[s]" data is reminiscent of Xceligent's mass piracy scheme.  In CoStar's lawsuit against Xceligent, discovery revealed that Xceligent used an Indian BPO to access LoopNet and copy content, while trying to hide the wrongdoing.

128.   CREXi's LoopNet access is repeated and widespread.  Indeed, it is consistent with automated scraping emanating from both India and the United States.  Just since the end of 2019, IP addresses affiliated with CREXi's main office in California, CREXi's temporary space at WeWork locations in New York and Miami, and CREXi's subcontractor in India, have triggered thousands upon thousands of "bot warnings" from a third-party security application that monitors activity on CoStar sites, including LoopNet.  These warnings are indicative of systematic access to LoopNet to harvest content en masse.

### 3.   CREXi's LoopNet Access And Use Violates LoopNet's Terms and Conditions

129.   CREXi is prohibited from repeatedly accessing and using LoopNet to compete.  That is plain from the industry standard LoopNet Terms and Conditions.  The type of widespread competitive LoopNet access in which CREXi has engaged

has also been permanently enjoined by multiple federal courts, including in CoStar's cases against Xceligent in Kansas City and RE Back Office in Pittsburgh.

130.   By accessing LoopNet more than a million times and using the website for competitive purposes despite this bar, CREXi was simultaneously entering into and violating a binding contract with CoStar.

131.   CREXi was on notice that use of LoopNet was subject to LoopNet's Terms and Conditions.  IP addresses and user accounts affiliated with CREXi have triggered thousands of Error & Abuse notices that contain a conspicuous hyperlink to LoopNet's Terms and Conditions and warn that use of LoopNet that does not comply with the terms is prohibited.  There is no doubt whatsoever that CREXi and its senior management are on notice of their repeated contractual breaches. Indeed, CoStar has served Mr. Cohen, CREXi's National Sales Director, an Error & Abuse notice with the hyperlink to LoopNet's Terms and Conditions no fewer than 94 times.

132.   In addition to violating CoStar's contractual prohibition on competitor access, when CREXi routinely accessed and used LoopNet, it falsely warranted that it was not a competitor of CoStar.

133.   Nor is CREXi permitted to access LoopNet through Arcgate, its Indian contractor.  LoopNet's Terms and Conditions expressly prohibit access by competitors like CREXi, as well as "any company . . . acting on behalf of a competitor of LoopNet . . . ."

### 4.     CREXi Steals Copyrighted Photographs from CoStar and Publishes Them on Its Competing Website

134.   CREXi's wrongdoing is not limited to covertly accessing CoStar's services using passwords issued to other companies, or setting up saved searches on LoopNet under fake names in lieu of conducting research, or downloading CoStar's broker directory information to create customer lead lists and a cloned directory product, or hand selecting and copying a few CoStar photographs to

improve its marketing presentations.  Rather, CREXi is infringing CoStar's copyrighted photographs on a massive scale.  A preliminary review has revealed more than ***ten thousand*** copyrighted CoStar images on CREXi's website through July 30, 2020.

135.   As noted above, these instances of infringement are almost certainly the tip of the iceberg, as they relate only to those property listings that CREXi has chosen to display.  Discovery will be required to determine how many CoStar copyrighted images reside in CREXi's systems.  Past lawsuits indicate that the number is likely a multiple of those on public display.

136.   Attached as **Exhibit C** are 100 examples of the more than ten thousand CoStar-copyrighted images found on crexi.com.  Attached as **Exhibit D** is a chart summarizing information about those infringing images, including the crexi.com URL where each image was publicly displayed by CREXi.  Set forth below are some of the images CREXi has infringed, as they appear(ed) on loopnet.com and as they appear(ed) on crexi.com.  The photographs have been produced side-by-side for purposes of comparison:

<u>**CoStar Copyrighted Photograph**</u>          <u>**CREXi Listing Photograph**</u>

 

| **CoStar Copyrighted Photograph** | **CREXi Listing Photograph** |
|---|---|
|  |  |
|  |  |
|  |  |

137.   As the images above show, CoStar's copyrighted images displayed on CREXi's website have been cropped to remove the CoStar watermark.  In an effort to conceal and disguise its copying, CREXi appears to have removed the watermarks from CoStar's images and generated cropped images—thereby improperly creating derivative works—to publish and display on its competing website without CoStar's permission.

138.   As described in more detail below, CREXi routinely accessed the copyrighted photographs on LoopNet only a few days before the infringing photographs appeared—without watermarks—on CREXi's website.

139.   CoStar's watermarks on its copyrighted photographs undoubtedly served as a red flag that put CREXi on notice that these images belonged to CoStar.  The removal or alteration of CoStar's watermark conceals CREXi's infringement of CoStar's copyrighted images.  Indeed, CoStar has used the presence of the watermark to identify infringement in prior lawsuits, such as the Xceligent litigation.  CREXi must also have been aware, simply as a matter of common sense, that removing the watermark would enable, facilitate, and indeed induce the infringement of CoStar's copyrighted materials because it was publishing sought after copyrighted photographs to the world with the indicia of copyright removed.

140.   The extent and consistency of the cropping demonstrates that CREXi is responsible for this deliberate attempt to hide its infringement.

### 5.   CREXi Copies Real Estate Listings from LoopNet and Posts Them on CREXi.com without Authorization and without Broker Knowledge

141.   CREXi has admitted that it is not allowed to copy listings from LoopNet.  But that is exactly what it does, often without contacting the relevant broker.  And even when it does contact the listing broker, CREXi is careful not to discuss copying from LoopNet, other than to acknowledge its impermissibility.

142.    Recently, CoStar was contacted by bewildered brokers, asking whether CoStar was in business with CREXi because the brokers' listings— including CoStar's copyrighted materials—were appearing without the brokers' authorization on CREXi's site.

143.   For example, one brokerage alerted CoStar after noticing that one of its Florida property listings appeared on CREXi with CoStar's images.  The broker

confirmed that it never gave CREXi authorization to list the property on CREXi's website, and that the broker did not upload CoStar's photographs to CREXi.

144.    CREXi's listing of the broker's Florida property contained several copyrighted CoStar photographs.  The photographs had been cropped, but poorly, as CoStar's watermark was still partially visible on a number of the infringing photographs:

### CREXi Listing Photographs





145.   This same story played out across the country.  Brokers who learned that their listings were posted on CREXi were puzzled because they had never even heard of CREXi or sent CREXi any information about their properties, much less given CREXi any permission to copy their property listings from LoopNet.

146.   By way of another example, a broker who listed a Nevada property on LoopNet was surprised to learn that her listing also appeared on CREXi.  She had never heard of CREXi and never gave CREXi permission to post her listing.  Nevertheless, CREXi posted her property on its website and infringed CoStar's copyrighted photographs in the process:

<u>**LoopNet Listing Photograph**</u>          <u>**CREXi Listing Photograph**</u>

 

147.   Notably, CREXi added this Nevada broker's listing on May 19, 2020.  On May 15, 2020—only four days earlier—an IP address attributable to CREXi viewed the same property on LoopNet.  In other words, CREXi accessed LoopNet without authorization, viewed the individual's LoopNet listing, and then four days later, the individual's listing appeared without her permission and with CoStar's copyrighted photographs on CREXi's website.  The obvious explanation: deliberate copying and publication by CREXi.

148.   CREXi's practice of copying listings wholesale without broker involvement is causing havoc in the marketplace.  A representative property owner in Long Island started to receive multiple calls inquiring about the potential

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1   purchase of a property that had already sold.  When she questioned a caller, it

2   turned out that the property was listed for sale on CREXi.  The owner-

3   representative tracked down the listing broker featured on CREXi.  The broker was

4   unaware that the listing was even on CREXi, and said that he had certainly not

5   posted it.

6       149.   This pattern repeated across the country.  In Arkansas, a brokerage

7   received multiple calls about a property that had already sold.  One of the callers

8   revealed that the property was listed as for sale on CREXi.  As in the New York

9   example above, the brokerage had not added the listing to CREXi and was

10  unaware that the listing was even on CREXi.  The brokerage contacted CoStar

11  asking if CREXi was a CoStar subsidiary and if CoStar would remove the listing.

12  The upshot: CREXi obtains and posts listings without broker involvement, and

13  causes confusion for buyers, sellers, and brokers.

14      150.   In some instances, CREXi did at least contact the listing broker and

15  offer to place the listing on CREXi free of charge.  But CREXi was deliberately

16  vague regarding how CREXi planned to obtain the listing and did not disclose that

17  it intended to copy from LoopNet.  For example, a CREXi representative, Nick

18  DeGiorgio—CEO Michael DeGiorgio's cousin—contacted a marketing manager at

19  a brokerage and offered to post one of the brokerage's property listings in

20  Maryland.  The brokerage accepted, but was not asked to provide, and did not

21  provide, CREXi with any information, photographs, or marketing material for the

22  property.  Neither did the brokerage upload any CoStar images to CREXi.

23  Nevertheless, CREXi posted the listing on its website.

24      151.   Subsequently, CREXi's Mr. Rosenfeld called the marketing manager

25  and tried to sell him a subscription to CREXi's platform.  The manager asked Mr.

26  Rosenfeld where CREXi had obtained the marketing material that it used to list the

27  property on its website, since the brokerage never provided CREXi with any such

28  material.  Mr. Rosenfeld replied vaguely that CREXi had various partnerships with

companies that allowed CREXi to get the information.  When the manager asked

which companies, Mr. Rosenfeld would not provide that information.

152.   The marketing manager then contacted Mr. Rosenfeld again, asking

whether CREXi had a partnership with CoStar, because the CREXi listing

contained exactly the same information as the brokerage's listing on LoopNet.  Mr.

Rosenfeld admitted that CREXi did not have a partnership with CoStar.  He stated

that once CREXi received the brokerage's permission to post their listing, CREXi

copied the information "off the internet."

153.   The manager notified CoStar of Mr. Rosenfeld's suspicious

statements and provided a side-by-side comparison of photographs from the

CoStar and CREXi listings.  As the manager pointed out, the photograph that

CREXi posted exactly matches CoStar's copyrighted photograph, with the

exception that CoStar's watermark had been fully cropped out of the lower right-

hand portion of the photograph.  The side-by-side comparison that the manager

sent to CoStar appears below:



154.   These photographs make clear that when Mr. Rosenfeld told the

manager that CREXi pulled the listing "off the internet," he really meant that

CREXi copied the listing—including the copyrighted photograph—from LoopNet,

even though CREXi was not authorized to do so.  (Of course, had CREXi's

Rosenfeld believed that CREXi was permitted to copy from LoopNet, then he would have readily admitted that LoopNet, and not "the internet," was the source.) Once the brokerage indicated it was interested in seeing the listing on CREXi, CREXi simply lifted the relevant information and copyrighted photograph from LoopNet, rather than spend the time and money to take its own photographs of the property and conduct its own research (or even ask the brokerage to send its own information).  When the brokerage learned that pulling the information "off the internet" meant copying from LoopNet, the brokerage ended its relationship with CREXi.

155.   As another example, on June 17, 2020, Mr. Rosenfeld accessed LoopNet and viewed another property listing in Maryland, as well as the listing broker's profile on LoopNet.  CREXi subsequently contacted the broker and offered to post the listing for free on CREXi.  The broker agreed.  However, there was no discussion of where CREXi would obtain the listing information.  The broker never gave CREXi permission to copy from LoopNet.  On June 19, 2020—only two days after Mr. Rosenfeld viewed the broker's listing on LoopNet—the listing appeared on CREXi with CoStar's copyrighted photograph:

**LoopNet Listing Photograph**          **CREXi Listing Photograph**

 

156.   Similarly, on April 2, 2020, Mr. Rosenfeld accessed LoopNet and created a saved search for properties in Washington, D.C., that met certain criteria, including a minimum price of $1 million.  Mr. Rosenfeld named the search "DC

1  1M+."  That same day, Mr. Rosenfeld viewed two listings on LoopNet that met the

2  search criteria.

3      157.   Unsurprisingly, shortly after Mr. Rosenfeld accessed these two

4  listings on LoopNet, they appeared on CREXi with CoStar's copyrighted

5  photographs.  Indeed, one of the photographs on CREXi still featured CoStar's

6  watermark:

7  **LoopNet Listing Photograph**             **CREXi Listing Photograph**

 

 

26      158.   Although brokers are free to list their properties anywhere, brokers

27  know—not least because of industry knowledge about CoStar's efforts to protect

28  its intellectual property—that they do not have the right to permit CREXi to copy

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

from a CoStar site.  For instance, CREXi contacted a brokerage in Alabama and offered to list its properties on CREXi for free.  The brokerage agreed.  But the brokerage and CREXi never discussed where the information for the listings would come from, and there was no mention of CREXi copying from LoopNet.  (In fact, the broker later acknowledged that he would not have the right to give CREXi permission to use CoStar's copyrighted content.)  Nevertheless, the CREXi listing of the brokerage's property contains CoStar's copyrighted photographs, cropped to remove the CoStar watermark:

**LoopNet Listing Photograph**          **CREXi Listing Photograph**

 

159.   CREXi posted the brokerage's listing on its website on May 15, 2020. The day before the listing appeared on CREXi, an IP address associated with CREXi visited the same listing on LoopNet.  In other words, CREXi visited a listing on LoopNet, and then one day later, the listing appeared on CREXi's website with CoStar's copyrighted material.  Again, the obvious explanation is that CREXi copied the listing from LoopNet, without authorization.

160.   As can be seen, there is no question that even when it is not simply copying and pasting from LoopNet without broker involvement, CREXi routinely posts listings, rather than simply being a passive forum for uploads, when it makes contact with brokers.  Indeed, CREXi trumpets the fact that it is actively involved in creating the listings on its site.  Eli Randel, CREXi's Chief Strategy Officer,

explained during a webinar that CREXi users can send property information to CREXi, and CREXI will "build your listings for you."  And during a June 19, 2020 video conference titled, "Welcome to CREXi: Richmond's New CRE Marketplace," CREXi's Paul Cohen stated to his broker audience: "If we don't have your listings on CREXi, send them to us today, and *we'll add them*."

161.   Given CREXi's active role in "build[ing]" or "add[ing]" listings, it is unsurprising there are CREXi listings that display CoStar-copyrighted photographs that do not appear anywhere in the listing broker's marketing materials.  It would be illogical for brokers to upload their CoStar-copyrighted photographs to CREXi—an action that CoStar prohibits—while excluding those photographs from their own marketing materials—a use that CoStar permits.  The obvious explanation (and the one consistent with CREXi's offers to build listings on behalf of brokers) is that CREXi *itself* took the CoStar-copyrighted photographs directly from LoopNet and added those photographs to CREXi.

162.   For example, a cropped version of the CoStar-copyrighted photograph of the commercial property shown below appears on CREXi.  However, the broker's marketing brochure contains different, non-CoStar copyrighted photographs, indicating that CREXi took this image directly from CoStar.



**CoStar's Copyrighted Photograph**          **CREXi Listing Photograph**

 

**Photographs from Broker's Marketing Brochure**





163.   CREXi fully understood that copying the images from LoopNet infringed on CoStar's intellectual property rights.  In one instance, a broker who agreed to list properties on CREXi's website asked if CREXi could pull the listing information from LoopNet.  Tellingly, CREXi said no and explained that it was not allowed to pull information from LoopNet.  But time and again, as the above examples indicate, CREXi nevertheless did copy CoStar's copyrighted photographs and real estate information from LoopNet, despite knowing that it was not permitted to do so.

164.   CREXi knowingly and willfully infringed on CoStar's copyrights to build out its own business and compete unfairly with CoStar.

**6.      CREXi Knows Full Well That CoStar Does Not Permit Competitors to Copy Content from Its Website**

165.   Even putting aside CREXi's conversations with brokers described above, including the acknowledged prohibition on copying from LoopNet, there can be no doubt that CREXi is aware that CoStar does not permit competitors to use its websites or subscription database, or to infringe its copyrighted

photographs, and that CoStar protects and vindicates its intellectual property and contractual rights though many methods, including—when the copying is on a huge scale and clearly deliberate—litigation.

166.   The trade and national press have extensively covered CoStar's prior lawsuits against infringers and content thieves, such as Xceligent, Apartment Hunters, and RealMassive, and against those who access its databases without authorization, or enable others to do so.[4]  CoStar has litigated across the country, from New Jersey to Kansas City, from Austin to Los Angeles, to protect its intellectual property, and has obtained judgments and injunctions that value its copyrighted images and real estate listings most recently at $50,000 per photograph, and $50,000 per real estate listing.

167.   CREXi is well aware of CoStar's judgments protecting its intellectual property and contractual rights, including the record-breaking half billion dollar judgment against Xceligent based on harvesting content from LoopNet.  Indeed, CREXi replaced Xceligent as the National Association of Realtors ("NAR") commercial technology partner following Xceligent's highly publicized bankruptcy during that case.

168.   Nevertheless, CREXi has engaged in the very same illegal behavior as Xceligent: appropriating thousands of images and listings from LoopNet, free-riding on CoStar's investment in order to build a competing service, and accessing CoStar's services without authorization.

169.   Moreover, CREXi is, or should be, aware that federal courts around the country have issued injunctions barring competitors from accessing LoopNet,

---

[4] *See e.g.*, CoStar Takes Off the Gloves in Battle Against Xceligent Over Alleged Data Theft (available at https://www.wsj.com/articles/costar-takes-off-the-gloves-in-battle-against-xceligent-over-alleged-data-theft-1513080000); Real Estate Data Dispute Yields $500 Million Judgment (available at https://finance-commerce.com/2020/01/real-estate-data-dispute-yields-500-million-judgment/); Apartment Hunters Found Liable in CoStar Copyright Infringement Dispute (available at https://therealdeal.com/la/2017/03/29/apartmenthunterz-com-found-liable-in-costar-copyright-infringement-dispute/); CoStar Starts Going After Password-Sharing Users in Latest Legal Blitz (available at https://www.bisnow.com/national/news/technology/costar-starts-going-after-password-sharing-users-in-latest-legal-blitz-93586).

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

CoStar's website.  For example, the Western District of Missouri permanently enjoined Xceligent from "accessing CoStar Websites or CoStar Databases for the purposes of competitive use, including without limitation for the purposes of copying CoStar Data, verifying broker-sourced data using CoStar Data, or generating leads from CoStar Data."  Judgment and Permanent Injunction, *CoStar Group Inc. v. Xceligent*, Case 4:16-cv-01288-FJG  (W.D. MO. Dec. 3, 2019) (ECF No. 204).

170.   This Court required another CoStar competitor, Apartment Hunters, specifically to "abide by the terms of use applicable to . . . LoopNet.com" which, as explained above, expressly prohibit competitor access.  Judgment at 5, *CoStar Realty Information, Inc, v. Apartment Hunters, Inc.*, Case No. 8:15-cv-02111-JLS-KES (C.D. CA Mar. 27, 2017) (ECF No. 62).   CREXi, undeterred, has accessed LoopNet at least more than a million times.

171.   Similarly, federal courts have vindicated CoStar's right to prohibit unauthorized persons from accessing its subscription service or facilitating such unauthorized access.  For example, the District of New Jersey permanently enjoined a brokerage from "sharing any username, password, passcode or other access credential for any CoStar Database with any individual or entity that is not authorized by CoStar to utilize such username."  Amended Judgment and Permanent Injunction, *CoStar Group Inc. v. SandBox Real Estate and Development LLC,* No. 2:18-cv-14611-JLL-SCM (D. N.J. Jan. 1, 2019) (ECF No. 13).  CREXi employees, nevertheless, used credentials issued to other companies in order to access CoStar's subscription service on a widespread basis, collect data, and use them to compete against CoStar.

**E.     CREXi's Illegal Behavior Is Consistent with Its Prior Willful Misconduct**

172.   This is not the first time that CREXi has improperly profited from another company's investment and intellectual property.  Indeed, CREXi sought to establish itself based on content misappropriated from Ten-X, now part of CoStar.

173.   CREXi's co-founder and CEO, Michael DeGiorgio, and co-founder Luke Morris previously worked for Ten-X and were engaged in a scheme to misappropriate highly-confidential trade-secret customer lists from Ten-X to launch CREXi.  Ten-X uncovered the theft and brought suit against CREXi and Mr. DeGiorgio, immediately securing a preliminary injunction.  In the course of litigation, CREXi admitted that that it used Ten-X customer reports to create a master list of customer contacts, and used the master customer list to market its website and services.

174.   The California state court that entered the preliminary injunction against CREXi found that Ten-X was highly likely to succeed on the merits of its claims for misappropriation of trade secrets, breach of the duty of loyalty, breach of a proprietary information and inventions agreement, and breach of a confidentiality agreement.  The court barred the operation of CREXi to the extent it operated online real estate auctions, and prohibited CREXi's use of Ten-X's customer lists and all documents and information derived therefrom.  The court also ordered that the misappropriated materials be returned or purged.

175.   Seeing the writing on the wall, CREXi paid $1.6 million in damages, issued a public apology, and—according to a press release issued by CREXi— agreed to certain ongoing restrictions, including a prohibition on any further use of the misappropriated information.  In a public statement, Michael DeGiorgio "apologize[d] to Ten-X for the actions which led to this lawsuit" and stated, "I regret my conduct at the time I departed Ten-X."

176.   Despite the payment and (hollow) apology, CREXi and Mr. DeGiorgio have picked up where they left off.  In an article published by the LA Business Journal on July 20, 2020, Mr. DeGiorgio claimed that CREXi could overtake CoStar Group as the "go-to" source for information in the commercial real estate sector, insisting that CREXi wants to "offer a better product, more accurate data, more usable data."  But in fact, CREXi is trying to clone CoStar's service, using content stolen from CoStar, while publicly boasting that it can do "better."  In its quest to take market share from and "overtake" CoStar, CREXi continues to engage in unlawful and unfair business practices, including accessing CoStar's services without authorization and misappropriating CoStar's copyrighted photographs and real estate data.

177.   Ironically, Ten-X, CREXi's initial victim, is now part of the CoStar Group.  CoStar must defend itself from the recidivism of CREXi, Mr. DeGiorgio, and other CREXi executives, and safeguard CoStar's decades of innovation, investment, and hard work.

## **FIRST CLAIM FOR RELIEF**

### **Copyright Infringement**

178.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

179.   Each of CoStar's photographs constitutes an original work of authorship and copyrightable subject matter under the laws of the United States.

180.   CoStar owns or has exclusive rights to all rights, title, and interest in and to the photographs.

181.   CREXi had and has access to CoStar photographs through the internet or other means.

182.   CREXi has copied, reproduced, distributed to the public, and/or displayed publicly on crexi.com CoStar's copyrighted photographs—including

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

without limitation those copyrighted works identified in **Exhibit C** hereto—without the consent or authority of CoStar, thereby infringing CoStar's copyrights.

183.   Further, CREXi has created derivative works based on CoStar's copyrighted images by cropping and manipulating CoStar's registered images. Examples appear on **Exhibit C**.  CREXi has gone as far as to add its own watermark to some of the cropped CoStar-registered images in order to re-brand them as their own.  Examples appear at Paragraphs 33–34, *supra*.

184.   CoStar owns the exclusive rights in each of the photographs detailed in **Exhibit C**.  Prior to the filing of this suit, CoStar has validly registered each of the photographs detailed in **Exhibit C** with the United States Copyright Office. CREXi copied, reproduced, distributed, and publicly displayed on CREXi's website without authorization each of the copyrighted photographs detailed in **Exhibit C**.

185.   Upon information and belief, CREXi's unlawful copying, reproducing, distributing, and public displaying of these CoStar photographs occurred on or around April 21 to July 30, 2020, as set forth in **Exhibit D**.  On information and belief, a valid registration was obtained by CoStar for each photograph detailed in **Exhibit C** prior to CREXi's first infringement of the photograph.

186.   CREXi's copies, reproductions, distributions, and displays are identical and/or substantially similar to CoStar's photographs.  Further, CoStar, which owns an exclusive right to prepare derivative works of its copyrighted images, did not give CREXi permission to create any derivative works.

187.   CREXi is directly liable for these acts of infringement in violation of 17 U.S.C. §§ 106 and 501.

188.   The infringement of CoStar's rights in each of its copyrighted photographs constitutes a separate and distinct act of infringement.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

189.   CREXi's acts of infringement have been willful, intentional, purposeful, and in disregard of CoStar's rights under the Copyright Act.  CREXi knew its acts were infringing and intentionally or recklessly disregarded the law by its conduct.

190.   CoStar did not authorize CREXi's acts.

191.   CoStar believes that additional instances of CREXi's infringement of its copyrighted photographs will be revealed during the discovery process.

192.   As a result of CREXi's willful copyright infringement, CoStar has been and will continue to be damaged as a direct and proximate result of the infringing acts set forth above, and CREXi has profited and will continue to profit as a result of its unlawful infringement of CoStar's copyrighted photographs in an amount to be proven at trial.

193.   CREXi's conduct also has caused irreparable and incalculable harm and injuries to CoStar and is ongoing.  Unless enjoined, CREXi's conduct will cause further irreparable and incalculable injury, for which CoStar has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Violation of the Digital Millennium Copyright Act ("DMCA")

### Removal of Copyright Management Information, 17 U.S.C. §§ 1202(b)(1)

194.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

195.   With respect to the more than ten thousand copyrighted CoStar images referenced above having been found on CREXi, and additional CoStar copyrighted photographs infringed by CREXi to be identified in the course of discovery, CoStar's watermark constitutes copyright management information ("CMI"), as it identifies CoStar as the copyright owner of such photographs.

196.   In many such photographs, including several specifically identified above as examples, CREXi intentionally and systematically cropped out CoStar's watermark from CoStar-copyrighted photographs.

197.   CREXi removed CoStar's CMI while knowing, having reasonable grounds to know, and with the intent that it would induce, enable, facilitate, and/or conceal infringement of CoStar's copyrights, in violation of 17 U.S.C. § 1202(b).

198.   CoStar has suffered damage and loss as a result of these violations.

199.   CoStar has suffered and will continue to suffer irreparable harm as a result of CREXi's continued removal of CoStar CMI on CoStar-copyrighted photographs, and, as such, CoStar has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### Violation of the Digital Millennium Copyright Act ("DMCA")

### Distribution of Works with Removed or Altered Copyright Management Information, 17 U.S.C. §§ 1202(b)(3)

200.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

201.   CoStar's watermark constitutes CoStar's protected CMI.

202.   CREXi has distributed and is distributing CoStar's protected works, or copies of works, knowing that protected CMI has been removed or altered without CoStar's authority.

203.   CREXi distributed CoStar's CMI while knowing, having reasonable grounds to know, and with the intent that it would induce, enable, facilitate, and/or conceal infringement of CoStar's copyrights, in violation of 17 U.S.C. § 1202(b)(3).

204.   CoStar has suffered damage and loss as a result of these violations.

205.   CoStar has suffered and will continue to suffer irreparable harm as a result of CREXi's continued distribution of CoStar's protected works, or copies of

works, knowing that protected CMI has been removed or altered without CoStar's authority, and, as such, CoStar has no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF

### Common Law Misappropriation

206.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

207.   CoStar has invested substantial time, labor, skill, and financial resources into the creation and maintenance of CoStar's services, its computer systems and servers, including system and server capacity, as well as the content on CoStar's subscription service and the LoopNet website.  CoStar goes to great lengths, in terms of time, number of research personnel and invested dollars, to locate, manage, update, and curate its verified listings and provide a seamless, up-to-date user experience that constitutes a substantial portion of CoStar's value proposition.

208.   CoStar's verified listings are time-sensitive.  CoStar's content, including the content on the LoopNet website, is updated in real time, an indispensable feature of the website that attracts users to the website and contributes to its value.  For example, a potential buyer or lessee needs to be able to rely on the fact that a property that she is viewing is actually still for sale or lease, and that the price or rental cost is accurate and up-to-date.

209.   Without authorization, CREXi wrongfully accessed and appropriated CoStar's services, computer systems and servers, and its content without having to make the substantial investment in time, labor, skill, and financial resources made by CoStar.  CREXi is in direct competition with CoStar and has made CoStar's content available to CREXi's users.  As such, CREXi's use of CoStar's computer systems and servers, including system and server capacity, as well as CoStar's content, constitutes free-riding on CoStar's substantial investment of time, effort, and expense.  CREXI is reaping where it has not sown.

210.   As a result of this misappropriation, CREXi wrongfully competes and/or enables others to compete, with CoStar, and CoStar has been forced to expend additional time and resources, including but not limited to, investigating CREXi's activities and attempting to prevent such misappropriation by technological means.

211.   CoStar has been and will continue to be damaged as a result of CREXi's misappropriation of CoStar's valuable information and property.  If permitted to continue, the ability of CREXi and other parties to free-ride on CoStar's substantial investment would so reduce CoStar's incentive to produce products or services such as LoopNet that the existence or quality of these products or services would be substantially threatened.

212.   CoStar has suffered and will continue to suffer irreparable injury, and its remedy at law is not itself adequate to compensate for injuries inflicted by CREXi.

### FIFTH CLAIM FOR RELIEF

### California Unfair Competition

213.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

214.   By the acts described herein, CREXi has engaged in unlawful business practices.  It has done so by infringing on CoStar's copyrighted materials, violating the DMCA, and misappropriating CoStar's property, as set forth in Counts One through Four.

215.   CREXi's unlawful business practices have injured and will continue to injure CoStar in its business and property, in violation of California Business and Professions Code Sections 17200, *et seq.*

216.   CREXi's acts alleged herein have injured CoStar.  CoStar has suffered lost transaction opportunities, lost business opportunities, lost market share, and present and future diminishing of business value.

LATHAM&WATKINS⎡⎡⎡
ATTORNEYS AT LAW

217.   CREXi's acts alleged herein have also caused, and will continue to cause, irreparable injury to CoStar, unless and until CREXi is permanently enjoined and ordered to pay restitution for CoStar's lost interests.

## SIXTH CLAIM FOR RELIEF

### Breach of Contract

218.   CoStar repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

219.   Use of CoStar's subscription database and the LoopNet website is subject to contractually binding terms and conditions.  Such terms are common in the industry, and as a sophisticated business entity, CREXi and its employees would be well aware of both the presence and binding nature of the terms and conditions.

220.   CREXi had actual and/or constructive knowledge that access to the CoStar database is subject to CoStar's Terms of Use.  As described above, CoStar's Terms of Use appear: directly below the log-in button for the CoStar database; in an email to users before they log into the database for the first time; whenever users export data from CoStar's database; and at the bottom of each results page.  Additionally, users are required to affirmatively accept the Terms of Use in a pop-up window that appears after every 30 days.

221.   CoStar's Terms of Use prohibit competitors from accessing, using, or transmitting any portion of CoStar's content in the subscription database.

222.   CoStar's Terms of Use prohibit competitors from disclosing or transmitting any portion of the Service to any direct or indirect competitor of CoStar.

223.   CoStar's Terms of Use prohibit users from sharing passcodes with any other person.

224.   In direct violation of CoStar's Terms of Use, CREXi accessed CoStar's subscription database despite being its competitor, in order to steal the

content therein, including broker directory information, and disclose that content to its employees.

225. Further, in direct violation of CoStar's Terms of Use, CREXi's employee and agent, Mr. Hamlin allowed at least one unauthorized person—namely, the head of CREXi's New York office—to use his CoStar credentials.

226. CREXi also had actual and/or constructive knowledge that access to LoopNet was subject to LoopNet's Terms and Conditions. As described above, a hyperlink to LoopNet's Terms and Conditions were displayed on every page of the LoopNet website. CREXi employees who registered for LoopNet accounts also received an email before signing in for the first time that contained multiple references to the Terms and Conditions. The LoopNet Terms and Conditions also appear directly below the log-in button for the LoopNet website. Moreover, CREXi received *thousands* of Error & Abuse notices that all contained a conspicuous hyperlink to LoopNet's Terms and Conditions and explained that use of LoopNet was subject to the terms.

227. LoopNet's Terms and Conditions prohibit competitors from viewing, using, or accessing LoopNet, including using LoopNet for or in connection with any other listing service.

228. LoopNet's Terms and Conditions prohibit using or reproducing any content obtained from LoopNet for or in connection with any other listing service.

229. In direct violation of LoopNet's Terms and Conditions, CREXi accessed LoopNet despite being its competitor, in order to steal intellectual property, data, and other content, including copyrighted photographs, and use such content on CREXi.com, a listing service.

230. CREXi's breaches of these terms have been material, willful, repeated, and systematic.

231.   CREXi caused damage and continues to cause irreparable harm to CoStar by building databases and selling data based, at least in part, on CoStar content derived as a result of contractual breaches.

232.   CoStar is therefore entitled to damages in an amount to be proven at trial, injunctive relief, and other relief as the Court deems appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, CoStar prays for relief as follows:

1.     For an order pursuant to 17 U.S.C. § 502 permanently enjoining and restraining CREXi and its officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the infringements of CoStar's exclusive rights under the Copyright Act, or from authorizing any other person to do the same;

2.     For an award pursuant to 17 U.S.C. § 504 of CoStar's actual damages and CREXi's profits or, alternatively at CoStar's election, for statutory damages for CREXi's infringement and willful infringement—including without limitation for the instances of infringement identified in **Exhibit C**, and other instances of infringement subsequently disclosed or uncovered during discovery— in the maximum amount allowable by law;

3.     For a finding that CREXi has willfully infringed CoStar's federally registered copyrights;

4.     For an award pursuant to 17 U.S.C. § 1203 of CoStar's actual damages and CREXi's profits, or alternatively at CoStar's election, for statutory damages for CREXi's violations of the DMCA in the maximum amount allowable by law;

5.     For an order permanently enjoining and restraining CREXi and its

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

officers, agents, servants, and employees from accessing CoStar websites and the databases that power them;

6. For a finding that CREXi's access to CoStar's websites and databases is unauthorized;

7. For an award of damages arising from CREXi's breaches of CoStar's and LoopNet's binding terms and conditions;

8. For an order permanently enjoining and restraining CREXi and its officers, agents, servants, and employees and all those in active concert or participation with them from breaching CoStar's and LoopNet's binding terms of service;

9. For an award of damages arising from CREXi's misappropriation of data and content from CoStar's computers and servers;

10. For an order permanently enjoining and restraining CREXi and its officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the misappropriation of CoStar data and information;

11. For an order granting all available relief under California Business and Professions Code Section 17203, including without limitation restitution for CREXi's wrongful gains for its unfair competition;

12. For an order permanently enjoining and restraining CREXi and its officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating CREXi's unfair competition;

13. For further permanent injunctive relief as deemed necessary by the Court, including without limitation for an order pursuant to 17 U.S.C.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

§503(b) or otherwise requiring the purging and destruction of all CoStar content from CREXi's database(s) and system(s) by an independent source that reports to CoStar and the Court and monitors CREXi's future compliance with the Court's orders;

14. For an award of CoStar's costs, including its reasonable attorneys' fees;

15. For pre-judgment and post-judgment interest according to law;

16. For exemplary and punitive damages to the extent available; and

17. For such further and additional relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Civil L.R. 38-1, CoStar hereby demands a trial by jury.

Dated:  September 25, 2020                    Respectfully submitted,


/s/ Jessica Stebbins Bina
JESSICA STEBBINS BINA
jessica.stebbinsbina@lw.com
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525

NICHOLAS J. BOYLE*
nicholas.boyle@lw.com
SARAH A. TOMKOWIAK*
sarah.tomkowiak@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200

Attorneys for Plaintiffs
*Pro hac vice pending