KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS #158708
epeters@keker.com
WARREN A. BRAUNIG #243884
wbraunig@keker.com
ELIZABETH K. MCCLOSKEY #268184
emccloskey@keker.com
NICHOLAS S. GOLDBERG #273614
ngoldberg@keker.com
ANN NIEHAUS #325474
aniehaus@keker.com
CHRISTINE ZALESKI #331727
czaleski@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Attorneys for Defendant
COMMERCIAL REAL ESTATE EXCHANGE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> COMMERCIAL REAL ESTATE EXCHANGE, INC., <br><br> Defendant. | Case No. 2:20-CV-8819 CBM (ASx) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS** <br><br> Date:  February 23, 2021 <br> Time:  10:00 a.m. <br> Courtroom:  8B <br> Judge:  Hon. Consuelo B. Marshall <br><br> Date Filed:  September 25, 2020 <br><br> Trial Date:   None set |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................... 1

II.    FACTUAL BACKGROUND ...................................................... 3

    A.     Brokers share listing data with commercial real estate platforms. ....................................................................... 3

    B.     CoStar successfully argues that competitors are legally permitted to access publicly-available listing information on LoopNet. ....................................................................... 4

    C.     CoStar acquires LoopNet and drives Xceligent out of business. ......................................................................... 6

    D.     CoStar's complaint against CREXi. ................................... 7

III.   ARGUMENT ......................................................................... 8

    A.     CoStar's Fourth Claim for common law misappropriation fails. ............................................................................... 8

        1.     CoStar's effort to block CREXi from accessing publicly-available information is contrary to Ninth Circuit precedent. ................................................... 8

        2.     CoStar's misappropriation claim is preempted by the Copyright Act. .................................................. 11

        3.     Commercial real estate data is not "hot news." ......... 12

    B.     CoStar's Sixth Claim for breach of contract fails. .............. 15

        1.     CoStar fails to allege contract formation between CREXi and CoStar or LoopNet. ............................... 15

            a.     LoopNet ......................................................... 16

            b.     CoStar .......................................................... 18

        2.     CoStar fails to allege that any employee was authorized to bind CREXi. ................................... 19

    C.     CoStar's Second and Third Claims for violation of the DMCA fail. ..................................................................... 21

    D.     CoStar's Fifth Claim for unfair competition fails. ............... 24

IV.    CONCLUSION ...................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Aaberg v. Francesca's Collections, Inc.*,
  2018 WL 1583037 (S.D.N.Y. Mar. 27, 2018) ................................... 22

*Alvarez v. Chevron Corp.*,
  656 F.3d 925 (9th Cir. 2011) .................................................................. 8

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,
  2011 WL 2690437 (N.D. Cal. July 8, 2011) ........................................ 25

*Applebaum v. Lyft, Inc.*,
  263 F. Supp. 3d 454 (S.D.N.Y. 2017) ........................................... 18, 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................... 8

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
  650 F.3d 876 (2d Cir. 2011) ................................................................ 12

*Berman v. Freedom Fin. Network, LLC*,
  2020 WL 5210912 (N.D. Cal. Sept. 1, 2020)....................................... 16

*Colgate v. JUUL Labs, Inc.*,
  402 F. Supp. 3d 728 (N.D. Cal. 2019)............................................ 18, 19

*Crosbie v. W. Progressive, LLC*,
  2018 WL 6133411 (C.D. Cal. May 2, 2018)......................................... 25

*Cullinane v. Uber Techs., Inc.*,
  893 F.3d 53 (1st Cir. 2018) ............................................................ 18, 19

*Dastar Corp v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003) ............................................................................... 24

*Disney Enterprises, Inc. v. Redbox Automated Retail, LLC*,
  336 F. Supp. 3d 1146 (C.D. Cal. 2018)................................................ 16

*E & E Co. v. Light in the Box Ltd.*,
  2015 WL 5915432 (N.D. Cal. Oct. 9, 2015)......................................... 21

*Ebner v. Fresh, Inc.*,
    838 F.3d 958 (9th Cir. 2016)...................................................................25

*Eclectic Prop. E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014)......................................................................8

*In re Facebook Biometric Info. Privacy Litig.*,
    185 F. Supp. 3d 1155 (N.D. Cal. 2016) ...................................................18

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ........................................................................7, 11, 12

*Fredianelli v. Jenkins*,
    931 F. Supp. 2d 1001 (N.D. Cal. 2013) ...................................................20

*Golden Nugget, Inc. v. Am. Stock Exch., Inc.*,
    828 F.2d 586 (9th Cir. 1987) ...................................................................10

*Goldstein v. Metro. Reg'l Info. Sys., Inc.*,
    2016 WL 4257457 (D. Md. Aug. 11, 2016)..............................................23

*hiQ Labs, Inc. v. LinkedIn, Corp.*,
    938 F.3d 985 (9th Cir. 2019)...........................................................*passim*

*United States ex rel. Hong v. Newport Sensors, Inc.*,
    2016 WL 8929246 (C.D. Cal. May 19, 2016)..........................................17

*Imageline, Inc. v. CafePress.com, Inc.*,
    2011 WL 1322525 (C.D. Cal. Apr. 6, 2011).............................................21

*International News Service v. Associated Press*,
    248 U.S. 215 (1918) ...........................................................................12, 14

*IQ Grp., Ltd. v. Wiesner Pub., LLC*,
    409 F. Supp. 2d 587 (D.N.J. 2006)...........................................................24

*James v. Childtime Childcare, Inc.*,
    2007 WL 1589543 (E.D. Cal. June 1, 2007).............................................10

*Jurisearch Holdings, LLC v. Lawriter, LLC*,
    2009 WL 10670588 (C.D. Cal. Apr. 13, 2009).........................................11

*Kodadek v. MTV Networks, Inc.*,
    152 F.3d 1209 (9th Cir. 1998).................................................................25

iii

*Lennard v. Yeung,*
  2012 WL 13006214 (C.D. Cal. Feb. 23, 2012) .................................................. 20

*Maule v. Anheuser Busch, LLC,*
  2018 WL 3608934 (E.D. Pa. July 27, 2018) ............................................. 22, 23

*Media.net Advert. FZ-LLC v. Netseer, Inc.,*
  198 F. Supp. 3d 1083 (N.D. Cal. 2016) ............................................................. 25

*Montz v. Pilgrim Films & Television, Inc.,*
  649 F.3d 975 (9th Cir. 2011) ............................................................................. 12

*Murphy v. Fullbright,*
  2012 WL 4754730 (S.D. Cal. Oct. 4, 2012) ...................................................... 20

*Nat'l Basketball Ass'n v. Motorola, Inc.,*
  105 F.3d 841 (2d Cir. 1997) ........................................................................ 12, 13

*Nghiem v. Dicks' Sporting Goods, Inc.,*
  2016 WL 9131962 (C.D. Cal July 5, 2016) ...................................................... 15

*Nguyen v. Barnes & Noble Inc.,*
  763 F.3d 1171 (9th Cir. 2014) .................................................................... 15, 16

*OEM-Tech v. Video Gaming Techs., Inc.,*
  2012 WL 12920087 (N.D. Cal. July 31, 2012) ................................................. 20

*Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.,*
  2012 WL 414803 (N.D. Ill. Feb. 8, 2012) ................................................... 22, 23

*Reilly v. Plot Commerce,*
  2016 WL 6837895 (S.D.N.Y. Oct. 31, 2016) .................................................... 23

*Snow v. Eventbrite, Inc,*
  2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ....................................... 16, 17, 19

*Specht v. Netscape Commc'ns Corp.,*
  306 F.3d 17 (2d Cir. 2002) ................................................................................ 19

*Stevens v. Vodka & Milk, LLC,*
  2018 WL 11222927 (S.D.N.Y. Mar. 15, 2018) ................................................. 25

*Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.,*
  7 F.3d 1434 (9th Cir. 1993) ............................................................................... 11

iv

*Ticketmaster Corp. v. Tickets.com, Inc.*,
    2000 WL 1887522 (C.D. Cal. Aug. 10, 2000) ............................................. 13, 14

*United States v. Gines-Perez*,
    214 F. Supp. 2d 205 (D.P.R. 2002) ....................................................... 10

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ........................................................... 8

*X17, Inc. v. Lavandeira*,
    563 F. Supp. 2d 1102 (C.D. Cal. 2007) ........................................... 10, 13

*X17, Inc. v. Lavandeira*,
    2007 WL 790061 (C.D. Cal. Mar. 8, 2007) ....................................... 14

*Yi v. Circle K Stores, Inc.*,
    258 F. Supp. 3d 1075 (C.D. Cal. 2017) ............................................ 15

**State Cases**

*Aleksick v. 7-Eleven, Inc.*,
    205 Cal. App. 4th 1176 (2012) ........................................................ 25

*Balboa Ins. Co. v. Trans Glob. Equities*,
    218 Cal. App. 3d 1327 (1990) ................................................... 11, 12

*Kabehie v. Zoland*,
    102 Cal. App. 4th 513 (2002) ......................................................... 11

*Meyer v. Glenmoor Homes, Inc.*,
    246 Cal. App. 2d 242 (1966) .......................................................... 19

*Moreno v. Hanford Sentinel, Inc.*,
    172 Cal. App. 4th 1125 (2009) ....................................................... 10

*Murillo v. Homebridge Fin. Servs., Inc.*,
    2019 WL 4284515 (C.D. Cal. July 8, 2019) ..................................... 25

*Van't Rood v. Cty. of Santa Clara*,
    113 Cal. App. 4th 549 (2003) ......................................................... 20

**Federal Statutes**

17 U.S.C. § 103 ................................................................................... 12

17 U.S.C. § 401 ................................................................................................ 22

17 U.S.C. § 1202(c) ......................................................................................... 22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
Case No. 2:20-CV-8819 CBM (ASx)

1538883

## I. INTRODUCTION

Defendant Commercial Real Estate Exchange, Inc. ("CREXi") is an innovative and fast-growing commercial real estate marketplace and technology platform. Plaintiffs CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar") are a $36 billion industry behemoth that have made a habit of abusing the court system to compensate for product shortcomings and guard market power. Rather than compete in a fair and open market, CoStar pursues aggressive litigation and public-relations warfare against its rivals to suppress innovation and bully competitors that are succeeding where CoStar has failed. Remarkably, CoStar's complaint touts its anticompetitive behavior, bragging about the numerous lawsuits it has filed against competitors like CREXi, beset on elbowing them out of the market. CREXi will not be so bullied.

At heart, CoStar's complaint takes issue with the existence of public commercial real estate listing information and photographs on CREXi's platform. But CoStar's hypocrisy is staggering. Before CoStar acquired LoopNet, CoStar successfully sought open access to the same publicly-available information that it now claims to own and fought to prevent LoopNet from blocking CoStar's access to such information. As CoStar said at the time, "we think it's silly that LoopNet makes this listing information available on its public Web site for all of the world to see, and that they're trying to essentially argue that CoStar can't look at it."[1] Now that CoStar owns LoopNet, it has reversed course and makes the same "silly" argument here. LoopNet is a publicly-accessible website that brokers use to "market their listings" with their own listing data. Compl. ¶ 18. The fact that brokers publicize their listings by providing listing information and photographs to both LoopNet and CREXi is both unsurprising and perfectly legal.

---

[1] *LoopNet, CoStar, Begin A New Round in Long Boxing Match*, National Real Estate Investor, June 15, 2009, https://www.nreionline.com/news/loopnet-costar-begin-new-round-long-boxing-match.

1    Indeed, it is CoStar, not CREXi, that has engaged in unfair and unlawful
2    competition by blocking CREXi from accessing publicly-available data on CoStar's
3    platforms.  Just last year, the Ninth Circuit affirmed a preliminary injunction
4    enjoining the professional networking website LinkedIn from blocking a competitor
5    from "collecting and using information" that was publicly "available for viewing by
6    anyone with a web browser" on LinkedIn's website.  *See hiQ Labs, Inc. v.*
7    *LinkedIn, Corp.*, 938 F.3d 985, 989 (9th Cir. 2019).  If "companies like LinkedIn
8    [and CoStar], whose servers hold vast amounts of public data, are permitted
9    selectively to ban only potential competitors from accessing and using that
10   otherwise public data, the result … may well be considered unfair competition
11   under California law."  *Id.* at 998.
12        Recognizing the fatal impact of *hiQ* on its theory here, CoStar has attempted
13   to plead around the Ninth Circuit's decision, asserting a grab bag of claims.  Those
14   claims suffer from multiple legal defects that require their dismissal.  *First*,
15   CoStar's misappropriation claim is foreclosed by *hiQ* and preempted by the
16   Copyright Act.  *Second*, CoStar's breach of contract claim fails to allege the
17   formation of any contract between CREXi and either CoStar or LoopNet.  *Third*,
18   CoStar's claims that CREXi supposedly altered or removed copyright management
19   information ("CMI") in violation of the Digital Millennium Copyright Act
20   ("DMCA") fail as a matter of law because CoStar merely alleges that the
21   photographs bear its unadorned logo, which is not CMI.  *Fourth*, CoStar's
22   California Unfair Competition Law ("UCL") claim is preempted by the Copyright
23   Act and derivative of its untenable misappropriation and DMCA claims.
24        CoStar is undoubtedly frustrated that a more innovative company like CREXi
25   has, as CoStar puts it, "attract[ed] buyers, sellers, and brokers to its website" and
26   "divert[ed] revenue streams and growth opportunities from CoStar."  Compl. ¶
27   94.  But competition in a free market is no basis for CoStar's legal claims.  The
28   Court should grant CREXi's motion and dismiss with prejudice the second, third,

2

1  fourth, fifth, and sixth claims.[2]

2  **II.    FACTUAL BACKGROUND**

3        **A.    Brokers share listing data with commercial real estate platforms.**

4        This case is about three commercial real estate ("CRE") platforms: CoStar,

5  LoopNet (owned by CoStar) and CREXi.  Each platform makes available data and

6  images for CRE properties for sale or lease.  *See* Compl. ¶¶ 2, 3, 17, 18, 20, 21.

7  CREXi and LoopNet operate "competing online marketplace[s]" for CRE listings

8  and information, providing facts about commercial properties, such as address,

9  building size, year built, zoning information, listing prices, acreage, and photos,

10  among other things.  *Id.* ¶¶ 8, 18, 48, 49.  CREXi and LoopNet are both accessible

11  to the public for free, and users can access and browse their websites without

12  creating an account.[3]  Compl. Ex. B at 1, 3.  Generally speaking, CREXi's website

13  (crexi.com) and LoopNet's website (loopnet.com) serve a similar purpose for

14  commercial real estate as Redfin and Zillow do for residential real estate.  CREXi

15  and CoStar also maintain subscription databases with additional property

16  information, such as sale and lease comparables, and market data and reports.  *Id.*

17  ¶¶ 43, 96.  And CREXi and CoStar both operate CRE auction platforms.  *Id.* ¶¶ 2-3.

18        The CoStar, LoopNet, and CREXi platforms all contain listing information

19  and photographs originated, provided, and submitted by real estate brokers.  Compl.

20  ¶¶ 2, 3, 7, 18, 28, 46, 82 & Exs. A–B.  Brokers typically market their properties as

21  widely as possible and distribute property listing information and photographs to

22  multiple platforms, including LoopNet and CREXi.  Once brokers prepare listing

23  information for a new property, they do not want to re-create it.  So, after one

24

25        [2] While the factual basis for CoStar's first cause of action for copyright
   infringement is based on flawed information and misplaced assumptions, and
26  CREXi denies that it has knowingly or intentionally infringed CoStar copyrights,
   CREXi does not herein challenge that CoStar has adequately *pleaded* a copyright
27  cause of action.

28  [3] Both CREXi and LoopNet also offer premium services that provide users access
   to certain additional features.

platform posts a listing for a new property, brokers will often share a link to that posting with other CRE platforms, expecting those platforms to post the same listing.  *See id*. ¶ 82 ("Brokerages remain free to provide their own photographs and information to such competing platforms"); ¶ 158 ("brokers are free to list their properties anywhere").  As the terms of service for both CoStar and LoopNet make clear, photographs and other listing content provided by a broker, remain the property of the broker, even if CoStar adds its logo to the content.  *Id*., Ex. A (CoStar Terms of Use) at 9; Ex. B at (LoopNet Terms and Conditions) at 5.  Publicly-available property listing information thus flows between these CRE platforms, which is perfectly legal.

**B.  CoStar successfully argues that competitors are legally permitted to access publicly-available listing information on LoopNet.**

CoStar, the brainchild of founder and CEO Andrew Florance, is the industry behemoth of CRE platforms.  CoStar has achieved its industry power not through innovation, but through aggressive litigation tactics—suing to weaken its competitors and then acquiring them or putting them out of business.  *See* Compl. ¶¶ 12, 165–171 (touting CoStar's history of anticompetitive growth).[4]  CoStar's tactics are perhaps best exemplified by its acquisition of LoopNet and subsequent efforts to drive former CoStar competitor Xceligent out of business.

Before CoStar acquired LoopNet, the two companies were competitors.  Beginning in 2005, CoStar and LoopNet engaged in a series of legal battles against one another in courts across the country.[5]  Some of those lawsuits bear striking

---

[4] *See also* Putzier Konrad, David Jeans, Christian Bautista, Nancy C. Carvajal, *Search and destroy: How CoStar became a $15B juggernaut*, The Real Deal (Sep. 2018), https://therealdeal.com/issues_articles/how-costar-became-a-15-billion-dollar-juggernaut/.

[5] *See Costar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 691 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004); *Loopnet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, No. 05-cv-1220 (N.D. Cal. Mar. 24, 2005); *CoStar Group, Inc. v. LoopNet Inc.*, No. 08-CV-01156 (S.D.N.Y. Feb. 5, 2008); *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. Nov. 15, 2007).

4

resemblance to CoStar's complaint against CREXi, but in those cases, it was LoopNet seeking to strangle CoStar's growth by preventing CoStar from accessing public information on LoopNet's website.  CoStar defended its right to access and use information that LoopNet made publicly available.  And CoStar was successful.

LoopNet accused CoStar of "access[ing] LoopNet's proprietary listings database and member directory in order to unlawfully obtain LoopNet's listings and member information, to copy and misappropriate the information contained within, and to contact LoopNet's members in an effort to convince those persons to use CoStar's competing service in place of LoopNet's."  Request for Judicial Notice (RJN) Ex. 1 (Compl. ¶ 16, *Loopnet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, No. 05-cv-1220, ECF 1 (N.D. Cal. Mar. 24, 2005)).  CoStar and LoopNet resolved that action, agreeing that ***both entities could access and use publicly-available information on one another's websites***.  RJN Ex. 2 (Decl. of Andrew Florance ¶¶ 2, 4, *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. Apr. 7, 2009)).

Two years later, LoopNet sued CoStar once again, accusing CoStar of accessing and copying publicly-available CRE information from LoopNet's website.  *See* RJN Ex. 3 (Compl., *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. Nov. 15, 2007)).  CoStar objected, proclaiming that it should be allowed to use public information on LoopNet and that there was no legal basis to prevent it from doing so.  CoStar's CEO explained, "***CoStar has openly and notoriously accessed information on the non-password protected areas of LoopNet's website*** . . . . Specifically, CoStar has accessed, among other things, LoopNet's press releases, earnings calls, product descriptions, pricing descriptions, marketing materials, and listings, and made use of that information for competitive purposes."  RJN Ex. 2 ¶ 15 (emphasis added).

CoStar then moved to enjoin LoopNet from blocking CoStar's access to public portions of LoopNet's website.  In that motion, CoStar acknowledged that,

1538883

in the CRE industry, brokers share identical property listing information and pictures with a variety of online platforms.  CoStar explained: "[B]rokers often respond to CoStar's inquiries by referring CoStar researchers to the public parts of LoopNet's website or to their own sites hosted on LoopLink. . . . Instead of simply visiting a broker's own website or viewing the listing the broker uploaded to LoopNet and linked to CoStar, CoStar's researchers must either obtain the details of a listing over the phone to trouble the broker to send the listing in a form that is not blocked by LoopNet's denial of access.  These processes slow down CoStar's research process, meaning that fewer listings are updated on a daily basis."  RJN Ex. 4 at 19 (Motion for Preliminary Injunction, *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. Apr. 7, 2009)).  The Court denied CoStar's motion in part but held that LoopNet could not block CoStar's access to the non-password protected areas of LoopNet's website.  RJN Ex. 5 (Rulings/Orders, *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. July 6, 2009)).

## C.    CoStar acquires LoopNet and drives Xceligent out of business.

These court battles took their toll on LoopNet, and in 2011, CoStar sought to acquire LoopNet for $860 million.  *See* Compl., *In the Matter of Costar Grp., Inc., et al.*, No. 111-0172, 2012 WL 1561034, *2 (F.T.C. Apr. 26, 2012).  The Federal Trade Commission ("FTC") determined, however, that CoStar's proposed acquisition of LoopNet was anticompetitive and violated antitrust laws.  *Id*. at *3 To resolve the complaint, CoStar agreed to a consent order pursuant to which it was prohibited from, among other things, "[d]irectly or indirectly prohibit[ting] or restrict[ing] a Customer from providing any CoStar Competitor . . . CRE Listings or CRE Information that . . . was obtained or derived by the Customer from a source other than a CoStar Database."  FTC Decision and Order at § III.A, *In the Matter of CoStar Grp., Inc., et al.*, No. C-4368, 2012 WL 3862130, *14 (F.T.C. Aug. 29, 2012).  The FTC also required CoStar to divest LoopNet's interest in Xceligent,

1   another provider of CRE information.  *Id.* at *10 (§ II.A).  The FTC's Order was

2   designed to foster Xceligent's expansion, so that it would be a viable market

3   alternative to CoStar.

4          But what did CoStar do?  It sued Xceligent for accessing publicly-available

5   listing information from CoStar—the same conduct that CoStar had previously

6   maintained was legal.  As CoStar now brags in this complaint, that lawsuit resulted

7   in Xceligent's demise.  Compl. ¶¶ 12, 169.  CoStar suggests that it caught Xceligent

8   red-handed, *id.*, but that case never made it beyond the pleading stages and CoStar

9   obtained a judgment only because it forced Xceligent into insolvency.  So, despite

10  the FTC's conclusion that Xceligent's existence and expansion was necessary to

11  foster competition, CoStar's successful effort to drive Xceligent out of business

12  furthered CoStar's anticompetitive monopoly position—precisely the outcome the

13  FTC sought to avoid.  CoStar now seeks to run the same playbook against CREXi.

14         **D.     CoStar's complaint against CREXi.**

15         CoStar filed this lawsuit against CREXi on September 25, 2020.  CoStar

16  alleges that CREXi "attract[s] buyers, sellers, and brokers to its website" and

17  "diverts revenue streams and growth opportunities from CoStar" by "free-riding"

18  on CoStar.  Compl. ¶¶ 3, 94.  Specifically, CoStar claims that CREXi employees

19  have accessed CoStar and LoopNet's websites and have used CRE listing data and

20  photographs on CREXi's website.  *Id.* ¶¶ 3–8.  CoStar does not, and cannot, claim

21  that listing information is protectable intellectual property because it is "universally

22  understood" that there "can be no valid copyright in facts."  *Feist Publications, Inc.*

23  *v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344 (1991).  Instead, CoStar's case depends

24  on its claimed registration of generic photographs of commercial real estate with

25  the Copyright Office, generic Terms of Service posted on its websites, and

26  anticompetitive technological measures imposed to block competitors from

27  accessing its platforms.  Compl. ¶¶ 54–87.  Based on these allegations, CoStar

28  brings claims for: (1) copyright infringement; (2) removal of CMI in violation of

7

the DMCA, 17 U.S.C. § 1202(b)(1); (3) removal or alteration of CMI in violation of the DMCA, 17 U.S.C. § 1202(b)(3); (4) common law misappropriation; (5) unlawful competition under California's UCL; and (6) breach of contract.

CoStar did not inform CREXi of these supposed violations or initiate good-faith discussions, as a genuinely aggrieved plaintiff might. Instead, CoStar filed this lawsuit without warning and initiated a widespread PR and customer-interference campaign, in order to maximize this lawsuit's anticompetitive impact.

## III.   ARGUMENT

A complaint must be dismissed under Rule 12(b)(6) unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The factual allegations "must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Eclectic Prop. E., LLC v. Marcus & Millichap C*o., 751 F.3d 990, 996 (9th Cir. 2014) (citation omitted). Though the allegations of material fact are taken as true and construed in the light most favorable to the plaintiff, *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012), courts "disregard threadbare recitals of the elements of a cause of action" and "unsupported legal conclusions," *Alvarez v. Chevron Corp.*, 656 F.3d 925, 930 (9th Cir. 2011) (affirming dismissal with prejudice) (citation omitted).

### A.   CoStar's Fourth Claim for common law misappropriation fails.

#### 1.   CoStar's effort to block CREXi from accessing publicly-available information is contrary to Ninth Circuit precedent.

CoStar alleges that CREXi has committed common law misappropriation by accessing CRE data available on the CoStar and LoopNet websites. Compl. ¶¶ 207–209. But CoStar's effort to prevent CREXi from accessing publicly-available listing information runs headlong into the Ninth Circuit's recent decision in *hiQ v. LinkedIn*, 938 F.3d at 989, 998–99.

8

In that case, LinkedIn, the professional networking website, attempted to prevent hiQ, its competitor, from accessing and collecting publicly-available LinkedIn member profiles, which included resume information, such as education, publications, and employment history. HiQ moved for a preliminary injunction, seeking to protect its right to obtain public data available on LinkedIn. The district court granted hiQ's motion, and the Ninth Circuit affirmed, holding that LinkedIn had no "protected property interest" in the underlying data on member profiles and that members "intend" their profiles to be "accessed by others, including for commercial purposes." *Id.* at 995. LinkedIn thus did not have a protected interest in "preventing 'free riders' from using profiles posted on its platform." *Id.* The court held that, if "companies like LinkedIn, whose servers hold vast amounts of public data, are permitted selectively to ban only potential competitors from accessing and using that otherwise public data, the result—complete exclusion of the original innovator in aggregating and analyzing the public information—may well be considered unfair competition under California law." *Id.* at 998; *see also id.* (holding that LinkedIn's "conduct may well not be within the realm of fair competition") (internal quotation marks and citation omitted).

In a futile attempt to side-step the Ninth Circuit's decision in *hiQ*, CoStar alleges that CREXi's access to and use of publicly-available data hosted on LoopNet constitutes common law misappropriation. But allowing CoStar to assert such a claim would conflict with the Ninth Circuit's *hiQ* decision.[6]

---

[6] CoStar can hardly dispute that the *hiQ* decision bears directly on the facts at issue here. Indeed, CoStar submitted an amicus brief to the Ninth Circuit in *hiQ* supporting LinkedIn's position and raising many of the same arguments it advances now to support its misappropriation claim. *Compare* Br. of Amicus Curiae CoStar Group, Inc., *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-16783, 2017 WL 4698990, *4 (9th Cir. Oct. 17, 2017), Dkt. 16 ("hiQ claims entitlement to free-ride on LinkedIn's 15-year effort to build its database") *with* Compl. ¶ 3 ("CREXi is attempting to build its own online commercial real estate marketplace and auction platform by free-riding on CoStar's billions of dollars of investments and the thirty-plus years of hard work by CoStar's employees.").

To establish a misappropriation claim, CoStar must allege that it has an "identifiable property interest" that was misappropriated. *Golden Nugget, Inc. v. Am. Stock Exch., Inc.*, 828 F.2d 586, 591 (9th Cir. 1987). CoStar cannot do so. CoStar alleges that "users"—*i.e.*, brokers—post listing information to LoopNet. Compl. ¶¶ 48, 59. Brokers post this information so that it can be "accessed by others," including to market real estate. *hiQ*, 938 F.3d at 995. The listing information is neither proprietary nor uniquely available to CoStar. It includes the size of the building and plot, the year the building was built, zoning information, and the listing price. Compl. ¶¶ 29–30. All of that information is also available in public tax records, the broker's own public listings, and other publicly-available sources. Just as LinkedIn had no "protected property interest" in publicly-available member profile data, CoStar has no "protected property interest" in publicly-available data concerning CRE listings. *hiQ*, 938 F.3d at 995; *cf. Moreno v. Hanford Sentinel, Inc.*, 172 Cal. App. 4th 1125, 1130 (2009) (posting information on a "hugely popular internet site" made information "available to any person with a computer and thus opened it to the public eye"); *United States v. Gines-Perez*, 214 F. Supp. 2d 205, 225 (D.P.R. 2002) ("A person who places information on the information superhighway clearly subjects said information to being accessed by every conceivable interested party.").

CoStar's misappropriation claim would turn unfair competition law on its head. Common law misappropriation "is one of a number of doctrines subsumed under the umbrella of unfair competition." *James v. Childtime Childcare, Inc.*, No. Civ. S-06-2676, 2007 WL 1589543, at *3 n.5 (E.D. Cal. June 1, 2007); *X17, Inc. v. Lavandeira*, 563 F. Supp. 2d 1102, 1104 (C.D. Cal. 2007) (misappropriation is a "species of the common law tort of unfair competition."). CoStar cannot evade the Ninth Circuit's *hiQ* decision by asserting a different "species" of the same "common law tort" of unfair competition against CREXi here. Under *hiQ*, it is CoStar—not CREXi—that is engaged in unfair competition.

## 2. CoStar's misappropriation claim is preempted by the Copyright Act.

CoStar's misappropriation claim must also be dismissed because it is preempted by federal law.  CoStar's attempt to evade the limitations of copyright law by re-fashioning its claim as common law "misappropriation" fails.

Section 301 of the Copyright Act expressly preempts state laws that protect "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright."  *Kabehie v. Zoland*, 102 Cal. App. 4th 513, 520 (2002).  If a state claim "enters a field of regulation" covered by the Copyright Act, it can survive preemption only if it has an "extra element distinguishing it from copyright . . . protection."  *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1440 (9th Cir. 1993) (citation omitted).  Section 301 preempts the vast majority of common-law misappropriation claims, as those claims seek to protect rights equivalent to those protected under the Copyright Act.  *See Balboa Ins. Co. v. Trans Glob. Equities*, 218 Cal. App. 3d 1327, 1353 (1990); *Summit*, 7 F.3d at 1440.

CoStar attempts to deploy common law misappropriation protect what it cannot under the Copyright Act.  At root, CoStar seeks to protect the "content" of its "verified listings."  Compl. ¶¶ 207–209.  That "content," however, is just publicly available facts that are not entitled to copyright protection.  *See Feist*, 499 U.S. at 344.  To the extent that CoStar could have any "legally definable property interest" in publicly available data, it is in the nature of a copyright interest in the compilation of that data.  *See Jurisearch Holdings, LLC v. Lawriter, LLC*, No. CV 08-03068 MMM, 2009 WL 10670588, at *5–6 (C.D. Cal. Apr. 13, 2009).

But the law is clear that CoStar has no copyright interest in CREXi's compilation of publicly available data—even if CREXi obtained that data from CoStar.  The Copyright Act does not prohibit "a subsequent compiler" from using "facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement."

11

*Feist*, 499 U.S. at 349.  As the Supreme Court has explained, this principle "encourages others to build freely upon the ideas and information conveyed by a work." *Id.* at 349–50.   Here, because CREXi's listings use different selections and arrangements than CoStar's, Compl. ¶¶ 29–30, there can be no claim CREXi has infringed CoStar or LoopNet's compilations.

To circumvent this roadblock, CoStar instead alleges a misappropriation claim based on CREXi's alleged use of the data in its compilations, but that claim is preempted because it seeks to protect rights that fall "within the general scope of copyright" protections." *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 850 (2d Cir. 1997) (quoting H.R. No. 94–1476 at 132); *see also* 17 U.S.C. § 103 ("The subject matter of copyright as specified by section 102 includes compilations and derivative works.").  Federal preemption of state-law claims touching on copyright is "broader than the protections" afforded by the Copyright Act. *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011).  Thus, "Section 301 preemption bars state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements." *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 892 (2d Cir. 2011) (citation omitted). CoStar's misappropriation claim is preempted. *See Balboa*, 218 Cal. App. 3d at 1353.

### 3.   Commercial real estate data is not "hot news."

CoStar further attempts to evade preemption by alleging a "narrow form" of misappropriation known as "hot news" misappropriation. *Barclays*, 650 F.3d at 889; Compl. ¶¶ 207–211.  This argument too is a non-starter.  The "hot news" misappropriation doctrine is intended to protect time-sensitive, breaking news, not widely distributed, publicly available information, like commercial real estate data.

Hot news misappropriation originated in *International News Service v. Associated Press*, 248 U.S. 215 (1918) ("*I.N.S.*").  There, the Supreme Court held that the Associated Press had an actionable claim against a competing news service

1   for pirating breaking news stories from the AP's bulletin before the AP could

2   publish them.  *Id.* at 231–32.  The Court recognized that while the AP held no

3   property right in the factual information in the stories, the "peculiar features" of

4   news gathering require that news services have a "quasi property" interest in

5   preventing competitors from pirating news stories before the services can reap the

6   benefit of being first to publish.  *Id.* at 235–38.

7        The hot news doctrine has been narrowly construed and is inapplicable here.

8   *See Ticketmaster Corp. v. Tickets.com, Inc.*, No. 99CV7654, 2000 WL 1887522, at

9   *4 (C.D. Cal. Aug. 10, 2000), *aff'd*, 2 F. App'x 741 (9th Cir. 2001) (rejecting "hot

10  news" misappropriation theory because events were not typically sold out within

11  "hours or minutes"); *Nat'l Basketball Ass'n*, 105 F.3d at 854 (upholding dismissal

12  of misappropriation claim as preempted because plaintiffs failed to plausibly allege

13  a hot news claim).  To succeed on such a claim, a plaintiff must prove that:

14        (i) a plaintiff generates or gathers information at a cost; (ii) the
          information is time-sensitive; (iii) a defendant's use of the information
15        constitutes free riding on the plaintiffs efforts; (iv) the defendant is in
          direct competition with a product or service offered by the plaintiffs;
16        and (v) the ability of other parties to free-ride on the efforts of the
          plaintiff or others would so reduce the incentive to produce the product
17        or service that its existence or quality would be substantially threatened.

18  *X17*, 563 F. Supp. 2d at 1105 (citation omitted).

19        CRE listing information bears no resemblance to breaking news.  CRE data

20  is not confidential; it is not highly perishable; and it confers little unique value on

21  the entity who is first to report it.  As CoStar has acknowledged, this information is

22  widely disseminated by brokers (in order to generate commercial interest) and

23  publicly available over the course of weeks, if not months or years.  *See* Compl. ¶¶

24  82, 158 & Exs. A–B; RJN Exs. 2, 4.

25        There is no doubt that the CRE listing information at issue cannot meet the

26  elements for a claim of "hot news" misappropriation.  ***First,*** the listing information

27  does not "derive [its] value from [its] time-sensitive nature."  *X17*, 563 F. Supp. 2d

28  at 1106.  A misappropriation claim does not provide the proponent with a

permanent monopoly on facts, but postpones redistribution of those facts "*only to the extent necessary* to prevent [a] competitor from reaping the fruits of complainant's efforts and expenditure." *I.N.S.*, 248 U.S. at 241 (emphasis added). The period of exclusion is measured by "hours after publication by the plaintiff," not days or weeks. *See id.* at 248 (Holmes, J. dissenting). In *Ticketmaster*, for example, a court in this district dismissed a hot news misappropriation claim brought by an online ticket retailer against its competitor alleging copying of information concerning events because that information was not sufficiently "hot" to qualify as "hot news." *See Ticketmaster*, 2000 WL 1887522, at *4. The court held that Ticketmaster failed to allege that events were sold out "within hours or minutes of the tickets becoming available" with sufficient frequency to constitute hot news. *Id.*

While the complaint alleges that listing information is "time sensitive," CoStar concedes that is merely referring to property information that is "accurate and up-to-date." Compl. ¶ 208. CoStar cannot allege that real estate information derives its primary value from being accessible on CoStar within minutes or hours of it becoming available. CoStar also cannot allege that it receives any competitive advantage from publishing information about commercial real estate sales—which typically take months or years to complete—within a short time after it becomes available. In short, not only is commercial real estate information not "news," it is in no way "hot" enough to give rise to a hot news misappropriation claim.

**Second**, CREXi's alleged use of information posted on LoopNet and CoStar does not "threaten the existence of the service [CoStar] provides," as it must do to qualify as "hot news" misappropriation. *X17, Inc. v. Lavandeira*, No. CV06-7608-VBF, 2007 WL 790061, at *4 (C.D. Cal. Mar. 8, 2007). CREXi's alleged use of information available on CoStar or LoopNet does not undermine CoStar's incentive to aggregate that information such that the existence of CoStar's services is threatened. On the contrary, even CoStar acknowledges that it has "billions of

dollars" in resources, "more than four thousand" employees, and continues to make "diligent efforts" to build and maintain its products. *See* Compl. ¶¶ 3, 15. CoStar also admits that commercial real estate data is widely disseminated by brokers in order to generate commercial interest. *See* Compl. ¶¶ 82, 158 & Exs. A–B; RJN Exs. 2, 4. CREXi's alleged further redistribution of that information does not threaten the existence of CoStar's services. CoStar cannot make out a claim under the hot news misappropriation doctrine.

The Court should dismiss CoStar's Fourth Claim for misappropriation.

## B.   CoStar's Sixth Claim for breach of contract fails.

CoStar's Sixth Claim for breach of contract fails from the start. CoStar must plead that "a contract exists" between CoStar and CREXi. *Yi v. Circle K Stores, Inc.*, 258 F. Supp. 3d 1075, 1082 (C.D. Cal. 2017). But CoStar fails to allege (1) that any CREXi employee assented to the online Terms detailed in the complaint; and (2) that, even if they did, those employees entered into any contract on CREXi's behalf.

### 1.   CoStar fails to allege contract formation between CREXi and CoStar or LoopNet.

The "touchstone of contract" is the "mutual manifestation of assent." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citation omitted). Here, the complaint does not plausibly allege that any CREXi user intended to agree or actually knew that they were agreeing to the LoopNet or CoStar Terms.[7] Under such circumstances, courts will enforce an online agreement only if a "reasonably prudent" user would have been on constructive notice of the terms. *Nguyen*, 763 F.3d at 1177. "[T]he onus must be on website owners to put

---

[7] CoStar is required to plead facts establishing that CREXi had "'actual knowledge of the agreement' at issue.'" *See Nghiem v. Dicks' Sporting Goods, Inc.*, No. 16-00097-CJC, 2016 WL 9131962, *3 (C.D. Cal July 5, 2016). While the complaint alleges, in conclusory fashion, that CREXi had "actual . . . knowledge" of the terms, Compl. ¶ 220, it does not allege any facts to support that legal conclusion. CoStar fails to allege that any CREXi employee checked a box agreeing to be bound to the terms, or that any CREXi employee even viewed the terms.

users on notice of the terms."  *Id.* at 1179.  "[C]ourts enforce contracts accepted by an electronic 'click' on a website only if 'the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement.'"  *Berman v. Freedom Fin. Network, LLC*, No. 18-CV-01060-YGR, 2020 WL 5210912, at *2 (N.D. Cal. Sept. 1, 2020) (citation omitted).

### a.  LoopNet

CoStar offers a hodgepodge of allegations concerning the availability of the LoopNet Terms, but none gives rise to an enforceable agreement.

*First*, the complaint alleges that CREXi users agreed to the LoopNet Terms attached to the complaint as Exhibit B.  But those Terms state that they were "Last Updated July 1, 2020."  Compl. Ex. B at 28.  CoStar fails to allege that *any* CREXi user accessed LoopNet on or after July 1, 2020.  *See* Compl. ¶¶ 117, 119–20.  That alone requires dismissal of the Sixth Claim with respect to LoopNet.

*Second*, CoStar alleges that the LoopNet Terms were (1) "available to all users" via a link on its website, Compl. ¶ 74; (2) that certain users may have received a pop up notification that use of LoopNet is "subject to . . . terms and conditions," *id*. ¶ 75; and (3) that users are sent e-mails that "contain[] reference to LoopNet's Terms and Conditions," *id*. ¶ 76.  Again, this is insufficient as a matter of law.  Courts require an "affirmative manifestation of assent" for online contracts, typically in the form of an electronic click of a button, coupled with a sufficiently conspicuous notice that the user will be bound.  *See Disney Enterprises, Inc. v. Redbox Automated Retail, LLC*, 336 F. Supp. 3d 1146, 1152, 1155 (C.D. Cal. 2018).  Posting a link to terms—even on "every page of [a] website"—that "otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent . . . is insufficient to give rise to constructive notice."  *Nguyen*, 763 F.3d at 1179.  Nor do "after-the-fact emails" provide sufficient notice to bind recipients.  *Snow v. Eventbrite, Inc*, No. 3:20-CV-03698-WHO, 2020 WL 6135990, at *10 (N.D. Cal. Oct. 19, 2020).

The sole allegation suggesting that CoStar required a user to take *any* step to manifest assent to the LoopNet Terms is in Paragraph 77, which shows a version of the LoopNet log-in page.  Compl. ¶ 77.  While CoStar alleges that six CREXi employees *created LoopNet accounts* at some point, it fails to allege that any user *actually logged in using the process alleged at Paragraph 77.  See id*. ¶¶ 117, 118, 120, 120 n.3, 121.  Indeed, CoStar concedes that users can avoid logging in to LoopNet by accessing it through a "Connect with Google" button, which does not require a user to assent to LoopNet's Terms.  *See id*. ¶ 77.

*Third*, even if *all* users accessed their accounts using the log-in process alleged at Paragraph 77—an allegation that appears nowhere in the complaint—CoStar fails to allege, as required, "the date when the website first adopted its present appearance."  *Snow*, 2020 WL 6135990, at *5.  It thus fails to allege that this page existed at the time any CREXi user accessed LoopNet.  Indeed, LoopNet appears to have changed its log-in process in July 2020.  RJN Exs. 6–7.[8]  The CREXi user alleged to have last accessed LoopNet did so in June 2020.  Compl. ¶¶ 117, 119–20.  Thus, CoStar's allegations concerning the current log-in process do not support a claim that any CREXi employee assented to the LoopNet Terms.

*Fourth*, the notice and link to the LoopNet Terms on the alleged log-in screen is insufficiently conspicuous to create a binding agreement.  Compl. ¶ 77.  The LoopNet log-in screen identified in the complaint is reproduced below:



---

[8] Courts "routinely" judicially notice "content from the Internet Archive's Wayback machine" on a motion to dismiss.  *United States ex rel. Hong v. Newport Sensors, Inc.*, No. 13-1164-JLS, 2016 WL 8929246, at *3 (C.D. Cal. May 19, 2016).

Even if CoStar had alleged that a CREXi user logged-in using this screen—which, again, CoStar has *not* alleged—the LoopNet Terms are insufficiently conspicuous to form an agreement.  On that page, the notice "By clicking 'Log In,' I agree to LoopNet's Terms of Use" is written in considerably smaller and less conspicuous typeface than the prominent dark red "Log In" button, and the larger "Connect with Google" button, which is offset by a gray box and an eye-catching multicolored logo.  *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018) (refusing to enforce terms of service where "the presence of other terms on the same screen . . . with more noticeable attributes diminished the hyperlink's capability to grab the user's attention").  Further, the hyperlink to the "Terms of Use" fails to use underlining, bold type, or any other attribute that makes it sufficiently conspicuous to put a reasonably prudent user on notice that the text is a clickable hyperlink. *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019) (refusing to enforce hyperlinked terms that were written in blue but were "not highlighted, underlined, in all caps, or in a separate box"); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017) ("Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract.").

CoStar could have easily adopted a log-in process that required users to click a check box affirming agreement to LoopNet's Terms, but it failed to do so.  *See In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1165 (N.D. Cal. 2016).  CoStar thus cannot bind users to those Terms.

### b.   CoStar

CoStar's allegations as to contract formation between CREXi and CoStar are riddled with the same defects.

***First***, CoStar makes allegations concerning how users ***might*** access CoStar Terms, but fails to allege that any CREXi employee manifested assent to the Terms. It alleges that (1) at "the bottom" of its website, users may view a notice stating "By using this site, you agree to our Terms of Use," Compl. ¶ 66; (2) the Terms

18

themselves state that they bind users, *id*. ¶ 68; and (3) the Terms are linked to an e-mail sent after a user logs in, *id*. ¶ 63.  But references to terms "on a submerged screen" that a user must scroll or click to access, are "not sufficient to place consumers on inquiry or constructive notice of those terms." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002).  Nor is a mere reference to terms in a follow up e-mail.  *Snow*, 2020 WL 6135990, at *10.[9]

**Second**, the log-in page alleged at Paragraph 62 contains a notice that is just as inconspicuous as the LoopNet log-in page alleged at Paragraph 77.  The CoStar log-in page contains a tiny notice at the bottom of the screen that states "By clicking "Log In", I accept CoStar's Terms of Use."  Compl. ¶ 62.  That notice is written in the smallest type on the page, in a light gray color on a white background, whereas other text on the page is in darker, more prominent type. *Colgate*, 402 F. Supp. 3d at 765.  The notice is also submerged beneath the larger, more conspicuous hyperlinks that state "Remember Me" and "Forgot Password?" *Cullinane*, 893 F.3d at 63.  The hyperlink to the Terms itself is also insufficiently conspicuous and does not contain any underlining, italics, or other features to notify users that it contains clickable text.  *Applebaum*, 263 F. Supp. 3d at 467.

### 2. CoStar fails to allege that any employee was authorized to bind CREXi.

Even if CoStar had sufficiently alleged that a CREXi employee agreed to the LoopNet or CoStar Terms, there is no plausible allegation that such an agreement binds CREXi.  To plead that an online contract is binding on a corporation, the proponent of the contract must allege that "it was made on [the corporation's] behalf by someone who had authority to act for it."  *Meyer v. Glenmoor Homes, Inc.*, 246 Cal. App. 2d 242, 252–53 (1966).  Such authority may be "actual" or

---

[9] The only allegation that suggests a user must take any affirmative action to manifest assent concerns the log in page alleged at Paragraph 62, but, as with LoopNet, the complaint fails to allege that any CREXi user actually logged in using that page.  Compl. ¶¶ 101, 103.

"ostensible," but a principal cannot be bound to a contract entered into by an agent who acted "beyond the scope of his . . . authority." *Van't Rood v. Cty. of Santa Clara*, 113 Cal. App. 4th 549, 573 (2003).  "While the existence of an agency relationship is a factual matter, a complaint must plead facts indicating the existence of such a relationship to survive a motion to dismiss." *Lennard v. Yeung*, No. CV1009322MMMAGRX, 2012 WL 13006214, at *15 (C.D. Cal. Feb. 23, 2012); *see Murphy v. Fullbright*, 2012 WL 4754730, at *4 (S.D. Cal. Oct. 4, 2012) (dismissing complaint "devoid of any factual allegations" supporting agency).

CoStar fails to allege *any* facts that CREXi actually authorized its employees to enter into contracts with CoStar.  Actual authority "flows from the conduct of the corporation which causes the agent reasonably to believe that the company has intentionally consented to the agent's act." *OEM-Tech v. Video Gaming Techs., Inc.*, No. C 10-04368 RS, 2012 WL 12920087, at *4 (N.D. Cal. July 31, 2012) (citation omitted).  The principal must take an affirmative step to indicate its "intent to confer actual authority or cause[] the agent to believe he possesses such authority." *Fredianelli v. Jenkins*, 931 F. Supp. 2d 1001, 1018 (N.D. Cal. 2013). CoStar alleges that eight CREXi employees assented to CoStar's or LoopNet's Terms, Compl. ¶¶ 101, 103, 117–118, 120–121, but never alleges that any of those employees received actual authority from CREXi to enter into contracts with CoStar, or that they were even CREXi employees when they allegedly entered into any contract.  The complaint thus fails plausibly to allege that CREXi conferred actual authority on its employees to bind CREXi to the CoStar or LoopNet Terms.

CoStar also fails to allege that any CREXi employee had ostensible authority to bind CREXi to the LoopNet or CoStar Terms.  An agent has ostensible authority only if the "third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) Of Agency § 2.03 (2006).  Here, there is "nothing to suggest" that CREXi led CoStar to believe that the employees who allegedly assented to the

1    Terms had any relationship with CREXi.  *E & E Co. v. Light in the Box Ltd.*, No.

2    15-CV-00069-EMC, 2015 WL 5915432, at *5 (N.D. Cal. Oct. 9, 2015).  To the

3    contrary, CoStar admits that these individuals used non-CREXi e-mail addresses

4    and did not otherwise suggest that they were affiliated with CREXi.  *See* Compl. ¶¶

5    100–01, 103, 117–118, 120–121.  Indeed, the users allegedly "represent[ed] and

6    warrant[ed]" that they were "***not*** . . . acting on behalf of a competitor of LoopNet"

7    and were affiliated with different companies, ***not*** CREXi.  Compl. ¶¶ 100, 103 &

8    Ex. B at 2 (emphasis added).  CoStar thus had no reason to believe that those

9    employees were acting on behalf of CREXi.

10       **C.     CoStar's Second and Third Claims for violation of the DMCA fail.**

11           CoStar's Second and Third Claims for violations of the DMCA must be

12   dismissed because CoStar cannot plead any plausible facts that CREXi removed,

13   altered, or replaced statutorily-defined copyright management information ("CMI").

14   "Both § 1202(b)(1) and § 1202(b)(3) [of the DMCA] require, at [the pleading]

15   stage, an allegation that an original copyrighted work contained CMI."  *Imageline,*

16   *Inc. v. CafePress.com, Inc.*, No. CV 10-9794 PSG, 2011 WL 1322525, at *6 (C.D.

17   Cal. Apr. 6, 2011).  CoStar's complaint suggests that its logo superimposed in the

18   corner of photographs on the LoopNet and CoStar websites constitutes CMI under

19   the DMCA.  Compl. ¶ 195.  But CoStar's unadorned logo fails to meet the statutory

20   definition of CMI as a matter of law.

21           The DMCA defines CMI to include, among other things:

22       (1) The title and other information identifying the work, including the
         information set forth on a notice of copyright.
23
24       (2) The name of, and other identifying information about, the author of
         a work.
25       (3) The name of, and other identifying information about, the copyright
         owner of the work, including the information set forth in a notice of
26       copyright.

27       …

28       (6) Terms and conditions for use of the work.

---

21

(7) Identifying numbers or symbols referring to such information or links to such information.

*See* 17 U.S.C. § 1202(c).  Courts across the country have held that a bare logo without more, is not sufficient identifying information to constitute CMI.  *See, e.g.*, *Maule v. Anheuser Busch, LLC*, No. 17-00461, 2018 WL 3608934, at *6 (E.D. Pa. July 27, 2018); *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, No. 11 C 5177, 2012 WL 414803, at *6 (N.D. Ill. Feb. 8, 2012).  This is because "the point of CMI is to inform the public that something is copyrighted and to prevent infringement," and a logo does not achieve that statutory objective.  *Pers. Keepsakes, Inc.*, 2012 WL 414803, at *6; *see also* 17 U.S.C. § 401 (requiring that a copyright notice include, among other things, "the symbol © …, or the word 'Copyright', or the abbreviation 'Copr.'").

In *Maule v. Anheuser Busch, LLC*, for example, the court dismissed the plaintiff's DMCA claim against Anheuser Busch for the company's use of the plaintiff's photograph of the Philadelphia skyline in a neon Budweiser beer sign. 2018 WL 3608934, at *6.  The court found that the plaintiff's claimed CMI, the words "Visit Philly Skyline Dot Com" printed on the photo, referring to a website the plaintiff owned, was not sufficient to identify him as the author or copyright owner because it "d[id] not contain [his] name or any identifying information about him as the author of the photograph or owner of the copyright to that work, *see* § 1202(c)(2–3), nor d[id] it inform the public that something is copyrighted or prevent infringement."  *Id.* (internal quotation marks and citation omitted).

Here, like in *Maule*, CoStar's logo does not include sufficient information to identify it as the author or owner of the copyright, and therefore does not meet the statutory definition of CMI.  Specifically, CoStar's logo does not include the copyright symbol (©) or ***any*** identifying information about the author of the work, such as a web address or company name.  *Compare Aaberg v. Francesca's Collections, Inc.*, No. 17-CV-115 (AJN), 2018 WL 1583037, at *7 (S.D.N.Y. Mar. 27, 2018) (combination of the plaintiffs' names, brand name, logo and website

22

address sufficient to constitute CMI); *Reilly v. Plot Commerce*, No. 15-CV-05118 (PAE), 2016 WL 6837895, at *1, *5–6, *11 (S.D.N.Y. Oct. 31, 2016) (combination of the author's name, website, and copyright notice sufficient to constitute CMI); *Goldstein v. Metro. Reg'l Info. Sys., Inc.*, No. TDC-15-2400, 2016 WL 4257457, at *7 (D. Md. Aug. 11, 2016) (combination of the copyright symbol "©" with the author's website which included his name sufficient to constitute CMI).

Moreover, CoStar's logo is not prominently displayed, appearing in small grey print in the bottom right corner of the photographs. *See* Compl. ¶ 136. Plaintiff's logo seems almost intentionally easy to miss, in stark contrast to typical watermarks that are prominently displayed in diagonal across or through the center of an image. The absence of identifying information is highlighted by the watermark's resemblance to a Möbius strip or loop, which is used in a variety of places, including as the ubiquitous recycling symbol:

| Plaintiff's Logo | Recycling Symbol |
|---|---|
|  |  |

Thus, like "Visit Philly Skyline Dot Com" in *Maule*, CoStar's logo is insufficient to identify CoStar as the author or copyright owner of the allegedly infringing photographs. A bare logo, confined to the far corner of photographs, without CoStar's or LoopNet's name, web address, or even the copyright symbol (©), is not enough to identify CoStar as the author or copyright owner of the images. "Allowing a plaintiff to make out a DMCA claim based on alleged CMI that does not link up in any way to the copyright registration is an invitation to unfair litigation against parties who have tried to tread carefully to avoid copyright infring[e]ment." *Pers. Keepsakes, Inc.*, 2012 WL 414803, at *6.

CoStar's attempt to claim its logo as CMI also would impermissibly blur the

distinction between trademark and copyright law.  The Supreme Court has warned

that disregarding the distinction between trademark and copyright law, as CoStar

seeks to do here, "would create a species of mutant copyright law." *See Dastar*

*Corp v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003).  But allowing

CoStar to "invoke DMCA protection of copyrights" based solely on its trademarked

logo would "eliminat[e] the differentiation of trademark from copyright that is

fundamental to the statutory schemes."  *IQ Grp., Ltd. v. Wiesner Pub., LLC*, 409 F.

Supp. 2d 587, 592 (D.N.J. 2006).[10]  "If every removal or alteration of a logo

attached to a copy of a work gives rise to a cause of action under the DMCA, the

DMCA becomes an extension of, and overlaps with, trademark law."  *Id.*  The

Court should reject CoStar's attempt to expand the definition of CMI in the DMCA

to cover a bare trademark.

  The Second and Third Claims fail to state a claim and should be dismissed.

  **D. CoStar's Fifth Claim for unfair competition fails.**

  Finally, CoStar's Fifth Claim under the California UCL also fails.  As

discussed above, it is CoStar, not CREXi, that has engaged in unfair competition by

seeking "selectively to ban" CREXi from "accessing and using that otherwise

public data" on LoopNet.  *hiQ*, 938 F.3d at 998.  CoStar's backward assertion that

CREXi has engaged in "unlawful" business acts in violation of the UCL fails as a

matter of law.  *See* Compl. ¶ 214.

  ***First***, to the extent the UCL claim is based on CoStar's copyright

infringement claim, it is preempted under the Copyright Act.  Again, to evade

preemption under Section 301, a state-law claim must add an "'extra element' that

makes the right asserted *qualitatively different* from those protected under

the Copyright Act."  *Media.net Advert. FZ-LLC v. Netseer, Inc.*, 198 F. Supp. 3d

---

[10] In *Murphy v. Millennium Radio Group LLC*, the Third Circuit held that there is no requirement that CMI be implemented electronically or automatically, rejecting a portion of the District Court of New Jersey's decision in *IQ Group* on that issue. 650 F.3d 295, 305 (3d Cir. 2011).  That issue is not implicated by this motion.

1083, 1087 (N.D. Cal. 2016) (emphasis in original and citation omitted).  The UCL claim here is based on precisely the same conduct set forth in the Copyright Act claim, and thus contains no such "extra element."  It is thus preempted.  *See Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1213 (9th Cir. 1998).

*Second*, the DMCA-based UCL claim also is preempted.  Federal courts have found that Congress intended to "occup[y] an entire field" by passing the DMCA, and thus "even complementary state regulation" within that field is preempted.  *Stevens v. Vodka & Milk, LLC*, No. 17-CV-8603 (JSR), 2018 WL 11222927, at *2 (S.D.N.Y. Mar. 15, 2018) (citation omitted); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. C 10-05696 CRB, 2011 WL 2690437, at *5 (N.D. Cal. July 8, 2011).

*Third*, to the extent the UCL claim is derivative of CoStar's DMCA and misappropriation claims, it fails for the same reasons those claims fail.  *See Aleksick v. 7-Eleven, Inc.*, 205 Cal. App. 4th 1176, 1185 (2012) ("When a statutory claim fails, a derivative UCL claim also fails"); *Murillo v. Homebridge Fin. Servs., Inc.*, No. CV 19-1328-PA, 2019 WL 4284515, at *3 (C.D. Cal. July 8, 2019) (same).

## IV.    CONCLUSION

For the foregoing reasons, CREXi respectfully requests that this Court dismiss the Second, Third, Fourth, Fifth, and Sixth Claims.  Because those claims suffer from fatal legal defects that cannot be cured by amendment, they should be dismissed with prejudice.  *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 968 (9th Cir. 2016) (affirming dismissal with prejudice where "amendment would be futile"); *Crosbie v. W. Progressive, LLC*, No. CV 18-494-MWF, 2018 WL 6133411, at *6 (C.D. Cal. May 2, 2018) (dismissing initial complaint with prejudice where legal "infirmities cannot be cured by amendment").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  November 23, 2020

KEKER, VAN NEST & PETERS LLP


By:  */s/ Elliot R. Peters*
ELLIOT R. PETERS

Attorneys for Defendant
COMMERCIAL REAL ESTATE
EXCHANGE, INC.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
Case No. 2:20-CV-8819 CBM (ASx)

1538883