KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS #158708
epeters@keker.com
WARREN A. BRAUNIG #243884
wbraunig@keker.com
ELIZABETH K. MCCLOSKEY #268184
emccloskey@keker.com
NICHOLAS S. GOLDBERG #273614
ngoldberg@keker.com
ANN NIEHAUS #325474
aniehaus@keker.com
CHRISTI ZALESKI #331727
czaleski@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Attorneys for Defendant and Counterclaimant
COMMERCIAL REAL ESTATE EXCHANGE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> COMMERCIAL REAL ESTATE EXCHANGE, INC., <br><br> Defendant. | Case No. 2:20-CV-8819 CBM (ASx) <br><br> **COMMERCIAL REAL ESTATE EXCHANGE INC.'S COUNTERCLAIMS** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Ctrm:        8B <br> Judge:       Hon. Consuelo B. Marshall |
| COMMERCIAL REAL ESTATE EXCHANGE, INC., <br><br> Counterclaimant, <br><br> v. <br><br> COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., <br><br> Counterdefendants. | |

# TABLE OF CONTENTS

**Page**

I.      Introduction ............................................................................................... 1

II.     Parties ...................................................................................................... 6

III.    Jurisdiction, Venue, and Interstate Commerce .................................... 7

IV.     The Relevant Markets .......................................................................... 8

        A.      The internet CRE listing services market. ........................... 8

        B.      The internet CRE information services market. ................... 11

        C.      The internet CRE auction services market. ......................... 12

        D.      The geographic scope of the relevant product markets. ..... 14

        E.      There are significant barriers to entry in the relevant markets. .......... 15

V.      CoStar Monopolizes the Relevant Markets........................................ 19

        A.      CoStar stifles competition through anticompetitive acquisitions and by driving competitors out of business. .................. 19

        B.      The FTC sues CoStar to block its anticompetitive acquisition of LoopNet and requires CoStar to divest Xceligent. ....................... 21

        C.      CoStar drives Xceligent out of business, leaving CoStar with a monopoly position in the relevant markets. ................... 24

        D.      The FTC sues CoStar again to block its proposed anticompetitive acquisition of RentPath. ........................... 25

        E.      CoStar holds monopoly positions in the relevant markets. ............... 27

VI.     CoStar's Scheme of Anticompetitive Conduct ............................... 31

        A.      CoStar's exclusionary conduct to prevent customers from using competitors' services and to selectively block competitors from accessing public CRE information. ...................... 31

                1.      CoStar induces brokers to provide CoStar with public CRE listing information. ........................... 32

                2.      CoStar chooses to make CRE listing information available to the public for free. .................. 34

                3.      CoStar imposes terms to prevent customers from using competitors' services and to selectively block competitors from accessing public listing information. ........... 39

                4.      CoStar reverses its policy that competitors should have open access to public CRE listings on CoStar and

LoopNet. ...............................................................................44

     5.    Despite blocking CREXi from CoStar, LoopNet and LoopLink-hosted broker websites, CoStar repeatedly accesses CREXi to compete against it.....................................50

B.    CoStar's false claim of intellectual property ownership over brokers' CRE information and photographs to stifle competition..........................................................................52

C.    CoStar's blatant infringement of CREXi's trademarked name to engage in unfair competition. ..................................59

VII.   CoStar Has No Procompetitive Justification  for its Anticompetitive Conduct ...............................................................................64

VIII.  CREXi Has Suffered Antitrust Injury .................................................66

CLAIMS FOR RELIEF ...........................................................................70

PRAYER FOR RELIEF ..........................................................................90

JURY DEMAND.....................................................................................91

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

Counterclaimant Commercial Real Estate Exchange, Inc. ("CREXi"), by and through its undersigned counsel, brings the following counterclaims against Counterdefendants CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar"), and alleges as follows:

## I.     Introduction

1.     This case is about CoStar's anticompetitive scheme to establish and entrench its monopolies over internet commercial real estate (CRE) listing, information, and auction services by stifling competition.  Since its founding in 1987, CoStar has spent billions of dollars buying up and elbowing out competitors, to become the dominant provider in the markets for internet CRE listing, information, and auction services.  At a market cap of $35 billion and growing, CoStar is an industry behemoth whose size and reach far exceeds that of any company in the history of these markets.

2.     CREXi is an innovative and fast-growing CRE marketplace and technology platform, and a direct competitor to CoStar.  CREXi knows from experience that vigorous competition is the hallmark of a healthy, free-market economy.  Indeed, CREXi's development of marketing automation tools, lead analytics, featured listing offerings, an online auction platform, and a robust broker suite is leading the CRE industry into the digital age.

3.     Recognizing the competitive threat posed by a more innovative company like CREXi, CoStar has resorted to a playbook of anticompetitive conduct to preserve its monopoly power.  CoStar's Chief Executive Officer, Andrew Florance, has specifically targeted CREXi in an effort to drive it out of the market. CoStar's goal is to improperly maintain and extend its monopolies through exclusionary conduct that harms customers and competition itself.  Mr. Florance said so himself during a December 2019 CoStar all-hands meeting, acknowledging the significant competitive threat posed by CREXi and emphasizing the importance of CoStar maintaining its monopoly.

4.      While CREXi is the latest victim of CoStar's anticompetitive scheme, it is certainly not the first.  For decades, CoStar has systematically eliminated perceived competitive threats by deploying a combination of exclusionary tactics, aggressive litigation, and public-relations warfare to weaken its competitors for acquisition or destroy them entirely.

5.      CoStar's scheme has had its intended anticompetitive effect.  Since its founding, CoStar has engaged in more than 30 acquisitions, spending billions of dollars, to gobble up and eliminate competitors.  In 2012, the Federal Trade Commission (FTC) intervened by filing an antitrust complaint, after CoStar sought to acquire LoopNet, then one of CoStar's last true competitors.  The FTC eventually allowed CoStar's acquisition of LoopNet to proceed, but only on the condition that CoStar divest a company called Xceligent.  Although the FTC's order was designed to promote Xceligent's expansion and foster a competitive market, CoStar instead trained its fire on Xceligent, deploying many of the same anticompetitive tactics against Xceligent that CoStar now uses against CREXi.  CoStar's anticompetitive scheme worked—Xceligent went bankrupt in 2017.

6.      The market impact of CoStar's fatal attack on Xceligent was swift and solidified CoStar's monopoly in the relevant markets.  Just seven months after Xceligent filed for bankruptcy, CoStar raised its average monthly prices for new customers a whopping 80%.  CoStar's durable monopoly power in the relevant markets is lucrative, allowing CoStar to reap billions in revenue at supra-competitive prices.

7.      Today, CoStar enjoys virtually unchecked monopoly power in the markets for internet CRE listing, information, and auction services in metropolitan areas across the United States.  CoStar holds at least a 90% market share in each of these three markets.  CoStar concedes its market dominance in its communications with customers, claiming that it is "driving 18X more activity than [its] nearest competitor."  And CoStar wields its monopoly power to the detriment of customers.

2

1618773

As one commercial broker stated, "CoStar is the only organization that I deal with that is widely hated by its customers…. You don't talk to them.  They will sell your data to you, and every time they acquire a competitor, they raise their prices."

8.    Now, CoStar seeks to eliminate yet another competitor: CREXi. Instead of engaging in fair competition on the merits by producing better and more innovative services, CoStar focuses on building an impenetrable moat to protect its monopolies.  CoStar does so with an anticompetitive scheme to prevent customers from working with competitors and block its rivals' access to public data and information regarding CRE properties.

9.    *First*, CoStar imposes exclusionary contractual terms, enforced by technological measures, to prevent customers from using competitors' services and to selectively block competitors from accessing publicly available CRE information.  Even though this information does not belong to CoStar and is available to the public for free on the LoopNet website and brokers' websites, CoStar conditions access to its websites on users' agreement not to compete with CoStar and on a series of terms of service that restrict brokers from providing public CRE listings to competing platforms.

10.    To make matters worse, CoStar imposes technological barriers to block its competitor, CREXi, from accessing publicly available CRE information on CoStar's websites.  CoStar even goes so far as to employ technological means to surreptitiously block CREXi from accessing publicly available CRE listings on **brokers' own websites** that use CoStar's LoopLink tool to display CRE listings on brokers' websites.  Unbeknownst to brokers who use LoopLink, CoStar imposes technological measures to selectively block CREXi from accessing brokers' CRE listings, even when CREXi is directed to those listings by brokers themselves.

11.    CoStar's exclusionary practices operate as *de facto* exclusive agreements.  The natural and intended effect is to prevent customers from using competitors' products and to stifle competition in the relevant markets by making it

3

more difficult for competitors like CREXi to access public listing information and work with customers to compete with CoStar.

12. CoStar knows this conduct is anticompetitive. Before CoStar acquired LoopNet, CoStar's policy was that competitors should have free access to use CRE listings publicly available on LoopNet and brokers' LoopLink-hosted websites for competitive purposes. Likewise, CoStar agreed that LoopNet could access the public information available on CoStar's websites. When LoopNet sought to block CoStar from accessing publicly available listings, CoStar fought to protect its ability to access CRE information on LoopNet to compete effectively. As CoStar said at the time, "we think it's silly that LoopNet makes this listing information available on its public Web site for all of the world to see, and that they're trying to essentially argue that CoStar can't look at it." Now that CoStar owns LoopNet, it has reversed its policy of open access and enforces anticompetitive measures to selectively block competitors from accessing publicly available CRE listing information on CoStar's websites. Meanwhile, while it is blocking CREXi from CoStar's and brokers' websites, CoStar engages in asymmetrical warfare by accessing listings and information on CREXi's platform thousands of times to compete with CREXi.

13. *Second*, CoStar engages in a policy and practice of unilaterally modifying brokers' CRE listing information and photographs to falsely claim intellectual property protection over information CoStar does not own. CoStar induces brokers and other customers to provide CRE information and photographs to CoStar by telling them: "What's yours stays yours, and you can do anything you want with your data." But, in fact, CoStar's contracts with brokers include language purporting to allow CoStar to unilaterally "modify" brokers' listings by altering information in the listings and adding CoStar's supposed "digital watermark"—which CoStar claims identifies it as the copyright holder—to photographs supplied by brokers. After unilaterally altering brokers' listings and

4

falsely claiming copyright ownership over brokers' photographs, CoStar simply declares the brokers' information "proprietary" to CoStar and forbids brokers from using the information and photographs with any CoStar competitor.

14. CoStar has implemented these nakedly anticompetitive contractual terms to maximum anticompetitive effect. CREXi's investigation has revealed that CoStar routinely seeds brokers' listings with inaccurate data and adds its watermark to photographs provided by brokers. The effect of CoStar's anticompetitive policy and practice is to once again effectively restrain customers from using competitors' products and services; to prevent competitors from using brokers' CRE information and photographs to compete with CoStar; and to secure for CoStar a sham copyright monopoly beyond that legitimately granted by the Copyright Office.

15. *Third*, CoStar intentionally infringes CREXi's trademarked name to advertise and market CoStar's services. By doing so, CoStar misrepresents its services as affiliated with CREXi and misleadingly directs customers searching for CREXi to CoStar's websites. CoStar purchases "CREXi" as a Google AdWord and infringes CREXI's trademarked name in the header and text of CoStar's advertisements. As a result, prospective customers searching for "crexi" on Google see, at the very top of the page, an advertisement for "Commercial Buildings For Sale – **Crexi**." But the CoStar advertisement links to a CoStar website, rather than CREXi's website. CoStar's anticompetitive trademark infringement unfairly siphons customers away from CREXi and stifles legitimate competition.

16. CoStar's anticompetitive conduct has harmed CREXi and competition in the internet CRE listing, information, and auction services markets. To end CoStar's anticompetitive and unlawful practices, restore competition, and prevent CoStar from engaging in similar conduct in the future, CREXi asserts the following counterclaims.

1618773

## II.    Parties

17.    Counterclaimant CREXi is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 4086 Del Rey Ave, Marina Del Rey, California 90292.

18.    CREXi is an innovative and fast-growing commercial real estate marketplace and technology platform.  A group of seasoned CRE professionals formed CREXi in 2015, astonished by how the CRE industry lagged behind other industries moving into the digital age.  Determined to create a platform needed in the industry, they subsequently built and launched the CREXi marketplace in 2016. CREXi began as a marketplace where brokers could list properties and manage leads to find the ideal buyers and tenants efficiently and effectively.  From launch, CREXi has developed marketing automation tools, lead analytics, featured listing offerings, an auction platform, and secure file storage into a robust online broker suite for CRE in the digital age.

19.    Counterdefendant CoStar Group, Inc. is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 1331 L Street, NW, Washington, District of Columbia 20005.

20.    Counterdefendant CoStar Realty Information, Inc. is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 1331 L Street, NW, Washington, District of Columbia 20005.  CoStar Realty Information, Inc. is a wholly owned subsidiary of CoStar Group.

21.    CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar") are the brainchild of founder and CEO Andrew Florance.  In the three decades since Florance founded the company in 1987, CoStar has grown to become a $35 billion industry behemoth of CRE platforms.  CoStar owns numerous corporate entities in the commercial and residential real estate space.  Three of the assets it owns are CoStar.com, LoopNet.com, and Ten-X.com, all CRE websites.

6

CoStar is the self-proclaimed largest commercial real estate information and analytics provider.

22.   LoopNet, Inc. was a corporation organized and existing under the laws of the State of California with a principal place of business in San Francisco, California.  LoopNet was acquired by merger by CoStar, after which LoopNet became a wholly owned subsidiary of CoStar Group.  On January 1, 2017, LoopNet, the CoStar Group subsidiary, merged into CoStar Realty, and CoStar Realty is the successor in interest as to LoopNet's liabilities.

23.   Ten-X Holding Company, Inc. was a corporation organized and existing under the laws of the State of Delaware with a principal place of business in Irvine, California.  On June 24, 2020, CoStar acquired Ten-X and its subsidiaries by merger.  Following the merger, Ten-X became a wholly owned subsidiary of CoStar Realty Information, Inc., and CoStar has since integrated the Ten-X platform into both LoopNet and CoStar.

### III.   Jurisdiction, Venue, and Interstate Commerce

24.   This Court has subject matter jurisdiction over the counterclaims under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 16 of the Clayton Act, 15 U.S.C. § 26, and the Lanham Act, 15 U.S.C. § 1125.

25.   This Court has supplemental subject matter jurisdiction over the pendent state law counterclaims under 28 U.S.C. § 1367, as they are so related to the federal counterclaims that they form part of the same case or controversy.

26.   Venue is proper in this District under 28 U.S.C. § 1391, and because the counterclaims arise out of the transactions and occurrences that are the subject matter of CoStar's claims.  In addition, venue is proper because CREXi suffered harm from CoStar's unlawful conduct in this District.

1618773

27.    CoStar provides data, information, and images for CRE properties for sale or lease across state lines.  CoStar is engaged in interstate commerce and its activities substantially affect interstate commerce.  The acts complained of herein have occurred within the flow of, and have substantially affected, interstate trade and commerce.

## IV.    The Relevant Markets

28.    CoStar and CREXi are direct competitors in the markets for internet CRE listing services, internet CRE information services, and internet CRE auction services—each of which constitutes a relevant product market with significant barriers to entry.[1]

### A.    The internet CRE listing services market.

29.    "Internet CRE listing services" consist of an online organized collection of information concerning commercial real estate listings available for sale or lease.[2]  The listing information includes, among other things, CRE addresses, sale prices and lease rates, square footage, photographs, narrative descriptions of the properties, and brokers' contact information.  Internet CRE listing services operate as online collections of listings where customers may both publish and search listings for CRE available for lease or sale.

30.    CREXi and LoopNet operate competing internet CRE listing services. LoopNet, for example, describes its service as providing an "online real estate marketplace, connecting tenants and investors to commercial real estate available for sale and lease.  By meeting the feature-rich requirements of digital advertising,

---

[1] As used herein, commercial real estate or "CRE" consists of land or real property in the United States, with or without any structures, fixtures, or other improvements of any kind, used at any time, suitable for use, or offered for sale or lease solely or primarily for retail, manufacturing, shipping, governmental, the exploitation of natural resources, commercial, or business purposes of any kind. Commercial real estate also includes residential structures containing five or more units used as short-term residences (e.g., hotels and motels) or as long-term residences (e.g., condominium and apartment buildings).  *See* FTC Decision and Order, *In the Matter of CoStar Grp., Inc., et al.*, No. C-4368, 2012 WL 3862130, at *5 (F.T.C. Aug. 29, 2012).

[2] *See id.* at *5-6.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

LoopNet allows professionals to directly market to a massive audience of searchers at precise exposure levels."[3]  Similarly, CREXi's internet CRE listing service provides a marketplace where brokers can list properties and manage leads to find the ideal buyers and tenants efficiently and effectively.[4]

31.    CoStar also offers a LoopLink tool that gives brokers the ability to integrate the brokers' CRE listings into the brokers' publicly available website utilizing the database functionality offered by LoopNet.  According to CoStar, "LoopLink is a fully hosted listing management solution that seamlessly connects [brokers'] website[s] and listings with the LoopNet database, allowing visitors to engage with your property and spaces quickly and efficiently."[5]

32.    CREXi and LoopNet's internet CRE listing services make available online facts about CRE properties for sale or lease, including address, building size, year built, zoning information, listing price, acreage, and photographs, among other things.  As discussed in more detail below, nearly all listing content available on LoopNet is originally generated by brokers or property owners, based on publicly available information.  CREXi and LoopNet are accessible to the public for free, and users can browse their websites without creating an account.  CREXi and LoopNet both also offer a subscription service, targeted to brokers and property owners, with additional internet CRE listing features (such as premium listing placements and additional support services).

33.    Most commercial real estate brokers, when representing a seller or lessor, utilize internet CRE listing services.  These services have lower search costs, in terms of identifying potential buyers and lessees, than other digital and non-

---

[3] CoStar Group, *Our Real Estate EcoSystem*, WWW.COSTARGROUP.COM, https://www.costargroup.com/about-us/brands (last visited Jun. 16, 2021).

[4] *See* CREXi, *Commercial Properties for Sale*, https://www.crexi.com/properties (last visited Jun. 16, 2021).

[5] *See* LoopNet, *LoopLink Brings the Power of LoopNet to Your Websites*, https://www.loopnet.com/solutions/advertise/ad-packages/web-solutions (last visited Jun. 16, 2021).

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

digital services.  Similarly, most commercial real estate brokers, when representing a buyer or lessee, utilize internet CRE listing services.  These services have lower search costs, in terms of identifying potential buildings for sale or office space for lease, than other digital and non-digital services.

34.     Other digital services include traditional search engine and information services such as Google, Bing, and Facebook Marketplace.  However, these services have substantially higher search costs for both sellers/lessors and buyers/lessees of CRE.  In principle, a broker acting as an agent for a seller/lessor could bid on keywords that would appear as advertisements when certain searches are performed on search engines such as Google or Bing.  However, as a practical matter, CRE brokers rarely pay for such advertising, in large part because potential buyers/lessors generally do not use search engines to identify potential buildings for sale or office space for lease because the search costs substantially exceed those on dedicated internet CRE listing services websites like LoopNet and CREXi.

35.     Non-digital services include on-site advertising and print advertising.  Such non-digital advertising reaches far fewer potential buyers and lessees than internet CRE listing services.  However, commercial CRE real estate brokers, when representing a seller or lessor, often utilize non-digital advertising, as well as internet CRE listing services.  This illustrates the fact that non-digital CRE advertising services are complements—rather than substitutes—for internet CRE listing services.

36.     Other digital services such as Google, Bing, and Facebook Marketplace, as well as non-digital services such as on-site advertising and print advertising are not reasonably interchangeable with internet CRE listing services.  As a result, if the price of internet CRE listing services increased by a small but significant amount, CRE customers would not substitute away from these services by a sufficient amount to render the price increase unprofitable.  For all of these reasons, internet CRE listing services constitute a relevant product market.

10

**B.    The internet CRE information services market.**

37.    "Internet CRE information services" consist of data and analytical tools used by CRE brokers and other customers to locate, research, evaluate, and optimize the sale or lease of CRE.  Internet CRE information services include, but are not limited to, CRE addresses, the prices at which a property has previously been offered for sale or lease, the prices at which comparable properties have been offered, leased, or sold in the past, lease histories, property histories, property descriptions, detailed floor plans, photographs, tenant history, and vacancy rates.[6]

38.    CREXi and CoStar are competitors in the CRE information services market.  Both CoStar and CREXi maintain proprietary databases of CRE information.  CoStar describes its internet CRE information services as "a standardized platform of information, analytics, and online marketplace services where industry professionals and consumers of commercial real estate, including apartments, and the related business communities, can continuously interact and facilitate transactions by efficiently accessing and exchanging accurate and standardized real estate-related information."[7]  CoStar describes its CRE information services as providing "information about space available for lease, comparable sales information, information about properties for sale, tenant information, Internet marketing services, analytical capabilities, information for clients' websites, information about industry professionals and their business

---

[6] CRE information services do not include CRE market analyses, market forecasts, or market projections prepared based upon the information gathered concerning CRE, or software applications or products (and any related software integration services) offered for sale or lease, or sold or leased separately, from data relating to CRE.  Additionally, CRE information services do not include information or databases relating to the rental or leasing of residential units in residential structures containing five or more residential units, or the sale of individual units in such structures, which information or databases are not used by purchasers or sellers (or agents for purchasers or sellers) of residential structures containing five or more residential units to locate, research, or evaluation CRE, or to list CRE for sale or lease.  *See* FTC Decision and Order, *In the Matter of CoStar Grp., Inc., et al.*, 2012 WL 3862130, at *5.

[7] CoStar Group, Inc., Quarterly Report (Form 10-Q), at 31 (Oct. 28, 2020).

11

relationships, and industry news."[8]  Similarly, CREXi's CRE information services provide comparable sales information, detailed market reports, and a data center.[9]

39.    Many commercial real estate brokers subscribe to internet CRE information services.  These services provide online access to large, proprietary databases of valuable information regarding CRE.  CoStar's information and analytics operations account for approximately 45% of the company's total $1.5 billion annual revenue, demonstrating the substantial willingness-to-pay on the part of CRE brokers.[10]

40.    Some data on the CRE industry can be obtained from local real estate boards, exchanges, or associations such as the National Association of Realtors.  However, collecting relevant CRE data from such sources would be substantially more time consuming and no analytical tools would be available.

41.    There are no services that are reasonably interchangeable with internet CRE information services.  If the price of internet CRE information services increased by a small but significant amount, CRE customers would not substitute away from these services by a sufficient amount to render the price increase unprofitable.  For all these reasons, internet CRE information services constitute a relevant product market.

**C.    The internet CRE auction services market.**

42.    "Internet CRE auction services" consist of online sales platforms where sellers can solicit bids from multiple buyers, facilitating the rapid and efficient sale of commercial buildings and office space.

43.    CREXi and CoStar are competitors in the internet CRE auction services market.  For example, CoStar's internet CRE auction service (Ten-X, a subsidiary CoStar acquired to compete with CREXi in the internet CRE auction

---

[8] *Id.* at 33.

[9] *See* CREXi, *Intelligence for CRE*, https://go.crexi.com/intelligence/ (last visited Jun. 16, 2021).

[10] CoStar Group, Inc., Quarterly Report (Form 10-Q), at 18 (Oct. 28, 2020).

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

services market) describes its service as providing a "platform [that] empowers brokers, sellers and buyers with data-driven technology and comprehensive marketing tools to expand market visibility and decrease time to close."[11] Similarly, CREXi provides an online auction platform that opens up a new world of virtual bidding, removing the roadblock of physical distance and expensive travel from potential sales.[12]

44.    Internet CRE auction services are distinguished from internet CRE listing services primarily by the speed with which sales transactions can be finalized as compared to standard CRE listings.  Internet CRE auction service providers play a more active role in the transaction process—hosting the auction, managing its terms, promoting the auction, and determining the auction winner, if any, based on the auctioning party's predetermined limits or other rules.

45.    The sale of a commercial building through an internet CRE auction service also typically requires a substantially shorter period of time than would the same transaction through an internet CRE listing service.  As a result, sellers seeking quick sales will often choose an internet CRE auction service rather than an internet CRE listing service.

46.    The closest substitute to internet CRE auction services are internet CRE listing services.  However, the fact that two leading online CRE firms, CoStar and CREXi, offer both of these distinct services shows that the two services are not reasonably interchangeable.  If the price of internet CRE auction services increased by a small but significant amount, CRE customers would not substitute away from these services by a sufficient amount to render the price increase unprofitable.  For these reasons, internet CRE auction services constitute a relevant product market.

---

[11] Ten-X, *About Us*, WWW.TEN-X.COM, https://www.ten-x.com/company/resources/about-ten-x/ (last visited Jun. 16, 2021).

[12] *See* CREXi, *Auction*, https://go.crexi.com/auctions/ (last visited Jun. 16, 2021).

13

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

**D.      The geographic scope of the relevant product markets.**

47.      Geographic markets for internet CRE listing, information, and auction services consist of individual metropolitan areas.

48.      Customers of CRE listing, information, and auction services generally do not regard locations in different metropolitan areas as reasonable substitutes. Before listing their properties for sale or lease, and before beginning their search for CRE information, customers have identified a particular metropolitan area.  CoStar, LoopNet, Ten-X, and CREXi design their websites to facilitate searches by metropolitan area.

49.      In a recent antitrust case against CoStar, the FTC similarly concluded with respect to the geographic extent of markets for apartment internet listing services that "the appropriate geographic markets are individual metropolitan areas…."[13]

50.      One reason why the relevant geographic markets are individual metropolitan areas is that CRE customers cannot arbitrage internet CRE services. For example, CRE customers cannot purchase internet CRE listing services at a low price in one metropolitan area and profitably resell (i.e., arbitrage) those services by selling them at a higher price in another metropolitan area.  As the FTC similarly concluded in a recent antitrust case against CoStar, "[c]ustomers of [internet listing service] advertising for large apartment complexes [can] not avoid a targeted price increase through arbitrage because [internet listing service] advertising is inherently property-specific."[14]

---

[13] FTC, *In the Matter of CoStar Group, Inc. and RentPath Holdings, Inc.* (Nov. 30, 2020), Docket No. 9398, ¶ 46. Redacted Public Version *available at* https://www.ftc.gov/system/files/documents/cases/d09398complaintpublic.pdf.

[14] *Id.* at ¶ 29.

14

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

**E.    There are significant barriers to entry in the relevant markets.**

51.    The relevant product markets are characterized by significant barriers to entry and expansion.[15]  The presence of barriers that delay or limit the entry of firms into a market tends to make that market relatively more conducive to market concentration and monopolies, since those barriers act to limit the entry of competitive firms.[16]  There are several factors that contribute to the high entry and expansion barriers for potential new entrants and existing competitors in the relevant markets for internet CRE listing, information, and auction services.

52.    To begin with, the monetary costs and investment in time and resources to develop and maintain products and services in the internet CRE listing, information, and auction services markets is substantial.  To launch commercial real estate listing, information, and auction services requires millions of dollars for initial development, and then many millions more to recruit customers, maintain the information, and build an effective sales network.  Further, the cost of developing software is incurred prior to the ability of a new entrant to offer internet-based services.  Software costs are "sunk," i.e., the money spent developing the software cannot be recovered.  As is well established in economics, sunk costs are antitrust barriers to entry.[17]  Because sunk costs cannot be recovered, the necessity to incur such costs prior to entry increases the *ex-ante* risk to entrants.  This increase in risk reduces, other factors being the same, the willingness of firms to enter the market.  As one industry analyst reported, the significant monetary costs and investment in

[15] "An antitrust barrier to entry is a cost that delays entry and thereby reduces social welfare relative to immediate but equally costly entry." McAfee, R. P., Mialon, H., and Williams, M. (2004), "What is a Barrier to Entry?" *American Economic Review*, vol. 94, p. 463.

[16] *See, e.g.*, Carlton, D. and Perloff, J. (2005), *Modern Industrial Organization*, 4th ed., Boston, MA: Pearson Addison Wesley, Chapter 5.

[17] McAfee, R. P., Mialon, H., and Williams, M. (2004), "What is a Barrier to Entry?" *American Economic Review*, vol. 94, pp. 461-465. "Sunk costs cause firms to delay entry because of their option value. The option of entering is lost once the firm enters. With uncertainty about market conditions, this option has value. Thus, dynamic entry is delayed relative to a static world." *Id.*, at 465.

15

time are a "primary moat" protecting CoStar's monopoly position.[18]  "Any potential competitor would have to spend years and potentially billions of dollars to replicate CoStar's data offering."[19]

53.    Another barrier to entry in the relevant product markets is the high switching costs for customers.  Due to CoStar's strategy of growing through dozens of acquisitions, many customers have become reliant on CoStar's platforms.  Prior to CoStar's acquisition of LoopNet in 2012, many real estate professionals subscribed to LoopNet's low-cost data and advanced search offerings for property listings.  Many of these users considered LoopNet's service to be a substitute for CoStar's offerings.  However, with CoStar's acquisition of LoopNet and subsequent successful effort to remove Xceligent from the market, CoStar converted most LoopNet and Xceligent customers to CoStar's services.  CoStar also regularly posts high customer renewal rates, typically around 90%, and sometimes at or above 95% for clients who have been customers for five years or longer.[20]  These customers are reliant on CoStar's services.  As such "CoStar benefits from a switch cost moat" that protects its monopoly in the relevant markets.[21]

54.    The barrier to entry posed by high switching costs is exacerbated by CoStar's anticompetitive conduct to lock in customers and prevent them from sharing public commercial real estate listing information with CoStar's competitors. Even though the listing information available on CoStar's websites does not belong to CoStar—and despite the fact that much of this information is available to the

---

[18] Yousuf Hafuda, *CoStar Group Firing on All Cylinders as the Company Continues to Target Growth Opportunities*, MORNINGSTAR (Oct. 28, 2020).

[19] *Id.*

[20] CoStar Group, Inc., Annual Report (Form 10-K), at 36 (Feb. 24, 2021); Seeking Alpha, *CoStar Group's (CSGP) CEO Andy Florance on Q4 2020 Results – Earnings Call Transcript* (Feb. 24, 2021), https://seekingalpha.com/article/4408470-costar-groups-csgp-ceo-andy-florance-on-q4-2020-results-earnings-call-transcript (last visited Apr. 15, 2021).

[21] Hafuda, *CoStar Group Firing on All Cylinders as the Company Continues to Target Growth Opportunities*, MORNINGSTAR (Oct. 28, 2020).

16

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

public for free on LoopNet—CoStar imposes exclusionary contractual terms, enforced by technological measures, to frustrate brokers' ability to share that information with competitors and to block competitors from accessing this information. This conduct makes it more difficult for competitors like CREXI to access public commercial real estate information and more difficult for customers to use competitors' products.

55. Additionally, internet CRE listing, information, and auction services markets are characterized by "network effects." A network effect exists in a market if (1) an increase in the number of users of a service on one side of a market leads to (2) an increase in the value of a complementary service on the other side of the market, which can then increase the value of the first service. For example, an increase in the number of CRE brokers representing sellers or lessors who utilize internet CRE listing services leads to an increase in the value of the internet CRE listing service to CRE brokers representing buyers or lessees. The resulting increase in the number of CRE brokers representing buyers or lessees who utilize the internet CRE listing service leads to an increase in the value of the listing service to CRE brokers representing sellers or lessors.

56. The existence of network effects leads to a "chicken-and-egg" problem. A new entrant providing an internet CRE listing, information, or auction service cannot attract brokers representing sellers or lessors if there is not a significant number of brokers representing buyers or lessees already utilizing the service. Conversely, a new entrant providing an internet CRE listing, information, or auction service cannot attract brokers representing buyers or lessees if there is not a significant number of brokers representing sellers or lessors already utilizing the service.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

57.    As the FTC has recognized, "[s]ignificant network effects characterize the market for CRE listings databases and create a substantial barrier to new entry."[22]

58.    The FTC reached the same conclusion in its most recent antitrust complaint against CoStar regarding the presence of barriers to entry in the market for apartment internet listing services:

> Significant barriers exist for potential new entrants, due in part to the network effects that characterize ILS ["internet listing service"] platforms. Network effects occur where the value of a product depends in part on the number of users. More specifically, indirect network effects arise in multi-sided platforms (like ILSs) when the value of the product to users on one side of the platform depends on the participation of users on the other side. In the ILS context, indirect network effects give rise to a classic "chicken and egg" problem: an ILS cannot provide a significant number of leads to [property management companies] unless it can attract a large number of prospective renters to the ILS. However, an ILS cannot attract prospective renters unless it lists a sufficient number of properties. Such network effects and other barriers hinder both entry by new competitors and expansion by [CoStar's] existing rivals.[23]

59.    Finally, CoStar's anticompetitive conduct of falsely claiming intellectual property ownership over broker-owned and broker-supplied information and photographs creates yet another barrier to entry.  As discussed further below, CoStar digitally places its name or logo (which CoStar claims is a "watermark") on photographs uploaded to the CoStar and LoopNet websites by brokers— photographs over which CoStar has no legal copyright ownership interest.  CoStar places that same watermark on other photographs that it does own, falsely claiming that the generic logo is CoStar's copyright management information.  As a result, the presence of CoStar's watermark on a photograph does not provide reliable information regarding whether or not CoStar actually holds a valid copyright on the

---

[22] FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In the Matter of CoStar Group, Inc., Lonestar Acquisition Sub, Inc., and LoopNet, Inc.*, File No. 111-0172, at 3, https://www.ftc.gov/sites/default/files/documents/cases/2012/04/120426costaranal.pdf.

[23] FTC, *In the Matter of CoStar Group, Inc. and RentPath Holdings, Inc.* (Nov. 30, 2020), Dkt. No. 9398, at ¶ 11.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

photograph.  Thus, when a broker provides or directs a CoStar competitor to a broker's listing, the competitor does not know whether or not CoStar holds a valid copyright on the image.  The effect of CoStar's anticompetitive practice is to create confusion in the marketplace regarding legitimate ownership of property photographs, making it untenable for brokers and CoStar competitors to share CRE photographs, even when CoStar holds no ownership over them.

60.    CoStar's history of aggressive, anticompetitive litigation—threatening and pursuing legal action against customers and competitors alike—only intensifies this barrier to entry.  Based on CoStar's litigation history, rival firms, potential market entrants, and customers all must anticipate being sued by CoStar, even if CoStar's claims of copyright ownership are invalid.  The resulting anticipated litigation costs create a barrier to entry for potential entrants and a barrier to expansion for existing firms.

61.    Given these barriers to entry and expansion, competition on the merits in the relevant markets is critical to ensuring the resulting benefits to consumers.  If CoStar's anticompetitive conduct is not stopped, the anticompetitive harm in the relevant markets will be long term and likely irreversible.

### V.    CoStar Monopolizes the Relevant Markets

### A.    CoStar stifles competition through anticompetitive acquisitions and by driving competitors out of business.

62.    Although CoStar claims to "spend considerable time and effort" to build its online database of CRE information,[24] in reality, CoStar's market dominance is attributable to its aggressive acquisition strategy and anticompetitive tactics to drive competitors out of the relevant markets.  As it admits in its securities filings, CoStar has spent the last three decades "expanding [its] markets and services partially through acquisitions of complementary businesses."[25]  Indeed,

---

[24] CoStar First Amended Complaint (FAC), Dkt. 33, ¶ 50.

[25] CoStar Group, Inc., Annual Report (Form 10-K), at 36 (Feb. 28, 2019).

19

since its founding in 1987, CoStar has spent billions of dollars to acquire more than 30 companies.

63.    CoStar first implemented its inorganic growth-by-acquisition strategy soon after its founding, when it began buying up local and regional competitors in the CRE information business to "expand the geographical coverage of [its] existing information and marketing services."[26]  With each acquisition, CoStar eliminated a local or regional competitor and added another CRE database to its own.  CoStar's buying spree for competing CRE data providers gained steam in the 2000s.  By 2011, CoStar touted that it "ha[d] successfully integrated over a dozen acquisitions," allowing CoStar to expand its market share in the internet CRE information services market and to push into the rental listings business.[27]  And CoStar's growth-by-acquisition strategy continued throughout the 2010s and through the present, with massive acquisitions of leading competitors, including CoStar's 2012 acquisition of LoopNet (in the internet CRE listings services market) and 2020 acquisition of Ten-X (in the internet CRE auction services market).  A chart of various CoStar's acquisitions is attached hereto as **Exhibit A**.

64.    After more than three decades of inorganic growth through aggressive acquisitions, CoStar's market share in the relevant markets has skyrocketed, while its competition has been virtually eliminated.  CoStar's relentless acquisition strategy has cleared the field of competition across multiple product and geographic markets, enabling CoStar to engage in the anticompetitive, monopolistic behavior described herein.

---

[26] CoStar Group, Inc., Annual Report (Form 10-K), at 27 (Feb. 24, 2011).

[27] Press Release, CoStar Group, Inc., CoStar Group to Acquire LoopNet (Apr. 26, 2011), https://www.costargroup.com/costar-news/details/costar-group-to-acquire-loopnet.

20

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

**B.     The FTC sues CoStar to block its anticompetitive acquisition of LoopNet and requires CoStar to divest Xceligent.**

65.     In addition to its inorganic growth-by-acquisition strategy, CoStar has consolidated its market power through aggressive litigation tactics—suing to weaken its competitors and then acquiring them or putting them out of business. On numerous occasions (and as recently as November 2020), this conduct has caused the FTC to scrutinize CoStar's anticompetitive behavior.

66.     CoStar's tactics are perhaps best exemplified by its acquisition of LoopNet and subsequent efforts to drive former CoStar competitor Xceligent out of business.  Before CoStar acquired LoopNet, the two companies were competitors. In fact, LoopNet was CoStar's last significant competitor in the mid-to-late 2000s.

67.     Beginning in 2005, CoStar and LoopNet engaged in a series of legal battles against one another in courts across the country.[28]  These court battles took their toll on LoopNet.  Teetering on the edge of bankruptcy, the LoopNet Board finally relented and agreed to sell the company to CoStar for $860 million.

68.     The FTC intervened to block CoStar's proposed acquisition of LoopNet because it was anticompetitive and violated antitrust laws.  *See* Compl., *In the Matter of Costar Grp., Inc., et al.*, No. 111-0172, 2012 WL 1561034, at *2 (F.T.C. Apr. 26, 2012).[29]  The FTC alleged that CoStar's proposed acquisition of LoopNet would reduce competition in the markets for commercial real estate

---

[28] *See Costar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004); *Loopnet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, No. 05-cv-1220 (N.D. Cal. Mar. 24, 2005); *CoStar Group, Inc. v. LoopNet Inc.*, No. 08-CV-01156 (S.D.N.Y. Feb. 5, 2008); *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. Nov. 15, 2007).

[29] The FTC is an independent federal agency charged with promoting a competitive marketplace and protecting consumer interests.  Along with the Department of Justice, the FTC shares primary responsibility for enforcing the federal antitrust laws.  To that end, the FTC will challenge anticompetitive business practices and mergers that could harm consumers by resulting in higher prices, lower quality, fewer choices, or reduced rates of innovation.  The FTC monitors business practices, reviews potential mergers, and challenges them when appropriate to ensure that the market works according to consumer preferences, not illegal practices.  *See* Federal Trade Commission, *About the FTC*, WWW.FTC.GOV, https://www.ftc.gov/about-ftc (last visited Apr. 9, 2021); *see also* Federal Trade Commission, *What We Do*, https://www.ftc.gov/about-ftc/what-we-do (last visited Apr. 9, 2021).

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

listings and information services and that CoStar and LoopNet were the only two providers with nationwide coverage.  The FTC further alleged that Xceligent (then owned by LoopNet) was the "most similar competitor for information services"[30] to CoStar and, therefore, the combination would eliminate the "direct, and substantial competition between CoStar and LoopNet and between CoStar and Xceligent," *id.* at *3.  The FTC found that the proposed CoStar/LoopNet merger would "increas[e] the likelihood that CoStar w[ould] exercise market power unilaterally."  *Id.*

69.     To resolve the complaint, CoStar agreed to a consent order that placed a number of restrictions on its proposed acquisition, including the divestiture of Xceligent.  The consent order required that the combined CoStar-LoopNet take several steps to ensure that Xceligent was able to compete and expand aggressively in the United States market for CRE databases and information services. Specifically, the consent order imposed "certain conduct requirements to assure the continued viability of Xceligent as a competitor to the merged firm and to reduce barriers to competitive entry and expansion."[31]  These additional provisions "w[ould] facilitate Xceligent's geographic expansion and prevent foreclosure of [the parties'] established customer base."[32]

70.     To achieve that goal, the consent order provided that CoStar could not, for five years, "prohibit[] or restrict[] a Customer from providing any CoStar Competitor . . . CRE Listings or CRE Information that . . . was obtained or derived by the Customer from a source other than a CoStar Database."  FTC Decision and Order at § III.A, *In the Matter of CoStar Grp., Inc., et al.*, 2012 WL 3862130, at *14.  In addition, CoStar was barred, for five years, from "[d]irectly or indirectly

---

[30] Press Release, Federal Trade Commission, FTC Places Conditions on CoStar's $860 Million Acquisition of LoopNet (Apr. 26, 2012), https://www.ftc.gov/news-events/press-releases/2012/04/ftc-places-conditions-costars-860-million-acquisition-loopnet.

[31] FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In the Matter of CoStar Group, Inc., Lonestar Acquisition Sub, Inc., and LoopNet, Inc.*, File No. 111-0172, at 1, http://www.ftc.gov/sites/default/files/documents/cases/2012/04/120426costaranal.pdf.

[32] *Id.*

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

prohibit[ing] a Customer from subscribing to any service provided by, or purchasing access to any database containing CRE Listings or CRE Information from, a CoStar Competitor." *Id.* CoStar was further barred, for five years, from prohibiting a customer from endorsing any competitor. *Id.* at *15.

71. The FTC also prohibited CoStar from bundling, or tying, its products together in ways that could impede its competitors (except under certain limited circumstances). *Id.* at *17, *31. The agency therefore barred CoStar, for five years, from requiring customers to buy any of its products as a condition for receiving other products, and also from requiring customers to subscribe to multiple geographic coverage areas to gain access to a single area in which they are interested. *Id.* Moreover, CoStar was required to offer customers certain core products on a stand-alone basis for three years after the acquisition. *Id.*

72. The FTC also placed restrictions on CoStar's ability to terminate its contracts with customers at will. For example, CoStar was prohibited from retaliating against customers for doing business with, or providing CRE data to, CoStar's competitors, including Xceligent. *Id.* at *18. CoStar, in turn, was required to allow customers to terminate their existing contracts—without penalty, with one year's notice—in order to prevent long-term CoStar subscription commitments from hindering competition. *Id.* at *15, *31.

73. The FTC required CoStar to divest LoopNet's interest in Xceligent. *Id.* at *10 (§ II.A). The consent order explained that "[t]he purpose of the divestiture" was "to preserve Xceligent as an independent, viable, and effective competitor in the relevant markets . . . , to facilitate Xceligent's expansion of its product line and its geographic coverage, and to remedy the lessening of competition resulting from the Acquisition . . . ." *Id.* at *13.

74. Finally, the FTC appointed an independent monitor to review CoStar's compliance with the consent order and required CoStar to notify the agency in

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

advance before acquiring any firm that gathers, markets, or sells CRE information in the United States for 10 years.  *Id.* at \*21, \*23.

### C.    CoStar drives Xceligent out of business, leaving CoStar with a monopoly position in the relevant markets.

75.    The FTC's Order was designed to foster Xceligent's expansion, so that it would be a viable market alternative to CoStar.  But CoStar flouted that consent order to achieve the opposite effect.  It sued Xceligent for accessing publicly available listing information from CoStar, seeking to drive Xceligent out of business and remove yet another major competitor from the marketplace.

76.    As CoStar now brags in its complaint, its lawsuit resulted in Xceligent's demise.  *See* FAC ¶¶ 15, 183.  Although CoStar suggests that it caught Xceligent stealing its copyrighted photos red-handed, that case never made it beyond the pleading stages and CoStar obtained a judgment only because it forced Xceligent into insolvency.

77.    Critically, by forcing Xceligent into bankruptcy, CoStar was able to avoid facing Xceligent's antitrust claims.  As a condition of CoStar's settlement with the Xceligent bankruptcy trustee, Xceligent agreed to dismiss its antitrust counterclaims against CoStar.  Those counterclaims included claims against CoStar for monopolization and attempted monopolization of the CRE information services market and CRE listings database market and use of exclusionary contracts, in violation of the Sherman Act, 15 U.S.C. §§ 1, 2.

78.    The devastating market impact of CoStar's fatal attack on Xceligent was swift and solidified CoStar's monopoly in the relevant markets.

79.    As one industry analyst reported in October 2020, CoStar is a "borderline monopoly" that "has no true threats in terms of competition."  CoStar's monopoly position "was amplified following Xceligent's declaration of bankruptcy in December 2017.  Following this development, the only remaining companies in the space are all small startups focused on crowdsourcing data.  In a survey of

commercial real estate professionals in 2018, 98% stated that they rely on either CoStar or LoopNet for commercial real estate data."[33]

80.     After driving Xceligent out of business, Costar predictably responded like the monopolist that it is:  CoStar significantly raised prices.  Just seven months after Xceligent filed for bankruptcy, CoStar raised the average monthly price it charged new customers from $255 to $466—a whopping 80% price increase.[34]

81.     Thus, despite the FTC's conclusion that Xceligent's existence and expansion was necessary to foster competition, CoStar's successfully drove Xceligent out of business and furthered its own anticompetitive monopoly position—precisely the outcome the FTC sought to avoid.

**D.      The FTC sues CoStar again to block its proposed anticompetitive acquisition of RentPath.**

82.     CoStar's series of anticompetitive acquisitions continues today, and the FTC rightly remains concerned about CoStar's monopoly power.  In November 2020, the FTC stepped in once again to block another proposed anticompetitive merger by CoStar.

83.     CoStar and RentPath, which operates Rent.com and ForRent.com, are competitors for apartment internet listing services ("ILSs").  *See* Compl., *In the Matter of Costar Group., Inc., et al.*, No. 201-0061, Dkt. No. 9398, ¶ 2 (F.T.C. Nov. 30, 2020).[35]  Specifically, the two companies compete to provide residential rental ILSs, defined by as two-sided platforms that bring together (i) purchasers of ILS advertising (property management companies and rental properties), and (ii) consumers of ILS search services (prospective renters).  *Id.* ¶ 19.

---

[33] Hafuda, *CoStar Group Firing on All Cylinders as the Company Continues to Target Growth Opportunities*, MORNINGSTAR (Oct. 28, 2020).

[34] *See id.*; *see also* Konrad Putzier, David Jeans, Christian Bautista, and Nancy C. Carvajal, THEREALDEAL, *Search and destroy: How CoStar became a $15B juggernaut* (Sep. 1, 2018), https://fortisinvestmentgroup.com/2018/09/search-and-destroy-how-costar-became-a-15b-juggernaut/.

[35] Redacted Public Version *available at* https://www.ftc.gov/system/files/documents/cases/d09398complaintpublic.pdf.

25

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

84.     According to the FTC, "[f]or years, CoStar and RentPath have competed fiercely with one another to sell ILS advertising to PMCs in metropolitan areas across the United States." *Id.* ¶ 9.  "For example, CoStar's internal documents reflect that in 2019, CoStar launched a sales campaign to '[c]ompet[e] directly and powerfully with RentPath for the business of our duplicative clients and those unique properties using RentPath but not Apartments.com.'"  *Id.*  "In preparing its sales staff for this campaign, CoStar informed them that RentPath itself had 'severely cut [its] prices in an effort to compete.'"  *Id.*

85.     On February 12, 2020, CoStar announced its intent to acquire RentPath for $587.5 million.  *Id.* ¶ 18.  As a condition of CoStar's acquisition offer, RentPath filed for bankruptcy protection and reorganization under Chapter 11 of the United States Bankruptcy Code that same day.  *Id.*

86.     The FTC quickly demanded more information from CoStar, and on November 30, 2020, the agency filed an administrative complaint to block the acquisition and charge CoStar with violating antitrust laws, on the grounds that the proposed merger would be anticompetitive.  *Id.* ¶ 1.  The FTC also filed a lawsuit in federal court in the District of Columbia to block the merger, and the parties agreed to a temporary restraining order forestalling the planned merger.

87.     The FTC defined the relevant product market as ILS advertising for large apartment complexes.  *Id.* ¶¶ 19, 20–30.  The agency pointedly excluded from that definition non-digital forms of advertising, such as on-site advertising, real estate brokers, or print advertising, observing that "[m]ost large apartment complexes could not cost-effectively replace the volume of leads generated by ILS advertising through [such] non-digital forms of advertising[.]"  *Id.* ¶ 22.  The FTC defined the relevant geographic market as individual metropolitan areas within the United States.  *Id.* ¶¶ 19, 31–39.

88.     The FTC alleged that CoStar's proposed acquisition of RentPath "w[ould] eliminate price and quality competition that benefits renters and property

26

1618773

managers today, resulting in higher prices for the internet listing services relied upon by managers of large apartment buildings." *Id.* ¶ 1. "Indeed, RentPath's CEO acknowledged in a 2019 e-mail to the company's Board of Directors that the Acquisition may lead to 'more stable pricing and fewer promotions in the long term.'" *Id.* ¶ 9. RentPath "summarized the effect of this transaction in simple terms: Prices WILL NOT stay the same, it will almost be a monopoly." *Id.* ¶ 1.

89. On December 29, 2020, RentPath announced that it had terminated the CoStar acquisition agreement following the FTC's decision to sue to block the merger.[36]

90. While the FTC was able to block this anticompetitive merger, CoStar reportedly has other acquisitions currently in the works.[37]

**E. CoStar holds monopoly positions in the relevant markets.**

91. There is substantial direct evidence of CoStar's monopoly power in the relevant markets.

92. Industry participants—including CoStar itself—have recognized CoStar's dominance in the relevant markets.

---

[36] Press Release, RentPath Holdings, Inc., RentPath terminates agreement to be acquired by CoStar Group (Dec. 29, 2020), https://www.prnewswire.com/news-releases/rentpath-terminates-agreement-to-be-acquired-by-costar-group-301199185.html.

[37] John Banister, *CoStar To Look At New Sectors For Next Acquisitions After Failed Deals, FTC Scrutiny*, Bisnow (Mar. 16, 2021), https://www.bisnow.com/national/news/technology/costar-to-look-at-new-sectors-for-next-round-of-acquisitions-after-failed-deals-108133; Catherine Shu, *RentPath drops acquisition deal with CoStar after FTC antitrust lawsuit*, Techcrunch.com (Dec. 29, 2020), https://techcrunch.com/2020/12/29/rentpath-drops-acquisition-deal-with-costar-after-ftc-antitrust-lawsuit/.

27

1618773

93.    CoStar claims that it receives a dominate share of website visitors in the internet CRE listings services market:



94.    Based on the above pie chart, CoStar claims that it is "driving 18X more activity than [its] nearest competitor."



95.    Customers in the relevant markets characterize CoStar as a monopolist and have described the ways in which CoStar exercises its monopoly power.  In particular, brokers have consistently complained about CoStar's supra-competitive prices, but noted that they are forced to continue purchasing services from CoStar because of its monopoly share and anticompetitive conduct.  The following are representative statements from CoStar customers:

28

1618773

i)      "No idea how loopnet / costar gets away with what they do as an extremely litigious attempt at a monopoly that feels more like extortion than a service every time you pay them."

ii)     "We only have so many dollars to spend and costar/loopnet eats up a large part of that.  Like everyone else we would like to see a good alternative to costar but at this point I don't think we are prepared to cut the cord."

iii)    "It's honestly pretty ridiculous no website can really compete with LoopNet and they rip everyone off. Crexi is trying but they have a long way to go."

iv)     "We have ZERO marketing budget left right now and Costar/Loopnet nearly breaks us with their fees, but I obviously cannot pull that back for the time being."

v)      "Too bad CoStar is nearly impossible to compete with...could really use some (accurate) competition in the CRE data space."

vi)     "We already pay a fortune for Costar."

vii)    "Costar is Satan."

96.    Customers have been forced to pay increasingly supra-competitive prices as CoStar acquires and drives competitors out of the relevant markets.

97.    After its acquisition of LoopNet, CoStar drastically raised its prices for both its information services and the listing services previously offered by LoopNet.  Following the CoStar/LoopNet merger, one CoStar customer reported a price increase of a whopping 300% to 500%:

> Now that Loopnet has decided to gouge brokers and has drastically raised their prices (by 300% ~ 500% depending on the level of functionality you are using. In my case the expense is going from $200/month to approximately $1132/month)…. The Commercial Broker community is up in arms about this latest bit of price gouging by the CoStar/Loopnet group and in my own county the commercial board has held multiple meetings on the topic.

98.    In the face of these extreme price increases, customers looked to Xceligent as a potential alternative to CoStar.  As one broker explained, "I am

29

going to reduce my exposure on Loopnet by half and abandon the Loopnet Premium search features; this way my monthly Loopnet costs only rise from my current rate by 75%. Then I am going to use Xcelligent for their search tools and monitor how well their listing tools come online."

99.    As discussed above, despite the FTC's efforts to protect Xceligent as a viable competitor, CoStar attacked Xceligent and drove it into bankruptcy.  CoStar then again raised its prices by another 80%, further demonstrating CoStar's ability to raise prices above those that would be charged in a competitive market.[38]

100.   As one commercial broker was recently quoted, "CoStar is the only organization that I deal with that is widely hated by its customers…. You don't talk to them. They will sell your data to you, and every time they acquire a competitor, they raise their prices."[39]

101.   The conclusion by both industry participants and brokers that CoStar possesses monopoly power is supported by an examination of CoStar's share of the relevant markets.

102.   On information and belief, CoStar's current share of the internet CRE listings services market is over 90%.

103.   On information and belief, CoStar's current share of the internet CRE information services market is over 90%.

104.   On information and belief, CoStar's current share of the internet CRE auction services market is 95%.

105.   Although full and complete market share data for individual metropolitan areas is not currently available to CREXi, on information and belief, CoStar is dominant in an overwhelming majority of metropolitan areas.

---

[38] Hafuda, *CoStar Group Firing on All Cylinders as the Company Continues to Target Growth Opportunities*, MORNINGSTAR (Oct. 28, 2020); Putzier, *Search and destroy: How CoStar became a $15B juggernaut*, THEREALDEAL (Sep. 1, 2018).

[39] Banister, *CoStar To Look At New Sectors For Next Acquisitions After Failed Deals, FTC Scrutiny*.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

106.   As discussed in Section IV.E, there are substantial antitrust barriers to entry in the relevant markets .

107.   In sum, CoStar has attempted to, and succeeded in, acquiring and maintaining monopoly power in the relevant markets.  As a consequence, CoStar has been able to profitably increase and maintain prices substantially above competitive levels.

## VI.    CoStar's Scheme of Anticompetitive Conduct

108.   CoStar has engaged in an anticompetitive scheme to forestall competition and drive competitors out of business in order to maintain its monopoly power in the relevant markets.

109.   Rather than compete on the merits, CoStar has engaged in several anticompetitive acts as part of this scheme:

i)    CoStar imposes exclusionary contractual terms, enforced with strict technological measures, to prevent customers from using competitors' products and services and to selectively block competitors from accessing public CRE information on CoStar's and brokers' websites.

ii)    CoStar engages in a policy and practice of unilaterally modifying brokers' listings and photographs to falsely claim intellectual property protection over information CoStar does not own to stifle competition in the relevant markets.

iii)    CoStar engages in unfair competition by infringing CREXi's trademarked name to advertise CoStar's own products and services in the relevant markets.

### A.    CoStar's exclusionary conduct to prevent customers from using competitors' services and to selectively block competitors from accessing public CRE information.

110.   CoStar imposes exclusionary contractual terms to prevent customers from using competing products and services and to block competitors from accessing publicly available CRE listing information.  Even though this listing

31

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

information does not belong to CoStar and much of it is available to the public for free on LoopNet or broker websites, CoStar conditions access to its websites and LoopLink-hosted broker websites on users' agreement not to compete with CoStar and on a series of terms of service that restrict brokers from providing public CRE listings to competing platforms.  To make matters worse, CoStar imposes technological barriers to block competitors, such as CREXi, from accessing publicly available CRE information on CoStar's websites and brokers' own websites hosted by LoopLink.

111.   CoStar's exclusionary contractual terms and technological measures operate as exclusive agreements.  The natural and intended effect is to prevent customers from using competitors' products and to stifle competition in the relevant markets by making it more difficult for competitors like CREXi to access public listing information to compete with CoStar, to the detriment of customers and competition.

### 1. CoStar induces brokers to provide CoStar with public CRE listing information.

112.   CRE listing information available on CoStar and LoopNet's websites consists of publicly available facts, and information and photographs originated, provided, and submitted by real estate brokers and others.

113.   CoStar induces brokers and other third parties to provide information to CoStar and LoopNet by expressly disavowing any ownership in or claim to the data, agreeing that CoStar's right to use the data will be "non-exclusive," and assuring brokers and other third parties that they, not CoStar, will decide who can access and use their information.

114.   CoStar claims that brokers' "submission of information to LoopNet" is governed by Terms and Conditions posted on the LoopNet website (the "LoopNet Terms").  Ex. B (LoopNet Terms) at 1.[40]  The LoopNet Terms provide that brokers

---

[40] The LoopNet Terms are attached as **Exhibit B** hereto.

who submit listings to LoopNet "retain any applicable ownership rights" in their "Submitted Content," which is defined to include "property descriptions, photographs, images, videos …, graphics and financial, contact or other information." *Id.* at 2. LoopNet and its "affiliates (including other CoStar Group, Inc. companies)" are granted a "non-exclusive … right and license … to all such Submitted Content." *Id.*

115. CoStar imposes similar terms on users of CoStar's subscription services (the "CoStar Terms"). The CoStar Terms provide that a broker who submits "information, data, text, photographs, images, graphics, messages, links, expressions of ideas and other content" to CoStar will "retain any applicable ownership rights [he or she] may have with respect to such information and images." Ex. C (CoStar Terms) at 9.[41] CoStar is merely granted a "non-exclusive … right and license … with respect to such content" submitted by brokers. *Id.* CoStar acknowledges that a broker's submission of "Submitted Content to the [CoStar] Site does not create any new or alter any existing relationships between [the broker] and CoStar." *Id.* at 10. CoStar tells brokers that "[w]hat's yours stays yours, and you can do anything you want with your data." *Id.*

116. CoStar also purports to bind users to terms of service on brokers' websites hosted by LoopLink (the "LoopLink Terms").[42] Like the LoopNet and CoStar Terms, the LoopLink Terms merely grant LoopNet a "non-exclusive … license" to "all User Content" that a user elects to "upload, post, e-mail or otherwise transmit to or via the Site." Ex. D (LoopLink Terms) at 5.

117. Consistent with these contractual terms, it is widely understood in the CRE industry that brokers should have the right to share their CRE listings and other information with anyone they choose. Brokers have an interest in marketing their properties as widely as possible and distributing property listing information

---

[41] The CoStar Terms are attached as **Exhibit C** hereto.
[42] The LoopLink Terms are attached as **Exhibit D** hereto.

33

and photographs to multiple platforms, including CoStar, LoopNet, and CREXi, so that more potential buyers or lessees can view those property listings.

118.   Once brokers prepare listing information for a new property, they do not want to re-create it.  So, brokers frequently share links to their listings with competing CRE platforms, expecting them to post the same listing.  Brokers have directed CREXi employees to gather listing information from the broker's public listings on LoopNet or have emailed a link to the broker's inventory on LoopNet or the brokers' own LoopLink-hosted website.  This practice leads to obvious efficiencies for brokers since they do not have to spend the time and effort to re-create their listings on multiple platforms.

119.   CoStar itself recognizes these industry norms.  CoStar's CEO, Andrew Florance, stated in a 2008 declaration that brokers "owe a fiduciary duty to the property owners that contract with them to market their listings as widely as is appropriate under the circumstances (and in some states the law requires as much)." Ex. F (Mar. 5, 2008 Florance Decl.) ¶ 3.  As Mr. Florance explained, "[b]ecause brokers make money when their properties are sold or leased, they are naturally eager to obtain the maximum possible exposure for their listings." *Id.* ¶ 4.  Thus, it is common for brokers to "direct CoStar researchers to take their listings from the brokers' own websites or email their listings to CoStar." *Id.*

### 2.    CoStar chooses to make CRE listing information available to the public for free.

120.   CRE listing information is available to the public for free on LoopNet's website and brokers' LoopLink-hosted websites.  Users can access CRE listing information on LoopNet and brokers' LoopLink-hosted websites without signing in, creating a LoopNet account, agreeing to the LoopNet or LoopLink Terms, or otherwise registering for LoopNet's service.[43]  Brokers and prospective

---

[43] LoopNet also offers a "paid" or "premium" subscription service with additional features, which does requiring logging in and creating a LoopNet account.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

purchasers of commercial real estate value free, publicly available listings because they lead to expanded viewership and increased opportunities for transactions.

121.    As such, any person can freely access the LoopNet website and search for commercial real estate listings across the United States, as shown below:

35

1618773



122.   For example, any person can search the LoopNet website for commercial real estate for sale in Los Angeles, California, and receive hundreds or even thousands of results, as shown below:



CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

123. A person can then select any of the listings publicly available on the LoopNet website and view additional information regarding the property, including a description of the property, the contact information for the relevant broker(s), the sale price, property type, building size, year built, building class, construction status, occupancy, location, and photos of the property.

124. For example, a listing for a retail building on Wilshire Boulevard in Los Angeles, California is publicly accessible on the LoopNet website,[44] as show in the screenshots below:









---

[44] Available at: https://www.loopnet.com/Listing/3500-Wilshire-Blvd-Los-Angeles-CA/21016208/ (as of December 29, 2020).

37

1618773

125.   As discussed above, LoopNet has also created a tool, called LoopLink, which allows brokers to integrate their CRE listings into the brokers' own publicly available website utilizing the database functionality offered by LoopNet. Brokerages across the United States have adopted CoStar's LoopLink tool to power publicly available CRE listings on brokers' own websites.

126.   For example, Voitco, a broker based in Southern California, uses LoopLink to power CRE listings on Voitco's website.  As shown below, any person can navigate to the Voitco website and search for Voitco's CRE listings for free:





127.   Any person can select any of the LoopLink-hosted CRE listings publicly available on the Voitco website and view additional information regarding the property.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

128.   For example, a CRE listing in Chula Vista, California is publicly accessible through the Voitco website, hosted by LoopLink,[45] as show in the screenshots below:



129.    Again, all of this standard listing information is made available to the general public for free on LoopNet and brokers' own websites powered by LoopLink, without the need for any registration, login, password, or subscription.

**3.    CoStar imposes terms to prevent customers from using competitors' services and to selectively block competitors from accessing public listing information.**

130.   Despite the fact that this CRE listing information is available to the public for free, CoStar conditions access to its websites and brokers' LoopLink-hosted websites on terms that restrict customers' ability to use competitors' services and bar competitors from accessing broker-provided and broker-owned public

---

[45] Available at: https://looplink.voitco.com/Listing/2300-Boswell-Rd-Chula-Vista-CA/4776176/ (as of June 16, 2021).

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

information.  CoStar enforces these anticompetitive contractual conditions with technological measures that block competitors from CoStar and LoopNet's websites, and even brokers' own websites powered by LoopLink.

131.   The first page of the LoopNet Terms requires users to "represent and warrant" that they "are not a competitor of LoopNet, CoStar Realty Information, Inc. or any of its affiliates, including, without limitation, any company owned or operated by CoStar Group, Inc. … or acting on behalf of a competitor of LoopNet." Ex. B (LoopNet Terms) at 1.

132.   The LoopNet Terms then purport to forbid anyone from using content available on LoopNet "in connection with any other listing service" or accessing LoopNet "as part of any effort to compete" with LoopNet.  The LoopNet Terms state:

> You shall not use or reproduce any Content that is obtained from the Service, or that is otherwise made available to You in the Service, for or in connection with any other listing service or device. You further shall not use the Service in any other manner for or in connection with any other listing service or device. You shall not use the LoopNet Service as part of any effort to compete with LoopNet, including, without limitation, using the LoopNet Service to provide, alone or in combination with any other product or service, any database services to any third party or any use that causes a reduction or loss from an existing or potential LoopNet customer….

*Id.* at 3.

133.   CoStar also purports to bind users of brokers' websites hosted by LoopLink to similar anticompetitive terms of use.  The LoopLink Terms condition access to CRE listing information on brokers' LoopLink-hosted websites on users' agreement not to compete with CoStar.  The LoopLink Terms provide that users "shall not," *inter alia*, "use, reproduce, copy or access any portion of the Product if you are a direct or indirect competitor of LoopNet."  Ex. D (LoopLink Terms) at 2. The LoopLink Terms further purport to forbid users from "provid[ing], disclos[ing]

1618773

or transmit[ing] any portion of the Product to any direct or indirect competitor of LoopNet." *Id.*

134.   The CoStar Terms similarly condition access to CoStar's website, broker-provided CRE listing information, databases, or software (defined in the CoStar Terms as the "Product") on users' agreement not to compete with CoStar. The CoStar Terms provide that users "shall not … [a]ccess or use any portion of the Product if you are a direct or indirect competitor of CoStar, nor shall you provide, disclose or transmit any portion of the Product to any direct or indirect competitor of CoStar." Ex. C (CoStar Terms) at 5. The CoStar Terms broadly define "direct or indirect competitor" to include "Internet listing services or other real estate information services and employees, independent contractors and agents of such services." *Id.*

135.   Ten-X imposes similar terms on its users (the "Ten-X Terms"). Ex. E (Ten-X Terms) at 5.[46] The Ten-X Terms purport to require users to "agree not to use the Services in any way that," among other things, "[c]ompetes with [Ten-X's] business or impacts [Ten-X's] revenue." *Id.*

136.   In other words, CoStar conditions access to its CoStar, LoopNet, and Ten-X websites, as well as brokers' LoopLink-hosted websites, on users' agreement not to compete with CoStar. CoStar also purports to forbid competitors—and only competitors—from accessing broker-provided and broker-owned publicly available listing information available on those websites.

137.   On top of these exclusionary contractual terms, CoStar employs technological measures to selectively block competitors from accessing the publicly available listing information hosted on CoStar and LoopNet's websites, and brokers' LoopLink-hosted websites.

138.   CoStar employs an "abuse monitor," whose job is to ferret out whether internet protocol (IP) addresses associated with CoStar's competitors are accessing

---

[46] The Ten-X Terms are attached hereto as **Exhibit E**.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

CoStar and LoopNet.  If the abuse monitor determines that a competitor has accessed CoStar or LoopNet, CoStar will send the user an "Error and Abuse" notice, temporarily blocking the user from accessing the CoStar or LoopNet website, as shown below:



139.   CoStar and LoopNet also use "firewalls"[47] to permanently block IP addresses associated with competitors from accessing CoStar and LoopNet, as shown below:

[47] In computer network parlance, a "firewall" is a network security system that monitors and controls incoming and outgoing network traffic based on predetermined security rules.  A firewall can be used to establish a barrier between a trusted network and an untrusted network.  *See Firewall (computing)*, WIKIPEDIA, https://en.wikipedia.org/wiki/Firewall_(computing) (last visited Apr. 9, 2021).

42

140.   CoStar employs these same technological means to block CREXi from accessing publicly available CRE listings on ***brokers' own websites*** that use CoStar's LoopLink tool, as shown in the example below:



141.   CoStar deploys these technological blocking measures without informing the brokers who use CoStar's LoopLink product.  In other words, unbeknownst to brokers who use LoopLink, CoStar imposes technological measures to block CREXi from accessing ***brokers' CRE listings*** on ***brokers' own websites***, even when CREXi is directed to those listings by brokers themselves.

142.   For example, in September 2020, a broker reached out to CREXi to request that CREXi access the listings on the broker's website and add them to CREXi's platform.  When CREXi was unable to access those listings due to CoStar's technological block, the broker was surprised:  "I'm not sure why you can't access these [listings] because ***they are on our own website***."  (Emphasis added).  But CREXi was unable to access the broker's own listings on the broker's own website due to CoStar's surreptitious implementation of its anticompetitive technological block.

143.   As CoStar brags in its complaint, CoStar has repeatedly deployed these technological measures to selectively block CREXi from accessing publicly available CRE listing information.  *See* FAC ¶¶ 4, 15, 32, 95, 96, 114, 122–129.

43

CoStar has technologically blocked CREXi from publicly available CRE listings on brokers' websites even though CoStar has disclaimed any allegations of wrongdoing related to CREXi's accessing of "broker websites powered by CoStar's LoopLink product." *See* FAC ¶ 3, fn.1.

144.   CoStar's technological blocks are imposed not in response to systematic scraping or copying of listings on LoopNet or brokers' LoopLink hosted websites, but to inhibit the free transfer of information from brokers to companies that compete with CoStar.  Indeed, CREXi employees are routinely blocked, via technical means, from accessing publicly available CRE listings on LoopNet and brokers' LoopLink hosted websites, even when they are directed or otherwise authorized to access and obtain those listings by brokers themselves.

145.   CREXi is not the only competitor that CoStar has blocked from accessing publicly available listing information on CoStar, LoopNet, and brokers' LoopLink powered websites.  As discussed above, CoStar previously employed this same anticompetitive tactic to block Xceligent from accessing publicly available broker listings on those websites.

146.   The practical effect of CoStar's exclusionary conduct is to lock-in brokers to exclusive relationships with CoStar, deprive brokers of the effective use of publicly available listing information, and to prevent competition in the marketplace.

**4.     CoStar reverses its policy that competitors should have open access to public CRE listings on CoStar and LoopNet.**

147.   CoStar is well aware that blocking competitors from accessing publicly available listing information is anticompetitive.  Indeed, before CoStar acquired LoopNet, CoStar's policy was that competitors should have free access to LoopNet and the ability to use CRE listings publicly available on LoopNet for competitive purposes.  When LoopNet sought to block CoStar from accessing those

44

1618773

publicly available listings, CoStar fought tooth and nail to protect its ability to access CRE information on LoopNet to compete effectively.

148.   As discussed above, in 2012, when they were still separate companies, CoStar and LoopNet were engaged in intensive multi-forum litigation.  But in those legal battles, it was *LoopNet* that sought to block *CoStar's* access to public listings on LoopNet's website.

149.   LoopNet accused CoStar of "access[ing] LoopNet's proprietary listings database and member directory in order to unlawfully obtain LoopNet's listings and member information, to copy and misappropriate the information contained within, and to contact LoopNet's members in an effort to convince those persons to use CoStar's competing service in place of LoopNet's."[48]

150.   CoStar and LoopNet resolved that action, agreeing that both entities could access and use publicly available information on one another's websites.[49] CoStar and LoopNet agreed that they "shall not block or impair access to areas of a Party's website other than Password Protected Areas," and that their public websites "may be accessed by one another."[50]

151.   Following that settlement, CoStar adopted a written "Third Party Websites Policy" memorializing CoStar's right to access publicly available listing information on LoopNet.  The CoStar policy allowed CoStar employees to continue to obtain brokers' listings from publicly available websites, including "viewing a broker's publicly-available website," "clicking on a hyperlink that a broker sends via email," and "viewing the public areas of the LoopNet website."[51]  CoStar's Third Party Websites Policy stated:

---

[48] Docket No. 56-1 (Compl. ¶ 16, *Loopnet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, No. 05-cv-1220, ECF 1 (N.D. Cal. Mar. 24, 2005)).

[49] Docket No. 56-2 (Decl. of Andrew Florance ¶¶ 2, 4, *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. Apr. 7, 2009)).

[50] Sep. 6, 2005 CoStar/LoopNet Settlement Agmt. Art. III(A).

[51] Ex. F (Mar. 5, 2008 Florance Decl.) ¶ 24.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

> The following activities . . . are not prohibited by [CoStar's] Third Party Websites Policy: (a) viewing a broker's publicly-available website that is powered through the LoopLink™ service, (b) clicking on a hyperlink that a broker sends via email, and (c) viewing the public areas of the LoopNet Website, such as where press releases and product description information is made available.

152. Two years later, LoopNet sued CoStar once again, accusing CoStar of copying publicly available CRE information from LoopNet's website.[52]  CoStar objected, proclaiming that it should be allowed to use public information on LoopNet and that there was no legal basis to prevent it from doing so.  CoStar maintained that it was "not doing anything wrong" by accessing public listing information on LoopNet and using it for competitive purposes.  As CoStar explained, "we think it's silly that LoopNet makes this listing information available on its public Web site for all of the world to see, and that they're trying to essentially argue that CoStar can't look at it."[53]

153. CoStar's CEO, Andrew Florance, explained in a 2009 declaration that "CoStar has openly and notoriously accessed information on the non-password protected areas of LoopNet's website[.]"[54]  CoStar admitted that it had accessed "LoopNet's press releases, earnings calls, product descriptions, pricing descriptions, marketing materials, and listings, ***and made use of that information for competitive purposes***."[55]  Mr. Florance claimed that it was "Costar's right to update its database from broker websites or from listings on the LoopNet website to which brokers had directed CoStar by email."[56]

---

[52] *See* Docket No. 56-3 (Compl., *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. Nov. 15, 2007)).

[53] Denise Kalette, *LoopNet, CoStar, Begin A New Round in Long Boxing Match*, National Real Estate Investor (Jun. 15, 2009), https://www.nreionline.com/news/loopnet-costarbegin-new-round-long-boxing-match.

[54] Ex. G at ¶ 15.

[55] *Id.* (emphasis added).

[56] *Id.* ¶ 3.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

154.   Mr. Florance instructed CoStar employees that CoStar had a "complete right" to "access, copy, [and] use" the public listing information on the LoopNet website:

> Q     Okay. So, to clarify, you have never in substance said to employees of CoStar that it's okay to copy listings from LoopNet.com?
>
> A     Actually, I think I probably, you know, am a hundred percent certain that *I have said to CoStar employees that I believe we have complete right to copy – access, copy, use information in non-password protected areas of LoopNet.* I have said that.[57]

Mr. Florance testified that it was "critical" for CoStar to be able to access public listing information on LoopNet.[58]  Indeed, Mr. Florance admitted personally accessing public listings on LoopNet for competitive purposes.[59]

155.   CoStar's policy also was to use publicly available listing information on LoopNet to prospect for brokers and develop new customers.  CoStar used public listing information on LoopNet "in creating or updating listings for CoStar's database, *including by contacting brokers*."[60]  CoStar further harvested customer information from LoopNet so that CoStar salespeople could call them to prospect for business.[61]

156.   At the time, CoStar also recognized that imposing technological measures to block competitors' access to publicly available listings was, in the words of Mr. Florance, "outrageous."[62]  Mr. Florance explained that LoopNet had no right to impose "IP blocks," or other "restrictions" on CoStar's access to public listing information on the LoopNet website.  According to Mr. Florance, CoStar was free to "access the public areas of the [LoopNet] website, and that there would

---

[57] Jun. 8, 2009 Florance Depo. Tr. at 120:15–22 (emphasis added).

[58] *Id.* at 87:6–24.

[59] *Id.* at 85:24–87:2; *see also id.* at 118:22–119:18.

[60] CoStar's Supp. Objs. & Resps. to LoopNet's First Set of RFAs, No. 5 (emphasis added).

[61] June 8, 2009 Florance Depo. Tr. at 114:17–19.

[62] Ex. F (Mar. 5, 2008 Florance Decl.) ¶ 22.

47

be no IP blocks to the public area, there'd be no restrictions put on the public area. They [LoopNet] wouldn't try to control how we use it…."[63]

157.   CoStar has not only acknowledged that its current practice of blocking competitor access to CRE listings is anticompetitive, but, in Mr. Florance's view, such conduct also constitutes unlawful intentional interference with contractual or prospective business relationships.  As Mr. Florance explained, "LoopNet's conduct of blocking CoStar's access to its website and/or broker websites supported by LoopNet's LoopLink technology has interfered with the performance of CoStar's customers under their license agreements" and "makes it less likely that other prospective customers will enter into economic relationships with CoStar."[64]

158.   CoStar claimed that LoopNet's efforts to block CoStar from public listing information damaged CoStar's relationships with "every [CoStar] customer," and constituted irreparable harm.[65]

159.   In fact, CoStar moved to enjoin LoopNet from blocking CoStar's access to public portions of LoopNet's website.  In that motion, CoStar acknowledged that, in the CRE industry, brokers share identical property listing information and pictures with numerous online platforms by referring competitors the listing posted on LoopNet.  As CoStar explained:

> [B]rokers often respond to CoStar's inquiries by referring CoStar researchers to the public parts of LoopNet's website or to their own sites hosted on LoopLink. . . . Instead of simply visiting a broker's own website or viewing the listing the broker uploaded to LoopNet and linked to CoStar, CoStar's researchers must either obtain the details of a listing over the phone or trouble the broker to send the listing in a form that is not blocked by LoopNet's denial of access.  These processes slow down CoStar's research process, meaning that fewer listings are updated on a daily basis.[66]

---

[63] June 8, 2009 Florance Depo. Tr. at 293:16–21.

[64] Mar. 10, 2009 Florance Decl. ¶¶ 6–7; *see also* Ex. G (Apr. 7, 2009 Florance Decl.) at ¶ 30.

[65] June 8, 2009 Florance Depo. Tr. at 69:5–15, 89:14–17.

[66] Docket No. 56-4 at 19 (Motion for Preliminary Injunction, *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. Apr. 7, 2009)).

48

160.   CoStar further claimed that the public listing information available on LoopNet belongs to brokers—not CoStar or LoopNet.  "Whether made available via LoopLink or an email, ***the content belongs to the brokers***, who then voluntarily share it with CoStar, and CoStar never needs to gain access to any password-protected areas on LoopNet's website to receive content from brokers.  The only connection with LoopNet is that the brokers' content resides on LoopNet's hosting servers."[67]  CoStar claimed to have "used these lawful methods of obtaining broker-written listings for years."[68]

161.   CoStar also previously acknowledged that attempting to bind competitors to exclusionary contractual terms barring their access to public information is anticompetitive.  In litigating against LoopNet, CoStar maintained that LoopNet could not bind CoStar to exclusionary contractual terms purporting to bar competitor access to publicly available listings.  CoStar's general counsel testified that so long as CoStar employees accessed listing information in the "non-password protected area"—i.e., public area—of LoopNet's website, they were not bound by LoopNet's exclusionary contractual terms:

> Q     And when are CoStar employees permitted to violate the Terms of Use for the LoopNet web site?
>
> A     When they're in the non-password protected area.[69]

162.   CoStar is also aware that its current efforts to block competitors' access to public information on CoStar, LoopNet, and LoopLink-hosted broker websites through contractual terms and technological measures, is anticompetitive.  Again, as Mr. Florance explained in his 2008 declaration in the LoopNet case, "IP blocking would mean that no one with a CoStar IP address could visit LoopNet's website at all," which "would not work" because competitors are allowed to access

---

[67] Mar. 5, 2008 Mem. of P&As in Opp'n to Mot. to Strike at 4 (emphasis added).

[68] *Id.*

[69] June 4, 2009 Coleman Depo. Tr. at 145:10–13.

49

publicly available listing information on LoopNet, including on brokers websites "using LoopNet's LoopLink technology."[70]

163.   Indeed, when LoopNet denied CoStar access to LoopNet's websites, CoStar went so far as to employ technological and other "self-help" tools to circumvent LoopNet's denial of access.  "To avoid LoopNet's unlawful self-help efforts to block access, CoStar decided to engage in its own self-help by using technological and other means to avoid LoopNet's denial of access."[71]

164.   Now that CoStar owns LoopNet, it has ***completely reversed*** its position and ***abandoned*** its previous pro-competitive policy of requiring and facilitating open access to public CRE listing information.  Instead, it has adopted and enforced anticompetitive contractual and other exclusionary measures to block competitors from accessing publicly available CRE listing information on LoopNet, CoStar, and LoopLink-hosted broker websites—a practice CoStar previously railed against.

### 5.   Despite blocking CREXi from CoStar, LoopNet and LoopLink-hosted broker websites, CoStar repeatedly accesses CREXi to compete against it.

165.   CoStar employees also frequently access CREXi, as a way of tracking CREXi properties and generating leads for CoStar (the same conduct that CoStar hyperbolically asserts as breach of contract and common law misappropriation against CREXi).

166.   At least fifty employees of CoStar, or its wholly owned subsidiary Ten-X, have created accounts on CREXi over a period spanning 2016 through August 2020.  Without discovery, it is impossible to identify the total number who have done so though, because most of them use personal email accounts in order to disguise their identity when they are visiting CREXi.  For example, Yan Khamish, a Managing Director at Ten-X, registered using a personal email address, khamish@yahoo.com.  Likewise, Cameron George, a Senior Research Associate at

---

[70] Ex. F at ¶ 13.

[71] Ex. G at ¶ 26.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

CoStar, created a CREXi account using his personal email address, csgeorge23@gmail.com.

167.   The visits to CREXi by CoStar employees are neither rare nor fleeting. Registered users whom CREXi has been able to trace as CoStar employees have visited CREXi *more than 1,000 times*, clicking on 19,000 unique pages within CREXi's website.  CoStar employees have visited CREXi property listings, signed confidentiality agreements—in order to gain access to due diligence materials concerning the property—and created saved searches on CREXi that will automatically send them email messages containing new CREXi listings.

168.   CREXi has also been able to trace multiple CoStar employees to the same IP addresses, indicating that those IP addresses are affiliated with a CoStar office.  In addition to activity traced to registered accounts, CREXi user data shows substantial activity by un-registered users originating from those same IP addresses. On information and belief, that data reflects CoStar employees utilizing CREXi's property listings and services without registering, and thus potentially disclosing that they are affiliated with CoStar.  These anonymous CoStar-affiliated users have logged into CREXi on at least 1,800 separate occasions, clicking on close to 17,000 unique CREXi webpages.

169.   CREXi believes in free competition and has not sought to bar access to the CREXi platform from particular IP addresses, even if it suspects the IP address is affiliated with CoStar.  CREXi does not attempt to contractually bar competitors from visiting its publicly available site.  Nor does CREXi send threatening emails or notifications to anyone who registers using a CoStar, LoopNet, or Ten-X email address or tries to view property listings.

170.   CoStar's frequent and extensive engagement in the same conduct it now brands as unlawful when performed by CREXi is not just hypocritical; it is also unfair competition that inhibits and deters pro-competitive activity by other players in the market.

51

**B.    CoStar's false claim of intellectual property ownership over brokers' CRE information and photographs to stifle competition.**

171.    CoStar engages in a policy and practice of unilaterally modifying brokers' listings and photographs to falsely claim intellectual property over information CoStar does not own.  The effect of this anticompetitive policy and practice is to effectively restrain customers from using competitors' products and services, and to prevent competitors from using brokers' CRE information and photographs to compete with CoStar.  By doing so, CoStar has effectively secured for itself a copyright monopoly beyond that legitimately granted by the Copyright Office.

172.    CoStar's terms of service purport to reserve the right for CoStar to unilaterally insert its watermark and claim ownership over broker-owned and supplied photographs and listing information.  The LoopNet Terms grant CoStar the unilateral right to "modify" brokers' listings by "add[ing] digital watermarks to certain parts of your property listing, including, without limitation, adding digital watermarks to your photographs."  Ex. B (LoopNet Terms) at 2.  The LoopNet Terms also purport to grant LoopNet the unilateral right to "adjust portions of the information," including "within property listings" supplied by brokers.  *Id.*

173.    CoStar further falsely claims that its inclusion of a watermark signifies CoStar's ownership of a photograph and indicates that it has copyrighted the image.  CoStar alleged in its lawsuit against CREXi that its "watermark"—*i.e.*, logo—"publicly identifies CoStar's ownership of the images and protects CoStar's property, constitutes copyright management information."  FAC ¶ 65; *see also id.* ¶ 209.  But as this Court ruled, CoStar's "watermark logo does not constitute" copyright management information and, therefore, CoStar's claims against CREXi under the Digital Millennium Copyright Act "fail as a matter of law."  Order Re: Motion to Dismiss, Dkt. 71, 6.

1618773

174.   Nothing in the LoopNet Terms require CoStar to notify brokers when, or explain how, LoopNet has modified their listings or watermarked their photos before doing so.  In other words, brokers may not realize that CoStar has added its supposed watermark to brokers' images, much less that CoStar is representing that it now owns brokers' images.

175.   The LoopNet Terms also purport to require brokers and other users of LoopNet to "treat all information obtained from the Service," including the broker's own "listings … and any other information otherwise made available" as "proprietary to LoopNet."  Ex. B (LoopNet Terms) at 2.  The LoopNet Terms then forbid brokers from providing that content to any LoopNet competitor.  The LoopNet Terms provide that "You shall not use or reproduce any [c]ontent that is obtained from [LoopNet's] Service, or that is otherwise made available to You in [LoopNet's] Service, for or in connection with any other listing service or device."  *Id.* at 3.  And the broker must agree that it "shall constitute a prima facie breach" of the LoopNet Terms if CoStar determines that "any third party," including a competitor, "has access to property listings" provided by brokers and modified by CoStar.  *Id.* at 2, 3.

176.   In other words, after unilaterally altering brokers' listings and falsely claiming copyright ownership over brokers' photographs by adding CoStar's watermark, CoStar simply declares the information "proprietary to LoopNet" and forbids brokers from using that same listing information and photographs—which the brokers themselves provided to CoStar—with competitors of CoStar.  Then, CoStar threatens that brokers are in "prima facie breach" of contract simply by sharing the brokers' own listing information and photographs with CoStar's competitors.

177.   As one broker aptly summed up CoStar's anticompetitive policy and practice:

> Costar: Give me your data and I will list the property.

53

Broker: Here ya go.

Costar: Thanks. Let me just change this decimal.

Broker: What? Can I have my data back now?

Costar: What data? This is mine. If you use it I will sue you.

178.    CoStar has implemented this nakedly anticompetitive policy and practice to maximum anticompetitive effect.

179.    In addition to unilaterally altering property listing information, CoStar routinely adds its watermark to photographs provided to CoStar by brokers and other third parties—creating confusion about who exactly owns the copyright and what the watermark represents.  CREXi's investigation has revealed that CoStar engages in a regular practice of adding CoStar's watermark to photographs provided by brokers.

180.    In one instance, for example, a broker paid to use a third-party's photograph to market a commercial listing in the Atlanta, Georgia area.  The broker uploaded the photograph to the LoopNet website in order to advertise the listing.  Despite the fact that the photograph had been provided by the broker and CoStar held no copyright over the photograph, CoStar added its logo to the bottom right hand corner of the broker-supplied photograph.

181.    The same broker subsequently used the photograph as a representative image to advertise a separate commercial listing in Indiana, which was still under construction at the time of the listing.[72]  Yet again, however, CoStar superimposed

---

[72] Using a representative photograph to market properties that are still under construction is a standard practice in the CRE industry.

its logo to the bottom right hand corner of the broker-supplied photograph.  The photographs have been produced side-by-side for purposes of comparison:

| Broker-Supplied Image | CoStar Addition of Logo |
| --- | --- |
|  |  |

182.   In another example, a broker uploaded a photograph to LoopNet in order to advertise a listing in New Orleans, Louisiana.  The broker later discovered that CoStar superimposed its logo to the bottom right hand corner of the photograph.  The photographs have been produced side-by-side for purposes of comparison:

| Broker-Supplied Image | CoStar Addition of Logo |
| --- | --- |
|  |  |

1618773

183.   Set forth below are additional examples of images owned by brokers or other third-parties, and supplied to CoStar, which CoStar has improperly branded with its logo to falsely claim copyright ownership over the image.  The photographs have been produced side-by-side for purposes of comparison:

| **Broker-Supplied Images** | **CoStar Addition of Logo** |
| --- | --- |
|  |  |
|  |  |
|  |  |

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773



184.   The examples set forth above are, on information and belief, just the tip of the iceberg.  CoStar has engaged in a widespread and systematic practice of adding its logo to photographs provided by or collected from brokers and other third parties, falsely claiming copyright ownership over images CoStar does not own.  The full breadth of CoStar's anticompetitive practice cannot be known until discovery is complete.

185.   CoStar's policy and practice of unilaterally altering brokers' listings and falsely claiming copyright ownership over brokers' and other third parties' photographs operate as a *de facto* barrier preventing customers from using competing products.  They also operate as a barrier preventing CoStar's competitors from freely using broker and other customer data and photographs in the ordinary course of their business.

186.   For customers, CoStar's policy and practice of asserting intellectual property protection over brokers' own information and photographs places the burden on brokers to keep records proving that the content is, in fact, the brokers' content.  Even if brokers can establish that they own and originated the content provided to CoStar, the LoopNet Terms still require brokers to agree that, by CoStar unilaterally altering the brokers' listings or adding its logo to the brokers' photographs, the brokers' information is somehow transmuted into information "proprietary to LoopNet."  The LoopNet Terms then prohibit brokers from using that same information—again, information owned and provided to CoStar by brokers—with any CoStar competitor.  On top of all of this, CoStar claims that "if

57

any third party," including a CoStar competitor, gains access to the property listings provided by brokers and unilaterally modified by CoStar, then the broker has engaged in a "prima facie breach" of contract. The net effect of CoStar's policy and practice is that, as a condition of using CoStar's products and services, customers are effectively restrained from using competing products and services.

187. CoStar has leveraged these anticompetitive conditions to threaten customers and frustrate CREXi's competitive expansion. For example, CoStar sent one mutual customer a letter from its litigation counsel at Latham & Watkins claiming that the customer's "strategic relationship with CREXi" raises "significant concerns" that the customer had violated its license agreement with CoStar because "CoStar does not permit competitors—either direct or indirect—to access its products." CoStar demanded that the customer cease from "providing advice or other services to CREXi," or "providing CREXi any CoStar reports or data (including derivative data)," and bar "anyone with access to CoStar data from providing any strategic guidance or any other services to CREXi."

188. For the same reasons, CoStar's policy and practice effectively prevents competitors, including CREXi, from using brokers' information and photographs to compete with CoStar. In fact, CoStar's anticompetitive policy and practice places competitors in an even more untenable situation. CoStar falsely claims that the logo it uses as a watermark "identifies CoStar's ownership of the images" and constitutes CoStar's "copyright management information." FAC ¶¶ 65, 209. By unilaterally watermarking photographs CoStar does not own with the CoStar logo, competitors and other industry participants cannot distinguish between photographs legitimately owned by CoStar and those owned by brokers and other third parties.

189. As a result, the presence of CoStar's logo on a photograph does not provide reliable information regarding whether or not CoStar actually holds a valid copyright on the photograph. This creates confusion in the marketplace regarding the legitimate ownership of property photographs, making it untenable for brokers

58

and CoStar competitors to share CRE photographs, even when CoStar holds no ownership over them.  CoStar has, in effect, created a minefield through which brokers and CoStar competitors must walk if they seek to use photographs for which CoStar does not hold a valid copyright.  Such anticompetitive conduct is an example of the well-known strategy of raising rivals' costs.  CoStar's history of targeting competitors with aggressive litigation, discussed above, only exacerbates the anticompetitive effect of CoStar's misconduct.

### C.   CoStar's blatant infringement of CREXi's trademarked name to engage in unfair competition.

190.   CoStar also engages in anticompetitive conduct by intentionally misappropriating CREXi's trademarked name to advertise and market CoStar's own products and services in the relevant markets.  In doing so, CoStar capitalizes on CREXi's goodwill and market recognition to compete unfairly with CREXi in the relevant markets.

191.   On June 5, 2015, CREXi filed U.S. Trademark Application Serial No. 86653786 for registration of the CREXI® mark.  On August 29, 2017, the U.S. Patent and Trademark Office issued to CREXi U.S. Trademark Registration No. 5,276,877 for the word mark CREXI®.  CREXi's registration of the CREXI® mark is valid and enforceable.  Indeed, the registration of the CREXI® mark constitutes *prima facie* evidence of its validity and of CREXi's exclusive right to use the mark pursuant to 15 U.S.C. § 1057(b).  A true and correct copy of CREXi's Certificate of Registration is attached hereto as **Exhibit H**.

192.   Continuously since August 29, 2017, CREXi has used the CREXI® mark to identify its products and services and to distinguish them from those sold by competitors.  Among other things, CREXi prominently displays its CREXI® mark on its website www.crexi.com, letterhead, bills, and advertising and marketing materials distributed throughout the United States.

193.   CREXi has invested tens of millions of dollars to establish its distinctive CREXI® mark in the consumer marketplace.  In 2021 alone, CREXi has budgeted for $6.5 million, and will likely spend closer to $10 million, in marketing, advertising, and promotion, all of which is based upon and features its CREXI® mark.

194.   CREXi also makes significant investments by purchasing search engine advertisements with the word "Crexi" and using the CREXI® mark in its paid Google advertisement headers to drive traffic to CREXi's website.  Search engines such as Google, Yahoo!, and Microsoft's Bing allow advertisers to select keywords, such that when an online consumer enters a keyword search, the advertiser's website advertisement will appear prominently on the page.

195.   For example, CREXi pays Google to purchase the Google AdWord "Crexi" as a search engine advertisement.  As shown in the screen-capture below, the CREXI® mark is clearly identified with the registered trademark symbol ® in the header of CREXi's Google advertisement headers:



196.   CREXi users frequently access CREXi's website by searching the word "Crexi" alone, or in combination with other search terms, or by clicking on CREXi's paid Google AdWords advertisements.  In 2020 alone, 3,550,000 unique visitors navigated to CREXi's website from Google both through search results and CREXi's paid Google advertisements, constituting 48% of all unique visitors during the year.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

197.   CREXi enjoys substantial consumer recognition and valuable goodwill in its CREXI® mark owing to CREXi's substantially exclusive and continuous use of the CREXI® mark, significant investments to establish the mark, and the inherently distinctive nature of the mark.  As such, the trade and the public have come to identify the CREXI® mark as an indication that CREXi's products and services originate exclusively from CREXi.

198.   Rather than advance its products and services through fair competition, CoStar has blatantly infringed CREXI's trademark by advertising CoStar's products and services using the CREXI® mark.  CoStar's actions in this regard are exclusionary, i.e., they are profitable to CoStar only because of their anticompetitive effects.

199.   CoStar has infringed CREXi's intellectual property in order to try to sell CoStar's products and services and mislead customers into believing that CoStar's products are in some way made by, approved by, sponsored by, or affiliated with CREXi.

200.   CoStar has purchased "CREXi" as a Google AdWord and explicitly infringed the CREXI® mark in the header and text of CoStar's advertisements.  For example, at various times, a search for "crexi" on Google yielded, at the very top of the page, an advertisement for "Commercial Buildings For Sale – Crexi."  But the advertisement was actually purchased by CoStar and links to CoStar's Ten-X website, as shown in the screen-capture below:

61

CREXI'S COUNTERCLAIMS<br>Case No. 2:20-CV-8819 CBM (ASx)

1618773



201.   In the example above, when a consumer searched for the term "crexi" on Google, that consumer, intending to find CREXi's website and services, was instead directed to a website owned by CoStar—www.ten-x.com/cre_lstings. Notably, the header of the CoStar advertisement featured the CREXI® mark, and made no mention of either CoStar or Ten-X.  Such advertisements create the false impression that CoStar's Ten-X product is associated with the CREXI® mark.

202.   Similarly, at various times, a search for "crexi california" on Google yielded, at the very top of the page, a CoStar-purchased advertisement for "Commercial Buildings For Sale – Crexi – Ten-X.com."  But again, rather than being directed to CREXi's website, a user searching for CREXi in California would be directed to CoStar's Ten-X website, as shown in the screen-capture below:

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

203. Thus, when a consumer searched for the phrase "crexi california" on Google, that consumer, intending to find CREXi's website and services, was instead directed to a website owned by CoStar—www.ten-x.com/cre_lstings. The header of CoStar's advertisement not only infringes CREXi's trademark, but it features the CREXI® mark first, before identifying Ten-X, in order to create a false and misleading initial association with CREXi.

204. As demonstrated by the chart below, CREXi has identified numerous other examples of CoStar's pervasive, anticompetitive trademark infringement. CREXi suspects many more examples of CoStar's anticompetitive trademark infringement will be revealed in discovery.

| Google Search Term | CoStar's Trademark Infringing Advertisement |
|---|---|
| "crexi property" | "Buy/Sell Commercial RE – Crexi Properties," |
| "crexi buy" | "Crexi – Commercial Buildings for Sale" |
| "crexi commercial property for sale" | "Crexi Commercial – Commercial Buildings For Sale" |
| "crexi site" | "Buy/Sell Commercial RE – Crexi – Commercial Buildings For Sale" |
| "crexi state" | "Buy/Sell Commercial RE – Crexi – Commercial Buildings For Sale" |
| "crexi Orlando" | "Buy/Sell Commercial RE \| Crexi \| Ten-X.com" |
| "crexi Florida" | "Buy/Sell Commercial RE – Crexi – Ten-X.com" |
| "crexi connecticut" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi maine" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi oregon" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi portland" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi vermont" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi fort myers" | "Crexi – Commercial Buildings For Sale – Ten-X.com" |
| "crexi commercial real estate columbus ohio" | "Commercial Buildings For Sale – Crexi Commercial Real…" |

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

205.   On information and belief, Google has informed CoStar that its practice of infringing CREXi's trademark to advertise CoStar's services violates Google's policies, and has removed CoStar's infringing advertisements.  Despite Google's actions to remove certain infringing CoStar advertisements, CoStar continues to advertise its services unlawfully by using the CREXI® mark.

206.   CoStar's use of the CREXI® mark in its advertisements for Ten-X constitutes anticompetitive conduct and willful and intentional trademark infringement, which has damaged CREXi.

### VII.   CoStar Has No Procompetitive Justification for its Anticompetitive Conduct

207.   CoStar has no valid procompetitive justification for its anticompetitive conduct.  Its sole purpose is the suppression of competition, and its exclusionary conduct offers no procompetitive benefit in the relevant markets.

208.   *First*, there is no procompetitive justification for CoStar's exclusionary conduct to prevent customers from using competing products and services and to block competitors from accessing publicly available CRE listing information on CoStar's and brokers' public websites.

209.   CoStar does not own the vast majority of the public CRE information available on its websites.  Most of the CRE information on CoStar's websites is public data provided by CoStar's customers, such as brokers, who pay CoStar to store and display it to the public.  It is these customers, not CoStar, who are making the investment in creating this data.  Moreover, CoStar chooses to make CRE information available to the general public for free on LoopNet's website.  There is no legitimate procompetitive basis for CoStar to make CRE information available to the general public for free, but selectively ban competitors from accessing that same public information.  And CoStar's actions to block CREXi from accessing public listings hosted by LoopLink on ***brokers' websites***, unbeknownst to the brokers themselves, is nakedly anticompetitive.  There is no procompetitive

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

justification for CoStar's interference with competitors' business relationships with brokers by blocking competitors from accessing public listing information on a brokers' website.

210.   Any claimed procompetitive justification proffered by CoStar for its behavior would be pretextual and refuted by its previous policy that publicly available listings should be openly accessible to competitors.

211.   As discussed above, before CoStar acquired LoopNet, CoStar had a formal written policy permitting its employees to access and using CRE information publicly available on LoopNet and LoopLink-hosted websites for competitive purposes.  CoStar likewise had a policy that permitted LoopNet to access the public areas of CoStar's websites.  When LoopNet sought to block CoStar from accessing publicly available listings, CoStar fought in court to protect its ability to access CRE information on LoopNet to compete effectively.  Now that CoStar owns LoopNet, CoStar has reversed its policy of open access and blocks competitors from accessing public information in which it has no independent legal right in order to create proprietary control over information it does not own.

212.   The sole purpose for CoStar's change in position is to foreclose competition in the relevant markets.

213.   *Second*, there is no procompetitive justification for CoStar's conduct to falsely imply intellectual property ownership over CRE information and photographs CoStar does not own.

214.   There is no legitimate justification for CoStar to superimpose its logo—which CoStar falsely claims is its "copyright management information"— to photographs it does not own.  Copyright and other intellectual property laws grant intellectual property holders with a *limited* monopoly extending only to the covered property and only for a defined period of time.  The law prohibits CoStar from seeking to extend a copyright monopoly to other products or works.  Here, CoStar's conduct is even more pernicious and anticompetitive.  By affixing its logo to

1618773

images supplied to CoStar by brokers or other third parties, and then incorrectly claiming that the logo is "copyright management information," CoStar falsely implies copyright ownership over images it never owned in the first place.

215. CoStar's only purpose in doing so is to restrain customers from using competitors' products and services, to prevent competitors from using brokers' CRE information and photographs to compete with CoStar, and to sow confusion in the marketplace regarding the legitimate ownership of property photographs.

216. *Third*, there is no procompetitive justification for CoStar's blatant infringement of CREXi's trademarked name to advertise CoStar's own products and services in the relevant markets. The only purpose of CoStar's use of the CREXI® mark is to unfairly compete with CREXi by misrepresenting CoStar's products as affiliated with CREXi and misleadingly directing customers searching for CREXi's products and services to CoStar's websites. CoStar's anticompetitive trademark infringement siphons customers away from CREXi's competing products and services and only serves to impede competition in the relevant markets.

## VIII.  CREXi Has Suffered Antitrust Injury

217. CoStar's anticompetitive conduct has foreclosed innovative competition in the relevant markets, causing substantial harm to competition.

218. As a direct and proximate cause of CoStar's anticompetitive conduct, CREXi has suffered antitrust injuries of the type the antitrust laws are intended to prevent and that flow from that which makes CoStar's acts unlawful. The injury to CREXi from CoStar's anticompetitive actions is a direct byproduct of the injury to consumers.

219. While CoStar's anticompetitive scheme is designed to foreclose all innovative competition in the relevant markets, CoStar has particularly targeted CREXi. After failing to slow CREXi's momentum in the marketplace through legitimate competition, CoStar specifically targeted CREXi with its scheme of

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

anticompetitive conduct designed to preclude competitors, and CREXi in particular, from making further gains in the relevant markets. Those gains would inevitably result in lower prices, increased innovation, and increased consumer choice.

220. CoStar's targeting of CREXi follows CoStar's *modus operandi* of engaging in anticompetitive behavior to push competitors out of the marketplace or weaken them once they achieve a certain size that CoStar deems to be a competitive threat. It is the same playbook that CoStar ran against LoopNet in order to weaken LoopNet for CoStar's eventual acquisition. It is also the same playbook that CoStar later ran against Xceligent, successfully driving Xceligent out of the market entirely.

221. Like all CoStar competitors, CREXi is unable to compete fully and effectively with CoStar's products and services due to CoStar's anticompetitive conduct. Even though CREXi is a more innovative company with superior products and services, CoStar has been able to maintain its monopolies in the relevant markets and maintain supra-competitive prices by imposing exclusionary contractual terms, claiming intellectual property protection over images and data CoStar does not own, and infringing CREXi's trademarks to advertise CoStar's own products and services.

222. Although CREXi has grown rapidly due to its success, CREXi would present an even greater competitive threat to CoStar's monopolies in the relevant markets if it were permitted to compete on the merits. Indeed, the harm to CREXi is a proxy for the harm to industry-wide competitors and customers because CREXi is the type of innovative and efficient competitor that, if not improperly hindered by CoStar's anticompetitive scheme, would be able to significantly penetrate the relevant markets. That market penetration, absent CoStar's conduct, would force CoStar to become more innovative and efficient to the benefit of consumers. Instead, the opposite is occurring. Competitors such as CREXi (and Xceligent and LoopNet before it) are being improperly foreclosed or acquired by CoStar, and

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

CoStar is maintaining its market dominance not by virtue of its products and services, but rather through its overall anticompetitive scheme.

223.    CREXi's injury reflects the anticompetitive effects of CoStar's exclusionary conduct.  It is through the exclusion of CREXi and other rivals from effective competition in the relevant markets that CoStar has been able to maintain its monopoly power, resulting in higher prices, reduced output, and slowed innovation.

224.    CoStar's anticompetitive conduct has caused significant damage to CREXi in the form of substantially higher costs to pursue entry into the relevant markets, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

225.    Through the imposition of its exclusionary contractual terms and technological measures, CoStar has effectively locked customers into exclusive deals with CoStar and prevented them from competing with CoStar or working with CoStar's competitors.  As a result, CoStar has obstructed and continues to obstruct and restrain CREXi's ability to access brokers' listings and other public CRE data for the purpose of building products and services to compete with CoStar in the relevant markets.

226.    CoStar's anticompetitive conduct disrupts the free flow of CRE information throughout the relevant markets and frustrates the efficient distribution of CRE content by brokers to competitors of CoStar in the relevant markets.  As a direct and proximate result of CoStar's anticompetitive behavior, CREXi has incurred, and will continue to incur, substantially higher costs in an effort to enter and compete with CoStar in the relevant markets.

227.    Likewise, CoStar's anticompetitive practice of claiming intellectual property protection over brokers' photographs and other information that CoStar does not own increases CREXi's costs

1618773

228.   CoStar's infringement of CREXi's trademarked name to advertise CoStar's own products and services has diminished CREXi's goodwill, caused consumer confusion, and hindered CREXi's ability to realize market share and profits through fair competition.

229.   CoStar's anticompetitive behavior has also slowed CREXi's expansion in the relevant markets.  Building internet CRE listing services, information services, and auction services, as CREXi has done and continues to do, is a time-consuming, costly, and labor-intensive endeavor.  Because CoStar's anticompetitive conduct has the effect of blocking CREXi's access to brokers' own CRE information and photographs, CREXi has been forced to spend additional time, resources, and money to build its products and services, substantially slowing CREXi's expansion.

230.   As a direct and proximate result of CoStar's anticompetitive conduct, CREXi has experienced lost revenue and lost profits from unrealized market share that CREXi otherwise would have acquired in the relevant markets, from potential customers electing not to switch from CoStar's services to CREXi's services or from using CREXi's services in addition to CoStar's, and from existing customers electing to terminate their relationships with CREXi.

231.   Finally, CoStar's anticompetitive conduct has caused and will continue to cause substantial harm to competition in the internet CRE listing services, information services, and auction services markets.  As discussed in detail above, CoStar's exclusionary behavior has already led to substantial consolidation in the relevant markets, the elimination of competitors, and further entrenched CoStar's monopoly power.  But for CoStar's anticompetitive behavior, CREXi's entry and growth would have fostered much-needed competition to these relevant markets, paving the way for future competitors, increased market efficiency, greater transparency, innovation, increased consumer choice, and lower costs for brokers

69

1618773

and other customers who are paying supra-competitive prices for CoStar's products and services.

## FIRST CLAIM FOR RELIEF

### (Unlawful Monopolization of the Internet CRE Listing Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)

232. CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 231.

233. CoStar's conduct constitutes the intentional and unlawful maintenance of monopoly power in the internet CRE listing services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

234. The internet CRE listing services market constitutes a relevant product market. A metropolitan area is the relevant geographic market for the product market.

235. CoStar holds monopoly power in the internet CRE listing services market.

236. Barriers to entry and barriers to expansion by existing firms are high in the internet CRE listing services market.

237. CoStar unlawfully maintains its monopoly power in the internet CRE listing services market through the anticompetitive acts described herein, including by:

i)     Imposing exclusionary contractual and technical restrictions to prevent customers from using competitors' products and services and to selectively block competitors from accessing public CRE information on CoStar's and brokers' websites;

ii)     Falsely claiming intellectual property ownership over CRE information and photographs CoStar does not own; and

iii)     Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

70

238.   CoStar's conduct affects a substantial volume of interstate commerce.

239.   CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the internet CRE listing services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE listing services.

240.   CoStar does not have a legitimate business purpose for its anticompetitive conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE listing services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE listings market.  The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

241.   Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative internet CRE listing services, and lower prices for such services, including the products offered by CREXi.

242.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE listing services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

71

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

243.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## SECOND CLAIM FOR RELIEF

**(Unlawful Monopolization of the Internet CRE Information Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)**

244.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 243.

245.   CoStar's conduct constitutes the intentional and unlawful maintenance of monopoly power in the internet CRE information services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

246.   The internet CRE information services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market.

247.   CoStar holds monopoly power in the internet CRE information services market.

248.   Barriers to entry and barriers to expansion by existing firms are high in the internet CRE information services market.

249.   CoStar unlawfully maintains its monopoly power in the internet CRE information services market through the anticompetitive acts described herein, including by:

i)      Imposing exclusionary contractual and technical restrictions to prevent customers from using competitors' products and services and to selectively block competitors from accessing public CRE information on CoStar's and brokers' websites;

ii)     Falsely claiming intellectual property ownership over CRE information and photographs CoStar does not own; and

72

iii)    Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

250.   CoStar's conduct affects a substantial volume of interstate commerce.

251.   CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the internet CRE information services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE information services.

252.   CoStar does not have a legitimate business purpose for its anticompetitive conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE information services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE information services market.  The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

253.   Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative internet CRE information services, and lower prices for such services, including the products offered by CREXi.

254.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

information services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

255.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## THIRD CLAIM FOR RELIEF

**(Unlawful Monopolization of the Internet CRE Auction Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)**

256.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 255.

257.   CoStar's conduct constitutes the intentional and unlawful maintenance of monopoly power in the internet CRE auction services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

258.   The internet CRE auction services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market.

259.   CoStar holds monopoly power in the internet CRE auction services market.

260.   Barriers to entry and barriers to expansion by existing firms are high in the internet CRE auction services market.

261.   CoStar unlawfully maintains its monopoly power in the internet CRE auction services market through the anticompetitive acts described herein, including by:

    i)   Imposing exclusionary contractual and technical restrictions to prevent customers from using competitors' products and services and to selectively block competitors from accessing public CRE information on CoStar's and brokers' websites;

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

ii)    Falsely claiming intellectual property ownership over CRE information and photographs CoStar does not own; and

iii)    Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

262.    CoStar's conduct affects a substantial volume of interstate commerce.

263.    CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the internet CRE auction services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE auction services.

264.    CoStar does not have a legitimate business purpose for its anticompetitive conduct. The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification. CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE auction services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE auction services market. The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

265.    Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative internet CRE auction services, and lower prices for such services, including the products offered by CREXi.

266.    As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust

75

1618773

laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE auction services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

267.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## FOURTH CLAIM FOR RELIEF

**(Attempted Monopolization of the Internet CRE Listing Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)**

268.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 267.

269.   The internet CRE listing services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market.

270.   CoStar willfully and wrongfully attempted to obtain and maintain monopoly power in the internet CRE listing services market.

271.   Barriers to entry and barriers to expansion by existing firms are high in the internet CRE listing services market.

272.   CoStar acted with a specific intent to monopolize and to destroy competition in the internet CRE listing services market through the anticompetitive acts described herein, including by:

i)   Imposing exclusionary contractual and technical restrictions to prevent customers from using competitors' products and services and to selectively block competitors from accessing public CRE information on CoStar's and brokers' websites;

76

ii)      Falsely claiming intellectual property ownership over CRE information and photographs CoStar does not own; and

iii)      Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

273.   CoStar's conduct affects a substantial volume of interstate commerce.

274.   CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the internet CRE listing services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE listing services

275.   CoStar does not have a legitimate business purpose for its anticompetitive conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE listing services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE listing services market.  The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

276.   Throughout the time CoStar engaged in the exclusionary conduct alleged herein, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the internet CRE listing services market and excluding its competitors.

277.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust

laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE listing services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

278.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## FIFTH CLAIM FOR RELIEF

**(Attempted Monopolization of the Internet CRE Information Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)**

279.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 278.

280.   The internet CRE information services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market.

281.   CoStar willfully and wrongfully attempted to obtain and maintain monopoly power in the internet CRE information services market.

282.   Barriers to entry and barriers to expansion by existing firms are high in the internet CRE information services market.

283.   CoStar acted with a specific intent to monopolize and to destroy competition in the internet CRE information services market through the anticompetitive acts described herein, including by:

i)      Imposing exclusionary contractual and technical restrictions to prevent customers from using competitors' products and services and to selectively block competitors from accessing public CRE information on CoStar's and brokers' websites;

1618773

ii)     Falsely claiming intellectual property ownership over CRE information and photographs CoStar does not own; and

iii)     Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

284.   CoStar's conduct affects a substantial volume of interstate commerce.

285.   CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the internet CRE information services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE information services

286.   CoStar does not have a legitimate business purpose for its anticompetitive conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE information services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE information services market.  The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

287.   Throughout the time CoStar engaged in the exclusionary conduct alleged herein, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the internet CRE information services market and excluding its competitors.

288.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust

1618773

laws are intended to protect against. Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE information services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

289. Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law. To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## SIXTH CLAIM FOR RELIEF

### (Attempted Monopolization of the Internet CRE Auction Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)

290. CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 289.

291. The internet CRE auction services market constitutes a relevant product market. A metropolitan area is the relevant geographic market for the product market.

292. CoStar willfully and wrongfully attempted to obtain and maintain monopoly power in the internet CRE auction services market.

293. Barriers to entry and barriers to expansion by existing firms are high in the internet CRE auction services market.

294. CoStar acted with a specific intent to monopolize and to destroy competition in the internet CRE auction services market through the anticompetitive acts described herein, including by:

i) Imposing exclusionary contractual and technical restrictions to prevent customers from using competitors' products and services and to selectively block competitors from accessing public CRE information on CoStar's and brokers' websites;

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

ii) Falsely claiming intellectual property ownership over CRE information and photographs CoStar does not own; and

iii) Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

295. CoStar's conduct affects a substantial volume of interstate commerce.

296. CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the internet CRE auction services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE auction services

297. CoStar does not have a legitimate business purpose for its anticompetitive conduct. The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification. CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE auction services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE auction services market. The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

298. Throughout the time CoStar engaged in the exclusionary conduct alleged herein, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the internet CRE auction services market and excluding its competitors.

299. As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust

laws are intended to protect against. Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE auction services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

300. Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law. To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## SEVENTH CLAIM FOR RELIEF

### (Exclusionary Contracts in Violation of Section 1 of the Sherman Act — 15 U.S.C. § 1)

301. CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 300.

302. Internet CRE listings, information, and auctions services constitute relevant product markets. A metropolitan area is the relevant geographic market for the product markets.

303. Through agreements with customers, including the exclusionary contractual restrictions and other conduct described in Sections VI.A–B, *supra*, CoStar has unreasonably restrained trade in the internet listings, information, and auctions services markets.

304. CoStar's conduct affects a substantial volume of interstate commerce.

305. CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the internet CRE listing, information, and auction services markets and has deprived consumers of the benefits of competition among multiple providers of these services.

CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773

306.   Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative internet CRE listing, information, and auction services, and lower prices for such services, including the products offered by CREXi.

307.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE listing, information, and auction services markets, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

308.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## EIGHTH CLAIM FOR RELIEF

(Exclusionary Contracts in Violation of the Cartwright Act —

Cal. Bus. & Prof. Code § 16720)

309.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 308.

310.   Internet CRE listings, information, and auctions services constitute relevant product markets.  A metropolitan area is the relevant geographic market for the product markets.

311.   Through agreements with customers, including the exclusionary contractual restrictions and other conduct described in Sections VI.A–B, *supra*, CoStar has unreasonably restricted trade in the internet listings, information, and auctions services markets.

312.   CoStar's conduct affects a substantial volume of commerce.

83

1618773

313.   CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competitors from the internet CRE listing, information, and auction services markets and has deprived consumers of the benefits of competition among multiple providers of these services.

314.   Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative internet CRE listing, information, and auction services, and lower prices for such services, including the products offered by CREXi.

315.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE listing, information, and auction services markets, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

316.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## NINTH CLAIM FOR RELIEF

### (Trademark Infringement — 15 U.S.C. § 1114)

317.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 316.

318.   As alleged above, the CREXI® mark is a valid, federally registered trademark owned by CREXi.  CREXi uses the CREXI® mark to describe, advertise, and promote its products and services.  The CREXI® mark is unique, distinctive, and memorable.

84

319.   CoStar has used and is using in interstate commerce reproductions, copies, facsimiles, and depictions of the CREXI® mark in conducting CoStar's business in connection with CoStar's advertising, offering for sale, distribution and sale of its products and services in a manner likely to cause confusion or mistake or to deceive.

320.   CoStar's actions in using the CREXI® mark have at all times been without CREXi's consent and with the intent to cause confusion, mistake and to deceive.  Indeed, CoStar purposefully used the CREXI® mark as a Google AdWord and in the header of CoStar's advertisements in order to associate its products with CREXi's products, to cause consumer confusion, and to direct consumers to its own website instead of CREXi's.

321.   As a result of CoStar's trademark infringement, CoStar has gained profits and CREXi has lost profits.

322.   CoStar's acts constitute trademark infringement in violation of the Trademark Act of 1946, as amended, 15 U.S.C. § 1114.

323.   CoStar's acts complained of herein have damaged, and will irreparably damage, CREXi.  CREXi has no adequate remedy at law for these wrongs and injuries.  The damage to CREXi includes harm to its goodwill and reputation in the marketplace that money damages cannot compensate.  Therefore, CREXi is entitled to injunctive relief restraining and enjoining CoStar and its agents, servants, and employees, and all persons acting in concert therewith, from using the CREXI® mark in connection with the sale, offering for sale, distribution or advertisement of goods, products, or services, or in any manner likely to cause confusion or mistake or to deceive the trade or public as to the source or origin of CoStar's goods, products, or services.

324.   Because CoStar has willfully used the CREXI® mark in a manner calculated to promote the sale of CoStar's goods, products, or services, CREXi is entitled to recover three times CoStar's profits and CREXi's damages, reasonable

85

attorneys' fees, and the costs of this action under 15 U.S.C. §§ 1114, 1116, and 1117.

## TENTH CLAIM FOR RELIEF

### (False Advertising — 15 U.S.C. § 1125(a)(1)(B))

325.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 324.

326.   CoStar's use of the CREXI® mark and promotion of CoStar's products and services as "Crexi" constitutes false advertisements that misrepresent the nature, characteristics, and qualities of CoStar's products and services, and mislead consumers into believing that the products and services offered by CoStar are associated or affiliated with CREXi when in fact they are not.

327.   CoStar's false and misleading advertisements are likely to influence consumers' purchasing decisions about CoStar's products and services, thereby diverting revenue from CREXi.  CoStar's false and misleading advertisements are also likely to lessen the goodwill associated with the CREXI® mark by associating them with the inferior products sold by CoStar.

328.   CoStar's acts complained of herein have damaged, and will irreparably damage, CREXi.  CREXi has no adequate remedy at law for these wrongs and injuries.  The damage to CREXi includes harm to its goodwill and reputation in the marketplace that money damages cannot compensate.  Therefore, CREXi is entitled to injunctive relief restraining and enjoining CoStar and its agents, servants, and employees, and all persons acting in concert therewith, from engaging in the false and misleading advertising alleged herein.

329.   CREXi is also entitled to recover CoStar's profits, CREXi's damages, and CREXi's costs of suit under 15 U.S.C. § 1117.  Furthermore, CoStar's willful use of the CREXI® mark without excuse or justification renders this an exceptional case and entitles CREXi to its reasonable attorneys' fees.

1618773

## ELEVENTH CLAIM FOR RELIEF

### (False Advertising — Cal. Bus. & Prof. Code § 17500)

330. CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 329.

331. CoStar's use of the CREXI® mark and promotion of CoStar's products and services as "Crexi" constitutes false advertisements that misrepresent the nature, characteristics, and qualities of CoStar's products and services, and mislead consumers into believing that the products and services offered by CoStar are associated or affiliated with CREXi when in fact they are not.

332. CoStar knew, or through the exercise or reasonable care should have known, that its statements, advertising, and promotions were untrue or misleading.

333. CoStar's false and misleading advertisements are likely to influence consumers' purchasing decisions about CoStar's products and services, thereby diverting revenue from CREXi. CoStar's false and misleading advertisements are also likely to lessen the goodwill associated with the CREXI® mark by associating them with the inferior products sold by CoStar.

334. CoStar's acts complained of herein have damaged, and will irreparably damage, CREXi. CREXi has no adequate remedy at law for these wrongs and injuries. The damage to CREXi's includes harm to its goodwill and reputation in the marketplace that money damages cannot compensate. Therefore, CREXi is entitled to injunctive relief restraining and enjoining CoStar and its agents, servants, and employees, and all persons acting in concert therewith, from engaging in the false and misleading advertising alleged herein.

335. As a direct and proximate result of CoStar's false and misleading advertising, CREXi has lost money and/or property.

1618773

# TWELFTH CLAIM FOR RELIEF

## (Unfair Competition — Cal. Bus. & Prof. Code § 17200)

336.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 335.

337.   CoStar's anticompetitive and exclusionary conduct violates the policy or spirit of antitrust law.

338.   CoStar engages in unfair competition by:

i)     Imposing exclusionary contractual and technical restrictions to prevent customers from using competitors' products and services and to selectively block competitors from accessing public CRE information on CoStar's and brokers' websites;

ii)     Falsely claiming intellectual property ownership over CRE information and photographs CoStar does not own; and

iii)     Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

339.   CoStar does not have a legitimate business purpose for its anticompetitive and unfair conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE information services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Neither does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE information services market.  The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

340.   Thus, CoStar's actions described herein constitute actionable violations of the UCL's "unfair" business practices prong.

88

341.   As a direct and proximate result of CoStar's conduct, CREXi has suffered and will continue to suffer loss of money and property including but not limited to lost business.

342.   Unless CoStar is enjoined from engaging in the conduct described herein, CREXi will suffer severe, irreparable harm.  CREXi has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of CREXi's business relationships and client goodwill.  CREXi is informed and believes that unless the Court grants injunctive relief and orders CoStar to pay restitution, CoStar will continue to engage in the unfair business practices described herein.

## THIRTEENTH CLAIM FOR RELIEF

### (Unlawful Competition — Cal. Bus. & Prof. Code § 17200)

343.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 342.

344.   CoStar's aforementioned acts—monopolization, attempted monopolization, trademark infringement, and false advertising—constitute violations of the UCL's "unlawful" business practices prong.

345.   As a direct and proximate result of CoStar's conduct, CREXi has suffered and will continue to suffer loss of money and property including but not limited to lost business.

346.   Unless CoStar is enjoined from engaging in the conduct described herein, CREXi will suffer severe, irreparable harm.  CREXi has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of CREXi's business relationships and client goodwill.  CREXi is informed and believes that unless the Court grants injunctive relief and orders CoStar to pay restitution, CoStar will continue to engage in the unfair business practices described herein.

1618773

## FOURTEENTH CLAIM FOR RELIEF

**(Declaratory Judgment that CREXi Has Not Engaged in Unlawful Conduct by Accessing Publicly Available Information on CoStar's Websites)**

347.   CREXi incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 346.

348.   An actual controversy exists between CREXi and CoStar.  CoStar, through its selective enforcement of purported contractual terms, imposition of technological blocking measures, and litigation, has asserted that CREXi engages in wrongful or unlawful conduct by seeking to access publicly available information on CoStar's websites, including LoopNet.  CoStar has engaged in this conduct for an improper, anticompetitive purpose and to give itself an unfair competitive advantage.

349.   CREXi maintains that it is lawful for CREXi to access publicly available information on CoStar's websites, including LoopNet.  CREXi further maintains that it is unlawful for CoStar to selectively block its competitor, CREXi, from accessing publicly available information on CoStar's websites, including LoopNet.

350.   Accordingly, CREXi seeks a declaration that it has not and will not engage in unlawful conduct by accessing publicly available information on CoStar's websites.  CREXi further seeks a declaration that CoStar may not enforce purported contractual terms of service, technological measures, or take any other steps to block CREXi's access to publicly available information on CoStar's websites.  CREXi also seeks a declaration that CoStar has engaged in unlawful conduct by blocking CREXi's access to publicly available information on CoStar's websites.

## PRAYER FOR RELIEF

WHEREFORE, CREXi prays for judgment in favor of CREXi and against CoStar as follows:

1618773

1.      Issuing an Order directing the termination of CoStar's anticompetitive conduct and injunctive relief mandating that CoStar take all necessary steps to cease its unlawful conduct and to restore competition to the relevant markets;

2.      Actual damages for Claims 1–8 in an amount to be determined at trial, trebled pursuant to Section 4 of the Clayton Act and Cal. Bus. & Prof. Code § 16750, along with interest;

3.      Actual and punitive damages for Claims 9–11 in an amount to be determined at trial;

4.      CREXi's costs of suit herein, including its attorneys' fees;

5.      Restitutionary relief;

6.      Awarding a declaration that CoStar's exclusionary and anticompetitive conduct complained of herein is unlawful and unenforceable;

7.      Awarding a declaration that CREXi has not and will not engage in unlawful conduct by accessing publicly available information on CoStar's websites; and

8.      Such other relief as may be just and proper

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 38-1, CREXi respectfully requests a trial by jury on all claims and counterclaims.

Dated: June 23, 2021                    KEKER, VAN NEST & PETERS LLP


By:  */s/ Elliot R. Peters*
       ELLIOT R. PETERS

       Attorneys for Defendant and Counterclaimant
       COMMERCIAL REAL ESTATE
       EXCHANGE, INC.

91
CREXI'S COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1618773