JESSICA STEBBINS BINA (BAR NO. 248485)
jessica.stebbinsbina@lw.com
ELYSE M. GREENWALD (BAR NO. 268050)
elyse.greenwald@lw.com
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525
Fax: 424.653.5501

*Attorneys for Plaintiffs*

[Additional Counsel Listed on the Next Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>　　　　Defendant.<br><br>COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>　　　　Counterclaimant,<br><br>　　v.<br><br>COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC.,<br><br>　　　　Counterdefendants. | CASE NO. 2:20-cv-8819-CBM-AS<br><br>**COSTAR'S NOTICE OF MOTION AND MOTION TO DISMISS CREXi'S COUNTERCLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:　　　　November 2, 2021<br>Time:　　　　10:00 a.m.<br>Courtroom:　8B<br>Before:　　　Hon. Consuelo B. Marshall<br><br>Trial Date:　None Set |

BELINDA LEE (BAR NO. 199635)
belinda.lee@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Tel: 415.391.0600

NICHOLAS J. BOYLE*
nicholas.boyle@lw.com
SARAH A. TOMKOWIAK*
sarah.tomkowiak@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201

Attorneys for Plaintiffs
*Admitted pro hac vice*

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that on November 2, 2021, at 10:00 AM, or as soon thereafter as this matter can be heard, in the courtroom of the Honorable Consuelo B. Marshall, located at the First Street Courthouse, 350 W. 1st Street, Los Angeles, CA 90012, Courtroom 8B, Plaintiffs CoStar Group, Inc., and CoStar Realty Information, Inc. (collectively "CoStar") will move for an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing with prejudice all of Defendant Commercial Real Estate Exchange, Inc.'s ("CREXi") Counterclaims (Dkt. 74), including CREXi's antitrust claims brought under Sections 1 and 2 of the Sherman Act and California's Cartwright Act; its claims for false advertising and trademark infringement under the Lanham Act; its state law claims for false advertising, and unfair and unlawful competition; and its request for declaratory relief.  This Motion is made on the following grounds:

1.     CREXi's monopolization and attempted monopolization claims brought under Section 2 of the Sherman Act should be dismissed because CREXi has not alleged that CoStar has engaged in any actionable exclusionary conduct.  *See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (requiring "an element of anticompetitive *conduct*" to state monopolization claims).

2.     CREXi's claims for "exclusionary contracts" under Section 1 of the Sherman Act and the Cartwright Act should be dismissed because CREXi fails to plausibly plead any exclusive arrangement between CoStar and its customers or that CoStar's supposedly exclusive agreements have foreclosed a substantial share of any relevant market.  *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).

3.     All of CREXi's antitrust claims (whether brought under Section 1, Section 2, or the Cartwright Act) should also be dismissed because CREXi has failed

1    to sufficiently plead that CoStar has market power in any relevant antitrust market.

2    CREXi's alleged unidentified "individual metropolitan areas" is too vague to state a

3    plausible geographic market.  *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063

4    (9th Cir. 2001).  And, its allegations that CoStar is "dominant in an overwhelming

5    majority" of some unknown "metropolitan areas" is too conclusory to plead market

6    power.  *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th

7    Cir. 2008).

8        4.    CREXi's false advertising claims under the Lanham Act and California

9    law should be dismissed because CREXi fails to allege that (i) CoStar made any

10   false statement; (ii) CoStar's ads actually deceived or had a tendency to deceive

11   reasonable consumers; or (iii) CoStar's ads actually influenced any consumer's

12   purchasing decision.  *See Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171,

13   1179 (9th Cir. 2010); *Novation Ventures, LLC v. J.G. Wentworth Co.*, 2015 WL

14   12765467, at *7-8 (C.D. Cal. Sept. 21, 2015).

15       5.    CREXi's claim for trademark infringement under the Lanham Act also

16   should be dismissed because CREXi has not plausibly pled a likelihood of consumer

17   confusion stemming from CoStar's alleged use of CREXi's trademark in its Google

18   AdWord ads for its auction platform, Ten-X.  *See Network Automation, Inc. v.*

19   *Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, ,1144 (9th Cir. 2011).  Even if

20   CREXi's allegations were plausible, they would concern potential "initial interest"

21   confusion that does not result in a diverted sale, and thus should provide no basis for

22   relief.  *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1030

23   & n.43 (9th Cir. 2004).

24       6.    CREXi's claims of unfair and unlawful competition under California

25   Business & Professional Code § 17200 are derivative of its antitrust, false

26   advertising, and trademark claims and fail for the same reasons.  *See ThermoLife*

27   *Int'l, LLC v. Am. Fitness Wholesalers, L.L.C.*, 831 F. App'x 325, 326 (9th Cir. 2020);

28   *Cullen v. Netflix, In*c., 880 F. Supp. 2d 1017, 1028 (N.D. Cal. 2012).

7. Finally, CREXi's request for a declaratory judgment that it is lawful for it to access CoStar's websites should be dismissed because it simply repackages legal issues that CREXi and CoStar are already litigating. *See Englewood Lending Inc. v. G & G Coachella Invs., LLC*, 651 F. Supp. 2d 1141, 1145 (C.D. Cal. 2009). This claim should also be dismissed because this Court has already rejected CREXi's argument that it is entitled to access CoStar's websites, *see* Dkt. 71, and CoStar has no legal obligation to allow CREXi to access its products.

This Motion is based on this Notice of Motion and Motion to Dismiss, the accompanying Memorandum of Points and Authorities, CREXi's Counterclaims, the Court's record on this matter, the arguments of counsel, and other evidence and argument that may be presented prior to the Court's decision on this Motion.

**Compliance with Local Rule 7-3**. This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on August 6, 2021. The parties were unable to resolve the issues raised by this Motion.

Respectfully submitted,

Dated: August 13, 2021

**LATHAM & WATKINS LLP**

By: */s/* Jessica Stebbins Bina
(Bar No. 248485)

Elyse M. Greenwald
(Bar No. 268050)
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525
Fax: 424.653.5501
Email: jessica.stebbinsbina@lw.com
elyse.greenwald@lw.com

Belinda S Lee (Bar. No. 199635)
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Tel: 415.391.0600
Fax: 415.395.8095
Email: belinda.lee@lw.com

Nicholas J. Boyle
(admitted *pro hac vice*)

3

CASE NO. 2:20-cv-8819-CBM-AS
COSTAR'S NOTICE OF MOTION AND MOTION TO
DISMISS CREXi'S COUNTERCLAIMS; MEMORANDUM
OF POINTS AND AUTHORITIES

Sarah A. Tomkowiak
(admitted *pro hac vice*)
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201
Email: nicholas.boyle@lw.com
       sarah.tomkowiak@lw.com

*Counsel for CoStar Group, Inc., and
CoStar Realty Information, Inc.*

1

## **TABLE OF CONTENTS**

2   INTRODUCTION ................................................................................................. 1

3   LEGAL STANDARD ......................................................................................... 3

    CREXI'S ALLEGATIONS ................................................................................. 3

4   ARGUMENT ....................................................................................................... 5

5   I.      THE COURT SHOULD DISMISS CREXI'S ANTITRUST
            CLAIMS ................................................................................................... 5

6
        A.     CREXi Fails To Plead Exclusionary Conduct To Support
7              A Monopolization Or Attempted Monopolization Claim ................. 6

8              1.     CoStar's Supposed Refusal To Deal With CREXi
                      Is Not Actionable Under The Antitrust Laws ......................... 6

9              2.     CoStar's Agreements With Brokers Are, On Their
                      Face, Not "Exclusionary" ....................................................... 9

10             3.     CoStar's Alleged Trademark Infringement Is Not
                      Actionable Under the Sherman Act ....................................... 12

11
        B.     CREXi Fails To Allege Any Claim Under Section 1 Or
12             The Cartwright Act ......................................................................... 13

13      C.     CREXi's Antitrust Claims Should Also Be Dismissed
               Because CREXi Does Not Plausibly Allege That CoStar
               Has Market Power ............................................................................ 14

14
               1.     CREXi Does Not Allege A Plausible Geographic
15                    Market ................................................................................... 15

               2.     CREXi Also Has Not Plausibly Alleged That
16                    CoStar Has Market Power ..................................................... 16

17  II.     THE COURT SHOULD DISMISS CREXI'S REMAINING
            CLAIMS ................................................................................................. 18

18
        A.     CREXi Has Not Pled A Claim For False Advertising Or
19             Trademark Infringement .................................................................. 18

               1.     CREXi Fails To State Claim For False Advertising
20                    Under The Lanham Act .......................................................... 18

21             2.     CREXi Fails To State A Claim For False
                      Advertising Under California Law ......................................... 19

22             3.     CREXi Fails To Plead A Trademark Infringement
                      Claim ..................................................................................... 20

23      B.     CREXi's Unfair And Unlawful Competition Claims Fail
               Too .................................................................................................... 24

24      C.     CREXi Is Not Entitled To A Declaratory Judgement ...................... 25

25  CONCLUSION .................................................................................................. 25

26

27

28

i

CASE NO. 2:20-cv-8819-CBM-AS
COSTAR'S NOTICE OF MOTION AND MOTION TO
DISMISS CREXi'S COUNTERCLAIMS; MEMORANDUM
OF POINTS AND AUTHORITIES

1
2

# <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

## CASES

5
6
7

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  755 F. Supp. 2d 1151 (D. Utah 2010), *aff'd in part, rev'd in part
  on other grounds*, 722 F.3d 1229 (10th Cir. 2013) ............................................. 13

8

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ..................................................... 10, 12

9
10

*AK Metals, LLC v. Norman Indus. Materials, Inc.*,
  2013 WL 417323 (S.D. Cal. Jan. 31, 2013) ...................................... 24

11
12

*Aleksick v. 7-Eleven, Inc.*,
  205 Cal. App. 4th 1176 (2012) .......................................... 24

13
14

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) ........................................ 14

15
16

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's
  Found. of Am., Inc.*,
  307 F. Supp. 3d 260 (S.D.N.Y. 2018) .................................... 13

17
18
19

*American Professional Testing Service, Inc. v. Harcourt Brace
  Jovanovich Legal & Professional Publications, Inc.*,
  108 F.3d 1147 (9th Cir. 1997) .................................... 12, 13

20
21

*AMF, Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) ..................................... 21

22
23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................. 3

24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ............................................. 8

25
26

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
  457 F.3d 1062 (9th Cir. 2006) .................................. 22

27
28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................... 3

*Blue Water Innovations, LLC v. Fettig*,
    2019 WL 1904589 (S.D. Fla. Mar. 8, 2019) ...................................................... 21

*Chase Mfg., Inc. v. Johns Mansville Corp.*,
    2019 WL 2866700 (D. Colo. July 3, 2019)........................................................ 16

*Chase Mfg., Inc. v. Johns Manville Corp.*,
    2020 WL 1433504 (D. Colo. Mar. 23, 2020)....................................................... 17

*CollegeSource, Inc. v. AcademyOne, Inc.*,
    653 F.3d 1066 (9th Cir. 2011)............................................................................ 5

*Cullen v. Netflix, Inc.*,
    880 F. Supp. 2d 1017 (N.D. Cal. 2012) .......................................................... 25

*Ebner v. Fresh, Inc.*,
    838 F.3d 958 (9th Cir. 2016) ........................................................................... 20

*Englewood Lending Inc. v. G & G Coachella Invs., LLC*,
    651 F. Supp. 2d 1141 (C.D. Cal. 2009).............................................................. 25

*FTC v. Facebook, Inc.*,
    2021 WL 2643627 (D.D.C. June 28, 2021) ....................................................... 17

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ....................................................... 6, 7, 8, 9, 10, 14

*Gate Pharmacy Serv. v. Pfizer, Inc.*,
    433 F. App'x 598 (9th Cir. 2011)..................................................................... 15

*Guardian Pool Fence Sys. Inc. v. Sunwest Indus., Inc.*,
    2017 WL 2931413 (C.D. Cal. June 1, 2017)....................................................... 21

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ......................................................................... 15

*Hip Hop Bev. Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018)................................................................ 14, 17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    485 F. Supp. 3d 1137 (N.D. Cal. 2020) ........................................................ 8, 9

*Karl Storz Imaging, Inc. v. Pointe Conception Med., Inc.*,
    2011 WL 13195980 (C.D. Cal. Aug. 1, 2011) .................................................. 23

*Kelsey K. v. NFL Enters., LLC*,
 757 F. App'x 524 (9th Cir. 2018)........................................................... 13

*LiveUniverse, Inc. v. MySpace, Inc.*,
 304 F. App'x 554 (9th Cir. 2008)........................................................ 8, 12

*Manley Toys, Ltd. v. FNF Enters., Inc.*,
 2010 WL 11519536 (C.D. Cal. Aug. 2, 2010) ...................................... 19

*Multi Time Mach., Inc. v. Amazon.com, Inc.*,
 804 F.3d 930 (9th Cir. 2015) ........................................................... 21, 23

*Murray v. Cable Nat. Broad. Co.*,
 86 F.3d 858 (9th Cir. 1996) ................................................................... 20

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
 638 F.3d 1137 (9th Cir. 2011) ................................................... 21, 22, 23

*Novation Ventures, LLC v. J.G. Wentworth Co.*,
 2015 WL 12765467 (C.D. Cal. Sept. 21, 2015)............................... 18, 19

*Novation Ventures, LLC v. J.G. Wentworth Co.*,
 2016 WL 6821110 (C.D. Cal. Feb. 1, 2016), *aff'd*, 711 F. App'x
 402 (9th Cir. 2017) ............................................................................... 22

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
 555 U.S. 438 (2009) ................................................................................ 7

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
 354 F.3d 1020 (9th Cir. 2004)......................................................... 21, 23

*R & A Synergy LLC v. Spanx, Inc.*,
 2019 WL 4390564 (C.D. Cal. May 1, 2019).......................................... 19

*Rebel Oil Co. v. Atl. Richfield Co.*,
 51 F.3d 1421 (9th Cir. 1995) ........................................................... 16, 17

*Retractable Technologies, Inc. v. Becton Dickinson & Co.*,
 842 F.3d 883 (5th Cir. 2016) ................................................................. 12

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
 532 F.3d 963 (9th Cir. 2008) ........................................................... 15, 17

*Royal Holdings Techs. Corp. v. FLIR Sys., Inc.*,
 2021 WL 945246 (C.D. Cal. Jan. 8, 2021) ........................................... 19

*Sen v. Amazon.com, Inc.*,
  2020 WL 4582678 (S.D. Cal. Aug. 10, 2020), *appeal filed*, No. 20-
  55857 (9th Cir. Aug. 20, 2020) ........................................................................ 24

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ............................................................................. 3

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ......................................................................................... 12

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) .......................................................................... 15

*ThermoLife Int'l, LLC v. Am. Fitness Wholesalers, L.L.C.*,
  831 F. App'x 325 (9th Cir. 2020) ..................................................................... 24

*Top Rank, Inc. v. Haymon*,
  2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ............................................ 16, 17

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
  610 F.3d 1171 (9th Cir. 2010) ..................................................................... 19, 22

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ..................................................................................... 6, 7, 8

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) ............................................................................ 9

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
  758 F.3d 1069 (9th Cir. 2014) .......................................................................... 18

**STATUTES**

15 U.S.C. § 1 ............................................................................................... 5, 13, 14

15 U.S.C. § 2 ........................................................................................... 5, 6, 12, 14

Cal. Bus. & Prof. Code § 17200 .............................................................................. 24

Cal. Bus. & Prof. Code § 17500 .............................................................................. 19

**RULES**

Fed. R. Civ. Proc. 12(b)(6) ...................................................................................... 3

# OTHER AUTHORITIES

Elisa V. Mariscal & David S. Evans, *The Role of Keyword Advertising in Competition Among Rival Brands*, Univ. of Chi. Law. Sch., Coase-Sandor Inst. for Law & Econ. Working Paper No. 619 (Nov. 2012) ..................................................................................................... 13

Google, *Rigorous Testing*, https://www.google.com/search/howsearchworks/mission/users/ (last visited Aug. 12, 2021) ............................................................. 20

**INTRODUCTION**

Plaintiffs CoStar Group, Inc. and CoStar Realty Information, Inc. (together, "CoStar") provide commercial real estate information, analytics, and online property marketplaces to property owners, lessees, and brokers, among others. CoStar has built its business the right way: relying on the hard work of thousands of employees over three decades, and investing over $5 billion to develop its commercial real estate products, including its subscription database and the LoopNet marketplace.

CoStar competitor and Defendant Commercial Real Estate Exchange Inc. ("CREXi") has taken an alternative route. CREXi steals from CoStar. CREXi accesses CoStar's password-protected database using credentials belonging to other companies and then mass downloads content from CoStar's database. It has copied more than 11,000 CoStar copyrighted photographs and published them on its competing website. It has impermissibly accessed CoStar's LoopNet marketplace more than one million times to copy images and leverage other content. That is why CoStar sued CREXi for copyright infringement, misappropriation, unfair competition, false advertising, and breach of contract. CREXi did not even contest CoStar's claim for infringement and, after considering CREXi's motion to dismiss, the Court allowed all of those other claims to proceed.

Caught red-handed, CREXi seeks to divert attention by concocting counterclaims. They are rooted in the idea that CREXi, despite the masses of evidence of its wrongdoing, is somehow a victim, and the misguided notion that CoStar is required as a matter of law to help CREXi compete. CREXi seeks to allege a supposedly "anticompetitive scheme" by CoStar to prevent brokers from using competing commercial real estate ("CRE") services, block competitors from accessing CoStar's products, and confuse consumers through false advertising and trademark infringement.

CREXi's counterclaims are makeweight and should be dismissed. Its antitrust claims are conclusory, contradictory, and based on the faulty legal premise that

CoStar is obligated to build CREXi's business.  The antitrust laws do not require that CoStar provide CREXi access to its content so that CREXi can copy and display it.  And CREXi's assertion that CoStar has entered into "exclusive" agreements that preclude brokers from using competitors' products is implausible.  CoStar's contracts, which CREXi attaches and incorporates by reference into its counterclaims, are on their face "***non-exclusive***" and do not prevent brokers from sharing information with CREXi or anyone else.  Faced with that contradiction, CREXi is forced to assert that CoStar adds fake data to listings and watermarks broker photographs to achieve exclusivity, but those conclusory claims are unsubstantiated, implausible, and contrary to CREXi's other allegations.  CREXi fails to plead a single example of a modified listing, watermarked photo, or broker who as a result of CoStar's conduct could not deal with CREXi.  And CREXi affirmatively alleges that brokers use multiple listing sites, which undercuts its allegation of CoStar-exclusivity, and admits that it tells the world that CREXi has more listings than any other site, consistent with the plain language of CoStar's non-exclusive contracts, and contrary to its claim of monopoly maintenance.  CREXi ultimately concedes that the only barrier to more listings on CREXi is that it takes effort on the part of brokers, but that is not a violation of the antitrust laws.

CREXi's other claims are similarly deficient.  CREXi has not alleged that CoStar has made any false statement to support a false advertising claim or that any sophisticated consumer of CRE auction services would be confused by CoStar's alleged use of CREXi's trademark in its Google AdWords ads for Ten-X, when that consumer is searching for high priced CRE to buy or sell.  Its derivative unfair and unlawful competition claims must likewise fail; and CREXi is not entitled to any declaratory relief regarding the very conduct that is the subject of this litigation.

CREXi's claims, brought nine months after CoStar filed its initial complaint, and only after the Court allowed CoStar's claims against CREXi to proceed, should be seen for what they are:  a smokescreen to distract from CREXi's own wrongdoing

2

CASE NO. 2:20-cv-8819-CBM-AS
COSTAR'S NOTICE OF MOTION AND MOTION TO
DISMISS CREXi'S COUNTERCLAIMS; MEMORANDUM
OF POINTS AND AUTHORITIES

and a cudgel to increase the cost of resolving CoStar's claims.  Those counterclaims should be dismissed in their entirety, and with prejudice.

## LEGAL STANDARD

A complaint must be dismissed under Rule 12(b)(6) unless it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  A claim is plausible only where the plaintiff pleads "facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct." *Somers v. Apple, Inc.*, 729 F.3d 953, 959-60 (9th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The "insistence on specificity" in pleading is particularly important when a plaintiff alleges antitrust claims, because antitrust discovery can be "costly and protracted." *Id.* at 966 (citation omitted).

## CREXI'S ALLEGATIONS

Seeking to excuse its now admitted wrongdoing[1], CREXi claims to be the "victim" of a supposedly anticompetitive scheme that CoStar deploys to maintain its alleged monopolies in the internet CRE listing, information, and auction services markets in "metropolitan areas." CREXi Countercls., Dkt. 74, ¶¶ 1, 4, 7.  According to CREXi, CoStar's "scheme" has three components:

***First***, CREXi claims that CoStar imposes "exclusionary contractual terms" that (1) prohibit competitors from accessing broker-provided information on CoStar's websites, and (2) prevent brokers from using competing internet CRE products and services. *Id.* ¶ 9.  Specifically, CREXi claims that the terms of use for CoStar's products—LoopNet, LoopLink, Ten-X, and its CoStar database—prohibit competitors from accessing its websites and that CoStar enforces this prohibition

---

[1]   CREXi's Answer concedes that its employees used stolen passwords to access and copy from CoStar's subscription database (Dkt. 73, ¶ 112); its Motion to Dismiss did not even attempt to challenge CoStar's showing of mass copyright infringement (Dkt. 55-1 at 3); and rather than deny that it had misappropriated data, CREXi argued instead that it was justified in doing so if the content appeared on a public site (*id.* at 9), an argument the Court rejected.  Dkt. 71 at 6.

through technological measures. *See, e.g.*, *id.* ¶¶ 136-37. In addition, CREXi claims that CoStar's terms of use prevent "brokers from providing public CRE listings to competing platforms," though it has identified no contractual provision that actually includes such a prohibition. *Id.* ¶¶ 110-11; *see also id.* ¶ 111 ("CoStar's exclusionary contractual terms . . . operate as exclusive agreements."); *accord id.* ¶ 225.

In reality, CoStar is allowed to prohibit competitors from accessing its products, and its terms of use, which CREXi attaches, only provide CoStar with a "***non-exclusive***" license to broker-submitted content, *see, e.g.*, *id.* at Ex. B at 2. Those terms also require that brokers "retain[] [their own] back-up copies of all information [and] photographs" provided to CoStar. *Id.* Brokers are free to share their information with any competing CRE platform, which they do, as CREXi advertises that it has "far more listings than the competitors out there." First Am. Compl. ¶ 25, Dkt. 33 ("FAC"); Answer ¶ 25, Dkt. 73. It might be easier to covertly copy listing information from CoStar instead of obtaining it from brokers, as CREXi concedes, Countercls. ¶ 118, but that is hardly the concern of the antitrust laws.

***Second***, CREXi claims that CoStar "routinely seeds brokers' listings" on LoopNet "with inaccurate data and adds its watermark to photographs provided by brokers" so that it can "falsely claim intellectual property protection." *Id.* ¶¶ 13-14. CREXi argues that this supposed conduct "operate[s] as a *de facto* barrier preventing customers from using competing products" and "CoStar's competitors from freely using broker and other customer data." *Id.* ¶ 185. These allegations are unsubstantiated and implausible.[2] Even if those allegations were true, because CoStar's agreements are, on their face, non-exclusive, brokers can freely share their

---

[2]    CREXi does not identify a single listing that CoStar has supposedly inaccurately modified, a broker-provided image to which CoStar has applied its watermark (as opposed to its name, which CoStar does not allege signifies its copyright over an image), or any broker who was unable to provide its information to CREXi because of CoStar's supposedly "routine" practices. CREXi's speculation about those practices is thus conclusory and unsubstantiated and may be disregarded. That speculation is also at odds with the actual contracts at issue, which require brokers to maintain their own information, and contradicted by CREXi's allegation that brokers use multiple listing services. It should not be credited for those additional reasons.

4

CASE NO. 2:20-cv-8819-CBM-AS
COSTAR'S NOTICE OF MOTION AND MOTION TO
DISMISS CREXI'S COUNTERCLAIMS; MEMORANDUM
OF POINTS AND AUTHORITIES

information with competing CRE websites.  Indeed, CREXi admits that brokers use multiple listing services and can share their information with competing platforms, they just prefer not to invest the "time and effort" to do so.  *Id.* ¶¶ 118, 229.

***Third***, CREXi alleges that CoStar has infringed its trademark by buying "CREXi" as a Google AdWord and using the mark in Google-generated ads for Ten-X.  *Id.* ¶¶ 198, 200.  "An AdWord is a word or phrase that, when entered as a search term in Google, prompts Google to display an advertisement designed by the AdWord owner linking to the owner's website."  *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1071 (9th Cir. 2011).  But keyword advertising on a competitor's trademark is commonplace, and CREXi fails to allege how any consumers were, or plausibly could have been, confused by CoStar's ads.[3]

CREXi argues that this "anticompetitive scheme" gives rise to federal antitrust claims under Sections 1 and 2 of the Sherman Act; a state antitrust claim under the Cartwright Act; federal trademark infringement and false advertising claims under the Lanham Act, and state false advertising, unfair, and unlawful competition claims.  CREXi also seeks a declaratory judgment that it has not engaged in unlawful conduct by accessing CoStar's websites, including LoopNet.  Each of these claims is inadequately pled and should be dismissed.

## ARGUMENT

## I.   THE COURT SHOULD DISMISS CREXI'S ANTITRUST CLAIMS

CREXi's claims for monopolization (Counts I, II and III), attempted monopolization (Counts IV, V, and VI), and "exclusionary contracts" (Counts VII and VIII) are meritless.

---

[3]   While CREXi alleges that CoStar has grown through "anticompetitive acquisitions" and litigation, Countercls. ¶¶ 62-90, CREXi is not bringing any claim based on CoStar's alleged *acquisition* of monopoly power.  It is only alleging that CoStar has unlawfully *maintained* its alleged monopoly in specific markets.  *See id.* ¶¶ 233, 245, 257.  CREXi's allegations regarding CoStar's acquisition of LoopNet a decade ago and the demise of Xceligent in 2017 are thus irrelevant.  So too is the FTC's blocking of CoStar's RentPath transaction, which involved a market for internet listing services for large residential apartment complexes, a market not at issue here.

5

CASE NO. 2:20-cv-8819-CBM-AS
COSTAR'S NOTICE OF MOTION AND MOTION TO
DISMISS CREXi'S COUNTERCLAIMS; MEMORANDUM
OF POINTS AND AUTHORITIES

**A.    CREXi Fails To Plead Exclusionary Conduct To Support A Monopolization Or Attempted Monopolization Claim**

CREXi's monopolization and attempted monopolization claims brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, should be dismissed because CREXi has not alleged that CoStar engaged in any exclusionary conduct.  While CREXi repeatedly denigrates CoStar as a "monopolist" and pretends that label states a claim, the Supreme Court has made clear that "the mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only ***not unlawful; it is an important element of the free-market system.***"  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("*Trinko*") (emphasis added).  Thus, to plead a Section 2 claim, CREXi must do more than (wrongly) label CoStar a "monopolist."  *See id.*  CREXi must allege that CoStar has maintained or attempted to acquire monopoly power through ***exclusionary conduct***, *i.e.*, conduct that has "an anticompetitive effect" and "harm[s] the competitive *process* and thereby harm consumers."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (citation and quotation omitted).  CREXi has alleged no conduct that satisfies that standard.  None of the three prongs of CoStar's supposed "scheme" rise to the level of actionable exclusionary conduct.[4]

**1.    CoStar's Supposed Refusal To Deal With CREXi Is Not Actionable Under The Antitrust Laws**

CREXi complains that CoStar prohibits competitors from accessing its websites, but as this Court already recognized, CoStar is allowed to do exactly that.  In moving to dismiss CoStar's claim for misappropriation, CREXi argued that

---

[4]    CREXi has brought separate antitrust claims focused on three product markets.  Countercls. ¶¶ 232-316.  While CREXi talks of a "scheme" to try to tie together its claims of exclusionary conduct, that conduct has to be assessed in a relevant market.  For example, that CoStar supposedly modifies LoopNet listings has no relevance (alleged or in reality) to the antitrust claims relating to the auction or information services markets.  *See, e.g.*, *id.* ¶¶ 172, 174, 176, 180-83.  The allegations of exclusionary conduct are deficient in the aggregate, but are even more so when they are viewed in the context of each alleged relevant market.  *See* Ex. A, attached hereto, which details CREXi's allegations of exclusionary conduct and the relevant markets to which they apply.

CoStar's blocking of CREXi from its websites constituted "unfair and unlawful competition." Dkt. 55-1 at 2. But the Court rejected CREXi's argument in allowing CoStar's claim to proceed. Dkt. 71 at 6. The Court's decision was correct as a matter of antitrust law because, "[a]s a general rule, businesses are free to choose the parties with whom they will deal," including dealing or not dealing with a competitor. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *see also Trinko*, 540 U.S. at 408. Under the Sherman Act, there is "no duty to aid competitors," and the Supreme Court has repeatedly affirmed that a party alleged to have provided "insufficient assistance" to its rivals has not violated the antitrust laws. *Trinko*, 540 U.S. at 410-11; *linkLine*, 555 U.S. at 448-51; *see also Qualcomm*, 969 F.3d at 994 ("[T]here is 'no duty to deal under the terms and conditions preferred by a competitor's rival.'" (citation omitted)).

At best, all that CREXi alleges is that CoStar has provided it "insufficient assistance," which the Supreme Court recognized "is not a recognized antitrust claim under the Court's existing refusal-to-deal precedents." *Trinko*, 540 U.S. at 410. CREXi contends that "the monetary costs and investment in time and resources to develop and maintain products and services in the internet CRE listing, information, and auction services markets is substantial." Countercls. ¶ 52. CREXi would like to avoid those costs, reasoning that it would be cheaper and easier to build competing products if it could simply access and copy the contents of CoStar's websites and databases. *See id.* ¶ 118. Thus, CoStar's supposedly "anticompetitive" acts consist of nothing more than actions that CoStar has taken to protect the fruits of its hard labor and billions of dollars of investment. This includes prohibiting competitors from accessing and copying content from CoStar's websites in order to compete with CoStar, *id.* ¶¶ 131-36; employing technological measures to block competitors' access to its products, *id.* ¶¶ 137-40; and asserting rights over its CRE marketplaces

and database, *id.* ¶¶ 171-89.[5]  All of CREXi's allegations merely describe CoStar's refusal to allow CREXi to access its websites and database to steal content in order to create competing CRE products.

As the Supreme Court explained in *Trinko*, there would be no incentive for a company like CoStar to invest in building its successful CRE database and marketplaces if it could be compelled "to share the source of [its] advantage" with other firms that did not make the same investment.  540 U.S. at 407.  It is for that reason—"[t]o safeguard the incentive to innovate," *id.*—that the antitrust laws impose no obligation to deal with or render assistance to competitors.  The Sherman Act thus provides no basis to force CoStar to provide a shortcut that would accelerate the growth of CREXi's business while eroding the value of CoStar's.  *See, e.g.*, *LiveUniverse*, *Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556-58 (9th Cir. 2008) (affirming dismissal of LiveUniverse's monopolization claim because MySpace had no duty to deal with LiveUniverse or allow MySpace users to link to content on competing social networking sites); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1149–52, 1155 (N.D. Cal. 2020) (holding that hiQ failed to plead a plausible monopolization claim based on LinkedIn's refusal to allow hiQ to access its website even to access otherwise publicly available user submitted information).

While there is "one, limited exception" to the "general rule that there is no antitrust duty to deal," it does not apply here.  *Qualcomm*, 969 F.3d at 993.  The Ninth Circuit has explained that under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), "a company engages in prohibited, anticompetitive conduct when (1) it unilaterally terminates a voluntary and profitable course of dealing; (2) the only conceivable rationale or purpose is to sacrifice short term

---

[5]   CREXi misleadingly suggests that CoStar interferes with its ability to access brokers' websites.  *See, e.g.*, Countercls. ¶ 10.  In its complaint, CoStar is clear that it is not alleging that CREXi has unlawfully accessed LoopLink, FAC at 2 n.1, and in its counterclaims, CREXi points to only a single example of CoStar supposedly blocking access to the LoopLink hosted portion of a broker's website.  *See* Countercls. ¶¶ 140-42.  But, even assuming that CREXi's allegations were plausible (and they are not), all it has pled is that CoStar blocks it from accessing the part of a broker's website that is hosted by *CoStar's* LoopLink product.  *See id.* ¶ 31.

benefits in order to obtain higher profits in the long run from the exclusion of competition; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993-94 (citations omitted).  To fit within the *Aspen Skiing* exception, a plaintiff must plead all three elements, and CREXi has pled none.  CREXi alleges no previous "voluntary and profitable course of dealing" between it and CoStar that CoStar terminated.[6]  *Id.* at 993 (citation omitted).  Nor does CREXi plead that CoStar sacrificed any short-term benefit in order to obtain higher profits in the long run.  *See id.*  And, CREXi does not allege that CoStar has singled out CREXi; instead, it alleges that CoStar prohibits ***all*** competitors from accessing its products. Countercls. ¶¶ 131-36.  Thus, CREXi's allegations that CoStar blocks it from accessing its products, even if true, reflect permissible conduct that cannot give rise to any Section 2 claim.

### 2.    CoStar's Agreements With Brokers Are, On Their Face, Not "Exclusionary"

CREXi's allegations that CoStar "imposes exclusionary contractual" terms that prevent customers from using competing products, *id.* ¶ 110, also cannot support a Section 2 claim because CREXi alleges no facts to support any finding of exclusivity.  The agreements that are the basis for CREXi's claims—the terms of use for CoStar's products—expressly contradict CREXi's allegations of exclusivity. *See id.* ¶¶ 114-16, Exs. B-D; *see also Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (a court is not required to accept as true allegations that are contradicted by agreements attached to or referenced in a complaint).

An "exclusive" arrangement under the antitrust laws has a particular meaning and refers to "an agreement between a vendor and a buyer that prevents the buyer

---

[6]    While CREXi alleges that prior to its acquisition of LoopNet, CoStar was of the view that it should be able to access information on LoopNet, but after its acquisition took a different position, Countercls. ¶¶ 152-64, that does not identify any "voluntary and profitable course of dealing" between CoStar and ***CREXi***.  *See hiQ*, 485 F. Supp. 3d at 1150-51 (*Aspen Skiing* did not apply where hiQ failed to allege that it and LinkedIn had "a voluntary course of dealing").

from purchasing a given good from any other vendor." *Qualcomm*, 969 F.3d at 1003 (citation omitted).  While CREXi alleges that CoStar's terms of use "restrict brokers from providing public CRE listings to competing platforms," Countercls. ¶¶ 9, 110, it fails to identify ***any*** contractual provision that prevents brokers from sharing their information with CoStar's competitors.  Each of the agreements that CREXi wrongly labels as "exclusive" only grants CoStar a ***non-exclusive*** license to broker-submitted content.  *Id.* ¶¶ 114 ("LoopNet and its affiliates . . . are granted a ***non-exclusive . . .*** right and license to all such [broker] Submitted Content."), 115 (alleging that CoStar's subscription database's terms of use provide a "***non-exclusive right*** and license with respect to . . . content submitted by brokers"), 116 ("[T]he LoopLink Terms merely grant LoopNet a ***non-exclusive*** license . . . .") (emphases added). CoStar's agreements could not be clearer in their lack of exclusivity.  CoStar's terms of use also require that brokers maintain a copy of any materials they provide to LoopNet.  *E.g.*, *id.* at Ex. B at 2.  Brokers who supply CRE listings or photographs to CoStar are thus free to supply the same information to CREXi.  Indeed, CREXi admits that brokers do exactly that.  CREXi alleges that brokers typically use multiple "internet CRE listing services," Countercls. ¶ 33, and admits that it advertises that it has "far more listings than the competitors out there."  FAC ¶ 25; Answer ¶ 25.  While it may be more burdensome than copying wholesale from CoStar, CREXi admittedly can obtain listing information directly from brokers. Tellingly, CREXi does not identify any broker from which it was unable to obtain listing information because of the broker's agreement with CoStar.

CREXi also cannot avoid the lack of exclusivity in CoStar's agreements by alleging that CoStar's "exclusionary practices operate as *de facto* exclusive agreements."  Countercls. ¶ 11.  Courts will only recognize claims premised on *de facto* exclusive agreements where the terms of an agreement create powerful incentives for customers to behave as though their contracts are exclusive even when they are not.  *See, e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171,

1182 (9th Cir. 2016) ("In certain limited situations, discounts and rebates conditioned on a promise of exclusivity . . . may be understood as 'de facto' exclusive dealing . . . ."). CREXi has identified no such terms in CoStar's agreements, and there are none.

CREXi focuses instead on CoStar's alleged "policy" of "routinely" modifying brokers' LoopNet listings by inserting inaccurate data and adding its "watermark" to broker-supplied photographs.[7] Countercls. ¶¶ 13-14, 171-89. According to CREXi, CoStar "falsely claim[s]" copyright ownership over brokers' photographs and forbids brokers from sharing their own information with CoStar's competitors. *Id.* ¶ 176. These allegations too are insufficient. Even if CoStar "routinely" engaged in the conduct that CREXi alleges, the only type of exclusivity CoStar's conduct allegedly creates—control over a ***particular copy*** of information, as opposed to exclusivity ***with the broker*** who provided it—is not a concern of the antitrust laws.[8]

As CREXi's allegations ultimately concede, the actual reason some brokers supposedly choose to put listing information on CoStar's websites while not providing it to other competing platforms is that they do not want to "spend the time and effort" to do so. Countercls. ¶ 118. That, of course, is a far cry from an agreement between CoStar and its customers to deal exclusively. But what CREXI's concession does reveal is the core of its misguided quest: CREXi is asking this Court to wield the antitrust laws against CoStar because its customers decide not to engage a competing service that would require "time and effort." *Id.* That CREXi is unable,

---

[7] This supposed conduct is limited to LoopNet and the listing services market. CREXi does not allege that CoStar modifies listing information or adds its watermark to information provided to its subscription database or to Ten-X. Countercls. ¶¶ 171-89; *see id.* at Ex. A.

[8] The allegations are, in any event, conclusory. While CREXi labels CoStar's "policy" "routine[]," Countercls. ¶ 179, it does not identify even one listing that CoStar has inaccurately modified or any instance where CoStar applied its watermark to a broker-provided image. Instead, CREXi leaves the allegations about listing modifications entirely unsubstantiated, and provides only a few examples of instances when CoStar added its ***name*** to broker images. *See id.* ¶¶ 181-83. But CoStar did not allege that its name (as opposed to its ***watermark***) signifies its copyright; and it alleged that it watermarked only its own copyrighted photographs. *See, e.g.*, FAC ¶ 66. CREXi offers not one contrary example.

or does not wish to invest the resources, to convince brokers "to re-create their listings on multiple platforms" cannot be laid at the feet of CoStar, and certainly is not an antitrust violation. *See LiveUniverse*, 304 F. App'x at 557 (dismissing Section 2 claim because LiveUniverse failed to plead any antitrust injury where MySpace users "remain[ed] free to choose which online social networks to join, and on which websites they upload . . . content").[9]

### 3. CoStar's Alleged Trademark Infringement Is Not Actionable Under the Sherman Act

The third prong of CoStar's supposedly anticompetitive scheme—its alleged infringement of CREXi's trademark in its ads for Ten-X, its auction services product—also does not plead any exclusionary conduct under Section 2. The Sherman Act is directed "against conduct which unfairly tends to destroy competition," and, thus, "courts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993); *see also Aerotec Int'l, Inc.*, 836 F.3d at 1175 (the Sherman Act "directs itself not against conduct which is competitive, even if severely so, but against conduct which unfairly tends to destroy competition itself").

For example, courts have held that patent infringement and false advertising do not constitute exclusionary conduct. In *Retractable Technologies, Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 893 (5th Cir. 2016), the Fifth Circuit held that "patent infringement cannot serve as a basis for imposing antitrust liability because . . . [b]y definition, patent infringement invades the patentee's monopoly rights, causes competing products to enter the market, and thereby increases competition." Similarly, in *American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal & Professional Publications, Inc.*, 108 F.3d 1147 (9th Cir. 1997), the Ninth Circuit held that, "[w]hile false or misleading advertising directed solely

---

[9]     Just as the plaintiff in *LiveUniverse*, CREXi alleges only harm to itself and not any harm to "the process of competition" or "consumer welfare," as is required to plead antitrust injury. 304 F. App'x at 557.

at a single competitor may not be competition on the merits, the [advertising] must have a significant and enduring adverse impact *on competition itself* in the relevant markets to rise to the level of an antitrust violation." *Id.* at 1152 (emphasis added).

The result is the same for CREXi's allegations of trademark infringement. CoStar's allegedly infringing ads provide consumers with information regarding an alternative to CREXi's services and allow consumers to compare the two companies' products. That is clearly more—not less—competition. *Cf. Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 286-87 (S.D.N.Y. 2018) (noting that bidding on a rival's trademark in a keyword search allows easier comparisons between products); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1188-89 (D. Utah 2010) (agreement among competitors not to bid on each other's trademarks would likely violate antitrust laws and limit competition), *aff'd in part, rev'd in part on other grounds*, 722 F.3d 1229 (10th Cir. 2013); *see also* Elisa V. Mariscal & David S. Evans, *The Role of Keyword Advertising in Competition Among Rival Brands*, Univ. of Chi. Law. Sch., Coase-Sandor Inst. for Law & Econ. Working Paper No. 619 at 7 (Nov. 2012) ("As with other methods for targeting a rival's customers, keyword advertising increases competition for consumers . . . ."). Because CREXi's allegations of CoStar's trademark infringement, even if true, do not harm competition or allegedly contribute to CoStar's supposed market power, those allegations cannot support CREXi's Section 2 claims.

## B.   CREXi Fails To Allege Any Claim Under Section 1 Or The Cartwright Act

CREXi's claims under Section 1 and the Cartwright Act based on CoStar's allegedly "exclusionary contracts" should also be dismissed. *See* Countercls. ¶¶ 301-16; *see also Kelsey K. v. NFL Enters., LLC*, 757 F. App'x 524, 527 (9th Cir. 2018) (requirements for pleading a claim for exclusive dealing under Section 1 and the Cartwright Act are the same). Recycling the same (non-actionable) allegations

from its monopolization claims, Countercls. ¶ 303, CREXi alleges that CoStar's agreements conferring a "***non-exclusive***" right to license brokers' CRE information somehow constitute an exclusive agreement. *Id.* ¶¶ 111, 113-16 (emphasis added). However, as discussed above, the agreements at issue do not impose any obligation on brokers to deal exclusively with CoStar, nor do they provide incentives that would have the same functional effect. *See id.* ¶¶ 114-16; *id.* at Exs. B-E.

CREXi's Section 1 and Cartwright Act claims should also be dismissed for an independent reason—CREXi fails to allege that CoStar's agreements have "foreclose[d] competition in a substantial share of the line of commerce affected." *Qualcomm*, 969 F.3d at 1003 (citation omitted). This is a required element of an exclusive dealing claim because "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution," then the alleged exclusive dealing does not foreclose the plaintiff from the relevant market or harm competition. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010) (citation omitted). Here, CREXi's counterclaims are silent as to the percentage of the broker market that is supposedly tied up by CoStar's allegedly exclusive agreements and plead nothing about the percentage of the relevant markets that are allegedly foreclosed to it. *Hip Hop Bev. Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (affirming dismissal of claim where plaintiff alleged that four brokers had exclusive agreements with defendant but "did not allege how many total brokers were in the market"). CREXi thus has not stated a plausible claim under Section 1 or the Cartwright Act.

## C. CREXi's Antitrust Claims Should Also Be Dismissed Because CREXi Does Not Plausibly Allege That CoStar Has Market Power

The Court should also dismiss all of CREXi's antitrust claims (whether brought under Section 1, Section 2, or the Cartwright Act) because CREXi fails to plausibly allege that CoStar has market power in any relevant market. For all of its

antitrust claims, CREXi must plausibly allege that CoStar has market power in a properly defined relevant market. *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008); *Golden Gate Pharmacy Serv. v. Pfizer, Inc.*, 433 F. App'x 598, 598 (9th Cir. 2011). While a plaintiff need not plead a relevant market with "specificity," a complaint may be dismissed if its market allegations are "facially unsustainable." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (citation omitted); *see also Rick-Mik Enters.*, 532 F.3d at 973 (allegations of market power must be pled with specificity). CREXi's market allegations are too vague and conclusory to state a claim.

### 1.    CREXi Does Not Allege A Plausible Geographic Market

CREXi's geographic market allegations are "facially unsustainable" and require dismissal. A relevant market for an antitrust claim must include a "geographic market," which is the "'area of effective competition' where buyers can turn for alternative sources of supply." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (citation omitted). CREXi alleges that the geographic market for each of its antitrust claims is "individual metropolitan areas" because customers supposedly "do not regard locations in different metropolitan areas as reasonable substitutes." Counbcls. ¶¶ 47, 49. CREXi, however, does not identify any specific metropolitan area in which it contends CoStar has market power, nor does it even define what it considers to be a "metropolitan area." *Id.* It is entirely unclear what "metropolitan areas" CREXi alleges CoStar has unlawfully monopolized. Is CREXi alleging that CoStar has unlawfully monopolized all "metropolitan areas" (presumably in the U.S.)? Or just some, and if so, which ones? CREXi's geographic market allegations are thus, on their face, too vague to support any antitrust claim.[10] *See Tanaka*, 252 F.3d at 1063 (affirming dismissal where plaintiff failed to plausibly

---

[10]    CREXi suggests that its geographic market allegations suffice because the FTC supposedly used the same geographic market definition when it sued to enjoin CoStar's acquisition of RentPath. The FTC, however, identified 49 specific metropolitan areas. CREXi, in comparison, has not identified a single metropolitan area where it contends CoStar has market power.

allege a relevant geographic market); *Chase Mfg., Inc. v. Johns Mansville Corp.*, 2019 WL 2866700, at *6 (D. Colo. July 3, 2019) (dismissing complaint where "the geographic market [was] vaguely alleged to be 'many major metropolitan areas'").

### 2. CREXi Also Has Not Plausibly Alleged That CoStar Has Market Power

CREXi's allegations regarding CoStar's supposed market power are also deficient. "Market power is the ability (1) to price substantially above the competitive level and (2) to persist in doing so for a significant period without erosion by new entry or expansion.'" *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *7 (C.D. Cal. Oct. 16, 2015) (citation omitted). A plaintiff may plead market power by either (1) direct evidence, *i.e.*, "evidence of restricted output and supracompetitive prices," or (2) "circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). CREXi alleges neither.

CREXi has not pled any "direct" evidence of CoStar's supposed market power in the relevant product markets. CREXi nowhere alleges that CoStar has the ability to raise prices above competitive levels by reducing output or that its allegedly anticompetitive conduct has caused a reduction in output in the internet CRE listing, information, or auction services markets. Nor does CREXi allege that CoStar has the ability to charge supracompetitive prices for a sustained period of time in any of those markets. CREXi complains about price increases for CoStar's information and listing services products in 2012 after CoStar acquired LoopNet, Countercls. ¶ 97, and another supposed price increase for an unidentified product in 2017 after Xceligent's demise, *id.* ¶ 99, but its counterclaims say nothing about CoStar's pricing since 2017. Nor does CREXi allege anywhere that CoStar can persistently charge supracompetitive prices for any (let alone each) of its listing, information, and auction services without the fear of new entry into the market.

CREXi also has not plausibly alleged market power based on circumstantial

evidence either.  CREXi must allege that CoStar has market power in the relevant geographic market for its claims—"individual metropolitan areas"—but the best it can muster is that "on information and belief, CoStar is dominant in an overwhelming majority of metropolitan areas."  *Id.* ¶ 105; *see also Rick-Mik Enters.*, 532 F.3d at 972–73 (plaintiff must plead market power in the relevant market for its allegations); *Top Rank*, 2015 WL 9948936, at *8 (same).  CREXi's allegations are insufficient to plead market power.  It is not clear in which metropolitan areas CREXi alleges CoStar has market power or what it means that CoStar is "dominant" in the "majority" of an unspecified number of unidentified metropolitan areas. Conclusory allegations of market power, like CREXi's, are insufficient to state an antitrust claim.  *See Hip Hop Bev.*, 733 F. App'x at 382 (allegation that defendant "controlled a 'major percent' of the energy-drink market" was insufficient to plead market power); *Chase Mfg., Inc. v. Johns Manville Corp.*, 2020 WL 1433504, at *7 (D. Colo. Mar. 23, 2020) (finding insufficient plaintiff's allegations that defendant is "believed to have at least a 60% share of the . . . market" (emphasis omitted)).[11]

Finally, CREXi cannot allege market power by relying on complaints of unidentified customers.  *See* Countercls. ¶ 95.  The opinions of disgruntled CoStar customers—even assuming they were customers and that CREXi has accurately quoted them—are not credible or circumstantial evidence of market power.  *See Rebel Oil*, 51 F.3d at 1434; *see also FTC v. Facebook, Inc.*, 2021 WL 2643627, at *14 (D.D.C. June 28, 2021) ("[W]hatever it may mean to the public, 'monopoly power' is a term of art under federal law with a precise economic meaning . . . .").  Because CREXi has not pled that CoStar has market power in any relevant market,

---

[11]      While CREXi also alleges that, "[o]n information and belief," CoStar's "current share of" the listing services, information, and auction services markets is 90%, 90%, and 95%, respectively, Countercls. ¶¶ 102-04, those allegations too are insufficient.  Not only does CREXi provide no information as to how it calculated CoStar's supposed share of the listing, information, or auction services markets, it is silent as to the geographic area in which CoStar supposedly has those market shares.  *See Top Rank*, 2015 WL 9948936, at *8 (dismissing complaint where plaintiff failed to allege market power in the *relevant* market or explain how it calculated market shares).

1   the Court should dismiss its antitrust claims.

2   **II.    THE COURT SHOULD DISMISS CREXI'S REMAINING CLAIMS**

3       CREXi's remaining claims for false advertising (Counts X and XI), trademark

4   infringement (Count IX), unfair and unlawful competition (Counts XII and XIII) and

5   declaratory judgment (Count XIV) fare no better and should likewise be dismissed.

6
7       **A.    CREXi Has Not Pled A Claim For False Advertising Or Trademark Infringement**

8       CREXi's allegations regarding the commonplace, competitive practice of

9   purchasing a rival's name as a keyword search also form the basis of its false

10  advertising and trademark infringement claims.  These claims fail out of the gate.

11
12      **1.    CREXi Fails To State Claim For False Advertising Under The Lanham Act**

13      CREXi fails to state a plausible false advertising claim under the Lanham Act

14  for three reasons.

15      ***First***, CREXi fails to allege that CoStar made any false statement about

16  CoStar's or CREXi's products.  Instead, CREXi alleges that CoStar's ads appear on

17  Google (clearly labeled as an "**Ad**") in response to consumers' use of "CREXi" as a

18  keyword search.  Countercls. ¶ 201.  An "advertisement, expressly labeled as an

19  'Ad,' that appears after an individual consumer inputs search terms and clicks to

20  'search,'" simply is not "a false statement that can be attributed to" CoStar.  *Novation*

21  *Ventures, LLC v. J.G. Wentworth Co.*, 2015 WL 12765467, at *7 (C.D. Cal. Sept.

22  21, 2015) (dismissing false advertising claim based on defendants' practice of

23  paying Google "to display certain advertisements in response to a consumer's

24  question as typed into the internet search engine").

25      ***Second***, CREXi fails to allege that CoStar's ads actually deceived or had the

26  tendency to deceive a "substantial segment" of its audience.  *See id.* (citing *Wells*

27  *Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014)).

28  CREXi alleges that CoStar's ads "mislead consumers into believing that the products

and services offered by CoStar are associated or affiliated with CREXi when in fact they are not." Countercls. ¶ 326. But the Ninth Circuit has explicitly recognized that internet consumers "fully expect to find some sites that aren't what they imagine based on a glance at the domain name or search engine summary," and "don't form any firm expectations until they've seen the landing page—if then." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010). Here, the ads that CREXi challenges prominently display the domain name "ten-x.com" among other references to CoStar's Ten-X product. Countercls. ¶¶ 200-03. Moreover, CREXi alleges that CoStar's ads are labeled as "**Ad[s]**," which "makes [CREXi's] claim of deception even less plausible." *Novation Ventures*, 2015 WL 12765467, at *7.

*Third*, CREXi fails to allege how CoStar's ads are "likely to influence the purchasing decision" of any consumer. *R & A Synergy LLC v. Spanx, Inc*., 2019 WL 4390564, at *12 (C.D. Cal. May 1, 2019) (dismissing false advertising claim for failure to allege materiality of the deception). CREXi alleges only that CoStar's ads create a momentary "initial association" with CREXi, Countercls. ¶ 203; CREXi does not allege that consumers are likely to be confused that Ten-X is affiliated with CREXi at the time of purchase (*i.e.*, after clicking on the Ten-X URL). Lacking allegations that CoStar's ads influenced consumers' purchasing decisions, CREXi's Lanham Act claim fails. *See, e.g.*, *Manley Toys, Ltd. v. FNF Enters., Inc*., 2010 WL 11519536, at *4 (C.D. Cal. Aug. 2, 2010) (dismissing false advertising claim for failure to allege how the false statement influenced purchasing decisions).

### 2.   CREXi Fails To State A Claim For False Advertising Under California Law

For similar reasons, CREXi's false advertising claim under California Business & Professional Code § 17500 must also be dismissed. *See Royal Holdings Techs. Corp. v. FLIR Sys., Inc.*, 2021 WL 945246, at *6 (C.D. Cal. Jan. 8, 2021) (analyzing Plaintiff's Lanham Act and FAL claims together because the two legal theories are "substantially congruent" (citation omitted)). That claim is governed by

the "reasonable consumer" test.  *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016).  To satisfy that standard, CREXi must plausibly allege facts from which the Court can infer "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."  *Id.* (citation omitted).  CREXi's allegations support the opposite inference.

CREXi's allegations focus on Google, a popular search engine that separates ads and search results for its consumers.  *See* Google, *Rigorous Testing*, https://www.google.com/search/howsearchworks/mission/users/ (last visited Aug. 12, 2021) ("When you use Google Search, ads may appear with your search results. We think it's important to be transparent about the difference between paid and organic results, which is why ads are clearly labeled, so they are easy to distinguish from the rest of the page.").  Indeed, CREXi alleges that CoStar's Ten-X ads are unmistakably labeled as "**Ad[s]**," and appear next to a conspicuously placed option on the side of the screen where users can "see about the actual search results for" CREXi.  Countercls. ¶¶ 195, 202.  Under these circumstances, CREXi has not plausibly alleged any facts supporting its bare conclusion that Ten-X ads "mislead consumers into believing that the products and services offered by CoStar are associated or affiliated with CREXi."  *Id.* ¶¶ 326, 331.

### 3.    CREXi Fails To Plead A Trademark Infringement Claim

CREXi's trademark infringement claim suffers from similar fatal deficiencies. Consumer confusion is the crux of a trademark infringement claim and CREXi has not plausibly alleged any consumer confusion stemming from CoStar's alleged use of CREXi's trademark in the header of its Google AdWord ads.  *See Murray v. Cable Nat. Broad. Co.*, 86 F.3d 858, 860 (9th Cir. 1996) (a district court may determine likelihood of confusion as a matter of law at the dismissal stage).

Like its false advertising claims, CREXi alleges that CoStar's purchase of CREXi as a Google AdWord creates a likelihood of initial interest confusion because when a customer searches Google for "CREXi," the results page displays ads that

link to URLs for Ten-X's website.  Countercls. ¶¶ 15, 198-204.  But CREXi does not allege that a single consumer was actually confused by a Ten-X ad, or confused after they clicked on a Ten-X ad and landed on Ten-X's website.   CREXi's allegations amount to a sophisticated consumer of CRE auction services (looking to sell or acquire properties that range from hundreds of thousands to millions of dollars) potentially being confused momentarily before realizing that they were going to click or had clicked on the Ten-X website.  Even if they were plausible, CREXi's allegations would be—at best—about potential initial confusion that does not result in a diverted sale, and thus should provide no basis for relief.  *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004) ("Initial interest confusion is customer confusion that creates initial interest in a competitor's product" that is dispelled before a sale occurs.); *Blue Water Innovations, LLC v. Fettig*, 2019 WL 1904589, at *3 (S.D. Fla. Mar. 8, 2019) (dismissing Lanham Act claim because "initial interest confusion" provides no basis for relief "where the confusion is remedied prior to sale" (citations omitted)).

Moreover, in the context of keyword advertising, the consumer confusion inquiry "ultimately turn[s] on what the consumer saw on the screen and reasonably believed, given the context."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011).  For this purpose, the Ninth Circuit has "eschewed the *Sleekcraft* test[12] in favor of a more streamlined inquiry: '(1) Who is the relevant reasonable consumer?; and (2) What would he reasonably believe based on what he saw on the screen?'"  *Guardian Pool Fence Sys. Inc. v. Sunwest Indus., Inc.*, 2017 WL 2931413, at *5 (C.D. Cal. June 1, 2017) (quoting *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937 (9th Cir. 2015)).  With respect to the first question, "[t]he nature of the goods and the type of consumer is highly relevant

---

[12]   Traditionally, courts in the Ninth Circuit use the eight-factor *Sleekcraft* test to analyze consumer confusion in trademark infringement cases.  *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  However, the *Sleekcraft* factors are not particularly apt here, because CREXi does not allege that CoStar's trademarks are sufficiently similar to CREXi's trademarks to cause confusion (the issue the *Sleekcraft* factors were originally developed to analyze).

to determining the likelihood of confusion in the keyword advertising context." *Network Automation*, 638 F.3d at 1152.  CREXi alleges that the "goods" are internet CRE listing, information, and auction services, powered by "large, proprietary databases of valuable [CRE] information," which facilitate billions in sale transactions of commercial buildings and office space.  *See, e.g.*, Countercls. ¶ 39 (alleging that there is "substantial willingness-to-pay on the part of CRE brokers"). The alleged "consumers" are sophisticated professionals, including "[m]ost commercial real estate brokers" who use multiple "internet CRE listing services." *Id.* ¶ 33; *see also id.* ¶ 39 ("Many commercial real estate brokers subscribe to internet CRE information services"); FAC ¶ 53 (CoStar customers comprise "investors," "lenders," "developers," "brokerage firms," "corporations," "banks," and "valuation professionals").  And, CREXi's allegations of trademark infringement are expressly limited to ads for Ten-X's auction services, which are alleged to facilitate the "sale of commercial buildings and office space," Countercls. ¶ 42, and are "distinguished" by the "speed with which sales transactions can be finalized."  *See id.* ¶ 44.

Taking CREXi's allegations regarding the nature of the goods and the type of consumer as true, there is no plausible likelihood of confusion.  *See e.g.*, *Toyota*, 610 F.3d at 1179 ("reasonable, prudent and experienced internet consumers" expect to explore web results "by trial and error" and are "ready to hit the back button" when they do not get the results they want); *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006) ("Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive or sophisticated items."); *Novation Ventures, LLC v. J.G. Wentworth Co.*, 2016 WL 6821110, at *8 (C.D. Cal. Feb. 1, 2016) ("[T]he Court finds that there is no plausible likelihood of deception where the relevant reasonable consumer would exercise a heightened degree of care and precision, where the purchase price of the transactions range from $5,000 to $1,000,000 . . . ."), *aff'd*, 711 F. App'x 402 (9th Cir. 2017).

1    Turning to the second question, "the labeling and appearance of the
2  advertisements and the surrounding context on the screen displaying the results
3  page" is of particular importance in cases involving internet search terms.  *Multi*
4  *Time Mach.*, 804 F.3d at 936 (quoting *Network Automation*, 638 F.3d at 1154).  The
5  alleged screenshots in CREXi's counterclaims make clear that what the reasonable
6  consumer "saw on the screen" is insufficient as a matter of law to plead consumer
7  confusion.  For example, CREXi alleges that a search for "crexi" on Google yielded
8  an ad with the line "Commercial Buildings for Sale – Crexi."  Countercls. ¶ 200.
9  But as shown in the screenshot in Paragraph 200, the single insertion of the AdWord
10 "Crexi" is in the middle of a clearly labeled ad for Ten-X.  The first line of the ad
11 reads: "**Ad** - www.ten-x.com/cre_listings" (bold emphasis in original).  A consumer
12 reviewing these search results would see "**Ad**" and the Ten-X URL before anything
13 else, reducing the chance that even any initial interest confusion could occur (let
14 alone further confusion).  *See Playboy Enters.*, 354 F.3d at 1030 & n.43 (finding that
15 "a situation in which a banner advertisement clearly identifies its source with its
16 sponsor's name . . . might eliminate the likelihood of initial interest confusion").

17   The remainder of the challenged ad only reinforces that the ad is for Ten-X,
18 not CREXi.  Countercls. ¶ 200 (alleging that the remainder of the ad reads:  "Find
19 Commercial Real Estate With Ten-X, The Most Powerful Place to Buy & Sell
20 Nationwide" / "Search CRE Properties - How Ten-X Works - About Ten-X
21 Commercial.").  The mere mention of "CREXi" in a single line in an otherwise
22 clearly labeled ad for Ten-X simply is not enough to plead customer confusion.  *See*
23 *Karl Storz Imaging, Inc. v. Pointe Conception Med., Inc.*, 2011 WL 13195980, at
24 *19-20 (C.D. Cal. Aug. 1, 2011) (a clearly labeled ad that is segregated from
25 objective results and "lists a URL that does not use the trademark" is not likely to
26 cause "even initial interest confusion").

27   CREXi's second alleged example fares no better.  In Paragraph 202, CREXi
28 alleges that a search for "crexi california" on Google yielded a CoStar ad with the

line "Commercial Buildings For Sale – Crexi – Ten-X.com."  Countercls. ¶ 202.
Here, not only does the word "Crexi" immediately precede the domain name "Ten-X.com," but the single challenged line also appears in the middle of an otherwise clearly labeled advertisement for Ten-X, directly below the "**Ad**" header with the Ten-X URL "www.ten-x.com/cre_listings" prominently displayed, and is followed by three more lines of text describing Ten-X, not CREXi.  *Id.*  Moreover, as explained above, CREXi pleads that this distinctly labeled ad appears next to a conspicuously placed option on the side of the screen where users can see the actual search results for "CREXi."  *Id.*  On these allegations, CREXi cannot plead consumer confusion.  *See Sen v. Amazon.com, Inc.*, 2020 WL 4582678, at *6 (S.D. Cal. Aug. 10, 2020) (segregation of ad results and search results along with the clear labeling of an ad is sufficient to negate confusion), *appeal filed*, No. 20-55857 (9th Cir. Aug. 20, 2020); *AK Metals, LLC v. Norman Indus. Materials, Inc.*, 2013 WL 417323, at *5-6 (S.D. Cal. Jan. 31, 2013) (declining to issue preliminary injunction and finding that plaintiff had not met its burden to show likelihood of consumer confusion despite the plaintiff's trademark appearing in the header of defendant's ad).  Because CREXi has not pled facts plausibly alleging a likelihood of consumer confusion, its trademark infringement claim cannot survive.

## B.   CREXi's Unfair And Unlawful Competition Claims Fail Too

CREXi's twelfth and thirteenth causes of action are claims of unfair and unlawful competition under California Business & Professional Code § 17200, which are derivative of its Sherman, Cartwright, and Lanham Act claims.  These claims fail for the same reasons the antitrust, false advertising, and trademark claims fail.  *See, e.g.*, *Aleksick v. 7-Eleven, Inc.*, 205 Cal. App. 4th 1176, 1185 (2012) ("When a statutory claim fails, a derivative UCL claim also fails"); *ThermoLife Int'l, LLC v. Am. Fitness Wholesalers, L.L.C.*, 831 F. App'x 325, 326 (9th Cir. 2020) ("[B]ecause ThermoLife's common-law unfair-competition and Lanham Act claims are substantially similar, ThermoLife's unfair-competition claim fails for the same

reasons."); *Cullen v. Netflix, In*c., 880 F. Supp. 2d 1017, 1028 (N.D. Cal. 2012) ("If the [underlying] claim is dismissed, then there is no 'unlawful' act upon which to base the derivative [UCL] claim." (citation omitted)).

### C.   CREXi Is Not Entitled To A Declaratory Judgement

Last, CREXi's request for a declaratory judgment that it is lawful for it to access CoStar's websites, Countercls. ¶¶ 347-50, should be dismissed.

*First*, CREXi's claim for declaratory relief is inappropriate because it simply repackages legal issues that CREXi and CoStar are already litigating.  The purpose of a declaratory judgment is to "relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never." *Englewood Lending Inc. v. G & G Coachella Invs., LLC*, 651 F. Supp. 2d 1141, 1145 (C.D. Cal. 2009) (citation omitted).  Here, CoStar has already sued CREXi for impermissibly accessing and copying the content of its websites and thus whether CoStar may block CREXi's access is squarely before the Court.  *See id.* (dismissing counterclaim for declaratory judgment where it overlapped with relief sought in plaintiff's complaint).

*Second*, this Court has already rejected CREXi's position that it is entitled to access CoStar's websites.  In moving to dismiss, CREXi argued that CoStar's efforts to block it from accessing its websites were "contrary to Ninth Circuit precedent." Dkt. 55-1 at 9.  The Court, however, denied CREXi's motion.  Dkt. 71 at 7.  As discussed above, the Court reached the correct conclusion because CoStar has no legal obligation to allow CREXi to access its products.  CREXi's request for a declaratory judgment thus also fails because as a matter of law CREXi is not entitled to the relief that it seeks.

### CONCLUSION

For the foregoing reasons, CoStar requests that the Court dismiss each of CREXi's counterclaims with prejudice.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:  August 13, 2021

**LATHAM & WATKINS LLP**

By:  */s/* Jessica Stebbins Bina
(Bar No. 248485)

Elyse M. Greenwald
(Bar No. 268050)
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525
Fax: 424.653.5501
Email: jessica.stebbinsbina@lw.com
        elyse.greenwald@lw.com

Belinda S Lee (Bar. No. 199635)
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Tel: 415.391.0600
Fax: 415.395.8095
Email: belinda.lee@lw.com

Nicholas J. Boyle
(admitted *pro hac vice*)
Sarah A. Tomkowiak
(admitted *pro hac vice*)
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201
Email: nicholas.boyle@lw.com
        sarah.tomkowiak@lw.com

*Counsel for CoStar Group, Inc., and
CoStar Realty Information, Inc.*

# EXHIBIT A

| Relevant Market | Alleged Exclusionary Conduct | Relevant Allegations | Relevant Claims |
|---|---|---|---|
| **Internet CRE Information Services Market** | Terms of Use Prohibit Competitors from Accessing CoStar's Products | "CoStar conditions access to its *CoStar*, LoopNet, and Ten-X websites, as well as brokers' LoopLink-hosted websites, on users' agreement not to compete with CoStar.  CoStar also purports to forbid competitors—and only competitors—from accessing broker-provided and broker-owned publicly available listing information available on those websites."  Countercls. ¶ 136 (emphasis added). | Claims 2 and 5 |
| **Internet CRE Auction Services Market** | Terms of Use Prohibit Competitors from Accessing CoStar's Products | "CoStar conditions access to its CoStar, LoopNet, and *Ten-X* websites, as well as brokers' LoopLink-hosted websites, on users' agreement not to compete with CoStar.  CoStar also purports to forbid competitors—and only competitors—from accessing broker-provided and broker-owned publicly available listing information available on those websites."  Countercls. ¶ 136 (emphasis added). | Claims 3 and 6 |
| | Trademark Infringement through Google AdWords | "CoStar's use of the CREXI® mark in its advertisements for *Ten-X* constitutes anticompetitive conduct and willful and intentional trademark infringement, which has damaged CREXi."  Countercls. ¶ 206 (emphasis added); *see also id*. ¶¶ 200-04 (all allegedly infringing ads relate to CoStar's auction services platform, Ten-X). | Claims 3 and 6 |
| **Internet CRE Listing Services Market** | Terms of Use Prohibit Competitors from Accessing CoStar's Products | "CoStar conditions access to its CoStar, *LoopNet*, and Ten-X websites, as well as brokers' LoopLink-hosted websites, on users' agreement not to compete with CoStar.  CoStar also purports to forbid competitors—and only competitors—from accessing broker-provided and broker-owned publicly available listing information available on those websites."  Countercls. ¶ 136 (emphasis added). | Claims 1 and 4 |

| Relevant Market | Alleged Exclusionary Conduct | Relevant Allegations | Relevant Claims |
|---|---|---|---|
| | CoStar Uses "Technological Measures" to Block Competitors from Accessing Its Products | "CoStar employs technological measures to selectively block competitors from accessing the publicly available *listing information* hosted on CoStar and *LoopNet's* websites, and brokers' *LoopLink*-hosted websites."  Countercls. ¶ 137 (emphases added).<br><br>"CoStar employs an 'abuse monitor,' whose job is to ferret out whether internet protocol (IP) addresses associated with CoStar's competitors are accessing CoStar and *LoopNet*."  *Id.* ¶ 138 (emphasis added).<br><br>"CoStar and *LoopNet* also use 'firewalls' to permanently block IP addresses associated with competitors from accessing CoStar and *LoopNet* . . . ."  *Id.* ¶ 139 (emphasis added) (footnote omitted). | Claims 1 and 4 |
| | "Exclusionary" or "Exclusive" Agreements with Brokers | "The *LoopNet* Terms then prohibit brokers from using that same information—again, information owned and provided to CoStar by brokers—with any CoStar competitor."  Countercls. ¶ 186 (emphasis added). | Claims 1, 4, 7 and 8 |
| | Inaccurately Modifying Broker Listing Information and Adding Watermark to Broker Provided Images | "The *LoopNet* Terms grant CoStar the unilateral right to 'modify' brokers' listings by 'add[ing] digital watermarks to certain parts of your property listing, including, without limitation, adding digital watermarks to your photographs."  Countercls. ¶ 172 (alteration in original) (emphasis added) (citation omitted).<br><br>"Nothing in the *LoopNet* Terms require CoStar to notify brokers when, or explain how, *LoopNet* has modified their listings or watermarked their photos before doing so."  *Id.* ¶ 174 (emphases added).<br><br>"[A]fter unilaterally altering brokers' listings and falsely claiming copyright ownership over brokers' photographs by adding CoStar's watermark, CoStar simply declares the information 'proprietary to *LoopNet*' . . . ."  *Id.* ¶ 176 (emphasis added); *see also id.* ¶¶ 180-83 (alleging that CoStar added its name to photographs that brokers uploaded to LoopNet). | Claims 1 and 4 |