# EXHIBIT A

*Judgment dt 3/1/22 alw Decree* (1)

Certified P.S. Copy of ~~order~~

IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

AT JODHPUR

D.B. CIVIL MISC. APPEAL NO. _384_ / 2021

STAMP REPORTER SE...
Rajasthan High Court, J...
Criminal/Civil/Writ

0 3 APR 2021

Inward No. ........
Intl. of: J.J.A./J.A./S.J

APPELLANTS:

1. **CoStar Group Inc.**

   A corporation registered under the laws of the State of Delaware and having its principal place of business at 1331 L Street, NW, Washington, District of Columbia 20005, United States of America

2. **CoStar Realty Information, Inc.**

   A corporation registered under the laws of the State of Delaware and having its principal place of business at 1331 L Street, NW, Washington, District of Columbia 20005, United States of America

   *...Plaintiffs*

V E R S U S

RESPONDENT:

**Arcgate Teleservices Private Limited**

A company incorporated under the Companies Act, 2013 having its registered Office at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan: 313001

   *...Defendant*

:::

CIVIL MISC. APPEAL UNDER SECTION 13 OF THE COMMERCIAL COURTS ACT READ WITH ORDER 43 RULE 1(r) C.P.C. AGAINST THE ORDER DATED 23.03.2021 PASSED BY MRS. SHIVANI JOHRI BHATNAGAR, RJS (D.J. CADRE),

1 1 JAN 2022

Exhibit A
4

LEARNED COMMERCIAL COURT, UDAIPUR, RAJASTHAN, IN COMMERCIAL

SUIT NO. 06/2021 MU DI (41), C.I.S. NO. 06/2021 IN CIVIL ORIGINAL SUIT NO.

29 OF 2021 ("INTERIM APPLICATION") FILED BY THE APPELLANTS, WHEREBY

THE LEARNED COURT BELOW HAS DISMISSED THE APPELLANTS' (ORIGINAL

PLAINTIFFS) APPLICATION FOR EX-PARTE AD-INTERIM INJUNCTION AGAINST

THE RESPONDENT (ORIGINAL DEFENDANT) .

:::



## HIGH COURT OF JUDICATURE FOR RAJASTHAN AT JODHPUR

### D.B. Civil Misc. Appeal No. 384/2021

1. Costar Group Inc., A Corporation Registered Under The Laws Of The State Of Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America.

2. Co Star Realty Information, Inc., A Corporation Registered Under The Laws Of The State Of Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America. (Plaintiffs)

----Appellants

Versus

1. Arcgate Teleservices Private Limited, A Company Incorporated Under The Companies Act, 2013 Having Its Registered Office At G1-10 I.t. Park, Madri Industrial Area, Udaipur, Rajasthan 313001.

2. M/s Arcgate, A partnership firm having registration no.17/26/78/2005 and having its registered office at G-11 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan 313001

----Respondents

| For Appellant(s) | : | Mr M.S.Singhvi Sr. Advocate assisted by Mr Muktesh Maheshwari Mr Aidan Choudhary Mr Nishit Shah |
|---|---|---|
| For Respondent(s) | : | Mr Vikas Balia Mr Falgun Buch Mr Prateek Gattani Mr Karan Lahiri (through VC) |

## HON'BLE MR. JUSTICE VIJAY BISHNOI
## HON'BLE MR. JUSTICE ARUN BHANSALI

#### Judgment / Order

03/12/2021



Exhibit A
6

(2 of 3)                                        [CMA-384/2021]

This appeal has been filed by the appellants aggrieved against the order dated 23.03.2021 passed by Commercial Court, Udaipur, whereby the prayer of the appellant for grant of ex parte ad interim injunction was declined.

An application has been filed by the parties under Order XXIII Rule 3 CPC seeking passing of a compromise decree based on the settlement arrived at between the parties.

By order dated 26.11.2021, the record of the suit No.29/2021 from the Commercial Court, Udaipur was summoned, which has been received.

Learned counsel for the parties made submissions that as the parties have settled their dispute mutually, which has been reduced in the consent terms and permanent injunction filed as Annexure-A/1, the suit itself along with the present appeal may be decided in terms of the said settlement arrived at between the parties.

'In the circumstances of the case, wherein the parties in the present appeal are seeking disposal of the suit pending before the Commercial Court, Udaipur, exercising powers under Section 24 CPC, the Civil Original Suit No.29/2021 along with pending applications is withdrawn to this Court.

In view of the submissions made, the suit and pending applications are disposed of in terms of the settlement/ compromise arrived at between the parties annexed as Annexure-A/1 to the application filed under Order XXIII Rule 3 CPC. The

(3 of 3)                    [CMA-384/2021]

decree be drawn. The consent terms and permanent injunction shall form part of the decree.

The present appeal also stands disposed of.

Information regarding disposal of the suit be sent to the Commercial Court, Udaipur.

**(ARUN BHANSALI),J**                    **(VIJAY BISHNOI),J**

1-masif/-PS



<u>THE RAJASTHAN HIGH COURT AT JODHPUR</u>

<u>DECREE IN MISCELLANEOUS APPEAL</u>

(ORDER XLI, Rule, 35, C.P.C.)

*APPELLANTS:*

1. CoStar Group Inc.

A corporation registered under the laws of the **State of Delaware** and having its principal place of business at **1331 L Street, NW, Washington, District of Columbia 20005, United States of America**

2. CoStar Realty Information, Inc.

A corporation registered under the laws of the **State of Delaware** and having its principal place of business at **1331 L Street, NW, Washington, District of Columbia 20005, United States of America**

**...Plaintiffs**

*RESPONDENTS:*

Aregate Teleservices Private Limited

A company incorporated under the Companies Act, 2013 **having its registered Office at G1-10 I.T. Park, Madri Industrial Area,** Udaipur, Rajasthan: 313001

M/s Aregate

A partnership firm having registration no. 17/26/78/2005 **and** having its registered Office at G-11 I.T. Park, Madri **industrial** Area, Udaipur, Rajasthan, 313001

**...Defendants**





## APPLICATION FOR GRANT OF EX PARTE

## AD INTERIM INJUNCTION

**D.B. Civil Misc. Appeal No. 384 of 2021** from the case of the Court of Commercial Court, Udaipur, dated the 23.03.21, in Case No. 06/2021 Misc. Case (41), C.I.S. No. 06/21 in Civil Original Suit no. 29 of 2021

This appeal coming for hearing on the 03.12.2021 before the **Hon'ble Mr. Justice Vijay Bishnoi and Hon'ble Mr. Justice Arun Bhansali** in the presence of **Mr. M.S. Singhvi Sr. Advocate assisted by Mr. Muktesh Maheshwari, Mr. Aidan Choudhary, Mr. Nishit Shah Adv.** for the appellants and **Mr. Vikas Balia, Mr. Falgun Buch, Mr. Prateek Gattani, Mr. Karan Lahiri (through VC) Adv.** for the respondents, it is ordered that

> *"In the circumstances of the case, wherein the parties in the present appeal are seeking disposal of the suit pending before the Commercial Court, Udaipur, exercising powers under Section 24 CPC, the Civil Original Suit No. 29/21 along with pending applications is withdrawn to this Court.*
>
> *In view of the submissions made, the suit and pending applications are disposed of in terms of the settlement/compromise arrived at between the parties annexed as Annexure-A/1 to the application filed under Order XXIII Rule 3 CPC. The decree be drawn. The consent terms and permanent injunction shall form part of the decree."*

The consent terms and permanent injunction mentioned above (Enclosed as Annexure-A/1) shall be part of the decree.

The costs of the this appeal as detailed below amounting to Rs. NIL only are to be paid by the respondents to the appellants.



The costs of the court below are to be paid by as ordered by court below.

Given under my hand and the seal of this court this day...... of year....

Deputy Registrar (Judicial)
राजस्थान उच्च न्यायालय
जोधपुर

## COSTS OF APPEAL

| APPELLANT | | | RESPONDENT. | | |
|---|---|---|---|---|---|
| S.NO. Detail | Rs. | P. | S. No. Details | Rs. | P. |
| 1.Stamp for the memorandum of appeal + stay | 25.00 | | 1. Stamp for cross-objection if any | - - | |
| 2. Stamp for power | 00.00 | | 2. Stamp for power | 00.00 | |
| 3. Process fee | 00.00 | | 3. Process fee | | |
| 4.Counsel's fee | - - | | 4. Counsel's fees | | |
| 5. Costs of paper-Book | - - | | 5. Costs of Paper-books | - | |
| 6. Miscellaneous | 00.00 | | 6. Miscellaneous. | 05:00 | |
| TOTAL | 25.00 | | TOTAL | 05.00 | |

NOTE:- Counsels fee has not been taxed as fee certificate not filed U/R 9 1(1) of R.H.C. Rules.





Annex - A/1

(115 8)

## CONSENT TERMS AND PERMANENT INJUNCTION

These consent terms and the associated permanent injunction (the "Consent Terms") are effective as of 24 November 2021 (the "Effective Date"), and are made and entered into between CoStar Group, Inc., and CoStar Realty Information, Inc. (collectively "CoStar"), and Arcgate, a Partnership Firm (also known as M/s Arcgate) and its individual partners, as well as Arcgate Teleservices Pvt. Ltd. and any other affiliated or related Arcgate entity (collectively "Arcgate"). CoStar and Arcgate are referred to herein together as the "Parties" and each individually as a "Party."

WHEREAS, CoStar is the Plaintiff in Civil Suit no. 29 of 2021 (the "Suit") captioned *CoStar Group, Inc., et al. v. Arcgate Teleservices Pvt. Ltd.*, pending before this Hon'ble Court (collectively, with any appeals or ancillary actions therefrom, the "Litigation");

WHEREAS, Commercial Real Estate Exchange, Inc. ("CREXi"), as principal, hired Arcgate as a service provider to conduct U.S. commercial real estate research acting for, at the direction of, and for the benefit of, CREXi;

WHEREAS, Arcgate acted for, at the direction of, and for the benefit of, CREXi for the purposes of this work;

WHEREAS, Arcgate has worked on approximately 108 different tasks for CREXi since October 2017;

WHEREAS, CREXi executives and managers engaged in regular oversight of the Arcgate research teams, including through regular email communications, Slack messages and video teleconferences, and by receiving, editing, and reviewing work product provided by Arcgate via email, Google documents, and other electronic means, including the direct updating of CREXi's backend system by Arcgate;

WHEREAS, CREXi executives and managers instructed Arcgate researchers to access, use as a competitive resource, and to copy content, including, without limitation, broker-related information and auction-listing information, from websites owned by CREXi's competitor CoStar (including LoopNet.com, Ten-X.com and Cityfeet.com);

WHEREAS, Arcgate, acting for, at the direction of, and for the benefit of, CREXi, also accessed, used as a competitive resource, and copied or derived content from other websites owned by CREXi's competitor CoStar (including Showcase.com, Homesnap.com, Landsofamerica.com, and Homes.com), delivered content to CREXi copied or derived from such sites, and received no objection from CREXi when CREXi received content that was identified as having been sourced from these additional CoStar owned websites;

WHEREAS, after CREXi acknowledged to Arcgate that 'we should refrain from using any site that is, or could be considered, a direct competitor of CREXi," CREXi continued to instruct Arcgate to access and use CoStar websites as a resource, and to collect and provide content copied or derived from CoStar sites to CREXi, even as CREXi stated that "complying with any website's terms is important";



Bhantl

OATH COMMISSIONER
Raj. High Court JODHPUR

Exhibit A

12

1159

WHEREAS, as a result, and at CREXi's direction and for CREXi's benefit, Aregate continued to access CoStar sites for CREXi and agree to the sites' terms, use such sites as a competitive resource, and copy or derive information from such sites, providing work product to CREXi that cited as a source multiple CoStar sites, including Ten-X.com, LoopNet.com, and Cityfeet.com;

WHEREAS, even after acknowledging that competing sites should not be used as a resource, and that it is important to comply with website terms of use, CREXi specifically directed Aregate, in writing, to harvest content from CoStar's websites in violation of CoStar's websites' terms of use, including for example, directing Aregate to mass copy real estate auction listing information and broker information from CoStar's Ten-X.com website;

WHEREAS, CREXi later directed Aregate to delete references to CoStar websites being sources of information in CREXi's backend system, and Aregate did so after logging into that system, deleting more than two hundred links to CoStar's sites that appeared in that part of CREXi's system;

WHEREAS, CREXi provided training to Aregate regarding building property listings on CREXi's website, which involved instructions on taking property brochures and copying their contents into CREXi's system, including specifically copying "as many photos as possible" of the real estate properties, with no training or instruction given regarding determining the copyright ownership of those photographs;

WHEREAS, despite Aregate raising what it described as a red flag regarding using CoStar sites as a competitive resource, CREXi executives and managers instructed Aregate researchers to provide to CREXi (via spreadsheets and Google documents and other electronic means, including by directly updating CREXi's backend system) content or information obtained from or verified on CoStar's websites;

WHEREAS, Aregate now understands that it is improper and unlawful to access, use as a resource, and copy content from CoStar's websites for a competitor's benefit;

WHEREAS, CREXi did not ask Aregate to preserve evidence relating to the September 2020 lawsuit brought by CoStar against CREXi in federal court in Los Angeles until October 27, 2020, and even then was not clear that Aregate should preserve firewall or other logs reflecting its access to CoStar sites, thus resulting in the deletion of such logs through May 2021;

WHEREAS, it was not until October 27, 2020, after CoStar had sued CREXi, that CREXi issued a memo to Aregate where Aregate was asked not to "use information that was printed out from LoopNet or that bears a LoopNet logo or that otherwise appears to have come from Costar or Loopnet (even if provided by a broker or CREXi employee) to create CREXi listings";

WHEREAS, Aregate states that the narrative set forth herein is based on documents that relate to its engagement with CREXi for the period from October 2017 through October 31, 2020;

WHEREAS, the Parties desire to avoid the necessity, expense, inconvenience, and uncertainty of the Litigation;

OATH COMMISSIONER
Raj. High Court JODHPUR

11 JAN

Exhibit A
13



NOW, THEREFORE, the Parties, in consideration of the mutual promises set forth below, mutually agree as follows:

1. (a) the Parties hereto have the full power and authority to enter into and perform these Consent Terms; (b) the execution, delivery, and performance of these Consent Terms have been approved by all requisite action on the part of such Party; (c) these Consent Terms have been executed and delivered by or on behalf of such Party and constitute the valid and binding obligations of such Party enforceable in accordance with their terms; and (d) these Consent Terms are binding upon the successors and assigns of each Party.

2. Each Party represents and warrants that such Party has received no notice and has no knowledge of any judgment, restraining order, consent decree, or judicial or administrative prohibition binding upon them that would be violated by its entry into these Consent Terms.

3. Each Party represents and warrants that such Party: (a) was represented by legal counsel of such Party's choice in connection with the execution of these Consent Terms; (b) has read and understood all aspects of these Consent Terms and all of its effects; and (c) has executed these as a free and voluntary act of his or its own free will and without any threat, force, fraud, duress, or coercion of any kind.

4. Each Party acknowledges that it understands that the other Party is signing these Consent Terms and agreeing hereto based upon the truth of the representations set forth herein, and that otherwise such Party would not sign or enter into these Consent Terms or take any action based upon these Consent Terms.

5. For the sake of brevity, the Parties agree to the definitions provided below.

   a. "**Circumvention Measures**" means any method of circumventing CoStar's abuse monitor or blocking software, including without limitation rotating IP addresses, proxies, anonymizers, virtual private networks, and/or TOR or similar browsers.

   b. "**CoStar**" means CoStar Group, Inc., and CoStar Realty Information, Inc., and all and any parent, subsidiary, sister company, affiliate, related entity, assignee, transferee, designee, or successor in interest of either.

   c. "**CoStar-Sourced Content**" means both CoStar Photograph(s) and CoStar-Sourced Data.

   d. "**CoStar-Sourced Data**" means any and all broker or auction listing or property listing information or data, whether now in existence or later created, which is displayed on any CoStar Website or in any CoStar Database or on or in any other website or database operated by CoStar now or in the future.

   e. "**CoStar Database**" means any subscription database owned or operated by CoStar, now or in the future, including databases licensed under the name or names CoStar, CoStar Property, CoStar Professional Directory, CoStar Comps, CoStar Tenant, CoStar Suite, CoStar Market Analytics, CoStar Portfolio Strategy, CoStar Go, CoStar Mobile, CoStar Risk Analytics, CoStar Investment Analysis, CoStar



Exhibit A
14





Real Estate Manager, CoStar Brokerage Applications, CoStar Private Sale Network, CoStar News, CoStar Lease Comps, or Lease Analysis.

f. **"CoStar Photograph(s)"** means any and all copyrighted images (or portions thereof), whether in the form of a photograph, video, or other non-textual format, and whether now in existence or later created, in which CoStar owns or controls an exclusive right under Section 106 of the United States Copyright Act (17 U.S.C. § 106) or under Section 51 of the (Indian) Copyright Act, 1957.

g. **"CoStar Website(s)"** means any website owned or operated by CoStar, including loopnet.com, costar.com, ten-x.com, showcase.com, cityfeet.com, apartments.com, apartamentos.com, apartmentfinder.com, apartmenthomeliving.com, bizbuysell.com, landsofamerica.com, landandfarm.com, landwatch.com, costar.co.uk, propex.co.uk, showcase.co.uk, shopproperty.co.uk, realla.co.uk, bizquest.com, forrent.com, after55.com, corporatehousing.com, forrentuniversity.com, westsiderentals.com, str.com, homes.com, and homesnap.com. webpages within those domains, and any apps or mobile sites associated with any of the foregoing domains. The defined term CoStar Website(s) also includes any websites, apps, or mobile sites that CoStar may acquire in the future and of which it informs Aregate in writing, or which Aregate independently learns or determines is or are owned by CoStar. For the avoidance of doubt, the defined term CoStar Website(s) does not include LoopLink or CoStar Connect or other third-party websites that are hosted, provided, or powered by CoStar or that reside on CoStar systems, including products that are substantively identical to LoopLink that CoStar may create in the future.

h. **"Aregate"** means Aregate, a Partnership Firm (also known as M/s Aregate) and its individual partners, as well as Aregate Teleservices Pvt. Ltd., and all and any of their respective parents, subsidiaries, or affiliates, and includes all Aregate Employees.

i. **"Aregate Employee"** means any individual who acts or purports to act on behalf of Aregate, whether as an executive, manager, director, officer, employee, independent contractor, agent, counsel, representative, investor or otherwise.

j. **"California Action"** means the lawsuit styled *CoStar Group, Inc., et al., v. Commercial Real Estate Exchange, Inc.*, Case No. 2:20-cv-8819-CBM-AS, in the United States District Court for the Central District of California, collectively with any appeals or ancillary actions therefrom.

6. Aregate sets forth a summary of facts relating to its work for CREXi in the declaration attached as Exhibit A and made part of these Consent Terms as if set forth herein.

7. Aregate agrees to cooperate with CoStar to provide to CoStar all documentary evidence in its possession, custody or control relating to the activities and events described in Exhibit A on being directed to do so by an order of this Hon'ble Court or another court of competent jurisdiction, agrees to seek guidance from the Hon'ble Court on this issue within 15



Exhibit A

15



working days of the Effective Date, and agrees to cooperate to answer questions posed by CoStar regarding such activities and events. Aregate represents that its cooperation with CoStar to date does not violate any contract, law, judgment, order, or any other restriction.

8. Aregate confirms that it shall identify all content it copied from CoStar Websites or CoStar Databases, and to sequester that content at Aregate (such that it cannot be accessed or used by the Aregate business or its clients) till such time as the California Action is concluded.

9. The Parties agree to file these Consent Terms as agreed hereinafter in full and final settlement of the disputes between the Parties (and only the Parties) as enumerated in the Plaint of CoStar in the present proceedings.

10. Aregate agrees and understands that Aregate, and all those in active concert or participation with it, shall be permanently restrained and enjoined from (a) infringing by any means, directly or indirectly, any exclusive rights under the U.S. Copyright Act and/or the (Indian) Copyright Act, 1957 in CoStar Photographs; (b) accessing or using CoStar Websites or CoStar Databases for the purposes of competitive use, including without limitation for the purposes of copying CoStar-Sourced Content, collecting, reviewing or verifying broker-sourced data using CoStar-Sourced Content, or generating or confirming leads using CoStar-Sourced Content; (c) employing Circumvention Measures to bypass CoStar's abuse monitor, blocking software, or any other access-blocking or security measures; (d) publishing CoStar-Sourced Content in or on its own websites or databases or any third-party website or database; (e) providing CoStar-Sourced Content to any individual or entity for competitive use; and (f) inducing any individual or entity to provide CoStar-Sourced Content or secure CoStar-Sourced Content from any other individual or entity ("Permanent Injunction").

11. If Aregate is found to have violated the terms of this Permanent Injunction by infringing a CoStar Photograph, copying CoStar-Sourced Data, or accessing a CoStar Website or Database for competitive purposes, Aregate undertakes to forthwith pay CoStar the amount of INR 4,000,000 (Rupees Forty Lakhs only) per infringing photograph, and INR 4,000,000 (Rupees Forty Lakhs only) per property listing that it accesses and/or copies, in whole or in part. Aregate agrees and confirms that this relief is non-exclusive and shall be in addition to any other relief that would or could be sought by CoStar and ordered by the Court. Aregate agrees that such payments fairly reflect, as best as can be determined, the harm that would be incurred by CoStar as a result of such conduct. CoStar agrees that it will not seek such payments where such conduct is inadvertent and limited in scope, ceases as soon as is practicable upon notice by CoStar to Aregate, and where Aregate remedies such conduct including by sequestering any content copied during such inadvertent limited conduct.

12. The parties irrevocably and fully waive any and all right to appeal the Permanent Injunction, to have it vacated or set aside, to seek or obtain a new trial thereon, or otherwise to attack in any way, directly or collaterally, its validity or enforceability.

13. Aregate will undertake to give notice of this Permanent Injunction to each of its officers, directors, agents, servants, employees, assigns, owners, affiliates, all entities through which



OATH COMMISSIONER
Raj. High Court JOODHPUT

Exhibit A
16





it now or at a later time conducts business, representatives, successors, licensees, and all those acting in concert or participation with each or any of them, to the extent such persons exist, and require adherence to the terms of this Permanent Injunction.

14. CoStar and Aregate agree that these Consent Terms relate to harms and injuries separate and distinct from any harms or injuries alleged against any other individual or entity including without limitation CREXi, or any current or former executives, managers, directors, officers, employees, agents, contractors, counsel, representatives or investors (collectively, the "CREXi Entities"); any other current or former contractor or agent that CREXi hired, retained, or paid any amount of money at any time (the "CREXi Unnamed Agents"); or any current or former CREXi customer or client (the "CREXi Customers"). These Consent Terms resolve claims of CoStar in the present suit and resolve claims of CoStar in respect of all actions/acts committed by Aregate, up till the date of present Consent Terms, relating to alleged infringements of CoStar copyrighted photographs by Aregate and/or for alleged wrongful access to CoStar database by Aregate and do not apply to any acts committed by or attributed to any other individual or entity, including without limitation any CREXi Entity, CREXi Unnamed Agent, or CREXi Customer. Aregate is entering into these Consent Terms for its own benefit and not for the benefit of any CREXi Entity, CREXi Unnamed Agent, or CREXi Customer. The Parties agree that these Consent Terms have no impact on, and do not redress, any claim brought by CoStar against any CREXi Entity, CREXi Unnamed Agent, or CREXi Customer, and that there is no privity or other representative or contractual relationship between Aregate and any CREXi Entity, CREXi Unnamed Agent, or CREXi Customer with respect to these Consent Terms or the settlement of claims hereunder.

## RELEASES AND COVENANT NOT TO SUE

15. Subject to and conditioned upon CoStar's receipt of: (i) these Consent Terms executed by an authorized signatory for Aregate and (ii) these Consent Terms entered by the Court overseeing the Litigation, as of (but not after) the Effective Date, on behalf of itself and its affiliates, CoStar fully, finally, and forever releases and discharges Aregate and its partners (collectively, the "Aregate Releasees") from and against all actions, causes of action, claims, suits, debts, damages, judgments, liabilities, and demands whatsoever, whether matured or unmatured, whether at law or equity, whether before a local, state, or federal court or state or federal administrative agency, tribunal, or commission, regardless of location, and whether now known or unknown, liquidated or unliquidated, that CoStar now has, had, or may have had, or hereafter claims to have, arising out of, relating to, or concerning the issues in the Litigation ("CoStar Claims"); provided, that the foregoing shall not release or discharge the CREXi Entities, the CREXi Unnamed Agents, the CREXi Customers, or any of their respective directors, officers, general partners, limited partners, members (including each of their managers, advisors, or sub-advisors), partnerships, managing directors, employees, agents, attorneys, managers, advisors, sub-advisors, insurers, accountants, auditors, trustees, financial advisors, lenders (including each of their managers, advisors, or sub-advisors), investment bankers (including each of their managers, advisors, or sub-advisors), associates, representatives, heirs, executors, personal representatives, estates, administrators, successors, and assigns. By way of example, nothing in these Consent Terms shall be construed to release any claims that CoStar may





have against current or future parties to the California Action or any insurer involved therewith.

16. On behalf of itself and the Arcgate Releasees and subject to withdrawal of the Suit, Arcgate fully, finally, and forever releases and discharges CoStar and all of its directors, officers, general partners, limited partners, members (including each of their managers, advisors, or sub-advisors), partnerships, managing directors, employees, agents, attorneys, managers, advisors, sub-advisors, insurers, accountants, auditors, trustees, financial advisors, lenders (including each of their managers, advisors, or sub-advisors), investment bankers (including each of their managers, advisors, or sub-advisors), associates, representatives, heirs, relatives, executors, personal representatives, estates, administrators, successors, and assigns (collectively, the "CoStar Releasees") from and against all actions, causes of action, claims, suits, debts, damages, judgments, liabilities, and demands whatsoever, whether matured or unmatured, whether at law or in equity, whether before a local, state, or federal court or state or federal administrative agency, tribunal, or commission, regardless of location, and whether now known or unknown, liquidated or unliquidated, that Arcgate now has, had, or may have had, or hereafter claims to have, arising out of, relating to, or concerning the issues in or the filing of the Litigation ("Arcgate Claims"); provided, that the foregoing shall not release or discharge the CREXi Entities, the CREXi Unnamed Agents, the CREXi Customers, or any of their respective current or former directors, officers, general partners, limited partners, members (including each of their managers, advisors, or sub-advisors), partnerships, managing directors, employees, agents, attorneys, managers, advisors, sub-advisors, insurers, accountants, auditors, trustees, financial advisors, lenders (including each of their managers, advisors, or subadvisors), investment bankers (including each of their managers, advisors, or subadvisors), associates, representatives, heirs, executors, personal representatives, estates, administrators, successors, and assigns.

17. Except as otherwise provided herein, Arcgate agrees and undertakes not to initiate, join, support, encourage, induce, act for a party in, fund, or voluntarily participate in any way in any action, suit, claim, case, litigation, arbitration, proceeding, review, inquiry, or investigation, related to the Arcgate Claims, against or into any CoStar Releasee, as applicable, in any court or forum or by or before any entity, whether governmental, regulatory, private, or otherwise.

18. Except as otherwise provided herein, CoStar agrees not to initiate, join, support, encourage, induce, act for a party in, fund, or voluntarily participate in any way in any action, suit, claim, case, litigation, arbitration, proceeding, review, inquiry, or investigation, related to the CoStar Claims, against or into any Arcgate Releasee, as applicable, in any court or forum or by or before any entity, whether governmental, regulatory, private, or otherwise.

19. In the event of a breach of any of the terms set out in the Consent Terms by either Party, CoStar/Arcgate, as the case may be, shall inform the Party committing breach of such breach by email explaining the nature of the breach. On receipt of such intimation the Party committing breach shall within five (5) days of receipt of such email communication, rectify the breach and/or desist the actions/acts causing breach of the terms herein to the satisfaction of CoStar/Arcgate, as the case may be, and intimate the same to



Exhibit A
18




(1165)

CoStar/Arcgate, as the case may be. In the event that actions causing breach are not rectified/desisted by the Party committing the breach to the satisfaction of CoStar/Arcgate, as the case may be, within five (5) days from the date of email communication, the non-breaching party may take all appropriate steps to enforce its rights under these Consent Terms.

## MISCELLANEOUS PROVISIONS

20. Each Party shall execute such further instruments and documents and shall perform such further acts as may be reasonably necessary or convenient to carry out and perform the terms and provisions of these Consent Terms.

21. The Parties acknowledge that they have not executed these Consent Terms in reliance on any promise, representation, or warranty except as expressly set forth herein, and that these Consent Terms supersedes all prior statements or agreements, both oral and written

22. No modification or waiver of any of the terms hereof shall be valid or effective unless made in writing and executed by the duly authorized representative of each Party, or its respective successor or assign. No waiver of any breach hereof or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

23. The provisions of these Consent Terms are for the sole benefit of the Parties, and these Consent Terms are not intended to and shall not be construed to give any other person or entity (including without limitation any of the CREXi Entities, CREXi Unnamed Agents, and CREXi Customers) any interest or rights (including without limitation any third party beneficiary rights), except as expressly provided for in these Consent Terms.

24. These Consent Terms shall be construed in accordance with and governed by the laws of India in effect as of the Effective Date.

25. No provision of these Consent Terms shall act as a waiver or release of either Party's right to assert a claim for an alleged breach of the terms or conditions of these Consent Terms. A Party bringing a legal action or proceeding in accordance with the terms of these Consent Terms shall bring the legal action or proceeding in accordance with the laws of India. For the avoidance of doubt, CoStar does not submit or consent to jurisdiction in India for any other purpose.

26. The Parties agree that irreparable damage will occur if any provision of these Consent Terms is not performed in accordance with the terms hereof and that each Party shall be entitled to an injunction or injunctions (without the posting of a bond or other security) to prevent breaches of these Consent Terms or to enforce specifically the performance of the provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.

27. If any provisions or portions thereof of these Consent Terms shall be deemed unenforceable for any reason, the remaining provisions will be given full force and effect.



OATH COMMISSIONER
Raj. High Court JODHPUR

Exhibit A
19



(1166)

28. Neither these Consent Terms nor any obligations hereunder shall be assigned, delegated, or transferred by either Party except with the prior written consent of the other Party.

29. These Consent Terms shall be construed as if the Parties jointly drafted and prepared them, and any uncertainty or ambiguity shall not be interpreted against either Party because of the manner in which these Consent Terms were drafted or prepared.

30. These Consent Terms may be executed in counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same instrument.

31. On the decreeing of these Consent Terms by this Hon'ble Court, each of CoStar and Aregate shall unconditionally withdraw all cases filed by either Party before any courts against each other and the same shall be done within 7 working days of such order. For the avoidance of doubt, this paragraph does not require CoStar to withdraw or otherwise limit any cases or claims against the CREXi Entities, the CREXi Unnamed Agents, the CREXi Customers, or any other individual or entity other than the Aregate Releasees.

32. These Consent Terms constitute the entire resolution of the disputed claims presently being litigated between the Parties.

33. In view of the above, the Parties pray that this Hon'ble Court be pleased to accept all undertakings given in these Consent Terms as undertakings given to this Hon'ble Court and dispose of the suit in terms of these Consent Terms.

34. In view of the above, the Parties pray that this Hon'ble Court issue and order as follows: "The Parties hereto have executed Consent Terms which are annexed hereto. This Court orders and decrees the Consent Terms and Permanent Injunction, which are incorporated herein by reference. This Court thus disposes of this Suit in accordance with the Order XXIII Rule 3 of the Civil Procedure Code, 1908."

IN WITNESS WHEREOF, the Parties hereto have caused these Consent Terms to be executed as of the Effective Date.

Aregate

By Its Duly Authorized Representative

Name: KUNAL BAGLA
Title: CEO

OATH COMMISSIONER
Raj. High Court JODHPUR

1 1 JAN 2022

Exhibit A
20

 

CoStar Group, Inc., and

CoStar Realty Information, Inc.

By Their Duly Authorized Representative

Name:  Jeannette C. Koonce
Title:   Interim General Counsel & Secretary





1168

EXHIBIT A





# DECLARATION

I, Kunal Bagla, do declare and state as follows:

1. I am one of the founders, and the Chief Executive Officer, of Arcgate, an Indian partnership firm (also known as M/s Arcgate) ("Arcgate"). I have held that role since June 1, 2005. In my role as CEO of Arcgate, I have personal knowledge of the facts set forth below. I am over the age of eighteen and competent to give testimony.

2. Arcgate performs various tasks, including commercial-real-estate-related research, acting for, at the direction of, and for the benefit of, Commercial Real Estate Exchange, Inc. ("CREXi"), a U.S. company based in Marina Del Rey, California. Arcgate has worked for CREXi since October 2017. In August 2017, CREXi first reached out to Arcgate in order to discuss engaging Arcgate.

3. CREXi executives and employees, including Lawson Dees, James Burton, Ashley Kobovitch, Forrest Kobayashi, Steve Long, Bryan Barajas, Andrew Gianelli, Roger Smith, Tyler Benz, Devin Duke, Doug Shankman, Sonya Bokano, Kyla Dickman, Nick Hanna, Zack Zlotnick, Alex Beroza, Ashir Badami, Chris Finck, Robert Anderson, Ryan Schlesinger, Jessica Garbutt, Jessica LaRusso, Michael Lindman and Steve Narish, interacted with and directed Arcgate. Specifically, CREXi directed Arcgate to access other real estate websites for the benefit of CREXi, including www.loopnet.com ("LoopNet"), www.ten-x.com ("Ten-X") and www.cityfeet.com ("Cityfeet"), to use those sites as a competitive resource, and to copy and/or derive content from such sites. These communications between CREXi and Arcgate occurred via email, Slack, DropBox, Google Sheets, and videoconference.

OATH COMMISSIONER
Raj. High Court JODHPUR

Exhibit A
23



4. Accordingly, for CREXi, at CREXi's direction and for CREXi's benefit, Arcgate employees routinely accessed real estate websites, including LoopNet, Ten-X, Cityfeet, and other CoStar websites and copied data on a large scale, starting approximately in early 2019 and continuing well into 2020.

5. Arcgate has used at least the following IP addresses to access websites, including LoopNet, Ten-X, Cityfeet and other CoStar websites for CREXi's benefit and at CREXi's direction: 115.178.100.18 and 202.129.210.67.

6. Arcgate does not maintain firewall logs or similar logs that would reflect Arcgate's access of LoopNet, Ten-X, Cityfeet, and other CoStar websites, at CREXi's direction and for CREXi's benefit, prior to May 2021. While extensive access to those sites at CREXi's direction and for its benefit occurred from 2019 through October 27, 2020, those logs are no longer available because in or around May 2021 Arcgate switched firewall device and logs dating prior to that switch were rendered inaccessible. Arcgate did not know at that time that it should preserve such logs, as explained in Paragraph 30 below.

7. Arcgate's work for CREXi, at CREXi's direction for CREXi's benefit, has involved accessing real estate websites including LoopNet, Ten-X, Cityfeet, and other CoStar websites thousands of times and copying thousands of data points. Each time Arcgate accessed those sites for CREXi, it agreed, for CREXi, to be bound to their terms. To the extent access was blocked by CoStar, Arcgate employees took the decision to circumvent such blocks using VPNs or proxies or similar means, in order to complete the work and tasks assigned by CREXi. Arcgate employees transferred data taken from or verified on CoStar websites to CREXi for use in its business. The materials provided to CREXi by Arcgate include information about the source of the data copied or derived by Arcgate for



OATH COMMISSIONER
Raj. High Court JODHPUR

Exhibit A
24




CREXi, including CoStar website URLs. CREXi instructed Arcgate to provide it with data from CoStar websites by adding it into shareable Google documents and/or entering it directly into CREXi's backend system, for CREXi's use, or by editing spreadsheets or other documents, and Arcgate provided these materials to a number of CREXi managers and directors via email, Google Drive and DropBox.

8. Arcgate understands that CoStar prohibits using its websites, and data obtained from its websites, to compete against it. For example, the LoopNet Terms and Conditions (https://www.loopnet.com/solutions/terms-and-conditions) clearly state that any user who accesses LoopNet warrants that they "are not a competitor of LoopNet, CoStar Realty Information, Inc. or any of its affiliates" and that they will not use any content from LoopNet "as part of any effort to compete with LoopNet." The Ten-X Terms of Use (https://www.ten-x.com/company/legal/terms/) also clearly state that anyone who accesses the website "agree[s] not to use the Services in any way that: . . . Competes with our business or impacts our revenue." Similarly, the Cityfeet Terms of Use (https://www.cityfeet.com/cont/Help/Terms) clearly state that anyone who accesses the website "shall not use the Cityfeet Service as part of any effort to compete with Cityfeet."

9. Arcgate also recognizes that accessing many websites, including CoStar's websites, creates a binding contract, not least because Arcgate itself employs the same method of binding users (and their principals, if the users are agents) to its website terms of use. The Arcgate Terms of Use (https://www.arcgate.com/terms-of-use) state that "[b]y accessing and browsing the [Arcgate website] or by using and/or downloading any content from same, [users] agree and accept the Terms of Use as set forth below."



Exhibit A
25



10. And just as CoStar prohibits competitive access to its websites, so too does Arcgate.  As part of the binding contract with Arcgate, users must agree to only use the material on Arcgate's website "for personal and non-commercial purposes."  Any other use of Arcgate's content, e.g., a competitive use, requires "prior written authorization" from Arcgate.

11. CREXi was aware that Arcgate, acting for CREXi, was accessing for competitive purposes, and copying or deriving content from, LoopNet, Ten-X, Cityfeet, and other CoStar websites for CREXi's competitive use.  Indeed, CREXi directed Arcgate, in writing, to undertake such activities.

12. Specifically, CREXi instructed Arcgate to perform a number of tasks, many of which required Arcgate to access and use CoStar websites in violation of their terms of use.  For example, in October 2019, Lawson Dees, CREXi's Senior Vice President of Operations, instructed Arcgate to access and obtain content from CoStar websites, including broker information, for CREXi's use in its business.  On October 9, 2019, Mr. Dees instructed Arcgate to search the Internet for commercial real estate listings associated with certain brokers that CREXi had provided to Arcgate in an Account scrub file.  Specifically, CREXi directed Arcgate to enter an estimated number of real estate listings for the broker and a link to where those listings could be located.  When Arcgate provided this property-listing information to CREXi, Arcgate asked CREXi (in the form of Mr. Dees) the following question: "Some of the Broker listings are listed on 'LoopNet' website. Should we consider these?"  Mr. Dees replied, "You can note that you found listings for the broker on that website."  As Mr. Dees instructed, Arcgate noted in its deliverable to CREXi that it had accessed and reviewed CoStar websites, including LoopNet, Showcase, Ten-X, Cityfeet,

OATH COMMISSIONER
Raj. High Court JODHPUR




Homesnap, Lands of America, and Homes.com, six hundred and sixty times, and provided

the source URLs for these CoStar websites to CREXi. CREXi accepted this work product

that clearly referenced CoStar website URLs as sources and never raised any issues or

concerns about the presence of CoStar website URLs in this work product. Accordingly,

based on the instructions from CREXi, Arcgate understood that CREXi was directing

Arcgate to access and use CoStar websites for CREXi's benefit and for competitive

purposes.

13. On January 2, 2020, Arcgate asked CREXi again about using competing websites for

competitive purposes, initially using a well-known third-party U.S. real estate website as

an example. CREXi's Forrest Kobayashi expressly acknowledged that CREXi and

Arcgate "should refrain from using any site that is, or could be considered, a direct

competitor of CREXi." Nevertheless, in a follow up email dated the next day, January 3,

2020, Ashley Kobovitch, a Regional Director at CREXi, instructed Arcgate to obtain

content for CREXi, including broker information, from both LoopNet and Cityfeet, two

CoStar sites. Arcgate attempted to push back, raising specific concerns about accessing

and obtaining content from LoopNet and Cityfeet because of direct competition between

CoStar and CREXi, which Arcgate referred to as "red flags" in its response email.

14. At first, in response to Arcgate raising "red flags" about accessing CoStar sites, CREXi's

Senior Vice President Doug Shankman stated that CREXi's "Ashley [Kobovitch] will

work to update the directions pertaining to other websites with our expectations and return

to you for review and completion." Then, CREXi senior manager Forrest Kobayashi

responded a few days later by stating, "Please disregard the information previously

provided in this string." It was unclear what exactly Arcgate was to disregard: the



OATH COMMISSIONER
Raj. High Court JOOHPUR




statement about refraining from using any site that is, or could be considered to be, a direct competitor of CREXi, or the contradictory instruction to use competing sites like LoopNet and CityFeet, or both, or something else. (But as explained below, when work product was thereafter delivered by Aregate to CREXi, reflecting CoStar websites as the source URL, no objection was raised by CREXi.)

15. Clarity was provided by CREXi in an email the same day. CREXi (in the form of Mr. Kobayashi) wrote: "To answer your question about using third-party websites, we are ok with you identifying brokers as active market participants for any website. By active market participant, we mean having at least one 'For Szale' [sic] or 'For Lease' listing." In other words, in response to Aregate's multiple questions about whether it was advisable to use competing websites for competitive purposes, CREXi directed Aregate to go ahead and do so, i.e., use "any website."

16. CREXi's Mr. Kobayashi continued: "However, for the contact information we've requested, our preference is to source this information from the broker's social profiles or brokerage website as this tends to be the most up-to-date information." CREXi expressed a "preference" that, after accessing and using third-party sites as a competitive resource, Aregate should then copy data from a broker social profile or site. But there was no direction that copying from LoopNet or CityFeet or any competing site was forbidden during the access to those sites that CREXi directed should occur.

17. CREXi's Mr. Kobayashi concluded by saying: "Of course, complying with any website's terms is important to us." But CREXi had simultaneously directed Aregate to access and use competing sites (e.g., Ten-X) as resources, and had not prohibited copying from those sites, even as that activity violated the terms of use of those websites.



Exhibit A
28



18. CREXi then followed up about a week later to notify Aregate that CREXi had created a Slack shared workspace where CREXi would provide additional updates going forward, as opposed to relying solely on email.

19. Aregate thus proceeded, for CREXi, at CREXi's direction and for CREXi's benefit, to access and use CoStar websites, obtain broker and property auction listing information from CoStar websites (e.g., Ten-X), and provide that information to CREXi for CREXi's use with a clear notification to CREXi that the information had been obtained from CoStar websites, and CREXi accepted the broker and property auction listing information, knowing that Aregate had obtained such information from CoStar websites (e.g., Ten-X). For example, as discussed in more detail below, in April 2020, CREXi specifically instructed Aregate to "scrub" auction-listing data from CoStar's Ten-X.com website. And the following month, as also detailed below, CREXi asked Aregate to delete references to CoStar websites being sources of information in CREXi's backend system, and Aregate did so after logging into that system, deleting more than two hundred links to CoStar's sites that appeared in that part of CREXi's system. CREXi did not ask Aregate to refrain from using those CoStar websites. Instead, CREXi directed Aregate merely to remove all references to CoStar websites as a source of information and leave the rest of the information in the system.

20. One project of particular significance (which occurred after Aregate's raising of red flags about using CoStar sites, and CREXi's acknowledgment of the importance of complying with terms of use and not using competing sites) was CREXi's express direction in April 2020 to harvest significant amounts of real estate data and information from the competing CoStar auction website Ten-X. At that time, CREXi expressly directed Aregate during a



18. CREXi then followed up about a week later to notify Aregate that CREXi had created a
    Slack shared workspace where CREXi would provide additional updates going forward, as
    opposed to relying solely on email.

19. Aregate thus proceeded, for CREXi, at CREXi's direction and for CREXi's benefit, to
    access and use CoStar websites, obtain broker and property auction listing information
    from CoStar websites (e.g., Ten-X), and provide that information to CREXi for CREXi's
    use with a clear notification to CREXi that the information had been obtained from CoStar
    websites, and CREXi accepted the broker and property auction listing information,
    knowing that Aregate had obtained such information from CoStar websites (e.g., Ten-X).
    For example, as discussed in more detail below, in April 2020, CREXi specifically
    instructed Aregate to "scrub" auction-listing data from CoStar's Ten-X.com website. And
    the following month, as also detailed below, CREXi asked Aregate to delete references to
    CoStar websites being sources of information in CREXi's backend system, and Aregate
    did so after logging into that system, deleting more than two hundred links to CoStar's sites
    that appeared in that part of CREXi's system. CREXi did not ask Aregate to refrain from
    using those CoStar websites. Instead, CREXi directed Aregate merely to remove all
    references to CoStar websites as a source of information and leave the rest of the
    information in the system.

20. One project of particular significance (which occurred after Aregate's raising of red flags
    about using CoStar sites, and CREXi's acknowledgment of the importance of complying
    with terms of use and not using competing sites) was CREXi's express direction in April
    2020 to harvest significant amounts of real estate data and information from the competing
    CoStar auction website Ten-X. At that time, CREXi expressly directed Aregate during a



Exhibit A
30





Zoom call to obtain broker information and information about every real estate auction listing on the Ten-X site (as well as another third-party commercial real estate auction platform that competed with CREXi). CREXi instructed Aregate to track the auction data on Ten-X monthly for three months to capture any changes in the Ten-X auctions, such as the auction start date and the starting bid, to copy the data for every broker on the Ten-X site that was not already in CREXi's database, and for those brokers already in CREXi's database, to copy any broker data on the Ten-X site not already in the CREXi database. Accordingly, at CREXi's direction, Aregate accessed CoStar's Ten-X website for CREXi, and copied real estate auction listing data for every auction on that site, and all of the requested broker data. Aregate completed this project and provided to CREXi the copied data CREXi had requested on or around April 19, 2020.

21. In May 2020, as noted above, CREXi gave Aregate instructions to delete references to CoStar websites that appeared in CREXi's system as the source of information in that system, but not to delete the information itself. On May 15, 2020, James Burton, CREXi's Manager of Customer Success Operations, sent Aregate an email with the subject "NEW HIGH PRIORITY PROJECT." CREXi directed Aregate to log into CREXi's system, remove whatever website was listed in the "Website" section of a table of data relating to brokers, and add that information into a "cross references notes" section of a spreadsheet. When Aregate reviewed the table on CREXi's system, the "Website" section contained more than two hundred references to CoStar websites, including LoopNet, CityFeet, CoStar and Showcase. Aregate was directed by CREXi to then search for each of these brokers on the Internet and to substitute the brokerage's website into the "Website" section instead of the original reference to a CoStar website.

OATH COMMISSIONER
Raj. High Court JODHPUT



22. After Aregate completed this task for CREXi, Mr. Burton criticized the work saying that he was "still seeing showcase and city feet links in the cross reference notes for websites." Aregate then understood it needed to remove all traces of a CoStar website as the source of this information in CREXi's system, so Aregate deleted all links to CoStar websites and then emailed Mr. Burton that Aregate had "removed all these links 'Showcase, Costar, Looplink, Loopnet, [and] Cityfeet' from all the accounts." James Burton then responded with "Great work!"

23. The Ten-X project in April 2020 mentioned above involved copying broker information and data available on Ten-X that was missing from CREXi's broker records into the work product to be imported into CREXi's system. CREXi also directed Aregate to copy auction listing data in the same manner.

24. In or around March 13, 2020, CREXi provided instructions to Aregate regarding creating or "building" real property listings on CREXi's website. Those instructions involved taking third-party property brochures and copying their contents into CREXi's system. CREXi's instructions included a specific direction to copy "as many photos as possible" of the real estate properties, and upload those photographs into CREXi's system. There was no training on determining the ownership of those photographs. Ultimately, CREXi did not send Aregate any tasks to perform related to this project.

25. As noted above, Aregate raised concerns with CREXi regarding CREXi's directions that Aregate access and use CoStar websites in order to obtain information or copy content, including broker information. CREXi did not direct Aregate to stop accessing or using CoStar websites and continued to accept work product from Aregate, knowing that Aregate, acting for CREXi, was accessing, using and copying content from CoStar





websites to complete its assignments for CREXi.  In fact, CREXi continued to direct Arcgate to access and obtain content, including broker information, from other real estate websites, including specifically from CoStar websites.  It was only on October 27, 2020, after CoStar sued CREXi, that CREXi issued a memo to Arcgate where Arcgate was asked not to "use information that was printed out from LoopNet or that bears a LoopNet logo or that otherwise appears to have come from Costar or Loopnet (even if provided by a broker or CREXi employee) to create CREXi listings."  Even then, the memo did not mention any other CoStar websites.

26. Arcgate, acting for, and for the benefit of, CREXi, agreed to LoopNet's Terms and Conditions for CREXi each and every time it accessed and used LoopNet for CREXi's benefit.

27. Arcgate, acting for, and for the benefit of, CREXi, also accessed www.ten-x.com and agreed to Ten-X's Terms and Conditions for CREXi each and every time it accessed and used Ten-X for CREXi's benefit.

28. Arcgate, acting for, and for the benefit of, CREXi, also accessed www.cityfeet.com and agreed to Cityfeet's Terms and Conditions for CREXi each and every time it accessed and used Cityfeet for CREXi's benefit.

29. Arcgate recognizes now that it was improper, and a violation of the applicable terms, to have accessed, used and copied or derived information from LoopNet, Ten-X, Cityfeet and other CoStar websites at CREXi's direction and for CREXi's benefit, and—as detailed in the Consent Terms—agrees not to do so in the future.

30. CREXi did not inform Arcgate, in or around September 2020, of the need to preserve all materials relating to Arcgate's work for CREXi.  After CREXi was sued by CoStar in



September 2020 in the United States based on CREXi's access to and use of CoStar sites
and copying of content, CREXi did contact Aregate in late October 2020  On October 27,
2020, a memo was sent to Aregate which provided details of the CoStar lawsuit without
mentioning specifically that Aregate had been named/mentioned in the said lawsuit. The
memo requested Aregate to "take appropriate measures to preserve all records relating to
your work for CREXi, including suspension of any automatic document-deletion policies
or programs" as "[i]nformation related to your prior and ongoing work for CREXi may be
relevant to the litigation." However, Aregate was not specifically asked to retain network
firewall logs or other logs reflecting its access to CoStar websites.  In fact, the memo stated
that "[t]he scope of this request should include paper or electronic files, including memos,
emails, or chats, however they are kept in the ordinary course of business."  As a result,
while Aregate did preserve paper and electronic files, memos, emails, chats and any other
documentation created/generated in connection with prior and ongoing work for CREXi,
Aregate did not take steps to preserve other evidence, such as network firewall logs that
would reflect the websites, including CoStar websites, that Aregate accessed for CREXi.
As noted above, in or around May of 2021, Aregate switched its firewall device and now
only has access to firewall logs after that date.

31. I, Kunal Bagla, attest that all the records of data, documents, and information that are
described herein and on the basis of which Aregate is stating the above were made at or
near the time the activities took place.  All of those records of data, documents, and
information were created by someone with direct knowledge of the described events.  All
of these records were kept in the course of regularly conducted business activities and



(1180)

making these records was a regular practice of Aregate.  I personally have reviewed all the records and hereby attest to their truthfulness and authenticity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed      on      November   24,   2021

Name: KUNAL BAGLA

Title:  CEO

OATH COMMISSIONER
Raj. High Court JODHPUR

