1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

11
12
13
14
15

| | |
|---|---|
| CoStar Group, Inc., *et al*., | Case No.:  CV 20-8819-CBM(ASx) |
|      Plaintiffs, | **ORDER RE: COUNTERCLAIM DEFENDANTS' 12(B)(6) MOTION TO DISMISS COUNTERCLAIM [82]** |
| v. | |
| Commercial Real Estate Exchange Inc. | |
|      Defendant. | |

16
17
18
19
20

     The matter before the Court is Plaintiffs and Counterclaim Defendants CoStar Group, Inc. and CoStar Realty Information, Inc.'s (collectively "CoStar") Motion to Dismiss the Counterclaim brought by Defendant and Counterclaim Plaintiff Commercial Real Estate Exchange, Inc. ("CREXi").  (Dkt. 82.)  The matter is fully briefed.

21

## I.    BACKGROUND

22
23
24
25
26
27
28

     CoStar provides commercial real estate ("CRE") services in three relevant markets: CRE information, CRE listings, and CRE auction services.  (CC ¶ 1, dkt. 74.)  CREXi is a competitor attempting to build its own online CRE marketplace and technology platform.  (*Id.* ¶ 2.)  CREXi alleges CoStar has 90% market share in each of these three markets and engages in anticompetitive and other illegal conduct in order to block and bankrupt competition.  This conduct includes blocking CREXi from accessing any websites hosted by CoStar, altering

information and images on websites it hosts including by adding watermarks and its own logo, and a CoStar subsidiary including CREXi's trademarked name in the header of advertisements placed on Google. The Court has previously ruled on a motion to dismiss in the underlying case. (Dkt. 71.)

The Counterclaim was filed June 23, 2021, and alleges the following[1]: Claims 1–6 are for both monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, for each of the three (3) relevant markets where CREXi and CoStar compete; Claims 7–8 are brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, B&P § 16720, respectively, for CoStar's use of exclusionary contract provisions; Claims 9, 10, and 11 are brought under the Lanham Act for trademark infringement, 15 U.S.C. § 1114, false advertising, 15 U.S.C. § 1125(a)(1)(B), and California's False Advertising Law, B&P § 17500, respectively, due to CoStar's use of CREXi's trademark in certain Google ads; Claim 12 is brought under the "unfair" prong of California's Unfair Competition Law ("UCL") based on the anticompetitive conduct, B&P § 17200, and Claim 13 is brought under the unlawful prong of the UCL based on the antitrust, trademark, or false advertising claims; and Claim 14 is for declaratory relief.

## II.   STATEMENT OF THE LAW

Defendants move to dismiss the entire Counterclaim with prejudice for failure to state a claim pursuant to Fed. R. Civ. Proc. 12(b)(6). Rule 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. Proc. 12(b)(6). Dismissal of a complaint can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a motion to dismiss, the complaint

---

[1] For readability of this Order the Court uses the word claims to refer to the causes of action within the Counterclaim.

"must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663, (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A formulaic recitation of the elements of a cause of action will not suffice.  *Twombly*, 550 U.S. at 555.  Labels and conclusions are insufficient to meet the plaintiff's obligation to provide the grounds of his or her entitlement to relief.  *Id.*  "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*  On a motion to dismiss for failure to state a claim, courts accept as true all well-pleaded allegations of material fact and construes them in a light most favorable to the non-moving party.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031–32 (9th Cir. 2008).  The court may only consider the allegations contained in the pleadings, exhibits attached to or referenced in the complaint, and matters properly subject to judicial notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[2]

## III.   DISCUSSION

### A.   Antitrust Claims

CREXi brings a total of eight antitrust claims against CoStar. CREXi brings a total of six claims under Section 2 of the Sherman Act for both monopolization and attempted monopolization in each of the three markets in which they compete. (CC ¶¶ 28–46.)  CREXi also brings one claim under Section 1 of the Sherman Act and another under California's Cartwright Act for CoStar's use of exclusionary contractual provisions.  (CC ¶¶ 30 –316.)  All of CREXi's antitrust claims require CoStar to have engaged in anticompetitive conduct; the only difference between the statutory requirements of the Sherman Act claims is that "Whereas § 1 of the Sherman Act targets *concerted* anticompetitive conduct, § 2 targets *independent*

---

[2] At the hearing both parties presented and discussed information beyond the allegations in the Counterclaim which the Court declines to consider for purposes of ruling on the instant Motion to Dismiss.

anticompetitive conduct." *Qualcomm*, 969 F.3d at 989–90 (emphasis in original); *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (explaining that the analysis under the Cartwright Act mirrors the Sherman Act). The Court will therefore conduct a single analysis of the alleged anticompetitive conduct in this case instead of a separate analysis for each statutory provision. *Qualcomm*, 969 F.3d at 991.

The Court starts its analysis of CREXi's antitrust claims by evaluating the alleged conduct in light of the recognition in antitrust law that a business generally has the right to refuse to deal with its competitors. The Court then evaluates CoStar's alleged market power, a required element for all of CREXi's antitrust claims, based the allegations of CoStar's market dominance in the geographic markets where its anticompetitive conduct occurred.

### 1. **Alleged Anticompetitive Conduct**

CREXi alleges that in each the relevant product markets (Internet CRE listing services, Internet CRE information services, and Internet CRE auction services) CoStar engaged in three types of anticompetitive conduct: imposing exclusionary contractual and technological measures, falsely claiming ownership over CRE information, and infringing CREXi's trademark.[3]  (CC ¶¶ 109(i)-(iii).)

### a. **Refusal to Deal**

"As a general rule, businesses are free to choose the parties with whom they

---

[3] At least some of the alleged conduct could not plausibly impact all three of the relevant product and geographic markets.  For example, the alleged trademark infringement is limited to a CoStar subsidiary's ads on Google for its own Internet CRE auction services, often for specific cities, that also used CREXi's mark. There are no plausible allegations connecting that trademark infringement with anticompetitive results in the other two product markets or any other geographic market.  However, the Court does not need to address the relationship between each category of alleged anticompetitive conduct, product market, and hypothetical geographic market because each of these is a required element of CREXi's antitrust claims and each of them is based on deficient allegations.

will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ("*Linkline*"). Likewise, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (alteration in original) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also Trinko*, 540 U.S. at 411 ("there is no duty to aid competitors."). "[T]he U.S. Supreme Court has recognized that a market participant's right to refuse to deal with competitors generally serves procompetitive purposes, and that restricting that right can have anticompetitive effects." *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-CV-07182-JCS, 2021 WL 3885981, at *7 (N.D. Cal. Aug. 31, 2021) (quoting *Trinko*, 540 U.S. at 407–08). "This is because the antitrust laws, including the Sherman Act, were enacted for the protection of competition, not competitors." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (quotation omitted) ("*Qualcomm*").

There are also certain "limited exceptions" to a business's right to refuse to deal with its competitors when antitrust laws will in fact require competitors to deal with each other, such as the Essential Facilities doctrine identified by the Ninth Circuit. This doctrine "imposes liability where competitors are denied access to an input that is deemed essential, or critical, to competition." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("*Aerotec*"). This doctrine requires, among other things, that competitors be "unable reasonably or practically to duplicate the facility," and is limited to where control of a facility "carries with it the power to eliminate competition in the downstream market." *Id.* at 1185 (quoting *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991)). CREXi expressly disclaims reliance on any exception to the refusal to deal doctrine because it argues CoStar is directly

liable under antitrust laws, but CREXi seeks to have CoStar's data treated as if it were an Essential Facility even though its current allegations do not satisfy the requirements of that doctrine. Moreover, the existence of such exceptions emphasizes how narrow and rare the circumstances are when antitrust laws will affirmatively require businesses to deal with their competitors such as through sharing access to data.  The Court therefore reviews CoStar's alleged conduct to determine whether it was anticompetitive or merely a business's legitimate refusal to provide free aid and assistance to its competitor.

b. **CoStars Blocks Competitors from Accessing CRE Listing Information on its Own Websites**

CREXi argues that CoStar imposes exclusionary contractual provisions and technological measures in order to "block competitors from accessing public CRE information" on CoStar's own website, the website of its subsidiary LoopNet, and the websites of independent brokers that are hosted by its subsidiary LoopLink.[4] (CC ¶¶ 109, 112, 116.)

CREXi repeatedly alleges CoStar has made the blocked CRE listing information available to the "public" for free and continually describes it as "publicly available" but CREXi fails to explain either of those terms and how they support its antitrust claims.  (*E.g., id.* ¶¶ 31, 163 (alleging CoStar "has adopted and enforced anticompetitive contractual and other exclusionary measures to block competitors from accessing publicly available CRE listing information on

_____

[4] For the purposes of analyzing the sufficiency of CREXi's antitrust counterclaims, the Court ignores any factual disputes and generally finds it unnecessary to distinguish which specific subsidiary's website contained the CRE information because it is undisputed that they were all ultimately hosted by CoStar.  The Court recognizes, however, that there may be significant differences in what CoStar is permitted to do contractually or otherwise when the CRE information is located on an independent broker's website that is hosted by a CoStar subsidiary.

1    LoopNet, CoStar, and LoopLink-hosted broker websites.").)  But there is an

2    inherent contradiction between the allegations that CoStar chose to make this

3    information available to the public for free and the allegations that CREXi and

4    competitors have been blocked from accessing information available to the public.

5    (*Compare* CC ¶¶ 120–129 *with id.* ¶¶ 130–145.) This is because if CREXi and

6    others have been blocked then, by definition, that information was never available

7    to the public.  PUBLIC, Black's Law Dictionary (11th ed. 2019) ("Open or

8    available for all to use, share, or enjoy.").  More accurately described, CoStar

9    chose to make the Internet CRE listing information available for free to the

10   anyone *except its direct competitors*.

11          CREXi argues that being blocked from CoStar's websites prevents brokers

12   from making "public" listings available to competitors and is analogous to *Lorain*

13   *Journal Co v. United States*, where the Supreme Court found that newspapers

14   committed an antitrust violation when they prohibited advertisers from using

15   radio.  42 U.S. 143, 152 (1951).  But the analogy fails because CoStar blocking

16   CREXi from its own websites does not forbid brokers from hiring CREXi or even

17   stop brokers from sharing the exact same information to both CREXi and

18   CoStar—it only appears to stop CREXi from accessing broker information

19   through CoStar's own websites.  The fundamental problem for CREXi is that

20   "[o]nce brokers prepare listing information for a new property, they do not want to

21   re-create it."  (CC ¶ 118.)  But this unwillingness by brokers cannot be described

22   as anticompetitive conduct by CoStar.

23          In effect, CREXi seeks assistance in the form of free access to valuable

24   information solely because CoStar chose to give that information to others for

25   free.  But the antitrust laws do not compel CoStar to provide such assistance to a

26   competitor.  CREXi argues this is not assistance under the refusal to deal doctrine

27   because it instead merely seeks to stop CoStar's affirmative steps of imposing a

28   vertical input restraint by "chok[ing] off competitors' access to public CRE listing

information that CoStar does not own." (Opp'n at 8 (emphasis omitted)).  But as explained above, this information was not "public," the fact that CoStar does not own it only highlights that CREXi has not been denied access to anything it cannot obtain it elsewhere, and it is legally irrelevant because "mandating access . . . shares the same concerns as mandating dealing with a competitor."  *See Aerotec*, 836 F.3d at 1185.  Therefore, as a matter of law, the information CREXi seeks from CoStar (for free no less) constitutes a form of assistance under the antitrust laws that CoStar is not obligated to provide.

Accordingly, it is not anticompetitive conduct for Costar to block its competitors from accessing CRE listing information hosted on its own websites.

### c. **CoStar's Claims of Ownership over CRE Information and Photographs on its Own Websites**

CREXi next argues that even though CoStar's contracts with brokers do not contain an exclusivity clause, CoStar has established a de facto exclusivity clause that raises costs and creates a barrier to entry for competitors through its claims of ownership over CRE information and photographs, including by altering information and adding watermarks and logos onto some photos it hosts. (CC ¶ 171-189.)  This exclusivity clause allegedly constitutes anticompetitive conduct because it raises the costs for CoStar's rivals and creates a barrier to their entry.  However, these allegations are insufficient because they do not show how the "de facto" exclusivity clause "substantially foreclosed dealing with a competitor for the same good or service"  because brokers expressly retain the rights to the original information and photographs they provided to CoStar.  *Aerotec*, 836 F.3d at 1182.  This alleged de facto exclusivity clause therefore cannot increase or otherwise impact CREXi's costs when it obtains information directly from the brokers or any other source besides CoStar's websites.  Further, CoStar adding watermarks or logos to the versions hosted on its websites only increases CREXi's costs because it makes copying CoStar less financially appealing, presumably

because CREXi is unwilling to host pictures with a competitor's logo or watermark.  (CC ¶¶ 114-16.)  It is not anticompetitive for CoStar to seek to limit the amount it in effect subsidizes its competitors.

As explained above, CoStar is under no obligation to provide information or photographs to CREXi at all, so its decision in some cases to add watermarks or logos to the information to hosts is not anticompetitive conduct.

### d.  **CoStar Infringes CREXi's Trademark**

CREXi finally argues that CoStar engaged in anticompetitive conduct by blatantly infringing on its trademark when it purchased CREXi as a Google AdWord as well as when it included CREXi in the header to Google ads for CoStar's Ten-X product.  (CC ¶¶ 190-206.)  CREXi cites to two cases to argue that trademark infringement in combination with other exclusionary conduct may constitute anticompetitive conduct under Section 2 of the Sherman Act.  (Opp'n at 13 (citing *Church & Dwight Co. v. Mayer Labs.*, Inc., 2011 WL 1225912, at *16 (N.D. Cal. Apr. 1, 2011) and *Dodge Data & Analytics LLC v. iSqFt, Inc.*, 183 F. Supp. 3d 855, 868 (S.D. Ohio 2016)).)  But neither case reaches that conclusion, and such a holding is contrary to the actual standards applied by those courts. *Church* required the trademark infringement to "establish substantial foreclosure from competition," 2011 WL 1225912, at *16, and *Dodge Data* required "the conduct be designed to have an anticompetitive effect on the relevant market," 183 F. Supp. 3d at 868.  CREXi does not reference either of these holdings, and under either standard the Counterclaim's allegations regarding a relatively limited number of instances of trademark infringement in ads for a CoStar subsidiary are insufficient.

Accordingly, CoStar's alleged infringement of CREXi's trademark does not constitute anticompetitive conduct.

### 2.  **Allegations of Market Power**

"Market power is the ability to raise price profitably by restricting output."

1  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (emphasis removed)

2  (quoting Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of

3  Antitrust Principles and Their Application ¶ 5.01 (4th ed. 2017)).  "A threshold

4  step in any antitrust case is to accurately define the relevant market, which refers

5  to 'the area of effective competition.'"  *Qualcomm*, 969 F.3d at 992 (citing *Am.*

6  *Express Co.*, 138 S. Ct. at 2285).  Under Section 1 and Section 2 of the Sherman

7  Act "the plaintiff must allege both that a 'relevant market' exists and that the

8  defendant has power within that market."  *Newcal Indus., Inc. v. Ikon Off. Sol.*,

9  513 F.3d 1038, 1044, 1044 n.3 (9th Cir. 2008).  "The relevant market must include

10  both a geographic market and a product market."  *Hicks v. PGA Tour, Inc.*, 897

11  F.3d 1109, 1120 (9th Cir. 2018).  Such allegations need not be pled with

12  specificity.  *Newcal Indus.*, Inc., 513 F.3d at 1045.  Although the "validity of the

13  'relevant market' is typically a factual element rather than a legal one," an

14  antitrust complaint may be dismissed under Rule 12(b)(6) "if the complaint's

15  'relevant market' definition is facially unsustainable."  *Id.*  In addition, "failure to

16  identify a relevant market is a proper ground for dismissing a Sherman Act claim."

17  *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

18       CREXi alleges the relevant product markets for its antitrust claims are

19  "Internet CRE listing services, Internet CRE information services, and Internet

20  CRE action services," (CC ¶ 28) and the relevant geographic markets are

21  "individual metropolitan areas."  (*Id.* ¶ 47.)  In order to establish CoStar's market

22  power, CREXi alleges on information and belief for each product market that

23  CoStar's current share is over either 90% or 95% and that "CoStar is dominant in

24  an overwhelming majority of metropolitan areas."  (*Id.* ¶¶ 102–104.)  CoStar does

25  not challenge CREXi's identification of the relevant product markets but does

26  challenge its allegations regarding the relevant geographic market and its

27  dominance in that market.

28

a. **Geographic Market of the Antitrust Violations**

"A geographic market is an area of effective competition where buyers can turn for alternate sources of supply." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (cleaned up). A geographic market must "'correspond to the commercial realities' of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) ("although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area.") (citation omitted). In other words, "a market is the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995) (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir.1989)) (internal quotation marks omitted).

CoStar argues that the allegations of the geographic markets for CREXi's antitrust claims are insufficient because they do not identify a single specific location, provide a definition of what constitutes "individual metropolitan areas," or explain why the claim is limited to those metropolitan areas, and that these deficiencies also prevent it from defending itself. (Mot. at 15; Reply at 6 (quoting *Orchard Supply Hardware LLC v. Home Depo USA, Inc.*, 939 F. Supp. 2d 1002, 1010 (N.D. Cal. 2013)).) While CREXi correctly notes that the factual scope of the geographic market cannot be resolved on a motion to dismiss, an antitrust complaint may be dismissed at the 12(b)(6) stage if the allegations of market power are "facially unsustainable," *Newcal Indus., Inc.*, 513 F.3d at 1044, or "fail[] to identify a relevant market," *Tanaka*, 252 F.3d 1059, 1063. "Individual metropolitan areas" is insufficient under either standard. CREXi's three-word allegation is essentially a placeholder that contains virtually no factual details and makes it impossible to know whether any location is part of this lawsuit or not. *Flaa v. Hollywood Foreign Press Ass'n*, No. 2:20-CV-06974-SB (Ex), 2021 WL

11

1399297, at *6 (C.D. Cal. Mar. 23, 2021) (holding that "vague, confusing, or economically nonsensical market allegations" may be challenged at the pleading stage).  None of the cases CREXi cites contain allegations of a geographic market as undefined as "individual metropolitan areas," and this description fails to provide CoStar with notice of the markets being targeted or the opportunity to defend itself.

CREXi therefore fails to sufficiently allege the geographic market for its antitrust claims.

### b.  **Market Dominance**

Along with a relevant market definition, a plaintiff must plead that the defendant has power within that market.  *Newcal Indus., Inc.*, 513 F.3d at 1052.  Market power may be demonstrated through either of two types of proof: (1) "direct evidence of the injurious exercise of market power," i.e., "evidence of restricted output and supracompetitive prices;" or (2) more commonly, "circumstantial evidence pertaining to the structure of the market."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."  *Id.*

"Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition."  *Am. Express Co.*, 138 S. Ct. at 2284 (quotation and citation omitted).  Market power must ordinarily be assessed in the context of a properly defined relevant market, *id.* at 2284–2285, but here the allegations CREXI identifies as direct evidence of CoStar's market power are largely conclusory, anecdotal, implausible, or legally insufficient to establish detrimental effects to competition such as CoStar's ability to "control prices or exclude competition."  (Opp'n at 16–17 (quoting *Cost Mgmt. Servs.*, 99 F.3d at

950).)  For the reasons discussed above, the Court is unable to evaluate the plausibility of CREXi's allegations that CoStar's current share of each product market is over 90% or 95% in the absence of a properly defined geographic market.  Finally, CREXi does not allege facts demonstrating that CoStar's competitors "lack the capacity to increase their output in the short run." *Rebel Oil Co., Inc.*, 51 F.3d at 1434.  The Counterclaim therefore fails to allege CoStar's market power in the relevant markets.

Based on the foregoing deficiencies, Claims 1–8 in the Counterclaim for antitrust violations under Section 1 and Section 2 of the Sherman Act and the Cartwright Act are dismissed with leave to amend.

**B.     Trademark Infringement**

CREXi's ninth counterclaim alleges that CoStar committed trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114.  "To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (citation and quotation omitted).  CoStar argues that CREXi has not plausibly alleged that its use of CREXi trademark in its Google AdWord ads created a likelihood of confusion among the sophisticated consumers bidding on commercial real estate, and its alleged infringement would not have resulted in a diverted sale and would have only impacted a consumer's "initial interest."  The Court declines to consider these arguments on a motion to dismiss.

The Court rejects as premature CoStar's invitation at this stage to focus only on two of the eight factors discussed in *Sleekcraft*, *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), and conclude its purchase and use of CREXi's mark in ads for Ten-X could not create a likelihood of confusion as a matter of law.  CoStar may ultimately prove to be correct on both points, but

drawing all factual inferences in CREXi's favor, as the Court must on a motion to dismiss, the Counterclaim alleges sufficient facts to state a claim for trademark infringement under the Lanham Act.

CoStar also argues that "initial interest confusion" provides no basis for relief under the Lanham Act "where the confusion is remedied prior to sale," citing to an opinion from the Southern District of Florida. *Blue Water Innovations, LLC v. Fettig*, 2019 WL 1904589, at *3 (S.D. Fla. Mar. 8, 2019). But the preceding sentence of the opinion notes that the Eleventh Circuit has not expressly decided the issue. *Id.* (quoting *Brain Pharma, LLC v. Woodbolt Distribution, LLC*, No. 12-60141-CIV, 2012 WL 12838277, at *6 (S.D. Fla. May 1, 2012)) (discussing *N. Am. Medical Corp. v. Axiom Worldwide Inc.*, 522 F.3d 1211, 1222 (11the Cir. 2012))).  It is well-settled in the Ninth Circuit that even though initial interest confusion is "dispelled before an actual sale occurs, initial interest confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable trademark infringement." *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004).

Accordingly, CREXi alleges sufficient facts to state a claim for trademark infringement under the Lanham Act.

## C.   False Advertising

CREXi's tenth claim is for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and its eleventh claim is for false advertising under California's False Advertising Law, Business and Profession Code § 17500.  The parties agree that these claims are "substantially congruent" and can be analyzed together.  Establishing a false statement in violation of the Lanham Act requires proving:

> (1) a false statement of fact by the defendant in a
> commercial advertisement about its own or another's
> product; (2) the statement actually deceived or has the

14

tendency to deceive a substantial segment of its
audience; (3) the deception is material, in that it is likely
to influence the purchasing decision; (4) the defendant
caused its false statement to enter interstate commerce;
and (5) the plaintiff has been or is likely to be injured as
a result of the false statement, either by direct diversion
of sales from itself to defendant or by lessening of the
goodwill associated with its products.

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014).  CoStar seeks dismissal for CREXi's failure to satisfy the first three elements listed above: false statement, deception, and materiality.

CREXi's false advertising claims are limited to the same Ten-X ads at issue in its claim for trademark infringement. The Counterclaim alleges that CoStar's use of CREXi's mark "constitutes false advertisements that misrepresent the nature, characteristics, and qualities of CoStar's products and services." (CC ¶¶ 201–204, 326, 331.)  Although CREXi provides no supporting factual details for the Court to review, the Counterclaim does contain screenshots of ads which the Court has reviewed to determine if CREXi has stated claims for false advertising. (*Id.* ¶¶ 200, 202.)

### 1. **False Statement**

To satisfy the first element an actionable statement must be "a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021) (quotation omitted).  CREXi alleges that CoStar's ads are false because they use CREXi's mark, but in considering the ads both with and without the offending word, CREXi does not explain how the inclusion of the word "CREXi" in the ads "misrepresents the nature, characteristics, qualities," of CoStar's products and services, as required to state a claim for false advertising

under the Lanham Act.  15 U.S.C. § 1125(a)(1)(B).  CREXi does not, for example, argue the ads were ambiguous or otherwise implied a false statement.  *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020) ("Although a false advertising claim may be based on implied statements, those statements must be both specific and communicated as to deceive a significant portion of the recipients.").  CREXi also cites to *U-Haul Int'l, Inc. v. Jartran, Inc.*, but the alleged ads do not contain any comparative claims (deliberately false or otherwise) about CREXi or its products.  793 F.2d 1034, 1040 (9th Cir. 1986).  Confusingly, CREXi instead argues that the inclusion of its name renders the ads subject to the "literal falsity" doctrine.  (Mot. at 22–23.)  As explained by Judge Posner in *Southland Sod Farms v. Stover Seed Co.*, 586 F.3d 500, 513 (7th Cir. 2009) ("*Southland*") the "literal falsity" doctrine creates a presumption of deception for a "patently false statement that means what it says to any linguistically competent person."  Here, just as in *Southland*, merely stating a competitor's name cannot render an ad "literally false" because, *inter alia*, "there is no statement in the ordinary sense, because there is no verb."  *Id.* (reminding plaintiffs they cannot "just intone 'literal falsity' and by doing so prove a violation of the Lanham Act.").

### 2.  **Likely to Deceive**

On the second element of deception for a false advertising claim under the Lanham Act, CoStar argues that its ads could not have deceived or had a tendency to deceive a substantial segment of their audience.  However, in analyzing CREXi's claim for trademark infringement, the Court has already concluded that, at least for the purposes of the Motion to Dismiss, the Counterclaim sufficiently alleges that CoStar's use of CREXi's mark is likely to cause confusion or deceive.

### 3.  **Materiality**

However, not all deceptions are actionable as false advertisements, and CoStar's use of CREXi's mark was not material because it did not influence the

purchasing decision of any consumer for two distinct reasons.  First, CREXi's argues that the use of its mark created a false belief that CoStar and CREXi were affiliated, but the Counterclaim's allegations are entirely conclusory and insufficient to plausibly establish an impact to any consumer's decision on which website to use to buy or sell commercial real estate.  (*See* CC ¶ 326–27.)  Second, in order for a deception to be material a consumer necessarily must have been exposed to it, and CREXi also fails to allege facts establishing that consumers of commercial real estate were ever even exposed to these ads.  The Ninth Circuit has held that false statements in a video jacket were immaterial and could not influence a purchasing decision when the video was sold to consumers over the phone who never saw it.  *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc).  Similarly, the Counterclaim simply provides no factual allegations from which the Court can conclude that consumers making decisions regarding buying or selling commercial real estate online could have been exposed to CoStar's ads.  (CC ¶ 204.)

Accordingly, CREXi fails to plead sufficient facts to state its tenth claim for false advertising under the Lanham Act and eleventh claim for false advertising under California's False Advertising Law and the Court dismisses them with leave to amend.

**D.     UCL Claims**

The Counterclaim alleges two distinct UCL claims. The Counterclaim's twelfth claim is for violations of the UCL under the unfair prong, while its thirteenth claim is for violations under the unlawful prong.  The UCL claim based on the unlawful prong states a claim predicated on trademark infringement, as discussed above.

CREXi argues that CoStar's practices also constitute unfair competition

under California law, relying heavily on the Ninth Circuit's recent opinion in *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194 (9th Cir. 2022) ("*hiQ*").  But the facts and claims at issue in *hiQ* were very different from those presented by the Counterclaim.  *HiQ* involved a data analytics company scraping data from professional profiles available on LinkedIn to create "people analytics" which it sold to business clients.  *Id.* at 1187.  LinkedIn attempted to electronically block it from accessing its website and data, and hiQ obtained a preliminary injunction based on its claim under California law for intentional interference with contractual relations because being blocked from LinkedIn's data would prevent it from fulfilling its existing contracts with third parties and put it out of business. Significantly, CREXi does not bring a claim for tortious interference with contractual relations or even allege any such contracts exist, and the Ninth Circuit expressly declined to reach hiQ's UCL claim.  *Id.* at 1194.  The Ninth Circuit's comment that blocking hiQ from accessing otherwise public data on LinkedIn's servers "may well be considered unfair competition under California law" was expressly based on the fact that blocking hiQ would result in the "complete exclusion of the original innovator in aggregating and analyzing the public information."  *Id.* at 1193–94.  But CREXi is not the "original innovator" in aggregating and analyzing the public information on CoStar's websites, nor has CREXi alleged that being blocked from scraping has completely excluded it from accessing public information on the relevant markets and therefore put it out of business.  CREXi in fact alleges the opposite – it was founded in 2015 (almost thirty years after CoStar) by a group of seasoned CRE professionals who were "astonished by how the CRE industry lagged behind other industries moving into the digital age."  (CC ¶¶ 18, 21.)  CREXi argues that *hiQ* stands for the proposition that a private website cannot have a property right in information that is public or otherwise owned by the brokers who submitted it.  But *hiQ* does not lend itself to such a broad reading that is entirely divorced from the contractual

relationships at issue and history between the parties.  More importantly, this argument does not appear to help CREXi in establishing a violation of California's Unfair Competition Law because it only highlights that CoStar cannot stop CREXi from obtaining CRE information for itself from other sources such as public records or the brokers themselves, unlike in *hiQ* where LinkedIn was the exclusive source of data.

CREXi therefore fails to plead sufficient facts to establish its thirteenth claim based on violations for the unfair prong of the UCL and the Court dismisses this claim with leave to amend.

**E.     Declaratory Relief**

The Court finds the allegations in the Counterclaim and the surviving claims are sufficient for CREXi to state a request for declaratory relief at this stage.

## IV.   CONCLUSION

Accordingly, the Court **DENIES** Costar's Motion to Dismiss the Counterclaim as to the ninth claim for trademark infringement, thirteenth claim for unlawful violations of the UCL, and the fourteenth claim for declaratory judgment, and **GRANTS** the Motion to Dismiss as to all other claims with leave to amend to correct the deficiencies identified in this Order.  Any amended complaint shall be filed **no later than July 12, 2022**.


**IT IS SO ORDERED.**


DATED:  June 17, 2022.

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE