KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS #158708
epeters@keker.com
WARREN A. BRAUNIG #243884
wbraunig@keker.com
ELIZABETH K. MCCLOSKEY #268184
emccloskey@keker.com
NICHOLAS S. GOLDBERG #273614
ngoldberg@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Attorneys for Defendant and Counterclaimant
COMMERCIAL REAL ESTATE EXCHANGE, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>Defendant. | Case No. 2:20-CV-8819 CBM (ASx)<br><br>**COMMERCIAL REAL ESTATE EXCHANGE, INC.'S FIRST AMENDED COUNTERCLAIMS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Ctrm:        8B<br>Judge:      Hon. Consuelo B. Marshall<br><br>Date filed:   September 25, 2020<br>Trial date:    October 3, 2023 |
| COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC.,<br><br>Counterdefendants. | **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |

# <u>TABLE OF CONTENTS</u>

I.      Introduction ...................................................................................... 1

II.     Parties .............................................................................................. 6

III.    Jurisdiction, Venue, and Interstate Commerce ................................ 7

IV.     CoStar's Anticompetitive Scheme ................................................... 8

    A.      ███████████████████████████ ................ 9

    B.      CoStar technologically blocks brokers from working with CREXi. ................................................................................. 11

    C.      CoStar's exclusionary contractual terms prevent brokers from using competitors' services. ...................................... 15

        1.      CoStar initially induces brokers to provide CoStar with public CRE listing information. ................................ 15

        2.      CoStar imposes contractual terms to lock in brokers and force *de facto* exclusivity. ................................... 16

    D.      CoStar falsely claims ownership over brokers' CRE information and photographs to stifle competition. ............ 20

        1.      CoStar unilaterally modifies listing data and photographs. ............................................................ 20

        2.      CoStar falsely asserts ownership over brokers' photographs. ............................................................ 22

            a.      CoStar adds its watermark to brokers' images .............. 22

            b.      CoStar falsely claims ownership over brokers' images. ............................................................ 29

        3.      CoStar targets industry participants with litigation. ................. 34

    E.      CoStar has infringed CREXi's trademarked name to engage in unfair competition. ................................................... 35

    F.      CoStar's exclusionary practices have substantially foreclosed competition in the relevant markets. ....................... 41

V.      The Relevant Markets ................................................................... 42

    A.      The internet CRE listing services market. .......................... 42

    B.      The internet CRE information services market. ................... 44

    C.      The internet CRE auction services market. ......................... 46

    D.      The geographic scope of the relevant product markets. ....... 47

i

  E.  There are significant barriers to entry in the relevant markets. .......... 49

VI. CoStar Monopolizes the Relevant Markets ....................................... 54

  A.  CoStar stifles competition through anticompetitive acquisitions and by driving competitors out of business. .................. 54

  B.  The FTC sued CoStar to block its anticompetitive acquisition of LoopNet and required CoStar to divest Xceligent. ....................... 56

  C.  CoStar drove Xceligent out of business, leaving CoStar with monopoly power in the relevant markets ............................................ 59

  D.  The FTC sued CoStar again to block its proposed anticompetitive acquisition of RentPath. ............................................ 60

  E.  CoStar holds monopoly power in the relevant markets ..................... 62

VII. CoStar Has No Procompetitive Justification  for its Anticompetitive Conduct ................................................................................................ 67

VIII. CREXi Has Suffered Antitrust Injury ............................................... 70

IX. CoStar Interferes with CREXi's Contracts and Business Prospects ............ 73

CLAIMS FOR RELIEF ................................................................................. 77

PRAYER FOR RELIEF ............................................................................... 100

JURY DEMAND ......................................................................................... 101

Counterclaimant Commercial Real Estate Exchange, Inc. ("CREXi"), by and through its undersigned counsel, brings the following amended counterclaims against Counterdefendants CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar"), and alleges as follows:

## I.    Introduction

1.    This case is about CoStar's anticompetitive scheme to establish and entrench its monopolies over internet commercial real estate (CRE)[1] listing, information, and auction services by stifling competition.  Since its founding in 1987, CoStar has spent billions of dollars buying up and elbowing out competitors, to become the dominant provider in the markets for internet CRE listing, information, and auction services.  With a market cap of $25 billion, CoStar is the CRE industry behemoth, with a size and reach that far exceeds any company in the history of these markets.  Today, CoStar enjoys monopoly power in the relevant markets for internet CRE listing, information, and auction services in at least 50 specific metropolitan areas across the United States.

2.    CREXi is an innovative CRE marketplace and technology platform, founded in Venice, California in 2015.  CREXi's development of marketing automation tools, lead analytics, featured listing offerings, an online auction platform, and a robust broker suite is leading the CRE industry into the digital age.

3.    CoStar, on the other hand, is a dinosaur.  Instead of innovating, CoStar has grown by acquiring its competitors or suing them into submission.  CoStar's three internet platforms—CoStar (information services), LoopNet (listing services) and Ten-X (auction services)—dominate each of the three relevant product markets.

---

[1] As used herein, commercial real estate or "CRE" consists of land or real property in the United States, with or without any structures, fixtures, or other improvements of any kind, used at any time, suitable for use, or offered for sale or lease solely or primarily for retail, manufacturing, shipping, governmental, the exploitation of natural resources, commercial, or business purposes of any kind. Commercial real estate also includes residential structures containing five or more units used as short-term residences (e.g., hotels and motels) or as long-term residences (e.g., condominium and apartment buildings).  *See* FTC Decision and Order, *In the Matter of CoStar Grp., Inc., et al.*, No. C-4368, 2012 WL 3862130, at *5 (F.T.C. Aug. 29, 2012).

CoStar's anticompetitive scheme is carefully orchestrated to appear on the surface as above-board.  But its intent and effect are to substantially foreclose competition and unlawfully maintain CoStar's monopoly power in the relevant markets.  CoStar has established an anticompetitive scheme to block CRE brokers from working with competitors by engaging in practices that collectively lock brokers into *de facto* exclusive arrangements, raise rivals' costs, reduce output, and ultimately drive competitors out of the market.

4.  ***First***, CoStar offers a product called LoopLink, which CoStar markets as a way for brokers to display listings on their own websites, while synching data with LoopNet, CoStar's internet CRE listing service.  But, unbeknownst to brokers who use LoopLink, CoStar has surreptitiously devised technological measures to block those brokers from sharing ***their own "LoopLink powered" listings***, ***on their own websites***, with CREXi and other CoStar competitors—even when CREXi is directed to those listings by brokers themselves.

5.  These actions have the intended effect of locking brokers who use LoopLink into exclusive relationships with CoStar, making it near-impossible for those brokers to work with CoStar's competitors.  As Broker 1 told CREXi:[2]

> Unfortunately our listings are on the [brokerage] website via LoopLink. I do not keep lists of our listings on excel or other platforms as we have over 300 listings that change daily, and I don't have the extra time to keep track on multiple platforms. I can't think of an alternative way to get you [my brokerage]'s listings at this time.

CREXi has been foreclosed from working with hundreds, if not thousands, of brokers who use LoopLink and who are precluded by CoStar from sharing their own listings appearing on their own websites with CREXi.

6.  ***Second***, CoStar imposes contractual terms to prevent brokers from working with competitors.  CoStar conditions access to its websites on terms that,

---

[2] Throughout this pleading, CREXi presents various brokers' accounts anonymously to protect their identities.  In the course of CREXi's investigation, several brokers declined to even speak anonymously with CREXi's counsel for fear of retaliation by CoStar.

in practice, prohibit brokers from using, reproducing, or sharing their own listings with CoStar's competitors.  CoStar declares that listings posted by brokers on the LoopNet website are "proprietary to LoopNet," and forbids brokers from providing those same listings to CoStar's competitors.  CoStar then threatens brokers that they are in "prima facie breach" of contract simply by sharing the brokers' own listings with CoStar's competitors.  CoStar's contractual terms serve no procompetitive purpose.  Instead, they operate as *de facto* exclusive agreements, choking off the supply of brokers and CRE listings to potential competitors, and enabling to CoStar to charge supra-competitive prices.  The natural, intended, and actual effect is to prevent brokers from using competitors' services and to stifle competition in the relevant markets by makini it more difficult for competitors like CREXi to work with brokers.  Many brokers have declined to do business with CREXi because they believe that doing so would conflict with their contracts with CoStar and expose them to claims by CoStar—a famously litigious company, known for targeting customers and competitors with litigation.

7.     ***Third***, CoStar engages in a policy and practice of falsely claiming intellectual property ownership over information that CoStar does not own.  CoStar routinely modifies brokers' listings and photographs to add its digital watermark—which CoStar claims identifies it as the copyright holder—to photographs owned and supplied by brokers.  Again, there is no procompetitive justification for this exclusionary practice.  Its sole purpose is to sow confusion about the ownership of CRE photos and make it more difficult for brokers to work with competitors.

8.     Many brokers have disputed CoStar's claims of ownership, often presenting evidence that the photographs were paid for and owned by the brokers.  **Exhibit A** provides an exemplary, non-exhaustive catalog of over two dozen different brokers' responses to CoStar's false copyright claims over brokers' photographs.  These examples illustrate in stark terms the harm inflicted on brokers and the disruption of CREXi's business and contractual relationships caused by

3

1875322

CoStar's false ownership claims.  CoStar's specious assertions of intellectual property ownership foment confusion in the marketplace regarding the legitimate ownership of real estate photographs, deterring brokers from using competitor platforms.  CoStar has effectively created a minefield through which brokers and CoStar competitors must tiptoe if they seek to use these photographs—which CoStar does not in fact own.

9.     CoStar also demands that competitors employ technological "filters," supposedly to prevent brokers from uploading CoStar-copyrighted images on competitor platforms.  But CoStar uses those filters to falsely claim ownership over brokers' own photographs and third-party images, forcing competitors to remove from their platforms photographs and listings over which CoStar has no legitimate ownership claim.

10.     ***Fourth***, CoStar's anticompetitive scheme was designed to, and does, interfere with CREXi's contracts with brokers, as well as its existing and prospective economic relationships with brokers.  CoStar's tortious conduct disrupts CREXi's ability to provide services to its clients.

11.     ***Fifth***, CoStar intentionally infringes CREXi's trademarked name to advertise and market CoStar's services.  By doing so, CoStar misrepresents its services as affiliated with CREXi and misleadingly directs customers searching for CREXi to CoStar's websites.  CoStar's anticompetitive trademark infringement unfairly siphons customers away from CREXi and stifles legitimate competition.

12.     To be clear, CREXi's antitrust claims do ***not*** seek to force CoStar to deal with CREXi.  CREXi does ***not*** seek to scrape CoStar's websites to populate CREXi with listings.  CREXi does ***not*** seek free access to CoStar-owned data. CREXi does ***not*** seek a contractual relationship with CoStar.  CREXi does ***not*** seek to compel CoStar to subsidize or provide CREXi with assistance.  And CREXi does ***not*** seek the right to use photographs over which CoStar holds legitimate intellectual property rights.  To the contrary, CREXi has invested significant sums

4

of money to proactively filter out and remove CoStar-owned photographs from its website, even though CoStar has never once served CREXi with a copyright takedown notice.  What CREXi does seek is the ability to compete for business in the relevant CRE markets on a level playing field, free from CoStar's anticompetitive scheme to lock-in brokers and prevent them from working with CREXi.  That is what CREXi's antitrust claims seek to remedy.

13.    It is no accident that CoStar's anticompetitive conduct has targeted CREXi.  In a December 2019 CoStar all-hands meeting, CoStar CEO Andrew Florance acknowledged the significant competitive threat posed by CREXi, specifically, and emphasized the importance of CoStar maintaining its monopoly. CoStar has employed the same set of unfair and monopolistic practices against other upstart competitors, including Xceligent, which CoStar drove out of business.

14.    CREXi is not the only entity that has taken notice of CoStar's anticompetitive conduct.  Recently, CoStar was forced to reveal in discovery that

███████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

15.    CoStar's anticompetitive conduct has harmed CREXi and competition in the internet CRE listing, information, and auction services markets.  The conduct that injures CREXi also injures brokers and injures competition as a whole. Notably, brokers make significant investments in compiling CRE information, and CoStar exploits those investments by asserting ownership over brokers' listings. CoStar's acts limit output and innovation, constrain brokers from working with

CoStar's competitors, and cement CoStar's monopoly power which affords it the ability charge supra-competitive prices.

16.     To end CoStar's unlawful practices, restore competition, and prevent CoStar from engaging in similar conduct in the future, CREXi asserts the following counterclaims.

## II.     Parties

17.     Counterclaimant CREXi is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 4086 Del Rey Ave, Marina Del Rey, California 90292.

18.     CREXi is an innovative commercial real estate marketplace and technology platform.  A group of seasoned CRE professionals formed CREXi in 2015, astonished by how far the CRE industry lagged behind other industries moving into the digital age.  Determined to create a platform needed in the industry, they built and launched the CREXi marketplace in 2016.  CREXi began as a marketplace where brokers could list properties and manage leads to find the ideal buyers and tenants efficiently and effectively.  From launch, CREXi has developed marketing automation tools, lead analytics, featured listing offerings, an auction platform, and secure file storage into a robust online broker suite for CRE in the digital age.  Unlike CoStar's antiquated services, CREXi is innovating the commercial real estate industry by building an online platform and technical infrastructure to carry the industry into the future.

19.     Counterdefendant CoStar Group, Inc. is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 1331 L Street, NW, Washington, District of Columbia 20005.

20.     Counterdefendant CoStar Realty Information, Inc. is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 1331 L Street, NW, Washington, District of Columbia

1875322

20005.  CoStar Realty Information, Inc. is a wholly owned subsidiary of CoStar
Group.

21.     CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively,
"CoStar") were founded by Andrew Florance, who sits as CEO.  In the three
decades since Florance founded the company in 1987, CoStar has grown to become
a $25 billion industry behemoth of CRE platforms.  CoStar owns numerous
corporate entities in the commercial and residential real estate space.  Three of the
assets it owns are CoStar.com, LoopNet.com, and Ten-X.com, all CRE websites.
CoStar is the self-proclaimed largest commercial real estate information and
analytics provider.

22.     LoopNet, Inc. was a corporation organized and existing under the laws
of the State of California with a principal place of business in San Francisco,
California.  LoopNet was acquired by merger by CoStar, after which LoopNet
became a wholly owned subsidiary of CoStar Group.  On January 1, 2017,
LoopNet, the CoStar Group subsidiary, merged into CoStar Realty, and CoStar
Realty is the successor in interest as to LoopNet's liabilities.

23.     Ten-X Holding Company, Inc. was a corporation organized and
existing under the laws of the State of Delaware with a principal place of business
in Irvine, California.  On June 24, 2020, CoStar acquired Ten-X and its subsidiaries
by merger.  Following the merger, Ten-X became a wholly owned subsidiary of
CoStar Realty Information, Inc., and CoStar has since integrated the Ten-X
platform into both LoopNet and CoStar.

### III.    Jurisdiction, Venue, and Interstate Commerce

24.     This Court has subject matter jurisdiction over the counterclaims under
28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331
(federal question), as this action arises under Section 2 of the Sherman Act, 15
U.S.C. § 2, Section 16 of the Clayton Act, 15 U.S.C. § 26, and the Lanham Act, 15
U.S.C. § 1125.

1875322

25.     This Court has supplemental subject matter jurisdiction over the pendent state law counterclaims under 28 U.S.C. § 1367, as they are so related to the federal counterclaims that they form part of the same case or controversy.

26.     Venue is proper in this District under 28 U.S.C. § 1391, and because the counterclaims arise out of the transactions and occurrences that are the subject matter of CoStar's claims.  In addition, venue is proper because CREXi suffered harm from CoStar's unlawful conduct in this District.

27.     CoStar provides data, information, and images for CRE properties for sale or lease across state lines.  CoStar is engaged in interstate commerce and its activities substantially affect interstate commerce.  The acts complained of herein have occurred within the flow of, and have substantially affected, interstate trade and commerce.

## IV.     CoStar's Anticompetitive Scheme

28.     CoStar has engaged in an anticompetitive scheme to substantially foreclose competition and maintain its monopoly power in the three relevant product markets of internet CRE information services, internet CRE information services, and internet CRE auction services, which are defined in Section V, *infra*.

29.     Rather than compete on the merits, CoStar has engaged in several anticompetitive acts as part of this scheme:

i)     CoStar forces LoopLink customers to also use its LoopNet product, then surreptitiously blocks competitors' access to brokers' own listings on brokers' own websites, locking these brokers into *de facto* exclusive arrangements with CoStar and interfering with competitors' ability to work with these brokers.

ii)     CoStar lures brokers to use its products and services by promising to display their listings, without informing brokers that their use of CoStar will, in practice, prevent the brokers from working with CoStar's competitors.  CoStar then imposes punitive contractual terms to lock-in brokers to *de facto* exclusive arrangements, while threatening brokers that they are in "prima

8

1875322

facie breach" of their contracts with CoStar if the brokers provide ***the brokers' own listing information and photographs*** to CoStar's competitors.

iii)    CoStar engages in a policy and practice of unilaterally modifying brokers' listings and photographs to falsely claim intellectual property protection over information CoStar does not own, to stifle competition in the relevant markets.  CoStar further propagates uncertainty in the marketplace about its intellectual property rights by demanding that competitors use technological "filters" that prevent brokers from uploading their own images and information to competitors' sites, based on CoStar's false claims of copyright ownership.  Such uncertainty and false assertions of copyright ownership deters brokers from working with competitors, particularly given that CoStar frequently threatens lawsuits against brokers who often do not have the resources to defend against allegations—even baseless allegations—of copyright infringement.

iv)    CoStar has infringed CREXi's trademarked name to advertise CoStar's own products and services in the relevant markets.

30.    CoStar's scheme of anticompetitive conduct is interdependent, self-reinforcing, and operates together as a whole.  The scheme's intended purpose and its combined effect is exclusionary and unlawful.  CoStar's scheme must be considered as a whole, rather than each piece analyzed independently standing alone.  *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 990 (9th Cir. 2000).

**A.**



---

[3] The FTC is an independent federal agency charged with promoting a competitive marketplace and protecting consumer interests.  Along with the Department of Justice, the FTC shares primary responsibility for enforcing the federal antitrust laws.  To that end, the FTC will challenge anticompetitive business practices and mergers that could harm consumers by resulting in higher



32. ████████████████████████████████

████████████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████

██████████████████████████████████

33. ██████████████████████████████

████████████████████████████

███████████████████████  █████████████

██████████

34. ██████████████████████████████

████████████████████████████

██████████████████████████

████████████████████████████

██████████████████████████████

███████████████████████████████████

████████████

_____

prices, lower quality, fewer choices, or reduced rates of innovation.  The FTC monitors business practices, reviews potential mergers, and challenges them when appropriate to ensure that the market works according to consumer preferences, not illegal practices.  *See* Federal Trade Commission, *About the FTC*, WWW.FTC.GOV, https://www.ftc.gov/about-ftc (last visited Aug. 5, 2022); *see also* Federal Trade Commission, *What We Do*, https://www.ftc.gov/about-ftc/what-we-do (last visited Aug. 5, 2022).

[4]

████████████████████████████████

████████████████████████████████.

CREXI'S FIRST AMENDED COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1875322

35.     CREXi moved to compel production of CoStar's communications with the FTC and, on February 18, 2022, the Court ordered CoStar to produce "all communications with the FTC, during the past four years - that bear on the antitrust allegations in this matter." Dkt. 111 at 7.

36.     CoStar delayed complying with the Court's February 18, 2022 Order until *after* the Court held a hearing on CoStar's motion to dismiss CREXi's original counterclaims.  It was not until June 15, 2022, nearly two months after the hearing on CoStar's motion to dismiss, that CoStar finally began producing documents responsive to the Court's February 18, 2022 Order.

37.     ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████     As of the date of this filing, CoStar still has not complied with the Court's February 18, 2022 Order.

38.     ████████████████████████████████████
████████████████████

**B.     CoStar technologically blocks brokers from working with CREXi.**

39.     CoStar offers a web tool called LoopLink that gives brokers the ability to display the brokers' CRE listings on the brokers' own publicly available website utilizing database functionality offered by LoopNet.  When brokers use the LoopLink widget, CoStar integrates its LoopNet search technology directly into the brokers' website.  Upon information and belief, brokers can upload their CRE listings—including property information and brokers' own photos—directly into LoopNet or have a CoStar employee upload the listings.

11

1875322

40.      Brokerages across the United States have adopted CoStar's LoopLink tool to power CRE listings on brokers' own websites, which consequently tethers these brokers' listings to the LoopNet database.  According to one 2019 publication, CoStar's LoopLink "listings management platform is used by some of the top companies in the industry," including "over 1,000 additional real estate firms and brokerages."[5]

41.      In large brokerage firms, many different brokers or their assistants may submit listings for the brokerage's LoopLink-powered website, and the brokerage's website becomes a comprehensive source for the brokerage's listings.  Based the forced use of LoopNet that accompanies the use of LoopLink, many brokerages have become dependent on LoopNet as a repository for their broker-owned listings, even when displayed on the brokers' own website using CoStar's LoopLink tool.  If listings available on a broker's own website, operated by LoopNet, are not available to competitors, it is often unfeasible for any competitor to compete with CoStar for those brokers because, for many of them, the only original copies the brokers have of their listings are on the broker's LoopLink-powered website.

42.      After intertwining the listings data between LoopLink and LoopNet, CoStar employs technological measures to block brokers from sharing their own listing information with competitors, even on brokers' own websites.  In the example below, a CREXi employee was directed by a broker to the broker's listings on the broker's website but was denied access *by CoStar* to those listings:

---

[5] Reonomy, *Is LoopLink the Best Option for DIY Listings* (Dec. 11, 2019).  *See also Loopnet : LoopNet Releases Next Generation of LoopLink, Which Powers Commercial Property Listings on More Than 1,000 Real Estate Websites, Market Screener*, available at https://www.marketscreener.com/quote/stock/LOOPNET-INC-17271/news/Loopnet-LoopNet-Releases-Next-Generation-of-LoopLink-Which-Powers-Commercial-Property-Listings-on-475914/ (last visited Aug. 5, 2022).

1875322

43.     CoStar deploys its technological blocking measures without informing the brokers to whom the listings belong.  In other words, unbeknownst to brokers who use LoopLink, CoStar imposes technological blocks prevent CREXi from accessing **brokers' CRE listings** on **brokers' own websites**, even when CREXi is directed to those listings by brokers themselves.[6]

44.     CoStar's technological blocks prevent many brokers from working with CREXi.

45.     For example, Broker 1 directed CREXi to her own brokerage website to pull CRE listings that she wanted posted on CREXi's platform.  Upon learning that CREXi was unable to access those listings on her own website, because the site was hosted by LoopLink, Broker 1 expressed that there was no practicable way for her brokerage to do business with CREXi.  Broker 1 explained:

---

[6] Separately, CREXi employees are blocked from accessing brokers' CRE listings found on CoStar's websites, even when the listings are otherwise publicly available and the broker directs CREXi to those listings.  CREXi understands that, in ruling on CoStar's motion to dismiss CREXi's original counterclaims, the Court disagreed that CoStar's selective blocking of competitors from accessing non-proprietary information on CoStar's publicly available websites could form the basis for anticompetitive conduct.  CREXi, however, includes and re-asserts these allegations in order to preserve its rights to appeal on that separate issue.

> Unfortunately our listings are on the [brokerage] website
> via Looplink. I do not keep lists of our listings on excel or
> other platforms as we have over 300 listings that change
> daily, and I don't have the extra time to keep track on
> multiple platforms. I can't think of an alternative way to
> get you [my brokerage]'s listings at this time.

Broker 1 did not previously know that CoStar had blocked her ability to share information found on her own brokerage's website.

46.     Similarly, Broker 3 reached out to CREXi to request that CREXi access the listings on Broker 3's website and add them to CREXi's platform. When CREXi was unable to access Broker 3's listings due to CoStar's technological block through LoopLink, Broker 3 was surprised:  "I'm not sure why you can't access these [listings] because **they are on our own website**."  (Emphasis added.) But CREXi was unable to access Broker 3's listings on the broker's own website due to CoStar's tethering of information between LoopLink and LoopNet and its surreptitious implementation of its anticompetitive technological block.

47.     Numerous other brokers express interest in using CREXi's platform, but after learning that CREXi is unable to retrieve their listings at the brokers' direction from brokers' own websites, they simply cease responding to communications from CREXi.  Thus, CREXi loses the potential business of those brokers due to CoStar's technological barriers.

48.     CoStar's technological blocks are imposed not in response to systematic scraping or copying of listings on LoopNet or brokers' LoopLink-hosted websites, but to inhibit the free transfer of information from brokers to companies that compete with CoStar.

49.     The practical effect of CoStar's exclusionary conduct is to lock-in brokers to exclusive relationships with CoStar, deprive brokers of the effective use of their own CRE listings, and to prevent competition in the marketplace.

**C.    CoStar's exclusionary contractual terms prevent brokers from using competitors' services.**

50.    CoStar also imposes exclusionary contractual terms to prevent customers from using competing services.  CoStar imposes terms and conditions on the access and use of CoStar's publicly accessible websites, and brokers' own websites hosted by LoopLink, that purport to convert broker-submitted listing information and photographs into CoStar property.  CoStar then deters brokers from sharing their own listings with competitors and threatens brokers that they are in breach of their contracts with CoStar if they do so.  The natural and intended effect is to prevent brokers from using competitors' products and to stifle competition in the relevant markets by making it more difficult for competitors like CREXi to compete with CoStar, to the detriment of customers and competition.

**1.    CoStar initially induces brokers to provide CoStar with public CRE listing information.**

51.    CRE listing information available on CoStar's and LoopNet's websites consists of publicly available facts, along with information and photographs originated, provided, and submitted by real estate brokers and others.

52.    CoStar induces brokers and other third parties to provide information to CoStar and LoopNet by expressly disavowing any ownership in or claim to the data, agreeing that CoStar's right to use the data will be "non-exclusive," and assuring brokers and other third parties that they, not CoStar, will decide who can access and use their information.  These promises are illusory and contradicted by CoStar's actions as well as other CoStar contractual terms.

53.    CoStar claims that brokers' "submission of information to LoopNet" is governed by Terms and Conditions posted on the LoopNet website (the "LoopNet Terms").  **Exhibit F** (LoopNet Terms) at 3.  The LoopNet Terms provide that brokers who submit listings to LoopNet "retain any applicable ownership rights" in their "Submitted Content," which is defined to include "property descriptions, photographs, images, videos …, graphics and financial, contact or other

15

information." *Id.* LoopNet and its "affiliates (including other CoStar Group, Inc. companies)" are granted a "non-exclusive … right and license … to all such Submitted Content." *Id.* at 3–4.

54.    CoStar imposes similar Terms of Use on users of CoStar's subscription services (the "CoStar Terms"). The CoStar Terms provide that a broker who submits "information, data, text, photographs, images, graphics, messages, links, expressions of ideas and other content" to CoStar will "retain any applicable ownership rights that [he or she] may have with respect to such information and images." **Exhibit H** (CoStar Terms) at 9. CoStar is merely granted a "non-exclusive … right and license … with respect to such content" submitted by brokers. *Id.* at 10. CoStar acknowledges that a broker's submission of "Submitted Content to the [CoStar] Site does not create any new or alter any existing relationships between [the broker] and CoStar." *Id.* CoStar tells brokers that "[w]hat's yours stays yours, and you can do anything you want with your data." *Id.* at 11.

### 2.    CoStar imposes contractual terms to lock in brokers and force *de facto* exclusivity.

55.    Despite providing assurances that brokers retain ownership rights over their submissions to CoStar, CoStar conditions access to its websites, and even brokers' own websites hosted by LoopLink, on terms that restrict brokers' ability to do whatever they want with their data, including work with CoStar's rivals. These contractual terms are non-negotiable, so all CoStar's customers are subject to them. Because of CoStar's entrenched monopoly power, brokers may initially be compelled or strongly incentivized to post their listings on CoStar's websites for visibility. But once they sign up for CoStar's services, the contractual terms impede them from exploring competitive options, effectively ensnaring those brokers in a trap.

56.    The LoopNet Terms purport to forbid anyone from using content available on LoopNet "in connection with any other . . . listing service" or

16

1875322

"integrat[ing] or incorporat[ing] any portion of the Content into any other database."  The LoopNet Terms state:

> You shall not use or reproduce any Content that is obtained from the Service, or that is otherwise made available to You in the Service, for or in connection with any other device, listing service . . . or any other data sharing arrangement. You shall not integrate or incorporate any portion of the Content into any other database. You further shall not use the Service in any other manner for or in connection with any other listing service or device. You shall not use the Service as part of any effort to compete with LoopNet, including, without limitation, using the Service to provide, alone or in combination with any other product or service, any database services to any third party or any use that causes a reduction or loss from an existing or potential LoopNet customer

Exhibit F at 6.

57.    CoStar has also purported to bind brokers who use LoopLink to similar anticompetitive Terms of Use (the "LoopLink Terms").  The LoopLink Terms have conditioned access to CRE listing information on brokers' LoopLink-hosted websites on users' agreement not to compete with CoStar.  The LoopLink Terms provide that competitors may not access or use the broker data that appears on a broker website powered by LoopLink; users "shall not . . . use, reproduce, copy or access any portion of the Product if you are a direct or indirect competitor of LoopNet." **Exhibit J** (LoopLink Terms) at 2.  After CREXi first filed its original counterclaims, upon information and belief, CoStar removed these standalone LoopLink Terms from its public-facing website.

58.    The CoStar Terms similarly condition access to CoStar's website, broker-provided CRE listing information, databases, or software (defined in the CoStar Terms as the "Product") on users' agreement not to transmit their listings to CoStar's competitors.  The CoStar Terms provide that users "shall not . . . provide, disclose or transmit any portion of the Product to any direct or indirect competitor of CoStar." **Exhibit H** at 6.  The CoStar Terms broadly define "direct or indirect

17

competitor" to include "Internet listing services or other real estate information services and employees, independent contractors and agents of such services." *Id.*

59.    Ten-X imposes similar Terms of Use on its users (the "Ten-X Terms"). **Exhibit I** (Ten-X Terms) at 4.  The Ten-X Terms purport to require users to "agree not to use the Services in any way that," among other things, "[c]ompetes with [Ten-X's] business or impacts [Ten-X's] revenue." *Id.* at 3–4.

60.    In other words, CoStar conditions access to its CoStar, LoopNet, and Ten-X websites, as well as brokers' LoopLink-hosted websites, on a sweeping agreement to not support, or even share equivalent data with, CoStar's competitors. These terms, by design, limit brokers' ability to use other listing platforms while they are signed up for CoStar's services, and have a chilling effect on brokers' willingness to work with competitors, for fear that they will run afoul of CoStar's overbroad terms.

61.    The LoopNet Terms also purport to require brokers and other users of LoopNet to "treat all information obtained from the Service," including the broker's own "listings … and any information otherwise made available" as "proprietary to LoopNet." **Exhibit F** at 5.  The LoopNet Terms then forbid brokers from providing that content to any LoopNet competitor.  The LoopNet Terms provide that "You shall not use or reproduce any Content that is obtained from [LoopNet's] Service, or that is otherwise made available to You in [LoopNet's] Service, for or in connection with any other device [or] listing service." *Id.* at 6.

62.    In other words, CoStar simply declares information ***provided by brokers*** as "proprietary to LoopNet" and forbids brokers from using that same listing information and photographs with competitors of CoStar.  Then, CoStar threatens that brokers are in "prima facie breach" of contract simply by sharing the brokers' own listing information and photographs with CoStar's competitors.

63.    Moreover, the broker must agree that it "shall constitute a prima facie breach" of the LoopNet Terms if CoStar determines that "any third party,"

including a competitor, "has access to property listings" provided by brokers and modified by CoStar.  *Id.* at 5.

64.     As one broker aptly summed up CoStar's anticompetitive policy and practice:

> Costar: Give me your data and I will list the property.
>
> Broker: Here ya go.
>
> Costar: Thanks. Let me just change this decimal.
>
> Broker: What? Can I have my data back now?
>
> Costar: What data? This is mine. If you use it I will sue you.

65.     CoStar's contractual restrictions are widely understood by brokers to foreclose their ability to work with competing platforms, including CREXi.

66.     Broker 5, for example, declined to work with CREXi because of LoopNet's restrictive Terms and Conditions.  CREXi had offered to post the broker's listings onto CREXi's platform, to match the listings posted on the broker's own website.  Broker 5, however, stated that such an arrangement would be "problematic in regard to our contractual relationship with CoStar/Loopnet (Loopnet) as well as any user of Loopnet."  Citing LoopNet's contractual requirements that the broker "shall not integrate or incorporate any portion of the [LoopNet listing] Content into any other database" and "shall not use the [LoopNet] Service in any other manner for or in connection with any other listing service or device," Broker 5 explained that, based on CoStar's contractual terms, he fears his brokerage would be vulnerable to frivolous but potentially costly litigation from CoStar if it allowed CREXi to post property listings using information available ***on the broker's own website***.

67.     Another broker, Broker 2, stated that she could not give CREXi permission to post her brokerage's CRE property listings onto CREXi's platform— even if mirroring the information posted on the brokerage's own website—because

1875322

"from what I understand, that would be some sort of breach of contract with
LoopNet."

68.     Similarly, Broker 6 was foreclosed from working with CREXi because
it would "conflict[] with our National CoStar agreement."

69.     Thus, although brokers, buyers, and competition would benefit from
brokers being able to widely publicize their CRE listings on different platforms,
brokers signed up for CoStar's services are foreclosed from working with a
competing company like CREXi, due to CoStar's anticompetitive contractual
terms.  CoStar's *de facto* contractual exclusivity squelches meaningful competition
between different platforms, resulting in inflated prices, suppressed output, and
smothered innovation.

### D.     CoStar falsely claims ownership over brokers' CRE information and photographs to stifle competition.

70.     CoStar has engaged in a policy and practice of unilaterally modifying
brokers' listings and photographs to manufacture false claims of ownership.  CoStar
also falsely asserts copyright ownership over photographs that CoStar does not
own, threatening legal actions against brokers and industry participants based on
bogus copyright assertions.  The effect of these anticompetitive policies and
practices is to restrain brokers from using competitors' products and services, and
to prevent competitors from using brokers' CRE information and photographs to
compete with CoStar.  By doing so, CoStar has effectively secured for itself a
copyright monopoly beyond that legitimately granted by the U.S. Copyright Office.

### 1.     CoStar unilaterally modifies listing data and photographs.

71.     For years, CoStar's terms of service purported to reserve the right for
CoStar to unilaterally insert its watermark and claim ownership over broker-owned
and supplied photographs and listing information.  These LoopNet Terms granted
CoStar the right to "add digital watermarks to certain parts of your property listing,
including photographs."  **Exhibit G** (Previous LoopNet Terms) at 2.  Notably, just

20

*two weeks after CREXi filed its original counterclaims* citing these CoStar contractual terms, CoStar amended LoopNet's Terms and Conditions to remove this language regarding its watermarking practices.  See **Exhibit F** (LoopNet Terms) at 3–4 (last updated July 7, 2021).

72.     Even after that amendment, the LoopNet Terms still purport to grant LoopNet the unilateral right to "adjust portions of the information contained within the Service," including "within property listings" supplied by brokers.  *Id.* at 5.  The Ten-X Terms of Use similarly grant CoStar the "right to . . . edit any content and any Submissions in our sole discretion."  **Exhibit I** at 5.

73.     CoStar has judicially admitted that it "inserts bits of fictitious data within the property records that appear within the CoStar Service," a practice that it calls "seeding" or "salting" listings.[7]  CoStar further has admitted that its "CoStar database contains certain 'seed listings,' which include fictitious information…."[8]

74.     CoStar further falsely claims that its inclusion of a watermark signifies CoStar's ownership of a photograph and indicates that it has copyrighted the image. CoStar alleged in its lawsuit against CREXi that its "watermark"—*i.e.*, logo— "publicly identifies CoStar's ownership of the images and protects CoStar's property, constitutes copyright management information."  FAC ¶ 65; *see also id.* ¶ 209.  But as this Court ruled, CoStar's "watermark logo does not constitute" copyright management information and, therefore, CoStar's claims against CREXi under the Digital Millennium Copyright Act "fail as a matter of law."  Order Re: Motion to Dismiss, Dkt. 71 at 6.

75.     Nothing in the LoopNet Terms require CoStar to notify brokers when, or explain how, LoopNet has modified their listings or watermarked their photos before doing so.  In other words, brokers may not realize that CoStar has added its

---

[7] Compl., *CoStar Realty Information, Inc. v. Does*, Case No. 1:14-cv-2304-AKH (S.D.N.Y. filed Apr. 2, 2014) at ¶ 4.

[8] First Am. Compl., *CoStar Realty Information, Inc. v. Centers & Malls, LLC, et al.*, Case No. 07-cv-01182-AW, Dkt. 39 ¶ 23 (D. Md. Jul. 16, 2007).

21

1875322

supposed watermark to brokers' images, much less that CoStar is representing that it now owns brokers' images.

### 2. CoStar falsely asserts ownership over brokers' photographs.

76. CoStar routinely adds its watermark to photographs provided to CoStar by brokers and other third parties. CoStar also frequently asserts false claims of copyright ownership over broker-supplied photographs, even where CoStar's watermark does not appear on the image. CoStar thus creates confusion in the marketplace regarding the legitimate ownership of property photographs, making brokers and CoStar competitors hesitant and often unwilling to share or use CRE photographs, even when CoStar holds no ownership over them.

77. CoStar has, in effect, created a minefield through which brokers and CoStar competitors must navigate when they seek to use photographs for which CoStar does not hold a valid copyright. Such anticompetitive conduct is an example of the well-known strategy of raising rivals' costs. CoStar's history of targeting competitors with aggressive litigation only exacerbates the anticompetitive effect of CoStar's misconduct.

78. CoStar's policy and practice of falsely claiming copyright ownership over brokers' and other third parties' photographs operate as a *de facto* barrier preventing customers from using competing products. They also prevent CoStar's competitors from freely using brokers' data and photographs, at the request of actual and potential customers, in the ordinary course of their business. Brokers are thus deprived of the opportunity for innovative services and lower prices.

### a. CoStar adds its watermark to brokers' images.

79. CREXi's investigation has revealed that CoStar engages in a regular practice of adding CoStar's watermark to photographs provided by brokers, sometimes even cropping out brokers' own watermarks in the process. As a result of CoStar's policies and practices of unilaterally modifying images, the presence of

CoStar's logo on a photograph does not provide reliable information regarding whether CoStar actually holds a valid copyright on the photograph.

80.     CoStar falsely claims that the logo it uses as a watermark "identifies CoStar's ownership of the images" and constitutes CoStar's "copyright management information." FAC ¶¶ 65, 209.  By unilaterally watermarking photographs CoStar does not own with the CoStar logo, competitors and other industry participants cannot distinguish between photographs legitimately owned by CoStar and those owned by brokers and other third parties.  This confusion is compounded over time.

81.     For example, Broker 73 recounted that he listed a property on CoStar, posting photographs that he paid for himself.  Later, when the property was being re-sold, he found his pictures on another broker's listing, with CoStar watermarks.  When confronted, the second broker claimed that he was a CoStar subscriber and got the photographs from CoStar, so he believed they were his to use.  Upon information and belief, events like this this are commonplace to CoStar's widespread application of its logo to photographs it does not own.  As a result, when a broker attempts to provide the listing and photograph to a competitor listing platform, the competitor has no certainty as to whether photos with a CoStar logo belong to a broker or to CoStar, and no easy way of determining the answer.

82.     In one instance, for example, Broker 7 paid to use a third-party's photograph to market a commercial listing in the Atlanta, Georgia area.  The broker uploaded the photograph to the LoopNet website to advertise the listing.  Even though the photograph had been provided by the broker and CoStar held no copyright over the photograph, CoStar added its logo to the bottom right-hand corner of the broker-supplied photograph.

1875322

83.     Broker 7 subsequently used the photograph as a representative image to advertise a separate commercial listing in Indiana, which was still under construction at the time of the listing.[9]  Yet again, however, CoStar superimposed its logo on the bottom right-hand corner of the broker-supplied photograph.  The photographs are depicted side-by-side for purposes of comparison:

| Broker-Supplied Image | CoStar Addition of Logo |
| --- | --- |
|  |  |

//
//
//
//
//
//
//
//
//
//
//

_____

[9] Using a representative photograph to market properties that are still under construction is a standard practice in the CRE industry.

1875322

84.     In another example, Broker 7 uploaded a photograph to LoopNet to advertise a listing in New Orleans, Louisiana.  The broker later discovered that CoStar superimposed its logo on the bottom right-hand corner of the photograph. The photographs are depicted side-by-side for purposes of comparison:

| Broker-Supplied Images | CoStar Addition of Logo |
|---|---|
|  |  |

85.     Set forth below are additional examples of images owned by brokers or other third-parties, and supplied to CoStar, which CoStar has improperly branded with its logo to falsely claim copyright ownership.  The photographs are depicted side-by-side for purposes of comparison:

| Broker-Supplied Images | CoStar Addition of Logo |
|---|---|
|  |  |

//

//

//

| Broker-Supplied Images | CoStar Addition of Logo |
|---|---|
|  |  |
|  |  |
|  |  |

86.     The examples set forth above are, on information and belief, just the tip of the iceberg.  CoStar has engaged in a widespread practice of adding its logo to photographs provided by or collected from brokers and other third parties, falsely claiming copyright ownership over images CoStar does not own.

87.     After CREXi filed its original counterclaims with the examples of CoStar adding its watermark to broker-supplied photographs, CoStar identified one of the brokers associated with the exemplary images set forth above—Broker 9. Costar's litigation counsel sent him a letter.  Apparently attempting to intimidate

Broker 9, CoStar demanded that the broker inform CoStar "whether you have ever sent to CREXi, or directed anyone else to send to CREXi, any materials derived from CoStar," and demanded that the broker preserve documents.

88.     Broker 9 responded that he had "never taken things from CoStar and [s]ent them to Crexi." The broker confirmed that he "paid for that picture to be taken (thus own the rights)," "posted it on loopnet, and then somehow it appeared on CoStar with CoStar Branding." Broker 9 asked: "Since you are CoStar[']s legal counsel, can you answer why their logo is on my photo? Over the years I have seen CoStar branding on my personal photos often, once they have been uploaded to LoopNet. Thus since CoStar owns Loopnet, I surmise … that CoStar takes photos we brokers upload to LoopNet and brands them with their logo, and puts them on the CoStar platform." Broker 9 repeatedly asked CoStar's lawyers to explain how CoStar's watermark ended up on a photo the broker owned, but CoStar's lawyers had no explanation. Excerpts of this e-mail exchange are shown below:

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, August 5, 2021 6:08 PM
**To:** Triantafyllou, Kimon (DC) <Kimon.Triantafyllou@lw.com>
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Boyle, Nicholas (DC) <Nicholas.Boyle@lw.com>;
Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>
**Subject:** Re: Document Preservation Notice

What does the lawsuit allege? How can I find out how one of my photos came to have CoStars logo on it?

Me, My Team, My Firm have never given Crexi a Photo with a CoStar Logo on it.

Are you asking if we have ever provided Crexi with a personally owned photo for marketing purposes on their service...if so the answer is yes. If you are asking if we ever have given the Crexi a photo taken from CoStar, the answer is no.

1875322

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, August 6, 2021 10:27 AM
**To:** Triantafyllou, Kimon (DC) <Kimon.Triantafyllou@lw.com>
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮ Boyle, Nicholas (DC) <Nicholas.Boyle@lw.com>; Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>
**Subject:** Re: Document Preservation Notice

Hi Kimon,

Thanks for your response, and I am not looking for your legal advice.

Since you are CoStars legal counsel, can you answer why their logo is on my photo?

Over the years I have seen CoStar branding on my personal photos often, once they have been uploaded to Loopnet. Thus since CoStar owns Loopnet, I surmise and again in my personal layman's opinion only that CoStar takes photos we brokers upload to Loopnet and brands them with their logo, and puts them on the CoStar Platform.

89.     Other brokers and brokerage employees, including Broker 1, Broker 4, and Broker 8 have reported that CoStar routinely add its logo watermark to virtually every photo the brokerages uploaded to CoStar, even though those images were paid for and owned by the brokerages. Upon information and belief, since CREXi filed its original counterclaims in June 2021, CoStar has removed its watermark from some such photographs, either in acknowledgement that doing so was improper or as a means to prevent CREXi from assembling information in support of its counterclaims. The full scope of this conduct will be determined in discovery.

90.     Through the course of this litigation, CoStar has been forced to concede ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CoStar incurs costs to modify brokers' listings and photographs by adding its digital watermark, enabling CoStar to falsely claim intellectual property ownership over content that CoStar does not own. These costly actions are profitable to CoStar only *because* of their anticompetitive effect, in that they prevent competitors from using brokers' own listings. CoStar's actions in this regard are, thus, exclusionary by design and effect. The full breadth of

28

1   CoStar's anticompetitive practice, however, cannot be known until discovery is

2   complete.

3                   **b.    CoStar falsely claims ownership over brokers' images.**

4           91.    CREXi respects third parties' legitimate claims of intellectual property

5   protection and does not want CoStar's copyrighted images on its website.  CREXi

6   consistently conveys to its employees and its customers that CREXi will decline

7   submissions that contain photographs not owned or licensed by the broker who is

8   submitting the photographs, and CREXi will remove images from its website if

9   they are discovered to infringe on another party's copyrights.

10          92.    After CoStar filed this lawsuit against CREXi, and despite not once

11  providing CREXi with a take-down notice under the Digital Millennium Copyright

12  Act (DMCA), CoStar demanded that CREXi hire a vendor to install an image filter

13  to run on CREXi's website.  The purpose of the image filter, CoStar claimed, was

14  to screen for CoStar's copyrighted images and filter out such images.  CoStar

15  insisted that CREXi use one of two vendors that had a relationship with CoStar.

16          93.    CoStar falsely represented that the filter contained ***only*** CoStar's

17  copyrighted images.  Based on CoStar's representations that the filter would

18  prevent any image for which CoStar owns a valid copyright from being displayed

19  on CREXi's website, and that the filter only includes images legitimately

20  copyrighted by CoStar, CREXi engaged CoStar's proposed vendor to implement

21  that filter on CREXi's website—at CREXi's own expense.

22          94.    CREXi soon learned that the filter is rife with images over which

23  CoStar does not have a copyright, including logos of third parties like Subway and

24  Kentucky Fried Chicken, and close-up photographs of brokers' own logos.[10]  The

25  filter routinely flags for removal from CREXi's website CRE images submitted to

26  CREXi by brokers, based on CoStar's false assertion that CoStar owns a copyright

27  _____

[10] The inexplicable inclusion of close-up photographs of broker signage and chain retailer logos
28  in the filter's image repository disrupted CRE listing displays on CREXi's plaform involving
major brokers and retailers.

CREXI'S FIRST AMENDED COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1875322

in such images.  CREXi also discovered that, based on a sample of 2,350 flagged images, one out of every nine images flagged by the filter was a false positive, meaning that the image on CREXi's website does not actually match the image in CoStar's repository of supposed CoStar-copyrighted images, yet was still flagged for removal.

95.     Numerous times, CREXi raised concerns to CoStar that the filter includes images over which CoStar does not own a copyright, and requested an explanation of why images were wrongly included in the CoStar filter and why the false-positive rate was so high—contrary to CoStar's representations about how the filter would work.  CoStar dismissed CREXi's concerns and refused to remedy the filter errors.  Yet CoStar continues to insist to this day that CREXi implement the filter, at significant cost to CREXi.

96.     In the course of scanning CRE property listing images on CREXi's website, the filter has flagged brokers' Offering Memoranda (OMs) and marketing brochures as containing images over which CoStar claims a copyright.  CREXi sends those brokers a notice of CoStar's copyright claim and informs them that CREXi has taken down the brokers' flagged OMs and marketing brochures on CREXi's website.

97.     In response to these notices, numerous brokers have disputed CoStar's copyright claims, presenting evidence that the images in their OMs and marketing materials were paid for and owned by brokers, or used with permission from the owners—and demanding that their listing photographs be immediately restored to CREXi's platform.  Unsurprisingly, brokers are confused and displeased by the disruption caused by CoStar's false ownership claims and the faulty image filter that CoStar induced CREXi to use based on its false representations.

98.     CoStar's assertion of its spurious copyright claims has disrupted CREXi's relationships with its customers, as well as CREXi's reputation.  Attached as **Exhibit A** is an exemplary, non-exhaustive catalog of over two dozen different

brokers' responses to CoStar's false copyright claims over images contained in brokers' marketing materials.  Some of these responses are set forth below:

99.   The CoStar filter flagged Broker 10's marketing brochures as containing images over which CoStar claims a copyright.  Accordingly, CREXi sent that broker a notice of removal of the flagged images from CREXi's platform.  Broker 10 was incensed because the photos belonged to her brokerage.  She sent CREXi a screenshot of a private photo gallery containing the original images in question, and emphasized:

> These images are NOT owned by Costar.  I double-checked and the photos in our brochure for 11600 Miramar Parkway brochure are owned by [my brokerage].  We had them shot in 2019.  We use these photos in all of our marketing on various sites including CoStar.  We would like a formal apology from Costar for tagging these images that are rightfully [the brokerage]'s.

100.   In another episode, after her listings were flagged for removal based on CoStar's false copyright claims, Broker 11 provided proof that her brokerage took the photos at issue, in the form of screenshots of the original photos in her personal archive.  Broker 11 explained:

> I would like to appeal this immediately. We paid for all of our pictures and they are the property of [my brokerage]. The only thing I can think of here is we also upload those listings/ Pictures to LoopNet. By default Costar adds our pictures to the Costar records- however that does not make it the property of Costar.

101.   Another broker, Broker 12, provided proof he personally took the photos over which CoStar claimed ownership, and noted that the photos themselves contained his leasing sign:

> Again, if you would look at the pictures you would see my leasing sign in the pictures. I personally took every picture in Crexi as shown below. . . . In fact it appears that Costar

31

has taken some of my pictures without MY permission.

102.   Broker 13 expressed incredulity that CoStar was claiming ownership over a photo that he took on his own cell phone, and that he wished to post on CREXi's platform.  Broker 13 provided proof of this photo in his own personal photo archives and remarked, "Its funny how Co Star can steal all of my photos that I have uploaded to my listings there and keep them on their site even when I have removed the property."

103.   In response to another CoStar false copyright claim that triggered a notice from CREXi, Broker 14 forcefully explained that the photo belonged to the property owner and not to CoStar: "These photos were taken by ownership years ago, not Costar; it's insane that costar takes over the photos and claims them like that."

104.   Broker 16 expressed his exasperation over CoStar's false claims of copyright ownership over his own images:  "Well, that's a 'BS' claim by them! I've been marketing that building for 15-20 years, which is well before Costar was even in the Madison market. They've used 'our' photos and then cropped out our watermark and then has the guts to claim those are their photos. Complete BS."

105.   Broker 15 supplied a link to his photo gallery to show that the photos belonged to his brokerage, and not CoStar.  He further elaborated:

> I am not sure why CoStar is claiming copyright on these photos however these were taken by us. . . . Attached is the link to the photos we took. This is ridiculous – these are our photos. Have Costar reach out to me directly – again, I am a client of theirs.

106.   Broker 17 insisted that her brokerage owned all photos they used in marketing:  "We pay and own all of our own photos – LoopNet CoStar can suck it. If they want to reimburse me the $6,000 + annually we spend on photos I am happy to have a discussion."  Broker 17 also emphasized the importance of promptly

1  resolving CoStar's false copyright claim so that the property listing could go back

2  on CREXi's site: "We need this re-instated ASAP."

3      107.   Although most brokers were insistent that CREXi restore their listings

4  as soon as practicable, CoStar's assertion of copyright claims—however baseless—

5  still deterred many brokers from using CREXi's platform to post images that the

6  brokers lawfully owned.

7      108.   For example, Broker 18 affirmed, "I own all images and had my

8  photographer take those photos. I also created the OM/marketing brochure. Costar

9  does not own any. I uploaded the images and OM/marketing brochure to Costar too

10  when I did the listing, but they do not own them." But despite owning the photos,

11  Broker 18 relented in the interest of avoiding a potential conflict with CoStar,

12  stating, "I am ok with you taking the marketing brochure down if that will make

13  Costar happy" and "I am ok with taking those items down as it's not worth the

14  hassle with costar." In other words, CoStar's false claim of ownership led the

15  broker to remove a portion of his listing from CREXi, inhibiting the customer's

16  ability to work with CREXi.

17      109.   These brokers represent just a small sample of CREXi customers

18  whose CRE listings were disrupted or impaired due to CoStar's widespread

19  practices of claiming ownership over photographs that CoStar does not own.

20  CoStar's unfounded claims of image ownership have interfered with CREXi's

21  operations and its business relations with brokers. CoStar's bogus ownership

22  claims have forced the removal of brokers' images from CREXi's platform—

23  despite CoStar having no legitimate claim of ownership.

24      110.   By fomenting confusion and uncertainty about the ownership of CRE

25  listing photographs, CoStar has constructed a minefield for competitors who wish

26  to compete lawfully against it. CREXi has no assurance of being able to accurately

27  identify CoStar-owned photographs, even when it pays to use CoStar's

28  recommended vendor, ostensibly, to filter out Costar-copyrighted images.

111.    Although CoStar claims to have a policy that enables brokers to retain ownership rights over images they submit to CoStar or LoopNet, CoStar disregards that policy in its actual business operations.  In reality, CoStar indiscriminately claims proprietary rights over photographs it does not own and, through litigious threats against brokers and anticompetitive tools like CoStar's filter, is able to deter brokers from working with CREXi.

### 3.    CoStar targets industry participants with litigation.

112.    CoStar's well-documented history of targeting brokers, competitors, and other industry participants with litigation and threats exacerbates the anticompetitive impact of its technological blocks, exclusionary contractual terms, and false claims of intellectual property ownership.  Since 2015, CoStar has filed at least 37 separate lawsuits in the United States alleging claims of intellectual property infringement, false advertising, unfair competition, or breach of contract. This figure does not include CoStar's threats of litigation, which are undoubtedly much more numerous.

113.    CoStar has also retaliated against brokers, advisors, and other industry participants that support CREXi, in a transparent attempt to interfere with CREXi's business and to dissuade customers from working with CREXi.

114.    For example, in May 2021, CoStar terminated services to Leon Capital, an investment company specializing in real estate, claiming that Leon Capital had violated CoStar's Terms of Use.  After CoStar filed its lawsuit against CREXi, CoStar accused Leon Capital of being "a competitor, or at the very least an indirect competitor, of CoStar" because Leon Capital's CEO is an advisor to and promotes CREXi.  CoStar terminated Leon Capital's services under provisions of CoStar's Terms of Service described above, which purport to prohibit competitors from accessing CoStar's services, and then filed a lawsuit against Leon Capital claiming damages for the remaining term of the contract under a supposed "acceleration clause."

115.   CoStar has also threatened brokers who have cooperated with CREXi, in a naked attempt to dissuade them and other brokers from exposing CoStar's anticompetitive and unlawful practices.  After CREXi identified examples of brokers whose images had been improperly manipulated by CoStar to create a false claim of copyright, CoStar's litigation counsel sent them threatening letters and served them with overbroad and harassing subpoenas.

116.   Armed with its army of outside lawyers, CoStar has also engaged in a scorched-earth campaign against independent contractors that have worked with CREXi, to intimidate them and extract misleading testimony against CREXi. CoStar has filed at least two separate legal actions against CREXi's independent contractors in India based on misleading allegations, threatening them with excessive damages claims, and in one case so far, charges of criminal contempt. CoStar's objective appears to be to exert enough pressure on these entities that they will be forced to "settle" with CoStar by signing misleading declarations apparently drafted by CoStar's lawyers, assenting to assist CoStar, and agreeing not to cooperate with CREXi.

117.   CoStar's lawsuits and threats levied against brokers, advisors, and other supporters of CREXi is nothing more than retaliation for their association with CREXi in order to discourage other brokers and industry professionals from associating with CREXi and exposing CoStar's unlawful conduct.

### E.   CoStar has infringed CREXi's trademarked name to engage in unfair competition.

118.   CoStar also engaged in anticompetitive conduct when its subsidiary Ten-X intentionally misappropriated CREXi's trademarked name to advertise and market Ten-X's own products and services in the relevant markets.  In doing so, Ten-X capitalized on CREXi's goodwill and market recognition to compete unfairly with CREXi in the relevant markets.

119.   On June 5, 2015, CREXi filed U.S. Trademark Application Serial No. 86653786 for registration of the CREXI® mark.  On August 29, 2017, the U.S.

35

Patent and Trademark Office issued to CREXi U.S. Trademark Registration No. 5,276,877 for the word mark CREXI®.  CREXi's registration of the CREXI® mark is valid and enforceable.  Indeed, the registration of the CREXI® mark constitutes *prima facie* evidence of its validity and of CREXi's exclusive right to use the mark pursuant to 15 U.S.C. § 1057(b).  A true and correct copy of CREXi's Certificate of Registration is attached hereto as **Exhibit E**.

120.   Continuously since August 29, 2017, CREXi has used the CREXI® mark to identify its products and services and to distinguish them from those sold by competitors.  Among other things, CREXi prominently displays its CREXI® mark on its website www.crexi.com, letterhead, bills, and advertising and marketing materials distributed throughout the United States.

121.   CREXi has invested tens of millions of dollars to establish its distinctive CREXI® mark in the consumer marketplace.  In 2021 alone, CREXi has budgeted for $6.5 million, and will likely spend closer to $10 million, in marketing, advertising, and promotion, all of which is based upon and features its CREXI® mark.

122.   CREXi also makes significant investments by purchasing search engine advertisements with the word "Crexi" and using the CREXI® mark in its paid Google advertisement headers to drive traffic to CREXi's website.  Search engines such as Google, Yahoo!, and Microsoft's Bing allow advertisers to select keywords, such that when an online consumer enters a keyword search, the advertiser's website advertisement will appear prominently on the page.

123. For example, CREXi pays Google to purchase the Google AdWord "Crexi" as a search engine advertisement. As shown in the screen-capture below, the CREXI® mark is clearly identified with the registered trademark symbol ® in the header of CREXi's Google advertisement headers:



124. CREXi users frequently access CREXi's website by searching the word "Crexi" alone, or in combination with other search terms, or by clicking on CREXi's paid Google AdWords advertisements. In 2020 alone, 3,550,000 unique visitors navigated to CREXi's website from Google both through search results and CREXi's paid Google advertisements, constituting 48% of all unique visitors during the year.

125. CREXi enjoys substantial consumer recognition and valuable goodwill in its CREXI® mark owing to CREXi's substantially exclusive and continuous use of the CREXI® mark, significant investments to establish the mark, and the inherently distinctive nature of the mark. As such, the trade and the public have come to identify the CREXI® mark as an indication that CREXi's products and services originate exclusively from CREXi.

126. Rather than advance its products and services through fair competition, CoStar has infringed CREXI's trademark by advertising Ten-X's products and services using the CREXI® mark. CoStar's actions in this regard are exclusionary, *i.e.*, they are profitable to CoStar only because of their anticompetitive effects.

127.   CoStar has infringed CREXi's intellectual property to try to sell Ten-X's products and services and mislead customers into believing that CoStar's products are in some way made by, approved by, sponsored by, or affiliated with CREXi.

128.   Ten-X has purchased "CREXi" as a Google AdWord and explicitly infringed the CREXI® mark in the header and text of CoStar's advertisements.  For example, at various times, a search for "crexi" on Google yielded, at the very top of the page, an advertisement for "Commercial Buildings For Sale – Crexi."  But the advertisement was actually purchased by CoStar and links to CoStar's Ten-X website, as shown in the screen-capture below:



129.   In the example above, when a consumer searched for the term "crexi" on Google, that consumer, intending to find CREXi's website and services, was instead directed to a website owned by CoStar—www.ten-x.com/cre_listings. Notably, the header of the CoStar advertisement featured the CREXI® mark, and made no mention of either CoStar or Ten-X.  Such advertisements created the false impression that CoStar's Ten-X product is associated with the CREXI® mark.

38

1875322

130.   Similarly, at various times, a search for "crexi california" on Google yielded, at the very top of the page, a CoStar-purchased advertisement for "Commercial Buildings For Sale – Crexi – Ten-X.com."  But again, rather than being directed to CREXi's website, a user searching for CREXi in California would be directed to CoStar's Ten-X website, as shown in the screen-capture below:



131.   Thus, when a consumer searched for the phrase "crexi california" on Google, that consumer, intending to find CREXi's website and services, was instead directed to a website owned by CoStar—www.ten-x.com/cre_listings.  The header of CoStar's advertisement not only infringes CREXi's trademark, but it features the CREXI® mark first, before identifying Ten-X, to create a false and misleading initial association with CREXi.

132.   As demonstrated by the chart below, CREXi has identified numerous other examples of CoStar's pervasive, anticompetitive trademark infringement. CREXi suspects many more examples of CoStar's anticompetitive trademark infringement will be revealed in discovery.

CREXI'S FIRST AMENDED COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1875322

| Google Search Term | CoStar's Trademark Infringing Advertisement |
|---|---|
| "crexi property" | "Buy/Sell Commercial RE – Crexi Properties," |
| "crexi buy" | "Crexi – Commercial Buildings for Sale" |
| "crexi commercial property for sale" | "Crexi Commercial – Commercial Buildings For Sale" |
| "crexi site" | "Buy/Sell Commercial RE – Crexi – Commercial Buildings For Sale" |
| "crexi state" | "Buy/Sell Commercial RE – Crexi – Commercial Buildings For Sale" |
| "crexi Orlando" | "Buy/Sell Commercial RE | Crexi | Ten-X.com" |
| "crexi Florida" | "Buy/Sell Commercial RE – Crexi – Ten-X.com" |
| "crexi connecticut" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi maine" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi oregon" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi portland" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi vermont" | "Commercial Buildings For Sale – Crexi – Ten-X.com" |
| "crexi fort myers" | "Crexi – Commercial Buildings For Sale – Ten-X.com" |
| "crexi commercial real estate columbus ohio" | "Commercial Buildings For Sale – Crexi Commercial Real…" |

133.   On information and belief, Google informed CoStar that its practice of infringing CREXi's trademark to advertise CoStar's services violates Google's policies, and removed CoStar's infringing advertisements.

134.   On information and belief, CREXi has missed out on business opportunities because of the customer confusion caused by CoStar's trademark infringement.

135.   CoStar's use of the CREXI® mark in its advertisements for Ten-X constitutes anticompetitive conduct and willful and intentional trademark infringement, which has damaged CREXi.

1875322

**F.    CoStar's exclusionary practices have substantially foreclosed competition in the relevant markets.**

136.    CoStar's contractual limitations and technological blocks trap CoStar's customers into keeping their CRE property listings exclusively on CoStar's websites, and prevent customers from exploring competitors' products and services. All of CoStar's customers are subject to its exclusionary contractual terms, and thousands of brokers use CoStar's LoopLink product that prevents brokers from even sharing their own property listings information housed on their own websites.

137.    Moreover, CoStar's false claims of intellectual property ownership, combined with its aggressive litigiousness, foster a market environment where brokers are deterred from sharing their own CRE property information with competitors like CREXi.  CoStar has deliberately interfered with CREXi's customer contracts and its business relationships, and has caused customer confusion by infringing upon CREXi's mark.  CoStar's specious intellectual property claims spread uncertainty regarding information and photograph ownership, among industry participants across the entirety of the relevant markets, diminishing market efficiencies that brokers would otherwise enjoy by being able to freely share their own listing information.

138.    As illustrated by examples of dozens of exemplary broker accounts, from Brokers 1–18, 73, 74, *supra*, and set forth in **Exhibit A** (select broker responses to CoStar's false copyright claims), CoStar's anticompetitive scheme has substantially foreclosed CREXi's ability to work with brokers.

139.    In these markets for CRE listing services, information services and auction services —which are characterized by network effects, and where the barriers to entry are already substantial—a newer entrant's inability to amass property listings is detrimental.  There are no other substantial viable competitors in these markets besides CREXi, and CoStar's anticompetitive conduct is designed to drive CREXi out of the markets.  Given CoStar's dominant market share in the relevant geographic markets, the vast majority of brokers in these markets are

41

1  subjected to CoStar's anticompetitive practices.  With no other meaningful
2  competitors besides CREXi, CoStar's exclusionary conduct forecloses competition
3  in a substantial share of the relevant markets.

4  <center>**V.    The Relevant Markets**</center>

5       140.   CoStar and CREXi are direct competitors in the markets for internet
6  CRE listing services, internet CRE information services, and internet CRE auction
7  services—each of which constitutes a relevant product market with significant
8  barriers to entry.

9       **A.    The internet CRE listing services market.**

10      141.   "Internet CRE listing services" consist of an online organized
11 collection of information concerning commercial real estate listings available for
12 sale or lease.[11]  The listing information includes, among other things, CRE
13 addresses, sale prices and lease rates, square footage, photographs, narrative
14 descriptions of the properties, and brokers' contact information.  Internet CRE
15 listing services operate as online collections of listings where customers may both
16 publish and search listings for CRE available for lease or sale.

17      142.   CREXi and LoopNet operate competing internet CRE listing services.
18 LoopNet, for example, describes its service as providing an "online commercial real
19 estate marketplace" that "connects tenants and investors to properties available for
20 sale and lease.  By meeting the feature-rich requirements of digital advertising,
21 LoopNet allows professionals to directly market to a massive audience of searchers
22 at precise exposure levels."[12]  Similarly, CREXi's internet CRE listing service
23 provides a marketplace where brokers can list properties and manage leads to find
24 the ideal buyers and tenants efficiently and effectively.[13]

---

[11] *See* FTC Decision and Order, *In the Matter of CoStar Grp., Inc., et al.*, No. C-4368, 2012 WL 3862130, at *5–6 (F.T.C. Aug. 29, 2012).

[12] CoStar Group, *LoopNet*, WWW.COSTARGROUP.COM, https://www.costargroup.com/about-us/brands/loopnet (last visited Aug. 5, 2022).

[13] *See* CREXi, *Commercial Properties for Sale*, https://www.crexi.com/properties (last visited Aug. 5, 2022).

<center>42</center>

143.    CREXi and LoopNet's internet CRE listing services make available online facts about CRE properties for sale or lease, including address, building size, year built, zoning information, listing price, acreage, and photographs, among other things.  Nearly all listing content available on LoopNet is originally generated by brokers or property owners, based on publicly available information.  CREXi and LoopNet are accessible to the public for free, and users can browse their websites without creating an account.  CREXi and LoopNet both also offer a subscription service, targeted to brokers and property owners, with additional internet CRE listing features (such as premium listing placements and additional support services).

144.    Most commercial real estate brokers, when representing a seller or lessor, utilize internet CRE listing services.  These services have lower search costs, in terms of identifying potential buyers and lessees, than other digital and non-digital services.  Similarly, most commercial real estate brokers, when representing a buyer or lessee, utilize internet CRE listing services.  These services have lower search costs, in terms of identifying potential buildings for sale or office space for lease, than other digital and non-digital services.  Hence, they do not belong in the same product market.

145.    Other digital services include traditional search engine and information services such as Google, Bing, and Facebook Marketplace.  However, these services have substantially higher search costs for both sellers/lessors and buyers/lessees of CRE.  In principle, a broker acting as an agent for a seller/lessor could bid on keywords that would appear as advertisements when certain searches are performed on search engines such as Google or Bing.  However, as a practical matter, CRE brokers rarely pay for such advertising, in large part because potential buyers/lessors generally do not use search engines to identify potential buildings for sale or office space for lease because the search costs substantially exceed those for dedicated internet CRE listing services websites like LoopNet and CREXi.

43

146.   Non-digital services include on-site advertising and print advertising. Such non-digital advertising reaches far fewer potential buyers and lessees than internet CRE listing services.  However, commercial CRE real estate brokers, when representing a seller or lessor, often utilize non-digital advertising, as well as internet CRE listing services.  This illustrates the fact that non-digital CRE advertising services are complements—rather than substitutes—for internet CRE listing services.

147.   Other digital services such as Google, Bing, and Facebook Marketplace, as well as non-digital services such as on-site advertising and print advertising, are not reasonably interchangeable with internet CRE listing services. As a result, if the price of internet CRE listing services increased by a small but significant amount, CRE customers would not substitute away from these services by a sufficient amount to render the price increase unprofitable.  For all of these reasons, internet CRE listing services constitute a relevant product market.

## B.    The internet CRE information services market.

148.   "Internet CRE information services" consist of data and analytical tools used by CRE brokers and other customers to locate, research, evaluate, and optimize the sale or lease of CRE.  Internet CRE information services include, but are not limited to, CRE addresses, the prices at which a property has previously been offered for sale or lease, the prices at which comparable properties have been offered, leased, or sold in the past, lease histories, property histories, property descriptions, detailed floor plans, photographs, tenant history, and vacancy rates.[14]

---

[14] CRE information services do not include CRE market analyses, market forecasts, or market projections prepared based upon the information gathered concerning CRE, or software applications or products (and any related software integration services) offered for sale or lease, or sold or leased separately, from data relating to CRE.  Additionally, CRE information services do not include information or databases relating to the rental or leasing of residential units in residential structures containing five or more residential units, or the sale of individual units in such structures, which information or databases are not used by purchasers or sellers (or agents for purchasers or sellers) of residential structures containing five or more residential units to locate, research, or evaluation CRE, or to list CRE for sale or lease.  *See* FTC Decision and Order, *In the Matter of CoStar Grp., Inc., et al.*, 2012 WL 3862130, at *5.

The CRE listing services market is complementary to the CRE information services market; listings represent a critical input for CRE information services. The more listings a platform displays, the more likely a buyer or seller is to use that platform for CRE information services.

149. CREXi and CoStar are competitors in the CRE information services market. Both CoStar and CREXi maintain proprietary databases of CRE information. CoStar describes its internet CRE information services as "a standardized platform of information, analytics and online marketplace services where industry professionals and consumers of commercial real estate, including apartments, and the related business communities, can continuously interact and facilitate transactions by efficiently accessing and exchanging accurate and standardized real estate-related information."[15] CoStar describes its CRE information services as providing "information about space available for lease, comparable sales information, information about properties for sale, tenant information, Internet marketing services, analytical capabilities, information for clients' websites, information about industry professionals and their business relationships, and industry news."[16] Similarly, CREXi's CRE information services provide comparable sales information, detailed market reports, and a data center.[17]

150. Many commercial real estate brokers subscribe to internet CRE information services. These services provide online access to large, proprietary databases of valuable information regarding CRE. For this reason, a strong position in the listings market complements a firm's position in the CRE information services market. CoStar's information and analytics operations account for

---

[15] CoStar Group, Inc., Quarterly Report (Form 10-Q), at 31 (Oct. 28, 2020).

[16] *Id.* at 33.

[17] *See* CREXi, *Intelligence for CRE*, https://go.crexi.com/intelligence/ (last visited Aug. 5, 2022).

approximately 45% of the company's total $1.5 billion annual revenue, demonstrating the substantial willingness-to-pay on the part of CRE brokers.[18]

151.   Some data on the CRE industry can be obtained from local real estate boards, exchanges, or associations such as the National Association of Realtors. However, collecting relevant CRE data from such sources would be substantially more time consuming and no analytical tools would be available.

152.   There are no services that are reasonably interchangeable with internet CRE information services.  If the price of internet CRE information services increased by a small but significant amount, CRE customers would not substitute away from these services by a sufficient amount to render the price increase unprofitable.  For all these reasons, internet CRE information services constitute a relevant product market.

## C.   The internet CRE auction services market.

153.   "Internet CRE auction services" consist of online sales platforms where sellers can solicit bids from multiple buyers, facilitating the rapid and efficient sale of commercial buildings and office space.  The CRE listing services market is complementary to the CRE auction services market.  The more listings a company amasses, the more likely a buyer or seller is to use the auction services of that company.

154.   CREXi and CoStar are competitors in the internet CRE auction services market.  For example, CoStar's internet CRE auction service (Ten-X, a subsidiary CoStar acquired to compete with CREXi in the internet CRE auction services market) describes its service as providing a "platform [that] empowers brokers, sellers and buyers with data-driven technology and comprehensive marketing tools to expand market visibility and decrease time to close."[19]

---

[18] CoStar Group, Inc., Quarterly Report (Form 10-Q), at 18 (Oct. 28, 2020).

[19] Ten-X, *More Than a Decade of Experience Facilitating CRE Transactions*, WWW.TEN-X.COM, https://www.ten-x.com/company/resources/about-ten-x/ (last visited Aug. 5, 2022).

1875322

Similarly, CREXi provides an online auction platform that opens up a new world of virtual bidding, removing the roadblock of physical distance and expensive travel from potential sales.[20]

155.   While the internet CRE auction services market is complementary to the internet CRE listing services market, the two markets are distinguished primarily by the speed with which sales transactions can be finalized compared to standard CRE listings.  Internet CRE auction service providers play a more active role in the transaction process—hosting the auction, managing its terms, promoting the auction, and determining the auction winner, if any, based on the auctioning party's predetermined limits or other rules.

156.   The sale of a commercial building through an internet CRE auction service also typically requires much less time than would the same transaction through an internet CRE listing service.  As a result, sellers seeking quick sales will often choose an internet CRE auction service rather than an internet CRE listing service.

157.   The closest substitutes to internet CRE auction services are internet CRE listing services.  However, the fact that two leading online CRE firms, CoStar and CREXi, offer both of these distinct services shows that the two services are not reasonably interchangeable.  If the price of internet CRE auction services increased by a small but significant amount, CRE customers would not substitute away from these services by a sufficient amount to render the price increase unprofitable.  For these reasons, internet CRE auction services constitute a relevant product market.

**D.     The geographic scope of the relevant product markets.**

158.   Geographic markets for internet CRE listing, information, and auction services consist of individual metropolitan areas across the United States.

159.   Individual metropolitan areas, as used herein, refer to Metropolitan Statistical Areas ("MSAs"). An MSA is defined by the U.S. Census Bureau as:

---

[20] *See* CREXi, *Auction*, https://go.crexi.com/auctions/ (last visited Aug. 5, 2022).

1875322

A geographic entity delineated by the Office of Management and Budget for use by federal statistical agencies. Metropolitan statistical areas consist of the county or counties (or equivalent entities) associated with at least one urbanized area of at least 50,000 population, plus adjacent counties having a high degree of social and economic integration with the core as measured through commuting ties.[21]

160. **Exhibit B** identifies a list of 50 large MSAs in United States, which comprise certain relevant geographic markets. The list includes all the major metropolitan CRE markets—such as Atlanta, New York, and Chicago. These 50 MSAs account for 53.7% of the total U.S. population. Market share calculations for these metropolitan markets are thus representative.

161. Customers of CRE listing, information, and auction services generally do not regard locations in different metropolitan areas as reasonable substitutes. Before listing their properties for sale or lease, and before beginning their search for CRE information, customers have identified a particular metropolitan area.

162. CoStar, LoopNet, Ten-X, and CREXi design their websites to facilitate searches by metropolitan area. CoStar also provides market data to the National Association of Realtors based on metropolitan areas.

163. In a recent antitrust case against CoStar, the FTC similarly concluded with respect to the geographic extent of markets for apartment internet listing services that "the appropriate geographic markets are individual metropolitan areas…."[22] In that matter, the FTC identified 49 such markets.

164. One reason why the relevant geographic markets are individual metropolitan areas is that CRE customers cannot arbitrage internet CRE services.

---

[21] U.S. Census Bureau, *Glossary - Metropolitan Statistical Area*, https://www.census.gov/programs-surveys/metro-micro/about/glossary.html (last visited Aug. 5, 2022).

[22] FTC, *In the Matter of CoStar Group, Inc. and RentPath Holdings, Inc.* (Nov. 30, 2020), Docket No. 9398, ¶ 46. Redacted Public Version *available at* https://www.ftc.gov/system/files/documents/cases/d09398complaintpublic.pdf.

For example, CRE customers cannot purchase internet CRE listing services at a low price in one metropolitan area and profitably resell (*i.e.*, arbitrage) those services by selling them at a higher price in another metropolitan area.  As the FTC similarly concluded in a recent antitrust case against CoStar, "[c]ustomers of [internet listing service] advertising for large apartment complexes [can] not avoid a targeted price increase through arbitrage because [internet listing service] advertising is inherently property-specific."[23]

165.   CoStar and CREXi compete within individual metropolitan areas across the United States, and competitive conditions are substantially similar across many of these local markets.  Accordingly, while the relevant geographic market includes at least the 50 metropolitan areas identified in **Exhibit B**, national information is relevant and useful for analyzing CoStar's monopoly power.

### E.   There are significant barriers to entry in the relevant markets.

166.   The relevant product markets are characterized by significant barriers to entry and expansion.[24]  The presence of barriers that delay or limit the entry of firms into a market tends to make that market relatively more conducive to market concentration and monopolies, since those barriers limit the entry of competitive firms.[25]  There are several factors that contribute to the high entry and expansion barriers for potential new entrants and existing competitors in the relevant markets for internet CRE listing, information, and auction services.

167.   To begin with, the monetary costs and investment in time and resources to develop and maintain products and services in the internet CRE listing, information, and auction services markets is substantial.  To launch commercial real estate listing, information, or auction services requires millions of dollars for initial

---

[23] *Id.* at ¶ 29.

[24] "An antitrust barrier to entry is a cost that delays entry and thereby reduces social welfare relative to immediate but equally costly entry." McAfee, R. P., Mialon, H., and Williams, M. (2004), "What is a Barrier to Entry?" *American Economic Review*, vol. 94, p. 463.

[25] *See, e.g.*, Carlton, D. and Perloff, J. (2005), *Modern Industrial Organization*, 4th ed., Boston, MA: Pearson Addison Wesley, Chapter 5.

1875322

development, and then many millions more to recruit customers, maintain the information, and build an effective sales network.  Further, the cost of developing software is incurred prior to the ability of a new entrant to offer internet-based services.  Software costs are "sunk," *i.e.*, the money spent developing the software cannot be recovered.  As is well established in economics, sunk costs are antitrust barriers to entry.[26]  Because sunk costs cannot be recovered, the necessity to incur such costs prior to entry increases the *ex-ante* risk to entrants.  This increase in risk reduces, other factors being the same, the willingness of firms to enter the market.  As one industry analyst reported, the significant monetary costs and investment in time are a "primary moat" protecting CoStar's monopoly position.[27]

168.   Additionally, internet CRE listing, information, and auction services markets are characterized by "network effects."  A network effect exists in a market if (1) an increase in the number of users of a service on one side of a market leads to (2) an increase in the value of a complementary service on the other side of the market, which can then increase the value of the first service.  For example, an increase in the number of CRE brokers representing sellers or lessors who utilize internet CRE listing services leads to an increase in the value of the internet CRE listing service to CRE brokers representing buyers or lessees.  The resulting increase in the number of CRE brokers representing buyers or lessees who utilize the internet CRE listing service leads to an increase in the value of the listing service to CRE brokers representing sellers or lessors.

169.   The existence of network effects leads to a "chicken-and-egg" problem.  A new entrant providing an internet CRE listing, information, or auction

---

[26] McAfee, R. P., Mialon, H., and Williams, M. (2004), "What is a Barrier to Entry?" *American Economic Review*, vol. 94, pp. 461–65. "Sunk costs cause firms to delay entry because of their option value. The option of entering is lost once the firm enters. With uncertainty about market conditions, this option has value. Thus, dynamic entry is delayed relative to a static world." *Id.*, at 465.

[27] Yousuf Hafuda, *CoStar Group Firing on All Cylinders as the Company Continues to Target Growth Opportunities*, MORNINGSTAR (Oct. 28, 2020).

1875322

service cannot attract brokers representing sellers or lessors unbless there is a significant number of brokers representing buyers or lessees already utilizing the service.  Conversely, a new entrant providing an internet CRE listing, information, or auction service cannot attract brokers representing buyers or lessees if there is not a significant number of brokers representing sellers or lessors already utilizing the service.

170.    As the FTC has recognized, "[s]ignificant network effects characterize the market for CRE listings databases and create a substantial barrier to new entry."[28]

171.    CoStar exploits the network effects in the three relevant product markets by, for example, developing barriers to entry via the imposition of high switching costs for customers.  Due to CoStar's strategy of growing through dozens of acquisitions, many customers have become reliant on CoStar's platforms.  Prior to CoStar's acquisition of LoopNet in 2012, many real estate professionals subscribed to LoopNet's low-cost data and advanced search offerings for property listings.  Many of these users considered LoopNet's service to be a substitute for CoStar's offerings.  However, with CoStar's acquisition of LoopNet and subsequent successful effort to oust Xceligent from the market, CoStar converted most LoopNet and Xceligent customers to CoStar's services.  CoStar also regularly posts high customer renewal rates, typically around 90%, and sometimes at or above 95% for clients who have been customers for five years or longer.[29]  These customers are reliant on CoStar's services.  As one commentator stated in September 2018, "[w]ith no true competitive threats, wide-moat commercial real

---

[28] FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In the Matter of CoStar Group, Inc., Lonestar Acquisition Sub, Inc., and LoopNet, Inc.*, File No. 111-0172, at 3, https://www.ftc.gov/sites/default/files/documents/cases/2012/04/120426costaranal.pdf.

[29] CoStar Group, Inc., Annual Report (Form 10-K), at 36 (Feb. 24, 2021); Seeking Alpha, *CoStar Group's (CSGP) CEO Andy Florance on Q4 2020 Results – Earnings Call Transcript* (Feb. 24, 2021), https://seekingalpha.com/article/4408470-costar-groups-csgp-ceo-andy-florance-on-q4-2020-results-earnings-call-transcript (last visited Aug. 5, 2022).

estate data provider CoStar Group is a borderline monopoly."[30] That article explains that CoStar "keeps competitors at bay with a switching cost moat source" because "[i]t's just too risky to switch sources."[31] In addition "[s]trong platform effects found throughout CoStar's product offerings earn the company a network effect moat source, too."[32] As of 2018, that commentator indicated that "we think CoStar's moat is growing stronger, and we award it a positive moat trend."[33]

172.    CoStar's CEO has similarly described CoStar's position in the marketplace as one protected by a "moat." In CoStar's Q4 2018 earnings conference call for investors, held on February 26, 2019, CoStar's CEO, Mr. Florance described CoStar's market position and noted that "we think that -- while we are taking share, and leading the market -- we wanna keep the pressure up, and accelerate the -- keeping share *to widen the moat* and increase the lead."[34] As such, "CoStar benefits from a switching cost moat" that protects its monopoly in the relevant markets.[35]

173.    The barrier to entry posed by high switching costs is exacerbated by CoStar's anticompetitive conduct to lock in brokers and prevent them from working with CoStar's competitors.  CoStar's exclusionary contractual terms, technological measures, and false intellectual property claims frustrate and interfere with brokers' ability to work with competitors.  This conduct increases the costs for brokers to work with competitors like CREXi.  These tactics serve to increase costs to competitors, and to deprive brokers of product choices they value.

---

[30] Michael Wong, *The Best Company You've Never Heard Of*, MORNINGSTAR (Sept. 13, 2018).

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Costar Group Inc (CSGP) Q4 2018 Earnings Conference Call Transcript*, THE MOTLEY FOOL (Feb. 27, 2019), *available at* https://www.fool.com/earnings/call-transcripts/2019/02/27/costar-group-inc-csgp-q4-2018-earnings-conference.aspx (last visited Aug. 5, 2022).

[35] Hafuda, *Costar Group Firing on All Cylinders as the Company Continues to Target Growth Opportunities*, MORNINGSTAR (Oct. 28, 2020).

174.    CoStar's predatory contractual terms, punitive cancellation policies, and supra-competitive pricing present another barrier to entry.  CoStar locks users into contracts, auto-renews those contracts, and requires lengthy notice periods to prevent the auto-renewal.  Many CoStar customers are surprised when they are unable to cancel their contracts.  Numerous CoStar customers have complained about these practices on public websites and message boards.  And many brokers have informed CREXi that CoStar's predatory contractual terms and supra-competitive pricing fortify the barriers to working with CREXi.

175.    Finally, CoStar's anticompetitive conduct of falsely claiming intellectual property ownership over broker-owned and broker-supplied information and photographs creates yet another barrier to entry.  As discussed above, CoStar repeatedly places its digital name or logo (which CoStar claims is a "watermark") on photographs uploaded to the CoStar and LoopNet websites by brokers—photographs over which CoStar has no legal copyright ownership interest.  CoStar places that same watermark on other photographs that it does own, falsely claiming that the generic logo is CoStar's copyright management information.  As a result, the presence of CoStar's watermark on a photograph does not provide reliable information regarding whether CoStar actually holds a valid copyright on the photograph.  CoStar also frequently asserts false claims of copyright ownership over broker-supplied photographs, even where CoStar's watermark does not appear on the image.  Thus, when a broker provides or directs a CoStar competitor to a broker's listing, the competitor does not know whether CoStar holds a valid copyright on the image.  The effect of CoStar's anticompetitive practice is to create confusion in the marketplace regarding legitimate ownership of real estate photographs, deterring brokers and CoStar competitors from sharing CRE photographs, even when CoStar holds no ownership over them.

176.    CoStar's history of aggressive, anticompetitive litigation—threatening and pursuing legal action against customers and competitors alike—exacerbates this

53

barrier to entry.  Broker 19 declined to even speak about his experiences using CoStar's services, because the broker was fearful that CoStar is "too powerful of an organization."  Based on CoStar's litigation history, rival firms, potential market entrants, and customers all must anticipate being sued by CoStar, even if CoStar's claims of copyright ownership are invalid.  The resulting anticipated litigation costs create a barrier to entry for potential entrants and a barrier to expansion for existing firms.

177.   CoStar's dominant market position and the moat it creates for market entrants prevents competitors from increasing their output in the short run.  Specifically, CoStar's dominant market position and barriers to entry—some intrinsic to the CRE industries at issue and others caused or exacerbated by CoStar's anticompetitive conduct (including the steps they take to lock customers into contracts and to prevent brokers from sharing their own information with competitors)—rob market entrants of the capacity to increase the number of brokers and listings on their platform in the short run.

178.   Given these barriers to entry and expansion, competition on the merits in the relevant markets is critical to benefit consumers.  If CoStar's anticompetitive conduct is not stopped, the anticompetitive harm in the relevant markets will be long-term and likely irreversible.

## VI.   CoStar Monopolizes the Relevant Markets

### A.   CoStar stifles competition through anticompetitive acquisitions and by driving competitors out of business.

179.   Although CoStar claims to "spend considerable time and effort" to build its online database of CRE information,[36] in reality, CoStar's market dominance is attributable to its aggressive acquisition strategy and anticompetitive tactics to drive competitors out of the relevant markets.  As it admits in its securities filings, CoStar has spent the last three decades "expanding [its] markets and

---

[36] CoStar Group, Inc.'s First Amended Complaint (FAC), Dkt. 33, ¶ 50.

services partially through acquisitions of complementary businesses."[37]  Indeed, since its founding in 1987, CoStar has spent billions of dollars to acquire more than 30 companies.

180.   CoStar first implemented its inorganic growth-by-acquisition strategy soon after its founding, when it began buying up local and regional competitors in the CRE information business to "expand[] the geographical coverage of [its] existing information and marketing services."[38]  With each acquisition, CoStar eliminated a local or regional competitor and added another CRE database to its own.  CoStar's buying spree for competing CRE data providers gained steam in the 2000s.  By 2011, CoStar touted that it "ha[d] successfully integrated over a dozen acquisitions," allowing CoStar to expand its market share in the internet CRE information services market and to push into the rental listings business.[39]  And CoStar's growth-by-acquisition strategy continued throughout the 2010s and through the present, with massive acquisitions of leading competitors, including CoStar's 2012 acquisition of LoopNet (in the internet CRE listing services market) and 2020 acquisition of Ten-X (in the internet CRE auction services market).  A chart of exemplary CoStar's acquisitions is attached hereto as **Exhibit D**.

181.   After more than three decades of inorganic growth through aggressive acquisitions, CoStar's market share in the relevant markets has skyrocketed, while its competition has been virtually eliminated.  CoStar's relentless acquisition strategy has cleared the field of competition across multiple product and geographic markets, enabling CoStar to engage in the anticompetitive, monopolistic behavior described herein.

---

[37] CoStar Group, Inc., Annual Report (Form 10-K), at 36 (Feb. 28, 2019).

[38] CoStar Group, Inc., Annual Report (Form 10-K), at 27 (Feb. 24, 2011).

[39] Press Release, CoStar Group, Inc., CoStar Group to Acquire LoopNet (Apr. 26, 2011), https://www.costargroup.com/costar-news/details/costar-group-to-acquire-loopnet (last visited Aug. 5, 2022).

**B.     The FTC sued CoStar to block its anticompetitive acquisition of LoopNet and required CoStar to divest Xceligent.**

182.    CoStar is no stranger to scrutiny by the FTC.  ████████████ ███████████████████████████████████████████████  CoStar's unfair and anticompetitive conduct has caused the FTC to scrutinize CoStar's behavior on numerous prior occasions.

183.    CoStar's tactics are perhaps best exemplified by its acquisition of LoopNet and subsequent successful efforts to drive former CoStar competitor Xceligent out of business.  Before CoStar acquired LoopNet, the two companies were competitors.  In fact, LoopNet was CoStar's last significant competitor in the mid-to-late 2000s.

184.    Beginning in 2005, CoStar and LoopNet engaged in a series of legal battles against one another in courts across the country.[40]  These court battles took their toll on LoopNet.  Teetering on the edge of bankruptcy, the LoopNet Board finally relented and agreed to sell the company to CoStar for $860 million.

185.    The FTC intervened to block CoStar's proposed acquisition of LoopNet because it was anticompetitive and violated antitrust laws.  *See* Compl., *In the Matter of Costar Grp., Inc., et al.*, No. 111-0172, 2012 WL 1561034, at *2 (F.T.C. Apr. 26, 2012). The FTC alleged that CoStar's proposed acquisition of LoopNet would reduce competition in the markets for commercial real estate listings and information services and that CoStar and LoopNet were the only two providers with nationwide coverage.  The FTC further alleged that Xceligent (then owned by LoopNet) was the "most similar competitor for information services"[41] to

---

[40] *See Costar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004); *Loopnet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, No. 05-cv-1220 (N.D. Cal. Mar. 24, 2005); *CoStar Group, Inc. v. LoopNet Inc.*, No. 08-CV-01156 (S.D.N.Y. Feb. 5, 2008); *LoopNet Inc. v. CoStar Group, Inc., CoStar Realty Information, Inc.*, BC380863 (Los Angeles Super. Ct. Nov. 15, 2007).

[41] Press Release, Federal Trade Commission, FTC Places Conditions on CoStar's $860 Million Acquisition of LoopNet (Apr. 26, 2012), https://www.ftc.gov/news-events/press-releases/2012/04/ftc-places-conditions-costars-860-million-acquisition-loopnet.

CoStar and, therefore, the combination would eliminate the "direct, and substantial competition between CoStar and LoopNet and between CoStar and Xceligent," *id.* at \*3. The FTC found that the proposed CoStar/LoopNet merger would "increas[e] the likelihood that CoStar w[ould] exercise market power unilaterally." *Id.*

186.   To resolve the complaint, CoStar agreed to a consent order that placed a number of restrictions on its proposed acquisition, including the divestiture of Xceligent. The consent order required that the combined CoStar-LoopNet company take several steps to ensure that Xceligent was able to compete and expand aggressively in the United States market for CRE databases and information services. Specifically, the consent order imposed "certain conduct requirements to assure the continued viability of Xceligent as a competitor to the merged firm and to reduce barriers to competitive entry and expansion."[42] These additional provisions "w[ould] facilitate Xceligent's geographic expansion and prevent foreclosure of [the parties'] established customer base."[43]

187.   To achieve that goal, the consent order provided that CoStar could not, for five years, "prohibit[] or restrict[] a Customer from providing any CoStar Competitor . . . CRE Listings or CRE Information that . . . was obtained or derived by the Customer from a source other than a CoStar Database." FTC Decision and Order at § III.A, *In the Matter of CoStar Grp., Inc., et al.*, 2012 WL 3862130, at \*14. In addition, CoStar was barred, for five years, from "[d]irectly or indirectly prohibit[ing] a Customer from subscribing to any service provided by, or purchasing access to any database containing CRE Listings or CRE Information from, a CoStar Competitor." *Id.* CoStar was further barred, for five years, from prohibiting a customer from endorsing any competitor. *Id.* at \*15.

---

[42] FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In the Matter of CoStar Group, Inc., Lonestar Acquisition Sub, Inc., and LoopNet, Inc.*, File No. 111-0172, at 1, http://www.ftc.gov/sites/default/files/documents/cases/2012/04/120426costaranal.pdf.
[43] *Id.*

1875322

188.   The FTC also prohibited CoStar from bundling, or tying, its products together in ways that could impede its competitors, except under certain limited circumstances.  *Id.* at *17, *31.  The agency therefore barred CoStar, for five years, from requiring customers to buy any of its products as a condition for receiving other products, and also from requiring customers to subscribe to multiple geographic coverage areas to gain access to a single area in which they are interested.  *Id.* at *17.  Moreover, CoStar was required to offer customers certain core products on a stand-alone basis for three years after the acquisition.  *Id.* at *40

189.   The FTC also placed restrictions on CoStar's ability to terminate its contracts with customers at will.  For example, CoStar was prohibited from retaliating against customers for doing business with, or providing CRE data to, CoStar's competitors, including Xceligent.  *Id.* at *18.  CoStar, moreover, was required to allow customers to terminate their existing contracts—without penalty, with one year's notice—in order to prevent long-term CoStar subscription commitments from hindering competition.  *Id.* at *15, *31.

190.   The FTC required CoStar to divest LoopNet's interest in Xceligent. *Id.* at *10 (§ II.A).  The consent order explained that "[t]he purpose of the divestiture" was "to preserve Xceligent as an independent, viable, and effective competitor in the relevant markets . . . , to facilitate Xceligent's expansion of its product line and its geographic coverage, and to remedy the lessening of competition resulting from the Acquisition . . . ."  *Id.* at *13.

191.   Finally, the FTC appointed an independent monitor to review CoStar's compliance with the consent order and required CoStar to notify the agency in advance before acquiring any firm that gathers, markets, or sells CRE information in the United States for 10 years.  *Id.* at *21, *23.

1875322

**C.    CoStar drove Xceligent out of business, leaving CoStar with monopoly power in the relevant markets.**

192.   The FTC's Order was designed to foster Xceligent's expansion, so that it would be a viable market alternative to CoStar.  But CoStar flouted that consent order to achieve the opposite effect.  It sued Xceligent for accessing publicly available listing information from CoStar, seeking to drive Xceligent out of business and remove yet another major competitor from the marketplace.

193.   As CoStar now brags in its complaint, its lawsuit resulted in Xceligent's demise.  *See* FAC ¶¶ 15, 183.  Although CoStar suggests that it caught Xceligent stealing its copyrighted photos red-handed, that case never made it beyond the pleading stage and CoStar obtained a judgment only because it forced Xceligent into insolvency.

194.   Critically, by forcing Xceligent into bankruptcy, CoStar was able to avoid facing Xceligent's antitrust claims.  As a condition of CoStar's settlement with the Xceligent bankruptcy trustee, Xceligent agreed to dismiss its antitrust counterclaims against CoStar.  Those counterclaims included claims against CoStar for monopolization and attempted monopolization of the CRE information services market and CRE listings database market and use of exclusionary contracts, in violation of the Sherman Act, 15 U.S.C. §§ 1, 2.

195.   The devastating market impact of CoStar's fatal attack on Xceligent was swift and solidified CoStar's monopoly in the relevant markets.

196.   As one industry analyst reported in October 2020, CoStar is a "borderline monopoly" that "has no true threats in terms of competition."  CoStar's monopoly position "was amplified following Xceligent's declaration of bankruptcy in December 2017.  Following this development, the only remaining companies in the space are all small startups focused on crowdsourcing data.  In a survey of

1875322

commercial real estate professionals in 2018, 98% stated that they rely on either CoStar or LoopNet for commercial real estate data."[44]

197.   After driving Xceligent out of business, Costar predictably responded like the monopolist that it is:  it significantly raised its prices.  Just seven months after Xceligent filed for bankruptcy, CoStar raised the average monthly price it charged new customers from $255 to $466—a whopping 80% price increase.[45]

198.   Thus, despite the FTC's conclusion that Xceligent's existence and expansion was necessary to foster competition, CoStar's successfully drove Xceligent out of the market through its litigation tactics and solidified its own anticompetitive monopoly position—precisely the outcome the FTC sought to avoid.

**D.   The FTC sued CoStar again to block its proposed anticompetitive acquisition of RentPath.**

199.   CoStar's series of anticompetitive acquisitions continues today, and the FTC rightly remains concerned about CoStar's monopoly power.  In November 2020, the FTC stepped in once again to block another proposed anticompetitive merger by CoStar.

200.   CoStar and RentPath, which operates Rent.com and ForRent.com, are competitors for apartment internet listing services ("ILSs").  *See* Compl., *In the Matter of Costar Group., Inc., et al.*, No. 201-0061, Dkt. No. 9398, ¶ 2 (F.T.C. Nov. 30, 2020).[46]  Specifically, the two companies compete to provide residential rental ILSs, defined by as "two-sided platforms that bring together (i) purchasers of

---

[44] Hafuda, *CoStar Group Firing on All Cylinders as the Company Continues to Target Growth Opportunities*, MORNINGSTAR (Oct. 28, 2020).

[45] *See id.*; *see also* Konrad Putzier, David Jeans, Christian Bautista, and Nancy C. Carvajal, THEREALDEAL, *Search and destroy: How CoStar became a $15B juggernaut* (Sep. 1, 2018), https://fortisinvestmentgroup.com/2018/09/search-and-destroy-how-costar-became-a-15b-juggernaut/.

[46] Redacted Public Version *available at* https://www.ftc.gov/system/files/documents/cases/d09398complaintpublic.pdf.

1875322

ILS advertising" (property management companies and rental properties), and "(ii) consumers of ILS search services (i.e., prospective renters)". *Id.* ¶ 19.

201. According to the FTC, "[f]or years, CoStar and RentPath have competed fiercely with one another to sell ILS advertising to PMCs in metropolitan areas across the United States." *Id.* ¶ 9. "For example, CoStar's internal documents reflect that in 2019, CoStar launched a sales campaign to '[c]ompet[e] directly and powerfully with RentPath for the business of our duplicative clients and those unique properties using RentPath but not Apartments.com.'" *Id.* "In preparing its sales staff for this campaign, CoStar informed them that RentPath itself had 'severely cut [its] prices in an effort to compete.'" *Id.*

202. On February 12, 2020, CoStar announced its intent to acquire RentPath for $587.5 million. *Id.* ¶ 18.

203. On November 30, 2020, the FTC filed an administrative complaint to block the acquisition and charge CoStar with violating antitrust laws, on the grounds that the proposed merger would be anticompetitive. *Id.* ¶ 1. The FTC also filed a lawsuit in federal court in the District of Columbia to block the merger, and the parties agreed to a temporary restraining order forestalling the planned merger.

204. The FTC defined the relevant product market as ILS advertising for large apartment complexes. *Id.* ¶¶ 19, 20–30. The FTC defined the relevant geographic markets as individual metropolitan areas within the United States—the same relevant geographic markets defined here. *Id.* ¶¶ 19, 31–39.

205. The FTC alleged that CoStar's proposed acquisition of RentPath "w[ould] eliminate price and quality competition that benefits renters and property managers today, resulting in higher prices for the internet listing services relied upon by managers of large apartment buildings." *Id.* ¶ 1. RentPath "summarized the effect of this transaction in simple terms: 'Prices WILL NOT stay the same, it will almost be a monopoly.'" *Id.* ¶ 1.

61

206.   On December 29, 2020, RentPath announced that it had terminated the CoStar acquisition agreement following the FTC's decision to sue to block the merger.[47]

207.   While the FTC was able to block this anticompetitive merger, CoStar proceeded to acquire Homes.com, a residential property listing and marketing platform.  That deal closed in May 2021, with CoStar having paid $156 million in cash.[48]

**E.   CoStar holds monopoly power in the relevant markets.**

208.   There is substantial direct evidence of CoStar's monopoly power in the relevant markets.

209.   Industry participants—including CoStar itself—have recognized CoStar's dominance in the relevant markets.

210.   Indeed, CoStar boasts that "nearly 90% of all CRE activity occurs on a CoStar Network."[49]

---

[47] Press Release, RentPath Holdings, Inc., *RentPath terminates agreement to be acquired by CoStar Group* (Dec. 29, 2020), https://www.prnewswire.com/news-releases/rentpath-terminates-agreement-to-be-acquired-by-costar-group-301199185.html.

[48] *CoStar Group Closes Acquisition of Homes.com*, BUSINESS WIRE (May 24, 2021), https://www.businesswire.com/news/home/20210524005501/en/CoStar-Group-Closes-Acquisition-of-Homes.com.

[49] CoStar Realty Information, Inc., *About CoStar Group,* https://www.costargroup.com/docs/librariesprovider3/media-kit/csg-057-16_aboutcostar.pdf (last visited Aug. 5, 2022).

1875322

211.   CoStar claims that it receives a dominant share of website visitors in the internet CRE listing services market:



212.   Based on the above pie chart, CoStar claims that it is "driving 18X more activity than [its] nearest competitor."



213.   Customers in the relevant markets characterize CoStar as a monopolist and have described the ways in which CoStar exercises its monopoly power.  In particular, brokers have consistently complained about CoStar's supracompetitive prices, but noted that they are forced to continue purchasing services from CoStar because of its monopoly share and anticompetitive conduct.  The following are representative statements from CoStar customers:

i)     "No idea how loopnet / costar gets away with what they do as an extremely litigious attempt at a monopoly that feels more like extortion than a service every time you pay them."

ii)     "We only have so many dollars to spend and costar/loopnet eats up a large part of that.  Like everyone else we would like to see a good alternative to costar but at this point I don't think we are prepared to cut the cord."

iii)     "It's honestly pretty ridiculous no website can really compete with LoopNet and they rip everyone off. Crexi is trying but they have a long way to go."

iv)     "We have ZERO marketing budget left right now and Costar/Loopnet nearly breaks us with their fees, but I obviously cannot pull that back for the time being."

v)     "Too bad CoStar is nearly impossible to compete with...could really use some (accurate) competition in the CRE data space."

vi)     "We already pay a fortune for Costar."

vii)     "Costar is Satan."

214.   Customers have been forced to pay increasingly inflated prices as CoStar acquires and drives competitors out of the relevant markets.

215.   After its acquisition of LoopNet, CoStar drastically raised its prices for both its information services and the listing services previously offered by LoopNet.  Following the CoStar/LoopNet merger, one CoStar customer reported a price increase of a whopping 300% to 500%:

> Now that Loopnet has decided to gouge brokers and has drastically raised their prices (by 300% ~ 500% depending on the level of functionality you are using. In my case the expense is going from $200/month to approximately $1132/month).... The Commercial Broker community is up in arms about this latest bit of price gouging by the CoStar/Loopnet group and in my own county the commercial board has held multiple meetings on the topic.

216.   In the face of these extreme price increases, customers looked to Xceligent as a potential alternative to CoStar.  As one broker explained, "I am

64

going to reduce my exposure on Loopnet by half and abandon the Loopnet Premium search features; this way my monthly Loopnet costs only rise from my current rate by 75%. Then I am going to use Xceligent [*sic*] for their search tools and monitor how well their listing tools come online."

217. As discussed above, despite the FTC's efforts to protect Xceligent as a viable competitor, CoStar attacked Xceligent and drove it into bankruptcy. CoStar then again raised its average prices by another 80%, further demonstrating CoStar's ability to raise prices above those that would be charged in a competitive market.[50]

218. As one commercial broker was recently quoted, "CoStar is the only organization that I deal with that is widely hated by its customers…. You don't talk to them. They will sell your data to you, and every time they acquire a competitor, they raise their prices."[51]

219. The conclusion by both industry participants and brokers that CoStar possesses monopoly power is supported by an examination of CoStar's share of the relevant markets.

220. On information and belief, CoStar's current share of the internet CRE listing services market is over 90%.

221. On information and belief, CoStar's current share of the internet CRE information services market is over 90%.

222. On information and belief, CoStar's current share of the internet CRE auction services market is 95%.

223. **Exhibit B** shows CoStar's 2021 estimated market shares for internet CRE listings in the metropolitan areas as defined in Section V.D, *supra*. These

---

[50] Hafuda, *CoStar Group Firing on All Cylinders as the Company Continues to Target Growth Opportunities*, MORNINGSTAR (Oct. 28, 2020); Putzier, *Search and destroy: How CoStar became a $15B juggernaut*, THEREALDEAL (Sep. 1, 2018); *CoStar Group Inc (CSGP) Q2 2018 Earnings Conference Call Transcript*, THE MOTLEY FOOL (July 24, 2018), *available at* https://www.fool.com/earnings/call-transcripts/2018/07/26/costar-group-csgp-q2-2018-earnings-conference-call.aspx (last visited Aug. 5, 2022).

[51] Banister, *CoStar To Look at New Sectors For Next Acquisitions After Failed Deals, FTC Scrutiny,* BISNOW (Mar. 16, 2021).

market share figures were calculated by estimating the dollar value of for-sale listings on CoStar's listings platform in relation to the total value of closed CRE sales transactions in each MSA. Under these calculations, in 12 of the metropolitan areas, CoStar's market share equals or exceeds 90%. In 31 of the metropolitan areas, CoStar's market share equals or exceeds 80%. In 38 of the metropolitan areas, CoStar's market share equals or exceeds 70%. In 46 of the metropolitan areas, CoStar's market share equals or exceeds 60%. And CoStar's market share exceeds 57% in all 50 listed metropolitan areas. Moreover, because CoStar's share of the nationwide internet CRE information services is over 90%, it is reasonable to infer that CoStar's market shares are dominant in individual metropolitan areas. A high aggregate market share implies high market shares in most disaggregated areas.

224.   Internet CRE information services and CRE listing services are complementary products. CRE listings are a critical input for information services, which include sales and leasing information, detailed market reports, and other analytics regarding CRE in a given market. The demand for these products is linked; a failure to obtain a critical mass of CRE listings stymies a company's ability to furnish robust information services. Individual market data regarding the revenues of information services providers are not publicly available. But market-level monopoly power in CRE listing services translates to market-level monopoly power in CRE information services, given the complementary nature of the two products. Complete market share data for individual metropolitan areas in the internet CRE information services markets can be ascertained in the course of discovery.

225.   Similarly, the internet CRE auction services and CRE listing services are complementary products. Both products facilitate CRE sales transactions, although the desired speed of the transaction differs between the two products. The demand for these products is linked; a company with more CRE listings is likely to

66

be viewed as more desirable to customers of CRE auction services. Individual market data regarding the revenues of auction services providers are not publicly available. But market-level monopoly power in CRE listing services translates to market-level monopoly power in CRE auction services, given the complementary nature of the two products. Complete market share data for individual metropolitan areas in the internet CRE auction services markets can be ascertained in the course of discovery.

226. As discussed in Section V.E, *supra*, there are substantial barriers to entry in the relevant markets. Further, competitors cannot increase output in the short run to bring CoStar's prices down. There are two reasons for this. First, CoStar imposes prices much higher than those of its competitors for years, and has not been forced to reduce them. If it were possible for competitors to put downward pressure on prices, it would have happened by now. Second, the conduct described above is purposefully designed to reduce competitor output and to minimize rivals' ability to reduce prices in the market. This is so even when competitors, such as CREXi, have product features comparable or superior to those of CoStar.

227. In sum, CoStar has attempted to acquire and maintain monopoly power in the relevant markets—and has succeeded. As a consequence, CoStar has been able to profitably increase and maintain prices substantially above competitive levels.

## VII.   CoStar Has No Procompetitive Justification for its Anticompetitive Conduct

228. CoStar has no valid procompetitive justification for its anticompetitive conduct. Its sole purpose is the suppression of competition, and its exclusionary conduct offers no procompetitive benefit in the relevant markets.

229. ***First***, there is no procompetitive justification for CoStar's exclusionary conduct to prevent customers from sharing their own listings (whose contents are not proprietary to CoStar) to publicize their CRE properties. CoStar's actions to

67

block CREXi from accessing public listings hosted by LoopLink on **brokers' websites**, unbeknownst to the brokers themselves, is nakedly anticompetitive. There is no procompetitive justification for CoStar's interference with competitors' business relationships with brokers by blocking competitors from accessing public listing information on a brokers' website, or from accessing that same information from public portions of CoStar's websites.

230.   Any claimed procompetitive justification proffered by CoStar for its behavior would be pretextual and refuted by CoStar's previous internal policy that publicly available listings should be openly accessible to competitors.

231.   Before CoStar acquired LoopNet, CoStar had a formal written policy permitting its employees to access and use CRE information publicly available on LoopNet and LoopLink-hosted websites for competitive purposes.  CoStar likewise had a policy that permitted LoopNet to access the public areas of CoStar's websites. When LoopNet sought to block CoStar from accessing publicly available listings, CoStar fought in court to protect its ability to access CRE information on LoopNet to compete effectively.  Now that CoStar owns LoopNet, CoStar has reversed its policy of open access and blocks competitors from accessing public information in which it has no independent legal right in order to create proprietary control over information it does not own.

232.   The sole purpose for CoStar's change in position is to substantially foreclose competition in the relevant markets.

233.   CoStar does not own the vast majority of the public CRE information available on its websites.  Most of the CRE information on CoStar's websites is public data provided by CoStar's customers, such as brokers, who pay CoStar to store and display it to the public.  It is these customers, not CoStar, who are making the investment in creating this data.

234.   **Second**, there is no procompetitive justification for CoStar's conduct to falsely imply or assert intellectual property ownership over CRE information and photographs CoStar does not own.

235.   There is no legitimate justification for CoStar to superimpose its logo—which CoStar falsely claims is its "copyright management information"—onto photographs it does not own.  Copyright and other intellectual property laws grant intellectual property holders with a *limited* monopoly extending only to the covered property and only for a defined period of time.  The law prohibits CoStar from seeking to extend a copyright monopoly to other products or works.  Here, CoStar's conduct is even more pernicious and anticompetitive.  By affixing its logo to images supplied by brokers or other third parties, and then incorrectly claiming that the logo is "copyright management information," CoStar falsely implies copyright ownership over images it never owned.

236.   Even in instances when it does not modify CRE listing contents, CoStar still brashly asserts false copyright claims over photographs it does not own to force the removal of such photos from CREXi's platform.  While many brokers have come forward with evidence to prove that they—not CoStar—own these photographs, CoStar's baseless assertions nonetheless disrupt CREXi's relationships with brokers and foster market uncertainty about the ownership and permitted use of images contained in brokers' listings.

237.   CoStar's only purpose in its widespread false claims of intellectual property ownership is to restrain customers from using competitors' products and services, to prevent competitors from using brokers' CRE information and photographs to compete with CoStar, and to sow confusion in the marketplace regarding the legitimate ownership of property photographs.

238.   **Third**, there is no procompetitive justification for CoStar's infringement of CREXi's trademarked name to advertise CoStar's own products and services in the relevant markets.  The only purpose of CoStar's use of the

CREXI® mark is to unfairly compete with CREXi by misrepresenting CoStar's products as affiliated with CREXi and misleadingly directing customers searching for CREXi's products and services to CoStar's websites.  CoStar's anticompetitive trademark infringement siphons customers away from CREXi's competing products and services and serves only to impede competition in the relevant markets.

## VIII.  CREXi Has Suffered Antitrust Injury

239.   CoStar's anticompetitive conduct has foreclosed innovative competition in the relevant markets, causing substantial harm to competition.

240.   As a direct and proximate cause of CoStar's anticompetitive conduct, CREXi has suffered antitrust injuries of the type the antitrust laws are intended to prevent and that flow from that which makes CoStar's acts unlawful.  The injury to CREXi from CoStar's anticompetitive actions is a direct byproduct of the injury to consumers.

241.   While CoStar's anticompetitive scheme is designed to substantially foreclose all innovative competition in the relevant markets, CoStar has particularly targeted CREXi.  After failing to slow CREXi's momentum in the marketplace through legitimate competition, CoStar specifically targeted CREXi with its scheme of anticompetitive conduct designed to preclude competitors, and CREXi in particular, from making further gains in the relevant markets.  Those gains, if realized, would inevitably result in lower prices, greater output, increased innovation, and increased consumer choice.

242.   CoStar's targeting of CREXi follows CoStar's *modus operandi* of engaging in anticompetitive behavior to push competitors out of the marketplace or weaken them once they achieve a certain size that CoStar deems to be a competitive threat.  It is the same playbook that CoStar ran against LoopNet to weaken LoopNet for CoStar's eventual acquisition.  It is also the same playbook that CoStar later ran against Xceligent, successfully driving Xceligent out of the market entirely.

70

243.   Like all CoStar competitors, CREXi is unable to compete fully and effectively with CoStar's products and services due to CoStar's anticompetitive conduct.  Even though CREXi is a more innovative company with superior products and services, CoStar has been able to maintain its monopolies in the relevant markets and maintain supra-competitive prices by imposing exclusionary contractual terms, claiming intellectual property protection over images and data CoStar does not own, and infringing CREXi's trademarks to advertise CoStar's own products and services.

244.   Although CREXi has grown due to its success, CREXi would present an even greater competitive threat to CoStar's monopolies in the relevant markets if it were permitted to compete on the merits.  Indeed, the harm to CREXi is a proxy for the harm to industry-wide competitors and customers because CREXi is the type of innovative and efficient competitor that, if not improperly hindered by CoStar's anticompetitive scheme, would be able to significantly penetrate the relevant markets.  That market penetration, absent CoStar's conduct, would force CoStar to become more innovative and efficient to the benefit of consumers.  Instead, the opposite is occurring.  Competitors such as CREXi (and Xceligent and LoopNet before it) are being improperly foreclosed or acquired by CoStar, and CoStar is maintaining its market dominance not by virtue of its products and services, but rather through its overall anticompetitive scheme.

245.   CREXi's injury reflects the anticompetitive effects of CoStar's exclusionary conduct.  It is through the exclusion of CREXi and other rivals from effective competition in the relevant markets that CoStar has been able to maintain its monopoly power, resulting in higher prices, reduced output, and slowed innovation.

246.   CoStar's anticompetitive conduct has caused significant damage to CREXi in the form of substantially higher costs to pursue entry into the relevant

71

1875322

markets, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

247.   Through the imposition of its exclusionary contractual terms and technological measures, CoStar has effectively locked customers into exclusive deals with CoStar and prevented them from competing with CoStar or working with CoStar's competitors.  As a result, CoStar has obstructed and continues to obstruct and restrain CREXi's ability to access brokers' listings and other public CRE data for the purpose of building products and services to compete with CoStar in the relevant markets.

248.   CoStar's anticompetitive conduct disrupts the free flow of CRE information throughout the relevant markets and frustrates the efficient distribution of CRE content by brokers to competitors of CoStar in the relevant markets.  As a direct and proximate result of CoStar's anticompetitive behavior, CREXi has incurred, and will continue to incur, substantially higher costs in its efforts to enter and compete with CoStar in the relevant markets.

249.   Likewise, CoStar's anticompetitive practice of claiming intellectual property protection over brokers' photographs and other information that CoStar does not own increases CREXi's costs.  That practice inhibits CREXi's ability to access CRE listings directly from brokers.

250.   CoStar's infringement of CREXi's trademarked name to advertise CoStar's own products and services has diminished CREXi's goodwill, caused consumer confusion, and hindered CREXi's ability to realize market share and profits through fair competition.

251.   CoStar's anticompetitive behavior has also slowed CREXi's expansion in the relevant markets.  Building internet CRE listing services, information services, and auction services, as CREXi has done and continues to do, is a time-consuming, costly, and labor-intensive endeavor.  Because CoStar's anticompetitive conduct has the effect of blocking CREXi's access to brokers' own CRE

72

1875322

information and photographs, CREXi has been forced to spend additional time, resources, and money to build its products and services, substantially slowing CREXi's expansion.

252.   As a direct and proximate result of CoStar's anticompetitive conduct, CREXi has experienced lost revenue and lost profits from unrealized market share that CREXi otherwise would have acquired in the relevant markets, from potential customers electing not to switch from CoStar's services to CREXi's services or from using CREXi's services in addition to CoStar's, and from existing customers electing to terminate their relationships with CREXi.

253.   Finally, CoStar's anticompetitive conduct has caused and will continue to cause substantial harm to competition in the internet CRE listing services, information services, and auction services markets.  CoStar's exclusionary behavior has already led to substantial consolidation in the relevant markets, the elimination of competitors, and further entrenched CoStar's monopoly power.  But for CoStar's anticompetitive behavior, CREXi's entry and growth would have fostered much-needed competition to these relevant markets, paving the way for future competitors, increased market efficiency, greater transparency, innovation, increased consumer choice, and lower costs for brokers and other customers who are paying supra-competitive prices for CoStar's products and services.

## IX.   CoStar Interferes with CREXi's Contracts and Business Prospects.

254.   In addition to CoStar's antitrust violations and trademark infringement, CoStar has tortiously interfered with CREXi's contracts and prospective economic advantage.

255.   CREXi maintains business relationships with its customers by offering both free and paid services to brokers, buyers, and tenants to view, lease, rent, and list CRE on CREXi's marketplace.  Customers that pay for access to CREXi's platform—known as "Pro" customers—also get access to a suite of tools and services, including an option for a client's listing to rank higher in searches, the

73

1   ability to download lead reports for properties, access to CREXi's Intelligence

2   service for detailed CRE information, dedicated support from customer success

3   managers, in-depth reporting and analytics, and access to lead contact information.

4   256.   CoStar's conduct impedes, disrupts, and otherwise hampers CREXi's

5   ability to provide services to its clients.

6   257.   **First,** CoStar's use of LoopLink as a surreptitious method to lock

7   brokers into using LoopNet, and its deployment of blocking technology to prevent

8   brokers from working with CREXi, as described in Section IV.B, *supra*, impedes

9   CREXi's ability to populate, maintain, or develop CRE listings at the behest of its

10   customers and prospective customers.  CREXi has over 500 existing customers who

11   use CoStar's LoopLink tool and whose CRE listings CoStar has blocked CREXi

12   from accessing on those brokers' own websites.  CREXi also has many more

13   customers who have directed CREXi to access their listings on LoopNet, but whose

14   listings CREXi is unable to access due to CoStar's technological blocks.  CoStar

15   has interfered with CREXi's ability to work with countless other prospective

16   customers through the same means.

17   258.   CoStar's CEO, Mr. Florance, has admitted that blocking competitors

18   from accessing CRE listings on brokers' own websites constitutes unlawful

19   intentional interference with contractual or prospective business relationships.

20   Before CoStar acquired LoopNet, LoopNet blocked CoStar's access to LoopNet

21   and LoopLink-hosted websites.  As Mr. Florance explained at that time,

22   "LoopNet's conduct of blocking CoStar's access to its website and/or broker

23   websites supported by LoopNet's LoopLink technology has interfered with the

24   performance of CoStar's customers under their license agreements" and "makes it

25   less likely that other prospective customers will enter into economic relationships

26   with CoStar."[52]  CoStar claimed that LoopNet's efforts to block CoStar from public

27
28   [52] Mar. 10, 2009 Florance Decl. ¶¶ 6–7, *Loopnet Inc. v. CoStar Group, Inc.*, BC380863 (Los Angeles Super. Mar. 10, 2009); *see also* Ex. G, Florance Decl. at ¶ 30, *Loopnet Inc. v. CoStar Group, Inc.*, BC380863 (Los Angeles Super. Ct, Apr. 7, 2009).

74

listing information damaged CoStar's relationships with "every [CoStar] customer," and constituted irreparable harm.[53]

259.   The same is true now.  CoStar's intentional and deliberate efforts to block CREXi from brokers' websites hosted by LoopLink has, in Mr. Florance's own words, "interfered with the performance of [CREXi's] customers" under their contracts with CREXi, "makes it less likely that other prospective customers will enter into economic relationships with [CREXi]," and has damaged CREXi's relationships with "every [CREXi] customer."[54]

260.   **Second**, CoStar's false claims of copyright ownership over photographs and other CRE listing information has led to multiple interruptions of service for CREXi's customers.  In July 2022 alone, over 50 CREXi customers e-mailed CREXi to dispute CoStar's copyright claims, after CREXi notified them that CREXi had removed the brokers' OMs due to CoStar's copyright claims.  Many of these brokers provided CREXi with evidence that they owned the image at issue and asked that the listings be reinstated.  These interruptions in CREXi's contracted-for services, predicated on false claims of copyright by CoStar, damage CREXi's business relationships, impede the operation of CREXi's CRE marketplace, and hinder CREXi's clients' access to CRE listings.

261.   **Third,** CoStar's anticompetitive conduct and use of exclusionary contracts has interfered with CREXi's prospective business relationships.  CREXi has signed multiple clients to its platform, only to have those users balk at continuing to use or investing in CREXi's services because of CoStar's oppressive contracts, extreme pricing, and restrictive policies.

   i)   For example, CREXi initiated a relationship with Broker 65 operating throughout North America, with the expectation that Broker 65 would list CRE properties on CREXi's website.  Broker 65, however, balked at maintaining

---

[53] June 8, 2009 Florance Depo. Tr. at 69:5–15, 89:14–17.
[54] *See* Mar. 10, 2009 Florance Decl. ¶ 6, *Loopnet Inc. v. CoStar Group, Inc.*, BC380863 (Los Angeles Super. Mar. 10, 2009)

its relationship with CREXi due to concerns regarding "CoStar's photo restrictions." That broker ceased doing business with CREXi.

ii)    Similarly, Broker 66 declined to work with CREXi due to CoStar and LoopNet's restrictive contracts, which Broker 66 understood to preclude it from cross-listing CRE properties on both CREXi's and CoStar's platforms.

iii)    Likewise, CREXi attempted to establish a client relationship with a Broker 64, who expressed considerable interest in CREXi's products and platform. Unfortunately, however, that client's inability to cancel his contract with CoStar, and the attendant expenses, precluded him from signing with CREXi. Broker 64 declined to do business with CREXi.

262.  CoStar is aware that its conduct has impeded CREXi's ability to offer its services and satisfy its agreements with its clients. CoStar is readily familiar with the processes, services, and tools for listing CRE properties in the United States. And CoStar is directly in contact with CREXi's clients, who CoStar knows may attempt to cross-list on both parties' platforms. CoStar also monitors CREXi's website and listings and, therefore, is aware of CREXi's customers.

263.  Additionally, CREXi's customers have directly informed CoStar that CoStar's fraudulent copyright claims have disrupted CREXi's services. Indeed, CoStar has received so many complaints regarding its false assertions of ownership over CRE images that it has developed a form response and dedicated phone line to deal with those complaints. However, CoStar's form response is designed to sow further confusion as to the legitimate ownership of CRE images. CoStar refuses to tell brokers in concrete terms whether CoStar claims ownership over any specific image at issue, while leveling spurious accusations against CREXi to further harm CREXi's standing with brokers.

264.  CoStar's false claims of copyright ownership, efforts to block CREXi's access to its customers' and prospective customers' websites, and other

exclusionary conduct are for anticompetitive and disruptive purposes.  By engaging
in this conduct, CoStar impedes the functionality of CREXi's listings marketplace,
interferes with CREXi's relationships, restricts the output of CRE listings, and
seeks to drive CREXi out of the market.  CoStar's conduct has caused CREXi to
lose both current and prospective clients, damaging it reputationally and financially.

## FIRST CLAIM FOR RELIEF

### (Unlawful Monopolization of the Internet CRE Listing Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)

265.   CREXi incorporates by reference all previous paragraphs as though
fully set forth herein.

266.   CoStar's conduct, individually or taken as a whole, constitutes the
intentional and unlawful maintenance of monopoly power in the internet CRE
listing services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

267.   The internet CRE listing services market constitutes a relevant product
market.  A metropolitan area is the relevant geographic market for the product
market, including the 50 metropolitan areas identified in **Exhibit B.**

268.   CoStar holds monopoly power in the internet CRE listing services
market.

269.   Barriers to entry and barriers to expansion by existing firms are high in
the internet CRE listing services market.

270.   CoStar unlawfully maintains its monopoly power in the internet CRE
listing services market through the anticompetitive acts described herein, whose
goals and effects are to inhibit competitors of CoStar from working with brokers.
Examples of CoStar's anticompetitive conduct are:

i)      Leveraging LoopLink to force customer use of LoopNet and
surreptitiously blocking competitors' access to brokers' own listings on brokers'
own websites, to prevent brokers from working with competitors;

ii)    Imposing exclusionary contractual restrictions to prevent brokers from using competitors' services; and

iii)    Falsely claiming intellectual property ownership over customers' CRE information and photographs to stifle competition.

271.   CoStar's conduct affects a substantial volume of interstate commerce.

272.   CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competition from the internet CRE listing services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE listing services.

273.   CoStar does not have a legitimate business purpose for its anticompetitive conduct. The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification. CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE listing services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE listings market. The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

274.   Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative internet CRE listing services, and lower prices for such services, including the products offered by CREXi.

275.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust

laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE listing services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

276.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## SECOND CLAIM FOR RELIEF

**(Unlawful Monopolization of the Internet CRE Information Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)**

277.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

278.   CoStar's conduct, individually or taken as a whole, constitutes the intentional and unlawful maintenance of monopoly power in the internet CRE information services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

279.   The internet CRE information services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market, including the 50 metropolitan areas identified in **Exhibit B.**

280.   CoStar holds monopoly power in the internet CRE information services market.

281.   Barriers to entry and barriers to expansion by existing firms are high in the internet CRE information services market.

282.   CoStar unlawfully maintains its monopoly power in the internet CRE information services market through the anticompetitive acts described herein, whose goals and effects are to inhibit competitors of CoStar from working with brokers.  Examples of CoStar's anticompetitive conduct are:

i)     Leveraging LoopLink to force customer use of LoopNet and surreptitiously blocking competitors' access to brokers' own listings on brokers' own websites, to prevent brokers from working with competitors;

ii)     Imposing exclusionary contractual restrictions to prevent brokers from using competitors' services; and

iii)     Falsely claiming intellectual property ownership over customers' CRE information and photographs to stifle competition.

283.    CoStar's conduct affects a substantial volume of interstate commerce.

284.    CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output. Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competition from the internet CRE information services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE information services.

285.    CoStar does not have a legitimate business purpose for its anticompetitive conduct. The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification. CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE information services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE information services market. The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

286.    Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to

1875322

alternative internet CRE information services, and lower prices for such services, including the products offered by CREXi.

287.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE information services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

288.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## THIRD CLAIM FOR RELIEF

### (Unlawful Monopolization of the Internet CRE Auction Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)

289.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

290.   CoStar's conduct, individually or taken as a whole, constitutes the intentional and unlawful maintenance of monopoly power in the internet CRE auction services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

291.   The internet CRE auction services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market, including the 50 metropolitan areas identified in **Exhibit B.**

292.   CoStar holds monopoly power in the internet CRE auction services market.

293.   Barriers to entry and barriers to expansion by existing firms are high in the internet CRE auction services market.

81

294.   CoStar unlawfully maintains its monopoly power in the internet CRE auction services market through the anticompetitive acts described herein, whose goals and effects are to inhibit competitors of CoStar from working with brokers. Examples of CoStar's anticompetitive conduct are:

i)   Leveraging LoopLink to force customer use of LoopNet and surreptitiously blocking competitors' access to brokers' own listings on brokers' own websites, to prevent brokers from working with competitors;

ii)   Imposing exclusionary contractual restrictions to prevent brokers from using competitors' services;

iii)   Falsely claiming intellectual property ownership over customers' CRE information and photographs to stifle competition; and

iv)   Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

295.   CoStar's conduct affects a substantial volume of interstate commerce.

296.   CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competition from the internet CRE auction services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE auction services.

297.   CoStar does not have a legitimate business purpose for its anticompetitive conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE auction services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE auction services market.  The only "benefit" that flows from

CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

298.   Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative internet CRE auction services, and lower prices for such services, including the products offered by CREXi.

299.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE auction services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

300.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## FOURTH CLAIM FOR RELIEF

### (Attempted Monopolization of the Internet CRE Listing Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)

301.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

302.   The internet CRE listing services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market, including the 50 metropolitan areas identified in **Exhibit B.**

303.   CoStar willfully and wrongfully attempted to obtain and maintain monopoly power in the internet CRE listing services market.

1875322

304.   Barriers to entry and barriers to expansion by existing firms are high in the internet CRE listing services market.

305.   CoStar acted with a specific intent to monopolize and to destroy competition in the internet CRE listing services market through the anticompetitive acts described herein, including by:

   i)      Leveraging LoopLink to force customer use of LoopNet and surreptitiously blocking competitors' access to brokers' own listings on brokers' own websites, to prevent brokers from working with competitors;

   ii)     Imposing exclusionary contractual restrictions to prevent brokers from using competitors' services; and

   iii)    Falsely claiming intellectual property ownership over customers' CRE information and photographs to stifle competition.

306.   CoStar's conduct affects a substantial volume of interstate commerce.

307.   CoStar's conduct, individually or taken as a whole, has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competition from the internet CRE listing services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE listing services

308.   CoStar does not have a legitimate business purpose for its anticompetitive conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE listing services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE listing services market.  The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to

84

1875322

further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

309.    Throughout the time CoStar engaged in the exclusionary conduct alleged herein, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the internet CRE listing services market and excluding its competitors.

310.    As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE listing services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

311.    Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## FIFTH CLAIM FOR RELIEF

### (Attempted Monopolization of the Internet CRE Information Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)

312.    CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

313.    The internet CRE information services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market, including the 50 metropolitan areas identified in **Exhibit B.**

314.    CoStar willfully and wrongfully attempted to obtain and maintain monopoly power in the internet CRE information services market.

315.    Barriers to entry and barriers to expansion by existing firms are high in the internet CRE information services market.

85

1875322

316.    CoStar acted with a specific intent to monopolize and to destroy competition in the internet CRE information services market through the anticompetitive acts described herein, including by:

i)    Leveraging LoopLink to force customer use of LoopNet and surreptitiously blocking competitors' access to brokers' own listings on brokers' own websites, to prevent brokers from working with competitors;

ii)    Imposing exclusionary contractual restrictions to prevent brokers from using competitors' services; and

iii)    Falsely claiming intellectual property ownership over customers' CRE information and photographs to stifle competition.

317.    CoStar's conduct affects a substantial volume of interstate commerce.

318.    CoStar's conduct, individually or taken as a whole, has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competition from the internet CRE information services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE information services

319.    CoStar does not have a legitimate business purpose for its anticompetitive conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE information services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE information services market.  The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

1875322

320.   Throughout the time CoStar engaged in the exclusionary conduct alleged herein, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the internet CRE information services market and excluding its competitors.

321.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE information services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

322.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## SIXTH CLAIM FOR RELIEF

### (Attempted Monopolization of the Internet CRE Auction Services Market in Violation of Section 2 of the Sherman Act — 15 U.S.C. § 2)

323.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

324.   The internet CRE auction services market constitutes a relevant product market.  A metropolitan area is the relevant geographic market for the product market, including the 50 metropolitan areas identified in **Exhibit B.**

325.   CoStar willfully and wrongfully attempted to obtain and maintain monopoly power in the internet CRE auction services market.

326.   Barriers to entry and barriers to expansion by existing firms are high in the internet CRE auction services market.

CREXI'S FIRST AMENDED COUNTERCLAIMS
Case No. 2:20-CV-8819 CBM (ASx)

1875322

327.   CoStar acted with a specific intent to monopolize and to destroy competition in the internet CRE auction services market through the anticompetitive acts described herein, including by:

i)   Leveraging LoopLink to force customer use of LoopNet and surreptitiously blocking competitors' access to brokers' own listings on brokers' own websites, to prevent brokers from working with competitors;

ii)   Imposing exclusionary contractual restrictions to prevent brokers from using competitors' services;

iii)   Falsely claiming intellectual property ownership over customers' CRE information and photographs to stifle competition; and

iv)   Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

328.   CoStar's conduct affects a substantial volume of interstate commerce.

329.   CoStar's conduct, individually or taken as a whole, has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competition from the internet CRE auction services market and has deprived consumers of the benefits of competition among multiple providers of internet CRE auction services

330.   CoStar does not have a legitimate business purpose for its anticompetitive conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE auction services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Nor does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE auction services market.  The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to

88

1875322

further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

331.    Throughout the time CoStar engaged in the exclusionary conduct alleged herein, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the internet CRE auction services market and excluding its competitors.

332.    As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE auction services market, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

333.    Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## SEVENTH CLAIM FOR RELIEF

### (Exclusionary Contracts in Violation of Section 1 of the Sherman Act — 15 U.S.C. § 1)

334.    CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

335.    Internet CRE listings, information, and auctions services constitute relevant product markets.  A metropolitan area is the relevant geographic market for the product market, including the 50 metropolitan areas identified in **Exhibit B.**

336.    Through agreements with customers, including the exclusionary contractual restrictions and other conduct described in Sections IV.B–F, *supra*, CoStar has unreasonably restrained trade in the internet listings, information, and auctions services markets.

337.   CoStar's conduct affects a substantial volume of interstate commerce.

338.   CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competition from the internet CRE listing, information, and auction services markets and has deprived consumers of the benefits of competition among multiple providers of these services.

339.   Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative internet CRE listing, information, and auction services, and lower prices for such services, including the products offered by CREXi.

340.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE listing, information, and auction services markets, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

341.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## EIGHTH CLAIM FOR RELIEF

### (Exclusionary Contracts in Violation of the Cartwright Act —

### Cal. Bus. & Prof. Code § 16720)

342.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

1875322

343.   Internet CRE listings, information, and auctions services constitute relevant product markets.  A metropolitan area is the relevant geographic market for the product market, including the 50 metropolitan areas identified in **Exhibit B.**

344.   Through agreements with customers, including the exclusionary contractual restrictions and other conduct described in Sections IV.B–F, *supra*, CoStar has unreasonably restricted trade in the internet listings, information, and auctions services markets.

345.   CoStar's conduct affects a substantial volume of commerce in and affecting the state of California.

346.   CoStar's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.  Through its anticompetitive conduct, CoStar has excluded, or seeks to exclude, competition from the internet CRE listing, information, and auction services markets and has deprived consumers of the benefits of competition among multiple providers of these services.

347.   Through its anticompetitive conduct, CoStar has harmed consumers and the marketplace and impaired competition by depriving consumers of access to alternative internet CRE listing, information, and auction services, and lower prices for such services, including the products offered by CREXi.

348.   As a direct, foreseeable, and proximate result of CoStar's anticompetitive conduct, CREXi has been harmed in a manner that the antitrust laws are intended to protect against.  Without limitation, CREXi has suffered harm in the form of substantially higher costs to pursue entry into the internet CRE listing, information, and auction services markets, lost revenue and profits, diminished future sales opportunities, and increased operating costs.

349.   Unless CoStar's anticompetitive conduct is enjoined, CREXi will suffer immediate and irreparable injury for which CREXi is without an adequate

1875322

remedy at law.  To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## NINTH CLAIM FOR RELIEF

### (Trademark Infringement — 15 U.S.C. § 1114)

350.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

351.   As alleged above, the CREXI® mark is a valid, federally registered trademark owned by CREXi.  CREXi uses the CREXI® mark to describe, advertise, and promote its products and services.  The CREXI® mark is unique, distinctive, and memorable.

352.   CoStar has used in interstate commerce reproductions, copies, facsimiles, and depictions of the CREXI® mark in conducting CoStar's business in connection with CoStar's advertising, offering for sale, distribution and sale of its Ten-X products and services in a manner likely to cause confusion or mistake or to deceive.

353.   CoStar's actions in using the CREXI® mark have at all times been without CREXi's consent and with the intent to cause confusion, mistake and to deceive.  Indeed, CoStar purposefully used the CREXI® mark as a Google AdWord and in the header of CoStar's advertisements in order to associate its Ten-X products with CREXi's products, to cause consumer confusion, and to direct consumers to its own website instead of CREXi's.

354.   As a result of CoStar's trademark infringement, CoStar has gained profits and CREXi has lost profits.

355.   CoStar's acts constitute trademark infringement in violation of the Trademark Act of 1946, as amended, 15 U.S.C. § 1114.

356.   CoStar's acts complained of herein have damaged, and will irreparably damage, CREXi.  CREXi has no adequate remedy at law for these wrongs and injuries.  The damage to CREXi includes harm to its goodwill and reputation in the

marketplace that money damages cannot compensate.  Therefore, CREXi is entitled to injunctive relief restraining and enjoining CoStar and its agents, servants, and employees, and all persons acting in concert therewith, from using the CREXI® mark in connection with the sale, offering for sale, distribution or advertisement of goods, products, or services, or in any manner likely to cause confusion or mistake or to deceive the trade or public as to the source or origin of CoStar's goods, products, or services.

357.   Because CoStar has willfully used the CREXI® mark in a manner calculated to promote the sale of CoStar's goods, products, or services, CREXi is entitled to recover three times CoStar's profits and CREXi's damages, reasonable attorneys' fees, and the costs of this action under 15 U.S.C. §§ 1114, 1116, and 1117.

## **TENTH CLAIM FOR RELIEF**

### **(Intentional Interference with Contract)**

358.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

359.   CREXi entered into valid and binding contracts with its customers, including, without limitation: Broker 1; Broker 2; Broker 3; Broker 6; Broker 9; Broker 10 on September 4, 2019; Broker 11 on June 3, 2016; Broker 12, who is a Pro user, on May 1, 2018; Broker 13 on April 13, 2018; Broker 14, who is a Pro user, on September 30, 2016; Broker 15; Broker 16, who is a Pro user, on February 27, 2020; Broker 17 on June 4, 2019; Broker 18, who is a Pro user, on March 15, 2022; Broker 19, who is a Pro user, on March 25, 2020; Broker 20 on August 26, 2021; Broker 21; Broker 22 on May 30, 2017; Broker 23 on February 27, 2021; Broker 24 on March 7, 2019; Broker 25 on September 21, 2016; Broker 26, who is a Pro user, on March 7, 2019; Broker 27, who is a Pro user, on March 7, 2019; Broker 28 on March 11, 2019; Broker 29 on August 21, 2017; Broker 30 on March 19, 2019; Broker 31, who is a Pro user, on February 3, 2020; Broker 33 on January

13, 2016; Broker 34 on December 12, 2019; Broker 35 on December 26, 2020; Broker 36 on January 25, 2016; Broker 37 on January 25, 2016, Broker 38, who is a Pro user, on March 21, 2019; Broker 39, who is a Pro user, on January 28, 2018; Broker 40 on March 18, 2022; Broker 41;  Broker 42 on March 10, 2020; Broker 43 on November 1, 2021; Broker 44 on March 25, 2022; Broker 45 on August 4, 2020; Broker 46, who is a Pro user, on July 28, 2017; Broker 47, who is a Pro user, on April 4, 2017; Broker 48, who is a Pro user, on June 22, 2016; Broker 49 on November 11, 2021; Broker 50; Broker 51, who is a Pro user, on May 17, 2016; Broker 52, who is a Pro user, on February 1, 2017; Broker 53, who is a Pro user, on September 18, 2021; Broker 54, who is a Pro user, on March 3, 2020; Broker 55, who is a Pro user, on July 8, 2021; Broker 56, who is a Pro user, on June 6, 2016; Broker 57, who is a Pro user, on October 30, 2018; Broker 58 on September 25, 2017; Broker 59, who is a Pro user, on September 11, 2019; Broker 61, who is a Pro user, on August 23, 2017; Broker 62, who is a Pro user, on September 25, 2017; Broker 63 on March 2, 2020; Broker 67, who is a Pro user, on February 28, 2018; Broker 68 on November 6, 2020; Broker 69, who is a Pro user, on July 18, 2016; Broker 70 on April 10, 2019; and Broker 71, who is a Pro user, on July 5, 2018.

360.   CoStar has and had knowledge of CREXi's contracts with CREXi's customers.  As the largest CRE platform in the United States, CoStar has been in direct contact with CREXi's clients and is aware of CREXi's operations in the CRE marketplace.  Additionally, CREXi's customers have directly informed CoStar of their contractual relationships with CREXi, as described in paragraph 263.  And CoStar actively monitors CREXi's website and, therefore, is aware of CREXi's customers and contracts. Upon information and belief, CoStar was specifically aware of CREXi's contractual relationships with the brokers identified *supra*, including those listed in paragraph 359.

361.   CoStar intended to disrupt and interfere with CREXi's contractual relationships.  CoStar was aware of the harm to CREXi that would and did result from CoStar deploying technological measures to surreptitiously block CREXi's access to CREXi's customers' own listings on those customers' own websites.  CoStar was also aware of the harm to CREXi that would and did result from CoStar's false claims of ownership over CREXi's customers' own listing information and photographs.  And CoStar was aware of the harm to CREXi that would and did result from CoStar's anticompetitive conduct and exclusionary contractual terms to lock brokers into *de facto* exclusive arrangements with CoStar, while threatening brokers that they are in breach of their contracts with CoStar if they provide their own information and photographs to CREXi.

362.   CoStar's conduct did in fact disrupt and interfere with CREXi's contractual relationships, requiring breach, termination, and/or substantial inference with these contracts.  CoStar's deployment of technological measures to surreptitiously block CREXi's access to CREXi's customers' own listings on those customers' own websites affected CREXi's ability to provide its contracted-for services.  Likewise, CoStar's false claims of ownership over CREXi's customers' own listing information and photographs disrupted the provision of CREXi's services to its customers.  And CoStar's anticompetitive conduct and exclusionary contractual terms to lock brokers into *de facto* exclusive arrangements with CoStar has disrupted the provision of CREXi's services to its customers.

363.   CoStar was neither justified nor privileged in taking such actions.

364.   As a direct and proximate result of CoStar's conduct, CREXi has suffered damages, including but not limited to lost business, loss of client goodwill, and impeded ability to continue operating in the commercial real estate market.

365.   CoStar's conduct constitutes oppression, fraud, and malice, entitling CREXi to an award of exemplary or punitive damages against CoStar, in an amount to be determined at trial.

1875322

## ELEVENTH CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Advantage)

366.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

367.   By virtue of its economic relationships with its customers, including those contractual relationships described *supra* in paragraphs 358–65, CREXi enjoyed a prospective business relationship that carried with it the probability of future economic benefit.  In addition, CREXi had economic relationships with prospective clients, including Brokers 2, 5, 6, and 64–69, who had been in contact with CREXi about listing CRE on CREXi's platform.

368.   CoStar has and had knowledge of CREXi's economic relationships with its customers.  CoStar was also aware that its conduct was substantially certain to cause disruption of those contractual and economic relationships.  As the largest CRE platform in the United States, CoStar has been in direct contact with CREXi's clients and is aware of CREXi's operations in the CRE marketplace.  Additionally, CREXi's customers have directly informed CoStar of their business relationships with CREXi, including their expectation that they may or expect to list CRE on CREXi's platform. And CoStar actively monitors CREXi's website and, therefore, is aware of CREXi's customers, its business activities, and the clients with whom it works and expects to continue working. Upon information and belief, CoStar was specifically aware of CREXi's prospective client relationships and contractual relationships with the Brokers identified *supra*, including those listed in paragraphs 359 and 367.

369.   As described in more detail above, CoStar engaged in intentional and wrongful conduct designed to interfere with and disrupt CREXi's prospective economic advantage.  CoStar falsely claimed copyright ownership over CRE listing data and photographs, interfering with CREXi's economic relationships with its prospective and current clients.  CoStar blocked CREXi's access to its customers'

96

1  and prospective customers' websites, interfering with CREXi's economic

2  relationships with its prospective and current clients.  CoStar committing

3  exclusionary and anticompetitive conduct, including by interfering with CREXi's

4  contractual relations.

5      370.   As described *supra*, including in paragraphs 43, 44, 64–69, and 254–

6  64, CoStar's conduct did in fact disrupt and interfere with CREXi's prospective

7  business advantage.

8      371.   As a direct and proximate result of CoStar's conduct, CREXi has

9  suffered and will continue to suffer damages, including but not limited to lost

10  business, loss of client goodwill, and impeded ability to operate in the CRE market.

11      372.   CoStar's conduct constitutes oppression, fraud, and malice, entitling

12  CREXi to an award of exemplary or punitive damages against CoStar, in an amount

13  to be determined at trial.

14                    **TWELFTH CLAIM FOR RELIEF**

15         **(Unfair Competition — Cal. Bus. & Prof. Code § 17200)**

16      373.   CREXi incorporates by reference all previous paragraphs as though

17  fully set forth herein.

18      374.   CoStar's anticompetitive and exclusionary conduct, individually or

19  taken as a whole, violates the policy or spirit of antitrust law.

20      375.   CoStar engages in unfair competition by:

21          i)      Leveraging LoopLink to force customer use of LoopNet and

22  surreptitiously blocking competitors' access to brokers' own listings on brokers'

23  own websites, to prevent brokers from working with competitors;

24          ii)     Imposing exclusionary contractual restrictions to prevent

25  brokers from using competitors' services;

26          iii)    Falsely claiming intellectual property ownership over

27  customers' CRE information and photographs to stifle competition; and

28

1875322

iv)     Infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi.

v)     CoStar does not have a legitimate business purpose for its anticompetitive and unfair conduct.  The anticompetitive effects of CoStar's conduct far outweigh any purported procompetitive justification.  CoStar's conduct does not result in any greater ability to reduce costs in producing or innovating upon internet CRE information services that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers.  Neither does CoStar's conduct reduce barriers to other rivals' entry, or otherwise result in greater competition in the internet CRE information services market.  The only "benefit" that flows from CoStar's anticompetitive conduct is reduction in competition, which only serves to further cement CoStar's monopoly while disadvantaging consumers and competition on the merits.

376.   Thus, CoStar's actions described herein constitute actionable violations of the UCL's "unfair" business practices prong.

377.   As a direct and proximate result of CoStar's conduct, CREXi has suffered and will continue to suffer loss of money and property including but not limited to lost business.

378.   Unless CoStar is enjoined from engaging in the conduct described herein, CREXi will suffer severe, irreparable harm.  CREXi has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of CREXi's business relationships and client goodwill.  CREXi is informed and believes that unless the Court grants injunctive relief and orders CoStar to pay restitution, CoStar will continue to engage in the unfair business practices described herein.

## THIRTEENTH CLAIM FOR RELIEF

### (Unlawful Competition — Cal. Bus. & Prof. Code § 17200)

379.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

380.   CoStar's aforementioned acts—monopolization, attempted monopolization, tortious interference, and trademark infringement—whether considered individually or taken as a whole, violate the UCL's "unlawful" business practices prong.

381.   As a direct and proximate result of CoStar's conduct, CREXi has suffered and will continue to suffer loss of money and property including but not limited to lost business.

382.   Unless CoStar is enjoined from engaging in the conduct described herein, CREXi will suffer severe, irreparable harm.  CREXi has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of CREXi's business relationships and client goodwill.  CREXi is informed and believes that unless the Court grants injunctive relief and orders CoStar to pay restitution, CoStar will continue to engage in the unfair business practices described herein.

## FOURTEENTH CLAIM FOR RELIEF

### (Declaratory Judgment that CREXi Has Not Engaged in Unlawful Conduct by Accessing Publicly Available Information on CoStar's Websites)

383.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

384.   An actual controversy exists between CREXi and CoStar.  CoStar, through its selective enforcement of purported contractual terms, imposition of technological blocking measures, and litigation, has asserted that CREXi engages in wrongful or unlawful conduct by seeking to access publicly available information on CoStar's websites, including LoopNet.  CoStar has engaged in this conduct for

99

an improper, anticompetitive purpose and to give itself an unfair competitive advantage.

385.   CREXi maintains that it is lawful for CREXi to access publicly available information on CoStar's websites, including LoopNet.  CREXi further maintains that it is unlawful for CoStar to selectively block its competitor, CREXi, from accessing publicly available information on CoStar's websites, including LoopNet.

386.   Accordingly, CREXi seeks a declaration that it has not and will not engage in unlawful conduct by accessing publicly available information on CoStar's websites.  CREXi further seeks a declaration that CoStar may not enforce purported contractual terms of service, technological measures, or take any other steps to block CREXi's access to publicly available information on CoStar's websites.  CREXi also seeks a declaration that CoStar has engaged in unlawful conduct by blocking CREXi's access to publicly available information on CoStar's websites.

## **PRAYER FOR RELIEF**

WHEREFORE, CREXi prays for judgment in favor of CREXi and against CoStar as follows:

1.     Issuing an Order directing the termination of CoStar's anticompetitive conduct and injunctive relief mandating that CoStar take all necessary steps to cease its unlawful conduct and to restore competition to the relevant markets;

2.     Actual damages for Claims 1–8 in an amount to be determined at trial, trebled pursuant to Section 4 of the Clayton Act and Cal. Bus. & Prof. Code § 16750, along with interest;

3.     Actual and punitive damages for Claims 9–11 in an amount to be determined at trial;

4.     CREXi's costs of suit herein, including its attorneys' fees;

5.     Restitutionary relief;

1875322

6.     Awarding a declaration that CoStar's exclusionary and anticompetitive conduct complained of herein is unlawful and unenforceable;

7.     Awarding a declaration that CREXi has not and will not engage in unlawful conduct by accessing publicly available information on CoStar's websites; and

8.     Such other relief as may be just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 38-1, CREXi respectfully requests a trial by jury on all claims and counterclaims.

Dated: August 5, 2022                    KEKER, VAN NEST & PETERS LLP

By:   /s/ *Elliot R. Peters*
      Elliot R. Peters
      Warren A. Braunig
      Elizabeth K. McCloskey
      Nicholas S. Goldberg
      Connie P. Sung
      Jason George
      Christine Zaleski

      Attorneys for Defendant and Counterclaimant
      COMMERCIAL REAL ESTATE
      EXCHANGE, INC.

101

1875322