KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS #158708
epeters@keker.com
WARREN A. BRAUNIG #243884
wbraunig@keker.com
ELIZABETH K. MCCLOSKEY #268184
emccloskey@keker.com
NICHOLAS S. GOLDBERG #273614
ngoldberg@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Attorneys for Defendant and Counterclaimant
COMMERCIAL REAL ESTATE EXCHANGE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> COMMERCIAL REAL ESTATE EXCHANGE, INC., <br><br> Defendant. | Case No. 2:20-cv-08819 CBM (ASx) <br><br> **DISCOVERY MATTER** <br><br> **CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE** <br><br> Date:        September 29, 2022 <br> Time:       10:00 a.m. <br> Ctrm:       540 <br> Judge:      Hon. Alka Sagar <br><br> Date Filed:  September 25, 2020 |
| COMMERCIAL REAL ESTATE EXCHANGE, INC., <br><br> Counterclaimant, <br><br> v. <br><br> COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., <br><br> Counterdefendants | Discovery Cutoff: November 4, 2022 <br> Pretrial Conference: August 1, 2023 <br> Trial: October 3, 2023 |

1

1860275

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................ 4

    A.    CREXi's Introduction .......................................................... 4

    B.    CoStar's Introduction ......................................................... 7

II.     DISPUTED REQUESTS FOR PRODUCTION ................................. 10

III.    CREXI'S POSITION ...................................................................... 13

    A.    Background .......................................................................... 13

        1.    CoStar sues the wrong Arcgate entity in India and fails to provide notice to CREXi. .................................... 13

        2.    CoStar settles with Arcgate in exchange for a misleading declaration, and files the declaration in this Court. ......................................................................... 15

        3.    CoStar coerces a false and misleading declaration from Arcgate. .................................................................. 16

        4.    CoStar refuses to produce information concerning its settlement with Arcgate. .......................................... 19

    B.    Argument ............................................................................ 19

        1.    United States law, not Indian law, governs here. ........... 20

        2.    Even under Indian Law, the "without-prejudice" rule does not prevent the production of the requested documents. ....................................................................... 26

    C.    Conclusion .......................................................................... 30

IV.     COSTAR'S POSITION ................................................................... 30

    A.    BACKGROUND ................................................................ 33

        1.    CREXi, With Assistance From Third-Party Agents, Has Built Its Business By Piggybacking On CoStar. ............... 33

        2.    CoStar Sued CREXi's Agent Arcgate To Enjoin Its Misconduct Against CoStar. .......................................... 37

        3.    The Parties Negotiated Consent Terms, Which Were Reviewed And Entered By The Rajasthan High Court And Have The Full Force Of A Final Judgment. ................... 39

        4.    CREXi Chose Not To Intervene In The Arcgate Action, And Instead Has Engaged In A Campaign To Harass And Intimidate Arcgate And CoStar. .......................... 42

2

1860275

5.   The Misconduct Continues: As Evidenced by Developments Relating to CoStar's Suit Against Neptune ........................................................... 44

B.   ARGUMENT ................................................................. 47

1.   CREXi Seeks Relief In The Wrong Forum. ........................... 48

2.   India's Without Prejudice Privilege Bars Discovery Of The CoStar-Arcgate Settlement Communications. ................. 51

3.   No Exceptions To The Without Prejudice Privilege Apply. ....................................................................... 67

C.   CONCLUSION ................................................................ 70

1860275

1    Pursuant to Federal Rule of Civil Procedure 37 and Local Rule 37-2,

2  Defendant and Counterclaimant Commercial Real Estate Exchange, Inc.

3  ("CREXi") respectfully moves the Court to compel Plaintiffs and

4  Counterdefendants CoStar Group, Inc. and CoStar Realty Information, Inc.

5  (collectively, "CoStar") to produce discovery regarding CoStar's settlement with

6  Arcgate.

7    Pursuant to Local Rule 37-1, the Parties submit this stipulation following a

8  series of good faith meet-and-confer efforts between counsel that failed to eliminate

9  this dispute.  Pursuant to Local Rule 37-2.1, a copy of the Court's August 30, 2021

10 amended scheduling order (Dkt. 85) is attached hereto as Exhibit A.

11 I.    INTRODUCTION

12    A.    CREXi's Introduction

13    CREXi moves to compel CoStar to produce documents concerning the

14 circumstances under which CoStar procured and filed before this Court a

15 declaration by a former CREXi contractor, Arcgate, that contains false and

16 misleading allegations against CREXi.

17    In March 2021, approximately five months after bringing this suit, CoStar

18 sued Arcgate for copyright infringement in an Indian court. CoStar's lawsuit

19 against Arcgate alleged copyright infringement based entirely on Arcgate's work

20 for CREXi, but CoStar never provided CREXi notice of the suit. Even though

21 CoStar failed to uncover any evidence of copyright infringement by Arcgate,

22 CoStar convinced an Indian court to enter an *ex parte* order allowing a

23 commissioner to "enter by force" Arcgate's property and to "seize" CoStar

24 photographs. CoStar then initiated *criminal contempt* proceedings against Arcgate

25 for supposed failure to comply with that *ex parte* order. Faced with CoStar's threats

26 to Arcgate's business and punitive personal measures, Arcgate settled with CoStar

27 in November 2021.

28    In exchange for CoStar dropping its lawsuit and criminal contempt

4

1860275

proceedings, Arcgate agreed to turn over documents to CoStar, to cooperate with CoStar (and affirmatively to *not* cooperate with CREXi) in this litigation, and for Arcgate's CEO, Kunal Bagla, to sign a hyperbolic and factually misleading declaration, apparently crafted by CoStar's lawyers. That declaration, which was signed under penalty of perjury of the laws of the United States (not under Indian law), was custom-made for use in this litigation. As soon as the settlement was entered in Indian court, CoStar turned around and filed the Arcgate settlement, and the Bagla declaration, in this action, in a blatant attempt to smear CREXi. *See* Dkt. 100-1, at 21 (attached as Exhibit B to this stipulation). CREXi now seeks discovery regarding how CoStar procured Mr. Bagla's declaration, the circumstances under which that declaration was crafted, and CoStar's communications with Arcgate.

Discovery into the circumstances of the Arcgate settlement, including the drafting and negotiation of the settlement and Mr. Bagla's declaration, is highly relevant and necessary to cross-examine and impeach Mr. Bagla's testimony. In addition, discovery is necessary to determine whether CoStar and its counsel violated ethical rules and federal law that forbid providing anything of value— including a release of claims—in exchange for testimony in litigation. *See* Cal. R. Prof. Conduct 3.4(d); 18 U.S.C. § 201(c)(2); *see also e.g.*, *State of N.Y. v. Solvent Chem. Co. Inc.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996) ("[O]rchestrating [a] settlement" and obtaining litigation peace are "the equivalent of making cash payments" for "securing . . . testimony"); *Patel v. 7-Eleven, Inc.*, 2015 WL 9701133, at *5 (C.D. Cal. Apr. 14, 2015) (disqualifying counsel that paid for testimony).

CoStar does not seriously contest the relevance of CREXi's discovery, or the fact that responsive documents exist. Instead, CoStar has sought to conceal these highly relevant documents from CREXi by asserting a misguided claim of "settlement privilege" under *Indian law*. CoStar's argument is without merit.

***First***, CoStar's attempt to invoke a purported Indian "settlement privilege" to

1    shield itself from discovery in this United States federal litigation fails. The Bagla

2    declaration was signed under penalty of perjury under *United States* law, obtained

3    by CoStar (a *United States* company) for use in *United States* litigation, and filed

4    by CoStar in this *United States* District Court. Moreover, United States federal

5    courts have repeatedly rejected attempts to apply foreign privileges where those

6    privileges are not recognized under U.S. federal law. Indeed, the only cases CoStar

7    has cited involve extensions of the *attorney-client* privilege—a privilege well

8    recognized under U.S. law. By contrast, there is no federal "settlement privilege"

9    under federal law, *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2019 WL 13032152, at

10   *1 (C.D. Cal. Mar. 20, 2019), and CoStar has not cited any case that applies a

11   *foreign* settlement privilege in federal court. U.S. law—not Indian law—applies to

12   this discovery dispute.

13          ***Second***, even if Indian law were to apply—and it does not—it would not

14   shield from discovery the documents CREXi has requested. CoStar seeks to apply

15   India's so-called "without-prejudice" rule—an Indian rule of evidentiary

16   admissibility for certain settlement communications—as a *privilege* when there is

17   no Indian decision that has applied that rule to block the production of evidence in

18   discovery. CoStar instead cites *English law* and speculates that Indian courts would

19   adopt this English authority. But accepting CoStar's argument would require this

20   Court to first interpret the scope of *English* law, then speculate as to how *Indian*

21   courts would apply that English law. That is an improper judicial exercise for this

22   Court, and CoStar's argument should be rejected on this basis alone. *See United*

23   *States v. Vetco Inc.*, 691 F.2d 1281, 1289 (9th Cir. 1981) ("[A] party relying on

24   foreign law has the burden showing that such law bars production.").[1] In any event,

25   Indian law forecloses CoStar's view of the "without-prejudice" rule: the Indian

26   Supreme Court has explicitly quoted authority stating that the "without-prejudice"

27   rule is inapplicable where, as here, the parties have already executed a settlement

28   _____

[1] Unless otherwise indicated, internal citations have been omitted throughout this brief.

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

agreement. Furthermore, Indian law prioritizes the truth-seeking process. It does not allow a party to present false and misleading testimony, while blocking discovery into the circumstances of its procurement—especially when such negotiations may contain evidence of coercion and misconduct.

This motion presents important issues of fairness and due process. It would undermine these proceedings if CoStar is permitted to inject into the record false and misleading testimony maligning CREXi, while hiding critical information about how CoStar procured that testimony, including evidence that may establish that CoStar engaged in misconduct by coercing testimony from a witness. These considerations are made all the more pressing by the fact that CoStar has brought suit against another CREXi vendor in India—yet again using threats and scare tactics, rather than the Hague Convention, to obtain discovery for use in this litigation. The Court should order CoStar to produce the requested information.

**B.    CoStar's Introduction**

CREXi's motion is a desperate and untimely attempt to undermine a final judgment in an Indian case involving its Indian agent, Arcgate, a judgment that underscores CREXi's wrongdoing against CoStar.  CREXi seeks relief in the wrong court.  On notice, it declined to intervene in the Arcgate case in India, and has no right to belatedly and collaterally attack the Arcgate judgment or its components here.  Moreover, the materials sought by CREXi are privileged under applicable Indian law, as confirmed by CoStar's Indian law expert, a former Justice of the Indian Supreme Court.  The motion should be denied.

Starting in 2016, CREXi engaged business processing organizations ("BPOs") in India and elsewhere to target CoStar websites and harvest content on an industrial scale.  CoStar sued two of these CREXi agents in India: Arcgate, the subject of this motion, in March 2021, and Neptune Business Solutions Private Limited ("Neptune") in July 2022.  The Arcgate action settled in November 2021. As part of the case resolution, Arcgate produced to CoStar its communications with

7

CREXi (which CREXi still has not produced here, as it continues to stonewall
discovery into its BPOs).  The communications show that CREXi acknowledges it
is wrongful to use CoStar sites for competitive purposes, but that CREXi instructed
its agent Arcgate to do so anyway.  Arcgate's CEO Kunal Bagla described these
documents in testimony offered in support of the Arcgate settlement and injunction,
testimony that was reviewed and entered by the High Court of Rajasthan as part of
a final judgment.  The Neptune action is only just beginning, but the High Court of
Madras entered an interim injunction against, and authorized a civil seizure of
evidence from, CREXi's agent Neptune based on its finding that CoStar presented
"*prima facie* evidence of large scale infringement and piracy."  Even worse, a
commissioner appointed by that court issued a report regarding the seizure showing
widespread evidence of misconduct, including copyright violations, and "mass
deletion" by Neptune of materials related to CoStar and CREXi.  Troublingly, the
commissioner's report included evidence that CREXi's U.S. and Indian counsel—
CREXi's declarants in support of the pending motion—placed a call to, or had
multiple calls with, Neptune's managing director the day before the commissioners'
seizure uncovering the misconduct and widespread destruction of evidence.[2]

It is against this backdrop of mounting and damning revelations that CREXi
seeks to collaterally attack the consent judgment against Arcgate.  CoStar
respectfully requests that the Court deny CREXi's motion for two reasons:

***First***, CREXi seeks relief in the wrong forum.  The Rajasthan High Court
reviewed and entered as a Decree the settlement (filed as "Consent Terms"), which
incorporates Mr. Bagla's testimony, and ordered that Indian law applies to the
settlement, which now has the force of a final judgment, as CoStar's expert, former
Indian Supreme Court Justice B.N. Srikrishna explains.  CREXi was aware of the

---

[2] CoStar is not yet in a position to determine the contents of these communications
by counsel, over which CREXi has not claimed privilege, and thus makes no
accusation as to involvement in the spoliation.  But the record reflects that CREXi
is deeply involved in the Indian cases; it simply prefers to act behind the scenes.

Arcgate lawsuit during its pendency, was (and is) represented by Indian counsel,
had the opportunity to seek to intervene, and chose not to do so.  Having declined to
participate in the Arcgate action, CREXi has no basis to seek to undermine the
result of that case in this Court.  Moreover, CoStar has not to date offered Mr.
Bagla's testimony as evidence in this action.  To the extent *CREXi* wishes to make
Mr. Bagla a witness, it may seek to obtain his documents and testimony using the
Hague Evidence Convention.  Requiring CREXi to seek discovery using this
process would allow Arcgate and CoStar's joint privilege claim to be adjudicated
by the Indian court ordering discovery and would allow Arcgate to be heard.

*Second*, India's "without prejudice" privilege bars CREXi's discovery of the
CoStar-Arcgate settlement communications.  Under the "touch base" analysis used
by U.S. federal courts to decide choice of law issues in cases where the alleged
privileged communications occurred in foreign proceedings, the communications
CREXi seeks concern the settlement of an Indian case against an Indian defendant.
Accordingly, the default position is that Indian law applies.  CREXi's purported
"justifications" for overriding Indian law—including that it requires discovery to
defend itself against Mr. Bagla's (not-yet-proffered) testimony and/or to determine
if CoStar *may* have engaged in bad conduct—fail.  CREXi has provided no
evidence that Mr. Bagla's declaration is "misleading," much less "false."  Indeed,
CREXi executive-declarant Lawson Dees does not even dispute the core (and
devastating) facts reflected in Mr. Bagla's testimony: that CREXi directed Arcgate
to access CoStar sites, and to copy content from, and verify content on, those sites,
even while CREXi acknowledged that such competitive access is not permitted.  He
simply argues about CREXi's "purpose" in directing Arcgate to undertake just two
projects.  Moreover, the mere fact that Mr. Bagla testified in connection with the
resolution of a dispute gets CREXi nowhere.  As CREXi knows, it is not unusual
(or unethical) for parties in India (and in the United States) to provide testimony or
documents as part of settling litigation.  CREXi has no basis to argue that U.S. law

9

must be applied to avoid "impair[ing] the integrity of these [*i.e.*, California] proceedings," as it hyperbolically claims.  Under Indian law, the "without prejudice" privilege protects communications and documents written for the purpose of resolving a legal dispute.  As former Justice Srikrishna explains, the privilege squarely protects the CoStar-Arcgate settlement communications, and no exception applies to permit their discovery.  CREXi, meanwhile, offers as a privilege "expert" its litigation counsel Rohan George, an IP practitioner who has no apparent expertise in privilege issues and is deeply enmeshed in the Indian cases at issue here.  Mr. George can hardly be considered a neutral authority.  While he suggests reasons why this Court is at liberty to disregard the privilege, none is well-founded as a matter of Indian law, and all are refuted by former Justice Srikrishna.  CoStar thus respectfully requests that the Court deny CREXi's motion.

## II.   DISPUTED REQUESTS FOR PRODUCTION

*Request No. 92*: All COMMUNICATIONS with ARCGATE, including, but not limited to, COMMUNICATIONS with any counsel or representative for ARCGATE.

*Response to Request No. 92*: CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar objects to Request No. 92 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" communications, for an unlimited time period, on any subject, between Arcgate, Arcgate's counsel, or Arcgate's representative and anyone else. CoStar further objects to Request No. 92 to the extent it seeks communications that are not in CoStar's possession, custody, or control. CoStar further objects to Request No. 92 because it seeks documents that are not relevant to any claim or defense in this matter. CoStar further objects to Request No. 92 to the extent that it is duplicative and cumulative of Request Nos. 93 and 94. CoStar further objects to the undefined term "representative" as vague, ambiguous, and overly broad. CoStar further

10

1860275

*objects to Request No. 92 to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law.*

*Request No. 93: All DOCUMENTS and COMMUNICATIONS RELATING TO the November 24, 2021 Consent Terms and Permanent Injunction executed by ARCGATE and COSTAR, including any drafts of that document and any COMMUNICATIONS RELATING TO that document.*

*Response to Request No. 93: CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar objects to Request No. 93 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents and communications over an unlimited time period. CoStar further objects to this Request to the extent it seeks communications and drafts that are protected by the attorney client privilege or work product doctrine. CoStar further objects to this Request to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law. CoStar further objects to this Request to the extent it is duplicative and cumulative of Request Nos. 92 and 94. CoStar further objects to Request No. 93 to the extent that communications related to the consent decree and judgment are based on documents already in CREXi's possession, custody, or control, and which CREXi has not produced to CoStar.*

*Subject to and without waiving the foregoing General and Specific objections, CoStar will produce the November 24, 2021 Consent Terms and Permanent Injunction.*

*Request No. 94: All DOCUMENTS and COMMUNICATIONS RELATING TO the declaration executed by Kunal Bagla on November 24, 2021, including any drafts of that declaration and any COMMUNICATIONS RELATING TO that declaration.*

*Response to Request No. 94: CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar*

11

1860275

*objects to Request No. 94 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents and communications over an unlimited time period. CoStar further objects to this Request to the extent it seeks communications and drafts that are protected by the attorney client privilege or work product doctrine. CoStar further objects to this Request to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law. CoStar further objects to this Request to the extent it is duplicative and cumulative of Request Nos. 92 and 93. CoStar further objects to Request No. 94 to the extent responsive documents and communications are already in CREXi's possession, custody, or control, and which CREXi has not produced to CoStar.*

*Subject to and without waiving the foregoing General and Specific objections, CoStar will produce the November 24, 2021 declaration of Kunal Bagla.*

*<u>Request No. 97</u>: All DOCUMENTS and COMMUNICATIONS RELATING TO any claim for damages or other relief YOU demanded or requested from ARCGATE.*

*<u>Response to Request No. 97</u>: CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar objects to Request No. 97 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents and communications relating to "any" claim against Arcgate for an unlimited time period. CoStar further objects to Request No. 97 as not relevant or reasonably calculated to lead to the discovery of admissible evidence. CoStar further objects to Request No. 97 to the extent that it is duplicative and cumulative of other Requests. CoStar further objects to Request No. 97 to the extent that it seeks documents that are attorney client privileged and/or protected by the work product doctrine. CoStar*

*further objects to Request No. 97 to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law.*

*Subject to and without waiving the foregoing General and Specific objections, CoStar will produce the complaint CoStar filed against Arcgate in India, which contains CoStar's claims for relief against Arcgate.*

*Request No. 98: All DOCUMENTS RELATING TO ARCGATE.*

*Response to Request No. 98: CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar objects to Request No. 98 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents over an unlimited time period and not limited to any subject matter. CoStar further objects to Request No. 98 because it seeks documents that are entirely unrelated to any claim or defense in this matter, and to the extent that it is duplicative and cumulative of other Requests. CoStar further objects to Request No. 98 to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law.*

*Subject to and without waiving the foregoing General and Specific objections, CoStar reiterates that it will produce, in response to the preceding Requests, the November 24, 2021 Consent Terms and Permanent Injunction and Declaration of Kunal Bagla, and the complaint CoStar filed against Arcgate in India as part of that same action.*

## III.   CREXI'S POSITION

### A.   Background

#### 1.   CoStar sues the wrong Arcgate entity in India and fails to provide notice to CREXi.

On March 9, 2021, three months after CoStar filed its operative Amended Complaint against CREXi, CoStar sued Arcgate Teleservices Private Limited

1860275

("Arcgate Teleservices") for copyright infringement in Udaipur Commercial Court in India. Declaration of Elizabeth K. McCloskey ("McCloskey Decl."), Ex. A ("Arcgate Compl."). CoStar's lawsuit against Arcgate Teleservices was flawed from the start because CoStar named the wrong entity and no Arcgate entity ever performed photograph-related services for CREXi. Starting in 2017, CREXi retained an entity named "Arcgate" to perform data processing services. Declaration of Lawson Dees ("Dees Declaration") ¶ 3. In October 2020, that independent contractor relationship was further described in a written contract with an entity named M/s Arcgate. *Id.* ¶ 4. CREXi is unfamiliar with the Arcgate Teleservices entity or any relationship with it. *Id.* In addition, the Arcgate entity that CREXi retained never performed any work for CREXi related to photographs, much less photographs from CoStar. *Id.* ¶ 5.

Despite these facts, CoStar falsely accused Arcgate Teleservices of copyright infringement based on a tenuous temporal connection between searches on CoStar's website from IP addresses allegedly affiliated with Arcgate Teleservices and the appearance of alleged CoStar-copyrighted photos on CREXi's website near in time to those searches. Arcgate Compl. ¶¶ 33–35. The copyright claim was not based on copyrights issued to CoStar in India, but instead on CoStar's United States copyrights, enforced through an international treaty mechanism. *Id.* ¶ 50. Based on its sparse and circumstantial allegations, CoStar sought over $100,000 in damages from Arcgate Teleservices and an *ex parte* order for a commissioner to "enter . . . by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, [Arcgate Teleservices'] premises . . . any time of the day or night without notice" in order to "seize" any CoStar photographs and copy the entirety of Arcgate Teleservices' servers, purportedly to protect CoStar's intellectual property. *Id.* ¶ 67.e. On June 4, 2021, the lower court denied that extraordinary relief, but CoStar filed an *ex parte* writ petition, and on July 30, 2021, the High Court for Rajasthan issued an *ex parte* order allowing a commissioner to break into Arcgate

14

1860275

Teleservices' premises as requested. *Id.* Ex. B, at 9, 10–11 (July 30, 2021 Order).

Armed with an order against Arcgate *Teleservices*, CoStar then sought to enforce the order against *M/s Arcgate*. According to pleadings filed in the Indian court, on August 6, 2021, two commissioners and approximately 16 people working for CoStar forced their way onto the property of M/s Arcgate and began to carry out the order. *Id.* Ex. C, at 9–15. M/s Arcgate eventually ejected the two commissioners and 16 CoStar agents from the premises because they had exceeded the bounds of the *ex parte* order by attempting to access the building and information of M/s Arcgate, a different entity than Arcgate Teleservices. *Id.* Nevertheless, on September 6, 2021, CoStar instituted criminal contempt proceedings against Arcgate Teleservices and M/s Arcgate (for the first time asserting they were alter egos), and numerous employees, including Kunal Bagla, M/s Arcgate's CEO. *Id.* Ex. D.[3]

Despite pursuing proceedings in India to obtain discovery against CREXi in the United States, CoStar never provided notice of the Indian proceedings to CREXi or its counsel. McCloskey Decl. ¶ 6.

### 2.   CoStar settles with Arcgate in exchange for a misleading declaration, and files the declaration in this Court.

On November 24, 2021, CoStar entered a settlement agreement with M/s Arcgate, Arcgate Teleservices, and all other "affiliated or related Arcgate entit[ies]" (collectively, "Arcgate"). Dkt. 100-1, at 10. CoStar agreed to drop its claims against Arcgate, including the demand for $100,000 in damages, in exchange for Arcgate providing evidence against CREXi in this lawsuit. CoStar obtained a declaration from Kunal Bagla, Arcgate's CEO, signed "under penalty of perjury under the laws of the United States of America." *Id.* at 33. CREXi has reason to believe that CoStar procured the Bagla declaration through coercion and that CoStar's counsel

---

[3] CREXi has assembled these facts from a record of the Indian proceedings that it was able to obtain from publicly available sources. CoStar has refused to produce the full set of documents it filed in the Indian litigation. McCloskey Decl. Ex. O.

drafted that declaration for the sole purpose of wielding it against CREXi in this lawsuit. As discussed further below, Mr. Bagla's declaration contains false and misleading statements, and arguments apparently crafted by CoStar's attorneys to support CoStar's narrative in this case. *See* Section III.A.3, *infra*. CoStar's settlement agreement also required Arcgate to produce all of Arcgate's communications with CREXi, and contained a one-way cooperation agreement. Arcgate agreed to "cooperate with CoStar" to provide documents and answer questions, Dkt. 100-1 at 13, ¶ 7, while agreeing to not "support" or "voluntarily participate in any way" in any related action against CoStar, including CREXi's counterclaims against CoStar, *id.* at 16, ¶ 17.

Despite the overwrought allegations of copyright infringement in CoStar's complaint against Arcgate, nowhere in the settlement agreement or Mr. Bagla's declaration is there *any* statement that Arcgate participated in any acts of copyright infringement, or even performed image-related services for CREXi. *See generally id.*

On January 11, 2022, the Rajasthan High Court issued a consent judgment and permanent injunction against the Arcgate entities pursuant to the terms of the settlement agreement. Dkt. 100-1 at 4–6. The next day, on January 12, 2022, CoStar filed the settlement agreement and the declaration of Mr. Bagla in this suit, styled (improperly) as a "Notice of Judgment in a Related Case." Dkt. 100, 100-1.[4] In short, CoStar used the threat of litigation and criminal sanctions against an unsophisticated foreign independent contractor to coerce an evidentiary declaration, in a misleading effort to tarnish CREXi in this Court.

### 3. CoStar coerces a false and misleading declaration from Arcgate.

Mr. Bagla's declaration contains numerous false and misleading statements

---

[4] CoStar's filing was in contravention of the Local Rules. A notice of related case is reserved for instances when there are "two or more civil cases filed in this District." C.D. Cal. L.R. 83-1. And CoStar's notice was not a notice of supplemental authority, *see* Fed. R. App. P. 28(j), as the judgment was not "authority" on any pending issue.

regarding CREXi and Arcgate's work for CREXi. Mr. Bagla repeatedly twists facts to fit CoStar's theories, and opines on issues, such as CREXi's intent and purpose in requesting a task, that are not in his personal knowledge. *See, e.g.*, *id.* at 24, ¶ 11 (asserting that actions were taken for "competitive purposes"). CREXi's proposed discovery will show the reason for that: CoStar's lawyers wrote the declaration and pressured Mr. Bagla to sign it under threat of further punitive litigation, financial damages, and criminal sanctions.

As one example, Mr. Bagla's declaration references a project in May 2020 where CREXi asked Arcgate to (1) copy and paste links associated with brokers in the "Website" field of CREXi's database to the "Cross-reference notes" field in CREXi's database; and (2) search Google to find the broker's webpage to populate the "Website" field. Dkt. 100-1, at 28–30, ¶¶ 19, 21–22. Where the website link copied into the Cross-reference notes field mentioned a CoStar website, CREXi asked Arcgate to remove the links. *Id.* Mr. Bagla claims that the "Website" section of CREXi's database was the "source" of CREXi's information about a broker and that Arcgate's work was intended to "remove all traces of a CoStar website as the source of this information." *Id.*

Mr. Bagla's claim is false on both counts. The "Website" field in CREXi's database is merely a link associated with the broker, is typically populated by brokers themselves, and does *not* indicate the source of CREXi's data about a broker or their listings. Dees Decl. ¶ 8. In addition, CREXi asked Arcgate to complete this task to *avoid* using CoStar's websites: Specifically, CREXi provides an optional cross-reference service to its customers where, each month, CREXi updates the listings on CREXi's website to match the listings on the broker's own website. *Id.* At the time, CREXi used the Cross-reference notes field in its database to perform the cross-referencing service. *Id.* CREXi asked Arcgate to move the website that the broker had provided with its listing to that field so that CREXi was using the broker-authorized website to update that broker's listings. *Id.* ¶¶ 8–9. At

17

1  the same time, CREXi asked Arcgate to delete references to CoStar websites from

2  the Cross-reference notes field to ensure that CREXi's cross-referencing service

3  would *not* inadvertently use a CoStar website to update broker listings on CREXi.

4  *Id.* ¶¶ 8, 10.

5       Mr. Bagla also references a project in April 2020 to purportedly "harvest

6  significant amounts of real estate data" from the "competing CoStar auction website

7  Ten-X." Dkt. 100-1 at 28-29, ¶ 20. As an initial matter, Mr. Bagla's

8  characterization of Ten-X as a CoStar website is incorrect because in April 2020,

9  CoStar did not own Ten-X—CoStar purchased Ten-X two months later in June

10 2020, and the project ended before that deal was complete. Dees. Decl. ¶ 11. More

11 importantly, the task CREXi asked Arcgate to perform was not intended to

12 "harvest" data, but rather was intended to prevent unfair competition from Ten-X.

13 *Id.* ¶ 12. CREXi asked Arcgate to monitor auction information on Ten-X's website

14 because CREXi had become aware that Ten-X employees were scraping from

15 CREXi's auction listings and that there were numerous listings on the CREXi

16 platform that were solely advertisements for auctions on the Ten-X platform. *Id.*

17 The request for auction information from Arcgate was to determine whether Ten-X

18 was poaching listings from CREXi and to flag or remove listings that were

19 advertising Ten-X auctions on CREXi. *Id.* CREXi's attempt to defend itself against

20 Ten-X's unscrupulous activities and piggybacking on CREXi's network is far

21 different from CoStar's manufactured spin in the Bagla declaration.

22      The Bagla declaration also makes a false and outlandish claim about

23 preservation of Arcgate's server logs. According to Mr. Bagla, Arcgate changed its

24 firewall device in May 2021, and so does not have access to Internet logs prior to

25 that date. Dkt. 100-1 at 32, ¶ 30. Using that declaration, CoStar has accused CREXi

26 of responsibility for that loss of data. McCloskey Decl., Exs. E, F. CoStar's

27 accusations, and Mr. Bagla's declaration, are absurd not only because Arcgate was

28 an independent contractor and CREXi had no control over Arcgate's servers, but

also because soon after CoStar filed its claims against CREXi, in late September 2020, CREXi *specifically requested* that Arcgate "preserve all records relating to your work for CREXi" and that the preservation should include "paper or electronic files." Dkt. 100-1, at 32 ¶ 30. Mr. Bagla's declaration, while acknowledging that notice, contains the counterfactual assertion that server logs were somehow not included in that request. *Id.* In reality, CREXi suspects that CoStar's lawyers inserted the language about Arcgate's server logs in the Bagla declaration to deflect from CoStar's own spoliation of logs demonstrating CoStar's mass access to CREXi's website—a revelation CoStar was forced to disclose just before the Bagla declaration was executed.

### 4.    CoStar refuses to produce information concerning its settlement with Arcgate.

Following CoStar's filing of the Arcgate settlement agreement and Mr. Bagla's declaration in this Court, CREXi and CoStar exchanged multiple letters, where CREXi requested information regarding the circumstances of that settlement. McCloskey Decl., Exs. G, H, I. CoStar refused to voluntarily provide the requested information. On February 2, 2022, CREXi served its Third Set of Requests for Production on CoStar. *Id.* ¶ 12. Request numbers 92 to 94 and 97 to 98 sought documents related to CoStar's settlement agreement with Arcgate and Mr. Bagla's declaration. McCloskey Decl., Ex. J, at 8–13. The requests are set forth in Section II, above. After meeting and conferring on March 16, 2022, and extended correspondence regarding the issue, CoStar has refused to produce its settlement communications with Arcgate pursuant to CREXi's Requests for Production, asserting that they are protected by a supposed Indian settlement privilege. *See id.* ¶ 13 & Exs. K, L, M, N & O.

### B.    Argument

CREXi requests discovery regarding CoStar's settlement negotiations with Arcgate and the Bagla declaration. There is no serious dispute that this discovery is

19

relevant. CoStar filed the Arcgate settlement agreement and Mr. Bagla's declaration in this Court, citing it as evidence against CREXi. CREXi is entitled to discovery allowing it to cross-examine and impeach that evidence. Moreover, this discovery is necessary to determine whether CoStar and its attorneys violated ethical rules and federal law by pressuring Arcgate to provide false and misleading testimony against CREXi in exchange for dropping CoStar's punitive litigation against Arcgate in India. *See* Cal. R. Prof. Conduct 3.4(d); 18 U.S.C. § 201(c)(2); *Solvent Chem.*, 166 F.R.D. at 289; *Patel*, 2015 WL 9701133, at *5 (disqualifying counsel that paid for testimony).

CoStar's basis for withholding these documents is not relevance, but rather, the improper assertion of a supposed "settlement privilege." But it is well established in the Ninth Circuit that "there is no privilege against disclosure of settlement agreements and communications." *Ironhawk*, 2019 WL 13032152, at *1.[5] CoStar does not argue otherwise. Instead, CoStar invokes a supposed "settlement privilege" under Indian law by relying on the Indian "without-prejudice" rule—a rule of admissibility under Indian law that CoStar seeks to expand to American discovery—in a bid to bypass the mechanisms of the Federal Rules of Civil Procedure. That effort fails. First, United States law applies. Second, even if Indian law were to apply, the Indian without-prejudice rule does not shield the requested communications from discovery.

### 1. United States law, not Indian law, governs here.

Under Rule 501 of the Federal Rules of Evidence, "[federal] common law . . . governs a claim of privilege." Fed. R. Evid. 501. While federal courts will

---

[5] *See also, e.g.*, *Bd. of Trustees of Leland Stanford Junior Univ. v. Tyco Int'l Ltd.*, 253 F.R.D. 521, 523 (C.D. Cal. 2008) ("there is no federal privilege preventing the discovery of settlement agreements and related documents."); *L. A. Printex Indus., Inc. v. Design Collection, Inc.*, 2011 WL 13254533, at *3 (C.D. Cal. Nov. 1, 2011) ("There is no settlement privilege in the Ninth Circuit"); *Middlesex Ret. Sys. v. Quest Software, Inc.*, 2009 WL 10673943, at *1 (C.D. Cal. July 8, 2009) ("there is no federal settlement privilege that may be invoked to prevent the discovery of written communications made during the course of settlement discussions."); *GT Beverage Co., LLC v. Coca-Cola Co.*, 2010 WL 11590890, at *1 n.2 (C.D. Cal. Sept. 16, 2010) (same).

1  sometimes look to foreign law "in defining the contours of" a privilege based on

2  principles of comity, *Madanes v. Madanes*, 199 F.R.D. 135, 145 (S.D.N.Y. 2001),

3  CREXi is unaware of (and CoStar has not cited) any case where *a foreign country's*

4  *settlement privilege* has been applied to discovery in federal court.

5       This is no surprise. Many courts have declined to apply foreign privileges

6  that differ from U.S. federal privilege law because doing so would be inconsistent

7  with the liberal policy of discovery under the Federal Rules of Civil Procedure. *See*

8  *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 52 (S.D.N.Y. 1989) (rejecting foreign

9  notary and accountant privilege).[6] In *Duttle*, for example, the Southern District of

10  New York denied the application of an asserted German privilege for notaries and

11  tax advisors. *Id.* The court first determined that because the case involved federal

12  claims, the privileges available under federal common law would apply. *Id.* In

13  response to a request to apply foreign law as a matter of comity, the *Duttle* court

14  noted that, unlike cases where the relationship at issue was similar to that of an

15  attorney and client, the role of the German notaries and tax advisors were "more

16  akin to that of an accountant," a relationship with no privilege under federal law. *Id.*

17  The *Duttle* court thus determined that comity did not require the application of a

18  foreign privilege that would "inhibit the truth-seeking process" under the Federal

19  Rules of Civil Procedure, especially because the foreign plaintiffs had chosen to sue

20  in federal court. *Id.*

21       Here, as in *Duttle*, CoStar has brought federal claims against CREXi

22  (copyright infringement) and thus federal privilege law applies. Moreover, the

23  purported privilege CoStar asserts—a settlement privilege—is unavailable under

24

25  _____

[6] *See also Status Time Corp. v. Sharp Elecs. Corp.*, 95 F.R.D. 27, 33 (S.D.N.Y. 1982) (noting the
26  "uniquely restrictive" nature of the attorney-client privilege, and refused to expand it to other
types of confidential relationships, such as with foreign patent agents); *Novamont N. Am. Inc. v.*
27  *Warner–Lambert Co.*, 1992 WL 114507, *2 (S.D.N.Y., May 6, 1992) ("I decline to extend the
attorney-client privilege, on the basis of comity, to communications with foreign patent agents
who are not admitted attorneys."); *SmithKline*, 2000 WL 1310668, at *3–4 (looking to whether,
28  in the relationship privileged under foreign law, the agent was "more or less functioning as [an]
attorney[]").

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

federal law, and so comity does not require the Court to inhibit the truth-seeking process by applying such a privilege. CoStar also cannot complain of prejudice after it chose to file in this Court its settlement agreement and a declaration that was signed under the laws of the United States.

In the parties' meet-and-confer process, CoStar has argued that, rather than follow the approach in *Duttle*, this Court should instead apply a choice-of-law analysis called the "touch base" test. McCloskey Decl. Ex. L, at 2. In a touch-base analysis, "any communications touching base with the United States will be governed by the federal discovery rules while any communications related to matters solely involving [a foreign country] will be governed by the applicable foreign statute." *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 520 (S.D.N.Y. 1992) (alteration in original). Even if the touch-base test suggests applying foreign law, courts still refuse to apply a foreign privilege if doing so would "undermine any compelling policy interest reflected in domestic law." *Id.* at 523.

For starters, the touch-base test has no relevance here. Every case CoStar has cited applying the touch-base test under Rule 501[7] involved the attorney-client privilege and the "important policy" underlying that privilege. *Id.* at 522.[8] Those cases emphasize that the privileged relationship at issue involved a confidential advisor (such as a foreign patent agent) that "perform[ed] services akin to lawyers."

---

[7] The Second Circuit in *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 99 (2d Cir. 2020), applied the touch-base test in a case brought under 18 U.S.C. § 1782—a statute used to obtain discovery *for use in foreign proceedings*. The Second Circuit applied a touch-base analysis, not as a matter of federal common law under Rule 501, but because § 1782 mandates a court to apply any "legally applicable privilege" including those under foreign law. No such statutory mandate exists here, and so *Mangouras* is inapposite.

[8] *See also, e.g.*, *Philips N. Am. LLC v. Fitbit LLC*, -- F. Supp. 3d --, 2022 WL 252392, at *5 (D. Mass. Jan. 27, 2022) (applying Dutch law of attorney-client privilege to communications with an in-house patent attorney); *Masillionis v. Silver Wheaton Corp.*, 2018 WL 1725649, at *3 (C.D. Cal. Apr. 2, 2018) (applying Canadian law to attorneys in Canada), *vacated on other grounds*, 2018 WL 11394848 (C.D. Cal. Aug. 2, 2018); *Cadence Pharms., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1020–21, 1024 (S.D. Cal. 2014) (German attorney-client privilege applied to patent agent); *Astra Aktiebolag v. Andrx Pharms., Inc.*, 208 F.R.D. 92, 98–99 (S.D.N.Y. 2002) (attorney-client privilege under German and Korean law).

*Id.* Because there is no federal settlement privilege implicating an "important policy" like the attorney-client privilege, there is no basis to apply a purely contacts-based analysis. The Court should apply United States law instead.

Even if the Court were to utilize the touch-base analysis, however, United States law would still apply. Far from a situation where the communications relate "to matters solely involving" a foreign country, *Golden Trade*, 143 F.R.D. at 520, the communications surrounding the Arcgate settlement and declaration have everything to do with this United States litigation. CoStar is a United States entity, and its sole basis for suing Arcgate was Arcgate's work for CREXi (another United States entity). Arcgate Compl. ¶¶ 19–49 (describing factual bases for allegations against Arcgate). The legal underpinnings of CoStar's claims were also based on United States copyright law, not any Indian copyrights or intellectual property. *Id.* ¶¶ 50–51. Indeed, CoStar's entire objective in filing litigation against Arcgate was to obtain evidence against CREXi for use in this United States litigation. As a result of CoStar's settlement communications with Arcgate, Arcgate produced to CoStar approximately 9,000 emails between CREXi and Arcgate. McCloskey Decl. ¶ 10. The settlement agreement itself requires Arcgate to cooperate with CoStar in this litigation, and forbids Arcgate from cooperating with CREXi in its claims against CoStar. Dkt. 100-1, at 13 ¶ 7 & 16 ¶ 17. And as part of the consideration for the CoStar-Arcgate settlement agreement, Mr. Bagla provided a declaration against CREXi tailor-made for use in this lawsuit, signed under penalty of perjury of the *laws of the United States of America*, not the laws of India. *Id.* at 33. CoStar's Arcgate lawsuit, although brought in India, had this lawsuit in the United States as its primary focus.

The Southern District of New York's decision in *Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D. 58 (S.D.N.Y. 2010), is on point. In *Gucci*, the defendant sought discovery of communications of a non-lawyer member of Gucci Italy's in-house legal team created during its investigation of trademark infringement in Italy.

23

1860275

*Id.* at 64–65. The defendant contended that Italian law should apply and would allow the production of the requested communications. *Id.* The *Gucci* court rejected that position, instead holding that U.S. law applied (and ultimately held that some documents were privileged, and others were not, under U.S. law). *Id.* at 69–73. In determining that U.S. law applied, the *Gucci* court focused on whether there was a "more than incidental" connection between the communications and the United States. *Id.* at 67. Because Gucci America and its Italian affiliate in that case had coordinated their investigations in a "common endeavor[] to commence parallel trademark infringement actions against Guess in the United States and Italy" based on trademarks registered *in the United States*, the connection to the United States was "more than incidental" and federal attorney-client privilege rules applied. *Id.* at 66–67. Here, the facts are even more compelling than in *Gucci* because CoStar's litigation against Arcgate in India was wholly derivative of CoStar's lawsuit in the United States against CREXi, and specifically designed to obtain evidence against CREXi for use in the United States.

Moreover, courts refuse to apply foreign privileges where doing so would undermine compelling interests of United States law. *Golden Trade*, 143 F.R.D. at 520. Here, applying a foreign settlement privilege would undermine compelling United States interests for three reasons.

***First***, CREXi requires the requested discovery to defend itself against CoStar's filing and use of a false and misleading declaration to malign CREXi.[9] Our adversarial system must allow CREXi the discovery it needs to cross-examine and impeach the statements made in the settlement and declaration CoStar filed. CREXi may not treat the Arcgate settlement and Bagla declaration as both sword and shield. *Cf. Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir. 2003) (client may not put their attorney's performance at issue while refusing to waive privilege over

---

[9] CoStar has already cited to Mr. Bagla's declaration in briefing to the Court on discovery disputes. *See* McCloskey Decl., Ex. P (CoStar's Opp. to CREXi's Request for Custodians), at 10.

24

documents relevant to the lawyer's performance).

*Second*, the communications CoStar seeks to hide may demonstrate that CoStar violated ethical rules and federal law by obtaining and using Mr. Bagla's declaration—an issue that cannot be secreted away without risking the integrity of these proceedings. California Rule of Professional Conduct 3.4(d) explicitly forbids a lawyer from "directly or indirectly pay[ing] . . . a witness contingent upon the content of the witness's testimony." This prohibition exists whether the paid-for testimony is "truthful or not," and may result in the exclusion of the evidence or disqualification of the submitting attorneys. *Patel*, 2015 WL 9701133, at \*5. Federal law likewise prevent anyone from "directly or indirectly . . . giv[ing] . . . anything of value to any person, for or because of the testimony under oath." 18 U.S.C. § 201(c)(2). Here, the circumstances of CoStar's settlement with Arcgate suggest that CoStar dropped its suit against Arcgate—which the law recognizes as something of value, *see, e.g.*, *Solvent Chem.*, 166 F.R.D. at 289 ("[O]rchestrating [a] settlement" and obtaining litigation peace are "the equivalent of making cash payments" for "securing . . . testimony")—in exchange for Mr. Bagla's declaration. The false, argumentative, and misleading nature of that declaration, along with the fact that it was signed "under penalty of perjury of the laws of the United States," suggests that CoStar's counsel was involved in the drafting. CoStar cannot be allowed to hide its misconduct under the cover of a supposed foreign "settlement privilege" that does not exist in the United States.[10]

*Finally*, the Federal Rules of Civil Procedure promote a "broad and liberal" policy of discovery. *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). As a result, "testimonial exclusionary rules and privileges are not favored" because "a

---

[10] The policy justification for disclosure is particularly heightened because CoStar is at it again. CREXi recently learned that CoStar has sued another of CREXi's vendors on trumped-up copyright-infringement claims, once again seeking and obtaining a draconian *ex parte* order to seize all of the vendor's technology assets in an effort to drum up discovery for this litigation (rather than simply follow the Hague Convention). CoStar is following the same playbook as with Arcgate, and the Court should not allow CoStar to run a rogue discovery operation in India, while shielding evidence of any negotiations with third-parties.

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1    fundamental principle of our jurisprudence [is] that the 'public . . . has a right to

2    every man's evidence.'" *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141

3    (2d Cir. 1987). Indeed, the Supreme Court and Congress struck a specific policy

4    balance in enacting Rule 408 of the Federal Rules of Evidence. While Rule 408

5    excludes settlement materials for certain purposes (*e.g.*, to prove the validity or

6    amount of a disputed claim), it provides for their admissibility for all *other*

7    purposes. Fed. R. Evid. 408(b). In short, because Rule 408 "specifically provided

8    that settlement negotiations can be admitted for certain purposes, . . . any federal

9    settlement privilege is *contrary to the enactment approved by the legislature*."

10   *Matsushita Elec. Indus. Co. v. Mediatek, Inc.*, 2007 WL 963975, at *5 (N.D. Cal.

11   Mar. 30, 2007) (emphasis added). CoStar cannot cast aside this policy choice.

12        In sum, regardless of the analytical approach, United States law applies, and

13   the Court should order the production of CoStar's communications with Arcgate.

### 2.    Even under Indian Law, the "without-prejudice" rule does not prevent the production of the requested documents.

15        Even if the Court were to apply Indian law (and it should not, for the reasons

16   detailed above), there would be no basis for CoStar to resist the production of the

17   requested settlement communications.

18        Under Federal Rule of Civil Procedure 44.1, "the party who claims that the

19   foreign law is different from the local law of the forum has the burden of

20   establishing the content of the foreign law." *Bel-Ray Co., Inc. v. Chemrite (Pty)*

21   *Ltd.*, 181 F.3d 435, 440–441 (3d Cir. 1999); *see also Vetco*, 691 F.2d at 1289 ("The

22   party relying on foreign law has the burden of showing that such law bars

23   production."). "Where parties fail to satisfy [that] burden, the court will ordinarily

24   apply the forum's law." *Bel-Ray*, 181 F.3d at 441.[11] The purpose of this burden is to

---

[11] *See also Interpool Ltd. v. Char Yigh Marine (Panama) S.A.*, 890 F.2d 1453, 1458 (9th Cir. 1989) ("Where no authority, or insufficient authority, is presented by the parties about foreign law, a court may conclude that the parties have acquiesced in the application of the law of the forum"); *BrightEdge Techs., Inc. v. Searchmetrics, GmbH*, 2014 WL 3965062, at *2 (N.D. Cal. Aug. 13, 2014) ("[T]he party relying on foreign law has the burden of showing such law bars production [of documents]."); *Hammerl v. Acer Europe, S.A.*, 2009 WL 30130, *8 (N.D. Cal. Jan.

26

1860275

avoid a "speculative foray[] into legal territories unfamiliar to federal judges." *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 80 (2d Cir. 1997) (alteration in original). The burden of establishing a privilege also "rests with the party asserting the privilege." *Clarke v. Am. Com. Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992).

CoStar has failed to satisfy its burden to show that Indian law would bar production of settlement communications between CoStar and Arcgate. In fact, as detailed in the attached declaration of Rohan George, an experienced legal practitioner in India, Indian law would require their production. In the parties' lengthy meet-and-confer process, CoStar has asserted that the so-called "without-prejudice" rule under Indian law acts as a privilege protecting settlement communications and drafts from discovery. *See, e.g.*, McCloskey Decl. Ex. N, at 1–6. CREXi has repeatedly requested that CoStar provide authority supporting this interpretation. *Id.* Exs. K, M, O. But the sole authority CoStar has provided that has blocked production of documents under the "without-prejudice rule" is an *English* case, *Rush & Tompkins Ltd. v. Greater London Council* [1989] AC 1280. *See* McCloskey Decl. Ex. N, at 1–6. But English decisions are not binding on Indian courts. Declaration of Rohan K. George ("George Decl."), ¶¶ 12–14.[12] Although CoStar has identified India Supreme Court cases that cite *Rush*, *Chairman & M.D., N.T.P.C. Ltd v. M/S. Reshmi Constrs., Builders & Contractors*, (2004) 2 SCC 663, George Decl. Ex. G ("*Chairman*"), and *Peacock Plywood Pvt. Ltd. v. The Oriental Insurance Co. Ltd.*, (2006) 12 SCC 673, George Decl. Ex. H ("*Peacock*"), those cases solely addressed questions of admissibility, not production. CoStar thus fails

---

5, 2009) ("If the party asserting foreign law fails to carry that burden, 'the forum will usually decide the case in accordance with its own law.'").

[12] To the extent CoStar asks this Court to *predict* how Indian law would address this question, the Court should decline to do so. Although the weight of authority under Indian law shows that CoStar's interpretation of the without-prejudice rule is incorrect, the Court should avoid a "speculative foray[]" into an issue of foreign law. *Metallgesellschaft AG*, 121 F.3d at 80.

1    to cite any Indian authorities that supports its position.[13]

2          A bar on production of settlement communications based on the without-

3    prejudice rule would be inconsistent with principles of Indian law. George Decl.

4    ¶¶ 18–30. Indeed, while CoStar points to the *Chairman* and *Peacock* decisions as

5    supposed evidence that Indian law adopted *Rush*, those decisions cite a reversed

6    *lower appellate court* decision in *Rush*, which had held that the without-prejudice

7    rule did *not* block production of documents. *See* George Decl. ¶¶ 18–28 & Exs. G,

8    H. Indeed, *Chairman* quotes the reasoning that resulted in the lower appellate

9    court's holding, namely, that "the parties must be taken to have intended and agreed

10   that the privilege *will cease* if and when the negotiations 'without prejudice' come

11   to fruition in a concluded agreement." *Chairman*, 2 SCC 663 (emphasis added); *see*

12   *also Peacock*, 12 SCC 673 ("If the purpose for which [the without-prejudice rule] is

13   used is accomplished, no legitimate claim can be allowed to be defeated thereby.").

14   Because this case involves a concluded settlement agreement, Indian courts would

15   not apply the without-prejudice rule to CoStar's settlement negotiations with

16   Arcgate. *See* George Decl. ¶¶ 21–24.

17         Other principles of Indian law also require production of the requested

18   communications. Section 165 of the Indian Evidence Act provides Indian courts the

19   authority to "order the production of any document or thing" and "neither the

20   parties nor their agents shall be entitled to make any objection to any such . . .

21   order." This power extends to "any matter relevant or irrelevant" because "every

22   trial is a voyage of discovery in which truth is the quest." *Ved Parkash Kharbanda*

23   *v. Vimal Bindal* (2013) 198 DLT 555, ¶¶ 15.5, 15.7.7, George Decl. Ex. M.

24   Although there are exceptions to a judge's power to order the production of

25   _____

26   [13] CoStar has also cited in meet-and-confer correspondence an administrative decision by the Competition Commission of India ("CCI"). McCloskey Decl. Ex. N, at 1–2. That decision, too,

27   solely addresses admissibility. George Decl. Ex. I ¶ 160 (citing House of Lords decision in *Rush* solely for principle that the "without prejudice rule is a rule governing the admissibility of evidence" and in cases where "no question of discovery arises"). In any event, CCI decisions

28   have no binding effect on Indian courts. George Decl. ¶¶ 27–28.

1860275

documents, such as the attorney-client privilege, the without-prejudice rule is not
one of them. George Decl. ¶ 36. Indian courts have likewise admonished parties
that the without-prejudice rule cannot be used to mislead the court. *Id.* ¶ 34; *Zatrix
Limited v. MV Nikoforos*, (2020) R/O.J.APPEAL NO. 18 of 2018, at *17–*18,
George Decl. Ex. K (holding without-prejudice materials admissible in denying a
request for equitable relief that was misleading without those materials).

Even under the decision of the English court in *Rush* (which, of course, is not
binding on Indian courts and has no application in this Court), the without-
prejudice privilege does not apply "when the justice of the case requires it." *Rush*,
[1989] AC 1280, at 1300, George Decl., Ex. F, at 10. *Rush* notes that the privilege
cannot be used to "suppress a threat if an offer is not accepted"—an exception that
has been expanded in later United Kingdom cases to include circumstances where
the privilege is used "as a cloak for perjury, blackmail or other 'unambiguous
impropriety.'" *Unilever plc v. The Proctor & Gamble Co.* (2000) 1 WLR 2436,
George Decl., Ex. J. In addition, the rule does not apply if the admission concerns
an "independent fact" not connected to the "merits of the cause." *Rush*, [1989] AC
1280, at 1300, George Decl., Ex. F, at 10; *cf. Havels India Ltd. v. Electrium Sales
Ltd.*, 2013 (136) DRJ 648, George Decl. Ex. C (allowing admission of settlement
communications to prove that a party invoked arbitration provision).

Even if *Rush* applied, so would these exceptions. CoStar cannot file a false
and misleading declaration in this matter, and then deny discovery on how it was
drafted to "cloak" the reasons for Mr. Bagla's false statements. *Rush*, [1989] AC
1280, at 1300. Nor can CoStar hide any threats or pressure it applied to Arcgate to
induce it to settle. *Id.* The "justice of the case" certainly requires their production.
In addition, all of these issues are independent from the "merits" of CoStar's claims
against Arcgate—it is beside the point that CoStar's claim of copyright
infringement against Arcgate were baseless. What CREXi seeks is information on
CoStar's conduct, its potential breach of ethical rules, and the pressure it applied on

1    Arcgate and Mr. Bagla to extract the declaration it has filed in this matter.[14]

2        Thus, even following the path of CoStar's "speculative foray[]" into Indian

3    law by way of non-binding English common law—a foreign voyage this Court

4    should "avoid," *Metallgesellschaft AG*, 121 F.3d at 80—the without-prejudice rule

5    would not shield CoStar from CREXi's discovery.

6        **C.    Conclusion**

7        For the foregoing reasons, the Court should order CoStar to produce the

8    settlement communications responsive to CREXi's requests for production.

9    **IV.   COSTAR'S POSITION**

10       CREXi has used a network of offshore agents to harvest content from CoStar

11   since 2016.  CREXi instructed these agents, including several Indian BPOs, to

12   make use of CoStar's websites for multiple competitive purposes, including to copy

13   property details and photographs, without any regard for copyrights, and convert

14   them into listings for CREXi.  CREXi also had these agents harvest auction details

15   from CoStar's auction site, copy or verify broker information from multiple CoStar

16   sites, and "snip" CoStar-owned photographs from property brochures, including

17   those with CoStar or LoopNet branding.  Indeed, according to CREXi, these

18   offshore agents uploaded roughly two-thirds of the 10,000 infringing images

19   identified in CoStar's complaint.

20       Unsurprisingly, then, CREXi has fought tooth and nail to avoid discovery

21   into its interactions with these, and its other, BPOs.  CREXi refused for more than

22   six months even to ask its BPOs for documents responsive to CoStar's requests, and

23   did so only after CoStar said it would seek relief from this Court.  And CREXi

---

24

25   [14] The India Supreme Court's *Peacock* decision supports this conclusion, as it quotes authority
     indicating that in a "three party situation," *i.e.*, where a third party is seeking discovery of others'
26   settlement communications, "without prejudice documents are only protected in circumstances
     where a public policy justification can be provided, ***namely where the issue is whether***
27   ***admissions were made***." *Peacock*, 12 SCC 673 (emphasis added). Because CREXi is seeking the
     requested communications not for "admissions," but for evidence of CoStar's misconduct and
28   issues relevant to Mr. Bagla's truthfulness, CoStar cannot justify the application of the without-
     prejudice rule.

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

itself has produced almost no documents relating to these BPOs—not even its communications with Arcgate.

Consistent with stonewalling discovery into all of its agents, CREXi now seeks to undermine the judgment entered against its agent Arcgate. CREXi's motion insinuates that it was powerless to assert its rights in India, and only learned about the Arcgate case when CoStar filed a Notice of Judgment in a Related Case in January 2022. But as reflected in emails with Arcgate that have been withheld by CREXi, CREXi's U.S. counsel, including its declarant Elizabeth McCloskey, discussed the Indian litigation with Arcgate while it was ongoing, in mid-October 2021, a month and a half before the settlement, and several months before the High Court of Rajasthan entered a final Decree adopting the settlement. Further, declarant Rohan George, CREXi's Indian counsel, wrote to Arcgate threatening civil liability under U.S. and Indian law, and potential criminal liability, because Arcgate had produced its communications with CREXi to CoStar. CREXi has refused to produce these contemporaneous communications, which show that it had more than enough time to intervene in the Arcgate case, and that it has no problem taking actions in India, it just prefers to act behind the scenes, including using Indian counsel to threaten Arcgate based on Arcgate's compliance with an Indian court order.

CoStar's recent suit against another of CREXi's BPOs, Neptune, further underscores CREXi's ability to seek to further its interests in India, and its deliberate decision to do so without formal intervention in court. In the Neptune case, in which evidence of wrongdoing and mass destruction of evidence was recently uncovered, the court-appointed Commissioners' reports show that the same CREXi declarant-lawyers (McCloskey and George) placed a call to, or had multiple calls with, Neptune's managing director, Mr. Ganesh Subramanian, the morning the court appointed the Commissioners and the day before the Commissioners performed their search. During that search, the Neptune managing director initially

31

1    told the Commissioners that "there was no reason for him to preserve the materials

2    relating to CoStar and Crexi and therefore he had deleted those materials," before

3    trying to backpedal.  He did not deny, and was unable to ultimately explain, the

4    mass deletion—an incredible revelation not least because CREXi has (to date)

5    admitted that Neptune, on CREXi's behalf, uploaded almost a thousand CoStar-

6    owned images to CREXi's systems.  The managing director then refused to answer

7    further questions unless they were in writing and his lawyer had a chance to take

8    direction (from someone else) on responses.  When pressed, CREXi's counsel

9    would not confirm or deny their calls to Neptune (reflected in Mr. Subramanian's

10   call logs), or whether they directed Neptune's written responses during the

11   seizure.[15]

12         These are the circumstances in which CREXi seeks to launch an improper

13   collateral attack in this Court on an Indian judgment against its agent Arcgate,

14   insinuating that it was unable to protect itself in India, and pretending that the basis

15   for that judgment does not accurately reflect wrongdoing against CoStar.  The High

16   Court of Rajasthan was the place for CREXi to challenge the settlement and the

17   supporting testimony that led to the judgment against CREXi's agent, Arcgate.

18   CREXi, on notice of the case, declined to do so and has thus waived its right to

19   seek relief, including before this court.  Further, as detailed by CoStar's expert,

20   former Justice of the Indian Supreme Court B.N. Srikrishna, the CoStar-Arcgate

21   settlement negotiations are protected by an Indian privilege of broad application,

22

23   _____
     [15] As noted above, plainly, CREXi's counsel is able to take whatever steps they deem

24   necessary in India to advance or protect CREXi's interests there, contrary to the
     suggestions in CREXi's motion, and this record is offered to make that point.  CoStar

25   refrains at this time from accusing CREXi's counsel of colluding in Neptune's
     reported mass destruction of evidence regarding CoStar and CREXi.  To date, the
     Commissioner's Report reflects contact between CREXi's counsel and Neptune the

26   day before the seizure, mass deletions revealed by the seizure, and an indication that
     Neptune was taking direction from another party and/or their counsel during the

27   seizure.  CREXi's counsel has refused to address these issues, despite repeated
     requests, and will not even state whether there is any basis to claim privilege over

28   their apparent communications with Neptune's managing director.  CoStar will
     continue to pursue these issues.

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

and CREXi has no basis to pierce it.  In particular, CREXi's claim that the testimony is "false" finds no support in the declaration of CREXi's Lawson Dees, who merely quibbles with CREXi's supposed "purpose" in undertaking the admitted mass deletion of references to CoStar sites, and the comprehensive scraping of the Ten-X site now owned by CoStar.  The final Indian judgment against CREXi's agent Arcgate, including the court-approved injunction and testimony incorporated therein, are rightfully devastating to CREXi.  Its desperate and belated effort to undermine the consequences of its misconduct should be denied.

### A.   BACKGROUND

#### 1.   CREXi, With Assistance From Third-Party Agents, Has Built Its Business By Piggybacking On CoStar.

Rather than make the necessary investments to compete honestly in the commercial real estate information industry, CREXi has attempted to build its business by free-riding on CoStar's billions of dollars of investments and decades of hard work.  As part of its scheme to scale up its business as quickly and cheaply as possible, by whatever means necessary, CREXi, like serial infringer Xceligent, Inc. ("Xceligent") before it,[16] engaged agents in India and elsewhere to surreptitiously access CoStar's websites and view and harvest content for CREXi's competitive use.  Indeed, rather than deny that *modus operandi*, CREXi embraced it, expressly alleging in pleadings filed in this Court that it is industry standard to

---

[16] CoStar sued Xceligent for copyright infringement and unfair competition in 2016, and eventually obtained a permanent injunction and a $500 million judgment. Declaration of Nicholas Boyle in Supp. of CoStar's Statement of Position Regarding CREXi's Mot. to Compel Discovery Regarding CoStar's Settlement with Arcgate ("Boyle Decl."), Ex. H, Judgment.  CoStar also pursued legal action against Xceligent's Indian BPO Maxval Technologies Pvt. ("MaxVal"), which was accessing CoStar's websites without authorization and copying content *en masse*, before the Court of District Judge at Thane, Maharashtra. Declaration of Faraz Alam Sagar in Supp. of CoStar's Statement of Position Regarding CREXi's Mot. to Compel Discovery Regarding CoStar's Settlement with Arcgate ("Sagar Decl.") ¶ 3. In April 2018, the parties filed consent terms under which MaxVal confirmed its contributory infringement on behalf of Xceligent and acceded to a permanent injunction barring it from CoStar's databases or websites. *Id.*

access and use competing sites such as CoStar's LoopNet to copy property listings,
ECF No. 74, Counterclaims ¶ 118, that it is permissible because brokers told them
to do so, *id.*, and that CoStar's attempts to combat CREXi's free-riding were
anticompetitive, *passim*.  (This Court subsequently rejected all of CREXi's antitrust
claims, including specifically its claim that it was permissible to access LoopNet for
competitive purposes.  ECF No. 146, Order on Mot. to Dismiss, at 8 ("[I]t is not
anticompetitive conduct for Co[S]tar to block its competitors from accessing CRE
listing information hosted on its own websites.").

Consistent with Xceligent's approach, CREXi has averred that, starting in
late 2016 and continuing to the present day, it hired at least six different Indian
companies, along with individual independent contractors in the Philippines and
elsewhere.  Boyle Decl., Ex. A, CREXi's Supp. Resps. to Interrogatories Nos. 2, 5,
12, at 20-30.  CREXi states that these BPOs perform tasks such as "creat[ing] and
updat[ing] commercial real estate listings."  *See, e.g.*, *id.* at 21.

The evidence shows these BPOs do indeed create listings, and that their work
is key to CREXi's strategy of unauthorized access to CoStar sites,
misappropriation, and infringement.  The limited information CREXi has provided
on the source of the 10,000 infringing photographs CoStar identified in its
complaint shows that roughly two-thirds of the 10,000 were uploaded to CREXi's
systems by its BPO agents—6,596 in total.  *See* Boyle Decl., Ex. B, Am. Appendix
C.  And as discussed in detail *infra* §§ IV.A.2 & IV.A.5, CoStar independently
developed evidence that Arcgate, based in Udaipur, India, and Neptune, based in
Chennai, India, accessed CoStar's websites without authorization to view, verify
and copy the content.  CoStar sued Arcgate in March 2021, and Neptune in July
2022, in India.  Documents produced in the Arcgate action show that while CREXi
later argued to this Court that it was justified in piggybacking on CoStar, it knew at
that time that by accessing and using CoStar websites it was engaging in
wrongdoing.  Both cases have also revealed the destruction of evidence of

wrongdoing against CoStar: server logs showing Arcgate's website access, and reported mass deletions by Neptune, including similar server logs and a slew of other CoStar- and CREXi-related materials.

CREXi, tellingly, has vigorously resisted producing documents and information regarding its BPOs.  Since December 2021, CoStar repeatedly has asked CREXi to produce information responsive to CoStar's discovery requests in its possession, custody, or control, including from BPOs.  Boyle Decl. ¶¶ 5, 6. CREXi initially refused even to ask its BPOs for information, *id.* ¶¶ 5-7, and did not agree to send correspondence to its BPOs regarding CoStar's requests until June 2022, *id.* at Ex. C, E. McCloskey Email (June 10, 2022), and only after CoStar told CREXi it planned to move to compel, *id.* at Ex. C, J. Carney Email (June 9, 2022). CREXi then continued to stonewall, refusing to produce its letters to the BPOs or any responses.  *Id.* at Ex. C, E. McCloskey Email (July 6, 2022).  On August 5, again, after CoStar said it would move to compel, CREXi made a paltry production, *see id.* at Ex. C, E. McCloskey Email (Aug. 5, 2022), containing its requests to its BPOs (which inaccurately describe the information sought by CoStar), and self-serving responses from BPOs containing strikingly similar, and in many instances verbatim, language and American legalese implausibly denying any access to or use of CoStar's websites.[17]

CREXi's efforts to hide or discredit its agents' role in CREXi's free-riding on CoStar, including by withholding documents in this case and attacking the Arcgate judgment, is consistent with CREXi's strategy of stopping at nothing to misappropriate competitors' content.  In 2016, Ten-X (now part of CoStar) sued CREXi's co-founders Michael DeGiorgio and Luke Morris, who previously worked for Ten-X, in connection with a scheme to misappropriate highly confidential customer lists to launch CREXi.  Boyle Decl., Ex. D, Compl.  Ten-X obtained a

---

[17] CoStar will address these BPOs' denials of wrongdoing, and refusal to produce documents that would evidence wrongdoing, in future submissions to this Court.

preliminary injunction against CREXi, *id.* at Ex. E, Order, and the parties settled in
May 2017 for a seven-figure damages payment, *id.* at Ex. F, Settlement, at 2.  As
part of the settlement, Mr. DeGiorgio, like Arcgate's Mr. Bagla, submitted a sworn
declaration, *id.* at Ex. G, DeGiorgio Decl.  Mr. DeGiorgio also issued a public
apology.  *Id.* at Ex. F, Settlement, Public Stmt.  That CREXi embarked on its
scheme to steal content from CoStar using BPOs in late 2016, *see id.* at Ex. A,
CREXi's Supp. Resps. to Interrogatories Nos. 2, 5, 12, at 20-30, calls into
question—to say the least—the sincerity of Mr. DeGiorgio's apology.[18]

More recently, in August 2021, CoStar was forced to sue its former
subscriber, Leon Capital, after it learned that Leon Capital—which invests in and
promotes CREXi and whose CEO is a co-founder of CREXi—was accessing
CoStar's database using pilfered passwords and exporting records *en masse*.  Boyle
Decl., Ex. I, Compl.  In June 2022, the U.S. District Court for the District of
Columbia denied Leon Capital's motion to dismiss four of CoStar's five claims,
including a claim for violating the federal anti-hacking statute, the Computer Fraud
and Abuse Act.  *Id.* at Ex. J, Order.  In the course of preparing to amend its
complaint, CoStar discovered that Leon Capital—apparently undeterred by
CoStar's lawsuit or the Court's order—continued as recently as July 2022 to access
CoStar's products, specifically LoopNet, without authorization, just like CREXi
and its agents, until CoStar blocked access by the offending employees.  *Id.* at Ex.
K, Proposed Am. Compl. ¶¶ 72-74.  CoStar thus continues to be forced to litigate
on all fronts, in the United States and abroad, to stem the tide of wrongful
misconduct by CREXi, its associates and its agents.

---

[18] In fact, CREXi's BPOs were uploading CoStar's copyrighted photos to CREXi in
early 2017, before Mr. DeGiorgio's apology, and continued to do so long after.  Boyle
Decl., Ex. B, Am. Appendix C (showing uploads by contractors starting in February
2017).

1860275

## 2.    CoStar Sued CREXi's Agent Arcgate To Enjoin Its Misconduct Against CoStar.

In March 2021, CoStar sued Arcgate in the Learned Commercial Court at Udaipur, India after discovering that Arcgate was accessing CoStar's LoopNet site and misappropriating content on behalf of CREXi.  Sagar Decl., Ex. A, Arcgate Plaint.  CoStar's surveillance identified a specific Indian IP address with multiple connections to Arcgate, which had accessed LoopNet tens of thousands of times between April 2016 and January 2021.  *Id.* ¶¶ 39-41.  When CoStar's anti-piracy software blocked the IP address, the perpetrators switched to a third-party anonymizer service to continue accessing LoopNet.  *Id.* ¶¶ 42-43.  Armed with this and other evidence, CoStar brought claims against Arcgate for contributory copyright infringement under the Indian Copyright Act, 1957, along with common law claims for piracy/theft, improper access to CoStar's websites, and misappropriation of CoStar's proprietary content.  *Id.* ¶ 48.

CoStar's initial request for relief was an *ex-parte ad-interim* order of injunction and an order allowing court-appointed agents, called Commissioners, to seize evidence of wrongdoing to prevent spoliation.  *Id.* ¶¶ 54-57.  The appointment of a Commissioner to conduct a seizure is a measure available in extraordinary circumstances under India's Civil Procedure Code "not, as much to collect evidence but to preserve and protect the infringing evidence."  *Autodesk Inc. v. A.V.T. Shankardass*, AIR 2008 Del 167, ¶ 14; *see Morgan Stanley Mut. Fund v. Kartick Das*, 4 SCC 225 ¶ 36 (1994) ("[a]s a principle, [an] *ex parte* injunction could be granted only under exceptional circumstances" and listing six factors which Indian courts must weigh before granting such an injunction).  Initially, the Udaipur Commercial Court dismissed both applications, but CoStar appealed to the High Court of Rajasthan, and the High Court overturned the lower court's denial of the request for a seizure, finding that CoStar had adduced sufficient evidence to make out a *prima facie* case.  Sagar Decl., Ex. B, Order, at 8-9.

1    When the Commissioners executed the Commission on August 6, 2021, they

2  faced "significant resistance and hostility" from Arcgate.  Sagar Decl., Ex. C,

3  Commission Report, at 1.  Initially, it was discovered that on March 23, 2021, a

4  mere thirteen days after CoStar filed suit, the Arcgate Teleservices Private Limited

5  entity (the original respondent) had been struck from the Indian Ministry of

6  Corporate Affair's Registrar of Companies, rendering it nonexistent.  *Id*. at 7.

7  Based on these grounds, Arcgate refused entry to the Commissioners claiming that

8  the premises belonged to an entity called "M/s Arcgate."  *Id*. at 6-8.  Upon further

9  investigation, the Commissioner discovered that both entities were owned and

10  controlled by the same family, the Baglas.  *Id*. at 8-9.  After involving the local

11  police, the Commissioners finally gained access to the premises.  *Id.* at 8.  Arcgate

12  employees made various attempts "to mislead and not cooperate with the

13  commission," including refusing to answer questions.  *Id*. at 6, 10, 12.  Ultimately,

14  the Commissioners were forced to leave after being threatened with physical

15  violence.  *Id*. at 13, 16-17.  The limited evidence the Commissioners did obtain

16  showed that multiple Arcgate employees were, in fact, assigned to CREXi projects,

17  but the Commissioners were unable to review materials that would have showed the

18  nature of their work.  *Id*. at 14-16.  Moreover, the Commissioners learned that

19  Arcgate had recently deleted firewall logs that would have reflected Arcgate's

20  access to CoStar's websites.  *Id*. at 13-14.

21    As a result of the thwarted execution of the Commission, CoStar went back

22  to the High Court to seek the only remedy available under Indian Law for the

23  prevention, obstruction, and interference of the administration of the Commission: a

24  contempt petition.  Sagar Decl. ¶ 19 & Ex. D,  Contempt Pet.  However, CoStar did

25  not seek incarceration (as is typical of such contempt petitions) but instead simply

26  asked the court to "issue appropriate orders and direction to punish the Contemnors

27  and such other persons as th[e] Hon'ble Court may deem fit."  *Id.* at Ex. D,

28  Contempt Pet., at 27.  Simultaneously, Arcgate also filed a petition to hold CoStar

in contempt for allegedly exceeding the bounds of the Commission based on the
distinction between Arcgate Teleservices Pvt. Ltd. and M/s Arcgate.  *See*
Declaration of Elizabeth K. McCloskey in Supp. of CREXi's Mot. to Compel
Arcgate Documents ("McCloskey Decl."), Ex. C.

> ### 3.    The Parties Negotiated Consent Terms, Which Were Reviewed And Entered By The Rajasthan High Court And Have The Full Force Of A Final Judgment.

After vigorously litigating for months, CoStar and Arcgate entered into
"without prejudice" discussions, and ultimately, agreed to settle their dispute in the
form of Consent Terms and a Permanent Injunction.  Sagar Decl., Ex. H.  Arcgate
was represented in these negotiations by sophisticated counsel, including Senior
Advocate Nakul Dewan, a Barrister (Senior Advocate) who appears in the United
Kingdom, Singapore, and India, Advocates Karan Lahiri and Raghav Shankar, both
practitioners in front of the Supreme Court of India, and Ashima Obhan, Senior
Partner at New Delhi-based Obhan & Associates, where she heads the corporate
law practice.  Sagar Decl. ¶¶ 20-25 & Exs. F & G.[19]

As part of the settlement, Arcgate agreed to "cooperate with CoStar to
provide to CoStar all documentary evidence in its possession, custody or control
relating to the activities and events described" in the Arcgate Plaint.  Sagar Decl.,
Ex. H, Consent Terms ¶ 7.  The documents Arcgate produced regarding its
wrongdoing, *i.e.*, its work for CREXi, are damning.  Among other things, they
reveal that:

- Arcgate raised "[r]ed flags" in response to instructions from CREXi to obtain broker information from CoStar's LoopNet and CityFeet

---

[19] Arcgate's legal team also included Dr. Abhishek Manu Singhvi, a Member of the Parliament of India, who remains the youngest designated Senior Advocate in the Supreme Court and is a former Additional Solicitor General of India, as well as Mr. Paras Kuhad, a Senior Advocate of the Supreme Court of India and a former Additional Solicitor General of India.  Sagar Decl. ¶¶ 20-22 & Ex. E.

websites because of their competitive status. Boyle Decl., Ex. L,
Arcgate-CREXi Work Group Email (Jan. 4, 2020), at CoStar00037004.

• CREXi's Forrest Kobayashi expressly acknowledged that Arcgate and
   CREXi should "refrain from using any site that is, or could be
   considered, a direct competitor of CREXi." Boyle Decl., Ex. M, F.
   Kobayashi Email (Jan. 2, 2020), at CoStar00036876.

• CREXi professed to Arcgate that "complying with any website's terms
   is important to [CREXi]," but nonetheless instructed Arcgate to access
   and use "any website" (*e.g.*, including CoStar websites), with no regard
   to whether that activity violated CoStar's Terms of Use. Boyle Decl.,
   Ex. N, F. Kobayashi Email (Jan. 8, 2020), at CoStar00037485.

• After Arcgate had raised those red flags about accessing competing
   websites, CREXi initiated a project directing Arcgate to remove
   references to CoStar websites "from the 'Website' section" on CREXi's
   backend system.  Boyle Decl., Ex. O, J. Burton Email (May 14, 2020),
   at CoStar00046462.

• CREXi's Manager of Customer Success Operations James Burton,
   directed Arcgate in May 2020, as a "HIGH PRIORITY," to delete more
   than two hundred references to CoStar websites, including "Showcase,
   Costar, Looplink, Loopnet, [and] Cityfeet." *See* Boyle Decl., Ex. P,
   Arcgate-CREXi Work Group Email (May 21, 2020), at
   CoStar00046597. (This is the project that CREXi declarant Lawson
   Dees now does not deny, but merely quibbles over its "purpose." *See*
   Declaration of Lawson Dees in Supp. of Mot. to Compel Arcgate
   Documents ("Dees Decl.") ¶¶ 7-10.)

• In April 2020, CREXi directed Arcgate to access real estate auction
   website Ten-X, which was acquired by CoStar only two months later,
   to harvest real estate data and information, in knowing violation of Ten-
   X's terms of use.  Echoing the misconduct that led Ten-X to sue CREXi
   in 2016, CREXi directed Arcgate to copy broker information for every
   broker who was not already in CREXi's database, as well as real estate
   auction listing data for every auction on Ten-X. *See* Boyle Decl., Ex.
   Q, Arcgate-CREXi Work Group Email (Apr. 18, 2020), at
   CoStar00046209 (delivering final work product to CREXi).  (Mr. Dees
   does not deny this project occurred, but again simply proffers a self-
   serving alternative "purpose" for this mass-copying from a competitor.
   *See* Dees Decl. ¶¶ 11-12.)

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

Arcgate also submitted fact testimony from its CEO, Mr. Bagla in support of the settlement. Sagar Decl., Ex. H, Consent Terms, Declaration of Kunal Bagla ("Bagla Decl.").  Based on and supported by contemporaneous communications, including the above, Mr. Bagla explained that:

- "CREXi directed Arcgate to access other real estate websites for the benefit of CREXi, including www.loopnet.com ('LoopNet'), www.ten-x.com ('Ten-X') and www.cityfeet.com ('Cityfeet'), to use those sites as a competitive resource, and to copy and/or derive content from such sites," Bagla Decl. ¶ 3;

- "Arcgate's work for CREXi, at CREXi's direction for CREXi's benefit, has involved accessing real estate websites including LoopNet, Ten-X, Cityfeet, and other CoStar websites thousands of times and copying thousands of data points," *id.* ¶ 7;

- Arcgate visited CoStar's websites and copied data on CREXi's behalf from "approximately in early 2019 well into 2020," *id.* ¶ 4; and

- Arcgate "access[ed] and use[d] CoStar websites, obtain[ed] broker and property auction listing information from CoStar websites (e.g., Ten-X), and provide[d] that information to CREXi for CREXi's use with a clear notification to CREXi that the information had been obtained from CoStar websites, and CREXi accepted the broker and property auction listing information, knowing that Arcgate had obtained such information from CoStar websites (e.g., Ten-X)," *id.* ¶ 19.

Mr. Bagla also explained that server logs that would have reflected Arcgate's access of CoStar websites were no longer available because, in or around May 2021, Arcgate switched firewall devices, and logs prior to that time were rendered inaccessible.  *Id.* ¶ 6.  Arcgate "did not know at that time that it should preserve such logs."  *Id.*

The High Court reviewed the Consent Terms, which incorporated Mr. Bagla's declaration.  Sagar Decl. ¶ 37.  On December 3, 2021, the High Court deemed the settlement to be lawful, not void or voidable, and freely entered into by both parties.  *Id.* & Ex. I, Order; *see also* Justice B.N. Srikrishna Opinion Letter ("J.

41

1860275

Srikrishna Op.") ¶¶ 80-82.  In making that order, the High Court adjudged as a matter of law that the settlement was not a product of fraud, misrepresentation, undue influence or any other legal impropriety.  J. Srikrishna Op. ¶ 87.  The settlement was entered as a final Decree of the High Court on January 11, 2022, and now reflects a final determination of Indian law that the settlement agreement between Arcgate and CoStar is valid and enforceable, and protected from collateral attack by any third party.  Sagar Decl. ¶ 39 & Ex. J, Decree; *see also* J. Srikrishna Op. ¶¶ 81-84.

### 4.    CREXi Chose Not To Intervene In The Arcgate Action, And Instead Has Engaged In A Campaign To Harass And Intimidate Arcgate And CoStar.

CREXi was aware of the Arcgate suit while it was ongoing and had the ability and opportunity to intervene.  Sagar Decl. ¶¶ 26-29.  Arcgate's counsel communicated with CREXi's U.S. counsel about the case as early as October 14, 2021, *id.* ¶ 30, months before the High Court entered a final decree, and CREXi's U.S. counsel referenced the action in communications with CoStar's counsel starting in November 2021, Boyle Decl., Ex. R,  CREXi's Resps. to CoStar's First Requests for Production (Nov. 23, 2021) (*see, e.g.*, Response to Request No. 54: "… CoStar . . . has sued one of CREXi's contractors [Arcgate]"), *id.* at Ex S,  E. McCloskey Email (Nov. 29, 2021).  CREXi is represented by Indian counsel, Rohan George of Samvad Partners, who communicated directly with Arcgate's counsel about the lawsuit starting in January 2022.  Sagar Decl. ¶ 40.  Furthermore, proceedings in both the initial action in the Commercial Court and the appeal in the High Court were publically noticed, and appeared contemporaneously in the respective courts' publicly accessible websites.  Sagar Decl. ¶¶ 5, 9, 12, 13, 29.  Nonetheless, for reasons known only to CREXi, CREXi chose not to intervene in the Arcgate suit.  Instead, it opted to threaten Arcgate and CoStar out of view of both the Indian court and this Court.

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

As to Arcgate, CREXi's threats to Arcgate culminated in a letter from Mr. George in January 2022 accusing Arcgate of committing illegal acts and breaches of contract under both U.S. and Indian law.  Sagar Decl. ¶ 40.  The apparent basis for the accusation was CREXi's claim that it had a confidentiality interest in the documents referenced in Mr. Bagla's testimony and provided to CoStar as part of the settlement: in other words, the documents evidencing CREXi's theft from CoStar were being characterized as akin to a trade secret.  *See id.*  Just as spuriously, CREXi claimed that the documents could contain personal information implicating data privacy laws, *id.*, knowing that was untrue, as it had the documents in its possession and could therefore tell that they did not.  CREXi sent similarly threatening letters to CoStar's counsel after CoStar notified the Court of the judgment in the Arcgate case in January 2022.[20]  *See* ECF No. 100, CoStar's Notice of Judgment in a Related Case.  CREXi's counsel made unhinged claims about the circumstances underlying the settlement, threatening counsel with ethical violations and criminal liability under the federal bribery statute, and claimed the Arcgate settlement and testimony was perjured, purchased, and/or coerced.  *See, e.g.*, Boyle Decl., Ex. T, W. Braunig Ltr. (Feb. 17, 2022), at 1 (claiming that CoStar's actions "violate the rules of professional conduct, longstanding common-law principles, and perhaps even the federal bribery statute"); *id.* at 3 (accusing CoStar of "pa[ying] for" testimony that is "highly misleading (if not outright false)"); *id.* at 4 (demanding that "CoStar cease and desist from any further improper, unethical, and illegal behavior" and "reserv[ing] all rights and remedies, including the right to seek monetary sanctions, evidentiary sanctions, revocation of the *pro hac vice* status of non-California lawyers involved in these ethical violations, and disqualification of counsel.").

CREXi also sought to obtain both non-privileged and privileged

---

[20] CREXi did not, however, make any submission to the Court challenging the propriety of the notice or asking it to be stricken.

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

communications related to the Arcgate settlement.  CREXi's counsel first

demanded that CoStar produce the communications with CREXi that Arcgate

provided pursuant to the settlement (even though these communications involve

CREXi and are already in CREXi's possession) and, as it did in its threat to

Arcgate, initially purported to assert a "confidentiality" interest in documents that

show CREXi directing its agent to piggyback on CoStar.  Boyle Decl. ¶ 26 & Ex. S,

E. McCloskey Email (Nov. 29, 2021).  CoStar produced these communications to

CREXi in April 2022.[21]  Boyle Decl. ¶ 27.  CREXi subsequently abandoned the

pretense that these documents are confidential, and its counsel have not, to this day,

sought to designate any of these documents under the Protective Order in this suit.

*Id*.

CREXi then sought the privileged communications exchanged between

CoStar and Arcgate regarding the negotiation of the settlement.  CREXi first

demanded them from Arcgate, which invoked the without prejudice privilege and

declined to provide them.  Sagar Decl. ¶ 40.  CREXi also served requests for

production on CoStar in this case.  *See* Boyle Decl., Ex. U, CREXi's Third Set of

Requests for Production, to which CoStar objected on the basis that the requests,

*inter alia*, sought "communications that are privileged and otherwise non-

discoverable under applicable foreign law."  *Id.* at Ex. V, CoStar's Resps. & Objs.,

at 8-10.

### 5.    The Misconduct Continues: As Evidenced by Developments Relating to CoStar's Suit Against Neptune

Undeterred by lawsuits in the United States and India, CREXi, along with its

---

[21] Notably, CoStar is the only party to have produced these communications between CREXi and Arcgate in this litigation—CREXi has produced only a few documents relating to Arcgate, and, as far as CoStar can tell, no documents related to the testimony by Mr. Bagla that CREXi now challenges.  Nor has CREXi produced its communications with Arcgate about its litigation with CoStar.  Boyle Decl. ¶¶ 27, 28.  CoStar asks CREXi to immediately produce those documents, including communications demonstrating that CREXi was on notice of the Arcgate suit at least as of October 14, 2021, along with Mr. George's January 2022 letter to Arcgate threatening Arcgate with liability if it provided documents to CoStar.

BPOs, continues its pattern of piggybacking on CoStar—and, disturbingly, there appears to have been yet more destruction of evidence by another BPO.

CoStar sued CREXi's agent Neptune and its managing director Ganesh Subramanian in the High Court of Madras on July 12, asserting claims similar to those it brought against Arcgate. Sagar Decl., Ex. K, Neptune Plaint. As with Arcgate, CoStar discovered independently that Neptune has accessed CoStar's websites tens (possibly hundreds) of thousands of times without authorization since 2016, and as recently as a few days before the Neptune Plaint was filed on July 12, including accessing CoStar's websites directly from CREXi's internal Salesforce system. *Id.* ¶¶ 6-7, 78, 84. Neptune has used the same IP addresses CREXi itself has used to access CoStar's sites without authorization, as well as using the same VPN anonymizing services CREXi has used in the past to conceal its access to CoStar's websites. *Id.* ¶¶ 6-7, 81-83. On the strength of CoStar's application, the High Court of Madras ruled that "in the extraordinary circumstances of the case, i.e., *prima facie* evidence of large scale infringement and piracy," it would be appropriate to provide preliminary injunctive relief against Neptune and appoint Commissioners recommended by CoStar, including forensic specialists, to collect evidence. Sagar Decl., Ex. L, Op. ¶ 4.

The Commissioners executed their Commission on July 15. Sagar Decl., Ex. N, Expert Commissioner's Report ¶ 4. As explained in the Expert Commissioner's Report released on August 4, Neptune's managing director indicated he had been notified in advance of the court action against Neptune and one handwritten note found onsite stated "we need to tell them before CoStar notice comes." *Id*. ¶ 6(d), 10.2(H). The Commissioners found "a large amount of evidence showing or referring to [Neptune's] work for CREXi and documents and messages relating to CoStar": the Commissioner was able to recover, for example, multiple files with "CoStar" in their title, CoStar and LoopNet logos on an external hard drive, and multiple links to LoopNet in spreadsheets and references to LoopNet in emails. *Id.*

¶ 6.  A draft email on the topic of "copyright violations" identified 200 images with CoStar logos uploaded by Neptune to CREXi's system and stated that Neptune had not been told by CREXi to avoid copying from LoopNet until late 2021, even though it had worked for CREXi from 2017 to 2020.  *Id.* ¶ 6(i).

In addition, the Court's Expert Commissioner also uncovered evidence of "[m]ass deletion of data relating to CoStar and CREXi."  *Id.* ¶ 6.  The Expert Commissioner found, for example, that Neptune had deleted "CoStar" folders and files (for example, property reports) with "CoStar" in their title from workstations and, as with Arcgate, server logs that would have evidenced Neptune's access to CoStar sites.  *Id.* ¶¶ 6, 10.2(E), 10.2(F).  The Commissioner recovered evidence reflecting "an internal audit check with respect to attempts to sanitise or delete CoStar-related data."  *Id.* ¶¶ 6, 10.2(D).  The Commissioner asked Mr. Subramanian, Neptune's managing director, about the deletion of materials, and he initially said "there was no reason for him to preserve the materials relating to CoStar and Crexi and therefore he deleted those materials," but later changed his story after consulting with lawyers.  *Id.* ¶¶ 6, 10.2(G).  Mr. Subramanian's Indian counsel asked the Commissioner for written questions regarding deletion so Mr. Subramanian could provide "answers in writing."  *Id.*  ¶ 10.2(G).  The Commissioner was then told to "wait for a few hours" so that Mr. Subramanian's lawyer "could receive direction on the responses," not from his client but from an unidentified third party.  *Id.*  Mr. Subramanian then changed his story in his written responses to indicate he had been told to preserve materials relating to CREXi and CoStar, but even in these responses, he was unable to explain why he had deleted huge amounts of these materials.  *Id.*  ¶¶  6, 10.2(G).

Finally, the Commissioner noted that Mr. Subramanian resisted turning over his mobile phone for imaging, and only did so "[a]fter speaking with his lawyers multiple times."  *Id.* ¶ 6(j).  The Commissioner found that a number of WhatsApp messages from July 13-15, the days leading up to the execution of the Commission,

1860275

1   had been deleted.  *Id.* ¶¶ 6, 10.2(D).  The call logs, attached to the Commissioners'

2   Report, *see id.* at Annexures 1 and 2, show a missed call to Neptune's managing

3   director from a U.S. cell phone number, which public records reveal belong to

4   CREXi's counsel Elizabeth McCloskey, *see* Boyle Decl., Ex. W, Public Record, on

5   July 14, the day the High Court issued its order and the day before the evidence

6   seizure.  The log also shows multiple calls between Neptune's managing director

7   and CREXi's Indian counsel, Rohan George, reflecting more than 12 minutes of

8   discussions that same day.[22]

9          The Neptune litigation continues.

10  **B.    ARGUMENT**

11         CoStar respectfully requests the Court to deny CREXi's motion, *first*,

12  because the relief CREXi seeks is not properly addressed to this Court, and, *second*,

13  because Indian law applies to the dispute, and the communications CREXi seeks

14  are protected by the "without prejudice" privilege from discovery by third parties.

15         In support of both positions, CoStar submits the opinion of former Indian

16  Supreme Court Justice B.N. Srikrishna pursuant to Federal Rule of Civil Procedure

17  44.1, which permits the Court to consider expert testimony in determining an issue

18  of foreign law.[23]  *See Universe Sales Co. v. Silver Castle*, 182 F.3d 1036, 1038 (9th

19  Cir. 1999) ("[E]xpert testimony accompanied by extracts from foreign legal

20  materials has been and will likely continue to be the basic mode of proving foreign

21  law."); *Pandey v. GBGI Ltd.*, No. SACV 20-01055-JVS-JDEx, 2020 WL 7013997,

22  at *9–10 (C.D. Cal. Oct. 26, 2020) (relying on Justice Srikrishna's declaration on

---

23  [22] As noted above, CoStar does not yet have the details of the communications
24  between CREXi's counsel and Neptune, and thus makes no accusations against
    counsel at this time.  However, it intends to vigorously pursue the issue.

25  [23] Federal Rule of Civil Procedure 44.1 authorizes a court to "consider any relevant
26  material or source" to determine foreign law.  FED. R. CIV. P. 44.1.  As the Ninth
    Circuit has explained, Rule 44.1 "treats issues of foreign law as 'questions of law'
27  for the court to decide . . . and contemplates that the ' process of ascertaining foreign
    law' will be 'equivalent to the process for determining domestic law, insofar as
28  possible.'"  *G & G Prods. LLC v. Rusic*, 902 F.3d 940, 948 (9th Cir. 2018) (citations
    omitted).

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

Indian corporate law). CoStar refers the Court to former Justice Srikrishna's opinion for in-depth explanations of (1) the significance of the High Court of Rajasthan's entry of the parties' Consent Terms, which incorporate the testimony of Mr. Bagla, as a final judgment, (2) the "without prejudice" privilege, and (3) how the privilege applies to CREXi's request for discovery from an Indian legal perspective.

### 1. CREXi Seeks Relief In The Wrong Forum.

As a threshold and dispositive matter: CREXi seeks relief in the wrong forum. CREXi's motion, at its core, seeks discovery to collaterally attack the Consent Terms, which incorporate injunctive relief and supporting testimony from Mr. Bagla, and were incorporated into a final judgment in India. By CREXi's own argument, it is seeking discovery in order to undermine the judgment entered by a foreign court.

The High Court of Rajasthan had an independent obligation to review the Consent Terms and supporting material—including Mr. Bagla's declaration—and satisfy itself that the settlement was entered into lawfully before entering it as a final judgment. J. Srikrishna Op. ¶¶ 11, 80-82. The fact that the High Court entered the Consent Terms is significant because it reflects the High Court's final determination, as a matter of Indian law, that the settlement between Arcgate and CoStar is valid and enforceable and that its terms were not the product of fraud, misrepresentation, undue influence, or other legal impropriety—if the Court had determined otherwise, it would not have entered the decree on January 11, 2022, which now carries the full force of a final Indian judgment. *See id.* ¶¶ 83, 87. CREXi was aware of CoStar's lawsuit against Arcgate, was able to hire Indian counsel, and could have intervened in that suit. Sagar Decl. ¶¶ 20-30. But CREXi declined and thus waived its rights to challenge the final judgment as unlawful. *See* J. Srikrishna Op. ¶ 83 (explaining that under Indian law a third party can intervene in a proceeding to determine whether to approve consent terms between other

48

parties, but "once a court enters consent terms (which then have the force and effect of a final judgment), no party can challenge the decree as unlawful by instituting a new lawsuit").

CREXi's request that this Court order discovery so that CREXi can attempt to discredit the Indian court's judgment, and in particular the settlement terms and testimony incorporated therein, is offensive to principles of international comity. *Id.* ¶¶ 85-89; *see also MacKay v. McAlexander*, 268 F.2d 35, 38–39 (9th Cir. 1959) (holding that "considerations of comity and reciprocity would thus preclude American courts from entertaining a collateral attack upon a [foreign decree]"); *In re Blackwell*, 270 B.R. 814, 822 (W.D. Tex. 2001) ("This court has no more right to entertain collateral attacks on [foreign] court's ruling than it does to entertain collateral attacks on the rulings out of the state courts in this country.").  As former Justice Srikrishna explains, the Supreme Court of India has held that raising an issue litigated in another court is "an abuse of the process of the court and contrary to the principles of justice and public policy," and, consistent with this, Indian courts respect the finality of judgments, including those entered by foreign courts. J. Srikrishna Op. ¶¶ 85-86 (quoting *K.K. Modi v. K. N. Modi*, AIR 1998 SC 1297). Any attempt by a foreign court "to undo or discredit [an] Indian court's order would therefore be a violation of the principle of comity; which comity an Indian court would extend to a foreign court were the relative positions of the courts reversed." *Id.* ¶ 87.

CREXi implies that it did not have notice of the Arcgate action until January 12, 2022, when CoStar filed notice of a judgment in a related case with this Court. *See* CREXi Mot. § III.A.1; McCloskey Decl. ¶ 6.  In truth, CREXi's counsel was well aware of the lawsuit during its pendency, as Arcgate informed CREXi's U.S. counsel about the case as early as October 14, 2021, *see* Sagar Decl. ¶ 30, and CREXi's U.S. counsel referenced the suit in responses and objections to CoStar's discovery requests and email communications with CoStar's counsel in November

49

1    2021, *see* Boyle Decl., Ex. R, CREXi's Resps. to CoStar's First Requests for

2    Production (Nov. 23, 2021); *id.* at Ex. S, E. McCloskey Email (Nov. 29, 2021).

3    CREXi therefore cannot cite ignorance of the Arcgate suit, or lack of representation

4    or resources in India, as the reason for its failure to intervene.  Instead, for reasons

5    known only to CREXi, it sat on its hands.  It thus has no basis to seek relief from

6    this Court.  *See, e.g.*, *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d

7    1249, 1259 (11th Cir. 2006) (affirming dismissal of collateral attack against foreign

8    judgment where plaintiff had opportunity to participate in foreign proceeding).

9         CREXi tries to justify its attempt to obtain the privileged communications on

10   the grounds that the documents it seeks are, purportedly, "highly relevant and

11   necessary to cross-examine and impeach Mr. Bagla's testimony."[24]  CREXi Mot.

12   § I.A.  But CoStar has not to date offered Mr. Bagla as a witness, or his testimony

13   as evidence, in this case.  CoStar simply filed a Notice of Judgment in a Related

14   Case with the Court.  ECF No. 100, CoStar's Notice of Judgment in a Related Case.

15   To the extent *CREXi* wishes to make Mr. Bagla a witness, or seek documents from

16   Arcgate, the proper method to attempt to do so is pursuant to the Hague Evidence

17   Convention, a treaty to which both India and the United States are signatories, that

18   provides methods for taking international discovery.[25]

19        Requiring CREXi to pursue discovery regarding the Arcgate Consent Terms

20

21   [24] CREXi relatedly claims that CoStar secured a "one-way cooperation agreement"
     from Arcgate in the Consent Terms, CREXi Mot. § III.A.2, but the Consent Terms
22   only prohibit Arcgate from supporting any litigation "related to the Arcgate Claims,"
     *see* Sagar Decl., Ex. H, Consent Terms ¶ 17, and CREXi's counsel has expressly
23   stated that the Arcgate Claims are not related to this suit, *see* Boyle Decl., Ex. T, W.
     Braunig Ltr. (Feb. 17, 2022), at 3.  Moreover, CREXi can hardly complain of any
24   prejudice from the settlement agreement.  CREXi already has its communications
     with Arcgate (which it has not produced to CoStar), and CoStar understands that by
25   virtue of its November 2020 agreement with Arcgate, CREXi has a contractual right
     to obtain documents and information from CREXi.  Finally, as Mr. Dees' declaration
26   demonstrates, CREXi does not require any "cooperation" from Arcgate to make its
     arguments, however weak.

27   [25] For the avoidance of doubt, CoStar does not concede that the seeking of any such
     discovery would be justified.  But using the Hague Convention, not this Court, to
28   attempt to do so is the appropriate path, for the reasons discussed above.

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

pursuant to the Hague Evidence Convention would allow the Indian Court issuing the letters rogatory to adjudicate Arcgate and CoStar's claim of privilege under Indian law, and obviate the need for this Court to address this issue.  *See Nursing Home Penson Fund v. Oracle Corp.*, 2007 WL 1880381, at *5 (N.D. Cal. June 29, 2007) (Hague Convention recognizes privileges in the "law of the State of execution").  Adopting this approach, which allows both parties to invoke their jointly held privilege and have the issued determined in the appropriate forum, respects both the authority of foreign courts and the ability of a foreign litigant, Arcgate, to assert its rights under applicable law.  For this reason alone, CREXi's motion should be denied.

### 2. India's Without Prejudice Privilege Bars Discovery Of The CoStar-Arcgate Settlement Communications.

Even if CREXi had the right to collaterally attack the Arcgate judgment and seek to undermine supporting testimony, and it does not, CREXi's motion should fail because India's "without prejudice" privilege bars discovery of the CoStar-Arcgate settlement communications.

### a. Indian Privilege Law Applies To This Dispute.

"Federal Rule of Evidence 501 provides that questions of privilege in a federal question case are governed by the principles of common law." *Cadence Pharms., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1018-19 (S.D. Cal. 2014) (citing *Astra Aktiebolog v. Andrx Pharms., Inc.*, 208 F.R.D. 92, 97 (S.D.N.Y. 2002)).  This "common law" approach to questions of privilege incorporates "choice of law questions." *Cadence Pharms., Inc.*, 996 F. Supp. 2d at 1019 (quoting *Astra Aktiebolog*, 208 F.R.D. at 97).  As described below, where choice of law principles favor the application of foreign law, federal courts routinely apply foreign privilege law under Federal Rule of Evidence 501 to shield protected documents from discovery.[26]

---

[26] CREXi argues (in Section III.B.1) that "[m]any courts have declined to apply

51

"Most courts apply the 'touch base' analysis in deciding choice of law issues in cases where the alleged privileged communications occurred in a foreign country or involved foreign attorneys or proceedings." *Cadence Pharms*, 996 F. Supp. 2d at 1019 (citing cases). That analysis sets forth a two-step test for determining whether to apply a foreign evidentiary privilege in U.S. litigation. *First*, courts look to the nature of the connection between the United States and the communication at issue. If a communication "has nothing to do with the United States" or has "only an incidental connection to this country," courts apply the foreign privilege law. *VLT Corp. v. Unitrode Corp.*, 194 F.R.D. 8, 16 (D. Mass. 2000). *Second*, even if the privileged communication has something more than an "incidental connection" to the United States, courts will apply the privilege law "of the nation having the most direct and compelling interest in the communication." *Id*. That analysis makes plain that the CoStar-Arcgate settlement communications—which relate to the resolution of Indian legal claims under Indian law against an Indian defendant in an Indian court and a resultant Indian judgment—are governed by Indian law. This is a case in which the default rule—that "foreign privilege law typically governs communications relating to 'foreign legal proceeding[s] or foreign law,'" *Cadence Pharms.*, 996 F. Supp. 2d at 1019—clearly applies. As shown below, CREXi's arguments to the contrary fail at both steps of the analysis.

**<u>Step One</u>**. First, the CoStar-Arcgate settlement communications do not "touch base" with the United States. CoStar brought a copyright claim in an Indian

---

foreign privileges that differ from U.S. federal privilege law," but cites only one case that refused to engage in choice-of-law analysis. *See* CREXi Mot. § III.B.1 (citing *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 52 (S.D.N.Y. 1989)). That decision has been abrogated by intervening Second Circuit precedent, which explains that "in circumstances where the parties dispute which nation's privilege law furnishes the 'legally applicable privilege,' and those competing national laws provide different results, courts should first conduct a choice-of-law analysis to determine which body of privilege law applies." *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 98 (2d Cir. 2020) (quoting 28 U.S.C. § 1782(a)).

1860275

court against an Indian defendant under the *Indian Copyright Act* of 1957,[27] along
with claims under *Indian common law* for piracy/theft, improper access to CoStar's
websites, and misappropriation of CoStar's proprietary content.  Sagar Decl., Ex.
A, Arcgate Plaint ¶¶ 50–52.  The action resulted in Consent Terms entered by the
Rajasthan High Court, which are in turn governed by Indian law, and a decree
incorporating those terms, including Mr. Bagla's testimony, that has the force of
Indian law.  *See* J. Srikrishna Op. ¶¶ 81-84.  CREXi is therefore manifestly wrong
when it asserts (in Section III.B.1) that CoStar's claims against Arcgate "were
based on United States copyright law, not any Indian copyrights or intellectual
property."  CREXi also notes (in Section III.B.1) that CoStar and CREXi are U.S.
companies, and argues that CoStar's "sole basis for suing Arcgate was Arcgate's
work for CREXi."  But CoStar's basis for suing Arcgate (an Indian entity) was
Arcgate's violations of Indian law arising from Arcgate's conduct in India.

CREXi further contends (in Section III.B.1) that CoStar's "entire objective"
in the Arcgate litigation was to "obtain evidence against CREXi."  That speculative
imputation of motive fails:  CoStar sought, and obtained through the Consent
Terms, an injunction against Arcgate to stop Arcgate, in India, from accessing its
sites without authorization and otherwise violating CoStar's legal rights.  For this
reason, CREXi's reliance (in Section III.B.1) on the district court's decision in
*Gucci America* is misplaced.  In that case, Gucci's Italian intellectual property
counsel conducted investigations and communicated with outside counsel in the
United States and Italy in preparation for "parallel trademark infringement actions
against [the same defendant] in the United States and Italy."  *Gucci Am. v. Guess?,
Inc.*, 271 F.R.D. 58, 66 (S.D.N.Y. 2010).  In that instance, according to an
admission by Gucci's own general counsel, "litigating against [the defendant] in the

---

[27] Works originally copyrighted in the United States are protected in India by virtue
of international agreements such as the Berne Convention and the Indian Copyright
Act of 1957.  *See* Government of India, Copyright Office, *International Copyright
Order*, 1999.

United States was essential to Gucci's overall litigation strategy because it would not [otherwise] be able to obtain injunctive relief in Italy." *Id.* The district court therefore determined that the work of Gucci's Italian counsel should be analyzed under U.S. privilege law. *Id.* at 69-70. Here, however, CoStar's settlement communications with Arcgate resolved CoStar's litigation against an entity that is not a party to this case, and concerned Indian copyright and common law claims that have not been pressed here. Unlike in *Gucci America*, the resolution of CoStar's claims against Arcgate was not "essential" to the resolution of its claims, or relief sought, against CREXi, and vice versa. The CREXi lawsuit was initiated and proceeded without the Arcgate case, and the Arcgate case was resolved without the CREXi case. CREXi does not argue otherwise. Indeed, to the contrary, CREXi has argued that there was no reason for CoStar even to file a mere notice of the judgment in the Arcgate matter in this case. *See, e.g.*, CREXi Mot. § III.A.2 (CoStar "improperly" styled its submission to the Court as "Notice of Judgment in a Related Case"). And elsewhere CREXi's counsel has argued that the Arcgate matter was independent of CoStar's litigation against CREXi, with Mr. Braunig expressly stating in a February letter to CoStar that "the Indian litigation is not 'related' within the meaning of the Local Rules." Boyle Decl., Ex. T, W. Braunig Ltr. (Feb. 17, 2022).[28]

Finally, CREXi also notes (in Section III.B.1) that Mr. Bagla's declaration in support of the Consent Terms was filed under penalty of perjury pursuant to U.S. law. But that point is subsumed by the fact that Mr. Bagla submitted the declaration in support of entry of Consent Terms by the High Court of Rajasthan; those Consent Terms are governed by Indian law, as made clear in the Consent

---

[28] In an about-face, Ms. McCloskey claimed in an email to CoStar just days before CREXi served this motion that "CoStar's action in India against Neptune and Arcgate *are* closely related to this one." Boyle Decl., Ex. X, E. McCloskey Email (July 21, 2022) (emphasis added). CREXi's change of position only underscores CREXi's willingness to adopt whatever litigation position it believes is convenient at the time, without regard to consistency or the underlying facts.

Terms themselves, Sagar Decl., Ex. H, Consent Terms ¶ 24, and the decree
incorporating that testimony has the force of Indian law, J. Srikrishna Op. ¶¶ 81-84.
The oath under which Mr. Bagla signed his declaration was incidental to the
general resolution of Indian claims, via settlement communications concerning
questions of Indian law, regarding conduct in India.

**_Step Two_**. Even if CREXi could show that the Arcgate-CoStar settlement
communications have more than an incidental connection to the United States,
however, that would not resolve the choice-of-law analysis. If "the communication
has more than an incidental connection to the United States," courts apply a
traditional choice-of-law analysis and apply the privilege law "of the nation having
the most direct and compelling interest in the communication." _VLT Corp._, 194
F.R.D. at 16. In conducting this analysis, courts examine the geographic focus of
the communications, as well as "the substance of the communication" and "the
needs of the international system." _Id_. Courts will also consider whether the
application of foreign privilege law would be "_clearly inconsistent_ with important
policies embodied in federal law." _Cadence Pharms._, 996 F. Supp. 2d at 1021
(emphasis added) (quoting _Astra_, 208 F.R.D. at 103). In each of these respects,
India has the predominant interest in the application of its privilege law to the
Arcgate settlement communications.

To start, the communications are geographically centered in India, and their
substance dealt with the resolution of Indian legal claims against an Indian
defendant before an Indian court. Those factors point strongly in favour of the
application of Indian law. _See Johnson Matthey, Inc. v. Rsch. Corp._, No. 01-CIV-
8115, 2002 WL 1728566, at *9 (S.D.N.Y. July 24, 2002) (applying English law to
communications that were "centered in the United Kingdom . . . before the British
courts"). Moreover, the "needs of the international system," _VLT Corp._, 194 F.R.D.
at 16, likewise support the application of Indian law. Counsel have a legitimate
expectation that their settlement discussions relating to the resolution of Indian

55

claims brought in an Indian court will be protected by Indian privilege law.  *See*,
*e.g.*, *Mitre Sports Int'l Ltd v. Home Box Office, Inc.*, No. 08 Civ. 9117 (GBD)
(HBP), 2010 WL 11594991, at *4 (S.D.N.Y. Oct. 14, 2010) (applying the English
legal professional privilege because counsel "expect[ed] that their privileged
communications would be governed by the laws of the jurisdiction where their
communications were made" (citing *Lego v. Stratos Lightwave, Inc.*, 224 F.R.D.
576, 579 (S.D.N.Y. 2004))); *Astra Aktiebolag*, 208 F.R.D. at 99.  Arcgate's and
CoStar's counsel entered into settlement negotiations with that exact expectation,
Sagar Decl. ¶ 31, as reflected in the fact that the settlement negotiations resulted in
Consent Terms "governed by the laws of India," *id.* at Ex. H, Consent Terms ¶ 24.
*See*, *e.g.*, *Connolly Data Sys., Inc. v. Victor Techs, Inc.*, 114 F.R.D. 89, 92 (S.D.
Cal. 1987) (finding provision that agreement would "be governed by the laws of the
State of California" supported applying California privilege law).  Because the
High Court decreed that Indian law governed the Consent Terms, it has an interest
in ensuring that Indian law governs all related disputes.  Indian courts, in
recognition of the importance of international comity, do not permit collateral
attack on a final judgment of a foreign court, particularly where the petitioner had
the opportunity to participate in the foreign action, *see* J. Srikrishna Op. ¶¶ 85-89,[29]
and CoStar respectfully submits that this Court should extend the same courtesy to
the High Court of Rajasthan here.

Finally, application of Indian privilege law here would not be "clearly
inconsistent" with important federal policies.  *VLT Corp.*, 194 F.R.D. at 16 (citation
omitted).  Indeed, numerous federal courts around the country—including federal
district courts in California—have applied a similar settlement-communications

---

[29] That rule that a party's knowing failure to intervene in a proceeding constitutes
waiver of that party's right to object to the outcome of the adjudication "is
especially salient here because CREXi's contentions about the propriety of the
consent terms 'so clearly could have been raised [before the High Court] that it
would be an abuse of the process of the court to allow a new proceeding to be
started in respect of them.'" J. Srikrishna Op. ¶ 89 (quoting *Varghese v. Tower
Vision Ltd.*, 2012 SCC Online Del 5728, ¶ 51).

56

privilege as a matter of federal law, on policy grounds that are indistinguishable from the policy interests motivating the Indian without-prejudice privilege. *See, e.g., Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980, 983 (6th Cir. 2003) (recognizing that there is "a strong public interest in favor of secrecy of matters discussed by parties during settlement negotiations," and holding that "any communications made in furtherance of settlement are privileged"). And courts have applied the privilege where, as here, a third party seeks discovery of settlement communications preceding a final agreement to use as impeachment evidence in a separate litigation. *See, e.g., E & J Gallo Winery v. Encana Energy Servs.*, No. CV-F-03-5412 AWI LJO, 2005 WL 8172973, at *4 (E.D. Cal. Jan. 28, 2005) (applying the settlement privilege to prevent third-party discovery of settlement communications to "cross examine defendants under the ruse of impeachment evidence") (citing *Goodyear Tire & Rubber Co.*, 332 F.3d at 980).

CREXi offers three justifications for overriding Indian law. Each fails.

*First*, CREXi asserts (in Section III.B.1) that it "requires" the requested discovery to defend itself against "CoStar's filing and use of a false and misleading declaration" by Mr. Bagla. Notably, "necessity" is not a consideration in the choice-of-law analysis that courts follow in determining whether foreign privilege law should apply.[30] In any event, CREXi has submitted a declaration from Lawson Dees, CREXi's Vice President of Operations, to attempt to rebut Mr. Bagla's testimony. That in itself demonstrates that CREXi is able to defend itself without resorting to privileged settlement communications—for example, by presenting testimony from CREXi witnesses (or documents, as CoStar has requested on more than one occasion). And notably, after claiming that Mr. Bagla perjured himself, the testimony of Mr. Dees does not establish that Mr. Bagla's testimony is "misleading," much less "false." Mr. Dees does not contradict Mr. Bagla's factual

---

[30] It is easy to see why: Parties resisting a claim of foreign privilege *always* assert that the privileged materials are necessary to resolve a matter in litigation; otherwise, there would be no need to analyze whether foreign privilege law should apply.

assertions regarding that work done by Arcgate for CREXi.  At most, Mr. Dees purports to provide *CREXi's* take on the purported "purpose" behind just two of the projects that Mr. Bagla describes in his declaration.

Initially, Mr. Dees takes issue with a sentence in Paragraph 21 of Mr. Bagla's declaration regarding CREXi's May 2020 request that CREXi delete references to CoStar websites in CREXi's system as the source of information in the system, but not to delete the information itself.  Dees Decl. ¶ 7.  Mr. Bagla testified that, based on this instruction, "*Arcgate then understood* it needed to remove all traces of a CoStar website as the source of [] information." Bagla Decl. ¶ 22 (emphasis added).  Mr. Dees (who notably was not a party to this email chain) characterizes Mr. Bagla's statement as "false and misleading."  Dees Decl. ¶ 8.  However, Mr. Dees then confirms (including by attaching the corresponding email as an exhibit) that CREXi asked Arcgate to perform exactly the task that Mr. Bagla described.  One can hardly stake a claim that a party's subjective understanding of an assignment was itself "false and misleading."  Similarly, Mr. Dees takes issue with Mr. Bagla's description of a mass data harvesting project from rival website Ten-X in April 2020 as "grossly misleading, both as to the purpose of the process and what was being performed."  Dees Decl. ¶ 11.  While Mr. Dees contradicts Mr. Bagla's understanding of the purpose of the project as being "copying broker information and data available on Ten-X . . . to be imported into CREXi's system," Mr. Dees never contradicts the specific tasks Mr. Bagla asserts that CREXi asked Arcgate to perform.  *See* Bagla Decl. ¶ 23.  Mr. Dees merely provides an alternative purpose for *why* CREXi asked Arcgate to perform the tasks described, which he *admits* involved  "gather[ing] information" from Ten-X in order to send it to CREXi.  *See* Dees Decl. ¶ 12.  At bottom, Mr. Dees is quibbling over the purported "purpose" behind actions represented in just four paragraphs of a 31-paragraph-long declaration.  Tellingly, Mr. Dees does not deny that Arcgate, at CREXi's direction, accessed CoStar's sites as a competitive resource, acknowledged that it should not

be doing so, but then overrode Arcgate's concerns about such use.

*Second*, CREXi baldly asserts (in Section III.B.1) that "the communications CoStar seeks to hide *may* demonstrate that CoStar violated ethical rules and federal law by obtaining and using Mr. Bagla's declaration" (emphasis added).  That speculative and incendiary assertion is entitled to no weight:[31]  CoStar and Arcgate entered into a settlement to resolve mutual claims after several months of adversarial litigation.  Arcgate was, when in court and during all stages of the negotiations, represented by top-flight Indian counsel, *see supra* § IV.A.3, who argued Arcgate's case before the Rajasthan High Court.  CREXi's suggestion that CoStar obtained a settlement, including the testimony of Arcgate's CEO, by "threat[ening]" "an unsophisticated foreign independent contractor" (at Section III.A.2) is absurd and insulting.  And, as a factual matter, CoStar made no "threats."  The reality that litigation will continue if a resolution is not reached does not constitute an improper "threat," as authorities have recognized.  *See infra* § IV.B.3.  The Consent Terms expressly reflect that Arcgate negotiated the agreement through counsel and executed it free from any threat, force, fraud, duress or coercion.  ECF No. 100-1, Consent Terms, at 12.[32]  And the Rajasthan High Court found that the entire settlement was lawful, not void or voidable, and reflected the free consent of the parties.  *See* J. Srikrishna Op. ¶¶ 77-84 (explaining that entry of consent terms requires judicial determination of lawfulness and constitutes a final decree).

Moreover, contrary to CREXi's suggestion, there is nothing inappropriate, much less illegal or unethical, about the circumstances of CoStar and Arcgate's

---

[31] By attempting to leverage criminal allegations against CoStar and its counsel, CREXi engages in precisely the wrongdoing that CREXi falsely imputes to CoStar.

[32] And contrary to CREXi's insinuation in Section III.A.2, CoStar did not seek "criminal sanctions" against Arcgate related to the settlement negotiations.  Rather, CoStar filed a contempt application against Arcgate for its obstruction of the execution of the Commission, because that is the only remedy available under Indian law for impeding the execution of a judicial order.  Even so, in the Contempt Petition, CoStar did not seek the full range of penalties available, and did not press the court for a hearing on the matter.  *See* Sagar Decl. ¶ 19 & Ex. D, Contempt Pet.

settlement.  As CREXi knows, agreeing to exchange evidence for a release, or even to facilitate a monetary payment, is ordinary course for settlements, judgments, and other case resolutions and not improper "compensation" (much less "bribery" under 18 U.S.C. § 201(c)(2)).  *See, e.g.*, *Ayala v. Pac. Mar. Ass'n*, No. C 08-0119 THE, 2009 WL 1916964. at *3-4 (N.D. Cal. July 1, 2009) (rejecting non-settling defendants' argument that settlement between defendant and plaintiffs was "collusive" because plaintiffs provided a release in exchange for payment and a declaration from the defendant's corporate witness, among other concessions); *Luan v. Luan*, No. 06-CV-246, 2008 WL 11504545, at *1-2 (N.D. Ind. Sept. 4, 2008) (enforcing settlement agreement pursuant to which defendants paid plaintiff in exchange for a release from certain objections and a verified declaration prepared by plaintiff for defendants to sign regarding the trust at issue).  In fact, CREXi's CEO Mr. DeGiorgio provided a sworn declaration (and a public apology for CREXi's misappropriation of customer lists) as part of its settlement with Ten-X. *See* Boyle Decl., Ex. F, Settlement, Public Stmt.; *id.* at Ex. G, DeGiorgio Decl.

Indeed, courts in the U.S. routinely consider and rely on testimony offered in support of settlements and releases in a wide variety of contexts.  *See, e.g.*, *Ellison v. Steve Madden, Ltd.*, No. CV 11 - 5935 PSG (AGRx), 2013 WL 12124432, at *1 (C.D. Cal. May 7, 2013) (approving class action settlement and attorneys' fees agreement, including an incentive award to lead plaintiff, based in part on plaintiff's declaration about the underlying TCPA violations alleged in the case); Final J. & Order of Dismissal, *In re Broadcom Corp. Derivative Litig.*, No. 06-cv-03252-R-CW, (C.D. Cal. May 23, 2011), ECF No. 945 (approving $79 million settlement and release, in part based on sworn declarations by lead plaintiffs' counsel and general counsel of corporation).  And the same is true for Indian courts. J. Srikrishna Op. ¶¶ 16, 80, 98 ("As part of the Order 23 analysis, judges will

1    regularly consider affidavits submitted by the parties in support of compromise.").[33]

2        *Third*, CREXi argues vaguely (at Section III.B.1) that the "Federal Rules of

3    Civil Procedure promote a 'broad and liberal' policy of discovery," that "Rule 408

4    of the Federal Rules of Evidence" generally provides for the admissibility of

5    settlement materials, and that "CoStar cannot cast aside this policy choice."  But

6    CoStar takes federal law and federal policy as it is found in the decisions of federal

7    courts, and (as noted above) numerous federal courts have held under federal law

8    that "communications made in furtherance of settlement are privileged."  *Goodyear*

9    *Tire & Rubber Co.*, 332 F.3d at 977, 983 (holding that "statements made in

10   furtherance of settlement are privileged and protected from third-party discovery").

11   That is because there is a "strong public interest in favor of [the] secrecy of matters

12   discussed by parties during settlement negotiations," and "confidential settlement

13   [negotiations] are a tradition in this country."  *Id.* at 980.  As the Ninth Circuit has

14   observed, Rule 408 of the Federal Rules of Evidence is built on the same public

15   policy.  *See U.S. v. Contra Costa Cnty. Water Dist.*, 678 F.2d 90, 92 (9th Cir. 1982)

16   (observing that Rule 408 serves "the public policy favoring the compromise and

17   settlement of disputes" and encourages "full and open disclosure . . . thereby

18   furthering the policy toward settlement").  Even if there were some degree of doubt

19   as to the extent of the federal privilege concerning "communications made in

20   furtherance of settlement," *Goodyear Tire & Rubber Co.*, 332 F.3d at 983, CREXi

21   cannot possibly show that application of foreign privilege law to a foreign

22   settlement would be "clearly inconsistent with important policies embodied in

23   federal law."  *Cadence Pharms.*, 996 F. Supp. 2d at 1021.

---

24   [33] Setting aside the baselessness of CREXi's desultory assertion that the settlement
25   communications "may demonstrate" that CoStar "violated . . . federal law," that
     speculation is insufficient to override a claim of privilege under foreign law:  Courts
26   engaged in a choice-of-law analysis do not allow parties to defeat a claim of foreign
27   privilege on the basis of conjecture about policy conflicts that *might* present
     themselves if the privileged materials were subject to discovery.
28

1860275

b.      **India's "Without Prejudice" Privilege Bars Discovery
Into The CoStar-Arcgate Settlement Communications.**

CREXi has no right to attack in this Court the resolution of the Arcgate case.

Moreover, as detailed below, and as set forth in the expert declaration of former

Justice B.N. Srikrishna,[34] application of India's without prejudice privilege here

squarely forecloses CREXi's efforts to obtain the CoStar-Arcgate settlement

communications. The privilege protects against communications and documents

that are written for the purpose of compromising a legal dispute, J. Srikrishna Op.

¶¶ 7, 25, 68, 92-93; is jointly held by the parties to a settlement negotiation in order

to encourage frankness in such negotiations, *id.* ¶¶ 7, 62, 68; and prevents

subsequent discovery of such privileged communications and documents subject to

certain narrow exceptions, none of which apply here, *id.* ¶¶ 41, 48, 94-103.

CREXi's arguments to the contrary rest on a self-serving declaration from its Indian

lawyer, Mr. George, an intellectual property practitioner who has helped execute

CREXi's legal strategy in India, who previously threatened Arcgate with civil and

criminal liability based on Arcgate's disclosure of wrongdoing to CoStar, Sagar

Decl. ¶ 40, and who was in repeated contact with Neptune just before, and

potentially during, the execution of the court commission that reportedly found

mass spoliation and evidence of misconduct.[35]  Mr. George does not claim *any*

expertise with respect to Indian privilege law, Sagar Decl. ¶ 42, and his opinion

reflects fundamental errors regarding the scope and application of the without

---

[34] Courts may "consider a foreign law expert's opinion even on ultimate legal conclusions." *Fabricant v. Elavon, Inc.*, No. 20-cv-02960-SVW-MAA, 2021 WL 1593238, at *3 (C.D. Cal. Mar. 8, 2021); *see also Universe Sales Co.*, 182 F.3d at 1038 (holding that district court should have credited declaration that applied Japanese law to the facts of the case).

[35] Again, because CoStar does not know the details of these communications between CREXi's counsel and Neptune, CoStar is not at this time accusing CREXi's counsel of colluding in the destruction of evidence, but instead setting forth the facts as it understands them, reflecting that CREXi's counsel coordinated with Neptune, and is therefore indisputably able to advance CREXi's interests in India.   CoStar nevertheless intends to vigorously pursue these issues.

1   prejudice privilege.  J. Srikrishna Op. ¶¶ 17, 20, 24, 27, 34, 37-39, 42, 48 n.1, 67,

2   69, 94, 96, 105.  This Court should assign no weight to Mr. George's declaration,

3   and should, if it deems it necessary to reach the issue, uphold India's without

4   prejudice privilege in this case.

5          The without prejudice privilege draws on both Section 23 of the Indian

6   Evidence Act and common law.  *Id.* ¶¶ 22-26.  The Indian Evidence Act was

7   intended to codify the English common law of evidence.  *Id.* ¶ 18.  The without

8   prejudice privilege is also grounded in Indian common law, which is similarly

9   derived from English common law.  *Id.* ¶ 19.  As Justice Srikrishna explains, the

10  "default" rule is that English case law is applicable in India unless an Indian rule or

11  decision has explicitly abrogated that law, or there is a showing that the law does

12  not apply to Indian conditions, and thus, English case law on the without prejudice

13  privilege presumptively applies in India.  *Id.* ¶ 20.

14         Justice Srikrishna notes that the without prejudice privilege is "notable for its

15  breadth."  *Id.* ¶ 7.  It applies to all settlement communications, which "may contain

16  a mixture of admissions and half-admissions against a party's interest, more or less

17  confident assertions of a party's case, offers, counter-offers, and statements (which

18  might be characterised as threats, or as thinking aloud) about future plans and

19  possibilities."  *Unilever Plc v. Procter & Gamble Co.* [2000] 1 WLR 2436 at 2444

20  (Eng.).  The rule must be "generous in application" in order to "remove[] the

21  inhibiting effect" that would attend judicial scrutiny of statements made in

22  settlement negotiations.  *Ofulue v. Bossert* [2009] UKHL 16, [2009] 1 A.C. 990

23  (appeal taken from Eng.), ¶ 12.; J. Srikrishna Op. ¶ 7.

24         The privilege may "normally be waived [only] with the consent of both

25  parties to the correspondence."  *Peacock Plywood Pvt. Ltd. v.  Oriental Ins. Co. Ltd*,

26  (2006) 12 SCC 673, 688, ¶ 43 (India).  The privilege applies not only to prohibit the

27  use of privileged communications in litigation between the parties to the

28  negotiations, but also in a "three party situation" where a third party seeks

discovery of such communications, after a settlement has concluded, in subsequent litigation.  *Id.*; *see also* J. Srikrishna Op. ¶¶ 27-28, 38 n.2.  The basic purpose of the privilege is to "facilitate compromise" by ensuring that settlement communications remain confidential.  *Chairman & M.D., N.T.P.C. Ltd. v. Reshmi Constrs., Builders & Contractors,* (2004) 2 SCC 663 ¶ 34 (India).

The scope of the without prejudice privilege, its exceptions, and its application with respect to discovery sought by third parties were best articulated by Lord Griffiths in an opinion for the English House of Lords in *Rush & Tompkins Ltd. v. Greater London Council*, [1989] AC 1280 (HL) (appeal taken from Eng.), *see* J. Srikrishna Op. ¶¶ 28-33, an opinion that, along with its progeny, has been applied in India, *see* Competition Comm'n of India, *Matrimony.com Ltd. v. Google LLC,* Case Nos. 07 & 30 of 2012, ¶ 160; *Sifandros Carrier Ltd. v. LMJ Int'l Ltd.*, 2018 SCC Online Cal 7146, ¶ 61 (India) (citing *Unilever Plc v.  Procter & Gamble Co.* [2000] 1 WLR 2436, ¶ 17 (Eng.)).  Lord Griffiths' opinion in *Rush* held that the purpose of the privilege is to promote settlement by applying to "all negotiations genuinely aimed at settlement whether oral or in writing," [1989] AC 1280 (HL), 1299; that the privilege applies against third parties even after settlement has been achieved, so that it "renders inadmissible in any subsequent litigation connected with the same subject matter proof of any admissions made in a genuine attempt to reach a settlement," *id.* at 1301; and that the privilege not only governs evidentiary admissibility, but also "protect[s] [settlement] negotiations from being discoverable to third parties," *id.* at 1305.

CREXi briefly contends (at Section III.B.2) that India's without prejudice privilege extends only to "questions of admissibility, not production," and that a "bar on production of settlement communications based on the without-prejudice rule would be inconsistent with principles of Indian law."  But *Rush* clearly holds otherwise, and as the leading English case on this question, it is a proper authority for discerning the "true meaning" of Indian evidentiary law. *Sodhi Sukhdev Singh*,

64

AIR 1961 SC 493, ¶ 93 (India) ("In case of doubt or ambiguity over the interpretation of any of the sections of the Evidence Act[,] we can with profit look to the relevant English common law for ascertaining their true meaning.").  CREXi does not point to any authority to show English common law has been abrogated or rendered inapplicable by Indian conditions, and thus CREXi has no basis to argue that *Rush* is not part of the law of India.  *Muniswamy v. State of Mysore*, (1963) SCC Online Kar 55, ¶ 29 (India) ("[E]xcept to the extent that the common law of England has been abrogated or is inapplicable to Indian conditions, its rules are part of the law of our country"); *see also* J. Srikrishna Op. ¶ 28 ("I am not aware of any Indian cases contradicting *Rush* or any reason why it is inapplicable to Indian conditions and, thus, the default presumption that it is part of the law of India applies.").

Moreover, the Supreme Court of India has recognized, consistent with *Rush*, that the privilege may apply in "three party situation[s]" where a third party seeks discovery of such communications.  *Peacock*, 12 SCC 673, ¶ 43.  Furthermore, the Indian Competition Commission—which investigates and adjudicates antitrust violations, and includes a judge on each adjudicatory panel, *see* J. Srikrishna Op. ¶ 34—recently applied *Rush* in ordering that statements made by Google in settlement negotiations with other antitrust enforcers must be "deleted from [the] records" of a Commission-appointed Director General tasked with investigating Google.  *Matrimony.com Ltd.*, Case Nos. 07 & 30 of 2012, ¶ 161; *see also* J. Srikrishna Op. ¶¶ 34-36.  CREXi has supplied no reason—other than pure speculation—to believe that the Supreme Court of India would not follow the common law rule laid down in *Rush*.  By contrast, CoStar's expert, former Indian Supreme Court Justice B.N. Srikrishna, has opined, based on the foregoing principles and decisions, that an Indian court would in fact follow the *Rush* decision. J. Srikrishna Op. ¶¶ 28, 34.

CREXi also argues (in Section III.B.2) that the privilege is inapplicable with

respect to a "concluded settlement agreement."  That contention is likewise

mistaken.  As the Supreme Court of India has recognized, the whole point of the

privilege is to "facilitate compromise," a purpose that would be gravely impaired if

the privilege applied only to *failed* compromise efforts.  *Chairman*, 2 SCC 663,

¶ 34; *see also Rush*, [1989] AC 1280 (HL) at 1301 (noting that it goes "without

saying that admissions made to reach settlement . . . are . . . inadmissible whether or

not settlement was reached"); J. Srikrishna Op. ¶ 48 n.3 (observing there would be

no need for narrow exceptions to the without prejudice rule if settlement

communications lost protection when a settlement was concluded).  In advancing

its novel argument, CREXi selectively quotes (in Section III.B.2) a Supreme Court

of India decision (*Chairman*) for the proposition that "the parties must be taken to

have intended and agreed that the privilege will cease if and when the negotiations

'without prejudice' come to fruition in a concluded agreement."  *Chairman*, 2 SCC

663, ¶ 34.  But as Justice Srikrishna explains in his opinion, that comment (along

with a similar one in *Peacock*, also quoted by CREXi in Section III.B.2) stands for

the proposition that the privilege does not apply to communications that occur *after*

a settlement is concluded.  J. Srikrishna Op. ¶¶ 37-40.  That rule fits with the

purpose of the privilege, since the privilege is meant only to "facilitate

compromise," *Chairman*, 2 SCC 663, ¶ 34, and thus covers only those

communications "written for the purpose of a genuine attempt to compromise a

dispute," *Peacock*, 12 SCC 673, ¶ 43.

Here, all of the settlement communications at issue happened *before* a

compromise between Arcgate and CoStar was reached.  Those communications

were made "for the purpose of a genuine attempt to compromise a dispute," *id.*,

indeed they led to a settlement (that was approved by a court).  And neither of the

parties to those communications (Arcgate and CoStar) have consented to produce

those communications.  The communications are therefore properly subject to the

without prejudice privilege, and are not subject to discovery by CREXi.[36]  *See* J.
Srikrishna Op. ¶¶ 92-93, 104-05 (opining that the privilege applies to CoStar-
Arcgate communications).

### 3.    No Exceptions To The Without Prejudice Privilege Apply.

CREXi also argues (in Section III.B.2) that even if the privilege generally
bars the production in discovery of settlement communications, the
communications at issue fall within one of the narrow exceptions identified by the
House of Lords in *Rush*.  CREXi hurriedly identifies a few exceptions in its request
for discovery; its lawyer, Mr. George, identifies four in all.  None of those
exceptions apply.

*First*, CREXi contends that the privilege does not apply "when the justice of
the case requires it."  CREXi Mot. § III.B.2 (quoting *Rush*, [1989] AC 1280, at
1300).  But no English or Indian court has ever recognized or applied a general
"justice of the case" exception.  Although Lord Griffiths used that phrase in *Rush*,
he identified it with more specific, distinct exceptions to the privilege, such as
threats of blackmail.  J. Srikrishna Op. ¶ 95.  Indeed, last year the English Court of
Appeal declined to recognize such an exception in view of the "unacceptable
interference with the public policy" of the without prejudice rule that such an
exception would introduce.  *Berkeley Square Holdings & Ors v Lancer Prop. Asset
Mgmt. Ltd.,* [2021] EWCA (Civ) 551, ¶ 89 (Eng.); *see* J. Srkrishna Op. ¶¶ 66, 95.
CREXi's invocation of this non-existent exception is unavailing.

*Second*, CREXi argues that the privilege cannot be used "as a cloak for
perjury, blackmail, or other 'unambiguous impropriety.'"  CREXi Mot. § III.B.2

---

[36]  CREXi also argues (in Section III.B.2) that Section 165 of the Indian Evidence
Act "require[s] production of the requested communications."  That is incorrect.
Section 165 applies only at trial—not after a court has issued a final judgment.  J.
Srikrishna Op. ¶¶ 70-72.  Even if it did apply, Section 165 allows a court to probe
ostensibly "irrelevant" and "unrelated" evidence, but does not authorize a court to
seek "inadmissible evidence."  *Tewari v. State of U.P.*, (2010) 10 SCC 677, ¶ 37
(India).  Because communications subject to the without prejudice privilege are
inadmissible, they are not subject to production under Section 165.  J. Srikrishna Op.
¶¶ 73-76.

67

1   (quoting *Unilever plc v. Procter & Gamble Co.* (2000) 1 WLR 2436 (Eng.)).  But

2   as the English Court of Appeal explained in *Unilever*, that narrow exception applies

3   "only in the clearest cases of abuse of a privileged occasion."  *Unilever*, 1 WLR

4   2436, 2444.  Just last year, the English Court of Appeal reiterated that this

5   exception requires a party to provide evidence "establish[ing] an unambiguous

6   impropriety," and that "[n]othing less will do."  *Motorola Sols., Inc. v. Hytera*

7   *Commc'ns Corp. Ltd.* , [2021] EWCA (Civ) 11, ¶¶ 60, 64 (Eng.); *see* J. Srikrishna

8   Op. ¶¶ 10, 52-55 ("*Motorola* thus stands for the principle that 'the without

9   prejudice rule must be 'scrupulously and jealously protected' so that it does not

10  become eroded.") (quoting *Motorola*, [2021] EWCA (Civ) 11, ¶ 31).  In that case,

11  the Court of Appeal rejected the notion that a "good arguable case (or a plausible

12  evidential basis)" for impropriety would justify application of the exception.

13  *Motorola*, [2021] EWCA (Civ) 11, ¶ 65.  Here, as discussed *supra* § IV.B.2.a,

14  CREXi has not adduced even a "plausible evidential basis" of impropriety, much

15  less made the kind of unambiguous showing that would trigger the exception.  J.

16  Srikrishna Op. ¶ 97.  CREXi vaguely asserts (in Section III.B.2) that CoStar may

17  not "deny discovery . . . to 'cloak' the reasons for Mr. Bagla's false statements," or

18  to "hide any threats or pressure it applied to Arcgate to induce it to settle."  But

19  CREXi has not identified any particular falsities in Mr. Bagla's declaration, *see*

20  *supra* § IV.B.2.a, J. Srikrishna Op. ¶ 98, and the only "threats or pressure" it has

21  identified is its allegation that CoStar told Arcgate that it would continue its

22  litigation if the parties were unable to reach a resolution.  *See* CREXi Mot. §

23  III.A.3.  Any warning of further legal action is no impropriety.  In the very case that

24  CREXi cites (*Unilever*), which concerned an alleged threat of legal action in the

25  absence of settlement, the English Court of Appeal *rejected* application of the

26  "unambiguous impropriety" exception, noting that a threat of legal action "may be

27  deeply embedded in negotiations for a compromise solution," 1 WLR at 2444, and

28  explaining that such "threats" are neither "oppressive, [n]or dishonest, [n]or

68

1   dishonourable," *id.* at 2449; *see* J. Srikrishna Op. ¶¶ 50, 52.  CREXi's invocation

2   of the "unambiguous impropriety" exception recognized in *Unilever* therefore fails

3   on *Unilever*'s own terms.

4          *Third*, CREXi points to an exception for establishment of an "independent

5   fact" not connected to the "merits of the cause."  CREXi Mot. § III.B.2.  (quoting

6   *Rush*, [1989] AC 1280 (HL), 1300).  In *Rush*, for instance, the House of Lords

7   noted that a party might permissibly use settlement communications to identify the

8   "handwriting of one of the parties."  *Rush*, [1989] AC 1280 (HL), 1300 (citing

9   *Waldridge v. Kennison* (1794) 1 Esp. 142 (Eng.)).  That exception is inapposite

10  here because CREXi does *not* seek discovery of the Arcgate-CoStar settlement

11  communications in order to establish a fact unrelated to the Arcgate settlement, *see*

12  J. Srikrishna Op. ¶ 95; it seeks discovery precisely because it asserts the

13  communications would show that Mr. Bagla's testimony, which was incorporated

14  into the High Court's decree, reflects false or coerced statements in support of what

15  it alleges is a "flagrantly inappropriate" settlement.  Boyle Decl., Ex. T, W. Braunig

16  Ltr., at 3 (Feb. 17, 2022).  *Fourth*, CREXi's lawyer, Mr. George, asserts that

17  "[s]eparate from English law, Indian courts also find exceptions to the without

18  prejudice privilege" where "a party submits a false or misleading document to a

19  court."  George Decl. ¶ 34.  But Mr. George does not identify a single Indian court,

20  let alone multiple courts, that has found such an exception.  Instead, in support of

21  this point, Mr. George cites a decision by the High Court of Gujarat, *Zatrix Limited*

22  *v. MV Nikoforos*, MANU/GJ/0621/2020 (India).  But that decision is wholly

23  inapposite because it did not involve settlement negotiations, or an exception to the

24  privilege.  *See* J. Srikrishna Op. ¶ 67.  The documents at issue were emails one

25  party had sent as part of its compliance with a settlement agreement.  The emails

26  had nothing to do with the settlement negotiations that produced the agreement.

27  That is why the court held the without prejudice privilege had "no relevance to the

28  facts" of that case.  *Zatrix*, MANU/GJ/0621/2020, ¶ 13.  In any event, CREXi has

1  not identified with any specificity any "false or misleading" information in the

2  documents submitted to the High Court of Rajasthan in connection with the Arcgate

3  settlement.  *See* J. Srikrishna Op. ¶ 98.  Moreover, the High Court reviewed the

4  Consent Terms and accompanying testimony from Mr. Bagla.  *Id.* ¶¶ 77-82; Sagar

5  Decl. ¶¶ 36-39.  As Justice Srikrishna explains, "the High Court of Rajasthan could

6  not have approved the Consent Terms and entered its judgment before first

7  concluding that the Consent Terms (including the declaration) were lawful . . . ."

8  *Id.* ¶ 82.  Mr. George's belated challenge is therefore unavailing.

9      Because none of the exceptions to the without prejudice privilege invoked (or

10  made up) by CREXi is applicable, its argument for disregarding the privilege fails.

11      **C.    CONCLUSION**

12      For the foregoing reasons, CoStar respectfully requests the Court to deny

13  CREXi's motion to compel.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275

1

2      Dated: August 23, 2022                    KEKER, VAN NEST & PETERS LLP

3

4                                          By:   /s/ *Elliot R. Peters*
                                                 ─────────────────────────────
5                                                ELLIOT R. PETERS
                                                 WARREN A. BRAUNIG
6                                                ELIZABETH K. MCCLOSKEY
                                                 NICHOLAS S. GOLDBERG
7
                                                 Attorneys for Defendant and Counterclaimant
8                                                COMMERCIAL REAL ESTATE
                                                 EXCHANGE, INC.
9      Dated: August 23, 2022                    LATHAM & WATKINS LLP

10
                                                 /s/ *Nicholas J. Boyle*
11                                               ─────────────────────────────
                                                 NICHOLAS J. BOYLE, *Pro Hac Vice*
12                                               nicholas.boyle@lw.com
                                                 SARAH A. TOMKOWIAK, *Pro Hac Vice*
13                                               sarah.tomkowiak@lw.com
                                                 555 Eleventh Street, NW
14                                               Suite 1000
                                                 Washington, D.C. 20004
15                                               Tel: 202.637.2200

16

17                                               JESSICA STEBBINS BINA
                                                 jessica.stebbinsbina@lw.com
18                                               ELYSE M. GREENWALD
                                                 (BAR NO. 268050)
19                                               elyse.greenwald@lw.com
                                                 10250 Constellation Boulevard
20                                               Suite 1100
                                                 Los Angeles, CA 90067
21                                               Tel: 424.653.5525

22

23                                               Attorneys for Plaintiffs

24

25

26

27

28

1860275

1

## ATTESTATION

2    Pursuant to Civil Local Rule 5-4, I, Elliot R. Peters, attest that all signatories

3 listed, and on whose behalf the filing is submitted, have authorized the filing of the

4 stipulation.

5

6 DATED: August 23, 2022    By: */s/ Elliot R. Peters*

7               ELLIOT R. PETERS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREXI'S MOTION TO COMPEL DISCOVERY REGARDING COSTAR'S SETTLEMENT WITH ARCGATE
Case No. 2:20-cv-08819 CBM (ASx)

1860275