KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS #158708
epeters@keker.com
WARREN A. BRAUNIG #243884
wbraunig@keker.com
ELIZABETH K. MCCLOSKEY #268184
emccloskey@keker.com
NICHOLAS S. GOLDBERG #273614
ngoldberg@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Attorneys for Defendant and Counterclaimant
COMMERCIAL REAL ESTATE EXCHANGE, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>                    Defendant. | Case No. 2:20-cv-08819 CBM (ASx)<br><br>**DISCOVERY MATTER**<br><br>**DECLARATION OF ELIZABETH K. MCCLOSKEY IN SUPPORT OF CREXI'S MOTION TO COMPEL ARCGATE DOCUMENTS**<br><br>Judge:      Hon. Alka Sagar<br><br>Date Filed   September 25, 2020<br><br>Trial Date:  None set |
| COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>                    Counterclaimant,<br><br>          v.<br><br>COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC.,<br><br>                    Counterdefendants | |

I, Elizabeth K. McCloskey, declare as follows:

1.      I am an attorney licensed to practice law in the State of California and am a partner at Keker, Van Nest & Peters LLP, located at 633 Battery Street, San Francisco, California, 94111, counsel for Defendant and Counterclaimant Commercial Real Estate Exchange, Inc. ("CREXi") in the above-captioned action. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to them under oath.

2.      Attached as **Exhibit A** is a true and correct copy of the complaint and ex parte application filed in the matter of *CoStar Group, Inc. et al. v. Arcgate Teleservices Private Limited* ("CoStar Arcgate Lawsuit") before the Commercial Court of Udaipur in India on March 9, 2021.

3.      Attached as **Exhibit B** is a true and correct copy of the High Court for Rajasthan's July 30, 2021 *ex parte* Order in the CoStar Arcgate Lawsuit.

4.      Attached as **Exhibit C** is a true and correct copy of M/s Arcgate's Civil Contempt Petition filed on August 19, 2021 against CoStar Group, Inc. and CoStar Realty Information, Inc. ("CoStar") in the High Court of Rajasthan in the CoStar Arcgate Lawsuit.

5.      Attached as **Exhibit D** is a true and correct copy of CoStar's Criminal Contempt Petition filed on September 6, 2021 against Arcgate Teleservices Private Limited, M/s Arcgate, and employees of M/s Arcgate, including Rakesh Jain, Manish Choudhari, Dilip Bagla, Sushma Bagla, Kunal Bagla, and Devyani Kunal Bagla in the High Court of Rajasthan in the CoStar Arcgate Lawsuit.

6.      Although CoStar based its allegations against Arcgate Teleservices Private Limited in the CoStar Arcgate Lawsuit entirely on services that Arcgate allegedly provided to CREXi, CoStar never provided notice to CREXi or its attorneys of the lawsuit until it filed the settlement agreement and consent order from that lawsuit in this Court on January 12, 2022.

7.     Attached as **Exhibit E** is a true and correct copy of a January 21, 2022 letter from Sarah Tomkowiak to Elizabeth McCloskey concerning CoStar's allegations that CREXi was responsible for Arcgate's loss of its firewall logs.

8.     Attached as **Exhibit F** is a true and correct copy of a February 8, 2022 letter from Connie Sung to Sarah Tomkowiak responding to the January 21, 2022 letter from Sarah Tomkowiak to Elizabeth McCloskey.

9.     Attached as **Exhibit G** is a true and correct copy of a February 17, 2022 letter from Warren Braunig to Nicholas Boyle regarding CoStar's potential violation of ethical rules and federal law in connection with procuring the testimony of Kunal Bagla. In this letter, among other things, CREXi asked CoStar to provide additional information and produce documents concerning CoStar's negotiations of its settlement with Arcgate.

10.    Attached as **Exhibit H** is a true and correct copy of a February 28, 2022 letter from Nicholas Boyle to Warren Braunig responding to the February 17, 2022 letter from Warren Braunig to Nicholas Boyle. In this letter, Nicholas Boyle agreed to produce the documents that Arcgate had produced to CoStar in the CoStar Arcgate Lawsuit. On April 1, 2022, CoStar produced approximately 9,000 documents, which are almost entirely comprised of communications between CREXi and Arcgate.

11.    Attached as **Exhibit I** is a true and correct copy of an April 1, 2022 letter from Warren Braunig to Nicholas Boyle responding to the February 28, 2022 letter from Nicholas Boyle to Warren Braunig.

12.    On February 2, 2022, CREXi served its Third Set of Requests for Production on CoStar. Attached as **Exhibit J** is a true and correct copy of CoStar's Objections and Responses to CREXi's Third Set of Requests for Production, served on March 4, 2022.

13.    The parties met and conferred telephonically, on March 16, 2022, regarding CoStar's responses. On March 18, 2022, my colleague sent an email

2

summarizing that meet-and-confer discussion, a true and correct copy of which is attached as **Exhibit K**. The parties subsequently engaged in extended back and forth on issues related to CoStar's refusal to produce its settlement communications with Arcgate. True and correct copies of those correspondence are attached as **Exhibits L**, **M**, **N**, and **O**.

14.     Attached as **Exhibit P** is a true and correct copy of CoStar's Opposition to CREXi's Request for Custodians, submitted to the Court on June 15, 2022.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 25, 2022, in San Francisco, California.

_____
ELIZABETH K. MCCLOSKEY

DECLARATION OF ELIZABETH K. MCCLOSKEY IN SUPPORT OF
MOTION TO COMPEL ARCGATE DOCUMENTS
Case No. 2:20-cv-08819 CBM (ASx)

1877385

# EXHIBIT A

## BEFORE THE LEARNED COMMERCIAL COURT

## AT UDAIPUR

## CIVIL ORIGINAL SUIT NO. _____ OF 2021

1.  **CoStar Group, Inc.**                                    )

    A corporation registered under the laws  )
    of the State of Delaware and having its   )
    principal place of business at 1331 L
    Street, NW,                                               )

    Washington, District of Columbia          )
    20005, United States of America           )


2.  **CoStar Realty Information, Inc.**                  )

    A corporation registered under the laws  )
    of the State of Delaware and having its   )
    principal place of business at 1331 L     )
    Street, NW,                                               )

    Washington, District of Columbia          )
    20005, United States of America           )
                                                              )  ... ... ... **Plaintiffs**

                               *Versus*

**Arcgate Teleservices Private Limited**  )

A company incorporated under the           )
Companies Act, 2013 having its
registered Office at G1-10 I.T. Park,       )

Madri Industrial Area, Udaipur,             )

Rajasthan: 313001                           )  ... ... ... **Defendant**

**SUIT UNDER SECTION 51 OF THE COPYRIGHT ACT, 1957**

**FOR INJUNCTION AND DAMAGES AND FOR OTHER**

**ANCILLARY RELIEFS.**

VALUATION OF SUIT: Rs. 90,00,000/-

COURT FEE PAID: Rs. 3,05,100/- AFFIXED HERETO

MAY IT PLEASE YOUR HONOUR,

THE PLAINTIFFS RESPECTFULLY SUBMIT AS UNDER:

**INTRODUCTION:**

1. Plaintiff No. 1 ("CoStar Group") is a company incorporated under the laws of the state of Delaware in the United States of America, having its principal place of business at the address mentioned in the cause title. Plaintiff No. 2 ("CoStar Realty") is a wholly owned subsidiary of Plaintiff No. 1 having its principal place of business at the address mentioned in the cause title. Together, the Plaintiffs will be referred to herein as "CoStar."

2. The Defendant is a company incorporated under the Companies Act, 2013 having its registered office at the address mentioned in the cause title. The Defendant is *inter alia* engaged in the business of providing information technology services including data collection & cleansing, data enrichment and content moderation. Defendant company had a presence in the United States of America through Arcgate LLC, which

was incorporated in Austin, Texas. The details of Arcgate LLC are annexed herewith as **Annexure 1**.

3.  The present suit has been instituted for injunctive and monetary reliefs against the Defendant in respect of the acts of contributory copyright infringement, piracy/theft, improper access to CoStar websites and misappropriation of proprietary content owned by CoStar, including content generated, gathered, enhanced, updated, and curated by CoStar ("CoStar proprietary content"). The acts of the Defendant are also criminal in nature since they are in violation of Copyright Act, 1957, Information Technology Act, 2000, Indian Penal Code, 1882 for which CoStar reserves its right to initiate appropriate proceedings.

## FACTUAL BACKGROUND:

### CoStar, Its Products and Services, and the Steps It Takes to Protect Its Intellectual Property, Including Prior Litigation in India

4.  CoStar is a leading provider of commercial real estate information, analytics and online marketplaces in the United States of America.

5.  Founded in 1987, CoStar employs more than four thousand people worldwide. As a result of these employees' diligent efforts—and the investment of over USD 5 billion over the last three decades—CoStar has developed the most comprehensive database of commercial real estate in the world, which includes painstakingly-researched and verified data about commercial real estate properties and transactions, integrated with millions of CoStar's copyrighted photographs.

6.  CoStar expends enormous time and resources to populate and maintain the CoStar database, including averaging 24,000 thousand phone calls

*per day* to brokers, owners, developers, and other real estate professionals, canvassing a half million properties per year, and taking nearly one million photographs annually. CoStar's marketing research operations make millions of data changes to the CoStar database each year. CoStar works continuously to verify that the data contained in its database are up-to-date and reliable.

7.   CoStar offers a password-protected subscription to its database that commercial real estate brokers and other industry participants use to obtain comprehensive commercial real estate data, news, and analytics, as well as copyrighted photographs of commercial real estate properties. The leading commercial real estate brokerages in the United States, as well as a significant number of smaller brokerages, property owners, banks, retailers, real estate investment trusts (REITs), and other professionals are subscribers. The subscription database is also used by a number of United States federal, state, and local government entities and agencies. CoStar licenses its subscription database content for a recurring fee. Those fees, which vary according to the scope of access a user seeks, generate significant revenue.

8.   In addition to the subscription database, CoStar also owns and maintains a number of marketplaces containing listings of real estate for sale and for lease. CoStar's LoopNet.com website ("LoopNet") (available at http://www.loopnet.com) is the foremost digital marketplace for commercial real estate in the United States. LoopNet provides information on more than 650,000 for-lease and for-sale listings at any point in time and is one of CoStar's biggest revenue

generators. Real estate listings on LoopNet contain CoStar copyrighted photographs and data from the CoStar database. Every day, buyers, sellers, lessors, lessees, owners, and brokers access and use LoopNet to list, buy, sell, lease, rent, or browse commercial real estate. In addition, CoStar runs a commercial real estate auction platform, known as Ten-X.com ("Ten-X") (available at www.ten-x.com). A copy of a few pages from each website which illustrate the nature of the business activity of CoStar is produced herewith as **Annexure 2** and **Annexure 3**.

9.  LoopNet, like CoStar's other marketplaces, leverages CoStar's vast commercial real estate database to help build and enhance property listings. For instance, if a broker or property owner wants to market a listing on LoopNet relating to a property that is in CoStar's database, he or she can, and typically does, populate the LoopNet listing with CoStar's copyrighted photographs and with a variety of data that CoStar has added to the database through its various research efforts.

10. Moreover, a broker or property owner can also pay LoopNet for varying levels of marketing services. LoopNet's premium services, called Signature Ads, include labor-intensive contributions by CoStar marketing research professionals, including, among other things, custom professional photos, listing curation, and generation or revision of narrative property descriptions to increase marketability. The curation process involves reviewing, editing, and populating multiple data fields, including with data from the CoStar database. For other listings on LoopNet, a marketing researcher will likewise conduct a



curation of the listing and may also help generate or revise a narrative property description to increase marketability.

11.  CoStar's database is the engine that drives CoStar's business, attracting paying subscribers, licensees, and users, and powering its various information services, analytical tools, and digital marketplaces, including LoopNet and Ten-X. Over three decades, nearly thirteen thousand CoStar researchers have contributed to the CoStar database, adding millions of properties, shooting millions of professional photos and drone videos, and driving and flying over two million miles in any given year. CoStar generates, updates, and curates the CoStar databases at a cost of hundreds of millions of dollars each year.

12.  CoStar has taken an average of over one million photographs in recent years. The photographs are of various properties around the United States and are displayed in the CoStar database and on LoopNet. The photographers engaged by CoStar take such photographs using their skill, judgment and hard work. The photographs are taken for and on behalf of CoStar, for which valuable consideration is paid by CoStar to such photographers. The photographs are original works, and CoStar Realty is the owner of the copyright therein. CoStar Group and LoopNet are authorized by CoStar Realty to use these photographs in the course of their business. While not formally required under United States law, CoStar Realty, Plaintiff No. 2, registers tens of thousands of these photographs with the United States Copyright Office each month.

13.  The content that CoStar gathers, curates, and generates—including its copyrighted photographs—is at the root of CoStar's products and

therefore is central to its business. CoStar's customers use and rely upon the copyrighted images and content in the CoStar databases to generate property listings and make significant commercial decisions. CoStar's content is critical to supporting USD 1 trillion of commercial real estate transactions each year. CoStar attributes significant commercial value to its content in general, and to its copyrighted photographs in particular.

14. Accordingly, CoStar observes a robust policy of protecting its intellectual property from competitors and other unauthorized third parties. CoStar protects its content in three primary ways. First, as discussed above, CoStar registers its copyrighted photographs with the United States Copyright Office. Second, users must assent to CoStar's contractually binding terms in order to use CoStar products, including both the CoStar subscription database and LoopNet. Third, CoStar protects its content by employing state-of-the-art anti-piracy technology.

15. Copies of the current binding contractual terms of service for both the subscription database and LoopNet are produced herewith as **Annexure 4 and Annexure 5,** respectively. Those terms of service expressly prohibit the use of CoStar's products for competitive purposes. CoStar has occasionally updated the terms, but the prohibition against competitive use has remained consistent for many years, across various updates and at all times relevant to this lawsuit.

16. Among its technological anti-piracy efforts, CoStar services, including LoopNet, employ an abuse monitor. If a single IP address views an

excessive number of listings or executes an excessive number of searches on the site—consistent with data or content mining operations, automated bots, or other illegitimate users—that IP address is temporarily blocked from accessing the site. On LoopNet, for example, if this abuse monitor is tripped, the user immediately receives an unauthorized access notice, also known as an "Error & Abuse" notice. The notice provides a hyperlink to LoopNet's Terms and Conditions and explains that use of LoopNet is subject to such terms, and that use that does not comply with the terms is unauthorized:

17. CoStar has brought multiple prior lawsuits against infringers and content thieves, such as Xceligent, Apartment Hunters, and RealMassive, and against those who access its databases without authorization, or enable others to do so. CoStar has litigated across the United States, from New Jersey to Kansas City, from Austin to Los Angeles, to protect its intellectual property, and has obtained judgments and injunctions that value its copyrighted images and real estate listings



most recently at USD 50,000 per photograph, and USD 50,000 per real estate listing.

18. CoStar has also previously litigated in India to vindicate its right to stop Indian-based contractors from copying content from LoopNet on behalf of CoStar's competitors in the United States. For instance, in 2016, CoStar filed a suit similar to the instant case against Maxval Technologies Pvt. Ltd. ("MaxVal") before the Court of District Judge at Thane, Mumbai. MaxVal, like the Defendant, was accessing LoopNet without authorization, and copying content, including copyrighted photographs, on behalf of one of CoStar's competitors, Xceligent. The Hon'ble District Court, being prima facie satisfied that MaxVal was committing contributory infringement on behalf of Xceligent, was pleased to grant an ex-parte ad-interim injunction and order appointing a court commissioner to preserve the evidence found in Maxval's computer systems. Such relief was set forth *vide* orders dated 13 December 2016. The Parties thereafter filed consent terms dated 16 April 2018 under which MaxVal confirmed its acts of contributory infringement on behalf of Xceligent and acceded to a permanent injunction barring MaxVal from, *inter alia,* accessing CoStar databases or websites, including LoopNet, for the purpose of competitive use and decreeing the Suit in favor of CoStar. Annexed hereto and marked as **Annexure 6, Annexure 7 and Annexure 8** are the orders dated 13 December 2016 granting an ex-parte ad-interim injunction and appointing a court commissioner and the order dated 12 June 2018 decreeing the Suit.

**CREXi, Its Scheme to Steal from CoStar, and**
**Its Use of the Defendant to Facilitate That Unlawful Conduct**

19. One of CoStar's current competitors in the United States is Commercial Real Estate Exchange, Inc. ("CREXi"). CREXi is a company incorporated in the State of California in the United States with its principal place of business in Marina Del Rey, California. CREXi was founded in 2015 by Michael DeGiorgio, Luke Morris, Erek Benz, and Ben Widhelm. The founders had all previously worked at Ten-X, which is now part of CoStar.

20. On its website (www.crexi.com), CREXi describes itself as "a commercial real estate marketplace that simplifies transactions for brokers with a suite of easy-to-use tools to manage the entire process from listing to closing." CREXi's website allows users to view commercial real estate listings in markets across the United States. CREXi also runs an online auction marketplace which is similar to Ten-X.

21. It is understood that CREXi has raised a significant amount of funding recently and is in a position to compete fairly with CoStar. Instead, CREXi is attempting to build its own online commercial real estate marketplace and auction platform by free-riding on CoStar's billions of dollars of investments and the thirty-plus years of hard work by CoStar's employees. CREXi has accessed CoStar's database and LoopNet more than a million times (at least) in breach of binding terms and conditions. Once there, CREXi has copied property listings containing CoStar's copyrighted photographs and listing data. A

preliminary review of CREXi's website through 30 July 2020, reveals that more than **ten thousand** of CoStar's copyrighted photographs have been published on CREXi's rival website without authorization. The photographs have been illegally copied and then re-uploaded, in some cases after making minor changes to them, for example removing or obscuring the CoStar name and/or logo.

22. CREXi knows that accessing CoStar's websites and stealing its listings is wrong. CREXi has received "Error & Abuse" notices from CoStar containing a conspicuous hyperlink to LoopNet's Terms and Conditions and a warning that use of LoopNet that does not comply with the terms is prohibited. Furthermore, CREXi itself has admitted that it is not allowed to copy CoStar's listings from LoopNet. Nevertheless, the evidence shows that this is precisely what CREXi does.

23. An illustrative compilation of 100 photographs which are owned by CoStar Realty and which appear on CREXi's website, along with a summary chart of the said photographs containing a URL link to the page on CREXi's website where each CoStar copyrighted photograph was found, is produced herewith as **Annexure 9**.

24. This compilation of 100 photographs is a small subset of the 10,000 CoStar-copyrighted photographs that CoStar has found so far on CREXi's website. Copies of these 10,000 copyrighted photographs are filed herewith on a pen drive for the sake of brevity and convenience, and the pen drive is produced herewith as **Annexure 10**.

25. Although not required by United States Copyright law, each of the 10,000 images referenced above have been registered with the United States Copyright Office. Example copies of the registration certificates in favor of CoStar Realty are produced collectively herewith as **Annexure 11 (Colly)**. These registration certificates relate to the copyrighted photographs referenced below at paragraphs 33-34 and in Annexure 16. CoStar craves leave to refer to and rely upon a compilation of registration certificates when produced.

26. On 25 September 2020, CoStar filed a lawsuit against CREXi in the United States District Court for the Central District of California captioned *CoStar Group, Inc., et. al., v. CREXi, Inc.*, Case No. 2:20-cv-8819. On 14 December 2020, CoStar filed its First Amended Complaint against CREXi, alleging copyright infringement, violations of the United States Digital Millennium Copyright Act, misappropriation, unfair competition, false advertising and breach of contract.

27. The Defendant is assisting CREXi in its unlawful scheme, just as MaxVal assisted Xceligent before it was enjoined. CoStar submits that the Defendant is accessing LoopNet without authorization for competitive purposes on behalf of CREXi in violation of LoopNet's Terms and Conditions, committing contributory infringement of CoStar's copyrighted photographs, and engaging in piracy/theft, improper access to CoStar websites and misappropriation of CoStar proprietary content at CREXi's direction.

28. Just as in CoStar's prior litigation against MaxVal before the Court of District Judge at Thane, Mumbai, the Defendant, an Indian contractor,

is accessing LoopNet without authorization for competitive purposes on behalf of one of CoStar's competitors. Like MaxVal, the Defendant must be enjoined from accessing CoStar's websites.

29. In its lawsuit against CREXi, CoStar has alleged that CREXi accesses LoopNet through the Defendant. Annexed hereto and marked as **Annexure 12** is a copy of the amended complaint dated 14 December 2020 filed by CoStar. To date, CREXi has not denied or disclaimed that the Defendant is accessing LoopNet on CREXi's behalf. And tellingly, while CREXi has sought the dismissal of some claims that CoStar has brought against it, CREXi has not sought to dismiss CoStar's claim of mass copyright infringement.

30. CoStar's evidence demonstrates that the Defendant is working on behalf of CREXi. CoStar discovered on the internet a publicly available spreadsheet (the "Arcgate spreadsheet") that contains a selection of records of the daily work activities of various employees of the Defendant. An excerpt of the Arcgate spreadsheet is attached as **Annexure 13**. The Arcgate spreadsheet identifies at least 13 employees of the Defendant who performed work on behalf of CREXi in March and April 2020. As discussed below, evidence indicates that the Defendant's work on behalf of CREXi was not limited to March and April 2020. Accordingly, it is likely that there are additional spreadsheets in the Defendant's possession covering these other periods. Notably, however, it appears that the Arcgate spreadsheet corresponding to March and April 2020 is no longer publicly available.

Thus, it is possible that the Defendant has deleted the spreadsheet and others like it.

31. In addition to the Arcgate spreadsheet, an online resume of one of the Defendant's (former) employees shows that the Defendant worked for CREXi, even before March 2020. Ishan Aditya Bhatnagar worked as a Senior Quality Analyst at the Defendant from August 2015 to September 2018. Mr. Bhatnagar's online resume states that, during that time, he worked as a contractor for CREXi. Mr. Bhatnagar's resume is attached as **Annexure 14**. Thus, the Defendant's work for CREXi is not limited to 2020, but may have started as early as 2015, the year that CREXi was founded.

32. On top of these public sources, CoStar's own business records demonstrate conclusively that the Defendant has accessed LoopNet in connection with its work for CREXi. CoStar generates records of access to LoopNet in the ordinary course of business, in part to identify the companies that are accessing particular property listings. CoStar has provided such information to its listing broker or property owner customers *millions* of times over the last several years. To identify the companies that are accessing LoopNet, CoStar employs licensed third-party code widely utilized within the industry. The code relies on a variety of factors, including cookies, tracking pixels, and web beacons. CoStar's ordinary course records of access to LoopNet from March through May 2020, attached as **Annexure 15** (the "LoopNet access records") reflect that the Defendant accessed CoStar's LoopNet website



in those months, at the same time that the Arcgate spreadsheet shows

that employees of the Defendant were working on behalf of CREXi.

33. Moreover, right around this time, the same LoopNet access records

reflect that the Defendant ran searches on LoopNet, and these searches

returned property listings containing CoStar-copyrighted images.

Shortly thereafter, including in some cases a mere matter of days,

listings for these very same properties began appearing on CREXi with

CoStar's copyrighted photographs. For example, the LoopNet access

records reflect that the Defendant accessed LoopNet on 17 April 2020

and ran a search that included in the results a property located at 7226

N. Tryon St, Charlotte, North Carolina. Shortly thereafter, details of

that property—including cropped versions of CoStar-copyrighted

images published on LoopNet—were displayed on CREXi. A copy one

such infringing image is set forth below:

**CoStar-Copyrighted**
**Photograph on LoopNet**          **Cropped Image on CREXi**

    

34. By way of further example, the LoopNet access records show that the

Defendant accessed LoopNet on 02 May 2020, and ran a search that

included in the results a property located at 300 Littleton Rd,

Parsippany, New Jersey. A short time later, details of the property—

including a cropped version of a CoStar-copyrighted image published

on LoopNet—appeared on CREXi. A copy of the infringing image is set forth below:

**CoStar-Copyrighted Photograph on LoopNet**



**Cropped Image on CREXi**



35. The infringing images set forth above, along with ten other similar examples of infringing images published on CREXi after the Defendant ran searches on LoopNet that returned such properties, are attached as **Annexure 16**. The same exhibit includes, for each infringing photograph, the CREXi URL on which the photograph was published.

36. In other words, the LoopNet access records show that the Defendant accessed CoStar's LoopNet website at the same time the Defendant's own records show it was working for CREXi, and, shortly thereafter, CoStar's copyrighted images appeared on CREXi's website. This strongly indicates that the Defendant was accessing LoopNet on behalf of CREXi and contributing to CREXi's infringement of CoStar's copyrighted photographs.

37. The evidence also shows that the Defendant has continued to access LoopNet, even after CoStar filed its complaint against CREXi in September 2020. For instance, LoopNet access records from October 2020—attached as **Annexure 17**—show the Defendant's continued activity on LoopNet in the month *after* CoStar filed the lawsuit,

indicating that the Defendant's unauthorized access is continuing, and
will do so until it is enjoined.

38. In addition to the foregoing evidence of access and copying, CoStar has
identified at least two employees of the Defendant—including one
current employee—who have created accounts on LoopNet. Critically,
these accounts appear to be using IP address anonymizer services. This
is a tactic that CREXi and other infringing companies (such as the
Indian company MaxVal) have employed to hide their activity on
LoopNet. The use of these anonymizer services strongly suggests that
there is further activity on LoopNet attributable to the Defendant that
CoStar has not yet detected. Accordingly, CoStar is seeking directions
that an ex-parte Court Receiver/Court Commissioner be appointed for
the purpose of preserving this evidence until disposal of the present suit
failing which the suit will be rendered infructuous.

39. The Defendant's use of nefarious means to access LoopNet, evade
detection and circumvent LoopNet's technological blocking measures
is further demonstrated by evidence linked to one of the Defendant's IP
addresses.    CoStar    has    recently    identified    an    IP    address—
115.178.100.18 (the "115. IP address")—associated with the Defendant
with significant activity on LoopNet over the past several years.
Stunningly, from 06 April 2016 to 01 January 2021, sessions tied to the
115. IP address logged tens of thousands of hits on CoStar's LoopNet
website. CoStar's records show that Arcgate's activity on LoopNet has
continued unabated even after CoStar filed suit against CREXi. In fact,
from 26 September 2020–the day after CoStar filed its complaint—

through 01 January 2021, the 115. IP address alone has hit LoopNet almost a thousand times. Attached hereto as **Annexure 18** is an excerpt of CoStar's access records showing the 115. IP address activity described above.

40. Several independent pieces of evidence link the 115. IP address to the Defendant. First, web-based IP identification tools indicate that the 115. IP address is hosted in Udaipur, India—the headquarters of the Defendant. A printout obtained from the website www.dawhois.com evincing the above is at **Annexure 19**. Second, third-party abuse monitors report that the host name of the 115. IP is "ftp.arcgate.info"— thus linking the IP address directly to the Defendant. A printout obtained from the website www.abuseipdb.com evincing the above is at **Annexure 20**. Third, an individual using an email connected with the Defendant logged into LoopNet using the 115. IP address. Attached as **Annexure 21** is an extract from CoStar's authentication database, which tracks LoopNet log-in information. It shows that on 01 October 2020, an individual with the email "yogesh96.arcgate@gmail.com" logged into LoopNet while using the 115. IP address, further demonstrating that the Defendant uses the 115. IP address.

41. An analysis of the 115. IP address' activity on LoopNet shows that the Defendant knows that it is not permitted to access CoStar's websites and uses covert techniques to evade CoStar's blocking efforts. For instance, on 08 March 2020, the Defendant conducted sessions on LoopNet using the 115. IP address. These sessions generated a significant number of hits to LoopNet as the Defendant searched for



and accessed various property listings on the website. Eventually, the Defendant's excessive activity tripped LoopNet's abuse monitor, which temporarily blocked the Defendant's access to LoopNet from the 115. IP address and presented the Defendant with the Error & Abuse notice as described in Paragraph 16. The Error & Abuse notice contained a conspicuous hyperlink to LoopNet's Terms and Conditions, which make clear that competitive access to LoopNet is not permitted.

42. Despite being on notice that competitive access was forbidden, the Defendant continued to attempt to access LoopNet from the 115. IP address, which, in turn, prompted additional Error & Abuse notices. To circumvent the abuse monitor's blocking efforts and regain access to LoopNet, the Defendant masked its activity by switching from the 115. IP address to an IP address from a third-party anonymizer service. This tactic—known as "rotating" IP addresses—is designed to avoid anti-piracy measures and is a hallmark of data theft. Other content thieves, such as CREXi, Xceligent, and Maxval, have also rotated IP addresses using third-party anonymizer services as part of their unlawful schemes to harvest real estate listings and copyrighted images from CoStar. Indeed, CREXi uses many of the same anonymizer services as the Defendant, including Hurricane Electric, Digital Ocean, and LeaseWeb.

43. **Annexure 22**—an annotated excerpt of LoopNet's activity logs—shows the Defendant rotating IP addresses in order to avoid the abuse monitor and regain access to LoopNet. For instance, on 09 March 2019, one day after the 115. IP address tripped the abuse monitor, the

LoopNet activity logs show that the Defendant tried to access a property listing at 6658 SE East Paris Avenue, Caledonia, Michigan, using the 115. IP address. The Defendant was blocked and received an Error & Abuse notification. Less than a minute later—and during the same session on LoopNet—the Defendant switched to an anonymized IP address from Hurricane Electric and accessed the property listing despite knowing it was not permitted to do so. **Annexure 22** contains additional examples of the Defendant rotating IP addresses between 12–14 March to circumvent the abuse monitor. In each example, the Defendant attempted to conduct activity on LoopNet using the 115. IP address, received an Error & Abuse notification, switched to an anonymized IP address, and covertly resumed the forbidden activity.

44. After the 08 March temporary block eventually expired, the Defendant continued to access LoopNet using the 115. IP address and tripped LoopNet's abuse monitor yet again on 15 April 2019. In fact, between 8 March and 30 April 2019, LoopNet served over one thousand Error & Abuse notices on the 115. IP address, putting the Defendant on clear notice that its access was prohibited.

45. Like the Defendant, CREXi knows that it is not permitted to access CoStar's websites or copy CoStar's property listings. CREXi also received Error & Abuse notices when it accessed CoStar's LoopNet website, and CREXi has even admitted that it is not permitted to copy from CoStar. Nevertheless, on CREXi's behalf and at CREXi's direction, the Defendant is accessing LoopNet without authorization and contributing to CREXi's theft of CoStar's listings and copyrighted



photographs. The Defendant's unlawful work on CREXi's behalf must cease.

46. Fortunately, there are easily available, low-cost tools that CoStar's legitimate competitors use to filter out CoStar's copyrighted images. It does not appear that CREXi or the Defendant employ these tools. The Defendant claims to provide artificial intelligence and data analytics services to its clients, which are technologically sophisticated in nature. It is unlikely that the Defendant, being sophisticated in its business, is not aware that it is committing contributory infringement and criminal acts punishable under the Copyright Act, 1957, Information Technology Act, 2000 and Indian Penal Code, 1882. Therefore, to fully understand the methodology and the tools employed by the Defendant and CREXi to commit contributory copyright infringement, piracy/theft, improper access to CoStar websites and misappropriation of CoStar proprietary content, and so that the evidence is not deleted by a click of a button at the expense of CoStar's rights, it is vital that the incriminating evidence in the Defendant's systems is preserved and produced before the Court for proper adjudication. CoStar apprehends that the data / evidence will be destroyed by the Defendant if an ex-parte injunction and Court Receiver / Court Commissioner is not appointed as prayed.

47. The Defendant, at the direction of CREXi, has used CoStar's services and property, including its copyrighted images, in order to build CREXi's business, thereby making unlawful financial gains at Costar's expense and to its grave commercial prejudice. In these circumstances,

CoStar is entitled to monetary and injunctive relief against the Defendant.

**THE HARM TO COSTAR AND REQUESTED RELIEF:**

48. Based on this brazen conduct, including access to CoStar's websites in violation of the binding terms, and theft of its content, including copyrighted photographs, CoStar has already suffered and is likely to suffer irreparable loss and damage on account of the aforesaid acts of contributory copyright infringement, piracy/theft, improper access to CoStar websites and misappropriation of CoStar proprietary content. CoStar states that unless the aforesaid reliefs of injunction are granted, grave and irreparable harm, loss and injury will be caused to CoStar and pecuniary compensation will not be an adequate relief.

49. While the full scope of the Defendant's unlawful conduct cannot be known at this time, CoStar submits that by reason of the aforesaid acts, the Defendant has caused and is likely to cause further loss and/or damage to CoStar. A full assessment of the losses is not possible at the present stage. To the best of its knowledge, CoStar presently and preliminarily estimates the damages to the tune of INR 90,00,000 (Rupees Ninety Lakhs only). CoStar reserves its rights to amend the plaint at a later stage and claim further damages as may be necessary. CoStar is claiming relief by way of damages in addition to injunctive relief.

50. The subject photographs of CoStar were first published in the United States. CoStar's photographs are protected in India under Section 40 of the Copyright Act, 1957 read with the International Copyright Order,

1999 as the rights of authors of member countries of the Berne and Universal Copyright Conventions are protected under Indian Copyright law. CoStar says and submits that India and the United States are signatories to both the Universal Copyright Convention as well as the Berne Convention. CoStar's photographs are therefore subject matter of copyright protection in India by virtue of India's membership to the Berne Convention, the Universal Copyright Convention and the International Copyright Order, 1999. For the ease of reference, Section 40 of the Copyright Act is reproduced hereinbelow:

**Section 40.  Power to extend copyright to foreign works.—**
*The Central Government may, by order published in the Official Gazette, direct that all or any provisions of this Act shall apply—*

(a) *to works first published in any territory outside India to which the order relates in like manner as if they were first published within India;*

(b) *to unpublished works, or any class thereof, the authors whereof were at the time of the making of the work, subjects or citizens of a foreign country to which the order relates, in like manner as if the authors were citizens of India;*

(c) *in respect of domicile in any territory outside India to which the order relates in like manner as if such domicile were in India;*

(d) *to any work of which the author was at the date of the first publication thereof, or, in a case where the author was dead at that date, was at the time of his death, a subject or citizen of a foreign country to which the order relates in like manner as if the author was a citizen of India at that date or time;*

*and thereupon, subject to the provisions of this Chapter and of the order, this Act shall apply accordingly: Provided that—*

(i) *before making an order under this section in respect of any foreign country (other than a country with which India has entered into a treaty or which is a party to a convention relating to copyright to which India is also a party), the Central Government shall be satisfied that the foreign country has made, or has undertaken to make, such provisions, if any, as it appears to the Central*



*Government expedient to require for the protection in that country of works entitled to copyright under the provisions of this Act;*

(ii) *the order may provide that the provisions of this Act shall apply either generally or in relation to such classes of works or such classes of cases as may be specified in the order;*

(iii) *the order may provide that the term of copyright in India shall not exceed that conferred by the law of the country to which the order relates but such a term or copyright shall not exceed the term of copyright provided under this Act;*

(iv) *the order may provide that the enjoyment of the rights conferred by this Act shall be subject to the accomplishment of such conditions and formalities, if any, as may be prescribed by the order;*

(v) *in applying the provisions of this Act as to ownership of copyright, the order may make such exceptions and modifications as appear necessary, having regard to the law of the foreign country;*

(vi) *the order may provide that this Act or any part thereof shall not apply to works made before the commencement of the order or that this Act or any part thereof shall not apply to works first published before the commencement of the order.*

A copy of the International Copyright Order, 1999 dated 24 March 1999 is hereto annexed and marked **Annexure 23**.

51. By virtue of being the owner of the copyright in the CoStar copyrighted photographs described herein, CoStar Realty has an exclusive right to *inter alia* (i) reproduce its copyrighted photographs, (ii) issue copies of such photographs to the public, (iii) make any adaptation of such photographs or (iv) do such things as provided in Section 14 of the Copyright Act, 1957. CoStar Realty submits that the reproduction / storing / accessing / downloading / uploading of such photographs by the Defendant without its permission amounts to infringement of copyright in the said photographs under the provisions of Section 51 of the Copyright Act, 1957.



52. CoStar submits that the acts of the Defendant of *inter alia* accessing CoStar's websites and contributing to CREXi's theft of listings and copyrighted photographs without the permission and/or authority of CoStar amounts to infringement of copyright of CoStar in such photographs under the provisions of the Copyright Act, 1957.

53. CoStar is therefore entitled to a permanent order and injunction from this Hon'ble Court restraining the Defendant, their directors, employees, servants, agents and any person claiming through them, from using CoStar's photographs in any manner whatsoever and accessing, downloading, reproducing, publishing, storing, uploading and/or using the photographs, or any substantial parts thereof, as available on CoStar's websites, including LoopNet, in any manner whatsoever.

54. CoStar apprehends that its copyrighted photographs, and other communications and documents relating to the infringement including CoStar proprietary content, that exist on the servers or other computers or devices of the Defendant would be destroyed by the Defendant if the Defendant gets notice of the present Suit and the interim applications. CoStar strongly apprehends in view of the continued access to LoopNet in December 2020 and January 2021 that there is a significant risk that the Defendant makes further copies of the infringing photographs for CREXi or sells or transfers the same to other third parties, including other competitors of CoStar. In the circumstances, pending the hearing and final disposal of the Suit, a Court Receiver or Commissioner including an expert should be appointed with all powers under Order

XL Rule 1 or under XXVI Rule 9 of the C.P.C., 1908 in order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the Defendant's premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan- 313 001 or any other premises owned or occupied by Defendant any time of the day or night without notice to the Defendant and with the help of the representatives of CoStar, Police and forensic expert, to:

(i)     make inventory and seize, take possession, custody and control of the CoStar infringing photographs, along with all the Defendant's material, printed matter, communication, invoices, records, relevant passwords and passcodes, and such material and documents relating to CoStar's infringing photographs, CoStar proprietary content including such material stored electronically on any systems; and

(ii)    make inventory and take a mirror copy of the entire electronic data of the Defendant stored on the computer systems, data storage devices, handheld devices, hard disks, pen drives, computer records, cloud based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of the Defendant (which may be belonging to the Defendant or on lease) and submit the said mirror copy to this Hon'ble Court in a sealed envelope along with a report.

55. CoStar says and submits that it is imperative to preserve this evidence until disposal of the present suit failing which the suit will be rendered infructuous. CoStar further says and submits that the only way to preserve the aforesaid evidence and prevent the suit from becoming infructuous is by appointing a Court Receiver / Court Commissioner to visit the premises of the Defendant in order to search and make copies of such evidence without notice to the Defendant. It is further necessary to direct and order the Defendant to provide assistance to the Court Receiver / Court Commissioner and any person accompanying the Court Receiver / Court Commissioner, including without limitation providing access to premises, servers, desktop computers and handheld devices, and material stored in cloud storage or online accounts, including usernames and passwords for accessing such devices, cloud storage and accounts.

56. CoStar further prays that CoStar's representatives along with an independent forensic expert be allowed to assist the Court Receiver / Court Commissioner in making inventory and making such mirror copies. As described above, the Defendant is likely continuing to access LoopNet—as evidenced by its post-complaint activity on LoopNet— and is likely continuing to use anonymizers to mask its activity. As a result, CoStar apprehends that the Defendant is likely to be continuing to infringe CoStar's intellectual property.

57. CoStar further submits that pending the hearing and final disposal of this suit, it is absolutely just, necessary and proper that the Defendant, its directors, employees, servants, agents and any person claiming

through them be restrained by a temporary order of injunction of this Hon'ble Court from directly or indirectly infringing or contributing to the infringement of CoStar's copyrights.

58. CoStar submits that unless the aforesaid ex-parte ad-interim and interim reliefs are granted, grave and irreparable loss and injury will be caused to CoStar and monetary compensation will not be an adequate relief. CoStar further says and submits that there are no equities in favour of the Defendant given the brazen nature of the unlawful conduct, including without limitation its repeated access to CoStar's websites, and its attempts to circumvent CoStar's security measures.

59. CoStar submits that it is entitled to interim and ad-interim orders prayed herein. It is further submitted that grant of ex-parte relief is absolutely necessary in the present case. If the Defendant is given notice of the present proceedings prior to the passing of such orders, then it is extremely likely that it will destroy the infringing material and related materials or shift the same elsewhere thereby rendering the present suit entirely futile.

60. CoStar submits that once the Commission has been fully executed and mirror copy of the Defendant's entire electronic data is obtained by the Court Receiver / Commissioner / Forensic Experts and the same is filed in a sealed envelope along with the report, a further forensic expert would need to be appointed for examining and analysing the mirror copies in order to identify and preserve such incriminating evidence as would be necessary for adjudication of the present suit and file necessary reports with this Hon'ble Court. It is also necessary that such



forensic expert peruses the mirror copies and applies the necessary forensic and other tools for the purpose of identifying the incriminating evidence that ought to be preserved for the purpose of the suit.

61. While CoStar was previously aware that the Defendant was a contractor for CREXi, key evidence for the present suit was first located by CoStar in January 2021. At that time, CoStar reviewed the listings and copyrighted photographs set forth in paragraphs 33-34 and the additional sample photographs attached as Exhibit K evidencing the Defendant's contributory infringement of CoStar's copyrighted photographs. Based on this review, CoStar immediately took steps to initiate the present proceedings by collecting all the necessary information and documents and promptly filed the present suit. Furthermore, as detailed above, the Defendant has continued to access LoopNet even after CoStar filed its complaint against CREXi, and the Defendant is likely continuing to *inter alia* access LoopNet through anonymizers, which further strengthens CoStar's apprehension of continuing infringement. The said cause of action is therefore a continuing cause of action. Accordingly, this suit is therefore within time and is not barred by law of limitation.

62. The Defendant is carrying on its business from its registered office at Udaipur (as mentioned in the cause title) which is within the jurisdiction of this Hon'ble Court. The Defendant has committed its infringing activities from its office at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan- 313 001. Therefore, the entire cause of action against Defendant has arisen within the territorial jurisdiction of this



Hon'ble Court. The Dispute is a commercial dispute under the Commercial Courts Act, 2015 and therefore, this Hon'ble Court has the jurisdiction to try, entertain and dispose of the present proceedings.

63. CoStar craves leave to refer to and rely upon other necessary and relevant documents in support of this suit as and when produced.

64. For the purpose of court fee and jurisdiction CoStar preliminarily values its claim at INR 90,00,000/- (Rupees Ninety Lakhs only) and has paid the maximum court fees of INR 3,05,100/- (Rupees Three Lakhs Five Thousand and One Hundred only).

65. The Plaint has been signed, declared and verified by Mr. Bharath Madakari, constituted attorney of CoStar. Mr. Bharath Madakari has been duly authorised to do so by CoStar *vide* a power of attorney dated 11 February 2021.

66. CoStar will rely upon documents a list whereof is annexed hereto.

67. CoStar therefore prays:

a.  that the Defendant, its directors, employees, servants, agents, and/or any person claiming through and all those in active concert or participation with them be restrained by an order of permanent injunction from (i) accessing CoStar's databases and websites without permission, (ii) copying and/or using any CoStar copyrighted photographs including those as shown at Annexure 9, 10, and 16 hereto in any manner whatsoever, whether directly or indirectly, and (iii) accessing, downloading, reproducing, publishing, storing, uploading and/or using the photographs of CoStar, or any substantial parts thereof, or any CoStar proprietary

content, as available on CoStar databases or websites in any manner whatsoever;

b.  that the Defendants be ordered and decreed to pay to CoStar damages of INR 90,00,000/- (Rupees Ninety Lakhs) for the aforesaid acts of infringement of copyright or in the alternative, at CoStar's election, an accounting of all relevant profits;

c.  that the Defendants be ordered and decreed to deliver up to CoStar all infringing copies of all CoStar copyrighted photographs, and all other CoStar proprietary content copied from CoStar databases or websites, in its possession or control;

d.  that pending the hearing and final disposal of the Suit, the Defendant, its directors, employees, servants, agents and/or any person claiming through and all those in active concert or participation with them be restrained by an order of temporary injunction from (i) accessing CoStar's databases and websites without permission, (ii) copying and/or using any CoStar copyrighted photographs in any manner whatsoever, whether directly or indirectly, and (iii) accessing, downloading, reproducing, publishing, storing, uploading and/or using the photographs of CoStar, or any substantial parts thereof, or any CoStar proprietary content, as available on CoStar databases or websites in any manner whatsoever;

e.  that pending the hearing and final disposal of the Suit, a Court Receiver or Court Commissioner including an expert be appointed with all powers under Order XL Rule 1 or under XXVI Rule 9 of

the C.P.C., 1908 in order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the Defendant's premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan- 313 001 or any other premises owned or occupied by Defendant any time of the day or night without notice to the Defendant and with the help of the representatives of CoStar, Police and forensic expert, to:

(i)     make inventory and seize, take possession, custody and control of the CoStar infringing photographs, along with all the Defendant's material, printed matter, communication, invoices, records, relevant passwords and passcodes, and such material and documents relating to CoStar infringing photographs, CoStar proprietary content including such material stored electronically on any systems; and

(ii)    make inventory and take a mirror copy of the entire electronic data of the Defendant stored on the computer systems, data storage devices, handheld devices, hard disks, pen drives, computer records, cloud-based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of the Defendant (which may be belonging to the Defendant or on lease) and submit the said mirror copy to this Hon'ble Court in a sealed envelope along with a report;



f.   that pending hearing and disposal of the suit, the Hon'ble Court be pleased to order and direct the Defendant to provide assistance to the Court Receiver / Court Commissioner and/or any person accompanying the Court Receiver / Court Commissioner, including without limitation providing access to premises, servers, desktop computers and handheld devices, material stored in cloud storage or online accounts, including usernames and passwords for accessing such devices, cloud storage and accounts;

g.   for ex-parte ad-interim reliefs in terms of prayers (d), (e) & (f) above;

h.   for costs of the suit;

i.   for such further and other reliefs as the nature and circumstances of the case may require.

Advocate for the Plaintiffs

## VERIFICATION

I, Bharath Madakari, age 39, having my office at Samridhi Bungalow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depo, Charkop Kandivali (W) Mumbai – 400067, the constituted attorney of the Plaintiffs herein above named, do hereby solemnly declare that whatever is stated in the paragraphs 65 is true to my own knowledge and what is stated in paragraphs 1- 49, 54 is based on records maintained by the Plaintiffs and whatever stated in paragraphs 50-64 and 66-67 is based on information, belief and legal advice and I believe the same to be true.

Solemnly declared at Udaipur          )

this 9th day of March 2021             )


Advocate for the Plaintiffs

## BEFORE THE LEARNED COMMERCIAL COURT

## AT UDAIPUR

### CIVIL ORIGINAL SUIT NO. _____ OF 2021

**Plaintiffs:**

**CoStar Group, Inc. & Anr.**

*Versus*

**Defendant:**

**Arcgate Teleservices Private Limited**

### AFFIDAVIT IN SUPPORT OF PLAINT

I, Bharath Madakari, age 39, having my office at Samridhi Bungalow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depo, Charkop Kandivali (W) Mumbai – 400067, the constituted attorney of the Plaintiffs herein above named do state as under:

1.   That I am constituted attorney of the Plaintiffs in the above plaint and am fully conversant with the facts & circumstances of present case.

2.   That above plaint has been drafted by my counsel as per my instructions, contents whereof have been read over & explained to me, which I fully understood.

3.   That whatever is stated in the paragraphs 65 is true to my own knowledge and what is stated in paragraphs 1- 49, 54 is based on records maintained by the Plaintiffs and whatever stated in paragraphs 50-64 and 66-67 is based on information, belief and legal advice and I believe the same to be true.

**DEPONENT**

## VERIFICATION

I, the above named deponent do hereby verify that contents of my above affidavit are true and correct to my knowledge; nothing has been concealed therein and no part thereof is false. So help me God.

**DEPONENT**

ANNEXURE 23

**BEFORE THE LEARNED COMMERCIAL COURT**

**AT UDAIPUR**

**INTERIM APPLICATION NO. _____ OF 2021**

**IN**

**CIVIL ORIGINAL SUIT NO. _____ OF 2021**

1. **CoStar Group, Inc.**                              )

   A corporation registered under the        )

   laws of the State of Delaware and          )

   having its principal place of business     )

   at 1331 L Street, NW,

   Washington, District of Columbia         )

   20005, United States of America

2. **CoStar Realty Information, Inc.**            )

   A corporation registered under the        )

   laws of the State of Delaware and          )

   having its principal place of business     )

   at 1331 L Street, NW,                           )

   Washington, District of Columbia         )

   20005, United States of America          )   … … … **Applicants**

   *Versus*

   **Arcgate Teleservices Private**              )

   **Limited**                                             )

   A company incorporated under the       )

   Companies Act, 2013 having its            )

   registered Office at G1-10 I.T. Park,      )

   Madri Industrial Area, Udaipur,           )

   Rajasthan: 313001                              )   … … … **Defendant**



## APPLICATION UNDER ORDER 26 RULE 9 OF THE CIVIL PROCEDURE CODE, 1908 FOR APPOINTMENT OF A LOCAL COMMISSIONER

<u>MAY IT PLEASE YOUR HONOUR,</u>

<u>THE APPLICANTS RESPECTFULLY SUBMIT AS UNDER:-</u>

### INTRODUCTION:

1. Applicant No. 1 ("CoStar Group") is a company incorporated under the laws of the state of Delaware in the United States of America, having its principal place of business at the address mentioned in the cause title. Applicant No. 2 ("CoStar Realty") is a wholly owned subsidiary of Applicant No. 1 having its principal place of business at the address mentioned in the cause title. Together, the Applicants will be referred to herein as "CoStar."

2. The Defendant is a company incorporated under the Companies Act, 2013 having its registered office at the address mentioned in the cause title. The Defendant is *inter alia* engaged in the business of providing information technology services including data collection & cleansing, data enrichment and content moderation. Defendant company had a presence in the United States of America through Arcgate LLC, which was incorporated in Austin, Texas. The details of Arcgate LLC are annexed to the plaint as **Annexure 1**.

3. The captioned suit has been filed by the Applicants before this Hon'ble Court *inter alia* for seeking a decree of permanent injunction against



the Defendant restraining it from contributing to the infringement of the Applicants' copyrights in the photographs as set out in the application. It is respectfully submitted that along with the captioned Suit, the Applicants had also moved an application under Order 39 Rule 1 & 2 of the Code of Civil Procedure, 1908 ("C.P.C.") for seeking an ex-parte ad-interim injunction against the Defendant No. 1 and their assigns, employees distributors, agents, employees etc. restraining them from infringing the Applicant's copyright in the photographs as set out in the application hereto and from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the infringements of the Applicants' copyright in the said photographs or from authorizing any other person to do the same.

4.  The facts and circumstances leading up to the filing of the suit are mentioned in detail in the plaint. Briefly, it is the Applicants' case that the Defendant, acting at the behest of Applicants' competitor, has committed acts contributing to the infringement, piracy/theft, improper access to the Applicants' website and misappropriation of proprietary content owned by CoStar, including content generated, gathered, enhanced, updated, and curated by CoStar ("CoStar proprietary content"). The *modus operandi* used by the Defendant involves (i) accessing the Applicants' website ("LoopNet") without authorization for competitive purposes on behalf of the Applicants' competitor and in violation of LoopNet's Terms and Conditions, (ii) copying the Applicants' copyrighted photographs and other data available on LoopNet and CoStar databases and (iii) transferring such copied

photographs and other data to the Applicants' competitor for publication and use in its rival products.

## FACTUAL BACKGROUND:

### CoStar, Its Products and Services, and the Steps It Takes to Protect Its Intellectual Property, Including Prior Litigation in India

5.   CoStar is a leading provider of commercial real estate information, analytics and online marketplaces in the United States of America. Founded in 1987, CoStar employs more than four thousand people worldwide. As a result of these employees' diligent efforts—and the investment of over USD 5 billion over the last three decades—CoStar has developed the most comprehensive database of commercial real estate in the world, which includes painstakingly-researched and verified data about commercial real estate properties and transactions, integrated with millions of CoStar's copyrighted photographs.

6.   CoStar expends enormous time and resources to populate and maintain the CoStar database, including averaging 24,000 thousand phone calls *per day* to brokers, owners, developers, and other real estate professionals, canvassing a half million properties per year, and taking nearly one million photographs annually. CoStar's marketing research operations make millions of data changes to the CoStar database each year. CoStar works continuously to verify that the data contained in its database are up-to-date and reliable.

7.   CoStar offers a password-protected subscription to its database that commercial real estate brokers and other industry participants use to obtain comprehensive commercial real estate data, news, and analytics,

as well as copyrighted photographs of commercial real estate properties. The leading commercial real estate brokerages in the United States, as well as a significant number of smaller brokerages, property owners, banks, retailers, real estate investment trusts (REITs), and other professionals are subscribers. The subscription database is also used by a number of United States federal, state, and local government entities and agencies. CoStar licenses its subscription database content for a recurring fee. Those fees, which vary according to the scope of access a user seeks, generate significant revenue.

8.   In addition to the subscription database, CoStar also owns and maintains a number of marketplaces containing listings of real estate for sale and for lease. CoStar's LoopNet.com website ("LoopNet") (available at http://www.loopnet.com) is the foremost digital marketplace for commercial real estate in the United States. LoopNet provides information on more than 650,000 for-lease and for-sale listings at any point in time and is one of CoStar's biggest revenue generators. Real estate listings on LoopNet contain CoStar copyrighted photographs and data from the CoStar database. Every day, buyers, sellers, lessors, lessees, owners, and brokers access and use LoopNet to list, buy, sell, lease, rent, or browse commercial real estate. In addition, CoStar runs a commercial real estate auction platform, known as Ten-X.com ("Ten-X") (available at www.ten-x.com). A copy of a few pages from each website which illustrate the nature of the business activity of CoStar is annexed to the plaint as **Annexure 2** and **Annexure 3**.

9.   LoopNet, like CoStar's other marketplaces, leverages CoStar's vast commercial real estate database to help build and enhance property listings. For instance, if a broker or property owner wants to market a listing on LoopNet relating to a property that is in CoStar's database, he or she can, and typically does, populate the LoopNet listing with CoStar's copyrighted photographs and with a variety of data that CoStar has added to the database through its various research efforts.

10.   Moreover, a broker or property owner can also pay LoopNet for varying levels of marketing services. LoopNet's premium services, called Signature Ads, include labor-intensive contributions by CoStar marketing research professionals, including, among other things, custom professional photos, listing curation, and generation or revision of narrative property descriptions to increase marketability. The curation process involves reviewing, editing, and populating multiple data fields, including with data from the CoStar database. For other listings on LoopNet, a marketing researcher will likewise conduct a curation of the listing and may also help generate or revise a narrative property description to increase marketability.

11.   CoStar's database is the engine that drives CoStar's business, attracting paying subscribers, licensees, and users, and powering its various information services, analytical tools, and digital marketplaces, including LoopNet and Ten-X. Over three decades, nearly thirteen thousand CoStar researchers have contributed to the CoStar database, adding millions of properties, shooting millions of professional photos and drone videos, and driving and flying over two million miles in any

given year. CoStar generates, updates, and curates the CoStar databases at a cost of hundreds of millions of dollars each year.

12. CoStar has taken an average of over one million photographs in recent years. The photographs are of various properties around the United States and are displayed in the CoStar database and on LoopNet. The photographers engaged by CoStar take such photographs using their skill, judgment and hard work. The photographs are taken for and on behalf of CoStar, for which valuable consideration is paid by CoStar to such photographers. The photographs are original works, and CoStar Realty is the owner of the copyright therein. CoStar Group and LoopNet are authorized by CoStar Realty to use these photographs in the course of their business. While not formally required under United States law, CoStar Realty, Applicant No. 2, registers tens of thousands of these photographs with the United States Copyright Office each month.

13. The content that CoStar gathers, curates, and generates—including its copyrighted photographs—is at the root of CoStar's products and therefore is central to its business. CoStar's customers use and rely upon the copyrighted images and content in the CoStar databases to generate property listings and make significant commercial decisions. CoStar's content is critical to supporting USD 1 trillion of commercial real estate transactions each year. CoStar attributes significant commercial value to its content in general, and to its copyrighted photographs in particular.

14. Accordingly, CoStar observes a robust policy of protecting its intellectual property from competitors and other unauthorized third parties. CoStar protects its content in three primary ways. First, as discussed above, CoStar registers its copyrighted photographs with the United States Copyright Office. Second, users must assent to CoStar's contractually binding terms in order to use CoStar products, including both the CoStar subscription database and LoopNet. Third, CoStar protects its content by employing state-of-the-art anti-piracy technology.

15. Copies of the current binding contractual terms of service for both the subscription database and LoopNet are annexed to the plaint as **Annexure 4 and Annexure 5,** respectively. Those terms of service expressly prohibit the use of CoStar's products for competitive purposes. CoStar has occasionally updated the terms, but the prohibition against competitive use has remained consistent for many years, across various updates and at all times relevant to this lawsuit.

16. Among its technological anti-piracy efforts, CoStar services, including LoopNet, employ an abuse monitor. If a single IP address views an excessive number of listings or executes an excessive number of searches on the site—consistent with data or content mining operations, automated bots, or other illegitimate users—that IP address is temporarily blocked from accessing the site. On LoopNet, for example, if this abuse monitor is tripped, the user immediately receives an unauthorized access notice, also known as an "Error & Abuse" notice. The notice provides a hyperlink to LoopNet's Terms and Conditions

and explains that use of LoopNet is subject to such terms, and that use

that does not comply with the terms is unauthorized:

17. CoStar has brought multiple prior lawsuits against infringers and
content thieves, such as Xceligent, Apartment Hunters, and
RealMassive, and against those who access its databases without
authorization, or enable others to do so. CoStar has litigated across the
United States, from New Jersey to Kansas City, from Austin to Los
Angeles, to protect its intellectual property, and has obtained judgments
and injunctions that value its copyrighted images and real estate listings
most recently at USD 50,000 per photograph, and USD 50,000 per real
estate listing.

18. CoStar has also previously litigated in India to vindicate its right to stop
Indian-based contractors from copying content from LoopNet on behalf
of CoStar's competitors in the United States. For instance, in 2016,
CoStar filed a suit similar to the instant case against Maxval
Technologies Pvt. Ltd. ("MaxVal") before the Court of District Judge

at Thane, Mumbai. MaxVal, like the Defendant, was accessing
LoopNet without authorization, and copying content, including
copyrighted photographs, on behalf of one of CoStar's competitors,
Xceligent. The Hon'ble District Court, being prima facie satisfied that
MaxVal was committing contributory infringement on behalf of
Xceligent, was pleased to grant an ex-parte ad-interim injunction and
order appointing a court commissioner to preserve the evidence found
in Maxval's computer systems. Such relief was set forth *vide* orders
dated 13 December 2016. The Parties thereafter filed consent terms
dated 16 April 2018 under which MaxVal confirmed its acts of
contributory infringement on behalf of Xceligent and acceded to a
permanent injunction barring MaxVal from, *inter alia,* accessing
CoStar databases or websites, including LoopNet, for the purpose of
competitive use and decreeing the Suit in favor of CoStar. Annexed to
the plaint as **Annexure 6, Annexure 7 and Annexure 8** are the orders
dated 13 December 2016 granting an ex-parte ad-interim injunction and
appointing a court commissioner and order dated 12 June 2018
decreeing the Suit.

**CREXi, Its Scheme to Steal from CoStar, and
Its Use of the Defendant to Facilitate That Unlawful Conduct**

19. One of CoStar's current competitors in the United States is Commercial
Real Estate Exchange, Inc. ("CREXi"). CREXi is a company
incorporated in the State of California in the United States with its
principal place of business in Marina Del Rey, California. CREXi was
founded in 2015 by Michael DeGiorgio, Luke Morris, Erek Benz, and



Ben Widhelm. The founders had all previously worked at Ten-X, which is now part of CoStar.

20. On its website (www.crexi.com), CREXi describes itself as "a commercial real estate marketplace that simplifies transactions for brokers with a suite of easy-to-use tools to manage the entire process from listing to closing." CREXi's website allows users to view commercial real estate listings in markets across the United States. CREXi also runs an online auction marketplace which is similar to Ten-X.

21. It is understood that CREXi has raised a significant amount of funding recently and is in a position to compete fairly with CoStar. Instead, CREXi is attempting to build its own online commercial real estate marketplace and auction platform by free-riding on CoStar's billions of dollars of investments and the thirty-plus years of hard work by CoStar's employees. CREXi has accessed CoStar's database and LoopNet more than a million times (at least) in breach of binding terms and conditions. Once there, CREXi has copied property listings containing CoStar's copyrighted photographs and listing data. A preliminary review of CREXi's website through 30 July 2020, reveals that more than **ten thousand** of CoStar's copyrighted photographs have been published on CREXi's rival website without authorization. The photographs have been illegally copied and then re-uploaded, in some cases after making minor changes to them, for example removing or obscuring the CoStar name and/or logo.

22. CREXi knows that accessing CoStar's websites and stealing its listings is wrong. CREXi has received "Error & Abuse" notices from CoStar containing a conspicuous hyperlink to LoopNet's Terms and Conditions and a warning that use of LoopNet that does not comply with the terms is prohibited. Furthermore, CREXi itself has admitted that it is not allowed to copy CoStar's listings from LoopNet. Nevertheless, the evidence shows that this is precisely what CREXi does.

23. An illustrative compilation of 100 photographs which are owned by CoStar Realty and which appear on CREXi's website, along with a summary chart of the said photographs containing a URL link to the page on CREXi's website where each CoStar copyrighted photograph was found, is annexed to the plaint as **Annexure 9**.

24. This compilation of 100 photographs is a small subset of the 10,000 CoStar-copyrighted photographs that CoStar has found so far on CREXi's website. Copies of these 10,000 copyrighted photographs are filed herewith on a pen drive for the sake of brevity and convenience, and the pen drive is annexed to the plaint as **Annexure 10**.

25. Although not required by United States Copyright law, each of the 10,000 images referenced above have been registered with the United States Copyright Office. Example copies of the registration certificates in favor of CoStar Realty are annexed to the plaint collectively as **Annexure 11 (Colly)**. These registration certificates relate to the copyrighted photographs referenced below at paragraphs 33-34 and in



Annexure 16 to the plaint. CoStar craves leave to refer to and rely upon a compilation of registration certificates when produced.

26. On 25 September 2020, CoStar filed a lawsuit against CREXi in the United States District Court for the Central District of California captioned *CoStar Group, Inc., et. al., v. CREXi, Inc.*, Case No. 2:20-cv-8819. On 14 December 2020, CoStar filed its First Amended Complaint against CREXi, alleging copyright infringement, violations of the United States Digital Millennium Copyright Act, misappropriation, unfair competition, false advertising and breach of contract.

27. The Defendant is assisting CREXi in its unlawful scheme, just as MaxVal assisted Xceligent before it was enjoined. CoStar submits that the Defendant is accessing LoopNet without authorization for competitive purposes on behalf of CREXi in violation of LoopNet's Terms and Conditions, committing contributory infringement of CoStar's copyrighted photographs, and engaging in piracy/theft, improper access to CoStar websites and misappropriation of CoStar proprietary content, at CREXi's direction.

28. Just as in CoStar's prior litigation against MaxVal before the Court of District Judge at Thane, Mumbai, the Defendant, an Indian contractor, is accessing LoopNet without authorization for competitive purposes on behalf of one of CoStar's competitors. Like MaxVal, the Defendant must be enjoined from accessing CoStar's websites.

29. In its lawsuit against CREXi, CoStar has alleged that CREXi accesses LoopNet through the Defendant. Annexed to the plaint as **Annexure 12** is a copy of the amended complaint dated 14 December 2020 filed

by CoStar. To date, CREXi has not denied or disclaimed that the Defendant is accessing LoopNet on CREXi's behalf. And tellingly, while CREXi has sought the dismissal of some claims that CoStar has brought against it, CREXi has not sought to dismiss CoStar's claim of mass copyright infringement.

30. CoStar's evidence demonstrates that the Defendant is working on behalf of CREXi. CoStar discovered on the internet a publicly available spreadsheet (the "Arcgate spreadsheet") that contains a selection of records of the daily work activities of various employees of the Defendant. An excerpt of the Arcgate spreadsheet is annexed to the plaint as **Annexure 13**. The Arcgate spreadsheet identifies at least 13 employees of the Defendant who performed work on behalf of CREXi in March and April 2020. As discussed below, evidence indicates that the Defendant's work on behalf of CREXi was not limited to March and April 2020. Accordingly, it is likely that there are additional spreadsheets in the Defendant's possession covering these other periods. Notably, however, it appears that the Arcgate spreadsheet corresponding to March and April 2020 is no longer publicly available. Thus, it is possible that the Defendant has deleted the spreadsheet and others like it.

31. In addition to the Arcgate spreadsheet, an online resume of one of the Defendant's (former) employees shows that the Defendant worked for CREXi, even before March 2020. Ishan Aditya Bhatnagar worked as a Senior Quality Analyst at the Defendant from August 2015 to September 2018. Mr. Bhatnagar's online resume states that, during that

time, he worked as a contractor for CREXi. Mr. Bhatnagar's resume is annexed to the plaint as **Annexure 14**. Thus, the Defendant's work for CREXi is not limited to 2020, but may have started as early as 2015, the year that CREXi was founded.

32. On top of these public sources, CoStar's own business records demonstrate conclusively that the Defendant has accessed LoopNet in connection with its work for CREXi. CoStar generates records of access to LoopNet in the ordinary course of business, in part to identify the companies that are accessing particular property listings. CoStar has provided such information to its listing broker or property owner customers *millions* of times over the last several years. To identify the companies that are accessing LoopNet, CoStar employs licensed third-party code widely utilized within the industry. The code relies on a variety of factors, including cookies, tracking pixels, and web beacons. CoStar's ordinary course records of access to LoopNet from March through May 2020, annexed to the plaint as **Annexure 15** (the "LoopNet access records") reflect that the Defendant accessed CoStar's LoopNet website in those months, at the same time that the Arcgate spreadsheet shows that employees of the Defendant were working on behalf of CREXi.

33. Moreover, right around this time, the same LoopNet access records reflect that the Defendant ran searches on LoopNet, and these searches returned property listings containing CoStar-copyrighted images. Shortly thereafter, including in some cases a mere matter of days, listings for these very same properties began appearing on CREXi with

CoStar's copyrighted photographs. For example, the LoopNet access records reflect that the Defendant accessed LoopNet on 17 April 2020 and ran a search that included in the results a property located at 7226 N. Tryon St, Charlotte, North Carolina. Shortly thereafter, details of that property—including cropped versions of CoStar-copyrighted images published on LoopNet—were displayed on CREXi. A copy one such infringing image is set forth below:

**CoStar-Copyrighted
Photograph on LoopNet**        **Cropped Image on CREXi**

   

34. By way of further example, the LoopNet access records show that the Defendant accessed LoopNet on 02 May 2020, and ran a search that included in the results a property located at 300 Littleton Rd, Parsippany, New Jersey. A short time later, details of the property— including a cropped version of a CoStar-copyrighted image published on LoopNet—appeared on CREXi. A copy of the infringing image is set forth below:

**CoStar-Copyrighted
Photograph on LoopNet**        **Cropped Image on CREXi**

 

35. The infringing images set forth above, along with ten other similar examples of infringing images published on CREXi after the Defendant ran searches on LoopNet that returned such properties, are annexed to the plaint as **Annexure 16**. The same annexure includes, for each infringing photograph, the CREXi URL on which the photograph was published.

36. In other words, the LoopNet access records show that the Defendant accessed CoStar's LoopNet website at the same time the Defendant's own records show it was working for CREXi, and, shortly thereafter, CoStar's copyrighted images appeared on CREXi's website. This strongly indicates that the Defendant was accessing LoopNet on behalf of CREXi and contributing to CREXi's infringement of CoStar's copyrighted photographs.

37. The evidence also shows that the Defendant has continued to access LoopNet, even after CoStar filed its complaint against CREXi in September 2020. For instance, LoopNet access records from October 2020—annexed to the plaint as **Annexure 17**—show the Defendant's continued activity on LoopNet in the month *after* CoStar filed the lawsuit, indicating that the Defendant's unauthorized access is continuing, and will do so until it is enjoined.

511

38. In addition to the foregoing evidence of access and copying, CoStar has
identified at least two employees of the Defendant—including one
current employee—who have created accounts on LoopNet. Critically,
these accounts appear to be using IP address anonymizer services. This
is a tactic that CREXi and other infringing companies (such as the
Indian company MaxVal) have employed to hide their activity on
LoopNet. The use of these anonymizer services strongly suggests that
there is further activity on LoopNet attributable to the Defendant that
CoStar has not yet detected. Accordingly, CoStar is seeking directions
that an ex-parte Court Receiver/Court Commissioner be appointed for
the purpose of preserving this evidence until disposal of the present suit
failing which the suit will be rendered infructuous.

39. The Defendant's use of nefarious means to access LoopNet, evade
detection and circumvent LoopNet's technological blocking measures
is further demonstrated by evidence linked to one of the Defendant's IP
addresses.   CoStar   has   recently   identified   an   IP   address—
115.178.100.18 (the "115. IP address")—associated with the Defendant
with significant activity on LoopNet over the past several years.
Stunningly, from 06 April 2016 to 01 January 2021, sessions tied to the
115. IP address logged tens of thousands of hits on CoStar's LoopNet
website. CoStar's records show that Arcgate's activity on LoopNet has
continued unabated even after CoStar filed suit against CREXi. In fact,
from 26 September 2020–the day after CoStar filed its complaint—
through 01 January 2021, the 115. IP address alone has hit LoopNet
almost a thousand times. Annexed to the plaint as **Annexure 18** is an



excerpt of CoStar's access records showing the 115. IP address activity described above.

40. Several independent pieces of evidence link the 115. IP address to the Defendant. First, web-based IP identification tools indicate that the 115. IP address is hosted in Udaipur, India—the headquarters of the Defendant. A printout obtained from the website www.dawhois.com evincing the above is annexed to the plaint as **Annexure 19**. Second, third-party abuse monitors report that the host name of the 115. IP is "ftp.arcgate.info"—thus linking the IP address directly to the Defendant. A printout obtained from the website www.abuseipdb.com evincing the above is annexed to the plaint as **Annexure 20**. Third, an individual using an email connected with the Defendant logged into LoopNet using the 115. IP address. Annexed to the plaint as **Annexure 21** is an extract from CoStar's authentication database, which tracks LoopNet log-in information. It shows that on 01 October 2020, an individual with the email "yogesh96.arcgate@gmail.com" logged into LoopNet while using the 115. IP address, further demonstrating that the Defendant uses the 115. IP address.

41. An analysis of the 115. IP address' activity on LoopNet shows that the Defendant knows that it is not permitted to access CoStar's websites and uses covert techniques to evade CoStar's blocking efforts. For instance, on 08 March 2020, the Defendant conducted sessions on LoopNet using the 115. IP address. These sessions generated a significant number of hits to LoopNet as the Defendant searched for and accessed various property listings on the website. Eventually, the

Defendant's excessive activity tripped LoopNet's abuse monitor, which temporarily blocked the Defendant's access to LoopNet from the 115. IP address and presented the Defendant with the Error & Abuse notice as described in Paragraph 16. The Error & Abuse notice contained a conspicuous hyperlink to LoopNet's Terms and Conditions, which make clear that competitive access to LoopNet is not permitted.

42. Despite being on notice that competitive access was forbidden, the Defendant continued to attempt to access LoopNet from the 115. IP address, which, in turn, prompted additional Error & Abuse notices. To circumvent the abuse monitor's blocking efforts and regain access to LoopNet, the Defendant masked its activity by switching from the 115. IP address to an IP address from a third-party anonymizer service. This tactic—known as "rotating" IP addresses—is designed to avoid anti-piracy measures and is a hallmark of data theft. Other content thieves, such as CREXi, Xceligent, and Maxval, have also rotated IP addresses using third-party anonymizer services as part of their unlawful schemes to harvest real estate listings and copyrighted images from CoStar. Indeed, CREXi uses many of the same anonymizer services as the Defendant, including Hurricane Electric, Digital Ocean, and LeaseWeb.

43. **Annexure 22** annexed to the plaint—an annotated excerpt of LoopNet's activity logs—shows the Defendant rotating IP addresses in order to avoid the abuse monitor and regain access to LoopNet. For instance, on 09 March 2019, one day after the 115. IP address tripped the abuse monitor, the LoopNet activity logs show that the Defendant

54

tried to access a property listing at 6658 SE East Paris Avenue, Caledonia, Michigan, using the 115. IP address. The Defendant was blocked and received an Error & Abuse notification. Less than a minute later—and during the same session on LoopNet—the Defendant switched to an anonymized IP address from Hurricane Electric and accessed the property listing despite knowing it was not permitted to do so. **Annexure 22** annexed to the plaint contains additional examples of the Defendant rotating IP addresses between 12–14 March to circumvent the abuse monitor. In each example, the Defendant attempted to conduct activity on LoopNet using the 115. IP address, received an Error & Abuse notification, switched to an anonymized IP address, and covertly resumed the forbidden activity.

44.  After the 08 March temporary block eventually expired, the Defendant continued to access LoopNet using the 115. IP address and tripped LoopNet's abuse monitor yet again on 15 April 2019. In fact, between 8 March and 30 April 2019, LoopNet served over one thousand Error & Abuse notices on the 115. IP address, putting the Defendant on clear notice that its access was prohibited.

45.  Like the Defendant, CREXi knows that it is not permitted to access CoStar's websites or copy CoStar's property listings. CREXi also received Error & Abuse notices when it accessed CoStar's LoopNet website, and CREXi has even admitted that it is not permitted to copy from CoStar. Nevertheless, on CREXi's behalf and at CREXi's direction, the Defendant is accessing LoopNet without authorization and contributing to CREXi's theft of CoStar's listings and copyrighted

photographs. The Defendant's unlawful work on CREXi's behalf must cease.

46. Fortunately, there are easily available, low-cost tools that CoStar's legitimate competitors use to filter out CoStar's copyrighted images. It does not appear that CREXi or the Defendant employ these tools. The Defendant claims to provide artificial intelligence and data analytics services to its clients, which are technologically sophisticated in nature. It is unlikely that the Defendant, being sophisticated in its business, is not aware that it is committing contributory infringement and criminal acts punishable under the Copyright Act, 1957, Information Technology Act, 2000 and Indian Penal Code, 1882. Therefore, to fully understand the methodology and the tools employed by the Defendant and CREXi to commit contributory copyright infringement, piracy/theft, improper access to CoStar websites and misappropriation of CoStar proprietary content, and so that the evidence is not deleted by a click of a button at the expense of CoStar's rights, it is vital that the incriminating evidence in the Defendant's systems is preserved and produced before the Court for proper adjudication. CoStar apprehends that the data / evidence will be destroyed by the Defendant if an ex-parte injunction and Court Receiver / Court Commissioner is not appointed as prayed.

47. The Defendant, at the direction of CREXi, has used CoStar's services and property, including its copyrighted images, in order to build CREXi's business, thereby making unlawful financial gains at Costar's expense and to its grave commercial prejudice. In these circumstances,

CoStar is entitled to monetary and injunctive relief against the Defendant.

## THE HARM TO COSTAR AND REQUESTED RELIEF:

48. Based on this brazen conduct, including access to CoStar's websites in violation of the binding terms, and theft of its content, including copyrighted photographs, CoStar has already suffered and is likely to suffer irreparable loss and damage on account of the aforesaid acts of contributory copyright infringement, piracy/theft, improper access to CoStar websites and misappropriation of CoStar proprietary content. CoStar states that unless the aforesaid reliefs of injunction are granted, grave and irreparable harm, loss and injury will be caused to CoStar and pecuniary compensation will not be an adequate relief.

49. While the full scope of the Defendant's unlawful conduct cannot be known at this time, CoStar submits that by reason of the aforesaid acts, the Defendant has caused and is likely to cause further loss and/or damage to CoStar. A full assessment of the losses is not possible at the present stage. To the best of its knowledge, CoStar presently and preliminarily estimates the damages to the tune of INR 90,00,000 (Rupees Ninety Lakhs only). CoStar reserves its rights to amend the plaint at a later stage and claim further damages as may be necessary. CoStar is claiming relief by way of damages in addition to injunctive relief.

50. The subject photographs of CoStar were first published in the United States. CoStar's photographs are protected in India under Section 40 of the Copyright Act, 1957 read with the International Copyright Order,

1999 as the rights of authors of member countries of the Berne and

Universal Copyright Conventions are protected under Indian Copyright

law. CoStar says and submits that India and the United States are

signatories to both the Universal Copyright Convention as well as the

Berne Convention. CoStar's photographs are therefore subject matter

of copyright protection in India by virtue of India's membership to the

Berne Convention, the Universal Copyright Convention and the

International Copyright Order, 1999. For the ease of reference, Section

40 of the Copyright Act is reproduced hereinbelow:

***Section 40.  Power to extend copyright to foreign works.—***
*The Central Government may, by order published in the Official
Gazette, direct that all or any provisions of this Act shall apply—*

(a) *to works first published in any territory outside India to which the
order relates in like manner as if they were first published within
India;*

(b) *to unpublished works, or any class thereof, the authors whereof
were at the time of the making of the work, subjects or citizens of a
foreign country to which the order relates, in like manner as if the
authors were citizens of India;*

(c) *in respect of domicile in any territory outside India to which the
order relates in like manner as if such domicile were in India;*

(d) *to any work of which the author was at the date of the first
publication thereof, or, in a case where the author was dead at that
date, was at the time of his death, a subject or citizen of a foreign
country to which the order relates in like manner as if the author
was a citizen of India at that date or time;*

*and thereupon, subject to the provisions of this Chapter and of the
order, this Act shall apply accordingly: Provided that—*

(i) *before making an order under this section in respect of any foreign
country (other than a country with which India has entered into a
treaty or which is a party to a convention relating to copyright to
which India is also a party), the Central Government shall be
satisfied that the foreign country has made, or has undertaken to
make, such provisions, if any, as it appears to the Central*



> Government expedient to require for the protection in that country of works entitled to copyright under the provisions of this Act;
>
> (ii) the order may provide that the provisions of this Act shall apply either generally or in relation to such classes of works or such classes of cases as may be specified in the order;
>
> (iii) the order may provide that the term of copyright in India shall not exceed that conferred by the law of the country to which the order relates but such a term or copyright shall not exceed the term of copyright provided under this Act;
>
> (iv) the order may provide that the enjoyment of the rights conferred by this Act shall be subject to the accomplishment of such conditions and formalities, if any, as may be prescribed by the order;
>
> (v) in applying the provisions of this Act as to ownership of copyright, the order may make such exceptions and modifications as appear necessary, having regard to the law of the foreign country;
>
> (vi) the order may provide that this Act or any part thereof shall not apply to works made before the commencement of the order or that this Act or any part thereof shall not apply to works first published before the commencement of the order.

A copy of the International Copyright Order, 1999 dated 24 March 1999 is annexed to the plaint as **Annexure 23**.

51. By virtue of being the owner of the copyright in the CoStar copyrighted photographs described herein, CoStar Realty has an exclusive right to *inter alia* (i) reproduce its copyrighted photographs, (ii) issue copies of such photographs to the public, (iii) make any adaptation of such photographs or (iv) do such things as provided in Section 14 of the Copyright Act, 1957. CoStar Realty submits that the reproduction / storing / accessing / downloading / uploading of such photographs by the Defendant without its permission amounts to infringement of copyright in the said photographs under the provisions of Section 51 of the Copyright Act, 1957.

52. CoStar submits that the acts of the Defendant of *inter alia* accessing CoStar's websites and contributing to CREXi's theft of listings and copyrighted photographs without the permission and/or authority of CoStar amounts to infringement of copyright of CoStar in such photographs under the provisions of the Copyright Act, 1957.

53. CoStar has separately filed application praying for ex-parte temporary injunction from this Hon'ble Court restraining the Defendant, their directors, employees, servants, agents and any person claiming through them, from using CoStar's photographs in any manner whatsoever and accessing, downloading, reproducing, publishing, storing, uploading and/or using the photographs, or any substantial parts thereof, as available on CoStar's websites, including LoopNet, in any manner whatsoever.

54. CoStar apprehends that its copyrighted photographs, and other communications and documents relating to the infringement including CoStar proprietary content, that exist on the servers or other computers or devices of the Defendant would be destroyed by the Defendant if the Defendant gets notice of the present Suit and the interim applications. CoStar strongly apprehends in view of the continued access to LoopNet in December 2020 and January 2021 that there is a significant risk that the Defendant makes further copies of the infringing photographs for CREXi or sells or transfers the same to other third parties, including other competitors of CoStar. In the circumstances, pending the hearing and final disposal of the Suit, a Court Receiver or Commissioner including an expert should be appointed with all powers under Order

XL Rule 1 or under XXVI Rule 9 of the C.P.C., 1908 in order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the Defendant's premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan- 313 001 or any other premises owned or occupied by Defendant any time of the day or night without notice to the Defendant and with the help of the representatives of CoStar, Police and forensic expert, to:

(i)     make inventory and seize, take possession, custody and control of the CoStar infringing photographs, along with all the Defendant's material, printed matter, communication, invoices, records, relevant passwords and passcodes, and such material and documents relating to CoStar's infringing photographs, CoStar proprietary content including such material stored electronically on any system; and

(ii)    make inventory and take a mirror copy of the entire electronic data of the Defendant stored on the computer systems, data storage devices, handheld devices, hard disks, pen drives, computer records, cloud based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of the Defendant (which may be belonging to the Defendant or on lease) and submit the said mirror copy to this Hon'ble Court in a sealed envelope along with a report.

55. CoStar says and submits that it is imperative to preserve this evidence until disposal of the present suit failing which the suit will be rendered infructuous. CoStar further says and submits that the only way to preserve the aforesaid evidence and prevent the suit from becoming infructuous is by appointing a Court Receiver / Court Commissioner to visit the premises of the Defendant in order to search and make copies of such evidence without notice to the Defendant. It is further necessary to direct and order the Defendant to provide assistance to the Court Receiver / Court Commissioner and any person accompanying the Court Receiver / Court Commissioner, including without limitation providing access to premises, servers, desktop computers and handheld devices, and material stored in cloud storage or online accounts, including usernames and passwords for accessing such devices, cloud storage and accounts.

56. CoStar further prays that CoStar's representatives along with an independent forensic expert be allowed to assist the Court Receiver / Court Commissioner in making inventory and making such mirror copies. As described above, the Defendant is likely continuing to access LoopNet—as evidenced by its post-complaint activity on LoopNet— and is likely continuing to use anonymizers to mask its activity. As a result, CoStar apprehends that the Defendant is likely to be continuing to infringe CoStar's intellectual property.

57. CoStar submits that unless the aforesaid ex-parte ad-interim and interim reliefs are granted, grave and irreparable loss and injury will be caused to CoStar and monetary compensation will not be an adequate relief.

CoStar further says and submits that there are no equities in favour of the Defendant given the brazen nature of the unlawful conduct, including without limitation its repeated access to CoStar's websites, and its attempts to circumvent CoStar's security measures.

58. CoStar submits that it is entitled to interim and ad-interim orders prayed herein. It is further submitted that grant of ex-parte relief is absolutely necessary in the present case. If the Defendant is given notice of the present proceedings prior to the passing of such orders, then it is extremely likely that it will destroy the infringing material and related materials or shift the same elsewhere thereby rendering the present suit entirely futile.

59. CoStar submits that they have a strong prima facie case on merits. CoStar submits that irreparable loss will ensue to CoStar if the present application is not allowed since the continued use by the Defendant of the infringing material will inevitably dilute the value of CoStar's content and database of copyrighted images.

60. This application is made bona fide and in the interest of justice. Moreover, the suit and the present application have been filed expeditiously and do not suffer from any delay or latches. On the other hand, the Defendant has no equities in their favour.

**PRAYER**

In view of the aforesaid facts and circumstances, and keeping in view the urgency of the matter, it is most respectfully prayed that this Hon'ble Court may be pleased:

a.   that pending the hearing and final disposal of the Suit, a Court Receiver or Court Commissioner including an expert be appointed with all powers under Order XL Rule 1 or under XXVI Rule 9 of the C.P.C., 1908 in order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the Defendant's Premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan- 313 001 or any other premises owned or occupied by Defendant any time of the day or night without notice to the Defendant and with the help of the representatives of CoStar, Police and forensic expert, to:

(i)   make inventory and seize, take possession, custody and control of the CoStar infringing photographs, along with all the Defendant's material, printed matter, communication, invoices, records, relevant passwords and passcodes, and such material and documents relating to CoStar infringing photographs, CoStar proprietary content including such material stored electronically on any systems; and

(ii)   make inventory and take a mirror copy of the entire electronic data of the Defendant stored on the computer systems, data storage devices, handheld devices, hard disks, pen drives, computer records, cloud-based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of the Defendant (which may be belonging to the Defendant or on lease) and submit the said mirror copy to this Hon'ble Court in a sealed envelope along with a report;

b.  that pending hearing and disposal of the suit, the Hon'ble Court be pleased to order and direct the Defendant to provide assistance to the Court Receiver / Court Commissioner and/or any person accompanying the Court Receiver / Court Commissioner, including without limitation providing access to premises, servers, desktop computers and handheld devices, material stored in cloud storage or online accounts, including usernames and passwords for accessing such devices, cloud storage and accounts;

c.  for *ex parte ad* interim reliefs in terms of prayers (a) and (b) above;

d.  for such further and other reliefs as the nature and circumstances of the case may require.

Advocate for the Applicants                    Applicants

## VERIFICATION

I, Bharath Madakari, aged 39 years, having my office at Samridhi Bungalow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depo, Charkop Kandivali (W) Mumbai – 400067, the constituted attorney of the Applicants herein above named, do hereby solemnly declare that what is stated in paragraphs 1-49, 54 is based on records maintained by the Applicant and whatever stated in paragraphs 50-60 is based on information, belief and legal advice and I believe the same to be true.

Udaipur, Rajasthan

Dated: 9th March 2021                    **DEPONENT**

**BEFORE THE LEARNED COMMERCIAL COURT**

**AT UDAIPUR**

**CIVIL ORIGINAL SUIT NO. _____ OF 2021**

**Applicant:**

**CoStar Group, Inc. & Anr.**

*Versus*

**Defendant:**

**Arcgate Teleservices Private Limited**

**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Bharath Madakari, aged 39 years, having my office at Samridhi Bungalow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depo, Charkop Kandivali (W) Mumbai – 400067, the constituted attorney of the Applicants herein above named do state as under:

1.   That I am constituted attorney of the Applicants in the above application and am fully conversant with the facts & circumstances of present case.

2.   That above application has been drafted by my counsel as per my instructions, contents whereof have been read over & explained to me, which I fully understood.

3.   That whatever is stated in the paragraphs 65 is true to my own knowledge and what is stated in paragraphs 1- 49, 54 is based on records maintained by the Applicant and whatever stated in

paragraphs 50-60 is based on information, belief and legal advice and I believe the same to be true.

DEPONENT

**VERIFICATION**

I, the above named deponent do hereby verify that contents of my above affidavit are true and correct to my knowledge; nothing has been concealed therein and no part thereof is false. So help me God.

DEPONENT

453
असल से नकल

19 APR 2021

प्रभारी अधिकारी, प्रतिलिपि शा...
जिला एवं सेशन न्यायालय, उदयपुर
आदेश दिनांक –06.04.2021

CoStar Group Inc. A Order V/s Arcgate Teleservices Private Limited

**1**

## न्यायालय : न्यायाधीश, वाणिज्यिक न्यायालय, उदयपुर (राज.)

पीठासीन अधिकारी                                    शिवानी जौहरी भटनागर
                                                   ...केडर

## प्रकरण संख्या 06 / 2021 मु.दी.(41)
## C.I.S No. 06/2021

1- Costar Group, Inc.
    A Corporation registered under the laws of the state of delaware and having its principal place of business at 1331 L Street, NW, Washington, District of Columbia 20005, United States of America
2- Costar Ralty Information, Inc.
    A corporation registered under the laws of the State of Delaware and having its principal place of busines at 133 L Street, NW, Washington, District of Columbia 20005, United States of America

.....प्रार्थीगण

### बनाम

Arcgate Teleservices Private Limited
A company incorporated under the Companies Act,2013 having its registered office at G1-10 I.T. Park Madri Industrial Area, Udaipur, Rajasthan 313001

.....विपक्षी

## प्रार्थनापत्र बाबत एकतरफा कमिशनर नियुक्त किये जाने

प्रमाणित सत्य प्रतिलिपि
मुख्य प्रतिलिपि कार
जिला न्यायालय, उदयपुर

**उपस्थित :-**
1. श्री पी.पी.चौधरी एवं सहयोगी–विद्वान अधिवक्तागण–प्रार्थीगण की ओर से
2. विपक्षी की ओर से तामील होने से पूर्व सुनवाई की गई।

## // आदेश //
                                                   **दिनांक : 06.04.2021**

हस्तगत प्रकरण में यह दावा कॉ–स्टार ग्रुप इन–कॉर्पोरेशन जो कि अमेरिका इनकॉर्परिटेट कम्पनी है तथा उसकी सहयोगी कम्पनी कॉ–स्टार रियल्टी इनफोरमेशन जो पुनः अमेरिका में इन–कॉर्पोरेटेड कम्पनी है के द्वारा आर्कगेट टेली सर्विसेज प्राईवेट लिमिटेड जो कि भारत में इन–कॉर्पोरेटेड एक कम्पनी है के विरूद्ध लाया गया है तथा प्रार्थीगण द्वारा नोटिस तामील होने से पूर्व एकतरफा कमिशनर नियुक्त करते हेतु यह प्रार्थनापत्र प्रस्तुत किया है। इस आदेश के द्वारा एकतरफा कमिश्नर नियुक्त करने प्रार्थनापत्र का निस्तारण किया जा रहा है।

प्रार्थनापत्र के संक्षेप में तथ्य इस प्रकार से है कि प्रार्थी कम्पनी के द्वारा स्वयं का अमेरिका में रियल स्टेट से संबंधित व्यापार करना जिसमें कमर्शियल रियल ......... बेस तैयार करना और इस डेटा बेस को तैयार करने के लिए प्रोफेशनल ...........

**454**

(528)

प्रार्थना संख्या 08/2021 म धी .A—
CoStar Group Inc. & Other Vs Airgate Teleservices Private Limited
आदेश दिनांक –06.04.2021

2

फोटोग्राफ खींचवाकर उसे कॉपी राईट करवाना तथा खरीदारो ब्रोकर्स को सम्पत्ति स्वामियों को व अन्य रियल स्टेट प्रोफेशनलस को अप दू-डेट डेटा उपलब्ध करवाने का कार्य करती है जिसमे उसकी पूर्ण स्वामित्व वाले सांसिडरी कम्पनिया सहयोग करती है। प्रार्थी स2 को–स्टार रियल्टी इन्फोरमेशन इन–कॉर्पोरेशन के पास उपरोक्त वर्णित फोटोग्राफ के कॉपी राईट अधिकार होना बताया गया है। इसी तरह प्रार्थीगण के इन्टरनेट प्लेटफार्म लूपनेट तथा टेनएक्स डॉट कॉम भी इन फोटोग्राफ को इस्तेमाल करते है तथा ये दोनों प्लेटफार्म प्रोपर्टी को लिस्ट करने, खरीदने, बेचने, ब्राउज करने आदि की सुविधा उपलब्ध कराते है। इसके लिए लूप नेट व टेनएक्स कुछ शर्तो के अधीन अपने इन्टरनेट प्लेटफार्म को यूज करने के लिए कुछ रूपयों को अदा करते हुए एसेस प्रदान करते है तथा थर्ड पार्टी को उनके डेटा बेस को यूज करने के लिए शर्तो के अधीन अधिकृत करते है। इनमे मुख्य शर्त यह है कि डेटाबेस कॉम्पीटिटिव परपज के लिए उपयोग में नही लिया जायेगा।

प्रार्थी ने अपने प्रार्थनापत्र में यह वर्णित किया है कि उनकी कॉम्पीटीटर कम्पनी Crexi के द्वारा उनकी कॉपी राईट फोटोग्राफस को विपक्षी आर्कगेट टेली सर्विसेज प्राईवेट लिमिटेड के माध्यम से कॉप करके या फोटोग्राफस में मामूली बदलाव करके अपनी साईट पर दिखाया जा रहा है जो कि अमेरिकन कॉपी राईट कानून का उल्लंघन है तथा भारत व अमेरिका के मध्य बर्न सम्मेलन देशो की संधि होने से तथा भारत के राजपत्र असाधारण के भाग II खण्ड–3 उपखण्ड–II जो कि 6.4.1999 को प्रकाशित हुआ था, अमेरिका या भारत में यदि कोई कॉपी राईट का उल्लंघन होता है तो दोनों ही देश में कार्यवाही किया जाना इस राजपत्र में प्रकाशित अन्तर्राष्ट्रीय कॉपी राईट आदेश का भी उल्लंघन होने से इसे भारत में प्रवर्तनीय होना बताया।

Crexi के इस कृत्य में सहायता करने से आर्कगेट टेली सर्विसेज प्राईवेट लिमिटेड के द्वारा भी कॉपी राईट कानून का उल्लंघन किया गया है। उन्होंने अपने इस तर्क का यह आधार दिया है कि आर्कगेट टेली सर्विसेज प्राईवेट लिमिटेड अन–ऑथोराईज्ड रूप से लूपनेट की डेटाबेस में जाकर उक्त फोटोग्राफस को कॉप रहा है तथा लूपनेट की अपनी सिक्युरिटी सर्विसेज के द्वारा बाधित किये जाने पर वह अपनी आईडेन्टिटी को छुपाने वाले सॉफ्टवेयर प्रोग्राम का उपयोग करते हुए अवैधानिक रूप से लूपनेट के डेटाबेस को एसेस कर रहा है। उनका यह भी तर्क रहा है कि जब जब आर्कगेट टेली सर्विसेज प्राईवेट लिमिटेड की एक्टिविटी उनकी लूपनेट प्लेटफार्म पर कुछ प्रोपर्टीज के लिए आईडेन्टिफाईड की गई है, उन्हीं प्रोपर्टीज को कुछ ही समय के उपरात Crexi के वेबसाईट पर देखा गया है। इसके अलावा उन्होंने यह भी तर्क दिया है

प्रमाणित सत्य प्रतिलिपि
मुख्य प्रतिलिपिकर्ता
मुंसिफ – नागौर, राज0

उ.प.र्ए. प्रकरण सं. 2021 मु.नं. (41)
UniStar Group In. & Other Vs. Airgate Teleservices Private Limited
आदेश दिनांक –06.04.2021

**3**

तथ्य न्यायालय के समक्ष रखने की कोशिश की है कि आर्कगेट टेली सर्विसेज प्राईवेट लिमिटेड के कर्मचारीगण के रिज्यूम में Crexi के लिए काम करना दर्शाया गया है तथा जिस आई.पी.एड्रेस से आर्कगेट के कर्मचारीगण लूपनेट में एग्जम करते है वह इन्टरनेट पर उपलब्ध आई.पी.एड्रेस आईडेंटिफायर टूल्स के द्वारा आर्कगेट का होना पाया गया है। उन्होने आर्कगेट के इस कृत्य को अमेरिकन कॉपी राईट कानून तथा भारत के कॉपी राईट कानून का उल्लंघन करना बताते हुए प्रार्थीगण ने आर्कगेट के विरूद्ध एक प्रार्थनापत्र बाबत एकतरफा कमिशनर नियुक्त करने हेतु प्रस्तुत किया।

साथ ही उन्होने इस प्रकरण में कमिशनर नियुक्त किये जाने हेतु एक प्रार्थनापत्र सौरभ कुमार सीनियर डायरेक्टर Risk Advisory and Investigation FTI Consulting India Private Limited की ओर से प्रस्तुत किया गया जिसमें उन्होने इस प्रकरण में कमिशनर/कम्प्यूटर एक्सपर्ट के रूप में अपनी सहायता देने का प्रस्ताव रखा है। साथ ही एक अन्य प्रार्थनापत्र उदयपुर बार एसोसिएशन से संबंधित अधिवक्ता श्री हनुमान शर्मा के द्वारा कमिशनर के रूप में सहयोग करने का प्रस्ताव दिया है। इन दोनो ही व्यक्तियों ने यह उल्लेख किया है कि वे दोनो पक्षकारों से किसी प्रकार से संबंधित नही है और वाद विषय में कोई रूचि नही रखते है।

अपने कमिशनर नियुक्त करने के प्रार्थनापत्र में प्रार्थीगण ने न केवल अपनी भौतिक सम्पदा की रक्षा हेतु स्वयं को सक्षम होना बताया है एव कमिशनर नियुक्त करने की माग की है। उनके द्वारा बहस के दौरान यह भी जाहिर किया गया कि प्रार्थीगण द्वारा इसी तरह का एक पूर्व में प्रकरण भारत में आधारित कॉन्ट्रेक्टर मैक्सवेल टैक्नोलॉजी प्रा.लि. के विरूद्ध जिला न्यायालय, थाणे मुम्बई में लाया गया था। मैक्सवेल के द्वारा भी विद आउट ऑथोराईजेशन लूपनेट को एसेस किया जा रहा था एवं कन्टेन्ट कॉपी किये जा रहे थे और तत्समय कॉ–स्टार की प्रतिद्वंदी कम्पनी Xceligent भी तत्समय में जिला न्यायालय, थाणे में एक्स पार्टी अन्तरिम ऑर्डर व कमिशनर नियुक्त करने का आवेदन दिया था और यह भी निर्देश दिया था कि मैक्सवेल के कम्प्यूटर सिस्टम में आरेख से साक्ष्य को सुरक्षित करे। बाद में मैक्सवेल ने अपनी कॉन्ट्रीब्यूटरी इनफ्रेजमेंट को स्वी करते हुए स्वयं के विरूद्ध स्थाई निषेधाज्ञा पारित की गई तथा उन्होंने यह आदेश प्रार्थनापत्र एनेक्चर–7, एनेक्चर–8 के रूप में प्रदर्शित करवाये। साथ ही उनने बहस के दौरान इस तथ्य पर जोर दिया कि Crexi कम्पनी ने लगभग 10 हजार से ज्यादा कॉ–स्टार के कॉपी राईटस फोटोग्राफस का इस्तेमाल करते हुए कॉपी राईट कानून का उल्लंघन किया और इस संबध में उन्होने लगभग 100 फोटोग्राफस प्रस्तुत किये व पैनड्राईव प्रस्तुत किये।



4

उन्होंने अपने प्रार्थनापत्र के पेज संख्या 30 में यह जाहिर किया कि आर्कगेट की रपेजशीट जो कि इन्टरनेट पर उपलब्ध है माने व अप्रैल 2020 के मध्य 13 लोगों का Crexi के लिए काम करना बताया तथा माने व अप्रैल 2020 की एग्जहीट वर्तमान में प्रत्येक व्यू से हटा देना बताया है और यह संभावना जताई कि प्रत्यर्थी यह साक्ष्य व अन्य साक्ष्य डिलीट कर सकता है। साथ ही उन्होंने यह भी तर्क दिया कि कॉन्ट्रार के द्वारा जिन वेबपेज को लूमटेरा पर दर्शाया गया था उन्हीं प्रार्थनी का प्रत्यर्थी आर्कगेट के द्वारा जब एसस किया गया कि थोड़ी ही समय बाद का प्रार्थी Crexi की वेबसाइट पर उसी इमेज को कॉप करते हुए प्रदर्शित की गई। उक्त इमेजेज गाड़ियां बदलन अगर कुछ तो लैण्डमार्कस है जो किसी भी हालत में यथावत आना असंभव है। उन्होंने यह भी तर्क दिया कि आर्कगेट की कार्य करने की पद्धति मैक्सवेल की तरह ही है जिसमें व खुद नहीं एनोनिमाईजर सॉफ्टवेयर के जरिये अपनी उपस्थिति को छिपाते हुए प्रार्थी की वेबसाइट पर एसस करते है। प्रार्थी के सॉफ्टवेयर के द्वारा प्रत्यर्थी के आई पी एड्रेस ''5 ---- हजारो यूजर एब्यूज के नोटिस देने के बाद भी प्रत्यर्थी जान बूझकर उनकी वेबसाइट को एसस करते है। इसी कारण से उन्होंने उनके इस कृत्य को कॉपी राईट एक्ट '1957 आई टी एक्ट 2000, भारतीय दण्ड संहिता 1882 के तहत दण्डनीय अपराध होने से तथा आजकल की संवेदनशील टैक्नोलॉजी को देखते हुए जहा मात्र एक बटन के क्लीक से एवीडेंस को मिटाया जा सकता है, उन्होंने उक्त एवीडेंस को प्रिजर्व करने के लिए प्रत्यर्थी के सिस्टम से उनके कार्यों / सॉफ्टवेयरस की मिरर कॉपीज करने की अनुमति कमिश्नर का देने प्रार्थना की ताकि उक्त एवीडेंस प्रत्यर्थी को दण्डित करने में प्रयोग की जा सके। उन्होंने प्रत्यर्थी के इस कृत्य से अभी तक 90 लाख भारतीय रूपये की क्षति होना बताया है व बर्न सम्मेलन देशों में भारत व अमेरिका का सिग्नेटरी होने से धारा ०० उल्लेखित कॉपी राईट अधिनियम के तहत प्रदत्त शक्तियों का प्रयोग करते हुए कम करते हुए मात्र विदेशी आर्ट वर्क को प्रिजर्व करने की शक्ति होना बताया। साथ ही उक्त प्रार्थना के समर्थन में माननीय न्यायिक दृष्टांत पेश किये –

1- Acko General Insurance Limited & Anr. V/s Yogesh Ahirrao and Anr. LD-VC-IA-1/2020 IN LD-VC-GSP-9/2020 Judgement Dated June 2020 Passed by Bombay High Court.

2- Lasa Supergenerics Limited V/s Shreegen Pharma and Anr. Interim Application(L) No.4324 OF 2020 In GSP(L)No.  2020 Jugdement Dated 12-10-2020 Passed by Bombay

3- The Suprme Industries Ltd. And Anr. V/s

531

आदेश दिनांक 06.04.2021

Ors. Notice of Motion(L) No 980 Of 2018 In Commercial Intellectual Property Rights Suit (L) No. 519 Of 2018 Jugdement Dated 25-04-2018 Passed by Bombay High Court.

4- Webstream Communication Pvt.Ltd. V/s Rohit Mansing Chawda Notice of Motion(L) No.3201 Of 2018 In Commercial Intellectual Property Rights Suit (L) No. 1764 Of 2018 Jugdement Dated 22-12-2018 Passed by Bombay High Court.

5- Autodesk Inc and Ors. V/s Mr.A.V.T.Shankardass and Anr FAO(OS) No 116/2008 Decided On 4-7-2008 Passed by Delhi High Court

6- Autodesk Inc and Ors. V/s Arup Das and Ors. CCP No0 49/2011 In CS(OS) No. 947@2011 Decided On 22-10-13 Passed by Delhi High Court.

7- CoStar Group Inc. V/s Maxval Technologies Pvt. Ltd. Exhibit-7, 5

8- L & L Products India Pvt.Ltd. V/s Tenneco Clean Air India Pvt.Ltd. Exhibit-5-Commercial Suit No.1/2021

9- L & L Products India Pvt.Ltd. V/s Tenneco Clean Air India Pvt.Ltd. Exhibit-8-Commercial Suit No.1/2021

10- Kishore H.Deasi V/s Lilawati Virji Chheda and Ors. Civil Revision Application No. 518 Of 1988 Decided On 11-12-1989 Passed by Bombay High Court.

11- Maroli Achuthan V/s Kunhipathumma. C.R.P. No.915 Of 1964 Decided On 29-11-1966 Passed by Kerala High Court.

12- Adobe Systems Inc. and Ors. V/s Sachin Naik and Ors. CS(OS) 2604/2008 & I.A. 15413/2008 Decided On 12-3-2013 Passed by Delhi High Court.

13- Mattel Inc. V/s Present Enterprises and Ors. CS(COMM) 447/2020 Decided On 13-10-2020 Passed by Delhi High Court.

सुना गया। पत्रावली का अवलोकन किया गया।

स्वयं प्रार्थीगण ने यह स्वीकार किया है आर्कगेट एक [illegible] अधिनियम के तहत 2013 में एक रजिस्टर्ड कम्पनी है जो कि [illegible] सर्विसेज जिसमें डाटा कलेक्शन और डाटा क्लीजींग तथा [illegible]

प्रमाणित सत्य प्रतिलिपि
मुख्य प्रतिलिपिकार

**458**

6

काम करते है। इसकी सहयोगी कम्पनी आर्कगेट सन्तुलन की प्रार्थिका मे इन कॉर्पोरेटेड है। जिसके प्रमाण मे उन्होने मूल दावे मे एक दस्तावेज प्रस्तुत किया है।

प्रार्थीगण का यह भी कथन रहा है कि Crexi कम्पनी के द्वारा उनके दस्तावेज मे जी जा रही पिक्चरस की चोरी के लिए उनका प्रार्थिका मे एक दावा 25.9.2020 को दाखिल किया है और उसमे यह आरोपित किया है कि Crexi कम्पनी के द्वारा अनाधिकृत कानूनन कॉपी राईट इनफ्रीजमेंट, डिजिटल कॉपी गाईड एक्ट और अनाधिक कॉम्पिटीशन का आरोप लगाया है। उनका का यह भी कथन रहा है कि उन्होने इस दावे को 14.12.2020 को संशोधित करायां है। उन्होने Crexi के विरुद्ध अमेरिका मे किए गए दावे की प्रति एनेक्चर–12 के रूप मे प्रदर्शित करवाया है। एनेक्चर–12 एक 294 पेज की कॉपी है लेकिन इस सम्पूर्ण दावे को देखने से केवल यह प्रतीत होता है कि प्रार्थीगण ने Crexi कम्पनी के विरुद्ध ही पृष्ठ संख्या–258 पर यह आरोपित किया है कि Crexi के एम्पलॉईज जो कि Crexi के एजेन्ट रूप मे काम कर रहे है तथा उनके कॉमन सबकॉन्ट्रेक्टरस के द्वारा कॉपी राईट का इनफ्रीजमेंट किया जा रहा है। उनके द्वारा इस दावे के पैरा संख्या–139 में इन विदेशी सबकॉन्ट्रेक्टर का वर्णन उक्त दावे मे अर्कगेट के रूप मे किया गया है।

उनके द्वारा अपने प्रार्थनापत्र में यह भी बताया गया कि Crexi के द्वारा अमेरिका मे इस प्रार्थनापत्र का जवाब देते हुए कही भी प्रार्थीगण के इस आरोप से इंकार नही किया गया है कि आर्कगेट Crexi को कॉपीराईट इनफ्रीजमेंट के लिए सहयोग नही कर रहा। इसके अलावा उन्होने आर्कगेट के आई.पी एड्रेस को प्राइवेट सॉफ्टवेयर टुल्स के जरिये आईडेन्टिफाईड करना व उनके एम्पलॉईज के रिज्यूम जो कि नेट पर उपलब्ध है जिसमे उनका Crexi के लिए काम करना बताया है।

उन्होने अपने आन्तरिक आंकलन से यह तर्क भी दिया कि जब आर्कगेट कम्पनी के आई.पी एड्रेस से लूपनेट मे एक्टिविटी के कुछ ही समय पश्चात Crexi की साईट पर प्रार्थीगण की कॉपीराईट इमेजेज पर पब्लिश हुई है। इन सब को दर्शित किया है लेकिन इन सबने केवल एक सभावना बताई है कि कॉपीराईट इनफ्रीजमेंट मे विपक्षी आर्कगेट Crexi का सहयोग करता है।

स्वयं प्रार्थीगण के द्वारा अपने प्रार्थनापत्र की मद संख्या–18 मे इसी प्रकार का पूर्व दावा एक्सलीजेट कम्पनी के विरुद्ध लाना बताया है और उसमे इसी प्रकार के आदेश प्राप्त करना बताया है और उन आदेशों की प्रतियां प्रस्तुत की है लेकिन इस मामले मे कमिश्नर अपोईन्ट करने के प्रार्थनापत्र के पैरा संख्या–51 मे इसे कॉपी राईट एक्ट की धारा 51 का उल्लंघन होना बताया है व पैरा संख्या–53 मे यह तर्क

',  ,     ,    ि  
 :   ें  ,   ,   ् Private Limited
आर्डर में दिनांक –08.04.2021

7

उनके यह सद्भावित आशंका है कि प्रत्यर्थी एक वकील पर समस्त फोटोग्राफ के डिलिट
कर दे और ऐसे में उनके पास कोई साक्ष्य नहीं रहेगी और मांग भी रहेगा यह प्रार्थना
की है ... कोर्ट रिसीवर या कमिश्नर जिसके पास आदेश 40 नियम 1 सिविल प्रक्रिया संहिता
के समस्त पोवरस हो या आदेश-26 नियम 9 सिविल प्रक्रिया संहिता के तहत नियुक्त
किया जाये जो कि प्रत्यर्थी के परिसर में बलपूर्वक दिन व रात में किसी भी समय प्रत्यर्थी
को नोटिस दिये बिना प्रवेश कर सके तथा वर्ल्ड स्टार के रिप्रजेंटेटिव पुलिस व एक्सपर्ट
की सहायता से एक इन्वेन्ट्री बनवाई जाये जो कि वर्ल्ड स्टार की कॉपी राईट का उल्लघन
किये हुए फोटोग्राफ को प्रत्यर्थी का मटेरियल कम्युनिकेशन इनवॉईस, पासवर्ड, फारमेट,
सभी को जब्त कर सके और प्रत्यर्थी की सम्पूर्ण डेटा की मिरर कॉपी बना सके। इसके
अलावा सर्वरस पर सेव डेटा की भी कॉपी बना सके और एक सील रिपोर्ट कोर्ट के सामने
प्रस्तुत करे ताकि मुख्य दावे के निस्तारण तक सारी साक्ष्य का प्रिजर्वेशन किया जा सके।

इसी प्रार्थनापत्र की मद संख्या–46 में प्रत्यर्थी के इस कृत्य को एक बेहद
संवेदनशील टैक्नोलॉजी का उपयोग करते हुए कॉपी राईट अधिनियम 1957 एवं
इनफार्मेशन टैक्नोलॉजी एक्ट, 2000 एवं भारतीय दण्ड संहिता 1882 के तहत दण्डनीय
अपराध भी होना बताया है।

स्वयं प्रार्थीगण के इन तर्कों से यह स्पष्ट है कि प्रार्थीगण कोर्ट के मार्फत पुलिस
अनुसंधान कार्य कोर्ट के कमिश्नर के द्वारा करवाना चाहते है। पुलिस अनुसंधान को सपोर्ट
करने के लिए कई तकनीकी एजेन्सिया जैसे फोरेंसिक आदि उपलब्ध है। हमारे समक्ष
जिला न्यायालय द्वारा नामित कोई भी कमिश्नर इस प्रकार की तकनीकी योग्यता नहीं
रखता है जो इस स्तर के तकनीकी अपराध की पड़ताल कर सके। यद्यपि स्वयं प्रार्थी
के द्वारा एक कम्पनी Risk Advisory and Investigation FTI Consulting India
Private Limited के डायरेक्टर के इस प्रकरण में कमिश्नर बनने की सहमति हेतु एक पत्र
दिया है, लेकिन क्या यह प्राईवेट लिमिटेड कम्पनी इस स्तर के तकनीकी अपराध की जांच
करने के लिए सक्षम है, यह केवल प्रार्थनापत्र के आधार पर निर्धारित नहीं किया जा
सकता है। इसके अलावा प्रार्थीगण के द्वारा यह भी संभावना जाहिर की गई है कि प्रत्यर्थी
किसी भी समय एक क्लीक पर रागरत डेटा डिलिट कर सकते है जिसे रिट्रीव करना
किसी प्राधिकृत सरकारी एजेन्सी के माध्यम से ही संभव हो सकता है। पुलिस विभाग के
पास में साईबर अपराधो की जांच के लिए एक सम्पूर्ण ब्रांच है जो इस विषय विशेषज्ञ तथा
अपने कर्मचारियों की ट्रेनिंग कराते है तथा प्रकरण के संवेदनशीलता को देखते हुए जब्त
प्रत्यर्थी कम्पनी के पासवर्ड, कम्पनी के डेटा की मिरर इमेजेस जैसे व्यवस्था चाही गयी
है, यह केवल साक्ष्य एकत्रिकरण का विषय है जिसे यह न्यायालय अनुसंधान पर जाना ...

प्रमाणित सत्य प्रतिलिपि
मुख्य प्रतिलिपिकार
जिला न्यायालय रायपुर

**8**

और इसके लिए पुलिस का अनुसरण विभाग पुलिस स्थान है। इसके सम्बन्ध मे माननीय
न्यायालय द्वारा प्रस्तुत हुए है जनमे से

सर्वप्रथम Acko General Insurance Limited & Anr. V/s Yogesh Agarwal
and Anr Jugdement Dated 16 June 2020 Passed by Bombay High Court. हस्तगत
प्रकरण के तथ्यों एवं परिस्थितियों से भिन्न है क्योंकि उक्त प्रकरण मे प्रार्थीगण के पास
विपक्षी के द्वारा डेटा चोरी के लिए काम मे लाया गया विपक्षी का एक अवैध प्रक्रिया-गत
कम्प्यूटर मौजूद था जिसका अध्ययन करने पर उसमे से कुछ डेटा डिलीट कर और बाद
मे उक्त डेटा का पुलिस रिपोर्ट करने के बाद रिट्रीव करना बताया गया है। तत्पश्चात
कोर्ट कमिश्नर के द्वारा विपक्षी के परिसर मे प्रवेश करते हुए महत्वपूर्ण साक्ष्य का एकत्रित
किया गया है।

इसी प्रकार Lasa Supergenerics Limited V/s Shreegen Pharma Ltd.and
Ors. Jugdement Dated 12-10-2020 Passed by Bombay High Court. के प्रकरण मे
Albendazole नामक दवा बनाने का सिक्रेट फार्मूला विपक्षी के द्वारा अनाधिकृत तरीके से
प्रयुक्त किया गया था। जिसे सार्वजनिक नही करने के लिए प्रार्थी ने अस्थाई निषेधाज्ञा
चाही थी और कोर्ट रिसीवर को यह निर्देशित किया गया था कि वह सारे आपत्तिजनक
मटेरियल को जब्त करे और यदि आवश्यकता हो तो परिसर मे बलपूर्वक प्रवेश करे।

हस्तगत प्रकरण मे कॉम्प्लीकेटेड टैक्नोलॉजी को देखते हुए यह आवश्यक नही है
कि प्रत्यर्थीगण के परिसर मे प्रवेश किया जाये बल्कि यह आवश्यक है कि कोई ऐसा योग्य
व्यक्ति अथवा संस्था इस कृत्य की निगरानी करे क्या वास्तव मे आई पी एड्रेस ११५ ---
कॉपी राईट इनफ्रीजमेंट के लिए प्रयुक्त किया जा रहा है अथवा नही व उसके पास यह
सूचना एकत्रित होने के लिए विश्वसनीय सोफ्टवेयर से तथा विशेष अनुमति से वह प्रत्यर्थी
की जानकारी की बिना उसे मॉनिटर कर सके। ऐसा नेटवर्क केवल पुलिस/अन्य
जांच एजेन्सी के पास है जहा पर वे अपनी जांच की अधिकारिता को रखते हुए किसी भी
सर्वर का निर्देशित कर सकते है कि वे आवश्यक सूचनाएं उपलब्ध कराये।

प्रार्थीगण का यह मानना कि यह सूचना एकत्रित करना इस न्यायालय के
कमिश्नर का काम है जिसका केवल और केवल उपयोग साक्ष्य के रूप मे किया जा
सकता है, सही प्रतीत नही होता है।

इसी प्रकार The Suprme Industries Ltd. And Anr. V/s Dynamic
Engineers and Ors. Jugdement Dated 25-04-2018 Passed by Bombay High
Court. हस्तगत प्रकरण मे भी प्रार्थीगण एक ऐसा उत्पाद बना रहे थे जिसमे कई
प्रकार की मशीनरी का इस्तेमाल करते हुए मल्टीलेयर्ड कोश लेमिनेट

CoStar Group Inc. & Other Vs Argate Teleservices Private Limited
**आदेश दिनांक –06.04.2021**

## 9

किया जा रहा था तथा इस फिल्म निर्माण की सिक्रेट सूचना को प्रत्यर्थी के एक्स कर्मचारी के द्वारा अनाधिकृत प्रयोग में लाया गया था और उसके लिए मशीनरी, ड्रईंग आदि लगाई गई थी जिसकी जांच करने व उसे डिसमेन्टल करने के लिए न्यायालय द्वारा कोर्ट कमिश्नर की नियुक्ति की गई।

यहां पर पुन. इस प्रकरण के तथ्य इस प्रकरण से भिन्न है, क्योंकि उपरोक्त प्रकरण में जो भी मशीनें थी वो फिजिकल रूप से प्रजेन्ट थी तथा उनका जब्त करने में किसी प्रकार का कोई तकनीकी रूकावट नहीं थी, लेकिन यहां पर स्वयं प्रार्थीगण यह कह कर आये है कि एक Key के दबाने से सम्पूर्ण डेटा खत्म किया जा सकता है ऐसी स्थिति में उन्हें एक्सपर्ट की आवश्यकता होगी जो डेटा रिट्रीव करने के लिए न केवल ट्रेन्ड हो बल्कि डेटा रिट्रीव करने की अधिकारिता को रखते हो।

यह न्यायालय केवल साक्ष्य एकत्रित करने का प्लेटफार्म नहीं हो सकता है। यह कार्य अनुसंधान एजेन्सी का है।

इसी प्रकार Webstream Communication Pvt.Ltd. V/s Rohit Mansing Chawda, Jugdement Dated 22-12-2018 Passed by Bombay High Court. हस्तगत प्रकरण में भी विपक्षी प्रार्थी का एक कर्मचारी था जिसने प्रार्थी के साथ एम्प्लॉयमेंट के समय एक फार्म भरा था कि वह कम्पेटेटिव कम्पनी के साथ काम नहीं करेगा और कम से कम 3 साल तक नौकरी छोड़ने के पश्चात प्रार्थी कम्पनी के व्यवसाय को करने वाली कम्पनियों को सहायता नहीं करेगा अन्यथा वह 25 लाख रूपये का हर्जाना भरेगा, लेकिन प्रत्यर्थी ने प्रार्थी कम्पनी के क्लाईन्ट को अप्रोच किया और अपने ऑफिशियल वेबसाईट से प्रार्थी कम्पनी का डाटा अपनी व्यक्तिगत वेबसाईट पर ट्रांसफर किया। इस प्रकरण में कोर्ट कमिश्नर की नियुक्ति की गई जो इस कंडीशन का उल्लंघन करते हुए पेम्पलेट, वाउचर आदि को जब्त करे। साथ ही उसका कम्प्यूटर सिस्टम का समस्त डाटा रिट्रीव करे।

हस्तगत प्रकरण में प्रार्थी व प्रत्यर्थी दोनों व्यवसायिक अनुबंध में नहीं है तथा प्रत्यर्थी कम्पनी के द्वारा यदि कोई कॉपी राईट का उल्लंघन किया जा रहा है तो यह केवल एक आपराधिक कृत्य है जिसका अनुसंधान आपराधिक कृत्य की तरह ही होना चाहिए। अभी तक हमारे समक्ष जो भी साक्ष्य प्रस्तुत हुई वह केवल यह इंडीकेशन करती है कि प्रत्यर्थी कम्पनी ने प्रार्थी कम्पनी की राईवल कम्पनी Crexi के लिए कॉपी राईट इनफ्रीजमेंट में सहयोग कर रही है, लेकिन इसका कोई निश्चयात्मक सबूत नहीं होने से इस स्टेज पर कोर्ट कमिश्नर के द्वारा साक्ष्य एकत्रित करने के लिए रिसीवर / कोर्ट कमिश्नर की नियुक्ति नहीं की जा सकती है।

इसी प्रकार Autodesk Inc and Ors. V/s Mr.A.V.T.Shankardass and Anr.



**462**

CoStar Group Inc. & Trhsr V/s Xceligent Telescrvices Private Limited

आदेश दिनांक -06.04.2021

## 10

Decided On 4-7-2008 Passed by Delhi High Court. & Autodesk Inc and Ors. V/s Arup Das and Ors. Decided On 22-10-13 Passed by Delhi High Court. के प्रकरण मे पक्षीगण के पास दावा दायरी से पहले यह निश्चयात्मक सबूत था कि विपक्षी के द्वारा उनकी कॉपी राईट सॉफ्टवेयर का अनाधिकृत उपयोग किया जा रहा था। उन्होंने सॉफ्टवेयर केवल एक सिस्टम के लिए दिया था, लेकिन उक्त सॉफ्टवेयर का 29 अन्य सिस्टम के द्वारा भी यूज किया जा रहा था जिस इनफॉरमेशन पर उन्होंने एक्स पार्टी कमिश्नर नियुक्त करने का आदेश दिया गया था।

हस्तगत प्रकरण के तथ्य उक्त माननीय न्यायिक दृष्टांत से भिन्न है क्योंकि हस्तगत प्रकरण मे प्रार्थीगण के द्वारा केवल यह आशकाए जताई गई है कि अर्कगेट के कर्मचारियों का रिज्यूमस मे उनकी प्रतिद्वंदी कम्पनी Crexi के साथ कार्य करन की इनफार्मेशन तथा अप्रार्थी कम्पनी के कर्मचारियों के द्वारा प्रार्थी कम्पनी की वेबसाईट लूपनेट को एसेस करना यह इंगित करता है कि उनकी कॉपी राईट फोटोग्राफस को अनाधिकृत तरीके से प्रर्थर्थी कम्पनी के द्वारा यूज किया जा रहा है।

इसी प्रकार CoStar Group Inc. V/s Maxval Technologies Pvt. Ltd. Exhibit-7, 5 पेज संख्या-67 से 71 तथा 72 से 73 ये केवल जजमेंट का पार्ट होने से तथा इस पर कोई साईटेशन नही होने से उक्त न्यायिक दृष्टांत को नही पढा जा सकता है।

इसी प्रकार Kishore H.Deasi V/s Lilawati Virji Chheda and Ors.Decided On 11-12-1989 Passed by Bombay High Court. प्रकरण रिलेवेंट नही है क्योकि उक्त न्यायिक दृष्टांत मे यह अभिनिर्धारित किया गया है कि एक्स पार्टी कमिश्नर यदि नियुक्त भी कर दिया जाये तो भी कमिश्नर की ड्यूटी बनती है कि वो दोनों पक्षकार को नोटिस देकर ही अपनी रिपोर्ट प्रस्तुत करें। अन्यथा ऐसी रिपोर्ट साक्ष्य में ग्राह्य नहीं होती है। इसी प्रकार माननीय न्यायिक दृष्टांत Maroli Achuthan V/s Kunhipathumma Decided On 29-11-1966 Passed by Kerala High Court. में यह अभिनिर्धारित किया गया है कि कमिश्नर रिपोर्ट साक्ष्य में किस प्रकार ग्राह्य होगी जो इस स्टेज पर रिलेवेंट नही है।

प्रार्थीगण के द्वारा प्रस्तुत सभी न्यायिक दृष्टांत हस्तगत प्रकरण के तथ्यों एवं परिस्थितियों से भिन्न है, क्योकि उपरोक्त सभी न्यायिक दृष्टांतों में प्रथम दृष्ट्या यह तथ्य सुरक्षापित था कि विपक्षी / प्रत्यर्थी द्वारा कॉपी राईट कानून का उल्लंघन किया जा रहा है लेकिन उनके पास कोई निश्चयात्मक सबूत नहीं है जिसे यह तथ्य स्थापित हो सके कि जिन फोटोग्राफस के आर्कगेट के कर्मचारियों ने एसेस किया उसे उन्होंने Crexi को



**11**

रासपर किया जब तक यह सबूत नही मिलता तब तक यह प्रार्थना नही की सकता था कि पत्यथी आर्कगेट Crexi कम्पनी के साथ मिलकर कॉपी राईट कानून का उल्लंघन कर रही है और निश्चित रूप से न्यायालय साक्षता की मिसिंग लिंक का पूर्ण कारण के लिए तुज नही बन सकता।

अत उपरोक्त विवेचन से प्रार्थीगण का प्रार्थनापत्र अन्तर्गत आदेश-26 नियम-9 सिविल प्रकिया संहिता इस स्तर पर अस्वीकार कर खारिज किये जाने योग्य सक जाता है।

## :: आदेश ::

प्रार्थीगण Costar Group, Inc.& Others की ओर से प्रस्तुत प्रार्थनापत्र एकतरफा कमिश्नर नियुक्त किये जाने अन्तर्गत आदेश-26 नियम-9 सिविल प्रकिया संहिता अस्वीकार किया जाकर खारिज किया जाता है।

( शिवानी जौहरी न्यायाधीश )

आदेश आज दिनांक 06.4.2021 को खुले न्यायालय में लिखाया जाकर हस्ताक्षर कर सुनाया गया।

( शिवानी जौहरी न्यायाधीश )

# EXHIBIT B



## HIGH COURT OF JUDICATURE FOR RAJASTHAN AT JODHPUR

S.B. Civil Writ Petition No. 9384/2021

1.    Costar Group Inc., A Corporation Registered Under The Law Of The State Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America.

2.    Costar Realty Information, Inc., A Corporation Registered Under The Laws Of The State Of Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America Through Power Of Attorney Holder Bharat Madakan Having My Office At Samridhi Bangolow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depo Charkop Kandivali ()W) Mumbai - 400047.

----Petitioners

Versus

Arcgate Teleservices Private Limited, A Company Incorporated Under The Companies Act, 2013 Having Its Registered Office At G1-10 I.t. Park, Madri Industrial Area, Udaipur, Rajasthan 313001.

----Respondent

| For Petitioner(s) | : | Mr M.S.Singhvi, Sr. Advocate assisted by Mr Muktesh Maheshwari Mr Faraz Sagar Mr Hiren Kamod Mr Aidan Choudhary Ms Simran Agarwal |
| For Respondent(s) | : | |

## HON'BLE MR. JUSTICE VIJAY BISHNOI

### Order

**30/07/2021**

        This writ petition is filed by the petitioners being aggrieved with the order dated 06.04.2021 passed by Judge, Commercial Court, Udaipur (for short 'the trial court' hereinafter) in C.I.S. No.06/2021, whereby the application preferred on behalf

(Downloaded on 16/10/2021 at 12:01:34 AM)



[CW-9384/2021]

of the petitioners for *ex parte* appointment of Court Commissioner as per the provisions of Order XXVI Rule 9 of the Code of Civil Procedure, 1908 (for short 'CPC' hereinafter) has been dismissed.

The petitioners filed a suit for injunction against the respondent – Arcgate Teleservices Private Limited before the trial court, which is pending consideration. Along with the said suit, the petitioners also preferred an application under Order XXVI Rule 9 CPC seeking ex parte appointment of Court Commissioner.

As per the petitioners, petitioner No.1 is a company incorporated under the laws of the State of Delaware in the United States of America and petitioner No.2 is a wholly owned subsidiary of petitioner No.1. It is claimed that the petitioners are leading provider of commercial real estate information, analytics and online marketplaces in the United States of America and they have developed the most comprehensive database of commercial real estate in the world.

It is also claimed that the petitioners are touching average 24,000 brokers, owners, developers and other real estate professionals daily through phone calls canvassing a half million properties per year and are taking nearly one million photographs annually.

It is contended by the petitioners that website 'LoopNet' (available at http://www.loopnet.com) is the foremost digital marketplace for commercial real estate in the United States and it contains petitioners' copyrighted photographs and data from its database. Every day, buyers, sellers, lessors, lessees, owners and brokers access and use LoopNet to list, buy, sell, lease, rent or browse commercial real estate.

(Downloaded on 16/10/2021 at 12:01:34 AM)



It is further contended by the petitioners that one of the current competitors of the petitioners in the United States of America is Commercial Real Estate Exchange, Inc. (CREXi). CREXi is a company incorporated in the State of California in the United States of America and as per its website, it describes itself as a commercial real estate marketplace that simplifies transactions for brokers with a suite of easy to use tools to manage the entire process from listing to closing. CREXi's website allows to use commercial real estate listings in markets across the United State of America. CREXi also runs an online auction marketplace.

Rajasthan High Court Web Copy - Not Official सत्यमेव जयते

It is further contended by the petitioners that the CREXi has raised a significant amount of funding recently and is competing with the petitioners. It is alleged that CREXi is attempting to build its own online commercial real estate marketplace and auction platform by free riding on petitioners' billions of dollars of investments and its three decades of hard work. It is also alleged that CREXi has accessed the petitioners' database and LoopNet more than a million times and forced the petitioners to file a lawsuit against it in the United States District Court for the Central District of California in the month of September, 2020. In the lawsuit, the petitioners have alleged that CREXi is involved in copyright infringement, violation of United States Digital Millennium Copyright Act, misappropriation, unfair competition, false advertising and breach of contract. In the very lawsuit, it is alleged that the respondent – Arcgate Teleservices Private Limited is working for CREXi and is accessing LoopNet without authorization for competitive purposes on behalf of CREXi in violation of LoopNet's terms and conditions, committing contributory infringement of the petitioners' copyrighted

(Downloaded on 16/10/2021 at 12:01:34 AM)

photographs and engaging in piracy/theft, improper access to petitioners' websites and misappropriation of the petitioners' proprietary contents at the behest of CREXi.

It is contended that in the lawsuit filed by the petitioners against the CREXi, it has not denied or disclaimed that the respondent - Arcgate Teleservices Private Limited is accessing LoopNet on behalf of CREXi.  The petitioners have placed on record certain documents before the trial court in support of their allegations that respondent - Arcgate Teleservices Private Limited is working on behalf of CREXi and is illegally accessing the LoopNet and transferring the data of the petitioners – company to CREXi.

The petitioners, by way of an application preferred under Order XXVI Rule 9  CPC before the trial court, sought *ex parte* appointment of a Court Commissioner, which came to be rejected by the trial court vide impugned order.  Hence, this writ petition.

Learned counsel for the petitioners has argued that the learned trial court grossly erred in rejecting the application filed by the petitioners for *ex parte* appointment of Court Commissioner. It is further submitted that the trial court failed to appreciate that granting of ad interim relief is necessary in the present case.

It is argued that the trial court erred in holding that for the appointment of *ex parte* Court Commissioner, it is insufficient to show that it is possible that the respondent committed the said act of copyright infringement, rather, there must be concrete evidence that the said act of infringement has been committed by the respondent. It is submitted that at the *ex parte* ad interim stage, the petitioners were required to make out a strong prima

(Downloaded on 16/10/2021 at 12:01:34 AM)



facie case and the petitioners have produced ample evidence on record that there is possibility that the respondent has committed the said act of copyright infringement.

Learned counsel for the petitioners has further submitted that the petitioners have adduced significant evidence of respondent's wrongdoings including evidence that the respondent is working on behalf of the petitioners' competitor – CREXi and is regularly accessing the petitioners' LoopNet website on behalf of the CREXi without authorization and in breach of petitioners' binding terms and as such committed contributory infringement of petitioners' copyrighted photographs and engaging in piracy/theft and misappropriation of petitioners' proprietary content.

Learned counsel for the petitioners has further submitted that the trial court has failed to appreciate that in intellectual property matters, a party is subjected to strict proof of infringement because at the initial stage, it cannot be expected from a party to have full fledged evidence of infringement.

It is further submitted that in case of involving technology/software/internet activity, it is impossible for a party to completely understand the nature of activity of a wrongdoer unless the evidence from its systems and files is taken into custody and preserved for trial.

Learned counsel for the petitioners has further submitted that the trial court has failed to consider the ratio in various judgments relied upon by the petitioners, where in  one of the judgments, the Delhi High Court has laid down the principles regarding appointment of *ex parte* Court Commissioner in similar type of cases.

(Downloaded on 16/10/2021 at 12:01:34 AM)



Learned counsel for the petitioners has also submitted that though the petitioners were successful in making out a *prima facie* case before the trial court but it has illegally rejected the application filed by the petitioners for appointment of *ex parte* appointment of Court Commissioner.

In support of the above contentions, learned counsel for the petitioners has mainly placed reliance on a decision of Delhi High Court in ***Autodesk Inc and Anr. vs. Mr. A.V.T. Shankardass and Anr.,*** reported in ***AIR 2008 Delhi 167.***

Heard learned counsel for the petitioners.

The learned trial court has rejected the application filed on behalf of the petitioners for *ex parte* appointment of Court Commissioner while observing that a Court Commissioner appointed by it would not be qualified to retrieve and preserve the relevant evidence or recover data, which might have been deleted. The trial court has also observed that only the police have means to recover any deleted data. The trial court is further of the opinion that mere existence of photographs on servers is not concrete proof of copyright infringement and sufficient to warrant seizing and preserving of evidence at this stage.  The trial court is not convinced that FTI Consulting India Private Limited can act as a Commissioner as its capability cannot be determined on the basis of an application and on asking of the petitioners.

From perusal of the impugned order dated 06.04.2021, it appears that the trial court is of the view that the Court Commissioner cannot be appointed for the purpose of collecting evidence for the plaintiff.

Ultimately, the trial court has held that the petitioners have failed to provide sufficient proof to establish the fact that

**(Downloaded on 16/10/2021 at 12:01:34 AM)**



some photographs are accessed by the respondent-Arcgate Teleservices Private Limited from the petitioners' website on behalf of the CREXi and thereafter transferred to it. The trial court has observed that until and unless this fact is established, it cannot be used as a tool to connect the missing link.

The Delhi High Court in **Autodesk Inc and Anr. vs. Mr. A.V.T. Shankardass and Anr.** (supra) laid down certain guidelines for appointment of a Court Commissioner in software infringement and piracy. The relevant portion of the judgment reads as under:

**14.** Coming now to the question of guidelines to be set, we have heard both the counsel for the parties. We are conscious of the fact that it is neither feasible nor practical to lay down guidelines, which would cater to numerous and all the situations that may arise. However, some of the following relevant factors and guidelines are being enumerated which the Court may take into consideration on the question of appointment of a Local Commissioner in software infringement and piracy matters:

(i) <u>The object of appointment of a Local Commissioner in software piracy matters is not, as much to collect evidence but to preserve and protect the infringing evidence.</u> The pirated software or incriminating evidence can only be obtained from the premises of the opposite party alone and in the absence of an ex parte appointment of a Local Commissioner there is likelihood that such evidence may be lost, removed or destroyed;

(ii) Request for ex parte appointment of a Local Commissioner in such matters is usual and in fact is intended to sub serve the ends of justice as it is imperative to have an element of surprise so that the actual position is not altered;

(iii) <u>The test of reasonable and credible information regarding the existence of pirated software or incriminating evidence should not be subjected to strict proof or the requirement to demonstrate or produce part of the pirated software/incriminating evidence at the initial stage itself.</u> It has to be tested on the touchstone of pragmatism and the natural and normal course of conduct and practice in trade.

(iv) It may not always be possible for a plaintiff to obtain any admission by employing decoy customers and

(Downloaded on 16/10/2021 at 12:01:34 AM)



gaining access to the defendant's premises. Any such attempt also inheres in it the possibility of dis-appearance of the pirated software/incriminating evidence in case the decoy customers is exposed. Accordingly, visit by decoy customer or investigator is not to be insisted upon as pre condition. A report of private Investigator need not be dis-regarded or rejected simply because of his engagement by the plaintiff. The information provided by the private Investigator should receive objective evaluation.

(v) In cases where certain and definite information with regard to the existence of pirated software or incriminating evidence is not available or where the Court may nurture some element of doubt, it may consider asking the plaintiff to deposit cost in Court so that in case pirated software or incriminating evidence is not found then the defendant can be suitably compensated for the obtrusion in his work or privacy."

*(Emphasis supplied)*

I am perfectly in agreement with the view of the Delhi High Court that the object of appointment of a Local Commissioner in software piracy matters is not, as much to collect evidence but to preserve and protect the infringing evidence and strict proof is not required to be given at initial stage.

The petitioners, along with an application for appointment of Local Commissioner, has placed on record certain documentary evidence in support of their claim that the respondent is illegally accessing LoopNet's website containing copyright photographs and database of the petitioners at the instance of CREXi and is transferring to it unauthorisedly.

After examining the said documentary evidence, which is also annexed with this writ petition, I am of the view that the petitioners are able to prima facie prove that the respondent has illegally accessed the copyright photographs and database of the petitioners – company from its website and

(Downloaded on 16/10/2021 at 12:01:34 AM)



might have transferred it to the CREXi, which used the said copyright photographs and database for its profit.

In view of the above discussion, I am of the view that the trial court has erred in not appointing the *ex parte* Court Commissioner in the matter in hand.

Before the trial court, two applications were moved, one on behalf of Shri Hanuman Sharma, Advocate, who offered himself to work as Court Commissioner and another by Shri Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited, who offered his services as Commissioner/Computer Expert.

Taking into consideration the overall facts and circumstances of the case, I find it a fit case for appointing *ex parte* Court Commissioners and the following directions are issued:

(1)   Issue notice of this writ petition to the sole respondent. Notices are made returnable on 6th September, 2021.

(2)   The petitioners shall deposit cost of Rs.10,00,000/- (Rupees ten lac) with the trial court within one week from today, so that in case incriminating evidence is not found, then the defendant can suitably be compensated for obstruction in its work.

(3)   Mr Hanuman Sharma, Advocate, Udaipur and Mr Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited are appointed as Court Commissioners. They shall serve a copy of this order to the respondent before starting commission. They will have all the powers under Order XL Rule 1 or under XXVI Rule 9 CPC in

order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the respondent's premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan – 313 001 or any other premises owned or occupied by respondent any time of the day or night without notice to the respondent and with the help of the representative of the petitioners and police. The Court Commissioners - Mr Hanuman Sharma, Advocate and Mr Saurabh Kumar shall make inventory and seize, take possession, custody and control of the petitioners infringing photographs, along with all the respondent's material, printed matter, communication, invoices, records, relevant passwords and passcodes, and such material and documents relating to infringing photographs owned by the petitioners including such material stored electronically on any systems. They shall also make inventory and take a mirror copy of the entire electronic data of the respondent stored on the computer systems, data storage devices, handled devices, hard disks, pen drives, computer records, cloud-based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of the respondent (which may be belonging to the respondent or on lease) and shall submit the said mirror copy to the trial court in a sealed envelope along with a report within a month.

The respondent is directed to co-operate and provide all assistance to the Court Commissioners but without limitation to providing access.

(Downloaded on 16/10/2021 at 12:01:34 AM)



The fees of the Court Commissioners shall be paid by the petitioners as per agreement between the petitioners and the Court Commissioners.

List on 06.09.2021.

**(VIJAY BISHNOI),J**

masif/-PS



(Downloaded on 16/10/2021 at 12:01:34 AM)

# EXHIBIT C

94

# IN THE HIGH COURT OF JUDICATURE AT RAJASTHAN AT JODHPUR

### S.B. CIVIL CONTEMPT PETITION No............625...../2021

### IN

### S.B. CIVIL WRIT PETITION NO. 9384/2021

**PETITIONER:-**
M/s Arcgate

**RESPONDENTS:-**
Costar Group Inc. & Ors.

## INDEX

| S.No. | Particulars | Page No |
|-------|-------------|---------|
| 1. | Contempt Petition | 1 - 21 |
| 2. | Affidavit in support of contempt petition | 22 |
| 3. | Affidavit in support of documents | 23 |
| | **DOCUMENTS** | |
| Annex C/1 | Copy of registration certificate of petitioner firm | 24 - 25 |
| Annex.C/2 | Copies of property papers of the premises as also the GST registration documents of the Petitioner firm | 26 - 39 |
| Annex C/3 | Copy of the letter dated 06.08.2021 | 40 - 42 |
| Annex C/4 | Copy of order dated 30.7.2021 | 43 - 53 |

**COUNSEL FOR THE PETITIONER**

**(VIKAS BALIA/ FALGUN BUCH/PRATEEK GATTANI)**
**COUNSEL FOR THE PETITIONER**

## GOVERNMENT OF RAJASTHAN
### e-Court Fee



| | |
|---|---|
| **DATE & TIME :** | 10-AUG-2021 12:25:33 |
| **NAMES OF THE ACC/ REGISTERED USER :** | SHCIL RAJASTHAN |
| **LOCATION :** | JODHPUR |
| **e-COURT RECEIPT NO :** | RJCT1028H2125M736 |
| **e-COURT FEE AMOUNT :** | ₹ 20 |
| | ( Rupees Twenty Only) |



RJCT1028H2125M736

Statutory Alert : The authenticity of this e-Court fee receipt should be verified at www.shcilestamp.com. Any discrepancy in the details on this receipt and as available on the website renders it invalid. In case of any discrepancy please inform the Competent Authority. This receipt is valid only after verification & locking by the Court Official.

No. 123, Sector 4, Bh. Charkop Bus Depot,   Charkop Kandivali (W) Mumbai - 400047.



10 AUG 2021

24898

Inward No.
Ind. of ... ... S.J.A.

# IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN AT JODHPUR.

****

## S.B. CIVIL CONTEMPT PETITION NO. 625 /2021

### IN

## S.B.CIVIL WRIT PETITION NO. 9384/2021

## PETITIONER

M/s Arcgate, a partnership firm having its office at G1-11 I.T Park, Madri Industrial Area, Udaipur, Rajasthan 313001 through its authorized representative Sh. Rakesh Jain, S/o Milap Chand Jain, aged about 50 years, resident of Archi Peace Park, Sector-4, Hiran Magri, Udaipur.

VERSUS

## RESPONDENTS/CONTEMNORS

1. Costar Group Inc., a corporation registered under the law of the State Delaware and having its principal place of business at 1331 l Street, NW, Washington, District of Columbia 20005, United States of America. through power of attorney holder Bharat Madakam.

   S 16/12/21

2. Costar Realty Information, Inc., a corporation registered under the laws of the State of Delaware and having its principal place of business at 1331 l street, NW, Washington, District of Columbia 20005, United States of America through power of attorney holder Bharat Madakan having office at Samridhi Bangolow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depot, Charkop Kandivali (W) Mumbai - 400047.

3.  Mr. Hanuman Sharma,
    Advocate
    15, Adarsh Nagar, E Block, Near Navdeep Academy,
    Kalakmata Road, Udaipur – 313 001.

4.  Mr. Saurabh Kumar,
    Senior Director, Risk Advisory and Investigation,
    FTI Consulting Pvt. Ltd., Unit 16, Level 3, The Executive
    Centre, The Capital, Plot No. C-70, G Block, Bandra
    Kurla Complex, Mumbai 400051, India.

***

**S.B. CIVIL CONTEMPT PETITION UNDER SECTIONS
11 AND 12 OF THE CONTEMPT OF COURTS ACT, 1971
READ WITH ARTICLE 215 OF THE CONSTITUTION
OF INDIA, 1950 SEEKING INTER ALIA INITIATION
OF CIVIL CONTEMPT PROCEEDINGS AGAINST THE
RESPONDENT(S) / CONTEMNOR(S) FOR THE
WILFUL DISOBEDIENCE AND VIOLATION OF THE
ORDER DATED 30.07.2021 PASSED BY THIS
HON'BLE COURT IN THE CAPTIONED MATTER –
S.B.CIVIL WRIT PETITION NO. 9384/2021**

To

THE HON'BLE CHIEF JUSTICE AND HIS OTHER
COMPANION JUDGES OF THE HIGH COURT OF
JUDICATURE FOR RAJASTHAN AT JODHPUR.



**MAY IT PLEASE YOUR LORDSHIPS.**

The humble above-named Petitioner (M/s Arcgate) most
respectfully submits as under:



1.   That the present Petition has been filed by the Petitioner under Sections 11 and 12 of the Contempt of Courts Act, 1971 (hereinafter **"the Act"**) read with Article 215 of the Constitution of India, as the Petitioner herein is aggrieved by the contumacious conduct of the Respondent, who have acted in blatant and wilful disobedience of this Hon'ble Court's Order dated 30.07.2021 in S.B. Civil Writ Petition No. 9384/2021. It is stated that the Respondents have committed civil contempt within the meaning of the Act. It is also respectfully stated that as this Court is a constitutional court with plenary jurisdiction to issue any appropriate orders in respect of the contempt of the Orders of this Hon'ble Court committed by the Respondents.

2.   The Petitioner firm is a registered partnership firm, by the name of Arcgate, constituted on 03.06.2005. The Petitioner firm is a business process outsourcing service provider with 2000+ employees. Owing to the unimpeachable track record of quality service and client satisfaction, and its endeavour to conform to the highest ethical practices and standards, the Petitioner firm has never been part of any litigation whatsoever in the last 16 years. The Petitioner firm has won several excellence awards from credible entities such as Dun & Bradstreet (D&B) and Export Credit Guarantee Corporation of India



(ECGC), which is the premier export credit agency of the Government of India.

Copy of the registration certificate of the Petitioner firm is annexed herewith as **Annexure- C/1.**

3.      Respondent Nos. 1 and 2 are entities which (as set out in this Hon'ble Court's Order dated 30.07.2021 in S.B. Civil Writ Petition No. 9384/2021) claim to be "leading providers of commercial real estate information, analytics and online marketplaces in the United States of America". They are incorporated under the laws of the State of Delaware in the United States of America, and Respondent No. 2 is stated to be the wholly owned subsidiary of Respondent No.1.

4.      Respondent Nos. 3 and 4 are local commissioners appointed by this Hon'ble Court vide Order dated 30.07.2021 in S.B. Civil Writ Petition No. 9384/2021, who have, despite being officers appointed by this Hon'ble Court, deemed it fit to violate this Hon'ble Court's orders, arrogating to themselves untrammeled powers beyond the circumscribed limits of this Hon'ble Court's binding directions.

5.      While the Petitioner shall elaborate upon its case hereunder, the sum and substance of the Petitioner's case is as follows. On 06.03.2021, the learned court-appointed local commissioners (i.e. Respondent Nos. 3 and 4 herein)



and 16 other people (acting for Respondent Nos. 1 and 2), forcefully entered into the business premises of the Petitioner firm (at G1-11, I.T. Park, Madri Industrial Area, Udaipur), misbehaved with the Petitioner's employees, and proceeded to conduct a forceful "inspection" of the Petitioner's premises. They claimed to be acting under the authority of the Order 30.07.2021 passed by the Hon'ble High Court in S.B. Civil Writ Petition No. 9384/2021. It was pointed out by the Petitioner's representatives that the Petitioner firm is not a party Respondent before this Hon'ble Court in S.B. Civil Writ Petition No. 9384/2021 (the Respondent in the said proceedings being a separate and distinct entity), nor was the premises in question the correct premises whose address was mentioned in this Hon'ble Court's order. Despite bringing these facts to the attention of the commissioners appointed by this Hon'ble Court, i.e. Respondent Nos. 3 and 4, as also the other individuals accompanying them (who were clearly representatives of and acting for Respondent Nos. 1 and 2), the said group of individuals continued their unlawful interference with the business activities of the Petitioner, all while exhibiting what can only be termed as unbecoming conduct for officers of this Hon'ble Court. Such conduct, coupled with wilful disobedience of judicial orders passed by this Hon'ble Court, amounts to contempt of court.



6.    At the outset, it would be necessary to analyze the contents of the Order dated 30.07.2021, passed by this Hon'ble Court in S.B. Civil Writ Petition No. 9384/2021 (which was handed over to the Petitioner herein on 06.08.2021, as elaborated upon hereunder). As per the cause title, the Petitioners in the writ proceedings are Respondent Nos. 1 and 2 herein. The Respondent in the said proceedings is not the Petitioner firm, but a separate and distinct entity by the name of Arcgate Teleservices Pvt. Ltd. The effective directions are reproduced below, for convenience: -

> Taking into consideration the overall facts and circumstances of the case, I find it a fit case for appointing ex parte Court Commissioners and the following directions are issued:
>
> (1)    Issue notice of this writ petition to the sole respondent. Notices are made returnable on 6th September, 2021.
>
> (2)    The petitioners shall deposit cost of Rs.10,00,000/- (Rupees ten lac) with the trial court within one week from today, so that in case incriminating evidence is not found, then the defendant can suitably be compensated for obstruction in its work.
>
> (3)    Mr Hanuman Sharma, Advocate, Udaipur and Mr Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited are appointed as Court Commissioners. They shall serve a copy of this order to the respondent before starting commission. They will have all the powers under Order XL Rule 1 or under XXVI Rule 9 CPC in order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the respondent's premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan – 313 001 or any other premises owned or occupied by respondent any time of the day or night without notice to the respondent and with the help of the representative of the petitioners and police. The Court Commissioners - Mr Hanuman Sharma, Advocate and Mr Saurabh Kumar shall make inventory and seize, take possession, custody and control of the petitioners infringing photographs, along with all the respondent's material, printed matter, communication, invoices,



*records, relevant passwords and passcodes, and such material and documents relating to infringing photographs owned by the petitioners including such material stored electronically on any systems. They shall also make inventory and take a mirror copy of the entire electronic data of the respondent stored on the computer systems, data storage devices, handled devices, hard disks, pen drives, computer records, cloud-based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of the respondent (which may be belonging to the respondent or on lease) and shall submit the said mirror copy to the trial court in a sealed envelope along with a report within a month.*

*The respondent is directed to co-operate and provide all assistance to the Court Commissioners but without limitation to providing access.*

7.  On a close reading of this Hon'ble Court's judgment and order dated 30.07.2021, it is apparent that the Order of this Hon'ble Court was based on a specific set of allegations against a specific entity, and pertained to a specific premises. The following aspects may, in particular, be noted: -

  i.  The Petitioners' allegations, as is evident from the aforementioned Order of this Hon'ble Court, pertain to Arcgate Teleservices Private Ltd.

  ii.  Further, allegations have been made against Commercial Real Estate Exchange, Inc (referred to as "CREXi"), without impleading this entity as a party.

  iii.  As set out at Page 3 of this Hon'ble Court's Order, as served upon / handed over to the Petitioner, it emerges that there is a lawsuit in America where there are allegations against Arcgate Teleservices Pvt. Ltd. (and not the Petitioner).



iv.    At Page 4 of this Hon'ble Court's aforementioned Order, Petitioners rely upon the purported failure of CREXi to deny certain allegation against Arcgate Teleservices Pvt. Ltd. (which is distinct from the Petitioner).

v.    The Order also refers to proceedings before the Commercial Court, Udaipur in C.I.S. No.06/2021. It may be noted that the Petitioner has no knowledge of such proceedings. Evidently, it cannot be a party in the said proceedings, since it is not a party in the captioned writ proceedings, which emanate from said the trial court proceedings, and since it has also not been served with an process in any proceedings before the Commercial Court.

vi.    Based on the above allegations, directed against Arcgate Teleservices Pvt. Ltd., this Hon'ble Court authorized the local commissioner to enter and carry out the commission at "the respondent's premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan – 313001 or any other premises owned or occupied by respondent".

vii.    The directions also stated: -

*"The Court Commissioners - Mr Hanuman Sharma, Advocate and Mr Saurabh Kumar shall make inventory and seize, take possession, custody and control of the petitioners infringing*



photographs, **_along with all the respondent's material,_** _printed matter, communication, invoices records, relevant passwords and passcodes, and such material and documents relating to infringing photographs owned by the petitioners including such material stored electronically on any systems. They shall also make inventory and take a mirror copy of the **_entire electronic data of the respondent_** stored on the computer systems, data storage devices, handled devices, hard disks, pen drives, computer records, cloud-based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) **_of the respondent (which may be belonging to the respondent or on lease_**) and shall submit the said mirror copy to the trial court in a sealed envelope along with a report within a month." **[Emphasis supplied]**_

8.    The Orders of this Hon'ble Court were specific and qualified. Despite this, the Respondents (including the learned local commissioners, i.e. Respondent Nos. 3 and 4) chose to blatantly violate the binding directions of this Hon'ble Court.



9.    The Petitioner craves leave to place certain essential facts for the consideration of this Hon'ble Court, which would establish the necessity for initiating contempt proceedings:

a.   On 06.08.2021 at 9:57 AM, Respondent Nos. 3 and 4, accompanied by two other individuals, arrived at

the Petitioner's office premises. Soon thereafter, 14 other individuals also arrived in multiple groups. While the other 16 individuals did not disclose their identity, it is clear that they were acting for and on the instructions of Respondent Nos. 1 and 2 herein. The group also included two videographers.

b.  That while they were entering the business premises of the Petitioner firm through the gate, the security guard posted at the gate inquired regarding their identity and the purpose of their visit. However, the said individuals forcefully barged into the Petitioner's office premises, instead of allowing the security personnel to communicate with the management.

c.  That on the unauthorized entry of the aforesaid individuals into the business premises of the Petitioner, the General Manager of the Petitioner firm, Sh. Rakesh Jain, inquired about their identity as well as their purpose of visit. It was at this stage that Respondent Nos. 3 and 4 identified themselves and handed over   copy of the order dated 30.07.2021 as passed in SB CW No. 9384/2021 by this Hon'ble Court.

d. The aforesaid Order of this Hon'ble Court was perused by Sh. Rakesh Jain and the same was communicated to the Petitioner's local advocate for his advice. Based on legal advice received, Sh. Rakesh Jain orally informed the learned court commissioners (Respondent Nos. 3 and 4) that:

    i. The aforesaid order dated 30.07.2021 pertained to an entity by the name of M/s Arcgate Teleservices Pvt. Ltd. The premises in question, however, was the premises of a separate and distinct entity by the name of M/s Arcgate, which is a partnership firm.

    ii. The premises which the commissioners were authorized to visit by the High Court G1-10 I.T. Park, Madri Industrial Area, Udaipur. However, the premises where the commissioners had presented themselves was G1-11, I.T. Park, Madri Industrial Area, Udaipur (not G1-10).



    iii. The learned commissioners were also duly informed that, according to information available with Mr. Jain, and as per his knowledge, M/s Arcgate Teleservices Pvt. Ltd., the party arrayed as Respondent in the

captioned proceedings, had been struck from the register of companies and dissolved by the Registrar of Companies, Jaipur vide Section 248(5) of the Companies Act, 2013 and Rule 9 of the Companies (Removal of Names of Companies from the Register of Companies) Rules, 2016.

e. Sh. Rakesh Jain, while making this information known, also endorsed receipt of the said Order in writing (provided to the local commissioners), while clarifying the position in the said endorsement that he was acting for M/s Arcgate (which was not the Respondent before the High Court).

f. However, this information did not cause the local commissioners and the accompanying individuals to desist.



g. Subsequently, Respondent Nos. 3 and 4 demanded documentation in order to verify the facts regarding the Petitioner partnership. They demanded the property papers of the premises as also the GST registration documents of the Petitioner firm. Despite not being bound to do so, Sh. Rakesh Jain handed over these papers.



True copies of property papers of the premises as also the GST registration documents of the Petitioner firm, which were also handed over to Respondent Nos 3 and 4, are annexed herewith as **Annexure- C/2 (collectively).**

In addition, the certificate of registration of the Petitioner firm was also handed over to Respondent Nos. 3 and 4.

h. Despite having verified the facts and documents, and despite being presented with evidence showing that they were at the premises of a different and distinct entity from the party Respondent in SB CW No. 9384/2021, Respondent Nos. 3 and 4 and the accompanying group of individuals did not desist. They continued to unlawfully intrude into four floors of the Petitioner's premises, including server rooms, operation areas, security rooms, rooms occupied by security staff etc. The said individuals chose not only to misbehave with the employees who were working in the office premises of the Petitioner firm but also proceeded to harass them, telling them that they were working for an organization which was a "thief". In one instance, they walked into a security room, picked up an envelope belonging to an employee sent by the employee's bankers, and tore open this envelope,



14

without any reason or authority whatsoever. The security cameras of the Petitioner contains the relevant footage, and the Petitioner seeks leave to place the same before this Hon'ble Court at the appropriate stage, if so required.

i. Respondent Nos. 3 and 4, and the accompanying individuals (acting for Respondent Nos. 1 and 2) also proceeded to forcefully inspect and access computer systems and the data in such systems. They continued the forced videography at the office premises of the Petitioner despite repeated requests by the Petitioner's representatives to respect privacy norms, which are critical in light of the Petitioner's confidentiality obligations qua its international clients. Such acts continued unabated despite the fact that the very presence of these individuals at the Petitioner's premises was without authority of law. It must be clarified that even qua the Respondent in the captioned writ proceedings, the powers given to the local commissioners was limited to entry, certain limited investigation, inventory, seizure etc. with reference to certain "infringing photographs" alleged to be in the possession of the Respondent in the writ proceedings. There was no direction regarding recording or videography.

j. In any event, it is clear that the fishing exercise conducted by the Respondents bore no fruit. Nothing "infringing" (either photographs or otherwise) was found. No inventory was made, nor was there any seizure. However, the Respondents insisted on accessing multiple computer systems and demanded to see various files, all while carrying out video-recordings. The intent appeared to be to capture confidential, private information on video, contrary to law.

k. Unfortunately, the Respondent Nos. 3 and 4, and the accompanying individuals (who were clearly present at the instructions of the Respondent Nos. 1 and 2), acted as if they were imbued with unbridled and uncanalised powers, despite the specific and circumscribed nature of the Order of this Hon'ble Court.



l. As the Respondents refused to desist even on being told the correct position orally, and also on being presented with documents showing that the premises belonged to the Petitioner herein, the Petitioner was constrained to serve upon the court commissioners a letter dated 06.08.2021, intimating them that the office premises which they were inspecting belonged to the Petitioner





37

आज दिनांक 9 माह September सन् 2009 को 15:27 बजे
श्री / श्रीमती / कुमारी DILIP BAGLA पुत्र / पुत्री / प नी श्री M.L. AGAL
उम्र 60 वर्ष, जाति BAGLA व्यवसाय BUSINESS
निवासी 45 AMBAV GARH, UDR
ने मेरे सम्मुख दस्तावेज पंजीयन हेतु प्रस्तुत किया।

हस्ताक्षर प्रस्तुतकर्ता        हस्ताक्षर उप पंजीयक, UDAIPUR-II
(20090°0192)
(Lease deed for local bodies ( Patta))

हस्ताक्षर    फोटो    अंगूठा

उक्त श्री / श्रीमती / कुमारी ( Executant )
1-DILIP BAGLA/M.L. BAGAL
Age:60, Caste-BAGLA
Ocu-BUSINESS
R/O-45 AMBAV GARH, UDR / PAN NO.
ADMPB-0556-D

2-SUSHMA/DILIP JI
Age:54, Caste-BAGLA
Ocu.-BUSINESS
R/O-45 AMBAV GARH, UDR / PAN NO.
ADOPB-9064-C

3-KUNAL/DILIP JI
Age:31, Caste-BAGLA
Ocu.-BUSINESS
R/O-45 AMBAV GARH, UDR / PAN NO.
AJKPB-1457-D

4-DEVYANI/KUNAL JI
Age:29, Caste-BAGLA
Ocu.-BUSINESS
R/O-45 AMBAV GARH, UDR / PAN NO.
ADYPS-5819-C

5-RIICO/MANEGAR
Age:0, Caste-
Ocu.-
R/O-UDR

उप-पंजीयक
उदयपुर-द्वितीय



38

दस्तावर       फोटो       अगूठा

ने लेख्यपत्र Lease deed for local bodies (Patta)
को पढ़ सुन व समझकर निष्पादन करना स्वीकार किया।
प्रतिफल राशी रू0 6498360 /-- पूर्व में / मेरे
समक्ष / में से रू0 6498360 /--पूर्व में --------
यमेरे समक्ष प्राप्त करना स्वीकार किया।

उक्त निष्पादन कर्ता की पहचान
1. श्री / श्रीमती / सुश्री RAKESH JAIN
पुत्र / पुत्री / पत्नी श्री MILAP CHAND उम्र 35 वर्ष
जाति JAIN व्यवसाय SERVICE
निवासी 507 A SEC 4 UDR

2. श्री / श्रीमती / सुश्री MANISH
पुत्र / पुत्री / पत्नी, श्री PREM CHAND उम्र 31 वर्ष
जाति MOGRA व्यवसाय ADVOCATE
निवासी SUBASH NAGAR UDR ने की है जिनके

समस्त हस्ताक्षर एवं अगूठा के निशान मेरे समक्ष दिये गये हैं।

(2009010192)                    उप पंजीयक, UDAIPUR-II
(Lease deed for local bodies (Patta))

39



रसीद नं0 2009010519 दिनांक 09/09/2009
पंजीयन शुल्क रू0 25000/–
प्रतिलिपि शुल्क रू0 200/–
पृष्ठांकन शुल्क रू0 0/–
अन्य शुल्क रू0 0/–
कमी स्टाम्प शुल्क रू0 0/–
कुल योग रू0 25200/–

(2009010192)    उप पंजीयक, UDAIPUR-II
(Lease deed for local bodies (Patta))

धारा 54 के तहत प्रमाण–पत्र

प्रमाणित किया जाता है कि इस विक्रय पत्र
की मालियत रूपये 6198360
मानते हुए इस पत्र देय कमी मुद्रांक
राशि 0 पर कमी पंजीयन शुल्क
रूपये 25000 कुल राशि 25200
जरिये रसीद संख्या 2009010519 दिनांक 09/09/2009
में जमा किये गये है।
अतः दस्तावेज को रु रये 0
के मुद्रांको पर निष्पादित माना जाता है।



(2009010192)    उप पंजीयक, UDAIPUR-II
(Lease deed for local bodies (Patta))

आज दिनांक 09/09/2009 को,
पुस्तक संख्या 1 जिल्द संख्या 366
में पृष्ठ संख्या 32 क्रम संख्या 2009003635 पर
पंजिबद्ध किया गया तथा अतिरिक्त
पुस्तक संख्या 1 जिल्द संख्या 1461
के पृष्ठ संख्या 315 से 324 पर
चस्पा किया गया।

(2009010192)    उप पंजीयक, UDAIPUR-II
(Lease deed for local bodies (Patta))



Annex- C/3

(40)

41, IT Park, MIA (Extn.)          T: +91 77420 52381/82
Jaipur 313003, Rajasthan         E: info@arcgate.com

# ARCGATE

06.08.2021

To,

1. **Mr. Hanuman Sharma,** Advocate
   Udaipur

2. **Mr. Saurabh Kumar,** Senior Director,
   Risk Advisory and Investigation
   FTI Consulting Private Limited

*(Court Commissioner appointed by Hon'ble High Court of Rajasthan)*

**Subject:** Appointment of your good self as the Court Commissioner vide order dated 30.07.2021 passed by the Hon'ble High Court of Rajasthan in *S.B. Civil Writ No. 9384/2021* **(hereinafter referred to as "the order")** for acting as "Court Commissioner" under Order XL Rule 1 or under XXVI Rule 9 CPC.

Sir,

We have been served upon with the order dated 30.07.2021 passed by the Hon'ble High Court in the aforesaid writ petition, wherein you are appointed as the Court Commissioner to inspect the business premises of M/s Arcgate Teleservices (P) Limited having Corporate Identification Number (CIN) U72200RJ2018PTC060838 allegedly situated at G1-10 I.T Park, Madri Industrial Area, Udaipur, Rajasthan-313001.

In this regard, this is to inform you that the Registrar of Companies, Jaipur (ROC) has while exercising their powers under Section 248 of the Companies Act, 2013 has struck off the name and record of the company M/s Arcgate Teleservices (P) Ltd. vide its order dated 23.05.2021 from the record of companies maintained at ROC.

JAS-ANZ
ISO 9001  : 2015
ISO 27001 : 2013
Reg. No. RIS91/9950



G1-11, IT Park, MIA (Extn.)
Udaipur 313003, Rajasthan

T: +91 77420 92381/82
E: info@arcgate.com

# ΛRCGATE

The screenshot from the portal of Ministry of Corporate Affairs (**MCA**) attached herewith.

This is also to inform you that the present premise i.e. G1-11, IT Park, Madri Industrial Area, Udaipur (Rajasthan) belongs to M/s Arcgate, which is partnership firm registered with Registrar Office, Udaipur since 2005. You may kindly take note of the same and not to undertake any coercive measures against M/s Arcgate, a partnership firm, which is operating from the aforesaid premises i.e. G1-11, IT Partk, Udaipur (Raj).

This is for your information. Please act accordingly.

Thanks

Regards,



Rakesh Jain,
General Manager, M/s Arcgate

ISO 9001  : 2015
ISO 27001 : 2013
Reg. No. RIS91/9950



Company Master Data



## Company Master Data

| | |
|---|---|
| CIN | U72200RJ2018PTC060838 |
| Company Name | ARCGATE TELESERVICES PRIVATE LIMITED |
| ROC Code | RoC-Jaipur |
| Registration Number | 060838 |
| Company Category | Company limited by Shares |
| Company SubCategory | Non-govt company |
| Class of Company | Private |
| Authorised Capital(Rs) | 100000 |
| Paid up Capital(Rs) | 100000 |
| Number of Members(Applicable in case of company without Share Capital) | 0 |
| Date of Incorporation | 06/04/2018 |
| Registered Address | G1-10 I.T. PARK MADRI INDUSTRIAL AREA UDAIPUR Udaipur RJ 313001 IN |
| Address other than R/o where all or any books of account and papers are maintained | |
| Email Id | rakesh@arcgate.com |
| Whether Listed or not | Unlisted |
| ACTIVE compliance | |
| Suspended at stock exchange | |
| Date of last AGM | 09/10/2020 |
| Date of Balance Sheet | 31/03/2020 |
| Company Status(for efiling) | Strike Off |

### Charges

| Assets under charge | Charge Amount | Date of Creation | Date of Modification | Status |
|---|---|---|---|---|
| No Charges Exists for Company/LLP | | | | |

### Directors/Signatory Details

| DIN/PAN | Name | Begin date | End date | Surrendered DIN |
|---|---|---|---|---|
| 08104682 | KUNAL BAGLA | 06/04/2018 | - | |
| 08104723 | DEVYANI KUNAL BAGLA | 06/04/2018 | - | |





Annex-4   (43)

## HIGH COURT OF JUDICATURE FOR RAJASTHAN AT JODHPUR

S.B. Civil Writ Petition No. 9384/2021

1.  Costar Group Inc., A Corporation Registered Under The Law Of The State Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America.

2.  Costar Realty Information, Inc., A Corporation Registered Under The Laws Of The State Of Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America Through Power Of Attorney Holder Bharat Madakan Having My Office At Samridhi Bangolow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depo Charkop Kandivali ()W) Mumbai - 400047.

----Petitioners

Versus

Arcgate Teleservices Private Limited, A Company Incorporated Under The Companies Act, 2013 Having Its Registered Office At G1-10 I.t. Park, Madri Industrial Area, Udaipur, Rajasthan 313001.

----Respondent

| For Petitioner(s) | : | Mr M.S.Singhvi, Sr. Advocate assisted by Mr Muktesh Maheshwari<br>Mr Faraz Sagar<br>Mr Hiren Kamod<br>Mr Aidan Choudhary<br>Ms Simran Agarwal |
|---|---|---|
| For Respondent(s) | : | |

## HON'BLE MR. JUSTICE VIJAY BISHNOI

### Order

**30/07/2021**

This writ petition is filed by the petitioners being aggrieved with the order dated 06.04.2021 passed by Judge, Commercial Court, Udaipur (for short 'the trial court' hereinafter) in C.I.S. No.06/2021, whereby the application preferred on behalf



(2 of 11)          [CW-9384/2021]

of the petitioners for *ex parte* appointment of Court Commissioner as per the provisions of Order XXVI Rule 9 of the Code of Civil Procedure, 1908 (for short 'CPC' hereinafter) has been dismissed.

The petitioners filed a suit for injunction against the respondent – Arcgate Teleservices Private Limited before the trial court, which is pending consideration. Along with the said suit, the petitioners also preferred an application under Order XXVI Rule 9 CPC seeking ex parte appointment of Court Commissioner.

As per the petitioners, petitioner No.1 is a company incorporated under the laws of the State of Delaware in the United States of America and petitioner No.2 is a wholly owned subsidiary of petitioner No.1. It is claimed that the petitioners are leading provider of commercial real estate information, analytics and online marketplaces in the United States of America and they have developed the most comprehensive database of commercial real estate in the world.

It is also claimed that the petitioners are touching average 24,000 brokers, owners, developers and other real estate professionals daily through phone calls canvassing a half million properties per year and are taking nearly one million photographs annually.

It is contended by the petitioners that website 'LoopNet' (available at http://www.loopnet.com) is the foremost digital marketplace for commercial real estate in the United States and it contains petitioners' copyrighted photographs and data from its database. Every day, buyers, sellers, lessors, lessees, owners and brokers access and use LoopNet to list, buy, sell, lease, rent or browse commercial real estate.

(45)

(3 of 11)          [CW-9384/2021]

It is further contended by the petitioners that one of the current competitors of the petitioners in the United States of America is Commercial Real Estate Exchange, Inc. (CREXi). CREXi is a company incorporated in the State of California in the United States of America and as per its website, it describes itself as a commercial real estate marketplace that simplifies transactions for brokers with a suite of easy to use tools to manage the entire process from listing to closing. CREXi's website allows to use commercial real estate listings in markets across the United State of America. CREXi also runs an online auction marketplace.

It is further contended by the petitioners that the CREXi has raised a significant amount of funding recently and is competing with the petitioners. It is alleged that CREXi is attempting to build its own online commercial real estate marketplace and auction platform by free riding on petitioners' billions of dollars of investments and its three decades of hard work. It is also alleged that CREXi has accessed the petitioners' database and LoopNet more than a million times and forced the petitioners to file a lawsuit against it in the United States District Court for the Central District of California in the month of September, 2020. In the lawsuit, the petitioners have alleged that CREXi is involved in copyright infringement, violation of United States Digital Millennium Copyright Act, misappropriation, unfair competition, false advertising and breach of contract. In the very lawsuit, it is alleged that the respondent – Arcgate Teleservices Private Limited is working for CREXi and is accessing LoopNet without authorization for competitive purposes on behalf of CREXi in violation of LoopNet's terms and conditions, committing contributory infringement of the petitioners' copyrighted

(4 of 11)          [CW-9384/2021]

photographs and engaging in piracy/theft, improper access to petitioners' websites and misappropriation of the petitioners' proprietary contents at the behest of CREXi.

It is contended that in the lawsuit filed by the petitioners against the CREXi, it has not denied or disclaimed that the respondent - Arcgate Teleservices Private Limited is accessing LoopNet on behalf of CREXi.  The petitioners have placed on record certain documents before the trial court in support of their allegations that respondent - Arcgate Teleservices Private Limited is working on behalf of CREXi and is illegally accessing the LoopNet and transferring the data of the petitioners – company to CREXi.

The petitioners, by way of an application preferred under Order XXVI Rule 9   CPC before the trial court, sought *ex parte* appointment of a Court Commissioner, which came to be rejected by the trial court vide impugned order.   Hence, this writ petition.

Learned counsel for the petitioners has argued that the learned trial court grossly erred in rejecting the application filed by the petitioners for *ex parte* appointment of Court Commissioner. It is further submitted that the trial court failed to appreciate that granting of ad interim relief is necessary in the present case.

It is argued that the trial court erred in holding that for the appointment of *ex parte* Court Commissioner, it is insufficient to show that it is possible that the respondent committed the said act of copyright infringement, rather, there must be concrete evidence that the said act of infringement has been committed by the respondent. It is submitted that at the *ex parte* ad interim stage, the petitioners were required to make out a strong prima

facie case and the petitioners have produced ample evidence on record that there is possibility that the respondent has committed the said act of copyright infringement.

Learned counsel for the petitioners has further submitted that the petitioners have adduced significant evidence of respondent's wrongdoings including evidence that the respondent is working on behalf of the petitioners' competitor – CREXi and is regularly accessing the petitioners' LoopNet website on behalf of the CREXi without authorization and in breach of petitioners' binding terms and as such committed contributory infringement of petitioners' copyrighted photographs and engaging in piracy/theft and misappropriation of petitioners' proprietary content.

Learned counsel for the petitioners has further submitted that the trial court has failed to appreciate that in intellectual property matters, a party is subjected to strict proof of infringement because at the initial stage, it cannot be expected from a party to have full fledged evidence of infringement.

It is further submitted that in case of involving technology/software/internet activity, it is impossible for a party to completely understand the nature of activity of a wrongdoer unless the evidence from its systems and files is taken into custody and preserved for trial.

Learned counsel for the petitioners has further submitted that the trial court has failed to consider the ratio in various judgments relied upon by the petitioners, where in one of the judgments, the Delhi High Court has laid down the principles regarding appointment of *ex parte* Court Commissioner in similar type of cases.

(48)

(6 of 11)          [CW-9384/2021]

Learned counsel for the petitioners has also submitted that though the petitioners were successful in making out a *prima facie* case before the trial court but it has illegally rejected the application filed by the petitioners for appointment of *ex parte* appointment of Court Commissioner.

In support of the above contentions, learned counsel for the petitioners has mainly placed reliance on a decision of Delhi High Court in **Autodesk Inc and Anr. vs. Mr. A.V.T. Shankardass and Anr.,** reported in **AIR 2008 Delhi 167.**

Heard learned counsel for the petitioners.

The learned trial court has rejected the application filed on behalf of the petitioners for *ex parte* appointment of Court Commissioner while observing that a Court Commissioner appointed by it would not be qualified to retrieve and preserve the relevant evidence or recover data, which might have been deleted. The trial court has also observed that only the police have means to recover any deleted data. The trial court is further of the opinion that mere existence of photographs on servers is not concrete proof of copyright infringement and sufficient to warrant seizing and preserving of evidence at this stage. The trial court is not convinced that FTI Consulting India Private Limited can act as a Commissioner as its capability cannot be determined on the basis of an application and on asking of the petitioners.

From perusal of the impugned order dated 06.04.2021, it appears that the trial court is of the view that the Court Commissioner cannot be appointed for the purpose of collecting evidence for the plaintiff.

Ultimately, the trial court has held that the petitioners have failed to provide sufficient proof to establish the fact that

(7 of 11)          [CW-9384/2021]

some  photographs  are  accessed  by  the  respondent-Arcgate
Teleservices  Private  Limited  from  the  petitioners'   website  on
behalf of the CREXi and thereafter transferred to it. The trial court
has  observed  that  until  and  unless  this  fact  is  established,  it
cannot be used as a tool to connect the missing link.

The Delhi High Court in **Autodesk Inc and Anr. vs.
Mr. A.V.T. Shankardass and Anr.** (supra) laid down certain
guidelines for appointment of a Court Commissioner in software
infringement and piracy. The relevant portion of the judgment
reads as under:

24. Coming now to the question of guidelines to be set,
we have heard both the counsel for the parties. We are
conscious of the fact that it is neither feasible nor
practical to lay down guidelines, which would cater to
numerous and all the situations that may arise. However,
some of the following relevant factors and guidelines are
being  enumerated  which  the  Court  may  take  into
consideration on the question of appointment of a Local
Commissioner  in  software  infringement  and  piracy
matters:

(i) The object of appointment of a Local Commissioner in
software  piracy  matters  is  not,  as  much  to  collect
evidence but to preserve and protect the infringing
evidence. The pirated software or incriminating evidence
can only be obtained from the premises of the opposite
party  alone  and  in  the  absence  of  an  ex  parte
appointment of a Local Commissioner there is likelihood
that such evidence may be lost, removed or destroyed;

(ii)  Request  for  ex  parte  appointment  of  a  Local
Commissioner in such matters is usual and in fact is
intended  to  sub  serve  the  ends  of  justice  as  it  is
imperative to have an element of surprise so that the
actual position is not altered;

(iii)  The  test  of  reasonable  and  credible  information
regarding  the  existence  of  pirated  software  or
incriminating evidence should not be subjected to strict
proof or the requirement to demonstrate or produce part
of  the  pirated  software/incriminating  evidence  at  the
initial stage itself. It has to be tested on the touchstone
of pragmatism and the natural and normal course of
conduct       and       practice       in       trade.

(iv) It may not always be possible for a plaintiff to obtain
any  admission  by  employing  decoy  customers  and

(8 of 11)          [CW-9384/2021]

50

gaining access to the defendant's premises. Any such attempt also inheres in it the possibility of dis-appearance of the pirated software/incriminating evidence in case the decoy customers is exposed. Accordingly, visit by decoy customer or investigator is not to be insisted upon as pre condition. A report of private Investigator need not be dis-regarded or rejected simply because of his engagement by the plaintiff. The information provided by the private Investigator should receive objective evaluation.

(v) In cases where certain and definite information with regard to the existence of pirated software or incriminating evidence is not available or where the Court may nurture some element of doubt, it may consider asking the plaintiff to deposit cost in Court so that in case pirated software or incriminating evidence is not found then the defendant can be suitably compensated for the obtrusion in his work or privacy."

*(Emphasis supplied)*

I am perfectly in agreement with the view of the Delhi High Court that the object of appointment of a Local Commissioner in software piracy matters is not, as much to collect evidence but to preserve and protect the infringing evidence and strict proof is not required to be given at initial stage.

The petitioners, along with an application for appointment of Local Commissioner, has placed on record certain documentary evidence in support of their claim that the respondent is illegally accessing LoopNet's website containing copyright photographs and database of the petitioners at the instance of CREXi and is transferring to it unauthorisedly.

After examining the said documentary evidence, which is also annexed with this writ petition, I am of the view that the petitioners are able to prima facie prove that the respondent has illegally accessed the copyright photographs and database of the petitioners – company from its website and

[CW-9384/2021]          

might have transferred it to the CREXi, which used the said copyright photographs and database for its profit.

In view of the above discussion, I am of the view that the trial court has erred in not appointing the *ex parte* Court Commissioner in the matter in hand.

Before the trial court, two applications were moved, one on behalf of Shri Hanuman Sharma, Advocate, who offered himself to work as Court Commissioner and another by Shri Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited, who offered his services as Commissioner/Computer Expert.

Taking into consideration the overall facts and circumstances of the case, I find it a fit case for appointing *ex parte* Court Commissioners and the following directions are issued:

(1)   Issue notice of this writ petition to the sole respondent. Notices are made returnable on 6th September, 2021.

(2)   The petitioners shall deposit cost of Rs.10,00,000/- (Rupees ten lac) with the trial court within one week from today, so that in case incriminating evidence is not found, then the defendant can suitably be compensated for obstruction in its work.

(3)   Mr Hanuman Sharma, Advocate, Udaipur and Mr Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited are appointed as Court Commissioners. They shall serve a copy of this order to the respondent before starting commission. They will have all the powers under Order XL Rule 1 or under XXVI Rule 9 CPC in

52

order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the respondent's premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan – 313 001 or any other premises owned or occupied by respondent any time of the day or night without notice to the respondent and with the help of the representative of the petitioners and police. The Court Commissioners - Mr Hanuman Sharma, Advocate and Mr Saurabh Kumar shall make inventory and seize, take possession, custody and control of the petitioners infringing photographs, along with all the respondent's material, printed matter, communication, invoices, records, relevant passwords and passcodes, and such material and documents relating to infringing photographs owned by the petitioners including such material stored electronically on any systems. They shall also make inventory and take a mirror copy of the entire electronic data of the respondent stored on the computer systems, data storage devices, handled devices, hard disks, pen drives, computer records, cloud-based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of the respondent (which may be belonging to the respondent or on lease) and shall submit the said mirror copy to the trial court in a sealed envelope along with a report within a month.

The respondent is directed to co-operate and provide all assistance to the Court Commissioners but without limitation to providing access.



(11 of 11)          [CW-9384/2021]

The fees of the Court Commissioners shall be paid by the petitioners as per agreement between the petitioners and the Court Commissioners.

List on 06.09.2021.

**(VIJAY BISHNOI),J**

masif/-PS



# EXHIBIT D

## IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

## AT JODHPUR

D.B. CRIMINAL CONTEMPT PETITION NO. _____2_____ 2021

IN

S.B. CIVIL WRIT PETITION NO. 9384 / 2021

| PETITIONERS:-*Versus* | CONTEMNORS: |
|---|---|
| CoStar Group, Inc & Anr. | Arcgate Teleservices Pvt. Ltd. & Ors. |

### INDEX

| S.NO. | PARTICULAR | PG NO |
|---|---|---|
| 1. | Criminal Contempt Petition | 1 - 27 |
| 2. | Affidavit in support of Contempt Petition | 28 |
| 3. | Affidavit in support of Documents. | 29 |

**DOCUMENTS:**

| Annex. 1 | A copy of the said Order dated 30 July 2021 | 30 - 40 |
|---|---|---|
| Annex. 2 | A copy of the Commissioners' report dated 9 August 2021and the relevant video recordings and photographs from the day of the commission | 41 - 92 |

COUNSEL FOR THE PETITIONER

# IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

## AT JODHPUR

D.B.  CRIMINAL CONTEMPT PETITION NO. ___2___ 2021

IN

S.B.  CIVIL WRIT PETITION NO.  9384 / 2021

**PETITIONERS:-**

1.   **CoStar Group, Inc.**

     A corporation registered under the laws of the          )
     State of Delaware and having its principal place        )
     of business at 1331 L Street, NW,
                                                              )
     Washington, District of Columbia 20005, United
     States of America                                       )

2.   **CoStar Realty Information, Inc.**

     A corporation registered under the laws of the          )
     State of Delaware and having its principal place        )
     of business at 1331 L Street, NW,
                                                              )
     Washington, District of Columbia 20005, United
     States of America                                       )

                          VERSUS                             )

**CONTEMNORS:-**

1.   **Arcgate Teleservices Private Limited**        ·       )

     A company incorporated under the Companies )
     Act, 2013 having its registered Office at G1-10         )
     I.T.  Park, Madri Industrial Area, Udaipur,
     Rajasthan: 313001 ...  **Contemnor No. 1**              )

2.   **M/s Arcgate**                                          )

A partnership having its registered Office at G- )
9/10/11 I.T. Park, Madri Industrial Area, )
Udaipur, Rajasthan: 313001.... **Contemnor**
**No. 2**


3.   **Mr. Rakesh Jain**                                     )

General Manager, Arcgate, having office at G- )
9/10/11 I.T. Park, Madri Industrial Area,
Udaipur, Rajasthan: 313001.:. **Contemnor**
**No. 3**


4.   **Manish Choudhari, Arcgate**                           )

IT Head, Arcgate, having office at G-9/10/11 )
I.T. Park, Madri Industrial Area, Udaipur,
Rajasthan: 313001...**Contemnor No. 4**


5.   **Dilip Bagla**                                         )

Partner, Arcgate, having office at G-9/10/11 )
I.T. Park, Madri Industrial Area, Udaipur,
Rajasthan: 313001 ...**Contemnor No. 5**


6.   **Sushma Bagla (W/o Dilip Bagla)**                      )

Partner Arcgate, having office at G-9/10/11 )
I.T. Park, Madri Industrial Area, Udaipur,
Rajasthan: 313001...**Contemnor No. 6**

7.  **Kunal Bagla  (S/o Dilip Bagla)**                    )

Partner Arcgate, having office at G-9/10/11  )

I.T.   Park, Madri Industrial Area, Udaipur,

Rajasthan: 313001...**Contemnor No. 7**


8.  **Devyani Kunal Bagla  (W/o Kunal Bagla)**          )

Partner, Arcgate, having office at G-9/10/11      )

I.T.  Park, Madri Industrial Area, Udaipur,

Rajasthan: 313001...**Contemnor No. 8**


\*\*\*

**CRIMINAL CONTEMPT PETITION UNDER SECTION
12 READ WITH SECTION 2(C) OF THE
CONTEMPTOF COURTS ACT, 1971 FOR WILLFULL
AND DELIBERATE OBSTRUCTION OF JUSTICE AND
WILLFUL DISOBEDIENCE OF THE ORDER DATED
30.07.2021 PASSED BY THIS HON'BLE COURT IN S.
B. CIVIL WRIT PETITION NO. 9384 / 2021 TITLED
AS COSTAR GROUP INC. VS ARCGATE
TELESERVICES PRIVATE LIMITED**

\*\*\*\*

To,

The Hon'ble Chief Justice, and his companion Judges of the High
Court of Judicature for Rajasthan at Jodhpur.

MAY IT PLEASE YOUR LORDSHIPS;

      On behalf of the petitioner, it is most respectfully submitted as under:

INTRODUCTION:

1      Petitioner No. 1 ("**CoStar Group**") is a company incorporated under the laws of the state of Delaware in the United States of America, having its principal place of business at the address mentioned in the cause title. Petitioner No. 2 ("**CoStar Realty**") is a wholly owned subsidiary of Petitioner No. 1 having its principal place of business at the address mentioned in the cause title. Together, the Petitioners will be referred to herein as "**CoStar.**"

2.      ContemnorNo.1 ("**Arcgate Teleservices**") is a company incorporated under the Companies Act, 2013 having its registered office at the address mentioned in the cause title. Contemnor No.1 is *inter alia* engaged in the business of providing information technology services including data collection & cleansing, data enrichment and content moderation. The Contemnor company had a presence in the United States of America through Arcgate LLC, which was incorporated in Austin, Texas.

3.      ContemnorNo. 2 ("**Arcgate**") is a partnership firm incorporated in India in 2005, having its registered place of business at G-1-11 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan: 313001. The Partners of Arcgate compriseDilip Bagla, Sushma Bagla, Kunal Bagla and Devyani Bagla ("**the Bagla Family**") and are arraigned as Contemnor Nos 5,6,7 and 8 respectively.

4.      Separately, Contemnor No. 3is the Manager of Arcgate / Arcgate Teleservicesand Contemnor No. 4 is the employee (I.T- Head) of Arcgate / Arcgate Teleservices.

5.      The captioned writ petitionwas instituted by the Petitioners, challenging the order dated 6 April 2021 passed by the Commercial Court at Udaipur. Vide the order dated 6 April 2021, the Commercial Court at Udaipurrejected the application filed by the Petitioner seekingthe ex-parte appointment of a court commissioner to preserve the

incriminating evidence present in the systems or at the premises of Contemnor No. 1 particularly in respect of the acts of contributory copyright infringement, piracy/theft, improper access to CoStar websites and misappropriation of content from CoStar, including content generated, gathered, enhanced, updated, and curated by CoStar (**"CoStar proprietary content"**).

6. This Hon'ble Court vide its Order dated 30 July 2021 (**"said Order"**) appointed. Mr. Hanuman Sharma, Advocate and Mr. Saurabh Kumar (**"Commissioners"**), as the Court Commissioner with all powers as provided in Order XL Rule 1 or XXVI Rule 9 of the Code of Civil Procedure, 1908. The Commissioners attempted to execute the commission at G1-11, I.T. Park, Madri Industrial Area, Udaipur, Rajasthan (**"Premises"**), the premises of Arcgate / Arcgate Teleservices on 6 August 2021. That attempt was thwarted by the Contemnors and associated persons willfully and intentionally. Indeed, the Commissioners themselves reported that Contemnor No. 1, Arcgate Teleservices *"and the persons owning and directing [Arcgate Teleservices], tried to circumvent the execution of this commission and the directions passed in the said Order."* A copy of the said Order dated 30 July 2021 is annexed as **Annexure–1**

7. The report filed by the Commissioners as well as the events that unfolded in the Premises on 6 August 2021 form the basis of this Petition. The Petitioners have filed a Suit against Contemnor No. 1, Arcgate Teleservices, before the Commercial Court, Udaipur wherein Contemnor Nos. 2 to 8 are not parties. Contemnors Nos. 2 to 8 are also not parties to the present Writ Petition filed by the Petitioners. However in the facts and circumstances of the present case, they are clearly liable for contempt of Court as they have willfully, knowingly and intentionally obstructed the implementation of the said Order passed by this Hon'ble Court and have interfered with the administration of justice. The Petitioners reserve their right to make these Contemnors parties to the Suit proceedings, if so advised.

8.  Despite the clear directions of this Hon'ble Court appointing the Commissioners and setting forth the powers of the Commissioners regarding the execution of the commission, Contemnor Nos. 1 to 8 chose to ignore and violate this Hon'ble Court's directions and acted in complete defiance, disregard, and in violation of the said Order. The Petitioners hereby prefers this Petition before this Hon'ble Court praying that the Contemnors be held to be in criminal contempt and be punished as per law.

9.  It is pertinent to note that the commission was obstructed by Contemnors, and prevented from being executed, on the grounds that Contemnor No. 1 / Arcgate Teleservices was no longer in existence and that the Premises, now belonged solely to Contemnor No. 2 / Arcgate.

### Contemnor No. 1 and Contemnor No. 2 are intertwined

10. It is pertinent to note that both Arcgate Teleservices (Contemnor No. 1) and Arcgate (Contemnor No. 2) are owned and controlled by the same family, the Baglas. Two of the Directors of Contemnor No. 1 are also the only partners of Contemnor No. 2. Arcgate and Arcgate Teleservices also occupy common premises. Arcgate's registered Office is G-1-9/10/11 I.T. Park, Madri Industrial Area, Udaipur. Arcgate Teleservices' registered Office is G-1-10 I.T. Park, Madri Industrial Area, Udaipur. As reported by the Commissioners, the only difference in the address is that the premises of Arcgate has an extra unit called Unit 11. There is a false division between Unit 10 and Unit 11, and they comprise the same premises and are practically the same area, with the same entry gate.

11. Both companies also use the same Internet and email domain, arcgate.com. According to the Ministry of Corporate Affairs, the email ID for Arcgate Teleservices is "rakesh@arcgate.com," and Arcgate advertises its services on www.arcgate.com. Both entities are also managed by the same person, Rakesh Jain. He is admittedly, the General Manager of Arcgate (and holds himself out to be on LinkedIn). And as noted above, he is listed by the Ministry of Corporate Affairs

as the contact person for Arcgate Teleservices. The Commissioners also found on the Premises evidence of work relating to Petitioner's competitor, Commercial Real Estate Exchange, Inc. ("CREXi"). As this Hon'ble Court is aware, Petitioners have alleged, and this Hon'ble Court has concluded that there is prima facie proof, that this work is unlawful.

*Contemnors' efforts to circumvent the Order of the Hon'ble Rajasthan High Court dated July 30, 2021*

12. Thus, there is no question that Arcgate and Arcgate Teleservices are intertwined, and that there is relevant evidence on the premises. Indeed, while Arcgate / Arcgate Teleservices has complained about the attempted execution of the Commission, they do not deny that they access Petitioners' website on behalf of Petitioner's competitor, CREXi. They do not deny copying content (other than images) from that website to provide to the Petitioners' competitor. They do not deny using methods to circumvent the Petitioners' website security. They do not deny that their access and copying is in violation of the applicable website terms of use. They do not deny that another BPO (Maxval) undertaking the same conduct for another of Petitioners' competitors was enjoined from doing so by the Court of District Judge at Thane, Mumbai.

13. **Instead, Arcgate and Arcgate Teleservices are relying on a manufactured excuse to evade the said Order issued by this Hon'ble Court, and thereby willfully acting in contempt.** Shortly after Petitioners first sought a commission and filed Suit No. 29 of 2021 with the Commercial Court, Udaipur on 9 March 2021, to preserve the evidence in the possession of Arcgate Teleservices, a company that had been in existence for years, Arcgate Teleservices applied to be struck off on April 2, 2021. The fact that this was a subterfuge designed to hide evidence, is underscored by what happened when the Commissioners tried to execute the commission set forth in the said Order issued by this Hon'ble Court. The moment the Commissioners attempted to execute the Commission, Contemnor No. 3, the General Manager of Arcgate (and Arcgate Teleservices),

without even reading the said Order, immediately argued that it was inapplicable on the grounds that the Arcgate / Arcgate Teleservices common registered Premises now belonged solely to Contemnor No. 2 (Arcgate) and not Contemnor No. 1 (Arcgate Teleservices), because Contemnor No. 1 (Arcgate Teleservices) had been struck off.

14.   **According to the Commissioners, there were multiple other efforts to frustrate the execution of the Commission**. Contemnor No. 3 called the police, who left after reading the said Order and concluding that the Commissioners had the right to execute the Commission. As detailed below, the Commissioners were given contradictory information by Arcgate IT employees about whether key Arcgate data (network logs) had been destroyed, or whether backup copies had been maintained. The Commissioners were able to review one computer folder that indicated that work for CREXi was being done on the Premises, but that effort was interrupted by Kuldeep Tank, an Advocate for Respondent, Arcgate, who verbally harassed the Commissioners and instructed security guards to eject them and their team. Ultimately the Commissioners were forced by Arcgate to leave the Premises because they feared for their physical safety.

15.   There can be no question that the Contemnors have conspired to evade the said Order issued by this Hon'ble Court and obstruct the execution of the said Order with full planning, deliberation and malafide intention. Contemnor No. 1 (Arcgate Teleservices) was struck off as a key part of this scheme. Mr. Kuldeep Tank, the advocate representing Contemnor No. 1 / Contemnor No. 2, and Contemnor No. 3, the General Manager of Contemnor No. 1 / Contemnor No. 2, took actions to block the execution of the Commission. Contemnor No. 4, also on behalf of Contemnor No. 1 / Contemnor No. 2, did likewise, and provided contradictory information to the Commissioners. Contemnor Nos. 5–8 are the Partners of Arcgate (Contemnor No. 2) and they are in charge and

control of both Aregate and Aregate Teleservices (Contemnor No. 2 and Contemnor No. 1). Contemnor Nos. 7 and 8 were Directors of Aregate Teleservices (Contemnor No. 1).

16.   The multiple actions to block the Commission were undertaken by the Contemnors. As detailed below, the record reflects that the *modus operandi* used by Contemnor No. 1 / Contemnor No. 2 involves (i) accessing the Petitioners' LoopNet.com website ("**LoopNet**") (available at http://www.loopnet.com) without authorization for competitive purposes on behalf of the Petitioners' competitor, CREXi, and in violation of LoopNet's Terms and Conditions, (ii) copying the Petitioners' copyrighted photographs and other data available on LoopNet and (iii) transferring such copied photographs and other data to the Petitioners' competitor for publication and use in its rival products. As noted above, none of these facts are disputed, other than an argument by Aregate, not substantiated, that the copying has been limited to data as opposed to images. There is also no dispute that the access and copying of content from LoopNet by another Indian BPO was the activity that was enjoined as unlawful by the Court of District Judge at Thane, Mumbai in the Maxval case. The acts of Contemnor No. 1 / Contemnor No. 2 and persons working for them are criminal in nature since they are in violation of Copyright Act, 1957, Information Technology Act, 2000, Indian Penal Code, 1882 for which CoStar reserves its right to initiate appropriate proceedings.

## FACTUAL BACKGROUND :

## CoStar, Its Products and Services, and the Steps It Takes to Protect Its Intellectual Property, Including Prior Litigation in India

17.   CoStar is a leading provider of commercial real estate information, analytics, and online marketplaces in the United States of America. As a result of these employees' diligent efforts—and the investment of over USD 5 billion over the last three decades—CoStar has developed the most comprehensive database of commercial real estate in the world, which includes painstakingly-researched and verified data about commercial real estate properties and transactions, integrated with millions of CoStar's copyrighted photographs.

18. CoStar owns and maintains a number of marketplaces containing listings of real estate for sale and for lease. LoopNet is the foremost digital marketplace for commercial real estate in the United States. LoopNet provides information on more than 650,000 for-lease and for-sale listings at any point in time and is one of CoStar's biggest revenue generators. Real estate listings on LoopNet contain CoStar copyrighted photographs and data from the CoStar database. Every day, buyers, sellers, lessors, lessees, owners, and brokers access and use LoopNet to list, buy, sell, lease, rent, or browse commercial real estate.

19. LoopNet, like CoStar's other marketplaces, leverages CoStar's vast commercial real estate database to help build and enhance property listings. For instance, if a broker or property owner wants to market a listing on LoopNet relating to a property that is in CoStar's database, he or she can, and typically does, populate the LoopNet listing with CoStar's copyrighted photographs and with a variety of data that CoStar has added to the database through its various research efforts. The curation process involves reviewing, editing, and populating multiple data fields, including with data from the CoStar database. For other listings on LoopNet, a marketing researcher will likewise conduct a curation of the listing and may also help generate or revise a narrative property description to increase marketability.

20. CoStar protects its content in three primary ways. First, as discussed above, CoStar registers its copyrighted photographs with the United States Copyright Office. Second, users must assent to CoStar's contractually binding terms in order to use CoStar products, including both the CoStar subscription database and LoopNet. Third, CoStar protects its content by employing state-of-the-art anti-piracy technology.

**CREXi, Its Scheme to Steal from CoStar, and Its Use of Contemnor No. 1 / Contemnor No. 2 to Facilitate That Unlawful Conduct**

21. One of CoStar's current competitors in the United States is CREXi. On its website (www.crexi.com), CREXi describes itself as "a commercial real estate marketplace that simplifies transactions for

brokers with a suite of easy-to-use tools to manage the entire process from listing to closing." CREXi's website allows users to view commercial real estate listings in markets across the United States.

22.    CREXi has accessed CoStar's database and LoopNet more than a million times (at least) in breach of binding terms and conditions. Once there, CREXi has copied property listings containing CoStar's copyrighted photographs and listing data. A preliminary review of CREXi's website through 30 July 2020 revealed that more than **ten thousand** of CoStar's copyrighted photographs have been published on CREXi's rival website without authorization. The photographs have been illegally copied and then re-uploaded. The evidence also shows that the Respondent has continued to access LoopNet, even after CoStar filed its complaint against CREXi in September 2020 and as recently as June 2021.

## HARM TO COSTAR

23.    The terms of use applicable to LoopNet preclude persons acting as competitors from accessing the site and copying content for competitive purposes. This prohibition, which is industry standard, is designed to protect CoStar's massive investment in its business. CoStar's right to protect its business have been vindicated in both United States and Indian courts. For example, in a lawsuit that CoStar brought against its competitor Xceligent, the court entered a judgment against Xceligent for damages of USD 50,000 per instance of "misappropriation of CoStar-owned data" based on CoStar's claims that Xceligent improperly accessed and used CoStar's websites and database, on top of, and separate from, a finding of liability and damages for Xceligent's infringement of CoStar's copyrighted images. And in the MaxVal Technologies Pvt. Ltd. ("**MaxVal**") case in India, the Court of District Judge at Thane, Mumbai found that MaxVal had in its possession infringing photographs that were similar to CoStar's copyrighted photographs. It passed an order for appointment a court commissioner (accompanied by a technical expert) to preserve the evidence and make mirrored copies of:

(i) **any related** CoStar data stored on the servers, desktop computers, handheld devices, and other electronic media maintained or utilized by MaxVal;

(ii) **communications existing on such servers, desktop computers, devices or media** between MaxVal and Xceligent regarding the infringement / misappropriation, CoStar and/or its websites and databases;

(iii) the methods by which MaxValgathered photographs and real estate data for the benefit of Xceligent;

(iv) the use of proxies, anonymizers or other methods to circumvent CoStar's antipiracy measures, and/or CoStar's terms of use

(v) the photographs and real estate data sent by MaxVal to Xceligent and information sufficient to show the form in which such data was provided and the way in which such transfer were effected:

(vi) server logs of access by MaxVal to LoopNet and/or the CoStar database, and

(vii) documents sufficient to identify the ISP (s)  used by MaxVal

24. The Court of District Judge at Thane, Mumbai also directed the Court Commissioner and a technical expert to visit the office of MaxVal to obtain and preserve a mirror image of pirated software or data from the CPU, computers etc. of MaxVal. The Court of District Judge at Thane, Mumbai, also restrained MaxVal by an order of temporary injunction from using any CoStar copyrighted photographs in any manner whatsoever, **whether directly or indirectly, and accessing,** downloading, reproducing, publishing, storing and/or using the photographs of CoStar, or any substantial parts thereof, as available on CoStar databases in any manner whatsoever. The Petitioners crave leave to rely on the orders of the Court of District Judge at Thane, Mumbai in the matter of *CoStar Group, Inc. & Ors. v. MaxVal Technologies Pvt. Ltd* dated December 13, 2016.

25.   In addition, by virtue of being the owner of the copyright in the CoStar copyrighted photographs described herein, CoStar Realty has an exclusive right to *inter alia* (i)   reproduce its copyrighted photographs, (ii)   issue copies of such photographs to the public, (iii) make any adaptation of such photographs or (iv)   do such things as provided in Section 14 of the Copyright Act, 1957.   CoStar Realty submits that the reproduction / storing / accessing / downloading / uploading of such photographs by Contemnor No. 1 / Contemnor No. 2 without its permission amounts to infringement of copyright in the said photographs under the provisions of Section 51 of the Copyright Act, 1957.

26.   Based on this brazen conduct, including access to CoStar's websites in violation of the binding terms, and theft of its content, including copyrighted photographs, CoStar has already suffered and is likely to suffer irreparable loss and damage on account of the aforesaid acts of contributory copyright infringement, piracy/theft, improper access to CoStar websites and misappropriation of CoStar proprietary content.

## PROCEEDINGS FILED BY THE PETITIONERS

27.   CoStar filed a Suit bearing No. 29 of 2021 before the Commercial Court, Udaipur on 9 March 2021, and filed an Interim Application for an ex-parte injunction which was numbered as Civil Misc. Application No. 6 of 2021.   CoStar also filed another Interim Application for an ex-parte appointment of Court Receiver / Court Commissioner and a forensic expert to:

(i)   make inventory and seize, take possession, custody and control of the CoStar's **infringing photographs**, along with all the Aregate / Contemnor No.1's material, printed matter, communication, invoices, records, relevant passwords and passcodes, **and such material and documents relating to CoStar's infringing photographs, CoStar proprietary content including such material stored electronically on any system**; and

(ii)    make inventory and take a mirror copy of the **entire electronic data of Aregate / Contemnor No.1 stored on the computer systems**. data storage devices, handheld devices, hard disks, pen drives, computer records, cloud based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of Aregate / Contemnor No.1 (which may be belonging to the Aregate / Contemnor No.1or on lease) and submit the said mirror copy to the Hon'ble Commercial Court, Udaipur in a sealed envelope along with a report.

28.    The Ld. Judge vide order dated 6 April, 2021, rejected the ex-parte appointment of Court Receiver / Court Commissioner prayed by the Petitioners vide Civil Misc. Application No. 6 of 2021, in the Civil Original Suit No. 29 of 2021.

**Order dated 6April 2021 passed by this Hon'ble Court**

29.    The Order dated 6 April 2021 was challenged by the Petitioners in Writ Petition No9384of 2021. This Hon'ble Court vide the said Order passed in the said Writ Petition held as under:

"*Petitioners are able to prima facie prove that the Respondent has illegally accessed the copyright photographs and database of the petitioners – company from its website and might have transferred it to CREXi, which used the said copyright photographs and database for its profit. In view of the above discussion, I am of the view that the trial court has erred in not appointing the ex parte Court Commissioner in the matter in hand.*"

"*Mr. Hanuman Sharma, Advocate, Udaipur and Mr. Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited are appointed as Court Commissioners. They shall serve a copy of this order to the Respondent before starting commission. They will have all the powers under Order XL Rule 1 or under XXVI Rule 9 CPC in order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the Respondent's premises including office situated at G1-10 I.T.*

*Park, Madri Industrial Area, Udaipur, Rajasthan – 313 001 or any other premises owned or occupied by Respondent any time of the day or night without notice to the Respondent and with the help of the representative of the petitioners and police.* The Court Commissioners – Mr Hanuman Sharma, Advocate and Mr Saurabh Kumar shall make inventory and seize, take possession, custody and control of the petitioners infringing photographs, along with all the Respondent's material, printed matter, communication, invoices, records, relevant passwords and passcodes, and such material and documents relating to infringing photographs owned by the petitioners including such material stored electronically on any systems. They shall also make inventory and take a mirror copy of the entire electronic data of the Respondent stored on the computer systems, data storage devices, handled devices, hard disks, pen drives, computer records, cloud-based servers, servers (including any servers maintained at a different location for business continuity purposes, and/or disaster recovery) of the Respondent (which may be belonging to the Respondent or on lease) and shall submit the said mirror copy to the trial court in a sealed envelope along with a report within a month

*The Respondent is directed to co-operate and provide all assistance to the Court Commissioners but without limitation to providing access.*"

## ACT OF CONTEMPT COMMITTED BY THE CONTEMNORS

**Execution of Commission – Commissioners Were Prevented from Carrying Out Execution of the Commission**

30.    Pursuant to the said Order, the Commissioners attempted to execute the commission at the Premises of Contemnor No. 1/Contemnor No. 2 on 6 August 2021. That attempt was thwarted by the Contemnors and other persons.

31.    Despite the clear directions of this Hon'ble Court appointing the Commissioners and setting forth the powers of the Commissioners regarding the execution of the commission, the Contemnors chose to

⑯

ignore and violate this Hon'ble Court's directions and acted in complete disregard and in violation of the said Order.

32.   Firstly, the Contemnors claimed that the Premiseswhich the Commissioners visited, belonged to 'Arcgate' and not Contemnor No. 1 against whom the Suit was filed and the said Order was passed. It seems that Contemnor No. 2 was formed as a partnership in the year 2005. However, a bare perusal of the Commissioners' report and the information provided below demonstrates that this is a subterfuge and sham to prevent the execution of the commission and evade the said Orders of the Hon'ble Court.

33.   The Partners of 'Arcgate' and the Directors of Contemnor No. 1 are the very same persons and it is clear that both entities are family-run by the Bagla Familyi.e.Contemnors No. 5 to 8.

| Partners of M/s ArcGate | Directors of Arcgate Teleservices Pvt. Ltd. |
|---|---|
| Kunal Bagla (S/o Dilip Bagla) | Kunal Bagla (S/o Dilip Bagla) |
| Devyani Kunal Bagla (W/o Kunal Bagla) | Devyani Bagla (W/o Kunal Bagla) |
| Dilip Bagla | -- |
| Sushma Bagla (W/o Dilip Bagla) | -- |

34.   Further, as set forth in the Registration Certificate of Arcgate, a copy of which was provided by employees of Arcgate to the Commissioner, the principal place of business of 'Arcgate' is the same as the registered place of business of Contemnor No. 1 as reflected on the Ministry of Corporate Affairs website.

| Registered place of business of M/s ArcGate | Registered Address of Arcgate Teleservices Pvt. Ltd. |
|---|---|
| G-1/11 I.T. Park, MIA (Extn) Udaipur Rajasthan — 313001 | G-1/10 I.T. Park, MIA (Extn) Udaipur Rajasthan — 313001 |

35. The only difference in the address is that the premises of Arcgate has an extra unit called Unit 11. There is a false division between Unit 10 and Unit 11. and they comprise the same premises and are practically the same area. with the same entry gate.

36. As discussed above. Rakesh Jain identified himself as the General Manager of Arcgate, and also holds himself out to be in LinkedIn. He also manages Arcgate Teleservices, and is the point of contact ("rakesh@arcgate.com") for that company listed on the Ministry of Corporate Affairs website. Moreover, that listing evidences that both companies use the same domain: arcgate.com.

37. Both the entities are under common control, operate (or operated)at the same location. have the same management, use the same domain, are in the same (technology/IT)business. and have the same registered place of business. as set forth in the documents described above.

38. Further. the founder of 'Arcgate.' Kunal Bagla, states on LinkedIn that he has worked at Arcgate without interruption since 2005. The 'Arcgate' company website remains the same, the same Arcgate logo remains affixed outside and around the Premises that are registered to both companies. and it appears that the business's assets and clients are in significant part the same before and after the striking off. Indeed, the Commissioners found on the Premises evidence of work relating to CREXi.

39. By contrast. the moment the Commissioners attempted to execute the commission. the Arcgate general manager, without ever reading the said Order issued by this Hon'ble Court, immediately argued that it was inapplicable on the grounds that the Premises now belonged solely to Contemnor No. 2 (Arcgate). and not to Contemnor No. 1 (Arcgate Teleservices). That immediate reaction underscores that the purpose of the filing of the application for striking off by Contemnor No. 1, which happened shortly after the Petitioners first sought an order against that entity (in the Suit bearing No. 29 of 2021 filed on 9 March 2021). was simply an attempt to evade the commission and block its ability to locate and preserve evidence of misconduct relating to

Contemnor No. 1 / Contemnor No. 2 (Arcgate Teleservices / Arcgate) and CREXi.

40.    As viewed by the Commissioners, practically speaking there is no distinction or difference in the operations that are conducted from the premises whether they are conducted by Arcgate or by Contemnor No. 1. And that same business is continuing under the control of the Bagla Family. **It is submitted that after the suit was filed by the Petitioners against Contemnor No. 1 on 9 March, 2021, Contemnor No. 1 filed an application for striking itself off from the Register of the Companies on 2 April, 2021**. It is pertinent to note that the business of 'Arcgate' has neither been affected nor been discontinued. Indeed, as noted above, the founder of 'Arcgate,' Mr. Kunal Bagla, states on LinkedIn that he has worked at Arcgate without interruption since 2005.

41.    It is apparent that Contemnor No. 1 and its owners and managers became aware of the Suit filed by the Petitioners and decided to engage in a subterfuge in order to frustrate the Petitioner from being able to seek reliefs or execute a commission, **a subterfuge predicated on the technicality that Contemnor No. 1 is no longer a going concern**.

**Resistance by Mr. Rakesh Jain / Contemnor No. 3 and Contemnor No. 5 to 8**

42.    When the Commissioners tried to enter the building situated at the Premises of Contemnor No. 1, at that time the Commissioners served Contemnor No. 1 with a copy of the said Order and explained to Contemnor No. 3, Mr. Rakesh Jain (General Manager of Arcgate and the Ministry of Corporate Affairs contact person for Arcgate Teleservices) that for the purpose of the commission, this Hon'ble High Court had directed the Contemnors to *"co-operate and provide all assistance to the Court Commissioners but without limitation to providing access."*

43.    Despite reading the said Order and the directions of this Hon'ble Court, there was immense hostility and resistance on part of Mr. Jain who prevented the Commissioners from entering the building. Mr. Jain

did not allow for the Commissioners to enter the building. As noted above, he argued that the said Order was in relation to executing the commission at Aregate Teleservices Pvt. Ltd. and not at the current organization - M/s Aregate, a partnership.

44.   In fact without reading the said Order, Mr. Rakesh Jain, Contemnor No. 3 yelled saying that this premises is not Aregate Teleservices Pvt. Ltd., it is "**Aregate**". The Commissioners noted that the said Order says that they have the authority to execute the commission at Aregate Teleservices Pvt. Ltd. or any other premises from where Aregate is operating. After several rounds of arguments, Mr. Rakesh Jain, Contemnor No. 3 allowed the Commissioners to sit at the reception. It was instantly clear that Contemnor No. 3 was already aware of the said Order and was acting on the directions of Contemnor No.s 5 – 8. Acting on the instructions of Contemnor No.s 5 – 8, Contemnor No. 3 had set up a ploy to make the Commissioners wait to buy time to call the police.

45.   Mr. Rakesh Jain, Contemnor No. 3, then called the local police officers. The police officers read the said Order and accepted that the Commissioners had full right to carry out the commission at the Premises and asked Contemnor No. 1/ Contemnor No. 2, and Contemnor No. 3 to allow the Commissioners access to the building.

**Resistance by IT Head – Manish Choudhari / ContemnorNo. 4**

46.   The Petitioners crave leave to rely on the Commissioners' report where it has been clearly set out that the IT Team was uncooperative and hostile.

47.   Among other delay tactics, and with a clear intent of obstructing justice, the Commissioners were informed by the IT Team that Contemnor No. 1/ Contemnor No. 2 had replaced its network firewall recently, hence the IT admitted that they do not have any network logs prior to the upgrade/firewall replacement. Contradicting the above statement, the Commissioners were later told by the IT Head / Contemnor No. 4 (Manish Choudhari), that they may have a back-up copy of the network logs. However the same was not



identified or provided to the team. However, the Commissioners were able to see network logs for August 6, 2021 from morning 6.00 a.m. IST onwards. The Commissioners were given contradictory answers on accessing the network logs in order to prevent them from the carrying out the commission. They were told that the systems have been replaced three months ago

48. Acting on the instructions of Contemnor No.s 5 – 8, this was clearly a ploy to waste the Commissioners' time, and delay the execution of the commission until the arrival of Mr. Kuldeep Tank, who at the verge of physical intimidation removed and threw out the Commissioners from the Premises.

**Conduct of Mr. Kuldeep Tank**

49. Vide its Order, this Hon'ble Court found thatCoStar was able to prima facie prove that Contemnor No. 1/Contemnor No.2 has illegally accessed the copyright photographs and database of the Petitioners from its website and might have transferred photographs and data to CREXi.

50. Pursuant to the said Order, the Commissioners accessed Arcgate's network logs for few minutes and were able to review one computer folder that revealed incriminating evidence indicating that work for CREXi was being done on the Premises. However, that effort was interrupted by Mr. Kuldeep Tank, an Advocate for Arcgate, who verbally harassed the Commissioners and instructed security guards to eject them and their team. Ultimately the Commissioners were forced by Arcgate to leave the Premises. They feared for their physical safety.

51. **In not allowing the Court Commissioner to carry on with the Commission despite knowing fully about the said Order passed by this Hon'ble Court, Mr. Kuldeep Tank has lowered the authority of this Hon'ble Court and has obstructed the administration of justice by preventing the commission from being executed asdirected by this Hon'ble Court.**

52.    The employees of Contemnor No. 1/2 along with Mr. Kuldeep Tank denied access to the Commissioners and prevented them from being able to carry out the commission. Subsequently, the commission had to be abandoned as the Commissioners were of the view that the **situation presented significant risk to the safety of the Commissioners and the Commissioners' personnel**. The Commissioners were specifically asked by Mr. Kuldeep Tank to let it be put record that Aregate was objecting to the commission. Mr. Kuldeep Tank kept yelling, almost at the verge of threatening the Commissioners' physical safety.

53.    Mr. Kuldeep Tank intended to scandalize and lower the authority of this Hon'ble Court. Despite pointing out that this Hon'ble Court had directed the Court Commissioners to execute the commission at "any other premises" of Aregate, Mr. Tank approached the technical expert, Mr. Sunil Verma (FTI Consulting) and his team and on the verge of physically removing them, demanded that they stop accessing Aregate's computer systems.

54.    It is pertinent to note that Mr. Tank had refused to show his bar council card or any other documents proving that he was an Advocate. Assuming that Mr. Tank was indeed an Advocate, his responsibility was even greater as an officer of the Court to allow the Commissioners to execute the said Order passed by this Hon'ble Court. Even after reading and understanding the said Order, Mr. Tank behaved in most defiant manner not suitable to a stature of an Advocate and threatened not only the Commissioners but also the representatives who were present at the site.

55.    The entire sequence is video recorded and despite Mr. Sunil Verma's repeated requests to Mr. Kuldeep Tank that he directly speak to the Court Commissioners about the matter, Mr. Tank continued to harass and verbally abuse the FTI Consulting team.

56.    The relevant extracts from the Commissioners' report setting out details of Mr. Kuldeep Tank's behaviour is as below:

"*b)   The Advocate Mr. Kuldeep Tank completely disregarded the authority of the Commissioners and the said Order passed by this Hon'ble Court. Even when he was told that this may amount to contempt, he showed complete disregards to the legal process and the commissioners. He handed over to the Commissioner, objections that were prepared by the Respondent and stated that the High Court will decide the issue and that the commission cannot be executed any further.*

*c)   As a result the Commissioners left with no option, left the premises of the Respondent without the proper execution of the commission.*"

"*9)   The Respondent, including by and through its General Manager and Advocate, prevented us from carrying out the commission despite being served the certified copy of the said Orders directing the execution of the commission at any premises of the Respondent. In particular, the behavior of the Advocate, Mr. Kuldeep Tank was disrespectful, contemptuous and ensured that the commission was abandoned in violation of this Hon'ble Court's orders.*"

(Pages 16 & 17)

57.   The actions of Mr. Tank were contemptuous and the Petitioners crave leave to rely on the videos and photographs submitted by the Commissioners where Mr. Tank's conduct has been recorded. By preventing the Commissioners from executing the commission, the Contemnors have made deliberate and willful disobedience of the said Order passed by this Hon'ble court. A copy of the Commissioners' report dated 9 August 2021 and the relevant video recordings and photographs from the day of the commission is annexed hereto as **Annexure-2**.

58.   In *Delhi Judicial Services Association* v. **State of Gujarat,** **(1991) 4 SCC 406**, the Hon'ble Supreme Court has held as follows (paras 42–43):

"42.      What constitutes contempt of court? The Common Law definition of contempt of court is: "An act or omission calculated to interfere with the due administration of justice." [Bowen LJ. in Helmore v. Smith (No. 2)[1]]. The contempt of court as defined by the Contempt of Courts Act, 1971 includes civil and criminal contempt. Criminal contempt as defined [in Section 2(c)] by the Act:

"means the publication (whether by words, spoken or written, or by signs, or by visible representations, or otherwise) of any matter or the **doing of any other act whatsoever** which

(i)     scandalizes or tends to scandalize, or lowers or tends to lower the authority of, any court; or

(ii)    prejudices, or interferes or tends to interfere with, the due course of any judicial proceeding; or

(iii)   <u>interferes, or tends to interfere with, or obstructs or tends to obstruct, the administration of justice in any other manner</u>"

**The definition of criminal contempt is wide enough to include any act by a person which would tend to interfere with the administration of justice or which would lower the authority of court.** The public have a vital stake in effective and orderly administration of justice. The Court has the duty of protecting the interest of the community in the due administration of justice and, so, it is entrusted with the power to commit for contempt of court, not to protect the dignity of the Court against insult or injury, but, to protect and vindicate the right of the public so that the administration of justice is not perverted, prejudiced, obstructed or interfered with. "It is a mode of vindicating the majesty of law, in its active manifestation, against obstruction and outrage."

---

[1] (1886) 35 Ch D 436, 455 : (1886) 34 Sol Jo 60

(Frankfurter. J. in Offutt v. US) The object and purpose of punishing contempt for interference with the administration of justice is not to safeguard or protect the dignity of the Judge or the Magistrate, but the purpose is to preserve the authority of the courts to ensure an ordered life in society. In Attorney General v. Times Newspapers, the necessity for the law of contempt was summarised by Lord Morris as: (AC p. 302)

> "In an ordered community courts are established for the pacific settlement of disputes and for the maintenance of law and order. In the general interests of the community it is imperative that the authority of the courts should not be imperiled and that recourse to them should not be subject to unjustifiable interference. When such unjustifiable interference is suppressed it is not because those charged with the responsibilities of administering justice are concerned for their own dignity: it is because the very structure of ordered life is at risk if the recognized courts of the land are so flouted and their authority wanes and is supplanted."...

...The power to punish contempt is vested in the Judges not for their personal protection only, but for the protection of public justice, whose interest requires that decency and decorum is preserved in Courts of Justice. Those who have to discharge duty in a Court of Justice are protected by the law, and shielded in the discharge of their duties, any deliberate interference with the discharge of such duties either in court or outside the court by attacking the presiding officers of the court, would amount to criminal contempt and the courts must take serious cognizance of such conduct." Emphasis Supplied]

59. Therefore these acts of the aforesaid persons are act of criminal contempt **within the meaning of Section 2 (c) (i) and (iii) of the Contempt of Courts Act, 1971**, thereby inviting punishment for the contempt of this Hon'ble Court under Section 12 of the Contempt of Courts Act, 1971 and as prescribed by several judicial precedents and in exercise of powers under Article 215 of the Constitution of India.

60. Undoubtedly, the acts and conduct of the Contemnors and their statements as set out above amount to **serious interference with the administration of justice under Section 2 (c) (iii) of the Contempt of Courts Act, 1971**. Each of the aforesaid actions of and statements made by the Contemnors as narrated above have resulted in preventing the commission from being executed and therefore, **preventing the orders of this Hon'ble Court from being executed, amounting to obstruction of justice under Section 2 (c) (iii) of the Contempt of Courts Act, 1971**. Therefore, such conduct warrants proceedings of criminal contempt against the Contemnors.

61. Towards the end, Mr. Rakesh Jain and Mr. Kuldeep Tank forcefully asserted themselves and shouted at the Court Commissioners, forcing them to provide a letter to sign from Contemnor No. 2 (M/s Aregate) Partnership firm which has the same address as that of Contemnor No. 1 (Aregate Teleservices). **The Commissioners signed the letter in order to ensure the situation did not go out of control and the Commissioners and their personnel were not further threatened**.

62. **The fact that the Contemnors prevented the Commissioners from carrying out the commission at the Premises in compliance with the said Order of this Hon'ble Court is a conclusive finding by Commissioners in their report** (filed herewith as Annexure 2). The relevant extracts from the report are as below:

    *"B.        We are filing this report before the Hon'ble Court in order to inform the court that we were unable to carry out the Commission as per the directions of this Hon'ble Court in the said Order. The reason for the failure to carry out the Commission was because the*

Commission met with significant resistance and hostility from the employees present at the said premises.

C.     As set out in more detail below, it also seems to us, based on the facts and circumstances and material we came across while trying to execute the Commission, *that the Respondent, and the persons owning and directing Respondent, tried to circumvent the execution of this commission and the directions passed in the said Order*" ..... .

"D.    We wish to inform this Hon'ble Court that there were multiple other efforts to frustrate the execution of the Commission"

(Pages 1& 2)

63.    It is evident that the Contemnors have willfully and deliberately obstructed the execution of the said Order passed by this Hon'ble Court and have thereby interfered with the administration of justice under Section 2 (c) (iii)  of the Contempt of Courts Act, 1971. The Contemnors have treated the said Order of this Hon'ble Court with casual disdain and are guilty of contempt of this Hon'ble Court and therefore liable to be punished as per the provisions of Contempt of Courts Act, 1971 and/or Article 215 of the Constitution of India. By their conduct, the Contemnors have demonstrated utter disregard to the said Order of this Hon'ble Court. The Contemnors be dealt with strictly and severely so that real and substantial justice is done and the dignity and honor of this Hon'ble Court is maintained.

64.    In the aforesaid premises, the Petitioner submits that this Hon'ble Court be pleased to issue appropriate orders and directions to punish the aforesaid Contemnorsand every other person this Court deems fit for having committed criminal contempt of this Hon'ble Court under the powers available to it under the Constitution of India and under the Contempt of Courts Act, 1971*inter alia* directing payment of fine, which this Hon'ble Court deems fit, by each of the Contemnors.

## PRAYER

A.   That this Hon'ble Court be pleased to issue appropriate orders and directions to punish the Contemnors and such other persons as this Hon'ble Court may deem fit for having committed criminal contempt of this Hon'ble Court, including by directing payment of fine as this Hon'ble Court deems fit by each of the Contemnors as provided under the provisions of the Contempt of Court Act, 1971 read with Article 215 of the Constitution of India.

B.   Any other order as the Court deems fit.

C.   For such other and further reliefs as the nature and circumstances of the case may require;

**COUNSEL FOR THE PETITIONERS**

**NOTES:-**
1. No such contempt petition has been filed previously in this matter.
2. Due to non-availability of pie-papers, this contempt petition is being preferred on these stout papers.
3. This contempt petition has been typed by my Private Steno.
4.        The matter pertains to jurisdiction of principal seat of Hon'ble Court.
5.      Email:                          Cell:

**COUNSEL FOR THE PETITIONERS**

(28)

IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

AT JODHPUR

D.B. CRIMINAL CONTEMPT PETITION NO_____2021

IN

S.B. CIVIL WRIT PETITION NO. 9384 / 2021

**PETITIONERS:** –*Versus***CONTEMNORS:**

CoStar Group, Inc & Anr.            Aregate Teleservices Pvt. Ltd. & Ors.

## AFFIDAVIT IN SUPPORT OF CONTEMPT PETITION

I, Bharath Madakari, aged 39 years, having my office at Samridhi Bungalow No. 97, Plot No. 125, Sector 4, Bh. Charkop Bus Depo, Charkop Kandivali (W) Mumbai – 400067, the constituted attorney of the Petitioner herein above named state on oath as under: –

1. That I am authorized to take oath on behalf of Petitioner in the instant Petition and am fully conversant with the facts and circumstances of the case.

2. That the annexed Petition has been drafted by my counsel as per the instructions and I have carefully gone through the contents of the case and understood the same fully well.

3. That the averments contained in the Petition are true and correct to my personal knowledge

## VERIFICATION:

I, the above named deponent do hereby verify that my above affidavit is true and correct, nothing has been concealed therein. SO HELP ME GOD.

IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

AT JODHPUR

D.B. CRIMINAL CONTEMPT PETITION NO_____2021

IN

S.B. CIVIL WRIT PETITION NO. 9384 / 2021

**PETITIONERS:-**Versus**CONTEMNORS:**

CoStar Group. Inc & Anr.
& Ors.

Aregate Teleservices Pvt. Ltd.

## AFFIDAVIT IN SUPPORT OF DOCUMENTS

I, Bharath Madakari, aged 39 years, having my office at Samridhi Bungalow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depo, Charkop Kandivali (W) Mumbai – 400067, the constituted attorney of the Petitioner herein above named state on oath as under:–

1. That I am authorized to take oath on behalf of Petitioner in the instant Petition and am fully conversant with the facts and circumstances of the case.

2. That all the annexed Documents to the Petition are true and correct copy/printouts of their respective originals.

## VERIFICATION:

I, the above named deponent do hereby verify that my above affidavit is true and correct, nothing has been concealed therein. SO HELP ME GOD.



3ᵒ

# HIGH COURT OF JUDICATURE FOR RAJASTHAN AT JODHPUR

S.B. Civil Writ Petition No. 9384/2021

1.  Costar Group Inc., A Corporation Registered Under The Law Of The State Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America.

2.  Costar Realty Information, Inc., A Corporation Registered Under The Laws Of The State Of Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America Through Power Of Attorney Holder Bharat Madakan Having My Office At Samridhi Bangalow No. 97, Plot No 123, Sector 4, Bh. Charkop Bus Depo, Charkop Kandivali ()W) Mumbai - 400047.

----Petitioners

Versus

Arcgate Teleservices Private Limit d, A Company Incorporated Under The Companies Act, 2013 Having Its Registered Office At G1-10 I.t. Park, Madri Industrial Area, Udaipur, Rajasthan 313001.

----Respondent

For Petitioner(s)   : Mr. M.S. Singhvi, Sr. Advocate assisted by Mr. Muktesh Maheshwari
Mr. Faraz Sadar
Mr. Hiren Kamod
Mr. Aidan Choudhary
Ms. Simran Agarwal

For Respondent(s)

## HON'BLE MR. JUSTICE VIJAY BISHNOI

### Order

### 30/07/2021

This writ petition is filed by the petitioners being aggrieved with the order dated 06.04.2021 passed by Judge, Commercial Court, Udaipur (for short 'the trial court' hereinafter) in C.I.S. No.06/2021, whereby the application preferred on behalf

[CW-9384/2021]

*31*

of the petitioners for *ex parte* appointment of Court Commissioner as per the provisions of Order XXVI Rule 9 of the Code of Civil Procedure, 1908 (for short 'CPC' hereinafter) has been dismissed.

The petitioners filed a suit for injunction against the respondent – Arcgate Teleservices Private Limited before the trial court, which is pending consideration. Along with the said suit, the petitioners also preferred an application under Order XXVI Rule 9 CPC seeking ex parte appointment of Court Commissioner.

As per the petitioners, petitioner No.1 is a company incorporated under the laws of the State of Delaware in the United States of America and petitioner No.2 is a wholly owned subsidiary of petitioner No.1. It is claimed that the petitioners are leading provider of commercial real estate information, analytics and online marketplaces in the United States of America and they have developed the most comprehensive database of commercial real estate in the world.

It is also claimed that the petitioners are touching average 24,000 brokers, owners, developers and other real estate professionals daily through phone calls canvassing a half million properties per year and are taking nearly one million photographs annually.

It is contended by the petitioners that website 'LoopNet' (available at http://www.loopnet.com) is the foremost digital marketplace for commercial real estate in the United States and it contains petitioners' copyrighted photographs and data from its database. Every day, buyers, sellers, lessors, lessees, owners and brokers access and use LoopNet to list, buy, sell, lease, rent or browse commercial real estate.

It is further contended by the petitioners that one of the current competitors of the petitioners in the United States of America is Commercial Real Estate Exchange, Inc. (CREXi). CREXi is a company incorporated in the State of California in the United States of America and as per its website, it describes itself as a commercial real estate marketplace that simplifies transactions for brokers with a suite of easy to use tools to manage the entire process from listing to closing. CREXi's website allows to use commercial real estate listings in markets across the United State of America. CREXi also runs an online auction marketplace.

It is further contended by the petitioners that the CREXi has raised a significant amount of funding recently and is competing with the petitioners. It is alleged that CREXi is attempting to build its own online commercial real estate marketplace and auction platform by free riding on petitioners' billions of dollars of investments and its three decades of hard work. It is also alleged that CREXi has accessed the petitioners' database and LoopNet more than a million times and forced the petitioners to file a lawsuit against it in the United States District Court for the Central District of California in the month of September, 2020. In the lawsuit, the petitioners have alleged that CREXi is involved in copyright infringement, violation of United States Digital Millennium Copyright Act, misappropriation, unfair competition, false advertising and breach of contract. In the very lawsuit, it is alleged that the respondent – Arcgate Teleservices Private Limited is working for CREXi and is accessing LoopNet without authorization for competitive purposes on behalf of CREXi in violation of LoopNet's terms and conditions, committing contributory infringement of the petitioners' copyrighted

photographs and engaging in piracy/theft, improper access to petitioners' websites and misappropriation of the petitioners' proprietary contents at the behest of CREXi.

It is contended that in the lawsuit filed by the petitioners against the CREXi, it has not denied or disclaimed that the respondent - Arcgate Teleservices Private Limited is accessing LoopNet on behalf of CREXi. The petitioners have placed on record certain documents before the trial court in support of their allegations that respondent - Arcgate Teleservices Private Limited is working on behalf of CREXi and is illegally accessing the LoopNet and transferring the data of the petitioners – company to CREXi.

The petitioners by way of an application preferred under Order XXVI Rule 9 CPC before the trial court, sought *ex parte* appointment of a Court Commissioner, which came to be rejected by the trial court vide impugned order. Hence, this writ petition.

Learned counsel for the petitioners has argued that the learned trial court grossly erred in rejecting the application filed by the petitioners for *ex parte* appointment of Court Commissioner. It is further submitted that the trial court failed to appreciate that granting of ad interim relief is necessary in the present case.

It is argued that the trial court erred in holding that for the appointment of *ex parte* Court Commissioner, it is insufficient to show that it is possible that the respondent committed the said act of copyright infringement, rather, there must be concrete evidence that the said act of infringement has been committed by the respondent. It is submitted that at the *ex parte* ad interim stage, the petitioners were required to make out a strong prima

34

(5 of 11)                          [CW-9384/2021]

facie case and the petitioners have produced ample evidence on record that there is possibility that the respondent has committed the said act of copyright infringement.

Learned counsel for the petitioners has further submitted that the petitioners have adduced significant evidence of respondent's wrongdoings including evidence that the respondent is working on behalf of the petitioners' competitor – CREXi and is regularly accessing the petitioners' LoopNet website on behalf of the CREXi without authorization and in breach of petitioners' binding terms and as such committed contributory infringement of petitioners' copyrighted photographs and engaging in piracy/theft and misappropriation of petitioners' proprietary content.

Learned counsel for the petitioners has further submitted that the trial court has failed to appreciate that in intellectual property matters, a party is subjected to strict proof of infringement because at the initial stage, it cannot be expected from a party to have full fledged evidence of infringement.

It is further submitted that in case of involving technology/software/internet activity, it is impossible for a party to completely understand the nature of activity of a wrongdoer unless the evidence from its systems and files is taken into custody and preserved for trial.

Learned counsel for the petitioners has further submitted that the trial court has failed to consider the ratio in various judgments relied upon by the petitioners, where in one of the judgments, the Delhi High Court has laid down the principles regarding appointment of *ex parte* Court Commissioner in similar type of cases.

Learned counsel for the petitioners has also submitted that though the petitioners were successful in making out a *prima facie* case before the trial court but it has illegally rejected the application filed by the petitioners for appointment of *ex parte* appointment of Court Commissioner.

In support of the above contentions, learned counsel for the petitioners has mainly placed reliance on a decision of Delhi High Court in *Autodesk Inc. and Anr. vs. Mr. A.V.T. Shankardass and Anr.,* reported in *AIR 2008 Delhi 167.*

Heard learned counsel for the petitioners.

The learned trial court has rejected the application filed on behalf of the petitioners for *ex parte* appointment of Court Commissioner while observing that a Court Commissioner appointed by it would not be qualified to retrieve and preserve the relevant evidence or recover data, which might have been deleted. The trial court has also observed that only the police have means to recover any deleted data. The trial court is further of the opinion that mere existence of photographs on servers is not concrete proof of copyright infringement and sufficient to warrant seizing and preserving of evidence at this stage. The trial court is not convinced that FTI Consulting India Private Limited can act as a Commissioner as its capability cannot be determined on the basis of an application and on asking of the petitioners.

From perusal of the impugned order dated 06.04.2021, it appears that the trial court is of the view that the Court Commissioner cannot be appointed for the purpose of collecting evidence for the plaintiff.

Ultimately, the trial court has held that the petitioners have failed to provide sufficient proof to establish the fact that

some photographs are accessed by the respondent-Arcgate Teleservices Private Limited from the petitioners' website on behalf of the CREXi and thereafter transferred to it. The trial court has observed that until and unless this fact is established, it cannot be used as a tool to connect the missing link.

The Delhi High Court in *Autodesk Inc and Anr. vs. Mr. A.V.T. Shankardass and Anr.* (supra) laid down certain guidelines for appointment of a Court Commissioner in software infringement and piracy. The relevant portion of the judgment reads as under:

"**14.** Coming now to the question of guidelines to be set, we have heard both the counsel for the parties. We are conscious of the fact that it is neither feasible nor practical to lay down guidelines which would cater to numerous and all the situations that may arise. However, some of the following relevant factors and guidelines are being enumerated which the Court may take into consideration on the question of appointment of a Local Commissioner in software infringement and piracy matters:

(i) The object of appointment of a Local Commissioner in software piracy matters is not, 'as much to collect evidence but to preserve and protect the infringing evidence. The pirated software or incriminating evidence can only be obtained from the premises of the opposite party alone and in the absence of an ex parte appointment of a Local Commissioner there is likelihood that such evidence may be lost, removed or destroyed;

(ii) Request for ex parte appointment of a Local Commissioner in such matters is usual and in fact is intended to sub serve the ends of justice as it is imperative to have an element of surprise so that the actual position is not altered;

(iii) The test of reasonable and credible information regarding the existence of pirated software or incriminating evidence should not be subjected to strict proof or the requirement to demonstrate or produce part of the pirated software/incriminating evidence at the initial stage itself. It has to be tested on the touchstone of pragmatism and the natural and normal course of conduct and practice in trade.

(iv) It may not always be possible for a plaintiff to obtain any admission by employing decoy customers and



सत्यमेव जयते

सत्य प्रतिलिपि
सहायक अधीक्षक न्यायिक
राजस्थान उच्च न्यायालय
जोधपुर

5 AUG 2021

gaining access to the defendant's premises. Any such attempt also inheres in it the possibility of dis-appearance of the pirated software/incriminating evidence in case the decoy customers is exposed. Accordingly, visit by decoy customer or investigator is not to be insisted upon as pre condition. A report of private Investigator need not be dis-regarded or rejected simply because of his engagement by the plaintiff. The information provided by the private Investigator should receive objective evaluation.

(v) In cases where certain and definite information with regard to the existence of pirated software or incriminating evidence is not available or where the Court may nurture some element of doubt, it may consider asking the plaintiff to deposit cost in Court so that in case pirated software or incriminating evidence is not found then the defendant can be suitably compensated for the obtrusion in his work or privacy."

*(Emphasis supplied)*

I am perfectly in agreement with the view of the Delhi High Court that the object of appointment of a Local Commissioner in software piracy matters is not, as much to collect evidence but to preserve and protect the infringing evidence and strict proof is not required to be given at initial stage.

The petitioners, along with an application for appointment of Local Commissioner has placed on record certain documentary evidence in support of their claim that the respondent is illegally accessing LoopNet's website containing copyright photographs and database of the petitioners at the instance of CREXi and is transferring to it unauthorisedly.

After examining the said documentary evidence, which is also annexed with this writ petition, I am of the view that the petitioners are able to prima facie prove that the respondent has illegally accessed the copyright photographs and database of the petitioners – company from its website and

might have transferred it to the CREXi, which used the said copyright photographs and database for its profit.

In view of the above discussion, I am of the view that the trial court has erred in not appointing the *ex parte* Court Commissioner in the matter in hand.

Before the trial court, two applications were moved, one on behalf of Shri Hanuman Sharma, Advocate, who offered himself to work as Court Commissioner and another by Shri Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited, who offered his services as Commissioner/Computer Expert.

Taking into consideration the overall facts and circumstances of the case, I find it a fit case for appointing *ex parte* Court Commissioners and the following directions are issued:

Issue notice of this writ petition to the sole respondent. Notices are made returnable on 6th September, 2021.

(2)  The petitioners shall deposit cost of Rs.10,00,000/- (Rupees ten lac) with the trial court within one week from today, so that in case incriminating evidence is not found, then the defendant can suitably be compensated for obstruction in its work.

(3)  Mr Hanuman Sharma, Advocate, Udaipur and Mr Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited are appointed as Court Commissioners. They shall serve a copy of this order to the respondent before starting commission. They will have all the powers under Order XL Rule 1 or under XXVI Rule 9 CPC in

order to attend at and/or enter either by force or by breaking
open the lock or by removing the obstruction or barrier or
otherwise, the respondent's premises including office situated at
G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan – 313
001 or any other premises owned or occupied by respondent
any time of the day or night without notice to the respondent
and with the help of the representative of the petitioners and
police. The Court Commissioners, Mr. Hanuman Sharma,
Advocate and Mr Saurabh Kumar shall make inventory and
seize, take possession, custody and control of the petitioners
infringing photographs, along with all the respondent's material,
printed matter, communication invoices, records, relevant
passwords and passcodes, and such material and documents
relating to infringing photographs owned by the petitioners
including such material stored electronically on any systems.
They shall also make inventory and take a mirror copy of the
entire electronic data of the respondent stored on the computer
systems, data storage devices, handled devices, hard disks, pen
drives, computer records, cloud-based servers, servers
(including any servers maintained at a different location for
business continuity purposes and/or disaster recovery) of the
respondent (which may be belonging to the respondent or on
lease) and shall submit the said mirror copy to the trial court in
a sealed envelope along with a report within a month.

        The respondent is directed to co-operate and provide
all assistance to the Court Commissioners but without limitation
to providing access.

[CW-9384/2021]

The fees of the Court Commissioners shall be paid by
the petitioners as per agreement between the petitioners and
the Court Commissioners.

List on 06.09.2021.

(VIJAY BISHNOI),J

masif/-PS





सत्यमेव जयते



IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

AT JODHPUR

CIVIL WRIT PETITION NO. 9384 OF 2021

CoStar Group, Inc. And Anr... Petitioners

Versus

Arcgate Teleservices Private Limited...Respondent

## COMMISSION REPORT

A.   We – Mr. Hanuman Sharma and Mr. Saurabh Kumar (**We / us / Commissioners**) were appointed by this Hon'ble Court as the Court Commissioner with all powers as provided in Order XL Rule or XXVI Rule 9 of the Code of Civil Procedure, 1908vide an order of this Hon'ble Court dated 30 July 2021 (**said Order**). We were intimated by the Advocate of the Petitioners about our appointment as the Commissioner vide an email dated 3 August, 2021 along with a copy of the said Order and the Civil Original Suit No.29 of 2021 filed in the Commercial Court at Udaipur (**Commercial Court**) and the Writ Petition filed before this Hon'ble Court.

B.   We are filing this report before the Hon'ble Court in order to inform the court that we were unable to carry out the Commission as per the directions of this Hon'ble Court in the said Order. The reason for the failure to carry out the Commission was because the Commission met with significant resistance and hostility from the employees present at the said premises.

C.   As set out in more detail below, it also seems to us, based on the facts and circumstances and material we came across while trying to execute the Commission, that the Respondent, and the persons owning and directing Respondent, tried to circumventthe execution of this commission and the directions passed in the said Order. Among other things, the Commission has found that the Directors of the Respondent i.e. Arcgate Teleservices Private Limited had passed a Board Resolution to strike off the Respondent Company on March 23, 2021 i.e. after the date on which the Suit was filed by the Petitioner before the Commercial Court, Udaipur on 10 March, 2021. However, the business is being done/continued by 'Arcgate' - a partnership owned and run by the same

Page..2

family that owned and ran Respondent, and this has been used to hinder, prevent and stop and avoid the Commission.

D.   We wish to inform this Hon'ble Court that there were multiple other efforts to frustrate the execution of the Commission. The General Manager called the police, to further delay the commissions entry into the premises and prevent the execution. The Police however left after reading the Order and concluding that the Commissioners had the right to execute the Commission. Furthermore, despite specifically asking access to the IT infrastructure, the Commissioners were given contradictory information by Arcgate IT employees about whether key data (network logs) belonging to the business had been destroyed, or whether backup copies had been maintained. We were able to briefly review only one device/ computer terminal where we immediately found one folder that indicated that work for CREXi was being done on the premises by several employees, but that effort/ review of the commission was interrupted and stopped by hostile threat and conduct of various employees and Advocate for Respondent/Arcgate, who verbally abused our team and instructed security guards to eject us. Ultimately, we were forced by the employees, the internal security guards and the advocate for the Respondent/Arcgate to leave the premises as there was a clear threat for our physical safety.

E.   The circumstances and events of the commission are as follows:

i)   A suit was filed by the Petitioners against the Respondent Company for infringement of its copyrighted photographs, misappropriation of other content and unauthorized access to Petitioner's website at the direction and behest of CREXi, a company based in the USA. In the Suit, the Petitioners had filed the interim application along with the application for appointment of Court Commissioner. Since the Commercial Court, Udaipur rejected the Petitioner's application for appointment of Commissioners ex-parte, the Petitioners filed a Writ before this Hon'ble Court challenging the order dated 6th April 2021.

ii.   This Hon'ble Court passed an ex-parte ad interim order, appointing Hanuman Sharma along with Saurabh Kumar (**Commissioners**) as local court Commissioners. A copy of the said Order dated 30 July, 2021 is attached with this Report as

**Annexure A.** For ease of reference the relevant part of the said Order is reproduced below:

" Taking into consideration the overall facts and circumstances of the case, I find it a fit case for appointing ex parte Court Commissioners and the following directions are issued:

1. Issue notice of this writ petition to the sole respondent. Notices are made returnable on 6th September, 2021.

2. The petitioners shall deposit cost of Rs.10,00,000/-(Rupees ten lac) with the trial court within one week from today, so that in case incriminating evidence is not found, then the Respondent can suitably be compensated for obstruction in its work.

3. Mr. Hanuman Sharma, Advocate, Udaipur and Mr. Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited are appointed as Court Commissioners. They shall serve a copy of this order to the respondent before starting commission. They will have all the powers under Order XL Rule 1 or under XXVI Rule 9 CPC in order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the respondent's premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan – 313 001 or any other premises owned or occupied by respondent any time of the day or night without notice to the respondent and with the help of the representative of the petitioners and police. The Court Commissioners - Mr Hanuman Sharma, Advocate and Mr Saurabh Kumar shall make inventory and seize, take possession, custody and control of the petitioners infringing photographs, along with all the respondent's material, printed matter, communication, invoices, records, relevant passwords and passcodes, and such material and documents relating to infringing photographs owned by the petitioners including such material stored electronically on any systems. They shall also make inventory and take a mirror copy of the entire electronic data of the respondent

stored on the computer systems, data storage devices, handled devices, hard disks, pen drives, computer records, cloud-based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of the respondent (which may be belonging to the respondent or on lease) and shall submit the said mirror copy to the trial court in a sealed envelope along with a report within a month.

The respondent is directed to co-operate and provide all assistance to the Court Commissioners but without limitation to providing access.

The fees of the Court Commissioners shall be paid by the petitioners as per agreement between the petitioners and the Court Commissioners."

F.    In order to comply with this Hon'ble Court's directions in the said Order and to execute the commission, the Commissioners spoke to chalk out a plan in respect of the date and modalities of the execution of the commission. It was decided between us that Advocates/Counsels for the Petitioners and a team of videographers and team of technical experts (of FTI Consulting India Private Limited), carrying all the necessary electronics equipment as may be required to execute the commission, be kept ready for execution of the commission on 6 August 2021 from 10 am onwards at the address mentioned in the said Order.

G.    On 6 August 2021, the Commissioners along with a team visited the Respondent's premises situated at Arcgate, IT Park, G1-11, MIA, Extn, Udaipur, Rajasthan 313003.

H.    The Commission also recorded some of the happenings that took place on 6 August, 2021. The relevant videos and photographs from the day of the Commission are annexed herewith in a pen drive as **Annex. B**.

I.    As stated above, the Commission faced severe opposition and hostility right from the outset till the time the Commission was constrained to cease due to the opposition of various individuals whose names are set

out in **Annex C**. We were able to commence the Commission for a few minutes but had to immediately abandon the same before any relevant data could be mirrored in terms of the said order. In furtherance of this Hon'ble Court's directions, the undersigned is submitting this report for compliance and to put on record the events that transpired on 6 August 2021:

## DETAILS / PARTICULARS OF EVENTS DURING THE EXECUTION OF THE COMMISSIONUNDER ORDER DATED 30/07/2021.

1) As per the said Order, the Hon'ble High Court directed the Commissioners to execute the commission at any premises owned or occupied by the Respondent (Arcgate) any time of the day or night without notice to the Respondent.

2) Thus, on 6 August 2021 the Commissioners accompanied by the following persons (for the sake of brevity hereinafter referred to as the **"said Representatives"**) reached the Respondent's premises situated at IT Park, G1-11, MIA, Extn, Udaipur, Rajasthan 313003 at 10:00 AM and were present at the Respondent's premises till approximately 11:45 AM.

   a) Adv. Hanuman Sharma, Commissioner

   b) Mr. Saurabh Kumar, Commissioner, FTI Consulting

       i) Shri Sunil Verma, Technical expert, FTI Consulting

       ii) Shri Kaustabh Deodhar, Technical expert, FTI Consulting

       iii) Smt. Sapna Chavan, Technical Expert, FTI Consulting

   c) Mr. Faraz Alam, Advocate for the Petitioners (M/s Cyril Amarchand Mangaldas)

   d) Ms. Simran Aggarwal, Advocate for the Petitioners (M/s Cyril Amarchand Mangaldas)

   e) Mr. Abhijeet Shinde, Counsel for the Petitioners

   f) Mr. Hiren Kamod, Counsel for the Petitioners

   g) Sachin Sakare, Security Personnel and 2 videographers (M/s InQuest)

## REPORT OF MR. HANUMAN SHARMA

3)   ## EVENT I: ENTRY MET WITH FORCEFUL RESISTANCE

a)   I left my house at 9.00 AM on August 6 to execute the commission. On my way I sought directions to the address of the Respondent from several bystanders who immediately guided me to the Respondent's premises. It appeared to be a well-known organization and I later learned that it employs at least 2,200 people.

b)   **Prominent Board of Arcgate:** At the entrance of the building and all over the building, the name 'Arcgate' was prominently displayed. The Arcgate boards, signs and branding on the building was at least 5 feet long and clearly visible. The address mentioned had a sign displaying Arcgate at the entrance. When we entered the building, we were told that the building has one entrance. The building had security personnel at the gate. The Head of Security confirmed that the security personnel were retired army officers.

c)   We were told that the Manager of 'Arcgate' would attend to us and only then we could enter the premises. I introduced myself and stated that I was there to execute the Commission as per the said Order passed by the Hon'ble High Court.

d)   The moment I met Shri Rakesh Jain, who introduced himself as the General Manager of 'Arcgate', **I handed over a copy of the said Order to him but even before he had read the said Order stated that the premises did not belong to the Respondent, Arcgate Teleservices Private Limited, rather to another entity viz. Arcgate.** On repeatedly being asked to identify the exact nature of this other business entity, there was no answer that was forthcoming from him as also the employees present at the premises. Mr. Rakesh Jain repeatedly stated that we could not proceed with the Commissioner without the presence of their Advocate, who has been informed and was on his way.

e)   Without reading the Order, Mr. Rakesh Jain yelled saying that this premises is not Arcgate Teleservices Pvt. Ltd. It is "Arcgate". I mentioned that the Order says that I have the authority to execute

the commission at the Respondent's address or any other premises from where Respondent is operating. After several rounds of arguments, he allowed me to sit at the reception with my team. **It was instantly clear to me that he was aware of the said Order before I arrived at the premises and had set up a ploy to make me wait to call the police in the meantime.**

f)   Mr. Rakesh Jain signed a letter acknowledging the receipt of the said Order. The acknowledgment letter is annexed herewith as Annex.D.

g)   On enquiry we were told that the Arcgate building had three parts and each were numbered separately - Units 9/10/11. Although it was one building and had one entrance, we were told that the premises where the Commissioners were present belonged to 'Arcgate' and not the Respondent. We were not told as to what the constitution of 'Arcgate' was but only that the premises did not belong to the Respondent and that the Respondent did not exist anymore. Through the Ministry of Corporate Affairs website, the Commissioners determined that the Respondent was struck off from the Registrar of Companies on application made by the Directors of the Respondent on 31 March 2021, i.e. after the date on which the subject Suit was filed by the Petitioner before the Udaipur District Court. It was clear that the premises on which the we were present belonged to the Respondent or an associated entity which was operating from the same address.

h)   **Refusal to enter;** Even after having the benefit of perusing the said Order and the Commissioners explaining the contents thereof to Mr. Rajesh Jain, General Manager and to other employees present, including one Mr. Bhatia, claiming to be the H.R. head, and others, there was a collective refusal to allow the Commissioners toenter the premises of the Respondent and to assist in the execution of the commission.

i)   Mr. Jain demanded that the Commissioners and the team assisting the commissioners' movement in the Respondent's premises be restricted to the conference room. Mr. Rajesh Jain further refused access to not only to the Commissioners but also to everyone accompanying the Commissioners.

j)   Later on after about an hour, two police officers, ostensibly from the local police station entered the Respondent's premises. The police officers were not called by the Commissioners. Mr. Jain and the other employees stated their objection with respect to the premises not being owned by the Respondent, but instead being owned and occupied by another 'Arcgate' entity, and Mr. Jain's argument that the commission could only be carried out if the Petitioner could prove that the premises belonged to the Respondent. At this stage, I explained to the officers the scope and the purport of the said Order and requested that they assist in the execution of the commission instead of creating an obstruction. I specifically showed the officers the portion of the said Order where this Hon'ble Court had directed assistance of the police for the execution of the commission on any premises connected to the Respondent. After being satisfied with the said Order the police officers directed the Manager of the Respondent to assist the Commissioners and provide access to everything as may be sought by them.

4)   **EVENT 2: TAKING NOTE OF COMMON MANAGEMENT OF M/S ARCGATE AND ARCGATE TELESERVICES PVT. LTD.**

a)   As soon as I entered the premises, Mr. Jain explained to me that I had the wrong address. There was no company called Arcgate Teleservices Pvt. Ltd. present at those premises.

b)   After much deliberation, Mr. Rakesh Jain showed us several documents to reveal that I was standing in the premises of "M/s ArcGate" (**Partnership**). In this regard, he handed over the Lease Agreement of the premises **Annex.E** and the electricity bill. As per the Allotment Letter **Annex.F** handed over to me, I understand that said Partnership is a partnership constituting of 4 partners. The Respondents also gave me their incorporation details available on the Ministry of Corporate Affairs portal which forms part of **Annex. D**. After perusing these documents, I took note that the Partners of said Partnership and the Board Directors of Respondent are common and appears that both the entities are family run entities of the Bagla family.

| Partners of M/s ArcGate | Directors of Arcgate Teleservices Pvt. Ltd. |
|---|---|
| Dilip Bagla | - |
| Sushma Bagla (W/o Dilip Bagla) | - |
| Kunal Bagla (S/o Dilip Bagla) | Kunal Bagla (S/o Dilip Bagla) |
| Devyani Kunal Bagla (W/o Kunal Bagla) | Devyani Bagla (W/o Kunal Bagla) |

c) It appears that the said Partnership was formed in the year 2005 and has been operating from the same premises as that of the Respondents. Clearly both the organizations have the same management and are in the technology and IT/ITes business.

d) All employees identified themselves to be associated with the said Partnership and not with the Respondent.

## EVENT 3: SPEAKING TO EMPLOYEES - ARCGATE IS AND HAS REMAINED FULLY FUNCTIONAL FOR YEARS

a) After several rounds of arguments I entered the building and spoke to the security guards and employees and HR Head of the said Partnership/Respondent. I have gathered from the employee log books, registers and interviews with employees and security guards, one being Mr. Manoj Dhariyal, that the business of the said Partnership and that of the Respondent is identical and the business was being conducted as usual and was fully functional. I will rely on videos and photographs annexed as part of **Annex. B** in this regard.

b) All the employees and security guards who I spoke to have been attending the premises at issue for at least several years and some for at least 15 years. Some of the information that was provided to the Commissioners is set forth below:

   i) I interviewed the following people:

   • Bharat Singh Jhala, Naveen Dayama, Manish Choudhary, Indra Lal Patel, Ashish Kumar Singh, Ranveer Singh, Anil.

   ii) When the employees were asked which company they worked for, **not a single employee was able to identify**

which company they worked for. **I even asked the HR
Manager Rajesh Bhatiya to identify the organization he
worked for, but even he was not able to identify the
organization.** The only response of the employees, and
including the HR Manager, was that they worked for
Arcgate.

iii)   On being asked whether they know that the Respondent
company does not exist, multiple employees stated that
they are unaware of the same. Many stated that they have
been working for the same company for several years and
it is a fully functioning company and they had no idea that
the Respondent has been struck off. On being repeatedly
asked which company, the employees' common reply was
'Arcgate'. There was not a single employee, with whom we
enquired, who told us that he knew that the Respondent
company had been struck off from the register of
Companies or there has been any change in the structure /
functioning / logistics of the Respondent.

iv)   On being asked if there has been any change in the salary
payments or whether they have been issued any fresh
appointment letters, all the employees from whom we
enquired denied any change. The Employees refused to
share their appointment letters or any details of their
employer.

v)   On being specifically being asked about Workmob Private
Limited, a company also owned and run by the Bagla
family, some of the employees had heard of the firm but
beyond that there was limited information.

vi)   On being asked about StonexInfotech Private limited,
another company associated withtheBagla family, almost
all employees feigned ignorance and stated that they are
not aware of the company.

vii)   We were also told that Arcgate is fully functioning and it
provides massive employment to people in Udaipur. It
appears that for the employees there was no difference in
respect of the operations or control of the Respondent /

Partnership and for all purposes the same was interchangeably used by the employees.

c)   **Role of KunalBagla and DilipBagla**; The Commissioners enquired with multiple people on the premises as to its ownership, the company leadership and also their employment. On being asked about KunalBagla, many employees acknowledged that he is the founder of the company. Similarly on being asked about DilipBagla, they stated that he was KunalBagla's Father.

d)   However, on being asked about DevyaniBagla, they feigned ignorance.

e)   Almost all employees we interacted with belonged to the internal IT operations, i.e. they were not working on a client project. It is pertinent to note that, that despite being told that all employees are working from home, the entire IT Team was present on site.

f)   When specifically asked about whether they had heard of CREXi, initially they feigned ignorance. However, they qualified their statement that as IT personnel, they would not know about each and every client.

g)   I was forcefully shouted at and provided a letter to sign from Arcgate – Partnership firm which has the same address as that of the Respondent which I did sign in order to ensure the situation did not go out of control and the commissioners and our personnel were not further threatened. The letter is annexed herewith as **Annex. G.**

h)   Furthermore, we did an online review of Respondent's/Arcgate's online presence, and the online profile of the company founder, it is clear that the Arcgate business has carried on without interruption before and after Respondent was struck off, holding itself out to the world, and third parties, as the same Arcgate today as has been in existence for many years.

i)   For example, the Arcgate LinkedIn page (available at https://www.linkedin.com/company/arcgate/about/) states that Arcgate was founded in 2005.



j) KunalBagla, who describes himself on LinkedIn as the founder of Arcgate(https://www.linkedin.com/in/kbagla/), states on that same page that he has been at Arcgate from "Apr 2005 – Present" in "Udaipur Area, India" where he has "[o]verall responsibility for the sales and marketing in the US market and for the strategy behind service offerings."

k) The Arcgate website itself also remains unaffected by the striking off of Respondent. See https://www.arcgate.com.

l) We note that the company website remains the same, the same Arcgate logo remains affixed outside and around the premises, and from the interview of the employees we noted that the business's assets and clients appear to be the same before and after the striking off.

m) Furthermore, we found on the premises evidence of work relating to CREXi. By contrast, the moment we attempted to execute the Commission, the Arcgate General Manager, without even reading the Order, immediately argued that it was inapplicable on the grounds that the premises now belonged to another entity, an Arcgate partnership, and not Respondent. We also found that the employees could not or were unwilling to statewhich entity employed them. No employee was willing to check, show or verify or provide their employment contract despite the commission requesting them to do so. The Commission was unable to find any employee or person who was able to inform the commission as to the name of the exact entity that functioned on the premises or who employed them.

n) Based on all the facts and circumstances, including the arguments and actions of the General Manager, the IT persona land the Advocate for Responder.t/Arcgate, we observe the additional following facts:

  i. that the commission was being expected and was immediately prevented for entering the premises;

  ii. that various attempts were made to mislead and not cooperate with the commission as set out in this report,



iii.     that the commission found clear and specific evidence of
         work/ data and files relating to CREXi and identified at least
         three individuals who were responsible for this work; The
         Commissions was immediately stopped once this
         information was found;

iv.      The commission was stopped, threaten and told to
         immediately leave the premises, at which time the
         commission felt that considering the safety of the people
         involved, it was important to leave the premises and report
         to this Hon'ble Court.


**ADDITIONAL REPORT OF MR. SAURABH KUMAR**

6)  **EVENT 4: VIEWING Respondent's / Partnerships DATA LOGS**

a)     After speaking to the employees, I requested that myself and Mr.
       Hanuman Sharma be taken to the server rooms for us to carry out
       the commission. The IT persons and employees wasted close to
       one hour of our time, trying to feign that they had no back-up of
       the data logs and networks of Arcgate. When Mr. Sharma
       mentioned that lying to a court-appointed commissioner had
       serious legal consequence, I and Mr. Sharma were directed to the
       server rooms.

b)     The Commissioners along with the videographers, captured the
       relevant photographs during the commissions and made notes of
       the requisite information after entering into the premises of the
       Respondent/Partnership ard to obtain all the necessary and
       requisite information about the impugned infringement material. I
       asked Mr. Jain to introduce the relevant IT employees to explain
       how the data systems are maintained at the company premises.
       The following details were shared by the IT team.

c)     **Respondent's/Arcgate's Network Log Review and Related
       Observations**

i)     We were informed that the Respondent/Arcgate had
       replaced network firewall recently, hence the network team



of Respondent/Partnership admitted that they do not have any network logs prior to the upgrade/firewall replacement.

ii) Contradicting the above statement, we were told by the IT Head that they may have a back-up copy of the network logs. However the same was not identified or provided to the team.

iii) However, we were able to see network logs for August 6, 2021 from morning 6.00 a.m. IST onwards.

iv) One of the employees also stated that all old network logs prior to 6 August 2021, were deleted.

v) Soon after this we were forced to stop our data collection/system review work and asked to leave the premises.

vi) We were given contradictory answers on accessing the network logs in order to prevent us from the carrying out the commission.

vii) We were told that the systems have been replaced three months ago.

d) **Evidence that CREXi was Respondent's/Arcgate's client:** Contemporaneously, with the help of another employee Mr. Daksh Bhatnagar (member of HR Team of the Respondent) some employee details were accessed. As per Mr. Daksh, there was a place on a cloud system which is used to record employee and project-related details such as employee master, current employment status, projects assigned to, time and attendance, leave management and employee performance management. On specific query about the folders and logs concerning work done for CREXi, Mr. Daksh identified a folder on one of the computers at the premises. When the folder was opened, profiles of several employees who were working on the CREXi project could be seen. My key observations are below.

e) We found CREXi related folder in the ARCCRM system reflecting three employees who have been assigned to the CREXi project



f) As per the folder we found the following data -- see Picture 1 below:

   i) Employee status field which shows employee status - "current employee"

   ii) Sub-department field which shows name of project employees assigned to - "CREXi, Inc"

   iii) Further, folder search result displayed three employees assigned to CREXI project:

| Name of employee | Rajesh Kumar Suthar | Ankit Garg | Hirendra Kumar Vasita |
|---|---|---|---|
| Designation | Quality Analyst | Senior Research Analyst | Senior Research Analyst |
| Tele No. | 8890765641 | 8107214390 | 9601038873 |
| Sub-department | CREXi, Inc | CREXi, Inc | CREXi, Inc |
| Emp. No. | 05-00583-RS | 05-05512-AG | 05-07026-HV |
| Joining Date | December 17, 2013 | April 9, 2018 | September 26, 2019 |

g) The Advocates for the Petitioners have given me a copy of the pleadings in the captioned matter. I understand that names of these three employees individuals were also filed with this Hon'ble High Court as part of Annexure 13 of the Writ Petition 9384 of 2021.

**Picture 1:** Rajesh Kumar Suthar, Ankit Garg, Hirendra Kumar Vasita working on CREXi project





**Picture 2:** WFH Output Report Consisting Name of employees working on CREXi, Inc



7) **Event 5: OBJECTION BY THE RESPONDENTS AND THREAT TO PHYSICAL SAFETY OF THE COMMISSIONERS** While the team was gathering more information on the folder was setting up systems to mirror the relevant files, the Advocate representing / assisting the Respondent, Mr. Kuldeep Tank, arrived in the room where the computer was being accessed by the Technical team and started shouting and abusing the Commissioners. He said that the 'you get up and leave the premises immediately'. He further threatened to throw the team out and asked the Security personnel to ensure that the commission is stopped. This misconduct can be viewed in the videos annexed herewith as part of the pen drive submitted to this Hon'ble Court as **Annex.B.**

a) The Commissioners and the technical team assisting the Commissioners were forced to abandon the commission due to the threats and obstructions that were created by the Respondent, its employees and specifically the Advocate Mr. Kuldeep Tank representing the Respondent.

b) The Advocate Mr. Kuldeep Tank completely disregarded the authority of the Commissioners and the Order passed by this Hon'ble Court. Even when he was told that this may amount to contempt, he showed complete disregards to the legal process and the commissioners. He handed over to the Commissioner, objections that were prepared by the Respondent and stated that the High Court will decide the issue and that the commission cannot be executed any further.





    c)    As a result, the Commissioners left with no option, left the premises of the Respondent without the proper execution of the commission.

8)     I am attaching herewith **Annex. H1 -- H3** the screen grabs of the videos taken during the execution of the commission with the relevant time stamps. These screenshots were taken during the execution of the commission at 10:00 AM

9)     The Respondent, including by and through its General Manager and Advocate, prevented us from carrying out the commission despite being served the certified copy of the said Orders directing the execution of the commission at any premises of the Respondent. In particular, the behavior of the Advocate, Mr. Kuldeep Tank was disrespectful, contemptuous and ensured that the commission was abandoned in violation of this Hon'ble Court's orders.

Hence, this Report.

Date: 9 August 2021

PLACE: Jodhpur

Hanuman Sharma

(Court Commissioner)

Saurabh Kumar

(Court Commissioner)

## <u>Annexure H1 - SOCIAL MEDIA PRESENCE OF THE COMPANY</u>

**ArcGate Corporate Website**



Dun & Bradstreet rated Arcgate as the Best Mid-Sized Enterprise in the IT & ITES sector in
India.

**LinkedIn Profile Arcgate Founder – Kunal Bagla**



## ArcGate Website Contact us page



## Arcgate Twitter page (last active July 15, 2021)





## Annex. H2 - INTERACTION WITH ARCGATE EMPLOYEES

**Image 1: Arcgate Security, on manager's instruction, preventing execution of commission**



**Image 2: ArcGate employees recording interaction with Commissioners.**





## Annex. H3 - COMMISSIONER EXECUTION AT ARCGATE PREMISES

### SEQUENCE OF EVENTS

**Image 1: Arrived at the Arcgate office**



**Image 2: Screen shot of Arcgate Premises**



Page - 2 -

Image 3: General Manager receiving the order



Image 4: General Manager refusing entry to the Court Commissioner





**Image 5: Court Commissioner being prevented from executing the commission**



**Image 6: Focused inquiries with present employees regarding company status**





**Image 7: general manager directing the Court Commissioner to leave the premises**



**Image 8: Police arriving on being called by the general manager**



Page 25



Image 9: Police interacting with the court Commissioner

Image 10: Commissioner team being allowed inside after police interaction

# HIGH COURT OF JUDICATURE FOR RAJASTHAN AT JODHPUR

## S.B. Civil Writ Petition No. 9384/2021

1. Costar Group Inc., A Corporation Registered Under The Law Of The State Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America.

2. Costar Realty Information, Inc., A Corporation Registered Under The Laws Of The State Of Delaware And Having Its Principal Place Of Business At 1331 L Street, Nw, Washington, District Of Columbia 20005, United States Of America Through Power Of Attorney Holder Bharat Madakan Having My Office At Samridhi Bangolow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depo, Charkop Kandivali ()W) Mumbai - 400047.

----Petitioners

Versus

Arcgate Teleservices Private Limited, A Company Incorporated Under The Companies Act, 2013 Having Its Registered Office At G1-10 I.t. Park, Madri Industrial Area, Udaipur, Rajasthan 313001.

----Respondent

| For Petitioner(s) | : | Mr.M.S.Singhvi, Sr. Advocate assisted by Mr.Mukesh Maheshwari Mr.Faraz Sagar Mr.Hiren Kamod Mr.Aidan Choudhary Ms.Simran Agarwal |
|---|---|---|
| For Respondent(s) | : | |

## HON'BLE MR. JUSTICE VIJAY BISHNOI

### Order

### 30/07/2021

This writ petition is filed by the petitioners being aggrieved with the order dated 06.04.2021 passed by Judge, Commercial Court, Udaipur (for short 'the trial court' hereinafter) in C.I.S. No.06/2021, whereby the application preferred on behalf

(Downloaded on 30/07/2021 at 02:53:28 PM)

of the petitioners for *ex parte* appointment of Court Commissioner
as per the provisions of Order XXVI Rule 9 of the Code of Civil
Procedure, 1908 (for short 'CPC' hereinafter) has been dismissed.

The petitioners filed a suit for injunction against the
respondent – Arcgate Teleservices Private Limited before the trial
court, which is pending consideration. Along with the said suit, the
petitioners also preferred an application under Order XXVI Rule 9
CPC seeking ex parte appointment of Court Commissioner.

As per the petitioners, petitioner No.1 is a company
incorporated under the laws of the State of Delaware in the United
States of America and petitioner No.2 is a wholly owned subsidiary
of petitioner No.1. It is claimed that the petitioners are leading
provider of commercial real estate information, analytics and
online marketplaces in the United States of America and they have
developed the most comprehensive database of commercial real
estate in the world.

It is also claimed that the petitioners are touching
average 24,000 brokers, owners, developers and other real estate
professionals daily through phone calls canvassing a half million
properties per year and are taking nearly one million photographs
annually.

It is contended by the petitioners that website
'LoopNet' (available at http://www.loopnet.com) is the foremost
digital marketplace for commercial real estate in the United States
and it contains petitioners' copyrighted photographs and data from
its database. Every day, buyers, sellers, lessors, lessees, owners
and brokers access and use LoopNet to list, buy, sell, lease, rent
or browse commercial real estate.

(Downloaded on 30/07/2021 at 02:53:28 PM)

It is further contended by the petitioners that one of the current competitors of the petitioners in the United States of America is Commercial Real Estate Exchange, Inc. (CREXi). CREXi is a company incorporated in the State of California in the United States of America and as per its website, it describes itself as a commercial real estate marketplace that simplifies transactions for commercial brokers with a suite of easy to use tools to manage the entire progress from listing to closing. CREXi's website allows to use commercial real estate listings in markets across the United State of America. CREXi also runs an online auction marketplace.

It is further contended by the petitioners that the CREXi has raised a significant amount of funding recently and is competing with the petitioners. It is alleged that CREXi is attempting to build its own online commercial real estate marketplace and auction platform by free riding on petitioners' billions of dollars of investments and its three decades of hard work. It is also alleged that CREXi has accessed the petitioners' database and LoopNet more than a million times and forced the petitioners to file a lawsuit against it in the United States District Court for the Central District of California in the month of September, 2020. In the lawsuit, the petitioners have alleged that CREXi is involved in copyright infringement, violation of United States Digital Millennium Copyright Act, misappropriation, unfair competition, false advertising and breach of contract. In the very lawsuit, it is alleged that the respondent – Arcgate Teleservices Private Limited is working for CREXi and is accessing LoopNet without authorization for competitive purposes on behalf of CREXi in violation of LoopNet's terms and conditions, committing contributory infringement of the petitioners' copyrighted

(Downloaded on 30/07/2021 at 02:53:28 PM)

(4 of 11)                                    [CW-9384/2021]

photographs and engaging in piracy/theft, improper access to petitioners' websites and misappropriation of the petitioners' proprietary contents at the behest of CREXi.

It is contended that in the lawsuit filed by the petitioners against the CREXi, it has not denied or disclaimed that the respondent - Arcgate Teleservices Private Limited is accessing LoopNet on behalf of CREXi. The petitioners have placed on record certain documents before the trial court in support of their allegations that respondent - Arcgate Teleservices Private Limited is working on behalf of CREXi and is illegally accessing the LoopNet and transferring the data of the petitioners – company to CREXi.

The petitioners, by way of an application preferred under Order XXVI Rule 9, CPC before the trial court, sought *ex parte* appointment of a Court Commissioner, which came to be rejected by the trial court vide impugned order. Hence, this writ petition.

Learned counsel for the petitioners has argued that the learned trial court grossly erred in rejecting the application filed by the petitioners for *ex parte* appointment of Court Commissioner. It is further submitted that the trial court failed to appreciate that granting of ad interim relief is necessary in the present case.

It is argued that the trial court erred in holding that for the appointment of *ex parte* Court Commissioner, it is insufficient to show that it is possible that the respondent committed the said act of copyright infringement, rather, there must be concrete evidence that the said act of infringement has been committed by the respondent. It is submitted that at the *ex parte* ad interim stage, the petitioners were required to make out a strong prima

(Downloaded on 30/07/2021 at 02:53:28 PM)

[CW-9384/2021]

facie case and the petitioners have produced ample evidence on record that there is possibility that the respondent has committed the said act of copyright infringement.

Learned counsel for the petitioners has further submitted that the petitioners have adduced significant evidence of respondent's wrongdoings including evidence that the respondent is working on behalf of the petitioners' competitor – CREXi and is regularly accessing the petitioners' LoopNet website on behalf of the CREXi without authorization and in breach of petitioners' binding terms and as such committed contributory infringement of petitioners' copyrighted photographs and engaging in piracy/theft and misappropriation of petitioners' proprietary content.

Learned counsel for the petitioners has further submitted that the trial court has failed to appreciate that in intellectual property matters, a party is subjected to strict proof of infringement because at the initial stage, it cannot be expected from a party to have full fledged evidence of infringement.

It is further submitted that in case of involving technology/software/internet activity, it is impossible for a party to completely understand the nature of activity of a wrongdoer unless the evidence from its systems and files is taken into custody and preserved for trial.

Learned counsel for the petitioners has further submitted that the trial court has failed to consider the ratio in various judgments relied upon by the petitioners, where in one of the judgments, the Delhi High Court has laid down the principles regarding appointment of *ex parte* Court Commissioner in similar type of cases.

(Downloaded on 30/07/2021 at 02:53:28 PM)

[CW-9384/2021]

Learned counsel for the petitioners has also submitted that though the petitioners were successful in making out a *prima facie* case before the trial court but it has illegally rejected the application filed by the petitioners for appointment of *ex parte* appointment of Court Commissioner.

In support of the above contentions, learned counsel for the petitioners has mainly placed reliance on a decision of Delhi High Court in *Autodesk Inc and Anr. vs. Mr. A.V.T. Shankardass and Anr.,* reported in *AIR 2008 Delhi 167.*

I heard learned counsel for the petitioners.

The learned trial court has rejected the application filed on behalf of the petitioners for *ex parte* appointment of Court Commissioner while observing that a Court Commissioner appointed by it would not be qualified to retrieve and preserve the relevant evidence or recover data, which might have been deleted. The trial court has also observed that only the police have means to recover any deleted data. The trial court is further of the opinion that mere existence of photographs on servers is not concrete proof of copyright infringement and sufficient to warrant seizing and preserving of evidence at this stage. The trial court is not convinced that FTI Consulting India Private Limited can act as a Commissioner as its capability cannot be determined on the basis of an application and on asking of the petitioners.

From perusal of the impugned order dated 06.04.2021, it appears that the trial court is of the view that the Court Commissioner cannot be appointed for the purpose of collecting evidence for the plaintiff.

Ultimately, the trial court has held that the petitioners have failed to provide sufficient proof to establish the fact that

(Downloaded on 30/07/2021 at 02:53:28 PM)

[CW-9384/2021]

some photographs are accessed by the respondent-Arcgate Teleservices Private Limited from the petitioners' website on behalf of the CREXi and thereafter transferred to it. The trial court has observed that until and unless this fact is established, it cannot be used as a tool to connect the missing link.

The Delhi High Court in *Autodesk Inc and Anr. vs. A.V.T. Shankardass and Anr.* (supra) laid down certain guidelines for appointment of a Court Commissioner in software infringement and piracy. The relevant portion of the judgment reads as under:

4. Coming now to the question of guidelines to be set, we have heard both the counsel for the parties. We are conscious of the fact that it is neither feasible nor practical to lay down guidelines which would cater to numerous and different situations that may arise. However, some of the following relevant factors and guidelines are being enumerated which the Court may take into consideration on the question of appointment of a Local Commissioner in copyright infringement and piracy matters:

(i) The object of appointment of a Local Commissioner in software piracy matters is not, as much to collect evidence but to preserve and protect the infringing evidence. The pirated software or incriminating evidence can only be obtained from the premises of the opposite party alone and, in the absence of an ex parte appointment of a Local Commissioner, there is likelihood that such evidence may be lost, removed or destroyed;

(ii) Request for ex parte appointment of a Local Commissioner in such matters is usual and in fact is intended to sub serve the ends of justice as it is imperative to have an element of surprise so that the actual position is not altered;

(iii) The test of reasonable and credible information regarding the existence of pirated software or incriminating evidence should not be subjected to strict proof or the requirement to demonstrate or produce part of the pirated software/incriminating evidence at the initial stage itself. It has to be tested on the touchstone of pragmatism and the natural and normal course of conduct and practice in trade.

(iv) It may not always be possible for a plaintiff to obtain any admission by employing decoy customers and

(Downloaded on 30/07/2021 at 02:53:28 PM)

[CW-9384/2021]

gaining access to the defendant's premises. Any such attempt also inheres in it the possibility of dis-appearance of the pirated software/incriminating evidence in case the decoy customers is exposed. Accordingly, visit by decoy customer or investigator is not to be insisted upon as pre condition. A report of private Investigator need not be dis-regarded or rejected simply because of his engagement by the plaintiff. The information provided by the private Investigator should receive objective evaluation.

(v) In cases where certain and definite information with regard to the existence of pirated software or incriminating evidence is not available or where the Court may nurture some element of doubt, it may consider asking the plaintiff to deposit cost in Court so that in case pirated software or incriminating evidence is not found then the defendant can be suitably compensated for the obtrusion in his work or privacy."

*(Emphasis supplied)*

I am perfectly in agreement with the view of the Delhi High Court that the object of appointment of a Local Commissioner in software piracy matters is not, as much to collect evidence but to preserve and protect the infringing evidence and strict proof is not required to be given at initial stage.

The petitioners, along with an application for appointment of Local Commissioner, has placed on record certain documentary evidence in support of their claim that the respondent is illegally accessing LoopNet's website containing copyright photographs and database of the petitioners at the instance of CREXi and is transferring to it unauthorisedly.

After examining the said documentary evidence, which is also annexed with this writ petition, I am of the view that the petitioners are able to prima facie prove that the respondent has illegally accessed the copyright photographs and database of the petitioners – company from its website and

(Downloaded on 30/07/2021 at 02:53:28 PM)

Case 2:20-cv-08819-CBM-AS   Document 175   Filed 08/24/22   Page 209 of 369   Page ID #:28284

[CW-9384/2021]

might have transferred it to the CREXi, which used the said copyright photographs and database for its profit.

In view of the above discussion, I am of the view that the trial court has erred in not appointing the *ex parte* Court Commissioner in the matter in hand.

Before the trial court, two applications were moved, one on behalf of Shri Hanuman Sharma, Advocate, who offered himself to work as Court Commissioner and another by Shri Saurabh Kumar, Senior Director, Risk Advisory and Investigation Consulting India Private Limited, who offered his services as Commissioner/Computer Expert.

Taking into consideration the overall facts and circumstances of the case, I find it a fit case for appointing *ex parte* Court Commissioners and the following directions are issued:

(1)    Issue notice of this writ petition to the sole respondent. Notices are made returnable on 6th September, 2021.

(2)    The petitioners shall deposit cost of Rs.10,00,000/- (Rupees ten lac) with the trial court within one week from today, so that in case incriminating evidence is not found, then the defendant can suitably be compensated for obstruction in its work.

(3)    Mr Hanuman Sharma, Advocate, Udaipur and Mr Saurabh Kumar, Senior Director, Risk Advisory and Investigation FTI Consulting India Private Limited are appointed as Court Commissioners. They shall serve a copy of this order to the respondent before starting commission. They will have all the powers under Order XL Rule 1 or under XXVI Rule 9 CPC in

(Downloaded on 30/07/2021 at 02:53:28 PM)

[CW-9384/2021]

order to attend at and/or enter either by force or by breaking open the lock or by removing the obstruction or barrier or otherwise, the respondent's premises including office situated at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan – 313 001 or any other premises owned or occupied by respondent any time of the day or night without notice to the respondent and with the help of the representative of the petitioners and police. The Court Commissioners : Mr. Hanuman Sharma, Advocate and Mr Saurabh Kumar shall make inventory and seize, take possession, custody and control of the petitioners infringing photographs, along with all the respondent's material, printed matter, communication, invoices, records, relevant passwords and passcodes, and such material and documents relating to infringing photographs owned by the petitioners including such material stored electronically on any systems. They shall also make inventory and take a mirror copy of the entire electronic data of the respondent stored on the computer systems, data storage devices, handled devices, hard disks, pen drives, computer records, cloud-based servers, servers (including any servers maintained at a different location for business continuity purposes and/or disaster recovery) of the respondent (which may be belonging to the respondent or on lease) and shall submit the said mirror copy to the trial court in a sealed envelope along with a report within a month.

The respondent is directed to co-operate and provide all assistance to the Court Commissioners but without limitation to providing access.

(Downloaded on 30/07/2021 at 02:53:28 PM)

(11 of 11)                                    [CW-9384/2021]

The fees of the Court Commissioners shall be paid by

the petitioners as per agreement between the petitioners and

the Court Commissioners.

List on 06.09.2021.

**(VIJAY BISHNOI),J**

masif/-PS



(Downloaded on 30/07/2021 at 02:53:28 PM)

## Exhibit B

ndrive – Videos and Photographs





## Exhibit C

## Names of Individuals

| S.NO. | NAME |
|-------|------|
| 1. | Rakesh Jain |
| 2. | Rajesh Bhatia |
| 3. | Bharat Singh Jhala |
| 4. | Naveen Dayama |
| 5. | Manish Choudhary |
| 6. | Indra Lal Patel |
| 7. | Ashish Kumar Singh |
| 8. | Ranveer Singh |



UDAIPUR



OCATE, LLB.

31st July, 2021

n: The Court Commissioner
Advocate, Mr. Hanuman Sharma

Arcgate Teleservices Private Limited

G1-10 I.T. Park, Madri Industrial

Area, Udaipur,

Rajasthan: 313001.

**Sub:** Execution of Commission

**Ref:** Order date July 30th, 2021 passed by Rajasthan High Court at Jodhpur in **S.B. Civil Writ Petition No. 9384/2021.**

1. Vide an order dated July 30, 2021 (**"Rajasthan High Court Order"**) as referenced in the Writ Petition, the Rajasthan High Court appointed me, Mr. Hanuman Sharma and Mr. Saurabh Kumar, Director FTI as Court Commissioners. A copy of the Order dated July 30th, 2021 is annexed herewith as Annexure **"A"**.

2. I am attaching with this letter the following documents in the referenced Writ Petition:

   a) Plaint dated March 9th, 2021

   b) Application for ex-parte Injunction dated March 9th, 2021

   c) Application for appointment of ex-parte Commissioner dated March 9th, 2021

   d) Order passed by the Udaipur District Court on the application for appointment of the Court Commissioner dated April 6th, 2021

   e) S.B. Civil Writ Petition No. 9384/2021

3. Vide the Rajasthan High Court Order (at Page 10), Arcgate Teleservices Private Limited is directed to co-<u>operate and provide all assistance to me</u>, including <u>providing access to computer systems and office premises</u>.

Page 1 of 2

HANUMAN SHARMA

ADVOCATE, LLB.

DISTRICT COURT
UDAIPUR

Yours sincerely,

Mr. Hanuman Sharma
The Court Commissioner

We acknowledge the receipt of this letter.

Arcgate Teleservices Private Limited

I Rakesh Jain, Employee of Arcgate have received the above notice of the other company M/s Arcgate Teleservices Pvt. Ltd at my address GI-11.

(Rakesh Jain GM)    Arcgate Partnership firm)

Received the high court copy



T: +91 77420 92502292
E: info@arcgate.com

06.08.2021

RM, MIA (Extn.)
13003, Rajasthan

**Mr. Hanuman Sharma**, Advocate
Udaipur

**Mr. Saurabh Kumar**, Senior Director,
Risk Advisory and Investigation
FTI Consulting Private Limited

*Court Commissioner appointed by Hon'ble High Court of Rajasthan)*

**Subject:** Appointment of your good self as the Court Commissioner vide order dated 30.07.2021 passed by the Hon'ble High Court of Rajasthan in ***S.B. Civil Writ No. 9384/2021*** (hereinafter referred to as **"the order"**) for acting as "Court Commissioner" under Order XL Rule 1 or under XXVI Rule 9 CPC.

Sir,

We have been served upon with the order dated 30.07.2021 passed by the Hon'ble High Court in the aforesaid writ petition, wherein you are appointed as the Court Commissioner to inspect the business premises of M/s Arcgate Teleservices (P) Limited having Corporate Identification Number (CIN) U72200RJ2018PTC060838 allegedly situated at G1-10 I.T Park, Madri Industrial Area, Udaipur, Rajasthan-313001.

In this regard, this is to inform you that the Registrar of Companies, Jaipur (ROC) has while exercising their powers under Section 248 of the Companies Act, 2013 has struck off the name and record of the company M/s Arcgate Teleservices (P) Ltd. vide its order dated 23.05.2021 from the record of companies maintained at ROC.

JAS-ANZ
ISO 9001  : 2015
ISO 27001 : 2013
Reg. No. RIS91/9950

Park, MIA (Extn.)
313003, Rajasthan

T: +91 77420 92381/82
E: info@arcgate.com

 ARCGATE

the screenshot from the portal of Ministry of Corporate Affairs (**MCA**) attached herewith.

This is also to inform you that the present premise i.e. G1-11, IT Park, Madri Industrial Area, Udaipur (Rajasthan) belongs to M/s Arcgate, which is partnership firm registered with Registrar Office, Udaipur since 2005. You may kindly take note of the same and not to undertake any coercive measures against M/s Arcgate, a partnership firm, which is operating from the aforesaid premises i.e. G1-11, IT Partk, Udaipur (Raj).

This is for your information. Please act accordingly.

Thanks

Regards,

Rakesh Jain,
General Manager, M/s Arcgate

JAS-ANZ   ISO 9001  : 2015
          ISO 27001 : 2013
          Reg. No. RIS91/9950

## Company Master Data

| | |
|---|---|
| | U72200RJ2018PTC060838 |
| Company Name | ARCGATE TELESERVICES PRIVATE LIMITED |
| ROC Code | RoC-Jaipur |
| Registration Number | 060838 |
| Company Category | Company limited by Shares |
| Company SubCategory | Non-govt company |
| Class of Company | Private |
| Authorised Capital(Rs) | 100000 |
| Paid up Capital(Rs) | 100000 |
| Number of Members(Applicable in case of company without Share Capital) | 0 |
| Date of Incorporation | 06/04/2018 |
| Registered Address | G1-10 I.T. PARK MADRI INDUSTRIAL AREA UDAIPUR Udaipur RJ 313001 IN |
| Address other than R/o where all or any books of account and papers are maintained | |
| Email Id | rakesh@arcgate.com |
| Whether Listed or not | Unlisted |
| ACTIVE compliance | |
| Suspended at stock exchange | - |
| Date of last AGM | 09/10/2020 |
| Date of Balance Sheet | 31/03/2020 |
| Company Status(for efiling) | Strike Off |

### Charges

| Assets under charge | Charge Amount | Date of Creation | Date of Modification | Status |
|---|---|---|---|---|
| | | No Charges Exists for Company/LLP | | |

### Directors/Signatory Details

| DIN/PAN | Name | Begin date | End date | Surrendered DIN |
|---|---|---|---|---|
| 08104682 | KUNAL BAGLA | 06/04/2018 | - | |
| 08104723 | DEVYANI KUNAL BAGLA | 06/04/2018 | - | |

https://www.mca.gov.in/mcafoportal/companyLLPMasterData.do

1/1



REGISTRATION & STAMPS DEPARTMENT
OFFICE OF THE SUB REGISTRAR
UDAIPUR-II
(Rule 25-7-11)
FEE RECEIPT

No. : 2009010519                                    Dated    : 09/09/2009
r Name : DILIP BAGLA                                Face Value : 6498360
r Address : 45 AMBAV GARH UDR
t Type : Lease deed for local bodies (Patta)
t S.No. : 2009010192                                Stamp Value : 0

ry Registration Fee     : 25000     Commission Fee      : 0
aning/Inspection Fee    : 200       Custody Fee         : 0
g Memorandum u/s 64/62  : 0         Miscellaneous Fee   : 0
ed Copying Fee u/s 57   : 0         Stamp Duty Cash     : 0
ation Fee u/s 62
due u/s 25-34

                                                    TOTAL : 25200

ount Rs. Twenty Five Thousand Two Hundred only

                                    Sub Registrar, UDAIPUR-II

Page 1

Rs. 50/-

FORM "C"
No. 78910

## LEASE - AGREEMENT

(SEE RULE 11 OF RIICO DISPOSAL OF LAND RULES, 1979)

Industrial Area ..... I.T.PARK , M/4 (Exh.)

Plot No. ...... G₁-11

THIS LEASE AGREEMENT made on the ........ 28 ....... day of ....8..... in the year two thousand ...... 2009 ........ between Rajasthan State Industrial Development & Investment Corporation Limited, Jaipur, incorporated under the Indian Companies Act, having its Registered Office at Udyog Bhawan, Tilak Nagar, Jaipur-302005, (hereinafter called the Lessor which expression shall, unless the context does not so admit, includes its successors and assigns) of the ONE PART AND

Shri ... DILIP BAGLA .............. S/o W. C. BAGLA .......... Age .60. Years
R/o .. 45, Ambavgarh, Udaipur
Shri Smt. SUSHMA BAGLA .. S/o W/o Sh. DILIP BAGLA Age .54. Years
R/o ..... 45, Ambavgarh, Udaipur
Shri .. KUNAL BAGLA ........ S/o Sh. DILIP BAGLA Age .31. Years
R/o .. 45, Ambavgarh, Udaipur
Shri Smt. DEVYANI SOMANI ... S/o W/o KUNAL BAGLA Age .29. Years
R/o .... 45, Ambavgarh, Udaipur

constituting the registered partnership firm M/s ..... ARC GATE

OR

M/s .................................................
A company registered under the Indian Companies Act and having its registered office at

OR

SR. DY. GENERAL MANAGER
RIICO LTD, UDAIPUR

M/s ..................................................
A society registered under the Co-operative Societies Act and having its registered office at

For ArcGate   For ArcGate   For ArcGate   For ArcGate

Partner        Partner        Partner        Partner

(Hereinafter called the Lessee, which expression shall, unless the context does not so admit, include his heirs, successors, executors, administrators, Legal representatives and permitted assigns) OF THE OTHER PART

WHEREAS the State of Rajasthan handed over the land to the Lessor for the purpose of setting up of industrial Area and the said Lessor (Co poration) planned the land into plots for leasing out to industrialists for erection/setting up/establishing industrial units.

AND WHEREAS the lessor has agreed to demise and the Lessee agreed to take on lease, the piece of land known as plot No. ........ G-17-11 ......... on the terms and conditions hereinafter appearing for the purpose of setting up an industrial unit for manufacturing ........ Coller Soft Sand ......7.. or any other industrial product that may ne allowed to be manufactured by the Lessee in writing according to the factory byelaws, designs and building plan, approved by the proper municipal or other competent authorities.
The plot has been alloted + it Later running rnt.
And whereas the lessor had handed over or shall be handing over possession of the demised land to lessee on ....... 28.6.05 ........ or in due course of time.

## NOW THIS LEASE AGREEMENT WITNESSETH AS FOLLOWS :

1.    In consideration of the covenants and agreement herein contained and on payment by the Lessee of Rs. 1 80 25... (Rs Three Thousand one Hundred ... towards the annual/one time economic rent (strike out which is not applicable) and the receipt where of the lessor hereby acknowledges, the lessor doth hereby demise to the Lessee the plot on land numbered as above in Industrial Area ...... Park, RIIA (sph) containing by mensurament ..3.82.sqm. be the same a little more or less, bounded.

PVT LAND

| | |
|---|---|
| On the North by | Road 18 mt. |
| On the South by | Plot No. G-10 & G-2 |
| On the East by | Road 18 mt. |
| On the West by | |

and the said plot of land is more clearly shown in the attached site plan, TO HOLD the said plot of land (hereinafter referred to as 'the demised premises') with their appurtenances unto the Lessee for the term of ninety nine years from the ...... 30 .. Day of .... 6 .......... year 2005 except and always reserving to the Lessor

1(a)  A right to lay water mains, drains, sewers or electric wires under or over the demised premises, if deemed necessary by the Lessor, in developing the area

1(b)  Full right and title to all mines and minerals in and under the demised premises or any part thereof.

1 (c) Yielding and paying thereof unto the lessor by 31st day of July in each year in advance the yearly rent. The lessor reserves the right to revise the rate of economic rent every 5 years, provided, however the enhancement in rent at each revision shall not exceed 25% of the rent payable for the period immediately preceding revision.
The quantum of rent determined by the lessor shall be final, conclusive and binding on the lessee and it shall not be questioned in any court of law or otherwise.

Provided further that in case the Lessee creates charge in favour of the State Government or Industrial Financial Corporation of India, Rajasthan Financial

For ArcGate          For ArcGate          For ArcGate          For ArcGate

Partner          Sushma Bagla Partner          Partner          Partner

...poration, IDBI, UTI, LIC, IRBI, IFC, SIDBI, EXIM Bank ...operative Banks and other Public Financial Institutions as defined in the ...operative Banks and other Public Financial Institutions as defined in the ...blic Financial Institution Act, 1952, Scheduled Banks or Private Lending ...encies. (hereinafter described as the financing body or bodies) for any ...velopment loan taken by him /it on the security of the premises hereby ...mised and the buildings and machinery is built upon or affixed thereto, first ...arge of the Lessor shall rank second to the charge of the financing body or ...odies provided financing body or bodies obtain prior permission from lessor ...or mortgaging the lease-deed and keep a specific clause in their mortgage ...eed that breach of any of the conditions of these presents (Lease Agreement) ...shall be treated as breach of the conditions of their mortgage deed.

Provided, however that the above provision shall not operate where land is allotted ...on instalment system or 100% development charges of plot are not paid by lessee ...and / or sheds are constructed and allotted on hire purchase basis by the lessor. In ...such cases, the lessee could create first charge in favour of financing body or bodies ...on land / or building as the case may be, with the condition that the balance ...development charges and / or cost of shed as the case may be, shall be remitted to ...the lessor by the financing body or bodies in whose favour the charge has been ...created if the allottee fails to make payment of the balance amount of development ...charges and / or cost of shed in time. In case, the allottee fails to make payment of ...the balance amount of development charges and / or the cost of shed then the Lessor ...shall have right to resume possession of the land irrespective of first charge of the ...financing body or bodies on the plot.

Provided further that the collateral security of plots for loans for any purpose for ...himself or others would be allowed to be created only in favour of financing body ...bodies mentioned in proviso to clause 1 of this Lease Agreement subject to ensuring ...that the Lessee has cleared all the outstanding dues of the Lessor and this is a ...condition of collateral security in the sanction letter of the concerned financing body ...or bodies.

**AND THE LESSEE DOTH HEREBY COVENANT WITH THE LESSOR IN THE MANNER FOLLOWING:**

2 (a) That the Lessee will bear, pay and discharge all rents, taxes, charges and assessment of every description which may, during the said term, be assessed, charged or imposed upon either the landlord or tenant or the occupier in respect of the demised premises or the building erected or to be erected thereupon.

2(aa) The lessee shall pay the development charges of the plot calculated at the rate decided by the Lessor for each Industrial Area. The Lessor reserves the right to enhance the rate of development charges if the compensation payable under an award is enhanced by any competent court subsequently.

2(b) That the Lessee will bear, pay and discharge all service charges required for the upkeep of the Industrial Areas which may during the said term be assessed, charged, levied or imposed and revised by the Lessor.

2 (c) That the Lessee will obey and submit to the rules of Municipal or other competent authority now existing or thereafter to exist so far as they relate to the immovable property or affect health, safety, convenience of the other inhabitants of the place.

2(d) That the Lessee will erect the industrial unit on the demised premises in accordance with the site plan and will complete construction activities within a period of two years and start commercial production within a period of three years from the date

For ArcGate    For ArcGate    For ArcGate    For ArcGate

Partner    Sushma Bral    Partner    D.Sawani
      Partner            Partner

of these presents or from the date of possession, whichever be earlier or within such extended period as may be allowed by the lessor in writing at its discretion on payment of additional charges or otherwise.

Provided that mentioned and of the allotted plot or plots shall revert to the lessor on expiry of the prescribed/extended period for starting production / expansion of the unit.

2 (d). That the Lessee shall not use any space in the industrial area other than demised premises for dumping / placing any construction material / raw material required for construction of factory or manufacturing item or for any product / waste and shall take all measures for proper disposal of waste material.

2 (cc) The lessee shall become a member of the Association / Agency created for setting up and operating the Common Effluent Treatment Plant (CETP) and Solid Waste (hazardous and non-hazardous) Disposal System (SWDS. All the Capital & Revenue expenses relating to acquisition, operation and maintenance of CETP & SWDS shall be borne by all members of Association / Agency in the proportion decided by the Committees of the said Association / Agency.

2 (f) That the Lessee shall take all measures, which are required for Pollution Control and shall strictly adhere to the stipulations, imposed by Rajasthan State Pollution Control Board and other statutory pollution laws of the State for the time being then in force.

2 (g) That the Lessee will provide and maintain in good repairs a properly constructed approach road or path across drain to the satisfaction of the Lessor / Local Municipal Authority leading from the public road to the demised premises.

2 (h) That the Lessee will not carry on or permit to be carried on, on the demised premises any obnoxious trade or business whatsoever or use the same or permit the same to be used for any religious purpose or any purpose other than for the industrial purposes as aforesaid without the previous consent in writing of the Lessor and the Local Municipal Authority and subject to such terms and conditions as the Lessor / Local Municipal Authority may impose and will not do or suffer to be done, on the demised premises or any part thereof any act or thing which may be or grow to be a nuisance, damage, annoyance or inconvenience to the Lessor or Local Municipal Authority or the owner or occupiers of other premises in the neighborhood.

2 (i) The Lessee will not without the previous consent in writing of the Lessor, transfer sub-lease, sublet, relinquish, mortgage, sub-divide, or assign his interest in the demised premises or the building standing thereon or both as a whole and every such transfer assignment, relinquishment, mortgage, sub-division, sub-leasing or subletting shall be subject to the condition that the transferee, assigns shall be bound by all the convenants and conditions herein contained and be answerable to the lessor in all respect thereof.

Provided further that if at any time the financing body or bodies mentioned above decide(s) to take over, sell, lease or assign the mortgaged assets in the demised premises in exercise of any rights vesting in it by virtue of deed or deeds executed in its favour by the Lessee at the time of taking the loan or loans or under any will for the time being in force, the sale, lease or assignment will be subject to the written consent of the Lessor.

Provided further that the Lessee will so often as the said premises shall by assignments or by death or by operation of law or otherwise howsoever become assigned, inherited or transferred during the term of lease hereby granted within one calendar month from the date of such assignment, inheritance or transfer, deliver a notice of assignment inheritance or transfer to the Lessor setting forth names and description of the parties to every probate or a will or letters of administration

For Ardee Infrastructure    For Del Duca    For ArcGate
Partner                     Sushma Bagla     Partner
                            Partner

such lease, order, certificate or other document or affecting or evidencing such assignment, inheritance or transfer and document as aforesaid accompanying the same may which shall remain always at the office of the Lessor AND it is hereby declared that failure to carry out this condition will without prejudice to the right of the Lessor to determine this Lease Agreement for breach of this covenant entail penalty of Rs. 1000/- to be paid by the Lessee. However, if the lessee's firm is dissolved and no successor in interest is there or appointed within 60 days of its dissolution, the lessor shall be entitled to determine this Agreement.

That Lessee will permit the members, officers, subordinates of the Lessor and their employed workmen and persons at all reasonable times of the day to enter into and upon the demised premises and the buildings erected thereupon in order to inspect the same.

(l) That the Lessee will not make any excavation upon any part of the demised premises except for foundation of building and for leveling and dressing the area.

(l) That the Lessee will not erect or permit to be erected on any part of the demised premises any stables, sheds or other structures of any description whatsoever for keeping house cattles, dogs, poultry, or other animals except and in so far as may be allowed by the Lessor in writing.

(m) That the Lessee will neither exercise his option of determining the lease nor hold the lessor responsible to make good the damage if by fire, tempest, flood or violence of any army or a mob or other irresistible force, any material part of the demised premises if wholly or partly destroyed or rendered substantially or permanently unfit for building purpose.

(n) That the Lessee shall apply for permission for any change in the location or production capacity or process of manufacturing to the lessor. If no communication is received by lessee from lessor within 30 days, request shall be deemed to accepted. However lessee proposing to set up polluting industrial unit under red category or setting up effluent discharging unit shall be required to take written permission from the Lessor before initiating any change in their manufacturing product.

2(o) If during the term of the lease the lessee or his workmen or servants

(i) injure or destroy any part of building or other structure contiguous or adjacent to the plot of land hereby demised or,

(ii) keep the foundation trenches or other pits on the demised land open or exposed to weather thereby causing any injury or damage to contiguous or adjacent buildings or

(iii) dig any pits near the foundation of any building thereby causing any injury or damage to such buildings,

the Lessee shall pay such damages thereof within three months as may be assessed by the Lessor whose decision as to the extent of injury or damage or the amount of damages payable therefore shall be final and binding on the Lessee.

2(p) That the Lessee shall also abide by the terms and conditions of the letter of allotment, RIICO Disposal of Land Rules, 1979 and amendments made therein from time to time. The letter of allotment shall form part and parcel of the Lease Agreement.

उप-प्रबन्धक
(प्रशासन)-द्वितीय

SR. DY. GENERAL MANAGER
RIICO LTD. UDAIPUR

For ArcGate    For ArcGate    For ArcGate    For ArcGate

5

Partner    Sushma Bagla    Partner    Partner
           Partner

**AND IT IS HEREBY FURTHER AGREED AND DECLARED BY AND BETWEEN THE PARTIES TO THESE PRESENTS AS FOLLOWS**

3 (b) Notwithstanding anything hereinbefore contained if there shall have been in the opinion of the Lessor any breach by the lessee or by the person claiming through or under him of any of the covenants or conditions herein before contained and on his part to be observed and performed and in particular without prejudice to the generality of the sub-clause, subject to exceptions or if any amount including interest due to the lessor remaining unpaid for a period of 90 days after the same shall have been demanded by the Lessor or if the Lessee or the persons in whom the terms hereby created / vested is adjudged insolvent and if this Agreement is determined as hereinbefore specified, it shall be lawful for the Lessor without prejudice to any other right of action of the Lessor in respect of any breach of this Agreement to re-enter without taking recourse to a court of law upon the demised premises or any part thereof in name of whole and thereupon this demise shall absolutely CEASE and determine and the money paid by the Lessee by virtue of these presents shall stand forfeited to the Lessor without prejudice to rights of the Lessor to recover from the Lessee all money that may be payable by the lessee hereunder with interest thereon at ............... percent per annum and the lessee shall not be entitled to any compensation whatsoever.

Provided always that the Lessee shall be at liberty to remove and appropriate to himself all buildings, erections and structures, if any made by him and all materials thereof from the demised premises after paying up all outstanding amount including interest upto date and all municipal and other taxes, rents and assessments then due and all damages and other dues accruing to the Lessor and to remove the materials from the demised premises within three months of the determination of lease and in case of failure on the Lessee's part to do so, the buildings and erections standing on the demised premises and all materials thereof shall vest in the Lessor and Lessee shall then have no right to claim for the refund of any money paid by him to the Lessor upto that time or to claim any compensation for the structures and materials put up by him on the demised premises.

Provided further and always the right of re-entry and determination of the lease of the industry shall not be exercised if the financing body or bodies remedy the breach within a period of 90 (ninety) days from the date of notice issued or served by the Lessor on the financing body or bodies regarding said breach or breaches.

3 (c) All legal proceedings for breach of the aforesaid conditions, shall be lodged in courts situated at Jaipur and not elsewhere.

3 (c) Any loss suffered by the lessor on a fresh grant of the demised premises for breach of aforesaid conditions on the part of the Lessee or any person claiming through or under him shall be recoverable from the lessee.

3 (d) Any notice or communication required to be served hereunder shall be deemed to have been sufficiently served on the Lessee if served by Registered acknowledgement Due Post and signed by an Officer of the Lessor and the services shall be deemed to have been made at the time of which the registered letter would in the ordinary course be delivered even though returned un-served on account of the refusal by the Lessee or otherwise howsoever.

3 (e) The security deposit made with the application for allotment of land shall be

For ArcGate    For ArcGate         For ArcGate         For ArcGate

*Partner*          Sushma Bagh     *Partner*            Dsouza...
Partner                              Partner              Partner

...ded to the Lessee after the unit goes into commercial production on all ...ation made by him.

...security deposit shall stand forfeited whenever there is a breach of any ...tion contained in the lease agreement

...powers exercised by the Lessor under this lease agreement may be ...cised by the Managing Director, Rajasthan State Industrial Development ...Investment Corporation Limited or such other person (s) authorised in this ...alf.

...ovided that the expression Managing Director shall include the person who ...entrusted by the Lessor with the functions similar to those of the Managing ...rector.

...very dispute, difference or questions touching or arising out or in respect of ...is Agreement or the subject matter thereof shall be referred to the sole ...bitration of the Collector of the district wherein the leased plot is situated or ...ny person appointed by him, the decision of such arbitrator shall be final and ...inding on the parties.

...The stamp and registration charges on this agreement shall be borne by the ...Lessee.

IN WITNESS HEREOF THE parties hereto have set their hands this day ...of the month of ............. in the year 2029

Dev charges
3282.82+45(?) Rs 1980/-Pan
= Rs 64983601=

SR. DY. GENERAL MANAGER
RIICO LTD. UDAIPUR

For and on behalf of
Rajasthan State Industrial Development
and Investment Corporation Limited

Signature of Witness

For Lessee
For ArcGate          For ArcGate
                     Subhas Rai
              Partner      Partner
For ArcGate          For ArcGate
      Partner              Devaun
                           Partner

Name : RAKESH JAIN        Partner Name ..............
(in capital letters)          (in capital letters)

Address : SOTA TAGORE NAGAR        Address :
SECTOR 4, HIRAN MAGRI
UDAIPUR, 313002

उप-पंजीयक
उदयपुर-द्वितीय

7

SITE PLAN OF PLOT NO. G1 - 11 AT ___ T PARK
MEWAR INDUSTRIAL AREA (EXTN) UDAIPUR
AREA 3282.00SQM

PVT. LAND

PLOT NO.
G1 - 9

PLOT NO.
G1 - 11

PLOT NO.
G1 - 10

R O A D   18.00M   W I D E

BUILDING PARAMETERS :
PLOT AREA                          3282.00SQM
MAXIMUM GROUND COVERAGE   40% OR AFTER LEAVING SET BACK (35.84%)
FAR                                1.75
HIGHT OF BUILDING                  AS PER RIICO RULES
PARKING REQUIREMENTS               1 ECS PER 35 SQ.MTR. OF FAR AREA

Sr. DRAUGHTSMAN          ASSTT. REGIONAL MANAGER          SR DY GENERAL MANAGER
                                                          RIICO LTD. UDAIPUR/SSIE

R I I C O   L T D   U D A I P U R

For ArcGate     For ArcGate     For ArcGate     For ArcGate

REGISTERED A.D.

Phone: 2491494

**OFFICE OF THE SENIOR DY GENERAL MANAGER, RIICO LTD.**
**MEWAR INDUSTRIAL AREA, ROAD NO. 2, UDAIPUR**

Dt.3.|.|.01

U(22)-3(11-G-18-20)2008/ 847

## ALLOTMENT LETTER

To
ArcGate,
Dilip Bagla,
Ambavgarh,
Udaipur

Sub : Allotment of Land for establishing of Computer Software/IT enabled Services in I.T. Park at MIA (Extn.), Udaipur

Dear Sir,

In reference to your application dated 29.5.2009 for allotment of land at it Park MIA(extn) Udaipur. The committee constituted by the Board of Directors of Corporation has considered your application for allotment of plot no. GI-11, measuring 3282 Sqm. @ 1800/- Psqm. + 10 % corner charges amounting to Rs. 6491360/- for establishing of Computer Software/IT enabled Services on the following terms & conditions :-

1.  That you have to pay 75% amount of development charges i.e. amounting to Rs 4873770/- and following amount within 60 days from the date of issue of this letter. -

    | | |
    |---|---|
    | (i) Economic Rent @ Rs 38 /- Per 4000 sqm. & part there of 318x10 = 3180/- (One time) | Rs. 3180.00 |
    | (ii) Service charges @Rs.2.75 Psqm | Rs. 4125.00 |
    | (iii) Add service charges @ Rs. 0.25 Psqm | Rs. 375.00 |
    | (iii) Service Tax/Education Cess Tax | Rs 464.00 |
    | (iii) Misc receipt (site plan & L D form ) | Rs. 400.00 |
    | Total amount | Rs 8544.00 |

    (v) That you shall have to submit the copy of SSI registration or registration for IT Unit from competent authority before execution of lease deed.

2.  You have to pay the Economic Rent and Service charges in future by 31 July each year.
    (a)   You have to execute the lease agreement and Registered at your cost within 60 days from the date of issue of this letter.
    (b)   That you shall take over the possession of the plot allotted to you within 60 days from the date of allotment, otherwise shall be deemed possession to you.

SR. DY. GENERAL MANAGER
RIICO LTD. UDAIPUR

ArcGate         For ArcGate         For ArcGate         For ArcGate

Partner         Sushma Bagla         Partner         Partner
                Partner

In case any extension of time limit is required for any of the above, the application stating the cogent reasons should reach to the undersigned within the time as it prescribed for the above.

In case amount of Economic Rent, Service Charges, Development charges and interest etc. per rules & these amount is not paid and the Lease deed is not executed within 60 days from the date of issue of the letter or within the authorised / extended time the allotment order will be treated as cancelled and the security money and other amount deposited shall be forfeited to the corporation.

No change in constitution of firm / Co. will be effective without depositing the charges / premium to the corporation as per rules. The present partners of the firm will be as under :-

1. Sh. Dilip Bagla 2. Smt Sushma Bagla 3. Sh. Kunal Bagla 4. Smt Devyani Somani.

7. That you will plant 100 Nos. of plants in the premises.

This allotment is in accordance with RIICO land Disposal Rules 1979 and afterwards amendments from time to time will also be applicable and rebate as per RIICO disposal of land rules shall also be allowed.

8. This allotment letter will be part and parcel of lease agreement.

9. This allotment letter shall also be treated N.O.C. of the corporation for taking Power / Water connection in the allotted plot from AVVNL / PHED. Any concerned department.

10. That the allottee shall take steps in the plot for harvesting of rain water to the maximum possible extent.

11. That you shall have to establish an unit for Computer Software/IT Enabled services unit on the plot with a minimum fixed investment of Rs. 2.13 Crore.

12. That you would be required to have construction activities completed within a period of two years and production activities started within a period of three years from the date of execution of Lease agreement/possession whichever is earliest.

13. That completion of construction means coverage of at least 20% of the plot area with a pucca structure whose roof has been built up.

14. The lease hold right of vacant plots will not be permitted to transfer in any case.

15. That you have to maintain the following building norms & Maximum height of the Building will be allowed as per RIICO building parameter for IT & ITES Industries.

| Front set back I | Front set back II | Side set back | Rear set back | FAR |
|---|---|---|---|---|
| 12.00 Mtrs | 12.00 Mtrs | 9.00 Mtrs | 9.00 Mtrs | 1.75 |

Thanking you,

Yours faithfully,

SR. DY. GENERAL MANAGER

Copy to:    1. General Manager ( DIC ), Udaipur for information.
            2. ARM (N) RIICO Ltd. Udaipur.

SR. DY. GENERAL MANAGER

SR. DY. GENERAL MANAGER
RIICO LTD. UDAIPUR

For ArcGate

For ArcGate

For ArcGate

For ArcGate

Partner

Sushma Bagla
Partner

Partner

Partner



आज दिनांक 9 माह September सन् 2009 को 15:27 बजे
श्री /श्रीमती / कुमारी DILIP BAGLA S/o /w/o /पत्नी श्री M.L. BAGAL
उम्र 60 वर्ष जाति BAGLA व्यवसाय BUSINESS
निवासी 45 AMBAV GARH, UDR
ने मेरे सम्मुख /रूपान्तरण अधिकारी हेतु प्रस्तुत किया ।

हस्ताक्षर प्रस्तुतकर्ता      हस्ताक्षर उप पंजीयक, UDAIPUR-II
(2009)010:92,
(Lease deed for local bodies (Patta))

हस्ताक्षर      फोटो      अंगूठा

**निष्पादन की/निष्पादित / सूची (Executant)**

1-DILIP BAGLA M.L. BAGAL
Age:83, Caste-BAGLA
Ocu-BUSINESS
R/O-45 AMBAV GARH, UDR / PAN NO.
ADMPB-0556-D

2-SUSHMA/DILIP JI
Age:54, Caste-BAGLA
Ocu-BUSINESS
R/O-45 AMBAV GARH, UDR / PAN NO.
ADOPB-0064-C

3-KUNAL/DILIP JI
Age:31, Caste-BAGLA
Ocu-BUSINESS
R/O-45 AMBAV GARH, UDR / PAN NO.
AJKPB-1457-D

4-DEVYANI/KUNAL JI
Age:29, Caste-BAGLA
Ocu-BUSINESS
R/O-45 AMBAV GARH, UDR / PAN NO.
ADYPS-5819-C

5-RIICO/MANEGAR
Age:0, Caste-
Ocu-
R/O-UDR

उप-पंजीयक
उदयपुर-द्वितीय



रसीद नं0 2009010519 दिनांक 09/09/2009
रजीयन शुल्क रु0 25000/—
प्रतिलिपि शुल्क रु0 200/—
पृष्ठांकन शुल्क रु0 0/—
अन्य शुल्क रु0 0/—
ग्राही उपकर शुल्क रु0 0/—
कुल योग रु0 25200/—

(2009010192)  उप रजीयक UDAIPUR-II
(Lease deed for local bodies (Patta))

धारा 54 के तहत प्रमाण-पत्र
प्रमाणित किया जाता है कि इस विक्रय पत्र
की गालियत रुप्ये 5-80360
चालते हुए दर पर एवं भी गृह्म
प्रति 0 गुर कागा पंजीयन शुल्क
रुपये 25000 कुल कागा 25200
जरिये रसीद संख्या 2009010519 दिनांक 09/09/2009
में जमा किये गये हैं।
अतः दस्तावेज पर रुप्ये 0
के मुद्रांकों पर प्रमाणित किया जाता है।

(2009010192)  उप रजीयक UDAIPUR-II
(Lease deed for local bodies (Patta))

आज दिनांक 09/09/2009 को
पुस्तक संख्या 1 जिल्द संख्या 3r6
में पृष्ठ संख्या 32 क्रम संख्या 2009006035 पर
पंजिबृद्ध किया गया तथा अतिरिक्त
पुस्तक संख्या 1 जिल्द संख्या 1461
के पृष्ठ संख्या 315 से 324 पर
चस्पा किया गया।

(2009010192)  उप रजीयक UDAIPUR-II
(Lease deed for local bodies (Patta))

5



# IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

## AT JODHPUR

### D. B. CRIMINAL MISC. APPLICATION NO._____/2021

## IN

### D. B. CRIMINAL CONTEMPT PETITION NO. 2/2021

| PETITIONERS | V/s | RESPONDENTS |
|---|---|---|
| Costar Group, INC. & Ors. | | Arcgate Teleservices Pvt. Ltd. & Ors. |

## I N D E X

| S. No. | Particulars | Pg. No. |
|---|---|---|
| 1. | Application for withdrawal of the Criminal Contempt Petition. | 98 - 100 |
| 2. | Affidavit in support of Application. | 101 |

Counsel for the Petitioners

1 5 DEC 2021

ATTESTED BY ME

SHANE CARDOZ
Advocate & Notary (Govt. of India)
Reg. No. 16388    B.Com, LL.B.
G3, Clifford House, Kadeshwari Mandir Road,
Next to Ganesh Mandir Chowk, Bandra (W),
Mumbai - 400 050.  Mob.: 98205 17020

98

1

## IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

## AT JODHPUR

D. B. CRIMINAL MISC. APPLICATION NO._____/2021

IN

D. B. CRIMINAL CONTEMPT PETITION NO. 2/2021

| PETITIONERS | V/s | RESPONDENTS |
|---|---|---|
| Costar Group, INC. & Ors. | | Arcgate Teleservices Pvt. Ltd. & Ors. |

\* \* \*

## APPLICATION FOR WITHDRAWAL / NOT PRESSING OF THE CRIMINAL CONTEMPT PETITION ON THE GROUND OF AMICABLE TERMS OF COMPROMISE.

\* \* \*

To

The Hon'ble Chief Justice and his other companion Judges of the high court of judicature for Rajasthan at Jodhpur.

**MAY IT PLEASE THIS HON'BLE COURT,**

1.   That the Petitioners have preferred the present criminal contempt petition ("**Criminal Contempt Petition**"). The petition contended that the Respondent's obstructed the implementation of the Order dated 30.07.2021 passed by this Hon'ble Court and had interfered with the administration of justice.

2.   That since the filing of the Criminal Contempt Petition, the matter is pending adjudication before this Hon'ble Court.

3.   That during the pendency of the proceedings of the Criminal Contempt Petition, the Respondents and the Petitioners have arrived at an amicable settlement amongst themselves through which they have entered into certain terms of settlement. Furthermore, the

SHANE CARDOZ
Advocate & Notary (Govt. of India)
Reg. No. 16388    B.Com., LL.B.
G3, Clifford House, Kadeshwari Mandir Road,
Next to Ganesh Mandir Chowk, Bandra (W),
Mumbai - 400 050.  Mob.: 98205 17020

99

2

Respondents have taken steps to purge allegations of contempt, and comply with the Order dated 30.07.2021, by handing over relevant documents to the Petitioners herein that would have been recovered in the course of the commission directed by this Hon'ble Court on 30.07.2021. The factum of such compliance by the Respondents is set out in the Order dated 24.11.2021 passed by this Hon'ble Court in S.B. Civil Writ Petition No. 9384/2021.

4.      Thus, the Petitioners do not want to contest and prosecute the Criminal Contempt Petition any further. Therefore, the present application is being preferred through which, the Petitioners are seeking leave and permission of this Hon'ble Court to withdraw / not press the Criminal Contempt Petition.

5.      That the Petitioners have no objection in case the Criminal Contempt Petition is dismissed by this Hon'ble Court as the instant dispute *inter se* the parties has been settled, and therefore, no legal injury shall be caused to any of the third persons in the event of dismissal of the Criminal Contempt Petition by this Hon'ble Court. The documents to be handed over in terms of the said Order dated 24.11.2021 have also been handed over, as directed, to the Petitioners' counsel. It is prayed, however, that since a large number of documents have been handed over without any accompanying chronology or index, a comprehensive factual narrative *inter alia* in respect of the document may be provided by the Respondents in affidavit form.

6.      That the applicants crave the permission of the Hon'ble Court to add and supplement other grounds at the time of arguments.

## P R A Y E R

It is therefore, most respectfully prayed that the present application to withdraw / not press the Criminal Contempt Petition may kindly be allowed and the Criminal Contempt Petition may kindly be dismissed in light of the aforesaid;

**ATTESTED BY ME**

1 5 DEC 2021

**SHANE CARDOZ**
Advocate & Notary (Govt. of India)
Reg. No. 16388    B.Com, LL.B.
Clifford House, Kadeshwari Mandir Road,
Near Ganesh Mandir Chowk, Bandra (W),
Mumbai - 400 050.  Mob.: 98205 17020

Any other order, which the Hon'ble Court deems fit and proper, may kindly be passed in favor of the applicants.

(Muktesh Maheshwari)

**Counsel for the Petitioners**

**NOTES**

1. No such application has previously been filed in this matter before the Hon'ble Court.
2. Typed by my Pvt. Steno on short papers, as pie papers are not readily available.
3. The matter is under the Jurisdiction of the Hon'ble High Court at Jodhpur.
4. Mail Id: - mukteshmaheshwari@gmail.com, contact No.: 98280 33617.

**Counsel for the Petitioner**

15 DEC 2021

**ATTESTED BY ME**

SHANE CARDOZ
Advocate & Notary (Govt. of India)
Reg. No. 16388      B.Com, LL.B.
G3, Clifford House, Kadeshwari Mandir Road,
Next to Ganesh Mandir Chowk, Bandra (W),
Mumbai - 400 050.  Mob.: 98205 17020

4

Reg. No. 16388    B'com L.L.B.
G3, Clifford House, Kadeshwari Mandir Road,
Next to Ganesh Mandir Chowk, Bandra (W),
Mumbai - 400 050.    Mob.: 98205 17020

# IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

## AT JODHPUR

### D. B. CRIMINAL MISC. APPLICATION NO._____/2021

### IN

### D. B. CRIMINAL CONTEMPT PETITION NO. 2/2021

**PETITIONERS**                    V/s                    **RESPONDENTS**

Costar Group, INC. & Ors.          Arcgate Teleservices Pvt. Ltd. & Ors.

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Bharath Madakari, aged 39 years, having my office at Samridhi Bungalow No. 97, Plot No. 123, Sector 4, Bh. Charkop Bus Depo, Charkop Kandivali (W) Mumbai – 400067, do hereby take oath in the name of GOD and state as under:

1.  That I am the authorized representative of the Petitioners in this application and I am fully conversant with all the facts and circumstances of the present application.

2.  That the contents of the application are true and correct to my personal knowledge and belief except the legal submissions made thereunder, which are true to my information and belief.

3.  That the contents of the said application have been drafted by my counsel under my instructions which have been read over to me and I have understood the same fully well..

**DEPONENT**

| Notary Register Serial No. | 3513/21 |
|---|---|
| Date: | 15 DEC 2021 |

**VERIFICATION:**

I, the above-named deponent do hereby verify that the contents of my above affidavit are true and correct to the best of my knowledge, nothing has been concealed therein.

ORIGINALS SEEN & VERIFIED
AADHAAR    PAN    ELECTION ID    DRIVING LICENSE NO.
0806 7565 1778

**DEPONENT**



**BEFORE ME**

**SHANE CARDOZ**
Advocate & Notary (Govt. of India)
Reg.No. 16388        B'com L.L.B.
G3, Clifford House, Kadeshwari Mandir Rd.
Next to Ganesh Mandir Chowk Bandra (W)
Mumbai  400 050  Mob. 98205 17020

# IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

## AT JODHPUR

D.B. CRIMINAL MISC. APPLICATION NO._____/2021

IN

D.B. CRIMINAL CONTEMPT PETITION NO._____ ___2021

**PETITIONERS:-** *Versus***CONTEMNORS:**

CoStar Group, Inc & Anr.          Arcgate Teleservices Pvt. Ltd.
& Ors.

### INDEX

| S.NO. | PARTICULAR | PG NO |
|-------|------------|-------|
| 1. | Criminal Misc. Application | 98 ─104 |
| 2. | Affidavit in support of Application | 105 |

**COUNSEL FOR THE PETITIONER**

IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN
AT JODHPUR

D.B. CRIMINAL MISC. APPLICATION NO._____/2021

IN

D.B. CRIMINAL CONTEMPT PETITION NO._____2021

IN

S.B. CIVIL WRIT PETITION NO. 9384 / 2021

## APPLICANTS :-

1. **CoStar Group, Inc.**
   )

   A corporation registered under the laws of the State of Delaware and )
   having its principal place of business at 1331 L Street, NW,
   )
   Washington, District of Columbia 20005, United States of America
   )

   )

2. **CoStar Realty Information, Inc.**

   A corporation registered under the laws of the State of Delaware and )
   having its principal place of business at 1331 L Street, NW,
   )
   Washington, District of Columbia 20005, United States of America
   )

   VERSUS
   )

   )

## RESPONDENTS :-

1 **Arcgate Teleservices Private Limited**
   )

   A company incorporated under the Companies Act, 2013 having its )
   registered Office at G1-10 I.T. Park, Madri Industrial Area,
   Udaipur, Rajasthan: 313001 .... **Contemnor No. 1**
   )

⑨⑨

2.  **M/s Arcgate**                                                    )

)

A partnership having its registered Office at G-9/10/11 I.T. )
Park, Madri Industrial Area, Udaipur, Rajasthan: 313001.... )
**Contemnor No. 2**                                                   )


3.  **Mr. Rakesh Jain**
                                                                      )

General Manager, Arcgate, having office at G-9/10/11 I.T. )
Park, Madri Industrial Area, Udaipur, Rajasthan: 313001.... )
**Contemnor No. 3**                                                   )


4.  **Manish Choudhari, Arcgate**
                                                                      )

IT Head, Arcgate, having office at G-9/10/11 I.T. Park, Madri )
Industrial Area, Udaipur, Rajasthan: 313001...**Contemnor No. 4**


5.  **Dilip Bagla**
                                                                      )

Partner, Arcgate, having office at G-9/10/11 I.T. Park, Madri )
Industrial Area, Udaipur, Rajasthan: 313001 ..**Contemnor No.**
5


6.  **Sushma Bagla (W/o Dilip Bagla)**
                                                                      )

Partner Arcgate, having office at G-9/10/11 I.T. Park, Madri )
Industrial Area, Udaipur, Rajasthan: 313001...**Contemnor No. 6**


7.  **Kunal Bagla (S/o Dilip Bagla)**
                                                                      )

Partner Arcgate, having office at G-9/10/11 I.T. Park, Madri )



Industrial Area, Udaipur, Rajasthan: 313001...**Contemnor No. 7**

8.   **Devyani Kunal Bagla (W/o Kunal Bagla)**                    )

Partner, Arcgate, having office at G-9/10/11 I.T. Park, Madri     )

Industrial Area, Udaipur, Rajasthan: 313001...**Contemnor No. 8**

## PETITION TO CRAVE THE LEAVE OF THE HON'BLE HIGH COURT UNDER SECTION 15 OF THE CONTEMPT OF COURTS ACT, 1971

To,

The Hon'ble Chief Justice, and his companion Judges of the High Court of Judicature for Rajasthan at Jodhpur.

### MAY IT PLEASE YOUR LORDSHIPS:

On behalf of the petitioner, it is most respectfully submitted as under:

—

1.   Applicant No. 1 ("**CoStar Group**") is a company incorporated under the laws of the state of Delaware in the United States of America, having its principal place of business at the address mentioned in the cause title. Applicant No. 2 ("**CoStar Realty**") is a wholly owned subsidiary of Applicant No. 1 having its principal place of business at the address mentioned in the cause title. Together, the Applicants will be referred to herein as "**CoStar.**"

2.   RespondentNo.1 ("**Arcgate Teleservices**") is a company incorporated under the Companies Act, 2013 having its registered office at the address mentioned in the cause title. Applicant No. 1 is *inter alia* engaged in the business of providing information technology services including data collection & cleansing, data enrichment and



content moderation. The Respondent company had a presence in the United States of America through Arcgate LLC, which was incorporated in Austin, Texas.

3.     Respondent No. 2 ("**Arcgate**") is a partnership firm incorporated in India in 2005, having its registered place of business at G-11 11 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan: 313001. The Partners of Arcgate compriseDilip Bagla, Sushma Bagla, Kunal Bagla and Devyani Bagla ("**the Bagla Family**") and are arraigned as Respondent Nos 5,6,7 and 8 respectively.

4.     Separately, Respondent No. 3 is the Manager of Arcgate / Arcgate Teleservicesand Respondent No. 4is the employee (I.T- Head) of Arcgate / Arcgate Teleservices.

5.     That theS.B. Civil Misc. Writ Petition9348/2021 was instituted by the Applicants challenging the order dated 6 April 2021 passed by the Commercial Court at Udaipur. Vide the order dated 6 April 2021, the Commercial Court at Udaipurrejected the application filed by the Applicant seekingthe ex-parte appointment of a court commissioner to preserve the incriminating evidence present in the systems or at the premises of Respondent No.1particularly in respect of the acts of contributory copyright infringement, piracy/theft, improper access to CoStar websites and misappropriation of content from CoStar, including content generated, gathered, enhanced, updated, and curated by CoStar ("**CoStar proprietary content**").

6.     This Hon'ble Court vide its Order dated 30 July 2021 ("**said Order**") appointed Mr. Hanuman Si arma, Advocate and Mr. Saurabh Kumar ("**Commissioners**"), as the Court Commissioner with all powers as provided in Order XL Rule 1 or XXVI Rule 9 of the Code of Civil Procedure, 1908. The Commissioners attempted to execute the commission at G1-11, I.T. Park, Madri Industrial Area, Udaipur, Rajasthan ("**Premises**"), the premises of Arcgate / Arcgate Teleservices on 6 August 2021. That attempt was thwarted by the Respondents and associated persons willfully and intentionally. Indeed, the Commissioners themselves reported that Respondent No.

1, Arcgate Teleservices and the persons owning and directing [Arcgate Teleservices], tried to circumvent the execution of this commission and the directions passed in the said Order.

7. That the report filed by the Commissioners as well as the events that unfolded in the Premises on 6 August 2021 form the basis of this Petition. The Applicants have filed a Suit against Respondent No. 1, Arcgate Teleservices, before the Commercial Court, Udaipur whereinRespondent Nos. 2 to 8 are not parties. Respondent Nos. 2 to 8 are also not parties to the present Writ Petition filed by the Applicants. <u>However in the facts and circumstances of the present case, they are clearly liable for contempt of Court as they have willfully, knowingly and intentionally obstructed the implementation of the said Order passed by this Hon'ble Court and have interfered with the administration of justice</u>. The Applicants reserve their right to make these Respondents / Contemnors parties to the Suit proceedings, if so advised.

8. Despite the clear directions of this Hon'ble Court appointing the Commissioners and setting forth the powers of the Commissioners regarding the execution of the commission, Respondents Nos. 1 to 8 chose to ignore and violated this Hon'ble Court's directions and acted in complete defiance, disregard and in violation of the said Order. The Applicants hereby prefers this Petition before this Hon'ble Court praying that the Respondents be held to be in criminal contempt and be punished as per law.

9. That the entire act of the Respondents is per se illegal and so also is flouting the order passed by this Hon'ble court and is a deliberate disobedience of the order. The Respondents have prevented the Commissioner appointed by this Hon'ble Court from discharging their official duties with regards to the directions passed by this Hon'ble Court. Such an action makes it apparent thatthe Contemnors / Respondents are clearly guilty of the criminal contempt of the orders of this Hon'ble court.

10. That in light of the facts as stated hereinabove, the Applicant is not in a position to obtain leave/ permission from the Learned Advocate



General for filing the instant Criminal Contempt, therefore, the Applicant is preferring the instant application seeking leave of this Hon'ble Court for preferring the Criminal Contempt. The instant application is filed bonafide and in the interest of justice.

11.  That the Applicants have filed a detailed Memo of Criminal Contempt Petition alongwith the present Application. The Applicant is not narrating the details and act of Criminal Contempt as committed by the Respondents/ Contemnors, to avoid repetition and bulkiness of the record. Thus, the contents and documents of the Memo of Criminal Contempt Petition may be read along with the present Application also.

12.  That other submission shall be made at time of arguments with due permission of the Hon'ble Court.

## PRAYER

It is therefore respectfully prayed that:

a.  Hon'ble Court may also be pleased to grant leave to the Petitioners to initiate the Criminal Contempt Proceedings against the Respondent / Contemnors and Register the Criminal Contempt Petition while taking the appended Memo of Criminal Contempt petition on Regular Number and may be pleased to proceed accordingly;

b.  Hon'ble Court may also be pleased to initiate the *Suo-Motto* criminal contempt proceedings in light of the facts and circumstances as narrated above and Punish the Contemnors for Committing the Criminal Contempt by interfering with the administration of justice;

c.  Any other relief this Hon'ble Court deems appropriate, may also be passed in favour of the Applicant.

**COUNSEL FOR APPLICANTS**

104

**NOTES:-**

1. Due to non-availability of pie-papers, this contempt petition is being preferred on these stout papers.
2. This Misc. Application has been typed by my Private Steno.
3. The matter pertains to jurisdiction of principal seat of Hon'ble Court.
4.                                                                  Email:
    Cell:

**COUNSEL FOR THE APPLICANTS**

(105)

# IN THE HIGH COURT OF JUDICATURE FOR RAJASTHAN

## AT JODHPUR

D.B. CRIMINAL MISC. APPLICATION NO._____/2021

IN

D.B. CRIMINAL CONTEMPT PETITION NO_____2021

**PETITIONERS:-** *Versus* **CONTEMNORS:**

CoStar Group, Inc & Anr.       Arcgate Teleservices Pvt. Ltd. &
Ors.

## AFFIDAVIT IN SUPPORT OF MISC. APPLICATION

I, Bharath Madakari, aged 39 years, having my office at Samridhi Bungalow No. 97, Plot No. 123, Sector 4, Bh.. Charkop Bus Depo, Charkop Kandivali (W) Mumbai – 400067, the constituted attorney of the Applicant herein above named state on oath as under:-

4. That I am authorized to take oath on behalf of Applicant in the instant Petition and am fully conversant with the facts and circumstances of the case.

5. That the annexed Application has been drafted by my counsel as per the instructions and I have carefully gone through the contents of the case and understood the same fully well.

6. That the averments contained in the Application are true and correct to my personal knowledge

## VERIFICATION:

I, the above named deponent do hereby verify that my above affidavit is true and correct, nothing has been concealed therein. SO HELP ME GOD.

# EXHIBIT E

**Sarah A. Tomkowiak**
Direct Dial: 2026372335
sarah.tomkowiak@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

January 21, 2022

## VIA E-MAIL

Elizabeth K. McCloskey
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
epeters@keker.com
emccloskey@keker.com

Re:  CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc., 2:20-cv-8819 (C.D. Cal.)

Dear Elizabeth:

We write on behalf of CoStar regarding the destruction of evidence by CREXi's agent, Arcgate.

As you know, in the recently concluded proceeding in the High Court of Rajasthan, Arcgate attested to the fact that CREXi, as principal, hired Arcgate in October 2017 to perform various tasks, including commercial real estate related research.[1]  At CREXi's direction, and for CREXi's benefit, Arcgate accessed various CoStar websites, such as LoopNet, Ten-X, and Cityfeet, to use those sites as a competitive resource, and to copy and/or derive content for CREXi.[2]  Indeed, despite Arcgate "raising 'red flags' about accessing CoStar sites" because of "direct competition between CoStar and CREXi,"[3] despite CREXi in response paying lip service to the idea that "Arcgate 'should refrain from using any site that is, or could be considered, a direct competitor of CREXi,'"[4] and despite CREXi's express acknowledgement that "complying with any website's terms is important,"[5] CREXi nevertheless expressly directed Arcgate to access and use CoStar's sites without authorization and in breach of those terms, including, for example, in April 2020, directing Arcgate to mass copy auction and broker information from CoStar's Ten-X site.[6]  Key

---

[1] See Declaration of Kunal Bagla, Dated November 24, 2021 at ¶ 2 ("Declaration").

[2] Id. at ¶¶ 3, 4, 7.

[3] Id. at ¶¶ 13–14.

[4] Id. at ¶ 13.

[5] Id. at ¶ 17.

[6] Id. at ¶¶ 19–20, 23

LATHAM&WATKINS LLP

evidence therefore, would be Arcgate's server or firewall logs, which would provide a record of this unauthorized access, on behalf of CREXi, to CoStar's sites.  Those logs, however, were destroyed by CREXi's agent in May 2021, during the pendency of this case.[7]

CREXi has never once, not even after the filing of the Arcgate judgment and declaration on January 12, 2022,[8] contacted CoStar to address this destruction of evidence.  We are therefore reaching out to seek to determine the full scope of the issue, including CREXi's role in the destruction and attempts to mitigate the loss, before determining our next steps vis a vis appropriate relief.

We are, of course, extremely concerned about the destruction of these logs of unauthorized access to CoStar sites, a core issue in the case, not least because of CREXi's alleged non-maintenance of its own logs of access of particular websites, including CoStar's sites.[9]  We would appreciate prompt answers to the following questions:

1.  Is it true that CREXi did not contact Arcgate regarding the preservation of relevant evidence until the end of October 2020?

2.  After the end of October 2020, did CREXi have any other communications with, or send any other directions to, Arcgate regarding the preservation of evidence generally, or the preservation of evidence of access to CoStar's sites specifically (as reflected in logs or otherwise)?

3.  When did CREXi learn of the deletion of the logs?

4.  What steps (if any) did CREXi take to determine whether there was any way to reverse the deletion of the logs, and when were those actions taken?

5.  What (other) steps has CREXi taken, if any, to attempt to mitigate the destruction of this evidence?

6.  Has CREXi identified any other records that would reflect all of the access contained in the now destroyed logs?  (We note that Mr. Bagla testified there was "extensive access to [CoStar] sites at CREXi's direction and for its benefit" between 2019 and October 2020.)[10]  If so, what is this evidence, and when will it be produced?

7.  Is it CREXi's position that the prejudice to CoStar from destruction of this evidence of "extensive" unauthorized access can somehow be rectified?  If so, how?

---

[7] *Declaration* at ¶ 30.

[8] *CoStar Grp., Inc. et al. v. Commercial Real Estate Exch. Inc.*, No. 2:20-cv-08819-CBM-AS, ECF Nos. 100, 100-1 (C.D. Cal. Jan. 12, 2022).

[9] *See* Defendant and Counterclaimant Commercial Real Estate Exchange, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories at 25.

[10] *Declaration* at ¶ 6.

**LATHAM&WATKINS**LLP

Given the deletion of significant evidence by at least one CREXi agent, we have some additional questions to determine the extent of the issue and prevent the further destruction of key evidence:

8.  With regards to other entities hired by CREXi that have been accessing CoStar websites or databases, including without limitation other BPOs and the individual hired by Paul Cohen,[11] when and how did CREXi take steps to ensure that relevant evidence would be preserved, and in light of the log destruction at Arcgate, has CREXi checked whether those other entities have also destroyed evidence relating to the litigation, including without limitation evidence of access to CoStar websites and databases, and the copying of content from such locations?  Please advise, and please let us know the identity of such entities so that we can ourselves confirm that key evidence has been preserved.

Further on the topic of the deletion of records of access to CoStar sites, Arcgate's CEO also testified that in May 2020, after Arcgate had raised concerns about accessing competing websites, CREXi initiated a project directing Arcgate to remove from certain CREXi materials "all references to CoStar websites as a source of information and leave the rest of the information in the system."[12]  Specifically, four months before CoStar sued CREXi, CREXi's Manager of Customer Success Operations, James Burton, directed Arcgate, as a "HIGH PRIORITY," to delete "more than two hundred references to CoStar websites, including LoopNet, Cityfeet, CoStar, and Showcase."[13]  Given this testimony, and the destruction of other evidence of access during the case, please advise:

9.  Whether other similar mass-deletions of CoStar-related URLs or references occurred, whether involving Mr. Burton, Arcgate, or otherwise, when those deletions occurred, and whether they may be reversed.

10.  Whether CREXi took any steps to ensure that the practice of deleting references to CoStar websites did not recur (or continue) after this lawsuit was filed, and (if so) whether CREXi was successful.

We look forward to a prompt response from CREXi.

Sincerely,

*/s/ Sarah A. Tomkowiak*

Sarah A. Tomkowiak

---

[11] *See* Defendant and Counterclaimant Commercial Real Estate Exchange, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories at 23–24.

[12] *Declaration* at ¶¶ 19, 21.

[13] *Id.* at ¶ 21.

# EXHIBIT F



Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809

415 391 5400
keker.com


**Connie P. Sung**
(415) 773-6607
csung@keker.com

February 8, 2022


**VIA ELECTRONIC MAIL**

Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004-1304
*sarah.tomkowiak@lw.com*

Re:   *CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc.*,
       2:20-cv-8819 (C.D. Cal.)

Dear Sarah,

I write in response to your January 21, 2022 letter, which levels baseless accusations against CREXi regarding an apparent inadvertent failure by an independent contractor, Arcgate, to retain server or firewall logs in the process of replacing its network firewalls in May 2021.

We are disappointed by CoStar's transparent attempt to divert attention from its own destruction of relevant evidence.  In our prior discussions regarding CoStar's interrogatory responses, you disclosed that CoStar had destroyed logs evidencing its own employees' access to CREXi's website prior to July 2020.  We followed up with you in a letter dated January 19, 2022, requesting additional information regarding CoStar's destruction of this evidence.  *See* 1/19/22 McCloskey Ltr. to Tomkowiak, at 8–9.  CoStar still has failed to answer CREXi's basic questions about that spoliation of evidence *by CoStar*.

Instead, two days after we sent our letter, CoStar sent us a letter raising makeweight allegations regarding Arcgate's inadvertent failure to retain certain logs.  But, if anything, CoStar's assertion that Arcgate logs reflecting website access constitute "key evidence" makes it all the more inexplicable that CoStar destroyed its own logs showing CoStar's access to CREXi's website.  And CoStar has not confirmed whether its own independent contractors and agents (including TinEye and others) have retained similar logs showing access to CREXi's website. We again request that CoStar immediately respond to our questions.

Your letter repeatedly cites the declaration of Arcgate's Kunal Bagla, which CoStar appears to have obtained through coercion and threats against Arcgate in its lawsuit in India.  We have

1820147

Sarah A. Tomkowiak
February 8, 2022
Page 2

serious concerns regarding CoStar's and its counsel's conduct in connection with obtaining Mr.
Bagla's declaration in that Indian litigation, and then filing it with the Court in this action for an
improper purpose.  We intend to follow up with you separately about those issues.

Even taking CoStar's representations regarding Arcgate's retention of documents at face value,
however, CoStar's allegations confirm that CREXi acted diligently and appropriately by
promptly instructing Arcgate to preserve all relevant evidence.  In October 2020, just weeks
after being served with CoStar's lawsuit, CREXi expressly instructed Arcgate to preserve "all
records relating to [its] work for CREXi, including suspension of any automatic document-
deletion policies or programs."  Bagla Decl. ¶ 30.  Moreover, in November 2020, Arcgate
contractually agreed to "preserve all records relating to its work for CREXI, including
suspension of any automatic document-deletion policies or programs" and to retain records
including "paper or electronic files, including memos, emails, or chats, however [Arcgate]
maintains that information in the ordinary course of business."  11/1/20 Arcgate-CREXi
Professional Services Agreement, ¶ 17.11. CREXi properly instructed Arcgate to preserve
evidence potentially relevant to this litigation.

Instead, seven months *after* CREXi instructed Arcgate to preserve "all records" relating to its
work for CREXi, Bagla Decl. ¶ 30, it appears that Arcgate inadvertently lost access to certain
log files when it replaced its network firewall, *id.* ¶ 6.  Arcgate was an independent contractor
for CREXi, and both parties to this business arrangement expressly disclaimed any agency
relationship.  11/1/20 Arcgate-CREXi Professional Services Agreement, ¶ 17.2.  CREXi had no
control over Arcgate's log server, and, to the extent those logs related to Arcgate's work for
CREXi, CREXi had no control over Arcgate's decision to ignore CREXi's preservation
instruction.  Nor did Arcgate inform CREXi at any point that any logs had been deleted.  The
law is clear that CREXi is not responsible for an independent contractor's failure to retain access
to logs, particularly when such action was taken in disobedience of CREXi's express
instructions, and contrary to Arcgate's contractual obligations.  *See Gemsa Enterprises, LLC v.*
*Specialty Foods of Alabama, Inc.* 2015 WL 12746220, at *10 (C.D. Cal. Feb. 10, 2015); *Vohra*
*v. City of Placentia,* 2017 WL 10544048, at *3 (C.D. Cal. Dec. 29, 2017).

CoStar's complaints ring particularly hollow because, prior to Arcgate's apparent loss of those
logs, CoStar had brought suit against Arcgate in India, without providing notice to CREXi.  Had
CoStar timely notified CREXi of this lawsuit, CREXi would have had the opportunity to remind
Arcgate of the preservation instructions CREXi had previously given.  Instead, CoStar sought to
hide the existence of that litigation until it could browbeat and threaten Arcgate into providing
testimony in this litigation.  Moreover, your letter does not indicate whether CoStar itself issued
a preservation notice to Arcgate when it filed suit.  If you failed to make this standard request of
a litigation adversary, the blame lies with you, not CREXi.

In sum, CoStar failed to preserve important evidence relating to its claims in this case, and its
brazen effort to muddy the waters by claiming wrongdoing by a CREXi contractor will fail.

We look forward to your responses concerning CoStar's failure to preserve evidence.

Sarah A. Tomkowiak
February 8, 2022
Page 3


Very truly yours,

KEKER, VAN NEST & PETERS LLP

Connie P. Sung

# EXHIBIT G

# KEKER
# VAN NEST
# & PETERS

Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809

415 391 5400
keker.com

**Warren Braunig**
(415) 773-6642
wbraunig@keker.com

February 17, 2022

**VIA ELECTRONIC MAIL**

Nicholas J. Boyle
Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004-1304
nicholas.boyle@lw.com
sarah.tomkowiak@lw.com

Jessica Stebbins Bina
Elyse Greenwald
Latham & Watkins LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
jessica.stebbinsbina@lw.com
elyse.greenwald@lw.com

Belinda S. Lee
Latham & Watkins LLP
505 Montgomery St., Ste. 2000
San Francisco, CA 94111
belinda.lee@lw.com

Re:   *CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc.*,
      No. 2:20-cv-8819 (C.D. Cal.)

Dear Counsel:

It has become apparent that CoStar is engaged in unethical and unlawful interference with at least one potential fact witness in the present litigation.  As reflected in CoStar's misleadingly styled "Notice of Judgment in a Related Case," Dkt. Nos. 100, 100-1, CoStar has improperly compensated Arcgate, a third-party independent contractor previously retained by CREXi, in exchange for Arcgate's testimony.  By all appearances, CoStar has also secured Arcgate's commitment to refrain from cooperating in the present litigation, except to the extent Arcgate provides further testimony or evidence for *CoStar's* use.  Having obtained these commitments — which violate the rules of professional conduct, longstanding common-law principles, and perhaps even the federal bribery statute — CoStar is now seeking to profit from its actions by contriving reasons to place its paid-for testimony before the Court.

It is universally understood that, although fact witnesses may be compensated for the time or costs reasonably expended in connection with testifying, they may not be compensated simply for agreeing to testify, or for the testimony itself.  Compensating a witness for testimony is a violation of bedrock principles meant to secure the fairness of judicial proceedings.  *Hamilton v.*

1823336

February 17, 2022
Page 2


*General Motors Corp.*, 490 F.2d 223, 228 (7th Cir. 1973) (agreements to pay fact witnesses "lean[] toward the procurement of perjury; toward the raising up of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit[;] toward the perversion of justice; and toward corruption in our courts" (citation omitted)).  As such, it is also a violation of the California Rules of Professional Conduct:

> A lawyer shall not . . . directly or indirectly pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the case.

CRPC 3.4.  Federal law makes criminal such compensation:

> Whoever . . . directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath . . . given or to be given by such person as a witness upon a trial, hearing, or other proceeding . . . , or for or because of such person's absence therefrom[,] shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2).  Impeding a witness's participation in litigation is equally unlawful, *Williamson v. Superior Court*, 21 Cal. 3d 829, 836-38 (1978); unethical, CRPC 3.4(a); and potentially criminal, 18 U.S.C. § 201(c)(2).

CoStar's own filings confirm that it has violated these foundational legal and ethical principles. In March 2021, CoStar filed an action against Arcgate in Indian court, in which CoStar claimed 9,000,000 INR in damages, sought to seize all of Arcgate's servers, and pursued criminal sanctions.  In November 2021, CoStar settled this litigation, promising to withdraw its demands in exchange for the "Consent Terms" it has now gratuitously filed in the present case as Dkt. No. 100-1.

CoStar's "Consent Terms" are troubling to say the least.  In consideration for releasing Arcgate from the considerable monetary and nonmonetary threats against it, CoStar obtained a declaration, no doubt written by CoStar's counsel and tailor-made for use in U.S. federal court. That declaration consists exclusively of slanted and misleading testimony impugning CREXi — a nonparty to the Indian litigation.  Dkt. No. 100-1 at 13, 21-33.  In addition, CoStar obtained Arcgate's promise to answer further questions or requests for information *from CoStar only* — along with a promise *not* to otherwise assist CREXi in litigation on related issues.  Dkt. No. 100-1 at 13-16.  In other words, CoStar secured a one-way cooperation agreement, allowing CoStar to extract further misleading testimony from Arcgate while barring Arcgate from cooperating with CREXi.  CoStar also obtained a purported right to enforce these improper, unethical, and illegal terms through injunctive relief in an Indian court.  Dkt. 100-1 at 17.  This arrangement is already playing out exactly as CoStar intended, with Arcgate refusing to cooperate with CREXi or even provide CREXi with a copy of the documents it produced to CoStar.

February 17, 2022
Page 3

CoStar's agreement with Arcgate and its procurement of the Arcgate declaration are flagrantly inappropriate. Whatever the underlying merits of the Indian causes of action, CoStar's blanket waiver and release is a form of substantial compensation. *See, e.g.*, *State of N.Y. v. Solvent Chem. Co.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996). In return, CoStar has not only obtained a promise to provide fact testimony; it has obtained the testimony itself, drafted specifically and intentionally for improper use in the present litigation. *Patel v. 7-Eleven, Inc.*, 2015 WL 9701133, at *5, 7 (C.D. Cal. Apr. 14, 2015) (paying a fact witness for a declaration filed on the docket justified disqualification of counsel) (Gutierrez, J.). As in Patel, this arrangement was "quid pro quo payment for testimony." *Id.* at *5. CoStar further used the promise of dismissal to secure a one-way commitment from Arcgate to assist CoStar (but not others) in related litigation like this one.

Indeed, CoStar has *already* used its paid-for testimony to prejudice CREXi in the present case. Although the Indian litigation is not "related" within the meaning of the Local Rules and was never previously disclosed to the Court, CoStar filed the full text of the Arcgate settlement on the public docket in this litigation, as a purported "judgment" in a "related case." Dkt. No. 100. CoStar also attached the testimony it obtained, which serves no purpose but to sandbag CREXi with disparaging and misleading testimony that CREXi was not able to cross-examine. Tellingly, CoStar also failed to provide CREXi with any notice before making its unauthorized filing, no doubt anticipating that CREXi would rightfully have objected to it. Magistrate Judge Sagar has since acknowledged reviewing CoStar's paid-for testimony in connection with an unrelated discovery dispute — just the return-on-investment CoStar hoped for.

Finally, although CoStar's arrangement would be unethical and unlawful even if the paid-for testimony were accurate, it is particularly egregious that CoStar has obtained a declaration containing both false and misleading allegations against CREXi. *U.S. v. Blaszak*, 349 F.3d 881, 887 (6th Cir. 2003) (federal bribery statute "clearly prohibits demanding or accepting anything of value in exchange for testimony," including "non-expert truthful testimony"); *Patel*, 2015 WL 9701133, at *5 ("[P]aying or offering to pay money or other rewards to witnesses in return for their testimony, be it truthful or not, . . . violates the integrity of the justice system and undermines the proper administration of justice." (citation omitted)). In misusing an administrative filing to introduce highly misleading (if not outright false) testimony, CoStar has denied CREXi an opportunity to reply consistent with the normal rules of procedure. And in limiting Arcgate's cooperation in discovery or further proceedings, CoStar has impeded CREXi's ability to complete and correct the record, as well as the factfinder's ability to do its job.

Given that the terms of CoStar's arrangement with Arcgate only came to light after CoStar improperly filed its purported "judgment" on the docket, we are deeply concerned that the full scope and severity of CoStar's wrongdoing is not yet known. We therefore demand that CoStar, and its agents, preserve all documents related to CoStar's lawsuit against, and arrangement with, Arcgate. We further demand that CoStar provide, **by no later than February 24**, the following information:

February 17, 2022
Page 4

- The identity of all individuals, including but not limited to counsel, involved in the solicitation, negotiation, drafting, or execution of the documents attached as Exhibit A to CoStar's Notice of Judgment in a Related Case;

- All drafts of the documents attached as Exhibit A to CoStar's Notice of Judgment in a Related Case, including but not limited to drafts created, edited, reviewed, sent, or received by counsel;

- All documents and communications pertaining to the documents attached as Exhibit A to CoStar's Notice of Judgment in Related Case, including but not limited to documents reflecting the negotiation of the Consent Decree, any threats to pursue further action (including damages or criminal contempt sanctions) against Arcgate or the nature of any anticipated future cooperation from Arcgate, and including documents and communications drafted, edited, reviewed, sent, or received by counsel; and

- All documents and communications comprising or including complaints, requests, threats, or demands against any other third party that is related to CREXi or to this litigation, including but not limited to any such documents and communications drafted, edited, reviewed, sent, or received by counsel.

At a minimum, the prejudice CoStar has inflicted on the current proceedings must be fully remedied and appropriately punished by the Court. The foregoing information is essential to this process. We look forward to your prompt response.

In the meantime, CREXi demands that CoStar cease and desist from any further improper, unethical, and illegal behavior with respect to Arcgate or any other potential witness in this matter. CREXi expressly reserves all rights and remedies, including the right to seek monetary sanctions, evidentiary sanctions, revocation of the *pro hac vice* status of non-California lawyers involved in these ethical violations, and disqualification of counsel. *Patel*, 2015 WL 9701133, at *7-8.

Very truly yours,

KEKER, VAN NEST & PETERS LLP

Warren Braunig

1823336

# EXHIBIT H

**Nicholas J. Boyle**
Direct Dial: 2026372339
nicholas.boyle@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

February 28, 2022

**VIA E-MAIL**

Warren Braunig
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
wbraunig@keker.com

> Re:  <u>CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc., 2:20-cv-8819</u>
> <u>(C.D. Cal.)</u>

Dear Warren:

We write on behalf of CoStar in response to your February 17, 2022 letter regarding the devastating evidence against CREXi offered by Arcgate in India, and CREXi's improper efforts to silence that witness and suppress that evidence.

Your letter is a new low in CREXi's multi-pronged efforts to escape the consequences of its actions.  That CREXi would seek to attack the declaration provided by Arcgate in India is, however, not surprising in light of the testimony therein.  That testimony, which is substantiated by, and directly quotes, contemporaneous emails sent by and to CREXi (but withheld by CREXi), demonstrates that:

- Directly contrary to CREXi's litigation position, CREXi's Forrest Kobayashi expressly acknowledged that CREXi and Arcgate should "refrain from using any site that is, or could be considered, a direct competitor of CREXi."[1]

- Arcgate raised "[r]ed flags" in response to instructions from CREXi to obtain broker information from LoopNet and CityFeet—two CoStar sites—because of competitive

---

[1] ECF No. 100-1 at 25.  This testimony reflects and quotes from an email from Mr. Kobayashi to Arcgate's CREXi team dated January 2, 2020, produced at Bates No. CoStar00018904.  CoStar will produce to CREXi a full set of the documents produced to CoStar by Arcgate, despite the fact that CREXi already has them, and has failed to produce them, despite multiple requests.

LATHAM&WATKINS LLP

status.[2]  Despite Arcgate's concerns, just four days later, CREXi told Arcgate to continue using "any website" as a competitive resource.[3]

- CREXi professed to Arcgate that "complying with any website's terms is important to [CREXi]," but, as noted above, nonetheless instructed Arcgate to access and use "any website" (e.g. CoStar websites), whether or not that activity violated CoStar's terms of use.[4]

- After Arcgate raised concerns about accessing competing websites, CREXi initiated a project directing Arcgate to remove all references to CoStar websites as a source of information "from the 'Website' section" on CREXi's backend system, replace the CoStar website by "googl[ing] each brokerage" to obtain non-CoStar source URLs, and leave the rest of the information in the CREXi system.[5]

- Specifically, CREXi's Manager of Customer Success Operations, James Burton, directed Arcgate, as a "HIGH PRIORITY," to delete more than two hundred references to CoStar websites, including "Showcase, Costar, Looplink, Loopnet, [and] Cityfeet."[6]

On the merits, Mr. Bagla's testimony disposes of much of CREXi's defense.  CREXi knew that it should not be stealing content from CoStar, or using CoStar's sites as a competitive resource in violation of those sites' terms of use, but it did so anyway.  Indeed, as Mr. Bagla further testified, even after expressly acknowledging that it should not be using competing sites, and even after Arcgate raised red flags, CREXi engaged in mass copying of content, including a huge manual scrape of data from CoStar's Ten-X site,[7] reminiscent of its previous misappropriation from the same company that led to an injunction, a damages payment, and a public *mea culpa* by CREXi's (then and current) CEO, Michael DeGiorgio.  Conduct like that is not just the mark of a serial wrongdoer, it wholly defeats CREXi's constant false refrain to this Court that its access to and copying from CoStar sites was in accordance with industry norms and was broker-directed, as opposed to CREXi-directed.  Further damaging CREXi's position, Mr. Bagla's declaration also states that CREXi instructed Arcgate how to lift real estate photographs (without regard to

[2] ECF No. 100-1 at 25.  This testimony reflects and quotes from emails between Arcgate's CREXi team and CREXi's Mr. Kobayashi, Ashley Kobovitch, Doug Shankman, and Lawson Dees, dated January 2–4, 2020, produced at Bates Nos. CoStar00018917–18919.

[3] ECF No. 100-1 at 26.  This testimony reflects and quotes from an email from CREXi's Forrest Kobayashi to CREXi's Arcgate team, dated January 8, 2020, produced at Bates No. CoStar00018933.

[4] ECF No. 100-1 at 26; CoStar00018933.

[5] ECF No. 100-1 at 27, 29.  This testimony reflects and quotes from an email from CREXi's James Burton to Arcgate's CREXi team, dated May 14, 2020, produced at Bates No. CoStar00018934.

[6] ECF No. 100-1 at 29.  This testimony reflects and quotes from emails between Arcgate's CREXi team to CREXi's James Burton, dated May 21, 2020 and May 22, 2020, produced at Bates No. CoStar00018935.

[7] ECF No. 100-1 at 28–30.  This testimony reflects emails and a spreadsheet between Arcgate's CREXi team and Lawson Dees on April 18, 2020, produced at Bates Nos. CoStar00018938; CoStar00018940.

**LATHAM&WATKINS** LLP

copyright), and reveals the destruction of months of server logs evidencing masses of access to CoStar sites for CREXi's benefit—spoliation on a grand scale.[8]

CREXi has not challenged, and cannot challenge, Mr. Bagla's testimony on the substance, because it's all true.  And CREXi knows it: much of the testimony is based on contemporaneous emails and other documents CREXi exchanged with Arcgate.[9]  CoStar has been seeking those documents from CREXi for months.  Not only has CREXi withheld that evidence to this day, even after it was detailed by Arcgate, but it refused (until recently, after CoStar informed CREXi that it was going to move to compel) to agree even to identify the names of the other Arcgate-like companies that it was using to access, and swipe content from, CoStar sites.[10]

CREXi is thus backed into a corner.  Its own agent disclosed its wrongdoing, by offering testimony based on documentary evidence in support of a judgment and permanent injunction in India.  So, five weeks after CREXi allegedly first became aware of that judgment and the associated declaration, CREXi has developed its latest collateral attack, throwing around wild accusations of bribery, perjury, and ethics violations.  The extreme nature of those attacks, and the targeting of counsel, only underscores CREXi's desperation in the face of damning evidence.

A few responses to CREXi's latest, disgraceful gambit:

*First*, contrary to CREXi's characterizations of the Consent Terms underlying the Indian judgment agreement as "troubling" and "flagrantly inappropriate," 2/17 Ltr. at 2–3, agreeing to exchange evidence for a release, or even to facilitate a monetary payment, is ordinary course for settlements, judgments and other case resolutions, not somehow improper "compensation." Putting aside the fact that the judgment at issue was entered in India, it is routine (and sensible) for U.S. courts to accept evidence as part of entering judgment, or enforcing a settlement.  For example, in *Ayala v. Pacific Maritime Assn'n*, the plaintiffs entered into a settlement with one defendant that provided for dismissal of all claims against that defendant and a release in exchange for a payment of $25,000, a declaration from the defendant's corporate witness regarding the interpretation of a policy at issue, and other concessions.  2009 WL 1916964, at *1 (N.D. Cal. July 1, 2009).  The non-settling defendants challenged the settlement agreement as collusive because, they argued, the testimony obtained in exchange for the release, testimony which undermined their litigation position, was false and contradictory.  *Id.* at *3.  The *Ayala* court rejected that argument and enforced the settlement, including the release and the declaration, noting that "different defendants may assert different interests and possess factual disputes in litigation without the presence of collusion."  *Id.* at *4.  So too here. CREXi may dispute Mr. Bagla's interpretation of the evidence set forth in his declaration (though to date, CREXi has not articulated any specific factual dispute), but that does not demonstrate CoStar misconduct.  By way of another example,

---

[8] ECF No. 100-1 at 31–32.

[9] *Id.* at 32–33.

[10] On February 9, CREXi committed to making that information available on February 28, but on February 24, reneged on that commitment.  Supposedly that information will be made available to CoStar on March 9.  Having seen Arcgate's documents, it is no wonder CREXi wishes to delay CoStar's review of other BPO evidence.

**LATHAM&WATKINS**LLP

in *Luan v. Luan*, the court enforced a settlement agreement pursuant to which the defendants agreed to pay $250,000 to the plaintiff in exchange for a release from certain objections and a verified declaration prepared by the plaintiff for the defendants to sign regarding the trust at issue. 2008 WL 11504545, at *1–2 (N.D. Ind. Sept. 4, 2008). *Luan* illustrates that it is routine for courts to enforce settlement terms that include testimony, as in the Arcgate matter.

In fact, every day courts around the country, including this district, consider and rely on testimony offered in support of settlements and releases in a variety of different contexts. *See, e.g.*, *Ellison v. Steven Madden, Ltd.*, 2013 WL 12124432, at *1 (C.D. Cal. May 7, 2013) (approving class action settlement and attorneys' fees agreement, including an incentive award to lead plaintiff, in part based on lead plaintiff's declaration about the underlying TCPA violations alleged in the case); *In re Broadcom Corp. Derivative Litigation*, No. 2:06-cv-03252-R-CW, ECF 945, Final Judgment and Order of Dismissal (C.D. Cal. May 23, 2011) (approving a $79 million settlement and release of claims, including a $25 million award of attorneys' fees and expenses, in part based on declarations by lead plaintiffs' counsel and general counsel of the corporation); *Sony Computer Ent. Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1073 (N.D. Cal. 2005) (entering consent judgment and permanent injunction signed by the parties and containing defendant's stipulation that he had marketed and sold software in violation of plaintiff's intellectual property rights). Were these plaintiff-side declarants engaging in criminal conduct because they offered testimony and received the benefits of monetary judgments in return? In the *Sony* case, were the plaintiffs guilty of bribery because they obtained testimony from the defendant that supported a negotiated judgment that may have been less than that obtained after trial? These questions answer themselves. To take yet another example, the Xceligent case, on which CREXi is fixated, was ultimately resolved with a judgment based on a joint factual stipulation offered by Xceligent as part of a negotiated settlement. Was that stipulation, accepted by Judge Gaitan in federal court in Missouri, also improperly purchased evidence? Of course not. CREXi's attempted (and desperate) gotcha falls entirely flat.

*Second*, despite CREXi's attempts to undermine its reliability and propriety, both the Consent Terms and Mr. Bagla's declaration have been filed with and reviewed by two courts and at least three judges. Indeed, the High Court in India used the Consent Terms and supporting declaration as a basis for entering judgment. And then CoStar publicly filed the Consent Terms, the associated judgment and injunction, and Mr. Bagla's declaration, in federal court in this Action,[11] and Judge Sagar referenced the Consent Decree and Declaration during the February 3, 2022 telephonic hearing for CREXi's motion to compel. Plainly CoStar has nothing to hide, and plainly no judge has raised an issue with a negotiated case resolution that involved one side testifying to the facts of the wrongdoing in exchange for a release. Further, the Consent Terms expressly reflect that Arcgate negotiated that agreement through counsel, executed it free from any

---

[11] As CREXi itself describes on page 3 of its letter, CoStar's lawsuit against Arcgate is "related litigation," and there is nothing improper under the local rules of CoStar's decision to notify the Court of this development via a Notice of Judgment in a Related Matter. CREXi was not entitled to advance notice of the filing, but it certainly could have filed a response. Instead, CREXi chose to avoid acknowledging the filing.

LATHAM&WATKINS LLP

threat, force, fraud, duress, or coercion of any kind, and would not have entered into the Consent Terms if the representations contained therein were false.[12]

*Third*, CREXi is not prejudiced by a claimed inability to cross-examine Mr. Bagla. As an initial matter, we see no reason why CREXi could not seek information from Mr. Bagla via the typical channels that US litigants use to obtain evidence abroad. More fundamentally, Mr. Bagla's testimony regarding the evidence in this case does not prevent CREXi from taking a different view—as in *Ayala*, CREXi is free to take a "differing position[]" on the evidence that Mr. Bagla testified to. *See Ayala*, 2009 WL 1916964 at *4. As discussed above, CoStar has fully disclosed the Consent Terms, the associated judgment and injunction, and Mr. Bagla's declaration to CREXi and the Court. Even if Mr. Bagla had been, as CREXi appears to believe, paid for his testimony (and of course he was not), it would be up to the trier of fact to evaluate Mr. Bagla's credibility and the truth of his testimony. *See U.S. v. Goff*, 847 F.2d 149, 161 (5th Cir. 1988) ("[T]he credibility of a compensated witness . . . is for the jury to determine."), *cert. denied*, 488 U.S. 932 (1988); *U.S. v. George*, No. ED CR 12-00065-VAP, 2015 WL 13450315, at *3 (C.D. Cal. Apr. 24, 2015) (explaining that the defendant had sufficient information to challenge cooperating witness' credibility because the government had disclosed all signed plea agreements and there was no evidence that the cooperating witnesses had received any other benefits).

*Fourth*, CREXi's baseless claims of perjury are beyond the pale. As noted above, much of Mr. Bagla's testimony is based on contemporaneous documents kept in the ordinary course of business.[13] While CREXi has withheld those documents to this day, it strains credulity that CREXi would not have reviewed these documents, and thus must know that Mr. Bagla is a truth teller. The real issue for CREXi is that the truth is catastrophic for its defense.

*Fifth*, contrary to your allegations, the Consent Terms state simply that Arcgate will "cooperate with CoStar to provide to CoStar all documentary evidence in its possession, custody or control relating to the activities and events described in Exhibit A on being directed to do so by an order of this Hon'ble Court or another court of competent jurisdiction" and that Arcgate will "cooperate to answer questions posed by CoStar regarding such activities and events."[14] Thus, the Consent Terms do not prohibit or "bar" Arcgate from cooperating with CREXi—they just say Arcgate will cooperate with CoStar. (We will however return to the issue of improperly pressuring witnesses to not cooperate with parties, a practice in which CREXi, not CoStar, is engaging.)

As you know, cooperation clauses in settlement agreements—even those that require significantly more cooperation that CoStar has sought from Arcgate, and even those requiring future testimony and the provision of witnesses and documents—are commonplace. *See Pruco Life Ins. Co. v. California Energy Dev. Inc.*, 2021 WL 2453280, at *5 (S.D. Cal. June 16, 2021) (enforcing settlement agreement that required cross-defendant to cooperate in cross-claimant's action to obtain the proceeds of a disputed life insurance policy, including providing written

---

[12] *See* ECF No. 100-1 at 12.

[13] *Id.* at 32–33.

[14] *Id.* at 13–14. To the extent CREXi is relying on Arcgate's covenant not to sue CoStar, *id*. at 14, such provisions are entirely commonplace in settlement agreements.

LATHAM&WATKINS LLP

declarations to support cross-claimant's ownership of policy proceeds); *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 2020 WL 8125638, at *1 (C.D. Cal. Nov. 16, 2020) (approving settlement agreement requiring defendant to cooperate with plaintiff by making its experts available and assisting plaintiff to defend against claims brought by another defendant); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2015 WL 9266493, at *6 (N.D. Cal. Dec. 17, 2015) (approving settlement in part because the settling plaintiffs "gain the value of Defendants' cooperation with Plaintiffs in pursuit of claims against the remaining defendant" and because settlement may "provide information, witnesses and documents that the [plaintiffs] may not otherwise be able to access."); *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, 2014 WL 12591624, at *2 (C.D. Cal. Jan. 10, 2014) (approving class action settlement agreement that required the settling defendant to cooperate with plaintiffs' continued prosecution of the action against the remaining defendants); *State of California v. eBay, Inc.*, 2014 WL 4273888, at *3 (N.D. Cal. Aug. 29, 2014) (approving class action settlement agreement that required the settling defendant to "provide documents and information relevant to the litigation or settlement, including identifying individuals, such as current or former employees, who may provide relevant information"). Arcgate's cooperation with CoStar in exchange for CoStar's release of legitimate claims against it is unremarkable.

*Sixth*, the case law CREXi cites is irrelevant and inapposite. Each of the cited cases centered on whether a party paid—or was obligated to pay—a fact witness for their testimony. *See Hamilton v. Gen. Motors Corp.*, 490 F.2d 223 (7th Cir. 1973) (fact witness not entitled to compensation for work on case); *State of N.Y. v. Solvent Chem. Co., Inc.*, 166 F.R.D. 284, 289–90 (W.D.N.Y. 1996) (work product protection did not apply because party improperly paid fact witness for "litigation consultant" services and improperly orchestrated settlement and indemnified witness in separate litigation); *Patel v. 7-Eleven, Inc.*, 2015 WL 9701133, at *3–5 (C.D. Cal. Apr. 14, 2015) (finding that a party improperly paid fact witness for testimony by posing a fact witness as an expert witness); *U.S. v. Blaszak*, 349 F.3d 881 (6th Cir. 2003) (affirming constitutionality of bribery statute as applied to defendant who offered testimony in exchange for $500,000); *Williamson v. Superior Court*, 21 Cal.3d 829, 835–38 (1978) (expert work product not protected from discovery because party paid codefendant to withdraw expert). CoStar has not paid Arcgate to offer testimony, or—as in *Patel*—tried to pass off Mr. Bagla as an expert in order to do so. Instead, CoStar filed a lawsuit in India to protect its intellectual property from Arcgate (as is its right to do); Arcgate engaged in adversarial litigation in Indian Court over Arcgate's work for CREXi; and, to avoid the necessity and uncertainty of litigation, both parties agreed to Consent Terms and a judgment enjoining Arcgate from violating CoStar's rights (supported by a sworn recitation of the evidence offered by Arcgate's CEO) in exchange for a release, just as happened in, for example, the *Ayala* and *Laun* cases cited above. That the testimony at issue here revealed CREXi's involvement in Arcgate's activities does not mean that both parties were not well within their rights to resolve their claims via the Consent Terms, as the judgment entered by the Indian high court underscores.

*Finally*, in attempting to leverage criminal allegations against CoStar and its counsel, CREXi engages in the wrongful litigation tactics that CREXi falsely imputes to CoStar. California Rule of Professional Conduct 3.10 prohibits a lawyer from threatening "to present criminal,

LATHAM&WATKINS LLP

administrative, or disciplinary charges to obtain an advantage in a civil dispute."  CoStar reminds
CREXi of its obligation to abide by both the letter and spirit of this Rule.

Let us turn now to the real wrongdoing in connection with Arcgate, beyond the revelations
about CREXi's misconduct against CoStar, and beyond your latest efforts to undermine them with
baseless and incendiary allegations.  We spoke with Arcgate's counsel and learned some very
troubling facts, beyond those reflected in Mr. Bagla's testimony.

Arcgate's counsel informed us that CREXi has been engaged in efforts to intimidate and
pressure Arcgate because of Arcgate's, and Mr. Bagla's, decision to come clean to CoStar about
CREXi's wrongdoing.  Specifically, CREXi's U.S. and Indian counsel have been harassing
Arcgate in writing, culminating in a letter from Indian counsel, copied to your firm, stating that by
providing evidence of CREXi's wrongdoing to CoStar, Arcgate had engaged in both illegal acts
and breaches of contract under U.S. and Indian law.  The apparent basis for the accusations of
criminal and civil wrongdoing was the claim by CREXi that it had a confidentiality interest in the
documents mentioned in Mr. Bagla's testimony (and provided to CoStar) evidencing theft from
CoStar.[15]  In other words, CREXi sought to intimidate Arcgate and its witness, Mr. Bagla, by
raising the specter of criminal liability and the prospect of a civil suit because they blew the whistle
on CREXi's misconduct.  And CREXi did so by making the spurious claim that criminal and civil
liability, and the resulting devastating consequences, would follow because evidence of theft from
CoStar was confidential information that should not have been, and should not be, disclosed.  This
effort to punish, and silence, a witness is, in a word, shocking.

We further learned from Arcgate's counsel that the allegations of illegality and breaches
were tied in part to a contract that CREXi induced Arcgate to sign in the immediate aftermath of
CoStar's suit against CREXi.  Arcgate stated that instead of properly instructing Arcgate to
preserve evidence, and instead of telling Arcgate that it had been referenced in CoStar's suit,
CREXi focused on pressing Arcgate to sign a contract that purported to reframe the relationship
between the parties in a way that CREXi believed would be helpful to the defense of CoStar's
case.  CREXi then, more recently, wielded this *ex post facto* CREXi-drafted agreement, which it
had tricked Arcgate into signing by not disclosing material information, to argue that information
about CREXi's wrongdoing that predated the agreement (and thus was not even arguably covered
by the agreement) was akin to a trade secret and thus Arcgate was liable for disclosing it.

As CREXi is well aware, there is no basis to enforce any agreement, let alone one tailored
to suppress evidence, in order to silence a witness.  *See Chambers v. Capital Cities/ABC*, 159
F.R.D. 441, 441–45  (S.D.N.Y. 1995) (finding that "agreements calling or appearing to call for
silence concerning matters relevant to alleged legal violations, whether or not such agreements are
sought to be enforced, inherently chill communication relevant to the litigation" and "are against

---

[15] Early in this campaign, you apparently raised confidentiality concerns premised on Arcgate
potentially sharing CREXi client information with CoStar.  But we understand that Arcgate
quickly confirmed to CREXi that they had not, and indeed could not have shared CREXi client
information with CoStar, because Arcgate—as CREXi must have known—had never received
client information from CREXi, and did not know even the identity of those clients.

**LATHAM&WATKINS**LLP

public policy."). Further, CREXi has no enforceable confidentiality interest with regards to the means by which it copied content from, and used as a resource, CoStar websites, and the content copied from or verified on those sites. Indeed, Ms. McCloskey, in writing, disclaimed that CREXi had such an interest.[16] That makes it all the worse that CREXi would now invoke that same interest in an effort to intimidate a third party witness and retaliate against its whistleblowing.

CREXi's baseless efforts to retaliate against a third party (and individual) that has offered evidence are beyond the pale. Perhaps that is the reason why Arcgate is, according to you, "refusing to cooperate with CREXi." 2/17 Ltr. at 2.

Please **CEASE AND DESIST** from threatening witnesses and third parties with criminal and/or civil liability based on providing evidence of CREXi's use of CoStar websites, databases and/or other resources to compete against CoStar.

Further, please withdraw, and confirm that you have withdrawn, all statements made to any individual or entity suggesting that they face liability for providing, or if they provide, evidence (whether documentary or testimonial) relating to CREXi's use of CoStar websites, databases and/or other resources to compete against CoStar.

Please also answer the following questions without delay so that we can address the full extent of CREXi's efforts to silence witnesses:

1. What involvement did your firm, Indian counsel and CREXi's in-house counsel have in drafting the contract that CREXi claims prohibits the disclosure of its wrongdoing? Please provide a copy of that contract, and all communications relating to it.

2. What involvement did your firm, Indian counsel and CREXi's in-house counsel have in drafting or approving the letter that CREXi sent to Arcgate alleging that it had engaged in illegal

---

[16] *See* December 2, 2021 email from E. McCloskey to S. Tomkowiak. Given Ms. McCloskey's (inevitable) concession, CREXi plainly has no enforceable right to use its contract with Arcgate to interfere with, or to punish Arcgate for, Arcgate's provision of evidence. *See In re JDS Uniphase Corp. Securities Litigation*, 238 F. Supp. 2d 1127, 1137 (N.D. Cal. 2002) ("To the extent that [confidentiality] agreements preclude former employees from assisting in investigations of wrongdoing that have nothing to do with trade secrets or other confidential business information, they conflict with the public policy . . ."). All Arcgate has done is offer evidence, both documentary and testimonial, of its work for CREXi accessing CoStar sites without authorization, and copying from them despite acknowledging that such access and copying was prohibited. That's not a trade secret; it's just anticompetitive conduct. While CREXi will no doubt argue that it has some enforceable confidentiality interest in matters that do *not* pertain to accessing and copying from CoStar, it has identified no such information that has been improperly disclosed, despite being in possession of the emails and documents it exchanged with Arcgate, and the testimony offered by Mr. Bagla. And even if it could identify any, that would not of course excuse its efforts to suppress evidence of its misconduct.

LATHAM&WATKINSLLP

acts and breaches of contract for sharing evidence of CREXi's wrongdoing?  Please provide a copy of that letter, all drafts of the letter, and all communications relating to that letter.

3.  Has CREXi's counsel, whether your firm, another firm, or in-house counsel, contacted any other third party and/or witness and suggested that their disclosure of information about their work for CREXi involving CoStar would be, in words or substance, an illegal act or a breach of contract or otherwise prohibited?[17]

*Further*:

4.  Please preserve and produce all documents and communications, whether purportedly privileged or not, relating to efforts to withhold or suppress the evidence offered, or that may be offered by Arcgate, any other BPO, or any other witness in this case, or efforts to retaliate after the disclosure of such evidence.   That includes at a minimum (a) all documents and communications relating to your letter of February 17, and all drafts of that letter, (b) all documents and communications that suggest that an entity or individual may be civilly and/or criminally liable if such person discloses documents or testifies relating to its work for CREXi involving CoStar, and (c) all other documents and communications concerning efforts to withhold or suppress evidence relating to CoStar, or to threaten, intimidate, pressure, punish, retaliate against, seek damages from, or hold liable persons who cooperate with CoStar's efforts to uncover CREXi's conduct *vis-à-vis* CoStar.

5.  In that regard, please identify (now, not on March 9) all BPOs, agents and contractors that CREXi has used to access CoStar sites or databases, copy content from those locations, or use them as a competitive resource.  With respect to each such person (whether an entity or individual), please preserve and produce forthwith all documents and communications relating to CoStar and this litigation, to include without limitation:

(a) all contracts entered into with such person after the CoStar lawsuit was filed, including drafts and related communications, to the extent such contracts purport to restrict the disclosure of confidential information or trade secrets or characterize the relationship between CREXi and that person;

(b) documents and communications that suggest or relate to the idea that the disclosure of information to CoStar about the person's work for CREXi would be prohibited as a breach of contract, an illegal act, or otherwise, or that CREXi has or is exercising a legal right (whether under contract or otherwise, and whether relating to confidential information or trade secrets or otherwise) to block disclosure of documents or evidence concerning the person's work for CREXi that relates to CoStar;

---

[17] Given CREXi's efforts regarding Arcgate, and its refusal to date to even disclose the identity of the other BPOs, agents or contractors it has used to harvest content from CoStar, we strongly suspect that CREXI, through counsel or otherwise, has engaged in a pattern of similar misconduct *vis-à-vis* other persons similarly situated to Arcgate.

**LATHAM&WATKINS**LLP

(c) all other communications about the CoStar lawsuit, not cooperating or communicating with CoStar, or any potential steps, legal or otherwise, that CoStar may take against such person;

(d) any and all other efforts to induce the entity to withhold documents or evidence relating to CoStar, or to intimidate, harass, threaten, pressure, silence or retaliate against such person, or suggest that they face actual or potential civil or criminal liability if they provide documents or testimony to CoStar;

(e) all documents and communications relating to such person's work for CREXi that concerns CoStar; and

(f) all communications relating to the preservation and/or destruction of documents that may be relevant to this lawsuit.

On the subject of evidence destruction, we have repeatedly asked CREXi questions about the deletion by its agent, Arcgate, of server logs evidencing significant access to CoStar's sites. CREXi to date has refused to answer any of those questions.  We therefore posed those same questions to Arcgate's counsel.  Their responses further underscore CREXi's spoliation, its failure to even try to remedy that spoliation, and the reason why CREXi has refused to answer questions on the topic:

- CREXi did not contact Arcgate regarding the preservation of relevant evidence until the end of October 2020 (and even then the instruction was plainly inadequate).  In CREXi's letter of August 20, 2021, your firm represented that "CREXi instructed Arcgate to preserve relevant documents" "in or about September 2020."  Not so.  CREXi waited until the end of the following month.

- After this initial contact at the end of October, CREXi did not have any other communications with, or send any other directions to, Arcgate regarding the preservation of evidence generally, or the preservation of evidence of access to CoStar's sites specifically (as reflected in logs or otherwise).

- At least to Arcgate's knowledge, CREXi has taken no steps to determine whether there is any way to reverse the deletion of the logs, or to identify substitute evidence.  Indeed, even though the Indian judgment, which included testimony regarding the deletion, was filed more than *six weeks ago*, CREXi has not once contacted Arcgate about the destruction of this evidence, even though it has been in touch during that period to intimidate Arcgate with talk of criminal and civil penalties regarding its disclosure of evidence.

If you deny any of the foregoing, please let us know right away.  With regard to CREXi's knowledge regarding the Arcgate litigation, we also ask:

6.  What steps has CREXi taken, if any, to attempt to mitigate the destruction of this evidence?

**LATHAM&WATKINS**LLP

7.   Has CREXi identified any other records that would reflect all of the access contained in the now destroyed logs?  If so, what is this evidence, and when will it be produced?

8.   Is it CREXi's position that the prejudice to CoStar from destruction of this evidence of "extensive" unauthorized access can somehow be rectified? If so, how?

9.   With regard to other entities hired by CREXi that have been accessing CoStar websites or databases, including without limitation other BPOs and the individual hired by Paul Cohen, when and how did CREXi take steps to ensure that relevant evidence would be preserved, and in light of the log destruction at Arcgate, has CREXi checked whether those other entities have also destroyed evidence relating to the litigation, including without limitation evidence of access to CoStar websites and databases, and the copying of content from such locations? Please advise, including whether CREXi provided the same cursory "instruction" to these other entities as it provided to Arcgate in late October 2020.

And further on the topic of the deletion of records of access to CoStar sites, please advise:

10. Whether other mass-deletions of records of access to CoStar-related URLs or references occurred, whether involving CREXi's James Burton, Arcgate, or otherwise, when those deletions occurred, and whether they may be reversed.

11. Whether CREXi took any steps to ensure that the practice of deleting references to CoStar websites did not recur (or continue) after this lawsuit was filed, and (if so) whether CREXi was successful.

*          *          *

CREXi's spoliation, and failure to take even basic steps to address it—indeed, not even contacting Arcgate to discuss the topic—are of a piece with its efforts to suppress the Arcgate evidence, and punish Arcgate for blowing the whistle.  Whatever CREXi needs to do to hide its wrongdoing, whether it be acquiescing in the destruction of evidence, making unfounded claims of bribery and perjury, or threatening witnesses, it will not hesitate.  This is, as we know, a company that was founded on misappropriation, and it did not learn from the consequences it faced five years ago.

The truth will come out.  It always does.  CREXi's efforts to silence Arcgate, any campaign to do the same with respect to other witnesses, and CREXi's disgraceful attack on counsel, will all fail.

We look forward to hearing from you forthwith.

Sincerely,

*/s/ Nicholas J. Boyle*

Nicholas J. Boyle

# EXHIBIT I



Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809

415 391 5400
keker.com

**Warren A. Braunig**
(415) 773-6642
wbraunig@keker.com

April 8, 2022

Nicholas J. Boyle
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
nicholas.boyle@lw.com

Re:    *CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc.*
       2:20-cv-8819 (C.D. Cal.)

Dear Nick:

Your February 28, 2022 response regarding CoStar's unethical and unlawful interference with a fact witness is inflammatory but plainly inadequate. Your letter provides no legitimate explanation for your client's and your firm's unethical procurement of misleading (if not false) testimony from Arcgate, which you then filed for no reason other than to improperly influence the Court. Rather than provide any of the requested details about CoStar's misconduct, you seek to shift the blame, obviously hoping to deflect attention from CoStar's wrongdoing. It is a strategy we have seen from CoStar all too often in this litigation. Your letter is wrong on the facts, the law, and on the boundaries of ethical conduct for a lawyer.

Your recitation of the "facts" concerning the Arcgate-CREXi relationship is just as misleading as the declaration you obtained from Arcgate's CEO, Mr. Bagla, a declaration that your firm undoubtedly drafted. In contrast to your overblown claims, the reality is that CREXi instructed Arcgate *not* to gather information from competitive websites—even though, of course, broker information on LoopNet is publicly available to anyone. Likewise, your attempt to imply wrongdoing because CREXi instructed Arcgate to identify non-CoStar website sources for a quality control project is the height of absurdity. As you ought to know, given your unfettered access to Arcgate, the purpose of that project was to avoid use of CoStar websites. After numerous months of delay, you have finally produced the documents that Arcgate produced to CoStar in India. Those documents confirm the fact that CoStar, both in its letter and in Mr. Bagla's declaration, cherry-picked language from emails sent over the course of more than a year to create a false impression that has no basis in reality.

Nicholas Boyle
April 8, 2022
Page 2

On the law, your letter notably does not deny that CoStar released significant damages claims against Arcgate, and dropped the seizure order CoStar had obtained for Arcgate's servers, in exchange for the content of Mr. Bagla's testimony. Instead, you contend that such arrangements are "routine." Although CoStar may routinely use litigation—and the threat of enormous damages—to secure testimony from third parties, that does not make it ethical.

It is obvious that such conduct is improper. California Rule of Professional Conduct 3.4 explicitly forbids a lawyer from "directly or indirectly pay[ing] . . . a witness contingent upon the content of the witness's testimony." Federal law likewise makes it criminal to "directly or indirectly . . . give . . . anything of value to any person, for or because of the testimony under oath." 18 U.S.C. § 201(c)(2).[1] These ethical and criminal prohibitions that CoStar and its attorneys flout are not mere window dressing—they exist to "maintain the effective administration of justice and the integrity of the Court." *Patel v. 7-Eleven, Inc.*, 2015 WL 9701133, at *5 (C.D. Cal. Apr. 14, 2015). As the Seventh Circuit put it, agreements to compensate fact witnesses for testimony "lean[] toward the procurement of perjury; toward the raising up of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit[;] toward the perversion of justice; and toward corruption in our courts." *Hamilton v. General Motors Corp.*, 490 F.2d 223, 228 (7th Cir. 1973). This prohibition exists whether the paid-for testimony is "truthful or not," *Patel*, 2014 WL 9701133, at *5, making it all the more egregious that CoStar and its attorneys obtained a declaration from Mr. Bagla containing allegations against CREXi that are misleading at best.

Your letter takes the astonishing position that these rules of ethics and criminal prohibitions don't matter at all, asserting that "[e]ven if Mr. Bagla had been . . . ***paid for his testimony*** . . ., it would be up to the trier of fact to evaluate Mr. Bagla's credibility and the truth of his testimony." 2/28/22 Ltr. at 5 (emphasis added). That position is contradicted by the ethical rules and criminal laws that forbid exchanging something of value for testimony, and the cases that require appropriate sanctions in response to such misconduct. Such sanctions include, at a minimum, the exclusion of the improper evidence, and potentially require the disqualification of counsel. *See Patel*, 2015 WL 9701133, at *6 (disqualifying counsel).

Neither your letter nor ***any*** of the cases you cite even address the rules forbidding compensation for testimony. *Ayala v. Pacific Maritime Ass'n*, 2009 WL 1916964 (N.D. Cal. July 1, 2009), and *Laun v. Laun*, 2008 WL 11504545 (N.D. Ind. Sept. 4, 2008), make no mention of these rules at all. In *Ayala*, the court addressed whether a settlement was entered collusively for the purpose of harming a non-settling defendant; no party raised the question of payment for testimony. *Ayala*, 2009 WL 1916964, at *5. And in *Laun*, the court was simply asked to interpret a settlement agreement, and not to opine on whether it violated ethical or criminal rules. *Laun*, 2008 WL 11504545, at *4-*6.

---

[1] To be clear, identifying CoStar's conduct for what it is does not violate any ethical rule. 2/28/22 Ltr. at 6-7.

1837903

Nicholas Boyle
April 8, 2022
Page 3

The factual circumstances of *Ayala*, *Laun*, and the other cases you cite are far different from what happened here.  It is undisputed that CoStar brought collateral litigation against a third-party witness in India (rather than seeking discovery through normal discovery mechanisms); obtained injunctive relief based on false claims about copyright infringement (notably, the Consent Judgment with Arcgate says nothing about copyright infringement); then settled the case in exchange for slanted and misleading testimony (drafted by CoStar's own attorneys, rather than the witness itself) that CoStar immediately turned around and sought to utilize in this action.

By contrast, in *Ayala*, the settling defendant, who paid the plaintiff $25,000 to settle, agreed to provide a declaration from a corporate witness with its ***legal*** interpretation of a relevant contractual provision fifteen days after execution of the settlement agreement; the witness was then to be subject to a Rule 30(b)(6) deposition.  *See Ayala v. Pac. Maritime Ass'n*, No. 3:08-cv-00119-TEH, ECF 98 & 99-3 (N.D. Cal. May 29, 2009).  Far from payment for specific testimony, the settling defendant merely agreed to provide, prior to its dismissal, relevant discovery on legal positions that could then be tested by the plaintiffs in deposition.  And in *Laun*, the declaration was ***not*** obtained for use as testimony against a third party.  Instead, that declaration merely served as the factual basis for the settlement by providing the plaintiff assurance that the trust at issue did not have funds or accounts "besides the ones that have already been disclosed to the plaintiff."  *Laun*, 2008 WL 11504545, at *5.

The other cases on which you rely similarly bear no resemblance to CoStar's actions.  Those cases involved circumstances, for example, where a lead plaintiff in a class action received incentive compensation for their role in the case;[2] where a defendant's testimony solely provided the factual basis for reaching a settlement (rather than extracted for use as fact testimony against a third party in a separate suit);[3] or where the agreements were only to "cooperate," rather than in payment for specific testimony against a third party.[4]  Indeed, your

---

[2] *Ellison v. Steven Madden, Ltd.*, 2013 WL 12124432, at *1 (C.D. Cal. May 7, 2013) (incentive award for lead plaintiff in class action); *see also In re Broadcom Corp. Derivative Litigation*, No. 2:06-cv-03252-R-CW, ECF 945 (C.D. Cal. May 23, 2011) (attorney's fees in derivative securities litigation).

[3] *Sony Computer Ent. Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1073 (N.D. Cal. 2005) (consent judgment for $6 million entered against defendant based on his own admissions); *Laun*, 2008 WL 11504545, at *5 (settlement reached because defendants certified that a trust did not have funds "besides the ones that have already been disclosed to the plaintiff").

[4] *Pruco Life Ins. Co. v. California Energy Dev. Inc.*, 2021 WL 2453280, at *5 (S.D. Cal. June 16, 2021) (ordering party to settlement agreement to "cooperate . . . by submitting to an interview regarding his knowledge of the facts related to this case"); *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 2020 WL 8125638, at *1 (C.D. Cal. Nov. 16, 2020) ("covenant of cooperation"); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2015 WL 9266493, at *6 (N.D. Cal. Dec. 17, 2015) (agreement to cooperate); *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, 2014 WL 12591624, at *2 (C.D. Cal. Jan. 10, 2014) (same); *State of California v. eBay*,

Nicholas Boyle
April 8, 2022
Page 4

letter seemingly concedes that the *Pruco* case, the *Santa Clarita* case, and the other cases you cite on that final point merely involved agreements to "cooperate" as a general matter rather than compensation for specific testimony—as CoStar extracted from Arcgate here.  2/28/22 Ltr. at 5-6.  You even cite ***criminal*** cases,[5] without acknowledging that government agents have special authority to use plea agreements and paid informants to pursue criminal enterprises, backstopped by the due process clause's prohibition on "outrageous" government conduct.  *United States v. McQuin*, 612 F.2d 1193, 1196 (9th Cir. 1980).  CoStar and its attorneys, however, are not the government and must comply with the rules of professional conduct and the federal criminal code.

Not only are your cited authorities entirely inapposite, but your attempts to distinguish CREXi's authorities fall flat.  You assert that the cases cited in my previous letter were limited to circumstances where a "party *paid . . .* a fact witness for their testimony."  2/28/22 Ltr. at 6.  But "payment" does not require a transfer of cash.  Giving something of value—or agreeing not to take something of value—is a form of compensation that is outlawed by the ethical rules and the federal statute.  *See* Cal. R. of Prof. Conduct 3.4; 18 U.S.C. § 201(c)(3).  As set forth in *United States v. Blaszak*, "[18 U.S.C.] Section 201(c)(3) clearly prohibits demanding or accepting ***anything*** of value in exchange for testimony."  349 F.3d 881, 887 (6th Cir. 2003) (emphasis added).  Likewise, in *State of New York v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284, 289–90 (W.D.N.Y. 1996), the court held that a litigation consulting agreement with a witness was improper based on "financial inducements (***or their equivalents***)."  *Id.* (emphasis added).  The *Solvent Chemical* court found that the parties "went too far" by providing "protection from liability" in a separate case by dropping claims against, and agreeing to indemnify, the witness.  *Id.*  These cases found improper conduct even in the absence of a direct monetary payment.  Your additional attempt to distinguish *Patel* because it involved a plaintiff that sought to pass a fact witnesses off as an expert witness similarly fails.  The principle that forbade the attorney's conduct in *Patel* was the bar against compensating a witness for testimony, *Patel*, 2015 WL 9701133, at *3-*5, the exact rule that CoStar violated here.

Your effort to rewrite the Arcgate consent judgment also does not excuse CoStar's conduct.  That agreement obligates Arcgate to "cooperate with CoStar" in providing evidence and testimony, ECF 100-1, at 13-14, ¶ 7, and forbids Arcgate from "support[ing]" or "voluntarily participat[ing] in any way" in any action related to the claims brought against Arcgate, *id.* at 16, ¶ 17, including CREXi's claims in this action.  By settling the litigation against Arcgate, you have obtained Arcgate's full cooperation with CoStar, as well as its stonewalling and *non-cooperation* with CREXi.  "A bargain for the concealment or suppression of . . . evidence is of course illegal."  *Williamson v. Super. Ct.*, 21 Cal. 3d 829, 837 (1978).

<hr>

*Inc.*, 2014 WL 4273888, at *3 (N.D. Cal. Aug. 29, 2014) (same).

[5] *United States v. Goff*, 847 F.2d 149, 161 (5th Cir. 1988) (paid informants in criminal cases); *United States v. George*, 2015 WL 13450315, at *3 (C.D. Cal. Apr. 24, 2015) (discussing witnesses in criminal trials who testified following plea bargains).

Nicholas Boyle
April 8, 2022
Page 5

In short, there is nothing "routine" about the unethical "sue first, then settle in exchange for testimony" strategy you employed with Arcgate.  CoStar's conduct since reaching an agreement with Arcgate only underlines the impropriety.  For example: (1) CoStar has refused to answer basic questions relating to the circumstances of the Arcgate settlement and declaration in response to CREXi's Third Set of Requests for Production; (2) CoStar filed the Arcgate declaration and judgment, not in response to any relevant pending issue but simply to influence the Court in these proceedings with a slanted and misleading declaration; and (3) CoStar refused for months to produce the information it obtained from Arcgate, despite our repeated requests.

Your overwrought eleven-page missive is most notable for what it does not do: respond to the factual questions raised by our letter.  It fails to explain, or produce evidence concerning, the circumstances by which Mr. Bagla was pressured into signing the declaration; the authorship and editing of the declaration; and how CoStar and Arcgate discussed the benefits Arcgate received for its testimony.

CREXi will get to the bottom of CoStar's misconduct.  To quote your letter, "[t]he truth will come out."  We reiterate our demand that you provide information immediately concerning the details and circumstances of CoStar's arrangement with Arcgate and Mr. Bagla.  Specifically, please provide:

- The identity of all individuals, including but not limited to counsel, involved in the solicitation, negotiation, drafting, or execution of the documents attached as Exhibit A to CoStar's Notice of Judgment in a Related Case;

- All drafts of the documents attached as Exhibit A to CoStar's Notice of Judgment in a Related Case, including but not limited to drafts created, edited, reviewed, sent, or received by counsel;

- All documents and communications pertaining to the documents attached as Exhibit A to CoStar's Notice of Judgment in Related Case, including but not limited to documents reflecting the negotiation of the Consent Decree, any threats to pursue further action (including damages or criminal contempt sanctions) against Arcgate or the nature of any anticipated future cooperation from Arcgate, and including documents and communications drafted, edited, reviewed, sent, or received by counsel; and

- All documents and communications comprising or including complaints, requests, threats, or demands against any other third party that is related to CREXi or to this litigation, including but not limited to any such documents and communications drafted, edited, reviewed, sent, or received by counsel.

Finally, I will briefly address the issues you raise at the end of your letter in an attempt to distract from CoStar's wrongdoing.  Those are easily dispelled.  We have already addressed your bizarre attempt to blame CREXi for Arcgate's alleged spoliation of data, which apparently took place after you had sued Arcgate in India without giving CREXi notice (and when you had

Nicholas Boyle
April 8, 2022
Page 6

the opportunity to demand that they retain documents you thought should be retained).  *See* 3/10/22 Sung Ltr. to Tomkowiak.  Those allegations are frivolous.

Your accusations that CREXi has "intimidated" Arcgate are absurd.  CREXi had an agreement with Arcgate that prohibited Arcgate from sharing CREXi confidential information and separately required Arcgate to give notice to CREXi before producing CREXi business information to a third party, even under legal compulsion.  Arcgate breached that agreement by providing CoStar with CREXi documents (without giving notice).  CREXi was well within its rights to request that Arcgate comply with its contractual obligations.[6]

CoStar and its lawyers have committed unethical—and potentially unlawful—conduct in their dealings with Arcgate, while simultaneously blocking CREXi's attempts to get to the bottom of it.  If CoStar indeed has nothing to hide about the way it secured Arcgate's testimony, CoStar should come clean, provide the information CREXi has requested, and allow this issue to be fully examined, rather than trying to cloak it under some far-fetched claim of privilege.

Sincerely,

KEKER, VAN NEST & PETERS LLP

Warren A. Braunig

WAB:em

---

[6] Insofar as CoStar was aware of Arcgate's contractual obligations and encouraged Arcgate to ignore them, CoStar may be separately liable for intentional interference with contract.

# EXHIBIT J

1  JESSICA STEBBINS BINA
2  (BAR NO. 248485)
   jessica.stebbinsbina@lw.com
3  ELYSE M. GREENWALD
   (BAR NO. 268050)
4  elyse.greenwald@lw.com
   LATHAM & WATKINS LLP
5  10250 Constellation Boulevard
   Suite 1100
6  Los Angeles, CA 90067
   Tel: 424.653.5525
7  Fax: 424.653.5501
8
9  *Attorneys for Plaintiffs-Counterdefendants*
10 [Additional counsel listed on signature page]

11        **UNITED STATES DISTRICT COURT**
12        **CENTRAL DISTRICT OF CALIFORNIA**

13
14 COSTAR GROUP, INC., and
   COSTAR REALTY
   INFORMATION, INC.,
15
                    Plaintiffs,
16
17       v.

18 COMMERCIAL REAL ESTATE
   EXCHANGE, INC.,
19
                    Defendant.
20
21 COMMERCIAL REAL ESTATE
   EXCHANGE, INC.,
22
                    Counterclaimant,
23
24       v.

   COSTAR GROUP, INC., AND
25 COSTAR REALTY INFORMATION,
   INC.,
26
                    Counterdefendants.
27
28

CASE NO. 2:20-cv-08819-CBM-AS

**COSTAR'S OBJECTIONS AND
RESPONSES TO CREXI'S THIRD
SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS**

**PROPOUNDING PARTY: CREXI
RESPONDING PARTY: COSTAR
SET: TWO (NOS. 92-115)**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiffs and Counterclaim Defendants CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar"), by and through their counsel, hereby submit their objections and responses to Defendant and Counterclaimant Commercial Real Estate Exchange, Inc.'s ("CREXi") Third Set of Requests for Production of Documents, (the "Requests" or individually, a "Request"), dated February 2, 2022.

## PRELIMINARY STATEMENT

The responses set forth below are provided without prejudice to CoStar's right to amend these responses if additional documents or information come to its attention.  This reservation, however, is not to be construed as an undertaking by CoStar of an affirmative duty to alter, supplement, amend, or otherwise modify these responses and objections in any manner, at any time, except as otherwise required by law.  The fact that CoStar has responded to any document request is not intended to be, and shall not be, construed as a waiver of all or part of any objection to any document request.  CoStar's production of documents in response to any request is not intended to be, and shall not be, construed as a waiver of any objection to the admissibility and use of these documents in a hearing on a motion, trial, or any other court proceeding, arbitration, mediation, or other alternative dispute resolution in this or any other action.  CoStar's responses are made without waiving, in any way, the right to object on any basis permitted by law to any other discovery request or proceeding involving or relating to the subject matter of these responses.  By making these responses, CoStar does not concede that the documents sought are relevant or proportional to the needs of this litigation.

## GENERAL OBJECTIONS

CoStar makes the following General Objections.  These General Objections shall be incorporated into each of CoStar's responses as if fully rewritten therein, and each response is subject to and without waiver of any of these General Objections.

1.    CoStar objects to the Requests, and to the section labeled "Definitions" (the "Definitions") and to the section labeled "Instructions" (the "Instructions") included in the Requests, to the extent that they seek to impose on CoStar any discovery obligation greater than or different from those imposed by the Federal Rules of Civil Procedure (the "Federal Rules"), by the Local Rules of the United States District Court for the Central District of California (the "Local Rules"), or by any Order entered by or to-be-entered by the Court in these proceedings, on the grounds that they are unduly burdensome. CoStar assumes no duty to respond to the Requests except as specifically required by the Federal Rules, the Local Rules, or an Order of the Court.

2.    CoStar objects to the Requests, Definitions, and Instructions to the extent that they seek the production of documents protected by the attorney-client privilege, the attorney work-product doctrine, the joint defense privilege, the common interest doctrine, and/or any other applicable privilege, immunity, or protection, including under applicable foreign law. CoStar will only produce information that it believes is non-privileged and is otherwise properly discoverable. To the fullest extent allowable under Federal Rule of Evidence 502 and any other applicable law, inadvertent identification or production of any protected or privileged documents shall not constitute a waiver of any privilege or protection with respect to the documents produced or the subject matter thereof; or a waiver of CoStar's right to object to the use of any such information during trial, arbitration, mediation, or any subsequent proceeding; or a waiver of the right to demand the return of any documents produced.

3.    CoStar objects to the Requests, Definitions, and Instructions to the extent that they seek the production of documents (i) protected from disclosure by any law, court order, or confidentiality or non-disclosure agreement; or (ii) the disclosure of which would violate the privacy rights of any of CoStar's current or former customers or employees.

4.     CoStar objects to the Requests, Definitions, and Instructions to the extent that they seek the production of "all" documents or "all" communications concerning a particular topic or topics when less than "all" documents or communications necessary and material to the claims or defenses in this case would be sufficient.  Such Requests are overly broad, unduly burdensome, and/or seek documents that are not relevant or proportional to the needs of the case.

5.     CoStar objects to the Requests, Definitions, and Instructions to the extent that they seek the disclosure of documents that are a matter of public record, are equally available to CREXi, or are already in CREXi's possession, custody, or control, on the basis that such Requests are unduly burdensome.

6.     CoStar objects to the Requests, Definitions, and Instructions to the extent that they seek to impose an undue burden upon CoStar by requesting documents the value of which, if any, is substantially outweighed by the burden or cost of searching, collecting, or reviewing them.

7.     CoStar objects to the Requests, Definitions, and Instructions to the extent that they seek the production of documents that are not in CoStar's possession, custody, or control.

8.     CoStar objects to the Requests, Definitions, and Instructions as unduly burdensome to the extent that they seek to impose an obligation to search the files of all current and former employees, including those who are not reasonably likely to have responsive documents.

9.     CoStar objects to the Requests, Definitions, and Instructions to the extent that they assume facts not in evidence and to the extent that they state or assume legal conclusions.  By providing these objections and responses, CoStar does not admit the factual or legal premise of any of the Requests.

10.     CoStar objects to the Requests, Definitions, and Instructions to the extent that they seek the production of documents that are not relevant to the claims or defenses of any party in this action or disproportionate to the needs of the case,

are overly broad, or are unduly burdensome.

11.     CoStar objects to each and every paragraph of the Definitions section to the extent that the Definitions purportedly set forth therein would (i) expand the definition of a term beyond its ordinary use in the English language; (ii) create an undue burden for CoStar when propounding its objections and responses to the Requests; and/or (iii) impose obligations on CoStar that exceed, or are inconsistent with, the obligations imposed by the Federal Rules.

12.     CoStar objects to the Requests, Definitions, and Instructions to the extent that they purport to require CoStar to make calculations or formulate and compile information in manners otherwise different from those used by CoStar in the ordinary course of its business.  CoStar further objects to each Request to the extent that it seeks information not maintained in the ordinary course of business.

13.     The failure to object on any particular ground or grounds shall not be construed as a waiver of CoStar's right to object on any additional ground(s).  CoStar reserves the right to amend and/or supplement these objections at a later time.

14.     CoStar objects to the Requests as overly broad, unduly burdensome, and seeking information that is not relevant and disproportionate to the needs of this case to the extent that they seek information unrelated to CoStar's commercial real estate websites or products.  To the extent CoStar responds to these Requests, its Responses will be limited to its commercial real estate websites and products that are relevant to this action.

15.     CoStar objects to the Requests as unduly burdensome and unreasonable to the extent that CREXi demands that CoStar produce documents within 30 days. CREXi has served multiple requests that will require CoStar to search custodial and non-custodial sources and it is not practical, feasible, nor necessary for CoStar to complete its production within 30 days.  CoStar is providing these responses on March 4, 2022, and will produce responsive, non-privileged documents at a reasonable time following the parties' meet and confers and/or motion practice

1    concerning these Requests.

2        16.    CoStar objects to the Requests as overly broad, unduly burdensome,

3    and seeking documents that are not relevant to any party's claims or defenses or

4    proportional to the needs of the case to the extent that Requests include no time

5    period.   In responding to these Requests, CoStar will search for and produce

6    responsive information for the time period from January 1, 2016 to June 23, 2021

7    (the "Relevant Time Period"), unless otherwise indicated.

8            **OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

9        1.    CoStar objects to CREXi's definition of "ARCGATE" as overly broad

10   and unduly burdensome to the extent that the definition purports to include "past or

11   present divisions, departments, parents, predecessors, successors, subsidiaries,

12   affiliates, and other organizational or operating units; and past or present officers,

13   directors, employees, agents, representatives, consultants, attorneys, and other

14   acting or purporting to act on its behalf."  In responding to these Requests, CoStar

15   will construe the term "Arcgate" to mean Arcgate, a Partnership Firm (also known

16   as M/s Arcgate) and/or Arcgate Teleservices Private Limited.

17       2.    CoStar objects to CREXi's definition of "COMMUNICATION" as

18   overly broad and unduly burdensome insofar as it encompasses documents and

19   information that are outside of CoStar's actual possession, custody, or control, or

20   that cannot be located with a reasonably diligent search.  CoStar further objects to

21   the definition as vague and ambiguous to the extent that it suggests intangible items

22   (e.g., "thoughts," "opinions," or "oral" "transfer[s] of information"), absent

23   recordation, may need to be produced.  CoStar also objects to the definition as

24   unduly burdensome to the extent that it purports to require that CoStar create

25   documents or compile information memorializing intangible communications solely

26   for the purposes of responding to these Requests.  In responding to the Requests,

27   CoStar will construe the term "COMMUNICATION" to be synonymous in meaning

28   and equal in scope to the term as it is defined under the Federal Rules.

3. CoStar objects to CREXi's definition of "COSTAR" as vague and ambiguous, overly broad, and unduly burdensome to the extent that the definition purports to include "any past or present divisions, departments, parents, predecessors, successors, subsidiaries, affiliates, and other organizational or operating units; and past or present officers, directors, employees, agents, representatives, consultants, attorneys, and others acting or purporting to act on its behalf." In responding to these Requests, CoStar will construe the term "COSTAR" to mean CoStar Group, Inc. and CoStar Realty Information, Inc.

4. CoStar objects to CREXi's definition of "DOCUMENT" as vague and ambiguous, overly broad, and unduly burdensome in that it is inconsistent with the Federal Rules and purports to create an obligation greater than that under the Rules. In responding to Requests that incorporate this term, unless otherwise specified, CoStar will construe the term "DOCUMENT" to be synonymous in meaning and equal in scope to the term as defined under Federal Rule of Civil Procedure 34(a)(1)(A).

5. CoStar objects to the definition of "PERSON" as vague and ambiguous, overly broad, and unduly burdensome, in that it seeks the production of documents pertaining to unspecified and unknowable "corporation[s]," "proprietorship[s]," "association[s]," "joint venture[s]," "compan[ies]," "partnership[s]," "business or legal entit[ies]," "governmental bodies," or "agencies." In responding to the Requests that incorporate this term, CoStar will construe the term "PERSON" to have its ordinary meaning.

6. CoStar objects to the definition of "RELATING TO" as vague and ambiguous, overly broad, and unduly burdensome because it seeks to expand the ordinary meaning of the term and incorporates terms that are inconsistent with the true and ordinary meaning of the phrase. In responding to the Requests that incorporate this term, CoStar will construe the term "RELATING TO" to have its ordinary meaning.

COSTAR'S OBJS. & RESPS. TO CREXI'S THIRD SET OF RFPS CASE NO. 2:20-cv-08819-CBM-AS

7.     CoStar objects to the definition of "THIRD PARTY" as vague and ambiguous, overly broad, and unduly burdensome because it seeks to expand the ordinary meaning of the term and includes unidentifiable "person[s]" that are not "employee[s], agent[s], or independent contractor[s]" of CoStar or CREXi.   In responding to the Requests that incorporate this term, CoStar will construe the term "THIRD PARTY" to have its ordinary meaning.

8.     CoStar objects to the definitions of "AND" and "OR" as overly broad, unduly burdensome, vague and ambiguous, including in that the definition purports to include the "conjunctive and disjunctive."   In responding to the Requests that incorporate these terms, CoStar will construe the terms "AND" and "OR" to have their ordinary meaning.

9.     CoStar objects to the definitions of "INCLUDING" and "INCLUDES" as overly broad, unduly burdensome, vague and ambiguous.   In responding to the Requests that include these terms, CoStar will construe the terms "INCLUDING" and "INCLUDES" to have their ordinary meaning.

10.    CoStar objects to Instruction No. 1 as unduly burdensome and seeking to impose obligations on CoStar greater than or inconsistent with those required by the Federal Rules and/or by the Local Rules.   CoStar will produce non-privileged information that is reasonably accessible to it after conducting a reasonable search, consistent with its obligations under Federal Rules 26 and 34.

11.    CoStar objects to Instruction No. 2 to the extent that it imposes a burden on CoStar that is greater than or inconsistent with those required by the Federal Rules and/or the Local Rules.   CoStar further objects to Instruction No. 2 to the extent that it is inconsistent with the ESI Order entered by the Court on January 19, 2022, at Dkt. 106 ("ESI Order") and/or the Federal and Local Rules.   CoStar will produce documents consistent with its obligations under the Federal Rules, Local Rules, and the ESI Order.

12.    CoStar objects to Instruction Nos. 3 and 4 to the extent that they are

COSTAR'S OBJS. & RESPS. TO
CREXI'S THIRD SET OF RFPS
CASE NO. 2:20-cv-08819-CBM-AS

inconsistent with the ESI Order and/or the Federal and Local Rules.  CoStar will produce documents consistent with its obligations under the Federal Rules, Local Rules, and the ESI Order.

13.    CoStar objects to Instruction No. 5 as unduly burdensome and seeking to impose obligations on CoStar greater than or inconsistent with those required by Federal Rules 26 and 34 and/or the Local Rules.  If CoStar withholds or redacts any responsive documents on the basis of the attorney-client privilege, work-product doctrine, or other similar privileges under domestic or applicable foreign law, CoStar will produce a privilege log that complies with the Federal Rules, Local Rules, and/or the ESI Order.  CoStar will meet and confer with CREXi regarding the timing for exchanging privilege logs.

## SPECIFIC OBJECTIONS AND RESPONSES TO THE REQUESTS

## REQUEST FOR PRODUCTION NO. 92:

All COMMUNICATIONS with ARCGATE, including, but not limited to, COMMUNICATIONS with any counsel or representative for ARCGATE.

## RESPONSE TO REQUEST NO. 92:

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 92 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" communications, for an unlimited time period, on any subject, between Arcgate, Arcgate's counsel, or Arcgate's representative and anyone else.  CoStar further objects to Request No. 92 to the extent it seeks communications that are not in CoStar's possession, custody, or control.  CoStar further objects to Request No. 92 because it seeks documents that are not relevant to any claim or defense in this matter.  CoStar further objects to Request No. 92 to the extent that it is duplicative and cumulative of Request Nos. 93 and 94.  CoStar further objects to the undefined term "representative" as vague, ambiguous, and overly

broad.    CoStar further objects to Request No. 92 to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law.

## REQUEST FOR PRODUCTION NO. 93:

All DOCUMENTS and COMMUNICATIONS RELATING TO the November 24, 2021 Consent Terms and Permanent Injunction executed by ARCGATE and COSTAR, including any drafts of that document and any COMMUNICATIONS RELATING TO that document.

## RESPONSE TO REQUEST NO. 93:

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 93 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents and communications over an unlimited time period.  CoStar further objects to this Request to the extent it seeks communications and drafts that are protected by the attorney client privilege or work product doctrine.  CoStar further objects to this Request to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law.  CoStar further objects to this Request to the extent it is duplicative and cumulative of Request Nos. 92 and 94.  CoStar further objects to Request No. 93 to the extent that communications related to the consent decree and judgment are based on documents already in CREXi's possession, custody, or control, and which CREXi has not produced to CoStar.

Subject to and without waiving the foregoing General and Specific objections, CoStar will produce the November 24, 2021 Consent Terms and Permanent Injunction.

**REQUEST FOR PRODUCTION NO. 94:**

All DOCUMENTS and COMMUNICATIONS RELATING TO the declaration executed by Kunal Bagla on November 24, 2021, including any drafts of that declaration and any COMMUNICATIONS RELATING TO that declaration.

**RESPONSE TO REQUEST NO. 94:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 94 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents and communications over an unlimited time period.  CoStar further objects to this Request to the extent it seeks communications and drafts that are protected by the attorney client privilege or work product doctrine.  CoStar further objects to this Request to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law.  CoStar further objects to this Request to the extent it is duplicative and cumulative of Request Nos. 92 and 93.  CoStar further objects to Request No. 94 to the extent responsive documents and communications are already in CREXi's possession, custody, or control, and which CREXi has not produced to CoStar.

Subject to and without waiving the foregoing General and Specific objections, CoStar will produce the November 24, 2021 declaration of Kunal Bagla.

**REQUEST FOR PRODUCTION NO. 95:**

All DOCUMENTS RELATING TO any COMMUNICATION with a THIRD PARTY RELATING TO ARCGATE.

**RESPONSE TO REQUEST NO. 95:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 95 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case

including to the extent it seeks "all" documents related to "any" communication with any "third party" for an unlimited time period that relate in any way to Arcgate. CoStar further objects to Request No. 95 to the extent that it seeks documents that are protected by the attorney client privilege or work product doctrine.  CoStar further objects to Request No. 95 to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law.  CoStar further objects to this Request as duplicative and cumulative of other Requests, including Requests No. 92-94.

**REQUEST FOR PRODUCTION NO. 96:**

All contractual or other agreements with ARCGATE.

**RESPONSE TO REQUEST NO. 96:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 96 as not relevant or reasonably calculated to lead to the discovery of admissible evidence, and overly broad to the extent it seeks "all contractual or other agreements" for an unlimited time period.  CoStar further objects to Request No. 96 to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law.  CoStar further objects to Request No. 96 to the extent it seeks publicly available agreements, or documents that are already in CREXi's possession.  CoStar further objects to this Request as vague and ambiguous, including its use of the undefined terms "contractual" and "other agreements."

Subject to and without waiving the foregoing General and Specific objections, CoStar responds that the November 24, 2021 Consent Terms are the only agreement between CoStar and Arcgate.

**REQUEST FOR PRODUCTION NO. 97:**

All DOCUMENTS and COMMUNICATIONS RELATING TO any claim for damages or other relief YOU demanded or requested from ARCGATE.

COSTAR'S OBJS. & RESPS. TO
CREXI'S THIRD SET OF RFPS
CASE NO. 2:20-cv-08819-CBM-AS

**RESPONSE TO REQUEST NO. 97:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 97 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents and communications relating to "any" claim against Arcgate for an unlimited time period.  CoStar further objects to Request No. 97 as not relevant or reasonably calculated to lead to the discovery of admissible evidence.  CoStar further objects to Request No. 97 to the extent that it is duplicative and cumulative of other Requests.  CoStar further objects to Request No. 97 to the extent that it seeks documents that are attorney client privileged and/or protected by the work product doctrine.  CoStar further objects to Request No. 97 to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law.

Subject to and without waiving the foregoing General and Specific objections, CoStar will produce the complaint CoStar filed against Arcgate in India, which contains CoStar's claims for relief against Arcgate.

**REQUEST FOR PRODUCTION NO. 98:**

All DOCUMENTS RELATING TO ARCGATE.

**RESPONSE TO REQUEST NO. 98:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 98 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents over an unlimited time period and not limited to any subject matter.  CoStar further objects to Request No. 98 because it seeks documents that are entirely unrelated to any claim or defense in this matter, and to the extent that it is duplicative and cumulative of other Requests.  CoStar

COSTAR'S OBJS. & RESPS. TO
CREXI'S THIRD SET OF RFPS
CASE NO. 2:20-cv-08819-CBM-AS

1  further objects to Request No. 98 to the extent it seeks communications that are

2  privileged or otherwise non-discoverable under applicable foreign law.

3      Subject to and without waiving the foregoing General and Specific objections,

4  CoStar reiterates that it will produce, in response to the preceding Requests, the

5  November 24, 2021 Consent Terms and Permanent Injunction and Declaration of

6  Kunal Bagla, and the complaint CoStar filed against Arcgate in India as part of that

7  same action.

8  **REQUEST FOR PRODUCTION NO. 99:**

9      All transcripts, recordings, videotapes, or audiotapes of YOUR "all-hands" or

10  company meetings that reference or relate to CREXi.

11  **RESPONSE TO REQUEST NO. 99:**

12      CoStar incorporates its General Objections and its Objections to Definitions

13  and Instructions as if fully set forth herein.  CoStar objects to Request No. 99 as

14  overly broad, not relevant or reasonably calculated to lead to the discovery of

15  admissible evidence, and not proportional to the needs of this case including to the

16  extent it seeks "all" transcripts, recordings, videotapes, or audiotapes for an

17  unlimited time period.  CoStar further objects to the undefined term "all-hands" as

18  vague and ambiguous, and to the undefined phrase "company meetings" as vague,

19  overbroad, and unduly burdensome.  CoStar also objects to this Request as unduly

20  burdensome in that it would require CoStar to review "recordings, videotapes, and

21  audiotapes" from all of its company meetings on any subject for an unlimited time

22  period, to the extent such recordings exist.

23      Subject to and without waiving the foregoing General and Specific objections,

24  CoStar responds its "all hands" meetings are not transcribed, and that it will produce

25  all responsive materials related to CoStar's December 2019 "all hands" meeting

26  referenced in the Counterclaims at ¶ 3 that reference CREXi.

27

28

COSTAR'S OBJS. & RESPS. TO
CREXI'S THIRD SET OF RFPS
CASE NO. 2:20-cv-08819-CBM-AS

**REQUEST FOR PRODUCTION NO. 100:**

All DOCUMENTS, including but not limited to presentations, prepared for or shared during any of YOUR "all-hands" or company meetings.

**RESPONSE TO REQUEST NO. 100:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 100 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents over an unlimited time period and not limited to any subject matter.  CoStar further objects to the undefined term "all-hands" as vague and ambiguous, and to the undefined phrase "company meetings" As vague, overbroad, and unduly burdensome. CoStar also objects to this Request as unduly burdensome in that it would require CoStar to review presentations from all of its "company meetings" on any subject for an unlimited time period, to the extent such presentations exist.

Subject to and without waiving the foregoing General and Specific objections, CoStar will produce responsive materials related to CoStar's December 2019 "all hands" meeting referenced in the Counterclaims at ¶ 3 that reference CREXi.  CoStar will also produce documents responsive to this Request and relevant to the Parties' claims or defenses in this Action that are identified through CoStar's custodial document review, should such documents exist.

**REQUEST FOR PRODUCTION NO. 101:**

All DOCUMENTS RELATING TO YOUR automated access, or scraping of, any website, including broker websites.

**RESPONSE TO REQUEST NO. 101:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 101 as overly broad, unduly burdensome, and not proportional to the needs of this case

including to the extent it seeks "all" documents for an unlimited time period. CoStar further objects to Request No. 101 as not relevant or reasonably calculated to lead to the discovery of admissible evidence because it seeks documents that are entirely unrelated to any claim or defense in this matter. CREXi has not alleged any "automated access" or "scraping" of any website by CoStar. CoStar further objects to Request No. 101 as vague and ambiguous, including in its use of the undefined terms and phrases "automated access," "scraping," and "broker websites." CoStar also objects to Request No. 101 as duplicative and cumulative of Request No. 102, and also Request Nos. 39 and 40 in response to which CoStar has already agreed to conduct a reasonable search and produce responsive documents.

**REQUEST FOR PRODUCTION NO. 102:**

All policies, practices, background materials or training guides RELATING TO YOUR automated access, or scraping of, any website, including broker websites.

**RESPONSE TO REQUEST NO. 102:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar objects to Request No. 102 as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks "all" materials for an unlimited time period. CoStar further objects to Request No. 102 as not relevant or reasonably calculated to lead to the discovery of admissible evidence because it seeks documents that are entirely unrelated to any claim or defense in this matter. CREXi has not alleged any "automated access" or "scraping" of any website by CoStar. CoStar also objects to Request No. 102 as vague and ambiguous, including in its use of the undefined terms and phrases "automated access," "scraping," and "broker websites." CoStar further objects to Request No. 102 as duplicative and cumulative of Request No. 101, and also Request Nos. 39 and 40, in response to which CoStar has already agreed to conduct a reasonable search and produce responsive documents.

**REQUEST FOR PRODUCTION NO. 103:**

All DOCUMENTS RELATING TO training guides, resource guides or background materials concerning YOUR Portfolio Research Tool.

**RESPONSE TO REQUEST NO. 103:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar objects to Request No. 103 as overly broad and unduly burdensome including to the extent it seeks "all" documents for an unlimited time period. CoStar further objects to Request No. 103 as not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case as it seeks documents that are entirely unrelated to any claim or defense in this matter. CoStar further objects to Request 103 as vague and ambiguous, including in its use of the undefined terms and phrases "training guides," "resource guides," "background materials," and "Portfolio Research Tool."

Subject to and without waiving the foregoing General and Specific objections, CoStar is willing to meet and confer with CREXi to understand the relevance of this Request.

**REQUEST FOR PRODUCTION NO. 104:**

All DOCUMENTS RELATING TO policies, practices, background materials or training guides RELATING TO obtaining photographs from CREXi.

**RESPONSE TO REQUEST NO. 104:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar objects to Request No. 104 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents for an unlimited time period. CoStar further objects to Request No. 104 as seeking irrelevant information as there are no allegations that CoStar has improperly "obtain[ed] photographs from CREXi."

1  CoStar further objects to Request No. 104 as vague and ambiguous, including in its

2  use of the undefined terms and phrases "policies," "practices," "background

3  materials," "training guides," and "obtaining photographs from CREXi."  CoStar

4  further objects to Request No. 104 as duplicative and cumulative of Request Nos.

5  101 and 102, and also Request Nos. 39 and 40, in response to which CoStar has

6  already agreed to conduct a reasonable search and produce responsive documents.

7  **REQUEST FOR PRODUCTION NO. 105:**

8  All DOCUMENTS RELATING TO YOUR cropping or altering of broker or

9  competitor watermarks, logos or other information from photographic images.

10  **RESPONSE TO REQUEST NO. 105:**

11  CoStar incorporates its General Objections and its Objections to Definitions

12  and Instructions as if fully set forth herein.  CoStar objects to Request No. 105 as

13  overly broad, unduly burdensome, and not proportional to the needs of this case to

14  the extent it seeks "all" documents for an unlimited time period.  CoStar further

15  objects to Request No. 105 as not relevant or reasonably calculated to lead to the

16  discovery of admissible evidence because there are no allegations that CoStar is

17  "cropping or altering" "broker or competitor watermarks, logos, or other

18  information."  CoStar further objects to Request No. 105 as vague and ambiguous

19  including in its use of the undefined terms and phrases "cropping," "altering,"

20  "competitor watermarks," "logos," or "other information."  CoStar further objects to

21  this Request as duplicative and cumulative of Request Nos. 12, 23, and 24, in

22  response to which CoStar has already agreed to conduct a reasonable search and

23  produce responsive documents.

24  **REQUEST FOR PRODUCTION NO. 106:**

25  DOCUMENTS sufficient to show YOUR policies, procedures, and practices

26  RELATING TO Dynamic Keyword Insertion.

27

28

**RESPONSE TO REQUEST NO. 106:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 106 as overly broad, unduly burdensome, and not proportional to the needs of this case including to the extent it seeks "all" documents for an unlimited time period.  CoStar further objects to Request No. 106 as not relevant or reasonably calculated to lead to the discovery of admissible evidence because it seeks documents that are entirely unrelated to any claim or defense in this matter.  CoStar further objects to this Request to the extent that it is duplicative and cumulative of Request No. 107.

Subject to and without waiving the foregoing General and Specific objections, CoStar will conduct a reasonable search of centrally maintained, non-custodial documents and produce responsive, non-privileged documents in response to this Request, to the extent such documents exist.

**REQUEST FOR PRODUCTION NO. 107:**

All DOCUMENTS RELATING TO any limitations on the use of any copy in Dynamic Keyword Insertion advertisements.

**RESPONSE TO REQUEST NO. 107:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 107 as overly broad, unduly burdensome, and not proportional to the needs of this case including to the extent it seeks "all" documents for an unlimited time period.  CoStar further objects to Request No. 107 as not relevant or reasonably calculated to lead to the discovery of admissible evidence because it seeks documents that are entirely unrelated to any claim or defense in this matter.  CoStar further objects to this Request to the extent that it is duplicative and cumulative of Request No. 106.

Subject to and without waiving the foregoing General and Specific objections, CoStar will conduct a reasonable search of centrally maintained, non-custodial

documents and produce responsive, non-privileged documents in response to this Request, to the extent such documents exist.

**REQUEST FOR PRODUCTION NO. 108:**

All DOCUMENTS RELATING TO statements claiming, alleging, or suggesting that YOU hold monopoly power.

**RESPONSE TO REQUEST NO. 108:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar objects to Request No. 108 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents for an unlimited time period and is not limited to the U.S., commercial real estate, or CREXi's alleged "relevant markets". CoStar further objects to Request No. 108 as duplicative and cumulative of Request No. 54, in response to which CoStar has agreed to conduct a reasonable search and produce responsive documents. CoStar further objects to Request No. 108 as vague and ambiguous, including in its use of the undefined term "monopoly power" which has a particular meaning under the antitrust laws. In responding to this Request, CoStar does not admit that any document it may produce represents "monopoly power" in a legal sense, or relates in any way to a legally cognizable relevant antitrust market.

Subject to and without waiving the foregoing General and Specific objections, CoStar is willing to meet and confer with CREXi to understand what information this Request seeks that is not already covered by CoStar's response to Request No. 54.

**REQUEST FOR PRODUCTION NO. 109:**

DOCUMENTS sufficient to identify the name(s) of your internal customer relationship software, or any software used by YOUR sales department to track or

record information RELATING TO YOUR customers, including potential and former customers.

**RESPONSE TO REQUEST NO. 109:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 109 as not relevant or reasonably calculated to lead to the discovery of admissible evidence because it seeks documents that are entirely unrelated to any claim or defense in this matter.   CoStar further objects to Request No. 109 as vague and ambiguous, including in its use of the undefined terms and phrases "internal customer relationship software," "customers," and "potential and former customers."  CoStar further objects to Request No. 109 as duplicative and cumulative of Request No. 110.  CoStar also objects to this Request because it seeks information that is properly sought through an interrogatory.

Subject to and without waiving the foregoing General and Specific objections, CoStar will conduct a reasonable search of centrally maintained, non-custodial documents and produce responsive, non-privileged documents in response to this Request, to the extent such documents exist.

**REQUEST FOR PRODUCTION NO. 110:**

DOCUMENTS sufficient to identify YOUR policies, procedures, and practices RELATING TO YOUR internal customer relationship software, or any software used by YOUR sales department to track or record information RELATING TO YOUR customers, including potential and former customers.

**RESPONSE TO REQUEST NO. 110:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 110 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case as it seeks documents that are entirely unrelated to any claim or defense in this

1  matter.   CoStar further objects to Request No. 110 as vague and ambiguous,

2  including in its use of the undefined terms and phrases "internal customer

3  relationship software," "customers," and "potential and former customers."

4      Subject to and without waiving the foregoing General and Specific objections,

5  CoStar is willing to meet and confer with CREXi to understand the relevance of this

6  Request.

7  **REQUEST FOR PRODUCTION NO. 111:**

8      All DOCUMENTS RELATING TO YOUR use, access, or review of data or

9  photographs from CREXi in connection with creating, populating, or updating

10  listings on any COSTAR website.

11  **RESPONSE TO REQUEST NO. 111:**

12      CoStar incorporates its General Objections and its Objections to Definitions

13  and Instructions as if fully set forth herein.   CoStar objects to Request No. 111 as

14  overly broad, unduly burdensome, and not proportional to the needs of this case

15  including to the extent it seeks "all" documents for an unlimited time period.   CoStar

16  further objects to Request No. 111 as overly broad, unduly burdensome, and not

17  relevant or reasonably calculated to lead to the discovery of admissible evidence

18  because it seeks documents that are entirely unrelated to any claim or defense in this

19  matter.   CoStar also objects to this Request as overly broad to the extent that it seeks

20  information that is not limited to commercial real estate.

21      CoStar further objects to this Request to the extent it is duplicative of Request

22  Nos. 12, 21, 23, 24, 39 and 40, in response to which CoStar has agreed to conduct a

23  reasonable search and produce responsive documents, as well as Interrogatory No.

24  17, in response to which CoStar provided detailed responses, produced documents,

25  and agreed to produce additional documents sufficient to show the training that field

26  researchers (photographers) and other researchers receive.

27

28

COSTAR'S OBJS. & RESPS. TO
CREXI'S THIRD SET OF RFPS
CASE NO. 2:20-cv-08819-CBM-AS

**REQUEST FOR PRODUCTION NO. 112:**

All DOCUMENTS RELATING TO policies, practices, training guides, or background materials RELATING TO YOUR use, access, or review of data or photographs from CREXI in connection with creating, populating, or updating listings on any COSTAR website.

**RESPONSE TO REQUEST NO. 112:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein. CoStar objects to Request No. 112 as overly broad, unduly burdensome and not proportional to the needs of this case including to the extent it seeks "all" documents for an unlimited time period. CoStar further objects to Request No. 112 as not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case as it seeks documents that are entirely unrelated to any claim or defense in this matter.

CoStar further objects to Request No. 112 as duplicative and cumulative of Request Nos. 12, 24, and 40, in response to which CoStar has agreed to conduct a reasonable search and produce responsive documents, as well as Interrogatory No. 17, in response to which CoStar provided detailed responses, produced documents, and agreed to produce additional documents sufficient to show the training that field researchers (photographers) and data researchers receive.

**REQUEST FOR PRODUCTION NO. 112(a):**[1]

All DOCUMENTS RELATING TO targets, metrics, incentives, bonuses, or other financial or business metrics in connection with creating, populating, or updating listings on any COSTAR website.

---

[1] CREXi's Third Set of Requests for Production inadvertently listed "Request for Production No. 112" twice. CoStar has amended the second Request to "Request No. 112(a)" to avoid any additional confusion.

COSTAR'S OBJS. & RESPS. TO
CREXI'S THIRD SET OF RFPS
CASE NO. 2:20-cv-08819-CBM-AS

**RESPONSE TO REQUEST NO. 112(a):**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 112(a) as overly broad, unduly burdensome, and not proportional to the needs of this case including to the extent it seeks "all" documents for an unlimited time period.  CoStar further objects to Request No. 112(a) as not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case as it seeks documents that are entirely unrelated to any claim or defense in this matter.  CoStar further objects to this Request as overly broad to the extent that it is not limited to CoStar's commercial real estate websites.  CoStar further objects to this Request as vague and ambiguous including in its use of the undefined terms "targets," "metrics," "incentives," "bonuses," "other financial" or "business metrics."

Subject to and without waiving the foregoing General and Specific objections, CoStar is willing to meet and confer with CREXi to understand the relevance of this Request.

**REQUEST FOR PRODUCTION NO. 113:**

All DOCUMENTS RELATING TO the strategic value to YOU or YOUR business of having brokers or customers utilize YOUR LOOPLINK feature.

**RESPONSE TO REQUEST NO. 113:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 113 as overly broad, unduly burdensome, and not proportional to the needs of this case including to the extent it seeks "all" documents for an unlimited time period.  CoStar further objects to Request No. 113 as not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case as it seeks documents that are entirely unrelated to any claim or defense in this

matter.   CoStar further objects to Request No. 113 as vague and ambiguous, including in its use of the undefined phrase "strategic value."

Subject to and without waiving the foregoing General and Specific objections, CoStar will produce documents responsive to this Request that are identified through CoStar's custodial document review, should such documents exist.

**REQUEST FOR PRODUCTION NO. 114:**

DOCUMENTS sufficient to show every broker or customer that utilizes YOUR LOOPLINK feature.

**RESPONSE TO REQUEST NO. 114:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 114 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including because it seeks information regarding "every broker" or "customer" who has utilized LoopLink for an unlimited time period.  There are no allegations in this case that require that CoStar identify "every" broker or "customer" who has ever used LoopLink for an unlimited time period.

**REQUEST FOR PRODUCTION NO. 115:**

All DOCUMENTS relating to YOUR efforts to block COSTAR competitors, including but not limited to CREXI, from accessing any portion of a customer's or broker's website, including pages hosted by or affiliated with LOOPLINK.

**RESPONSE TO REQUEST NO. 115:**

CoStar incorporates its General Objections and its Objections to Definitions and Instructions as if fully set forth herein.  CoStar objects to Request No. 115 as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case including to the extent it seeks "all" documents for an unlimited time period,.  CoStar further objects to Request No. 115 as duplicative and cumulative of Request No. 29,

1  in response to which CoStar has already agreed to conduct a reasonable search and
2  produce responsive documents.

3

4  Dated: March 4, 2022                    Respectfully submitted,

5                                          /s/ Nicholas J. Boyle

6                                          Jessica Stebbins Bina (Bar No. 248485)
7                                          Elyse M. Greenwald (Bar No. 268050)
                                           10250 Constellation Boulevard
8                                          Suite 1100
9                                          Los Angeles, CA 90067
                                           Tel: 424.653.5525
10                                         Fax: 424.653.5501
11                                         Email: jessica.stebbinsbina@lw.com
12                                                 elyse.greenwald@lw.com

13                                         Belinda S Lee (Bar. No. 199635)
                                           505 Montgomery Street
14                                         Suite 2000
15                                         San Francisco, CA 94111
                                           Tel: 415.391.0600
16                                         Fax: 415.395.8095
17                                         Email: belinda.lee@lw.com

18
                                           Nicholas J. Boyle
19                                         (admitted *pro hac vice*)
20                                         Sarah A. Tomkowiak
                                           (admitted *pro hac vice*)
21                                         555 Eleventh Street, NW
22                                         Suite 1000
                                           Washington, D.C. 20004
23                                         Tel: 202.637.2200
24                                         Fax: 202.637.2201
                                           Email: nicholas.boyle@lw.com
25                                                 sarah.tomkowiak@lw.com
26

27                                         *Counsel for CoStar Group, Inc., and*
28                                         *CoStar Realty Information, Inc.*

1

**CERTIFICATE OF SERVICE**

2

3     I am employed in the County of San Francisco, State of California.  I am over the age of 18 years and not a party to this action.  My business address is Latham & Watkins LLP, 505 Montgomery Street, Suite 2000, California 94111.

4

5     On March 4, 2022, I caused the following document(s) to be served:

6

7   • **COSTAR'S OBJECTIONS AND RESPONSES TO CREXI'S THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

8

9   via electronic mail delivery to the person(s), address(es), and email address(es) set forth below:

10

11                     Elliot R. Peters
                        Warren A. Braunig
12                     Elizabeth K. McCloskey
                        Nicholas S. Goldberg
13                     Ann Niehaus
                        Christi Zaleski
14                 KEKER, VAN NEST & PETERS LLP
                        633 Battery Street
15                   San Francisco, CA 94111-1809
                      Telephone: (415) 391-5400
16                   Facsimile: (415) 397-7188
                      Email: CREXSTAR@keker.com
17
                   *Attorneys for Defendant Commercial Real Estate Exchange, Inc.*
18

19        I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

20

21

22        Executed on March 4, 2022, at San Francisco, California.

23

24                                    */s/ Elizabeth Yandell*
                                       Elizabeth H. Yandell
25

26

27

28

COSTAR'S OBJS. & RESPS. TO
CREXI'S THIRD SET OF RFPS
CASE NO. 2:20-cv-08819-CBM-AS

# EXHIBIT K

| | |
|---|---|
| **From:** | Jason George |
| **To:** | elyse.greenwald@lw.com; elizabeth.yandell@lw.com; sarah.tomkowiak@lw.com |
| **Cc:** | CREXSTAR; costarcrexi.lwteam@lw.com |
| **Subject:** | CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc. |
| **Date:** | Friday, March 18, 2022 8:46:15 PM |

Counsel,

I send this follow up email to memorialize our conversations and the agreements of the parties on outstanding issues related to CREXi's third set of requests for production. As part of our discussion, each party indicated that they would follow up regarding certain issues. We have integrated our follow-up responses below. Please provide the authority you referenced regarding privilege under Indian law, and the follow-ups on other issues noted below, by Friday, March 25.

Requests Related to Arcgate: RFPs 92-98*

On these requests, which all relate to third-party Arcgate, you included numerous objections related to relevance and overbreadth. Yet ***CoStar*** has not only conceded, but has affirmatively asserted that these documents are relevant.  In CoStar's January 12, 2022 "Notice of Related Judgment," CoStar stated that "the judgment, the decree, and the Consent Terms and Permanent Injunction incorporated therein, including the declaration of Arcgate's CEO attached thereto, ***directly relate to the allegations in this proceeding***." ECF No. 100 at 1. CoStar cannot now object to discovery into documents related to Arcgate on relevance grounds when CoStar itself has put Arcgate at issue. And though CoStar claims that the requests are overbroad because they are not limited to CoStar's lawsuit against Arcgate, you refused to disclose in our meet-and-confer whether CoStar has in fact had *any* dealings with Arcgate outside of CoStar's lawsuit that would somehow make review and production of these documents unduly burdensome.

CoStar has asserted that certain responsive documents are privileged or non-discoverable under applicable foreign law. At the meet-and-confer, you asserted that some type of settlement privilege applicable in India prevented any discovery into communications and/or documents related to Arcgate in these U.S. proceedings. We asked you to provide the authority that would both (1) make these documents privileged under foreign law; and (2) would then make these documents, which you contend are privileged under foreign law, undiscoverable in U.S. federal court proceedings. You asserted that this "Indian settlement privilege" would apply to communications dated both prior to and post any settlement, including relating to non-settlement issues.  We thus also asked you to provide authority stating that the settlement privilege you referenced applies to communications unrelated to settlement (both before settlement talks began and after settlement talks concluded). You agreed to provide authority on these issues.

I now turn to each request, specifically, in which I will refer back to the above discussion.

RFP 92: Communications with Arcgate

Based on the discussion of the above issues, you agreed to provide authority with respect to the asserted settlement privilege, and any other basis for a relevance objection.  You also agreed to

inform us whether you will reconsider your refusal to produce responsive documents.

RFPs 93/94: Consent Terms and the Bagla Declaration

In response to RFPs 93/94, you refused to produce any responsive documents, with the exception of the Consent Terms and Permanent Injunction and Bagla declaration.  We noted that this response is at odds with Nicholas Boyle's February 28, 2022 Letter to Warren Braunig, which agreed that CoStar would "produce to CREXi a full set of the documents produced to CoStar by Arcgate." We stated that we expect CoStar to follow through on this prior agreement.  And as above, you indicated that you would provide authority for withholding documents based on privilege under foreign law, and also would inform us whether you would reconsider your refusal to provide responsive documents.

RFP 95: Documents relating to Communications with Third Parties concerning Arcgate

You objected on relevance and overbreadth grounds, to which we raised the arguments noted above—including that you failed to explain how this request could be overbroad, if you didn't have any communications with third parties relating to Arcgate. You agreed to follow up regarding whether you will agree that communications related to CoStar's suit against Arcgate are relevant (as CoStar has already conceded), and whether there were communications regarding Arcgate, that do not relate to CoStar's lawsuit, which you would contend make this request burdensome.

RFP 96: Agreements with Arcgate

You confirmed that there are no other agreements between CoStar and Arcgate other than the Consent Terms.

RFP 97: Claims for Damages or other Relief against Arcgate

You stated that you read this request to call for production of all pleadings from CoStar's lawsuit against Arcgate, as one could argue that all pleadings relate to CoStar's claim for damages from Arcgate.  We explained that we are looking for documents or communications specifically relating to a claim for damages or relief from Arcgate. You indicated that you would consider producing pleadings from the Arcgate litigation.  We noted, though, that this request encompassed other documents and communications as well. You agreed, but said that those documents will fall under the parties' discussion regarding the "Indian settlement privilege," and that, as already noted, your team would provide the related case law.

RFP 98: All Documents Relating to Arcgate

You indicated that this request is overbroad. We noted that if you provided an indication that there were documents related to Arcgate other than those related to the Arcgate litigation, we would consider suggesting a narrowed scope, including relating to the time period. You indicated that you would reconsider your refusal to produce responsive documents and follow up.

RFP 99/100: All-hands company meetings

We indicated that this request calls for production of materials relating to meetings in which CoStar's CEO, and/or executive leadership, addresses all or a substantial portion of CoStar's employees.  We understand that numerous of those meetings have included reference to CoStar's competitors, including CREXi.  You stated that you had audio recordings of some number of those meetings, but objected that listening to the recordings would be overly burdensome. We indicated that if CoStar did not want to review all such recordings, CREXi would be happy to do so.  We would also be willing to discuss other ways of decreasing the burden on CoStar, such as obtaining transcription services. Please confirm whether you will reconsider your refusal to produce all documents responsive to this request, with the exception of materials relating to the December 2019 "all hands" meeting.

With respect to documents responsive to RFP 100, please confirm whether there is a non-custodial repository of documents prepared for or shared during any of CoStar's "all-hands" or company meetings.  We understand that any agreement we reach regarding RFP 99 will impact the scope of materials you agree to produce in response to RFP 100.

RFP 101/102: Automated Access/scraping of websites, including broker websites

We indicated that this request is not duplicative of RFPs 39 and 40 because this asks for information regarding data obtained from other websites, including broker websites, whereas RFPs 39 and 40 concern only CREXi's website. We explained that such documents are unquestionably relevant, including if CoStar has scraped or otherwise accessed data from brokers or other websites. You agreed to let us know whether you will reconsider your refusal to produce responsive documents.

RFP 103: Portfolio Research Tool

We indicated that this Portfolio Research Tool is relevant, at least in part, because we understand that it is a mechanism CoStar uses to submit CRE data, including CRE data that does not originate from CoStar. In light of that explanation, you agreed to let us know whether you will reconsider your refusal to produce responsive documents.

RFP 104: CoStar's practices regarding obtaining photographs from CREXi

We discussed whether this request is duplicative of RFPs 39 and 40. On further consideration, can you confirm that the only CoStar policies, practices, background materials, or training guides related to obtaining photographs from CREXi involved access to or use of CREXi's website, as opposed to through another mechanism?

RFP 105: Cropping and altering photos

We discussed whether this request is duplicative of RFPs 12, 23, and 24. RFPs 12 and 24 concern documents related to "efforts, policies, procedures, rules, guidance, practices, and training manuals" and RFP 23 concerns communications with third parties.  RFPs 23 and 24 also concern information on "your websites." Meanwhile, RFP 105 requests documents relating to CoStar's "cropping or

altering of broker or competitor watermarks, logos or other information from photographic images," and thus encompasses a broader set of documents.  In light of this explanation, please confirm whether you will reconsider your refusal to produce responsive documents.

RFP 108: Monopoly power

We indicated that this RFP is broader than RFP 54 because it is not limited to a specific market. In light of that explanation, you agreed to reconsider your refusal to produce responsive documents.

RFP 110: CRM Software

We indicated that information requested by this request is relevant because it will provide information on how data regarding customers is input into CoStar's CRM software, and that data regarding customers of CoStar, including why they are, for example, choosing to continue or discontinue use of CoStar's services, are relevant to CREXi's claims and defenses.  In light of that explanation, you agreed to reconsider your refusal to produce responsive documents.

RFP 111/112: Use of CREXi when creating CoStar listings

We indicated that we would follow up regarding whether these requests are duplicative of RFPs 12, 21, 23, 24, 39, and 40.  These requests are not duplicative because they seek communications or documents relating to the "use, access, or review of data" from CREXi while creating CoStar listings, which is different in scope from prior requests, including for "policies, procedures, rules, guidance, practices, and training manuals" for photographs only (RFP 12), documents "sufficient to show" how data is collected for CoStar (RFP 12), documents related to modification of data gathered from third parties (RFPs 23 and 24), or the access to/use/analysis of CREXi's website (as opposed to use of data or photographs that may have originated from CREXi) (RFPs 39 and 40). In light of that explanation, please let us know whether you will reconsider your refusal to produce responsive documents.

RFP 112(a): Targets for CoStar employees

We indicated that this information is relevant because we understand that stringent targets set for CoStar employees may cause them to take actions that are wrongful. You indicated that you would consider our request with that information, but noted that we have yet to respond substantively to CoStar's Interrogatory No. 10, which addresses similar information.  We would agree to supplement CoStar interrogatory No. 10 with this information, if CoStar agrees to produce documents in response to this request.

RFP 113: Looplink's value

You had agreed to search for custodial documents responsive to this request. We asked whether there are any non-custodial documents, and you stated that you are not aware of any non-custodial repositories of this information.  If you learn that such a repository exists, we understand that you will so inform us.

<u>RFP 114: Documents Sufficient to Show LoopLink Customers</u>

The identities of Looplink customers is relevant to our antitrust claims, including the allegations regarding restrictions CoStar places on access to Looplink websites. In light of that explanation, you agreed to reconsider your refusal to produce responsive documents.

<u>RFP 115: Efforts to block competitors</u>

This RFP is distinct from RFP 29 because RFP 29 concerns "services or technical measures" for blocking access to websites, while RFP 115 encompasses any efforts, regardless of whether they involve "services or technical measures." As one example, legal threats to competitors falls under this RFP, but not necessarily RFP 29. In light of that explanation, you agreed to reconsider your refusal to produce responsive documents.

We look forward to receiving your response to these issues by Friday, March 25, 2022.

Best,
Jason

*All of the underlined titles in this email are intended for organizational purposes, and not to convey any agreement about the scope of the requests at issue.

**Jason George**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1890
+14159628847 direct | 415 391 5400 main
jgeorge@keker.com | vcard | keker.com
Pronouns: He/Him/His

# EXHIBIT L

**Elyse M. Greenwald**
Direct Dial: 424.653.5695
elyse.greenwald@lw.com

10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Tel: +1.424.653.5500  Fax: +1.424.653.5501
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

April 1, 2021

**<u>VIA EMAIL</u>**

Elizabeth K. McCloskey
Jason George
Keker Van Nest & Peters
633 Battery Street
San Francisco, CA 94111-1809
emcloskey@keker.com
jgeorge@keker.com

> Re:   <u>*CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc.*</u>, Case No. 2:20-cv-08819-CBM (ASx)

Counsel,

I write in response to your March 18, 2022 email regarding the parties' March 16, 2022 meet and confer on CREXi's third set of requests for production. For the avoidance of doubt, regardless of any agreement to search for or produce documents discussed herein, CoStar maintains all of the objections lodged in its March 4, 2022 responses and objections.

**<u>Arcgate-Related Requests (Nos. 92-98)</u>**

At the outset, we disagree with your position that, because CoStar filed a Notice of Judgment in a Related Case alerting the Court to the Indian judgment against CREXi's agent, Arcgate, CREXi is entitled to unbridled discovery into that litigation or "all" of CoStar's communications with or about Arcgate. CREXi was aware of that litigation, and could have intervened in that action if it wanted to, but it did not. Indeed, six weeks passed between CREXi's email regarding the Arcgate litigation and the entry of the Consent Terms and Permanent Injunction in that case, and CREXi sat on its hands. CREXi cannot now try to obtain discovery here that should have been properly sought in that matter, and CoStar's filing does not somehow make every document related to Arcgate, or that case, relevant.

Nonetheless, as your email notes, during our meet and confer, we agreed to provide authority regarding our position that CoStar's communications with Arcgate related to the consent terms and injunction entered by the Indian court are protected from disclosure under Indian law. Under Indian law, which draws on English common law, settlement communications are not discoverable. The Indian Supreme Court and other Indian courts have recognized the House of

**LATHAM&WATKINS**LLP

Lords' decision in *Rush & Tompkins Ltd. v. Greater London Council et al.*, (1988) 1 All ER 549, which held that settlement communications are not discoverable under the "without prejudice" privilege. *See, e.g., Peacock Plywood Pvt. Ltd. v. The Oriental Insurance Co. Ltd.* (2006) 12 SCC 673 (citing *Rush Tompkins* to describe "without prejudice" privilege); *Chairman & M.D., N.T.P.C. Ltd v. M/S. Reshmi Constrs., Builders & Contractors*, (2004) 2 SCC 663 (same). In *Rush*, Lord Griffiths explained that the "without prejudice" rule "is founded upon the public policy of encouraging litigants to settle their differences rather than litigate them to a finish." *Id.* at 942. "The rule applies to exclude all negotiations genuinely aimed at settlement whether oral or in writing from being given in evidence." *Id.* While "without prejudice" privilege usually arises in the context of admissibility, *Rush* held it also applies to discovery requests. *Id*. at 946 (citing *Rabin v. Mendoza & Co.* [1954] 1 W.L.R. 271) (Lord Denning) (declining to order production of "without prejudice" documents)). CoStar's communications with Arcgate related to the consent terms were "aimed at settlement" and indeed resulted in settlement, and are thus entitled to the protection of "without prejudice" status under Indian law. And CREXi's attempt to discover CoStar and Arcgate's protected communications through this litigation is an end-run around this established Indian law. Indeed, we understand that when CREXi sought these same communications from Arcgate, Arcgate's Indian counsel told CREXi's Indian counsel that the communications constituted settlement communications that were protected from disclosure under Indian law. Despite our requests for this correspondence, CREXi has withheld it. Please explain CREXi's basis for doing so.

Given the holdings of the House of Lords and the Indian Supreme Court, there can be little doubt as to the existence of the privilege in India. And the fact that *this* lawsuit is in the United States does not mean that CoStar can ignore its obligations under foreign law. United States federal courts routinely apply foreign privilege law in discovery disputes. *See Cadence Pharmaceuticals, Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1024 (S.D. Cal. 2014) (applying German attorney-client privilege); *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 208 F.R.D. 92, 99–103 (S.D.N.Y. 2002) (applying German and Korean privileges). The primary inquiry for U.S. courts is whether the communication involves or "touches base" with foreign law. *Cadence*, 996 F. Supp. 2d at 1019; *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 99 (2nd Cir. 2020) (applying the "touch base" test to determine whether foreign privilege law applies); *Masillionis v. Silver Wheaton Corp*, 2018 WL 1725649 at *3 (C.D. Cal. Apr. 2, 2018) (describing the "touch base" approach), *vacated on other grounds*, 2018 WL 11394848 (C.D. Cal. Aug. 2, 2018). Here, CoStar's settlement communications with Arcgate easily satisfy the touch base test with regards to Indian law because the dispute concerned Arcgate's conduct (albeit on CREXi's behalf) in India, the parties litigated in India, and the parties settled the litigation in India. *See, e.g., Cadence Pharmaceuticals*, 996 F. Supp. 2d at 1021 (finding that communications touched base with Germany because "the legal advice in this case was rendered in Germany and related to the prosecution of European patent applications, as well as the application of a German statute").

To the extent CREXi has any authority suggesting this established Indian privilege law does not apply to CoStar's communications with Arcgate, or may not be invoked in U.S. litigation, please provide it so that we can evaluate CREXi's position. Absent providing such authority, any motion to compel would, of course, be premature.

LATHAM&WATKINS LLP

**RFP No. 92:**

To the extent this Request seeks communications related to CoStar's settlement with Arcgate, CoStar maintains that those communications are protected from disclosure, as detailed above.  To correct the record, we did not represent during our meet and confer that the above-described Indian privilege protects communications "relating to non-settlement issues" or take the position that all pre- and post-settlement communications would be protected under that privilege.  To the extent they exist and are not otherwise privileged, CoStar will agree to produce communications with Arcgate in response to this Request.

**RFP Nos. 93 and 94:**

The documents and communications requested by RFP Nos. 93 and 94—those related to the Consent Terms and Permanent Judgment and Arcgate's CEO's accompanying declaration—are all related to CoStar's settlement of its lawsuit with Arcgate and therefore are protected from discovery under Indian law, as explained above.

Your March 18 email cites Nicholas Boyle's February 28, 2022 letter and agreement to produce to CREXi "the documents produced to CoStar by Arcgate."  That letter refers to Arcgate's production to CoStar regarding Arcgate's work for CREXi.  As promised in Mr. Boyle's February 28 letter, CoStar has now completed that production.

**RFP No. 95:**

As an initial matter, CoStar has not "already conceded" that "communications related to CoStar's suit against Arcgate are relevant" to this litigation.  Our responses and objections to CREXi's third set of requests make clear that is not CoStar's position.  CoStar maintains its objections to Request No. 95, including that CoStar's communications with third parties related to Arcgate are not relevant to any claim or defense and the request is overbroad and disproportionate to the needs of this case.

During the meet and confer, we agreed to investigate whether CoStar had any discoverable communications with third parties related to Arcgate.  Having now done so, we can confirm that the only communications with third parties related to Arcgate are communications with the courts and CoStar's hired vendors or agents that assisted in various phases of the litigation—the latter of which are protected work product.  In other words, there are no documents to produce in response to this Request.  We note that these types of third parties, *i.e.*, the courts or those working at the direction of CoStar, are not the third parties you  explained are of interest with respect to this Request.  We therefore hope our confirmation that these are the only third parties with whom CoStar communicated about Arcgate resolves this Request.

**RFP No. 97:**

Your email misstates our discussion during the meet and confer.  With regards to documents:  you asked whether there were any documents aside from CoStar's complaint that

**LATHAM & WATKINS** LLP

relate to CoStar's "claim for damages or other relief" in its lawsuit against Arcgate.  We responded that we did not believe there were, but that an extraordinarily broad reading of your Request might sweep in the other pleadings in the Indian action—since all pleadings "relate" to the claim for relief to some degree.  If you confirm in writing that your Indian counsel does not have access to those pleadings, CoStar agrees to review them for responsiveness.

With regards to communications:   as stated during the meet and confer, any communications with Arcgate related to damages or other relief, to the extent they exist, would be protected from disclosure under Indian privilege law.

**RFP No. 98:**

During our meet and confer, we explained that Request No. 98, which seeks "[a]ll documents relating to Arcgate," for an unlimited time period, was duplicative of the above RFPs and appeared to be an overbroad "catch-all."  CoStar maintains that position.  Because this Request asks for "all documents relating to Arcgate," any document CoStar produces in response to the preceding requests is necessarily responsive to this Request.  If there is unique information that is sought by this Request that is not covered by Request Nos. 92-97, please let us know and we will consider the request.

**RFP Nos. 99 and 100:**

Request No. 99 seeks "[a]ll transcripts, recording, videotapes, or audiotapes of YOUR 'all-hands' or company meetings that reference or relate to CREXi."  We explained during our meet and confer that your request was overbroad, including because it was unlimited in time period, and that CREXi had only identified one "all-hands" meeting (from December 2019) in its counterclaims that supposedly referenced CREXi.  We also explained that the term "company meeting" was too vague and ambiguous to allow CoStar to respond, and that in any event, it would be unduly burdensome for CoStar to listen to any recordings it has for its "all-hands" meetings for an unlimited time period to determine whether or not they reference CREXi.  We discussed that if CREXi were willing to narrow its request, CoStar would consider such a proposal.  However, you have refused to provide one and thus CoStar's position remains unchanged.

While your email notes that you "understand" that CREXi is frequently "reference[d]" at CoStar's "all-hands" meetings, that is not our understanding.  We have repeatedly asked CREXi to substantiate its allegation that CREXi was mentioned at CoStar's December 2019 "all-hands" meeting (or its new claim that it is referenced at "numerous" meetings) and you have refused to do so.  CoStar is not required to allow CREXi to go on a fishing expedition based entirely on an unsubstantiated allegation relating to one meeting.

**RFP Nos. 101 and 102:**

During our meet and confer, you stated that these requests are not duplicative of Requests No. 39 and 40 because they seek documents related to CoStar's scraping of *broker websites* (as opposed to scraping of CREXi's website).  We then asked you to explain why CoStar's scraping

Elizabeth K. McCloskey
April 1, 2022
Page 5

**LATHAM&WATKINS**LLP

of broker websites, to the extent it occurred, would be relevant to any claims or defenses in the
litigation. You said that if CoStar is scraping brokers' websites and then suing CREXi and others
for accessing that information from CoStar, it would be relevant. That is incorrect. This case is
about, among other things, CREXi's violations of CoStar's terms of use by accessing CoStar's
website and using that information in a competitive manner. This Request is not relevant to
CREXi's defense of those claims. Nor is it relevant to CREXi's allegations that CoStar has
engaged in anticompetitive conduct by (1) imposing exclusionary contractual terms to prevent
customers from accessing services provided by competitors and blocking CREXi and other
competitors from accessing CoStar's websites, (2) modifying CRE listing information and
photographs, and (3) infringing CREXi's trademark. *See* Dkt. 111 at 2.

**RFP No. 103:**

During our meet and confer and in your email, you explained that CoStar's Portfolio
Research Tool is relevant because it is supposedly a "mechanism CoStar uses to submit CRE data,
including CRE data that does not originate from CoStar." We disagree that this explanation
substantiates the relevance of the Portfolio Research Tool, as CREXi has still failed to tie this
Request to the defense of CoStar's claims, or its antitrust counterclaims against CoStar, as
described above in response to Request Nos. 101 and 102.

**RFP No. 104:**

This Request seeks "[a]ll documents relating to policies, practices, background materials
or training guides relating to obtaining photographs from CREXi." During our meet and confer,
we explained that this Request appeared to be duplicative of RFP Nos. 39 and 40. At the time,
you agreed that this Request is duplicative of RFP No. 40. In your email, you've now requested
that CoStar confirm that "the only CoStar policies, practices, background materials, or training
guides related to obtaining photographs from CREXi involved access to or use of CREXi's
website, as opposed to through another mechanism." While we don't fully understand your
question, we are aware of no evidence (or allegation) that CoStar obtains photographs from CREXi
through its website or otherwise. Regardless, we can confirm that CoStar has no polices that would
be responsive to this request other than those policies it has already agreed to search for and
produce in response to RFP No. 40.

**RFP No. 105:**

During our meet and confer, we noted that this Request, which seeks information regarding
CoStar's alleged cropping and altering of broker or competitor watermarks and logos, was
duplicative of at least Request Nos. 12, 23, and 24. You explained that this Request was somehow
broader than those previous requests because it sought documents regarding CoStar's "cropping
or altering of broker or competitor watermarks, logos or other information from photograph
images" regardless of whether those images were on CoStar's websites. However, there are no
allegations in CREXi's counterclaims that CoStar "crops" or "alters" broker or competitor
watermarks or logos, nor would such conduct be relevant to the "anticompetitive scheme" CREXi
has alleged. And this information is certainly not relevant to CREXi's defenses. Given that, and

Elizabeth K. McCloskey
April 1, 2022
Page 6

**LATHAM&WATKINS**LLP

the significant overlap between the information sought in Request Nos. 12, 23, and 24, CoStar maintains its objections to this Request, *i.e.*, that it is duplicative and unduly burdensome.

## RFP No. 108:

During our meet and confer, we explained that this Request, which seeks documents relating to "statements claiming, alleging, or suggesting that [CoStar] hold[s] monopoly power," was duplicative of Request No. 54 which seeks documents related to CoStar's monopoly power in the alleged relevant CRE markets.  You explained that this Request is broader than Request No. 54 because it seeks documents regarding CoStar's supposed monopoly power in ***any market*** and not just in the relevant markets that CREXi has alleged.

As we previewed during our meet and confer, CoStar maintains its objections to this Request because documents relating to CoStar's supposed "monopoly power" in markets other than those alleged in CREXi's counterclaims are plainly not relevant to any claim or defense.  This Request is thus irrelevant, unduly burdensome, and disproportionate to the needs of this case.  Indeed, in the Court's February 18, 2022 Order, Judge Sagar noted that "[c]ourts generally limit discovery in antitrust cases to the ambit of the applicable market."  Dkt. 111 at 5 n.3.

## RFP No. 110:

During our meet and confer, you explained that CoStar's training manuals for its customer relationship software are relevant because they may provide information on how data regarding customers is inputted into CoStar's software and why customers are, for example, choosing to continue or discontinue use of CoStar's services.  CoStar, however, has already agreed to produce information in response to RFP No. 66, which seeks documents relating to "the loss of business to companies that provide the relevant internet CRE services, including the reason why business was lost."  Specifically, CoStar has agreed to (i) *create* and provide a list of customers who are not currently using CoStar's subscription database but who were customers during the relevant time period, and (ii) include in its custodial productions documents related to instances where customers have stopped or reduced their use of the CoStar database or LoopNet, and documents related to the reasons why such business was lost.  Thus, CoStar fails to understand why the information sought by this Request is relevant or necessary, and maintains its objections.

## RFP Nos. 111 and 112:

During our meet and confer, we explained that these Requests, which seek information regarding CoStar's supposed use of CREXi to create listings, were duplicative of at least Request Nos. 12, 21, 23, 24, 39, and 40.  Your email suggests that Request Nos. 111 and 112 are not duplicative because they seek communications or documents relating to the "use, access, or review of data" from CREXi while creating CoStar listings, which is different from the previous requests we identified.  We disagree.  Request No. 111 seeks "all DOCUMENTS RELATING TO YOUR use, access, or review of data or photographs from CREXi in connection with creating, populating, or updating listings on any COSTAR website."  Previous Request No. 39, in response to which we have already agreed to conduct a reasonable search and produce documents, seeks "all

LATHAM&WATKINS LLP

DOCUMENTS RELATING TO the monitoring of, analysis of, access to, use, or automated scraping of CREXi's website by any natural person currently or formerly employed by YOU or acting on YOUR behalf as an agent or independent contractor." Request No. 39 already seeks "all documents" related to CoStar's "access or use" of CREXi. That would encompass anything produced in response to No. 111. To resolve this dispute, CoStar confirms that it will not withhold any documents based on its objection to Request No. 111—solely because any document responsive to No. 111 will have already been produced in response to No. 39. CoStar maintains its objection to the duplicative nature of this Request, however, including because it is improper for CREXi to propound repetitive and duplicative requests, thereby unnecessarily burdening CoStar by requiring CoStar to analyze and then meet and confer with CREXi despite having already agreed to produce the same materials.

Request No. 112 is similarly duplicative of previous RFP No. 40—which is apparent from the two Requests' plain language. Though CREXi has failed to explain the difference, to resolve this Request, CoStar confirms that any documents that would be responsive to Request No. 112 will be captured by CoStar's search for documents responsive to Request No. 40.

For the avoidance of doubt, because the information sought by these Requests, and the requests they are duplicative of, is not relevant to CREXi's claims or defenses, CoStar maintains its objections, including that these Requests are not proportional to the needs of this case.

## RFP No. 112(a):

Request No. 112(a) seeks documents relating to targets, metrics, incentives, bonuses, or other financial or business metrics in connection with creating, populating, or updating listings on any CoStar website. We asked why this information is relevant and you explained that supposedly stringent targets set for CoStar employees may cause them to take actions that are "wrongful." We disagree that the information sought by this Request is relevant. Neither during our meet and confer, in your email, or in the counterclaims has CREXi identified any "wrongful" conduct by CoStar employees or that such "wrongful" conduct is encouraged by CoStar's financial incentives. The premise for this Request is thus entirely speculative and CoStar maintains its objections.

The above position in no way absolves CREXi from responding to CoStar's Interrogatory No. 10. The information that CoStar seeks is plainly relevant to **CoStar's** (substantiated) claim that CREXi systematically accesses CoStar's sites and engages in, inter alia, the mass infringement of CoStar's copyrighted images. CREXi may not refuse to respond to discovery that is plainly relevant to *CoStar's claims* only if CoStar provides reciprocal information, when that information is not relevant, at all, to *CREXi's claims*. To that end: CoStar propounded Interrogatory No. 10 on October 8, 2021. On December 23, 2021, CREXi served its responses and objections without providing a substantive response to No. 10, instead indicating it was still investigating its response and would supplement its responses. Two months later on February 25, 2022, we inquired as to when CoStar could expect this supplement and asked that CREXi do so by March 4, 2022. Nearly another month has passed since that date and you have still not provided a supplement, or even responded. Please confirm that CREXi will provide a substantive response based on your now five-month investigation by April 8, 2022.

LATHAM&WATKINS LLP

**RFP No. 114:**

This request seeks documents sufficient to show every broker or customer that utilizes LoopLink. During our meet and confer, we asked why this information was relevant and why CREXi needed the identities of *every* LoopLink customer. You said that CREXi was entitled to know the identities of every LoopLink customer because CREXi is entitled to seek discovery from all of them to determine whether they have had issues with CoStar's product.

CREXi's counterclaims allege a ***single*** instance of a broker's LoopLink website being inaccessible to competitors. CoStar has explained this single and temporary instance was likely a technical glitch, and has repeatedly told CREXi that it does not block brokers' LoopLink pages. CREXi has not presented any evidence that CoStar has a pattern or practice of restricting access to LoopLink websites. And, as CREXi knows, CREXi is free to access broker websites to identify brokers whose websites are powered by LoopLink and to contact those brokers. If, after doing so, CREXi can demonstrate a pattern or practice of restricting access to brokers' LoopLink pages, CoStar will reconsider this Request. Until then, this Request is not reasonably calculated to lead to the discovery of admissible evidence, but rather simply a fishing expedition.

**RFP No. 115:**

This request seeks information regarding CoStar's efforts to block competitors, including CREXi, from accessing any portion of a customer's or broker's website, including pages hosted by or affiliated with LoopLink. During our meet and confer, we explained that this Request was duplicative of Request No. 29, which seeks documents regarding technical measures that CoStar supposedly employs to block competitors from accessing broker's LoopLink pages. In your email, you state that this Request is broader than Request No. 29 because it is not limited to "technical measures" and would include "legal threats to competitors."

As noted above, CoStar does not block competitors from accessing brokers' LoopLink pages and, to date, CREXi has only alleged a single instance of this occurring (despite the fact that thousands of brokers use or have used LoopLink during the relevant time period). CoStar is not aware of any "legal threats to competitors" regarding access to any broker's LoopLink page and thus maintains that this Request is duplicative of Request No. 29. If there is some other type of document that you believe would be responsive to this Request, please let us know and we will consider your proposal.

\* \* \*

**Elizabeth K. McCloskey**
**April 1, 2022**
**Page 9**

LATHAM&WATKINS LLP

     We are available to discuss by phone any of these requests and CoStar's responses if it would be helpful.

               Best regards,

               */s/ Elyse M. Greenwald*

               Elyse M. Greenwald
               of LATHAM & WATKINS LLP

# EXHIBIT M



Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809

415 391 5400
keker.com


**Elizabeth K. McCloskey**
(415) 676-2269
emccloskey@keker.com

April 29, 2022


Elyse Greenwald
Latham & Watkins LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
*elyse.greenwald@lw.com*

Re:     *CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc.*

Dear Ms. Greenwald,

I write regarding our March 16, 2022 meet and confer addressing CoStar's responses to CREXi's third set of requests for production. As you recall, my colleague Jason George memorialized our conversation in a March 18, 2022 email, and you responded to those points in a letter dated April 1, 2022.

Based on this correspondence, it appears that we have reached an impasse on several issues that require the Court's intervention. For each request below, please confirm your position by May 4, 2022 so that we can promptly raise these issues with the Court.

<u>CoStar's Assertion of Foreign Privilege for RFPs 92-98</u>

We disagree that CoStar has any basis for resisting production of communications with Arcgate regarding its settlement and the declaration of Mr. Bagla. Your assertion that CREXi should have intervened in the Arcgate matter to demand production of the requested documents is grossly disingenuous. CoStar filed a lawsuit against Arcgate in India based entirely on allegations of CREXi's purported copyright infringement in the United States, without ever serving or providing notice of the lawsuit to CREXi—a clear attempt to evade CREXi's right to due process. CoStar cannot now assert that CREXi should be prejudiced because it didn't catch onto CoStar's scheme fast enough or know that CoStar would quickly settle to pay for testimony against CREXi. And in any event, your claim that CREXi should have been able to intervene in six weeks — a period barely more than the time to file an initial answer in a lawsuit within the United States — is nonsensical. CREXi is a United States company. There is no basis to deny CREXi discovery based on CoStar's scheme to prejudice CREXi. Finally, your assertion that CREXi ***could*** have obtained the requested documents is a plain admission that all of the requested discovery is discoverable, and not covered by some broad-ranging privilege.

1851182

Elyse Greenwald
April 29, 2022
Page 2

There is, in any event, no privilege over CoStar's communications with Arcgate. CREXi's request for production of CoStar's communications with Arcgate seek relevant information, because those communications concern CoStar's unethical and unlawful attempt to influence a fact witness. At the very least, this discovery is necessary to address the "bias or prejudice" of Arcgate's CEO, Mr. Bagla, whose declaration CoStar filed in this matter. Fed. R. Evid. 408(b). This discovery is likewise relevant to uncover CoStar's and your firm's unethical and potentially unlawful actions in compensating Arcgate for Mr. Bagla's testimony. *See* Cal. R. of Prof. Conduct 3.4; 18 U.S.C. § 201(c). Your assertion of foreign privilege law fails to prevent production here.

First, India's privilege laws do not apply. Foreign law does not "deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate" foreign law. *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987). Indeed, multiple courts have held that federal privilege law governs when federal and state law claims are asserted, especially when the privilege at issue has no analogue in federal law. *See Duttle v. Bandler & Kass*, 127 F.R.D. 46, 51 (S.D.N.Y. 1989) ("Since the evidence sought is relevant to both the federal and state claims, any asserted privileges are governed by federal law."). You even concede that United States law, not Indian law applies, when you claim that the federal "work product" protection applies to CoStar's communications with third parties in India in response to RFP 95.

Second, the "touch base" test is inappropriate, as it has only been applied in the context of the attorney-client privilege. It has never been applied to the settlement privilege you assert here. Even assuming the "touch base" test is valid (which it is not), United States law would apply. CoStar's lawsuit against Arcgate was based entirely on Arcgate's contract work for CREXi and alleged copyright infringement within the United States. Indeed, CoStar's Indian complaint attached as an exhibit/annexure the first amended complaint that CoStar filed against CREXi. The entire Arcgate litigation is thus an offshoot of this United States litigation. And the settlement of that litigation, which involved securing testimony from Mr. Bagla for use in this case, "touches base" with the United States.

Third, even assuming that Indian law applies (it does not), it does not prevent production of documents here. You assert that Lord Griffiths' opinion in *Rush & Tompkins Ltd. v. Greater London Council et al.*, (1988) 1 All ER 549, prevents discovery of "without prejudice" documents. But you fail to cite any *Indian* authority that has construed such a privilege to prevent the production of documents. There is thus no basis for your claim that *Indian* law would prevent production here.

Fourth, even if United Kingdom law were somehow applicable (once again, it is not), there are numerous exceptions to the without prejudice privilege, many of which apply here. For example, Lord Griffiths' decision recognized that the without prejudice privilege is eliminated "when the justice of the case requires it." Here, the justice of the case certainly requires this discovery –

1851182

Elyse Greenwald
April 29, 2022
Page 3

CREXi seeks this discovery to uncover CoStar's unethical and improper attempt to interfere with a witness and to uncover the bias or prejudice of Mr. Bagla, whose declaration CoStar has filed in this suit. Indeed, in the United States, courts have pierced federal work-product protections in similar circumstances. *See State of New York v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284, 289–90 (W.D.N.Y. 1996) (requiring production despite assertion of work product rule). Regardless of the applicable law, CoStar's communications with Arcgate are discoverable.

We disagree with your assertion of privilege. Please let us know if you will produce the requested documents, or if we are now at an impasse by May 4, 2022 so that we can expeditiously raise this issue with the Court.

RFP 92

Thank you for agreeing to produce non-settlement-related documents. You state that they will be produced to the extent they are "not otherwise privileged." For the reasons stated above, our position is that no privilege can apply to responsive documents because the Arcgate settlement involved unethical and illegal witness interference, requiring any privilege CoStar asserts in response to this request to be set aside. *See State of New York v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284, 289–90 (W.D.N.Y. 1996) (requiring production despite claim of work-product protections). Please confirm what privilege you contend here applies, and the basis for that application.

RFP 93/94

You assert that the "documents and communications" requested by RFP Nos. 93 and 94 are protected by Indian privilege law. Even if the "without prejudice" privilege you cite applies to communications (for the reasons discussed above, it does not), you have provided no basis for why responsive ***documents*** (rather than communications) would be protected by that privilege. The without prejudice privilege requires a more stringent showing than documents being "related to" settlement—as the *Rush* decision on which you rely provides, the privilege can only apply to "negotiating correspondence." And, indeed, you have already produced documents that Arcgate provided to CoStar as part of settlement negotiations. We disagree with your overbroad assertion of a foreign privilege. Please agree to produce all such documents regardless of your position on the applicability of Indian law, or let us know if we are at an impasse.

RFP 95

CoStar has conceded—in fact, asserted—the relevance of the Arcgate litigation by filing in this case a notice of ***related*** case attaching the Consent Terms and Judgment and the declaration of Mr. Bagla. *See* ECF 100, 100-1. Because you have put the Arcgate litigation at issue, CREXi has the right to discovery into the factual circumstances of that litigation. This is a plain attempt to prejudice CREXi by using misleading testimony from the Arcgate litigation for CoStar's benefit while refusing to produce documents that are necessary for CREXi to respond. This request and all of the requests related to Arcgate are highly relevant and proportional to CoStar's actions.

Elyse Greenwald
April 29, 2022
Page 4

Your descriptions of the communications to third parties are too vague for us to conclude that there are "no documents to produce." In addition, as we noted above, it is unlikely that work product provides any protection to CoStar due to its improper conduct interfering with a fact witness. And as discussed above, your invocation of federal work product protections for these documents is yet another concession that *United States* law, not Indian law, applies to Arcgate-related communications. Please confirm that you agree to produce responsive documents.

RFP 97

Our prior communication did not misstate the content of the meet-and-confer discussion. You never stated that an "extraordinarily broad" reading of the RFP was required for it to encompass all of the pleadings in the Arcgate litigation. Indeed, the plain language of the request seeks all documents relating to "any claim for damages or other relief YOU demanded or requested from Arcgate," which, on its face, encompasses all pleadings from the Arcgate litigation, all evidence that you may have had against Arcgate, and any other documents related to your claims against Arcgate.

Your assertion that any communications with Arcgate related to damages or other relief "would be protected" under "Indian privilege law" is incorrect. For all the reasons noted above, there is no privilege applicable to these documents.

RFP 98

CoStar has put Arcgate and the Arcgate litigation front and center in this case in a transparent attempt to prejudice CREXi. This request seeks other documents related to Arcgate that, due to CoStar's evasive and bad faith maneuvers, are relevant to this litigation. CoStar must turn over evidence that is responsive, even if it is harmful to your client and your firm's interests. It is *your* obligation to perform a reasonably diligent search and tell us whether there are other responsive and relevant documents related to Arcgate and the Arcgate litigation in CoStar's possession, custody, or control, including documents that may demonstrate CoStar's improper payment of a fact witness. If you are refusing to comply with your obligations under the Federal Rules of Civil Procedure, please promptly let us know.

RFP 99/100

At our meet-and-confer, you indicated that you had a "good idea" about what is meant by "all-hands company meetings" in these requests. Your claim that you don't understand what we mean by all-hands company meetings now is in conflict with that statement. Your burden argument is also unsubstantiated—you claim that it would be burdensome to "listen to any recordings [CoStar] has" without providing any time or cost metric related to such review. We also provided you multiple less-burdensome alternatives, including obtaining transcription services, that you have seemingly rejected out of hand—again without articulating any specific burden. In addition, you provided no response concerning whether there were any non-custodial repositories of documents responsive to RFP No. 100 related to these all-hands meetings.

Elyse Greenwald
April 29, 2022
Page 5

CREXi has alleged CoStar's ongoing monopolistic and anticompetitive attempts to eliminate other companies in the marketplace, including CREXi. All-hands company meetings, where statements regarding CoStar's policies and approach to competitors are made, are thus highly relevant to this case. You state that it is "not [y]our understanding" that CREXi is frequently referenced at all-hands company meetings, but provide no basis for that assertion. It is your obligation to perform a reasonably diligent search, and produce responsive documents, including audio recordings. You have not articulated any basis why that cannot be done. Without conceding that any narrowing is necessary, CREXi is willing to narrow the timeframe from January 1, 2016 to present. Please confirm that you will produce all documents and material responsive to this request in that timeframe, or whether we are at an impasse.

RFP 101/102

CoStar's actions of scraping broker websites and other websites, and then suing CREXi and others for accessing that information at CoStar is highly relevant, both to CREXi's claim that CoStar engages in anticompetitive conduct as well as to CREXi's fourth affirmative defense of unclean hands and CREXi's sixth affirmative defense of copyright misuse. These actions are also relevant to CoStar's claims, as CoStar has argued that scraping websites is not an industry-standard practice, and CoStar's actions are relevant to that assertion. Please confirm that you will search for and produce documents responsive to these requests, or let us know if the parties are at an impasse.

RFP 103

CoStar's processes for collecting CRE data, including the data that is stored in its Portfolio Research Tool, are relevant to the claims and defenses at issue in this dispute. For example, to the extent CoStar obtains CRE information by scraping other websites, or appropriating brokers' CRE data, that evidence will be relevant to CoStar's assertions regarding industry-standard practices regarding the use of CRE data, CREXi's claims of anticompetitive conduct, and CREXi's unclean hands and copyright misuse defenses. Please confirm you will produce this information.

RFP 104

Your response indicates that you do not fully understand our request, namely, to "[c]onfirm that the only CoStar policies, practices, background materials, or training guides related to obtaining photographs from CREXi involved access to or use of CREXi's website, as opposed to through another mechanism." This could include policies and practices that apply when, as one example, CoStar obtains CREXi photographs from third parties without interacting with CREXi's website. With that clarification, please confirm that you will produce any policies, practices, background materials, and training guides responsive to this request, or confirm that none exists.

Elyse Greenwald
April 29, 2022
Page 6

RFP 105

Contrary to your assertion that CoStar altering broker or competitor watermarks or logos is "certainly not relevant to CREXi's defenses," such conduct is directly relevant to, at the very least, to CoStar's assertions regarding industry practices and CREXi's unclean hands and copyright misuse defenses. Accordingly, please confirm that you will produce responsive documents, or let us know if the parties are at an impasse.

RFP 108

Your response raises the question of whether CoStar will withhold documents where CoStar's monopoly power is at issue, but a specific market is not referenced. This request seeks all documents relating to statements, claiming, alleging, or suggesting that CoStar holds monopoly power—including where a specific market is not referenced. You cite to a footnote in Judge Sagar's order, but that footnote addressed the production of documents from prior CoStar lawsuits, not whether an RFP concerning monopoly power is appropriate. That citation is thus inapposite here. Please confirm that CoStar will produce all documents relating to statements claiming, alleging, or suggesting that it holds monopoly power, including, specifically, where such documents do not *explicitly* reference a particular market.

RFP 110

You are now raising an objection, for the first time, based on an assertion that some of the relevant information might be partially covered by RFP 66. Because you did not raise this objection before, it is waived and, in any event, not a basis to withhold documents. You admit that information about CoStar's CRE systems may lead to the discovery of admissible evidence—that is sufficient to require its production under the Federal Rules of Civil Procedure. CREXi is allowed fulsome discovery on these issues. And in any event, the reasons for continuing or discontinuing use was merely one example of potentially relevant information that a CRM system may provide – indeed, the reasons why a customer might complain (triggering an input in the CRM system) without then stopping or reducing use of CoStar are just as relevant. Please confirm that you will produce the requested information.

RFP 111/112

Contrary to your assertions, it is CoStar's mystifying attempt at withholding documents based on an assertion that differing requests are "duplicative" that has required additional meet-and-confer correspondence on these requests. The use of CREXi data or photographs to create a CoStar listing (RFP 111) is not duplicative of a request regarding access to or use of CREXi's website (RFP 39) because, as stated in the context of another request, CoStar may have received data or photographs through third parties, or such data or photographs may be on CoStar's servers without it being clear that they originated from CREXi's website. RFP 112 differs from RFP 40 for the same reason. The fact that CoStar may not have additional documents in response to these requests does not relieve its obligation to perform a reasonably diligent search for them. Please confirm that you will produce responsive documents.

Elyse Greenwald
April 29, 2022
Page 7

RFP 112(a)

We strenuously disagree that this request is speculative. In Paragraph 167 of CREXi's counterclaims, CREXi alleges that CoStar employees visited CREXi's website more than 1,000 times and visited over 19,000 unique pages, indicating that CoStar itself has engaged in the conduct that it asserts is actionable—such facts are highly relevant to, at least, CoStar's assertions regarding industry standards, CREXi's claims of anticompetitive conduct, and CREXi's copyright misuse and unclean hands defenses. Further, the metrics and incentives CoStar imposes on its employees unquestionably result in them passing off CRE data, which they obtain from third parties, as CoStar's own. This is conduct directly relevant to the claims and defenses asserted in this action. Please confirm that CoStar will produce all documents responsive to RFP 112(a).

RFP 114

CREXi alleges that CoStar blocks competitors from accessing information on customer websites that use LoopLink. This obligates you to produce relevant and responsive information, including the identities of witnesses to your misconduct. Your argument that there was only a single instance of this occurring due to a technical glitch does not trump the allegations in the cross-complaint or your obligations under the Federal Rules of Civil Procedure. The rationale we provide is directly related to the allegations in the cross-complaint and reasonably calculated to lead to the discovery of admissible evidence. Please confirm that you will produce documents responsive to this request, or let us know if we are at an impasse.

RFP 115

Your assertions are insufficient to show that CoStar has performed a reasonably diligent search for instances of it attempting to block access to portions of broker websites to competitors in addition to technical measures. You are obligated to produce information of any instance where CoStar has attempted to limit competitors from accessing any portion of a broker's website, and thus must agree to produce such documents after a reasonably diligent search. This includes not only "legal threats to competitors," but any other actions CoStar has taken to limit competitors' access to broker websites using LoopLink. Again, the burden is on *you* to perform a reasonably diligent search for such instances of anticompetitive behavior. To the extent no such documents exist, your unverified statements in a letter are insufficient—a verified response agreeing to produce all relevant documents is necessary.

*     *     *     *

Please confirm your position on the above items by Wednesday, May 4, 2022 so that we can raise these issues with the Court.

Elyse Greenwald
April 29, 2022
Page 8


Regards,

KEKER, VAN NEST & PETERS LLP

Elizabeth K. McCloskey

EKM:sm

1851182

# EXHIBIT N

**Elyse M. Greenwald**
Direct Dial: 424.653.5695
elyse.greenwald@lw.com

10250 Constellation Blvd., Suite 1100
Los Angeles, California  90067
Tel: +1.424.653.5500  Fax: +1.424.653.5501
www.lw.com

## LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

May 20, 2022

**VIA EMAIL**

Elizabeth McCloskey
Jason George
Keker Van Nest & Peters
633 Battery Street
San Francisco, CA 94111
emccloskey@keker.com
jgeorge@keker.com

Re:   *CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc.*

Counsel:

This letter responds to your April 29, 2022 letter regarding CREXi's third set of requests for production to CoStar. We agree that we have reached an impasse on certain of the requests discussed below but write to correct the record.

### Arcgate-Related Requests (RFPs No. 92-98)

We disagree that Indian law, which shields settlement communications from discovery, does not apply to CoStar's settlement communications with Arcgate. In our April 1, 2022 letter, we cited not one, but two, Indian Supreme Court cases citing *Rush & Tompkins* to establish the nature of the without prejudice privilege in India. In *Chairman & M.D., N.T.P.C. Ltd v. M/S. Reshmi Constrs., Builders & Contractors*, (2004) 2 SCC 663, for example, the Indian Supreme Court cited *Rush* for the principle that "[t]he rule which gives the protection of privilege to 'without prejudice' correspondence 'depends partly on public policy, *namely the need to facilitate compromise*, and partly on 'implied agreement' as Parker LJ stated in South Shropshire DC v Amos [1987] 1 All ER 340, at 343." (emphasis added). Similarly, in *Peacock Plywood Pvt. Ltd. v. The Oriental Insurance Co. Ltd.*, (2006) 12 SCC 673, the Court recognized the principle that where the surrounding circumstances indicate "that the parties were seeking to compromise the action, evidence of the content of those negotiations will, as a general rule, not be admissible." The only condition is that the communications must be "written for the purpose of a genuine attempt to compromise a dispute between the parties."  *Id.*

Indeed, the privilege is so firmly established in India that the Indian Competition Commission—India's antitrust regulator—decreed that its own investigator had been unlawfully influenced by settlement communications between Google and various government authorities outside India. The Commission reasoned that "if voluntary concessions offered by the parties in

**LATHAM&WATKINS**LLP

separate proceedings and different jurisdictions in different settings are referred to and relied upon by the investigators in another jurisdictions to base findings of contraventions, the consequences would be enormous." *Matrimony.com Limited and Another v. Google LLC and Others* ¶ 156 (2018 CompLR 101). The Commission noted that "such an approach would run contrary to public policy as the parties would be deterred from making even reasonable concessions to avoid a costly and protracted litigation." *Id.* ¶ 156. The Commission then cited *Rush* and observed that *Rush* involved a discovery dispute over "discovery of documents that came into existence for the purpose of settling the dispute." *Id.* ¶ 160. Relying on *Rush* and other Indian authorities, the Commission ultimately held that it could not reference or rely on any "voluntary draft commitments given by the parties in different jurisdictions" and that it would ignore any reference or reliance by the investigator on such materials and independently assess the investigator's findings on a revised record. ¶ 161.

Your claim that "the justice of the case certainly requires" discovery of Arcgate and CoStar's privileged settlement communications, Ltr. at 2, is entirely unsupported by *Rush*. In *Rush*, Lord Griffiths identified five narrow exceptions to the privilege under the "justice of the case" rule.

*First*, Lord Griffiths held that "'without prejudice' material will be admissible if the issue is whether or not the negotiations resulted in an agreed settlement." That is plainly not at issue here because CoStar and Arcgate entered into a publicly filed consent decree.

*Second*, Lord Griffiths noted that courts "will not permit the phrase to be used to exclude an act of bankruptcy." Again, that exception does not apply here.

*Third*, Lord Griffiths observed that the privilege does not apply "to suppress a threat if an offer is not accepted." In support of that proposition, Lord Griffiths cited *Kitcat v. Sharp* (1882) 48 L.T. 64. *Kitcat* involved a plaintiff clergyman who claimed that the defendant stock broker had falsely induced him to purchase shares. The main issue in *Kitcat* was whether the court could enjoin the defendant from publishing his correspondence with the plaintiff in an attempt to influence the public. *Id.* The defendant had sent several letters to the plaintiff, many of which were marked "private and confidential," and which threatened to distribute the plaintiff's statement of claim and correspondence to the plaintiff's fellow clergymen and bishop unless he withdrew his claim. *Id.* at 65. Over the defendant's objection, the court published the content of those letters to establish that the defendant had attempted to blackmail the plaintiff. *Id.* That "threat" exception does not apply here because there is no allegation, nor could there be, of a "threat" of blackmail or other illegal activity unrelated to the merits of the suit between Arcgate and CoStar —indeed, the only consequence of not settling was that the Indian litigation would continue (which would result in litigation risk for both sides).

*Fourth*, Lord Griffiths held that "'without prejudice' correspondence may be looked at to determine a question of costs after judgment has been given." That exception also does not apply.

*Fifth*, and finally, Lord Griffiths recognized that there is "authority for the proposition that the admission of an 'independent fact' in no way connected with the merits of the cause is admissible even if made in the course of negotiations for a settlement." Lord Griffiths cited the

LATHAM&WATKINS LLP

"admission that a document was in the handwriting of one of the parties" as an example of such an "independent fact." But Lord Griffiths regarded even that example as "an exceptional case" that "should not be allowed to whittle down the protection given to the parties to speak freely about all issues in the litigation both factual and legal when seeking compromise." Those are the "justice of the case" exceptions articulated by Lord Griffiths in *Rush* and none apply here.

Your additional citation to *State of New York v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284 (W.D.N.Y. 1996) is puzzling. By your own admission, that case involved an assertion of the work product doctrine, not the without prejudice privilege or any other foreign privilege. And *Solvent Chemical* involved a former adversary-turned-consultant and one party's attempt to shield the consulting agreement under the work product doctrine. *Id.* at 288–89. The court determined that, because the work product privilege is intended to preserve the "integrity of the adversary process," allowing it to shield the dubious circumstances surrounding the adversary's retention as a consultant would betray the purpose of the protection. *Id.* at 289. That case does not bear on the instant privilege dispute in no small part because (1) a different privilege is at issue, (2) Arcgate is not CoStar's consultant or agent—indeed, Arcgate is CREXi's agent, and (3) *Solvent Chemical* did not turn on any of the "justice" exceptions Lord Griffiths identified in *Rush*. As we explained to you in our February 28, 2022 letter, providing a recitation of facts in support of a consent judgment is an ordinary, and sometimes necessary, action. It is not a basis on which to seek discovery or to cast aside India's settlement privilege which is intended to promote settlement by avoiding the type of inquiry you seek into Arcgate and CoStar's settlement negotiations.

Since you cannot rely on substantive Indian law—and, indeed, you cited no substantive Indian law to us as we requested (a request which we reiterate here[1])—you have made unconvincing equitable and procedural arguments based on U.S. law. I'll take them in turn.

*First*, there is no serious doubt that CREXi could have intervened in the Arcgate matter had it chosen to do so. Your proclamation that you could not have intervened in the litigation despite having a six-week window to do so is absurd. The volume of pleadings, letters, and other correspondence generated by CREXi in this case alone demonstrates that CREXi is well resourced when it comes to litigation. And CREXi was able to hire counsel in India. Thus, there is no reason why CREXi, on notice of the Indian litigation, could not have intervened to defend against CoStar's allegations or to seek discovery. CREXi has to live with the decision to sit on its hands.

*Second*, you claim that CoStar has admitted that the requested documents are "not covered by some broad-ranging privilege." As you know, that is not what my last letter said. I explained that, because CREXi decided not to intervene in the Arcgate case (for whatever reason), it cannot now try to obtain discovery in the California litigation that it should have "sought in the [Arcgate] matter." The privilege would have nevertheless applied there, but all parties could have avoided arguing in a different forum (the Central District of California) about applicable Indian privileges months after the communications at issue were made and after the matter that the settlement communications related to had already proceeded to final judgment. Instead of promptly dealing

---

[1] To be clear, if you have any Indian authority to support your arguments, you are obligated to provide it during the meet-and-confer process.

May 20, 2022
Page 4

LATHAM&WATKINS LLP

with the issue in the appropriate forum, CREXi is now harassing its own agent, Arcgate, causing CoStar to expend resources responding to CREXi's current letter writing campaign, and arguing that CoStar somehow violated CREXi's "due process" rights despite having notice for six weeks that CoStar and Arcgate were involved in Indian litigation relating to Arcgate's work for CREXi. This situation is of CREXi's own making, not CoStar's.

*Third*, you fall back on the tired accusation that CoStar's settlement with Arcgate was illegal. As we already explained in our February 28 letter, agreeing to exchange evidence and create a record to support entry of a consent judgment is entirely routine and neither "unethical" nor "unlawful." Kunal Bagla's declaration reflects facts contained in documents and communications between CREXi and Arcgate that CoStar has produced to you (though you already had, or should have had, them), and that CREXi—for unknown reasons—has refused to produce in this case. Moreover, CREXi does not, and has never, challenged the accuracy of Mr. Bagla's declaration or the authenticity of the supporting documents CoStar produced. Documents do not have "bias or prejudice" and Mr. Bagla's declaration, which is based on those documents, similarly does not reflect "bias or prejudice." If CREXi had evidence contradicting Mr. Bagla's declaration, presumably CREXi would have produced it (rather than failing to produce a single Arcgate document). CREXi's silence on substance speaks volumes.

*Fourth*, you cite inapposite cases. The language you quote from *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987) refers to a French "blocking" statute restricting U.S. parties from seeking any French discovery outside the bounds of the Hague Convention. The Court's ruling in that case was focused on that category of statutes, *see id.* ("It is well settled that *such* statutes do not deprive an American court . . .") (emphasis added), which are not at issue here. The Court reasoned that such a statute would "appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge." *Id.* No such concern exists here where CoStar asks CREXi to respect India's without prejudice privilege. As CREXi identified, there are certain narrow exceptions to the privilege—the issue for CREXi is that none of them apply. And, notwithstanding the *Societe Nationale* Court's refutation of "blocking statutes", the Court still engaged in and emphasized the importance of comity between sovereign nations—it did not establish a rule that U.S. courts are prohibited from respecting foreign law. *Id.*

The second case, *Duttle v. Bandler & Kass*, 127 F.R.D. 46 (S.D.N.Y. 1989) also does not help your cause. In that case, foreign plaintiffs invoked the German privilege protecting communications between tax advisors and notaries. The Southern District of New York declined to recognize the privilege on the basis that, when a federal claim is at issue, federal privilege law prevails over *state* privilege law. *Id.* at 51–52 (citation omitted). The court did not engage or apply what the Second Circuit has recently dubbed the "traditional approach" to determining the applicability of foreign privilege law—the "touch base" test. *See Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 98–99 (2d Cir. 2020) (observing that "district courts within this Circuit have applied the "touch base" test, a "traditional choice-of-law 'contacts' analysis to determine the law that applies to claims of privilege involving foreign documents") (citations omitted). And the court's consideration of comity heavily weighed the fact that the foreign plaintiffs had filed suit in

**LATHAM&WATKINS** LLP

federal court but sought to "deprive the fact-finder of information on the basis of a privilege not recognized under federal common law." *Duttle*, 127 F.R.D. at 52.

Those facts are not present here. To start, there is no foreign plaintiff seeking to utilize the federal courts. And though CoStar timely notified the Court of the judgment in the Arcgate litigation, that does not justify violating the without prejudice privilege over the Arcgate settlement negotiations that is jointly held by CoStar and Arcgate on the basis that CREXi wishes the judgement (and CREXi's own communications supporting the judgment) did not exist. *See, e.g., Superintendent (Tech. I) Central Excise, I.D.D. Jabalpur and Others v. Pratap Rai*, (1978) 3 SCC 113 ("The rule is that nothing written or said 'without prejudice' can be considered at the trial without the ***consent of both parties***.") (emphasis added). CREXi had an opportunity to intervene in the Arcgate litigation to defend against CoStar's allegations, it chose not to. In washing its hands of the Arcgate litigation in India, CREXi cannot now seek to take advantage of U.S. discovery to obtain privileged communications it could not have obtained in India for the purpose of undermining the Bagla Declaration. Similar to the anomalous results the *Duttle* court observed would occur from allowing foreign plaintiffs to use U.S. courts while benefiting from a foreign privilege, CREXi is attempting to use U.S. litigation to get around the Indian privilege that would have prevented CREXi from obtaining CoStar's settlement communications with Arcgate had CREXi sought discovery of those communications in India.

Further, your assertion that CoStar has conceded that Indian privilege law does not apply misstates the record. In CoStar's Responses & Objections to CREXi's Third Set of Requests for Production, CoStar explicitly objected to Request No. 95 on the basis of attorney-client privilege, work product protection, and "to the extent it seeks communications that are privileged or otherwise non-discoverable under applicable foreign law." In my April 1st letter to you, CoStar confirmed that its only communications with third parties related to Arcgate are communications with the courts and "CoStar's hired vendors or agents that assisted in various phases of the litigation—the latter of which are protected work product." At no point did CoStar concede that Indian law does not protect those communications.

To the contrary, India, like the United States, recognizes the work product doctrine, as well as the attorney-client privilege. In *Larsen & Toubro Limited v. Prime Displays P Ltd. Abiz*, 2002 (5) BomCR 158, the Bombay High Court drew on English law and the Indian Evidence Act to enforce the work product doctrine, otherwise known as the "legal professional privilege." *Id.* ¶ 15. The High Court drew on Lord Simon of Glaisdale's observation in the English case *Waugh v. British Railways Board* (1979) 2 All E 1169 (HL) that the "system of adversary forensic procedure with legal professional advice and representation demands that communications between lawyer and the client should be confidential, since the lawyer is for the purpose of litigation, merely the client's alter ego. So too material which is to go into the lawyer's (i.e., the client's) brief or file for litigation. This is the basis for the privilege against disclosure of material collected by or on behalf of a client for the use of his lawyer in pending or anticipating litigation." *Larsen* ¶ 15.

The High Court in *Larsen* further explained that the Indian Evidence Act itself prohibits disclosure of "any communication made to [an attorney] in the course and for the purpose of his employment as such . . . by or in behalf of his clients, or to state the contents or conditions of any document with which he has become acquainted in the course and for the purpose of his

LATHAM&WATKINS LLP

professional employment, or to disclose any advice given by him to his client in the course and for the purpose of such employment." *Id.* And the Evidence Act applies that prohibition to the "clerks or servants" of attorneys. Citing the Evidence Act and other relevant authorities, the High Court held that "the legal professional privilege incorporated in [the Evidence Act] attaches to a document coming into existence in anticipation of litigation." *Id.* ¶ 16.5 The legal professional privilege, then, is substantively the same—and reflects the same widely-applied principles—as the federal work product doctrine.

Finally, your assertion that the "touch base" test is not valid is proven false by the use of the test by several courts across the country, including the Second Circuit and the Central District of California. *See, e.g., Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 99 (2d Cir. 2020) (applying the "touch base" test to determine whether foreign privilege law applies); *Philips North Am. LLC v. Fitbit LLC*, -- F. Supp. 3d --, 2022 WL 252392, at *5 (D. Mass. Jan. 27, 2022) (finding the "touching base" test supported applying Dutch privilege law); *Masillionis v. Silver Wheaton Corp*, 2018 WL 1725649, at *3 (C.D. Cal. Apr. 2, 2018) (applying the "touch base" test to determine whether Canadian or U.S. privilege law applied), *vacated on other grounds*, 2018 WL 11394848 (C.D. Cal. Aug. 2, 2018); *Cadence Pharmaceuticals, Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1020–21, 1024 (S.D. Cal. 2014) (applying the "touch base" test to determine that German privilege law applied); *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 208 F.R.D. 92, 98–99 (S.D.N.Y. 2002) (applying the "touch base" test to determine that German and Korean privilege law applied to requested documents).

You still have not provided any authority suggesting that the without prejudice privilege does not apply here. Indeed, you have not yet cited a single Indian case. By contrast, CoStar has explained what the privilege is and why the privilege applies, citing to applicable Indian and U.S. cases. If you have any authority, including specifically Indian authority, that supports your position, please let us know so that we may consider it. If you do not, please so state.

**RFP No. 92**

As explained in our April 1, 2022 letter, CoStar will conduct a search and produce responsive documents to the extent that they are not protected by the Indian settlement privilege. For the reasons stated above, CoStar stands by its assertion of privilege and awaits contrary authority, including Indian authority, from CREXi.

**RFP No. 93/94**

You claim that CoStar has provided "no basis" for the proposition that the Indian settlement privilege applies to documents is incorrect. The first sentence of Lord Griffiths opinion in *Rush* states that the case "raises a novel point on the right to discovery of documents." Indeed, that case concerned the production of documents that were created during settlement negotiations. Thus, your attempt to cabin the privilege to "negotiating correspondence" is wrong.

More importantly, Indian authorities understand that the *Rush* settlement privilege applies to documents. *See Matrimony.com* ¶ 160 (describing *Rush* as involving a dispute over "discovery of documents that came into existence for the purpose of settling the dispute between the parties.")

LATHAM&WATKINS LLP

To be clear, the documents we produced to you were not "related to settlement." Those were pre-existing documents that **_CREXi_** created in instructing Arcgate, its agent, to engage in wrongdoing. And we note that, despite our repeated requests over many months, CREXi has still not produced its own set of communications with Arcgate. CoStar stands by its assertion of privilege. If CREXi has any contrary authority, including specifically Indian authority, please provide it.

### RFP No. 95

As explained in our April 1st letter, the only communications with third parties related to Arcgate are communications with the courts and CoStar's hired vendors or agents that assisted in various phases of the litigation. The latter of which are not "Third Party" entities under your own definition and which communications are protected by the attorney-client privilege and work product protection in India and the United States.

CoStar confirms that it will conduct a reasonable search for non-privileged communications with third parties other than with the court or its own agents. But as we have already stated, we do not expect to find any responsive documents to produce.

### RFP No. 97

The only non-privileged documents potentially responsive to this Request other than the complaint, which we've agreed to produce, are pleadings in the Indian litigation that refer to CoStar's request for damages. In our April 1st letter, CoStar offered to collect and review the Indian pleadings for responsiveness **_if_** CREXi confirmed in writing that its Indian counsel does not already have access to the pleadings. We assume from your silence on that issue that CREXi already possesses (or at least has access to) the pleadings from the Arcgate litigation and thus there is nothing left to discuss.

To the extent you now seek all evidence CoStar had against Arcgate and other related documents, other than those we have already provided to you, those materials would be privileged as attorney-client communications and/or attorney-work product.

### RFP No. 98

CoStar is not refusing to comply with any discovery obligations. Federal Rule of Civil Procedure 34(b)(1) requires that you "describe with reasonable particularity" the category of documents you seek. Your unlimited and overly broad request for "All Documents Relating to Arcgate" is clearly duplicative of your other requests for Arcgate-related documents. We asked CREXi to identify any information that this request sought that was unique or different than what it sought in other requests and CREXi identified nothing. Thus, we can only assume that this Request only seeks documents covered by other Requests. It is your responsibility, not CoStar's, to formulate requests for production with the requisite particularity. We stand by our position that this request is overbroad and duplicative of CREXi's other Arcgate requests.

**LATHAM&WATKINS** LLP

**RFP Nos. 99/100**

CoStar has agreed to produce information responsive to this Request for the December 2019 "all hands" meeting, which is the only "all hands" meeting alleged in your Counterclaims. The remainder of these Requests remain overly broad and unduly burdensome.  As we have explained to you, though we understand what an "all hands" meeting refers to, we do not know what you intend to reference by the phrase "company meeting" (presumably you do not mean any time two or more employees gather).  And CoStar is not obligated to listen to or review any transcript or video (or pay someone to transcribe any video) of any "company meeting" for even a four year period to see if CREXi was mentioned based on CREXi's pure speculation, which it has never substantiated.  Unless CREXi provides more than an unsubstantiated allegation relating to one meeting, CoStar maintains that this Request is nothing more than a fishing expedition.

To respond to your question regarding RFP No. 100, there is no centrally maintained repository of materials related to "all-hands" meetings.  To be clear, however, to the extent CoStar identifies documents related to "all-hands" meetings that reference CREXi in its custodian review, it will produce those materials.

**RFP Nos. 101/102**

You still have not explained why any purported scraping of broker websites by CoStar would be relevant to any claims or defenses in this litigation.  CoStar did not sue CREXi for accessing broker websites.  In CoStar's First Amended Complaint, CoStar alleged that commercial real estate marketplaces such as those operated by 42Floors, Inc., Catalyst Real Estate Software, Inc., Yardi Systems, Inc., Brevitas, Inc., and RealMassive, Inc. prohibit competitive use of their websites and such a restriction is "industry standard." FAC ¶ 23.  But you have not explained why the scraping or other competitive use of *broker* websites is relevant to that allegation by CoStar (or any other).  And you do not explain why your vague allusion to "industry-standard practice" makes these Requests relevant.  Further, your Counterclaims allege that CoStar has engaged in anticompetitive conduct by (1) imposing exclusionary contractual terms to prevent customers from accessing services provided by competitors and blocking CREXi and other competitors from accessing CoStar's websites, (2) modifying CRE listing information and photographs, and (3) infringing CREXi's trademark. *See* Dkt. 111 at 2.  None of these practices relate to scraping of broker websites in any way.  Reflecting that fact, your Counterclaims make no allegation that CoStar engages in any form of scraping.  This Request is thus not relevant to CREXi's claims or defenses in this case.  To the extent CREXi continues to press these Requests, the parties are at an impasse.

**RFP No. 103**

CoStar has already agreed to undertake a reasonable search and produce non-privileged documents related to CoStar's collection and processing of CRE information and images, including the application of the CoStar watermark (Request No. 10), how CoStar collects CRE information or data (Request No. 21), and alleged "seeding" of CRE information (Request No. 22).  This Request is thus duplicative, unnecessarily cumulative, and unduly burdensome.  Without waiving those objections, earlier today, CoStar produced training materials related to the Portfolio

LATHAM&WATKINSᴸᴸᴾ

Research Tool as part of its production in response to Interrogatory No. 17. In light of that production, CoStar assumes there is no further dispute about this Request.

## RFP No. 104

Thank you for the clarification. We are aware of no evidence (or allegation) that CoStar obtains photographs from CREXi through its website whether directly, through a third party, or otherwise. Nonetheless, we can confirm that CoStar has no policies that would be responsive to this Request other than those policies CoStar has already agreed to search for and produce in response to RFP No. 40. We assume that there is no remaining dispute regarding this Request.

## RFP No. 105

As CoStar has previously explained, CREXi does not allege that CoStar crops or alters broker or competitor watermarks, logos, or other information from photographic images (and we are aware of no evidence of such conduct either). And, whether CoStar crops or alters logos (which it does not) would not support any unclean hands defense and cannot support a copyright misuse defense since it is untethered to the antitrust claims that are the basis of that defense and do not implicate CoStar's use of its copyrighted intellectual property. Thus, this Request is not related to any claim or defense in the case.

This Request is also duplicative of Request Nos. 12, 23, and 24. Request No. 12 seeks documents related to CoStar's policies, procedures, rules, guidance, practices, and training manuals concerning the modification of images provided to CoStar by third parties. Request No. 23 seeks communications with third parties regarding CoStar's modification or adjustment of any commercial real estate information provided by or owned by third parties on CoStar's websites. And Request No. 24 seeks all documents related to CoStar's efforts, policies, procedures, rules, guidance, practices, and training manuals concerning CoStar's modification or adjustment of any commercial real estate information provided by or owned by third parties that is available on CoStar's websites. Request No. 105 is duplicative of these three Requests, taken together.

CoStar will produce responsive documents to the extent CoStar is already producing those documents in response to Request Nos. 12, 23, and 24.

## RFP No. 108

CoStar reiterates its objection to the term "monopoly power" as overly broad, vague, and ambiguous because it does not refer to a particular market and therefore is an almost meaningless phrase absent a reference market. Nonetheless, CoStar has agreed to run search terms related to monopolization and, to the extent those terms (or other related terms the parties may agree to) return documents that discuss a general CoStar "monopoly power" without reference to any specific market, CoStar will agree to produce those documents. We assume that with this clarification, there is no remaining dispute.

May 20, 2022
Page 10

LATHAM&WATKINS LLP

**RFP No. 110**

CoStar could not have waived any objection that CoStar's response to Request No. 66 is sufficient to respond to this Request because this Request as propounded was vague, and it was not until our meet and confer that you explained what kind of information this Request seeks. In any event, CoStar reserved its right to raise objections following its initial response to preempt exactly the kind of bait and switch tactic CREXi apparently has chosen to deploy.

On substance, CoStar has not admitted that information about CoStar's CRM systems is relevant. We explained that we were already *creating* and providing information that CREXi has asked for and, as a result, there is no reason to review the training materials for CoStar's CRM system. And, you have still not explained why you need the training materials for the CRM system or why they are relevant to any claim or defense in this case.

Without waiving those objections, earlier today, CoStar produced training materials related to its CRM database as part of its production in response to Interrogatory No. 17. In light of that production, CoStar assumes there is no further dispute about this Request.

**RFP Nos. 111/112**

To be clear, there is no allegation or evidence that CoStar is using photographs from CREXi—whether obtained directly from CREXi or otherwise—to create listings. Any Request oriented toward that topic is not relevant to your defenses or to your Counterclaims. There is also no allegation that CoStar is violating CREXi or any brokers' copyrights. And these Requests have nothing to do with CREXi's allegations about purported anticompetitive conduct. For those reasons, CoStar maintains all of its objections to Request Nos. 111 and 112.

Nevertheless, because CoStar is already responding to Request Nos. 39 and 40, and Request Nos. 111 and 112, by their plain language, are duplicative of Request Nos. 39 and 40, CoStar has agreed to produce any document responsive to Request Nos. 111 and 112 that it discovers through its search for documents responsive to Request Nos. 39 and 40. As a result, we do not believe there should be any remaining dispute with respect to these Requests.

**RFP No. 112(a)**

Your response illustrates why this request is entirely speculative. You claim that any metrics or incentives CoStar imposes on its employees "unquestionably result in them passing off CRE data, which they obtain from third parties, as CoStar's own." But your Counterclaims make no allegations about CoStar employees misappropriating CRE data from third parties. Paragraph 167 of Your Counterclaims, which you cite to show the relevance of this Request, states only that CoStar employees have visited CREXi property listings, purportedly gained access to due diligence materials, and created saved searches. It does not say that CREXi owns any CRE data or that CoStar employees are "passing off" that hypothetical CREXi CRE data as their own. And you have not substantiated any connection between such unpled allegations and CoStar employees' compensation or bonus payments. Nor have you explained how the fact that CoStar employees may have visited CREXi's website puts their compensation or bonus payments at issue

**LATHAM&WATKINS** LLP

or how such compensation or bonus payments relate to your alleged tri-parte "anticompetitive scheme." And, this information has no relevance to any affirmative defense.

Further, you have refused to provide this same information to CoStar despite previously agreeing to do so. And you have still not satisfied our request that CREXi fulfill its prior commitment to respond to our Interrogatory No. 10, which we propounded over seven months ago on October 8, 2021. CoStar understands that you have now identified a "date certain" by which you will provide that response. We look forward to receiving it.

## RFP No. 114

CoStar does not disagree that discovery related to LoopLink is relevant given your allegations. However, your allegation of a single instance of a broker's LoopLink being inaccessible to CREXi does not entitle CREXi to CoStar's entire LoopLink customer list. CoStar's April 1, 2022 proposal was reasonable, and CoStar maintains that if CREXi can demonstrate a practice of systematically restricting access to brokers' LoopLink pages, CoStar will reconsider this Request. Until then, this Request is not reasonably calculated to lead to the discovery of admissible evidence. It is a fishing expedition.

## RFP No. 115

CoStar has agreed to conduct a reasonable search and produce documents responsive to Request No. 29, which seeks documents regarding services or technical measures that CoStar supposedly employs to block competitors from accessing brokers' LoopLink pages. You have indicated that this Request also includes documents related to "legal threats to competitors" that would block or constitute an attempt to block access to portions of broker websites to competitors. CoStar has confirmed that it is not aware of any "legal threats to competitors" regarding access to any broker's LoopLink page. If you have something in mind, please let us know. CoStar reiterates that it does not understand what "other actions" CoStar could take to "limit competitors' access to broker websites using LoopLink" other than technical measures related to LoopLink and thus maintains that this Request is duplicative of Request No. 29.

Unless CREXi can state with particularity the type of action it believes CoStar could take to block competitors from accessing customer or broker websites, CoStar's position is that our agreement as to Request No. 29 is reasonable and sufficient to cover this Request.

Best regards,

*/s/ Elyse M. Greenwald*

Elyse M. Greenwald
of LATHAM & WATKINS LLP

# EXHIBIT O

| | |
|---|---|
| **From:** | roberto.borgert@lw.com |
| **To:** | Jason George |
| **Cc:** | sarah.tomkowiak@lw.com; elyse.greenwald@lw.com; costarcrexi.lwteam@lw.com; CREXSTAR; Elizabeth K. McCloskey |
| **Subject:** | RE: CoStar v. CREXi |
| **Date:** | Friday, June 24, 2022 5:41:02 PM |

---

**[EXTERNAL]**

---

Hi Jason,

Thank you for your email.

CoStar's position is that we are certainly not at an impasse "as to every request" implicating privileged documents.  Our position is, and always has been, that we are willing to produce relevant responsive non-privileged documents.  That is our position with respect to Request Nos. 92-94, and it is our position for Request Nos. 95-98.  Indeed, we believe we have resolved most of these Requests on which you focus and that the parties' dispute is limited to privilege issues.

In contrast to our cooperative approach to your Arcgate-related Requests, CREXi has inexplicably refused to provide any Arcgate-related documents.  As we noted in our June 22 correspondence, you have not produced the November 1, 2020 Professional Services Agreement between CREXi and Arcgate, which you told us on March 10, 2022 you would provide.  You have also taken the astonishing position that CREXi will not request that Arcgate provide CREXi documents and information to supplement CREXi's Interrogatory responses.  This refusal is apparently based on a nonsensical interpretation of the Arcgate Consent Terms that is untethered to the text of the actual order.  And especially bewildering is CREXi's refusal to provide evidence supporting your February 17 accusations against CoStar and fellow counsel related to the Arcgate settlement.

That refusal is even more striking in light of the fact that you have justified your Arcgate-related discovery on phony allegations that CoStar acted improperly during the Arcgate settlement negotiations.  It has been over four months since you first lodged those baseless claims.  When do you intend to provide evidence to support those accusations?  If the thrust of your argument remains that a settlement agreement is unlawful or improper if it contains representations or testimony related to that litigation, did CREXi and its CEO Mr. DeGiorgio act unlawfully or improperly when they settled Ten-X's claims against them in 2017?  Of course not.  Mr. DeGiorgio's public statement apologizing for his actions was proper.  And neither Ten-X, CREXi, nor Mr. DeGiorgio (or their lawyers) acted improperly by including in the settlement agreement—an agreement signed by your firm—a promise to provide information relating to the lawsuit under oath.  If you are refusing to respond to CoStar's Request No. 141 because you have no documents or other evidence to produce in support of the allegations you made in your February 17, 2022 letter, please let us know as soon as possible.

CoStar's position on Request Nos. 95-98 is as follows:

**Request No. 95**

At the outset, we do not believe we are at an impasse on the applicability of the without prejudice

privilege to Request No. 95 because this Request does not seek settlement communications.

As we confirmed in our April 1st, 2022 letter, CoStar's only communications with third parties related to Arcgate are communications with the courts and CoStar's vendors or agents that assisted in various phases of the litigation.  To resolve this Request, CoStar agreed to, and has conducted, a search for non-privileged communications with third parties.  As expected, we have not identified any responsive documents to produce.

Regarding CoStar's communications with courts, you misstate the record.  CoStar has never suggested that you retain Indian counsel to obtain the pleadings in the Arcgate litigation.  In our April 1st letter, we offered to review the Arcgate pleadings for responsiveness to Request No. 97 if you confirmed in writing that the Indian counsel you retained months ago does not have access to those pleadings.  You never responded to that offer.  On May 20th, over a month ago, we told you that we assumed from your silence that CREXi has access to those pleadings or already possesses them.  Again, you did not respond.  We still do not know if you already possess these pleadings or if your counsel has access to them.  If you confirm in writing that your Indian counsel does not have access to those pleadings (explaining why, since that would be strange) and that you do not already have the pleadings, CoStar will review the pleadings for responsiveness.

As we agreed in the Stipulated Discovery Order, CoStar will log all responsive privileged communications.

**Request No. 96**
CoStar confirms that the Consent Terms settlement is the sole agreement between CoStar and Arcgate.

**Request No. 97**
Despite CREXi's refusal to provide its own communications with Arcgate, CoStar has produced CREXi's emails that relate to CoStar's claims against Arcgate.  The other non-privileged documents CoStar possesses related to those claims are included in CoStar's pleadings against Arcgate.

As noted above, CoStar has already offered to review the pleadings in the Arcgate litigation for responsiveness if CREXi confirmed that it does not have access to those pleadings.  If CREXi confirms in writing that its Indian counsel does not have access to those pleadings (explaining why) and that CREXi does not already have the pleadings, CoStar will review the pleadings for responsiveness.

CoStar maintains its position that any communications or documents responsive to this request that are part of CoStar's settlement negotiations with Arcgate are privileged.  CREXi has not articulated any argument under Indian or English law for why the privilege does not apply.  Unless and until CREXi chooses to do so, we remain at an impasse on this issue.

As we agreed in the Stipulated Discovery Order, CoStar will log all responsive privileged communications.

**Request No. 98**

CoStar confirms that the only documents CoStar has that pertain to Arcgate arise in the context of CoStar's lawsuit.  Given that there are no documents responsive to your narrowed request for documents related to Arcgate outside the confines of CoStar's lawsuit against Arcgate, we believe the parties' dispute related to this Request should be resolved.

Thank you,
Roberto

---

**From:** Jason George <jgeorge@keker.com>
**Sent:** Sunday, June 19, 2022 4:48 PM
**To:** Borgert, Roberto (DC) <Roberto.Borgert@lw.com>
**Cc:** Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Greenwald, Elyse (CC) <Elyse.Greenwald@lw.com>; #C-M COSTAR - CREXI - LW TEAM <COSTARCREXI.LWTEAM@lw.com>; crexstar@keker.com; emccloskey@keker.com
**Subject:** RE: CoStar v. CREXi

Roberto,

Thank you for confirming that we are at an impasse on the applicability of the without prejudice rule to settlement communications between CoStar and Arcgate for Request Nos. 92-94. We presume we are at an impasse as well as to every request where CoStar has previously stated such settlement communications are privileged (Request Nos. 95, 97, and 98).

As to the other points you make, I address each in turn.

**Request No. 95**

We understand from your May 20 letter that CoStar will "conduct a reasonable search for non-privileged communications with third parties other than with the court or its own agents." Has CoStar completed that search?  To the extent it has done so, will you supplement and verify your response to Request No. 95 to reflect your statement below that "the only communications CoStar has had with third parties related to Arcgate are communications with the courts and CoStar's hired vendors or agents that assisted in various phases of the litigation"?

As to communications with courts, are you agreeing to produce such documents? As noted below for RFP 97, even though you have stated that CREXi should retain Indian counsel to search for the various pleadings in the Arcgate litigation (to the extent they are publicly available at all), CoStar presumably has a complete set of these documents on hand, and so it will be far less burdensome for CoStar to simply produce these documents.  Will CoStar agree to do so?

As to communications with CoStar vendors and agents, even if the definition of third party does not include the communications you reference, other requests such as Request Nos. 97 and 98 would include these documents. We understand that you are claiming a work product protection under Indian or United States law. Will you agree to log any of these communications that you claim are privileged in your privilege log? CREXi reserves the right to challenge your privilege assertions.

**Request No. 96**

Please confirm that CoStar will supplement and verify its response to Request No. 96 that the Consent Terms is the sole agreement between CoStar and Arcgate.

**Request No. 97**

-

This request does not seek privileged documents. First, it encompasses documents filed in the Indian litigation, which plainly are not privileged and which CoStar should produce for the reasons discussed above. Second, you claim that CREXi's request for "evidence you may have had against Arcgate" and related documents "clearly seeks attorney-client communications." Not so—any underlying documents that constitute the evidence CoStar had or has relating Arcgate are not privileged. And to the extent you are claiming privilege over other documents that may include attorney-client communications or analyses of that evidence against Arcgate, please confirm that you will provide a privilege log as to those documents.

**Request No. 98**

-

We have requested several categories of documents pertaining to CoStar's lawsuit against Arcgate. Please confirm that the only documents CoStar has that pertain to Arcgate arise in the context of CoStar's lawsuit? If CoStar has documents in its possession, custody, or control related to Arcgate outside the confines of CoStar's lawsuit against Arcgate, then those documents are responsive to this request and must be produced.

Please provide CoStar's response to these issues by June 23.

Thanks,
Jason

**Jason George**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1890
+14159628847 direct | 415 391 5400 main
jgeorge@keker.com | vcard | keker.com
Pronouns: He/Him/His

**From:** roberto.borgert@lw.com <roberto.borgert@lw.com>
**Sent:** Friday, June 10, 2022 3:20 PM

**To:** Elizabeth K. McCloskey <EMcCloskey@keker.com>; Jason George <JGeorge@keker.com>; CREXSTAR <CREXSTAR@keker.com>
**Cc:** sarah.tomkowiak@lw.com; elyse.greenwald@lw.com; costarcrexi.lwteam@lw.com
**Subject:** RE: CoStar v. CREXi

[EXTERNAL]

Hi Elizabeth,

After reviewing the authorities CREXi provided on May 24, and consulting with foreign legal counsel, our position remains that the without prejudice privilege protects CoStar's settlement communications with Arcgate from discovery by CREXi.

However, we disagree that we are at an impasse for Request Nos. 95-98.

**Request No. 95**
Your position that we are at an impasse on Request No. 95 is perplexing.  As we have explained, the only communications CoStar has had with third parties related to Arcgate are communications with the courts and CoStar's hired vendors or agents that assisted in various phases of the litigation. Request No. 95 does not seek documents related to communications with CoStar's vendors or agents because it specifically seeks documents relating to communications with a "THIRD PARTY," a defined term.  CREXi's Requests define "THIRD PARTY" to exclude any "PERSON employed by COSTAR [], including any employee, agent, or independent contractor."  CREXi's Third Set of Requests for Production of Documents ¶ 9.  Since CoStar's vendors and agents are encompassed by the exclusion, they are not "third parties" under the Request, and communications with those vendors and agents, and any related documents, are thus not responsive to Request No. 95.  (Even if they were, those documents and communications are protected work product, but there does not seem to be any reason to reach that issue.).  Given CREXi's failure to respond to these basic points in its May 24 correspondence, CoStar assumes the parties have resolved this Request.

**Request No. 96**
The only agreement CoStar has with Arcgate is the Consent Terms agreement resolving the Arcgate litigation.  CREXi already possesses that agreement.  CoStar believes there is nothing more to discuss regarding this Request.

**Request No. 97**
We do not understand the basis for your belief that we are at an impasse on Request No. 97.  To the extent you construe the Request to encompass communications with Arcgate related to damages, the Request is duplicative of Request No. 92.  And to the extent you are asking for "all evidence that you may have had against Arcgate, and any other documents related to your claims against Arcgate," 04/29 Ltr. to E. Greenwald at 4, the Request clearly seeks attorney-client communications and work product, and thus the documents are not discoverable.  We note that you did not respond to our May 20 correspondence on this Request.  We assume therefore that the parties have resolved any dispute related to Request No. 97.

**Request No. 98**

We remain open to considering Request No. 98, so long as CREXi identifies, with the requisite particularity, the category or categories of non-privileged documents it seeks that are not duplicative of CREXi's other Requests.

If you would like to meet and confer further regarding Requests Nos. 95-98, please let us know when you are available to do so.

**Request Nos. 92-94**
As to Request Nos. 92, 93, and 94, CoStar has agreed to produce non-privileged documents responsive to those Requests.  With the understanding that CREXi refuses to recognize India's without prejudice privilege, CoStar agrees that the parties are at an impasse with respect to the privilege's applicability to these three Requests.

Thank you,
Roberto

---

**From:** Elizabeth K. McCloskey <emcclossKey@keker.com>
**Sent:** Friday, June 10, 2022 11:59 AM
**To:** Borgert, Roberto (DC) <Roberto.Borgert@lw.com>; jgeorge@keker.com; crexstar@keker.com
**Cc:** Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Greenwald, Elyse (CC) <Elyse.Greenwald@lw.com>; #C-M COSTAR - CREXI - LW TEAM <COSTARCREXI.LWTEAM@lw.com>
**Subject:** RE: CoStar v. CREXi

Roberto – we look forward to receiving today your response to the issues below.  Thanks.

---

**From:** roberto.borgert@lw.com <roberto.borgert@lw.com>
**Sent:** Friday, June 3, 2022 3:05 PM
**To:** Elizabeth K. McCloskey <EMcCloskey@keker.com>; Jason George <JGeorge@keker.com>; CREXSTAR <CREXSTAR@keker.com>
**Cc:** sarah.tomkowiak@lw.com; elyse.greenwald@lw.com; costarcrexi.lwteam@lw.com
**Subject:** RE: CoStar v. CREXi

**[EXTERNAL]**

Hi Elizabeth,

Given the resources CREXi has devoted to this litigation, and given that it hired a law firm in India many months ago, we remain perplexed as to why CREXi did not even attempt to substantiate its position for months.  And though CREXi, just over one week ago, finally cited three cases and three sections of a single statute, CREXi provided no explanation as to why this law supports its position.  Merely telling us that those authorities contain "exceptions" to our privilege claims while not identifying which exceptions you believe apply has caused undue delay.  CREXi's delaying tactics and failure, even now, to articulate its arguments, are puzzling.  We have counsel in two foreign jurisdictions reviewing that law, and plan, as I said earlier, to respond by the end of next week.

Thank you,
Roberto

---

**From:** Elizabeth K. McCloskey <emccloskey@keker.com>
**Sent:** Thursday, June 2, 2022 8:12 PM
**To:** Borgert, Roberto (DC) <Roberto.Borgert@lw.com>; jgeorge@keker.com; crexstar@keker.com
**Cc:** Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Greenwald, Elyse (CC) <Elyse.Greenwald@lw.com>; #C-M COSTAR - CREXI - LW TEAM <COSTARCREXI.LWTEAM@lw.com>
**Subject:** RE: CoStar v. CREXi

Thanks, Roberto.  We appreciate the additional information regarding the descriptions of CoStar's allegedly privileged communications, but it does not change our belief that the requested documents are discoverable.  You've now had our final position for nine days.  We understand that you are still considering, but we'd appreciate a response no later than Tuesday, June 7.  With the resources CoStar has devoted to this case, two weeks is surely enough for you to determine whether the parties are at an impasse on CREXi's RFP Nos. 92-98 – which we have been negotiating for some time, but without any movement toward an agreement.  You've asserted that CoStar does not want to delay discovery in this case, and thus we expect CoStar to follow up promptly.

Thanks,
Elizabeth

---

**From:** roberto.borgert@lw.com <roberto.borgert@lw.com>
**Sent:** Thursday, June 2, 2022 12:02 PM
**To:** Elizabeth K. McCloskey <EMcCloskey@keker.com>; Jason George <JGeorge@keker.com>; CREXSTAR <CREXSTAR@keker.com>
**Cc:** sarah.tomkowiak@lw.com; elyse.greenwald@lw.com; costarcrexi.lwteam@lw.com
**Subject:** RE: CoStar v. CREXi

[EXTERNAL]

---

Hi Elizabeth,

Your email is incorrect.  We provided our Indian authority more than two months ago, on April 1.  That authority included *Peacock Plywood Pvt. Ltd. v. The Oriental Insurance Co. Ltd.* (2006) 12 SCC 673 and *Chairman & M.D., N.T.P.C. Ltd v. M/S. Reshmi Constrs., Builders & Contractors*, (2004) 2 SCC 663.  And in our May 20 correspondence, we also cited the *Matrimony.com Limited and Another v. Google LLC and Others* (2018 CompLR 101), *Superintendent (Tech. I) Central Excise, I.D.D. and Others v. Pratap Rai*, (1978) 3 SCC 113, and *Larsen & Toubro Limited v. Prime Displays P Ltd. Abiz*, 2002 (5) BomCR 158 cases.  These cases all cite and rely on English common law or other English authorities.  It should be uncontroversial that we have cited the very English authorities that Indian courts cite.  And though CREXi recently provided two English cases in support of its arguments, CREXi failed to explain the relevance of those cases or whether those cases have been cited by Indian courts.  For example, the *Havels India Ltd. v. Electrium Sales Ltd.*, 2013 (136) DRJ 648 case CREXi cited does not refer to either of the two English cases CREXi asserts support its argument.  Naturally, without the

benefit of further explanation by CREXi, we have to review these cases ourselves and take advice from foreign counsel to determine if they support the merits of your argument to set aside the Indian without prejudice and legal professional privileges.  Similarly, as to CREXi's smattering of citations to the Indian Evidence Act, we note that you did not provide any analysis as to why you believe those provisions contradict the authorities we have provided, which do not cite the Act to describe or apply the without prejudice privilege.  Again, your belated citation and failure to explain your position is causing undue delay.

Nevertheless, in the spirit of making progress in parallel, we note that in prior correspondence you asserted that our descriptions of our privileged communications to third parties were too vague to conclude that there are no other non-privileged documents to produce in response to your Request No. 95.  In addition to our May 20 response to that statement, we provide the following information for your consideration while we continue to analyze the relevance of your authorities:  We confirm that the only communications with third parties related to Arcgate are communications with the courts and CoStar's hired vendors or agents that assisted in various phases of the litigation, including for purposes of factual development in anticipation of litigation.  Those communications are protected under the Indian legal professional privilege, which we have previously described and which protects work product, and the United States attorney work product doctrine.

We disagree that it would be efficient for the Court to consider CoStar's motion to compel responses to Interrogatory Nos. 2, 3, 13 and 14 with any motion you may file related to our dispute over your Requests concerning CoStar's litigation against Arcgate.  This is because the legal issues and subject matter are completely different.  While both disputes relate to CREXi's agents, that is where the similarities stop.  One dispute involves CREXi's "possession, custody or control" over agents' documents under Ninth Circuit precedent.  The other involves CREXi's attempts to obtain information through United States discovery that is privileged and that it could not have obtained in India.  The latter raises questions of foreign law, the application of foreign law in a United States proceeding, and principles of international comity.  It would be far more efficient to deal with these distinct issues separately, rather than attempt to brief them simultaneously.  It is a much different situation than the parties' respective disputes on ESI custodians, where there is obvious overlap and the Court must apply the exact same standards to each party's request.  We decline your suggestion to agree proceeding in that manner.

We will be in a position to respond to your newly cited authorities next week.  If we agree that we are at an impasse, we will let you know.  If we do not agree that we are at an impasse, we will propose times to meet and confer.

None of the above would justify CREXi's unilateral "postponement" of our meet and confer on CREXi's responses to Interrogatory Nos. 2, 3, 13, and 14, scheduled for later today.  It would be in neither party's interest if, throughout discovery, one party can refuse to meet and confer with another party on a scheduled topic, unless the other party accedes to a subsequent demand to discuss a different and unrelated topic at the same time.  We will be on the line at 2:30 PT, as planned.

Thank you,

Roberto

---

**From:** Elizabeth K. McCloskey <emccloskey@keker.com>
**Sent:** Thursday, June 2, 2022 1:25 AM
**To:** Borgert, Roberto (DC) <Roberto.Borgert@lw.com>; jgeorge@keker.com; crexstar@keker.com
**Cc:** Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Greenwald, Elyse (CC)
<Elyse.Greenwald@lw.com>; #C-M COSTAR - CREXI - LW TEAM <COSTARCREXI.LWTEAM@lw.com>
**Subject:** RE: CoStar v. CREXi

Roberto,

With respect to CoStar's refusal to respond to CREXi's RFP Nos. 92-98, based on a shifting claim of
privilege, the burden is on CoStar, the party asserting the privilege, to support that privilege. You
have failed to do so. Instead, you first claimed that Indian law provided the basis for the asserted
privilege---a claim that was contradicted by the authorities CREXi cited months ago. You then cited
United Kingdom law, not Indian law, as supporting the privilege, apparently assuming that Indian law
is identical to UK law. But the few Indian authorities you cited do not adopt UK law, and, in fact,
undercut your privilege claim. Now you claim that you need time because CREXi cited India's
Evidence Act and the provisions governing the without prejudice principles you assert. If CoStar
never looked at India's Evidence Act, CoStar did not have then, nor has it now, a good faith basis to
assert privilege.

Regardless, CoStar's motion to compel responses to Interrogatory Nos. 2, 3, 13 and 14 should be
brought at the same time as CREXi's motion to compel responses to RFP Nos. 92-98. These issues
both relate directly to CREXi's relationships with certain independent contractors, and thus I'm sure
you agree that it will be most efficient for the Court to consider both motions together—just as we
agreed to cross move on ESI custodians, for the benefit of the Court. We do not want to burden the
Court with multiple related motions, heard on different schedules.

Accordingly, the parties should hold our final meet and confer on CoStar's Interrogatory Nos. 2, 3, 13
and 14 and CREXi's RFP Nos. 92-98 at the same time, and if we confirm the parties are at impasse,
agree to one briefing schedule on those issues. We are willing to hold that meet and confer
tomorrow afternoon, if CoStar will be, by then, prepared to discuss its refusal to respond to CREXi's
RFP Nos. 92-98. If CoStar cannot be prepared by tomorrow afternoon—despite having a week to
consider our latest position, and many months to consider its refusal to respond to those requests—
then we are willing to postpone the meet and confer until CoStar can be prepared.

Please let us know when CoStar wishes to proceed with a final meet and confer on these issues.

Thanks,
Elizabeth

---

**From:** roberto.borgert@lw.com <roberto.borgert@lw.com>

**Sent:** Wednesday, June 1, 2022 3:56 PM
**To:** Elizabeth K. McCloskey <EMcCloskey@keker.com>; Jason George <JGeorge@keker.com>; CREXSTAR <CREXSTAR@keker.com>
**Cc:** sarah.tomkowiak@lw.com; elyse.greenwald@lw.com; costarcrexi.lwteam@lw.com
**Subject:** RE: CoStar v. CREXi

**[EXTERNAL]**

Thanks, Elizabeth.

As noted below, CREXi did not provide legal support for its position for nearly two months, indicating that it was not in any rush.  It then provided citations to cases from two foreign jurisdictions shortly before the long holiday weekend.

As you might expect, we are consulting with counsel in both the U.K. and India.  If we are ready to respond tomorrow, we will do so.  If not, we will let you know and indicate when we will be in a position to address CREXi's belatedly provided authority.

Thank you,
Roberto

**From:** Elizabeth K. McCloskey <emccloskey@keker.com>
**Sent:** Monday, May 30, 2022 11:29 PM
**To:** Borgert, Roberto (DC) <Roberto.Borgert@lw.com>; jgeorge@keker.com; crexstar@keker.com
**Cc:** Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Greenwald, Elyse (CC) <Elyse.Greenwald@lw.com>; #C-M COSTAR - CREXI - LW TEAM <COSTARCREXI.LWTEAM@lw.com>
**Subject:** RE: CoStar v. CREXi

Thanks, Roberto.  Your team has asked to confer this Thursday at 2:30pm regarding a number of CREXi's interrogatory responses.  We will also expect, at that time, to confirm whether the parties are at an impasse on CREXi's RFP Nos. 92-98.  We are not willing to delay the discussion any further.

Thanks,
Elizabeth

**From:** roberto.borgert@lw.com <roberto.borgert@lw.com>
**Sent:** Wednesday, May 25, 2022 7:14 PM
**To:** Elizabeth K. McCloskey <EMcCloskey@keker.com>; Jason George <JGeorge@keker.com>; CREXSTAR <CREXSTAR@keker.com>
**Cc:** sarah.tomkowiak@lw.com; elyse.greenwald@lw.com; costarcrexi.lwteam@lw.com
**Subject:** RE: CoStar v. CREXi

**[EXTERNAL]**

Hi Elizabeth,

Unfortunately, we will require more time to analyze the multiple sections of the Indian Evidence Act, two English cases, and Indian case CREXi cited to determine whether we are at an impasse.  For context, CoStar provided Indian authorities to support its objections over seven weeks ago, and CoStar gave CREXi ample time to review those authorities.  Now that CREXi has provided CoStar with authorities CREXi believes support its arguments, it is only fair that CoStar have the same opportunity to assess the strength of CREXi's arguments (which we could not do previously).  The burden of that assessment is amplified because this dispute concerns foreign law.

After we have had a sufficient opportunity to review your new authorities, we will let you know whether we agree we are at an impasse.  If we believe we are not at an impasse, we will propose times to meet and confer.

Thank you,
Roberto

**From:** Elizabeth K. McCloskey <emccloskey@keker.com>
**Sent:** Wednesday, May 25, 2022 6:22 PM
**To:** Borgert, Roberto (DC) <Roberto.Borgert@lw.com>; jgeorge@keker.com; crexstar@keker.com
**Cc:** Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Greenwald, Elyse (CC) <Elyse.Greenwald@lw.com>; #C-M COSTAR - CREXI - LW TEAM <COSTARCREXI.LWTEAM@lw.com>
**Subject:** RE: CoStar v. CREXi

Thanks, Roberto.  Let us know, by the end of the day tomorrow, May 26, whether we are at an impasse on CREXi's RFP Nos. 92-98.  If you do not think we are at an impasse, then we can discuss this issue during Friday's meet and confer call.  Thanks.

**From:** roberto.borgert@lw.com <roberto.borgert@lw.com>
**Sent:** Wednesday, May 25, 2022 3:06 PM
**To:** Jason George <JGeorge@keker.com>; CREXSTAR <CREXSTAR@keker.com>
**Cc:** sarah.tomkowiak@lw.com; elyse.greenwald@lw.com; costarcrexi.lwteam@lw.com
**Subject:** RE: CoStar v. CREXi

**[EXTERNAL]**

Jason,

We disagree with all of the points you make below for the reasons we have set forth in the various letters we have exchanged on this issue.  However, your email provides new legal authority—authority that we have asked CREXi to provide on multiple occasions—and we will need some time to review.  As a result, we cannot say that the parties are at an impasse.  After we've had a chance to review the new authority CREXi just provided, we will let you know whether we agree that the parties are at an impasse and, if not, will propose some times to meet and confer.

Thank you,
Roberto

**From:** Jason George <jgeorge@keker.com>
**Sent:** Tuesday, May 24, 2022 8:12 PM
**To:** Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; #C-M COSTAR - CREXI - LW TEAM <COSTARCREXI.LWTEAM@lw.com>
**Cc:** crexstar@keker.com
**Subject:** CoStar v. CREXi

Sarah:

We are still considering your position on several of the RFPs discussed in your May 20, 2022 correspondence, but we understand that the parties are now at an impasse on CREXi's RFP Nos. 92-98. The support for CREXi's position is its prior letter, and the additional authorities cited below.

First, you have yet to cite any case that has applied a foreign settlement privilege in the United States. Every example you cite concerns the attorney-client privilege, and the touch base test has never been held to apply outside that privilege (and even for that privilege, approaches vary, *see Duttle v. Bandler & Kass*, 127 F.R.D. 46, 51 (S.D.N.Y. 1989)). And regardless of the test used, United States law, not Indian law, applies. The entire Arcgate lawsuit was based on allegations concerning CREXi in the United States. And Mr. Bagla's declaration was signed under penalty of perjury of the laws **of the United States**. The entire suit and settlement were designed to obtain evidence concerning this United States lawsuit, and so United States law will apply.

Second, even if Indian law applied, you have yet to cite any Indian case that prevents *production* of without prejudice communications. The decision in *Chairman & M.D., N.T.P.C. Ltd v. M/S. Reshmi Constrs., Builders & Contractors* (2004) 2 SCC 663, supports CREXi, not CoStar, as it adopts the lower appellate court decision in *Rush* (not Lord Griffiths' opinion). Other authorities that support CREXi include Indian caselaw, *Havels India Ltd. v. Electrium Sales Ltd.*, 2013 (136) DRJ 648, the exceptions to the privilege found in UK law (to the extent UK law is applicable at all), *Unilever plc v. The Proctor & Gamble Co.* [(2000) 1 WLR 2436]; *Berkeley Square Holdings & Ors v Lancer Property Asset Management Ltd & Ors* ([2020] EWHC 1015 (Ch)), the boundaries of the without prejudice privilege as codified in the Indian Evidence act, *see* Indian Evidence Act section 23, and codified exceptions to the without prejudice privilege, *see, e.g.*, Indian Evidence Act section 11, and the discretion provided to Indian courts to order the production of information, regardless of other rules to the contrary, *see* Indian Evidence Act section 165.

Third, you have waived any privilege. You produced documents exchanged between Arcgate and CoStar as part of their settlement discussions—regardless of whether those documents were "pre-existing documents that **CREXi** created" as you claim, they were still part of settlement communications, thus waiving any right to the relevant privilege.

Likewise, your previous assertion of the federal "work product" protections have waived your attempt to invoke Indian law. Your shift to claiming that a different "legal professional privilege" applies to certain documents, including the evidence that CoStar had against Arcgate, does not eliminate CoStar's waiver.  And in any event, you are claiming privilege over even clearly

unprivileged documents, including the purported evidence of Arcgate's wrongdoing—the documents you have produced were obtained after your lawsuit was filed in India. If that is the evidence you contend supported your claims against Arcgate, then CoStar had no good faith basis to sue Arcgate in the first place.

_____

If CoStar disagrees that the parties are at an impasse, let's hold a final meet and confer **this Friday, May 27 between 2 and 4 p.m.** at the same time as we meet and confer on CoStar's attempt to obtain documents from third-party vendors through CREXi. If CoStar, however, agrees that the parties are at an impasse, CREXi will propose a briefing schedule. Let us know your position by **close of business tomorrow, May 25**.

Best,
Jason

_____

**Jason George**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1890
+14159628847 direct | 415 391 5400 main
jgeorge@keker.com | vcard | keker.com
Pronouns: He/Him/His

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

# EXHIBIT P

## I.      INTRODUCTION

From the outset, CoStar provided CREXi with a custodial proposal that included eleven individuals from key departments, including seasoned executives, who are most likely to have ESI responsive to CREXi's requests for production.  CoStar's custodian list includes senior executives who lead the sales teams for CoStar's commercial real estate ("CRE") products—Marc Swartz, Ken Lowey, and Brandon Lewe—as well as Vice Presidents who lead CoStar's CRE research teams—Brad McGetrick, Kevin Mason, and Corey Durant.[1]  Despite the thoroughness of CoStar's proposal, CREXi demands that CoStar add nine custodians—two senior executives and seven lower-level employees—none of whom is likely to have unique, relevant ESI.

Neither of the senior executives CREXi seeks to add—Lisa Ruggles and Max Linnington—is a necessary custodian.  Ms. Ruggles, CoStar's Senior Vice President of Global Marketing Research, is duplicative because CoStar has proposed as custodians the three Vice Presidents who report to Ms. Ruggles and lead the CRE research teams relevant to this litigation.  CREXi attempts to minimize these individuals by (mis)labeling them "mid-level" "new hires."  Not true.  They are each long-tenured CoStar executives who have worked in the research department for the majority of the relevant time period.  Likewise, Mr. Linnington is not a necessary custodian.  CoStar has already proposed as custodians the three Vice Presidents who lead CoStar's sales efforts for its CRE products.  CREXi argues that one of them, Mr. Swartz, has only been in his role since October 2020, and that Mr. Linnington is Mr. Swartz's predecessor, but that too is wrong.  Mr. Swartz has had high level responsibility for sales of CoStar's subscription database product dating back to March 2016, and Mr. Linnington is not his predecessor.

---

[1]      Each of CoStar's proposed custodians was identified in its initial disclosures.  Ex. A, June 9, 2022 Decl. of Elyse M. Greenwald ¶ 3 ("Greenwald Decl."), Ex. 1.

There is also no reason to add any of the seven individuals who CREXi alleges "frequently" accessed CREXi's website. CoStar has amassed evidence that CREXi hit CoStar's websites more than a million times as part of a campaign to steal CoStar's copyrighted images and other content. That number would be even higher had CREXi's agent, Arcgate, not destroyed server logs which would have shown that Arcgate repeatedly hit CoStar's websites at CREXi's direction. In a vain attempt to manufacture a counterweight, CREXi labels CoStar's supposed 1,000 "hits" on CREXi.com "frequent." And, even with respect to that smattering of access, CREXi does not mention that it (even today) blasts CoStar with emails featuring links to its site to encourage such clicks. Regardless, there are no plausible allegations that CoStar employees engaged in any wrongdoing by clicking on CREXi's website, and there is thus no reason for CoStar to search the ESI of these seven individuals.

To argue for additional custodians, CREXi asserts that CoStar supposedly blocks competitors from accessing its websites, seeds broker listings, and adds its watermark to photographs it does not own. But before Judge Marshall, CREXi disclaimed any allegation premised on CREXi's inability to access CoStar's sites. Mot. to Dismiss Hr'g Tr. 16:9-17:3 (Apr. 21, 2022) ("We don't want to access CoStar's website."). And when CoStar asked CREXi to identify a single instance of CoStar applying its watermark to photographs it does not own or just one example of CoStar seeding broker listings, CREXi could do neither. These entirely unsubstantiated claims (which remain subject to the pending motion to dismiss) do not justify the significant discovery burden CREXi seeks to impose.

From its eleven proposed custodians, CoStar has already collected ***more than 7 million documents*** along with nearly ***a million*** non-custodial documents from central repositories. Ex. A, June 9, 2022 Decl. of Elyse M. Greenwald ¶ 5 ("Greenwald Decl."). Were CoStar to add CREXi's

nine custodians, it would add hundreds of thousands (if not millions) of documents to its collection, rendering discovery impossible to complete in a timely manner.  May 26, 2022 Decl. of Sarah Tomkowiak ¶¶ 6-7.  CoStar has provided a search term proposal to CREXi that would have CoStar reviewing—among just its eleven proposed custodians—more than 142,000 documents. Greenwald Decl. ¶ 4, Ex. 2.  In comparison, CREXi has proposed just seven custodians, has never disclosed how many documents it has collected beyond vague descriptors (supposedly "millions"), and has insisted that its ESI review be limited to *less than 30,000* documents, a review population that is nearly *five times smaller* than the ESI review that CoStar has agreed to undertake (and *ten times smaller* than the ESI review that CREXi seeks to impose on CoStar).[2]  *Id.* ¶ 4.  Running CoStar's search terms across even one more custodian would not be justified, and there is no reason for CoStar to bear a disproportionate discovery burden.

While CoStar's motion seeks necessary discovery from the CREXi custodians instrumental in CREXi's misconduct, CREXi's request reaches beyond CREXi's scattershot counterclaims in a transparent effort to counterbalance its own bad acts.  For tactical reasons, CREXi is seeking to impose a burden on CoStar that dwarfs what CREXi is willing to shoulder itself.  The Court should deny CREXi's attempt to induce a Solomonic resolution of the custodial dispute at issue.

## II.   NONE OF CREXI'S NINE CUSTODIANS IS LIKELY TO HAVE UNIQUE, RELEVANT ESI

### A.   Lisa Ruggles

CREXi argues that Ms. Ruggles is a "necessary" custodian because she leads CoStar's

---

[2]   CoStar has refused to include many of CREXi's proposed search terms because CREXi's terms would result in a review population of nearly 300,000 documents.  Greenwald Decl. ¶ 4.  It is also incorrect that CoStar has failed to "make any substantive production[s]."  CREXi's Req. for Custodians at 3 (May 26, 2022) ("Mot.").  CoStar has produced more than 12,000 documents to date.  Greenwald Decl. ¶ 6.

research department and oversaw CoStar's integration of a hospitality analytics company, and that the Vice Presidents on CoStar's custodian list—Mr. Mason, Mr. McGetrick, and Mr. Durant—that report to Ms. Ruggles, are insufficient because they are "lower-level" and have been in their current positions a short-time.  CREXi's Req. for Custodians at 4-7 (May 26, 2022) ("Mot.").

Ms. Ruggles oversees CoStar's research teams in the U.S., U.K., and Canada, multi-family (i.e., residential apartment) research, the customer service group, and CoStar's analytics products. Ex. B, June 9, 2022 Decl. of Daniel McCallum ¶ 3 ("McCallum Decl.").  Because her role includes responsibility for multiple groups and teams that have no relevance to this litigation—including research in the U.K. and Canada, non-CRE research, analytics products, and customer service—CoStar proposed including three U.S.-focused CRE research Vice Presidents who report directly to Ms. Ruggles as custodians:  Mr. Mason, Mr. McGetrick, and Mr. Durant.  *See* May 26, 2022 Decl. of Elizabeth McCloskey ("McCloskey Decl."), Ex. A (CoStar's custodian proposal).  These individuals are each senior CoStar employees who are more likely to have potentially relevant ESI.

Mr. Mason is the Vice President, Field Research, and oversees nearly 200 field research photographers who gather and curate photographs and data regarding CRE properties and listings. McCallum Decl. ¶ 4.  The field researchers that Mr. Mason oversees capture hundreds of thousands of CRE photographs each year that are utilized by CoStar's products.  *Id.*  Mr. McGetrick is the Vice President, Marketing Research, and oversees a team that includes approximately 500 employees (including managers) who contact brokers and CRE property owners to obtain information regarding CRE listings and properties to populate CoStar's products.  *Id.* ¶ 5.  And, Mr. Durant, as the Vice President, Research, oversees a team of more than 100 tenant researchers and managers who are responsible for conducting research regarding the occupants of CRE properties.  *Id.* ¶ 6.  CoStar included Mr. Mason, Mr. McGetrick, and Mr. Durant as custodians

because CREXi claims as relevant the process by which CoStar obtains CRE data and images, and they are the individuals most likely to have responsive ESI.

Mr. Mason, Mr. McGetrick, and Mr. Durant are not "lower-level" employees, as CREXi argues. Mot. at 6. They are each Vice Presidents with a combined 35 years working at CoStar, and their files will include both "strategic and decisionmaking" communications with senior executives, including their supervisor, Ms. Ruggles, as well as communications with the research teams that are implementing those strategic decisions and gathering research on a day-to-day basis. McCallum Decl. ¶¶ 3-7. Indeed, in the custodial documents CoStar has collected to date, there are more than 62,000 communications on which Ms. Ruggles is a sender or recipient, Greenwald Decl. ¶ 7, making it highly unlikely that Ms. Ruggles will have non-duplicative, relevant ESI, as pertinent communications will be captured by CoStar's current proposed custodians.

While it is correct that Mr. Mason, Mr. McGetrick, and Mr. Durant each assumed their Vice President title (a promotion from "Director") in 2018 or later, all are long-tenured CoStar employees and CoStar will review their ESI for the entirety of the relevant time period. McCallum Decl. ¶¶ 4-6; Greenwald Decl. ¶ 8.[3] Mr. Mason and Mr. McGetrick have been Vice Presidents in the research group since March 2018 and November 2018, respectively (and CoStar employees for longer), McCallum Decl. ¶¶ 4-5, and while Mr. Durant received his current title in February 2020, between November 2016 and February 2020, he was the Senior Research Director, and had many of the same responsibilities that he has now. *Id.* ¶ 6. CoStar has also collected non-custodial

---

[3]     CREXi's assertion that its custodian proposal includes "high-level C-suite executives" while CoStar's only includes "newly-hired middle management," Mot. at 2, is wrong. Mr. Mason, Mr. Durant, and Mr. McGetrick have been employed at CoStar since February 2002, August 2009, and January 2017, respectively. McCallum Decl. ¶¶ 4-6. CREXi's custodian list primarily includes individuals in Senior Vice President or Vice President roles (or lower), which is no different than CoStar's list. *See* McCloskey Decl. Exs. A, B.

documents from the research department for the entirety of the relevant time period.  Greenwald Decl. ¶ 9.

Implicitly conceding the weakness of its position, CREXi casts around for a supporting argument, and settles on the fact that Ms. Ruggles oversaw CoStar's 2019 integration of STR, a hospitality analytics company.  Mot. at 4.  This is a non sequitur at best.  STR is not a CRE product and has no relevance to this litigation (and thus CREXi has failed to articulate one).  Nor does CoStar's acquisition of STR (or Ms. Ruggles' role in the integration) have anything to do with CREXi's allegations of CoStar's supposed "market power" in the CRE market.  *Id.*

Finally, CREXi argues that Ms. Ruggles, who reports to CoStar's CEO, Andrew Florance, is a necessary custodian because CoStar's custodians will "insulate" Mr. Florance "from scrutiny." Mot. at 7.  This Court, however, denied CREXi's motion to add Mr. Florance as a custodian and there is no need for "scrutiny" of Mr. Florance.  Dkt. 111 at 8.  Regardless, excluding Ms. Ruggles will not shield communications with Mr. Florance.  CoStar's custodian list includes two senior executives who reported directly to Mr. Florance during the relevant time period (Mr. Swartz and Leah McMurtry, CoStar's former Vice President of LoopNet).[4]  McCloskey Decl. Ex. A.  CoStar's current proposal is thus more than sufficient to capture responsive documents from CoStar's research group and Ms. Ruggles is not a necessary custodian.

B.    **Max Linnington**

CREXi's request to add Mr. Linnington as a custodian is equally meritless.  CREXi argues that Mr. Linnington is a necessary custodian because Mr. Swartz, CoStar's Vice President of Sales,

---

[4]    Same as CoStar, CREXi's custodian list excludes its Founder & CEO, Michael DeGiorgio—who CoStar alleges has engaged in a pattern of misconduct, First. Am. Compl. ("FAC"), Dkt. 33, ¶¶ 17, 186-91—and only includes three individuals that report directly to Mr. DiGiorgio, just one more than CoStar.  McCloskey Decl. Ex. B.

has only been in his current role since October 2020, and absent Mr. Linnington, CREXi will be deprived of documents for the entirety of the relevant time period.  Mot. at 8.  But that is incorrect and misunderstands Mr. Swartz's and Mr. Linnington's respective roles.  CREXi also argues that Mr. Linnington's emails are needed because he executed CoStar's supposedly "anticompetitive" agreements.  *Id.*  While untrue, the proof (or lack thereof) will be in the contracts themselves, and not former executive Mr. Linnington's emails.[5]

To the extent that emails from CoStar's CRE sales team are relevant, CoStar's proposed custodians are more than sufficient.  As the Senior Vice President of Sales, Mr. Swartz oversees CoStar's sales efforts for its subscription database product.  McCallum Decl. ¶ 8.  While Mr. Swartz only assumed the title of Senior Vice President in October 2020, Mr. Swartz had high level responsibility for sales of CoStar's database in his prior role as the Regional Vice President, CoStar Sales, which he held from March 2016 to September 2020.  *Id.*  During that same time period, Mr. Linnington, as the Executive Vice President, CoStar Sales, oversaw global sales for all of CoStar's brands, including CoStar's residential apartment product, Apartments.com, which has no relevance to this case.  *Id.* ¶ 9; *see also* Dkt. 111 at 5 n.3, 7 n.6 (noting that the residential market is not relevant).  In the fall of 2020, CoStar took steps to reorganize the company and its leadership positions, and as a result, Mr. Linnington is not Mr. Swartz's predecessor.  McCallum Decl. ¶ 9.

Mr. Linnington is also not a necessary custodian because his signature appears on some customer contracts.  While CREXi argues these contracts are "anticompetitive," Mot. at 8, the three contracts that CREXi attaches to its request only undermine CREXi's theory, as there is neither an exclusivity provision in any of the agreements, nor any other "anticompetitive" terms

---

[5]     CREXi also argues that CoStar's "sales practices are relevant" because CoStar seeks an award of its "actual damages."  Mot. at 8.  But even if that were correct, CREXi does not explain why that would necessitate a review of Mr. Linnington's ***emails***.

(and, tellingly, CREXi points to none).  *See* McCloskey Decl. Exs. H-J.  Mr. Linnington's signature on those agreements is irrelevant and does not indicate that Mr. Linnington participated in the contract negotiations.  McCallum Decl. ¶ 10.  Moreover, CoStar has agreed to produce template customer agreements for the relevant time period, which is all that is necessary for CREXi to test its (demonstrably false) theory.  Greenwald Decl. ¶ 10.

In addition to Mr. Swartz, CoStar has also proposed including as custodians Mr. Lowy and Mr. Lewe, the Vice Presidents responsible for LoopNet and Ten-X sales.  McCloskey Decl. Ex. A.  And, CoStar has agreed to collect and review non-custodial documents from the sales department for the relevant time period.  Greenwald Decl. ¶ 9.  CoStar's proposal thus captures the pertinent individuals and repositories of information related to CoStar's CRE sales teams and there is no need to add Mr. Linnington as a custodian.

### C.  The Seven Individuals Who Are Supposedly "Heavy Users of CREXi"

CREXi also requests that CoStar add *seven* lower-level employees as custodians—Kristin Arzaga, Gareth Wakeman, Matthew Rogers, Clarice King, Bennett Kamps, Victoria Whitfield, and Nathan Seeto—because they are each supposedly "frequent" and "heavy" users of CREXi's website.[6]  Mot. at 9.  None of these individuals is a necessary custodian.

Crucially, while CREXi's access of CoStar's websites is relevant, CoStar's alleged access of CREXi is not.  CREXi's access and use of CoStar's websites is relevant because CoStar has demonstrated that CREXi accessed CoStar's websites more than one million times for the purpose

---

[6]  At the relevant time, Ms. Arzaga, Ms. King, Mr. Rogers, Mr. Wakeman, and Mr. Seeto were client relationship consultants, responsible for monitoring customer's use of CoStar's products and assisting them with positioning their properties on CoStar's products.  McCallum Decl. ¶ 11.  Mr. Kamps is a sales associate, an entry level employee in the sales department, and Ms. Whitfield is a LoopNet marketing advisor, who is responsible for onboarding listings into the Ten-X platform, and then into LoopNet.  *Id.*

of infringing CoStar's copyrighted images and stealing its data for use in CREXi's competing product, all in violation of CoStar's terms of use. FAC ¶¶ 4, 32. While CREXi alleges that CoStar employees have occasionally accessed CREXi's website too, CREXi does not allege that CoStar has infringed CREXi's copyrighted images, misappropriated CREXi's information, or otherwise violated CREXi's terms of use. Counterclaims, Dkt. 74, ¶¶ 165-170. Further, even if CoStar's employees were "frequently" accessing CREXi's website, that would not be a defense to any of CoStar's claims nor support any of CREXi's counterclaims, or justify collecting and reviewing tens of thousands of emails that will have nothing to do with that "access."

In any event, the seven individuals that CREXi seeks to add are not "frequent" users of CREXi. The supposed 1,000 times that CoStar employees accessed CREXi's website, Mot. at 9, pales in comparison to CREXi's more than *one million hits* on CoStar's websites. FAC ¶¶ 4, 32. And, the majority of these "hits" likely resulted from CoStar employees (including these seven individuals) clicking on links they received in marketing emails from CREXi, which encouraged such access. *See* Greenwald Decl. Ex. 3 at 53.

CREXi's only justification for needing all of these individuals' emails is that CoStar supposedly "spoliated" evidence regarding its employees' access of CREXi's website. Mot. at 9-10. That too is wrong. CoStar maintains logs regarding its employees' access to external websites for one year because maintaining these logs is burdensome and expensive (e.g., one year of outbound access data for CoStar's employees is more than 100 *tera*bytes, or *100,000 gigabytes*). McCallum Decl. ¶ 12; Greenwald Decl. Ex. 4 at 7-8. CoStar implemented a litigation hold relating to this action in July 2020, three months before it filed its complaint against CREXi; however, at that time, CoStar's external access logs were not relevant to CoStar's claims against CREXi and were not subject to the hold. McCallum Decl. ¶ 13. After CREXi brought its counterclaims in

June 2021, which put CoStar on notice of CREXi's allegations regarding CoStar's access of CREXi's website, CoStar suspended its one-year retention policy for its outbound access logs. *Id.* At that time, CoStar had outbound logs dating back to July 1, 2020, which it has provided to CREXi. Greenwald Decl. ¶¶ 12, 14, Ex. 4. While CREXi complains about CoStar's supposed failure to maintain these logs, CoStar requested the same information from CREXi but CREXi does not, and has never, preserved these logs at CREXi *at all*. *Id.* ¶ 13, Ex. 5. Even worse, after the litigation was filed, CREXi failed to instruct its agent, Arcgate, to preserve Arcgate's outbound access logs, which would have shown Arcgate's repeated access to CoStar's websites on CREXi's behalf, and as a result Arcgate deleted all of those logs during the pendency of this litigation. *Id.* ¶ 15, Ex. 6; Dkt. 100-1 ¶ 30. Thus, not only does CoStar's preservation of a year of logs cut *against* adding these seven custodians—for those logs already reflect (infrequent) evidence of access—CREXi's argument that CoStar should have even more logs only highlights CREXi's own egregious failure to preserve evidence.

Finally, in an effort to compromise with CREXi, CoStar agreed to add four of the seven individuals that CREXi requested—Ms. Arzaga, Ms. Whitfield, Mr. Rogers, and Mr. Seeto—but, because the relevance of these individuals is limited to their supposed use of CREXi's website, CoStar proposed only running the search term "CREXi" across their ESI (instead of the full set of 70+ search terms). McCloskey Decl. Ex. C at 8. CREXi rejected that proposal. *Id.* CoStar remains willing to search these four individuals' files using the search term "CREXi," but to date, CREXi has rejected that offer without explaining why such a search is insufficient.

## III. CONCLUSION

For the foregoing reasons, CoStar respectfully requests that the Court deny CREXi's Request in its entirety.

10