KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS #158708
epeters@keker.com
WARREN A. BRAUNIG #243884
wbraunig@keker.com
ELIZABETH K. MCCLOSKEY #268184
emccloskey@keker.com
NICHOLAS S. GOLDBERG #273614
ngoldberg@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Attorneys for Defendant and Counterclaimant
COMMERCIAL REAL ESTATE EXCHANGE, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> COMMERCIAL REAL ESTATE EXCHANGE, INC., <br><br> Defendant. | Case No. 2:20-cv-08819 CBM (ASx) <br><br> **DECLARATION OF ROHAN K. GEORGE IN SUPPORT OF CREXI'S MOTION TO COMPEL ARCGATE DOCUMENTS** <br><br> Judge:        Hon. Alka Sagar <br><br> Date Filed   September 25, 2020 <br><br> Trial Date:   None set |
| COMMERCIAL REAL ESTATE EXCHANGE, INC., <br><br> Counterclaimant, <br><br> v. <br><br> COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., <br><br> Counterdefendants | |

I, Rohan K. George, declare as follows:

1.      I am a partner with the law firm Samvad Partners. I advise Indian and international clients on matters relating to data protection, intermediary liability, technology contracting and content licensing. I am also actively involved in commercial dispute resolution for the firm, particularly for disputes having a technology focus, an IP focus or a Chennai focus.

2.      I have been asked to provide information regarding the state of Indian law as it concerns the without prejudice privilege.

3.      I have been retained by CREXi to represent it in other matters, but the opinions set forth in this declaration are based on my independent expert judgment, and not as an advocate for CREXi.

### *Qualifications*

4.      I graduated from NALSAR University in 2004, and completed my LLM from Columbia University as a Lawrence A. Wein fellow in 2009. I passed the New York Bar Examination in 2009 and I am registered with the Bar Council of Tamil Nādu, in India. I am an arbitrator empanelled with the Madras High Court Arbitration Centre (MHCAC) and the MCCI Arbitration, Mediation and Conciliation Centre (MAMC). I am also an accredited mediator having completed my mediation training from the Indian Institute of Corporate Affairs.

5.      I have over 18 years of experience as an attorney in India. I began my career as an associate with the corporate law firm, Amarchand Mangaldas & Suresh A. Shroff and Co. in 2004. I then worked with the policy organisations Center for Science and the Environment (CSE), and Center for Trade and Development (CENTAD), writing and consulting on matters relating to intellectual property law and policy. After completing my LLM, I returned to India in 2009 and began my

litigation practice focusing on patent litigation matters. In 2012, I joined the partnership of the law firm, Samvad Partners.

6.      I have been involved in some of the landmark decisions involving emerging technologies in India, such as *Yahoo! vs The Assistant Controller of Patents*, the first decision on software patentability in India, *Athony Clement Rubin vs Union of India*, arguing against the linkage of government issued IDs with social media accounts, and *Elsevier Ltd. & Others vs Alexandra Elbakyan & Others*, or the *Sci-Hub* litigation, a case with significant implications for open access to academic knowledge worldwide. I am also actively involved in alternative dispute resolution in the field of technology, acting on behalf of a global technology company in mediation proceedings with the State of Kerala.

7.      I have also been involved in some of the more significant commercial litigations in India, representing clients such as the Hindu Group, Tata International Pte Ltd, BWCI Pension Trustees Ltd and HDFC Ltd.

8.      I was invited and retained by the United Nations Conference on Trade and Development (UNCTAD) to conduct training programs on patent laws and technology laws for judges from Vietnam, Sri Lanka, Bangladesh, India, and Nepal. I am currently part of the core team responsible for the creation of a Cybersecurity policy for the State of Karnataka. I was invited by the Indian Institute of Technology (IIT), Madras to serve as an 'External Invitee' to the IIT-Madras Patent Filing Committee. I was also invited by NALSAR University of Law, Hyderabad to teach a one-credit course on 'Indian Patent Law from the perspective of the TRIPS Agreement', and by Sai University, Chennai to teach a two-credit seminar on 'Disputes in Emerging Technology'. I have been the co-chair of the India Conference of the International Technology Lawyers (Itechlaw) Association for the past 6 years.

2

9.      I am a recommended practitioner by Chambers Asia-Pacific for Data Protection, Dispute Resolution: Litigation, Intellectual Property and Technology, Media & Telecommunications.

10.      I have been recognised and enlisted in the Asian Legal Business's (ALB) list of India's Rising Stars 2022, a Thomson Reuters publication. ALB spotlights Indian lawyers under the age of 40 who have been making an impact in the country's legal scene. I have also been recognised as a 'Future Star' for Intellectual Property Disputes by Benchmark Litigation Asia-Pacific 2021.

11.      My curriculum vitae is attached as **Exhibit A**.

### *Indian law differs from United Kingdom law*

12.      India's courts grew from the those established by the English colonial government, but has its own unique body of laws. India inherited the common law tradition and the adversarial system of dispute resolution, but its laws are not identical to those of England.

13.      The Constitution of India, adopted in 1950, is paramount under Indian law. It establishes that the law set forth by the Supreme Court of India is binding on all courts in India. Meanwhile, for procedural court rules, the Code of Civil Procedure, Code of Criminal Procedure, and the Indian Evidence Act are the primary sources of law.

14.      India is not bound by substantive or procedural rules issued by United Kingdom courts. There are countless examples of Indian courts disregarding United Kingdom common law decisions, whether the reason be a conflict with Indian statutes, a decision to evolve the common law in India differently from the United Kingdom, or any other number of reasons. As the Supreme Court of India has stated, "the decision of the English Courts are not binding in the courts of India," and instead, such decisions are limited to the "persuasive value" of their "observations" and "reasoning." *World Wide Agencies Pvt. Ltd. v Margarat T.*

*Desor and Ors on 19*, 1990 SCC (1) 536. A true and correct copy of the *World Wide Agencies* decision is attached as **Exhibit B**.

15.    The mere fact that an Indian case cites an English case on one point does not mean that Indian law has adopted the English case cited in its entirety.

### The without prejudice rule

16.    The without prejudice doctrine is a rule of admissibility in Indian courts that prevents the admission of communications aimed at settling a dispute. There is an inferred agreement between the parties to the settlement communication that it will not be admitted against them in future proceedings, should the parties not enter a final settlement agreement of their dispute. It is common knowledge that the without prejudice rule is given force and effect in India through the Indian Evidence Act, Section 23, which specifies: "In civil cases, no admission is relevant, if it is made either upon an express condition that evidence of it is not to be given, or under circumstances from which the Court can infer that the parties agreed together that evidence of it should not be given." Numerous decisions specify that the without prejudice rule is inseparable from Section 23 of the Indian Evidence Act including *Havels India Ltd. v. Electrium Sales Ltd.*, 2013 (136) DRJ 648; *Ministry Of Road Transport v. L&T; Transportation*, (2019) O.M.P. 289/2015; and *Om Logistics Limited vs National Insurance Company*, (2017) RSA No. 82/2017. True and correct copies of the *Havels*, *Ministry of Road*, and *Om Logistics* decisions are attached as **Exhibits C**, **D**, and **E**.

17.    For the without prejudice rule to apply, the party claiming its protection must show that the communication at issue was "written for the purpose of a genuine attempt to compromise a dispute between the parties." *M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd.*, (2006) 12 SCC 673. A heading of "without prejudice" on the document may help with this determination but is not dispositive. *Id.*

***The without prejudice rule does not prevent the production of documents and does not apply once a settlement has been reached.***

18. No Indian decision of which I am aware has held that the without prejudice rule prevents the production, as opposed to admissibility, of settlement communications.

19. I am aware of the English decision of *Rush & Tompkins Ltd. v. Greater London Council* [1989] AC 1280. In that decision, the House of Lords, through the opinion of Lord Griffiths, held that the without prejudice rule prevents the discoverability of settlement communications with some exceptions. A true and correct copy of the *Rush* decision is attached as **Exhibit F**.

20. Indian courts have not adopted the understanding of the without prejudice rule in Lord Griffiths' opinion regarding production of evidence. The two seminal cases from the Supreme Court of India on the without prejudice rule are *Chairman & M.D., N.T.P.C. Ltd v. M/S. Reshmi Constrs., Builders & Contractors*, (2004) 2 SCC 663 (*Chairman*), and *Peacock Plywood Pvt. Ltd. v. The Oriental Insurance Co. Ltd.*, (2006) 12 SCC 673 ("*Peacock*"). True and correct copies of the *Chairman* and *Peacock* decisions are attached as **Exhibits G** and **H**.

21. Although *Chairman* and *Peacock* cited the *Rush* decision, neither adopted the principles in Lord Griffiths' decision in *Rush* as it relates to the discoverability of documents. Both decisions concerned issues other than discoverability. In *Chairman*, the court addressed the without prejudice rule in the context of determining whether the acceptance of an offer in a letter labeled "without prejudice" could be admitted. In *Peacock*, the court addressed the without prejudice rule to determine whether a letter labeled "without prejudice" could be used to extend the statute of limitations for a claim. Neither decision provided a ruling that the without prejudice rule would prevent the production of documents.

22. The way that *Chairman* quotes *Rush* also indicates that the Supreme Court of India rejected Lord Griffiths' opinion. In the *Chairman* decision, the

5

Supreme Court of India quoted the definition of "without prejudice" provided by the lower Court of Appeal in *Rush*, which had reached the opposite conclusion as Lord Griffiths and the House of Lords. The quote of *Rush* in the *Chairman* decision specifically concludes with the following sentence: "In particular, subject to any such modification, the parties must be taken to have intended and agreed that the privilege will cease if and when the negotiations 'without prejudice' come to fruition in a concluded agreement." This is the reasoning that the *Rush* Court of Appeal relied upon to order the production of without prejudice communications in *Rush*.

23.     From this quote of the Court of Appeal in *Chairman*, I understand that the without prejudice rule does not apply once the parties to those communications have reached a final agreement.

24.     The decision in *Peacock* also quotes *Rush*, and does so for a similar principle. The *Peacock* court states that "[i]f the purpose for which [the without prejudice rule] is used is accomplished, no legitimate claim can be allowed to be defeated thereby." The *Peacock* decision thus supports the conclusion that the without prejudice rule dissipates once a concluded settlement agreement is reached.

25.     The *Peacock* decision also cites to a treatise, Phipson on Evidence, Sixteenth Edition, which discusses the without prejudice rule. As relevant here, that treatise notes that the without prejudice rule is different from a normal privilege:

> "Without prejudice privilege is seen as a form of privilege and usually treated as such. It does not, however, have the same attributes as the law of privilege. Privilege can be waived at the behest of the party entitled to the privilege. Without prejudice privilege can only normally be waived with the consent of both parties to the correspondence. **Whilst the rule in privilege is "once privileged, always privileged", the rule for without prejudice is less straightforward, and at least in three party cases, this will not always be the position. A third distinction is that in the three party situation, which is not governed by contract, without prejudice documents are only protected in circumstances where a public policy justification can be provided, namely where the issue is whether admissions were made. That is not a principle applicable in the law of privilege. Fourthly, whereas legal professional privilege is a substantive right, without prejudice privilege is generally a rule of**

6

admissibility, either based on a contractual, or implied contractual right, or on public policy. This may have consequences relevant to proper law issues. Finally, if a party comes into possession of a privileged document, subject to equitable relief for breach of confidence, there is no reason why he should not use it and it will be admissible in evidence. But the mere fact that a party has a without prejudice document does not entitle him to use it without the consent of other party." (*emphasis added*)

26.    The Supreme Court of India, from citing this passage in Phipson on Evidence, notes, *inter alia*, the principles that (1) the without prejudice privilege is a rule of admissibility only, not a "substantive right"; and (2) in a three-party situation, there must be a "public policy justification" to apply the rule, that is, it only potentially applies in three-party situations where "the issue is whether admissions were made."

27.    I understand that the plaintiffs in this case have cited the Competition Commission of India's ("CCI's") January 31, 2018 decision in *Matrimony.Com Limited vs Google Llc & Others* because it briefly discussed the without prejudice rule. A true and correct copy of the CCI's decision is attached as **Exhibit I**. As an initial matter, the CCI's decisions are quasi-judicial decisions that do not add to the body of precedent that is binding on Indian courts, and so the *Matrimony.com* decision does not demonstrate the content of Indian law. In addition, the *Matrimony.com* case solely addressed an issue of admissibility, namely, whether Google's "voluntary draft commitments" in prior regulatory proceedings in other jurisdictions could be used as evidence in the CCI's regulatory proceedings. Though the CCI quoted the *Rush* decision, it did so carefully, and only cited portions of the House of Lords decision that addressed admissibility issues. Specifically, at paragraph 160, it quoted portions of the *Rush* decision that stated that the "the 'without prejudice rule' is a rule governing the admissibility of evidence" and that "[n]early all the cases in which the scope of [the] without prejudice rule has been considered concern the admissibility of the evidence atrial after negotiations have failed."

7

28.     It is also unclear whether the CCI was applying the without prejudice rule in its traditional sense. Voluntary concessions in a regulatory proceeding are not necessarily the same as statements made during negotiations between two private parties. In addition, many of the public policy considerations the CCI described as the basis for applying the without prejudice rule were unique to the regulatory sphere. Specifically, the CCI stated at paragraph 156 the public policy rationale for applying the without prejudice rule as follows:

> It may be observed that if voluntary concessions offered by the parties in separate proceedings and different jurisdictions in different settings are referred to and relied upon by the investigators in another [sic] jurisdictions to base findings of contraventions, the consequences would be enormous. On the one hand, it may unduly prejudice the cause of such party and thereby may have the potential to vitiate the findings. And on the other hand, such an approach would run contrary to public policy as the parties would be deterred from making even reasonable concession to avoid a costly and protracted litigation.

Though these rationales overlap with those affecting private parties negotiating settlements, they are specifically addressing regulatory concerns. *Matrimony.com* thus does not provide generally applicable guidance regarding the without prejudice rule.

***The without prejudice rule does not apply to independent issues or to individuals not party to the without prejudice communication.***

29.     The terms of the without prejudice rule and Evidence Act Section 23 do not apply to claims independent of the disputed issue being negotiated. In *Havels India Ltd. v. Electrium Sales Ltd.*, 2013 (136) DRJ 648, attached as Exhibit C, one party argued that the without prejudice rule and Section 23 prevented the enforcement of an arbitration agreement between the parties, because the invocation of arbitration occurred in a "without prejudice" letter that was also used to negotiate the substance of the parties' dispute. *Id.* at *12. The Delhi High Court rejected that argument. *Id.* at *12-*13. The court reasoned that even though the letter involved negotiations over the substance of the parties' dispute, the letter was being admitted to prove an "independent cause of action regarding the invocation of the arbitration

8

clause." *Id.* This case stands for the principle that without prejudice communications can be admitted on issues that are independent of the dispute being negotiated in the without prejudice communication.

30.     The terms of the without prejudice rule also do not apply to third parties, except potentially where "public policy" justifies it. Evidence Act Section 23 is worded such that it applies where "the parties agreed together that evidence of it should not be given." But where a third party wants to introduce evidence of two other parties, not all parties have "agreed together" that the evidence "should not be given." This observation of the limits of Evidence Act Section 23 comport with the Supreme Court of India's decision in *Peacock* and its citation to Phipson, which observed that in third party situations, a "public policy justification" is necessary to apply the rule. And as the Phipson treatise observed, such public policy justifications only exist "where the issue is whether admissions were made." Where the issue is not whether admissions were made, but where the evidence is used to undermine the credibility of a witness or to show impropriety of some sort, the public policy justification does not require any bar to admissibility.

### *There are numerous exceptions to the without prejudice privilege*

31.     Although Indian courts have not adopted the version of the without prejudice rule stated in United Kingdom decisions, I understand that CoStar has asserted that such adoption has taken place, at least as to the *Rush* decision. Even if *in arguendo* such adoption has occurred, the United Kingdom exceptions to the without prejudice rule would also apply.

32.     In *Rush*, Lord Griffiths' opinion discussed the existence of exceptions to the without prejudice rule. The *Rush* decision states that the without prejudice privilege will not apply "when the justice of the case requires it." *Rush*, [1989] AC 1280, at 1300. Some examples that *Rush* cites include instances where the privilege is used to "suppress a threat if an offer is not accepted."

33.     Later United Kingdom case law has added additional categories of exceptions. For example, the without prejudice privilege may not be invoked if it is used "as a cloak for perjury, blackmail or other 'unambiguous impropriety.'" *Unilever plc v. The Proctor & Gamble Co.* (2001) 1 ER 783. Another exception exists where it is asserted that the negotiation should be set aside "on the ground of misrepresentation, fraud or undue influence." *Id.* at 792. There is also an exception when the purpose of the documents is "unconnected to the truth or falsity of anything stated in the negotiations." *Id.* One such example is when the communications are used to show a failure of one party to mitigate his or her losses. *Id.* A true and correct copy of the *Unilever* decision is attached as **Exhibit J**.

34.     Separate from English law, Indian courts also find exceptions to the without prejudice privilege. For example, when a party submits a false or misleading document to a court, the without prejudice rule does not prevent the admissibility of without prejudice communications showing that the document was misleading. In *Zatrix Limited v. MV Nikoforos*, (2020) R/O.J.APPEAL NO. 18 of 2018, for example, the plaintiff had filed a petition for a warrant of arrest to seize a boat, but in doing so failed to attach material evidence that was located in without prejudice communications. The counsel for the appellant, one Mr. Soparkar, sought to rely on portions of the Supreme Court of India's decision in *Chairman* to argue the applicability of the without prejudice rule to the disclosure to the court of such material evidence. The High Court of Gujarat held that the without prejudice rule was improperly applied:

> The Court therefore is of the opinion that by withholding the vital documents and not disclosing the correct facts in the plaint, the appellant plaintiff had suppressed material facts from the Court and had also committed fraud on the Court as also on the other side. The submission of Mr. Soparkar that the erstwhile owners having not fully complied with the terms of the settlement agreement entered into with the plaintiff and the emails dated 06.12.2016 addressed by the plaintiff and their attorney to the Buyers being "without prejudice", the consent given by the plaintiff for the sale of the defendant vessel was of no significance, has no force. If there were disputes pending between the plaintiff and the erstwhile owners, in respect of fulfillment of the

settlement and release agreement executed between them, that would not justify the act of plaintiff in withholding the material documents/e-mails from the Court, while seeking ex parte order of arrest of the vessel, already purchased by the Buyers from the erstwhile owners with the consent of the plaintiff one year prior to the order of arrest. The decision of the Supreme Court in case of Chairman and M.D., N.T.P.C. Ltd (supra) relied upon by the learned Senior Advocate Mr. Soparkar for the purpose of interpretation of the words "without prejudice" has no relevance to the facts of the present case..

*Zatrix Limited*, at *17-*18. A true and correct copy of the *Zatrix Limited* decision is attached as **Exhibit K**.

35.     Indian courts thus enforce principles of equity to prevent the use of the without prejudice privilege to hide the truth or commit a wrong.

***The search for truth is the primary goal in Indian courts***

36.     Section 165 of the Indian Evidence Act states that "[t]he judge may, in order to discover or to obtain proper proof of relevant facts, ask any question he pleases, in any form, at any time, of any witness, or of the parties, about any fact relevant or irrelevant; and may order the production of any document or thing; and neither the parties nor their agents shall be entitled to make any objection to any such question or order, nor, without the leave of the Court, to cross-examine any witness upon any answer given in reply to any such question." Although there are exceptions to the Court's power to order production of documents, such as communications between an attorney and his or her client, there is no exception specifically provided for without prejudice documents or evidence deemed inadmissible under Section 23.

37.     Speaking to Section 165, the Supreme Court of India has held that "[e]very trial is a voyage of discovery in which truth is the quest." *Ritesh Tewari & Anr v. State Of U.P.& Ors*, (2010) CIVIL APPEAL NO.8178/2010. "Therefore, power is to be exercised with an object to subserve the cause of justice and public interest, and for getting the evidence in aid of a just decision and to uphold the truth." *Id.*; *see also Ved Parkash Kharbanda v. Vimal Bindal* (2013) 198 DLT 555. Pursuant to this interest, Section 165 of the Indian Evidence Act "empowers the

11

Court to ask questions relevant, irrelevant or unrelated to the case to the party to ascertain the true facts." True and correct copies of the *Ritesh* and *Ved Parkash* decisions are attached as **Exhibit L** and **M**.

38.   In my opinion, under these principles, a judge would be able to directly ask questions about and order the production of documents related to the substance of without prejudice communications, regardless of their admissibility.

I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.  Executed on July 22, 2022, in, India.

_____
Rohan K. George

# EXHIBIT A

# Rohan. K. George

---

No. 1, East Coast Road, Pattipulam, Kanchipuram 603104 ● +919710286750 ● rohangeorge@gmail.com

## EXPERIENCE

**Samvad Partners,** Chennai, India                                    February 2013 - Present
*Partner-in-charge Chennai, Head of IP Practice*
- Disputes – Representative Matters
  - *Alexandra Elbakyan*, founder of the Open Access website Sci-Hub, in copyright infringement litigation by Elsevier Ltd and a number of other academic publishers before the Delhi High Court – See *Elsevier et al vs Alexandra Elbakyan and others*
  - *HDFC Ltd,* in different domain name disputes against cybersquatters through the UNDRP Online Dispute Resolution system
  - *Mahua Moitra,* as an intervenor in the *Athony Clement Rubin vs Union of India* writ petition, against the compulsory linkage of government identification with social media accounts
  - *The Hindu Group*, publishers of the Hindu, in a series of litigations and in mediation proceedings in matters involving commercial and corporate law before the Madras High Court, the Delhi High Court, the National Company Law Tribunal and the Supreme Court -
  - A major American real estate platform services provider, in litigation advice and strategy regarding copyright and trade secret infringement proceedings instituted by its competitor against its vendors in India
  - A multinational technology solutions company, in mediation proceedings with the Government of Kerala
  - *The Centre for Development of Telematics (C-DOT)* in arbitration-related litigation against the Sanmar Group
  - *Trojan Horse Media Pvt Ltd* in contract litigation over a popular OTT-format television show, and in related negotiations with *Greed Goddess Media*, resulting in a successful settlement of the dispute between them
  - *BWCI Pension Trustees Ltd*, the largest actuarial and actuarial consultancy firm in any International Finance Centre globally, in commercial litigations before the Madras High Court, the Supreme Court and in Court-instituted mediation proceedings
  - *Diageo Holdings Netherlands BV* in proceedings regarding the Kingfisher group of companies before the Debt Recovery Appellate Tribunal
  - *Tata International Singapore Pte Ltd* in commercial litigation before the Madras High Court resulting in a settlement in favour of the client
  - Currently presiding over two disputes before the *Madras High Court Arbitration and Centre (MHCAC)* as Sole Arbitrator

- Technology Practice
  - Represented clients in technology contract advisory, drafting, review and negotiations – A representative list of clients includes *Sundaram Finance Ltd, Reliance Brands Ltd, Freshworks Ltd, Practo Technologies Pvt Ltd, Delhivery Ltd, Nobroker Technology Solutions Pvt Ltd* and *Healthium Medtech Pvt Ltd*
  - Advising clients on Indian data protection laws and preliminary advice on the migration to the GDPR – A representative list of clients includes *HDFC Ltd, LG Electronics Inc, Sundaram Finance*

*Ltd, Daiwa Corporate Advisory Pvt Ltd, Scania AB, UNBXD Pvt Ltd* and *DHIWay Networks Pvt Ltd,*

- <u>Intellectual Property Practice</u>
  - Coordinated trademark filing strategy, filed trademark applications, represented clients at hearings before the trademark registry and negotiated trademark licensing and assignment agreements on behalf of clients – A representative list includes *Healthium Medtech Pvt Ltd, Firestar Holdings Ltd, Zapr Media Labs and Khodays India Pvt Ltd*
  - Advised on patent drafting and filing strategy, filed patent Indian and international patent applications, appeared at hearings before the patent registry and negotiated patent licensing and assignment agreements on behalf of clients – a representative list includes *MMTS GmBH, Sud Chemie India Pvt Ltd and Manufacturing Systems Inc.*

- <u>Policy and Academia</u>
  - Engaged with the *United Nations Conference on Trade and Development (UNCTAD)* as a trainer in workshops on patent laws for judges of the courts of India, Nepal, Bangladesh, Sri Lanka and Vietnam
  - Co-chaired the *International Technology Lawyers (Itechlaw)* India International Conference from 2017 to 2021
  - Special Invitee to the *IIT Madras* Patent Filing Committee from 2019 till date
  - Taught a one-credit Seminar at NALSAR University in 2015 on *'Indian Patent Law from the perspective of the TRIPS Agreement'*

**RKG Associates,** Chennai, India                    December 2011 – February 2013
Worked as an independent counsel advising on technology law, intellectual property, and litigation issues – Clients include Reliance Life Sciences, Bombay Jayashree, Kasturi & Sons Ltd, the Centre for Internet and Society (CIS) and the Drug Controller General of India (DCGI)

**Ali Associates,** Chennai, India                    September 2009 – November 2011
*Associate*
- Assisted in arguments before the Madras High Court in India's first litigation on quia timet in patent infringement suits – See *Matrix Laboratories v. Hoffman LaRoche and Another*
- Assisted in arguments before the Intellectual Property Appellate Board in the first decision on software patentability in India – See *Yahoo! Inc. v. Controller of Patents and Others*
- Assisted in revocation of patents proceedings before the Intellectual Property Appellate Board

**Centre for Trade and Development (Centad),** New Delhi, India          September 2007 – April 2008
*Research Consultant*
- Prepared a report on '*Identification of Novelty & Inventive Step in Traditional Knowledge based Inventions*', for the Department of Industry, Indian Ministry of Commerce and Industry.
- Performed lobbying, research and organisational activities for Centad's Access to Medicines program.
- Prepared briefing materials and presentations on the International and Indian legal scenario on Transfer of Technology and Climate Change for the UNFCCC Negotiations at Bonn, Germany, June, 2008.

**Centre for Science and the Environment(CSE)**, New Delhi, India   February 2007–September 2007
*Consultant*
- Worked as a journalist for the magazine, *Down to Earth*, on technology and human rights issues.

Covered issues concerning internet access, compulsory licensing, generic pharmaceuticals and political issues in computer gaming.
- Consulted with CSE on legal issues relating to copyright infringement, media law issues and legal issues concerning open access to article databases.

**Amarchand & Mangaldas & Suresh A. Shroff & Co.,** New Delhi, India          July 2004 – June 2006
*Associate*
- Assisted in the prosecution of patents relating to electronics, electrical appliances, medical products and pharmaceutical processes.
- Prepared reports on data exclusivity, interoperability, software patentability, internet regulation and intellectual property-competition law issues, briefed government officials and attended related conferences and seminars on behalf of the firm.
- Negotiated and drafted shareholder, joint venture, asset purchase, escrow and other transaction agreements required for mergers and acquisitions in the software technology industry.

## EDUCATION

**Columbia Law School,** New York, NY

LLM received in May, 2009
Lawrence A. Wien Fellow, 2008-2009
Highlighted Courses:  Patents, Copyrights, Law and Emerging Technologies, Jurisprudence
Activities:            Columbia Law <u>Revue</u>, Member

**NALSAR University,** Hyderabad

BA and LLB (Honours) received on June, 2004
Activities:            NALSAR Student Union, President – 2003-2004
                       Member of the Committee for drafting the First NALSAR Student Constitution

## ADDITIONAL INFORMATION
**Bar Qualifications: Admitted** as an Advocate to the Bar Council of Tamil Nadu on January 19, 2007.
            **Passed** the New York Bar Examination in 2009

**Other Accreditations / Affiliations:**
- Accredited Mediator empanelled with the National Company Law Tribunal, Chennai Bench
- Arbitrator empanelled with the *Madras High Court Arbitration Centre (MHCAC)* and the *MCCI Arbitration, Mediation and Conciliation Centre (MAMC)*

**Publications**
- Does One Size Fit All? A Comparative Study to Determine an Alternative to International Patent Harmonization – Available at <u>SSRN</u>
- We Must Adapt to EU Data Privacy Rules – Available at <u>The Hindu BusinessLine</u>

# EXHIBIT B

World Wide Agencies Pvt. Ltd. And ... vs Mrs. Margarat T. Desor And Ors on 19 December, 1989

Supreme Court of India

World Wide Agencies Pvt. Ltd. And ... vs Mrs. Margarat T. Desor And Ors on 19 December, 1989

Equivalent citations: 1990 AIR 737, 1989 SCR Supl. (2) 545

Author: S Mukharji

Bench: Mukharji, Sabyasachi (Cj)

```
                PETITIONER:
    WORLD WIDE AGENCIES PVT. LTD. AND ANR.

            Vs.

    RESPONDENT:
    MRS. MARGARAT T. DESOR AND ORS.

    DATE OF JUDGMENT19/12/1989

    BENCH:
    MUKHARJI, SABYASACHI (CJ)
    BENCH:
    MUKHARJI, SABYASACHI (CJ)
    RAY, B.C. (J)

    CITATION:
     1990 AIR  737          1989 SCR  Supl. (2) 545
     1990 SCC  (1) 536      JT 1989  Supl.    413
     1989 SCALE  (2)1473


    ACT:
        Companies Act, 1956---Sections 109, 397 and 398--Whether
    a  person  not registered as member of company  entitled  to
    move petition for winding up.



    HEADNOTE:
        The appellant No. 1 is a private limited Company  incor-
    porated  under the Indian Companies Act. The Company had  at
    all  relevant times 7 share-holders and the total number  of
    shares subscribed and paid up was 2010 shares. The appellant
    No.  2 is a shareholder and a whole-time  Director  of  the
    Company. Consequent upon the death of one share-holder,  Mr.
    S.K. Desor, who had controlling interest in the Company, his
    legal representatives, wife and children respondents herein.
    filed a petition under Section 397 and 398 of the Act and in
    the  alternative  prayed for winding up of  the  company.  A
    preliminary objection was raised on behalf of Mrs. Amrit  K.
    Singh, appellant No. 2 regarding the maintainability of  the
    petition on the ground that the respondents were not members
    of  the company as their names had not been recorded in  the
    register of members and as such they had no locus standi  to
    file the petition in question. A further objection was  also
    taken  that a composite petition under Sections 397 and    398
```

World Wide Agencies Pvt. Ltd. And ... vs Mrs. Margarat T. Desor And Ors on 19 December, 1989

of the Act with an alternative prayer for winding up of the company was not maintainable.

A company Judge of the High Court before whom the petition came up for hearing held that the respondents who were the wife and children of the deceased share-holder and who having obtained Reserve Bank's permission and letters of administration according to law should be treated as members for the purpose of maintaining a petition under Sections 397 and 398 of the Act. The company Judge also held that a composite petition was maintainable.

Appellant No. 2 preferred an appeal against the order of the Company Judge. The appellants also moved this Court under Article 136 of the Constitution against the order of the Company Judge. This court by its order dated 18th January 1989 stayed the further proceedings before the Single Judge and directed expeditious disposal of the appeal. The Division Bench dismissed the appeal holding that the petition under

546

Sections 397 and 398 was maintainable. Hence this appeal.

The same two questions as stated above arose for determination by this Court,

Dismissing the appeal, this Court,

HELD: Succession is not kept in abeyance and the property of the deceased member vests in the legal representatives on the death of the deceased and they should be permitted to act for the deceased member for the purpose of transfer of shares under Section 109 of the Act. [558D]

In some situations and contingencies, the 'member' may be different from a 'holder'. A 'member' may be a 'holder' of shares but a 'holder' may not be a 'member'. [558E]

To hold that the legal representatives of a deceased shareholder could not be given the same right of a member under Sections 397and 398 of the Act would be taking a hyper-technical view which does not advance the cause of enquiry or justice. [558B]

In the instant case, the legal representatives have been more than anxious to get their names put on the register of members in place of deceased member, who was the Managing Director and Chairman of the company and had the controlling interest. It would. therefore, be wrong to insist that their names must be first put on the register before they can move an application under Sections 397 and 398 of the Act. This would frustrate the very purpose of the necessity of action. [558F-G]

The decision of the English courts are not binding on the courts in India. But the observations or the reasoning are of persuasive value. [555C]

Re Jermyn Street Turkish Baths Ltd., [1970] 3 All E.R. 37; Re Bayswater Trading Co. Ltd. [1970] 1 All E.R. 608; James v. Quena Venture Nitrate Grounds Syndicate Ltd., [1896] 1 Chancery Division 456; Re Dlewellyn v. Kasintoe Rubber Estate Ltd., [1914] 15 All E.R. 558; New Zealand Gold

World Wide Agencies Pvt. Ltd. And ... vs Mrs. Margarat T. Desor And Ors on 19 December, 1989

```
Extraction Company, (Newberyvautin Process) Ltd. v. Peocock,
[1948]  1 Q.B. 622; Re Meyer Dougals Pty Ltd.,  [1965]  V.R.
638;  Kedar Nath Agarwal v. Jay Engg. Works Ltd.  and  Ors.,
[1963]  33  Company Cases 102; Rajahmundry  Electric  Supply
Corpn. Ltd. v. A. Nageshwara Rao and Ors., AIR 1956 SC  213;
Life Insurance Corporation of India v.Escorts Ltd. and Ors.,
AIR 1986 SC
547
1370 at p. 1412; Shanti Prasad Jain v. Kalinga Tubes, [1965]
35 Company Cases 363 and Bilasrai Joharmal and Ors. v. Akola
Electric  Supply  Co. Pvt. Ltd., 20 Company Cases  549,  re-
ferred to.
```

```
JUDGMENT:
```

CIVIL APPELLATE JURISDICTION: Civil Appeal No. 5 186 of 1989.

From the Judgment and Order dated 31.8.1989 of the Delhi High Court in Company Appeal No. 35 of 1988. F.S. Nariman, Ashok K. Mahajan and Subhash Sharma for the Appellants.

Anil B. Devan and Vinoo Bhagat for the Respondents. The Judgment of the Court was delivered by SABYASACHI MUKHARJI, CJ. Leave granted.

This is an appeal from the judgment and order of the Division Bench of the High Court of Delhi, dated 31st Au- gust, 1989. The appellant No. 1--M/s World Wide Agencies (P) Ltd. is a private limited company incorporated under the provisions of the Indian Companies Act, 1956 (hereinafter referred to as 'the Act') to which Table 'A' of Schedule 1 to the Act applies, as stipulated under the Articles of Association of the company. As per the memorandum of associ- ation the appellant company was carrying on the business of travel agents at G-40, Connaught Circus, New Delhi. The authorised Share capital of the company was to the tune of Rs.5 lakhs divided into 5000 equity shares of Rs. 100 each. The paid up capital as per the last annual return filed by the company with the Registrar of Companies, was Rs.2,01,000. The company had at all relevant times 7 share- holders and the total number of shares subscribed and paid up was 2010 shares.

The appellant No. 2 Mrs. Amrit Kaur Singh, at all rele- vant times, was a shareholder holding 545 fully paid up shares in the share capital of the company, and was also the whole-time working Director of the company, holding the office from 1974 onwards. Late Mr. S.K. Desor was a British national. He held 600 shares in the said company, acquired by him from the Ex-Managing Director Mr. Amrik Singh Saluja and his family. The respondents Nos. 2 & 3 to this appeal are children of late Mr. S.K. Desor who died on 5th March, 1985. As per the certified copy of the annual return made up to 15th February, 1984 the shareholders of appellant No. 1 (company) were as fol- lows:

```
Mr. S.K. Desor                  600 shares
Mrs. Amrit Kaur Singh           545 shares
Mr. Yash Pal Malhotra           250 shares
Mrs. Amrit Gupta                200 shares
```

World Wide Agencies Pvt. Ltd. And ... vs Mrs. Margarat T. Desor And Ors on 19 December, 1989

```
Mrs. Savitri Devi Kohli                    5 shares
Mr. A.S. Saluja                            5 shares
Mr. Balwant Singh                        405 shares
                                        2010 shares
```

A petition under ss. 397 & 398 of the Act and in the alternative for winding up of the company was
filed by the respondents on 25th March, 1985, wherein it was alleged that on 12th March, 1985
respondent No. 1, being the widow of late Mr. S.K. Desor, applied as a legal heir of late S.K. Desor to
the Board of Directors of the appellantcompany for transmission of 850 shares held by her late
husband. It is stated that the shares of Yash Pal Malhotra had been ac- quired by late Mr. S.K.
Desor; and that respondent No. 1 filed an affidavit of her daughter Ms. Kim Paul, relinquish- ing her
claim to the shares of her late father. The Board of Directors resolved that they had no objection to
transmis- sion of the shares held by Mr. S.K. Desor but the actual transmission would take place on
respondent No. 1's obtain- ing Reserve Bank of India's permission and the succession certificate.
The respondent No. 1's application for allot- ment of 5 shares as per her letter of the same date was
allowed by the Board of Directors, and it was resolved that in view of allotment of these shares, her
interest in the shares of her late husband, she be appointed as a Director of the company, subject to
Reserve Bank of India's permis- sion.

It is stated in the judgment under appeal that at the said meeting of the Board of Directors, they
recorded their deep appreciation for the services rendered by late Mr. S.K. Desor as Managing
Directorcum-Chairman of the company, and. mourned his passing away. The quorum of the said
meeting was two--Mrs. Amrit Gupta and Mrs. Savitri Devi Kohli. It is recorded in the judgment
under appeal that on 23rd March, 1985 the Board of Directors held another meeting. The minutes of
the meeting of 12th March, 1985 were confirmed by the two above-mentioned Directors. The third
Director, Mrs. Amrit K. Singh, however, objected as she stated that she had not been informed of the
last meeting. Various averments had been made in the petition with regard to oppression and
removal of certain valuables of Mrs. Amrit K. Singh and illegal operation of the bank ac- count etc. It
was also asserted that Mrs. Singh was holding 545 shares benami and these in fact belonged to Mr.
S.K. Desor.

A preliminary objection was raised on behalf of Mrs. Amrit K. Singh regarding the maintainability of
the petition on the ground that the appellants were not members of the company as their names had
not been recorded in the register of members. A further objection was taken that a composite
petition under ss. 397 & 398 of the Act with an alternative prayer for winding up of the company was
not maintainable. The learned single Judge of the High Court sitting as a Company Judge dealt with
the application and held that the appellants who were the wife and children of late Mr. S.K. Desor
and had obtained letters of administration. u/s 290 of the Indian Succession Act read with s. 273 of
the Act, as also the permission of the Reserve Bank of India, should be treated as members for the
purpose of maintaining a petition u/ss. 397 & 398 of the Act. The learned single Judge also held that
a composite petition was maintainable. The appellant Mrs. Amrit K. Singh filed an appeal for herself
and, as she alleged, as "Working Director" from the judgment and order dated 21st September, 1988
of the learned single Judge. It appears that the appellants, aggrieved thereby, had also moved this
Court under art. 136 of the Constitution. This Court by its order dated 18th January, 1989 stayed the
further proceedings before the learned single Judge and directed expeditious disposal of the appeal

pending before the division bench or the High Court, from the said order of 21st September, 1988 which had been admit- ted on 13th October, 1988, for consideration by the Division Bench of the High Court of the application for. directions. By a judgment and order delivered on 31st August 1989 the Division Bench dismissed the said appeal and held that the petition u/s. 397 & 398 was maintainable by the respondents in the facts and circumstances of the case, and that a composite petition u/ss. 397,398 & 433(f) of the Act was maintainable. Aggrieved thereby, the appellants preferred this appeal to this Court.

We are concerned with two questions of law, namely, whether the legal heirs of a deceased shareholder can be treated as members of the company for the purpose of main- taining a petition u/ss. 397 & 398 of the Act, and whether a composite petition under ss. 397, 398 & 433(f) of the Act is maintainable. We had the advantage of hearing Mr. F.S. Nariman, counsel for the appellants and Mr. Anil Diwan for the respondents. It may be mentioned that during the pendency of the appeal before the High Court, without prejudice to the rights and contentions of the parties, an emergent meeting of the Board of Directors was directed by the High Court to be held on 28th January, 1989 to consider the question of registration of 450 shares belonging to the deceased Mr. S.K. Desor in the name of Mrs. Margarat T. Desor and her son Sameer K. Desor, being re- spondents Nos. 1 & 3 respectively. It further appears that as per the directions of the Division Bench, dated 27th January, 1989 the court had appointed Chairman Mr. C.K. Mahajan and Mrs. Margarat T. Desor were not permitted to vote at the said meeting. At a meeting held subsequent thereto, by a majority, it was resolved not to register the respondents Nos. 1 & 3 as members. It must, however, be noted that the Division Bench vide its order dated 27th January, 1989 had directed that no effect would be given to the said Resolution.

The question, therefore, which is material to be consid- ered, is, whether the legal heirs of a deceased shareholder whose names are not entered in the register of members, are entitled to maintain petition u/ss. 397 & 398 of the Act. It was contended on behalf of the appellants that ss. 397 & 398 of the Act must be strictly construed.

Section 397 of the Act which is in chapter VI of the Act under the heading "Prevention of Oppression and Mismanage- ment", provides as follows:

> "Application to Court for relief in cases of oppression.(1) Any member of a company who complains that the affairs of the company are being conducted in a manner prejudicial to public interest or in a manner oppressive to any member or members including any one or more of themselves may apply to the Court for an order under this section, provided such members have a right so to apply in virtue of section 399.

> (2) If, on any application under sub-section (1), the Court is of the opinion--

> (a) that the company's affairs are being conducted in a manner prejudicial to public interest or in a manner oppressive to any member or members, and

World Wide Agencies Pvt. Ltd. And ... vs Mrs. Margaret T. Desor And Ors on 19 December, 1989

(b) that to wind-up the company would unfairly prejudice such member or members, but that otherwise the fact would justify the making of a winding-up order on the ground that it was just and equitable that the company should be wound-up;

the Court may, with a view to bringing to an end the matters complained of, make such order as it thinks fit."

On behalf of the appellants it was contended that the right which is a specific statutory right, is given only to a member of the company and until and unless one is a member of the company, there is no right to maintain application u/s 397 of the Act. Mr. Nariman contended that there was no automatic transmission of shares in the case of death of a shareholder to his legal heir and representatives, and the Board has a discretion and can refuse to register the shares. Hence, the legal representatives had no locus standi to maintain an application u/ss. 387 & 398 of the Act. Mr. Nariman submitted that the rights under ss. 397 & 398 of the Act are statutory rights and must be strictly construed in the terms of the Statute. The right, it was submitted, was given to "any member" of a company and it should not be enlarged to include "any one who may be entitled to become a member".

In order to decide the question involved, it would be necessary to examine certain provisions of the Act. Section 2(27) of the Act states that "member" in relation to company does not include a bearer of a share-warrant of the company issued in pursuance of section 114 of the Act. Section 41 of the Act provides as follows:

"(1) The subscribers of the memorandum of a company shall be deemed to have agreed to become members of the company, and on its registration, shall be entered as members in its register of members.

(2) Every other person who agreed in writing to become a member of a company and whose name is entered in its register of members, shall be a member of the company."

Section 26 of the English Companies Act, 1948 in sub-

stantially the same.

Section 109 of the Act states as follows:

"A transfer of the share or other interest in a company of a deceased member thereof made by his legal representative shall, although the legal representative is not himself a member, be as valid as if he had been a member at the time of the execution of the instrument of trans- fer."

In this connection, it would be relevant to refer to Articles 25 to 28 of Table A of the Act, which deal with the transmission of shares and which are in the following terms:

World Wide Agencies Pvt. Ltd. And ... vs Mrs. Margarat T. Desor And Ors on 19 December, 1989

"25.(1) On the death of a member the survivor where the member was a joint ,holder, and his legal representatives where he was a sole holder, shall be the only persons recognised by the company as having any title to his interest in the shares.

(2) Nothing in clause (1) shall release the estate of a deceased joint holder from any liability in respect of any share which had been jointly held by him with other persons.

26.(1) Any person becoming entitled to a share in consequence of the death or insolvency of a member may, upon such evidence being produced as may from time to time properly be required by the Board and subject as hereinafter pro- vided, elect, either--

(a) to be registered himself as holder of the share; or

(b) to make such transfer of the share as the deceased or insolvent member could have made. (2) The Board shall, in either case, have the same right to decline or suspend registration as it would have had, if the deceased or insolvent member had transferred the share before his death of insolvency.

27. (1) If the person so becoming entitled shall elect to be registered as holder of the share himself, he shall deliver or send to the company a notice in writing signed by him stating that he so elects.

(2) If the person aforesaid shall elect to transfer the share, he shall testify his election by executing a transfer of the share.

(3) All the limitations, restrictions and provisions of these regulations resulting to the right to transfer and the registration of transfers of shares shall be applicable to any such notice or transfer as aforesaid as if the death or insolvency of the member had not occurred and the notice or transfer were a transfer signed by that member.

28. A person becoming entitled to a share by reason of the death or insolvency of the holder shall be entitled to the same dividends or other advantages to which he would be entitled if he were the registered holder of the share, except that he shall not, become being registered as a member in respect of the share, be entitled in respect of it to exer- cise any right conferred by membership in relation to meetings of the company: Provided that the Board may, at any time, give notice requiring any such person to elect either to be registered himself or to transfer the share, and if the notice is not complied with within ninety days, the Board may thereafter withhold payment of all divi- dends, bonuses or other moneys payable in respect of the share, until the requirements of the notice have been complied with."

Article 28 is more or less in para materia to articles 32 of Table A to the English Companies Act. It may also be mentioned, as it' has been mentioned by the High Court, that s. 210 of the English Companies Act, before its amendment in 1990, was substantially the same as s. 397 of the Act. As mentioned hereinbefore, it is the admitted case of the parties that the regulation for management of the compa- ny as contained in Table A to the Act apply to appellant No. 1 and the said relevant provision in the articles of associ- ation of the company regarding transfer of shares is Article 17, which is as follows:

> "No share shall be transferred to any person other than a shareholder of the company so long as any member of the company is willing to purchase the same at fair value. This clause shall not apply to the executor of administrator of a deceased shareholder, if there is will or to the heir or lineal decend- ents where no letter of administration has been taken."

> Mr. Nariman submits that in view of the specific provi-

sions of s. 397 of the Act only a member is entitled to move a petition under ss. 397 and 398 of the Act and that member is one whose name is in the register of members in view of s. 41 of the Act, as mentioned hereinbefore. In this connec- tion, it is was emphasised that not only must the applicant be a member but in terms of s. 399 of the Act, he has to fulfil the conditions laid down under clauses (a) and (b) of s. 399 of the Act. These should be construed so as to mean what the words say. According to Mr. Nariman, a member is not, in view of the scheme of the Act, the representative of a deceased member.

It is true that it must be a member and s. 41 of the Act provides that a member of a company is a person who has applied in writing and "whose name is entered in the regis- ter of members" is entitled to move the petition. It appears in this case that names of respondent Nos. 2 and 3 had not then been entered in the register of members at the relevant time when the application was made. But the name of Late Shri S.K. Desor was still on the register of members and the requisite shareholding for moving a petition under ss. 397 and 398 of the Act was held by him. This question, though res integra so far as this country is concerned, has been considered in England, where Pennycuick, J. had occasion to consider this in Re Jermyn Street Turkish Baths Ltd., [1970] 3 All E.R. 57. The Company there was incorporated in 1946 and represented a joint venture by L and S. In 1952, S transferred his shareholding to Mrs. P who became a director of the company. L died in 1953 and thereafter Mrs. P was mainly responsible for the company's affairs. The petition- ers therein were appointed administrators in L's estate in 1960, and in 1961, at their request, the names of the peti- tioners therein were entered in the register of members of the company against the name of L as administrators of L. On the questions whether the entry constituted merely a note of the grant of administration or the registration of the petitioners as members, and whether the petitioners were members of the company for the purposes of presenting a petition under s. 210 of the English Companies Act at p. 65 of the report, Pennycuick, J. noted that it was contended before him that the petitioners therein were not members of the company and hence had no locus standi to present the petition bearing in mind that petition under s. 210 of the English Companies Act could only be presented by a member of the company. In the facts of that case, Pennycuick, J. held that the

petitioners were duly registered as members of the company but he proceeded to hold that even if it were so, the personal representatives of a deceased member must be regarded as members of the company for the purposes of S. 210 Of the English Companies Act. In this connection, reference was made to the decision of Buckley, J. in Re Bayswater Trading Co. Ltd., [1970] 1 All E.R. 608, where at p. 609 of the report, it was held that 'member' would in- clude representative of a deceased member for the purpose of s. 353 of the English Companies Act. This judgment of Penny- cuick, J. went up in appeal to the Court of Appeal and it was reversed. See Re Jermyn Street Turkish Baths Ltd., [1970] 3 All E.R. 184. But on the point whether the repre- sentative of a deceased member can maintain an action under s. 210 of the English Companies Act, the views of Penny- cuick, J. were not reversed or modified. Mr. Nariman submit- ted that the observations of Pennycuick, J. were obiter for the decision of the case. We are unable to agree. Indeed, this was a point specifically referred to by Pennycuick, J. as being raised and specifically decided. But we need not detain ourselves with this controversy because the decision of the English Courts are not binding in the courts of India. But the observations or the reasoning are of persua- sive value. We are clearly of the opinion that having regard to the scheme and the purpose of ss. 397 and 398 of the Act, the reasoning on a para materia provision of the English Act would be a valuable guide. The said construction, appears to us, to further the purpose intended to be fulfilled by petitions under ss. 397 and 398 of the Act. It facilitates solution of problems in case of oppression of the minorities when the member is dead and his heirs or legal representa- tives are yet to be substituted. This is an equitable and just construction. This construction, as suggested by Penny- cuick, J. does not militate against either equity or justice of the such situation. We would, therefore, adhere to that construction. In this connection, it may be mentioned that in the 1972 Edition of Gore-Browne on Companies, it has been stated as follows:

> "It has recently been settled that the person- al representatives of a deceased member, even though they are not registered as members, are entitled to present a petition under s. 210. In Re. Jermyn Street Turkish Baths Ltd., Pennycuick, J. held that on its true construc- tion section 210 required that the word 'member' should include the personal represen- tatives of a deceased member, on whom title of his shares devolved by operation of law." In 1st Supplement January 1978 of Gore-Browne on Compa-

nies, at para 16, it is stated that "while the shares remain in the name of the deceased holder, his estate is prima facie entitled to any subsequent benefits deriving from the shares". At p. 491 of Buckley on Companies Act, 1948, the decision of Re Jermyn Street Turkish Baths Ltd. 's case (supra) has also been referred to and it was observed that for the purpose of the petition under s. 210 of the English Companies Act, 'member' includes the personal representatives of a deceased member. Buckley also notes that this decision referred herein was reversed without affecting this point by the Court of Appeal. In Halsbury's Laws of England, 4th Edition, Vol. 7, para 1010, at p. 604, same view has been expressed. The division bench of the Delhi High Court also noticed that the view expressed in Re Jermyn Street Turkish Baths (supra) also finds indirect support from various other decisions of the English Courts. Reference was made to the decision in James v. Buena Venture Nitrate Grounds Syndicate Ltd., [1896] 1 Chancery Division 456; Re Dlewellyn v. Kasintoe Rubber Estate Ltd., [1914] 15 All E.R. 558 and New Zealand Gold Extraction Company (Newbe- ryyautin Proces)

Ltd. v. Peacock, [1894] 1 Q.B. 622. These decisions do indicate that the right of members in similar, though not identical situations, should be construed as being belonging to the legal representative or heirs of deceased members.

Our attention, however, was drawn to the decision of Supreme Court of Victoria in Re Meyer Dougals Pty. Ltd., [1965] V.R. 638 by Gowans, J. Article 22 of Table A to the Victorian Companies Act, 1938 (4602) provides as follows that:

> "22. A person becoming entitled to a share by reason of the death, bankruptcy or insolvency of the holder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered holder of the share, except that he shall not before being registered as a member in respect of the share be entitled in respect of it to exercise any right conferred by membership in relation to meeting of the company."

Gowans, J. in that case found that there was a "careful distinction between members and persons entitled to share by reason of the death of a member but who are not registered appear to deny the status of a member to a legal personal representative who is not a member". On an analysis of various decisions, Gowans, J. was of the view that a de- ceased's estate and its representative may in a particular context have to be treated as not a member and in view of the provisions of s. 186(1) of the Victorian Companies Act, 1961 which provides "any member of a company who complains that the affairs of the company are being conducted in manner oppressive to one or more of the members (including himself) may ... apply to the court for an order under that section", Gowans, J. came to the conclusion that there was no reason for treating the word "members" in that section as not applying to a legal repre- sentative who is not entitled to be accorded the right which registration would give him to vote in regulating the con- duct of the company's affairs. The object of the section, which is in para materia to s. 399 of the Act, was to pro- vide a remedy for the case where, notwithstanding the fact that a person possesses the right of a member enabling him to participate in the conduct of the affairs of the company, he can claim that he as a member or as one of a number of members, is or are being oppressed by those who conduct the affairs of the company. According to Gowans, J., it should not be treated as applying to someone who is not so entitled and cannot so claim. With respect, we are unable to accept this view. Having regard to the purpose of the section as we conceive it, it would not be just construction to deny the legal representatives of the deceased member the right of maintain a petition under ss. 397 and 398. We would prefer to accept the view of Pennycuick, J. in Re Jermyn Street Turkish Baths Ltd. 's case (supra). It appears to us that this will be in consonance with the equity of the sections. In Gower's Principles of Modern Company Law, at p. 68, reference has been made to Re Jermyn Street Turkish Baths Ltd. 's, case (supra) and also to Re Meyer Douglas Pry Ltd. 's, case (supra), which, according to the learned author, seems to be more convincing. Mr. Nariman also referred us to the comments in Hahlo's Casebook on Company Law, 2nd Edi- tion, p. 35 1, where in footnote, reference was made to Re Jermyn Street Turkish Baths Ltd. 's, case (supra), which have been followed in some decisions. It was noted as fol- lows:

"It appears doubtful whether personal repre-

sentatives of deceased shareholders, who themselves are not, or cannot become, registered as shareholders, can be regarded as "members" for the purposes of s. 210 of the 1948 Act: Re Cuthburt Cooper & Sons Ltd., [1937] Ch. 392 and Re Meyer Douglas Ltd., [1965] V.R. 635 at 655."

We do not agree for the reason mentioned before. It further appears to us the Australian judgment does not reconcile to logic in accepting that legal representative can petition for winding-up, which is called the "sledge- hammer remedy", but would refuse the lesser and alternative remedy of seeking relief against oppression and mismanage- ment though the latter remedy requires establishment of winding-up on just and equitable grounds as a precondition for its invocation. It would be rather incongruous to hold that the case for winding-up on just and equitable grounds can be made out by the legal representatives under s. 439(4)(b) of the Act but not the other. This does not appear to be logi- cal. It appears to us that to hold that the legal represen- tatives of a deceased shareholder could not be given the same right of a member under ss. 397 and 398 of the Act would be taking a hyper-technical view which does not ad- vance the cause of equity or justice. The High Court in its judgment under appeal proceeded on the basis that legal representatives of a deceased member represent the estate of that member whose name is on the register of members. When the member dies, his estate is entrusted in the legal repre- sentatives. When, therefore, these vestings are illegally or wrongfully affected, the estate through the legal represen- tatives must be enabled to petition in respect of oppression and mismanagement and it is as if the estate stands in the shoes of the deceased member. We are of the opinion that this view is a correct view. It may be mentioned in this connection that succession is not kept in abeyance and the property of the deceased member vests in the legal represen- tatives on the death of the deceased and they should be permitted to act for the deceased member for the purpose of transfer of shares under s. 109 of the Act.

In some situations and contingencies, the "member" may be different from a "holder". A "member" may be a "holder" of shares but a "holder" may not be a "member". In that view of the matter, it is not necessary for the present purpose to examine this question from the angle in which the learned Single Judge of the Calcutta High Court analysed the posi- tion in the case of Kedar Nath Agarwal v. Jay Engineering Works Ltd. and Ors., [1963] 33 Company Cases 102, to which our attention was drawn.

Admittedly in the present case, the legal representa- tives have been more than anxious to get theft names put on the register of members in place of deceased member, who was the Managing Director and Chairman of the company and had the controlling interest. It would, therefore, be wrong to insist their names must be first put on the register before they can move an application under ss. 397 and 398 of the Act. This would frustrate the very purpose of the necessity of action. It was contended on behalf of the appellant before the High Court that if legal representatives who were only potential members or persons likely to come on the register of members, are permitted to file an application under ss. 397 and 398 of the Act, it would create havoc, as then persons having blank transfer forms signed by members, and as such having a financial interest, could also claim to move an application under ss. 397 and 398 of the Act. The High Court held that this is a fallacy, that in the case of persons having blank transfer forms, signed by members, it is the members themselves who are shown on the register of members and they are different from the persons with the blank transfer forms whereas in the case of legal representatives it is the deceased member who is shown

World Wide Agencies Pvt. Ltd. And ... vs Mrs. Margaret T. Desor And Ors on 19 December, 1989

on the register and the legal representatives are in effect exercising his right. A right has devolved on them though the death of the member whose name is still on the register. In our opinion, therefore, the High Court was pre-eminently right in holding that the legal representa- tives of deceased member whose name is still on the register of members are entitled to petition under ss. 397 and 398 of the Act. In the view we have taken, it is not necessary to consider the contention whether as on the date of petition, they were not members. In that view of the matter, it is not necessary for us to consider the decision of this Court in Rajahmundry Electric Supply Corpn. Ltd. v. A. Mageshwara Rao & Ors., AIR 1956 SC 2 13. In view of the observations of this Court in Life Insurance Corporation of India v. Escorts Limited & Ors., AIR 1986 SC 1370 at p. 1412, it is not necessary, in our opinion, to consider the contention as made on behalf of the appellant before the High Court that the permission of the Reserve Bank of India had been errone- ously obtained and consequently amounts to no permission. In the present context, we are of the opinion that the High Court was right in the view it took on the first aspect of the matter.

The second question was whether a combined petition under ss. 397, 398 and 433(f) of the Act was maintainable. In view of the observations of this Court in Shanti Prasad Jain v. Kalinga Tubes, [1965] 35 Company Cases 363 and the reasoning of the Bombay High Court in Bilasrai Joharmal & Ors. v. Akola Electric Supply Co. Pvt. Ltd., 28 Company Cases 549, we are of the opinion that the averments which a petitioner would have to make to invoke the jurisdiction under ss. 397 and 398 are not destructive of the averments which are required to be made in a case for winding up under s. 433(f) of the Act on the just and equitable ground, though they may appear to be contradictory. As Halsbury's Laws of England, 4th Edition, Volume 7, at p. 604-605, discusses that the prayer must be made stating that the affairs are such which fulfil the requirement of winding up but to wind up the company would unfairly prejudice that part of the members, but otherwise the facts would justify the making of a winding up order on the ground that it was just and equitable that the company should be wound up, the Court may, with a view to bringing to an end the matters complained of, make such order as it thinks fit, whether for regulating the conduct of the company's affairs in future or otherwise. We are of the opinion that averments which a petitioner would have to make to invoke the juris- diction of ss. 397 and 398 of the Act are not destructive of the averments which are required to be made in a case for winding up under s. 433(f) on the just and equitable ground, though they may appear to be rather conflicting if not contradictory. We are in agreement with the High Court that the petition must proceed upto certain stage which is common to both winding up and though there may be some difference in procedure to be adopted, it is not such which is irrecon- cilable and cannot simultaneously be gone into. Indeed these are made in the manner indicated before. It has to be borne in mind that a discretion is conferred on the court and it is only when the Court is satisfied that the facts justify the making of a winding up order on the ground that it is just and equitable that the company should be wound up, but if the Court is further of the opinion that it would be a remedy worse than the disease, then the Court can examine whether the alternative relief by way of a direction under ' s. 397 can be granted. This is a well accepted remedy exercised by the Courts. We are, therefore, of the opinion that the High Court.was right in the view that a composite petition under ss. 397,398 and 433(f) of the Act is main- tainable.

The appeal, therefore, must fail and is accordingly dismissed. We dismiss the appeal with costs, which is as- sessed at Rs.5,000.

World Wide Agencies Pvt. Ltd. And ... vs Mrs. Margarat T. Desor And Ors on 19 December, 1989

Y. Lal                                                  Appeal dis-
missed.

# EXHIBIT C

Delhi High Court

Havels India Ltd. vs Electrium Sales Ltd. on 16 April, 2013

Author: M. L. Mehta

```
        *        THE HIGH COURT OF DELHI AT NEW DELHI

        +                        CS (OS) No. 2221/2012

                                        Date of Decision: 16.04.2013

        HAVELS INDIA LTD.                         .......Plaintiff

                            Through: Mr. Neeraj Kishan Kaul, Sr. Adv
                                     with Ms. Ferida Satarawala, Mr.
                                     Raghavendra M. Bajaj, Advs.

                                Versus

        ELECTRIUM SALES LTD.                       ......Defendant

                            Through: Mr. Arvind Nigam, Sr. Adv, with
                                     Mr. Atul Sharma, Mr. Milanka
                                     Chaudhury, Mr. Abhishek Sharma,
                                     Advs.

        CORAM:
        HON'BLE MR. JUSTICE M.L. MEHTA

        M.L. MEHTA, J.
```

I.A. 16236/2012 (Under Order 7 Rule 11 CPC read with Section 9 of CPC) and IA No.21237/2012 (Section 8 of Arbitration and Conciliation Act, 1996)

1. Both these applications are filed by the defendants. The background facts leading to the filing of these applications by the defendant are thus:

2. The plaintiff and Electrium (U.K.) had been having business dealings in terms of a Supply Agreement executed between them on September 30, 2002. The said agreement is still subsisting. The defendant, which is a co-subsidiary of Electrium (U.K.), has filed a Request for Arbitration (RFA), being Claim No. 18774/ARB, instituted before the International Chambers of Commerce (ICC), seeking reference of dispute that has arisen between itself and the plaintiff. The plaintiff has filed the instant suit seeking declaration to the effect that there is no agreement containing an arbitration agreement between itself and the defendant. Prayer is also made regarding restraining the defendant from pursuing the said claim before the ICC. It is during the pendency of the said suit that the defendant has filed the instant applications under Section 8 of Arbitration and Conciliation Act, 1996 (Act) as well as under Order VII Rule 11 CPC on various grounds.

3. The defendant contends that Delhi Court has no jurisdiction as neither the cause of action or a part thereof arose in Delhi, nor the defendant has any business activity or office in India, much less

Havels India Ltd. vs Electrium Sales Ltd. on 16 April, 2013

in Delhi. The defendant also contends that it is a co-subsidiary of Electrium (U.K.) and thus, a Related Person of Electrium (U.K.) as defined under the Supply Agreement; and that the Arbitration Clause contained in the Supply Agreement, was equally applicable to the transaction between itself and the plaintiff. The defendant while referring to various clauses of the Supply Agreement, particularly, Clauses 1.1, 2, 4, 14 and 15, contends that, from the reading of these clauses it would evidence that it was a Related Person of the signatory of the Supply Agreement, namely Electrium (U.K.) and that all the transactions taking place between itself and the plaintiff were subject to the terms and conditions of this umbrella agreement. The defendant proceeds to refer to the correspondence and communication taken place between itself and the plaintiff and while referring to Clause 14 relating to Mediation and Clause 15 relating to Arbitration in the Supply Agreement, submits that the plaintiff itself has been throughout taking the Supply Agreement to be the umbrella agreement and the transaction with the defendant covered therein. The submissions of the plaintiff to the mediation followed by managing committee meeting and then arbitration in terms of Clauses 14 and 15, would clearly evidence that the plaintiff has submitted to the dispute resolution mechanism as provided in the Supply Agreement, in respect of disputes which have arisen in the transaction. It is also submitted that the Purchase Order, which the plaintiff contends to be an independent transaction, was subject to the Supply Agreement inasmuch as the defendant had dealt with the plaintiff by placing order in terms of authority derived from Clause 2 of the Supply Agreement. It is submitted that the Purchase Order nowhere intended to abrogate the dispute resolution mechanism that was stipulated in Clauses 14 and 15 of the Supply Agreement. Based on all this, it is submitted that although the main Supply Agreement was signed by the Electrium (U.K.), but by virtue of being a Related Person, the defendant is privy to the terms of the Supply Agreement, including the dispute resolution mechanism.

4. The plaintiff has filed this suit seeking a decree of declaration that there is no agreement containing an arbitration agreement between itself and the defendant. And has also sought an anti-suit injunction against the arbitration proceedings instituted by the defendant before the ICC. In furtherance of its prayer, the plaintiff has raised various issues. It contends that there does not exist any arbitration agreement between the parties. And that it was only the signatory to the agreement who could place the order for purchase for itself or for related person. The Supply Agreement from where arbitration agreement is sought to be derived from was signed by Electrium (U.K.) and not by the defendant. And that it was only the signatory to the said agreement who could invoke arbitration agreement and not the related person. The dispute which has arisen between the parties is not the outcome of the Supply Agreement, but an independent Purchase Order of the defendant. One of the Signatories i.e. Electrium (U.K.), having gone into liquidation and thus not being in existence, the Purchase Order of the defendant could not be said to be under the Supply Agreement, but was a transaction independent to the said Supply Agreement.

5. The plaintiff also contends that the existence of an arbitration agreement does not come within the domain of Order VII Rule 11 application. And that the considerations for applicability of Order VII Rule 11 CPC are confined to the averments in the plaint along with the supporting documents of the plaintiff, and not beyond that. Further, the merits of the case could not be taken into consideration in an application under Order VII Rule 11. In support of these, the learned Senior Counsel for the plaintiff also submits that the Purchase Order had a clause 23, which is entirely

Havels India Ltd. vs Electrium Sales Ltd. on 16 April, 2013

inconsistent with the dispute resolution mechanism as under clause 14 and 15 of the Supply Agreement, in that by the Purchase Order, the parties had agreed to the jurisdiction of English Courts as against arbitration.

6. With regard to jurisdiction, the plaintiffs submissions are that these are mixed questions of law and fact which could not be summarily decided. In any case, the plaintiff submits that the agreement provided service upon the plaintiff in Delhi. The correspondence address of the plaintiff was Delhi. The letter regarding invocation of arbitration by the defendant was received by the plaintiff at Delhi. Moreover, relying upon the decision of the Apex Court in Bharath Aluminium Co. v. Kaiser Aluminium Technical Service, Inc. Civil Appeal No. 7019/2005 (BALCO Case), the plaintiff submitted that since the seat of arbitration was at Delhi, the Delhi Courts would have jurisdiction. With regard to the correspondence and the communication regarding the submission of the plaintiff to the dispute resolution mechanism of mediation and arbitration, it is contended that the entire correspondence, which is sought to be relied upon by the defendant, is without prejudice and further that the submission of the plaintiff to the dispute resolution mechanism of medication and arbitration was also without prejudice.

7. I have heard the counsels of the parties at length and also perused through the relevant documents. At this juncture, it is imperative for this Court to determine whether it has jurisdiction to decide the controversy at hand, qua the application filed by the defendant under Order VII Rule 11 of CPC. The defendant herein has contended that the plaint should be rejected on the ground that the suit is barred by law i.e. Section 5 of the Act. Section 5 of the Act, envisages the judicial intervention in arbitrations to be limited to the extent as specified under the Act. Section 8 of the Act mandates the Court to refer the parties to arbitration, wherever there is an arbitration agreement. Furthermore, Section 16 of the Act also empowers the tribunal to rule upon its own jurisdiction including determining the existence or validity of the arbitration agreement.

8. The position of law on this matter is fairly clear. A conjoint reading of Sections 5, 8 and 16 of the Act stipulate that upon being satisfied of the prima facie existence of an arbitration agreement, it is imperative for a court to refer the parties to arbitration. However, in the instant case, the controversy before this Court is to determine the privity of the defendant to the agreement containing the arbitration clause. In other words, this Court is required to have a prima facie view of the existence of the Supply Agreement between the parties.

9. Admittedly, the said agreement was entered into between the plaintiff and Electrium (UK), and not between the plaintiff and the defendant herein. Meanwhile, it is also admitted that the defendant herein and the Electrium (UK) are co-subsidiaries of a common parent company. At this juncture, it is pertinent to note the relevant provisions of the Supply Agreement:

10. The Recital of the Supply Agreement states:

"THIS AGREEMENT is made on the 30th of September 2002:

Havels India Ltd. vs Electrium Sales Ltd. on 16 April, 2013

BETWEEN ELECTRIUM (UK) LIMITED (No. 167171) whose registered office is at Lehfield Road, Brownhills, West Midlands, WS8 6JZ ("ELECTRIUM") which enters into this agreement in its own right and for and on behalf of each of its Related Persons; and HAVELL'S INDIA LTD. ("HAVELL'S) whose registered office is at 1 Raj Narain Marg, Civil Lines, Delhi 110054, India, which enters into this agreement in its own right and for and on behalf of each of its Related Persons." (emphasis supplied)

11. The terms party and related persons have been clearly defined in Clause 1.1 as under ""Party" means a party to this agreement;

"Related Person" means in relation to any party, its subsidiaries, its holding companies (if any) and the subsidiary companies of any such holding company from time to time, all of them and each of them as the context admits." (emphasis supplied).

12. Therefore, it is amply clear that the plaintiff and Electrium (UK) entered into the Supply Agreement not only between themselves, but also on behalf of their Related Persons, which includes holding companies as well as their subsidiary companies. In the instant case, it is not disputed, that the defendant is a co-subsidiary of Electrium (UK), wherein both Electrium (UK) as well as the defendant have a common holding/parent company. Moreover, the privity between the signatories and the Related Persons is further established by the terms regarding the subject matter of the agreement itself. Some of such provisions are as follows:

"2. SUBJECT:

2.1. Havell's shall sell or shall procure that its Related Persons shall sell to Electrium or its Related Persons, and Electrium shall buy or procure that its Related Persons shall buy from Havell's or its Related Persons (as the case may be) such quantities of the Products set out in Schedule 2 hereto as maybe ordered by Electrium or its Related Persons at the prices set out therein in accordance with the terms of this agreement. 2.2. If any obligation of a party set out herein cannot be performed by such party, that party shall procure the performance of any such obligation by its Related Persons." (emphasis supplied).

13. The above terms are unequivocal about the mutual rights and liabilities under the Supply Agreement not only qua the signatories to the Supply Agreement, but also qua the Related Persons. Further, I also do not find any merit in the plaintiffs argument that the dispute between the parties arose from Purchase Orders which are independent of the Supply Agreement. It is clear to me that the contractual arrangement between the parties was such that the Supply Agreement was the parent agreement containing the general terms and conditions of the entire business transactions between the parties. Whereas, the Purchase Orders were regarding specific obligations between the parties such as price, quantity or nature of products ordered for.

14. Further, Clause 4.1 of the Supply Agreement stipulates as under:

Havels India Ltd. vs Electrium Sales Ltd. on 16 April, 2013

"4.1. All the sales of the Products between the Parties or their Related Persons, shall be subject to the terms and conditions of this agreement only." (emphasis supplied).

15. The above mentioned provision clearly stipulates that all transactions/purchases made between the parties and Related Persons shall be governed by the Supply Agreement alone. Upon reading Clauses 2.1along with 4.1, it is amply clear to me, that the supply agreement is an umbrella agreement between the parties, wherein it was not only the signatories to the Supply Agreement who could place the Purchase Orders upon the plaintiff, but the Related Persons are equally entitled to place Purchase Orders. Conversely, the Related Persons could also be made liable for the defaults of either of the signatories to the Supply Agreement as provided under Clause 2.2. Therefore, I find that the Purchase Orders which led to the dispute between the parties was in accordance with and under the aegis of the Supply Agreement.

16. Regarding the argument of the plaintiff, that only the signatories to the Supply Agreement could invoke the dispute resolution clause under the Supply Agreement; the multi-tier dispute resolution/escalation clause set out in the Supply Agreement is as follows:

"14. MEDIATION:

In the event of any claim, dispute, controversy, or disagreement (each a "Dispute") between the parties or any related person under or related to this agreement, either of the Parties may notify the other in writing of the dispute or difference (the "Dispute Notice") together with reasonable details of such Dispute. The Parties will act in good faith and use commercially reasonable efforts to resolve promptly, the Dispute. If the Parties cannot promptly resolve the Dispute, the Dispute will be submitted to the Management Committee for resolution. For ten days, following submission of the Dispute, to the Managing Committee, the Managing Committee will have the exclusive right to resolve such Dispute.

If the Managing Committee is unable to resolve the Dispute amicably during the ten day period set out above, the Dispute shall be settled pursuant to Clause 15.

15. ARBITRATION Any dispute shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce (ICC) by one or three arbitrators to be appointed in accordance with the said rules. The arbitration proceedings shall be conducted in the English Language and shall take place in Delhi, India."

17. The Mediation Clause is worded with a wide ambit to include any event of claim, dispute, controversy or disagreement, not only between the parties i.e. signatories to the agreement, but also between Related Persons. It would be a perverse interpretation of the provision, if it were to be considered that only the signatories to the Supply Agreement can invoke the mediation/arbitration clause, more so in a case where the clauses are worded wide enough to cover disputes even between Related Persons. Moreover, by the plaintiffs own admission, one of the signatories to the Supply

Havels India Ltd. vs Electrium Sales Ltd. on 16 April, 2013

Agreement i.e. Electrium (UK) was no longer in existence when the RFA was filed before the ICC, and hence there was no opportunity for the defendant herein, to invoke the arbitration clause through Electrium (UK).

18. If the intention of the parties was to confine the dispute resolution clause only to the signatories of the Supply Agreement, there was no need to mention the Related Persons within the ambit of the mediation and arbitration clauses. In fact both parties had understood and intended this clause to be as equally applicable to them as also to their Related Persons. This is evidenced from the communications and correspondence that ensued between the parties as noted below.

19. The conduct of the plaintiff also suggests that they had ratified the invocation of the arbitration clause by the defendant. In the letter dated May 5, 2011, the counsel for the plaintiff wrote to the defendant stating:

> "Our Client expresses their appreciation for the proposal for mediation to resolve issues within the framework of the dispute resolution mechanism as provided for under Clause 14 of the Supply Agreement. Our client is agreeable to the proposal for a mediation to be followed if necessary, by the stipulated subsequent process between the representatives of Electrium and Havell's." (emphasis supplied).

As is evidenced above, the plaintiff was writing specifically with reference to the Clause 14 of the Supply Agreement and also indicates to proceed with mediation in accordance with the terms of the Mediation Clause. Furthermore, in the plaintiffs letter dated May 26, 2011, the plaintiff has categorically placed reliance on the Arbitration Clause as contained in Clause 15 of the Agreement.

> "Also, given that the parties had agreed to and contemplated arbitration proceedings seated at Delhi, we see no reason for negotiations to take place elsewhere. We therefore request you to agree to meetings at New Delhi on the dates indicated above."

Also, reference may be placed upon plaintiffs letter dated June 3, 2011 wherein it is unequivocally stated:

> "Our Clients are not agreeable to a meeting at Dubai. We reiterate that since the parties have agreed to Arbitration at New Delhi, there is no reason for the preceding Mediation to take place elsewhere. If the parties have agreed to New Delhi as a Seat for Arbitration, that is necessarily the logical choice for any preceding meetings contemplated under the contract."

Therefore, I have no doubt that by the above mentioned conduct; the plaintiff has ratified the invocation of the arbitration clause by the defendant under the Supply Agreement and now cannot claim otherwise.

Havels India Ltd. vs Electrium Sales Ltd. on 16 April, 2013

20. The plaintiff has also asserted that this Court must not rely upon the communications exchanged between the parties regarding the mediation, stating that the communications were without prejudice and according to the established rules of evidence under Section 23 of the Indian Evidence Act, such without prejudice documents could not be looked into or considered. I find no merit in this argument of the plaintiff for the following reasons. Firstly, with respect to the without prejudice communications, I find that the plaintiffs reliance upon Section 23 of the Evidence Act is misplaced. In order to arrive at this conclusion, it is relevant to re-visit the distinction drawn by the plaintiff regarding the dichotomy in the nature of the disputes between the parties herein. There is, no doubt, a dispute had arisen between the parties regarding certain alleged defects in the MCB products sold by the plaintiff to the defendant under the Purchase Orders. Meanwhile, there is an independent cause of action regarding the invocation of the arbitration clause contained in the Supply Agreement which is the grievance sought to be remedied though the instant suit. This distinction in causes of action is relevant because, the without prejudice communication between the parties is with respect to the earlier cause of action i.e. the disputed products sold by the plaintiff to the defendant, and not regarding recourse to dispute resolution mechanisms or the invocation of the arbitration clause by the defendant.

21. Without prejudice communications are commonplace in business correspondences, especially those involving a dispute or a difference. When a party tries to settle a matter amicably, he/she would make certain concessions on his claim in order to arrive at a middle ground with his adversary, and impress upon him a settlement of the dispute. However, in the event the said mediation/conciliation proceedings do not fructify, the concessions and admissions made by one of the parties regarding the merits of the dispute are not to be used prejudicially against the party making such concession/admission. In the instant case, the plaintiff at best can claim that his statements in the communication with the defendant were made without prejudice to the merits of the dispute regarding the MCBs. One cannot stretch the without prejudice statement to the dispute resolution mechanism or regarding the invocation of the arbitration. If that were the case, all multi-tier dispute resolution clauses, also known as escalation clauses can be frustrated by one party claiming that its participation in the preceding mediation proceedings cannot be used to trigger the arbitration clause, merely because it used the term without prejudice in the communications.

22. The plaintiff has also contended that this Court has to determine the existence of a valid arbitration clause between the parties in accordance with the law laid down by the Apex Court in the Case of SBP & Co. v. Patel Engineering (2005) 8 SCC 618 (SBP Case). In furtherance of this argument the plaintiff has urged that there is inconsonance between the Supply Agreement and the Purchase Orders regarding the dispute resolution mechanism. The plaintiff has contended the Supply Agreement envisages disputes to be resolved by an arbitration proceeding under the ICC Rules. On the contrary, as per Clause 23 of the Purchase Orders, parties have mutually agreed to submit to the exclusive jurisdiction of the English Courts. Therefore, the plaintiff contends, that even if it were to be considered that the defendant is privy to the Supply Agreement, the Clause 23 contained in the Purchase Orders, vitiates the arbitration clause contained in Clause 15 of the Supply Agreement.

23. At this juncture it is pertinent to take note of the relevant clauses within the Supply Agreement as well as the Purchase Orders.

Clause 13 of the Supply Agreement stipulates the applicable law:

"This agreement (and any dispute controversy, proceedings or claim of whatever nature, arising out of or in anyway relating this agreement or its formation) shall be governed by and construed in accordance with English Law. The Convention of The Hague regarding the Unification of Law Governing the International Sale of Goods, 1964 and the Convention of Vienna regarding the International Sales Contracts of Goods, 1980 shall not apply." (emphasis supplied).

Clause 23 of the Purchase Order stipulates:

> "The formation, construction, performance, validity, and all aspects of the Contract, are governed by English Law and the parties submit to the exclusive jurisdiction of the English Courts." (emphasis supplied).

24. I find that there is no inconsistency between Clause 23 of the Purchase Order and the dispute resolution mechanism contained in clauses 14 and 15 of the Supply Agreement. It cannot be said that by merely agreeing to the exclusive jurisdiction of the English Courts the parties have waived the dispute resolution mechanism as laid out in the Supply Agreement. It is amply clear to me that the parties mutually agreed that the Supply Agreement would be governed and construed in accordance with English Laws, as provided in Clause 13 of the Supply Agreement. It is also the intent of the parties to resolve all disputes arising between them as well as related Persons by way of mediation and arbitration. By agreeing upon the jurisdiction of English Courts, the parties have merely agreed upon a convenient judicial forum, where they can raise issues concerning resolution of disputes between them; i.e. through arbitration.

25. Such an arrangement is common place in international commercial contracts which are executed between parties belonging to different jurisdictions, and in cases where the performance of such contracts, transcends national boundaries and territorial jurisdiction of the Courts. In such cases, parties mutually agree upon a forum which is convenient and such clauses are known as Forum Selection Clauses. In the case of Rajasthan State Electricity Board v. M/s. Universal Petro Chemical Ltd. (2009)3 SCC 107; the Apex Court has made some pertinent observation regarding Forum Selection Clauses under the Sections 20 and 34 of the erstwhile Arbitration Act, 1940:

> "An analytical look at the provisions of sub-Sections (3) and (4) [of Section 30] will make it explicitly clear that any application in any reference, meaning thereby even an application under Section 20 of the Act could or should be filed in a court competent to entertain such proceeding and having jurisdiction to decide the subject of the reference. Such jurisdiction would or could be restricted by the agreements entered into by and between the parties. The parties have clearly stipulated and agreed that no other court, but only the court at Jaipur will have jurisdiction to try and decide the proceedings arising out of the said agreements, and therefore, it is the

Havels India Ltd. vs Electrium Sales Ltd. on 16 April, 2013

Civil Court at Jaipur which would alone have jurisdiction to try and decide such issue and that is the court which is competent to entertain such proceedings.

The said court being competent to entertain such proceedings, the said Court at Jaipur alone would have jurisdiction over the arbitration proceedings and all subsequent applications arising out of the reference. The arbitration proceedings have to be made at Jaipur Court and in no other court." (emphasis supplied).

Therefore, a forum selection by the parties cannot be interpreted to abrogate the dispute resolution mechanism as agreed between the parties. It only shows the intent of the parties to choose a convenient Court, which would have jurisdiction over the arbitration proceedings and all subsequent applications arising out of reference.

26. The issue regarding the jurisdiction of this Court to judicially determine the existence and validity of the arbitration agreement is no longer res integra. A three judge bench of the Apex Court has settled this issue in the case of Kvaerner Cementation India Ltd. v. Bajranglal Agarwal & Anr. 2001 (3) RAJ 414 (SC) (Kvaerner Case). The Court in the Kvaerner Case was faced with special leave applications against an order of the learned Single Judge of the Bombay High Court refusing to interfere with an order of the Civil Court vacating an interim order of an injunction granted by it earlier. The suit in question had been filed for a declaration, that there does not exist any arbitration clause and as such the arbitral proceedings are without jurisdiction.

27. The Apex Court held:

"There cannot be any dispute that in absence of any arbitration clause in the agreement, no dispute could be referred for arbitration to an arbitral tribunal. But, baring in mind the very object with which, the Arbitration and Conciliation Act, 1996 has been enacted and the provisions thereof, contained in Section 16 conferring the power on the Arbitral Tribunal to rule on its own jurisdiction including ruling on any objection with respect to the existence or validity of the arbitration agreement, we have no doubt in our mind that the Civil Court cannot have jurisdiction to go into that question.... In this view of the matter, we see no infirmity in the impugned order so as to be interfered with by this Court. The petitioner who is a party to the arbitral proceedings may raise the question of jurisdiction of the Arbitrator as well as the objection on the ground of non-existence any arbitration agreement in the so called dispute in question and such an objection being raised, the Arbitrator would do well in disposing of the same as a preliminary issue, so that it may not be necessary to go into the entire gamut of arbitration proceedings."

28. This proposition as laid down by the Apex Court has been consistently followed by this Court. In deciding upon a similar issue regarding the enforceability of an agreement containing an arbitration clause, this Court in the case of Bhushan Steel Ltd. v. Singapore International Arbitration Centre & Anr. (2010) ILR 6 Del. 295 (Bhushan Steel Case) held that such a suit would not be maintainable and is barred by Section 5 of the Act. In another similar case The Handicrafts and Handlooms

Exports Corporation of India Ltd. v. Ashok Metal Corporation & Anr. RFA 219/2009 (Handicrafts Case) this Court observed:

> "Thus, simply because while interpreting Sections 8 and 11 of the Act, it has been held by the Supreme Court that the Court before referring the parties to arbitration, must satisfy itself of the existence and validity of the arbitration agreement, is not reason enough to hold that a suit for the declaration of the same relief would also be maintainable. There is no provision in the Act enabling the filing of such a suit. It also cannot be lost sight of that an application under Section 8 is filed in a case where a suit is already before the Court; while an application under Section 11 is envisaged by the Act merely for the reference of the disputes to arbitration by appointment of the Arbitrator. Thus, in my considered opinion, merely because the Court must satisfy itself about the existence and validity of an arbitration agreement when faced with an application under Section 11 of the Act or one under Section 8 of the Act, is not good enough reason to hold that it would be open to a party to the arbitration agreement to file a suit challenging the validity or existence of the arbitration agreement."

29. It is also pertinent to note that the reasoning of this Court in the Handicrafts Case was maintained by the Division Bench of this Court in the case of Devender Kumar Gupta v. Realogy Corporation 2011 (125) DRJ 129. In the case of National Insurance Company Ltd. v. Boghara Polyfab Pvt. Ltd. (2009) 1 SCC 267 (Boghara Polyfabs Case), the Court observed:

> "Where the intervention of the Court is sought for appointment of an Arbitral Tribunal under Sec. 11, the duty of the Chief justice or his designate is defined in SBP & Co. This Court identified and segregated the preliminary issues that may arise for consideration in an application under Sec. 11 of the Act, into three categories i.e. (i) issues which the Chief justice or his designate is bound to decide;(ii) issues which he can also decide, i.e. issues which he may choose to decide; (ii) issues which should be left to the Arbitral Tribunal to decide."

30. The Apex Court in the SBP Case clearly held the circumstances in which the Court should leave the issues to the Arbitral Tribunal to decide:

> "(ix) In a case where an arbitral tribunal has been constituted by the parties without having recourse to Section 11(6) of the Act, the arbitral tribunal will have the jurisdiction to decide all matters as contemplated by Section 16 of the Act."

31. It may be noted that in the instant case, the Arbitral Tribunal has already been duly constituted as on December 26, 2012, when the President of the Arbitral Tribunal wrote to both the parties informing them about the constitution of the Tribunal. Moreover, it is not for this Court to strictly scrutinize the validity of the arbitration agreement in accordance with the provisions of Section 11(6). More so in the cases where the arbitral tribunal has already been constituted, the appropriate forum to impute the validity of the arbitration agreement is the arbitral tribunal.

Havels India Ltd. vs Electrium Sales Ltd. on 16 April, 2013

32. There is a pertinent observation in the Handicrafts Case, "The Courts are meant to carry out and implement the mandate of the legislature. The Legislature's explicit mandate is that judicial intervention be not allowed to circumvent dispute resolution through arbitration. The respondents, according to the appellant itself, have already set the arbitral process in motion and an Arbitrator has been appointed, who has called upon the appellant to file its statement of claim. In such circumstances, to state that the Civil Court must await the filing of an application under Section 8 of the Act by the party who has already set the arbitral machinery in motion would be hyper-technical to say the least."

33. Therefore, I find that prima facie, there is an agreement between the parties containing an arbitration agreement. I also find that the appropriate forum to raise any jurisdictional objection on merits, regarding the existence of the arbitration agreement, would be the arbitral tribunal. Borrowing the words of the learned judge in the Handicrafts Case, "Civil Courts would, therefore be well advised to steer clear of the arbitral process, leaving only their door ajar to the aggrieved party for the purpose of interim orders, appeals, etc. Any other view, would open the flood gates of pre-arbitral litigation, and in each and every case, the party interested in delaying the arbitral proceedings, would effectively resort to a civil suit, as an adjudicatory mechanism for adjudging the existence and validity of the arbitration agreement and the jurisdiction of the Arbitral Tribunal."

34. In view of above, having seen that there exists a prima facie arbitration agreement between the parties, the suit was apparently barred under Section 5 read with Section 16 of the Act. Consequently, the plaint is liable to be rejected under Order 7 Rule 11 and thus stands rejected. Both the applications as also the suit are disposed accordingly.

M.L. MEHTA, J.

APRIL 16, 2013 kk/rmm

# EXHIBIT D

Delhi High Court

Ministry Of Road Transport And ... vs L&T; Transportation ... on 11 October, 2019

```
*     IN THE HIGH COURT OF DELHI AT NEW DELHI
+     O.M.P. 289/2015

                          Reserved on: 07.08.2019
                          Date of Decision: 11.10.2019


    MINISTRY OF ROAD TRANSPORT AND HIGHWAYS
                                  ..... Petitioner
                Through: Mr.Sandeep Sethi, Sr. Adv.with
                         Mr.Ruchir Mishra, Mr.Mukesh Kr.
                         Tiwari, Mr.Sanjiv Kr. Saxena,
                         Mr.Ramneek Mishra, Mr.Abhishek
                         Rana and Mr.Sidhant Kumar,
                         Advs.


                    versus


    L&T TRANSPORTATION INFRASTRUCTURE LTD. & ANR.
                                  ..... Respondents
```

Through: Mr.Dayan Krishanan, Sr.Adv. with Mr.Arpan Behl, Adv. for R-1.

Mr.D.Balaraman and Mr.Anand Sathiyaseelan, Advs. for R-2.

CORAM:

HON'BLE MR. JUSTICE NAVIN CHAWLA

1. This petition under Section 34 of the Arbitration and Conciliation Act, 1996 has been filed by the petitioner challenging the Arbitral Award dated 12.12.2014 passed by the Arbitral Tribunal adjudicating the disputes that have arisen between the parties in relation to the Tripartite Concession Agreement dated 03.10.1997, executed between Larsen and Toubro Ltd. (L&T Ltd.) with the petitioner and the respondent no.2. The respondent no.1 herein is the assignee of L&T Ltd. under the Deed of O.M.P. No.289/2015 Page 1 Assignment dated 25.11.1997. It is a subsidiary of L&T Ltd. and is the Special Purpose Vehicle created under the terms of the contract and for discharge of the obligations of L&T Ltd. contained therein.

2. Before adverting to the challenge to the Arbitral Award, some basic facts in relation to the Concession Agreement need to be noticed. The Concession Agreement was awarded on Build, Operate and Transfer (BOT) basis. It includes design, construction, maintenance and operation of 28 km of the Coimbatore Bypass on NH-47 at KM 141/00 on the Salem side merging with KM 171/200 on Palghat side of the same highway. It further included construction of an additional Two Lane Bridge across river Noyyal which is the Athupalam Bridge, as also maintenance of existing bridges.

3. The Arbitral Tribunal noticed the important dates in regard to the Concession Agreement in paragraph 8 of the Award, which is reproduced hereinbelow:

Invitation of Tender on BOT basis September 1995 Invitation of re-submission of bids for 16/12/1995 additional scope of work by including 2 lane Athupalam Bridge Date of submission of bid by M/s L&T 05/06/1997 Date of signing the Concession Agreement 03/10/1997 Deed of Assignment to M/s L& T TIL by L&T 25/11/1997 Ltd.

```
Date of commencement of work of Athupalam      03/12/1997
Bridge & Bypass
Date of commissioning of Athupalam Bridge      03/12/1998
Date of commissioning of Bypass                03/12/1999
End of Concession period for Athupalam         03/12/2018
Bridge
End of Concession period for Bypass            03/12/2029
```

```
O.M.P. No.289/2015                                      Page 2
     Length of Bypass                  About 28 km
     Cost of Project                   Rs.104.40
                                       Crores
```

4. The majority of the Arbitral Tribunal, consisting of two Arbitrators has awarded a sum of Rs.136.22 crores to the respondent no. 1 along with interest towards loss of revenue sustained by the respondent no.1 for the Athupalam Bridge. This claim of the respondent no.1 was however, rejected by the Arbitrator in minority.

5. The first challenge to the Award is to the grant of the said claim in favour of the respondent no.1.

6. The learned senior counsel for the petitioner submits that this claim of the respondent no.1 was barred by limitation. He submits that in terms of Clause 2.14 of the Concession Agreement, a Steering Group (SG) was constituted for taking all project level decisions for the smooth implementation of the Concession Agreement. It had the representatives of the petitioner, the respondent no.2 as also the respondent no.1, the Concessionaire. Respondent no.1 raised a claim of financial compensation for loss of revenue in the form of collection of toll from Athupalam Bridge, however, the SG in its meeting held on 21.07.1999 recorded that the Concession Agreement does not provide for any cash compensation. Even in the meeting of the SG held on 18.04.2001, the respondent no.1 was advised to submit a proposal for compensation against loss of toll revenue considering the possible options of extension of period of concession or increase in toll rates or both. Grant of compensation in form of cash was not one of the options given to the O.M.P. No.289/2015 Page 3 respondent no.1. The respondent no.1, if aggrieved by these decisions, could have challenged the same through arbitration only within a period of three years from the date of such decisions. However, the respondent no.1 invoked arbitration only on 18.03.2010, therefore, the claim of the

respondent no.1 for grant of compensation in the form of cash was clearly barred by limitation.

7. On the other hand, the learned senior counsel for the respondent no.1 submits that the cause of action for claiming the above amount arose only on 12.03.2010 when the decision of the SG to affirm illegal termination of the Concession Agreement by the petitioner was communicated to the respondent no.1. As far as the Minutes of Meeting dated 21.07.1999 is concerned, the same did not create any cause of action and, in fact, amounts to an admission of liability on the part of the petitioner to compensate the respondent no.1 for the loss of toll revenue. It merely provided for the manner in which the respondent no.1 would be compensated for such loss. It is only with the illegal termination of the Concession Agreement that it became clear that the petitioner would not compensate the respondent no.1 for the loss suffered by it and therefore, invocation of arbitration by the letter dated 18.03.2010 was within the period of limitation.

8. I have considered the submissions made by the learned senior counsels for the parties and I am in agreement with the submissions made by the learned senior counsel for the respondent no.1.

9. The Minutes of Meeting dated 21.07.1999, though stated that the petitioner and respondent no.2 cannot compensate the respondent no.1 for the loss suffered by it in collection of toll as the Concession Agreement O.M.P. No.289/2015 Page 4 does not provide for any such remedy, at the same time further stated that all legitimate claims of the respondent no.1 will be examined and considered as per provisions of the Concession Agreement. In a subsequent meeting held on 18.04.2001, the respondent no.1 was called upon to submit its proposal for compensation against the loss of toll revenue duly supported by the detailed cash flow and considering the following options:

> (a) Extension of concession period with the same toll rates as in the Agreement:

> (b) Suitable increase in toll rates keeping the concession period same as in the Agreement;

(c) Suitable combination of A and B above.

10. The Arbitral Tribunal records that by a letter addressed by CE NH TN to a Regional Officer of the petitioner, the loss of revenue till 31.03.2001 suffered by the respondent no.1 was arrived at Rs.9,40,90,783/- on the basis of details worked out by Pallavan Transport Consultancy Services Ltd., which is a State undertaking, and respondent no.2 in consultation with the respondent no.1. Paragraph 51 of the Impugned Award is reproduced hereinbelow:

> "(51)The loss of revenue till 31.3.2001 was arrived at Rs. 9,40,90,783/- on the basis of details worked out by PTSCL State Undertaking and Second Respondent in consultation with the claimant M/s L&T TIL. This figure of LOR has been intimated by CE NH TN to regional officer of First Respondent. The detailed calculations for the same are available in Exhibit C-25 SOC Vol-II. The GOI did not attempt to reduce nor even disputed this loss of revenue."

Ministry Of Road Transport And ... vs LT Transportation ... on 11 October, 2019

O.M.P. No.289/2015 Page 5

11. Respondent no.1 in turn, from time to time, intimated the respondent no.2 about the loss sustained by it. Reference has been drawn to letters dated 22.11.2007 and 06.02.2010.

12. From the above, it is clear that the liability to compensate the respondent no.1 for the loss of toll revenue suffered by it at Athupalam Bridge, was not disputed. It was only the mode of recovery thereof, that was discussed. Whether the respondent no.1 is entitled to compensation in form of cash or not is a question distinct from the liability of the petitioner to so compensate the respondent no.1. As the petitioner has not produced any document on record by which it categorically denied its liability to compensate the respondent no.1 for the alleged loss of revenue, it cannot be said that the cause of action had arisen in favour of the respondent no.1 to claim such amount at any date prior to the date of decision of the SG to uphold the termination of the Agreement by the petitioner. Consequently, the claim of the respondent no.1 cannot be said to be barred by limitation.

13. On the merits of the claim, the learned senior counsel for the petitioner submits that the petitioner was under no obligation to indemnify any loss suffered by the respondent no.1 towards deficient recovery of toll from the Athupalam Bridge. He submits that the responsibility of the toll fee collection and the risk attached thereto was solely on the respondent no.1. He submits that in terms of Clauses 5.2 and 25.1 of the Concession Agreement, it was the sole responsibility of the respondent no.1 to take all steps for proper implementation of the Agreement. In terms of Clause 10.4 of the Agreement, the respondent O.M.P. No.289/2015 Page 6 no.1 was in fact entitled to charge fees lesser than the agreed fee without affecting the concession period. There was no obligation on the petitioner for ensuring recovery of full toll for the respondent no.1. In fact, in terms of Clause 5.4 of the Concession Agreement, the respondent no.1 was to have carried out necessary field surveys and investigations with respect to the site of the Bridge. The respondent no.1, therefore, should have been aware of all local conditions prevalent at the site thereby bearing the risk attached thereto. He submits that in absence of any obligation on the part of the petitioner to ensure full recovery of the toll for the respondent no.1, the petitioner cannot be held to be guilty on the performance of the contract or liable to compensate the respondent no.1 for alleged loss of toll revenue.

14. I have considered the submissions made by the learned senior counsel for the petitioner, however, find no merit in the same. As noted hereinabove, the liability of the petitioner to compensate the respondent no.1 for loss of toll revenue was never denied. In fact, not only the Minutes of Meeting of the SG accept such liability of the petitioner, but also by the letter dated 01.04.1999, a senior Officer of the petitioner informed the respondent no.2 that the shortfall in revenue is due to refusal/reluctance on part of the users including Tamil Nadu State Corporation to pay the toll fee, which sends a wrong signal to the users of the bridge who use this as an excuse for evasion of toll. The letter further advised the respondent no.2 to ensure that respondent no.1 is extended help in checking the evasion of toll or as an alternate respondent no.2 may have to compensate the respondent no.1 for the loss being incurred by respondent no.1, which was to the tune of Rs.40 lacs per month. Later O.M.P. No.289/2015 Page 7 by a letter dated 25.06.1999, even

the Minister for Railways and Surface Transport, Government of India, advised the respondent no.2 of a similar consequence.

15. The Arbitral Tribunal has further noted that the loss of revenue on Athupalam Bridge accrued due to inefficiency and total negligence of the Government of India and refusal of the petitioner and respondent no.2 to provide support to the Concessionaire. The police did not render any assistance in enforcing toll, rather it encouraged vehicles to pass through defiantly without paying toll fee.

16. The relevant findings of the Arbitral Tribunal are reproduced hereinbelow:

> "(82) The AT is of the majority view that the loss of revenue on Athupalam Bridge occurred due to inefficiency and total neglect of GOT and refusal to provide support, timely steps not being taken by respondents. There is the tripartite agreement signed and the terms of the same have to be acted upon and honoured by all the three parties. Five DO letters, two from Minister for MORTH and three from L&T officers apart from enumerable demand in writing from L&T officers did not cut much ice. The police did not render assistance in enforcing toll and help for collection of toll. Rather it encouraged vehicles to pass through defiantly without paying toll fee by creating scenes of violation even though they were in a position to render the required assistance. (83) L&T TIL wrote to every level of police officers i.e. DIG, Commissioner police, SP, DSP. The EE NH also wrote to police. The EE supplied, list of non paying vehicles category wise to RTO and police. The concessionaire requested for 4x1 police at its own cost. There was only lip sympathy to L&T and empathy towards cause of collection of toll fee.

> xxxxxx (85) Can such a situation help in building roads on BOT basis when the very first project is treated casually and made to fail? As O.M.P. No.289/2015 Page 8 vehemently argued by both the respondents, no doubt under para 4.1 CA it is the duty of concessionaire to collect toll but AT can't and should not ignore the fact that in absence State support by creating proper environs by way of effective police help etc. the concessionaire was made to fail. Under Clauses 6.6, 6.7 and 14.2 of the concession agreement it is the duty of Govt. of TN to check and monitor the quality, progress and standards of the toll facility through Engineer-in-charge. It has right to check the fee collection to ensure that the same is as per terms of the CA. The Govt. of TN has to supervise the work of construction, maintenance and operation of the toll facility at its own cost. It is realizing Rs.15 lacs supervision fee (subject to WPI linked price variation] per annum in advance from L&T. The GOT has miserably failed in implementation of the project. It is our [majority AT] strong view that LOR is payable by respondents and due to concessionaire. ........................"

17. The petitioner having awarded the contract on a Build, Operate and Transfer basis to the respondent no.1, wherein the respondent no.1 is to recover its costs and reasonable return from the collection of toll, cannot wash its hands of its responsibility to ensure a conducive environment for collection of such toll. The power of 'State' could only have been exercised by the petitioner and the respondent no.2 for ensuring collection of the toll in fact, as noted by the Arbitral Tribunal, the major defaulters were the Tamil Nadu State Road Transportation and Kerala State Road Transport.

18. Therefore, the petitioner can certainly not claim immunity from compensating the respondent no.1 of the loss suffered by it.

19. It is further contented by the learned senior counsel for the petitioner that, in any case, there was no provision in the agreement for O.M.P. No.289/2015 Page 9 grant of compensation, in form of cash to the respondent no.1. Compensation, if any, could have been granted only in form of extension of the concession period or increase in the toll rates or a combination of both. In absence of any term in the contract providing for compensation in form of cash, the Arbitral Tribunal has no right in granting the same.

20. I again cannot agree with the submissions made by the learned senior counsel for the petitioner. It is not the case of the petitioner that there is any clause in the Concession Agreement prohibiting grant of compensation in the form of cash. In the absence of any such prohibition, it cannot be said that the Arbitral Tribunal has awarded a claim in contravention of any contractual term. The relief to be granted by the Arbitral Tribunal has to be considered by the Arbitral Tribunal in the facts of each case and the Award passed by the Arbitral Tribunal cannot be set aside merely because the relief could have been molded in a manner other than the one adopted by the Arbitral Tribunal.

21. I may also note that the Arbitral Tribunal has, while granting compensation in form of cash, also relied upon a similar grant of cash compensation by the petitioner itself for the additional work granted to the respondent no.1 for construction of Chettiaplayam Road Over Bridge. In terms of Clause 6.9 of the Concession Agreement, incase, the petitioner desires to have additional works to be carried out by the respondent no.1, the compensation was in form of the increase in the concession period and/or fee rates. Therefore, even in such a case, the contract did not provide for compensation in form of cash, however, admittedly, it was given to the petitioner.

O.M.P. No.289/2015 Page 10

22. On the claim of compensation, the learned senior counsel for the petitioner lastly argued that there was no proof submitted by the respondent no.1 with respect to quantification of this claim. In the absence of any proof, the same could not have been granted. He submits that the Arbitral Tribunal has wrongly proceeded on an assumption that the petitioner accepted such quantification. The Arbitral Tribunal itself has recorded objection of the petitioner towards the quantification of such claim and absence of proof in support thereof.

23. As far as the quantification of the claim is concerned, the Arbitral Tribunal, though has noted that the petitioner did not challenge the same, has also based its findings on other factors. The relevant finding of the Arbitral Tribunal is reproduced hereinbelow:-

> "(76) LOR upto 31.3.2001 is Rs. 9.409 Cr. as per PTSCL's report, and worked out jointly with Second Respondent being the aggregate loss (C-
>
> 32) sustained. The project was viable only after adding one additional bridge at Athupalam even according to both respondents.

Ministry Of Road Transport And ... vs LT Transportation ... on 11 October, 2019

Loss as intimated during the meetings on 12.02.1999 Rs. 0.935 Cr.

Reported by L&T TIL Upto June 2000 Rs. 7.46 Cr.

As worked out by Executive Engineer, NH &PTSCL's upto 31.03.2001 Rs.9.409 Cr.

Reported by L&T TIL to Sery. MoRTH vide letter dated 15.05.2003 Reported by L&T
TIL upto 31.03.2003 Rs.17.13 Cr.

Reported by L&T TIL upto 31.05.2004 Rs.20.63 Cr.

Reported by L&T TIL upto 31.07.2005 Rs.23.899 Cr.

Reported by L&T TIL upto 31.08.2005 Rs.24.14 Cr.

```
O.M.P. No.289/2015                                          Page 11
      Reported by L&T TIL upto 31.10.2007            Rs.31.58 Cr.

      Cumulative LOR from 12/98 to June 2011           Rs.71.96 Cr.
                                                    (without interest)
                                                    and Rs.134.91 Cr.
                                                     (with interest)
```

Cumulative LOR from 12/98 to Oct. 2011 works out to Rs.77.09 Cr.

(without interest) and Rs.146.07 Cr.

(with interest) As per MoRTH Minister's DO letter dated 25.06.1999 to the Chief
Minister TN was required to pay Rs. 40.00 lacs per month to L&T TILL from
01.01.1999 upto 31.12.2014 i.e. 16 years without any interest Rs. 76.80 Cr."

xxxxxx (89) The claims of Claimant, which has been calculated on the basis of traffic
study conducted by PTSCL (Govt. of TN Organization] and acceptable to both the
parties the total of claim comes to Rs. 77.09 cr. till 31.10.2011 as per C-43 of SOC.
This is the principal amount. The AT by majority view allows 12 % simple interest per
annum on this amount from 31.10.2011 till the date of award i.e. 12.12.2014.

The SG in its meeting held on. 18.4.2001 has allowed a sum of Rs. 4.13 cr. against claim of Rs. 6.32
cr. in cash for construction of Chettipalayam ROB. This over bridge was an additional work within
the 28 km boundary limits of the bypass project. This was obviously got executed under this very
concession agreement. The SG in case of Athupalam bridge is contending that there is no way GOVT
of Tamilnadu or Govt. of India can compensate the concessionaire in cash but allowed the
construction of said O.M.P. No.289/2015 Page 12 over bridge and compensated the same
concessionaire in cash. This is quite strange. For the same project the SG in the same meeting dated
18.4.2001 allowed cash payment for construction of over bridge being additional work on

Chettipalayam ROB. It is irrational to apply two different yard sticks for the compensation? While the cash compensation is valid for additional ROB, yet it is strange to contend as not possible to compensate the loss of revenue in respect to Athupalam Bridge. The calculation of loss of revenue as set out in the written response of claimant is fairly correct and the same deserves to be accepted."

24. A reading of the above would clearly show that the Arbitral Tribunal has quantified the claim on the basis of the report of PTSCL, a Government Organization, as also the letters written by the petitioner and the Minister, MoRTH. It cannot, therefore, be said that the quantification is without any evidence. I see no reason to interfere with this finding of the Arbitral Tribunal.

25. The learned senior counsel for the petitioner further challenges the Arbitral Award holding the termination of the contract as illegal. He firstly submits that the termination of the Agreement had been accepted by the respondent no.1 and the only dispute to be adjudicated by the Arbitral Tribunal was the amount of compensation payable by the petitioner to the respondent no.1.

26. Relying upon the letter dated 24.02.2006, issued by respondent no.1 to the petitioner, he submits that the respondent no.1 itself claimed termination payments under Clause 16 of the Concession Agreement claiming force majeure conditions. The only dispute thereafter was with respect to the quantification of the claim of the respondent no.1. As far O.M.P. No.289/2015 Page 13 as the factum of termination of the contract is concerned, the same could not have been put to dispute.

27. On the other hand, the learned senior counsel for the respondent no.1 submits that the letter dated 24.02.2006 was clearly addressed as being without prejudice to the rights of the respondent no.1 under the Concession Agreement. He submits that this letter was not admissible in evidence under Section 23 of the Indian Evidence Act, 1872. In fact, thereafter various options were tried to make the contract workable, however, the petitioner remained adamant on terminating the contract. This was clearly put in issue before the Arbitral Tribunal and therefore, it cannot be said that the Arbitral Tribunal has no right to consider the validity of the termination of the Concession Agreement.

28. I have considered the submissions made by the learned senior counsel for the parties. Admittedly, letter dated 24.02.2006 of the petitioner was marked 'without prejudice' to its rights under the Concession Agreement. Though, the respondent no.1 raised a claim for termination payment, the same was not accepted by the petitioner. In a subsequent meeting held on 29.03.2007, the respondent no.1 was called upon to give proposal for four laning of the Coimbatore bypass which included the continuation of the Concession Agreement. It was only by the letter dated 11.05.2009, that is much after the letter dated 24.02.2006 relied upon by the petitioner, that the petitioner issued a notice of termination under Clause 16.2.3 (ii) of the Concession Agreement, which was confirmed by the SG in its meeting held on 12.02.2010. The respondent no.1 never accepted this termination and in fact, not only O.M.P. No.289/2015 Page 14 invoked arbitration but also filed an application under Section 9 of the Act before the Court.

29. This Court by an order dated 26.03.2010 inter alia directed as under:

"7. Accordingly, therefore, until further orders unless so varied by the court, the respondent is restrained from in any manner interfering with the operations and maintenance of the BOT project as constructed by the petitioner under the Concession Agreement dated 3.10.1997. The respondent is injuncted from in any manner taking over possession of the project except through the due process of courts and law."

30. In view of the above, it cannot be said that the question of legality of the termination notice was not an issue before the Arbitral Tribunal or could not have been adjudicated upon by the Arbitral Tribunal. It also cannot be said that the letter dated 24.02.2006 of the respondent no.1 amounted to acquiescence or waiver on its part to challenge such termination of the Concession Agreement.

31. On the merits of the termination, the learned senior counsel for the petitioner defends the termination by contending that not only was the respondent no.1 in breach of its contractual obligations under Clause 6.5 of the Concession Agreement to construct additional lanes on the bypass, but also because the parties could not arrive at a settlement on the terms of such construction of the bypass, the petitioner acted within its rights to terminate the Agreement. He submits that Clause 6.5 of the Concession Agreement clearly provides that the petitioner had a right to call upon the respondent no.1 to construct additional lanes, failing which the petitioner could either construct a new bypass or terminate the Concession O.M.P. No.289/2015 Page 15 Agreement for the default of the respondent no.1. For such additional lanes to be constructed, in terms of Clause 6.9, the respondent no.1 could seek compensation only in form of increase of the concession period and /or fee rates. The respondent no.1, however, started demanding arbitrary compensation for construction of the additional lanes and thereafter proposed allotment of additional work as a condition for such construction. As the same was not agreeable to the petitioner, the petitioner had no choice but to terminate the Agreement.

32. On the other hand, the learned senior counsel for the respondent no.1 submits that the termination notices dated 11.05.2009 and 19.11.2009 were clearly unsustainable under Clause 16 of the Concession Agreement. He submits that the respondent no.1 never refused to construct the additional lanes. In fact, even without asking the respondent no.1 to construct the same, the petitioner had issued a tender which included the Coimbatore bypass. This was immediately protested by respondent no.1. In the meeting held on 29.03.2007, the respondent no.1 was called upon to submit a proposal for carrying out the work of four laning of the bypass. This included allotment of additional area. The respondent no.1 submitted such proposal which also included the option of the increase in the toll rates. He submits that the petitioner, therefore, can neither claim breach of contract by respondent no.1, nor occurrence of any force majeure condition to justify the termination of the contract and equally, the finding of the Arbitral Tribunal in this regard cannot be faulted.

33. I have considered the submissions made by the learned senior counsels for the parties. Before adverting to them in detail, a few clauses O.M.P. No.289/2015 Page 16 of the Concession Agreement may be noticed and are reproduced hereinbelow:

"6.5 The Government of Tamilnadu shall ensure that no alternate facility to the bypass is constructed within a radius of 20 km during the concession period. However, if the traffic on the bypass substantially increases, the Company shall on a notice being given to this effect by GOI provide additional lanes in the bypass within a specified period failing which the Government may either construct a new bypass or terminate the Concession agreement for Company's default."

XXXXXX "6.9 In case GOI desires to have additional works to be carried out by the company beyond the Scope of the Project detailed in Clause 7, the concession period and/or fee rates shall be suitably increased based on analysed market rates to be approved by the Steering Group to compensate the Company on this account as decided by the Steering Group."

XXXXX "16. FORCE MAJEURE 16.1 As used in this Agreement a Force Majeure Event shall mean any or all of the acts or events set out in Section 16.2 hereinafter which completely prevent the party claiming Force Majeure (the "Affected Party") from performing its obligations under this Agreement or complying with any conditions required by other parties hereto under and in accordance with the provisions of this Agreement and which act or event is (i) beyond the reasonable control and not the fault of the Affected Party, and

(ii) the Affected Party has been unable to overcome such act or event and its effect on the obligations of the affected party under this agreement by the exercise of due diligence and reasonable efforts.

O.M.P. No.289/2015 Page 17 16.2 For the purposes of this Section 16 of the Agreement, Force Majeure Event shall mean one or more of the following acts or events:

xxxxxxxxxxxxxx 16.2.3 GOI Political Event

(i) Change in Law adversely and materially affecting toll rights of the Concession Company.

Explanation: (a) the enactment of any new Indian law or Indian Directive;

(b) the repeal in whole or in part (unless re- enacted with the same effect), or modification of any existing Indian law or Government Directive;

(c) A change in the interpretation or application of any Indian law or Government Directive such interpretation being legally binding on the parties to this Agreement.

(ii) expropriation or compulsory acquisition by any Indian Governmental Agency or any State Government Agency of any material assets or rights of the Company.

(iii) any other unlawful or unauthorized action on the part of GOI occurring after Financial Close which is directed against the Project (other than action taken in connection with or pursuant to a commercial contract between the GOI and the Company)."

XXXXX "16.9.2 Any notice pursuant to this Article shall include full particulars of:

(i) the nature of each Force Majeure Event which is the subject of any claim for relief under this Agreement;

(ii) the effect which such Force Majeure Event is having on the affected party's performance of its obligations under this Agreement;

O.M.P. No.289/2015 Page 18

(iii) the measures which the affected party is taking, or proposes to take, to alleviate the impact of those Force Majeure Events; and

(iv) any other information relevant to the affected party's claim.

For so long as the affected party continues to claim to be affected by a Force Majeure Event, it shall provide the other party with regular (and not less than monthly) written reports containing;

(1) the information called by this Article; and (2) such other information as the other party may reasonably request the affect party claiming the relief."

XXXXXX "17. TERMINATION ON COMPANY DEFAULT:

17.1 Save as otherwise provided in this Concession Agreement, if the company:

i fails to commence the works on Site within three months from the date of commencement; or ii fails to complete the construction works within the construction period from the date of commencement or within such extension as may be granted by the Government; or iii repeatedly and persistently remains in breach of any of his material obligations under this Concession Agreement; or iv Undergoes winding up proceedings or goes into liquidation whether compulsory or voluntary (except for the purpose of reconstruction, amalgamation or other similar purposes not involving the realization of the assets) or suffers an execution on his goods, or becomes insolvent or compounds with or makes similar arrangements with its creditors or does any act frustrating his ability to fulfill his obligations under this Concession Agreement;

v If the Company reduces its equity in the SPV to less than 51% during the construction period and to less than 26% equity during the balance of concession period arising from O.M.P. No.289/2015 Page 19 the sale, assignment, transfer or other disposition of capital stock by the SPV during the Concession Period. the GOI may, without prejudice to any other right or remedy it may possess, terminate this concession at any time after expiry of 90 (ninety) days after issuing of written notice to the company indicating GOI's intention to terminate this concession.

17.2 If the Concession is terminated in accordance with Clause 17.1 the company shall not be compensated."

34. The termination notice dated 11.05.2009 invoked Clause 16.2.3(ii) for termination of the Concession Agreement. It is reproduced hereinbelow:

"Please refer to the correspondence resting with your letter No.LTCD/DPDEU/L&TTL/DPDEU/01, dated February 24, 2006 intimating the amount of termination claim as Rs.273.05 crores in the event of termination of existing Concession Agreement of Coimbatore bypass. In this context Ministry's letter of event number, dated 28th July, 2006 may be referred wherein the compensation payable as Rs.122.02 crore as per clause 16.6.3(e) of the Concession Agreement was conveyed. This amount then intimated will further get reduced now as balance period has got reduced.

Subsequent to the above, several discussions have been held in the Ministry with your representatives. However, these discussions have not resolved the issue till date and the work of four-laning of NH 47 from km 100 to km 182 including Coimbatore bypass is getting delayed.

In view of the above and under the circumstances, the appropriate option available with the Ministry to achieve the objective of four-laning from km 100 to km 182 of NH 47, is to terminate this Concession Agreement. Accordingly, this letter should be treated as a notice for termination under clause 16.2.3(ii) of the Concession Agreement."

O.M.P. No.289/2015 Page 20

35. The termination notice dated 19.11.2009 further reads as under:

"Please refer to the notice of termination of the concession for the project of Coimbatore bypass issued vide this Ministry's letter No.RW/NH-12014/528/2000-TN/NH-8(pt) dated 11th May, 2009. Reference is also invited to your letter No.Nill dated 30 th June, 2009 wherein it has been accepted that the copy of termination notice from the Ministry has been received by you on 30th June, 2009.

2. Your comments/observations have been considered and it is decided that the proposal of the concessionaire to undertake the 4- laning of bypass in the form of annuity structure is not acceptable as this is not based on competition bidding. Your earlier proposal of combining the bypass along with widening 11/km stretch upto Kerala border was already examined by the Ministry and rejected as the same is beyond the scope of the concession.

3. In view of the foregoing, you are once again notified to Act in accordance with the Clause 16.6.3(f) considering the termination notice issued by the Ministry vide letter No.RW/NH- 12014/528/2000-TN/NH-8(pt) dated 11th May, 2009 as final. The clause 16.6.3(f) is reproduced as follows:

16.6.3(f)-(i) execution of transfer deeds and other writings in favour of GOI, transferring and assigning the Project Assets to GOI; and 16.6.3(f)-(ii) delivery of possession of the Project and Project Assets to GOI, whichever is later, free from all encumbrances, charges and liens whatsoever.

It may further be noted that this is without prejudice to any other remedies available to the Ministry under the concession agreement."

36. A reading of the above termination notices would clearly show that the petitioner did not invoke Clause 17 of the Concession Agreement O.M.P. No.289/2015 Page 21 which provides for termination of the Concession Agreement for default of the Concessionaire/respondent no.1. The petitioner, on the other hand, invoked Clause 16.2.3 (ii) which provides for termination of the Concession Agreement for 'GOI Political event' in form of 'Expropriation or compulsory acquisition by any Indian governmental agency or any State Government agency of any material assets or rights of the company.'

37. The Arbitral Tribunal has rightly held that in the facts of the present case, there was no expropriation or compulsory acquisition and therefore, there was no Force Majeure event justifying the termination of the Agreement.

38. As noticed by the Arbitral Tribunal, the Government of India on 25.07.2003, issued a certificate that it has engaged M/s Sanrachna Multipurpose Consultancy Services Pvt. Ltd., Bhopal as Detailed Project Report (DPR) Consultant for preparing DPR from KM 100 to KM 182 (Kerala Border). This included stretch of the Coimbatore bypass as well. The petitioner protested against the same by its letters dated 19.02.2004 and 18.11.2004. The respondent no.1, in the meeting of the SG held on 18.12.2006, even offered to construct the four laning for the entire stretch of KM 100 to KM 182. This was declined as being beyond the terms of the Concession Agreement. In the meeting held on 29.03.2007, the respondent no.1 was called upon to give a proposal for four laning of Coimbatore bypass. A suggestion was also given to do away with the Athupalam Bridge and instead the respondent no.1 will be allowed to extend the four laning up to Kerala border (KM 182) and collect user fee from the users of this facility. Respondent no.1 submitted the proposal O.M.P. No.289/2015

Page 22 and the petitioner by a letter dated 06.07.2007 called upon the respondent no.1 for a meeting to discuss the same. Therefore, clearly the respondent no.1 never refused to construct the additional lanes in the Coimbatore bypass, in fact, it was insisting that the said contract be allotted to the respondent no.1 alone. The respondent no.1, therefore, cannot be said to be in breach of its contractual obligations. Its suggestion of carrying out the four laning work for the entire stretch between KM 100 to KM 182 and/or for the additional area of 11 kilometers up to Walayar (Tamil Nadu/Karnataka Border) cannot be said to evidence its refusal to carry out the four laning work. In fact, as submitted by the learned senior counsel for the respondent no.1, in terms of Clause 6.5 of the Concession Agreement, the petitioner could have called upon the respondent no.1 to construct additional lanes only where the traffic on the bypass substantially increased. No such case of increase of traffic requiring construction of the additional lanes has been set up by the petitioner from the correspondence. It is clear that the additional lanes were been constructed as a part of a larger project of construction of four lane highway from KM 100 to KM 182 and not because of any increase in traffic on the Coimbatore bypass.

39. In view of the above, the finding of the Arbitral Tribunal that the termination of the Agreement was unsustainable cannot be said to be perverse or warranting any interference from this Court.

40. The last challenge of the petitioner is to the direction of the Arbitral Tribunal to award the four laning project for the Coimbatore bypass to the respondent no.1. The learned senior counsel for the petitioner submits that such a direction would amount to grant of specific O.M.P. No.289/2015 Page 23 performance of the contract for construction, which cannot be sustained. He submits that in fact, the Arbitral Tribunal itself has directed both the parties to work out the new toll rates which would be required as a consequence of the above direction.

41. This issue need not detain me as the learned senior counsel for the respondent no.1 has no objection if this direction is set aside by this Court, leaving it open to the parties to work out the issue of four laning of the Coimbatore bypass in accordance with the Concession Agreement, meaning thereby, that incase the petitioner seeks to have the lanes increased on the bypass, it would call upon the respondent no.1 to do the same in accordance with the terms of the Concession Agreement.

42. In view of the above concession by the respondent no.1, the direction of the Arbitral Tribunal as contained in paragraph 104 of the Impugned Award is set aside.

43. In view of the above discussion, the challenge to the Impugned Award, except to the direction contained in paragraph 104 thereof, is dismissed. The parties shall bear their own costs.

NAVIN CHAWLA, J

OCTOBER 11, 2019
RN

O.M.P. No.289/2015                                                    Page 24

# EXHIBIT E

Delhi High Court

Om Logistics Limited vs National Insurance Company ... on 30 May, 2017

```
        *              IN THE HIGH COURT OF DELHI AT NEW DELHI

        +                          RSA No.82/2017

        %                                              30th May, 2017

        OM LOGISTICS LIMITED                                  ..... Appellant
                    Through:              Mr. Arun Aggarwal, Advocate.

                              versus

        NATIONAL INSURANCE COMPANY LIMITED AND ANR.
                                    ..... Respondents
```

CORAM:

HON'BLE MR. JUSTICE VALMIKI J.MEHTA To be referred to the Reporter or not?

VALMIKI J. MEHTA, J (ORAL)

1. This Regular Second Appeal under Section 100 of the Code of Civil Procedure, 1908 (CPC) is filed by the defendant in the suit impugning the concurrent judgments of the courts below; of the Trial Court dated 12.4.2016 and the First Appellate Court dated 11.1.2017; by which the suit for recovery of Rs.1,44,547/- has been decreed along with interest at 9% per annum simple. The subject suit was filed by the respondents/plaintiffs for recovery of amount on account of loss caused by the appellant/defendant/transporter by short delivery of the goods transported by the appellant/defendant for the respondent no.2 herein, and who was the plaintiff no.2 in the trial court.

2. The facts of the case are that the National Insurance Company Limited as plaintiff no.1 and M/s Synthite Industrial Chemicals Limited as plaintiff no.2 (respondent nos.1 and 2 herein respectively) filed the subject suit pleading that the appellant/defendant is the common carrier of goods and which company was entrusted for transportation by the respondent no.2/plaintiff no.2, a consignment of 142 cartons with an insured value of Rs.16,91,305/-. The consignment in question was booked by the appellant/defendant vide its consignment note no. 948802 dated 1.10.2003. The consignment was ex-Kochi to New Delhi. Transportation was to be by road. During the course of transportation four cartons having value of Rs.1,44,547/- were lost by the appellant/defendant because out of the 142 cartons given to the appellant/defendant for transportation only 138 cartons were finally delivered. The appellant/defendant confirmed the short delivery of goods/cartons by issuing its short certificate delivery bearing serial no.1949 dated 11.11.2003. The respondent no.2/plaintiff no.2 had insured the consignment with the respondent no.1/plaintiff no.1, and accordingly because of the loss having occasioned which was covered under the Marine Policy no.570802/21/03/4400001, respondent no.1/plaintiff no.1 paid and settled the claim of Rs.1,44,547/- to the respondent no.2/plaintiff no.2. After settlement of the claim, the respondent

no.2/plaintiff no.2 executed a letter of subrogation dated 23.8.2004 in favour of the respondent no.1/plaintiff no.1. The loss notice under Section 10 of the Carriers Act (the Carriers Act, 1865, the statute as then applicable) dated 19.12.2003 was served upon the appellant/defendant by the respondent no.2/plaintiff no.2 with respect to the loss of Rs.1,44,547/-. The subject suit hence came to be filed on behalf of the two respondents/plaintiffs with the respondent no.2/plaintiff no.2 being the owner of goods who had transported its goods through the appellant/defendant, and the respondent no.1/plaintiff no.1/insurance company which had settled and paid the claim to the respondent no.2/plaintiff no.2 and taken the letter of subrogation dated 23.8.2004 in its favour.

3. The appellant/defendant contested the suit and denied its liability. It was pleaded by the appellant/defendant that the loss notice dated 19.12.2003 was not served upon the appellant/defendant. Locus standi of the respondent no.1/plaintiff no.1 to file the suit was denied. The appellant/defendant also denied that any cause of action had accrued in favour of the respondents/plaintiffs. It was accordingly prayed that the suit be dismissed.

4. After the pleadings were complete, the trial court framed the following issues:-

> "1. Whether the suit of the Plaintiff is barred by limitation?
>
> OPD
>
> 2. Whether the suit of the Plaintiff is not maintainable as Plaintiff had not complied with the provisions of Section 10 of Carriers Act? OPD
>
> 3. Whether the Plaintiff is entitled for a recovery of Rs.1,44,547/- from the Defendant as claimed for? OPP
>
> 4. Whether the Plaintiff is entitled for any interest if so at what rate and for which period? OPP
>
> 5. Relief, if any."

5. Evidence was thereafter led by both the parties and the documents which are proved through the deposition of witnesses of the respondents/plaintiffs and the appellant/defendant are referred to in paras 16 to 18 of the judgment of the trial court and these paras read as under:-

> "16. Plaintiff in order to prove his case, has examined Sh. Sharat Kashyap as Administrative Officer, National Insurance Company Limited at Delhi Regional Office-I, Jeevan Bharti Building, Cannaught Place, Parliament Street, New Delhi110001, as PW1 by way of his affidavit Ex.PW1/A. He relied upon the following documents:
>
> 1. Ex.PW1/1 was de-exhibited and marked as Mark-PW1/1 being a photocopy of power of attorney in favour of all the Manager.

2. Ex.PW1/2 Marine Insurance Certificate.

3. Ex.PW1/3 was de-exhibited and marked as Mark-PW1/3 being photocopy of invoice No.L/8322003-2004.

4. Ex.PW1/4 was de-exhibited and marked as Mark-PW1/4 being photocopy of consignment note.

5. Ex.PW1/5 certificate of facts dated 11.11.2003.

6. Ex.PW1/6 was de-exhibited and marked as Mark-PW1/6 being photocopy of letter of Ministry of Finance.

7. Ex.PW1/7 legal notice dated 19.12.2003 along with original AD card.

8. Ex.PW1/8 submission of claim dated 20.12.2003.

9. Ex.PW1/9 cost of missing cargo.

10. Ex.PW1/10 Section 64 VB Compliance Format.

11. Ex.PW1/11 is claim discharge voucher.

12. Ex.PW1/12 is letter of subrogation.

17. On the other hand, Defendant company has examined Sh. Anubhav Chaturvedi, Officer (Legal and Liaison), Om Logistics Limited as DW1 by way of his affidavit Ex.DW1/A. He has relied on the following documents:

1. Ex.DW1/1 resolution in favour of previous AR Sh. Vivek Kalia.

2. Ex.DW1/2 resolution in favour of DW1.

18. Defendant company has also examined Sh. Anil Kumar, Booking Clerk, Om Logistics Limited as DW2 by way of his affidavit Ex.DW2/A. He has relied on the documents Ex.DW2/1 which is authority letter."

6. The trial court decreed the suit holding that the suit is within limitation and also that the requirement of Section 10 of the Carriers Act of serving of notice dated 19.12.2003 was complied with. The loss in question was proved in terms of the short delivery certificate dated 11.11.2003 issued by the appellant/defendant itself. The suit was accordingly decreed on account of the loss of a sum of Rs. 1,44,547/- caused by the appellant/defendant as a transporter, being for the short delivery/non-delivery of four cartons, and the fact that the respondent no.1/plaintiff no.1/insurance company had paid the amount under the subject policy to the respondent no.2/plaintiff no.2 and

taken the letter of subrogation thus entitling it to recover the loss amount.

7. On behalf of the appellant/defendant it is argued that the judgments of the courts below are liable to be set aside and that there is perversity in the findings and conclusions of the courts below on account of the following reasons:-

(i) The subject suit was filed on 11.10.2006 and which is after three years and one day of arising of the cause of action because cause of action had accrued on 10.10.2003 when the consignment was short delivered to the extent of four cartons. The suit was thus time-barred.

(ii) That the loss notice under Section 10 of the Carriers Act dated 19.12.2003 has been wrongly held to be proved by the courts below to have been served upon the appellant/defendant.

(iii) The short delivery certificate dated 11.11.2003 could not have been looked into because it was a short delivery certificate issued without prejudice and hence the same could not be looked into in view of Section 23 of the Indian Evidence Act, 1872.

(iv) The letter of subrogation dated 23.8.2004 is a forged and fabricated document and which is clear from the fact that whereas the date of said letter of subrogation is 23.8.2004, however its attestation is of prior date of 17.6.2004. The letter of subrogation is also pleaded to be forged because the same was attested on 17.6.2004 whereas the purchase of the stamp paper is of a later viz. 7.7.2004.

(v) There was no valid authority on behalf of the respondent no.1/plaintiff no.1/insurance company for filing of the suit by the person who filed the suit namely Sh. N.S. Dhillow, Manager.

8. In my opinion, all the arguments urged on behalf of the appellant/defendant are without substance and are liable to be rejected. No substantial question of law arises. Reasons are given hereinafter.

9.(i) Taking the first issue as to the suit was barred by limitation because it is not filed within three years but it was filed on the first date after the expiry of three years, it is seen that the subject suit was admittedly filed on 11.10.2006. It is not disputed that cause of action in this case accrued on 10.10.2003 when there was short delivery of four cartons. The period of three years therefore has to be reckoned w.e.f 11.10.2003 and three years of which then would therefore expire on 10.10.2006. The suit has been however filed on 11.10.2006. The issue is that whether the suit is barred being beyond the period of limitation by one day.

(ii) In my opinion, the suit is not barred by time by one day inasmuch as the answer to this issue is found in Section 15(2) of the Limitation Act, 1963 and which provides that where a legal notice has to be given for filing of a suit then the period with respect to notice has to be added to the period of limitation. Section 15(2) of the Limitation Act reads as under:-

Om Logistics Limited vs National Insurance Company ... on 30 May, 2017

"Section 15. Exclusion of time in certain other cases.- XXXXX (2) In computing the period of limitation for any suit of which notice has been given, or for which the previous consent or sanction of the Government or any other authority is required, in accordance with the requirements of any law for the time being in force, the period of such notice or, as the case may be, the time required for obtaining such consent or sanction shall be excluded.

Explanation.-In excluding the time required for obtaining the consent or sanction of the Government or any other authority, the date on which the application was made for obtaining the consent or sanction and the date of receipt of the order of the Government or other authority shall both be counted."

(iii) In this case if the loss notice dated 19.12.2003, and sending of which is a sine qua non in view of the Section 10 of the Carriers Act, was duly served upon the appellant/defendant, then, the period with respect to this notice is liable to be excluded i.e added to the period of limitation of three years.

10. This aspect and argument of service of loss notice dated 19.12.2003 is also related to the second argument urged on behalf of the appellant/defendant because the appellant/defendant pleads that the loss notice dated 19.12.2003 was never served upon the appellant/defendant. Let us examine the first two arguments urged by the appellant/defendant.

11. The loss notice dated 19.12.2003 has been proved and exhibited as Ex.PW1/7. Along with the loss notice there is also an AD card of the postal department. This AD card bears the stamp of the appellant/defendant showing receipt of the letter dated 19.12.2003 on 3.1.2004. In my opinion therefore it is proved by the respondent no.2/plaintiff no.2 that the loss notice Ex.PW1/7 dated 19.12.2003 has been duly served upon the appellant/defendant in view of the filing and proving of the AD card of the postal department which is also exhibited as Ex.PW1/7 along with the loss notice dated 19.12.2003 also as Ex.PW1/7.

12. Learned counsel for the appellant/defendant sought to argue that the loss notice dated 19.12.2003/Ex.PW1/7 should not be held to be proved inasmuch as the sending of the legal notice can only be proved by a postal receipt, and not because of an AD card, however, this argument is completely misconceived because not only the acknowledgment card is a printed card of the department of posts, the same also contains the postal registration number of the postal cover as no.1653. Once the respondents/plaintiffs have proved and exhibited the loss notice and AD card as Ex.PW1/7, then, if the case of the appellant/defendant was that AD card is forged and fabricated, then the onus shifted upon the appellant/defendant to summon the official from the postal department that the AD card is not the AD card which is issued by the department of posts. Admittedly the appellant/defendant did not summon the witness from postal department to prove that the AD card is not with respect to a letter issued vide registration no.1653, and therefore, in my opinion, on preponderance of probabilities the courts below have rightly held that the loss notice dated 19.12.2003 along with its AD card have been rightly proved as Ex.PW1/7. The first two arguments urged on behalf of the appellant/defendant are therefore rejected because not only the loss notice dated 19.12.2003 has been proved to be served but also the fact that once the period of

service of the loss notice dated 19.12.2003 has to be taken as excluded, and which period will be at least of one day because it takes at least one day to issue the letter and sending it to the addressee, and therefore if one day is added to the limitation period of three years, then, the subject suit having been filed after three years and one day of arising of the cause of action would be within limitation by application of provision of Section 15(2) of the Limitation Act. In fact the period to be added to the period of three years would be from 19.12.2003 to 3.1.2004 when the loss notice was served upon the appellant/defendant. The first two arguments of the appellant/defendant thus have no merit and are accordingly rejected.

13.(i) The third argument urged on behalf of the appellant/defendant was that the short delivery certificate dated 11.11.2003/Ex.PW1/5 cannot be looked into as it was issued without prejudice and hence taking the same as evidence is barred under Section 23 of the Indian Evidence Act. In this regard, firstly it is seen that no objection was raised to the exhibition of this document Ex.PW1/5 when this document was tendered and exhibited in evidence in the statement of PW1 Sh. Sharat Kashyap on 7.10.2014. Once there is no objection to the exhibition of this document, any right which the appellant/defendant may have had under Section 23 of the Indian Evidence Act would stand waived. I may also note that there is no defence laid down in the written statement of the appellant/defendant that this loss notice Ex.PW1/7 dated 19.12.2003 cannot be looked into in view of the bar contained in Section 23 of the Indian Evidence Act and no such defence in the written statement could be pointed out to this Court during the course of arguments on behalf of the appellant/defendant.

(ii) There is another reason why the argument on behalf of the appellant/defendant that short delivery certificate Ex.PW1/5 cannot in law be looked into because it is issued without prejudice, inasmuch as, this certificate besides showing that it is without prejudice, it is stated in the same that that it is without prejudice to the rights of the appellant/defendant as a carrier i.e the rights of the appellant/defendant as a carrier under the Carriers Act are saved. The right of a carrier under the Carriers Act is only if the loss notice was not served upon the appellant/defendant/carrier as per Section 10 of the Carriers Act. As already discussed above, the loss notice dated 19.12.2003 Ex. PW1/7 has been duly proved to have been served upon the appellant/defendant, and therefore, the language of the short delivery certificate Ex.PW1/5 dated 11.11.2003 in fact goes against the appellant/defendant. Therefore in my opinion, nothing in fact turns upon the expression strictly without prejudice as stated in the short delivery certificate Ex.PW1/5 dated 11.11.2003. This argument of the appellant/defendant is also therefore rejected.

14.(i) The next argument urged on behalf of the appellant/defendant was that the letter of subrogation Ex.PW1/12 dated 23.8.2004 should be held to be a forged and fabricated document. Two arguments in this regard have been urged. Firstly, it is argued that if the document bears the date of 23.8.2004 then how can the same be attested by a Notary of an earlier date of 17.6.2004. Also, it is argued that the stamp paper in question with respect to letter of subrogation Ex.PW1/12 is dated 7.7.2004, and therefore, there could not have been attestation of an earlier date on 17.6.2004.

(ii) Both the arguments urged on behalf of the appellant/defendant to argue that the letter of subrogation Ex.PW1/12 is a forged and fabricated document are without any basis whatsoever.

Firstly, it is seen that there is no locus standi in the appellant/defendant to question the issue of letter of subrogation because the questioning of letter of subrogation issued by the respondent no.2/plaintiff no.2 in favour of the respondent no.1/plaintiff no.1/insurance company would only be of the respondent no.2/plaintiff no.2. Once the respondents/plaintiffs filed and proved the letter of subrogation then if the contention of the appellant/defendant was that the same was not duly executed by the respondent no.2/plaintiff no.2 in favour of the respondent no.1/plaintiff no.1, then, the appellant/defendant could have summoned any officer of the respondent no.2/plaintiff no.2 that the letter of subrogation was not issued by the respondent no.2/plaintiff no.2. That however has not been done. Also it is noted that the date of purchase of the stamp paper is not 7.7.2004 as is argued on behalf of the appellant/defendant but the date of the purchase of the stamp paper of the letter of subrogation is 7.7.2002 i.e much prior to execution of the letter of subrogation on 23.8.2004. The date of 7.7.2002 is also the date prior to the date of the attestation by the Notary on 17.6.2004. Accordingly, it cannot be argued on behalf of the appellant/defendant that the notarization dated 17.6.2004 is earlier than the date of purchase of the stamp paper which is alleged to be dated 7.7.2004 because in fact the purchase of the stamp paper of the letter of subrogation is not 7.7.2004 but is 7.7.2002 and which becomes clear from the back side of the stamp paper of the letter of subrogation and which has been examined by this Court.

(iii) Also the issue of notarization being of an earlier date of 17.6.2004 does not impress this Court for various reasons. Firstly it is seen that the Notary in his own hands by writing three lines has given endorsement of the notarization being of 23.8.2004, and this is found in green coloured pen lines written on the second page of the letter of subrogation. In any case at best this argument of the appellant/defendant will result in letter of subrogation being a non-notarized document, but non-notarization is not the same thing as non-execution and accordingly once the letter of subrogation has been proved and exhibited as Ex.PW1/12 by the respondents/plaintiffs, and unless the appellant/defendant had summoned any officer from the respondent no.2/plaintiff no.2 to prove the non- execution of the letter of subrogation Ex.PW1/12, the courts below have therefore committed no illegality in holding that the letter of subrogation Ex.PW1/12 stands duly proved. The fourth argument urged on behalf of the appellant/defendant that the letter of subrogation Ex.PW1/12 is a forged and fabricated document is therefore rejected.

15.(i) The last argument urged on behalf of the appellant/defendant is that the suit cannot be said to have been validly filed through Sh. N.S. Dhillow on behalf of the respondent no.1/plaintiff no.1 inasmuch as the power of attorney filed in favour of Sh. N.S. Dhillow was de-exhibited as from Ex.PW1/1 to Mark PW1/1.

(ii) This argument is misconceived as it is settled law after the judgment of the Supreme Court in the case of United Bank of India Vs. Naresh Kumar and Others (1996) 6 SCC 660 that if on behalf of a company a litigation is pursued to the hilt then on technicality such a suit/litigation could not be dismissed that the suit was not properly instituted.

(iii) I would also like to add another reason and which is that a suit by a company by virtue of Order XXIX CPC can always be instituted by a Principal Officer of the company. In the plaint, it is stated that Sh. N.S. Dhillow is the Manager of the respondent no.1/plaintiff no.1/insurance company and

in the written statement it is only the authority of Sh. N.S. Dhillow to file a suit which has been denied and it is not disputed that Sh. N.S. Dhillow is not the Administrative Officer of the respondent no.1/plaintiff no.1. Once Sh. N.S. Dhillow is a Principal Officer, then by virtue of Order XXIX Rule 1 CPC, the suit has to have been taken as validly filed on behalf of the respondent no.1/plaintiff no.1/insurance company by its Principal Officer being Sh. N.S. Dhillow and who was the Administrative Officer of the respondent no.1/plaintiff no.1. This argument of the appellant/defendant is also therefore rejected.

16. In view of the above, no substantial question of law arises. Dismissed.

```
     MAY 30, 2017                          VALMIKI J. MEHTA, J
     Ne
```

# EXHIBIT F





Document-Id: 302910, **Please cite as:** "https://www.trans-lex.org/302910"

## Title

Rush & Tompkins Ltd. v. Greater LondonCouncil [1989] AC 1280

## Table of Contents

Rush & Tompkins Ltd. v. Greater London Council

    Interlocutory Appeal from Judge Esyr Lewis Q.C., sitting on official referee's business.

    The following judgment of the court was handed down (21 December) Balcombe L.J.

    Appeal from the Court of Appeal.

      The facts are stated in the opinion of Lord Griffiths.

    Lord Bridge of Harwich (3. November)

    Lord Brandon of Oakbrook

    Lord Griffiths

    Lord Oliver of Aylmerton

    Lord Goff of Chieveley

## Content

1282

# Rush & Tompkins Ltd. v. Greater London Council

## Interlocutory Appeal from Judge Esyr Lewis Q.C., sitting on official referee's business.

By a writ dated 20 August 1979 and a statement of claim the plaintiffs, Rush & Tompkins Ltd., claimed, inter alia, (a) against the first defendant, the Greater London Council, a declaration that on a true construction of a main contract contained in documents dated 28 December 1971 and 1 April 1977 by which the plaintiffs undertook to carry out and complete the erection of dwellings and ancillary works on a site at the Hanwell Estate, Ealing, West London, the first defendant was bound to pay to the plaintiffs any sum in respect of direct loss and expense for which the plaintiffs were liable to the second defendants, the subcontractors, P. J. Carey Plant Hire (Oval) Ltd. (trading as P. Carey Contractors), save in so far as such loss had been caused by the plaintiffs' default; (b) against the first and second defendants an account and inquiry as to the amount of any direct loss and expense to which the second defendants were entitled under the terms of the subcontract entered into between themselves and the plaintiffs in or about 26 January 1973 for ground works on the site.

On 12 October 1981, following "without prejudice" correspondence, the plaintiffs and the first defendant entered into a compromise agreement whereby the first defendant agreed to pay to the plaintiffs the sum of £1,200,000, the plaintiffs agreeing to be responsible to meet all claims made by the second defendants. The plaintiffs thereafter discontinued their action against the first defendant.

By a summons dated 22 October 1986 the second defendants applied for an order that the plaintiffs be required to provide specific discovery of the documents specified in schedule 1 part 2 of their supplemental list of documents dated 5 September 1986, being correspondence between the plaintiffs and the first defendant brought into existence for the purpose of reaching settlement with the first defendant, which preceded and culminated in the compromise agreement made between those parties and dated 12 October 1981. On 12 February 1987 Judge Esyr Lewis Q.C. dismissed the second defendants' summons.

By their notice of appeal dated 5 March 1987 the second defendants appealed on the ground, inter alia, that the judge ought to have held that, by reason of the fact that the "without prejudice" correspondence led up to a concluded settlement between the plaintiffs and the first defendant, and of the fact that the second defendants were not parties to the correspondence, the documents were not, or alternatively, had ceased to be privileged from discovery at the suit of the second defendants.

The facts are stated in the judgment.

*Richard Fernyhough Q.C.* for the second defendants. Under the subcontract the second defendants are entitled to recover loss and

expense from the plaintiffs and in the global settlement reached with the first defendant the plaintiffs received moneys on account for the second defendants which they have failed to pay over to them. The "without prejudice" correspondence passing between the first defendant and the plaintiffs is not privileged from discovery on the facts of this case. The privilege accorded to "without prejudice " correspondence rests chiefly on the principle of public policy that parties should be encouraged to settle disputes out of court (see South Shropshire District Council v. Amos [1986] 1 W.L.R. 1271), but once established, the privilege is not absolute and may be defeated in various ways, e.g. to establish whether or not an agreement has in fact been reached or to prove a threat contained in a privileged letter: see Phipson on Evidence, 13th ed. (1982), para. 19-11 and Halsbury's Laws of England, 4th ed., vol. 17 (1976), pp. 151-153, paras. 212-213. Further, the court can and will remove privilege if the circumstances so require it: see Cutts v. Head [1984] Ch. 290. Thus it is apparent that the public policy principle encouraging settlement may give way on occasions to other principles of public policy which will not protect unlawful acts from disclosure. Moreover the privilege is personal to the immediate parties to the correspondence and only binds them. There is no reason in law why it should bind third parties: see Phipson on Evidence and Teign Valley Mining Co. Ltd. v. Woodcock, The Times, 22 July 1899.

I. Waxman & Sons Ltd. v. Texaco Canada Ltd. [1968] 1 O.R. 642, and on appeal [1968] 2 O.R. 452 can be distinguished from the present case. The judge at first instance in a judgment which was affirmed on appeal there considered correspondence which had not led to settlement, and he equated solicitor-client privilege with "without prejudice" privilege, but it is clear that the two heads of privilege are different with different considerations applying. See also Derco Industries Ltd. v. A. R. Grimwood [1985] 2 W.W.R. 137 and Lorne Stewart Ltd. v. William Sindall Plc. (1986) 35 B.L.R. 109.

The facts of the present case are common in building disputes. There are therefore good public policy reasons why the correspondence should be discoverable to third parties. The settlement agreement itself has been disclosed, but it is characteristically unhelpful to the second defendants since it states an agreement to compromise proceedings for a lump sum, but does not indicate how that sum has been perceived or calculated. In a building dispute it is the detailed breakdown which is crucial. Therefore disclosure of the relevant documents on which the first defendant and the plaintiffs have settled is likely to establish the true differences between the second defendants and the plaintiffs, and that in turn will shorten these proceedings and possibly lead to a further compromise. The judge dealt with the matter as one of overriding principle and did not look at the facts of the case. He was wrong to hold that the privilege arising between the plaintiffs and the first defendant extended to the whole world. He was also wrong to rely on the decision in The Aegis Blaze [1986] 1 Lloyd's Rep. 203. That case concerned litigation privilege to which different policy considerations apply; in particular, litigation privilege is by its very nature personal and attaches to the party claiming it; in consequence and unlike "without prejudice"

correspondence it does not arise solely due to communications with another party. *The Aegis Blaze* is accordingly distinguishable from the present case and is not binding on the court for present purposes.

The present "without prejudice" correspondence may be relevant to the pleaded issues between the plaintiffs and the second defendants. Its discovery may well lead to settlement of the remaining issues between them. The privilege does not bind third parties particularly since their interests are discussed in and effected by the settlement achieved as a result of the correspondence. After the conclusion of the settlement between the plaintiffs and the first defendant there can be no policy consideration in favour of continuing the privilege. It is however accepted that quite other considerations would arise where no settlement has been reached by virtue of the correspondence.

*Charles Hollander* for the plaintiffs. The judge was right to decide the matter as a question of general principle and he reached the correct conclusion. "Without prejudice" correspondence is protected because the law encourages the freedom of parties to negotiate without fear that any admission or concession will be used against them. To allow discovery of such correspondence even in another action would therefore weaken the protection thus given and, a fortiori, where the correspondence is sought to be disclosed in the same action, since the admissions, concessions and content of negotiations passing between the plaintiffs and the first defendant are far more likely to inhibit a party from conducting negotiations. If the disclosure as now sought were to be given, the effect would be to discourage settlements and that the court has always set its face against: see Hoghton v. Hoghton (1852) 15 Beav. 278, 321, *per* Sir John Romilly M.R., and Jones v. Foxall (1852) 15 Beav. 388, 396. Nor will the court permit the principle to be eroded: see La Roche v. Armstrong [1922] 1 K.B. 485, 489, *per* Lush J. Exactly the same principles apply to solicitor- client privilege as to "without prejudice " privilege, including the maxim "once privileged, always privileged": see I. Waxman & Sons Ltd. v. Texaco Canada Ltd. [1968] 1 O.R. 642, and [1968] 2 O.R. 452; Derco Industries Ltd. v. A. R. Grimwood Ltd. [1985] 2 W.W.R. 137 and The Aegis Blaze [1986] 1 Lloyd's Rep. 203 which is relevant and binding on the court.

The classic definition of "without prejudice" correspondence is that of Lindley L.J. in Walker v. Wilsher (1889) 23 Q.B.D. 335, 337, approved by Danckwerts L.J. and Ormrod J. in Tomlin v. Standard Telephones & Cables Ltd. [1969] 1 W.L.R. 1378, and by Oliver and Fox L.JJ. in Cutts v. Head [1984] Ch. 290, 305-306, 313. Walker v. Wilsher is also authority for the proposition that where letters have become inadmissible because written without prejudice they do not become admissible after the issues have been disposed of. The authorities show that "without prejudice" privilege therefore appears to be a mixture of public policy, convention and implied agreement: see Cutts v. Head [1984] Ch. 290.

However there is no binding authority on whether "without prejudice " correspondence is disclosable to third parties except The Aegis Blaze [1986] 2 Lloyd's Rep. 203 and the persuasive authority of I. Waxman & Sons Ltd. v. Texaco Canada Ltd. [1968] 1 O.R. 642 and [1968]    2    O.R.452.    Walker    v.    Wilsher,    23    Q.B.D.    335

, is concerned with the position between the parties, and does not deal with third parties. In addition in that case agreement had been reached as a result of the "without prejudice " correspondence. It is clear that if agreement is reached, the agreement itself is not

privileged: see Tomlin v. Standard Telephones & Cables Ltd. [1969] 1 W.L.R. 1378 and that in certain circumstances it might be a proper construction of the "without prejudice" negotiations for an unqualified admission to be made which is not protected: see In re Daintrey, Ex parte Holt [1893] 2 Q.B. 116. See also Holdsworth v. Dimsdale (1871) 24 L.T. 360; Teign Valley Mining Co. Ltd. v. Woodcock, The Times, 22 July 1899, and Stretton v. Stubbs Ltd., The Times, 28 February 1905; see also Cross on Evidence, 6th ed. (1985), pp. 408-410. Although a narrow view of "without prejudice" privilege cannot be justified (see Walker v. Wilsher, 23 Q.B.D. 335), where proceedings are not settled then the communications remain privileged and are not discoverable to third parties such as the second defendants. The officious bystander if asked whether "without prejudice " admissions could be relied on by the plaintiff in a new action against the defendant after settlement of a previous action would unhesitatingly say "No " and such a result accords with common sense and the policy behind the privilege.

If the court were to allow discovery, settlement would be discouraged particularly in multi-party actions because as soon as one part of the dispute had been settled there would be an application for discovery and all the negotiations would be opened up and interrogatories asked; also those advising as to "without prejudice" negotiations would probably suggest great caution thereby avoiding settlement. "Without prejudice" privilege would take a different route from other heads of privilege for no justifiable reason.

*Fernyhough* in reply. The question is whether the privilege subsists or disappears once the "without prejudice" negotiations reach a concluded settlement. Lindley L.J. defined the nature of the privilege in Walker v. Wilsher, 23 Q.B.D. 335, 337. But is the present case an exception to the cloak of privilege? There is no authority directly in point but where settlement is reached, then the cloak should go, since the policy reason for the privilege has been fulfilled. The result may well be that negotiations will be more difficult in multi-party actions, but that merely requires the parties to be circumspect in their dealings, and there is nothing to stop them conducting their negotiations orally. However it cannot be right for two parties to litigation to deny documents to a third party in the same litigation and the public policy preventing disclosure should cease to be a relevant consideration once the negotiations have achieved a settlement.

Cur. adv. vult.

## The following judgment of the court was handed down (21 December) Balcombe L.J.

In December 1971 the Greater London Council ("G.L.C.") entered into a contract with Rush and Tompkins Ltd. for

the development of the Hanwell Estate in Ealing by the construction of 639 dwellings. In January 1973 Rush and Tompkins engaged P. J. Carey Plant Hire (Oval) Ltd. (trading as P. Carey Contractors, and hereinafter called "Carey Contractors") as domestic subcontractors to carry out certain ground works required by the main contract. Between June 1976 and January 1979 Carey Contractors submitted to Rush and Tompkins claims for loss and expense to which they contend they are entitled under the subcontract. So far, Carey Contractors have only received a very small part of the sum to which they claim to be entitled.

In August 1979 Rush and Tompkins started proceedings to which the G.L.C. and Carey Contractors were defendants. By their statement of claim Rush and Tompkins claimed against the G.L.C. a declaration that the G.L.C. were liable to pay to them any sum which they (Rush and Tompkins) were liable to pay to Carey Contractors in respect of direct loss and expense under the subcontract, save in so far as such loss and expense had been caused by Rush and Tompkins' default. They also claimed as against both defendants an inquiry as to the amount of the loss and expense which Carey Contractors were entitled to recover from them, which as against Carey Contractors they contended did not exceed £ 10,000, and certain other heads of consequential relief.

To this statement of claim both defendants put in defences, and the action was in July 1981 transferred to the official referee's list. However, on 12 October 1981 Rush and Tompkins entered into a compromise agreement with the G.L.C., under which the G.L.C. paid the sum of £1,200,000 to Rush and Tompkins, who were to be responsible for meeting all subcontractors' claims. It is accepted by Rush and Tompkins that compromise agreement was preceded by correspondence "without prejudice" between themselves and the G.L.C. In December 1981 Rush and Tompkins discontinued the action against the G.L.C.

Rush and Tompkins' action as against Carey Contractors then went to sleep for over three years. We were not told why, and for the purposes of this judgment the delay is immaterial. After various interlocutory applications Carey Contractors were given leave to amend their defence by adding a counterclaim for an inquiry as to the amount due to them under the subcontract and for payment of any amount found due on the inquiry, which they did in February 1986. Since the hearing at first instance from which this appeal is brought, the counterclaim has been further amended and a defence to counterclaim served, but nothing now turns on this.

This appeal concerns Carey Contractors' application for specific discovery of the "without prejudice" correspondence between Rush and Tompkins and the G.L.C. leading up to the compromise agreement of October 1981. The compromise agreement itself has been disclosed to Carey Contractors. It is conceded by Rush and Tompkins that the correspondence may be relevant to the issues between themselves and Carey Contractors, in that it may show how the global settlement sum was arrived at and how the parties to that agreement evaluated Carey Contractors' claim, but they claim that the correspondence is privileged from disclosure because it was conducted without prejudice. This claim to privilege was upheld by Judge Esyr Lewis Q.C. in a judgment

delivered on 12 February 1987, and it is from that judgment that this appeal is brought with the leave of the judge.

The rule which gives the protection of privilege to "without prejudice " correspondence "depends partly on public policy, namely the need to facilitate compromise, and partly on implied agreement:" *per* Parker L.J. in South Shropshire District Council v. Amos [1986] 1 W.L.R. 1271, 1277. The nature of the implied agreement must depend on the meaning which is conventionally attached to the phrase "without prejudice." The classic definition of the phrase is contained in the judgment of Lindley L.J. in [Walker v. Wilsher](#) (1889) 23 Q.B.D. 335, 337:

"What is the meaning of the words 'without prejudice'? I think they mean without prejudice to the position of the writer of the letter if the terms he proposes are not accepted. If the terms proposed in the letter are accepted a complete contract is established, and the letter, although written without prejudice, operates to alter the old state of things and to establish a new one."

Although this definition was not necessary for the facts of that particular case and was therefore strictly obiter, it was expressly approved by this court in Tomlin v. Standard Telephones & Cables Ltd. [1969] 1 W.L.R. 1378: *see per* Danckwerts L.J. at p. 1383, and *per* Ormrod J. at pp. 1384-1385. Although he dissented in the result, on this point Ormrod J. agreed with the majority. The definition was further cited with approval by both Oliver and Fox L.JJ. in this court in Cutts v. Head [1984] Ch. 290, 305-306, 313. In our judgment, it may be taken as an accurate statement of the meaning of "without prejudice," if that phrase be used without more. It is open to the parties to the correspondence to give the phrase a somewhat different meaning e.g. where they reserve the right to bring an offer made "without prejudice" to the attention of the court on the question of costs if the offer be not accepted (*see* Cutts v. Head), but subject to any such modification as may be agreed between the parties, that is the meaning of the phrase. In particular, subject to any such modification, the parties must be taken to have intended and agreed that the privilege will cease if and when the negotiations "without prejudice" come to fruition in a concluded agreement.

The attribution of such intentions to the parties is, in our judgment, entirely consistent with the considerations of public policy which lead to the court to give protection to what has been said in the course of negotiations under the "without prejudice" rule. As Oliver L.J. said in Cutts v. Head, at p. 306:

"That the rule rests, at least in part, upon public policy is clear from many authorities, and the convenient starting point of the inquiry is the nature of the underlying policy. It is that parties should be encouraged so far as possible to settle their disputes without resort to litigation and should not be discouraged by the knowledge that anything that is said in the course of such negotiations (and that includes, of course, as much the failure to reply to an offer as an actual reply) may be used to their prejudice in the course of the proceedings. They should, as it was expressed

---

**1288**

by Clauson J. in Scott Paper Co. v. Drayton Paper Works Ltd. (1927) 44 R.P.C. 151, 156, be encouraged fully and frankly to put their cards on the table.... The public policy justification, in truth, essentially rests on the desirability of preventing statements or offers made in the course of negotiations for settlement being brought before the court of trial as admissions on the question of liability."

To the like effect was Fox L.J., at p. 314:

"As to public policy it obviously is desirable to facilitate compromise rather than forcing the parties to litigate to the end. But to achieve a compromise one of them has to make an offer. He might be apprehensive that his offer might be used against him if the negotiations failed. So he would make his offer without prejudice to his position if the offer was refused. But that was unfair to the other party. It was one-sided. So it was necessary to extend the 'without prejudice' umbrella to cover both parties."

However, unless the parties have chosen to give the phrase a different meaning, once the "without prejudice" correspondence has resulted in their reaching a concluded agreement, the protection has served the purpose for which it must be treated as having been intended, and this particular head of public policy has no further application. The more general head of public policy which lies behind the rules requiring discovery of documents in civil proceedings (currently R.S.C., Ord. 24 and Order 14 of the County Court Rules 1981) which is to provide the parties with the relevant documentary material before the trial, so as to assist them in appraising the strength or weakness of their respective cases, and thus to provide for the fair disposal of the proceedings before or at the trial: see Halsbury's Laws of England, 4th ed., vol. 13 (1979), p. 2, para. 1, can then take effect.

Approaching the present case on the basis of these principles, it seems to us clear that, unless further authorities compel a different conclusion: (a) the privilege afforded by the correspondence between Rush and Tompkins and the G.L.C. being marked "without prejudice" came to an end when that correspondence came to fruition in the compromise agreement of October 1981; (b) it would then have been discoverable as between the G.L.C. and Rush and Tompkins, had it been relevant to any issue that might still have been outstanding between them, although it is difficult to think of any issue between those parties to which it might have been relevant; (c) it is certainly discoverable as between Rush and Tompkins and Carey Contractors where it is conceded to be relevant.

We now turn to the principal further authorities cited to us to see whether they require us to reach any different conclusion. In Holdsworth v. Dimsdale (1871) 24 L.T. 360, the defendant was being sued on a bill of exchange drawn and indorsed by him. He wrote to the plaintiff's attorneys a letter, headed "without prejudice", as follows:

"I never had any notice of dishonour of this bill, but if the debt will be accepted without costs, I do not want Mr. Holdsworth to be the loser of it, and I would give a cheque."

---

**1289**

Thereupon the plaintiff applied to discontinue the action on payment of costs by him to the defendant, which costs were subsequently taxed and paid. The plaintiff then commenced another action on the bill against the defendant, and offered the "without prejudice" letter as evidence of waiver of notice of dishonour. It was held he could do so. Blackburn J. said, at p. 361:

"Then comes the further question, whether when the letter was only to be without prejudice conditionally and the condition was fulfilled, the letter could be used against the writer of it? The mere statement of the point resolves it. It is, of course, quite right that admissions made without prejudice should not be available against those making them; but when an admission is upon a condition, as here, which has been performed, it would be monstrous to say that it should never be used. Here the writer of the letter says in effect, 'I will waive notice of dishonour if you consent to forego costs. I say this is not an admission against myself unless you accept my offer; if you concur, of course, it may be used.'"

This decision is entirely consistent with the conclusion stated above.

Teign Valley Mining Co. Ltd. v. Woodcock, The Times, 22 July 1899, is cited by both Phipson on Evidence, 13th ed. (1982), paras. 19-11, 20-04; and Halsbury's Laws of England, 4th ed., vol. 17 (1979), p. 151, para. 212, as authority for the proposition that the

protection afforded by "without prejudice" does not extend to third parties.

The report of the Teign Valley case is by no means clear, but it appears that what happened was that, in proceedings between W. and R., W. sought to tender in evidence a document, marked "without prejudice," proposing terms of settlement in an action between T. and R., which contained certain admissions on the part of R. Darling J. admitted the document, although expressing doubts as to whether he was right to do so. The report is such that it is not worthy of citation as constituting authority for any proposition of law: but at least it can be said that it does not appear to be inconsistent with our conclusion above.

Stretton v. Stubbs Ltd., The Times, 28 February 1905, was an action for defamation. The plaintiff alleged that the defendants had published a statement that judgment had been obtained against him in the county court, the innuendo being that this imputed insolvency to the plaintiff. The defendants sought to put in a letter written by the plaintiff "without prejudice," which had led to a concluded settlement in another action, which contained admissions by the plaintiff that he was absolutely insolvent. The trial judge had refused to admit the letter, but this court allowed the letter to be read. Mathew L.J. said that, in his opinion, a letter written with regard to an action and marked "without prejudice" was only privileged for the purposes of that action. The report of this case is also not of the clearest, but the decision appears to be entirely consistent with our conclusion above.

Derco Industries Ltd. v. A. R. Grimwood Ltd. [1985] 2 W.W.R. 137 is a decision of the Court of Appeal for British Columbia which is directly   in   point.   On   facts   very   similar   to   those   in   the   present   case   it   was

**1290**

held that a plaintiff, in the same position as Carey Contractors, was entitled to production of without prejudice correspondence between the defendants and another party, which had led to a concluded settlement in another action arising from the same construction project.

The Derco Industries case was followed by Judge Hawser Q.C. in Lorne Stewart Ltd. v. William Sindall Plc. (1986) 35 B.L.R. 109.

Mr. Hollander, for Rush and Tompkins, relied, as did the judge below, on two appellate decisions, one of the Court of Appeal of Ontario and one of this court.

I. Waxman & Sons Ltd. v. Texaco Canada Ltd. [1968] 2 O.R. 452 is the Ontario Case. The headnote reads:

> "Communications written 'without prejudice' and with a view to settlement of issues between A and C are privileged from production at the instance of B in subsequent litigation between A and B on the same subject-matter or subject-matter closely related to that with which the correspondence in question was concerned."

The Court of Appeal of Ontario, in so holding in a short judgment, upheld a very full and careful judgment to that effect by Fraser J. [1968] 1 O.R. 642. However, a careful reading of both judgments makes it clear that the "without prejudice" correspondence there in question had not led to a concluded settlement: see [1968] 1 O.R. 642, 644. Accordingly, this case is distinguishable from the present one.

The decision of this court, on which Mr. Hollander and the judge relied, is The Aegis Blaze [1986] 1 Lloyd's Rep. 203. The privilege there in question was legal professional privilege. This court held that a party entitled to claim legal professional privilege for a document in one action could claim privilege for the same document in a second or subsequent action provided that there was a sufficient connection for the document to be relevant. However, legal professional privilege is based upon an entirely different head of public policy than that which justifies "without prejudice" privilege, and with all respect to Fraser J. in the Waxman case, who thought that similar reasoning might "well be applicable both to solicitor and -client privilege and to without prejudice privilege" (see [1968] 1 O.R. 642, 657), and to the judge in the present case, these two heads of privilege are wholly different. In our judgment, therefore, The Aegis Blaze affords no assistance in the present case.

That would be enough to dispose of the present appeal, but the case has disclosed what appear to be some widespread misconceptions as to the nature of "without prejudice" privilege. In an attempt to remove those misconceptions, and to give guidance to the profession, we venture to state the following principles. (1) The purpose of "without prejudice" privilege is to enable parties to negotiate without risk of their proposals being used against them if the negotiations fail. If the negotiations succeed and a settlement is concluded, the privilege goes, having served its purpose. This will be the case whether the privilege is claimed as against the other party or parties to the negotiations, or as against some outside party. (2) It is possible for the parties to use a form of words which will enable the "without prejudice " correspondence to be referred to, even though no concluded settlement is reached e.g. on the issue of

**1291**

costs: see [Cutts v. Head](#) [1984] Ch. 290. (3) In contrast, in our judgment, it might be possible for parties to use a special form of words which, at least as between the parties themselves, would preclude reference to "without prejudice" correspondence even after a settlement has been reached. However, no such special form of words was used in the present case and we find it unnecessary to express any view on the effect which the use of such special wording would have in the context of subsequent applications for discovery by third parties. (4) The privilege does not depend on the existence of proceedings. (5) Even while the privilege subsists i.e. before any settlement is reached, there are a number of real or apparent exceptions to the privilege. Thus: (a) the court may always look at a document marked "without prejudice" and its contents for the purposes of deciding its admissibility: see In re Daintrey, Ex parte Holt [1893] 2 Q.B. 116 and South Shropshire District Council v. Amos [1986] 1 W.L.R. 1271. This is not a real exception to the privilege, since the court must always be able to rule on the admissibility of a document, when a claim to privilege is challenged. It is under this head that the court can look at the documents to see e.g. if an agreement has been concluded and, if so, to construe its terms. (b) The rule has no application to a document which, by its nature, may prejudice the person to whom it is addressed. Thus a letter written without prejudice may be used to prove an act of bankruptcy: see In re Daintrey. Other examples are given in Phipson on Evidence, 13th ed. (1982), para. 19-11. (c) There may be other exceptions: see Phipson, but we do not think it appropriate to consider them further, since they do not arise in the context of the present case. (6) The privilege extends to the solicitors of the parties to the "without prejudice " negotiations: see La Roche v. Armstrong [1922] 1 K.B. 485. However, we do not think it necessary or desirable to express any view on the question whether the privilege is valid against a third party (other than a party's solicitor) when no settlement has been reached by the parties to the "without prejudice " negotiations. Teign Valley Mining Co. Ltd. v. Woodcock, The Times, 22 July

1899, suggests that it may not be valid against such a third party: *Waxman & Sons Ltd. v. Texaco Canada Ltd.* [1968] 2 O.R. 452is persuasive authority to the effect that it is valid against a third party in these circumstances. We can see that in such a case there is a balance to be held as between competing principles of public policy and this point should be left for decision in a case when the question arises fairly and squarely.

This appeal has been very well argued on both sides. For the reasons given above we allow it and make an order for specific discovery by Rush and Tompkins of the "without prejudice" correspondence between Rush and Tompkins and the G.L.C. brought into existence for the purpose of reaching settlement with the G.L.C.

*Appeal allowed. Order for specific discovery. Leave to appeal. ([Reported by Miss DIANA PROCTER, Barrister-at-Law] )*

**1292**

## Appeal from the Court of Appeal.

This was an appeal by the plaintiffs in the action, Rush & Tompkins Ltd. from the judgment dated 21 December 1987 of the Court of Appeal (Slade, Balcombe and Stocker L.JJ.), ante, p. 1285H, allowing an appeal by the second defendants, P. J. Carey Plant Hire (Oval) Ltd. (trading as P. Carey Contractors), from the judgment dated 12 February 1987 of Judge Esyr Lewis Q.C. (sitting on official referees' business) dismissing the second defendants' application for specific discovery of documents. The Court of Appeal had ordered that the plaintiffs should give discovery of certain correspondence marked "without prejudice " which had passed between the plaintiffs and the first defendant in the action, the Greater London Council, and which led to a concluded settlement of the disputes between those two parties.

**The facts are stated in the opinion of Lord Griffiths.**

*John Dyson Q.C.* and *Charles Hollander* for the plaintiffs. The issue raised by this appeal is a very short issue and may be stated as follows: if "without prejudice" correspondence comes into existence for the purposes of negotiating a settlement between parties A and B, is that correspondence privileged from production as against C, who is a party to the same action but not a party to the settlement agreement, and against whom A's action continues? There is very little authority on the point, and it should not be decided on the basis of what authority there is but on principle.

Reliance is placed on the following propositions: (1) The general rule is that statements and admissions made by A and B to each other in "without prejudice" negotiations to settle a dispute between them are inadmissible in subsequent litigation between those parties. There are exceptions but none are relevant in the present case. (2) The privilege which attaches to those rights is not removed as between A and B unless they consent to that removal and it is not removed merely because the dispute between them has been settled. (3) The rule is a rule of law and the reason for it is that it is a matter of public policy that settlements of disputes are to be encouraged. (4) The same reason of public policy which makes "without prejudice" material inadmissible as between A and B also makes it inadmissible between B and C, namely, the public interest in encouraging A and B to settle the dispute between them.

The general rule is not in doubt: for a judicial statement of the purpose of the privilege: see *Scott Paper Co. v. Drayton Paper Works Ltd.* (1927) 44 R.P.C. 151, 156, *per* Clauson J.

The courts have always recognised that there must be exceptions to the "without prejudice" rule. Most of them are discussed in Phipson on Evidence, 13th ed. (1982) paragraphs 19-10 and 19-11.

There is no authority which leads to the conclusion reached by the Court of Appeal. The Court of Appeal erred in the reliance it placed on *Walker v. Wilsher* (1889) 23 Q.B.D. 335, in particular, the judgment of Lindley L.J. at p. 337, where he refers to the meaning of the words "without prejudice." But that passage is strictly obiter as Balcombe L.J. in the present case accepted. He, however, pointed out that they had been approved in Tomlin v. Standard Telephones & Cables Ltd. [1969] 1 W.L.R. 1378 and *Cutts v. Head* [1984] Ch. 290. But                              in                              neither                              of                              those

**1293**

cases did the Court of Appeal have to deal with the position of correspondence leading to an agreement but not being part of that agreement once an agreement has been reached. In the Tomlin case the issue was whether two letters were admissible in order to prove an agreement, albeit written "without prejudice." *Cutts v. Head* was concerned with whether any conventional meaning of the words "without prejudice" could be varied by the parties so as to enable one party to stipulate that his "without prejudice" letter might be relied upon on a question of costs.

The second defendants did not seek to argue in the Court of Appeal that the immediate parties to "without prejudice" communications could never rely upon the privilege as against the third party; nevertheless the Court of Appeal left the point open. The only English authority which deals with this question is Teign Valley Mining Co. Ltd. v. Woodcock, The Times, 22 July 1899. Balcombe L.J. was correct in stating that the report is such that it is not worthy of citation as constituting authority for any proposition of law. The same observation may be made of Stretton v. Stubbs Ltd., The Times, 28 February 1905.

Strong reliance is placed on The Aegis Blaze [1986] 1 Lloyd's Rep. 203 by analogy. True it is distinguishable from the present case in that it deals with legal professional privilege, which is privilege simpliciter, and not "without prejudice" privilege, which is a form of privilege sui generis and might be described as quasi privilege. Nevertheless, the rationale behind the rule is similar. The law has taken a firm stand in respect of legal professional privilege that the public interest in maintaining that privilege outweighs the public interest in production of all relevant documentation so that legal professional privilege subsists in a different action so long as the party claiming privilege in the second action is the person entitled to privilege in the first action. Croom-Johnson L.J., at pp. 210-211, justified the maintenance of legal professional privilege outside the immediate action for which it was created on public policy grounds which are no different from those applicable in the present case. Accordingly, it would be wrong for English law to take a different course in respect of "without prejudice" privilege to that which obtains in respect of privilege simpliciter unless there are valid reasons

for it to do so. In the plaintiffs' submission there are none, and therefore the Court of Appeal should not have rejected its applicability to the present case.

To the question does the "without prejudice" rule subsist after agreement between A and B so that they may deny production to C, the answer is in the affirmative. The Court of Appeal referred to the decision of the Court of Appeal of British Columbia in Derco Industries Ltd. v. A. R. Grimwood Ltd. [1985] 2 W.W.R. 137, but that case does not address the issue in the way the present plaintiffs contend for. Further, there is little reasoning set out in the judgment of Lambert J.A., doubtless for the reasons stated, at p.141, that the decision was urgently required. The court merely asserted in weighing up the various factors involved that the balancing act might be different in respect of third parties after a settlement had been concluded. It does not represent English law.

1294

The only decision which discusses the present question in depth, and one on which the plaintiffs rely, is the Ontario case of I. *Waxman* & Sons Ltd. v. Texaco Canada Ltd. [1968] 2 O.R. 452 where the Court of Appeal of Ontario in a short judgment upheld the very full and careful judgment of Fraser J. [1968] 1 O.R. 642. The Court of Appeal in the present case distinguished *Waxman* on the basis that no concluded settlement was reached. However, *Waxman* did not proceed on that basis; indeed, given that the decision was based upon the importance for public policy reasons of maintaining privilege and the analogy with legal professional privilege, it would be difficult to see how the *Waxman* case could have been decided any differently had a concluded agreement been reached between the immediate parties.

In conclusion, the following passage from the judgment of Judge Esyr Lewis Q.C. at first instance is adopted as part of the argument. "It seems to me that it is the over-riding policy of the law to encourage the settlement of actions and parties say things during 'without prejudice' discussions that they would not want other parties to know about. Accordingly, as a matter of common sense and general principle, I consider that the privilege which arose between the plaintiffs and the G.L.C. extends to the whole world. Mr. Fernyhough argued that it is one thing between the parties to the course of privileged correspondence but quite another in relation to a third party. This, in my view, mistakes the nature and basis of the privilege. The reason for it is to enable people to speak their minds freely. If they know that 'without prejudice' negotiations are open to subsequent scrutiny by third parties, this may have an inhibiting effect on their approach. It will inhibit them from laying their cards on the table. For example, in a case when there are several defendants, if one defendant settles with the plaintiffs, the plaintiffs may makeconcessions to achieve the settlement. On Mr. Fernyhough's argument all the other defendants would be entitled to use the documents referring to those concessions. If parties thought that such documents could be used in this way, they would be careful and wary and could be inhibited from making a settlement. In my judgment, it is as a matter of good sense that the privilege arising from 'without prejudice' correspondence relating to the negotiations should not be limited to the immediate parties. I am not concerned with the circumstances in which privilege can be lost, such as by waiver, or the circumstances in which the court can examine 'without prejudice' correspondence where there is an issue as to whether the 'without prejudice' negotiations ended in a binding contract. It is my view that once privilege arises between A and B in the course of correspondence, that correspondence is privileged as against all."

*Richard Fernyhough Q.C.* and *Rosemary Jackson* for the second defendants. The basis on which the Court of Appeal decided the present case is correct on the present law and is the view that has been accepted over the years.

Alternatively, the second defendants are strangers to the "without prejudice " negotiations and therefore they are not bound by the "without prejudice " protection.

1295

Reliance is placed on the following propositions: (1) The privilege accorded to "without prejudice" correspondence determines as and when that correspondence results in a concluded agreement between the parties to it. (2) The privilege accorded to "without prejudice" correspondence which has resulted in a concluded agreement does not prevent a third party to that correspondence from requiring discovery of it providing that the third party can satisfy the overriding test of relevance. (3) The privilege accorded to "without prejudice " correspondence which has not resulted in a concluded agreement does not prevent a third party to that correspondence from requiring discovery of it providing that the third party can satisfy the overriding test of relevance. (4) The parties to "without prejudice" correspondence can use a form of words in that correspondence which would thereafter preclude use of that correspondence as between themselves, even though the correspondence has led to a concluded agreement. (5) The parties to "without prejudice" correspondence cannot use a form of words in that correspondence which would thereafter preclude discovery of that correspondence at the suit of a third party whether or not the correspondence leads to a concluded agreement.

What is the true nature of "without prejudice" privilege? (i) It is the protection which the law accords parties who are making a genuine attempt to settle a dispute. Therefore it only arises when there is an actual dispute in existence and where one party make a genuine attempt to settle the dispute. (ii) The protection given pertains to admissions or statements which are damaging to the party making them and which can be used against him by the other party. (iii) The rationale behind the privilege is to encourage parties to settle disputes and to have formed an opinion in so doing. (iv) The discussion "without prejudice" are subject to the implied condition that if a settlement is not reached one cannot use anything in the correspondence between the parties.

It follows from (iv) that the converse is true, namely, that if a settlement is reached then the privilege disappears: see the judgment of the Court of Appeal, ante, p. 1290G. This is a correct statement of the law following the dictum of Lindley L.J. in Walker v. Wilsher, 23 Q.B.D. 335, 337, which expresses the modern law: Cutts v. Head [1984] Ch. 290, 305H, *per* Oliver L.J. For examples of limitations to the doctrine, see In re River Steamer Co. (1871) L.R. 6 Ch.App. 822; Holdsworth v. Dimsdale (1871) 24 L.T. 360 and In re Daintrey, Ex parte Holt [1893] 2 Q.B. 116.

As to the Commonwealth cases. In Knapp v. Metropolitan Permanent Building Association (1888) 9 N.S.W.R. 468 there it was held that letters written "without prejudice" with a view to effecting a settlement of a case were privileged, but that the privilege was lost so soon as the settlement had been effected. Reliance is placed on Schetky v. Cochrane and The Union Funding Co. [1918] 1 W.W.R. 821 which shows that the privilege is personal to the parties to the negotiations and is not binding on third parties.

Attention is drawn to the distinction between discoverability of documents and admissibility of evidence. The present appeal only concerns discoverability of documents. It is questionable whether the

"without prejudice " doctrine is part of the law of privilege at all; rather it is a rule of evidence. "Without prejudice" documents are discoverable as between the immediate parties and at the suit of third parties if they are relevant. Whether those documents are admissible in evidence is an entirely different question. All the cases hitherto cited dealt with admissibility at the trial. This proposition can be tested by reference to the list of documents, which must be served on discovery. To the question: in which part of the List of Documents are "without prejudice" documents to be placed? The answer is that it can only be in the first part of the Schedule I. Cross on Evidence, 6th ed. (1985) chapter XII, section 3 refers to "statements made without prejudice," p. 408 and "C. limits of the privilege," at p. 410. In those passages there is no mention of discoverability.

R.S.C., Ord. 24 deals with discovery and inspection of documents: see Supreme Court Practice 1988, p. 408. For discovery by parties without order: see R.S.C., Ord. 24, r. 2(1). For the form of list of documents: see R.S.C., Ord. 24, r. 5. The privilege afforded is that against production: see the notes to that rule; Supreme Court Practice 1988, p. 420. On p. 425 of the Supreme Court Practice 1988, under the heading "Without Prejudice Communications" there is a note which states: "Any discussions between the parties for the purpose of resolving the dispute between them are not admissible, even if the words 'without prejudice' or their equivalent are not expressly used ... It follows that documents containing such material are themselves privileged from production." That last sentence is contested. There is no authority cited for the proposition there put forward.

If the plaintiffs' argument is accepted that a document incorporating a settlement of proceedings between A and B is subject to privilege it leads to the impossible position that no third party is entitled to see that document however relevant it might be in proceedings in which a third party is concerned. In this case the relevance of the "without prejudice" letters is conceded by the plaintiffs. Accordingly they ought to be compelled to give discovery of the documents leaving the trial judge to determine their admissibility when they are sought to be introduced in evidence.

The courts have always recognised that there must be exceptions to the "without prejudice" rule. There are a number of exceptions, most of which are discussed in Phipson on Evidence, 13th ed. (1982), paras. 19-10 and 19-11. The exceptions recognised have included the following: (i) The mere fact and date of such letters and negotiations, as distinguished from their contents, may sometimes be received to explain delay: Walker v. Wilsher, 23 Q.B.D. 335, 338. (ii) Letters are only protected when there was a dispute or negotiations pending between the parties and the letters were bona fide written with a view to compromise: In re, Daintrey, Ex parte Holt [1893] 2 Q.B. 116, 119. (iii) A letter marked "without prejudice" or "private and confidential" which contains a threat against the recipient if the offer is not accepted is admissible to prove such threat: Kitcat v. Sharp (1882) 48 L.T. 64, 66. (iv) Where the alternative to acceptance was the committal of an act of bankruptcy, the letter was admissible to prove such act: In re Daintrey, Ex parte                        Holt                [1893]                        2                Q.B.116

, 120. (v) Independent facts admitted during negotiations for a settlement are receivable: Waldridge v. Kennison (1794)1 Esp. 143; 170 E.R. 306. (vi) "Without prejudice" offers are receivable if the protected condition has been fulfilled: Holdsworth v. Dimsdale (1871) 24 L.T. 360, 361. (vii) Correspondence headed "without prejudice" is admissible for the purpose of ascertaining whether or not an agreement has been reached: Tomlin v. Standard Telephones & Cables Ltd. [1969] 1 W.L.R. 1378, 1382. (viii) If privilege is claimed, but challenged, the court can look at a document headed "without prejudice" in order to determine its nature: South Shropshire District Council v. Amos [1986] 1 W.L.R. 1271, 1277, per Parker L.J. (ix) Letters written "without prejudice save as to costs": Cutts v. Head [1984] Ch. 290.

The plaintiffs relied strongly by analogy on the position in relation to legal professional privilege and cited in support the decision in The Aegis Blaze [1986] 1 Lloyd's Rep. 203. But there is a difference. As to legal professional privilege, a party making or defending a claim has practically no other choice but than to seek legal advice and the law makes privileged what that party says to his legal adviser. But in relation to "without prejudice " privilege, a party is free to choose whether he will enter into "without prejudice" correspondence and he may decide what he will or will not state. At all times such a party is in control of what he states but in relation to his own solicitor he has to tell all. Legal professional privilege exists whether or not a dispute is in existence. Whereas "without prejudice" privilege only arises when there is a dispute and the parties are genuinely attempting to resolve it. This distinction is implicit in the judgment of the Court of Appeal; the two privileges are entirely distinct. The Aegis Blaze [1986] 1 Lloyd's Rep. 203 is solely concerned with legal professional privilege, and so has no bearing on the decision in this appeal.

Dyson Q.C. in reply. It is said that the present issue is not one of admissibility but of discoverability. It is further said that regardless of whether documents are admissible they should be produced. The matter is governed by R.S.C., Ord. 24, r. 5(2). If a matter goes to privilege it is dealt with at the interlocutory stage. The second defendants' argument could lead to grave difficulties at the trial in complicated proceedings. It is emphasised that the question of produceability has to be dealt with at the interlocutory stage. The question before the House is whether there is a proper claim to privilege where there are "without prejudice" negotiations. If there is to be a challenge to the claim for privilege it should be taken before the Master at the interlocutory stage.

As to the Schetky case [1918] 1 W.W.R. 821, there is no reference to it in either Cross on Evidence, 6th ed., or Halsbury's Laws of England, 4th ed. There is nothing in that case which detracts from the plaintiffs' contentions. As to the English authorities, it is plain that the dictum of Lindley L.J. in Walker v. Wilsher, 23 Q.B.D. 335, 337, has never been applied in the way that it was applied by the Court of Appeal in the present case. The point developed in Wigmore on Evidence, 2nd ed. (1923), vol. 2, p. 524 et seq., is not to be found in English law.

Their Lordships took time for consideration.

### Lord Bridge of Harwich (3. November)

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Griffiths. I agree with it and, for the reasons he gives, I would allow the appeal.

### Lord Brandon of Oakbrook

My Lords, for the reasons given by my noble and learned friend Lord Griffiths I would allow the appeal.

### Lord Griffiths

My Lords, this appeal raises a novel point on the right to discovery of documents. It arises out of a dispute under a building contract in the following circumstances. The appellants, Rush & Tompkins Ltd., entered into a building contract in December 1971 with the Greater London Council ("G.L.C.") to build 639 dwellings on the Hanwell Estate in Ealing. In January 1973 Rush & Tompkins engaged the respondents, P. J. Carey Plant Hire (Oval) Ltd., as subcontractors to carry out ground works required under the main contract.

The completion of the contract was subject to much disruption and delay and between June 1976 and January 1979 Carey put in claims for loss and expense to Rush & Tompkins. Rush &Tompkins for their part maintained that they were entitled to be reimbursed by the G.L.C. in respect of these claims for loss and expense under the subcontract. It appears that the G.L.C. would not agree Carey's claim and consequently Rush & Tompkins would not pay it. Eventually in order to resolve the deadlock Rush & Tompkins commenced proceedings in August 1979 against the G.L.C. as first defendant and Carey as second defendant in which they claimed an inquiry into the loss and expenses to which Carey were entitled under the subcontract and a declaration that they were entitled to be reimbursed that sum by the G.L.C.

However, before these proceedings came to trial Rush & Tompkins entered into a compromise with the G.L.C. on 12 October 1981 in which Rush & Tompkins accepted the sum of £1,200,000 in settlement of all outstanding claims under the main contract. It was a term of this settlement that Rush & Tompkins would accept direct responsibility for all the subcontractors' claims. This settlement embraced matters which ranged far beyond those raised in the action with which this appeal is concerned. Rush & Tompkins then discontinued the action against the G.L.C.

The terms of this settlement were disclosed to Carey but the settlement did not show what valuation had been put upon Carey's claim in arriving at the global settlement of £1,200,000.

The action then went to sleep but eventually it awoke and Carey added a counterclaim to recover their loss and expense which they quantified at £ 150,582.86. In their statement of claim Rush & Tompkins had pleaded that the architect had withheld consent to the settlement of Carey's claim and that the G.L.C. had stated in writing that the claim did not exceed a value of approximately £10,000. So on the face of it the gap between the parties was very wide.

Carey, however, believed that in the negotiations between Rush & Tompkins and the G.L.C. documents must have come into existence

which showed the basis upon which Carey's claim was valued for the purpose of the global settlement and they suspected that they might show that the figure was very much larger than the sum of £10,000 which had been alleged as the value of the claim in the statement of claim.

Rush & Tompkins admit that there are such documents and that they relate to the issues in the action, presumably because they cast light on the value of Carey's claim, but they maintain that Carey are not entitled to discovery of these documents because they came into existence for the purpose of settling the claim with the G.L.C. and are thus protected from discovery by the "without prejudice" rule.

Carey took out a summons for the specific discovery of this "without prejudice" correspondence but the official referee, Judge Esyr Lewis Q.C., accepted the argument the main contractors and refused discovery. The Court of Appeal reversed his decision and ordered discovery of the "without prejudice " correspondence passing between Rush & Tompkins and the G.L.C. holding that the protection given by the "without prejudice" rule ceased once a settlement had been reached.

The "without prejudice" rule is a rule governing the admissibility of evidence and is founded upon the public policy of encouraging litigants to settle their differences rather than litigate them to a finish. It is nowhere more clearly expressed than in the judgment of Oliver L.J. in Cutts v. Head [1984] Ch. 290, 306:

> "That the rule rests, at least in part, upon public policy is clear from many authorities, and the convenient starting point of the inquiry is the nature of the underlying policy. It is that parties should be encouraged so far as possible to settle their disputes without resort to litigation and should not be discouraged by the knowledge that anything that is said in the course of such negotiations (and that includes, of course, as much the failure to reply to an offer as an actual reply) may be used to their prejudice in the course of the proceedings. They should, as it was expressed by Clauson J. in Scott Paper Co. v. Drayton Paper Works Ltd. (1927) 44 R.P.C. 151, 156, be encouraged fully and frankly to put their cards on the table.... The public policy justification, in truth, essentially rests on the desirability of preventing statements or offers made in the course of negotiations for settlement being brought before the court of trial as admissions on the question of liability."

The rule applies to exclude all negotiations genuinely aimed at settlement whether oral or in writing from being given in evidence. A competent solicitor will always head any negotiating correspondence "without prejudice" to make clear beyond doubt that in the even of the negotiations being unsuccessful they are not to be referred to at the subsequent trial. However, the application of the rule is not dependent upon the use of the phrase "without prejudice" and if it is clear from the surrounding circumstances that the parties were seeking to compromise the action, evidence of the content of those negotiations will, as a general rule, not be admissible at the trial and                             cannot                                  be                              used                              to

1300

establish an admission or partial admission. I cannot therefore agree with the Court of Appeal that the problem in the present case should be resolved by a linguistic approach to the meaning of the phrase "without prejudice." I believe that the question has to be looked at more broadly and resolved by balancing two different public interests namely the public interest in promoting settlements and the public interest in full discovery between parties to litigation.

Nearly all the cases in which the scope of the "without prejudice" rule has been considered concern the admissibility of evidence at trial after negotiations have failed. In such circumstances no question of discovery arises because the parties are well aware of what passed between them in the negotiations. These cases show that the rule is not absolute and resort may be had to the "without prejudice" material for a variety of reasons when the justice of the case requires it. It is unnecessary to make any deep examination of these authorities to resolve the present appeal but they all illustrate the underlying purpose of the rule which is to protect a litigant from being embarrassed by any admission made purely in an attempt to achieve a settlement. Thus the "without prejudice" material will be admissible if the issue is whether or not the negotiations resulted in an agreed settlement, which is the point that Lindley L.J. was making in Walker v. Wilsher (1889) 23 Q.B.D. 335 and which was applied in Tomlin v. Standard Telephones & Cables Ltd. [1969] 1 W.L.R. 1378. The court will not permit the phrase to be used to exclude an act of bankruptcy: see In re Daintrey, Ex parte Holt [1893] 2 Q.B. 116 nor to suppress a threat if an offer is not accepted: see Kitcat v. Sharp (1882) 48 L.T. 64. In certain circumstances the "without prejudice" correspondence may be looked at to determine a question of costs after judgment has been given: see Cutts v Head [1984] Ch. 290. There is also authority for the proposition that the admission of an "independent fact" in no way connected with the merits of the cause is admissible even if made in the course of negotiations for a settlement. Thus an admission that a document was in the handwriting of one of the parties was received in evidence in Waldridge v. Kennison (1794) 1 Esp. 142. I regard this as an exceptional case and it should not be allowed to whittle down the protection given to the parties to speak freely about all issues in the litigation both factual and legal when seeking compromise and, for the purpose of establishing a basis of compromise, admitting certain facts. If the compromise fails the admission of the facts made for the purpose of the compromise should not be held against the maker of the admission and should therefore not be received in evidence.

I cannot accept the view of the Court of Appeal that Walker v. Wilsher, 23 Q.B.D. 335, is authority for the proposition that if the negotiations succeed and a settlement is concluded the privilege goes, having served its purpose. In Walker v. Wilsher the Court of Appeal held that it was not permissible to receive the contents of a "without prejudice" offer on the question of costs and no question arose as to the admissibility of admissions made in the negotiations in any possible subsequent proceedings. There are many situations when parties engaged upon some great enterprise such as a large building construction

1301

project must anticipate the risk of being involved in disputes with others engaged on the same project. Suppose the main contractor in an attempt to settle a dispute with one subcontractor made certain admissions it is clear law that those admissions cannot be used against him if there is no settlement. The reason they are not to be used is because it would discourage settlement if he believed that the admissions might be held against him. But it would surely be equally discouraging if the main contractor knew that if he achieved a settlement those admissions could then be used against him by any other subcontractor with whom he might also be in dispute. The main contractor might well be prepared to make certain concessions to settle some modest claim which he would never make in the face of another far larger claim. It seems to me that if those admissions made to achieve settlement of a piece of minor litigation could be held against him in a subsequent major litigation it would actively discourage settlement of the minor litigation and run counter to the whole underlying purpose of the "without prejudice" rule. I would therefore hold that as a general rule the "without prejudice" rule renders inadmissible in any subsequent litigation connected with the same subject matter proof of any admissions made in a genuine attempt to reach a settlement. Of course goes without saying that admissions made to reach settlement with a different party within the same litigation are also inadmissible whether or not settlement was reached with that party.

In arriving at my opinion on this aspect of the case I have taken into account the reports of two cases in "The Times" newspaper around the turn of the century. The first is a decision of Darling J. in Teign Valley Mining Co. Ltd. v. Woodcock, The Times, 22 July 1899, which is cited in both Phipson on Evidence, 13th ed. (1982), pp. 374-375, 386, paras. 19-11, 20-04; and Halsbury's Laws of England, 4th ed., vol. 17 (1976), para. 212 as authority for the proposition that the protection afforded by "without prejudice" does not extend to third parties. The report is short and unclear, but it appears that the claim was by a company for money owed upon calls upon its shares. The defendant, Woodcock, admitted liability to the company but claimed against a Captain Rising that he held the shares as his nominee. The judge admitted in evidence terms of the negotiation between the plaintiffs and Captain Rising in which Captain Rising admitted ownership of the shares standing in the name of the nominee. The judge expressed doubts whether he should have admitted the evidence and said he did so because he had been pressed to do so by counsel. I agree with the comment of the Court of Appeal [1988] 2 W.L.R. 533, 538 that "The report is such that it is not worthy of citation as constituting authority for any proposition of law" The other case is Stretton v. Stubbs Ltd., The Times, 28 February 1905. This was an action for libel and slander arising in the following circumstances. Mr. Stretton was an artist and judgment had been obtained against him in the sum of £16 in the City of London Court by a picture frame maker. That judgment had been entered by consent pursuant to a "without prejudice" agreement with the plaintiff's solicitor that no publicity should be given to the result of the action. The defendants published the judgment in "Stubbs' Weekly Gazette" and the plaintiff

1302

alleged that their canvasser had gone round to various tradesmen pointing out the importance of subscribing to the "Gazette", directing their attention to the plaintiff's name and saying that he could not be worthy of credit. The jury returned a verdict for the plaintiff of £25. As part of his case the plaintiff had relied upon the contract between himself and the solicitor for the plaintiff in the City of London Court action that the judgment should not be made public. This contract was contained in two "without prejudice" letters. The offer was contained in a letter from the plaintiff and the acceptance in a letter from the solicitor. The judge permitted the second letter to be put in evidence and read but refused to admit the first letter which had contained admissions by the plaintiff that he was absolutely insolvent. From a reading of the report it appears that the ground upon which it was submitted to the Court of Appeal that the judge had erred in refusing to admit the first letter was that putting in the second letter as part of the "without prejudice" correspondence rendered the first letter admissible. It was also submitted that it would be wrong for the plaintiff not to be allowed to be cross-

examined on his assertion that he was insolvent and at the same time to allow him to put himself before the jury as being quite solvent and of good credit. The Court of Appeal allowed the first letter to be read to the court. The report does not say why Sir Richard Henn Collins M.R. permitted it but Matthew L.J. is recorded as saying "that in his opinion a letter written with regard to an action and marked 'without prejudice' was only admitted for the purpose of that particular action." No citation of authority or reasoning is given in support of that opinion. There may well have been good grounds for admitting the first letter in that action on the ground that it was a part of a correspondence which the plaintiff had chosen to put in evidence, and possibly also on the ground of establishing an independent fact, namely, the plaintiff' s insolvency, which was unconnected with the merits of the dispute about the amount owed to the frame maker and was obviously of central importance to the issue of libel or slander. I cannot however regard it as an authority of any weight for the proposition that "without prejudice" negotiations should in all circumstances be admissible at the suit of a third party.

The only issue that now survives in the present litigation is the subcontractors' counterclaim. For the reasons I have given the contents of the "without prejudice" correspondence between the main contractor and the G.L.C. will not be admissible to establish any admission relating to the subcontractors' claim. Nevertheless, the subcontractors say they should have discovery of that correspondence which one must assume will include admissions even though they cannot make use of them in evidence. They say that the correspondence is likely to reveal the valuation put upon the claim by the main contractor and the G.L.C. and that this will provide a realistic starting point for negotiations and therefore be likely to promote a settlement. This is somewhat speculative because for all we know the subcontractors' claim may have been valued in the "without prejudice" correspondence at no more than the figure of £10,000 pleaded in the statement of claim leaving the parties as far apart

as ever. However, it is of course a possibility that it appeared at a much higher figure.

It was only at a late stage in the argument for Carey that the distinction between discoverability and admissibility was taken. In the courts below the question appears to have been considered solely on the question of admissibility. But the right to discovery and production of documents does not depend upon the admissibility of the documents in evidence: see O'Rourke v. Darbishire [1920] A.C. 581.

The general rule is that a party is entitled to discovery of all documents that relate to the matters in issue irrespective of admissibility and here we have the admission of the head contractors that the "without prejudice " correspondence would be discoverable unless protected by the "without prejudice" rule. There is little English authority on this question but I think some light upon the problem is to be gained from a consideration of the decision in Rabin v. Mendoza & Co. [1954] 1 W.L.R. 271. In that case the plaintiffs sued the defendants for negligence in surveying a property. Before the action commenced a meeting had taken place between the plaintiffs' solicitor and a partner in the defendants' firm of surveyors to see if the matter could be settled without litigation. The defendants agreed at the meeting to make inquiries to see if they could obtain insurance cover against possible risk of damage to the house so that litigation could be avoided. After the interview the defendants obtained a report from another surveyor for the purpose of attempting to obtain insurance cover. No settlement was reached and the action commenced. The defendants disclosed the existence of the report in their affidavit of documents but claimed privilege from production on the ground that it was made in pursuance of a "without prejudice" discussion between the plaintiffs' solicitor and the defendants'. The master, the judge and the Court of Appeal all upheld the defendants' claim to privilege. Denning L.J. after referring to Whiffen v. Hartwright (1848) 11 Beav. 111 said, at pp. 273-274:

> "The Master of the Rolls there affirms the undoubted proposition that production can be ordered of documents even though they may not be admissible in evidence. Nevertheless, if documents come into being under an express, or, I would add, a tacit, agreement that they should not be used to the prejudice of either party, an order for production will not be made. This case seems to me to fall within that principle. This report was clearly made as a result of a 'without prejudice' interview and it was made solely for the purposes of the 'without prejudice' negotiations. The solicitor for the plaintiff himself says in his affidavit that at the time of the interview it was contemplated that steps such as these should be undertaken. I find myself, therefore, in agreement with the decision of Master Burnand and the judge that this is not a case where production should be ordered."

Romer L.J. put the matter even more strongly saying, at p. 274:

> "It seems to me that it would be monstrous to allow the plaintiff to make use - as he certainly would make use - for his own purposes

as against the defendants of a document which is entitled to the protection of ' without prejudice' status."

This authority shows that even as between the parties to "without prejudice " correspondence they are not entitled to discovery against one another. In Canada there are conflicting decisions. In Schetky v. Cochrane and The Union Funding Co. [1918] 1 W.W.R. 821 the Court of Appeal in British Columbia ordered discovery to be given to a defendant of negotiations between the plaintiff and another defendant in the action but held that on the trial there would be no higher right to use the statements or admissions than that which a party to the negotiations would have who sought to introduce them in evidence. This decision was followed in British Columbia in Derco Industries Ltd. v. A. R. Grimwood Ltd. [1985] 2 W.W.R. 137 in which Lambert J.A. said, at p.142:

> "to the extent that there is a rule that prevents the production of documents that were prepared in the course of negotiations leading to a concluded settlement, it is my opinion that the rule does not extend to the prevention of the production of those documents at the instance of a litigant who was not a party to the settlement and whose claim for production comes under the rule in [Compagnie Financiere et Commerciale du Pacifique v. Peruvian Guano Co.. (1882) 11 Q.B.D. 55]."

Schetky v. Cochrane and The Union Funding Co. was not followed by the Court of Appeal of Ontario in I. Waxman & Sons Ltd. v. Texaco Canada Ltd. [1968] 2 O.R. 452. The Court of Appeal in a short judgment upheld a long reasoned judgment by Fraser J. who expressed the following opinion [1968] 1 O.R. 642, 656:

"I am of opinion that in this jurisdiction a party to a correspondence within the 'without prejudice' privilege is, generally speaking, protected from being required to disclose it on discovery or at trial in proceedings by or against the third party."

I suspect that until the present decision of the Court of Appeal the general understanding of the profession was that "without prejudice" negotiations between parties to litigation would not be discoverable to other parties and that admissibility and discoverability went together. For instance in The Supreme Court Practice 1988 under "Discovery and Inspection of Documents" Note 24/5/17 reads:

"Without prejudice communications - Any discussions between the parties for the purpose of resolving the dispute between a them are not admissible, even if the words 'without prejudice' or their equivalent are not expressly used (Chocoladefabriken Lindt & Sprungli A. G. v. Nestlé Co. Ltd. [1978] R.P.C. 287). It follows that documents containing such material are themselves privileged from production."

I would refer also to the critical note on this decision of the Court of Appeal written by one of the Law Commissioners, Mr. Brian Davenport

Q.C., in volume 104 of the Law Quarterly Review p. 349 in which he states that the decision will be received "with surprise and dismay by many practitioners."

I have come to the conclusion that the wiser course is to protect "without prejudice" communications between parties to litigation from production to other parties in the same litigation. In multi-party litigation it is not an infrequent experience that one party takes up an unreasonably intransigent attitude that makes it extremely difficult to settle with him. In such circumstances it would, I think, place a serious fetter on negotiations between other parties if they knew that everything that passed between them would ultimately have to be revealed to the one obdurate litigant. What would in fact happen would be that nothing would be put on paper but this is in itself a recipe for disaster in difficult negotiations which are far better spelt out with precision in writing.

If the party who obtains discovery of the "without prejudice" correspondence can make no use of it at trial it can be of only very limited value to him. It may give some insight into his opponent's general approach to the issues in the case but in most cases this is likely to be of marginal significance and will probably be revealed to him in direct negotiations in any event. In my view this advantage does not outweigh the damage that would be done to the conduct of settlement negotiations if solicitors thought that what was said and written between them would become common currency available to all other parties to the litigation. In my view the general public policy that applies to protect genuine negotiations from being admissible in evidence should also be extended to protect those negotiations from being discoverable to third parties. Accordingly I would allow this appeal and restore the decision of Judge Esyr Lewis Q.C.

## Lord Oliver of Aylmerton

My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Griffiths. I agree with it and would allow the appeal for the reasons which he has given.

## Lord Goff of Chieveley

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Griffiths. I agree with it and, for the reasons he gives, I would allow the appeal.

## Referring Principles

Trans-Lex Principle: XII.5 - Settlement privilege

# EXHIBIT G

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

Supreme Court of India

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

Author: K . V.N.

Bench: Cji, S.B. Sinha.

```
              CASE NO.:
     Appeal (civil)  2754 of 2002

     PETITIONER:
     Chairman & M.D., N.T.P.C. Ltd.

     RESPONDENT:
     M/s. Reshmi Constructions, Builders & Contractors

     DATE OF JUDGMENT: 05/01/2004

     BENCH:
     CJI & S.B. Sinha.

     JUDGMENT:
```

J U D G M E N T V.N. KHARE, CJI.

This appeal which arises out of a judgment and order dated 23-11-2001 passed by the High Court of Kerala at Ernakulam revolves round the question as to whether an arbitration clause in a contract agreement survives despite purported satisfaction thereof.

The parties to this appeal entered into an agreement for a project at Kayamkulam. Upon completion of the work the respondent herein submitted final bill which was allegedly not accepted by the appellant, whereafter they themselves prepared the final bill and forwarded the same along with a printed format being a "No Demand Certificate". The said "No Demand Certificate" was signed by the respondent herein which is in the following terms:

NO DEMAND CERTIFICATE Name of package : Earth filling in Temporary Township Part    II Letter of award : LOA No. KYM/CS/89/022/NIT- 005/LOA-065 dated 19.3.90 Name of the Contractor : Reshmi Construction, T.C. 4/1298, Keston Road, Kowdiar, P.O. Trivandrum    3

1. This is to certify that we have received all payment in full and final settlement of the supplied and services rendered and/ or all work performed by us in respect of the above referred LOA/ Contract and we have no other claims whatsoever final or otherwise outstanding against NTPC. We further confirm that we shall have no claim/ demands in future in respect of this contract of whatsoever nature, final or otherwise."

2. We would now request you to please release our security deposit/ contract performance Guarantee."

However, on the same day a letter dated 20-12-1990 was written by the respondent to the appellant stating:

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

"We have completed the aforementioned work in the Kayamkulam Super Thermal Power Project's temporary township area at Nangiarkulangara by the end of November 1990 itself. We had submitted a pre-final bill in November itself but the authorities denied the bill and insisted final bill. But when the alleged final bill was prepared the authorities insisted that a "No Demand Certificate" should be executed by us in favour of the Corporation. They served us with a printed specimen of the document and insisted that it should be typed in our own letterhead and submitted to the N.T.P.C. We refused to submit such a document.

But the authorities of N.T.P.C. threatened that unless and until we execute the said document in favour of the Corporation, the N.T.P.C. would not effect payment of our bill. More than six lakhs of Rupees is pending for payment vide the alleged final bill. We have incurred huge losses in the execution of the work purely due to the latches and lapses of the corporation. More over lakhs and lakhs of rupees has to be paid to our Bankers, creditors suppliers, workers, truck owners etc. etc. Under such a situation we have no other way other than budging to the coercion of the authorities of N.T.P.C. ltd. to get whatever they give merely for the necessity of our survival. We have to comply with the instructions of authorities of N.T.P.C. Ltd. out of our helplessness in order to receive payment. Hence this letter.

The certificates, undertakings, etc. as aforesaid have been executed without prejudice to our rights and claims whatsoever on account of the alleged final bill.

The money invested in the work comprises loans from the Federal Bank Ltd., private financiers, etc. as well the Firm's own funds. Those additional sums raised by loans have to be paid to the Bank, financiers, etc. hence under duress, coerction and under undue influence we are signing the bill and execute such documents as aforesaid to receive payment. Under such coercive circumstances the alleged final bill cannot be constructed as final bill. We are signing the alleged final bill under coerction, under undue influence and under protest only without prejudice to our rights and claims whatsoever. There is no accord and satisfaction between the contracting parties.

You are therefore requested to kindly pass the final bill incorporating all the measurements of the items such as sinkage, in and under water execution of works, compensation for suspension of works, reimbursement of cost escalation due to price hike of petroleum products, cost of idling, enhanced rates for quantities executed beyond the contractual period, market rate for excess quantities, extra additional items etc. besides the losses and damages by way of idling of tools and plants, workmen, staff, establishment costs, capital outlay, interest etc. as per actuals. We hope and request that your goodself may do the needful in the matter."

[Emphasis supplied] The respondent thereafter invoked the arbitration clause by reason of a letter through his advocate dated 21.12.91 wherein the claims under several heads as enumerated in clause (a) to (p) thereof. Therein a request was made to refer all the disputes and differences to a sole arbitrator for adjudication with a direction to make and publish the award within the statutory period.

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

The appellant herein thereafter discussed the matter at the company level and in its proceedings it was recorded:

"4.0 In case of M/s. Reshmi Constructions, Trivandrum Kerala (1(c) above) and M/s. C.S. Prakash, (1(d) above) of Perumbavoor, Kerala, the total payment for the works done were effected, the final bills have been settled without protest and the no-dues certificate in the standard proforma have been submitted by the contractors. 5.0 To seek legal opinion in the matter, we have approached Mr. B.S. Krishnan, a leading advocate from Cochin. On detailed study of the claims of the agencies and considering legal conditions, the advocate has advised us to appoint arbitrator/s nominated by CMD of NTPC, immediately. Accordingly our advocate has written suitable replies to the contractor's advocate Shri NT John, of Trivandrum, informing them that they will hear from NTPC regarding appointment of an arbitrator in terms of the contract conditions.

6.0 Submitted to appoint arbitrator/s for the four contract packages at para 1.0 above, please."

The appellant thereafter by its letter dated 13th February, 1992 replied thereto stating:

"My client acting upon the notice, though defective, takes it that all your claims are disputed ones and hence are to be resolved by Arbitration. Please note that the reference to arbitration does not mean that there is admission that the disputes are arbitrable. Many of the claims raised are beyond the terms of the contract and the Arbitrator will have not jurisidiction to deal with them. This is a matter which has to be taken up later and not at the stage of appointment of an Arbitrator.

As appointing authority, my client refrains from commenting upon in any manner, on the merits or otherwise of the disputes which your notice has set out.

It may be noticed that your client has already taken the final bill and has issued 'no dues' certificate. This is not merely accord and satisfaction, but bringing the contract to an end.

Your client will hear from my client as regards the appointment of the Arbitrator in terms of the contract conditions shortly."

[Emphasis supplied] A purported correction in the said notice was issued by the advocate of the appellant stating:

"Sub: Correction in the notice is issued by way of Reply notice is signed on behalf of M/s. Rashmi Constructions, Trivandrum   reg.

Ref: My Regd. Notice No. P3-G1/92/582 dt. 13.2.92.

Under instructions from my clients, the Chairman & Managing Director, National Thermal Power Corporation Ltd. NTPC Bhavan, New Delhi   110 003, I issue the following notice:

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

In the reply notice issued by me under reference number cited above, it was stated that the notice issued by you on behalf of your clients M/s. Rashmi Constructions, Trivandrum was returned since it was not signed by you and that the notice is sent back as the same was signed on your behalf by your client. On scrutiny I find that the notice is returned by you after the same is signed by you and not by your client on your behalf. In paragraph 2 of the reply notice, I stated that the notice is defective. It was so stated because of the mistaken impression that the notice is signed by your client and not by you. I stated that the mistake is in advert at and the same is regretted. I would like to bring to your notice one more fact which was omitted to be stated in the reply notice sent earlier. I have already stated that your client has issued 'no dues' certificate. The final bill is accepted by your client without any protest. This is further followed up by your client receiving the security deposit released on 21.1.92; that is after the expiry of the stipulated period reckoned from the date when the contract came to an end.

In all other respects the reply notice earlier sent stands."

The respondent herein filed an application under Section 20 of the Arbitration Act, 1940 before the Hon'ble Subordinate Judge's Court Mavelikkara and in terms of a judgment and order dated 30.6.1994 the said application was dismissed. Aggrieved, the respondent herein preferred an appeal before the High Court of Kerala which was allowed by reason of the impugned order. Mr. Bhatt, the learned counsel appearing on behalf of the appellant urged that as the contract itself came to an end upon execution of the "No Demand Certificate" and together with the same the arbitration clause also perished. In support of the said contention, reliance has been placed on M/s. P.K. Ramaiah and Company Vs. Chairman & Managing Director, National Thermal Power Corpn. [1994 Supp (3) SCC 126] and Nathani Steels Ltd. Vs. Associated Constructions [1995 Supp (3) SCC 324].

Mr. Bhatt further urged that as in its application under Section 20 of the Arbitration Act, the respondent did not raise a plea that they had been coerced to submit the "No Demand Certificate", the High Court committed a manifest error in passing the impugned judgment.

The learned counsel appearing on behalf of the respondent, on the other hand, submitted that in the facts and circumstances of the case neither any new contract has come into being nor there was any accord and satisfaction of the contract agreement.

The learned counsel appearing on behalf of the respondent also contended that despite coming to an end of the contract, the arbitration clause survives and all questions arising out of or in relation to the execution of the contract are referable to arbitration. Reliance in this connection has been placed on Damodar Valley Vs. K.K. Kar [(1974) 1 SCC 141], M/s. Bharat Heavy Electricals Limited Vs. M/s. Amar Nath Bhan Prakash [(1982) 1 SCC 625], Union of India and Another Vs. M/s. L.K. Ahuja and Co. [(1988) 3 SCC 76] and Jayesh Engineering Works Vs. New India Assurance Co. Ltd. [(2000) 10 SCC 178].

On the arguments of learned counsel for the parties, the questions that arise for our consideration are:

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

(i) Whether after the contract comes to an end by completion of the contract work and acceptance of the final bill in full and final satisfaction and after issuing a No Demand Certificate by the contractor, can any party to the contract raise any dispute for reference to arbitration?

(ii) Whether in view of letter dated 20.12.1990 sent by the respondent contractor the arbitration clause contained in the agreement can be invoked ?

(iii) Whether the arbitration clause in the agreement has perished with the contract?

In this context it is relevant to refer the arbitration clause contained in the agreement which runs as under:

"56. Except where otherwise provided for in the contract all questions and disputes relating to the meaning of the specifications, designs, drawing and instructions herein before mentioned and as to the quality of workmanship or materials used on the work or as to any other question, claim, right, matter or thing whatsoever in any way arising out of or relating to the contract, designs drawing, specifications, estimates, instructions, orders or these conditions or otherwise concerning the works; or the execution or failure to execute the same whether arising during the progress of the work or after the completion or abandonment thereof shall be referred to the sole arbitration of the General Manager of National Thermal Power Corporation Ltd.; and if the General Manager is unable or unwilling to act: to the sole arbitration of some other person appointed by the Chairman and Managing Director; National Thermal Power Corporation Ltd. willing to act as such arbitrator. There will be no objection if the arbitrator so appointed is an employee of National Thermal Power Corporation Ltd. and that he had to deal with the matters to which the contract relates and that in the course his duties as such he had expressed views on all or any of the matters in dispute or difference. The arbitrator to whom the matter is originally referred being transferred or vacating his office or being unable to act for any reason as aforesaid should act as arbitrator and if for any reason, that is not possible; the matter is not to be referred to arbitration at all.

Subject as aforesaid the provision of the Arbitration Act, 1940 or any statutory modification or reenactment thereof and the rules made thereunder and for the time being in force shall apply to the arbitration proceeding under this clause.

It is a term of the contract that the party invoking arbitration shall specify the disputes or disputes to be referred to arbitration under this clause together with the amount or amounts claimed in respect of each such dispute.

The arbitrator(s) may from time to time with consent of the parties enlarge the time, for making and publishing the award.

The work under the Contract shall, if reasonable possible, continue during the arbitration proceedings and no payment due or payable to the Contractor shall be withheld on account of such proceedings.

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

The Arbitrator shall be deemed to have entered on the reference on the date he issues notice to both the parties fixing the date of the first hearing.

The Arbitrator shall give a separate award in respect of each dispute or difference referred to him.

The venue of arbitration shall be such place as may be fixed by the Arbitrator in his sole discretion.

The award of the arbitrator shall be final, conclusive and binding on the all parties to this contract.

The cost of arbitration shall be borne by the parties to the dispute, as may be decided by the arbitrator (s).

In the event of disputes or differences arising between one public sector enterprise and a Govt. Department or between two public sector enterprises the above stipulations shall not apply, the provisions of B.P.E. Office Memorandum No. BPE/GL-001/76/MAN/2 (110-75-BPE(GM-1) dated 1st January 1976 or its amendments for arbitration shall be applicable."

Clause 52 of the agreement reads as follows:

"52. The final bill shall be submitted by the contractor within three months of physical completion of the works. No further claims shall be made by the contractor after submission of the final bill and these shall be deemed to have been waived and extinguished. Payment of those items of the bill in respect of which there is no dispute and of items in dispute, for quantities and at rates as approved by Engineer-in-Charge, shall be made within the period specified hereunder, the period being reckoned from the date of receipt of the bill by the Engineer-in-Charge:

(a) Contract amount not exceeding Rs. 5 lakhs    Four months.

(b) Contract Amount exceeding Rs. 5 lakhs    Six months.

After payment of the amount of the final bills payable as aforesaid has been made, the Contractor may if he so desires, reconsider his position in respect of the disputed portion of the final bill and if he fails to do so within 90 days, his disputed claim shall be dealt with as provided in contract."

[Emphasis supplied] The issues are required to be determined having regard to the facts as which arise for consideration whether by reason of the act of the parties the old contract was substituted by a new contract. Only in the event a new contract came into being, the arbitration agreement cannot be invoked.

In Damodar Valley Corporation vs. K.K. Kar [(1974) 1 SCC 141],this Court held:

"It appears to us that the question whether there has been a full and final settlement of a claim under the contract is itself a dispute arising 'upon' or 'in relation to' or 'in connection with' the contract. These words are wide enough to cover the dispute sought to be referred."

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

Normally, an accord and satisfaction by itself would not affect the arbitration clause but if the dispute is that the contract itself does not subsist, the question of invoking the arbitration clause may not arise. But in the event it is held that the contract survives, recourse to the arbitration clause may be taken. [See Union of India Vs. Kishorilal Gupta (AIR 1959 SC 1362) and Majhati Jute Mills Vs. Khvalirsa (AIR 1968 SC 522).

In Bharat Heavy Electricals Limited (supra) this Court observed that whether there was discharge of the contract by accord and satisfaction or not is a dispute arising out of a contract and is liable to be referred to arbitration.

Yet again in L.K. Ahuja (supra) Sabyasachi Mukharji, J., as the learned Chief Justice then was, laid down the ingredients of Section 20 of the Arbitration Act stating:

6. It appears that these questions were discussed in the decision of the Calcutta High Court in Jiwnani Engineering Works Pvt. Ltd. v. Union of India [AIR 1978 Cal 228] where one of us (Sabyasachi Mukharji, J.) was a party and which held after discussing all these authorities that the question whether the claim sought to be raised was barred by limitation or not, was not relevant for an order under Section 20 of the Act. Therefore, there are to aspects. One is whether the claim made in the arbitration is barred by limitation under the relevant provisions of the Limitation Act and secondly, whether the claim made for application under Section 20 is barred. In order to be a valid claim for reference under Section 20 of the Arbitration Act, 1940, it is necessary that there should be an arbitration agreement and secondly differences must arise to which the agreement in question applied and, thirdly, that must be within time as stipulated in Section 20 of the Act.

It was held that having regard to the fact that the existence of an arbitration agreement was not denied and there had been an assertion of claim and denial thereof, the matter would be arbitrable. It was observed:

In order to be entitled to ask for a reference under Section 20 of the Act, there must be an entitlement to money and a difference or dispute in respect of the same. It is true that on completion of the work, right to get payment would normally arise and it is also true that on settlement of the final bill, the right to get further payment get weakened but the claim subsists and whether it does subsist, is a matter which is arbitrable.

[Emphasis supplied] This aspect of the matter has also been considered in Jayesh Engineerng Works (supra) wherein following L.K. Ahuja (supra) it was held:

"Whether any amount is due to be paid and how far the claim made by the appellant is tenable are matters to be considered by the arbitrator. In fact, whether the contract has been fully worked out and whether the payments have been made in full and final settlement are questions to be considered by the arbitrator when there is a dispute regarding the same."

In M/s. P.K. Ramaiah and Company (supra) the amount was received unconditionally. The full and final satisfaction was acknowledged by a separate receipt in writing. In that situation the following

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

finding was recorded :

"Thus there is accord and satisfaction by final settlement of the claims. The subsequent allegation of coercion is an afterthought and a devise to get over the settlement of the dispute, acceptance of the payment and receipt voluntarily given."

We, however, may observe that the quotation from Russell on Arbitration may not be apt inasmuch as at the stage of reference what would be a good defence is not a matter to be taken into consideration.

Yet again in Nathani Steels Ltd. (supra) the disputes and differences were amicably settled by and between the parties and in that view of the matter it was held that unless and until the statement is set aside, the arbitration clause cannot be invoked. Such is not the position here.

The appellant herein did not raise a question that there has been a novation of contract. The conduct of the parties as evidenced in their letters, as noticed hereinbefore, clearly go to show that not only the final bill submitted by the respondent was rejected but another final bill was prepared with a printed format that a "No Demand Certificate" has been executed as other final bill would not be paid. The respondent herein, as noticed hereinbefore, categorically stated in its letter dated 20.12.1990 that as to under what circumstances they were compelled to sign the said printed letter. It appeares from the appendix appended to the judgment of the learned Trial Judge that the said letter was filed even before the trial court. It is, therefore, not a case whether the respondent's assertion of "under influence or coercion" can be said to have been taken by way of an afterthought.

Even when rights and obligations of the parties are worked out the contract does not come to an end inter alia for the purpose of determination of the disputes arising thereunder, and, thus, the arbitration agreement can be invoked. Although it may not be strictly in place but we cannot shut our eyes to the ground reality that in the cases where a contractor has made huge investment, he cannot afford not to take from the employer the amount under the bills, for various reasons which may include discharge of his liability towards the banks, financial institutions and other persons. In such a situation, the public sector undertakings would have an upper hand. They would not ordinarily release the money unless a 'No Demand Certificate' is signed. Each case, therefore, is required to be considered on its own facts.

Further, necessitas non habet legem is an old age maxim which means necessity knows no law. A person may sometimes have to succumb to the pressure of other party to the bargain who is on a stronger position.

We may, however, hasten to add that such a case has to be made out and proved before the Arbitrator for obtaining an award.

At this stage, the Court, however, will only be concerned with the question whether triable issues have been raised which are required to be determined by the Arbitrators.

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

Circumstances leading to passing an order by the courts of law directing the parties to get their disputes determined by domestic tribunal selected by them having regard to the correspondences exchanged between the solicitors came up for consideration in Goodman Vs. Winchester and Alton Rly [(1984) 3 All ER 594] wherein it was held:

"As I have already recounted, the plaintiff's solicitor may have had in mind that if there were an arbitration clause various matters could be sorted out cheaply and quickly under it. There is no evidence, in my judgment, that when he drafted the terms of the arbitration clause he had in mind that it would not apply to a repudiation of the contract by the defendants. He is a solicitor; he is clearly an experienced solicitor; and he should have appreciated (and I feel certain he did) that the arbitration clause which he drafted, and which was accepted by the defendants, would cover every aspect of the contract, including repudiation. But, apart altogether from what the plaintiff's solicitor had in mind, there is no evidence at all as to what the defendant company had in mind when it agreed to accept the arbitration clause, and it was wrong, in my judgment, for the Judge to say that neither party had in mind that it would apply to the summary dismissal of the plaintiff. It follows, therefore, that at the very beginning of his judgment the judge misdirected himself as to the construction of the arbitration clause and what it was mended to deal with."

Even correspondences marked as without prejudice may have to be interpreted differently in different situations.

What would be the effect of without prejudice offer has been considered in Cutts Vs. Head and Another [(1984) 2 WLR 349] wherein Oliver L.J. speaking for the Court of Appeals held:

"In the end, I think that the question of what meaning is given to the words "without prejudice" is a matter of interpretation which is capable of variation according to usage in the profession. It seems to be that, no issue of public policy being involved, it would be wrong to say that the words were given a meaning in 1889 which isimmutable ever after, bearing in mind that the precise question with which we are concerned in this case did not arise in Walker v. Wilsher, 23 Q.B.D. 335, and the court did not deal with it. I think that the wide body of practice which undoubtedly exists must be treated as indicating that the meaning to be given to the words is altered if the offer contains the reservation relating to the use of the offer in relation to costs."

Yet again in Rush & Tompkins Ltd. Vs. Greater London Council and Another [(1988) 1 All ER 549]:

"The rule which gives the protection of privilege to 'without prejudice' correspondence 'depends partly on public policy, namely the need to facilitate compromise, and partly on 'implied agreement' as Parker LJ stated in South Shropshire DC v Amos [1987] 1 All ER 340 at 343, [1986] 1 WLR 1271 at 1277. The nature of the implied agreement must depend on the meaning which is conventionally attached to the phrase 'without prejudice'. The classic definition of the phrase is contained in the judgment of Lindley LJ in Walker v. Wilsher (1889) 23 QBD 335 at 337:

'What is the meaning of the words "without prejudice"? I think they mean without prejudice to the position of the writer of the letter if the terms he proposes are not accepted. If the terms proposed in

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

the letter are accepted a complete contract is established, and the letter, although written without prejudice, operates to alter the old state of things and to establish a new one.' Although this definition was not necessary for the facts of that particular case and was therefore strictly obiter, it was expressly approved by this court in Tomlin v Standard Telephones and Cables Ltd. [1969] 3 All ER 201 at 204, 205, [1969] 1 WLR 1378 at 1383, 1385 per Danckwerts LJ and Ormrod J. (Although he dissented in the result, on this point Ormrod J agreed with the majority.) The definition was further cited with approval by both Oliver and Fox LJJ in this court in Cutts v. Head [1984] 1 All ER 597 at 603, 610, [1984] Ch. 290 at 303, 313. In our judgment, it may be taken as an accurate statement of the meaning of 'without prejudice', if that phrase be used without more. It is open to the parties to the correspondence to give the phrase a somewhat different meaning, e.g. where they reserve the right to bring an offer made 'without prejudice' to the attention of the court on the question of costs if the offer be not accepted (See Cutts v. Head) but subject to any such modification as may be agreed between the parties, that is the meaning of the phrase. In particular, subject to any such modification, the parties must be taken to have intended and agreed that the privilege will cease if and when the negotiations 'without prejudice' come to fruition in a concluded agreement."

Meaning the words "without prejudice" come up for consideration before this Court in Superintendent (Tech. I) Central Excise, I.D.D. Jabalpur and Others Vs. Pratap Rai [(1978) 3 SCC 113] wherein it has been held:

"The Appellate Collector has clearly used the words "without prejudice" which also indicate that the order of the Collector was not final and irrevocable. The term "without prejduce" has been defined in Black's Law Dictionary as follows:

Where an offer or admission is made 'without prejduce', or a motion is defined or a bill in equity dismissed 'without prejudice', it is meant as a declaration that no rights or privileges of the party concerned are to be considered as thereby waived or lost, except in so far as may be expressly conceded or decided. See, also Dismissal Without Prejudice.

Similarly, in Wharton's Law Lexicon the author while interpreting the term 'without prejudice' observed as follows:

The words import an understanding that if the negotiation fails, nothing that has passed shall be taken advantage of thereafter; so, if a defendant offers, 'without prejudice', to pay half the claim, the plaintiff must not only rely on the offer as an admission of his having a right to some payment.

The rule is that nothing written or said 'without prejudice' can be considered at the trial without the consent of both parties    not even by a Judge in determining whether or not there is good cause for depriving a successful litigant of costs   . The word is also frequently used without the foregoing implications in statutes and inter partes to exclude or save transactions, acts and rights from the consequences of a stated proposition and so as to mean 'not affecting', 'saving' or 'excepting'.

In short, therefore, the implication of the term 'without prejudice' means (1) that the cause or the matter has not been decided on merits, (2) that fresh proceedings according to law were not barred."

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

The appellant has in its letter dated 20th December, 1990 has used the term 'without prejudice'. It has explained the situation under which the amount under the 'No Demand Certificate' had to be signed. The question may have to be considered from that angle. Furthermore, the question as to whether the respondent has waived its contractual right to receive the amount or is otherwise estoppel from pleading otherwise will itself be a fact which has to be determined by the arbitral tribunal.

In Halsbury's Laws of England, 4th Edition, Vol.16 (Reissue) para 957 at page 844 it is stated:

"On the principle that a person may not approbate and reprobate a special species of estoppel has arisen. The principle that a person may not approbate and reprobate express two propositions:

(1) That the person in question, having a choice between two courses of conduct is to be treated as having made an election from which he cannot resile.

(2) That he will be regarded, in general at any rate, as having so elected unless he has taken a benefit under or arising out of the course of conduct, which he has first pursued and with which his subsequent conduct is inconsistent."

In American Jurisprudence, 2nd Edition, Volume 28, 1966, Page 677-680 it is stated:

"Estoppel by the acceptance of benefits: Estoppel is frequently based upon the acceptance and retention, by one having knowledge or notice of the facts, of benefits from a transaction, contract, instrument, regulation which he might have rejected or contested. This doctrine is obviously a branch of the rule against assuming inconsistent positions.

As a general principle, one who knowingly accepts the benefits of a contract or conveyance is estopped to deny the validity or binding effect on him of such contract or conveyance.

This rule has to be applied to do equity and must not be applied in such a manner as to violate the principles of right and good conscience."

The fact situation in the present case, would lead to the conclusion that the arbitration agreement subsists because:

(i) Disputes as regard final bill arose prior to its acceptance thereof in view the fact that the same was prepared by the respondent but was not agreed upon in its entirety by the appellant herein;

(ii) The appellant has not pleaded that upon submission of the final bill by the respondent herein any negotiation or settlement took place as a result whereof the final bill, as prepared by the appellant, was accepted by the respondent unequivocally and without any reservation therefor;

(iii) The respondent herein immediately after receiving the payment of the final bill, lodged its protest and reiterated its claims.

Chairman & M.D., N.T.P.C. Ltd vs M/S. Reshmi Constructions, ... on 5 January, 2004

(iv) Interpretation and/or application of clause 52 of the agreement would constitute a dispute which would fall for consideration of the arbitrator.

(v) The effect of the correspondences between the parties would have to be determined by the arbitrator, particularly as regard the claim of the respondent that the final bill was accepted by it without prejudice.

(vi) The appellant never made out a case that any novation of the contract agreement took place or the the contract agreement was substituted by a new agreement. Only in the event, a case of creation of new agreement is made out the question of challenging the same by the respondent would have arisen.

(vii) The conduct of the appellant would show that on receipt of the notice of the respondent through its advocate dated 21.12.1991 the same was not rejected outright but existence of disputes was accepted and the matter was sought to be referred to the arbitration.

(viii) Only when the clarificatory letter was issued the plea of settlement of final bill was raised.

(ix) The finding of the High Court that a prima facie in the sense that there are triable issues before the Arbitrator so as to invoke the provisions of Section 20 of the Arbitration Act, 1940 cannot be said to be perverse or unreasonable so as to warrant interference in exercise of extraordinary jurisdiction under Article 136 of the Constitution of India.

(x) The jurisdiction of the arbitrator under the 1940 Act although emanates from the reference, it is trite, that in a given situation the arbitrator can determine all questions of law and fact including the construction of the contract agreement. (See Pure Helium India Pvt. Ltd. Vs. Oil and Natural Gas Commission reported in 2003 (8) SCALE 553).

(xi) The cases cited by the learned counsel for the appellant [P.K. Ramaiah and Company (supra) and Nathani Steels (supra)] would show that the decisions therein were rendered having regard to the finding of fact that the contract agreement containing the arbitrator clause was substituted by another agreement. Such a question has to be considered and determined in each individual case having regard to the fact situation obtaining therein.

For the reasons aforementioned, we are of the opinion that there is no infirmity in the impugned judgment. This appeal is, therefore, dismissed. No Costs.

# EXHIBIT  H

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 96 of 337   Page ID
#:28551
M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

Supreme Court of India

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

Author: S.B. Sinha

Bench: S.B. Sinha, Dalveer Bhandari

```
                CASE NO.:
    Appeal (civil)  5608 of 2006

    PETITIONER:
    M/s. Peacock Plywood Pvt. Ltd.

    RESPONDENT:
    The Oriental Insurance Co. Ltd.

    DATE OF JUDGMENT: 05/12/2006

    BENCH:
    S.B. Sinha & Dalveer Bhandari

    JUDGMENT:
```

J U D G M E N T [Arising out of S.L.P. (C) No. 7392-7393 of 2005] S.B. SINHA, J :

Leave granted.

Interpretation of a policy of marine insurance entered into by and between the parties herein covering goods in transit is in question in this appeal which arises out of a judgment and order dated 16th December, 2004 passed by the High Court of Calcutta in APO No. 363 of 2000 whereby and whereunder the appeal preferred by Respondent    Insurance Company herein from a judgment and order dated 3rd December, 1999 passed in C.S. No. 480 of 1992 passed by a learned Single Judge of the said Court was allowed.

Appellant herein agreed to purchase 4000 cu. mt. of 'Sabha Log' (logs) at a total price of US $6,00,000/- from a Malaysian firm. 474 pieces of logs were loaded on a vessel known as 'Indera Pertama' (vessel) at the port of Western Sabah, Malaysia for their delivery at Calcutta. The ship left the Malaysian Port with cargo on 16th February, 1988. The logs were insured by Appellant with Respondent    Insurance Company for a sum of Rs. 39,90,122/- against the peril and/ or risk of non-delivery of said goods. The policy contained Institute Cargo Clause (C). It also expressly included the risk of non-delivery of even single piece of log.

The relevant clauses of the said contract are as under: "Institute Cargo Clause (C) Risks covered:

1. This insurance covers, except as provided in Clauses 4, 5, 6 and 7 below, 1.1 *** 1.1.1 *** 1.1.2 vessel or craft being stranded grounded, sunk or capsized  "

*** *** *** *** *** *** The insurance contract contained exclusion clauses, some of which are as under:

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

"4. In no case shall this insurance cover *** *** *** *** *** *** 4.6 loss, damage or expense arising
from insolvency or financial default of the owners, managers, chaterers or operators of the vessel.

*** *** *** *** *** *** 5.1 In no case shall this insurance cover loss damage or expense arising from
unseaworthiness of vessel or craft;

Unfitness of vessel craft conveyance container or lift-van for the sale carriage of the subject-matter
insured.

Where the assured or their servants are privy to such unseaworthiness or unfitness, at the time the
subject-matter insured is loaded therein.

*** *** *** *** *** ***

6. In no case shall this insurance cover loss, damage or expenses caused by *** *** *** *** *** ***
6.2 capture, seizure, arrest, restraint or detainment and the consequences thereof or any attempt
threat;"

*** *** *** *** *** *** 8.3 This insurance shall remain in force (subject to termination as provided
for above and to the provisions for clause 9 below) during delay beyond the control of the Assured,
any deviation, forced discharge, re-shipment or trans-shipment and during any variation of the
adventure arising from the exercise of a liberty granted to shipowners or charterers under the
contract of affreightment.

9. If owing to circumstances beyond the control of the Assured either the contract of carriage is
terminated at a port or place other than the destination named therein or the transit is otherwise
terminated before delivery of the goods as provided for in clause 8 above, then this insurance shall
also terminate unless prompt notice is given to the Underwriters and continuation of cover is
requested when the insurance shall remain in force, subject to an additional premium if required by
the Underwriters, either *** *** *** *** *** *** 9.2 if the goods are forwarded within the said period
of 60 days (or any agreed extension therein) to the destination named herein or to any other
destination, until terminated in accordance with the provisions of clause 8 above.

*** *** *** *** *** ***

13. No claim for Constructive Total Loss shall be recoverable hereunder unless the subject-matter
insured is reasonably abandoned either on account of its actual total loss appearing to be
unavoidable or because the cost of recovering, reconditioning and forwarding the subject-matter to
the destination to which it is insured would exceed its value on arrival."

An extended warranty clause was endorsed in the policy wherefor additional premium was paid in
the following terms:

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

"Notwithstanding anything contained herein to the contrary, it is hereby declared and agreed that the coverage granted under the within mentioned policy be extended to include the risks of "Theft, Pilferage and Non-Delivery" as well as "War and S.R.C.C." as per attached clause 6 & 11. In consequence above extension of risks, an additional premium of Rs. 1,496/- is hereby charged to the insured."

The ship developed engine troubles and was held up at Singapore Port till 13th March, 1988. It sailed for Port of Calcutta thereafter. It was, however, immobilised on reaching high sea at Anadamans. It underwent repairs but eventually returned back to Malaysia. Indisputably, Appellant kept Respondent    Insurance Company informed all through. While at Malaysian Port, the ship was arrested at the instance of one Gobsobs, one of the owners of the cargo in May, 1988. Appellant filed a caveat in the said proceedings with a view to take appropriate steps to have the logs belonging to it released.

The Malaysian Court discharged the order of arrest on 30th December, 1988 and the ship eventually proceeded again towards Singapore. At Singapore, the ship became stranded. On 3rd January, 1989, it offloaded its cargo and did not resume its journey. Appellant, however, with a view to minimise its loss due to non-delivery, took steps to recover the cargo or its value and on an application filed by it, the High Court of the Republic of Singapore in suit No. 711 of 1989 passed an order on 9th June, 1989 allowing the sale of the cargo. Admittedly, Appellant had received a sum of Rs. 20,01,743.53 out of the sale proceeds.

A claim by way of constructive total loss was raised by Appellant with the Insurer in terms of its letter dated 12th August, 1989 which was repudiated by Respondent in terms of its letter dated 1st April, 1991. The said stand was reiterated by it in terms of a letter dated 22nd October, 1991.

Appellant filed a suit before the original side of the Calcutta High Court which was marked as CS No. 480 of 1992 praying for a decree for a sum of Rs. 49,48,407/- with interest.

The Singapore Court, however, during pendency of the said suit on or about 19th May, 1995 released the money in favour of Appellant. The said sum being 20,01,740.53 was received by it at the then prevailing exchange rate on 22nd June, 1995.

The learned Single Judge in the suit inter alia framed the following issues:

"1. Is the plaintiff the owner of the subject goods?

*** *** *** 2(b) Was there any constructive total loss as alleged in paragraph 8 of the plaint?

3. Is the suit barred by the laws of limitation?

4. To what relief, if any, is the plaintiff entitled?"

In regard to Issue No. 1, the learned Judge opined:

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

"It follows therefore that the said Clause 6 cannot be set up by the defendant against the plaintiff's claim on account of non-delivery i.e. the peril insured against. Further in any event I am satisfied on the evidence adduced at the trial that the plaintiff had given prompt notice of the termination of the voyage at the Singapore Port but the defendant did not ask for payment of additions, premium for continuation of the said policy. The defendant therefore must be considered to have acquiesced in the continuation of the said policy at any rate it must be taken to have waived the condition prescribed in the said clause. I, therefore, answer this issue in the affirmative."

So far as Issue No. 2(b) is concerned, the learned Judge noticed the definition of 'constructive total loss' as contained in Section 60 of the Marine Insurance Act, 1963 and opined:

"There is no "express provisions" to the contrary in the said policy and as such it cannot be disputed that there has been constructive total loss of the said consignment. There is evidence on record to show that the cost of bringing down the said consignment to the Calcutta Port from the Singapore Port would be more than it is actual cost (see exhibit 'S' supra). I, therefore, here (sic) that this issue should be answered in the affirmative."

As regards, Issue No. 3, the learned Judge noticed the Respondent's contention which is in the following terms:

"  Plaintiff's claim was wrongful and not maintaining and the same was repudiated by this defendant's letter dated April 1, 1991 and October 22, 1991."

In regard to the said contention, it opined that the said repudiation was made on 1st April, 1991 and 22nd October, 1991.

As regards Issue No. 4, it was held that the suit was within limitation.

Keeping in view the fact that Appellant had received a sum of Rs. 20,01,740.53, it was opined that it was entitled only to a sum of Rs. 8,48,259.47 and the suit was decreed therefor together with simple interest at the rate of 18% per annum.

Aggrieved thereby, Respondent filed an intra-court appeal before a Division Bench of the said High Court which was marked as APD No. 363 of 2000. The High Court held that the repudiation of claim having been made on 8th July, 1988, subsequent correspondences having been marked as 'without prejudice', the same would not amount to extension of period of limitation as the suit was filed on 7th August, 1992. In regard to the correspondences passed between the parties, it was opined:

"  The conduct of the defendant/appellant in this regard clearly indicates that in order to help tracing out the situation, the defendant had extended its good office and that too without prejudice. Such a gesture does not seem to extend the period of limitation by admission or otherwise when on the face of Exhibit 5 (8th July, 1988), the defendant had already declined/denied its liability  "

It was furthermore held that having regard to Clause 9 of the policy, the contract of carriage stood terminated. On merit of the matter, the court, on the question as to whether the claim was established, held that the same had not been quantified in the absence of any definite proof with regard to the amount to be ascertained as claimable.

In regard to the question as to whether the policy was an all risk policy, the Division Bench opined that the policy was not an all risk policy and the exclusion clause contained in Clause 4.6 would operate.

In regard to the question of constructive total loss, keeping in view the fact that the goods were in existence, the court purported to have relied upon Middows v. Robertson [(1940) 67 Lloyd's Law Report 484] opining:

"  The unseaworthiness would not come within the peril of the insured against as was held in Wadsworth Lighterage Co. Ltd. (supra). The unseaworthiness of the vessel is a ground excluded in the policy as referred to hereinbefore. There is no pleading or any attempt to prove that the plaintiff or its servant was not privy to the unseaworthiness of the vessel at the time of loading."

It was held:

"6.15 If in a situation, loss occurs due to combination of more than one factors then if one factor is excluded the claim of the plaintiff cannot succeed. In the instant case, the proximate cause was delay and defaults committed by the plaintiff as mentioned aforesaid. Hence, the plaintiffs claim must fail."

In regard to the issue of loss caused by measures taken by Appellant to avert or minimize the effect of an insured period, it was opined that as the ship was detained due to unseaworthiness which is exclusionary clause the plaintiff cannot succeed in its claim. It was further opined that the insurance was hit by 'sue and labour clause' and Appellant has not been able to discharge its burden.

In regard to warehouse to warehouse loss, it was held that the policy did not include the risk of loading the goods in vessel which were unseaworthiness. It being a maritime industry peril, the enforcement would be against the exclusion clause contained in Clause 5.1.

It was concluded:

"10. For all these reasons, we are of the view (1) that because of the fact of denial by the insurer by its letter dated 8th July, 1988 (Ext. 5) coupled with the termination of the policy and its non-extension after the Cargo Safety Construction Certificate and Load Line Certificate expired on 15th July, 1988 and on account of plaintiff's failure to discharge its obligation either to obtain re-shipment of the goods soon thereafter and the failure to take a decision to sell the goods locally immediately and filing of the suit after 7th August, 1992 clearly indicates that the claim of the plaintiff was barred by limitation and the suit ought to have been dismissed; (2) the plaintiff has not been able to prove that he had taken all steps to avoid the delay; (3) the policy was not an all risk policy but was

circumscribed and restricted by reason of the Institute Cargo Clause (c) containing the restrictive clauses enumerated in paragraph 5 hereinbefore; (4) the plaintiff has not been able to establish its claim by discharging the burden lay upon it to sustain the claim on merit and that the goods were not lost when the claim was lodged; (5) the plaintiff has not been able to prove constructive loss by reason of abandonment; (6) that by reason of Sections 20 and 32 of the Evidence Act, it was proved that the goods were still in existence and were in good condition; and (7) that the loss cannot be ascribed to any peril insured as discussed hereinbefore."

Mr. Prasenjit Keswani, learned counsel appearing on behalf of Appellant, would submit that the Division Bench of the High Court committed a serious error in arriving at its conclusions insofar as it failed to take into consideration that once the goods were stranded, it was covered by the terms of extended insurance policy which would include non-delivery for any reason whatsoever. Non-delivery of goods, the learned counsel urged, would bring within its fold constructive total loss as there is no serious dispute in regard to the fact that cost of transportation of goods from Singapore to Calcutta was much higher than the actual costs of the goods. The burden of proof to show that the exclusionary clauses are attracted being on the insurer and such burden having not been discharged the decision of the Division Bench should not be upheld.

It was furthermore pointed out that neither any case of applicability of the exclusion clauses was made in the written statement nor any issue was raised. In any event, in case of an ambiguity, a contract of insurance should be construed in favour of the insured. Reliance in this behalf has been placed on United India Insurance Co. Ltd. v. Pushpalaya Printers [(2004) 3 SCC 694].

Mr. Vishnu Mehra, learned counsel appearing on behalf of Respondent, on the other hand, would submit that Institute Cargo Clause (C) contained restrictive clauses. Drawing our attention to Section 78 of the Marine Insurance Act, he would submit that the Division Bench of the High Court has rightly construed the words 'any peril'. It was submitted that having regard to Sub-section (4) of Section 78 of the Marine Insurance Act, the insured had a duty to minimize the loss and only in that view of the matter, Respondent extended its assistance which cannot be said to be an admission of its liability. It was urged that the insurance policy would cover only the perils mentioned therein and no case has been made out that the vessel was stranded.

Having regard to Clause No. 9 of the policy, it was contended that the contract became terminated and there being no request for continuation of the contract, it came to an end in December, 1988 when it was stranded at Singapore.

In regard to claim of Appellant on constructive total loss, it was submitted that the contract came to an end in December, 1988 and, thus, the case would come within the purview of Section 60 of the Marine Insurance Act. Constructive total loss, it was urged, must be commensurate with actual total loss, but, no case has been made out that it was a case of actual total loss as goods were existing and they were sold and the insured, therefore, have never been deprived of possession of the entire goods.

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

It was further submitted that even if the broad meaning is given to the term 'stranded', the insured having not been deprived of the possession of the goods, no loss occurred.

The questions which arise for consideration before us are:

(i) Whether the suit was barred by limitation.

(ii) Whether the policy of insurance was an all risk policy.

(iii) Whether the policy covered constructive total loss.

(iv) Whether the exclusion clauses in the policy are applicable in the facts of this case so as to repudiate the claim of Appellant.

In the plaint it was stated:

"13. By letters dated April 1, 1991 and October 22, 1991 the defendant wrongfully rejected the claim of the plaintiff."

In response to the said contentions, Respondent averred:

"15. With reference to paragraph 13 of the plaint this defendant denies that this defendant has wrongfully rejected the claim of the plaintiff. Plaintiff's claim was wrongfully and not maintainable and the same was repudiated by this defendant's letters dated April 1, 1991 and October 22, 1991. This defendant states that the contents of the said two letters are true and correct."

Appellant lodged its claim on 24th June, 1988. On or about 8th July, 1988, the Insurance Company purported to have repudiated the claim stating:

"We acknowledge receipt of your letter of 24th ultimo and note what you write. We would like to invite your attention to our letter dated 3.6.88, wherein requested you to take sincere and serious efforts to get the cargo landed at Calcutta Port before 11.7.88 even if necessary, by taking appropriate action that may be deemed fit. We also advised you to utilize the assistance of our Singapore Office, as and when necessary.

It is not clear from your letter under reference what steps have been taken to compel the ship owners to deliver the cargo at Calcutta Port as lading issued by them.

Please note that as the vessel loaded with full cargo has been located the question of 'Non- delivery' does not arise and no claim will be admissible by the underwriters where the existence of the goods is there. As per the terms and conditions of Marine Insurance Policy "Delay" is the excluded peril which note."

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

From a perusal of the said letter, it is evident that the only ground on which the claim of Appellant was not accepted was that the question of any 'Non-delivery" did not arise as the cargo had been in existence. Other contentions of Appellant in the said letter had not been repudiated.

On or about 11th August, 1988, Appellant herein served a notice of abandonment inter alia stating:

"In the circumstances of the case, we are to give you this Notice of abandonment of the consignments to you and you are at liberty to take possession of the subject matters insured.

In this connection, we may state that in a similar case in British & Foreign Marine Insurance Company Limited vs. Sanday & Another it was held that "Consequent on the adventure being frustrated by an insured peril the assured may abandon it and rever for a constructive total loss on the ground that the actual loss of the subject matter insured appears to be unavoidable, even though the goods themselves are uninjured."

It was stated:

"We lodged our formal claim with the shipowners at Kuala Lumpur as required under the Policy and copy of the same was endorsed to you. The shipowners have not acknowledged our claim notice and they have purposely kept silent. However, on any recovery proceedings we would render our full assistance even by signing the plaint etc."

Respondent admittedly got a survey conducted in March, 1989. Even in December, 1988, the ship had proceeded towards Singapore but only upon reaching the port of Singapore in January, 1989, the cargo was offloaded. A finding of fact has been arrived at by the learned Single Judge that the ship did not proceed due to its unseaworthiness. It is not in question.

We have noticed hereinbefore that indisputably Appellant on its own as also at the behest of Respondent took steps for realisation of cargo to the extent possible. It moved the Singapore High Court for sale of the cargo. It had also opposed the prayer of arrest of ship before a Malaysian Court. Respondent itself contended that Appellant made a pre-mature claim of constructive total loss. Having said so, it could not have raised a plea of limitation.

Our attention has been drawn to correspondences between the parties. In response to the Appellant's letter dated 11th August, 1988, Respondent in its letter dated 2nd September, 1988 stated that the settlement of claim would be considered strictly in terms of the policy. It was, however, stated:

"  So that the goods are not sold at the interest of the one consignee alone who has already taken action in Kuala Lumpur Court, we would without prejudice strongly recommend in your interest that action be taken by you as consignees and owners of the goods in proper Court at Kuala Lumpur to compel the shipowners to complete the voyage and meantime, 'restraint order' should also be secured to protect your interest as well alongwith the other interested Consignee so that no single or arbitrary action is taken by the Court jeopardizing your other consignee's interest.

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

We may here draw your attention that in terms of the Loss Minimisation Clause in the Policy, you are in duty bound to see that all protective measures are taken adequately against Carriers.

However, settlement of the claim under the policy would be considered only strictly in terms and conditions of the policy of insurance. This is without prejudice."

There had been no repudiation even at that stage. It was only when the ship could not leave the Singapore Port due to unseaworthiness, a claim of constructive total loss was made. Terms of the policy would indisputably have to be invoked for determining the rival clauses. But, it is one thing to say that the claim was barred by limitation or the exclusionary clauses would apply; but it is another thing to say that the question of invoking the said clause did not arise in terms of the contract of insurance.

Only because the expression "without prejudice" was mentioned, the same, in our opinion, by itself was not sufficient and would not curtail the right of the insured to which it was otherwise entitled to. The expression "without prejudice" may have to be construed in the context in which it is used. If the purpose for which it is used is accomplished, no legitimate claim can be allowed to be defeated thereby. [See Cutts v. Head and Another, (1984) 2 WLR 349 and Rush & Tompkins Ltd v. Greater London Council and another, (1988) 1 All ER 549] In Phipson on Evidence, Sixteenth Edition, pages 655-657, it is stated:

"Without prejudice privilege is seen as a form of privilege and usually treated as such. It does not, however, have the same attributes as the law of privilege. Privilege can be waived at the behest of the party entitled to the privilege. Without prejudice privilege can only normally be waived with the consent of both parties to the correspondence. Whilst the rule in privilege is "once privileged, always privileged", the rule for without prejudice is less straightforward, and at least in three party cases, this will not always be the position. A third distinction is that in the three party situation, which is not governed by contract, without prejudice documents are only protected in circumstances where a public policy justification can be provided, namely where the issue is whether admissions were made. That is not a principle applicable in the law of privilege. Fourthly, whereas legal professional privilege is a substantive right, without prejudice privilege is generally a rule of admissibility, either based on a contractual, or implied contractual right, or on public policy. This may have consequences relevant to proper law issues. Finally, if a party comes into possession of a privileged document, subject to equitable relief for breach of confidence, there is no reason why he should not use it and it will be admissible in evidence. But, the mere fact that a party has a without prejudice document does not entitle him to use it without the consent of the other party.

(c) When is correspondence treated as within the rule?

The first question is to determine what communications attract without prejudice privilege. The second stage is to consider when the court will, nevertheless, admit such communications.

Correspondence will only be protected by without prejudice privilege if it is written for the purpose of a genuine attempt to compromise a dispute between the parties. It is not a precondition that the

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

correspondence bears the heading without prejudice. If it is clear from the surrounding circumstances that the parties were seeking to compromise the action, evidence of the content of those negotiations will, as a general rule, not be admissible. The converse is that there are some circumstances in which the words are used but where the documents do not attract without prejudice privilege. This may be because although the words without prejudice were used, the negotiations were not for the purpose of a genuine attempt to settle the dispute. The most obvious cases are first, where the party writing was not involved in genuine settlement negotiations, and secondly, where although the words were used, they were used in circumstances which had nothing to do with negotiations. Surveyors reports, for example, are sometimes headed without prejudice, although they have nothing to do with negotiations. The third case is, where the words are used in a completely different sense. Thus, in Council of Peterborough v. Mancetter Developments, the documentation was admissible because in context the words meant "without prejudice to an alternative right and without concession to the other application" and had nothing to do with settlement.

There are circumstances in which the correspondence is initiated with a view to settlement but the parties do not intend that the correspondence should be without prejudice. It may be that the parties positively want any subsequent court to see the correspondence and always had in mind that it should be open correspondence. It may be a nice point whether negotiations at which no one mentioned the words "without prejudice" should be admitted in evidence: for example at an early meeting between the parties when the dispute first developed. There is no easy rule here. On the other hand, even when a letter is sent as the "opening shot" in negotiations, and is not preceded by any previous correspondence, it may be without prejudice. There are authorities in both directions on this and it will depend on the facts.

It has been said that if one is seeking to change the basis of the correspondence from without prejudice to open it is incumbent on that person to make the change clear, although that may be more a pointer than a rule. There is no reason why every letter for which without prejudice is claimed should contain an offer or consideration of an offer, so long as the without prejudice correspondence is part of a body of negotiation correspondence."

The actual repudiation was made on 1st April, 1991 and, thus, the suit having been filed on 7th August, 1992 was within the period of limitation in terms of Article 44 of the Schedule appended to the Limitation Act, 1963, the relevant portion whereof is as under:

"Description of suit Period of limitation Time from which period beings to run

(a) ***

(b) On a policy of insurance when the sum insured is payable after proof of the loss has been given to or received by the insurers.

Three years The date of the occurrence causing the loss, or where the claim on the policy is denied, either partly or wholly, the date of such denial."

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

When the termination of the contract of insurance has actually taken place is essentially a question of fact. An insurance policy is to be construed in its entirety. A marine insurance policy does not come to an end only because the ship became stranded at a port.

Termination of the transit before delivery of goods is subject to Clause 8 of the contract. The duration of contract is mentioned in Clause 8 of the contract of insurance. It commences from the time the goods leave the warehouse or other contingencies mentioned therein. It terminates:

(i) on delivery to the Consignees or other final warehouse;

(ii) on delivery to any other warehouse or place of storage;

(iii) for storage other than in the ordinary course of transit; or

(iv) for allocation or distribution or on the expiry of 60 days after completion of discharge overside of the goods insured from the oversea vessel at any final port of discharge.

None of the aforementioned clauses are attracted in the facts and circumstances of the present case.

Clause 8.3, subject of course to the operation of other provisions contained in Clause 8 as also the provisions contained in Clause 9, remains in force during delay beyond the control of the assured, any deviation, forced discharge, reshipment or transshipment and during variation of the adventure arising from the exercise of a liberty granted to ship owners or charterers under the contract of affreightment.

The Division Bench of the High Court committed an error in holding that the insurance policy stood terminated after June/ July, 1988 in terms of clause 9 of the policy when the contract of carriage had terminated on account of the unseaworthiness of the ship. Even Respondent had not made out any case to the said effect in the pleadings. If the contract of insurance did not terminate on its own, as was wrongly opined by the Division Bench of the High Court, the question of any request for its extension did not arise.

Undoubtedly, the contract of insurance was covered under Institute Cargo Clause (C). However, it included expressly the risk of non-delivery of even single piece of log. It included the risk of the vessel or craft being stranded or grounded. It also included the risk of institute theft pilferage and non-delivery.

Yet again on 2nd March, 1988 and 11th March, 1988, evidently, the scope of aforesaid policy was enlarged pursuant whereto or in furtherance whereof further endorsements were made by paying additional premium, in terms whereof the risk of non-delivery was specifically covered. It will bear repetition to state that the vessel could not proceed from Singapore owing to its unseaworthiness. It was, thus, covered by the terms of the extended terms of insurance policy. The Division Bench failed to consider this aspect of the matter.

Clause 1.1.2 included the risk of the vessel or craft being stranded or grounded. The word 'stranded' is not a term of art. The expression has also been used in the Navy Act.

In Stroud's Judicial Dictionary of Words and Phrases, Fifth Edition, Volume 5, the word 'strand' has been defined as :

"'Strand' is a Saxon word, signifying a shore or bank of a sea or any great river"

In The New Lexicon Wesbter's Dictionary of the English Language, Volume 2, the word 'strand' has been defined as:

"strand: 1. the shore of body of water (esp. of a sea or lake). 2 to drive onto the shore/ to run (a boat) aground/ to cause (someone) to find himself accidentally and unwillingly held up on a journey or left suddenly somewhere without resources, the fog stranded passengers at the airport (esp. pass.) to leave ashore when the tide goes out or water level sinks, the whale was stranded."

In P. Ramanatha Aiyar's Advanced Law Lexicon, 3rd edition, page 4494, it is stated:

"Strand. The word "strand" means the verge of the sea, or of any river.

Strand (Sax.) is any shore or bank of a sea or river. Hence the street in the west suburbs of London, which lay next the shore or bank of the Thames, is called the Strand."

In Black's Law Dictionary, Fifth Edition, the word 'strand' has been defined as :

"A shore or bank of the sea or a river."

If the ship was stranded at Singapore and goods were offloaded from it, Appellant must be held to have discharged its burden. Findings of fact were arrived at by the learned Single Judge on the basis of the pleadings of the parties. If a clause of Marine Insurance policy covers a broad fact, in our opinion, it would be inequitable to deny the insured to raise a plea particularly when the insurer being a State within the meaning of Article 12 of the Constitution of India is expected to act fairly and reasonably. The purport and object for which goods are insured must be given full effect. In a case of ambiguity, the construction of an insurance policy should be made in favour of the insured and not insurer.

In Pushpalaya Printers, this Court held:

"  Where the words of a document are ambiguous, they shall be construed against the party who prepared the document. This rule applies to contracts of insurance and clause 5 of the insurance policy even after reading the entire policy in the present case should be construed against the insurer  "

Section 60 of the Marine Insurance Act defines 'constructive total loss' in the following terms:

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

"60. Constructive total loss defined.-- (1) Subject to any express provision in the policy, there is a constructive total loss where the subject- matter insured is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it could not be preserved from actual total loss without an expenditure which would exceed its value when the expenditure had been incurred.

(2) In particular, there is a constructive total loss--

(i) where the assured is deprived of the possession of his ship or goods by a peril insured against, and

(a) it is unlikely that he can recover the ship or goods, as the case may be, or

(b) the cost of recovering the ship or goods, as the case may be, would exceed their value when recovered; or

(ii) in the case of damage to a ship, where she is so damaged by a peril insured against that the cost of repairing the damage would exceed the value of the ship when repaired.

In estimating the cost of repairs, no deduction is to be made in respect of general average contributions to those repairs payable by other interests, but account is to be taken of the expense of future salvage operations and of any future general average contributions to which the ship would be liable if required; or

(iii) In the case of damage to goods, where the cost of repairing the damage and forwarding the goods to their destination would exceed their value on arrival."

The definition of "constructive total loss" contained in Section 60 is not exhaustive. The opening words of Section 60 of the Marine Insurance Act are important.

In Mukesh K. Tripathi v. Senior Division Manager, LIC and Others [(2004) 8 SCC 387], this Court observed:

"The interpretation clause contained in a statute although may deserve a broader meaning having employed the word "includes" but therefor also it is necessary to keep in view the scheme of the object and purport of the statute which takes him out of the said definition. Furthermore, the interpretation section begins with the words "unless the context otherwise requires".

40. In Ramesh Mehta v. Sanwal Chand Singhvi it was noticed: (SCC p. 426, paras 27-28) "27. A definition is not to be read in isolation. It must be read in the context of the phrase which would define it. It should not be vague or ambiguous. The definition of words must be given a meaningful application; where the context makes the definition given in the interpretation clause inapplicable, the same meaning cannot be assigned.

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

28. In State of Maharashtra v. Indian Medical Assn. one of us (V.N. Khare, C.J.) stated that the definition given in the interpretation clause having regard to the contents would not be applicable. It was stated: (SCC p. 598, para 8) '8. A bare perusal of Section 2 of the Act shows that it starts with the words "in this Act, unless the context otherwise requires   ". Let us find out whether in the context of the provisions of Section 64 of the Act the defined meaning of the expression "management" can be assigned to the word "management" in Section 64 of the Act. In para 3 of the Regulation, the Essentiality Certificate is required to be given by the State Government and permission to establish a new medical college is to be given by the State Government under Section 64 of the Act. If we give the defined meaning to the expression "management" occurring in Section 64 of the Act, it would mean the State Government is required to apply to itself for grant of permission to set up a government medical college through the University. Similarly it would also mean the State Government applying to itself for grant of Essentiality Certificate under para 3 of the Regulation. We are afraid the defined meaning of the expression "management" cannot be assigned to the expression "management" occurring in Section 64 of the Act. In the present case, the context does not permit or requires to apply the defined meaning to the word "management" occurring in Section 64 of the Act.'"

[See also M/s. Pandey & Co. Builders Pvt. Ltd v. State of Bihar & Anr. 2006 (11) SCALE 665] Interpretation of 'constructive loss' contained in Section 60 is subject to any express provision in the policy. The definition of constructive total loss, therefore, as contained therein would be subject to any other clause which may be in the policy. The policy contained a clause which was not in commensurate with the said provision. We, in a case of this nature, have to give effect to the terms of insurance.

The Division Bench of the High Court has referred to Middows (supra), which has expressly been reversed by the House of Lords in Rickards v. Forestal Land Timber and Railways Co., Ltd. 1941 (3) All ER 62] wherein it was clearly held that the notice of abandonment can be given.

In Halsbury's Laws of England, Fourth Edition Volume 25, Reissue 2003, page 257, 'constructive loss' has been defined as follows:

"Subject to any express provision in the policy, there is a constructive total loss where the subject matter insured is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it could not be preserved from actual total loss without an expenditure which would exceed its value when the expenditure had been incurred. Whether these conditions as to constructive total loss are or are not satisfied is in each case a question of fact.

In particular, there is a constructive total loss-- (1) where the assured is deprived of the possession of his ship or goods by a peril insured against, and:

(a) it is unlikely that he can recover the ship or goods, as the case may be, or

(b) the cost of recovering the ship or goods, as the case may be, would exceed their value when recovered;"

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

The likelihood of recovery must be judged in the light of the probabilities as they would have appeared to a reasonable assured at the moment when he knew of his loss and could have given notice of abandonment. The former rule of law that a frustration of the venture by an insured peril gives rise to a constructive total loss under a voyage policy on goods, although the goods themselves are not damages, has not been altered. [See Rickards (supra)] It is again undisputed that after the ship became unseaworthy, Appellant took steps to recover the value of the cargo with a view to minimize its loss due to non-delivery. It, therefore, fulfilled its contractual obligation in that behalf. Sale of cargo was allowed by the High Court of Singapore in suit No. 711 of 1989. It was only at that stage, Appellant could come to the conclusion that the cost of recovering and getting the cargo back to Calcutta would cost more than if the sale was effected at Singapore. The cause of action arose then. The learned Single Judge has taken specific note of the said fact stating that Appellant had sought for advice of Respondent as to whether the sale would go through at Singapore or in Calcutta by its letter dated 12th August, 1989 which was marked as Ex. S, relevant portion whereof reads as under:

"Local Sale in Singapore"

On Solicitor's request the Court has given permission to dispose off the cargo in order to minimize the loss in view of the deterioration in quality of material. Accordingly, the Solicitors appointed M/s. Toplings, Recovery Agent, who advertised the sale in newspapers and the best offer received for the cargo consisting of 2300 CBM now lying over there is U.S. $ 85,000. Out of this our share comes as under:

Total value offered for 2300 CBM = US$ 85,000. Therefore, our shoare 85000 x 2057.73/ 2300 = US$ 76,046.54 US$ 76,046.54 x Rs. 16.90 = Rs. 12,85,166.50 Whereas we have already paid Rs. 12,85,166.50 towards the consignment of 296 logs measuring 1268.99 CBM under the L/C and US $ 1,18,416/- is still payable to the shipper against the documents for 178 Logs measuring 789.74 CBM received under the D.A. Thus, there is a loss of around over 30 lakhs while disposing the entire consignment in Singapore.

To bring the Cargo to Calcutta for Sale in India:

To bring the cargo from Singapore to Calcutta for sale in India, the position will be as under:

a) Expenditure to be borne by insurance co. towards freight and other charges like loading into ship etc. at Singapore i.e. US $75/- per CBM i.e. 2057.73 CBM x US $ 75 $1,54,329.75 x Rs. 16.90 = Rs. 26,08,172.77

b) Expenditure to be borne by us towards Duty and clearing expenses i.e. Rs. 721/- CBM i.e. 2057.73 CBM x Rs. 721/- per CBM comes = Rs.

14,83,623.30 Total = Rs. 40,91,796.07 The best price that we can get for the said Cargo in Calcutta is Rs. 1942/- per CBM.

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

Therefore, the total sale realization will be as under:

2057.73 x Rs. 1942 = Per CBM Rs. 39,95,700/-"

In that view of the matter, Respondent was held to be entitled to get credit thereof. Clause 13 of the insurance policy was, thus, clearly attracted.

Reliance has strongly been placed on a decision of this Court in Bihar Supply Syndicate v. Asiatic Navigation and Others [(1993) 2 SCC 639 : AIR 1993 SC 2054] wherein this Court was dealing with a different fact situation. In that case, the vessel in question was diverted to Vishakhapatnam along with cargo where the repairs of the vessel were expected to be completed. The vessel was, however, not repaired nor the wages of the crew members were paid as a result whereof the ship was directed to be arrested. It was in the aforementioned fact situation opined:

"  It is thus clear, after knowing the fact, that we are dealing with a Marine Insurance Policy with Institute Cargo Clauses (FPA) attached against the Insurance Company, it is the duty of the plaintiff to prove as a fact that the cargo was lost due to perils of the sea. Since the finding of the High Court is that no sea water entered in the engine room and the fact that the cargo was intact even after the ship was towed to Vishakhapatnam showed that no sea water entered the ship and, therefore, the loss to the plaintiff was not on account of perils of the sea and the suit of the plaintiff against the Insurance Company i.e. defendant 4 was rightly dismissed by the High Court."

The said decision cannot be said to have any application in this case in view of the extended terms of policy. Non-delivery of goods may be on any account. It need not always be a 'case of reasonably abandoned'. The meaning of the expression 'peril insured against' would depend upon the terms of the policy. The policy was extended to a case where the costs of transportation would be more than the value of the goods. Marine Insurance Act is subject to the terms of insurance policy. Where the insurer takes additional premium and insure a higher risk, no restrictive meaning thereto need be given. A term of the policy must be given its effect. While construing a contract of insurance, the reason for entering thereinto and the risks sought to be covered must be considered on its own terms.

When the entire case is based on a construction of insurance policy, the question of adduction of any oral evidence would be irrelevant particularly when the learned Single Judge gave due credit of the amount received on auction of the goods under the orders of the Singapore Court. The value of the cargo was known. It is not a disputed amount. Thus, whatever has been recovered by way of sale of the said logs, the same has to be credited for and Appellant should be held entitled only to the balance amount.

What would, thus, be the meaning of the word 'possession' under Sub-section (2) of Section 60 of the Marine Insurance Act read with Clause 13 of the policy? It is not the case of any of the parties that Appellant was given actual possession of the goods. Unseaworthiness of vessel due to which it became stranded as a result whereof the goods could not be delivered to Appellant, in our opinion, would come within the meaning of the expression "peril insured against".

M/S. Peacock Plywood Pvt. Ltd vs The Oriental Insurance Co. Ltd on 5 December, 2006

This leaves us to the question as to whether the exclusionary clauses contained in the insurance policy are attracted.

Respondent in its written statement did not raise such a contention. It was required to be specifically pleaded and proved by Respondent. The burden to prove the applicability of exclusionary clauses was on Respondent. Neither any issue has been raised, nor any evidence has been adduced in this behalf. It is also not a case that the servants of the assured were privy to the unseaworthiness as provided for in Clause 5.5.1 of the insurance policy. There has been no evidence to that effect. Even the said provision has not been applied by the learned Single Judge.

For the reasons aforementioned, the appeal is allowed and the impugned judgment of the Division Bench is set aside and the judgment and order of the learned Single Judge is restored. Appellant shall be entitled to costs throughout. Counsel's fees in this appeal assessed at Rs. 10,000/-.

# EXHIBIT I

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 114 of 337   Page ID
#:28569
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

Competition Commission of India

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

PUBLIC VERSION

```
                  COMPETITION COMMISSION OF INDIA
                     Case Nos. 07 and 30 of 2012




        Case No. 07 of 2012


        In Re:


        Matrimony.com Limited                              Informant


        And


        1. Google LLC                           Opposite Party No. 1
        2. Google India Private Limited         Opposite Party No. 2
        3. Google Ireland Limited               Opposite Party No. 3




                                   WITH
        Case No. 30 of 2012


        In re:


        Consumer Unity & Trust Society (CUTS)              Informant


        And


        1. Google LLC                           Opposite Party No. 1
        2. Google India Private Limited         Opposite Party No. 2
        3. Google Ireland Limited               Opposite Party No. 3




        C. Nos. 07 & 30 of 2012                                   1
                                              PUBLIC VERSION


        CORAM
```

Mr. Devender Kumar Sikri
Chairperson

Mr. S. L. Bunker
Member

Mr. Sudhir Mital
Member

Mr. Augustine Peter
Member

Mr. U.C. Nahta
Member

Mr. Justice G. P. Mittal
Member

Appearances:        Shri Rajshekhar Rao, Shri Naval Satarawala Chopra, Shri
                    Yaman Verma, Shri Aman Singh Sethi, Shri Sapan Parekh
                    and Shri Varun Mishra, Advocates alongwith Shri
                    Murugavel J. Ravichandran, Founder & CEO and Shri S.
                    Ravichandran, General Manager (Legal & Regulatory) for
                    Matrimony.Com Private Limited.


                    Shri Vijay Singh, Centre Co-ordinator for Consumer Unity
                    & Trust Society.


                    Dr. Abhishek Manu Singhvi, Shri Arvind Nigam and Shri
                    Arun Kathpalia, Senior Advocates with Shri Samir R.
                    Gandhi, Shri Suhail Nathani, Ms. Kamya Rajagopal, Shri
                    Ravishekhar Nair, Shri Arjun Khera, Ms. Aditi
                    Gopalakrishnan, Ms. Kadambari Chinoy, Ms. Krithika
                    Ramesh, Ms. Anuja Agrawal and Shri Aakarsh Narula,
                    Advocates alongwith Shri Munesh Mahtani, Senior
                    Competition Counsel, Ms. Gitanjali Duggal, Legal

C. Nos. 07 & 30 of 2012                                                    2
                                                                PUBLIC VERSION

                    Director and Shri Shekhar Sharad, Product Manager for
                    Google.


                    Order under Section 27 of the Competition Act, 2002


1.    The information in Case No. 07 of 2012 was filed under Section 19(1)(a)
      of the Competition Act, 2002 ('the Act') by Consim Info Private Limited
      ('the Informant'/ 'Consim', now known as Matrimony.com Limited)
      which is stated to provide internet as a vehicle/ platform for prospective

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

marriage alliances, against Google Inc. and Google India Private Limited
alleging contravention of the provisions of Section 4 of the Act.

2. The information in Case No. 30 of 2012 was filed under Section 19(1)(a)
of the Act by Consumer Unity & Trust Society (CUTS) ('the Informant')
which is stated to be a non-profit, non-governmental organisation working
on public interest issues including those related to consumer protection
and competition - against Google Inc. (now Google LLC) and Google
India Private Limited alleging inter alia contravention of the provisions
of Section 4 of the Act.

Facts

3. In Case No. 07 of 2012, it was stated by the Informant that Google runs
its core business of search and advertising in a discriminatory manner,
causing harm to advertisers and indirectly to the consumers. It was alleged
that Google is creating an uneven playing field by favouring Google's
own services and partners, through manually manipulating its search
results to the advantage of its vertical partners.

4. It was pointed out that in addition to running the world's most popular
search service, Google also provides a large number of vertical search

C. Nos. 07 & 30 of 2012                                                        3
                                                        PUBLIC VERSION

services, including video (YouTube), news (Google News), maps (Google
Maps), etc. It has been averred that in order to promote Google's own
vertical search sites, Google started mixing many of its vertical results into
its organic search results. Therefore, when a user searches, for example,
the name of a song on Google, he receives links to videos of that song
from Google Video or YouTube, both of which are properties owned by
Google.

5. It was further pointed out that Google's own sites would appear
prominently on the search results page irrespective of whether they are the
most popular or relevant sites to the search and Google will not place
results from any other vertical search sites as prominently as Google's
own vertical search sites in its list of results.

6. It was further averred by the Informant that acquisition of various software
products by Google to complete its vertical integration further fortifies its
monopolistic position and tendency to eliminate competition. Google's
dominance in algorithmic search market leads to its status as an
unavoidable trading partner in search advertisement market.

7.   It was stated that the search algorithm used by Google to determine where a website appears on a search results page the algorithm used to calculate an advertiser's quality score which forms the basis for determining where an advertisement appears, the history of changes to Google's search and quality score algorithms, the basis for placing Google's vertical properties towards the top of the search results pages and what caused Consim's quality scores to fall, the ad hoc behaviour of Google etc. will only come to light if and when Google is directed to provide this information by the Commission/ Director General during the course of an investigation.

C. Nos. 07 & 30 of 2012                                                              4

PUBLIC VERSION

8.   In view of the above, it was averred that Google has abused its dominant position in the relevant market in India thereby contravening the provisions of Section 4 of the Act.

9.   In Case No. 30 of 2012, the Informant averred that based on market structure for internet search and internet search advertising market, the relevant markets for the purposes of the present information are online search market and online search advertising market in India.

10. It was further averred that Google, because of its market share, size, resources, reputation etc., is widely recognized as enjoying a dominant position in the market for online search and online search advertising world-wide including in India. As such, Google enjoys a position of strength in the relevant market which enables it to operate independently of competitive forces and to affect its competitors, consumers and the market in its favour.

11. The Informant alleged that Google is indulging in abuse of its dominant position in the market for online search through practices leading to search bias, search manipulation, denial of access to competing search engines, refusal to license content to competing search engines and creation of entry barriers etc. Allegations were also made about the abusive conduct of Google in the market for online search advertising through imposition of unfair and discriminatory conditions on its customers etc.

     Directions to the DG

12. The Commission, after considering the entire material available on record, vide its order dated 03.04.2012 passed under Section 26(1) of the Act in Case No. 07 of 2012 directed the Director General (DG) to cause an investigation to be made into the matter.

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

C. Nos. 07 & 30 of 2012                                                    5

13. Subsequently, the Commission passed another order under Section 26(1)
    of the Act in Case No. 30 of 2012 on 20.06.2012 directing an investigation
    by the DG. Further, the Commission directed this information to be
    clubbed with Case No. 07 of 2012 in terms of the provisions contained in
    the proviso to Section 26(1) of the Act as similar issues were pending
    investigation before the DG in that case.

14. During the course of investigation, it was observed by the DG that Google
    Ireland Ltd., Ireland (GIL), a subsidiary of Google Inc., was playing an
    important role in the operations of Google in India and as such, on a
    reference made by the DG, the Commission vide order dated 03.09.2014
    directed Google Ireland Limited to be included as an Opposite Party in the
    cases. Accordingly, investigation was conducted against Google Inc.,
    Google India Pvt. Ltd. and Google Ireland Ltd. (collectively, "Google").

15. The DG, after receiving directions from the Commission, investigated the
    matters and filed confidential version of a common Investigation Report
    dated 27.03.2015 in both the cases. Subsequently, a non-confidential
    version of the Investigation Report was filed by the DG on 14.07.2015.

16. It may also be noted that the Commission, vide its order 31.07.2013 took
    on record the letter dated 12.07.2013 of the Informant in Case No. 07 of
    2012 whereby it was informed that the name of the Informant company
    has been changed to Matrimony.com Private Limited. Subsequently, it
    appears from the filings of this Informant that the name has now been
    changed to Matrimony.com Limited. Accordingly, the cause title
    mentions this name in the order.

C. Nos. 07 & 30 of 2012                                                    6

    Investigation by the DG

17. To investigate the allegations, the DG first determined the relevant
    market. Based on the analysis of characteristics, intended use and price, it
    was found that there is no substitution between Online General Web
    Search Services and Specialised/ Vertical Search Services or Site-Specific
    Search Services. Further, analysis of characteristics, intended use and
    price revealed that first of all, online advertising is distinct from offline
    advertising and secondly, online search advertising is distinct from other
    forms of advertising like display advertising consisting of text, images,

graphics and videos, social network advertising, email-based marketing
and advertisements on mobile applications. Online search advertising is
linked to user-initiated search query that reveals user's immediate interest
in the subject matter of the query and thus allows very effective means for
targeting potential customers. On the other hand, online non-search
advertising is more appropriate to improve brand awareness and brand
building.

18. It was further noted that the fact that these distinct categories exist and
many advertisers opt for several types of these advertising forms
simultaneously clearly show that they provide different kinds of
opportunities for advertising to target eyeballs. These are, in fact,
complementary in nature. It was also found that Online Search and Search
Advertising are complementary and do not form a part of the same
relevant product market.

19. Therefore, in terms of the provisions of Section 2(r), Section 2 (s) and
Section 2(t) read with Section 19(6) and Section 19(7) of the Act,
following relevant markets were delineated by the DG:

C. Nos. 07 & 30 of 2012                                                    7

                                                         PUBLIC VERSION

    a. Relevant market of Online General Web Search Service in
      India.

    b. Relevant market of Online Search Advertising in India.

20. On the issue of dominance, Google was found to be a dominant enterprise
in both the relevant markets of Online General Web Search Services and
Online Search Advertising in India. In the relevant market of Online
General Web Search, Google's market share, estimated using various
parameters such as number of search queries and page views and across
device categories, was found to be consistently more than          during
2009 to 2014. This was the case despite the long standing presence of
other competitors like Yahoo! and Microsoft Bing and the entry of new
players in the market. In the relevant market of Online Search Advertising
as well, Google was found to consistently maintain an estimated market
share of more than        in India during the period 2009 to 2013.

21. Other factors like Google's size and resources, economic power and
commercial advantages, entry barriers, etc. further reinforced Google's
position of dominance. As per the DG, there exist significant entry barriers
in the nature of high cost, technology, network effects, minimum scale
requirements, and contractual restrictions etc. that bestow substantial

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

economic power on Google and place it at a major advantage. For these
reasons, Google has been able to establish itself as a critical platform for
all the stakeholders. The competitors have not been able to dent its market
position despite long presence and do not pose any significant competitive
constraint upon it. The DG thus, concluded that Google enjoys a position
of strength in these markets which enables it to operate independently of
competitive forces and to affect its competitors/ consumers as well as the
relevant markets in its favour.

C. Nos. 07 & 30 of 2012                                                        8
                                                                  PUBLIC VERSION

22. Adverting to the issue of abuse of dominant position, it was noted by the
    DG that apart from Online General web search services, Google also
    offers specialised search services like Google News, Google Maps,
    Google Flights etc. It also provides other products and services such as
    Google Reviews, Google+, YouTube etc. Google was found to be
    indulging in practices of search bias and by doing so, it causes harm to its
    competitors as well as to users. Investigation has revealed that Google
    integrates/   blends    its    own    specialised/   vertical   search
    services/options/features in its online general web search services in
    Universal Results and Commercial units using mechanisms that do not
    apply in an equivalent manner to non-Google websites/ web content.
    Moreover, it offers its own specialised search features (Commercial Units,
    Universal Results etc.) at prominent ranks or positions on the Search
    Engine Results Page (SERP). Top results receive higher user attention and
    are critical for online visibility. Through this practice, Google steers users
    to its own products and services, and produces biased results. This
    structure offers abundant opportunities for leveraging and has also raised
    issues of conflict of interest. Thus, the users may not receive the most
    relevant results. This also adversely affects the competitive landscape in
    the markets for online general web search and search advertising as well
    as adjacent markets such as travel, maps, social networking, e-commerce
    etc. Such actions deter innovation in a wide-range of these online ancillary
    markets. Consequently, users may be devoid of additional choices of
    results. This shows that competition is hampered in the market-impeding
    innovation, and thus, harming consumers. Therefore, Google's conduct
    was found to be anti-competitive in terms of Section 4(2)(a)(i), Section
    4(2)(b)(ii), Section 4(2)(c) and Section 4(2)(e) of the Act.

23. Further, it was observed by the DG that Google does not disclose to the
    advertisers the details of their quality score or quality scores and bids
    received from various advertisers for a particular keyword in an auction,

C. Nos. 07 & 30 of 2012                                                        9
                                                                  PUBLIC VERSION

even on historical basis. While it would not be appropriate to disclose the

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

bid amount on real time basis to others to prevent collusive behaviour, in
the absence of disclosure of historical data, any aberrations in the process
on account of errors of bonafide nature or manipulations can remain
undetected by the concerned advertisers over long period of time. The
advertisers may be oblivious to the fact that demotion of their ads is due
to system faults/ possible quality score manipulations, thereby subjecting
them to unfair and discriminatory conditions. Investigation revealed that
there exists technical feasibility of sharing greater details of quality scores
of individual campaigns as well as of historical data. Complex nature of
determination of Quality Score coupled with non-disclosure of adequate
information to advertisers renders the entire process opaque and non-
transparent and susceptible to manipulation which amounts to imposition
of unfair conditions on advertisers in violation of Section 4(2)(a)(i) of the
Act. Google was, thus, found to be abusing its dominant position by not
making such details available to its advertisers and following non-
transparent procedure.

24. It was also noted by the DG that Google's policy regarding compensation
is entirely discretionary and does not place any obligation on it to
compensate the advertisers for losses that can be attributed to Google's
system error. While no site may be guaranteed to win a particular position
under the AdWords mechanism, nevertheless it should be treated in a fair
and non-discriminatory manner and Google needs to take up
responsibility for any aberrations in the system which subjects them to
unfair treatment.

25. The DG also recorded that Google is not required to pay any monetary
consideration for its House Ads which gives it an additional competitive
edge. Further, Google has access to information on quality score that the
system assigns to other websites including those of its competitors.

C. Nos. 07 & 30 of 2012                                                              10

PUBLIC VERSION

Google being aware of these is in a position to ensure that its House Ads
are assigned higher quality score than its competitors and ensure that
invariably its House Ads appear in the top slots and above third party ads
particularly of its competitors. The checks referred to by Google were
found to be inadequate to address and prevent preferential treatment of its
own properties in paid results. It was thus, found that there does not exist
a level playing field for third parties competing with Google's House ads
to appear in paid results in response to user searches. Such conduct also
amounts to imposition of unfair and discriminatory conditions on third
party advertisers using AdWords and was found by the DG to be in
violation of Section 4(2)(a)(i) of the Act.

26. Google was also found to be abusing its dominance in online web search
and online search advertising markets by imposing unfair conditions upon
trademark owners (particularly those who have notified their trademarks

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 122 of 337   Page ID
#:28577
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

to Google) whose trademarks are being allowed to be bid as keywords by
third parties in online search advertising, in violation of Section 4(2)(a)(i)
of the Act. As per the AdWords mechanism, ads that appear first may not
be the most relevant for users and may appear at that position due to higher
bid placed by an entity. The competitors get opportunity to free ride on
the goodwill and brand value of the trademark owner thereby hampering
fair competition. This practice also creates a significant risk of causing
confusion and deception in the minds of the users thereby causing
consumer harm. Unsuspecting consumers may be misled to believe that
there exists an association between the owner of the trademark and its
competitors (whose ads appear in response to searches on their brands)
and this may divert traffic. In such a scenario, the owner of the trademarks
are compelled to participate and outbid competitors (for their ads to appear
before them) thereby augmenting their advertising budgets.

C. Nos. 07 & 30 of 2012                                                                 11

PUBLIC VERSION

27. Further, it was observed that there is scope for Google to use the system
    in a discriminatory manner and ensure that its own trademarks are not
    subject to the same unfair conditions as those imposed upon third parties,
    where bidding under AdWords. Such conduct of Google was therefore
    found to be unfair and discriminatory in terms of the provisions of Section
    4(2)(a)(i) of the Act.

28. It was further noted that though Google's AdWords policy restricts usage
    of notified trademarks in Ad text of competitors, investigation brought out
    that on various occasions, ads of competitors using Consim's trademarks
    in Ad text in response to searches on these trademark terms despite
    notification. Further, Google allowed usage of minor variations of
    Consim's notified trademarks in Ad text of competitors under its
    AdWords program despite repeated complaints of Consim and this led to
    unfair bidding between trademark owner and other advertisers. This was
    in complete disregard of anti-competitive effect and appeared to be driven
    by Google's commercial interests. Consim's own ads were blocked for
    searches on its trademark terms even after it complied with Google's
    requisite procedures. Google thus, was concluded to have abused its
    dominant position and imposed unfair conditions on Consim in violation
    of Section 4(2)(a)(i) of the Act. Such conduct also resulted in unfair
    business gains to Consim's competitors as well as to Google itself.

29. The DG also found that apart from online web search services, Google
    also offers online search and advertising on other websites through
    Syndication/ Intermediation services. With regard to advertising,
    intermediation can take place for both search and non-search advertising.
    Google offers Syndication services under its AdSense program. The
    Online Search and Advertising Syndicate Services constitute distinct
    relevant markets. By virtue of its position of strength in the relevant

markets of Online General Web Search Services and Online Search

C. Nos. 07 & 30 of 2012                                                           12

Advertising Services, Google is also a preferred Syndicate service
provider for publishers wanting to offer search and advertising services on
their websites. Google was found to be using its dominant position in
Online General Web Search Service and Online Search Advertising
Service to impose certain restrictive conditions in its agreements for
syndicate search and advertising services in violation of Section 4(2)(e)
and Section 4(2)(c) of the Act. The nature of restrictions varied across
types of agreements. While in some cases, partners are prohibited from
using competing services, in other there are restrictions relating to the
manner of placement of ads of competitors. These restrictions prevented
competing service providers from achieving necessary scale which results
in creation of entry barriers for them.

30. The policy and conduct of Google, prior to May 2010, for not disclosing
AdSense Revenue to online AdSense partners was concluded by the DG
as amounting to imposition of unfair conditions on them resulting in
infringement of Section 4(2)(a)(i) of the Act.

31. Such agreement with AdSense partners was also held to be one-sided and
providing enough scope for arbitrary conduct without fair opportunity to
the other party. This amounts to imposition of unfair conditions by Google
within the meaning of Section 4(2)(a)(i) of the Act.

32. Google also entered into agreements with customers licensing AdWords
API from it. Google's AdWords API agreements with third party tool
developer entities contain certain restrictive clauses that have anti-
competitive effects    which the DG found to be in violation of the
provisions of Section 4(2)(a)(i), 4(2)(b)(ii) and Section 4(2)(c) of the Act.
These restrictions have the potential to be used as a tool for discouraging
advertisers from multi-homing thereby being instrumental in denial of
market access to competitors and causing other anti-competitive effects.

C. Nos. 07 & 30 of 2012                                                           13

Further, inclusion of a provision on termination without reason in the
AdWords API terms amounted to the imposition of an unfair condition on
AdWords API users in violation of Section 4(2)(a)(i) of the Act.

33. Resultantly, it was concluded by the DG that Google abused its dominant
position in the relevant markets of "Online General Web Search Service
in India" and "Online Search Advertising in India", in violation of Section

4(2)(a)(i), 4(2)(b)(ii), 4(2)(c) and Section 4(2)(e) of the Act.


Consideration of the Investigation Report by the Commission


34. The Commission considered the Investigation Report submitted by the
    DG in its ordinary meetings and decided to forward copies thereof to the
    parties for filing their respective objections/ suggestions thereto. After
    disposal of various procedural applications, the matter was finally heard
    by the Commission on January 12, 18, 19, 20, 23 and 24, 2017 whereupon
    the Commission decided to pass an appropriate order in due course.


Replies/ Objections/ Submissions of the parties


35. On being noticed, the parties filed their respective replies/ objections/
    submissions to the Investigation Report of the DG besides making oral
    submissions.


Replies/ objections/ submissions of the Opposite Party


36. Google filed its response to the Investigation Report and the same shall be
    referred to and dealt with while analysing the matters on merits.



C. Nos. 07 & 30 of 2012                                                    14
                                                              PUBLIC VERSION

Replies/ objections/ submissions of the Informants


37. The Informant in Case No. 07 of 2012 filed its objections and broadly
    supported the findings of the DG. The objections filed by this Informant
    shall be appropriately referred to in the order. The Informant in Case No.
    30 of 2012 filed its brief preliminary comments/ submissions and
    supported the findings of the DG.


                                ANALYSIS
38. Briefly stated, it was inter alia alleged in the informations that Google
    runs its core businesses of search and search advertising in an unfair and
    discriminatory manner, causing harm to the publishers and advertisers,
    and to the consumers. Further, it was alleged that Google was creating an
    uneven playing field by unduly favouring its own services. Google is
    leveraging its strong position in various online search market to enter into
    and enhance its position in ancillary markets. Not only does that cause
    direct harm to competitors in vertical markets, it also causes direct harm

to other website owners, since their websites are moved down on SERP and hence, they receive less clicks as a result of lessened traffic. Further, this also harms consumers as they no longer receive the most relevant results at the top of SERP.

39. To examine the allegations, it would be appropriate to highlight the working of search engine platforms. General web search engines like Google, also known as "Horizontal Search Engines", crawl and index websites/ web content and other online content and display results algorithmically on SERP on the basis of relevance in response to a user query entered in the search box/ input bar. They deliver information on a wide variety of topics/ content categories for a given user query.

C. Nos. 07 & 30 of 2012                                                    15

PUBLIC VERSION

40. A search engine service provider brings together the following categories of users: internet users who key in search terms to find relevant results on the web; websites and information/ content providers on internet whose links and content appear as results on the SERP; and Advertisers whose ads appear on SERP in response to search queries.

41. Service providers monetise their online search business through online search advertising. Internet users who utilise search services form consideration by providing their attention or "eyeballs" to the search result pages containing links to web content. In addition, they allow the search engines to collect their information for use. By doing so, users facilitate the generation of revenues through sponsored advertisements. On the other hand, by allowing links to and content from their webpages to appear in search results, websites enable search engines to maintain and enlarge their internet user base. This inter-relationship amongst internet users, websites and advertisers is reflective of the widely accepted multi-sided character of the search engine business. In a multi-sided market, there exist multiple distinct customer groups that have inter-related demand and so one or more groups impose a positive externality on the other group/s. In such a scenario, there exists possibility of subsidizing provision of services to a certain set of consumers by charging another set of consumers.

42. Against the aforesaid backdrop and on perusal of the information, the Investigation Report of the DG, replies/ objections filed thereto, the submissions made by the parties and other materials available on record, the following points arise for consideration and determination in the matter:

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

C. Nos. 07 & 30 of 2012                                                    16

(i) What is the relevant market(s) in the present case?

(ii) Whether Google is dominant in the said relevant market(s)?

(iii) If finding on Issue No. (ii) is in the affirmative, whether Google has abused its dominant position in the relevant market(s)?

43. Prior to examining the aforesaid issues, it would be appropriate to mention that throughout the analysis the term "Google" shall be used to denote collectively the three Opposite Parties viz. Google LLC, Google India Private Limited and Google Ireland Limited. As has been brought out by the DG in the Investigation Report, these three entities constitute a "Group" as defined in the Explanation (b) to Section 5 of the Act and no objection has been raised by Google against this finding of the DG.

Relevant Market

44. The DG has identified the relevant market after considering both the relevant product and geographic markets in accordance with Section 2(r), Section 2(s) and Section 2(t) read with Section19(6) and Section 19(7) of the Act:

Relevant Product Market

Online General Web Search Services

45. While delineating the relevant product market, the DG has conducted a detailed analysis of the factors set out in Section 19(7) of the Act.

46. The DG considered the question of substitutability of online general web search services and search advertising services and concluded that online general web search services and search advertising did not constitute the same relevant product market on account of wide variations in the

C. Nos. 07 & 30 of 2012                                                    17

mechanism for generation and display of results and also clicking behaviour. Further, the DG noted that these services served distinct goals and are perceived differently by various categories of users, namely, publishers (websites) and internet users entering search queries. The DG also observed that these services constituted complementary services from the point of view of websites striving for eyeballs.

47. The DG also considered the issue concerning substitutability of direct search option by typing the Uniform Resource Locator (URL) of a particular website in the internet browser with online general web search services. The DG acknowledged the limitations associated with the usage of the direct search option as it required the users to not only be aware of the websites that offer the relevant information but also required the users to remember URL. The DG also noted that given the large number of websites that are in existence coupled with the voluminous nature of information available on the webpages, it is virtually impossible for the users to be aware of all the websites that might be able to provide them with the desired information and their respective URLs. In fact, most of the users might not remember more than a handful of URLs of the websites. Additionally, internet users may prefer a general web search to explore the vast alternative online sources of information. On this basis, the direct search option involving URL has not been found by the DG to be substitutable with a general purpose web search option.

48. The DG also considered if online general web search services were interchangeable or substitutable with online specialized search services. While general purpose search engines allowed internet users to search information on a wide range of topics, specialised search services permitted online searches for information limited to particular topics or areas such as news, shopping, travel, entertainment, etc. Further, in response to a search query, general purpose web searches display

C. Nos. 07 & 30 of 2012                                                    18

PUBLIC VERSION

information from across the web while specialised search results return with information from a limited source, i.e., either its own contents or from the contents of certain specified websites. Additionally, pricing and registration requirements stipulated by the general purpose online searches and specialised searches are different. Accordingly, the DG concluded that online general web search services were not substitutable with site-specific search and specialised search services as there were variations in terms of their characteristics, intended use, price etc.

49. In view of the above, the DG identified online general web search services as a distinct relevant product market in accordance with the provisions of Section 2(s) read with Section 19(7) of the Act.

    Online Search Advertising Services

50. Further, the DG examined if consumers (who use advertising services) regarded online and offline advertising as substitutable. Online advertising is undertaken using internet as a medium. Therefore, its coverage is largely dependent on reach of the internet. Given that a very large number of people in our country still do not have access to the internet, online advertising is not substitutable with newspapers, radio or

television for advertisers who seek to target areas or user groups with limited internet access. In addition, advertising rates are significantly lower for online advertising in comparison to traditional media. Furthermore, online advertising allows advertisers to accurately monitor the effectiveness of their advertisements on the basis of actual number of users that it reaches whereas for offline advertisements, the advertisers rely on estimated number of views and not actual views. On account of vast differences in the characteristics of online and offline advertising, the DG noted that these are not substitutable and therefore not a part of the same relevant market.

C. Nos. 07 & 30 of 2012                                                          19

                                                            PUBLIC VERSION

51. Further, the DG considered the substitutability of online search advertising and online non-search advertising from consumer's (i.e., user of advertising services) perspective. Search advertising is unique from advertiser's perspective as it allows highly targeted advertisements by providing advertisers with clear insights into user's intents and desires. Search and non-search advertising fulfil different marketing functions. Typically, search advertisements are used for demand fulfilment while non-search advertisements are for brand awareness or recognition. Further, the two kinds of advertisements are priced using different pricing mechanisms. For example, search advertisements are generally paid on a cost-per-click basis, while non-search advertisements are usually paid on cost-per-thousand-impressions basis. Therefore, the characteristics, intended use and price of search and non-search advertising were found to be different from one another. Further, the advertisers simultaneously used many different forms of advertising on the basis of their specific advertising objectives. Accordingly, the DG held that one form of online advertising did not serve as a replacement for the other and the two are, therefore, complementary in nature.

52. In view of the aforesaid, the DG delineated online search advertising service as a distinct Relevant Product Market in accordance with the provisions of Section 2(s) read with Section 19(7) of the Act.

    Relevant Geographic Market

    Online General Web Search Services

53. The DG noted that local specification requirements, language differences and consumer preferences of users were relevant factors for the supply of online web search services to them. Supply was also dependent on the legislative framework of the country. Therefore, the conditions for supply and demand of online web search services in India are distinct from the

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

C. Nos. 07 & 30 of 2012                                          20

conditions prevailing in other areas. Accordingly, India has been considered as the relevant geographic market for online general web search services in accordance with the provisions of Section 2(t) read with Section 19(6) of the Act. It may, however, be mentioned that the relevant geographic market in any event could not have been taken as global since from a plain reading of the Explanation to Section 4 of the Act, 'dominant position' means a position of strength, enjoyed by an enterprise, in the relevant market, in India, which enables it to operate independently of the competitive forces prevailing in the relevant market or affect its competitors or consumers or the relevant market in its favour. Similar view has been taken by the Commission in previous cases including the Coal cases.

Online Search Advertising Services

54. The DG considered the conditions for demand of online search advertising services and those for supply of online search advertising (in terms of legislative framework, presence of local distribution entities and variations in applicable terms and conditions etc.) and held India to be the relevant geographic market for online search advertising services in accordance with the terms of Section 2(t) read with Section 19(6) of the Act.

Relevant Market

55. In sum, it may be noted that the DG has identified the following two relevant markets in the present case:

    (a) Market for Online General Web Search Services in India

    (b) Market for Online Search Advertising Services in India

C. Nos. 07 & 30 of 2012                                          21

Google's Response

56. Challenging the delineation of the relevant market by the DG, it was submitted on behalf of Google that the DG's market definition for search is flawed because there is no relevant market for general search. It was submitted that users do not conduct "general searches". They search for specific things, such as people, places, recipes, products, or local businesses. Within each of these query categories, Google competes with all types of services that are able to answer that query.

57. Elaborating, it was argued that for product queries, Google competes with all services that allow users to search for such products. For local queries, Google competes with all services that allow users to search for such local information. And for travel queries, Google competes with all services that allow users to search for travel information. The Investigation Report is therefore correct when it acknowledges that "there exist websites that provide search services for specific content categories that compete with Google in those areas". Yet, it was pointed out that the Investigation Report claims that vertical search services do not compete with general search services. The DG bases this conclusion on technical differences (such as data inputs and traffic sources) without analysing how or why these differences are relevant for users searching for information. This is wrong. Under Section 2(t) of the Act, relevant product market comprises of services "regarded as interchangeable or substitutable by the consumer". The Investigation Report should have analysed whether users consider vertical search services and general search services as substitutable for individual queries; however it has failed to do so.

58. It was further submitted that the Investigation Report also ignores the ad-funded nature of Google's business, which means that - as confirmed by international precedent - the relevant market can only be advertising, not free search. In fact, the Act, consistent with international precedent,

C. Nos. 07 & 30 of 2012                                                      22

PUBLIC VERSION

requires the existence of trading relationship between a company and its customers as a pre-condition for defining a relevant market and establishing dominance. Because search is free, Google has no trading relationship with the users of its search service, and so the basis for establishing dominance is absent.

59. Also the DG's market definition for advertising is flawed because the relevant market includes all forms of advertising. The DG's claim that relevant market constitutes only online search advertising is incorrect. An advertiser who wants to run an ad campaign can take advantage of a multitude of different advertising opportunities, both online and offline. These include TV, radio, newspapers, billboards etc. All these ad opportunities serve the same purpose of attracting awareness to the advertiser's product or service. Based on a relative assessment of their costs and Return-On-Investment ("RoI"), these forms of advertising are interchangeable from an advertisers' perspective. They, therefore, form part of the same relevant market.

60. The reasons given by the DG for excluding offline advertising from the relevant market suffer from the following methodological flaws:

(i)     The Investigation Report applies the hypothetical monopolist test

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

(SSNIP test) in the wrong direction
The Investigation Report erroneously dismisses offline advertising
as a constraint based on the low level of Internet coverage
throughout India, applying the hypothetical monopolist test in the
wrong direction and therefore commits a major economic error: the
test should start with the narrowest candidate frame of reference
and then examine the extent to which offline advertising would
constrain a hypothetical monopolist in that candidate market.

C. Nos. 07 & 30 of 2012                                                    23
PUBLIC VERSION

(ii)     Alleged differences in monitoring and targeting ignore recent
         developments
         The alleged differences in monitoring and targeting fail to take into
         account the recent developments in digital analytics and targeting
         technology that are available for offline ads. The Investigation
         Report points to differences in price, but erroneously ignores that
         products with price differences can and do compete through
         adjustments in quality to reflect price differences. In fact, the DG
         in its Investigation Report even recognises that offline ads may be
         more engaging than online ads. This is precisely the sort of
         difference that can explain online ads' lower prices.

(iii)    Given    recent    developments,    older    decisions    from    other
         jurisdictions are not probative
         The DG in its Investigation Report relies on older decisions from
         other jurisdictions that identify separate markets for online and
         offline advertising. But given recent developments in media, mix
         optimisation modelling and ad technology, these older decisions
         cannot be relied upon to delineate such separate markets in India.

61. It was argued that a full assessment of up-to-date evidence shows that the
    relevant market encompasses all forms of advertising. In this properly
    defined market, Google's share in India is just      .

62. It was also argued that the Investigation Report claims that search and
    non-search advertising should be differentiated based on differences in
    characteristics, without explaining how or why these affect advertiser
    demand. The Investigation Report ignores the substantial recent
    convergence between the two mediums. Non-search ads are increasingly
    used to elicit a direct response, and non-search ads exhibit sophisticated
    targeting capabilities.

C. Nos. 07 & 30 of 2012                                                    24
PUBLIC VERSION

The Informant's Response

63. The Informant, on the other hand, supported the determination and delineation of relevant product markets by the DG. Controverting Google's submission that it has no trading relationship with search users or websites because the search service is free, the Informant submitted that free services are covered within the ambit of the Act. There is no requirement for a monetary consideration for services anywhere under the Act and, therefore, where users of search engine are providing data as well as "eyeballs" to the search engine as a consideration, a commercial activity is clearly taking place and therefore the Act applies.

64. On the applicability of SSNIP test, the Informant submitted that a relevant market may be defined after taking into consideration any or all of the various factors listed in Section 19(6) and Section 19(7) of the Act. It is not necessary to use the SSNIP test, which is merely one tool used to determine what the relevant product market may be. While looking at online general web search, it may not be appropriate to use SSNIP test. Further, all other evidence suggests that online general web search is the relevant market for consideration.

65. Further supporting the delineation of the relevant product markets by the DG, the Informant submitted that there are several key differences between online search and search advertising, which make them separate products for advertisers such as the Informant. In fact, the Informant considers online search and search advertising to be complementary products, and not substitutes. It strives to appear at the top of the SERP for search terms that are relevant to its business, both through the online general web search results as well as the search advertising results. Google itself earmarks separate space for advertisements and online general web search results, which suggests that they are distinct. Further, users also have a greater trust in the results that are "organic" and not paid for and

C. Nos. 07 & 30 of 2012                                                      25

PUBLIC VERSION

therefore, general web search results are likely to be viewed as distinct from advertising results by the users as well. Therefore, the Informant submitted that online general web search and search advertising services are separate relevant product markets.

66. Further, the Informant submitted that using a URL bar would also be entirely meaningless for the purpose of discovering new information or websites online. A user can only type in the URL when he/she is aware of the URL or has visited the website before. A search engine provides access to websites that may have the specific information that a user wants, even though the user may never have been to, or heard of such a website. The URL bar cannot substitute this purpose, which is also why URL bars are now linked to a search engine such as Google. Therefore, if any phrase or

word that is not a URL is typed in the URL bar, the search engine linked
to the browser will carry out a search and the user will be shown the SERP
for that query. This establishes that URLs do not serve the same purpose
as a search engine, which is why URL bars need to link back to a search
engine so that the user can view the SERP when a search is carried out.

67. It was pointed out by the Informant that while Google provides a general
search service, the Informant's website provides a specialised search
service. Google is one of the major sources of new users for the Informant,
and the Informant is not a substitute for Google's online general web
search business in any way, as the Informant only provides a search
service for matrimonial needs. Further, site-wide search services offered
on the Informant's website also cannot be compared with Google's online
general web search, as the Informant is limited to searches on its site,
while a search on Google's website provides results from all over the
internet.

C. Nos. 07 & 30 of 2012                                          26
                                                    PUBLIC VERSION

68. Therefore, the Informant supported the DG's conclusion that the relevant
product market is the market for online general web search, and this is
distinct from search advertising, other sources of information online, as
well as vertical search services.

69. Commenting upon offline and online mode of advertising, it was
submitted by the Informant that from its perspective, while both online
and offline advertising are constrained by a common overall company
budget, the objectives of search advertising and offline advertising (such
as television campaigns) are entirely different. The Informant uses offline
advertising for creating brand awareness, while the objective of search
advertising is to convert a real-time query from a user into a click through
to the Informant's website. In fact, the Informant expects an increase in
searches on Google's website for keywords that relate to it, right after it
launches a television campaign. Therefore, these forms of advertising are
also seen as complementary, and not substitutes.

70. Similarly, distinguishing online Search and non-search advertising, it was
submitted on behalf of the Informant that search advertising provides
unique opportunity to convert a user query into a click on website. It is the
only form of online advertising with specifically timed targeted
advertising, which makes it a unique value proposition for the Informant
(and other advertisers). Although display advertising can, in some cases,
be targeted to the general preferences of the recipient of the advertising, it
is not targeted in real time.

71. Therefore, the Informant submitted, in line with the DG's conclusion, that the relevant product market is the market for online search advertising, and this is distinct from offline advertising, as well as online display/ non-search advertising.

C. Nos. 07 & 30 of 2012                                                    27

PUBLIC VERSION

72. On relevant geographic market, it was submitted by the Informant that Google has a separate entity to run India operations and its search results on the India specific URL (www.google.co.in) are customized to show pages mostly from India. Further, Google is yet to launch several services in India which are currently available elsewhere in the world like Google shopping. Accordingly, India is a separate and distinct geographical market.

73. In conclusion, the Informant submitted that the DG correctly delineated the relevant markets, as noted earlier.

The Commission's Analysis

74. The Commission has carefully examined the rival submissions on the issue of determination of the relevant market.

75. As per Section 2(r) of the Act, 'relevant market' means the market which may be determined by the Commission with reference to the relevant product market or the relevant geographic market or both. Further, the term 'relevant product market' has been defined in Section 2(t) of the Act as a market comprising all those products or services which are regarded as interchangeable or substitutable by the consumer, by reason of their characteristics, prices or intended use. The term 'relevant geographic market' has been defined in Section 2(s) of the Act to mean a market comprising the area in which the conditions of competition for supply of goods or provision of services or demand of goods or services are distinctly homogenous and can be distinguished from the conditions prevailing in the neighbouring areas.

76. For determining whether a market constitutes a 'relevant market' for the purposes of the Act, the Commission is required to have due regard to the 'relevant geographic market' and the 'relevant product market' by virtue

C. Nos. 07 & 30 of 2012                                                    28

PUBLIC VERSION

of the provisions contained on Section 19(5) of the Act.

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 135 of 337   Page ID
#:28590
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

77. To determine the 'relevant geographic market', the Commission, in terms of the factors contained in Section 19(6) of the Act, is to have due regard to all or any of the following factors viz., regulatory trade barriers, local specification requirements, national procurement policies, adequate distribution facilities, transport costs, language, consumer preferences and need for secure or regular supplies or rapid after-sales services.

78. Further, to determine the 'relevant product market', the Commission, in terms of the factors contained in Section 19(7) of the Act, is to have due regard to all or any of the following factors viz., physical characteristics or end-use of goods, price of goods or service, consumer preferences, exclusion of in-house production, existence of specialized producers and classification of industrial products.

79. In light of the aforesaid statutory landscape, the Commission proceeds to determine the relevant market in the instant case.

80. Before delving deep into this aspect, it is apposite to first deal with the contention raised by the learned senior counsel appearing on behalf of Google that to attract Section 4(a) of the Act, there has to be purchase or sale of goods or services. It was argued that in case of online search, there is no purchase or sale of goods or services as Google provides search services to users for free and hence, the question of applicability of Section 4 does not arise.

81. Be that as it may, for the present purposes, the Commission is of considered opinion that the plea of Google that there is no sale or purchase is not only flawed but altogether ignores the role of big data in the digital economy.

C. Nos. 07 & 30 of 2012                                                            29

PUBLIC VERSION

82. Coming to the facts of the present case, the Commission has no hesitation in holding that users offer indirect consideration to Google by: (a) providing their attention or "eyeballs" to SERP; and (b) allowing Google to collect and use their information, both of which facilitates generation of revenues by Google as it attracts more advertisers.

83. The matter can be looked at from another angle also. The Commission observes that online platforms such as Google, Bing, Yahoo etc. which provide search services are intermediaries that act as an interface between search users and advertisers. On the one side of the market are users who are looking/ searching for information from the World Wide Web and on the other side of the market are advertisers/ business firms/ merchants who seek to advertise their goods or services to consumers. Examples of such market are newspapers, credit card network, video game consoles etc.

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 136 of 337   Page ID
#:28591
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

Such markets can have two or more sides which are linked by the intermediary or platform. In the instant case, when a user seeks for some information that is available on the World Wide Web by accessing a search engine such as Google and places a requisition for a particular keyword or phrase, a search request gets initiated on the search side. Correspondingly, the search engine scans millions of websites or billions of web pages through its bots or spiders or crawlers and harvests relevant information and then sorts them based on some criteria which would then be displayed by the search engine on a dynamically generated SERP. These results displayed are known as organic results. On the other side of the market, the platform solicits bids for an auction from advertisers/ business firms/ merchants for display of relevant advertisements that match with the information sought on the search side and the top three or four bids received from advertisers are then prominently displayed along with the organic results in the dynamically generated SERP. The ordering of advertisements that are displayed against the top three or four positions would depend on certain criteria based on which the adspace auction is

C. Nos. 07 & 30 of 2012                                                        30

designed. The two sides of the market described above complement each other and they are interdependent. In the absence of one side or if the size of one side is too small the other side would not exist. A platform that is able to deliver relevant search results and that is able to attract a large number of search users would only be able to attract advertisers, apart from that the platform's pricing mechanism for its advertisement service is a crucial one.

84. The Commission observes that it has been contended by Google that the search services offered by it is free and hence there is no purchase or sale of goods or services. In markets that are characterised with more than one side, any market assessment that relies only on the side where the service offered is free to consumers distorts the true picture and leads to a biased assessment of the nature of competition in such markets. Whenever any users places a search requisition for a particular keyword or phrase through a search engine, the search platform seeks certain information from such users such as IP address, device information, location, information regarding Operating System etc. apart from the information with respect to date and time of search and the keyword or phrase searched for. The huge volume of such information generated from each and every search conducted on such platforms constitutes what is known as 'big data' by aid of which search platforms are able to attract advertisers, target relevant ads and conduct their search business. The submission made by the learned senior counsel completely misses the role and nature of 'big data' i.e. an aggregate of eyeballs/ choices which is being provided by users while availing the search services offered by a search engine.

85. It may be noted that rise of new business models based on collection and processing of Big Data is currently shaping the world. With the

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

development of data mining and machine learning, businesses are able to offer innovative, high-quality and customised products and services at low

C. Nos. 07 & 30 of 2012                                                          31

or even zero prices, with great gains for consumers. At the same time, it cannot be denied that the benefits of providing Big Data do not come without a cost. Consumers may be increasingly facing a loss of control over their data and are exposed to intrusive advertising and behavioural discrimination.

86. In fact, it would not be out of place to equate data in this century to what oil was to the last one. The Commission is not oblivious of the increasing value of data for firms which can be used to target advertising better. Moreover, the data can be turned into any number of revenue generating artificial-intelligence (AI) based innovations.

87. The Commission notes that while the aforesaid data is collected from the search side of the market, on the other side also some crucial events happen once an SERP is displayed. The search user by clicking on the results displayed reveals her choice and preferences and the most important aspect to be noted is the link on which the search user clicks. If the search user clicks on an organic result then the search engine lands the user in the appropriate webpage and the platform correspondingly does not receive any monetary payment for its services from the advertisement side. But on the contrary, if the search user clicks on the advertisements displayed then the search engine lands the user on the advertisers/ business firms/ merchants website and correspondingly the search engine receives a payment according to the bid price consummated in the adspace auction for its advertisement services which depends on the pricing mechanism that is pay per click. The revenue earned by search platforms' through provision of search based adservices bears testimony to not only to the potential of adservices offered by them but also negates the view that search services offered by such platforms are free. In view of the above, the Commission disagrees with the contention raised by Google that in case of online search there is no purchase or sale of goods or services and consequently holds that online search falls within the ambit of Section 4

C. Nos. 07 & 30 of 2012                                                          32

of the Act.

88. The Commission notes that it is not unusual for one-side in a multi-sided market to receive services subsidised by customers on the other side of the market. Several mobile applications and websites work through an advertiser funded model and free-to-air television channels are also based solely on advertising revenue. This, however, is not suggestive of the fact that users are not providing any consideration for availing these products and services. In such cases also, a commercial relationship exists and the

conduct of the participants in such commercial relationships can be examined within the four corners of the Act.

89. Having, thus, disposed of the preliminary objection raised by Google, the Commission now proceeds to examine the relevant market in the present case.

90. First of all, the Commission notes that on the question of substitutability of online general web search services and search advertising services, the DG concluded that online general web search services and search advertising did not constitute the same relevant product market on account of wide variations in the mechanism for generation and display of results and also the clicking behaviour. Further, the DG noted that these services serve distinct goals and are perceived differently by the various categories of users, namely, publishers (websites) and internet users entering search queries. The DG also noted that these services constitute complementary services from the point of view of websites striving for eyeballs.

91. Further, the DG also considered the issue concerning substitutability of direct search option by typing the URL of a particular website in the internet browser with online general web search services. The DG acknowledged the limitations associated with the usage of the direct search option as it requires the users to not only be aware of the websites

C. Nos. 07 & 30 of 2012                                                      33

that offer the relevant information but also requires the users to remember the specific URLs. The DG also noted that given the large number of websites that are in existence coupled with the voluminous nature of information available on the webpages, it is virtually impossible for users to be aware of all websites that might be able to provide them with the desired information and their respective URLs. In fact, most of the users might not remember more than a handful of URLs of the websites. Additionally, internet users may prefer a general web search to explore the vast alternative online sources of information. On this basis, the direct search option involving the URL has not been found to be substitutable with a general purpose web search option.

92. The DG also considered if online general web search services are interchangeable or substitutable with online specialised search services. While general purpose search engines allow internet users to search information on a wide range of topics, specialised search services permit online searches for information limited to particular topics or areas such as news, shopping, travel, entertainment, etc. Further, in response to a search query, general purpose web searches show information from across the web while specialised search results yield information from a limited source, i.e., either its own contents or from the contents of certain specified websites. Additionally, pricing and registration requirements stipulated by general purpose online searches and specialised searches are

also different. Accordingly, the DG has concluded that online general web
search services are not substitutable with site-specific search and
specialised search services as there are variations in terms of their
characteristics, intended use, price etc.

93. The Commission finds no reason to differ with the analysis of the DG and
agrees that online general web search services cannot be substituted with
direct search option by typing URL of websites in the internet browsers.

C. Nos. 07 & 30 of 2012                                                    34

PUBLIC VERSION

Users may not be aware of URLs of all websites that offer the information
they are searching or looking for. In these circumstances, search engines
become the first port of call for a user looking for information online. Any
comparison of general web search service with direct search option would
be thoroughly misplaced. Further, the Commission notes that online
general web search services cannot be equated with specialised search
services.

94. Resultantly, the Commission holds online general web search services to
be a distinct relevant product market in accordance with the provisions of
Section 2(s) read with Section 19(7) of the Act.

95. Next, the DG examined if the consumers (who use advertising services)
regard online and offline advertising as substitutable. On a detailed
analysis, the DG noted that these are neither substitutable nor part of the
same relevant market.

96. The DG has considered the substitutability of online search advertising
and online non-search advertising as well from consumer's (i.e., user of
advertising services) perspective and noted that one form of online
advertising does not serve as a replacement for the other and the two are,
therefore, complementary in nature.

97. The Commission is of the considered opinion that online and offline
advertising services are not comparable. Online advertising is undertaken
using internet as a medium and, hence, its coverage is largely dependent
on reach of the internet. Similarly, online advertising is not substitutable
for newspapers, radio or television for advertisers who seek to target areas
or user groups with limited internet access. As pointed out by the DG,
advertising rates are significantly lower for online advertising in
comparison to traditional media. Not only that, online advertising allows
advertisers to accurately monitor the effectiveness of the advertisement on

C. Nos. 07 & 30 of 2012                                                    35

PUBLIC VERSION

the basis of actual number of users that it reaches whereas for offline
advertisements, advertisers rely on estimated number of views and not the
actual views.

98. Adverting to the issue of search and non-search advertising, the
Commission notes that search advertising helps advertisers in targeting
specific users. Typically, search advertisements are used for demand
fulfilment while non-search advertisements are for brand awareness or
recognition. For that reason, both the advertisements are priced using
different pricing mechanisms. For example, search advertisements are
generally paid on a cost-per-click basis, while non-search advertisements
are usually paid on a cost-per-thousand-impressions basis. Thus, the
characteristics, intended use and price of search and non-search
advertising are different from one another.

99. In view of the aforesaid, the Commission holds that online search
advertising services to be a distinct relevant product market in accordance
with the provisions of Section 2(s) read with Section 19(7) of the Act.

100. On relevant geographic market in the context of online general web search
services, the DG noted that local specification requirements, language
differences and consumer preferences of users are relevant factors for the
supply of online web search services to them. Supply is also function of
the legislative framework of a country. Therefore, conditions for supply
and demand of online web search services in India are distinct from those
prevailing in other areas. Accordingly, India has been considered as the
relevant geographic market for online general web search services in
accordance with the provisions of Section 2(t) read with Section 19(6) of
the Act. The relevant geographic market in any event could not have been
taken as global since from a plain reading of the Explanation to Section 4
of the Act, 'dominant position' means a position of strength, enjoyed by

C. Nos. 07 & 30 of 2012                                                    36
                                                        PUBLIC VERSION

an enterprise, in the relevant market, in India, which enables it to operate
independently of competitive forces prevailing in the relevant market or
affect its competitors or consumers or the relevant market in its favour.
Since the Commission is concerned with the market in India, it holds the
relevant geographical market in case of online general web search services
to be limited to India.

101. Similarly, in respect of online search advertising services also, the DG
considered the conditions for demand for online search advertising
services and those for supply of online search advertising in terms of
legislative framework, presence of local distribution entities and
variations in applicable terms and conditions etc. and held India to be the
relevant geographic market for online search advertising services in

accordance with the terms of Section 2(t) read with Section 19(6) of the
Act. For the reasons noted earlier, the Commission agrees with the DG's
determination.

102. In the result, the Commission determines the following two relevant
markets in the present case for examining the alleged abusive conduct of
Google:

(a) Market for Online General Web Search Services in India;

(b) Market for Online Search Advertising Services in India.

### Assessment of Dominance

103. After having delineated the relevant market(s), the Commission proceeds
to assess Google's dominance in the same. It may be noted that by virtue
of explanation (a) to Section 4 of the Act, 'dominant position' means a
position of strength enjoyed by an enterprise in the relevant market in
India which enables it to operate independently of competitive forces

C. Nos. 07 & 30 of 2012                                                      37

PUBLIC VERSION

prevailing in the relevant market; or to affect its competitors or consumers
or the relevant market in its favour.

104. Further, to analyse dominance, the factors enumerated in Section 19(4) of
the Act are to be considered, namely, market share of the enterprise; size
and resources of the enterprise; size and importance of the competitors;
economic power of the enterprise including commercial advantages over
competitors; vertical integration of the enterprises or sale or service
network of such enterprises; dependence of consumers on the enterprise;
monopoly or dominant position whether acquired as a result of any statute
or by virtue of being a Government company or a public sector
undertaking or otherwise; entry barriers including barriers such as
regulatory barriers, financial risk, high capital cost of entry, marketing
entry barriers, technical entry barriers, economies of scale, high cost of
substitutable goods or service for consumers; countervailing buying
power; market structure and size of market; social obligations and social
costs; relative advantage, by way of the contribution to the economic
development, by the enterprise enjoying a dominant position having or
likely to have an appreciable adverse effect on competition; or any other
factor which the Commission may consider relevant for the inquiry.

105. The DG has assessed the question of Google's dominant position in both
the relevant markets identified in terms of Explanation (a) to Section 4 of
the Act after a detailed analysis of the above-stated factors enumerated in

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

Section 19(4) of the Act.

106. The DG has found Google to be a dominant enterprise in both the relevant
markets for online general web search services and online search
advertising services in India.

C. Nos. 07 & 30 of 2012                                                    38
PUBLIC VERSION

Google's Response

107. Google denied its dominance in the relevant market and submitted that
regardless of market definition, Google is not dominant in online search
services for the following reasons:

(i) Google faces substantial competitive constraints in each query
category
An empirical analysis of the search alternatives available to Indian
users reveals that Google is just one search option among many
popular providers. In fact, in product search, local search, and
travel search, Google has usage shares of only      ,     , and
respectively. These low shares preclude dominance in online
search market.

(ii) Usage shares are not, in any event, a proxy for market power over
quality and innovation
Further, usage shares of a free service, in any event, are not a proxy
for market power over quality and innovation. This is because
usage shares - unlike shares of sales - do not reflect investment or
commitment by users. It is very easy for users to shift to another
service provider. Usage shares, therefore, do not indicate whether
an enterprise can "behave independently" within the meaning of
Section 4 of the Act.

(iii) Google's high innovation rates exclude dominance
Because search is free, the Investigation Report correctly
recognises that the indicator for dominance is "whether Google
would lose [usage] share materially if it were to reduce
innovation". Google cannot plausibly reduce its innovation rates
without users at the margin switching to rival services. This is
borne out by Google's consistently high innovation rates. The

C. Nos. 07 & 30 of 2012                                                    39
PUBLIC VERSION

Investigation Report acknowledges that Google's "significant

innovations [...] have helped users all over the world", and CUTS also recognises Google's "tremendous record in innovation".

(iv) The Investigation Report ignores the constraint from user switching
The fact that users can switch to rivals with a single click provides an additional reason why Google cannot act independently of market forces. The Investigation Report dismisses such constraint from switching of users by pointing to Google's high usage share in general search. However, this conflates users' ability to switch with their incentive to do so. Multihoming evidence shows that users in India often try search services other than Google as well - with           of Google's users visiting another general search service in a single month. If users try other general search services, yet chose to return to Google, this can only demonstrate that Google is successfully competing by offering innovative and high-quality service showing the most relevant results.

(v) None of the "other factors" under Section 19(4) of the Act give Google market power
None of the other factors the Investigation Report relies on can establish Google's dominance in search. First, Google's size and resources do not distinguish it from its rivals, such as Microsoft, Yahoo!, and Amazon. Second, search is not subject to direct or indirect network effects. Third, returning high-quality search results is largely dependent on technological capabilities unrelated to query scale; the benefits of scale are subject to significant diminishing returns. Fourth, search is not characterised by substantial barriers to entry and expansion - particularly given recent developments in cloud computing and open-source

C. Nos. 07 & 30 of 2012                                                        40

PUBLIC VERSION

software. Fifth, Google is not vertically integrated in a way that conveys market power in search. Sixth, users and websites do not "depend" on Google - as shown by traffic source data contained in the Investigation Report itself.

108. Similarly, it was submitted on behalf of Google that regardless of market definition, Google is not dominant in advertising as well. It was argued that the Investigation Report ignores the competitive pressure Google faces when seeking to attract advertising revenue, erroneously dismisses the constraint from user multihoming, and overstates barriers to entry:

(i)    The Investigation Report ignores extra-market constraints
The Commission recently found in Cloudwalker that online advertising may compete with offline advertising, even if they

might not be in the same market. Similarly, the EU Commission held in Google/DoubleClick that search and non-search advertising constrain each other. Even if Facebook is not considered to be a part of the same online advertising market as Google, it cannot reasonably be ignored in a competitive analysis of online advertising in India. Given Facebook's growth and strength in online advertising, it is not plausible that Google can operate independently of competitive forces.

(ii)    The Investigation Report ignores constraint from advertiser switching
Advertisers frequently multihome between different advertising platforms. In September, 2015, advertisers accounting for          of paid clicks on Google also advertised on Bing/Yahoo!. This multihoming precludes dominance because if Google tries to raise prices or reduce quality of its ads, Google would lose a substantial proportion of its advertisers (who have easy access to rival ad

C. Nos. 07 & 30 of 2012                                              41
                                                        PUBLIC VERSION

platforms).

(iii)   Barriers to entry are not material
The Investigation Report overstates the relevance of capital costs and scale as evidence of barriers to entry, which are no greater than in other technological industries. The Investigation Report's references to scale and to the need for a "critical mass" of advertisers are erroneous. Advertisers can run multiple campaigns through publishing platforms, placing smaller proportion of their advertising budget with a new entrant than with established players. If a new entrant has an innovative product and succeeds in generating a good ROI, marketers will be driven to place greater proportions of their budget with the new entrant, and over time it will grow.

The Informant's Response
109. The Informants, however, supported the DG's findings on dominance.

The Commission's Analysis
110. The Commission has carefully examined the issue of dominance and considered the rival submissions on this point.

Market Share of the Enterprise
111. In coming to its conclusion on the market share of Google in the relevant markets of online general web search and online search advertising in India, the DG has taken into account: (a) volume of search business; and

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

(b) total revenues generated in India, as the basis of estimation.


Google's market share in online general web search services in India
112. The DG has considered the market share data (at pan-India level) on the basis of: number of searches; and number of search result page views; to

C. Nos. 07 & 30 of 2012                                                    42

PUBLIC VERSION


conclude that Google has consistently maintained a significant market share of more than          during 2009 to 2014 in the relevant market of Online General Web Search in India. This has been the case despite the long standing presence of other competitors like Yahoo! and Microsoft Bing and market entry of new players such as Ask.


113. The DG has also noted that even on a worldwide basis, Google has consistently held around          market share during 2010 to 2014 among all search engines offering online web search services despite the presence of several other online general search service providers.

114. The Commission notes that though the Act does not contemplate a market share threshold beyond which dominance is presumed, it is critical to observe that irrespective of the metric applied to assess market share, Google has the highest share, and this share is exponentially greater than its nearest competitor. Market share of Google in excess of          on various metrics coupled with very low market shares of competitors, clearly evidences that Google enjoys indisputable dominance in the relevant market.


 Google's market share in Online Search Advertising Services in India
115. After considering the revenues earned by Google from search advertising services under both the AdWords and the AdSense programmes, the DG concluded that Google's market share has been more than          during the period of investigation in the relevant market for online search advertising services in India.


116. Additionally, the DG dealt with Google's submissions on market share in the context of different relevant markets proposed by it. It may be noted that the DG considered Google's claims relating to its market shares in: (a) online web search services, including, vertical/site searches and social networking site searches; and (b) online advertising services including

C. Nos. 07 & 30 of 2012                                                    43

PUBLIC VERSION


advertisement services on mobile applications, and has recorded sound and cogent reasons for rejecting such submissions of Google.

117. Further, the DG also considered the case laws referred to by Google in its submissions and has stated that there is no denial of the fact that high technology services demand continuous innovation. In the present context, the question is whether Google would lose market share materially if it were to reduce innovation. Given high barriers to entry and Google's insurmountable scale advantage, the DG held that it is unlikely that a large number of users would switch to a competing search engine in a short or medium term if Google reduces the quality and innovation of its services. Further, in a multi-sided market, effect of marginal switch of users on one side of the market (like search service) may not lead to a switch on other sides (like search advertising).

118. The Commission observes that while high technology services demand continuous innovation, given barriers to entry and Google's scale advantage, it is unlikely that a large number of users would switch to a competing search engine in the short or medium term.

119. Thus, it is clear that the market conditions, including barriers to entry and Google's scale, reinforce the effect of Google's market shares in establishing Google's dominance in the online general web search and search advertising markets. These factors have been analysed by the DG in its Report and the same are noted in the succeeding paras.

    Analysis of other factors for assessing Google's dominance

120. The DG noted that the market shares of Google and its competitors show that none of Google's competitors has so far been able to match Google's market strength either in general purpose online web search services or online search advertising services in India. Further, the DG rejected Google's claim that Facebook is one of its main competitors in the online

C. Nos. 07 & 30 of 2012                                              44

                                                    PUBLIC VERSION

advertising market owing to its strong presence in the display advertisements segment.

121. As the relevant market has been defined by the DG to include online search advertising services only, and not online advertising services generally, Facebook and other entities that are engaged in non-search advertising are not Google's competitors in the search advertising market. Further, Facebook has also explicitly stated that it does not engage in online search advertising business. Not only this, the overall revenues earned by Facebook from online advertising in India are substantially lower than that of Google.

122. The Commission observes that for a search engine, it is extremely important to be able to crawl the web and index the data. Google has a significant head start in this regard, and the cost of crawling the entire internet, in terms of servers and technology, is prohibitive for a new

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 147 of 337   Page ID
#:28602
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

entrant. As Google has an insurmountable scale advantage and given that
only market participants in the online general web search market can
compete in the search advertising market, the barriers in the online general
web search market also effectively restrict entry into the search
advertising market.

123. Additionally, the DG has acknowledged the competitive advantage
enjoyed by Google on account of vertical integration and takes note of the
critical position of Google as a platform for users, publishers and
advertisers. The DG has also noted that the technology based market
structure and size of technology industry confer upon Google a position
of competitive strength.

124. The DG took note of the absence of countervailing buyer power in the
market for search advertising services. In this regard, the Commission
notes that due to dependence of its customers, as well as the disparity in

C. Nos. 07 & 30 of 2012                                                      45

size and resources between the average user and advertiser in comparison
to Google, none of them has countervailing buyer power. This is true for
the largest companies that advertise on Google. They might be of a similar
economic stature generally, but they are highly dependent on Google for
search advertising and, therefore, do not exercise any buying power over
Google.

125. The Commission acknowledges the fact that Google has revolutionised
the manner in which users access information on the Internet and agrees
with the DG that the market strength has been acquired by Google over a
period of time. In the high technology markets, innovation is key and in
multi-sided markets, market shares should be transient. However,
Google's market shares have been consistently high, which suggests that
it has got other advantages, besides technical advantages, which insulate
its market position. The structure of the market is both indicative of and
conducive to Google's dominance. In view of this, the Commission has
no hesitation in holding that Google is dominant in both the relevant
markets i.e. market for online general web search services and market for
online search advertising services in India.

### Abuse of Dominant Position

### Procedural Deficiencies

126. Before examining the Investigation Report and the findings contained
therein in respect of the alleged abusive conduct of Google, it would be
appropriate to deal with the procedural deficiencies highlighted by Google
in its response.

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 148 of 337   Page ID
#:28603
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

127. Google has argued that the DG's investigation was deficient on procedural
grounds and thereby provides an additional reason in itself as to why the
Investigation Report cannot form the basis of an infringement finding

C. Nos. 07 & 30 of 2012                                                    46

PUBLIC VERSION


against Google.


128. It was submitted that the DG's market consultation was flawed. It failed
to consult a representative cross-section of affected participants, and it
asked leading questions to the witnesses "formulated with the sole object
of finding fault" with Google contrary to the principles set out in Tamil
Nadu Film Exhibitors Association v. Competition Commission of India,
Appeal No. 19 of 2014, decided on 28.04.2015 by the Hon'ble
Competition Appellate Tribunal (COMPAT) whereby the order of the
Commission against the appellant was set aside inter alia on the ground
that the DG asked questions which were "clearly loaded against the
appellant" that prompted the respondent to support the Informant's legal
theories.

129. Further, it was pointed out that the Investigation Report "cherry picks" the
evidence. It does not properly assess the evidence in this case. It relies
almost exclusively on submissions of parties with an obvious commercial
motive to obstruct Google's business. It ignores the evidence that the DG
collected from third parties and Google that is exculpatory of Google. The
DG failed to engage with Google on the complainants' allegations, which
was especially problematic because these allegations concerned Google's
technologies. The Investigation Report exacerbates these deficiencies by
citing the draft EU commitments as if they were evidence of infringement
in India, while at the same time disregarding decisions by courts and
authorities in the UK, Germany, Brazil, Taiwan, Canada, Egypt, and the
USA, finding that Google's conduct is procompetitive.


130. The Investigation Report relies on mere hypothetical speculation. It was
pointed out that the DG is tasked with a fact-finding exercise to determine
whether Google in fact abused a dominant position. However, the DG has
failed to fulfil this duty. Instead, it identified concerns based on "mere
conjecture and imagination" and "possibilities".

C. Nos. 07 & 30 of 2012                                                    47

PUBLIC VERSION

131. The Investigation Report's conclusions are based on information to which
Google has not been granted access. Google has not been granted access
to critical aspects of the Investigation Report. Google cannot understand
the precise information relied upon against it, understand the Investigation
Report's reasoning, or verify the conclusions that the DG seeks to draw
from this information. Without access to such information, any
infringement decision against Google would be contrary to the principles
of natural justice and the jurisprudence of the Hon'ble COMPAT.

132. Lastly, it was argued that the DG has exceeded its statutory authority. It was argued that the Investigation Report may not be used to support an infringement finding against Google in relation to conduct or issues that the DG had no jurisdiction to investigate or determine. Specifically, the Investigation Report cannot be used as the basis of an infringement finding: (i) in relation to investigated issues that were not included in the Informations or Section 26(1) Order, (ii) against Google Ireland Limited, and (iii) in relation to matters of Intellectual Property law.

133. It was submitted that an unwarranted expansion of the scope of investigation is ultra vires and illegal. This principle applies to both the DG and the Commission. Referring to a decision of the Hon'ble COMPAT in Andhra Pradesh Film Chamber of Commerce v. Competition Commission of India, COMPAT Order dated 14.10.2015 in Appeal No. 15 of 2013, it was argued that the Hon'ble COMPAT ruled that the DG has no jurisdiction to deal with issues that are not raised in the Information originally filed before the Commission or in the Commission's referral order. This principle was confirmed in Grasim Industries Ltd. v. Competition Commission of India, W.P (C) No. 4159 of 2013.

134. It was contended that Section 26(1) of the Act provides that the DG's authority to investigate is exclusively conferred by the Commission.

C. Nos. 07 & 30 of 2012                                                             48

PUBLIC VERSION

Regulation 20(4) of the Competition Commission of India the (General) Regulations, 2009 (General Regulations) also does not permit the DG to add issues of its own accord and thereby expand the scope of the investigation. Therefore, it was argued by Google that any allegations that form part of the unwarranted expansion of scope are ultra vires and findings on such matters are not sustainable.

135. Specifically, it was pointed out by Google that the DG expanded the scope of investigation by investigating multiple issues that did not form a part of these prima facie orders (or the Informations). These issues include:

    (i)     Google's use of third-party content in Google search results (content use or scraping).

    (ii)    Google's treatment of one particular AdSense partner (Octathorpe).

    (iii)   Google's enforcement of its AdWords policies in relation to a specific category of advertisers (technology support advertisers).

136. It was submitted that any findings on these issues are without jurisdiction

and may not form part of any infringement finding against Google.

137. It was next contended that the Investigation Report cannot be used to
support an infringement finding against Google Ireland Limited. The
Commission's prima facie orders dated April 03, 2012 (Consim) and June
20, 2012 (CUTS) were directed solely against Google Inc. and Google
India Private Limited. There is no provision for the Commission to have
ordered an investigation against Google Ireland Limited ("Google
Ireland") without first making a prima facie determination that Google
Ireland has contravened Section 4 of the Act (i.e., without first issuing a
Section 26(1) order).

C. Nos. 07 & 30 of 2012                                                      49

PUBLIC VERSION

138. In contravention of the provisions of the Act, the DG requested the
Commission by a letter dated September 1, 2014, that Google Ireland be
added as a party to the investigation. Google has not, at any stage during
the investigation, had access to a copy of this letter. The Commission
agreed with the DG's request in a meeting held on September 3, 2014.

139. Neither the Commission nor the DG has communicated reasons for the
decision to join Google Ireland which are sufficient to establish that
Google Ireland had prima facie infringed Section 4 of the Act. Without
answering that question, there can be no infringement finding against
Google Ireland and any penalty imposed upon Google must not include
Google Ireland's revenues for computation.

140. Further, it was canvassed that the Investigation Report cannot be used to
support a finding on trademark law. The Commission and the DG are
charged with the application and enforcement of competition law only.
They have no statutory or common law jurisdiction to assess and apply
intellectual property laws. Yet the Investigation Report makes findings in
relation to trademark law. The Investigation Report and the DG's
assessment of trademarks cannot form part of an infringement decision
against Google. This is particularly so because courts of competent
jurisdiction (the Hon'ble Madras High Court) is currently seized of
exactly the same legal question and any finding on trademark law by the
Commission facilitates forum shopping and creates the risk of
irreconcilable judgments and conflict of laws.

141. Lastly, an objection was taken that the Investigation Report has been
issued in contravention of the requirements of the Act and is therefore
ultra vires.

142. Elaborating, it was contended that the DG Investigation Report is ultra
vires the Act. Section 26(3) of the Act statutorily obliges a specific

C. Nos. 07 & 30 of 2012                                                      50

PUBLIC VERSION

persona designata, the DG to whom the Commission may refer a
complaint under Section 26(1) and who is entrusted under Section 26(3)
to submit an Investigation Report containing his findings. No other
persons are conferred with these duties. Section 16 of the Act provides the
manner, mode, and qualifications for appointment of DG and other
officers in the DG's department. Section 16(2) makes clear that the DG's
department may discharge its statutory functions through its staff
(including Additional Director General, Joint Director General, Deputy
Director General) provided that those staff are under the "general control,
supervision and direction" of the DG. It is well established that when the
statute requires the Investigation Report to be submitted by a persona
designata, only he/ she can discharge that function. It was alleged that in
this case, Ms. Jyoti Jindgar, Additional DG, signed the Investigation
Report Google received on 24 August, 2015. There is no evidence that the
DG was involved in the investigation or applied his mind. There has thus
been an illegal delegation of power under Section 26(3) of the Act to a
person not entrusted with such power under law and not recognised by the
Act as being able to exercise and execute that power. It was submitted that
this assumed added significance since the DG's Investigation Report,
though not binding on the Commission, has caused serious prejudice to
Google, including publicly, and can result in Google being visited with
grave and irreparable consequences.

143. Based on these procedural defects, it was submitted that the Commission
may not safely rely on the Investigation Report and must close the inquiry
against Google.

The Commission's Analysis
144. The Commission has examined carefully each of the procedural
objections taken by Google.

C. Nos. 07 & 30 of 2012                                                      51

PUBLIC VERSION

145. At the outset, it may be noted that the DG conducted a wide-ranging
investigation against Google examining its various business aspects.
Some of these aspects were not even subject matter of information filed
by the Informants. It appears that during the course of investigation,
several third parties provided information to the DG pursuant to the probe
letters issued by the Office of the DG. In their submissions, the parties
apart from furnishing the information as sought for by the Office of the
DG, have made other allegations against Google. The DG has investigated
such allegations and returned findings on them. This is manifested in the
Investigation Report on the following counts:

    (i) Google's use of third-party content in Google search results (content

use or scraping).

    (ii) Google's treatment of one particular AdSense partner (Octathorpe).

    (iii) Google's enforcement of its AdWords policies in relation to a specific category of advertisers (technology support advertisers).

146. Google has objected to the DG enlarging the scope of investigation, however, the Commission is of the opinion that scope of the investigation cannot be unduly restricted and the DG may be justified in looking and examining the aspects which have not been specifically directed to be investigated by the Commission. It needs no reiteration that the purpose of an investigation is to cover all necessary facts and evidence in order to see as to whether there are any anti-competitive practices adopted by the persons complained against. For this purpose, as held by the Hon'ble Supreme Court of India in Excel Crop Care Limited v. Competition Commission of India & Anr., Civil Appeal No. 2480 of 2014 decided on 08.05.2017 that "...the starting point of inquiry would be the allegations contained in the complaint. However, while carrying out this investigation, if other facts also get revealed and are brought to light,

C. Nos. 07 & 30 of 2012                           52

                                      PUBLIC VERSION

revealing that the 'persons' or 'enterprises' had entered into an agreement that is prohibited by Section 3 which had appreciable adverse effect on the competition, the DG would be well within his powers to include those as well in his Investigation Report. Even when the CCI forms prima facie opinion on receipt of a complaint which is recorded in the order passed under Section 26(1) of the Act and directs the DG to conduct the investigation, at the said initial stage, it cannot foresee and predict whether any violation of the Act would be found upon investigation and what would be the nature of the violation revealed through investigation. If the investigation process is to be restricted in the manner projected by the appellants, it would defeat the very purpose of the Act which is to prevent practices having appreciable adverse effect on the competition. We, therefore, reject this argument of the appellants as well touching upon the jurisdiction of the DG".

147. Having said that, the Commission is not giving any opinion on them. They were not specifically alluded to in the information and the parties did not address them during final hearing.

148. The Commission also notes that Google has taken objection to joining of Google Ireland as party to the case. Yet nothing turns upon such a plea as such a course was clearly sanctioned by the order of the Commission. The further plea of Google that the Commission did not provide any reasons while allowing the DG's request to join Google Ireland as a party, is also

misplaced. It may be noted that the DG clearly provided reasons in its request to join Google Ireland as a party and the same were duly considered by the Commission. There is no requirement under the law to pass separate detailed orders at such intermediate stage when the Commission has already issued prima facie orders detailing the abusive conduct for investigation. Joining of such a party actually relates back to the stage of prima facie orders and it would be futile to record detailed

C. Nos. 07 & 30 of 2012                                                  53

reasons therefor. In fact, the Hon'ble Supreme Court of India in the Competition Commission of India v. Steel Authority of India Limited & Ors., Civil Appeal No. 7779 of 2010 decided on 09.09.2010 has clearly laid down that neither any statutory duty is cast on the Commission to issue notice or grant hearing, nor any party can claim, as a matter of right, notice and/or hearing at the stage of formation of opinion by the Commission, in terms of Section 26(1) of the Act that a prima facie case exists for issuance of a direction to the DG to cause an investigation to be made into the matter.

149. Thus, when the Commission is not obligated to issue notice or grant hearing at the stage of formation of prima facie opinion, it can be said that the Commission is much less required to record detailed reasons while joining a party to an ongoing investigation. In the result, the Commission finds no merit in the contention of Google that the DG had no jurisdiction to investigate Google Ireland Limited in the instant case.

150. As for the other alleged procedural deficiencies highlighted by Google i.e. the market consultation by the DG was flawed, the Investigation Report cherry picks the evidence and the Investigation Report is based upon hypothetical speculations, the Commission is afraid that the alleged deficiencies touch upon the merits of the case and cannot be termed as mere procedural deficiencies in any way. These          would be taken into consideration while examining the matter on merits.

151. Further, the Commission finds objection of Google that it has not been granted access to certain critical aspects of the Investigation Report, quite egregious. In this regard, the Commission notes that Google was granted access to the confidential information of the parties after following an elaborate procedure.

C. Nos. 07 & 30 of 2012                                                  54

152. Lastly, the Commission notes that the plea raised by Google that the DG's

Report is ultra vires the Act as Section 26(3) of the Act statutorily obliges a specific persona designata, namely, the DG, to whom the Commission may refer a complaint under Section 26(1) and who is entrusted under Section 26(3) to submit an Investigation Report containing its findings, is of no consequence. In the present case, the investigation was done and the Investigation Report was submitted and signed by Additional DG. It was therefore alleged that there has thus been an illegal delegation of power under Section 26(3) of the Act to a person not entrusted with such power in law and not recognised by the Act as being able to exercise and execute that power.

153. The plea is ex facie frivolous. In terms of the provisions contained in Section 26(1) of the Act, the Commission may direct the DG to cause an investigation to be made into the matter. The term "Director General" has been defined in Section 2(g) of the Act as meaning the Director General appointed under sub-section (1) of Section 16 and including any Additional, Joint, Deputy or Assistant Directors General appointed under that section. Thus, it is apparent that while the Commission may issue direction to the DG to conduct an investigation, the DG can, in turn, mark the case to any of the competent officers in his office such as Additional DG, Joint DG, Deputy DG or Assistant DG subject to his general control, supervision and direction. This is borne out from the scheme of Section 16 of the Act.

154. In view of the above discussion, the Commission finds no merit in the procedural deficiencies alleged by Google.

155. At this stage, the Commission would like to address one more plea which was urged by the learned senior counsel appearing on behalf of Google and which has a bearing upon the findings recorded by the DG on multiple

C. Nos. 07 & 30 of 2012                                              55
                                                          PUBLIC VERSION

counts. It was submitted that on many occasions, the DG while recording its findings was greatly swayed by the draft voluntary commitments made by Google before various authorities globally. It was submitted that such a course was impermissible in law for the DG to have adopted. The learned senior counsel cited various statutory provisions and the decisions in support of the plea.

156. The Commission has examined the plea and is of the considered opinion that reliance by the DG upon voluntary commitments given by Google elsewhere was against law and public policy. It may be observed that if voluntary concessions offered by the parties in separate proceedings and different jurisdictions in different settings are referred to and relied upon by the investigators in another jurisdictions to base findings of contraventions, the consequences would be enormous. On the one hand,

it may unduly prejudice the cause of such party and thereby may have the
potential to vitiate the findings. And on the other hand, such an approach
would run contrary to public policy as the parties would be deterred from
making even reasonable concessions to avoid a costly and protracted
litigation.

157. A brief survey of case law on the issue would also be appropriate.

158. In Wilson v. Howard, (1878) ILR 4 CAL 231, Hon'ble High Court of
Calcutta observed:

> Then, as regards the letter itself, upon which the Learned Judge in
> the court below has laid so much stress, it is perfectly true that it
> was a very improper thing for the defendants' attorneys to use a
> letter in evidence which was written without prejudice, and
> obviously in the course of negotiation between the attorneys on
> both sides for an amicable adjustment of the plaintiff's claim
> [Para 11].

C. Nos. 07 & 30 of 2012                                              56
PUBLIC VERSION

> Communication such as these are clearly inadmissible in
> evidence. They are excluded on grounds of public policy and
> convenience; and the rule of law which excludes them is as binding
> upon the arbitrators as upon Courts of Justice, notwithstanding
> Section 1 of the Evidence Act (see Taylor on Evidence, 7th edition,
> Section 795, and the authorities cited therein. One is only
> surprised that a rule, so well-known amongst professional men,
> should have transgressed in this instance by the defendants'
> attorney [Para 12].

159. Similarly, the Hon'ble Bombay High Court in Sanjay Kumar Agarwal v.
Central Bank of India, 2016 SCC Online BOM 10368 held:

> "... The correspondence written by the plaintiff are all on without
> prejudice basis. Therefore, in my view, we cannot even place
> reliance on such documents to conclude that there was a
> concluded understanding." [Para 15]

160. Lastly, the decision of the United Kingdom House of Lords in Rush &
Tompkins Limited. v. Greater London Council and Others, [1988] 3 All
ER 737 may be noted. In this case, the House of Lords was considering
the settlement negotiations between two parties wherein one of the parties
sought discovery of documents that came into existence for the purpose
of settling the dispute between the parties. It held:

> ...the "without prejudice rule" is a rule governing the
> admissibility of evidence and is founded upon the public policy of
> encouraging litigants to settle their differences rather than litigate
> them to a finish... the rule applies to exclude all negotiations
> genuinely aimed at settlements whether oral or in writing from
> being given in evidence.. Nearly all the cases in which the scope
> of without prejudice rule has been considered concern the
> admissibility of evidence at trial after negotiations have failed. In

C. Nos. 07 & 30 of 2012                                                    57

> such circumstances no question of discovery arises because the
> parties are well aware of what passed between them in the
> negotiations.

161. In view of the above, the Commission is of the considered opinion that no
reference can be made or reliance placed upon the voluntary draft
commitments given by the parties in different jurisdictions and in different
statutory architecture to base conclusions of contraventions in the instant
matter lest the same prejudice or vitiate the final determination.
Accordingly, any reference or reliance made by the DG to such draft
voluntary commitments given by Google before different Authorities or
Agencies or Courts in the Investigation Report shall stand deleted from
records. Each of the findings of the DG would be independently assessed
and examined by the Commission based on other material available on
record.

Description of Key Terms

162. Before framing the issues which fall for consideration in the present
inquiry, it would be apposite to describe a few key words/ terms which
would be used throughout the decision. These key terms have been
explained by Google in its response and the same are noted below for easy
reference. It is made clear that any qualitative comment provided by
Google while explaining and describing such words shall have no bearing
upon the merit of the case and its alleged abusive conduct shall be assessed
on merits separately and independently.

Online search services

163. An online search service (or search engine) is a service that searches for
information on the World Wide Web and responds to user's search
queries. General search services and vertical search services are types of
online search service:

C. Nos. 07 & 30 of 2012                                                    58

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

General search service
General search services, like Google, seek to answer queries for all types of information, such as products, local businesses, recipes, historical figures etc.

Vertical search service
Vertical search services focus on one (or more) categories of information, such as products, local businesses, or travel.

Search results

164. Search services return search results in response to users' queries. They typically use complex algorithms to find relevant search results from among the trillions of different webpages. There are two main types of search results:

Free search results
Free search results (also known as organic results) are search results whose ranking does not include a paid element.

Paid search results or ads

Search result formats

165. There is no single way to present search results. Different types of information benefit from different treatment. Google therefore presents search results in different formats for different types of information:

Generic results or blue links
Generic results are search results that appear as blue links and can cover any category of information.

C. Nos. 07 & 30 of 2012                                                     59

PUBLIC VERSION

Universal Results
Universal Results are groups of search results for a specific category of information, such as news, images, or local businesses.

OneBoxes
OneBoxes provide factual answers to users' queries. OneBoxes return direct answers to, for example, queries about mathematics, stock quotes, local time, currency conversion, and

the weather.

### Commercial Units
Commercial Units are result types that Google sets apart in ad space and distinguishes from search results with a "Sponsored" label.

### Specialised result designs
Specialised result designs refer collectively to Universal Results, OneBoxes, and Commercial Units.

### Snippets and image thumbnails
166. Like other search services, Google shows links to relevant search results along with text snippets and, in some cases, image thumbnails. Showing snippets and image thumbnails helps users to evaluate different search results and choose the ones that are most useful to them.

### AdWords
167. AdWords is Google's ad platform. AdWords enables advertisers to bid for ads to appear on Google's pages.

C. Nos. 07 & 30 of 2012                                                              60

PUBLIC VERSION

### Ad Rank
The position that an ad appears in Google's ad space is determined by its Ad Rank. Ad Rank is calculated as a function of an advertiser's bid and auction-time predictions of the ad's relevance and quality.

### 1-10 Quality Score
Google provides advertisers with an illustrative 1-10 Quality Score as a simple and easy-to-understand metric to get an indication for the quality of their ads.

### House Ads
House Ads refers to ads placed by Google for its own products in AdWords.

### Keyword Bidding Policy
AdWords advertisers bid for search terms ("keywords") for which an ad will be shown. Google's Keyword Bidding Policy does not prohibit advertisers from bidding on keywords that

may be trademarked.


Ad Text Policy
Google's Ad Text Policy defines the rules that apply to the text
of ads that Google shows. Under Google's Ad Text Policy,
Google investigates properly notified complaints concerning
unauthorised use of trademarks in the text of ads.


AdWords API
168. Google licenses an Application Programming Interface ("API") for
AdWords. The AdWords API allows advertisers and third-party
developers to use automatic ad campaign management tools. The


C. Nos. 07 & 30 of 2012                                              61
                                                        PUBLIC VERSION

AdWords API is one means that Google makes available for advertisers
to transfer ad campaigns to rival platforms. In order to obtain access to the
AdWords API, advertisers and developers must agree to certain terms and
conditions ("AdWords API T&Cs").


Intermediation (syndication) agreements
169. Google's intermediation agreements allow website owners ("publishers")
to incorporate Google's search and ad technologies on their websites.
Users can then conduct searches directly on the publisher's site.
Publishers gain the opportunity to earn revenues from Google ads shown
on their websites' pages. Google's intermediation service is called
AdSense.


Distribution agreements
170. Google's distribution agreements allow web browser providers (web
browsers are programs used to surf or navigate the internet) to incorporate
Google search functionality into their web browsers.


Issues under Consideration in the Inquiry
171. The Investigation Report states that Google biases its search results
because display of certain specialised search design is not strictly
determined by relevance. Not only that, Google provides insufficient
information to advertisers on performance of their ad campaigns. The
report further states that Google should block advertisers other than the
trademark owner from bidding for ads upon trademark keywords and
objects to Google's intermediation and distribution agreements as being
restrictive. Besides, the Investigation Report takes exception to Google's
conduct on certain counts which were not the subject matter of prima facie
orders, as detailed earlier.

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 160 of 337   Page ID
#:28615
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

C. Nos. 07 & 30 of 2012                                                        62

172. On a careful perusal of the Investigation Report , the Commission would
     examine the issues in the present inquiry under the following broad heads:

     (i)     Whether Google biases its search results?
     (ii)    Whether Google imposes unfair conditions on its
             advertisers?
     (iii)   Whether     Google's     distribution     agreements     restrict
             competition?
     (iv)    Whether Google's intermediation agreements restrict
             competition?


                            Search Bias


173. The DG objects to a number of Google's specialised result designs -
     Universal Results, OneBoxes, and Commercial Units - that Google shows
     as part of its search results.


174. To begin with, it would be appropriate to preface the analysis with the
     observations / findings of the DG in this regard:

        ... [i]t emerges that though determination of relevance and the
        generation of search results to a large extent is automatic, it runs on
        Algorithms which are computer processes and formulae, designed and
        owned by Google and changed almost on a daily basis. Google being
        in control of this algorithm which is pivotal to generate search results
        is thus in a position to intervene in the automated process at any point
        of time and impact the relevance and ranking of the results.
                             [Ref. Para 87, p. 304 Investigation Report]


        Available information indicates that Google notifies publically only
        selective algorithmic changes. Google has cited proprietary and
        security reasons for not disclosing the same. While Google may not be


C. Nos. 07 & 30 of 2012                                                        63

        in a position to publically disseminate complete details of algorithmic
        changes, disclosure of limited information after safeguarding their
        proprietary and security interest would enable the websites to make
        timely bonafide changes and ensure level playing field.
                             [Ref. Para 92, p.306 Investigation Report]

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 161 of 337   Page ID
#:28616
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

While no website can claim any particular rank in the SERP;
considering the impact that these changes have on the ranking on the
websites in search results and their ability to attract traffic, there is a
need for greater transparency and timely dissemination of information
about algorithmic changes. This aspect assumes further significance
on account of the fact that Google competes with others in display and
ranking of results and has a major competitive advantage due to access
to information related to such changes.

> [Ref. Para 95, p. 307 Investigation Report]

Due to the information asymmetry, non-transparency and considering
the fact that the algorithmic changes are not subject to external audit
or monitoring, Google is always in a position to alter the algorithm
and affect the search results discretely in a discriminatory manner.
Against this background it is found that despite Google's algorithmic
search framework being largely automated there exist enough scope in
the process for manual intervention, manipulation of Results.

> [Ref. Para 96, p.307 Investigation Report]

[A]ny manipulation by Google in the ranking of results especially in
the top ranks on the first page of SERP has potential to adversely affect
the ability of other web content providers to attract user eyeballs
particularly in light of the presumption of users that the top results are
the most relevant.

> [Ref. Para 122, p.318 Investigation Report]

C. Nos. 07 & 30 of 2012                                                                                  64

PUBLIC VERSION

Based on the examination of aforesaid facts is found that Google does
bring out algorithmic changes to effect ranks of the specialised search
results like One boxes, Knowledge Panel, Universal results in a pre-
determined manner. Rank of a result may thus not be strictly
determined by relevance (e.g. in the aforesaid instance local results
merged irrespective of relevance of individual results). The aforesaid
findings assume particular significance considering that throughout its
submissions Google has emphasised on its focus on delivering the most
relevant organic results to its users. Google's algorithms are at times
changed/designed in a manner that provides high ranks to particular
search features introduced by it.

> [Ref. Para 129, p.321 Investigation Report]

While the positioning of various kinds of results on the SERP in a
predetermined manner by itself is not a concern, the issue that merits
examination is whether all web content providers are treated

equivalently to appear on that position. Google is well within its rights
to innovate and modify its SERP, in view of its dominant position the
same should be done in a non-discriminatory and transparent manner
to ensure a level playing field for the web content providers.
                          [Ref. Para 130, p.321 Investigation Report]


Based on the analysis of the facts gathered during investigation it
stands established that under Universal/thematic Results that appear
in response to a query entered in Google's general purpose search
engine, Google gives preferential treatment to its own web content/
specialized search/vertical search services like Google News and
Google Images, etc.
                          [Ref. Para 158, p.334 Investigation Report]


... [U]niversal results occupy prominent ranks on the SERP and
significant real estate on SERP. Thus, for any search queries for which
information categories like news, images etc. are relevant, links to


C. Nos. 07 & 30 of 2012                                                65

                                                        PUBLIC VERSION

Google specialised search options/ vertical search services appears at
high ranks on the SERP through this integration.
                          [Ref. Para 159, p.334 Investigation Report]


While there is no denying of the fact that the users to some extent
benefit from Universal Search results and other innovations discussed
above, the objectionable area is the manner in which Google, which is
a dominant search engine, is systematically and clandestinely favoring
its own specialized search services when providing such results as
opposed to its claimed provision of the best unbiased results to the
users, regardless of the source. There may exist third party specialized
search services that cater to the user query better.
                          [Ref. Para 160, pp. 334-335 Investigation Report]


... [i]t stands established that Google integrates and gives preferential
treatment to its own content, various products and services in the
Online General Web Search Services.
                          [Ref. Para 183. p. 343 Investigation Report]


... [G]oogle does favours its own products and services over others
while   displaying    results    under    its   so-called   concept   of
Thematic/Universal results. Google's Universal search allows Google
to leverage its search engine dominance into virtually any field that it
may choose (online mapping, travel search, financial search

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

etc).Merely because of the fact that under thematic results, related
information is presented covering various facets such as News, Places,
Maps and thus may have a component of utility for users cannot justify
compromise to the basic characteristic of an organic search engine of
providing neutral and unbiased results. Hence under the garb of
thematic results Google has been strategically promoting and
prioritizing its own properties and partners in its organic search
operations at the expense of other competing websites.

[Ref. Para 187, p. 344 Investigation Report]


C. Nos. 07 & 30 of 2012                                                  66

PUBLIC VERSION

... [t]here is a conflict of interest in the present scheme of things where
Google's own websites compete for visibility with third party websites
on search result displayed through Google's Search engine. Complex
nature of process for generation of search results coupled with
information asymmetry distorts the level playing field and provides
room for preferential treatment of own websites in generation of search
results.

[Ref. Para 194, p. 347 Investigation Report]


Thus, the generation of OneBox results is being done in a
discriminatory manner and entails consumers harm by not necessarily
displaying the most relevant result which is further compounded by the
fact that they are not labelled which results in information asymmetry.

[Ref. Para 201, p. 350 Investigation Report]


It has therefore emerged that on Google.co.in, Commercial units for
content categories like Hotels and Flights contain triggers to their
respective Google Search Options/ Specialised search services. This
integration of Google's own search options/specialised search services
in the commercial unit in a preferential and non-transparent manner
has anti-competitive effect ...

[Ref. Para 221, p.361 Investigation Report]


... [G]oogle stands to benefit tremendously from the integration and
prominent placement of links to its specialized search options/services
in Universal Results and Commercial Units on its SERPs.

[Ref. Para 233, p. 366 Investigation Report]


Google's general purpose search engine is used by a large consumer
base searching for information under the bonafide belief that the
results are unbiased. The consumer harm resulting from such
favouritism is that they are misled to believe that the links to Google's
specialised search options/services that appear prominently in

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

response to their queries are purely driven by quality considerations

C. Nos. 07 & 30 of 2012                                                67

PUBLIC VERSION

even though they may not be most relevant and appear as such due to Google's practice of favouring its own results. The practice is thus unfair to the users searching for information on Google in violation of section 4(2)(a)(i) of the Act.

> [Ref. Para 243, p.369 Investigation Report]

As a consequence of the said search bias, equally efficient websites/specialised search service providers, due to reduced visibility, may not be able to acquire a sufficient volume of business (Minimum Efficiency Level) required to viably compete and survive against Google's own services and may thus be driven out of the market thereby foreclosing competition and reducing alternatives to consumers. This systematic exclusion leads to denial of market access to competing websites/ specialised search service providers, amounting to violation of section 4 (2) (c)of the Act. Such competing specialised search services will have reduced incentive to innovate resulting in consumer harm as well as limiting technological development in violation of section 4(2) (b) (ii) of the Act.

> [Ref. Para 244, pp. 369-370 Investigation Report]

... [i]n generation of several categories of results, Google doesn't treat third party websites/web content providers equivalently and steers users to their own products and services, producing biased results. Thus, the users may not receive the most relevant results. This also adversely affects the competitive landscape in the markets for search and search advertising as well as adjacent markets such as travel, maps, social networking, e-commerce etc. Such actions deter innovation in a wide-range of these online ancillary markets. Consequently, users may be devoid of additional choices of results. This shows that the competition is hampered in the market impeding innovation, and thus, harming consumers. Therefore, Google's conduct is found to be anti-competitive in terms of Section 4(2)(a)(i), 4(2)(b)(ii) , Section 4(2(c) and 4(2)(e) of the Act.

> [Ref. Para 253, pp. 384-385 Investigation Report]

C. Nos. 07 & 30 of 2012                                                68

PUBLIC VERSION

Google's Response

175. Google challenged the findings of the DG on "search bias" as unfounded in fact and in law. It was pointed out that the Investigation Report raises objections against Google's specialised result designs viz. Universal Results, OneBoxes, and Commercial Units which Google shows as part of its results. These designs are innovative features that improve the

quality of Google's result pages and benefit the users.

176. It was pointed out by Google that the Investigation Report's accusation against its specialised result designs is based on three main claims:

(i)    Google's display of Universal Results, OneBoxes, and Commercial Units involves "search bias" because the display of these designs is not "strictly determined by relevance";

(ii)   The alleged bias misleads users, who believe that Google's ranking is "driven purely by quality considerations"; and

(iii)  The alleged bias harms competition because it denies vertical search services market access, reduces innovation, and impedes choice.

177. It was stated that Google holds specialised result designs to the same consistent and strict standards of relevance and quality that it applies to all its results. Universal Results are groups of search results for a specific information category, such as news, images, or local businesses. The results shown in Universal Result groups are free search results - just like generic blue link results. They are, however, designed in ways that make them more relevant and useful for users.

C. Nos. 07 & 30 of 2012                                              69
                                                              PUBLIC VERSION

178. Google argued that the Investigation Report's claim that Universal Results are biased because their ranking "may [...] not be strictly determined by relevance", is incorrect and reflects a misunderstanding of the technologies involved. It was submitted that ranking of Universal Results is determined by relevance and Google holds Universal Results to the same standards of relevance as all its results. In particular, it was Google's systems which decide whether to show a Universal Result group in a given position by comparing the relevance of that group with the relevance of generic blue link results in that position. Google shows a Universal Results group only if its technical systems conclude that the Universal Results group is more relevant than other results in that same position.

179. On the DG's finding with respect to "fixed positions" of Universal Results, it was contended by Google that initially it limited the display of Universal Results to certain "fixed" positions because its systems were not advanced enough to conduct a relevance comparison for all the positions on its SERP. Explaining further, it was stated that Google

preferred not to show Universal Results in positions for which it could not conduct a reliable relevance assessment, rather than compromise its relevance and quality.

180. Hence, it was sought to be canvassed that the DG has erred and confused positions with relevance assessment. What matters is not in which positions a particular result type, such as Universal Results, can appear in principle. What matters is the conditions that these results must meet to be shown in those positions. To appear in any given position, Universal Results have to meet the same standards of relevance as generic blue link results in that position.

181. Adverting to OneBoxes, it was argued that they provide short factual answers in response to queries, such as a mathematical calculation, the

C. Nos. 07 & 30 of 2012                                                         70

PUBLIC VERSION

local time, or cricket statistics. The Investigation Report acknowledges that OneBoxes help users find the answers they seek. But the Report claims that showing OneBoxes involves bias because the content providers for OneBox information may not be the "most relevant". This contention is mistaken for two reasons: first, majority of OneBoxes respond to factual queries for which there is only one right answer - the result of a mathematical calculation, the time of day, or the outcome of a cricket match. OneBoxes then do provide the correct answer. A different content provider could not provide anything more relevant; second, for OneBoxes where there can be different possible answers e.g., weather forecasts, Google selects the content providers based on evaluation of relevance, quality, and business terms. Google is not paid by content providers and has, thus, no incentive to select an inferior content provider. The Report provides no evidence that Google has ever actually selected an inferior provider for its OneBoxes.

182. With respect to Commercial Units, it was pointed out by Google that such result types are set apart in ad space and clearly distinguished from free search results with a "sponsored" label. The display of Commercial Units leaves the selection of free results untouched. In India, Google shows two types of Commercial Units: Shopping Units, which display ads for product offers of merchants; and Flight Units, which identify flight offers for a given destination.

183. It was pointed out that Google's search service is based on a two-sided business model in which it provides its search service free to users, and funds this service through the display of paid results (i.e., ads) for which Google receives compensation from advertisers. The display of Commercial Units is a normal and legitimate consequence of Google's two-sided business model and Google shows sponsored results or ads

together with free search results.

C. Nos. 07 & 30 of 2012                                                      71
                                                        PUBLIC VERSION

184. In sum, it was argued that Google's specialised result designs (Universal
     Results, OneBoxes, and Commercial Results) do not mislead users.


185. It was also pointed out that Google's specialised result designs do not
     harm competition. The Investigation Report repeatedly recognises that
     Google's specialised result designs are product improvements that benefit
     users. At the same time, the Report claims that these designs are abusive,
     without any supporting analysis or evidence of competitive harm. If
     Google's conduct harmed competition, one would expect this to manifest
     itself in an observable foreclosure of competition that is attributable to the
     alleged abusive conduct. But since the time Google began showing the
     allegedly abusive designs, referrals from Google to vertical search
     services in India have skyrocketed:


     (i)    Between 2010 and 2015, free Google clicks to product search
            services in India increased over 25-fold, from             to over
                          .

(ii) Between 2007 and 2015, free Google clicks to local search services in India increased over 80-fold, from to over .

(iii) Between 2012 and 2015, free Google clicks to travel search services in India increased from around to over (116% growth in just three years).

PUBLIC VERSION Free Google Traffic to Vertical Search Services in India

186. It was submitted that these data understate the total traffic that vertical search sites receive because they only concern traffic from Google (Google does not have access to total traffic data for third parties). In fact, vertical search services receive of their total traffic from non- search sources.

187. Thus, it was submitted that hard data contradict any claim that Google has harmed competition in India by showing specialised result designs. Evidence on the file confirms this conclusion: 90% of the respondents to the DG's questionnaires express no concerns of denial of market access in search. And a number of parties, including Google's rivals such as Rediff and Flipkart, specifically confirm that Google does not deny market access to its rivals.

188. Referring to the provisions of Section 4 of the Act, it was submitted by Google that the Investigation Report failed to satisfy the requirements of PUBLIC VERSION Section 4 of the Act. Given that there is no search bias, no user deception, and no harm to competition, there can be no infringement of the Act. In addition, the specific provisions of Section 4 of the Act that the Report

invokes do not apply here:

(i) Section 4(2)(a)(i) does not apply Section 4(2)(a)(i) applies only to "purchase and sale of goods and services". But users do not purchase or sell anything when they see or click on Google's search results or ads. Moreover, application of Section 4(2)(a)(i) is excluded where a practice is "adopted to meet the competition". In the present case, Google developed its specialised result designs to improve the quality of its service, in competition with other search services, such as Yahoo! and Microsoft, which have also adopted similar designs.

(ii) Section 4(2)(b)(ii) does not apply The Investigation Report's claim that Google's conduct has led to a reduction in innovation in violation of Section 4(2)(b)(ii) is unsubstantiated. In reality, wide choice and innovation are the hallmarks of search in India.

(iii) Section 4(2)(c) does not apply The Commission confirmed in Kapoor Glass case that Section 4(2)(c) does not apply where alternative means of supply exist. The Investigation Report presents evidence showing that vertical search sites receive of their traffic from sources other than search, such as direct traffic and through mobile apps. Further, Hon'ble COMPAT also held in Fast Way Transmission that Section 4(2)(c) can only apply as between competitors. The Investigation Report notes in Chapter 2 that Google, as a general search service, does not compete with vertical search services.

PUBLIC VERSION

(iv)    Section 4(2)(e) does not apply

Section 4(2)(e) requires two, distinct relevant markets, as confirmed by the Hon'ble COMPAT in National Stock Exchange of India: one market where a firm is dominant, and one market where this dominance is leveraged. But the Investigation Report does not define two separate markets nor does the Investigation Report identify any competitive harm caused by the alleged leveraging.

189. Summing up, it was contended by Google that if the Investigation Report was upheld, it would be forced to make changes that would diminish the quality of its service. For instance, Google could show maps from other service providers but this is technically not feasible without seriously damaging the quality of Google's service - as the High Court of England and Wales recognised in its recent Streetmap judgment. Google cannot ensure the quality of results, and waiting for results of third-parties would cause significant delays in response time to the detriment of users. The only realistic option would, therefore, be for Google to discontinue its maps results and it would have to do this even when both the Taiwanese Fair Trade Commission and the High Court of England and Wales have recognised the indisputable benefits and lawfulness of Google's map display. Thus, Google would be forced to retreat to pre-2000 levels of technology, limiting itself to showing merely blue links. That would mean a seriously inferior service for Indian users compared to that offered in the rest of the world.

190. The two screenshots below illustrate the contrasting designs that Google would be able to show in the rest of the world compared to India if the Investigation Report's findings are upheld.

PUBLIC VERSION

191. An adverse order may risk chilling innovation in India. This would condemn product improvements and deny Indian users the benefits that innovation brings.

The Informants' Response

192. Per contra, the Informant in Case No. 07 of 2012 supported the findings of the DG. The Informant submitted that Google's shift to providing "universal results" by incorporating results from its own vertical properties onto its SERP, has pushed down the results of competing specialised search services from the SERP. This has resulted in a sharp reduction in traffic to these competing specialised search services. Google has combined the introduction of its own vertical properties on the SERP with demotion of competing vertical search services, through various "updates" to its algorithm, on the ground that they provide no original content. These two events, in combination, have had a disastrous effect on competitors of Google's vertical properties.

193. The Informant further submitted that most vertical search services rely heavily on Google's web search results for referrals, and a demotion on the SERP can lead to a significant decline in visitors (which has a knock- on effect on subscriptions as well as advertising revenues). Essentially, PUBLIC VERSION these websites depend on Google for their survival, and Google's search bias threatens their very survival.

194. The Informant also stated that Google appears to recognise that this preference it gives to its own vertical properties has anti-competitive ramifications. Therefore, it has offered commitments in the EU that address this concern. To corroborate its position, the Informant pointed out that several companies that compete with Google in vertical search spaces have complained about manual demotions, which have caused them significant harm. One such company, Foundem, was the Informant in the recent comparison shopping case against Google in the EU.

The Commission's Analysis

195. Having considered the DG's findings and submission of the parties, the Commission notes that the Investigation Report claims that Google engages in "search bias" by showing specialised results designs. The Report specifically objects to three specialised result designs: Universal Results, OneBoxes, and Commercial Units. The Commission would deal with search bias under the following heads:

(a) Universal Results

(b) OneBoxes

(c) Commercial Units

196. Before delving into the issues, the Commission would like to emphasize the special responsibilities and obligation of a dominant undertaking under anti-trust law and with a specific reference to the digital markets.

197. Innovation cycles are progressing at a fast pace in the digital economy disrupting and reshuffling long-established positions. In this context, it is of paramount importance that public intervention in such markets should PUBLIC VERSION be targeted and proportionate. Such a calibrated approach in technological markets ensures that intervention remains effective; it does not restrain innovation and helps the market to regulate itself. This concern, which applies to all economic sectors, has undoubtedly more resonance in the digital economy.

198. In the digital economy, players with strong market position often enjoy a virtual hegemony, due to the "winner takes all" phenomenon. This often correlates with the existence of two-sided market or network effects. Network effects appear if the value of a product grows more than proportionately to the number of users of the product or compatible products. When additional consumers join the network of existing consumers, this has a positive external effect on its existing members. Network effects can be regarded as significant above a given sign-up rate, when a critical mass is attained. Beyond that point, more and more customers will be interested, since the benefits of the service increase with the number of subscribers.

199. In multi-sided digital platforms, the network effects are more pronounced.

New users tend to choose platforms or networks that already have a large user base which can ultimately even lead to a dominance by a firm in the market. No doubt, network effects can also facilitate introduction of innovative products, yet it cannot be disputed that network effects can raise switching costs for users and barriers to entry for potential competitors. As a consequence, market entries become less likely and users switch less frequently to other suppliers, which has a market power enhancing effect.

200. While such effects may not necessarily lead to dominance of a single company, they entail potential anti-competitive risks because they may facilitate formation of a dominant position and curb market contestability, PUBLIC VERSION since the most appealing company for new customers is the one that already has the largest customer base.

201. To accurately assess whether a dominant enterprise in the digital space is abiding by special responsibility, it is important to take cognizance of fast- moving innovation, the novel products and services at issue, and the nature and extent of network effects that might exist. Dominant enterprises must not take unfair advantage of their position as such abusive conduct not only impacts the market as a whole but may also affect the entry and sustenance of other market participants into complementary markets associated with the platform.

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 171 of 337   Page ID
#:28626
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

202. In the present case, since Google is the gateway to the internet for a vast majority of internet users, due to its dominance in the online web search market, it is under an obligation to discharge its special responsibility. As Google has the ability and the incentive to abuse its dominant position, its "special responsibility" is critical in ensuring not only the fairness of the online web search and search advertising markets, but also the fairness of all online markets given that these are primarily accessed through search engines.

203. In view of the above, the Commission is cognizant of the fact that any intervention in technology markets has to be carefully crafted lest it stifles innovation and denies consumers the benefits that such innovation can offer. This can have a detrimental effect on economic welfare and economic growth, particularly in countries relying on high growth such as India.

204. The allegations and the findings against Google in respect of search results essentially centre around design of search engine result page, the Commission considers it appropriate to enter a caveat before embarking upon the scrutiny of the design to ascertain anti-trust violations. The PUBLIC VERSION Commission notes that product design is an important and integral dimension of competition and any undue intervention in designs of SERP may affect legitimate product improvements resulting in consumer harm.

205. Having said that, it is made clear that such regulatory forbearance from interfering with search design is only by way of self-imposed restraint but if in a given case the Commission finds the conduct to be egregious, appropriate remedies and directions shall be issued to correct such a distortion.

206. In the aforesaid backdrop, the Commission proceeds to examine the issues within the permissible parameters in technology markets.

Universal Results

207. Universal Results are groups of results for a specific type of information, such as news, images, local businesses etc. The results shown in Universal Result groups are stated to be free results - just like generic blue link results. According to Google, they are simply designed in ways that improve their relevance and usefulness for users.

208. Google states that it first introduced grouped results in 2001 (in the USA) for news articles. Over time, Google introduced other result groups, including for images (2004), and results for local businesses (2004). These result groups later came to be known as "Universal Results".

209. It was stated that Universal Results improve the quality and relevance of Google's results in three ways: (i) they group results for a specific information category; (ii) they select results within a group based on category-specific signals that allow Google to find more relevant results for that category of information; and (iii) they show results in formats tailored to the type of information at issue.

PUBLIC VERSION

210. To better appreciate the ecosystem of Universal Results, it would be apposite to note an illustration. For the query [Taj Mahal], for example, Google's results on May 27, 2015, included a group of results for relevant news articles and a group of results for relevant images as illustrated below. Users who seek news articles about the mausoleum can find relevant results quickly in the news results group. Users who want other types of results can find them easily on other portions of the page:

211. It was pointed out that Google experienced the deficiency of relying solely on generic signals during the September 11, 2001 terrorist attacks. At that time, Google was unable to surface results for recent news articles on the attack. The generic signals that Google's algorithms took into account, such as PageRank (which measures link relationships), were not suited for identifying relevant news articles. The relevance of news articles depends largely on how recent they are. Very recent news articles, however, will typically have few link relations. A search for a recent event, such as [IPL cricket news], on a search service that relies solely on link relationships as a signal would produce inferior results. Through this example, it was sought to be explained as to why Google developed mechanisms to take into account category-specific relevance signals for Universal Results. For PUBLIC VERSION news results, Google's algorithms consider how recent a news article is. For local businesses, Google measures location. And for products, Google may consider things like price, merchant rating, or stock availability. For local businesses, Google may show a map indicating the location of the businesses. For image results, Google shows an image thumbnail that helps users evaluate the image at a glance. These formats help users find the type of information that they are looking for.

212. In short, Google has argued that specialised result designs were part of Google's results almost from the beginning of Google's operations. They represent an important element through which Google provides relevant and high-quality results. Rather than deviating from Google's stated policy of providing search users with results that are most relevant and useful for their queries, Universal Results increase the relevance and usefulness of Google's results.

213. The DG noted in the Investigation Report that the ranking of Universal Results may not be "strictly determined by relevance" because Universal Results in the past could appear only in "specific fixed positions". The DG has pointed out in the Investigation Report that prior to October, 2010 Image Universal could only trigger in the 1st, 4th or 10th position on the SERP. Post-changes in algorithm in October, 2010 Image Universals were made free floating and, thus, were allowed to appear at any position on the SERP.

214. Google has submitted that Universal Results have to earn their place on the SERP based on the same consistent relevance standards that apply to generic blue link results. Universal Results appear at a particular position on the SERP only if their relevance when compared to the generic results, warrants that position.

PUBLIC VERSION

215. There is no doubt that Google initially limited the display of Universal Results to certain "fixed" positions. Prior to 2010 it limited the display of Universal Results to certain "fixed" (1st, 4th or 10th) positions. Google sought to ratiocinate the fixed positions being consistent with its relevance standards that it applied to generic blue link results. Yet, it gave no satisfactory reasons for limiting the display of Universal Results to the fixed positions. The contention of Google that "its systems were not sufficiently advanced to conduct a relevance comparison for all positions on the result page" cannot be accepted in the absence of concrete material in this regard. Google has not produced any material in support of its contention that its systems were not sufficiently advanced to conduct a relevance comparison for all positions on the SERP.

216. In light of this, the Commission holds that rankings of Universal Results prior to 2010 were not strictly determined by relevance, instead the rankings were pre-determined. The Commission holds that the aforesaid practice of Google displaying its Universal Results on fixed positions was unfair as it created a misleading façade that such search results appearing prominently in response to queries were algorithmically determined on the basis of relevance. Such a conduct falls foul of the provisions of Section 4(2)(a)(i) of the Act.

217. The Commission takes note of Google's submission that it has introduced fully-floating ranking for news results, image results, and local results between September - October 2010. Thus, the conduct of Google in fixing position for its Universal Results (news, images and local) prior to this, is of historical nature and this has been addressed by Google by making positions of Universal Results on SERP free floating. The DG has not recorded any finding qua the fully-floating ranking of Universal Results that Google currently uses and as such, it is not necessary for the Commission to examine this aspect any further. Moreover, the PUBLIC VERSION Commission shall consider this aspect (of Google making positions of Universal Results on SERP free floating) while issuing remedy in this regard.

218. The DG has considered Universal Results as "biased" also because "everytime Universal Results appear in response to a search query, the link for 'more results' leads only to Google's specialised/search options/services and not any other vertical search service". The Commission is, however, of view that the DG's conclusion in this regard is not well founded. First, the DG does not direct its criticism at the principal content of Universal Results; rather the DG takes objection to 'more results' link that leads to a page showing more results of the same type. The Commission observes that 'more results' link comprises part of Universal Results which enables Google to show additional results of the same category e.g., additional image results leading to third-party sites, or additional news results leading to third-party news articles.

219. Further, the Commission is of the opinion that that directing Google to replace these links with links to third-party vertical search services, may create confusion for the users. In such a scenario, Google's algorithms would rank the first few results, while another provider's entirely different ranking would rank the remaining set after the link. This may not be a workable proposition. Moreover, the Commission notes that no objective criterion can be laid down by way of a remedy to direct Google as to how it should choose between which third-party vertical search provider the more-results link should lead to. While reaching this conclusion, the Commission has also taken

note of Google's submission that it has no means to evaluate results generated by different search services and to select among them because it does not have information on their ranking functions.

PUBLIC VERSION

220. The DG also took objection to Google showing a map in response to queries for local businesses. The Investigation Report noted that it is not necessary that a map generated through Google Maps is the most relevant result among all service providers that display maps of those places. In addition, the Investigation Report notes that links to reviews from third parties are not displayed as prominently as reviews in local results.

221. The Commission has examined this issue in light of the DG's observations and responses filed by the parties thereto. This issue needs to be seen and understood by taking into account the comparative relevance of maps provided by various service providers. The observation seems to be based essentially upon the potential for abuse by Google.

222. It is observed that the DG accepts that showing a map in response to queries for addresses and local businesses benefits users, when it notes: "the addition of a map result on the SERP can be regarded as a step towards delivering more relevant results to the user". It cannot be denied that the map helps users understand the geographic location of the local results and makes it easier for them to evaluate and select results they are interested in. Thus, showing maps as part of local search results is an innovation and enhances user experience.

223. The DG's observation that Google should include third-party maps directly on its pages in response to user queries, has to be seen in the context of Google's business model as well as the technical feasibility of executing such a remedy. Google has made a submission that it does not have the technical systems to import data from third-party map sites and show them (within milliseconds) to users. Even otherwise, no justification has been made out by the DG or the Informants which would trigger such a course.

PUBLIC VERSION

224. The Commission is of opinion that requiring Google to show third-party maps may cause a delay in response time ("latency") because these maps reside on third-party servers. Latency is an important quality parameter of a search service. The fast load times cannot be achieved by showing third- party maps. Further, requiring Google to show third-party maps may break the connection between Google's local results and the map. Google may not accurately match its local results to locations on a third-party map. That being so, the Commission is of the view that no case of contravention of the provisions of the Act is made out in Google showing its own maps along with local search results. The Commission also holds that the same consideration would apply for not showing any other specialised result designs from third parties.

OneBoxes

225. The DG, while acknowledging that OneBoxes help users find the answers they seek, noted that showing OneBoxes involves bias because the content providers for OneBox information may not be the "most relevant". For reference, the findings of the DG on this issue are reproduced below:

> ...[t]he underlying competition concern is whether in display of direct answers in response to search queries Google is discriminating against other websites/web content providers. Although no website can claim to appear at a particular position, for the reasons discussed earlier they should be treated in a fair and non-discriminatory manner by Google in the display of results. Further, Oneboxes are sourced as data feeds from content providers with whom Google enters into agreement. While display of direct answers may cater to the user queries better, it is not necessary that the entity with whom Google ties up for the information is the most relevant for the users. Presently it is not evident to the user that the supply of information under One Box is based on contractual arrangements and not through crawling the web content. Thus, the generation of OneBox results is being done PUBLIC VERSION in a discriminatory manner and entails consumers harm by not necessarily displaying the most relevant result which is further compounded by the fact that they are not labelled which results in information asymmetry.

> [Ref. Para 201, p. 350 Investigation Report]

226. Google has submitted that large majority of OneBoxes respond to factual queries for which there is only one right answer and the OneBox provides that answer. Where there can be different possible answers, it was submitted that Google selects content providers based on an evaluation of relevance, quality, and business terms.

227. The Commission has examined the submissions and notes that OneBox provides short factual answer to users' query and returns an answer. The queries about mathematics, stock quotes, local time, currency conversion, and weather have one possible answer which must be relevant and useful response to the query. The Commission notes that Google selects information for OneBoxes with focus on relevance. While the Investigation Report acknowledges the benefits of OneBoxes, it claims that there is bias in the sources that Google selects for OneBoxes' content. The Commission finds that the DG's observation is not backed up by evidence. Mere possibility that it may not select the most relevant provider, is not a substitute for actual evidence of bias.

228. The Investigation Report's claim that crawling the web for providing OneBox information would be better than relying on licensed information, is also not well founded. The Commission notes that crawling generates unstructured data which is not suitable for displaying the structured, directly relevant information that is shown in OneBoxes. Relying only on crawled data would not allow to show users dynamic results in response. For example, mathematical calculations, currency conversions, or the time of day. If Google would rely only on crawled and not licensed data, users PUBLIC VERSION in India may receive a far-diminished service.

229. Further, the Commission observes that OneBoxes show authoritative information because large majority of OneBoxes respond to queries for which there is only one canonical or factual answer. In that case, different content provider may not a priori provide an answer that would be more relevant. The DG's concern that Google's OneBoxes do not select the most relevant answer is, therefore, mistaken.

230. The Commission is further of opinion that it would not matter if OneBoxes show authoritative information or non-authoritative information, for which there may be different possible answers, as long as the information provided is based on a careful evaluation of what is best for its users, relevance and quality as well as business terms. Google would have no reason to choose an inferior provider and more so, when it does not receive payment from content providers that it selects as an information source. In fact, if Google is paying for the content which appears in OneBoxes, it has every incentive to source the best possible content for the OneBoxes. Google has pointed out that it monitors and evaluates the content providers on an ongoing basis to decide whether to renew a content agreement with the same provider or select a different provider. If that is it, the Commission notes that the conclusions drawn by the DG qua OneBox partners are not made out and, more so, because no evidence has been presented by the DG to show that Google has selected an inferior information provider for any of its OneBoxes.

Commercial Units

231. Before coming to the issues involved, it may be appropriate to look at the product design and characteristics as submitted by Google.

PUBLIC VERSION

232. Commercial Units are result types that Google sets apart from free search results. It shows Commercial Units in the space utilised for showing ads which are above or at the right-hand-side of free search results. Google distinguishes Commercial Units from free search results with a label indicating Commercial Units are "Sponsored". In India, Google presently shows Commercial Units for Shopping and Flights only and does not show the Hotels Commercial Unit any more.

233. The DG noted that Google treats Commercial Units in a "preferential"

> manner because they are "based on mechanisms that do not apply in an equivalent manner to links to non-Google websites". This conclusion of the DG has been denied by Google.

234. With reference to Shopping Units, Google has submitted that such Units are enhanced ad formats and their display involves no bias. Like all search services, paid advertising enables Google to offer free search results. Showing ads alongside free results is how Google monetises its search service which it offers free.

235. The Commission notes that Google's display of Shopping Unit may not per se affect the ranking of free search results. However, this is not to suggest that commercial units displayed by Google would acquire any immunity from anti-trust investigation merely because such units have a commercial/ sponsored and paid element. It needs no reiteration that the product design may push down or altogether eliminate the market participants from competing in a fair and at a level playing field for that particular vertical category for which Google has placed its commercial units. This would appear evident, as discussed in succeeding paras, in the context of Google's flight commercial unit.

236. Google launched Google Flights in India in 2015. The Commission notes that the results are indicated by the term "sponsored" that appears next to PUBLIC VERSION the Commercial Unit and clicking on the information icon next to that reveals that "Google may be compensated by some of these providers". While the Flight Unit does not link to a separate and standalone search service, but it does lead to another page showing additional results of the same type.

237. Google has submitted that the development of Commercial Units represents Google's innovation in ads: instead of showing plain text, Google's ads in the Commercial Unit display design elements adapted to a particular category of advertisers, and this makes it easier for the user to find the information which they are looking for. The ranking in the Commercial Unit is based on a combination of relevance and bid price.

238. The Commission observes that Google monetizes Commercial Units based on advertisements and/ or by listing merchants/ travel agents etc. who can bid for inclusion and ranking on them. The DG has observed that on Google.co.in, Commercial Units for content categories such as Flights are integrated with Google's own search options/ specialised search services. The Commission is of the view that by integrating/ linking specialized search result pages with the Commercial Units and placing them prominently on SERP, Google is able to drive traffic to its own pages and also generate revenues through advertisements/ sponsored results.

239. In this regard, it is observed that a user's clicking behavior may also be influenced by Google's public claim of ranking results based on relevance. Google's claim of ranking results based on relevance is borne out from the following which have been summarised in the Investigation Report:

> In its 2004 initial public offering ("IPO") filing with the U.S. Securities and Exchange Commission, Google made the following statement:

> PUBLIC VERSION "We will do our best to provide the most relevant and useful search results possible, independent of financial incentives. Our search results will be objective and we will not accept payment for inclusion or ranking in them."

> In their letter accompanying the IPO filing, Google's founders similarly stated that its results are "unbiased and objective."

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

"Google users trust our systems to help them with important decisions: medical, financial and many others, Our search result are the best we know how to produce. They are unbiased and objective, and we do not accept payment for them or for inclusion or more frequent updating. We also display advertising, which we work hard to make relevant, and we label it clearly. This is similar to a well-run newspaper, where the advertisements are clear and the articles are not influenced by the advertisers' payments. We believe it is important for everyone to have access to the best information and research, not only to the information people pay for you to see."

The "users first" principle is also part of Google's official corporate philosophy that it summarised in its Ten things we know to be true statement. The first of these ten is the proclamation that Google places users above all:

"[w]hether we're designing a new Internet browser or a new tweak to the look of the homepage, we take great care to ensure that they will ultimately serve you, rather than our own internal goal or bottom line."

PUBLIC VERSION Google's Executive Chairman, Eric Schmidt, has stated that:

"the natural search answers [are] completely unbiased with respect to economics."

240. In view of such commitment to relevance by Google, it cannot be gainsaid that users would assume that ranking reflects the order of relevance. Hence, any deviance or departure from relevance in presenting search result would not only mislead the users of Google search services but may also hinder market access of the participants who are competing in particular verticals.

241. The implicit reliance of users upon rankings taking them to be based on relevance, is further highlighted from the various studies and reports collected by the DG during the course of the investigation.

242. In this regard, the Commission takes note of Microsoft's submissions provided to the DG whereby it has provided an image of a "Heat map" showing how users scan a search page which highlights the areas of SERP where users focus their attention. It has been explained that the image was prepared by recording the movement of users' eyes across SERP when search results are presented. Based on the analysis, it has been pointed out that the "top-left" section of SERP receives distinctly more attention than any other part of SERP.

243. Microsoft has also referred to various other internal studies conducted for the European Commission estimating the importance of rank of results on SERP in support of its contention that both demoting and promoting links yield significant differences in traffic, demonstrating the importance of rank itself (and not only site relevance) in generating clicks.

244. The Commission is of opinion that there can be no doubt that top ranks on SERP receive the maximum clicks and are thus crucial from the point of PUBLIC VERSION view of attracting

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 179 of 337   Page ID
#:28634
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

Internet traffic. All the web content providers compete to appear at higher ranks. The Commission also agrees that the development of Search Engine Optimization (SEO) services for improving ranking in search results further highlights the significance of high ranks for online visibility. By not ranking its own pages as those of competitors and placing them in the top ranks on the first page of SERP has potential to adversely affect the ability of other web content providers to attract user eyeballs particularly in light of the presumption of users that the top results are the most relevant.

245. In this connection, it is also pertinent to take note of Microsoft's letter dated 21.10.2013 submitted before the DG whereby it has stated that " * * * * * * * * * *"

246. In terms of anti-competitive effect, the DG has found and the Commission notes that Google treats Commercial Units in a "preferential" manner because they are based on mechanisms that do not apply in an equivalent manner to links to non-Google websites. The DG has looked at screenshots for the content category "Flights" and noted that the Flights Icon/ search option in the top bar in the specialised search result page gets highlighted. The DG has further noted that clicking on "more Google flight results" in the Commercial Unit leads the user to the specialised search result page of Google Flights.

PUBLIC VERSION

247. Google has pointed out in its submission that Flight Units provide users with relevant information on flights directly on the page and like Shopping Units, Flight Units are set apart from free search results and are indicated with a "sponsored" label. It cannot generate directly relevant up-to-date flight information by crawling the web because crawled data is unstructured and can only be updated when the "crawler" can access the next page. Therefore, replacing this link with a link to third-party flight search services would damage the quality of Google's service because it would create confusion.

248. The Commission observes that in case of Google's Commercial Unit i.e. Flight Units in India, primary competition concern emanates out of its prominent placement of its commercial units on SERP in addition to providing disproportionate real estate thereof to such unit. Moreover, it contains a link to "Search flights". Clicking on this link takes users to Google's Flights Page and not to a third-party website such as MakeMyTrip.com or Yatra.com. Therefore, Google has given rise to a search bias by unduly giving prominent placement and real estate of the Flight Unit on its SERP for directing traffic to its own specialized search service. It is observed that many users start their vertical search on Google's dominant general search engine, clicking on one or more of the verticals displayed on the Google SERP in response to their queries seeking specialist subject-specific content. It cannot be thus denied that Google's dominant position in General Web Search is being leveraged to provide gateway for users to find relevant travel verticals. As a result, Google's Search Engine is crucial for verticals that do not pay to appear in Google's Flights Unit. The insertion of Google's Flight Unit prominently above the blue link results in the SERP denying third-party travel verticals even the opportunity to be displayed on that key "real estate". Google's Flight Unit captures the traffic that would ordinarily PUBLIC VERSION flow to the top algorithmic listing. Further, Google's Flight Unit pushes the algorithmic results down and in some cases, even off the first page.

As a result of the displacement of algorithmic results, third-party travel verticals are driven to buy Google search advertising, since this is perhaps the only option left for them to re-acquire visibility and traffic, though, at a higher cost. In this situation, it cannot be ruled out that their advertising cost increases by intensified bidding on keywords.

249. The Commission also observes that such prominent placement of commercial units on SERP could give rise to yet another anti-trust concern. Capturing consumer eyeballs through search design by giving prominence to Google Flights and taking consumers to search for more Google Flight results may allow Google to collect more user data to reinforce its advantage in search advertising market. Additional specialized search data on users increases the value of the general search advertising as it provides search engines deeper data analysis of particular specialized search data. Extracting additional revenue from the advertisements alone by directing consumers to its specialized results pages may not be so much of an anti-trust concern, but the user data that it is able to collect may not allow other competing vertical search pages the same benefit and deteriorate their ability to further innovate on their products.

250. The Commission notes that the concerns raised by third parties regarding Google using its dominance to cross-sell its own products was captured by the DG by referring to a letter dated 09.10.2013 submitted by 'MakeMyTrip'. The letter in addition to providing historical screenshots of the SERP in support of its assertions, stated that:

> "While these products are unlikely to have a booking engine, the positioning of the product is likely to divert customers from Makemytrip.com at the stages of research. This reduction in PUBLIC VERSION customers is likely to have an impact on overall bookings. Over the long run, such rampant introduction of the new products can be detrimental to profitable existence of incumbents and will lead to reduction of choices for consumers. The only reason why Google is able to provide high visibility to its products is because of its dominant share in the search market - a platform that Google is using to cross-sell its own products."

251. Before concluding, the Commission also deems it appropriate to mention the following public statement made by Ms. Marissa Mayer, the then Vice President of Search Products and User Experience of Google:

"[When] we roll[ed] out Google Finance, we did put the Google link first. It seems only fair right, we do all the work for the search page and all these other things, so we do put it first... That has actually been our policy, since then, because of Finance. So for Google Maps again, it's the first link."

252. Further, it is also important to point out that Consim has presented evidence against Google citing the Staff Report of the Federal Trade Commission dated 08.08.2012 (FTC Staff Report). From the FTC Staff Report, the Commission observes that it reveals in no uncertain terms that Google has manipulated SERP to its advantage and to the detriment of its competitors. No doubt, ultimately FTC concluded that Google's search designs were not abusive, the statements made in the FTC Staff Report remained unchallenged. The Commission has only taken note of the FTC Staff Report

without placing any reliance upon it in reaching the findings of contravention in the present case.

253. On a comprehensive examination of the matter, the Commission observes that given the most vertical search service providers have revenue generation models which are heavily dependent on user traffic, such an PUBLIC VERSION unfair diversion of traffic by Google may not allow third-party travel verticals to acquire sufficient volume of business. The Commission notes that they may be equally efficient websites/ specialised search service providers, but due to reduced visibility, they may not be able to sustain and survive in the market for flight search services. In fact, in the present ecosystem of various start-ups gaining traction, it would be travesty if such attempts made by keeper of search highway is countenanced. The Commission has no hesitation in holding that Google through its search design has not only placed its commercial units right at a prominent position on SERP, it has also allocated disproportionate real estate thereof to those units resulting into either pushing down or pushing out of the verticals who were trying to gain market access. To top it all, Google has provided link which leads users of Google Flight commercial unit to its specialized search result page (Google Flight). Consequently, users may be devoid of additional choices of results and therefore, such conduct amounts to an unfair imposition upon the users availing search services. Such conduct of Google, being an unfair imposition upon the users of general search services, is in contravention of Section 4(2)(a)(i) of the Act.

Unfair or Discriminatory Conditions on AdWords Advertisers

254. Findings of the DG in respect of Google's advertising platform i.e. AdWords are examined under the following heads:

(i) Operation of Google's advertising platform (AdWords)

(ii) Permitting advertisers by Google to bid on trademarked keywords (Trademark Issue)

(iii) Restrictions by Google upon advertisers from transferring ad campaign to other ad platforms (AdWords API T&Cs)

255. Before analysing the competition issues, it would be appropriate to PUBLIC VERSION reproduce the findings of the DG on this infringement:

> Determination of the Quality Score is a complex process based on several parameters. Investigation has revealed that limited information is available in the public domain. Google also has access to information on the quality score that the system assigns to other websites including those of its competitors. Google being aware of these is in a position to ensure that its House Ads are assigned higher Quality Score than its competitors. Further, it has emerged that Google is not required to pay any monetary consideration for its House Ads which gives an additional competitive edge. The checks referred by Google are found to be inadequate to address and prevent preferential treatment of its own properties in paid results. Available information discussed above brings out that to appear at high ranks is critical for an ad to be

clicked. The existing scheme of things provides enough scope for Google to ensure that invariably its House Ads appear in the top slots and above third party ads particularly of its competitors.

[Ref. Para 148, p. 450 Investigation Report] It is thus found that there does not exist a level playing field for the third parties competing with Google's House ads to appear in paid results in response to user searches. The conduct amounts to imposition of unfair and discriminatory conditions on third party advertisers using AdWords and is found to be in violation of section 4(2)(a)(i) of the Act.

[Ref. Para 149, p. 451 Investigation Report] Google's Response

256. Google has contended that it does not impose unfair or discriminatory conditions on AdWords Advertisers. It has submitted that just like a free newspaper or radio station, advertising is the way that Google monetises and funds its free search service. AdWords enables advertisers to bid on search terms ("keywords") upon which ads would appear on Google's PUBLIC VERSION SERP.

257. Google ranks the ads based on advertiser's bid and auction-time predictions of the ad's relevance and quality. Google shows ads that are relevant and useful to users, while offering an effective promotion opportunity for advertisers.

258. The Investigation Report claims that one of the reporting metrics that Google provides to its advertisers - a metric called the "1-10 Quality Score" - is "opaque", of "very limited utility", and "susceptible to manipulation". Google has challenged this claim as wrong. It was pointed out that Google provides advertisers with extensive data and metrics to help them manage their ad campaigns. Google has no reason to provide insufficient data to advertisers because if advertisers' ads perform poorly, Google earns less revenue.

259. The DG has noted in the Report that the 1-10 Quality Score provides advertisers with "an easy way to understand the relative quality of their ads", because it "simplifies more complex metrics into a single one to ten scale". Indian advertisers expressly confirm that AdWords is "transparent, fair plus very easy to use". Therefore, the allegations that advertisers lack information on the performance of their ads has no basis.

260. DG's objection to the 1-10 Quality Score rests on a single, minor error that occurred during a product test that the Informant Consim (an operator of a matchmaking website) voluntarily signed up for. An error in Google's test systems caused Consim's test ads to drop in ranking on one type of device. Using the reporting tools and metrics that Google makes available, Consim and other testers identified the error and alerted Google about the problem. Google promptly responded and fixed the error. This was, thus, an example of the successful resolution of an error in a test system, not a violation of the Act. The error had a negligible impact on advertisers and PUBLIC VERSION did not affect competition in India generally. Besides, errors and technical bugs do not violate competition law.

261. Google has further submitted that the 1-10 Quality Score is not "opaque". It has explained the variables that comprise the 1-10 Quality Score. Further, the 1-10 Quality Score is not the only information Google provides to advertisers. It provides many other detailed metrics, such as average ad position, conversions, click-through-rates on ads, and average cost-per-click. Advertisers thus receive extensive data on their ad campaigns which, in fact, exceeds what Google's rivals, such as Bing, provide to advertisers.

262. Further, Quality Score is automatically generated by algorithms. It is not subject to "manual manipulation". The Investigation Report does not claim that Google has manipulated Quality Score but states that Google might be in a position to do so. The Report's reasoning is purely hypothetical and abstract. Moreover, the Report fails to provide evidence of harm to competition or consumers in the relevant market.

263. Google has contended that it does not discriminate with House Ads. Google treats House Ads like third-party ads and strictly prohibits operators of Google's House Ads accounts from accessing data or information that is not publicly available to all other AdWords advertisers.

264. The Investigation Report does not claim that Google has ever used non-

> public information for House Ads and its claims are limited to hypothetical possibilities. Google's House Ads have not harmed competition. The Report claims that Google hinders advertisers from transferring ad campaigns to other ad platforms. It was argued that Google makes it easy for advertisers to transfer ad campaigns and provides them with several mechanisms to do so. One of these is the AdWords API, which allows advertisers and third-party developers to use automatic PUBLIC VERSION campaign management tools.

> The Informant's Response

265. The Informant in Case No. 07 of 2012 while supporting the DG's findings argued that Google provides only indicative quality scores which, even according to Google, provide only a direction to advertisers. The Informant submits that the DG's findings are correct and there is lack of transparency associated with the quality score and the manual interventions made by the Google to cause demotions in the quality scores of advertisers. The complex nature of determination of quality score, coupled with non-disclosure of adequate information to advertisers renders the entire process opaque and susceptible to manipulation, amounting to imposition of unfair conditions on advertisers in violation of Section 4(2)(a)(i) of the Act.

The Commission's Analysis

266. The Commission has examined the Investigation Report and the contentions of the parties. The Report alleges that the data Google provides to AdWords advertisers is "opaque". It focuses on one performance metric i.e. - the 1-10 Quality Score - claiming that this is of "very limited utility".

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 184 of 337   Page ID
#:28639
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

267. To appreciate the issue in its perspective, it would be necessary to take an overview of AdWords, the 1-10 Quality Score, Ad Ranking and Ad Performance Evaluation. The Commission notes advertisers create ad campaigns by creating ads, assigning keywords, and setting targeting metrics. Google shows the advertisers' ads in response to users' queries relating to selected keywords. In this process, Google ranks ads based on a combination of the ad's relevance and the advertiser's bid.

268. According to Google, it provides advertisers with data, tools and reports on the performance of their ads. These tools and metrics help advertisers PUBLIC VERSION understand how often their ads appear, how many times users click on them, and how frequently these clicks lead to purchases. This, in turn, enables advertisers to plan their bidding, improve the ad quality. In this process, advertisers can keep track of the performance of their ads in their AdWords account.

269. The Commission notes that Google makes information available to advertisers on the performance of their ads which includes not only the 1- 10 Quality Score, but also other metrics. The 1-10 Quality Score consists of following three components:

(i) Expected click-through rate (expected "CTR" or "eCTR") eCTR estimates the likelihood that an ad will receive a click. The more likely users will click on a particular ad, the higher the eCTR.

(ii) Ad relevance Google analyses the language in an ad to determine how well it relates to a keyword. This helps ensure that ads shown will be relevant and useful to a user's query.

(iii) Landing page experience Google evaluates the quality of the landing page i.e., the page to which an ad directs users if they click on it. The better the landing page, more likely the ad will provide a relevant and useful response to a user's query.

270. Having perused the material on record, it appears that Google makes available the following information publicly:

(i) The AdWords Help Center contains over 200 articles - comprising nearly 600 pages of guidance for advertisers - on how to better understand their 1-10 Quality Scores, Google's ranking of ads, and PUBLIC VERSION AdWords reports and analytical tools. These articles cover eight different categories of guidance related to ad quality and ad performance reporting. Google also provides YouTube videos, white papers and blogs to advertisers on the subject of ad quality.

(ii) Guidance on using and understanding reports for tracking ad performance, such as the Report Editor and Keywords Report. These articles include information on how to measure sales and conversions, return on investment, brand awareness, and paid and organic search results.

(iii) Guidance on how to improve the components of the 1-10 Quality Score.

(iv) Guidance to advertisers on how the AdWords auction functions and the various bid strategies that they may employ to meet their advertising goals.

(v) Articles covering AdWords account maintenance, troubleshooting, and frequently asked questions are also publicly available.

(vi) The Help Center provides advertisers with guidance on when and how to contact Google regarding any questions, needs for assistance, or complaints that an advertiser may have related to AdWords.

271. The Commission notes that Google does not use 1-10 Quality Score when calculating an ad's position in an actual auction ("Ad Rank"). As the Investigation Report notes, an ad's position "is recalculated each time an advertisement is eligible to appear" for a given auction. An ad's position at auction is determined by Ad Rank, which is a function of an advertiser's bid, auction-time predictions of the same factors that make up the 1-10 PUBLIC VERSION Quality Score (click through rate, ad relevance, and landing page experience), and the predicted impact of an ad's ad extensions and ad formats. The components of Ad Rank take into account auction-specific information such as the time of day, the type of device (e.g., desktop or mobile), and the user's location.

272. Further, the Commission notes that there is no merit in the finding of the DG that the information Google provides to advertisers severely restricts their ability to critically evaluate their campaigns and take corrective steps. The Commission is of the opinion that this finding of the DG emanates out of singular focus on the 1-10 Quality Score. While it is true that 1-10 Quality Score gives one estimate of ad quality but Google also provides other metrics and tools for assessing ad and campaign performance as well. These are:

(i) Click-through rate (CTR) CTR measures how often users click on an ad. Improving the quality or relevance of ads can lead to increase in CTR.

(ii) Bid estimates Google provides estimates for the bid necessary to appear on the first page, at the top of the page, or in the first position. The higher the quality of the ad relative to others' ads, the lower is the bid amount necessary to appear in these positions.

(iii) Average position An advertiser can track where, on an average, its ad appears on the SERP on a daily basis. If an advertiser's average position unexpectedly decreases and the advertiser did not change any settings, it may wish to investigate other metrics to see what might have caused the change.

PUBLIC VERSION

(iv)    Conversions

This metric tracks events that are meaningful to an advertiser, such as when an ad click leads to a purchase, a phone call, or some other action. Tracking ad conversions allows an advertiser to see the immediate impact of its advertising campaign. Conversion tracking can help advertisers compare which clicks are more valuable.

(v) Time-of-day reporting This feature allows advertisers to run reports to analyse their performance metrics across different periods - ranging from hourly measurements, daily, quarterly, and beyond. The advertiser can use this information to adjust when it runs particular ads to maximise its return on investment.

(vi) Geographic targeting AdWords allows advertisers to target their ads to specific geographies. In India, this includes targeting at the city, state, and union territory level.

(vii) Bid simulator The bid simulator analytical tool helps advertisers test various bidding strategies before actually implementing them. If an advertiser is interested in knowing what impact, for example, increasing its bid might have on different metrics, it can use the simulator to test the results without actually increasing its bid.

(viii) Campaign drafts and experiments Advertisers seeking to test different ad creatives, keywords, bids, or ad placements can use Campaign Drafts and Experiments to apply experimental settings to a fraction of AdWords auctions. The PUBLIC VERSION advertiser can then track the outcome of its experimental set versus the original campaign to observe which changes were effective and which, perhaps, were not.

(ix) Auction Insights Report The Auction Insights Report allows advertisers to track their ad performance against that of competitors in ad auctions. The Auction Insights report shows an advertiser six different metrics for advertisers competing in the same auctions: impression share, average position, overlap rate, position above rate, and top of page rate.

273. In view of the above, the Commission is of the opinion that the DG's concern regarding disclosure of advertiser performance data by Google does not appear to be well founded. In fact, Google provides sufficient data to advertisers on the performance of their ads.

274. The DG has given a finding that the 1-10 Quality Score is of limited utility because it is not reported for each auction and does not include "auction- time" information such as type of device or user location. The Commission, however, notes that the whole purpose of 1-10 Quality Score is to provide advertisers with a simple and easy-to understand metric on the performance of their ads. Changing the 1-10 Quality Score to reflect auction-time information might defeat the whole point of having a simplified 1-10 metric. Since Google provides many more granular metrics other than the 1-10 Quality Score that help advertisers understand the performance of their ads, reporting the 1-10 Quality Score for each auction and including "auction-time" information may lead to confusion. This is a practice being followed by Microsoft's Bing. Bing's quality score is similar to that of Google's. In fact, Microsoft does not report quality scores for each auction and does not include auction-time information.

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

PUBLIC VERSION Rather, just like Google's 1- 10 Quality Score, Bing's quality score is reported once a day based on historical information.

275. In regard to the Investigation Report's objection to the 1-10 Quality Score in the context of Consim's allegations, the Commission notes that the same rests on a single technical error that occurred during a "beta test" for a new feature. In 2013, Consim volunteered to participate as a beta tester for an experimental AdWords format known as "image extensions". Google has explained that the error was part of a legitimate test for a new feature, of which Consim was fully aware when it signed up to take part in the test. Explaining the operation of the test, Google pointed out that the test allowed beta test advertisers to add images to their text ads when they were shown in the first position on the page. Because these images took up additional space, in browsers with limited screen height, the system was designed to show the original text ad without the image extension. However, a technical error prevented the ad that was supposed to show in the first position from appearing where the user was using a browser with limited screen height. As a result, Consim's beta test ads dropped in ranking in these browsers from position 1 to position 2 for nearly one month in 2013.

276. Google has pointed out that using the reporting tools and metrics that Google makes available, Consim and other beta testers identified the error and alerted Google about the problem. The error had nothing to do with the 1-10 Quality Score and no amount of additional reporting on the 1-10 Quality Score would have alerted Consim about the error. Instead, other metrics which Google provides to advertisers signaled the error and Consim (and others) quickly spotted the same and reported it to Google.

277. The Commission is of the opinion that it would not be safe to base a finding of competition law breach on errors in an experimental feature.

PUBLIC VERSION This may chill future experimentation and kill innovation in technology markets. The Commission is, thus, unable to lend its concurrence to such findings recorded by the DG. The same are set aside.

Trademark Issues

278. The DG has found Google to be abusing its dominance in the online search advertising market by imposing unfair condition on the trademark owners (particularly those who have notified their trademarks to Google) by allowing their trademarks to be bid as keywords by third parties in online search advertising. As per the AdWords mechanism, ads which appear first may not be the most relevant for the users and may appear at that position due to the higher bid of the entity. The competitors then get opportunity to free ride on the goodwill and brand value of the trademark owner, thereby hampering fair competition. Moreover, this practice creates a significant risk of causing confusion and deception in the minds of the users thereby causing consumer harm. Unsuspecting consumers may be misled to believe an association between the owner of the trademark and its competitors (whose ad appear in response to searches on their brands) and divert traffic. In such a scenario, the owner of the trademarks is compelled to participate and outbid

competitors (for their ads to appear before them) thereby augmenting their advertising budgets. The DG has further noted that there is scope for Google to use the system in a discriminatory manner and ensure that its own trademarks are not subject to the same unfair conditions as those of third parties, while bidding under AdWords.

279. Lastly, the DG has noted that though Google's AdWords policy restricts usage of notified trademarks in the Ad text of competitors, on various occasions, ads of competitors appeared using Consim's trademarks in Ad text in response to searches on these trademark terms despite notification. Google allowed usage of minor variations of Consim's notified PUBLIC VERSION trademarks in the Ad text of competitors under its AdWords program despite repeated complaints and this led to unfair bidding between the trademark owner and other advertisers. This appears to be driven by Google's commercial interests. Consim's own ads were blocked for searches on its trademark terms even after it complied with the requisite procedures suggested by Google. Google not only abused its dominant position and imposed unfair condition on Consim, such conduct also resulted in unfair business gains to its competitors as well as to Google itself.

Google's Response

280. Google has contested the DG's findings that permitting advertisers to bid on trademarked keyword is anti-competitive. According to Google, it actually increases competition. For example, in response to a search for [Ford cars] on google.co.in, Google may show ads from the official Ford website in India. At the same time, Google may also show ads from other advertisers, such as autoportal.com and cartrade.com, two Indian websites or other service providers of Ford. Google does not prevent advertisers other than Ford (the owner of the Ford trademark) from bidding and there is no good reason to do so. It does not violate trademark law and it is beneficial to competition. It enhances user choice and enables Indian websites to compete against the trademark owner. If Google blocks advertisers other than the trademark owner from bidding for ads for trademarked keywords, trademark owners would have a monopoly over ad space for their trademarked terms, reducing competition and user choice.

281. Google has argued that the Investigation Report cites no evidence that Google's trademark policies have diminished competition in any relevant market, harmed consumers, prevented consumers from finding Consim's websites, or otherwise caused Consim competitive injury. According to PUBLIC VERSION Google, the Report resorts to speculation about the "possibility" of events, what may be "presumed", "in all likelihood", and what "may not be evident" from the text of any given ad. These "conjectures and imaginations" cannot establish an abuse.

282. Lastly, Google pointed out that the Investigation Report does not identify an unfair condition that it imposes on advertisers. Rather than remove an unfair condition, the Report suggests that Google should impose restrictions on bidding for ads (i.e., preclude advertisers from bidding on trademarked terms). This condition would restrict, not promote, competition in India.

The Informant's Response

283. The Informant in Case No. 07 of 2012 submitted that far from protecting the intellectual property rights of its AdWords and AdSense users, Google allows advertisers to bid on trademarked keywords of their competitors. By doing so, Google supports a bidding war between trademark owners and their competitors as trademark owners are forced to outbid their rivals in paying Google to protect their brand. This results in a situation where first, competitors place high bids to be able to have their ads on the SERP for a trademarked term, and then the trademark owners bid even higher to ensure that their own ads appear on the SERP above those of competitors. Google benefits from such higher bids, and is effectively able to monetise such search results only by facilitating trademark violations.

284. Specifically, for the Informant, Google's AdWords allowed its competitors' ads to appear above the Informant's own ads on the SERP for searches for the Informant's trademarked keywords, even though the Informant's ads are more relevant to the search term. According to the Informant, this resulted in a loss of traffic that was meant for the Informant, as well as increased bids that the Informant had to make to ensure that its ads remained on top of the SERP.

PUBLIC VERSION

285. The fact that the Informant, despite raising its bid price to an astronomical INR 1000 per click, was unable to bid on its own trademarked terms as keywords, during a time (October- November 2013) when the Informant was heavily investing in advertising, shows that Google's conduct is discriminatory. Google benefits immensely from this conduct as it can monetize pages that would otherwise have no advertisements on them (as the keyword is trademark protected).

286. Further, adverting to use of trademarks as ad text and minor variations of trademarks, it was submitted that the Informant suffered significant financial loss on account of its competitors being allowed to use its trademarks in the Ad text of their ads. While such ads have been removed by Google on request, Google did not set up a preventive mechanism to disallow such use in the first place. Further, despite notification to Google of the Informant's trademarks, these trademarks have repeatedly been allowed to appear in the ads of competitors. In several cases the Informant noted that competitors used minor variations of its trademark protected words in their Ad text, even though such ads would be considered deceptive and confuse ordinary consumers. By not acting on the notifications and allowing repeated violations, Google's conduct amounts to imposition of an unfair and discriminatory conditions.

287. In the context of matrimonial websites, only the Informant uses the word "matrimony" and, therefore, Google's claim that this is a generic word must be rejected. Further, the phrase "bharat matrimony" is deceptively similar to "Bharatmatrimony". As per the Informant, none of the Informant's competitors use these so called "generic" words or phrases in any of their usual promotional material, except in the AdWords program. This adds credence to the fact that the purpose of using these terms in their ads is merely to divert traffic intended for the Informant, and therefore, Google's support and encouragement of such conduct violates the Act.

PUBLIC VERSION

288. Lastly, it was submitted that the Informant noticed a change in Google's conduct after the Informant filed a complaint in the Hon'ble Madras High Court against Google. In particular, Google no longer provided the Informant with favourable credit terms, which forced the Informant to suspend some of its advertising campaigns. Further, the Quality Score of its various advertisements reduced drastically, and no explanation was provided by Google for the same. Therefore, Google's conduct is opaque, leaving the Informant, and other advertisers, open to retaliation from Google and this may be the case with several advertisers who may not be able to identify and assess similar changes in Google's conduct.

The Commission's Analysis

289. The Commission has examined the DG's findings and the submission of the parties thereon.

290. The Commission notes that Google's Keyword Bidding Policy is part of AdWords i.e. Google's advertising service. AdWords enables advertisers to bid for keywords in ads to appear on Google's pages. When a user enters a query, Google shows ads in an area separate from free search results. To use AdWords, advertisers bid on keywords. When a user enters a query on Google, AdWords select candidate ads from those advertisers that bid on keywords and which correspond to the user query. The candidate ads participate in auctions, that rank the ads based on many factors, such as ad quality and bid amount, to determine which ads to show. The degree of similarity between the keyword and the query required for the ad to participate in the auction depends on the matching options the advertiser chooses, such as exact match, phrase match, or broad match.

291. The Commission finds that Google's Keyword Bidding Policy does not PUBLIC VERSION prohibit advertisers from bidding on trademarked keywords. Google applies this policy universally, and permits advertisers to bid on Google's own trademarks as well. Depending on the query and a variety of other factors, free results may include links for a trademark owner's rivals in response to queries that include a trademarked term. Prohibiting advertisers from bidding on queries that include trademarked terms might result in a perverse situation where Google cannot return ads for competitive or complementary products even when users are searching for them. Therefore by allowing bidding on trademarked terms, it increases the relevance of Google's ads which benefits users also.

292. Google has pointed out that advertisers want their ads to be seen by the same consumers who are looking at their competitors' ads and using their competitors' products. This proximity helps consumers, both in reviewing the ads and locating the products. Advertising based on keyword bidding is another way that competitors can target their ads to users who have mentioned a rival, and may be interested in viewings its goods and services. This targeting strategy offers similar consumer benefits to traditional advertising.

293. The Commission finds it logical and notes that the DG's finding of contravention based upon Google's Keyword Bidding Policy allowing bidding upon third party trademarked terms as amounting to "imposition" of unfair condition, is stretched. A plain reading of Section 4(2)(a)(i) of the Act makes it clear that it requires imposition of an unfair or discriminatory "condition in

purchase or sale of goods or service" to violate the Act. Thus, Google could violate Section 4(2)(a)(i) if it placed an unfair or discriminatory condition on the sale of (AdWords) keywords to the advertisers. The Investigation Report does not point out any unfair condition which has been imposed by Google upon the users or any condition it seeks to impose for blocking competitors of trademark owners PUBLIC VERSION from bidding on trademarked keywords.

294. The Commission is of the view that Google's Keyword Bidding Policy enables a user to include a trademarked keyword in its query and, consequently, the user is not only presented with ads from the trademark owner but will also see a broader range of ads, including from the trademark owner's competitors. This promotes competition and enhances user choice.

295. The Commission does not agree with the findings of the DG that Google did not enforce its Ad Text Policy in respect of Consim's trademarks properly. The Investigation Report notes that Google failed to stop Consim's rivals from: (i) using Consim's trademarks in ad text, consistent with Google's Ad Text Policy to investigate complaints against such use; and (ii) using "minor variations" of Consim's trademarks in their ad text, consistent with Google's Ad Text Policy i.e. Google failed to stop Shaadi.com, which offers matrimonial services in India/ Bharat, from using the words "Bharat Matrimony" in the text of its ads to describe its services because Consim has a trademark on the combined term (without a space) "BharatMatrimony." The DG does not find fault with lawfulness of Google's Ad Text Policy per se, but its challenge is primarily directed against its enforcement by Google in respect of Consim's trademarks.

296. As to the claim that Google did not follow its own Ad Text Policy to stop Consim's rivals from using Consim's trademarks in ad text, the Commission notes that the evidence showed that Consim did not take necessary steps to trigger Google to investigate and monitor its complaints. Google's Ad Text Policy is clear on the information a trademark complaint must contain and to whom it must be sent to be processed. Trademark complaints must be addressed to the Trademark Operations Team within the legal department, which has the knowledge, experience, training, and authority to take action consistent with Google's PUBLIC VERSION policies.

297. Consim did not comply with Google's established process for submitting complaints under its Ad Text Policy and failed to direct the complaints to the right place as well as provide the information necessary to process them. That being so, the Investigation Report should have rejected Consim's allegation in this respect.

298. Adverting to the allegations that Google failed to stop Consim's rivals using "minor variations" in their ad text with spaces between words which, when combined, make up Consim's trademarks (e.g., "Bharat matrimony"), Google submitted that processing those complaints would not have been consistent with trademark law or Google's Ad Text Policy. The Trade Marks Act, 1999 allows anyone to use words to convey their plain meaning, even if those words are registered trademarks. In this case, no trademark infringement would arise if Google refuses to block Consim's competitors from using combinations of words such as "Bharat" and "matrimony" in the text of Google AdWords to describe the services they offer - i.e., matrimonial services for those who live in Bharat.

299. Google's Ad Text Policy specifically exempts from investigation ad text that uses the term descriptively in its ordinary meaning rather than in reference to the trademark. This exception, according to Google, is consistent with the Trade Marks Act, 1999 which establishes that descriptive uses do not constitute trademark infringement. Since Consim's competitor's use of "Bharat matrimony" to describe its matrimony services in Bharat is a descriptive use, Google's Ad Text Policy is not to investigate such uses. Therefore, the DG's claim that Google failed to follow its Ad Text Policy regarding such use is factually incorrect.

300. Google has submitted that the allegations that Google did not successfully block every use of Consim's trademark before it appeared in ad texts of competitors do not raise competition issues. The DG has not defined the PUBLIC VERSION affected markets, and has not explained as to how delays in disabling isolated ads according to its Ad Text Policy, restricted competition in any such market.

301. Finally, joining issue with the DG holding that a delay by Google to "whitelist" a single Consim account following notification of Consim's September, 2009 litigation constituted a competition law violation, it was contended that any delay in whitelisting one account from a single website does not raise a competition issue.

302. The Commission has examined the issue in light of the DG's findings and the responses of the parties thereupon. The Commission notes that the DG found Google not enforcing its Ad Text Policy with respect to the use of Consim's trademark in ad text of its competitors. Under Google's Ad Text Policy, Google is to block trademark uses in the text of an ad of another in response to valid complaints from trademark owner. It is observed that Consim has not challenged the terms of the Ad Text Policy per se, but its allegation is essentially confined to the fact that Google did not implement its Ad Text Policy in response to Consim's complaints to its advertising account representatives at Google and that Consim's competitors were using Consim's trademark and "space variations" of those trademark in their ad text.

303. For reasons detailed below, the Commission is of opinion that the allegations laid by Consim do not appear to be well founded.

304. It would be relevant to outline Google's Ad Text Policy which provides that, "Google will investigate and may restrict the use of a trademark within ad text. Ads using restricted trademarks [i.e., trademarks for which valid complaints have been processed] in their ad text may not be allowed to run." A few stated exceptions to the Ad Text Policy apply, including:

PUBLIC VERSION An ad can use a trademarked term in its text if either of these conditions is true:

(i) the ad text uses the term descriptively in its ordinary meaning rather than in reference to the trademark

(ii) the ad is not in reference to the goods or services corresponding to the trademarked term.

305. Thus, it can be seen that the descriptive use condition allows uses of trademarked words in their ordinary, plain meaning consistent with the legal principle of fair use. The Commission notes that the same principle is embodied and codified in Section 30(2)(a) of the Trade Marks Act, 1999, which states: "A registered trade mark is not infringed where ... the use in relation to goods or services indicates the kind, quality, quantity, intended purpose, value, geographical origin, the time of production of goods or of rendering of services or other characteristics of goods or services." Furthermore, Section 35 of the Trade Marks Act, 1999 also provides: "Nothing in this Act shall entitle the proprietor or a registered user of a registered trade mark to interfere with any bona fide use by a person ... of any bona fide description of the character or quality of his goods or services."

306. The Commission observes that Google does not automatically block all uses of all trademarked words in ad text worldwide. As trademarks are territorial and apply only to certain goods and services, Google needs to know specific information about the scope of the trademark owner's rights (e.g., geographic area and product class) and the scope of the trademark owner's complaint (i.e., against a particular advertiser or against all advertisers), before Google will monitor and restrict use of a particular trademark in ad text.

PUBLIC VERSION

307. To process a trademark complaint and put into place monitoring restrictions, the trademark owner needs to identify certain information, including:

```
(i)     which trademarks it wants monitored;
(ii)    whether the marks are word or design [i.e., device] marks;
(iii)   the registration status of the marks;
(iv)    the registration numbers of the marks;
(v)     for which regions the trademark owner has rights;
(vi)    for which products or services the trademark owner has rights; and
```

(vii) whether the trademark owner wants to block specific advertisers or all uses of the trademark within the region and product category.

308. Further, a detailed procedure has been outlined for trademark owners to communicate the aforesaid information to Google. In this regard, the Commission notes that Google provides an online complaint form. Once the requested information is typed in, the trademark owner can press the submit button. Google also provides instructions for emailing, faxing, or sending the requested information by regular mail.

309. The Commission is of the opinion that no fault can be found in Google insisting that a trademark complaint needs to be sent to its Trademark Operations Team, using the contact information Google provides. This ensures uniform application of trademark policy by Google.

310. The Commission also notes from the Ad Text Policy as detailed by Google in its submissions that once its Trademark Operations Team receives a valid trademark complaint i.e., one that provides all of the necessary information, the Trademark Operations Team verifies the submitted

information and then adds the term in question to Google's monitoring system. The monitoring system automatically flags submitted ad text which uses a monitored trademark in the registered territory. Using a PUBLIC VERSION combination of automated and manual procedures, Google evaluates the proposed use to determine if it satisfies one of the exceptions to the general rule of not using third-party trademarks in ad text. If Google determines that the submitted ad text contains an impermissible trademark use, it disallows the ad from being shown. Upon it disallowing the ad for trademark reasons, the advertiser will receive an error message informing it that its ad is disapproved for trademark reasons.

311. Coming to the issue as to whether Consim provided valid notification of its trademark complaints under the Ad Text Policy to Google, the Commission notes that the DG appears to have relied on certain communications Consim sent to various Google employees raising concerns about its trademark use in ad text of shadi.com and seems to have assumed that these communications triggered the investigation and restriction of Google's Ad Text Policy.

312. In this regard, the Commission notes that in January, 2008, Consim wrote to its Google customer account representative about Shadi.com's use of "BharatMatrimony" in its ad text. In February 2008, Consim wrote again to its Google customer account representative about certain competitors using Consim's trademarks as keywords, and in March 2008, it wrote to follow up on its February email. These Consim communications neither contained the information required by Google to process trademark complaints nor were they addressed to the right group to process trademark complaints. Yet, Google representatives for Consim's account are stated to have contacted Consim's competitors to request that they withdraw the challenged ads, and the competitors complied. According to Google, Consim's account representatives at Google took this action to assist it. The same does not, however, change the fact that Consim failed to follow Google's trademark policy procedure for notifying it of trademark complaints nor did it provide sufficient notice for Google to PUBLIC VERSION implement its monitoring and blocking procedures. The DG's conclusion that Consim's incomplete and misdirected emails constituted "valid notification" of Consim's trademarks complaint as of 2008, is factually erroneous.

313. The Commission also notes that more than a year after the last email Consim sent in 2008 raising trademark concerns, it raised additional trademark concerns with various Google employees in 2009 before Consim filed its trademark lawsuit in the Hon'ble Madras High Court near the end of September 2009. As with its 2008 communications, Consim's pre-lawsuit 2009 communications neither contained all the information required by Google to process trademark complaints nor were they addressed to the right group to process trademark complaints.

314. Having considered all this, the Commission is of opinion that Consim did not comply with Google's laid out procedure, as adumbrated supra, for notifying complaints under its Ad Text Policy. It failed to direct such complaints to the designated Trademark Operations Team containing the requisite information as required under the Policy. The question of Google imposing any unfair or discriminatory condition upon Consim does not arise. Consim has failed to provide evidence of imposition of any unfair or discriminatory condition upon it by Google.

315. In the result, the Commission holds that the purported claims made by Consim against Google for allegedly not enforcing its Ad Text Policy are not only not made out from the evidence presented by the DG, but the same cannot be said to raise any competition issue.

316. The Commission further finds no merit in the claim that Google failed to stop rivals using "minor variations" with spaces between words that, when combined, make up Consim's trademarks (for e.g. "Bharat matrimony').

PUBLIC VERSION The Commission is of the opinion that it is not within the domain of the Competition Agency to pronounce upon trademark infringement issues simpliciter unless the same raise any competition issue. Moreover, it appears that Consim's trademark claims in relation to Google's Keyword Bidding Policy are already pending before the Hon'ble Madras High Court. In these circumstances, it was inappropriate for Consim to have canvassed these issues projecting them as competition claims before this forum.

317. The Commission does not also approve of the approach adopted by the DG in embarking upon itself the task of examining trademark infringement issues, particularly, when the same were pending adjudication before competent courts. The Commission notes that such an approach has the potential to create chaos in the regulatory cosmos if divergent rulings are handed out by the Competition Agency and the Trademark Authority/ Civil Court. The Commission notes that the approach by the DG in addressing the instant issue was misdirected in law. There was no need to have gone into the issues of Trade Marks Act, 1999 in such detail and project isolated transactional imperfections as competition infringement. This was particularly so when Consim never triggered Google's trademark policy as it failed to adopt Google's trademark notification procedure.

318. In this backdrop, the Commission finds it unnecessary to dilate upon the use in ad text of "space variations" of Consim's trademarks by Consim's competitors.

319. The Commission, however, notes that the DG has rejected Consim's allegation of retaliation by Google for the 2009 lawsuit. Nonetheless, the DG has recorded that a delay by Google to "whitelist" a single Consim account following notification of Consim's September 2009 litigation PUBLIC VERSION constituted a competition law violation.

320. The Commission is unable to lend concurrence to this finding of the DG. The delay in whitelisting one account from a single website does not constitute a competition law infringement and the same in any event stands belied from the material on record. From the records, it does not appear that Google's delay in obtaining whitelisting of a single Consim account was intentional. The Commission is satisfied with the explanation provided by Google in this regard.

321. The Commission notes that Google's Ad Text Policy sets out that "once a trademark complaint has been processed, all relevant ads (including the trademark owner's ads), will be rejected if they contain the trademark(s) listed in the complaint. The trademark owner must notify Google if it needs to exempt itself from the complaint by use of the AdWords trademark authorization process". Thus, after Google processed Consim's litigation trademark complaints, all uses of Consim's

trademark (as trademarks) in ad text were blocked, including in Consim's own ads, until Consim authorised its accounts to use those trademarks by "whitelisting" those accounts.

322. However, the DG found that because whitelisting of one of Consim's "child" accounts was not automatically processed with the whitelisting of its "parent" account, and instead took a couple of weeks to sort out, the conduct of Google amounted to imposition of unfair condition on Consim. This conclusion of the DG does not seem to be borne out from the material on the record.

323. The Commission is of opinion that every transactional dispute cannot be made a subject matter of anti-trust inquiry. It is the abusive conduct of the dominant undertaking as provided under the law that is proscribed.

PUBLIC VERSION AdWords API T&Cs

324. The DG has found that Google hinders advertisers from transferring ad campaigns to other ad platforms. The DG noted that the AdWords API Terms & Conditions ("T&Cs") prevent advertisers from transferring campaigns between platforms.

325. The DG has observed that Google enters into agreements with customers licensing AdWords API from it. Google's AdWords API agreements with third party tool developer entities contain certain restrictive clauses which have anti-competitive effects in violation of the provisions of Section 4(2)(a)(i), Section 4(2)(b)(ii) and Section 4(2)(c) of the Act. These restrictions have the potential of being used as a tool for discouraging advertisers from multi-homing, thereby resulting in denial of market access to competitors and causing other anti-competitive effects. Further, DG has noted that inclusion of a provision on termination without reason in the AdWords API terms amounts to imposition of an unfair condition on AdWords API users in violation of Section 4(2)(a)(i) of the Act.

Google's Response

326. Google has challenged the finding of the DG stating that it makes it easy for advertisers to transfer ad campaigns and provides them with several mechanisms to do so. One of them is the AdWords API, which allows advertisers and third-party developers to use automatic campaign management tools.

327. It has pointed out through data that Indian advertisers frequently use multiple ad platforms and that they report no constraint in data interoperability. The data and the statements from Indian advertisers in the DG's file also contradict the DG's speculation that the AdWords API T&Cs have harmed competition.

PUBLIC VERSION The Informant's Response

328. The Informant in Case No. 07 of 2012 has submitted that being the gateway to the internet, Google is an essential trading partner for advertisers who wish to reach out to potential customers

online. While competing platforms (such as Bing Ads) exist, by virtue of its scale in general web search, Google is a necessary partner for any advertiser.

329. The Informant has further submitted that as the dominant search engine in the market and with a market share which is by any measure several times more than its nearest competitors' in India, Google automatically receives a lion share of all search advertising (as advertisers have a strong preference for the platform that provides them with more eyeballs). However, Google requires all advertisers to sign up for the AdWords terms and conditions, which restrict advertising platform interoperability, making it prohibitively expensive for advertisers to use competing platforms along with Google's AdWords program.

330. Advertising campaign data is an important tool for measuring the effectiveness of campaigns. In view of that, the Informant has submitted that Google erects barriers to prevent advertisers from using their own advertisement data on other advertising platforms. Since Google is the unavoidable trading partner for all advertisers participating in the search advertising market, each advertiser would first create and manage its campaign on Google's AdWords program. Therefore, any restriction on data interoperability has the effect of creating a barrier to entry for competitors, as they limit advertisers to using only Google's services.

331. The option of placing the same ads on multiple platforms, such as Google website and Bing, has facilitated the emergence of tool developers offering advertisers and agencies the ability to manage online advertising campaigns across platforms. Global providers of campaign management PUBLIC VERSION software include Kenshoo, Marin Software, Search Force, and DoubleClick SearchV3 (Google's own search advertising campaign management tool).

332. In this regard, the Informant submitted that the proliferation of such tools has been restricted by the terms in Google's AdWords API License agreement which is entered into by Google with its customers for licensing the AdWords API. It stipulates terms and conditions for access to mainly big advertisers and third-party tool developers. The Informant submitted that several terms and conditions contained in the agreement are extremely restrictive, and effectively prohibit data portability between different advertising platforms. While Google voluntarily revised some of these restrictions in 2013 for a period of 5 years, pursuant to the FTC investigation, and this revision is being voluntarily applied by Google worldwide, it is required to implement the same only in the United States of America (U.S.) and it can withdraw these changes elsewhere anytime. But, even after these changes, the agreement remains restrictive in several ways and this been examined by the DG pre-and-post 2013.

333. The Informant submitted that Google is the first platform on which the Informant creates and manages its search advertising campaigns, as its (Google) search engine receives significantly more traffic than other search engines. The cost associated with managing advertising campaign is significant. The restrictions on data portability make it time consuming for the Informant to manage its campaigns on different platforms together. The reason being, it cannot transfer data from one platform to another. Other advertising platforms such as Bing and Yahoo have a simple process of porting the advertising campaign because they are aware that advertisers will advertise on their

platforms only if they can transfer campaign data from Google's AdWords (where they continuously update and manage their campaign) without employing significant amount of PUBLIC VERSION additional time and resources.

334. During investigation, the Informant demonstrated the time and cost involved, and that use of competitors' tools such as Bing Ads and Bing Editor, which use AdWords API, are not suited for advertisers running multiple campaigns. The Informant also demonstrated the difficulty faced in achieving interoperability from Google's AdWords to Bing. For porting 1 ad account from Google's AdWords to Bing Ads, the Informant required 22 steps which took more than 33 minutes to complete. This 1 account of the Informant ran 56 campaigns with 117 ad groups and 37,964 key-words. As of December 2013, the Informant had 32 accounts, running 3,808 campaigns with 4,09,873 ad groups bearing 11,74,468 text advertisements and 35,47,574 keywords. The Informant has estimated that it would take 2,142 minutes or 35.7 hours or 4.5 working days to move all of its own campaign data from Google's platform to Bing - and that too once.

335. The Informant submitted that whilst, easier methods are technically feasible, they have been contractually disallowed by Google, which causes advertisers harm. It also causes Google's competitors significant harm, as they lose out on potential customers who do not have the time or resources to manage a separate campaign on, for example, Bing Ads.

336. The Informant went on to submit that Google's argument that most advertisers have accounts on multiple search advertising platforms, is fallacious. The appropriate test for competition in the market is not whether Google's competitors have advertiser accounts set up on their platforms, but rather whether advertisers regularly update and manage such accounts, and how much of their total search advertising revenues are spent on such accounts. Given Google's pre-eminence in the online general web search market in India and, therefore, the search advertising PUBLIC VERSION market in India, lack of interoperability between Google and its competitors truly chokes Google's competitors of traffic.

The Commission's Analysis

337. The Commission notes that the DG has raised objections against the T&C for the use of Google's AdWords API. As discussed earlier, AdWords is Google's advertising platform. Through AdWords, advertisers bid on specific keywords entered by users. They can also define other targeting variables, such as time of day, location, and language. Many advertisers manage their AdWords campaigns through the AdWords website.

338. Google has submitted that it licenses (for free) a proprietary API for AdWords. The AdWords API allows advertisers and third-party developers to create tools that advertisers can use to manage their AdWords campaigns automatically. Because the AdWords API involves use of Google proprietary technologies, tools using AdWords API require a license from it (Google) to do so. The AdWords API T&Cs govern the use of the AdWords API. The AdWords API T&Cs leave advertisers free to use their AdWords data as they deem fit. They permit third-party developers to create tools that allow advertisers to transfer campaigns and run campaigns on multiple platforms (known as

"multihoming"). Thus, advertisers can run campaigns simultaneously on Google, Bing, Facebook, Twitter, and Baidu, with tools that make use of the AdWords API.

339. Google has pointed out that the DG's market investigation showed that no advertiser or ad agency had conveyed that Google's AdWords API T&Cs restricted multihoming across ad platforms or data interoperability. Every advertiser questioned by the DG confirmed that they faced no such restrictions. MakeMyTrip's response is typical, noting that it had not faced "any difficulties" related to "interoperability of data across different PUBLIC VERSION advertising platforms" and that it had not "come across any issues related to the Google [AdWords] API".

340. Yet, the Investigation Report notes that the AdWords API T&Cs "restrict the ability of advertisers to manage the ad campaigns across search platforms." Specifically, the Investigation Report objects to two groups of AdWords API T&C provisions:

(i) Sections III(2)(c)(i)-(ii) (the "Input and Copying Clauses"), which Google removed from the AdWords API T&Cs in January 2013; and

(ii) Certain clauses that remained in place or were added to the AdWords API T&Cs when Google removed the Input and Copying Clauses (the "Post-2013 Clauses").

341. The DG notes that these provisions had the consequence of limiting the ability of the developers to design tools for efficient management of online campaigns across search platforms. And it alleges that Google restricted the advertisers relying on third party tool [...] from multihoming.

342. Google has argued that AdWords API T&Cs have not harmed competition in India, Indian advertisers, or any third-party tools developers. To the contrary, challenged provisions of the AdWords API T&Cs serve important pro-competitive purposes. It was pointed out that the Input and Copying Clauses ensured that AdWords' innovative features were available to advertisers. The Input and Copying Clauses were license limitations that defined the scope of the license that Google granted for its AdWords API. These limitations applied only to ad management tools developed by third parties. They did not apply to tools developed by advertisers.

PUBLIC VERSION

343. Further, that the Input and Copying Clauses protected the functionality and user experience of AdWords. When an advertiser uses a tool developed by a third party to manage its AdWords campaigns, that tool controls the advertiser's experience of AdWords. The tool affects the advertisers' perception of the functionality and performance of AdWords.

344. The data at issue involve the settings and targeting parameters that an advertiser chooses for its advertising campaign. But different advertising platforms do not offer the same functionality and targeting parameters. For example, AdWords allows advertisers to specify granular time settings in 15 minute intervals. Other platforms offer much less granular time settings. As a result, if a third-party tool were to use common input fields for the settings of different ad services or

automatically copied settings of one ad service to another, this could have adverse consequences for the advertiser and the advertiser's perception of AdWords quality.

345. The DG's conclusion that AdWords API T&Cs have harmed competition is incorrect. Impugning the finding of the DG that the Input and Copying Clause restricted advertisers relying on third party tools […] from multihoming, Google has pointed out that the DG's own market investigation found that the advertisers [DG] wrote to have not expressed any constraint in data interoperability. The Brazilian antitrust authority, CADE, conducted a similar inquiry with advertisers and found that advertisers can easily multihome and that AdWords API T&Cs raise no concerns.

346. Google has pointed out that major developers, such as Kenshoo and Marin Software, provide ad campaign management tools with multihoming functionality, including cross-platform synchronisation and optimization, and actively encourage advertisers to multihome. This contradicts the DG's finding that AdWords API restricts advertisers relying on third-

PUBLIC VERSION party tools from multihoming.

347. The Commission notes that the DG does not take into account the fact that one of the major reasons why developers license AdWords API is to create tools that help advertisers port their campaign data. The AdWords API T&Cs define the scope of the license for the use of AdWords API and thus, makes multihoming easier.

348. The DG has taken exception to a number of clauses Google introduced since 2013 (the Post-2013 Clauses) in AdWords API without specifying as to how the Post-2013 clauses restrict competition. DG's objections to the Post-2013 Clauses largely seem to rest on the assumption that there exists certain non-clarity in the clauses. Before examining the issue in detail, the Commission is of opinion that "non-clarity" does not in itself raise a competition law concern much less amount to contravention of the provisions of the Act.

349. As regards the Post-2013 Clauses, Google has explained that these clauses and new AdWords Policies serve legitimate business purposes related to protecting advertisers and the AdWords platform. Specifically,

(i) Bi-Directionality Clause in Section III(2)(f)(iv) requires that third-

party tools provide reciprocal campaign data transfer functionality and this promotes advertiser multihoming.

(ii) Termination and Inspection Clauses in Sections IV(12) and IV(3)(A) are standard provisions which allow Google to determine whether licensees comply with the AdWords API T&Cs and to terminate their access to the API if they do not. In reality, Google has not used to terminate an API license arbitrarily or for illegitimate, anticompetitive purposes.

PUBLIC VERSION

(iii) Automated Use Clause in Section III(2)(m) Automated Use Clause requires licensees do not permit third parties to gain automated access to the AdWords platform without using their own API access credentials.

(iv) Transfer of AdWords API Report Data Clause in Section II(3)(a) protects advertisers by preventing licensees from transferring advertisers' data related to campaign performance to third parties.

(v) Reporting Clause in Section III(2)(c)(iii) allows AdWords campaign performance data to be reported either (i) separate from performance data from other platforms, or (ii) aggregated with performance data from other platforms. This benefits advertisers and protects AdWords by allowing advertisers to understand how AdWords campaign performance compared to performance on other platforms.

350. The Commission takes note of Google's submissions as well as the fact that in February 2015, Google moved the Post-2013 Clauses addressed in the Report, except the Inspection and Termination Clauses, from AdWords API T&Cs to the AdWords API Policies. At that time Google clarified some of the clauses, which eliminate the possibilities of any "non-clarity" as is alleged by the DG. After considering the matter in proper perspective, the Commission is of the opinion that the findings of the DG holding contravention of the provisions of Section 4 of the Act in respect of the AdWords API T&Cs are not sustainable. The Commission holds that advertisers are provided with different mechanisms to manage the parameters of their ad campaigns For Example the keywords for which they want to bid, the bid amount, the overall budget that they want to spend, the time period during which their ads should run, and the locations where they should show as well as the export parameter data from AdWords to rival ad platforms. The classic means for doing this - used PUBLIC VERSION by many AdWords advertisers - are the AdWords WebUI and the AdWords Editor:

(i) AdWords WebUI AdWords WebUI (formerly the AdWords Frontend) is a free website that allows advertisers to create and modify AdWords campaigns. Advertisers can export campaign parameter data directly from the AdWords WebUI into machine-readable, industry-standard formats and easily transfer the data into other ad platforms. ]

(ii) AdWords Editor Introduced in 2006, AdWords Editor is a free downloadable application that manages AdWords campaigns. The AdWords Editor allows advertisers to export a complete AdWords account with a single action.

351. Google introduced the AdWords API in 2005 as an additional means for advertisers to manage campaigns and export their data from AdWords. The AdWords API is a set of technologies that enables advertisers and third-party developers to build and use tools that manage AdWords campaigns automatically Third-party developers have used the AdWords API to build tools that allow advertisers to manage their AdWords campaign automatically and export their AdWords data

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

to other ad platforms.

352. The Commission notes that the DG also recognises that "constant innovation and new development" characterise the advertising campaign management tool industry. Both third-party developers and rival ad platforms have used the AdWords API to create sophisticated ad campaign tools that enable campaign management and multihoming across different platforms. In addition, Google provides advertisers with PUBLIC VERSION several different tools that allow them to export their AdWords campaign data.

353. The Commission notes that the DG's market investigation has revealed that advertisers face no barriers to multihoming across different ad platforms. This is evident from the Report which acknowledges that "[t]he advertisers [the DG] wrote to have not expressed any constraint in data interoperability". The Commission finds merit in the contention of Google that if advertisers believed Google's T&Cs imposed obstacles to using other platforms, advertisers surely would have lodged objections. Instead, they attest to the opposite:

(i) MakeMyTrip reported that it has not faced "any difficulties" related to "interoperability of data across different advertising platforms". MakeMyTrip further clarified that it has not "come across any issues related to the Google API".

(ii) Yatra.com stated that it has not encountered "any major technical or other constraint in data interoperability while working on such different platforms".

(iii) Flipkart and JustDial reported that they have not encountered any issues related to unfair conditions imposed through the AdWords API T&Cs.

354. In the result, the Commission is of the opinion that the AdWords API T&Cs do not impair data interoperability between search advertising platforms. Hence, the findings recorded by the DG on this issue are legally unsustainable and are set aside.

Distribution Agreements

355. The DG found Google to have contravened Section 4(2)(c) of the Act on the ground that two of its distribution agreements (i.e. Google's agreement PUBLIC VERSION with Apple for its Safari browser and Google's agreement with Mozilla for its Firefox browser) set Google as default search engine.

356. For appreciation of competition concern highlighted by the DG, it would be apposite to excerpt the finding of the DG from the Investigation Report itself:

...[i]t is found that the appearance of a default search engine of a dominant entity like Google through long term contractual arrangements also have the potential to strengthen its market position in online general web search and search advertising by denying access to others. It acts as an additional tool through which Google's dominance in entrenched. This amounts to a denial of

market access to competing search engines in markets for in violation of Section 4(2)(c) of the Act...

Google's Response

357. Google has pointed out that the Report objects to two search distribution agreements - Google's agreement with Apple (for its Safari browser) and Mozilla (for its Firefox browser). The Report does not claim that these agreements are exclusive. It only alleges that because Google is set as the default option, this "amounts to a denial of market access to competing search engines".

358. According to Google, a default setting does not deny market access to competitors. Defaults simply provide a convenient way for users to access a preferred search service. Users can easily switch away from the default if they so choose to. In fact, Microsoft Bing's website explains that it is "super easy" to use Bing from any web browser. Microsoft explains that in a few simple clicks Firefox users can set Bing as their search provider.

359. Google has contended that the Investigation Report identifies no evidence to suggest that the two distribution agreements have denied market access to rivals. In fact, Google lost one of these two distribution deals i.e. the PUBLIC VERSION Mozilla agreement, in 2014. Other search services - including Yahoo!, Yandex, and Baidu - are now the default providers on Mozilla's Firefox browser in some countries. For other countries, Mozilla was not contractually obliged to set any particular search service as default. The Mozilla experience demonstrates that there is ample competition for distribution deals. It was highlighted that Microsoft controls search distribution deals with all major PC OEMs and sets Bing as the default search service (via Internet Explorer and Edge).

The Commission's Analysis

360. The Commission has examined the DG findings and the material available on record. The Commission notes that search services use various distribution channels to provide their services to users. For example, a web browser or a PC OEM may set a particular search service as default for search access points. If a user types a search query into the address bar of the Apple Safari browser, the results will be provided by Google. The Investigation Report objects to two search distribution agreements - Google's agreement with Apple (for its Safari browser) and Mozilla (for its Firefox browser). The Commission notes that the DG seems to have been swayed by the fact that Google is set as the default option under these agreements that this amounts to a denial of market access to competing search engines Thus, the charge against Google is not that these agreements create exclusivity for Google. Rather, the conclusion of the DG is based upon the fact that such contractual arrangements by Google have the potential to strengthen its market position in online general web search and search advertising by denying access to others.

361. Thus, the entire finding is based upon the supposition that through such contractual arrangements, Google has the "potential" to strengthen its market position to the exclusion of other search engines. The Commission is of opinion that a default setting does not deny market access to PUBLIC VERSION competitors and users are free to switch away from the default if they so choose to. The DG has presented no evidence to show that these two distribution agreements have denied

market access to rivals.

362. Moreover, the distribution agreements are contestable and Google is stated to have lost one of the two distribution deals namely, the Mozilla agreement in 2014. Other search services - including Yahoo!, Yandex, and Baidu, are now the default providers on Mozilla's Firefox browser in some countries. Besides, the Commission notes that Microsoft controls search distribution deals with all major PC OEMs and sets Bing as the default search service (via Internet Explorer and Edge).

363. In view of the foregoing, the Commission is of the opinion that Google's distribution agreements are neither exclusive nor has it been established that such arrangements have denied market access to any of the competing search engines. The two browser distribution deals with Mozilla's Firefox and Apple's Safari, are not exclusive. They merely specify that Google should be the default search service on these browsers. The user, however, is not obliged to use that search service. In other words, default arrangements do not hamper a user's ability to access any other search service, such as Yahoo!, Flipkart, Jabong, or MakeMyTrip. The Commission notes that the DG found the default settings to create competitive problems because the process for selecting another search service is not apparent for ordinary internet users. The Commission notes that such a finding of the DG does not appear to be based on records of any survey or evidence to that effect. Moreover, the Commission holds that default setting cannot be equated with exclusivity because default arrangements leave partners free to provide users with other search service options as well. Thus, browsers typically list several other search options directly within the browser.

PUBLIC VERSION

364. This is borne out from an illustration given from Mozilla Firefox where it lists other search options directly within the browser:

365. Thus, it can be seen that there is a drop-down menu on the Firefox browser that allows a user to choose a search service with just two clicks. Similarly, Google has pointed out that Safari also makes it easy for users to choose a general search service. iOS Safari's standard home screen shows the icons of several search engines, including Bing and Yahoo!, which users only need to tap to enter their query as shown below:

366. The Commission has considered the submission of Google that default setting arrangements leave other search access options entirely free. Without a search service set as default, a browser could not support PUBLIC VERSION all of its features "out-of-the box", such as the ability for users to conduct a search simply by entering a query in the browser search box. This would severely diminish user experience. Google has urged that its distribution agreements are pro-competitive.

367. Having considered the submissions and reasons therein, the Commission is of the opinion that no case of contravention of the provisions of Section 4(2)(c) of the Act is made out against Google with regard to distribution agreements with browsers which neither create any exclusivity nor do they deny market access to competing search engines. The users are free to switch search engines in

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 205 of 337   Page ID
#:28660
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

their browsers and it is intrinsic for default settings to have only one search engine. In the absence of any restriction in switching, the "potential" concern highlighted by the DG can in itself be no ground to hold Google in contravention. Accordingly, the findings of the DG cannot be sustained and are set aside on this count.

Intermediation Agreements

368. The DG has noted that apart from online web search services, Google also offers online search and advertising services on other websites through Syndication/ Intermediation services. With regard to advertising, intermediation can take place for both search and non-search advertising. Google offers Syndication services under its AdSense program. The Online Search and Advertising Syndicate Services constitute distinct relevant markets. By virtue of its position of strength in the relevant markets of Online General Web Search Services and Online Search Advertising Services, Google is also a preferred Syndicate service provider for publishers wanting to offer search and advertising services on their websites. Google is using its dominant position in Online General Web Search Service and Online Search Advertising Service to impose certain restrictive conditions in its agreements for syndicate search and advertising services in violation of Section 4(2)(e) and Section 4(2)(c) of the Act. The nature of restrictions varies across types of agreements.

PUBLIC VERSION While in some cases partners are prohibited from using competing services, in other there are restrictions related to the manner of placement of ads of competitors. These restrictions prevent competing service providers from achieving the necessary scale which results in creation of entry barriers for them.

369. Further, it was noted by the DG that the policy and conduct of Google, prior to May, 2010, for not disclosing AdSense Revenue sharing with online AdSense partners, amounted to imposition of unfair conditions on them amounting to infringement of Section 4(2)(a)(i) of the Act. Lastly, it was noted by the DG that such agreements are one-sided and provide enough scope for arbitrary conduct without a fair opportunity to the other party. This amounts to imposition of unfair conditions by Google within the meaning of Section 4(2)(a)(i) of the Act.

Google's Response

370. Google has in response argued that Google offers a range of different types of intermediation agreements in India. Broadly speaking, these agreements enable website publishers to show Google search results or ads on their websites. Publishers choose to enter into these agreements because they create value both for publishers themselves and for users of their websites. It was submitted that these agreements do not create exclusivity nor do they harm competition.

371. Further, Google's online intermediation agreements are non-exclusive. The Investigation Report objects to a clause in Google's online intermediation agreements requiring publishers to distinguish between Google and non-Google search services and ads, so that they cannot reasonably be confused by users. The Report claims this non-confusion clause provides some scope for Google to interpret these provisions in a manner that in effect imposes exclusivity. The Investigation

Report, PUBLIC VERSION according to Google does not claim that the non-confusion clause in fact amounts to exclusivity; that Google has ever actually interpreted it in this way; or that any publisher has ever felt bound by exclusivity. In fact, Maps of India confirmed that there is nothing in Google's intermediation agreements that prevents it from displaying non-Google ads.

372. The Investigation Report claims that Google might hypothetically interpret its agreements to impose exclusivity, is a mere speculation. It does not mean that Google does in fact do so. Under the Act, the Report needs to show that an abuse has actually occurred; not merely that an abuse is a hypothetical possibility.

373. The non-confusion clause could not, in any event, impose exclusivity as it does not preclude publishers from showing third-party search functionalities and ads alongside Google's. All that the clause requires is that publishers appropriately label or distinguish third-party features so that users can tell the difference between Google and non-Google functionalities. Elaborating further, it was submitted that Google's direct intermediation agreements are non-exclusive and immaterial for India. Direct intermediation agreements are individually negotiated agreements.

374. The Investigation Report identifies three aspects of the template clause in direct intermediation agreements which Google uses as a basis for negotiation and which are objectionable :

(i) Google's direct search intermediation agreements that asks publishers not to show search functionalities that are "same or substantially similar" to Google's on the same site.

(ii) Template minimum ad and ad placement clauses in Google's direct search ad intermediation agreements.

(iii) Historic clause in Google's direct display ad intermediation agreements that asked publishers not to show non-Google display PUBLIC VERSION ads on their sites that were "the same as or substantially similar" to Google's display ads.

375. Referring to the Investigation Report's claims that, as a result of these provisions, Google's direct intermediation agreements deny intermediation rivals access to publishers; it was submitted by Google that these concerns are not correct because:

(i) The publishers remain free to include non-Google search functionalities that are not the same or substantially similar as Google's.

(ii) The contested minimum ad and ad placement clauses do not prevent publishers from showing non-Google ads in addition to Google ads.

(iii) Google's direct display ad agreements do not create exclusivity.

376. More importantly, Google's intermediation agreements do not harm competition. The Investigation Report does not define any markets where intermediation agreements restrict

competition nor does it provide evidence of competitive harm in any such putative markets. Further, Google's intermediation agreements are not a significant channel for generating search and ad business and therefore, cannot deprive rivals of query scale in the manner alleged by Microsoft.

377. The Report claims that Google's terms of trade entered into with its intermediation partners constitute an abuse of dominance. But the Report does not claim or establish that Google is dominant in search intermediation, search ad intermediation, or display ad intermediation. It is also submitted that the specific provisions of Section 4 of the Act that the Investigation Report invokes do not apply.

PUBLIC VERSION The Informants' Response

378. The Informants have, however, supported the DG's conclusions.

The Commission's Analysis

379. To appreciate the issues, it would be appropriate to first understand the ecosystem surrounding Google's intermediation agreements which allow website publishers to benefit from Google's technologies. In this regard, it is observed that Google's intermediation agreements allow website owners ("publishers") to incorporate Google's search technology and ads on their websites. The users can then conduct searches directly on the publisher's site and publishers earn revenues from Google ads shown on their websites' pages.

380. Google claims that its intermediation agreements provide at least five distinct benefits to Indian publishers, advertisers, and users:

(i) First, publishers benefit from an incremental revenue stream which they might not get otherwise.

(ii) Second, they allow the same publishers to benefit from the opportunity to make their websites' content more easily discoverable through the power of Google's search technology.

(iii) Third, they allow publishers these benefits without having to make significant investments.

(iv) Fourth, they give users the ability to conduct searches directly on the publisher's website.

(v) Fifth, they allow advertisers broader access to relevant advertising opportunities.

PUBLIC VERSION

381. The Commission notes that Google offers different types of intermediation agreements, namely:

(i) Search intermediation agreements Google's search intermediation agreements enable publishers to add a Google search bar to their website. The search bar allows users to search the pages of that

particular site or the web at large (at the discretion of the publisher). Google's algorithms generate the search results shown.

(ii) Search ad intermediation agreements - AFS Google's search ad intermediation agreements, called AdSense for Search ("AFS") enable publishers to show Google search ads when users enter search queries on their sites. Advertisers pay when users click on these ads. Google then shares the revenue from these clicks with publishers

(iii) Display ad intermediation agreements - AFC Google's display ad intermediation agreements, called AdSense for Content ("AFC") enable publishers to show Google display ads that relate to the content of a page or the user's interest based on his or her past browsing history. These ads are not targeted based on a search query, but based on the content of the relevant page. As under AFS agreements, Google shares the revenue from display ads with the publisher.

PUBLIC VERSION

382. These intermediation agreements come in two forms:

(i) Online agreements Online agreements are standard contracts that interested publishers can sign-up to through an online form. The large majority of Google's intermediation agreements are online agreements.

(ii) Direct agreements Direct intermediation agreements are agreements that Google negotiates individually, typically with some larger publishers. Google has just direct intermediation agreements in force with Indian publishers. All cover display ad and search ad intermediation, and one also covers search intermediation.

383. Google has explained as to how its different intermediation agreements interrelate:

384. The DG held Google's intermediation agreements being violative of the provisions of Section 4 of the Act essentially on the ground that Google's terms and conditions have the potential to create exclusivity. The findings PUBLIC VERSION of the DG in this regard are:

These prohibitions imposed under negotiated Search Agreements are therefore found to be unfair, as they restrict the choice of these partners and disallow them from using the search services provided by competing search engines along with Google, amounting to violation of section 4(2)(a)(i) of the Act.

[Ref. Para 44, p. 588 Investigation Report] Based on above analysis it is thus found that Google is using its dominance in market for Online General Web Search to impose restrictive conditions in online syndicate search agreements to strengthen its position in the market for online syndicate search services in violation of section 4(2)(e) of the Act. Its competitors in the search syndicate business have been denied market access to the online search syndicate market is violation of Section 4(2) (c) of the Act. Such syndicate agreements constitute an important source of traffic for

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

Google's competitors.

[Ref. Para 51, p. 590 Investigation Report] Google has thus used its dominance in the market for online General web search and online search advertising to impose restrictive conditions in AFS Agreements to enhance its position in online search advertising syndication market in violation of section 4(2) (e) of the Act. The conduct also amounts to denial of access to competing search engines to the search advertising syndicate market in violation of section 4(2)(c) of the Act. Through this conduct it is further able to strengthen its strong hold in online search advertising market.

[Ref. Para 80, pp. 601-602 Investigation Report]

385. The Investigation Report claims that Google's direct search intermediation agreements violate Section 4(2)(a)(i) of the Act because they involve imposition of unfair conditions on publishers. However according to Google, its direct search intermediation agreements do not PUBLIC VERSION contain any terms that amount to exclusivity. Direct search intermediation agreements are negotiated and if a publisher does not want to enter into such an agreement, it can always choose to enter into an online agreement which does not contain the aforementioned allegedly unfair terms. Further, the conduct that imposes exclusivity obligations that affect only a small portion of demand and therefore cannot deny market access.

386. As for the violation of Section 4(2)(e) of the Act, Google has submitted that Section 4(2)(e) is predicated on the existence of two distinct, relevant antitrust markets. The Investigation Report claims that Google leverages into a market for search and ad intermediation but it does not properly define such markets. Moreover, Google cannot leverage its strength in general search and online ads to impose restrictive conditions in online search intermediation and AFS agreements. It extensively negotiates clauses in direct AFS agreements with large and sophisticated publishers and if publishers do not want to agree to the template clauses in direct agreements, they are free to sign up to the online agreement.

387. The Commission has perused the findings of the DG as well as Google's submissions carefully. While dealing with Google's Online Customs Search Agreement, the DG examined the following clauses contained therein :

"Clause 1.5 During the Term, if You provide non-Google search services on any Site, You will ensure that such non-Google search services cannot reasonably be confused with or mistaken for those provided by Google. You further understand that Google will provide the Service to You on a nonexclusive basis, and that Google will continue to customize and provide its services to other parties for use in connection with a variety of applications, including search engine applications.

PUBLIC VERSION Clause 1.6: The Results Page or associated elements provided by Google through the Service may contain advertising, which You agree to display. The Service is compatible with, and You may apply for, the Google AdSense program (www.google.com/adsense), subject to the AdSense Terms and Conditions. If You provide Your own advertisements or third party advertisements in connection with the Results provided by the Service, You will ensure that such

advertisements cannot reasonably be confused with or mistaken for those provided by Google."

[Ref. Para 24, p.579 Investigation Report]

388. Further, the DG examined Google's Online Site Search Agreement. The relevant clauses pertaining to quoted below:

Clause 1.5

1. From Google. Customer may choose to display Ads on the Results Page in its sole discretion via the Admin Console. If Customer elects to display Ads on the Results Page, Customer must register for an AdSense Account and be subject to Google's terms and conditions as they relate to the placement of Ads.

2. From Customer or Third Parties. Customer may display its own advertisements, or third party advertisements, on the Results Page. If Customer chooses to do so, it must ensure that these advertisements cannot be confused with Ads.

[Ref. Para 26, pp. 580-581 Investigation Report]

389. From the above, the DG deduced that in so far as Google Custom Search and the online agreement for Google Site Search are concerned, there does not appear to be any prohibition on the use of third party search services or display of third party ads in the search results. The requirement being put in place by Google pertaining to third party search/ advertising PUBLIC VERSION services is that the display of search results or ads must not be done in a manner that can reasonably be confused with or mistaken for Google's services.

390. Accordingly, the DG returned the following finding:

> On the face of it these restrictions on the use of search services or display of ads that might be confused with Google appear to provide a reasonable check that Google would like to have to guard their bonafide interests. However, the provisions are drafted in a broad manner without clarifying what might be construed as something that can "reasonably be confused with or mistaken" for a service provided by Google. Therefore, considering the broad nature of the conditions there is some scope for Google to interpret these provisions in a manner that in effect imposes exclusivity.
>
> [Ref. Para 29, p. 582 Investigation Report]

391. The Commission is of the opinion that the observations of the DG, as reproduced/ quoted hereinabove, cannot be termed as a finding. The Commission finds it egregious when the DG notes that "there is some scope for Google to interpret these provisions in a manner that in effect imposes exclusivity". Such an observation can find a place in the realm of speculation and the Commission has no hesitation in holding that no exclusivity, de jure or de facto can be said to flow from Google's

online search intermediation agreements, as cited above.

392. That takes the Commission to Google's negotiated search intermediation agreements. On a perusal of the Investigation Report, it appears that in case of Google's direct (i.e. negotiated) search intermediation agreements, the Investigation Report finds one template clause for direct search intermediation agreements which asks publishers not to implement search technologies on their sites that are "same or substantially similar" to that of Google (the "substantially similar search clause"), as objectionable.

PUBLIC VERSION

393. With regard to this clause, the DG has noted that by virtue of substantially similar search clause in the agreements, Google imposed prohibitions under direct such intermediation agreements which are unfair. They restrict the choice of these partners and disallow them from using the search services provided by competing search engines along with Google.

394. A perusal of the stipulation evidences that Google, in abuse of its market power, has imposed restrictive conditions upon the publishers in negotiated search agreements. The Commission does not find merit in the contention of Google that publishers remain free to include non-Google search functionalities that are not the same or substantially similar as Google's. The Commission finds that Google prevented partners with whom it entered into negotiated search agreements from implementing on their websites any search services which are the same or substantially similar to Google's search service. The Commission observes that while Google is a crucial partner for publishers seeking web search syndicate services for their websites, they may wish to offer search services from websites other than Google. Therefore, the Commission holds that the prohibitions imposed under the negotiated search agreements are evidently unfair and they restrict the choice of the partners and prevent them from using the search services provided by competing search engines. Thus, Google has imposed unfair conditions on publishers which amounts to a violation of Section 4(2)(a)(i) of the Act.

395. The Commission further notes that by restricting websites from partnering with competing search services, Google was denying its competitors access to the search business and further marginalizing competitors and endangering their viability, while strengthening its own position. These restrictions amount to a de-facto imposition of online search exclusivity which is a contravention of Section 4(2)(c) of the Act.

PUBLIC VERSION

396. The Commission does not find merit in Google's argument that it has only web search syndication deals with Indian partners. The Commission notes that the volume of business generated through these agreements is substantial as can be seen from the table containing data on the revenue earned by Google from negotiated intermediation agreements:

Data of Syndicate Web Search Agreements Total number of queries Fee collected from Web Search Direct partners 2011: 2011:

|  |  |  |
|---|---|---|
| (negotiated agreements) | 2012: | 2012: |
|  | 2013: | 2013: |

397. The exclusive agreement needs to be examined in light of the importance of scale and network effects in online search and online search advertising and Google's substantial market shares in these markets. Viewed in this context, the exclusive search intermediation agreement ranging from 2-3 years reinforces the network effects enjoyed by Google, leaving no room for the competitors to attain sufficient scale to be seen by publishers as credible intermediation partners. This conduct creates conditions for extending and preserving Google's dominance in search intermediation in perpetuity. Google was using its dominance in the market for online general web search to impose restrictive conditions in online syndicate search agreement, in violation of Section 4(2)(e) of the Act. Further, as mentioned above, competitors were denied access to the online search syndication services market, a contravention of Section 4(2)(c) of the Act is also made out.

PUBLIC VERSION

398. This brings the Commission to Google's ad intermediation agreements. In case of Google's direct ad intermediation agreements, the Investigation Report's objections are in respect of the following clauses:

(i) Two template clauses for direct search ad intermediation agreements that asks publishers to request a minimum number of Google's ads per search query and define the placement of Google and non-Google ads (the "minimum ad and ad placement clauses"). Specifically, this clause implies that ads which are the same as or substantially similar to Google's AFS ads should not appear above or directly adjacent to Google's AFS ads; and AFS ads should be displayed in a single continuous block, not interspersed with other ads or content.

(ii) A historic template clause for direct display ad intermediation agreements that asked publishers not to show display ads on their sites that were the "same or substantially similar" to Google's display ads (the "substantially similar display ad clause").

399. With regard to the aforementioned clauses, the DG noted that Google has used its dominance in the market for online general web search and online search advertising to impose restrictive conditions in AFS Agreements and to enhance its position in online search advertising syndication market in violation of Section 4(2)(e) of the Act. It was also noted that the conduct amounted also to denial of access to competing search engines to the search advertising syndicate market in violation

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 213 of 337   Page ID
#:28668
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

of Section 4(2)(c) of the Act. It was further noted that through this conduct, Google is further able to strengthen its strong hold in the online search advertising market.

400. Similarly, in respect of negotiated AFC agreements, it was concluded by the DG that on account of advantage of scale and large advertiser base Google is an attractive syndicate service provider for display advertising.

PUBLIC VERSION Further, it was noted that several publishers opt for Google for various intermediation services like search, search advertising and display advertising simultaneously. Thus, Google was found to be using its dominant position in online general web search and online search advertising to impose restrictive conditions in its agreements for syndicate services for display advertising in violation of Section 4(2)(e) and 4(2)(c) of the Act.

401. Before proceeding to examine the direct (negotiated) AdSense agreements (AFC and AFS), it would be appropriate to first deal with the objections raised by the DG with regard to online AdSense agreements. Though, the DG has noted that the terms of such agreements do not contain any prohibition on the use of competing services for display of ads, however, it was also noted that according to Clause 1.5 of the online AdSense terms and conditions, if an AdSense partner chooses to opt for the Custom Search Engine service of Google, it is also required to accept Google's Custom Search Engine Terms of Service. Therefore, it was noted by the DG that Clause 1.6 of the Custom Search Engine Terms (quoted supra in Para 389), would be applicable to AdSense partners who opt for the Custom Search Engine service of Google, as it requires them to ensure that their own or third party advertisements cannot reasonably be confused with or mistaken for those provided by Google.

402. While the DG found this clause to be a reasonable check that was needed by Google to safeguard its interests; considering the broad nature of the condition, the DG noted that there was ample scope and incentive for Google to impose exclusivity through this condition.

403. The Commission is of the view that for the reasons given in the context of online search intermediation agreements, the aforesaid observations of the DG are insufficient to return a finding of contravention against Google.

PUBLIC VERSION

404. Coming now to the direct (negotiated) AdSense agreements (AFC and AFS), Google challenged the findings recorded by the DG which have been noticed hereinabove.

405. Google argued that with regard to negotiated AFS agreements, the contested minimum ad and ad placement clauses do not prevent publishers from showing non-Google ads in addition to Google ads. Google pointed out that the DG's Report itself recognises that these clauses "do not prohibit the display of online search ads from competing search engines". Moreover, with regard to negotiated AFC agreements, substantially similar display ad clause does not create exclusivity either and again, publishers can show non-Google display ads in addition to Google display ads.

406. The Commission has examined the DG's findings and the material available on record. The Commission notes that none of the clauses noted by the DG prevents publishers from accessing other ad intermediation operators. They leave publishers free to show third-party ads. The clauses at issue are, moreover, template clauses for agreements that Google negotiates with large and sophisticated publishers. Moreover, publishers have always the option to conclude online ad intermediation agreements, which do not include the challenged clauses. The Commission further notes that these clauses are legitimate means to protect its brand by Google and monetise the free results and technologies provided by it (Google) to third-party websites.

407. With regard to negotiated AFS agreements, the Commission notes that the DG's Report objects to the minimum ad and ad placement clauses in these agreements on the ground that these deny rival operators access to publishers' ad space. The DG in its Report also claims that even if third-party ads appear, the clauses ensure that "their chances of being clicked PUBLIC VERSION remain significantly low".

408. The minimum ad and ad placement clauses leave publishers free to display third-party ads, including in prominent space. The clauses only apply to ads that are the same or substantially similar to Google's. But publishers can place non-Google ads that are not the same or substantially similar to Google search ads above or alongside Google search ads. This includes:

(i) ads of a different type to Google's ads (e.g., display ads as opposed to Google search ads); and

(ii) ads of a different format than Google ads (e.g., non-text search ads where the agreement with Google only provides for text ads).

409. As an example, Indian direct partner Info Edge (Naukri.com) is showing a non-Google display ad above the Google AFS ads on its SERP, without breaching the terms of its direct agreement with Google:

PUBLIC VERSION

410. The Commission further notes that publishers can choose to include as many search ads on their search results pages as they like. Even if a publisher shows Google ads in response to a query, it can still show non- Google ads on the same page. As an example, direct partner RightHealth is using both Google and Bing search ads at the same time. The publisher shows four Bing ads together with two Google ad, this is not held to be breaching the terms of its direct agreement with Google.

411. The Commission also notes that for direct intermediation partners, Google makes specific investments and commits dedicated resources, including offering higher level of implementation and technical support, enhanced reporting tools, and optimisation assistance to publishers. The Commission is of the opinion that minimum ad and ad placement clauses are in a way a trade-off for the relationship-specific investments that Google makes in direct ad intermediation agreements. Thus, the Commission does not see any objection to Google seeking minimal assurances from publishers in terms of the number of ads they will show and their placement.

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

PUBLIC VERSION

412. With regard to negotiated AFC agreements, the DG's objections are against direct display ad agreements which relate to a historic substantially similar display ad clause. The Report recognises that this clause no longer applies to whole sites, and the requirement concerns only pages showing Google's display ads (AFC ads). The Report goes on further to claim that the substantially similar display ad clause denies to its rivals' access to the advertising space of publishers.

413. The Commission notes that the Report has not given evidence to support this conclusion. Substantially similar display ad clause leaves publishers free to show non-Google display ads and the clause according to Google, now applies only to pages that show Google AFC ads. Other pages on a partner's site are not covered. Even on those pages to which the clause applies, publishers can place non-Google display ads, provided that they are not the same or substantially similar to Google AFC ads.

414. As in the case of AFS ads, the Commission notes that ads of different type or format can be shown alongside Google AFC ads. The clause is thus meant to prevent confusion about Google and non-Google ads, and this protects legitimate interest of each company in preserving its brand. However, it is relevant to point out that the direct intermediation clauses to which the Investigation Report objects, are template clauses (i.e., model clauses), and are in reality subject to negotiation. Google has submitted that it concludes direct intermediation agreements with large and sophisticated publishers who are free to choose the option. The publishers generally do not seek to multihome search functionality or search ads on the same website. Those which do it, can use the template clauses as a starting position for negotiations. The clauses are subject to amendment during the course of negotiations. Google has argued that the negotiation process negates concerns that direct intermediation clauses involve imposition of "unfair" conditions from the outset. The publishers who PUBLIC VERSION want to deviate from the same or substantially similar search clause can and do negotiate amendments to the template clause. Likewise, publishers who want to deviate from the minimum ad and ad placement clauses can and do negotiate amendments to the AFS template agreement. Not only that, publishers can also negotiate amendments to the substantially similar display ad clause to provide even greater flexibility. In fact, publishers who have negotiated such amendments in the past include .

415. In light of this, the Commission holds that as publishers who do not want to enter into direct ad intermediation agreements have the option to enter into online ad intermediation agreements. Those who enter into direct ad intermediation agreement, do so as a result of free choice because the agreements accord with their business needs and commercial interests. This thus excludes the suggestion that Google "imposes" terms on publishers with its direct agreements.

416. With regard to the DG's finding that Google denied market access to competing search engines in violation of Section 4(2)(c) of the Act, the Commission finds that an enterprise violates Section 4(2)(c) of the Act only if it limits the ability of competitors to effectively compete in a market. Google's intermediation agreements do not deny market access within this meaning. They do not impose exclusivity, and certainly not in a way that limits the ability of rivals to compete. The

Commission hence holds that the DG's Report does not present evidence to the contrary. Therefore, the Commission is unable to accept the DG's finding with respect to Section 4(2)(c) of the Act.

417. Similarly, with regard to the DG's finding that Google leverages its dominant position in online general web search and online search advertising to impose restrictive conditions in its agreements for syndicate services for search and display advertising, the Commission finds that PUBLIC VERSION Google's intermediation agreements do not violate Section 4(2)(e) of the Act as the Investigation Report does not establish it nor does the Report explain as to how Google's strength in general search and online ads resulted in imposition of restrictive conditions in AFC and AFS agreements.

418. Before concluding on this aspect, the Commission notes that the DG has returned a number of the findings about Google's agreements. One of them is that Google imposes unfair conditions on publishers by not disclosing the revenue shares for its online ad intermediation agreements. Though Google has denied this claim as incorrect, the Commission is of the view that such issues raise no competition concern whatsoever. Further, it could not be established that Google's non-disclosure policy has restricted competition.

419. The DG's objection to the arbitration clause contained in Google's online AdSense Terms and Conditions with Indian publishers providing for arbitration in the United States on the ground that such framework may entail significant legal and financial costs for Indian partners, is not tenable. An arbitration clause in commercial agreements is a standard and legitimate business practice. It is beyond comprehension as to how such a clause in commercial agreements by itself can restrict competition without presenting evidence to support and sustain such finding of contravention of anti-trust law.

ORDER

420. In view of the discussion in the preceding paras, the Commission holds that Google enjoys dominant position in Online General Web Search and Web Search Advertising Services markets in India. The Commission further holds Google to have abused its dominant position on the PUBLIC VERSION following three counts:

> (a) Ranking of Universal Results prior to 2010 which was not strictly determined by relevance. Rather the rankings were pre-determined to trigger at the 1st, 4th or 10th position on the SERP. Such practice of Google was unfair to the users and was in contravention of the provisions of Section 4(2)(a)(i) of the Act.

> (b) Prominent display and placement of Commercial Flight Unit with link to Google's specialised search options/ services (Flight) amounts to an unfair imposition upon users of search services as it deprives them of additional choices and thereby such conduct is in contravention of the provisions of Section 4(2)(a)(i) of the Act.

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

(c) The prohibitions imposed under the negotiated search intermediation agreements upon the publishers are unfair as they restrict the choice of these partners and prevent them from using the search services provided by competing search engines. Imposing of unfair conditions on such publishers by Google amounts to violation of the provisions of Section 4(2)(a)(i) of the Act. Google is doing so because it has dominance in the market for online general web search to strengthen its position in the market for online syndicate search services. This amounts to violation of the provisions of Section 4(2)(e) of the Act. Further, as competitors were denied access to the online search syndication services market, contravention of Section 4(2)(c) of the Act is also made out.

421. Coming to the remedies, the Commission notes that so far as display of Universal Results at fixed positions is concerned, it has been submitted that since October, 2010, Google has made display of such results on free floating basis. As such, the contravention remains confined to the period PUBLIC VERSION from May, 2009 (i.e. when the provisions of the Act relating to Abuse of Dominant Position came into effect) to October, 2010 and that is no longer subsisting. Accordingly, the Commission takes Google's submission on record and refrains from issuing any cease order. In this regard, however, the Commission issues a desist order and directs Google not to resort to such fixing of position in future.

422. So far as the contravention noted by the Commission in respect of Flight Commercial Unit is concerned, the Commission directs Google to display a disclaimer in the commercial flight unit box indicating clearly that the "search flights" link placed at the bottom leads to Google's Flights page, and not the results aggregated by any other third party service provider, so that users are not misled.

423. Lastly, the Commission orders Google to not enforce the restrictive clauses with immediate effect, as is found in the order, in its negotiated direct search intermediation agreements with Indian partners.

424. The Commission has also considered the issue of imposition of monetary penalty upon Google and has bestowed its thoughtful consideration thereon.

425. Under the provisions contained in Section 27(b) of the Act, the Commission may impose such penalty upon the contravening parties as it may deem fit which shall be not more than ten per cent of the average of the turnover for the last three preceding financial years, upon each of such person or enterprises which are parties to such agreement or abuse.

426. It is evident that the legislature has conferred wide discretion upon the Commission in the matter of imposition of penalty. It may be noted that the twin objectives behind imposition of penalties are: (a) to reflect the seriousness of the infringement; and (b) to ensure that the threat of PUBLIC VERSION penalties will deter the infringing undertakings. Therefore, the quantum of penalties imposed must correspond with the gravity of the offence and the same must be determined after having due regard to the mitigating and aggravating circumstances of the case.

427. In this connection, it would also be apposite to refer to a recent decision of the Hon'ble Supreme Court of India in Excel Crop Care Limited v. Competition Commission of India & Anr., Civil Appeal No. 2480 of 2014 decided on 08.05.2017. One of the issues which fell for consideration before the Hon'ble Supreme Court in this case was as to whether penalty under Section 27(b) of the Act should be imposed on the total/ entire turnover of the offending company or only on "relevant turnover" i.e. relating to the product in question.

428. After referring to the statutory scheme as engrafted in Section 27 of the Act and analysing the case law at length, the Hon'ble Supreme Court opined that adopting the criteria of 'relevant turnover' for the purpose of imposition of penalty will be more in tune with the ethos of the Act and the legal principles which surround matters pertaining to imposition of penalties. While reaching this conclusion, the Hon'ble Supreme Court recorded the following reasons:

> When the agreement leading to contravention of Section 3 involves one product, there seems to be no justification for including other products of an enterprise for the purpose of imposing penalty. This is also clear from the opening words of Section 27 read with Section 3 which relate to one or more specified products. It also defies common sense that though penalty would be imposed in respect of the infringing product, the 'maximum penalty' imposed in all cases be prescribed on the basis of 'all the products' and the 'total turnover' of the enterprise. It would be more so when total turnover of an enterprise may involve activities besides production and sale PUBLIC VERSION of products, like rendering of services etc. It, therefore, leads to the conclusion that the turnover has to be of the infringing products and when that is the proper yardstick, it brings home the concept of 'relevant turnover'.

429. Thus, the starting point of determination of appropriate penalty should be to determine relevant turnover and thereafter, to calculate appropriate percentage of penalty based on facts and circumstances of the case.

430. Before examining this aspect, it would be first appropriate to note the contention of Google that calculation of penalty, if any, would have to be based on the relevant revenues generated by it in India, rather than globally, and would have to be limited to the revenues from the allegedly affected markets. It was argued that the Hon'ble Supreme Court has confirmed that only the revenues generated from the allegedly infringing product should be taken into account when determining the amount of the fine. It was pointed out that the DG has not identified any such affected markets.

431. The Commission has carefully considered the submissions made by Google on the issue of relevant turnover. To begin with, it is observed that the Commission had directed Google to provide the revenue generated from its India operations only. Hence, the Commission would consider the revenue generated from India operations and not the revenue generated by Google through its global operations. Having said that, the Commission is of opinion that the concept of relevant turnover cannot be applied to a technological platform such as Google as it is applied in the context of a conventional multi-product company. In a two sided market, the search side is free whereas the other side is monetized through advertisements. It would stultify the very object and intendment of

the Act if Google were to be allowed to contend that search being free, no penalty can be levied as there is no revenue stream from this side of the market. Such a pedantic PUBLIC VERSION approach, which is more appropriate for conventional market, would virtually allow two sided platforms to abuse one side and accord a virtual immunity from monetary penalty for anti-trust violations. It needs no reiteration that the two sides of such platforms are intricately interwoven with each other as one side cannot operate without the other. In such case, the entire platform has to be taken as one unit and revenue generated therefrom has to be seen as a whole. Any other interpretation or approach would render the deterrence exerted by the Statute as redundant and nugatory. That could not have been the intent of the legislature or the judicial pronouncements.

432. No doubt, the Commission directed Google to provide its segmental revenue but that was with a view to quantify the penalty in a proportionate measure so that the penalty, which is to be based after taking the whole revenue from the platform, does not become disproportionate vis-à-vis the revenues generated from the infringed segments. Thus, the Commission would consider the sum total of the revenues generated by Google as provided by it from its different segments of its India operations to reach a quantum of monetary penalty which is proportionate and commensurate to the infringing conduct.

433. In this connection, it is observed that the Commission vide its order dated 20.12.2017 directed Google to provide the details of revenue generated from its India operations in respect of the services specified therein by 05.01.2018. Subsequently, Google moved an application dated 29.12.2017 seeking extension of time by at least 3 weeks to comply with the Commission's directions.

434. Having considered the application and the reasons cited therein, the Commission vide its order dated 02.01.2018 allowed Google to submit the financial details sought for by the Commission by 15.01.2018. The Commission further permitted Google to submit the said details duly PUBLIC VERSION certified by an internal Chartered Accountant, instead of an external auditor, as prayed for. Google, however, moved another application on 15.01.2018 seeking extension upto 18.01.2018 again citing various reasons including religious holidays and logistical challenges in complying with the directions of the Commission. The request was acceded to by the Commission and Google was allowed to submit the financial details by 18.01.2018 i.e. the date requested by Google itself.

435. On perusal of the financial details submitted by Google, the Commission is constrained to note that notwithstanding a categorical and clean direction issued by the Commission to Google to furnish "...details of revenue generated from its India operations..." in respect of the specified services, Google has given financial details in which it has indicated at the top in Annex 1 to the following effect: "Relevant Turnover from Direct Sales in India (INR, Millions)". It is indeed perplexing as to what is meant by Direct Sales and what is left out by way of Indirect Sales. Further, Google has qualified every data its various footnotes and has indicated various aspects of its revenue which it does not "retain". Moreover, Google has also stated in the submissions that "...it was not possible to collate revenue data by user location in the time accorded by the Hon'ble Commission".

436. The Commission is dismayed at such disclaimers and caveats in respect of a figure which should have presented no difficulty in collecting and collating after availing sufficient time and certified by an internal auditor.

437. On penalty, Google has contended that even if the Commission finds a violation of Section 4 of the Act by Google, it must take into account the uncontested consumer benefits arising from Google's conduct, lack of evidence of anti-competitive intent or secretive behaviour. It was pointed out that the Investigation Report also acknowledges the procompetitive effect of Google's conduct in India.

PUBLIC VERSION

441. The Secretary is directed to provide copies of the public version of this order to the parties through their respective counsel(s) and inform them accordingly.

Sd/-

(Devender Kumar Sikri) Chairperson Sd/-

(S. L. Bunker) Member Sd/-

(Augustine Peter) Member Sd/-

(U.C. Nahta) Member New Delhi Date: 31/01/2018 [Dissent Note dated 08.02.2018 by Member (SM) and Member (GPM) at pp. 167-190] PUBLIC VERSION DISSENT NOTE PER Mr. Sudhir Mital Member Mr. Justice G. P. Mittal Member

1. In this opinion, we record our dissent to the order of the Commission that disposes of Case No. 07 of 2012 and Case No. 30 of 2012 filed under Section 19 (1) (a) of the Competition Act, 2002 ('the Act') by Consim Info Private Limited ('the Informant/ Consim', now known as Matrimony.com Limited) and by Consumer Unity & Trust Society (CUTS) ('the Informant') respectively against Google Inc. (now Google LLC) and Google India Private Limited alleging contravention of the provisions of Section 4 of the Act.

2. Besides perusing the material on record, we have had the benefit of going through the Majority order of the Commission. We are in agreement with the Majority order on the two relevant markets as have been defined and the assessment of Google's dominance in the same. We also agree with the Majority order's analysis relating to the procedural objections raised by Google as also with the conclusions of the Majority order on the issues of More Universal Results, Maps, One Boxes, Commercial Shopping Unit, AdWords, Trademarks, AdWords API T&Cs, Distribution Agreements and Direct Ad Intermediation Agreements. However, we are unable to persuade ourselves to subscribe to the Majority view in respect of the alleged contravention of the Act by Google in respect of Flights Unit, Direct (negotiated) Search Intermediation Agreements and historic use of Fixed Positions for Universal Results for the reasons recorded in the subsequent paras.

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

PUBLIC VERSION

3. For the sake of brevity, we shall not again recapitulate the background and facts of the matter (s) at hand which have already been dealt with in detail in the Majority order, and shall confine to the reasons for disagreeing with the Majority view in respect of Flights Unit, Direct (negotiated) Search Intermediation Agreements and historic use of Fixed Positions for Universal Results.

Flights Unit

4. Google Flights Unit is a Commercial Unit, which is distinguished from the free, organic search results with a label indicating the Unit as 'Sponsored'. The Unit appears in the space for display of ads on the Google Search Engine Results Page ('SERP') - above the free, organic search results. The Flights Unit provides users with flight information on routes specific to their search query. It contains a link 'Search Flights', clicking on which leads the users to Google's Flights page showing additional results of the same type. According to the Majority order, "Google through its search design has not only placed its commercial units right at a prominent position on SERP, it has also allocated disproportionate real estate thereof to those units resulting into either pushing down or pushing out of the verticals who were trying to gain market access. To top it all, Google has provided link which leads users of Google Flight commercial unit to its specialised search result page (Google Flights). Consequently, users may be devoid of additional choices of results and therefore, such conduct amounts to an unfair imposition upon the users availing search services." Such conduct of Google, as per the Majority, "being an unfair imposition upon the users of general search services, is in contravention of Section 4 (2) (a) (i) of the Act" [Para 253].

PUBLIC VERSION

5. We are unable to concur with the Majority's assessment of the issue at hand and accordingly with their conclusion of infringement of the provisions of the Act. We are of the view that determination of infringement, in this case contravention of Section 4 (2) (a) (i) of the Act, cannot be in the abstract. Section 4 (2) (a) (i) of the Act deprecates imposition of unfair condition by a dominant enterprise in purchase or sale of goods or services. However, the onus is on the Commission to establish, based on facts and evidence on record, as to whether and how an impugned practice of a dominant enterprise amounts to a conduct of unfair imposition on its consumers.

6. The issue under scrutiny here is the sponsored Flights Unit of Google.

To arrive at a conclusion that the 'prominent' placement of the Flights Unit is a conduct of unfair imposition on the users of Google's general search services, it needs to be established with evidence that user-clicks are guided solely or largely by the position at which a particular result is placed on Google SERP irrespective of whether it is an advertisement, Commercial Unit or generic result and that the users find the Flights Unit of Google and its 'prominent' placement on SERP to be confusing or misleading. As elaborated in the subsequent paragraphs, we could not find any relevant, reliable or cogent evidence that could aid a reasoned assessment of whether and how the mere presence of Google Flights Unit amounts to a conduct of imposition of unfair condition on the users.

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

7. The two metrics that would enable an objective assessment of user click behaviour are (i) the user click-through rates (CTR), calculated as clicks divided by impressions for users in India, of different ad positions, of Commercial Units including the Flights Unit and of different generic search results positions and (ii) the actual traffic flow to Google Flights via the Flights Unit on Google SERP vis-à-vis the traffic flow to other travel verticals via Google in India. The DG investigation did not bring PUBLIC VERSION the necessary data on these two metrics on record. During the course of hearings, Google was directed by the Commission to provide data in respect of CTR for different ad positions and free search result positions from 2009 to 2015 for users in India. Google submitted global data for desktop users for top ads, right hand ads and free results for the said period. The data submitted by Google for top ads and generic results, as tabulated in Table 1 below, shows that the CTR for the first ad appearing on the topmost position of the SERP was in while the corresponding figure for first free/ generic result was . It further reveals that intra-format, i.e. within the ads, the CTR goes down from the first to the second to the third ad position and the same holds true for generic results as well. While we note that the data is not specific to India and the CTR for the Commercial Units including the Flights Unit is still not on record, what can reasonably be inferred from the data is that globally higher position or prominent placement on SERP is a crucial determinant of CTR only within a particular category of results, i.e. generic results or ads. It further indicates that the top ad, despite having been placed on the most prominent real estate of the SERP could not attract the maximum clicks and the top free/generic result despite having been placed below the ads enjoyed the highest CTRs. This shows that users can and do distinguish between free results and ads and they have revealed their preference for top free/ generic results over ads.

Table 1: CTR 2009-2015

| Position | CTR (%age) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Top Ad 1 | * | | | | * | * | |
| Top Ad 2 | * | | | * | | | * |
| Top Ad 3 | | | * | * | | | * |
| Free Result 1 | | | * | * | | | * |
| Free Result 2 | | | * | * | | | * |

PUBLIC VERSION

| Position | CTR (%age) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Free Result 3 | | * | | | * | * | |

(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

| | | | | | | |
|---|---|---|---|---|---|---|
| Free Result 4 | | * | * | | * | * |
| Free Result 5 | | * | * | | * | * |
| Free Result 6 | | * | * | | * | * |
| Free Result 7 | * | | * | | * | * |
| Free Result 8 | | * | * | | * | * |
| Free Result 9 | | * | * | | * | * |
| Free Result 10 | | * | * | | * | * |

Source:

8. Here we would like to reiterate that the Flights Unit does not appear on the SERP as a free/ generic search result. It is neither surreptitiously embedded in the free/ generic search results, nor does it affect the ranking of free search results. It comes within a box and that it is a sponsored link is made explicit thereby making it visually distinguishable from generic blue link results. Thus, while there can be no ambiguity that the top free/ generic search result would get the maximum clicks amongst the free results, the same cannot be transposed to the Flights Unit, without supporting data. It may be the case that users distinguish between the commercial Flights Unit and the free/generic results and actually scroll down to the relevant generic results for what they might be looking for, especially if those results appear on the first few positions of the free generic results. It can also be the case that users do click on the Commercial Unit and do so consciously as they find the feature useful. Be that as it may, without any empirical underpinnings, a conclusion that users click on the Flights Unit just because it appears above the free results presupposes what the consumers i.e., the web-searchers, prefer and actually do. Not only that, it is also a presumption that the consumers are not sufficiently intelligent to distinguish an enhanced ad format from PUBLIC VERSION a free search result and that they will be lured by the 'prominent' placement and the 'disproportionate' size of the Flight Unit in the SERP.

9. The DG has referred to and the Majority has relied upon a few studies and reports conducted in other jurisdictions to highlight the importance of visibility in attracting user clicks. We have reviewed them carefully. The Microsoft 'Heat Map' study highlights the areas of the SERP where users focus their attention by recording the movement of users' eyes and points out that the 'top-left' section of the SERP receives distinctly more attention than any other part. We observe that the study is limited to eye movement and user attention. That the highest user attention may not translate into concomitant maximum actual clicks, is corroborated by the CTR data of top ads, which typically appear on the 'top-left' section of the SERP. The other external studies referred to by the DG highlight the importance of ranking of results within the generic free results, without providing a comparative picture of user click behaviour vis-à-vis the Commercial Units, the Flights Unit in particular. The only finding that has been relied upon by the DG and the Majority vis-à-vis

the Commercial Units is of the submitted to the by Microsoft with regard to . The finding referred to by the Majority only shows that the CTR for the top algorithmic result dropped considerably with the , without providing any CTR data for the other ads and search result positions including that of the . Any advertisement in any format is bound to affect the CTR of the top algorithmic result. Nevertheless, as the global data on CTRs submitted by Google shows, despite ads the top algorithmic result continues to enjoy the highest CTR. Moreover, to conclude that it is an unfair imposition on the users, as concluded by the Majority, it needs to be ascertained that the users did not actually find the to be useful but clicked on the same PUBLIC VERSION only because of its placement above the generic results deceptively believing the same to be the most relevant result, which the fails to do. The finding relied upon by the Majority does not throw any light on user preferences but simply shows that the CTR of top algorithmic results are affected by advertisements/ Commercial Units.

10. The Majority, in Para 239, observes "... a user's clicking behaviour may also be influenced by Google's public claim of ranking results based on relevance." The Majority further extracts certain statements of Google to bring forth Google's claim of ranking results based on relevance. We observe that in the statements of Google relating to online search, ranking of results in terms of relevance has been claimed for intra-format search results, i.e. relevance within free/ generic search results and within advertisements separately and not inter-format as construed by the Majority. For instance, the letter of the founders of Google accompanying the IPO filing (as quoted in Para 239 of the Majority), clearly distinguishes free/ generic search results from advertising:

> "... Google users trust our systems to help them with important decisions: medical, financial and many others. Our search results are the best we know how to produce. They are unbiased and objective, and we do not accept payment for them or for inclusion or more frequent updating. We also display advertising, which we work hard to make relevant, and we label it clearly. This is similar to a well-run newspaper, where the advertisements are clear and the articles are not influenced by the advertisers' payments."

> [emphasis supplied] PUBLIC VERSION Google's Executive Chairman, Eric Schmidt's statement, "the natural search answers [are] completely unbiased with respect to economics" [emphasis supplied] further indicates that Google's claim of relevance is with respect to its free/ generic search results. The Flights Units are an enhanced ad format that appear in the ad space and are marked as such by Google with the 'Sponsored' label. They need to be viewed as a means of monetisation of free search services through paid advertisements and not as free search results which Google claims to rank based on relevance. Google is a two-sided platform where search is free on one side and Google monetises the other side through advertising.

It is axiomatic that like all search services, paid advertising enables Google to offer free search results. To conclude 'prominent' placement of a publicly declared sponsored result as a deviance or departure from relevance in presenting search results is to strike at the core of the two- sided business model of Google or any other search engine. In fact, the Flights Unit typically appears

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 225 of 337   Page ID
#:28680
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

below the AdWords ads and not on the topmost section of the SERP. Thus, taking the argument to its logical conclusion would mean that the premium real estate on the SERP should be bereft of any advertisements, lest they mislead the users, even though the CTR data on record corroborates that users are discerning and they do not blindly click on the advertisements that appear on top.

11. In Para 238, the Majority has opined, "The Commission is of the view that by integrating/ linking specialised search result pages with the Commercial Units and placing them prominently on SERP, Google is able to drive traffic to its own pages and also generate revenues through advertisements/sponsored results" [emphasis supplied]. We respectfully differ from this Majority finding in absence of any evidence or data on record that corroborates significant traffic flow to Google Flights page via the Flights Unit. This brings to fore the other important metric of PUBLIC VERSION traffic flow that could have aided the assessment in an objective manner. While the DG report does not provide any data or systematic analysis of traffic flow to Google Flights via the Flights Unit, the data submitted by Google on the direction of the Commission shows that in , Google travel pages accounted for only of Google traffic to all travel pages.

12. In Para 253, the Majority concludes, "To top it all, Google has provided link which leads users of Google Flight commercial unit to its specialised search result page (Google Flight). Consequently, users may be devoid of additional choices of results ..." It is not apparent to us as to how the 'search flights' link to Google's flight page takes away the choice of results from the users when the AdWords ads that appear above the Flights Unit on SERP and the free/ generic results that appear below the Flights Unit continue to provide links to airlines and other travel verticals. There is no evidence on record that shows that the competing travel sites are demoted to such positions or pages that users cannot easily find and access them. If the conclusion of the Majority is to suggest that the impugned link should ideally have led the users to other third party travel verticals, instead of Google's own page, that would be incongruent with the Majority's own stance on 'more results' link in the case of Universal Results. As the Majority opines in Para 219 of its order and we agree, "... directing Google to replace these links with links to third-party vertical search services, may create confusion for the users. In such a scenario, Google's algorithms would rank the first few results, while another provider's entirely different ranking would rank the remaining set after the link. This may not be a workable proposition."

13. Finally, the views of the users of Google, on whom the Google Flights Unit is allegedly an unfair imposition, have not been accounted for in any manner in the investigation. Leave alone a reasonable sample of users, not even a single user/ searcher's view or even anecdotal account PUBLIC VERSION is on record for us to understand how users actually perceive the Google Flights Unit. Analysis of a design feature such as the Flights Unit with complete disregard for user preferences would be mere speculation about a possibility of user confusion, which in our view, may lead to an outcome that few users may possibly favour or require. Internet search has transitioned from the archetypal 'ten blue links' model to a model where search engines take on the function of providing end information or interactive interfaces to website information. Thereby, finding objections with a particular design feature without having gauged the users' experience may result in imposing regulatory preferences to the detriment of consumer preferences. Any conclusion based on imprecise perceptions runs the risk of misjudging user behaviour, thus disapproving legitimate,

competitively benign product designs and harming efforts at innovation. We are of the considered view that unless supported by evidence that indicates confusion or difficulty caused to any user of Google by a particular design feature, such second-guessing may lead to inferior outcomes for all market participants and chill innovation.

14. We shall now turn to examine the issue of the Flights Unit vis-à-vis the other stakeholder group, i.e. the competing travel sites. The Majority, while not finding the impugned conduct to be an unfair imposition on and thus an abuse of dominance vis-à-vis these websites, has deliberated at length on how the 'prominent' placement of the Flights Unit and the 'disproportionate' real estate allocated to it "may not" allow equally efficient websites to sustain and survive in the market for flights search services. The Majority, by using phrases such as "may also hinder market access", "has potential", "perhaps", "may not allow", "may be equally efficient", "may not be able to" has woven a narrative of hypothetical anti-competitive foreclosure. However, the hypothesis has not been tested.

PUBLIC VERSION

15. As per the Majority order, "Google's Flight Unit captures the traffic that would ordinarily flow to the top algorithmic listing" [Para 248] [emphasis supplied]. However, we note that there is no traffic data analysis on record that corroborates the diversion of traffic from competing sites to Google's flights pages. The Majority conclusion rests on the premise that "… such an unfair diversion of traffic by Google may not allow third-party travel verticals to acquire sufficient volume of business" [Para 253] [emphasis supplied]. Clearly, the first test to arrive at this conclusion should have been to examine and establish the diversion of traffic through an analysis of CTRs and traffic data of the competing flight services and the 'wrongful' gain made by Google on account of diversion of traffic by analysing their data. However, we note that no such analysis is available in the DG Report.

16. Google, in its reply to the DG Report, has presented an empirical analysis to show that 'prominent' placement of the Flights Unit did not affect traffic flow to competing sites in India. As per the data provided, clicks to Google Flights and Hotel result pages were minor, accounting in for only around total clicks. By contrast, MakeMyTrip, Goibibo, and Cleartrip have all substantially increased their clicks by at least over : for MakeMyTrip, from in to in (an increase of over ); for Goibibo, from around in to in (increasing by factor of over ); and for Cleartrip, from clicks in , to in (an increase of over ). Any counter-claim needs supporting evidence and we were presented with none in the instant case by the DG.

17. In this context, we further note that the Flights Unit as also the Google Flights Page offer a tool for the users to compare different flight offers from different airlines by various parameters such as price, duration, PUBLIC VERSION schedule etc. They do not offer the possibility for flights to be booked directly on Google Flights. By contrast, travel verticals such as MakeMyTrip, Cleartrip etc. not only have the search function but also allow for booking of flights on their sites. This distinction is reflected in the letter dated 09.10.2013 submitted to the DG by MakeMyTrip (quoted in the Majority order Para 250).

"While these products are unlikely to have a booking engine, the positioning of the product is likely to divert customers from Makemytrip.com at the stages of research."

[emphasis supplied] In view of the difference between a pure online flight comparison site such as Google Flights and the online flight booking sites, it was all the more necessary for the DG to empirically examine as to how the high visibility of the Flights Unit affected the traffic share of the third-party travel verticals. Apart from some conjectural assertions made by MakeMyTrip on the likelihood of an impact of the Flights Unit on its overall bookings, no other material has been brought on record by the DG that systematically analyses the traffic flow to the competing sites vis-à-vis Google Flights in India. For a complete assessment of alleged 'unfair' treatment meted out by Google to its rival sites in the flights domain, it was also necessary to examine who these competing sites are and at what positions on the SERP do they typically appear. However, such analysis was also not attempted.

18. It is our considered view that without any relevant data on or analysis of user click behaviour in India vis-à-vis the Commercial Units or actual traffic flow to these units, diversion of traffic by Google to the extent that would prevent third-party verticals to acquire sufficient volume of business, as claimed by the Majority, is not substantiated.

PUBLIC VERSION

19. We would like to further deliberate on our reservations on the Majority stance on certain fundamental issues. The Majority in Para 248 states:

"The Commission observes that in case of Google's Commercial Unit, i.e., Flight Units in India, primary competition concern emanates out of its prominent placement of its commercial units on SERP in addition to providing disproportionate real estate thereof to such unit." [underlined for emphasis] Further, in the same Para, the Majority states:

"the insertion of Google's Flights Unit prominently above the blue link results in the SERP denying third-

party travel verticals even the opportunity to be displayed on that key "real estate" Google's Flights Unit pushes the algorithmic results down and in some cases, even off the first page." [underlined for emphasis] While it is tautological that even a centimeter of "real estate" that Google uses for its enhanced format sponsored units denies other competing verticals that "key real estate", but to conclude that it actually drives traffic to Google's flights page and affects the competing websites' ability to effectively compete is a presumption. Why do we say this is a presumption? As discussed in the previous para, the supporting evidence in the form of either CTR of the Flights Unit or traffic data for the Flights Unit has not been placed before us. In any case, the Flights Unit does not typically appear on top of the Google SERP for search terms related to flights. On the top of the results page, the AdWords ads appear, and the Flights Unit appears below these ads. Ads in any

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 228 of 337   Page ID
#:28683
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

format on the top of the SERP would push the algorithmic results down. This is not to say that there should be no antitrust liability on a fact-specific basis for acts of exclusion against rival websites. However, without identifying who the allegedly affected websites are and how they would have received substantially more traffic in absence of the Flights Unit PUBLIC VERSION despite being 'equally efficient', alleged denial of opportunity to be displayed on "key real estate" to an unknown and the entire universe of third party websites, cannot be a sound basis to establish abuse of dominance. Moreover, it would be insightful to build a counterfactual scenario where the 'finding' of contravention by the Majority on account of 'prominent' placement of and 'disproportionate' real estate allocated to the Flights Unit is taken to its logical conclusion. If the size of the Flight Units is 'disproportionate', then what will be a proportionate size? If the ad format is prominently placed, then what will be an innocuous place such that the "misled" consumers do not click it? The answers to these questions have been avoided in the Majority order.

20. The remedy directed by the Commission, "a disclaimer in the commercial flight unit box indicating that the "search flights" link placed at the bottom leads to Google Flights page and not the results aggregated by any other third party service provider, so that users are not misled" [Para 422] does not address the purported harm caused or likely to be caused to the third party websites and presumes that users click on the 'search flights' link on the Flights Unit expecting it to lead to third party sites, without any evidence on record to that effect. Further, the concern raised by the Majority that the users cannot distinguish between sponsored and generic results despite the 'Sponsored' disclaimer of Google, does not get addressed by the proposed remedy. Given the premise of the Majority, it is equally likely that despite the insertion of the proposed disclaimer, the 'undiscerning' users might not take note of it and still be 'misled' to Google flights.

21. To conclude, in our opinion, the investigation has not brought on record the evidence necessary for a reasoned assessment of whether and how the 'prominent' placement of Flights Unit amounts to a conduct of imposition of unfair condition on the users. A conclusion of infringement PUBLIC VERSION of the Act needs to be premised on clear, unambiguous evidence covering various important aspects of user preference, the impact of higher visibility of the Flights Unit on CTRs, the flow of user traffic to Google flights via the Flights Unit and Google traffic to the competing websites, the positions at which such websites are ranked on the Google SERP etc. in India. The provisions of the Act relating to abuse of dominant position warrant ex post determination of abuse by a dominant enterprise, supported by facts and evidence. The application of the law is not amenable to hypothetical frameworks built on perceived premises. In view of the same and based purely on putative contentions, we are unable to persuade ourselves to concur with the Majority conclusion that by placing its Flights Unit on the SERP, Google has contravened Section 4 (2) (a) (i) of the Act.

Search Intermediation

22. In abuse of dominance cases, the first step is to delineate the relevant market followed by an assessment of dominance of the enterprise under scrutiny in that relevant market. The DG has not defined 'online search intermediation/ syndication services' as a relevant market in terms of the provisions of the Act and Google's dominance in this market too has not been assessed in terms of

Section 19 (4) factors. The DG and the Majority have inferred dominance in this market from Google's dominance in online general web search and online search advertising. The DG, in the investigation report, has stated that Google is found to be dominant in the relevant markets of online general web search in India and online search advertising in India. As per the DG, "By virtue of this position of strength in these relevant markets, Google is also a preferred syndicate service provider for publishers wanting to offer search and advertising services on their websites." Google, in its reply to the DG report, has averred, "the Report claims that Google's terms of trade PUBLIC VERSION entered into with its intermediation partners constitute an abuse of dominance. But the Report does not claim - let alone prove - that Google is dominant in search intermediation, search ad intermediation, or display ad intermediation. The Report thus fails to satisfy the first step in an abuse of dominance case. Its claims must fail as a result."

23. Online search intermediation is a service provided by Google and other search engines to web publishers in order to facilitate search on their websites, by providing search toolbars directly on the websites. Both the DG and the majority have considered online search intermediation/syndication services as a distinct market, which has allegedly been foreclosed from competitors and leveraged into by Google using its dominance in the online general search market. The Majority, in Para 397 of its order, observes, "Google was using its dominance in the market for online general web search to impose restrictive conditions in online syndicate search agreement, in violation of Section 4 (2) (e) of the Act. Further, as mentioned above, competitors were denied access to the online search syndication services market, a contravention of Section 4 (2) (c) of the Act is also made out" [emphasis supplied]. However, this market has not been defined as a relevant market and Google's dominance has not been established in the same as per the provisions of the Act. As per Section 4 (2) (e) of the Act, there will be an abuse of dominant position, if a dominant group or enterprise "uses its dominant position in one relevant market to enter into, or protect, other relevant market" [emphasis supplied]. Thus, the relevant provision of the Act warrants delineation of the relevant market where the enterprise is dominant as well as the relevant market that is being leveraged. In the instant case, as mentioned above, the second market of 'online search intermediation/ syndication services' has not been defined as a relevant market in accordance with the provisions of the Act. In view of the same, we are of the opinion that the legal requirement of defining PUBLIC VERSION 'online search intermediation/ syndication services' as a relevant market has not been met.

24. The impugned conduct is that in Google's direct search intermediation agreements, it stipulates a template clause that asks publishers not to implement search technologies on their sites that are "same or substantially similar" to that of Google. This, according to the DG and the Majority, is a restrictive condition imposed upon the publishers in negotiated search agreements since they may wish to offer search services from websites in addition to Google. Further, these restrictions, allegedly, amount to de-facto imposition of online search exclusivity in agreements of 2-3 years duration, thereby depriving competitors from acquiring the requisite scale.

25. It is important to note that the impugned clause is not there in the online standard contracts, which are available to all publishers. These are stipulated only in the negotiated contracts. As per Google, the impugned clause is a template clause subject to negotiation. The DG investigation has

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 230 of 337   Page ID
#:28685
(07/2012) Matrimony.Com Limited vs Google Llc & Others (30/2012) ... on 31 January, 2018

not brought forth any material that reveals the direct partners' views on the agreement and the negotiation mechanism. The publishers questioned by the DG have not suggested that they feel restricted by the agreements at issue.

26. Google, on the other hand, has contended that its experience of search intermediation agreements is that partners generally do not wish to multi-source search services as this adds to the transaction and integration cost without attendant improvement in end-user experience. Google has further averred that the DG report provides no evidence that a publisher would want to implement two search functionalities that are the "same or substantially similar". Including two substantially similar PUBLIC VERSION search functionalities on the same site would likely confuse and frustrate users.

27. We are of the opinion that the direct partners' views were critical in forming a conclusive view on the desirability of multiple search functionalities on the same website. The investigation does not adduce any evidence to establish that absent the clause, the direct partners would have opted for multiple search functionalities on their websites. Moreover, publishers that do not want to enter into direct intermediation agreements have the option to enter into online agreements, which do not contain the clause at issue. As per the DG Report, under the direct negotiated agreement, Google provides enterprise level support to its direct partners. The Majority, in Para 411, notes, "... for direct intermediation partners, Google makes specific investments and commits dedicated resources, including offering higher level of implementation and technical support, enhanced reporting tools, and optimisation assistance to publishers." Thus, it seems that the direct contracts bring certain additional benefits to the publishers, which incentivise them to enter into the same with Google rather than opting for online contracts. In view of the above, one can reasonably infer that the publishers that enter into the direct agreements do so in exercise of their free choice, driven by their business interest. Given that these are websites which generate larger volumes of search queries, they are presumably in a position to exercise some degree of countervailing power while negotiating the terms of agreement. Google, in its reply to the DG Report, has claimed, "no direct partner has ever expressed a desire to implement two search functionalities that are "the same or substantially similar", either before or after entering a negotiated search intermediation agreement." Absent any evidence on record to the contrary and proper investigation into the issue, the impugned clause in agreements entered into by the direct partners of their own volition, PUBLIC VERSION cannot simply be presumed to be an 'imposition' by Google. When publishers opt to adopt only one search intermediation service provider, they may be exercising their preference. Thus, we are of the considered view that the investigation provides no basis for holding the impugned clause to be either 'unfair' to or an 'imposition' on the direct partners. Moreover, in absence of the determination of unilateral imposition by Google and without 'online search intermediation/ syndication services' having been defined as a relevant market in terms of the provisions of the Act, we are unable to conclude that Google leveraged its dominance in the search and search advertising markets to enter into or protect the market of online search intermediation/ syndication services. Thus, we respectfully disagree with the Majority conclusion that the impugned clause is in contravention of Section 4 (2) (a) (i) and Section 4 (2) (e) of the Act.

28. On the question of whether the impugned clause results in denial of market access to the competing search intermediation service providers, we observe that the DG Report does not provide a competitive analysis of the online search intermediation market in India, neither does it identify intermediation operators active in the country who are allegedly affected by the clause. The internet landscape in India is thriving with the ever-growing number of websites. Only publishers ( ), during the period of investigation, were found to be subject to the impugned clause. The entire set of websites, barring the ones owned by these publishers, was open to the rival operators. Moreover, the direct intermediation agreements expire periodically, thereby offering the intermediation service providers the opportunity to compete for the direct contracts as well. However, there is no evidence or analysis on record that systematically analyses the intermediation market in India and the search intermediation contracts entered into by publishers in the PUBLIC VERSION country over time for a holistic assessment of switching cost or lock-in effects caused by the impugned clause.

29. In absence of the testimony of the direct partners with whom Google had the negotiated search agreements in India during the period of investigation, without any data or analysis on record pertaining to the search intermediation market in India, the players therein and the effect of the impugned clause on competition, we are of the considered view that no contravention of the Act is made out against Google on account of the impugned clause in the negotiated search intermediation agreements.

Universal Results

30. The DG investigation has revealed that prior to October 2010, Google limited the display of its grouped search results (i.e. image, news and local), known as 'Universal Results', to certain fixed (1st, 4th or 10th) positions on the SERP. The reason proffered by Google for having such fixed positions for Universal Results on the SERP is that "its systems were not sufficiently advanced to conduct a relevance comparison for all positions on the result page". The Majority order has found this contention of Google to be unacceptable "in the absence of concrete material in this regard." While taking note of the fact that Google introduced fully-floating ranking for the Universal Results between September and October 2010, the Majority found the historic use of fixed positions to be an unfair imposition on users, in contravention of Section 4 (2) (a) (i) of the Act.

31. We are unable to agree with the Majority on this issue. Google has submitted that prior to 2010, it limited the display of Universal Results to certain fixed positions (1st, 4th and 10th) because its systems were not sufficiently advanced to conduct a reliable relevance comparison for all PUBLIC VERSION positions on the SERP. Limiting Universal Results to fixed positions, as per Google, demonstrates its exacting relevance standards. Google preferred not to show Universal Results in positions for which it could not conduct a relevance assessment, rather than compromise its relevance and quality. Limiting the ranking position in which Universal Results could appear in principle does not mean that Google held Universal Results to a lower relevance standard. We would not like to comment on the contention raised by Google regarding technical infeasibility. However, it is an admitted position that Google shifted to the fully-floating regime, i.e. to display Universal Results at any position on the SERP depending on the same relevance screen applicable to other generic results, well before the present informations were filed before the Commission in June 2012

and the proceedings were initiated. In our view, the change in the system brought about by Google, on its own, obviates the need for any regulatory intervention in this aspect, especially when the new fully-floating regime appropriately addresses the concern. Hence, Google cannot be held liable for imposition of unfair condition on account of its historic use of fixed positions for the Universal Results on the SERP in contravention of Section 4 (2) (a) (i) of the Act.

32. Before we conclude, we may extract Section 4 of the Act for ready reference:

(1) No enterprise or group shall abuse its dominant position.

(2)There shall be an abuse of dominant position under sub-Section (1), if an enterprise, -

```
(a) directly or indirectly, imposes        unfair   or
    discriminatory--
    (i) condition in purchase or sale of goods or
        services; or
```

PUBLIC VERSION

(ii) price in purchase or sale (including predatory price) of goods or service; or Explanation.-- For the purposes of this clause, the unfair or discriminatory condition in purchase or sale of goods or services referred to in sub-clause

(i) and unfair or discriminatory price in purchase or sale of goods (including predatory price) or service referred to in sub- clause (ii) shall not include such discriminatory conditions or prices which may be adopted to meet the competition; or

(b) limits or restricts -

(i) production of goods or provision of services or market therefor; or

(ii) technical or scientific development relating to goods or services to the prejudice of consumers; or

(c) indulges in practice or practices resulting in denial of market access; or

(d) makes conclusion of contracts subject to acceptance by other parties of supplementary obligations which, by their nature or according to commercial usage, have no connection with the subject of such contracts; or

(e) uses its dominant position in one relevant market to enter into, or protect, other relevant market.

[emphasis supplied] It is important to note that each and every clause of sub-section (2) of Section 4 of the Act uses words or operatives to reflect abuse. For instance, Section 4 (2) (a) (i) uses "imposes unfair or discriminatory condition in purchase or sale of goods or services". Similarly, clauses 4 (2) (b), (c), (d) and (e) emphasise on other abuses with operatives such as "limits or restricts", "indulges in practice or practices resulting in denial of market access", "makes conclusion of contract", "uses its dominant position ... to enter into, or protect ...". Thus, a dominant PUBLIC VERSION player will be guilty of abuse only in the presence of proof of such behaviour as emphasised in the operatives used in these clauses. It goes without saying that the onus is on the Commission to establish from the evidence on record that there is either an imposition of unfair or discriminatory condition in purchase or sale of goods or services or there is a restriction of production of goods or provision of services or market, technical or scientific development or indulgence in practice or practices which result in denial of market access to some player (s) in the relevant market. Unfortunately, as detailed in the preceding paras, we do not find any evidence on record to establish abuse as indicated by the operatives used in Section 4 of the Act.

33. In conclusion, we note that with exponential growth of the internet, online markets now cover an ever-increasing spectrum of commercial activities. What we are also witnessing is creation of large online platforms that can wield substantial power over all market participants. By virtue of their access to the entire internet landscape as also to large volumes of personal data, they may be in a position to deter new innovation or dampen consumer welfare. However, market power or dominance in itself is not an antitrust concern; it is the conduct of such players that warrants careful competition scrutiny. It is when the evidence shows that the dominant firm uses its market power to stifle innovation and/ or competition or exploits the market power to the detriment of its consumers that a competition agency should intervene. Intervention can no longer revolve primarily around the creation or the strengthening of market power, but it should focus on the conduct of the dominant players and its implications for competition and consumers. We are of the view that regulatory interventions should be evidence- based as opposed to perception-based. In the instant case, the investigation has not brought on record the evidence and competitive analysis necessary to have a complete understanding of either the PUBLIC VERSION markets concerned or the conduct. Hence, we hesitate to use the instrumentality of this law to correct perceptions at the expense of the consumers who according to us are the constituency of this law. In view of the same, we do not find Google to be in contravention of Section 4 of the Act.

Sd/-

(Sudhir Mital) Member Sd/-

(Justice G. P. Mittal) Member New Delhi Date: 08/02/2018

# EXHIBIT J





Document-Id: 302950, **Please cite as:** "https://www.trans-lex.org/302950"

## Title

Unilever Plc v. Proctor & Gamble Co [2000] FSR 344

## Table of Contents

Unilever Plc v. Proctor & Gamble Co [2000] FSR 344

    Representation

    Introduction

    The facts

    Actionable threats

    Without prejudice communications: general

    Without prejudice: the old cases

    Without prejudice: conclusions

    Subsidiary issues: general

    Subsidiary issues: claim of right

## Content

# Unilever Plc v. Proctor & Gamble Co [2000] FSR 344

344

Unilever Plc v. The Procter & Gamble Company

In the Court of Appeal

CA

Before: Lord Justice Simon Brown Lord Justice Robert Walker Mr Justice Wilson

October 28, 1999

Patents--Declaration of non-infringement--Action founded on threats and claim of right by the defendant made in without prejudice meeting--Action struck out as being based on inadmissible statements--Appeal--Appeal dismissed.

Patents Designs and Trademarks Act 1883, s.32 .

Patents Act 1977, ss.60(1), 70, 71.

Civil Procedure Rules, Part 51, Sched. 1, Rules of the Supreme Court, Ord. 15, r.16.

The appellant/claimant sought a declaration of non-infringement of the respondent/defendant's patent. The defendant had made a claim of right and threatened to bring infringement proceedings during a without prejudice meeting between the parties. The claimant had argued that the privilege attached to without prejudice negotiations was confined to anything said being relied on as an admission and did not extend to assertions of rights or threats of proceedings. The judge struck the action out as being an abuse of process as it was based on inadmissible statements.[1] He held that there was no public interest in favour of allowing threats made in without prejudice circumstances to be sued upon which outweighed the public interest in fostering the non-litigious compromise of proceedings.

Held, dismissing the appeal:

(1) There were a number of well recognised occasions where the without prejudice rule did not prevent the admission into evidence of what one or both of the parties said or wrote. These included:

    (i)   where the issue was whether the without prejudice communications had resulted in a concluded compromise agreement;

(ii) where it was admissible to show that an agreement apparently concluded between the parties during negotiations should be set aside on the ground of misrepresentation, fraud or undue influence;

345

(iii) where a statement might be admissible as giving rise to an estoppel;

(iv) where the exclusion of the evidence would act as a cloak for perjury, blackmail or other unambiguous impropriety;

(v) where the evidence was admissible in order to explain delay or apparent acquiescence;

(vi) where, in an action for negligence, the evidence was admissible to show that the claimant had acted reasonably to mitigate his loss in his conduct and conclusion of negotiations brought by him against a third party;

(vii) where the evidence was admissible as being an offer made without prejudice save as to costs.

(2) The modern authorities made it clear that the without prejudice rule was founded partly in public policy and partly in the agreement of the parties. The protection of admissions against interest was the most important practical effect of the rule. However, to dissect out identifiable admissions and to withhold protection from the rest of without prejudice communications (except for a special reason) would not only create huge practical difficulties but would be contrary to the underlying objective of giving protection to the parties.

Cutts v. Head [1984] Ch. 290, Rush & Tompkins v. Greater London Council [1989] A.C. 1280 and Muller v. Linsley & Mortimer, November 30, 1994 , CA, 139 S.J. L.B. 43 referred to. Kurtz v. Spence (1888) 5 R.P.C. 161, 57 L.J. Ch. 238, 58 L.T. 438 disapproved . Skinner & Co. v. Shew & Co. [1893] 1 Ch. 413 and Daintrey, Re [1893] 2 Q.B. 116 considered and not followed.

(3) It was an abuse of process for the claimant to be allowed to plead anything that was said at the meeting either as a threat or as a claim of right.

(4) The claimant could not obtain a declaration of non-infringement under the general jurisdiction because no admissible claim of right had been asserted against it.

Barclays Bank plc v. Homan [1993] B.C.L.C. 680, Clay, Re [1919] 1 Ch. 66 followed. S, Re [1995] 3 All E.R. 290 distinguished.

The following cases were referred to in the judgments:

Alizadeh v. Nikbin, unreported, 1993, C.A.T. 205, CA.

Barclays Bank plc v. Homan [1993] B.C.L.C. 680.

Cavity Trays Ltd v. RMC Panel Products Ltd [1996] R.P.C. 361.

Clay, Re [1919] 1 Ch. 66.

Cutts v. Head [1984] Ch. 290.

D, Re [1993] 2 All E.R. 693.

Daintrey, Re [1893] 2 Q.B. 116.

346

Finch v. Wilson, unreported, May 8, 1987.

Foster v. Friedland, unreported, November 10, 1992, CA.

Halsey v. Brotherhood (1880) 15 Ch.D. 514.

Hawick Jersey International v. Caplan, The Times, March 11, 1988.

Hodgkinson & Corby Ltd v. Wards Mobility Services Ltd [1997] F.S.R. 178.

Hoghton v. Hoghton (1852) 15 Beav. 278.

Kurtz v. Spence (1888) 5 R.P.C. 161, 57 L.J. Ch. 238, 58 L.T. 438.

Rush & Tompkins v. Greater London Council [1989] A.C. 1280.

S, Re [1995] 3 All E.R. 290.

Skinner & Co. v. Shew & Co. [1893] 1 Ch. 413.

Tomlin v. Standard Telephones and Cables [1969] 1 W.L.R. 1378.

Underwood v. Cox (1912) 4 D.L.R. 66.

Waldridge v. Kenniston (1794) 1 Esp. 142.

Walker v. Wilsher (1889) 23 Q.B.D. 335.

## Representation

Geoffrey Hobbs Q.C. and Daniel Alexander instructed by Bird & Bird appeared for the appellant/claimant. Simon Thorley, Q.C. and Colin Birss instructed by Simmons & Simmonsappeared on behalf of the respondent/defendant.

Robert Walker L.J.:

## Introduction

This is an appeal with the leave of the judge from an order of Laddie J. made in the Patents Court on February 24, 1999.[2] His order struck out as an abuse of process an action by Unilever plc (Unilever), the appellant in this court. The defendant, the respondent in this court, is The Procter & Gamble Company (Procter & Gamble) a company based in Cincinnati, Ohio.

The principal issue raised in the appeal is as to the application of the general rule of evidence on "without prejudice" communications to a form of proceedings peculiar to patent law and some other fields of intellectual property law, that is (as Unilever contends its action was) an action for threats brought under section 70 of the Patents Act 1977 (the 1977 Act). There are subsidiary issues (which arise partly on the notice of appeal and partly on the respondent's notice) as to whether the action was indeed an action under section 70 and as to the granting of declaratory relief under some other head of jurisdiction.

## The facts

The facts can be stated quite shortly. Since Procter & Gamble's strike-out application was based on abuse of process, as well as on failure to disclose a cause of action, there was some affidavit evidence, but no significant factual dispute. Procter & Gamble is the proprietor of European Patent (U.K.) No. 0343069 which was granted in 1993 with designations for Germany, Italy, Spain and the United Kingdom. The patent is principally for a process ("for

the washing of laundry in a machine") rather than for a product but from Unilever's point of view the essential issue is whether or not the manufacture and sale of a product known as Persil Performance Tablets would constitute an infringement of Procter & Gamble's patent.

Opposition proceedings (initiated by a German company, Henkel) have been taking place in the European Patent Office and in May 1997 Henkel brought an appeal in those proceedings. There have also been proceedings in France brought in May 1998 by Procter & Gamble against a French company which is an indirect subsidiary of Unilever. It is not necessary to give details of the French proceedings, but they led to a high-level meeting in Frankfurt, on May 20, 1998, between representatives of Procter & Gamble and Unilever.

The judge described the meeting,[3]and subsequent events as follows:

...

**3"** The meeting took place in the context of ongoing discussions with a view to settling a number of issues between the two organisations. There is no dispute that both parties agreed to those discussions being conducted on a without prejudice basis. It is said that in the course of the meeting P&G made a claim of right and threatened Unilever with proceedings for infringement of the patent in suit.

**4"** On May 29, 1998 Henkel informed Unilever that it had come to an arrangement with P&G. One of the conditions of the arrangement was that Henkel would withdraw its opposition to the grant of the patent in the EPO. Unilever immediately issued the writ in the present action. It is common ground that Unilever's motivation in starting the current proceedings was to attempt to give it locus to intervene in the appeal proceedings before the EPO pursuant to Article 105 of the European Patent Convention ("EPC"). That Article permits a third party to intervene if he proves both that the proprietor of the patent has requested that he ceases alleged infringement of the patent and that he has instituted proceedings for a court ruling that he is not infringing the patent. Unilever filed an application to intervene under Article 105 EPC. It has been challenged by P&G and the EPO will have to rule on that issue.

**5"** Unilever could have commenced proceedings against P&G in this country had it complied with the provisions of section 71 of the Patents Act 1977 by applying in writing to P&G for a written acknowledgment of non-infringement. However that would have taken time.

Presumably because Unilever thought that the window of opportunity for it to try to come within Article 105 was narrow, the section 71 route was not taken.

**6"** On June 5, 1998 P&G commenced patent infringement proceedings under European Patent U.K. No. 0343069 in respect of Persil Performance Tablets in the Patents Court. It is not in dispute that the product is dealt with in this country by Lever Brothers and not by Unilever PLC. So the infringement proceedings are against Lever Brothers not against Unilever.

**7"**On October 26, 1998 P&G launched the Notice of Motion which is now before the Court seeking to strike out Unilever's action for a declaration of non-infringement.

The statement of claim in Unilever's action pleaded that Procter & Gamble had threatened to take proceedings, with the following particulars:

(a)  In early May, [Procter & Gamble] commenced proceedings in the Tribunal

de Grande Instance de Paris, in France against La Société Lever S.A. for infringement of the French equivalent of the patent.

(b)  At a meeting held in Frankfurt on May 20, 1998 attended by Mr Stephen Williams, General Counsel and Joint Company Secretary of [Unilever] and Mr James Johnson, Senior Vice-President and General Counsel of [Procter & Gamble], Mr Johnson stated that [Procter & Gamble] was taking similar action in the United Kingdom in the near future.

(c)  The said statement constituted (i) an assertion that the sale and marketing of Persil Performance Tablets in the United Kingdom infringes the patent and (ii) a threat to take proceedings in the United Kingdom in respect of such alleged infringement.

The judge proceeded on the basis that he should assume the particulars to be true, and that they amounted to a pleading of an actionable threat even though the prayer for relief sought, not an injunction or damages, but only a declaration (and not a declaration in the terms permitted by section 70(3)(a)). The terms of the declaration sought were:

that the manufacture, sale and/or marketing of Persil Performance Tablets in the United Kingdom (and any other act of the kind mentioned in section 60 of the Patents Act 1977 done in relation thereto) does not infringe European Patent (U.K.) No. 0343069 and/or such further or other declaration as shall to the court seem fit.

One of the subsidiary issues is whether the judge was right in the way in which he characterised the action.

## Actionable threats

An action for threat calls for some explanation for the benefit of those who do not regularly practise in the specialised field of intellectual property law. The power conferred on a patentee by the grant of a statutory monopoly was thought by Parliament to call for special safeguards, and the statutory jurisdiction was first introduced by section 32 of the Patents Designs and Trademarks Act 1883 (the 1883 Act), which was in the following terms:

Where any person claiming to be the patentee of an invention, by circulars advertisements or otherwise threatens any other person with any legal proceedings or liability in respect of any alleged manufacture use sale or purchase of the invention, any person or persons aggrieved thereby may bring an action against him, and may obtain an injunction against the continuance of such threats, and may recover such damage (if any) as may have been sustained thereby, if the alleged manufacture, use, sale, or purchase to which the threats related was not in fact an infringement of any legal rights of the person making such threats: provided that this section shall not apply if the person making such threats with due diligence commences and prosecutes an action for infringement of his patent.

Later statutes have contained comparable but by no means identical provisions. Section 70 of the 1977 Act, the provision now in force, is in the following terms,

**1"** Where a person (whether or not the proprietor of, or entitled to any right in, a patent) by circulars, advertisements or otherwise threatens another person with proceedings for any infringement of a patent, a person aggrieved by the

threats (whether or not he is the person to whom the threats are made) may, subject to subsection (4) below, bring proceedings in the court against the person making the threats, claiming any relief mentioned in subsection (3) below.

**2"** In any such proceedings the plaintiff or pursuer shall, if he proves that the threats were so made and satisfies the court that he is a person aggrieved by them, be entitled to the relief claimed unless

(a)  the defendant or defender proves that the acts in respect of which proceedings were threatened constitute or, if done, would constitute an infringement of a patent; and

(b)  the patent alleged to be infringed is not shown by the plaintiff or pursuer to be invalid in a relevant respect.

**3"** The said relief is

(a)  a declaration or declarator to the effect that the threats are unjustifiable;

(b)  an injunction or interdict against the continuance of the threats; and

(c)  damages in respect of any loss which the plaintiff or pursuer has sustained by the threats.

**4"**-paragraph> Proceedings may not be brought under this section for a threat to bring proceedings for an infringement alleged to consist of making or importing a product for disposal or of using a process.

**5"** It is hereby declared that a mere notification of the existence of a patent does not constitute a threat of proceedings within the meaning of this section.

It will be apparent that the proviso to section 32 of the 1883 Act permitted the customary courtesy of a letter before action (even one written in threatening terms) provided that it was promptly followed by a writ. Section 70 of the 1977 Act does not contain the same proviso, but subsection (5) enables an unobjectionable warning to be given by a discreetly worded letter, at any rate as between chartered patent agents who understand the need for coded messages. Subsection (4) contains an exception for a threat of infringement proceedings of a certain type, that is "an infringement alleged to consist of making or importing a product for disposal or of using a process."

In order to understand the effect of section 70(4)it is necessary to bear in mind that by section 60(1) of the 1977 Act the infringement of a patent in respect of a product consists of any of six acts carried out without the consent of the proprietor of the patent, that is (i) manufacturing it (ii) disposing of it (iii) offering to dispose of it (iv) using it (v) importing it and (vi) keeping it (for disposal or otherwise). Infringement of a patent in respect of a process consists of using the process or offering it for use, or doing any of acts (ii) to (vi) above in relation to a product obtained from the patented process. So the broad effect of the exception is that an aggrieved proprietor (or any other person aggrieved) can threaten a manufacturer or an importer of an allegedly infringing product or the user of an allegedly infringing process, but not persons such as small retailers or customers (the persons most likely to be deterred by threats, whether or not well-founded).

However section 70(4) must be construed in accordance with what this court has regarded as its clear terms, so that threats may be made with impunity to a manufacturer or an importer only in respect of acts of manufacture or importation. That was decided in Cavity Trays v. RMC Panel Products [1996] R.P.C. 361 , in which Aldous L.J. said (at page 373):

Section 70 provides relief against abuse of monopoly ... Subsection (4) is an exception added in the 1977 Act to allow warnings to be given in certain circumstances. In my view the subsection defines the acts of alleged infringement that are excluded and not the type of persons who may be threatened. The division between the type of acts in respect of which warnings are allowed without risk of suit and those which are not, can be said to be arbitrary but is sufficient to enable a patentee to give the appropriate warning.

Neill L.J. and Sir John Balcombe gave concurring judgments. Section 70(4) as interpreted in Cavity Trays is of some relevance as explaining the section's legislative purpose; in addition it is relevant to one of the subsidiary issues in the appeal.

The judge referred, in the summary of the facts already cited from his judgment, to Unilever's decision (apparently in the interests of saving time) not to take what the judge called "the section 71 route". That is a reference to the statutory jurisdiction conferred by section 71 of the 1977 Act to make a declaration that an act or proposed act by the claimant does not or would not constitute an infringement of a patent, even though the proprietor has not asserted the contrary, if the claimant shows that he has made a written application to the proprietor, with full written particulars, and the proprietor has refused or failed to give the acknowledgment requested. The court's power under section 71 is expressed to be "without prejudice to the court's jurisdiction to make a declaration ... apart from this section". Section 71 replaced section 66 of the Patents Act 1949 but did not have any counterpart in earlier legislation. So when the statutory cause of action for groundless threats was first introduced, and for about 65 years afterwards, there was no particular statutory jurisdiction to grant a declaration of non-infringement, and for part of this period the general jurisdiction to grant declaratory relief was less fully developed. At all times it has been only by a threats action that a claimant could obtain an injunction or damages.

## Without prejudice communications: general

In Rush & Tompkins v. Greater London Council [1989] A.C. 1280, 1299, Lord Griffiths said:

The "without prejudice" rule is a rule governing the admissibility of evidence and is founded upon the public policy of encouraging litigants to settle their differences rather than litigate them to a finish. It is nowhere more clearly expressed than in the judgment of Oliver L.J. in Cutts v. Head [1984] Ch. 290 at 306:

That the rule rests, at least in part, upon public policy is clear from many authorities, and the convenient starting point of the inquiry is the nature of the underlying policy. It is that parties should be encouraged so far as possible to settle their disputes without resort to litigation and should not be discouraged by the knowledge that anything that is said in the course of such negotiations (and that includes, of course, as much the failure to reply to an offer as an actual reply) may be used to their prejudice in the course of the proceedings. They should, as it was expressed by Clauson J. in Scott Paper Co. v. Drayton Paper Works Ltd [1927] 44 R.P.C. 151at 156, be encouraged fully and frankly to put their cards on the table ... The public policy justification, in truth, essentially rests on the desirability of preventing statements or offers made in the course of negotiations for

settlement being brought before the court of trial as admissions on the question of liability.

The rule applies to exclude all negotiations genuinely aimed at settlement whether oral or in writing from being given in evidence.

This well-known passage recognises the rule as being based at least in part on public policy. Its other basis or foundation is in the express or implied agreement of the parties themselves that communications in the course of their negotiations should not be admissible in evidence if, despite the negotiations, a contested hearing ensues.

In the course of counsel's clear and well-researched written and oral submissions a general issue arose as to whether the "without prejudice" rule should be seen as a rule of very wide scope which does however on occasion have to yield to some more powerful principle with which it comes in conflict (such as the need to prevent a litigant deceiving the court with perjured evidence); or whether that wide view represents a failure of proper analysis of the true foundation and purpose of the rule. The most forthright passages in support of the wide view are to be found in Walker v. Wilsher (1889) 23 Q.B.D. 335 , in passages from the judgments of Lord Esher M.R., Lindley L.J. and Bowen L.J. conveniently set out in the judgment of Oliver L.J. in Cutts v. Head [1984] Ch. 290, 302-304. The clearest statement of the need for analysis is in the judgment of Hoffmann L.J. in Muller v. Linsley & Mortimer (November 30, 1994, 139 S.J. L.B. 43) where Hoffmann L.J. said:

Some of the decisions on the without prejudice rule show a fairly mechanistic approach, but the recent cases, most notably the decisions of this court in Cutts v. Head [1984] Ch. 290, [1984] 1 All E.R. 597 and the House of Lords in Rush & Tompkins Ltd v. Greater London Council [1989] A.C. 1280, [1988] 3 All E.R. 737are firmly based upon an analysis of the rule's underlying rationale.

<u>Cutts v. Head</u> shows that the rule has two justifications. First, the public policy of encouraging parties to negotiate and settle their disputes out of court and, secondly, an implied agreement arising out of what is commonly understood to be the consequences of offering or agreeing to negotiate without prejudice. In some cases both of these justifications are present; in others, only one or the other. So, in <u>Cutts v. Head</u> the rule that one could not rely upon a without prejudice offer on the question of costs after judgment was held not to be based upon any public policy. It did not promote the policy of encouraging settlements because as Oliver L.J. said:

As a practical matter, a consciousness of a risk as to costs if reasonable offers are refused can only encourage settlement ...

It followed that the only basis for excluding reference to a without prejudice offer on costs was an implied agreement based on general usage and understanding that the party making the offer would not do so. Such an implication could be excluded by a contrary statement as in a Calderbank offer [see Calderbank v. Calderbank [1976] Fam. 93].

He then considered <u>Rush & Tompkins</u> at some length and continued:

If one analyses the relationship between the without prejudice rule and the other rules of evidence, it seems to me that the privilege operates as an exception to the general rule on admissions (which can itself be regarded as an exception to the rule against hearsay) that the statement or conduct of a party is always admissible against him to prove any fact which is thereby expressly or impliedly

asserted or admitted. The public policy aspect of the rule is not in my judgment concerned with the admissibility of statements which are relevant otherwise than as admissions, *i.e.* independently of the truth of the facts alleged to have been admitted.

Many of the alleged exceptions to the rule will be found on analysis to be cases in which the relevance of the communication lies not in the truth of any fact which it asserts or admits, but simply in the fact that it was made. Thus, when the issue is whether without prejudice letters have resulted in an agreed settlement, the correspondence is admissible because the relevance of the letters has nothing to do with the truth of any facts which the writers may have expressly or impliedly admitted. They are relevant because they contain the offer and acceptance forming a contract which has replaced the cause of action previously in dispute. Likewise, a without prejudice letter containing a threat is admissible to prove that the threat was made. A without prejudice letter containing a statement which amounted to an act of bankruptcy is admissible to prove that the statement was made; see Re Daintrey [1893] 2 Q.B. 116. Without prejudice correspondence is always admissible to explain delay in commencing or prosecuting litigation. Here again, the relevance lies in the fact that the communications took place and not the truth of their contents. Indeed, I think that the only case in which the rule has been held to preclude the use of without prejudice communications, otherwise than as admissions, is in the rule that an offer may not be used on the question of costs; a rule which, as I have said, has been held to rest purely upon convention and not upon public policy.

This is not the case in which to attempt a definitive statement of the scope of the purely convention-based rule, not least because, as Fox L.J. pointed out in <u>Cutts v. Head</u> at page 316, it depends upon customary usage which is not immutable. But the public policy rationale is, in my judgment, directed solely to admissions. In a case such as this, in which the defendants were not parties to the negotiations, there can be no other basis for the privilege.

Leggatt L.J. and Swinton Thomas L.J. agreed in short concurring judgments.

Without in any way underestimating the need for proper analysis of the rule, I have no doubt that busy practitioners are acting prudently in making the general working assumption that the rule, if not "sacred" (Hoghton v. Hoghton (1852) 15 Beav. 278 at 321), has a wide and compelling effect. This is particularly true where the "without prejudice" communications in question consist not of letters or other written documents but of wide-ranging unscripted discussions during a meeting which may have lasted several hours.

At a meeting of that sort the discussions between the parties' representatives may contain a mixture of admissions and half-admissions against a party's interest, more or less confident assertions of a party's case, offers, counter-offers, and statements (which might be characterised as threats, or as thinking aloud) about future plans and possibilities. As Simon Brown L.J. put it in the course of argument, a threat of infringement proceedings may be deeply embedded in negotiations for a compromise solution. Partial disclosure of the minutes of such a meeting may be, as Leggatt L.J. put it in Muller, a concept as implausible as the curate's egg (which was good in parts). As it happens the minutes of the Frankfurt meeting are exhibited in redacted form, in which the redacted parts of the document appear to amount to about 90 per cent of its contents.

Nevertheless there are numerous occasions on which, despite the existence of without prejudice negotiations, the without prejudice rule does not prevent the admission into evidence of what one or both of the parties said or wrote. The following are among the most important instances:

**1"** As Hoffmann L.J. noted in the first passage set out above, when the issue is whether without prejudice communications have resulted in a concluded compromise agreement, those communications are admissible. Tomlin v. Standard Telephones and Cables [1969] 1 W.L.R. 1378 is an example.

**2"** Evidence of the negotiations is also admissible to show that an agreement apparently concluded between the parties during the negotiations should be set aside on the ground of misrepresentation, fraud or undue influence. Underwood v. Cox (1912) 4 D.L.R. 66, a decision from Ontario, is a striking illustration of this.

**3"** Even if there is no concluded compromise, a clear statement which is made by one party to negotiations, and on which the other party is intended to act and does in fact act, may be admissible as giving rise to an estoppel. That was the view of Neuberger J. in Hodgkinson & Corby Ltd v. Wards Mobility Services Ltd [1997] F.S.R. 178 at 191, and his view on that point was not disapproved by this court on appeal.

**4"** Apart from any concluded contract or estoppel, one party may be allowed to give evidence of what the other said or wrote in without prejudice negotiations if the exclusion of the evidence would act as a cloak for perjury, blackmail or other "unambiguous impropriety" (the expression used by Hoffmann L.J. in Foster v. Friedland, November 10, 1992, CAT 1052).

Examples (helpfully collected in Foskett's Law & Practice of Compromise, 4th ed., paragraphs 9-32) are two first-instances decisions, Finch v. Wilson (May 8, 1987) and Hawick Jersey International v. Caplan (The Times, March 11, 1988). But this court has, in Foster v. Friedland and Fazil-Alizadeh v. Nikbin, 1993 CAT 205, warned that the exception should be applied only in the clearest cases of abuse of a privileged occasion.

**5"** Evidence of negotiations may be given (for instance, on an application to strike out proceedings for want of prosecution) in order to explain delay or apparent acquiesence.

Lindley L.J. in Walker v. Wilsher (1889) 23 Q.B.D. 335, at 338, noted this exception but regarded it as limited to "the fact that such letters have been written and the dates at which they were written". But occasionally fuller evidence is needed in order to give the court a fair picture of the rights and wrongs of the delay.

**6"** In Muller (which was a decision on discovery, not admissibility) one of the issues between the claimant and the defendants, his former solicitors, was whether the claimant had acted reasonably to mitigate his loss in his conduct and conclusion of negotiations for the compromise of proceedings brought by him against a software company and its other shareholders. Hoffmann L.J. treated that issue as one unconnected with the truth or falsity of anything stated in the negotiations, and as therefore falling outside the principle of public policy protecting without prejudice communications. The other members of the court agreed but would also have based their decision on waiver.

**7"** The exception (or apparent exception) for an offer expressly made "without prejudice except as to costs" was clearly recognised by this court in Cutts v. Head [1984] Ch. 290 and by the House of Lords in Rush & Tomkins, as based on an express or implied agreement between the parties. It stands apart from the principle of public policy (a point emphasised by the importance which the new Civil Procedure Rules, Part 44.3(4), attach to the conduct of the parties in deciding questions of costs). There seems to be no reason in principle why parties to without prejudice negotiations should not expressly

or impliedly agree to vary the application of the public policy rule in other respects, either by extending or by limiting its reach. In Cutts v. Head Fox L.J. said (at page 316) "what meaning is given to the words 'without prejudice' is a matter of interpretation which is capable of variation according to use in the profession. It seems to me that, no issue of public policy being involved, it would be wrong to say that the words were given a meaning in 1889 which is immutable ever after".

**8"** In matrimonial cases there has developed what is now a distinct privilege extending to communications received in confidence with a view to matrimonial conciliation: see Re D [1993] 2 All E.R. 693, at 697, where Sir Thomas Bingham MR thought it not

... fruitful to debate the relationship of this privilege with the more familiar head of "without prejudice" privilege. That its underlying rationale is similar, and that it developed by way of analogy with "without prejudice" privilege, seems clear. But both Lord Hailsham and Lord Simon in D. v. National Sociey for the Prevention of Cruelty to Children [1977] 1 All E.R. 589at 602, 610 [1978] A.C. 171 at 226, 236 regarded it as having developed into a new category of privilege based on the public interest in the stability of marriage.

That hybrid species of privilege is not in point in this case.

In relation to the older authorities the above summary owes much to a very learned article by Professor David Vaver published as long ago as 1974 in the University of British Columbia Law Review (1974 U.B.C.L.R. 85). Unlike Professor Vaver's article my summary is far from exhaustive; in particular, it does not touch on the decisions in Kurtz v. Spence (1888) 5 R.P.C. 161, Skinner & Co. v. Shew & Co. [1893] 1 Ch. 413 and Re Daintrey [1893] 2 Q.B. 116 (decisions which have been heavily relied on by Mr Geoffrey Hobbs Q.C. on behalf of Unilever and to which I return below). It is apparent that none of the exceptions to the public policy rule involves the disclosure of admissions bearing on the subject-matter in dispute, at any rate unless the expression "admission" is given a substantially wider meaning than it usually has in the law of evidence. (I disregard the old case of Waldridge v. Kennison (1794) 1 Esp. 142, which Lord Griffiths in Rush & Tompkins, at page 1300, regarded as exceptional.) Conversely, however, I respectfully doubt whether the large residue of communications which remain protected can all be described as admissions (again, unless that expression is given an unusually wide meaning). One party's advocate should not be able to subject the other party to speculative cross-examination on matters disclosed or discussed in without prejudice negotiations simply because those matters do not amount to admissions.

In the second of the passages already quoted from Hoffmann L.J.'s judgment in Muller he said:

... a without prejudice letter containing a threat is admissible to prove that the threat was made.

As he did not refer to any authority on this point it is not clear whether his remark was addressed to the sort of threats of perjury or blackmail which he had considered two years before in Forster v. Friedland, or in Kurtz v. Spence. To consider whether or not he had the latter case in mind, I must

now turn to it and to the other two nineteenth century cases on which Mr Hobbs has relied.

## Without prejudice: the old cases

This court was referred in detail to what seems to be the fullest report of Kurtz v. Spence (1888) 5 R.P.C. 161 (the case is also reported at 57 L.J. Ch. 238and 58 L.T. 438). It was an action for threats under section 32 of the 1883 Act. The threats relied on were said to

have been made in four letters from the defendants sent between January 23 and June 28, 1886, and during the course of a meeting held on February 11, 1886. It was common ground that these communications were made with a view to achieving a settlement and would normally be governed by the without prejudice rule. Kekewich J. heard as a preliminary issue the question whether there was a threat within the meaning of section 32. The defendants' counsel is reported as having argued that the alleged threats were mere warnings and that they occurred at a meeting held without prejudice and in letters written without prejudice. It is not clear whether the second point was free-standing or an elaboration of the first point. Kekewich J. gave an extempore judgment of some length in which (at page 173) he set out two imaginary statements by a litigant. As was pointed out by Wilson J. in the course of argument in this case, there is no perceptible difference of substance between the two, yet Kekewich J. apparently regarded the first as protected by the rule, whereas he said of the second:

It would be far from consonant with justice if I should shut out that threat and say that it is not a threat within section 32, so as to entitle the person against whom the threat is made to bring an action to restrain the continuance of it. I think that would be stretching "without prejudice" much too far, and in fact giving it a meaning which it was never intended to have.

The judgment as a whole is rather lacking in coherent analysis of the relevant principles. Nevertheless it has for a century appeared in a number of very reputable textbooks as authority for the proposition that an actionable threat may be made in a without prejudice communication.

The other two nineteenth century cases are relied on by Mr Hobbs by way of analogy only. Skinner & Co. v. Shew & Co. [1893] 1 Ch. 413 was an action for threats in connection with a patent for a camera. The defendants (the patentees) argued that letters answering questions posed by the plaintiffs (rival manufacturers) could not be threats, and that letters to a third party (apparently a wholesaler or retailer who did business with both manufacturers) were privileged. Laddie J. took that as a reference to legal professional privilege but Mr Hobbs has suggested that it referred to qualified privilege. That seems the more likely view since counsel had cited two cases on the old law of trade libel, to which malice was relevant (see Halsey v. Brotherhood (1880) 15 Ch.D. 514, the later of the two cases). Mr Hobbs relied by analogy on passages in the judgment of Lindley L.J. at page 422:

There is nothing in the language of the thirty-second section which invites or allows the consideration of such a question as privilege

356

That of Bowen L.J. at page 426:

The statute says circulars and advertisements nevertheless may contain threats, and uses those words "or otherwise" so as to sweep into its net every kind of threat ...

And that of A. L. Smith L.J. at page 426, who after noting the exceptions for well-founded threats and for prompt action said:

If he cannot bring himself within either of those two, what I call saving clauses, then the section absolutely forbids a man threatening legal proceedings with regard to a patent action at all; and in my opinion, it is *nihil ad rem* to say that what he did was *bona fide*, or that what he did was on a privileged occasion, because the section enacts that a man shall not threaten unless he comes within either of the two provisos at the end of the section.

In Re Daintrey [1893] 2 Q.B. 116 a creditor had presented a bankruptcy petition based solely on a letter from his debtor (against whom he had taken proceedings but not yet obtained judgment). The letter was headed "without prejudice" and made an offer to compound for the debt. But it also stated that the debtor could not pay his debts and would suspend payment unless the composition was accepted. The issue for the court was whether this was an act of bankruptcy, and the Brighton County Court accepted the debtor's argument that it was not. On appeal the creditor's counsel argued that the without prejudice rule had no application, and that a debtor could not evade the bankruptcy law by putting a "without prejudice" label on an act of bankruptcy. The debtor's counsel argued that the rule was very wide, citing Hoghton v. Hoghton and Walker v. Wilsher . This court (in a single reserved judgment) allowed the appeal. It said at pages 119 to 120:

In our opinion the rule which excludes documents marked "without prejudice" has no application unless some person is in dispute or negotiation with another, and terms are offered for the settlement of the dispute or negotiation, and it seems to us that the judge must necessarily be entitled to look at the document in order to determine whether the conditions, under which alone the rule applies, exist.

The rule is a rule adopted to enable disputants without prejudice to engage in discussion for the purpose of arriving at terms of peace, and unless there is a dispute or negotiations and an offer the rule has no application. It seems to us that the judge must be entitled to look at the document to determine whether the document does contain an offer of terms. Moreover, we think that the rule has no application to a document which, in its nature, may prejudice the person to whom it is addressed.

Apart from the last sentence, this passage spells out the uncontroversial point that "without prejudice" is not a label which can be used indiscriminately so as to immunise an act from its normal legal consequences, where there is no genuine dispute or negotiation. The obscurity of the last sentence has been commented on by Professor Vaver but it may contain the germ of the notion of abuse of a privileged occasion which has developed in later cases. Re Daintrey was not cited below and Mr Hobbs relied on it in this court as an example of the court lifting the "without prejudice" veil so as to expose wrongdoing. But the real point of the decision was that the veil was never there in the first place.

357

Kurtz v. Spence and Skinner & Co. v. Shew & Co., on the other hand, were cited and very fully discussed before the judge, who devoted separate sections of his judgment (paragraphs 40-42 and paragraphs 43-46) to these cases. As to Kurtz v. Spencethe judge concluded (paragraph 42) that it was essentially a decision on the construction of section 32 of the 1883 Act, and not on the exclusionary effect of the evidential rule. He stated that even had the case been more relevant:

I would not follow it. Kekewich J. was considering a very differently worded provision of the [1883 Act]. The more focused target of modern threats legislation ... is not to be found in [the 1883] Act and the jurisprudence on the without prejudice rule and the public policy considerations were less developed in 1888.

As to Skinner & Co. v. Shew & Co., the judge concluded (paragraph 46) that it did not throw light, even by analogy, on the issue which he had to decide: what was in issue in that case, he said, was open correspondence sent by one litigant to the other litigant and the latter's customer.

In my judgment the judge was right to conclude that neither of these old and rather obscure authorities was decisive, or even particularly helpful, on the issue before him. In Kurtz v. Spence the obscurity centres on Kekewich J.'s understanding of principle behind the without prejudice rule. In Skinner & Co. v. Shew & Co. the most important issue was whether the words "or otherwise" in section 32 of the 1883 Act should be read *ejusdem generis*, and the obscurity arose from counsel's submission harking back to the non-statutory law of trade libel. I consider that the judge was also right to give little or no weight to the fact that Kurtz v. Spence has for so long made a regular appearance in leading textbooks. It has not been suggested that this is a point on which practitioners regularly rely on statements in textbooks in the way that conveyancers sometimes used to in the field of property law.

## Without prejudice: conclusions

In those circumstances I consider that this court should, in determining this appeal, give effect to the principles stated in the modern cases, especially Cutts v. Head, Rush & Tompkins and Muller. Whatever difficulties there are in a complete reconciliation of those cases, they make clear that the without prejudice rule is founded partly in public policy and partly in the agreement of the parties. They show that the protection of admissions against interest is the most important practical effect of the rule. But to dissect out identifiable admissions and withhold protection from the rest of without prejudice communications (except for a special reason) would not only create huge practical difficulties but would be contrary to the underlying objection of giving protection to the parties (in the words of Lord Griffiths in Rush & Tompkins at page 1300):

to speak freely about all issues in the litigation both factual and legal when seeking compromise and, for the purpose of establishing a basis of compromise, admitting certain facts.

Parties cannot speak freely at a without prejudice meeting if they must

constantly monitor every sentence, with lawyers or patent agents sitting at their shoulders as minders.

Lord Griffiths in Rush & Tompkins noted (at page 1300c), and more recent decisions illustrate, that even in situations to which the without prejudice rule undoubtedly applies, the veil imposed by public policy may have to be pulled aside, even so as to disclose admissions, in cases where the protection afforded by the rule has been unequivocally abused.

With those principles in mind I come back to the facts of this case, bearing in mind (as Mr Hobbs enjoined the court to do) that this is an appeal in a strike-out and that the facts pleaded in Unilever's statement of claim ("a threat to take proceedings in the United Kingdom in respect of such alleged infringement") must be assumed, for strike-out purposes, to be true.

Ultimately Mr Hobbs's submission on this part of the case came down to two attractively simple propositions. The first was that there are some kinds of communication to which Parliament has attached particular consequences (such as a threat under section 70 of the 1977 Act, or a notice to creditors amounting to an act of bankruptcy as in Re Daintrey) and that those consequences cannot be avoided by pinning on a "without prejudice" label. The other was that Procter & Gamble cannot for strike-out purposes deny the threat, which constitutes a statutory tort and so must be assumed to be wrongful and undeserving of protection.

These submissions were skilfully crafted and developed but I find them remote from the realities of the situation as I see them. The circumstances of the Frankfurt meeting were as far removed as it is possible to imagine from the unilateral communication to which the debtor in Re Daintrey sought to add the "without prejudice" label. It was a high-level meeting between highly-skilled professionals representing the interests of multinational groups which are household names. The meeting was in the judge's words held "in the context of ongoing discussions with a view to settling a number of issues between the two organisations" . It was an occasion for both sides to speak freely. There is nothing (beyond the bare and unembroidered pleading of a threat) to suggest that Procter & Gamble's representatives at the meeting acted in any way that was oppressive, or dishonest, or dishonourable.

In my judgment the judge was right to conclude that it would be an abuse of process for Unilever to be allowed to plead anything that was said at the meeting either as a threat or as a claim of right. The circumstances were such that each side was entitled to expect to be able to speak freely, and their agreement to the meeting being arranged evinces that common intention. I would if necessary base my conclusion on the parties' agreement to extend the normal ambit of the rule based on public policy. But I do not think it is necessary to go that far. The Frankfurt meeting was undoubtedly an occasion covered by the normal rule based on public policy, and the pleading of the threat (or claim of right) has not been shown to come within any recognised exception. The expansion of exceptions should not be encouraged when an important ingredient of Lord Woolf's reforms of civil justice is to encourage those who are in dispute to engage in frank

discussions before they resort to litigation. The decision in Kurtz v. Spence should no longer be regarded as good law.

## Subsidiary issues: general

That conclusion is not sufficient to dispose of the appeal because Unilever had a fall-back argument that its action could succeed as a general claim for a declaration (that is, a claim not based on either section 70 or section 71 of the 1977 Act) and that in order to succeed in obtaining a declaration under the general jurisdiction it was not necessary for Unilever to plead a claim of right (that is, Procter & Gamble's assertion of adverse rights against it).

There were in fact four subsidiary issues canvassed before the judge. The other three were grounds on which Procter & Gamble sought to strike out Unilever's action even if Procter & Gamble did not succeed on the without prejudice issue. The tactical marching and countermarching during the interlocutory skirmishes may, I suspect, have caused even the expert advisers to the parties to have lost sight, from time to time, of the flags under which they were trying to rally. I will identify briefly Procter & Gamble's three would-be pre-emptive points and comment on them briefly. Then I will return to Unilever's fall-back argument.

Procter & Gamble's first subsidiary point was that Unilever's action could not be a threats action because a declaration of non-infringement (as opposed to a declaration of unjustifiable threats) cannot be obtained under section 70. The judge did not accept this argument (see paragraph 11 of the judgment). He does not seem to have noticed (or if he did notice, to have thought it worth mentioning) that quite apart from the without prejudice point Unilver seemed to be faced with the dilemma of choosing between a threats action in which it could not claim the precise relief apparently required to give it standing in the European Patent Office, and an action under the general jurisdiction which would give standing in Munich but might raise other problems. I do not think it is necessary to pursue this point further, because if it had been crucial there might have been an application for permission to amend.

Procter & Gamble's second point was that the pleaded particulars of a threat to sue for an infringement consisting of "sale and marketing" were not supported by the minutes of the Frankfurt meeting, which did not specify sale or marketing (nor did they specify manufacture or importation). This point comes back to the Cavity Trays case mentioned much earlier in this judgment. The judge declined to express a view on it (paragraph 48). I do not regard it as a proper basis for a strike-out.

Procter & Gamble's third point shades into Unilever's fall-back point, in that it concerns Unilever's right to claim declaratory relief when the allegedly infringing acts would be carried out in the United Kingdom by Lever Brothers Ltd (a wholly-owned subsidiary of Unilever's wholly-owned subsidiary). If that were all there was in the challenge to Unilever's standing I would not regard it as a strike-out point, especially in view of the factual matters deposed to in Mr Williams's second affidavit.

360

## Subsidiary issues: claim of right

That is not however the only difficulty in the way of Unilever claiming a declaration under the general jurisdiction regulated by Order 15, rule 16 as incorporated into the Civil Procedure Rules:

No claim or other proceeding shall be open to objection on the ground that a merely declaratory judgment or order is sought thereby, and the court may make binding declarations of right whether or not any consequential relief is or could be claimed.

The judge seems to have been satisfied (although he did not discuss the point at length, perhaps because he regarded it as clear) that Unilever could not obtain a declaration of non-infringement under the general jurisdiction unless Procter & Gamble (or, presumably, an exclusive licensee of Procter & Gamble) had asserted a relevant claim of right against it (see paragraph 24, where the judge referred to Barclays Bank plc v. Homan [1993] B.C.L.C. 680at 693, and paragraph 34).

Barclays Bank plc v. Homanwas a case concerned with problems of cross-border insolvency but in it (at page 693) Hoffmann J. stated the principle, not challenged on appeal, that:

a party against whom no claim has been formulated cannot sue for a declaration of non-liability.

He then referred to Re Clay [1919] 1 Ch. 66 as authority. Mr Hobbs has submitted that the authority of Re Clay has been cast into doubt by the decision of this court in Re S [1995] 3 All E.R. 290. But that case was concerned with a very different and very unusual question as to whether an elderly and disabled man should be cared for in Norway by his separated wife and son, or in England by his long-term companion. Millett L.J. referred (at page 305) to "something approaching an advisory declaration". Re Claywas not cited. Re S has not in my judgment changed the law where only property rights are in play. In patent cases the court should be particularly wary of granting declarations of non-infringement under the general jurisdiction, because of the existence of the special jurisdiction under section 71 of the 1977 Act and the detailed requirements which it imposes.

For these reasons (which are largely the same as those given by the judge) I would dismiss this appeal.

Wilson J.:

I agree.

Simon Brown L.J.:

I agree with all that Robert Walker L.J. has said and add a short judgment of my own only because of the interest of the central point at issue and the excellence of the arguments upon it.

Coming as a stranger to this arcane world of patent infringement threats actions, I am struck by the initial difficulty in understanding just what is the policy underlying section 70 of the Patents Act 1977. It seems to me that it is only when this is discovered that one can confidently pronounce on whether "the protection afforded by the [without prejudice] rule has been

361

unequivocally abused" so that "the veil imposed by public policy may have to be pulled aside" (to use my Lord's language).

In 1893, just 10 years after provision for these threats actions was first introduced by section 32 of the Patents Designs and Trade Marks Act 1883, the policy of the legislation was, I think, clear. As described by Bowen L.J. in Skinner & Co. v. Shew & Co. (1893) 1 Chancery 413 at 426, it related to:

... every kind of threat, the result of which might be to paralyse a man in his trade by having an action on a patent suspended before his eyes, without the opportunity of determining the suspense at once and bringing the question raised by his antagonist to a speedy and immediate issue.

But it is important to note (a) that the legislation at that time applied equally to manufacturers, importers and process users as to others, (b) that there was then no equivalent of the present section 71 (or, indeed, wide common law) scope for seeking declaratory relief, and (c) that the patentee was perfectly entitled to write threatening letters before action provided only that he thereafter commenced an action for infringement with due diligence.

Essentially, in its earliest manifestation this provision was designed to stop those patentees who were willing to wound but afraid to strike from hanging a Damocletian sword above any trader's head.

The true purpose of the legislation in its present form seems to me more difficult to discern. Limited clues are to be found in two of the subsections. As my Lord has explained, section 70(4) as interpreted in Cavity Trays v. RMC Panel Products [1996] R.P.C. 361 is of some relevance in explaining the section's legislative purpose. I would refer to one further passage from Aldous L.J.'s judgment at page 378:

The right of a patentee to make certain specified threats, but not others, without risk of proceedings being brought, may seem to provide an arbitrary division, but does not lead to absurdity. The subsection allows the main primary infringers (manufacturers and importers for disposal and users of processes), to be warned that they will be sued. That gives them an opportunity to stop manufacturing importing or using the process or alternatively to explain their position so as to persuade the patentee to drop his threatened position. It is not necessary for the warning to go further and allege that proceedings will be started for such acts as sale.

Section 70(5) perhaps provides another clue. It establishes, submits Mr Hobbs Q.C., a Rubicon between, on the one bank, the patentee reserving rights (which is permissible) and, on the other, him saying that he will assert them (which is forbidden).

I must say that I find the position today most curious and unsatisfactory. Although, essentially, I take the policy to be as contended for by Mr Thorley Q.C.--namely that rival manufacturers may threaten each other but should not threaten each other's customers with the objective of inducing them to cease dealing with their rivals--it cannot be pretended that the legislation is this narrowly confined: the decision in Cavity Trays and, indeed, the assumption that has to be made in the present action show otherwise. But the judge below must surely have been right in referring in paragraph 36 of

362

his judgment to "a stronger public interest in discouraging patentees from writing virulent threatening letters to their competitors' customers" than in suppressing threats of the sort assumed to have been made here.

The reality is that a threat of the present kind does no damage whatever to the rival manufacturer. It is not one made publicly or to customers. That, of course, explains the absence of any damages claim in the present proceedings. Indeed there would have been no conceivable occasion for the present proceedings but for the possible standing they may give Unilever in the proceedings before the E.P.O. In reality it is preferable that those engaged in without prejudice negotiations should be entirely candid in stating their future intentions than that they should have to tread so warily as not to cross Mr Hobbs' Rubicon.

I assume, as for strike out purposes I must, that in the course of the without prejudice negotiations here the respondents committed what Mr Hobbs calls "a statutory tort" under section 70. I nevertheless unhesitatingly conclude that they did not thereby unequivocally abuse the protection afforded by the without prejudice rule.

I too would dismiss this appeal.

Order: Appeal dismissed with costs. Permission to appeal to the House of Lords refused. Stay of order of Laddie J., pending petition to House of Lords.

---

[1] Reported at [1999] F.S.R. 849.

[2] Reported at [1999] F.S.R. 849.

[3] [1999] F.S.R. 849, at 850.

## Referring Principles

Trans-Lex Principle: XII.5 - Settlement privilege

# EXHIBIT  K

Gujarat High Court

Zatrix Limited vs Mv Nikiforos (Imo 9108116) ... on 6 March, 2020

Bench: Bela M. Trivedi, A.C. Rao

```
            C/OJA/18/2018                                    CAV JUDGMENT




                IN THE HIGH COURT OF GUJARAT AT AHMEDABAD

                     R/O.J.APPEAL NO. 18 of 2018

                  In R/ADMIRALITY SUIT NO. 37 of 2017


        FOR APPROVAL AND SIGNATURE:


        HONOURABLE MS.JUSTICE BELA M. TRIVEDI

        and
        HONOURABLE MR.JUSTICE A.C. RAO

        ==========================================================
```

1 Whether Reporters of Local Papers may be allowed to see the judgment ?

```
        2      To be referred to the Reporter or not ?

        3      Whether their Lordships wish to see the fair copy of the
               judgment ?

        4      Whether this case involves a substantial question of law
```

as to the interpretation of the Constitution of India or any order made thereunder ?

========================================================== ZATRIX LIMITED Versus MV NIKIFOROS (IMO 9108116) (EX-NAME - MV GO TRADER) ========================================================== Appearance:

MR S N SOPARKAR, SENIOR ADVOCATE WITH MS PAURAMI B MR DEVANG NANAVATI, SENIOR ADVOCATE and MRS PRACHITI SHAH, ADVOCATE WITH MS ANUJA S N A N A V A T I ( 5 2 2 9 ) f o r t h e O p p o n e n t ( s ) N o . 1 ========================================================== CORAM: HONOURABLE MS.JUSTICE BELA M. TRIVEDI and HONOURABLE MR.JUSTICE A.C. RAO Date : 06/03/2020 CAV JUDGMENT (PER : HONOURABLE MS.JUSTICE BELA M. TRIVEDI)

1. By way of present Appeal, the appellant Zatrix Ltd. (original plaintiff) has assailed the order dated 09.04.2018 passed by the single bench in Civil Application (O.J.) No. 1 of 2017 in R/Admirality Suit

No. 37 of 2017, whereby the Single Bench has allowed the said Civil Application preferred by the respondent (original defendant) and directed the Registry of the Court to return the amount of Rs. 3,41,44,852/□deposited by the respondent□defendant pursuant to the order of arrest dated 04.12.2017 read with further order dated 15.12.2017 passed by the Single Bench, and has further set aside the order of arrest dated 04.12.2017.

2. It appears that on 04.12.2017, at the request made by the learned Advocate for the appellant□ plaintiff, the Admiralty Suit was permitted to be circulated urgently on the same day. The suit was filed by the appellant□plaintiff seeking following reliefs:

"a. That this Hon'ble Court be pleased to pass an order and decree in favour of the Plaintiff and against the Defendant Vessel MV NIKIFOROS (IMO 9108116) (ex□ name□MV Go Trader) and/or her master and/or her owners and/or managers and/or operators and/or all persons interested in her in the sum of principal amount of USD 477,000 along with interest at the rate of 2% per annum from date of disbursement of funds till date amounting to USD 34,272 and USD 20,000 for cost of litigation in India aggregating USD 531,272 with further interest at the rate of 2% per annum from date of suit till its realization as per particulars of claim;

b. That the Defendant vessel MV NIKIFOROS (IMO 9108116) (ex name□MV Go Trader) together with her hull, engines, gears, tackles, bunkers machinery, apparel, plant, furniture, fixtures, appurtenances and paraphernalia, plant and machinery at present lying at Dahej Port, or wherever she is within the territorial waters of India be arrested by a Warrant of Arrest of this Hon'ble Court and the same be condemned in respect of the Claim herein and be ordered to be sold along with her hull, engines, gears, tackles, bunkers machinery, apparel, plant, furniture, fixtures, appurtenances and paraphernalia and the net sale proceeds thereof be ordered to be applied to the satisfaction of the Plaintiff's claim herein and the cost of this Suit;

c. That pending the hearing and the final disposal of the suit, this Hon'ble Court be pleased to order and direct the arrest of the Defendant Vessel MV NIKIFOROS (IMO 9108116) (ex name□MV Go Trader) along with her hull, engines, gears, tackles, bunkers machinery, apparel, plant, furniture, fixtures, appurtenances and paraphernalia, plant and machinery at present lying at the Port of Dahej or wherever she is within the territorial waters of India until the satisfaction of the Plaintiff's claim as per particulars of and also be committed for sale and the same be sold under the Orders and directions of this Hon'ble Court and the sale proceeds thereof be utilized in satisfaction of the Plaintiff's claim herein.

d. for interim and ad□interim reliefs n terms of prayer clauses

(c) and (d) above;

        e.      for costs of this Suit; and

```
    f.   for such further and other reliefs as this Hon'ble Court
```

may deem fit and proper in the nature and circumstances of the case;"

3. The Single Bench after hearing the learned Advocate appearing for the appellant-plaintiff and taking into consideration the undertaking in writing given by the plaintiff to the Registrar of the Court, inter alia ordered that the Registrar of the Court shall issue a warrant for the arrest of the defendant vessel, MV NIKIFOROS (IMO 9108116) along with her hull, engines, etc., and all appurtenances, at present lying at Dahej Port within the Indian territorial waters. It was further ordered that in the event of the defendant and/ or those interested in her, depositing in the Court the principal amount of USD 477,000 along with interest as directed in the order, the said Warrant of Arrest shall not be executed. The said order of arrest was modified by the Single Bench vide the order dated 15.12.2017, whereby the defendant was directed to deposit an amount of Rs. 3,41,44,852/□ for the release of the defendant vessel.

4. The respondent□defendant thereafter filed an application being Civil Application (OJ) No. 1 of 2017 in the said Admirality Suit No. 37 of 2017 seeking to vacate and set aside the order of arrest of the vessel dated 04.12.2017 contending inter alia that the plaintiff had obtained the order of arrest of the applicant□vessel suppressing important, relevant and material facts as stated in the application. The Single Bench after hearing the learned Advocates appearing for the parties vide the impugned order dated 09.04.2018 allowed the said application holding that the plaintiff had suppressed the material facts, more particularly about the express consent given by the plaintiff on 06.12.2016 for the sale of the defendant vessel, withdrawing its objections raised vide e□mail dated 29.11.2016 as well as about the consent given by their advocate. The Court also held that there was no maritime claim existing in favour of the plaintiff on the date of filing of the suit and the arrest of the vessel. The Court by the said order, set aside the order of arrest dated 04.12.2017 and directed the Registry to return to the defendant the amount of Rs. 3,41,44,852/□deposited by the defendant pursuant to the order of arrest dated 04.12.2017 read with the further order dated 15.12.2017. Being aggrieved by the said order the present appeal has been preferred by the plaintiff.

5. The learned Senior Advocate Mr. S N Soparkar for the appellant and the learned Senior Advocate Mr. Devang Nanavati appearing for the defendant have made lengthy submissions, however before adverting to their submissions it would be necessary to state certain facts as emerging from the record:

5.1. The plaintiff is a company incorporated under the foreign laws engaged in the business of providing financial services and advancing loans for acquisition of vessels. On 27.05.2015, the plaintiff entered into an agreement with various parties including 'Nikiforos Shipping S.A.' (hereinafter referred to as "the erstwhile owners of the defendant vessel") for financing the purchase of three ships including the defendant vessel MV NIKIFOROS (IMO 9108116) (ex□name□MV Go Trader). As per the said agreement, the vessel acquisitions were to be funded through a loan granted by Eurobank Ergasias S.A. (Eurobank) and the equity contributed by the investors. The share holding structure of each of the holding companies including Zatrix Ltd i.e. the plaintiff was also specified, whereby the plaintiff had agreed to hold 26% share. Pursuant to the said agreement,

another loan agreement was entered into between the shipping companies and the said Bank.

5.2. On 02.10.2016, a private settlement agreement was entered into between the erstwhile owners i.e. Nikiforos Shipping S.A. and the Buyers i.e. Poseidon Navigation Corporation, whereby the Buyers had agreed to purchase and the erstwhile owners had agreed to sell the defendant vessel, subject to the terms and conditions mentioned therein.

5.3. On 29.11.2016, the plaintiff addressed an e⎕mail putting all concerned parties to Notice, raising objections against the sale of the defendant vessel to the Buyers and declaring that the plaintiff did not consent to the sale of the vessel 'Nikiforos' as per the terms of the private agreement dated 02.10.2016, nor to the Bareboat Charter dated 28.01.2016.

5.4. On 06.12.2016, a private settlement and release agreement was entered into between the plaintiff and other parties including the erstwhile owners.

5.5. On 06.12.2016, the authorised directors of the plaintiff also addressed an e⎕mail to the authorised directors of the Buyers i.e. Poseidon Navigation Corporation withdrawing their objections contained in their earlier e⎕mail dated 29.11.2016. Similar e⎕mail was addressed on 06.12.2016 by the advocate of the plaintiff to the buyers and the erstwhile owners, specifically consenting to the sale of the vessel 'Nikiforos' pursuant to the agreement dated 02.10.2016, as amended.

5.6. On 07.12.2016, a certificate of ownership and encumbrance was issued by The Republic of Liberia in respect of the vessel in question.

5.7. The appellant ⎕plaintiff filed the admirality suit before this Court on 04.12.2017 i.e. after one year of the purchase of the vessel by the Buyer and obtained ad⎕interim ex⎕parte order of arrest as stated herein above, suppressing their e⎕mails dated 06.12.2016 whereby they had withdrawn their objections contained in the earlier e⎕mail dated 29.11.2016 and expressly granted consent to the sale of the defendant vessel.

6. The learned Senior Advocate Mr. S N Soparkar appearing for the appellant taking the Court to the documents on record more particularly, the averments made in the plaint as also the documents annexed thereto including the agreements entered into between the parties, submitted that there was no suppression of material facts by the appellant plaintiff as held by the Single Bench. Placing reliance on the decision of the Supreme Court in case of S.J.S Business Enterprises (P) Ltd. versus State of Bihar and Others reported in (2004) 7 SCC 166, he submitted that the general rule of denial of relief would apply only when the parties suppress a fact which is a material one, i.e. one which would have had an effect on the merits of the case, however so far as the facts of the present case are concerned, no such suppression was made as no such document which would have effect on the merits of the case was suppressed. Mr. Soparkar submitted that a perusal of the plaint clearly shows that the plaintiff had disclosed the facts justifying the cause of action for the arrest of the defendant vessel, as the plaintiff had a maritime claim against the defendant vessel. According to him, the Single Bench had failed to consider the fact that the email dated 06.12.2016 whereby the plaintiff

had given consent for the sale was a conditional one and "without prejudice" and therefore it could not be said that the appellant had withdrawn its objections unconditionally. Mr. Soparkar has also relied upon the decision of the Supreme Court in case of Chairman and M.D., N.T.P.C. Ltd Versus M/S. Reshmi Constructions, Builders & Contractors reported in (2004) 2 SCC 663, wherein the Supreme Court has elaborately dealt with the interpretation of the words "without prejudice". Reliance is also placed on the decision of the Supreme Court in the case of Videsh Sanchar Nigam Ltd. Versus M.V. Kapitan Kud & Ors reported in (1996) 7 SCC 127 to submit that the Single Bench had failed to appreciate the ratio laid down in the said case to the effect that if the plaintiff had an arguable, even though difficult case even in law, the action would be allowed to proceed to trial. Lastly he submitted that the admiralty action is an action in rem and when the claim of the plaintiff is found to be prima facie triable, the plaintiff is entitled to the interim relief.

7. The learned Senior Advocate Mr. Devang Nanavati appearing for the respondent⬜defendant however, vehemently submitted that the appellant⬜plaintiff had obtained the ex⬜parte ad⬜interim order of arrest suppressing material facts from the Court and making misleading statements in the plaint, which order has been rightly set aside by the Single Bench, on the defendant having moved the application bringing true facts on record. According to Mr. Nanavati, the plaintiff had specifically withdrawn their objections raised in the e⬜mail dated 29.11.2016, as per the e⬜mail dated 06.12.2016, consenting for the sale of vessel by the erstwhile owners to the defendant, however the said facts were deliberately, knowingly and purposefully not disclosed in the plaint nor the copy of the said e⬜mail was produced on record. He further submitted that the withdrawal of the objections raised by the plaintiff against the sale was further confirmed by their attorneys by addressing an e⬜mail on the same day to the Buyers and accordingly the defendant had proceeded further for the purchase of the vessel, and got the vessel registered on 07.12.2016 in the Office of Deputy Commissioner of Maritime Affairs of the Republic of Liberia. Placing heavy reliance on the decision of the Supreme Court in case of S.P Chengalvaraya Naidu vs Jagannath & Ors. reported in (1994) 1 SCC 1, Mr. Nanavati submitted that the plaintiff was bound to produce all the documents executed by them which were relevant to the litigation alongwith the plaint, and withholding of any vital document with a view to gain advantage would amount to playing fraud on the Court as well as on the defendant, and the entire proceedings filed by the plaintiff have to be thrown out on the ground of suppression of material facts alone. Mr. Nanavati further argued that as per the settled legal position, the arrest of the vessel is permissible only if a maritime claim existed against the person who owned the ship at the time of institution of the suit and as also when the arrest is affected. In the instant case, no maritime claim as contemplated in Section 4 of the Admirality (Jurisdiction and Settlement of Maritime Claims) Act, 2017 (hereinafter referred to as "the said Act") existed as there was neither any hypothecation or charge existing in favour of the plaintiff, nor was there any privity of contract between the plaintiff and the defendant in respect of the vessel in question. According to him, if there were disputes between the plaintiff and the erstwhile owners of the vessel in respect of the non⬜fulfillment of the terms of the settlement agreement executed between them, the defendant could not be made responsible for the same. Lastly, he submitted that the suit is one of the vexatious litigations filed by the plaintiff misusing the process of law one year after the purchase of the vessel by the defendant, and after the plaintiff having lost the litigation in the Court at Greece. Mr. Nanavati has relied upon various decisions of the Bombay High court and of this High Court to buttress his submission that the Court cannot order the arrest of the vessel on

the basis of surmises and bald allegations made in the vexatious and oppressive litigations.

8. Apropos the first and foremost allegation against the appellant ☐plaintiff about the suppression of material facts, it may be noted that an order of arrest is akin to an order of injunction, and the remedy of injunction being an equitable remedy, the principles of equity would be applicable when an order of arrest is sought. It cannot be gainsaid that the party seeking an injunction is obliged to bring to the notice of the Court all relevant facts and materials necessary for the determination of his right to that injunction and has to come with clean hands. If the plaintiff had failed to do so, and obtained ex☐parte order suppressing any material fact, the Court would not hesitate in vacating the ex☐parte injunction without even entering into the merits of the case. The equitable remedy of injunction has to be invoked following the principles of uberrima fides i.e. utmost good faith. The person who claims equity must do equity and come with clean hands disclosing all material facts relevant for obtaining ex☐parte ad☐interim order from the Court. As held by the Supreme Court in catena of decisions, a litigant who attempts to pollute the stream of justice or who touches the pure fountain of justice with tainted hands is not entitled to any relief, interim or final. Beneficial reference of the decisions of Supreme Court in case of S.P Chengalvaraya Naidu Vs. Jagannath & Ors. reported in (1994) 1 SCC 1, Amar Singh Vs. Union of India reported in (2011) 7 SCC 560, S.J.S Business Enterprises (P) Ltd. versus State of Bihar and Others reported in (2004) 7 SCC 166 and Mayar (H.K.) Ltd. and Ors. Vs. Owners & Parties, Vessel M.V. Fortune Express and Ors. reported in (2006) 3 SCC 100 be made in this regard.

9. In light of the aforestated settled legal position, if the allegations of the respondent☐defendant as regards the suppression of material facts at the instance of the appellant - plaintiff are examined, it appears that though the appellant☐plaintiff in the plaint had averred about the settlement and release agreement entered into by them with the erstwhile owners, the plaintiff had conveniently suppressed the material fact that in view of the said settlement with the erstwhile owners, the plaintiff had withdrawn their objections against the sale of the defendant vessel to the Buyer Poseidon Navigation Corporation. The e☐mails dated 06.12.2016 addressed by the plaintiff and their attorneys specifically withdrawing their objections and consenting to the sale of the subject vessel were neither referred to in the plaint, nor produced along with the plaint. The said e☐mails produced by the respondent☐defendant read as under:

> "We refer to our below message.
>
> Always without prejudice to the rights of the Seller of m/v Nikiforos and to the obligations of Buyers, pursuant to the, Agreement dated 02.10.2016, as amended, and pursuant to your relevant request, in so far as you may be concerned, this is to advise you that the below message has been withdrawn.
>
> Regards, On behalf of Zatrix Limited Rodolfo Odoni"

10. It may be noted that the 'below message' referred in the said e☐mail was the trailing e☐mail dated 29.11.2016, wherein the plaintiff had raised objections against the sale of the defendant vessel to the buyers. The said withdrawal of objections was further confirmed by the attorneys of the

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 253 of 337   Page ID
#:28708
Zatrix Limited vs Mv Nikiforos (Imo 9108116) ... on 6 March, 2020

plaintiff by addressing an e‐mail on the same day i.e. 06.12.2016 to the Buyers, consenting for the sale of the defendant ‐vessel to the Buyers. The said e‐mail reads as under:

> "Dear all, Further to our below and Buyers lawyers request always without prejudice to Sellers position, pursuant to the Agreement dated 02.10.2016, as amended, and is so far as you may be concerned, we hereby clarify that we consent to the sale of the vessel Nikiforos pursuant to the said agreement.
>
> On behalf of Zatrix Ltd.
>
> Akis Tourkantonis"

11. It is significant to note that the aforestated correspondences ensued between the appellant‐plaintiff and their attorneys with the Buyers in respect of the defendant vessel have not been disputed by the appellant ‐plaintiff. As transpiring from the record, the said facts about the withdrawal of their objections against the sale of the vessel were not mentioned in the plaint, nor the said e‐mail correspondences ensued between the parties were placed on record at the time of seeking arrest of the vessel alleging that the plaintiff had a Maritime lien/claim in respect of the vessel in question. In this regard, the only contention raised by the learned Senior Advocate Mr. Soparkar appearing for the appellant is that such non‐disclosure or non‐production of the e‐mail correspondences could not be said to be suppression of material facts, in view of the decision of the Supreme Court in case of S.J.S Business Enterprises (P) Ltd. (supra) wherein it has been observed inter alia that the suppressed fact must be material one in the sense that had it not been suppressed it would have had an effect on the merits of the case, and in the instant case the plaintiff had disclosed the material facts including the fact that the vessel was sold by the erstwhile owners to the defendant, however the said sale being prejudicial to the rights of the plaintiff and being fraudulent was not binding to the plaintiff. According to Mr. Soparkar, in any case, the said e‐mail correspondences having been ensued using the phrase "without prejudice", such correspondences would not be admissible in evidence and therefore non‐production of the same or non‐disclosure of the said e‐mail correspondences could not be said to be material suppression of facts dis‐entitling the plaintiff to claim arrest of the vessel in question. Such untenable submissions of Mr. Soparkar cannot be accepted. The Single Bench has elaborately discussed and dealt with the pleadings of the parties more particularly, the averments made in the plaint and has recorded the findings holding that the plaintiff had suppressed the material facts. This Court completely agrees with the findings recorded by the Single Bench. The precise findings of the Single bench are reproduced as under:

> "34. As noted hereinabove, the suit is based on the point that the defendant vessel could not have been sold without previous consent of the plaintiff and even if the contentions made in para 4 of the suit is believed to be gospel truth, the fact remains that in para 2 of the suit, it is specifically averred by the plaintiff that written consent was a prerequisite for sale which was never given by the plaintiff, which is factually incorrect. The record further indicates that acting upon the express consent given by the plaintiff's advocate, the defendant vessel came to transferred and the ownership was changed and defendant became owner w.e.f. 07.12.2016. It is the case of the

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 254 of 337   Page ID
#:28709
Zatrix Limited vs Mv Nikiforos (Imo 9108116) ... on 6 March, 2020

plaintiff that the consent which was given on 06.12.2016 was in reference to the agreements between the plaintiff and the erstwhile owner, however, it is specifically mentioned that while giving consent, with the earlier objections raised on 29.11.2016, so far as defendant is concerned, is withdrawn and reference is made to the agreement to sell entered into by the erstwhile owner and defendant on 02.10.2016. Even in the email sent by the learned advocate of the plaintiff, there is direct reference to the agreement dated 02.10.2016 and no other agreement which have been entered into between the plaintiff and the erstwhile owners and others is mentioned. Though the plaintiff was in knowledge of such facts and even the transfer of ownership, only a cursory statement is found in the plaint whereby it is stated that no consent was given and that sale is null and void, however these five emails have neither been referred to in the plaint nor have been placed on record by the plaintiff, which are vital to the very issue involved in the suit. It is not the case of the plaintiff that anything is due and payable by the defendant, but the claim in the suit is that they have charge or hypothecation over the defendant vessel and on that basis, it is stated that there is a maritime claim and therefore, the present suit is filed in admiralty jurisdiction of this Court and thus, plaintiff has deliberately suppressed the aforesaid material fact and in opinion of this Court, even though the plaintiff was well aware about the consent given by the plaintiff as well as the advocate and even though specifically the message dated 29.11.2016 has been withdrawn in reference to the agreement dated 02.10.2016, the email dated 29.11.2016 is relied upon by the plaintiff and at the same time the aforesaid five important documents have been withheld and having not produced on record, this Court exercised its admiralty jurisdiction and passed the order of arrest of defendant vessel on 04.12.2017 whereas the defendant became registered owner of the defendant vessel since 07.12.2016 and therefore, on the date of arrest, the erstwhile owner was not the owner of the defendant vessel, but the defendant was the registered owner.

35. ***

36. This Court is of the opinion that even though the plaintiff was aware about all the aforesaid emails and more particularly two emails dated 06.12.2016, they have not fully disclosed the facts before this Court and thus, in opinion of this Court, they have suppressed the material facts. The argument raised by the learned counsel appearing for the plaintiff that the said aspect even as per the ratio laid down by the Apex Court in the case of Amar Singh (supra) and S.P. Chengalvaraya Naidu (supra) cannot be looked into at this stage as it requires full fledged trial in facts of this case, ex facie there is no disclosure of the material fact and therefore, the said contention deserves to be negatived and as such therefore, there is suppression of material fact.

37. As decided the Apex Court in the case of Chrisomar Corporation (supra), it is materially to be considered that who was the owner of the defendant vessel on the date of arrest. In the facts of this case, the defendant was the owner of the vessel on the date of the arrest order and unilateral statement made in the plaint that the sale is bad and illegal and making a statement that no consent was given even though specific consent was given, there is nothing on record even further to suggest

that the consent given by the emails dated 06.12.2016 by the plaintiff as well as the advocate of the plaintiff separately have been withdrawn at any time by the plaintiff.

38. ****

39. ****

40. ****

41. ****

42. Consequently therefore, considering the submissions made by the learned counsels appearing for the parties and considering the ratio laid down by the judgments which are relied upon by both the sides, this Court is of the opinion that the plaintiff has suppressed material fact and more particularly the aspect of express consent given by the plaintiff on 06.12.2016 withdrawing objection raised vide email dated 29.11.2016 as well as the consent given by his advocate. There is nothing on record to show that such consent has ever been withdrawn by the plaintiff and therefore, on the said ground, the order of arrest as well as the further of deposit deserves to be modified. Having come to the conclusion that the sale of the defendant vessel is after the consent given by the plaintiff and in absence of any document to even remotely show that there was hypothecation in favour of the plaintiff and the defendant became the owner of the defendant vessel on 07.12.2016, i.e., on the date of order of arrest, the defendant was the owner and not the erstwhile owner as portrayed in the plaint, the defendant cannot be made liable for breach of settlement agreement dated 06.12.2016 and there is no privity of contract between the defendant and the plaintiff and resultantly, in opinion of this Court, no maritime claim exist."

12. The learned Senior Advocate Mr. Soparkar appearing for the appellant ☐plaintiff has failed to convince this Court to take a different view from the view expressed by the Single Bench. He has also failed to dispel any of the findings recorded by the Single Bench as regards the suppression of material facts and withholding of material documents namely the relevant e☐mails from the Court, while seeking the ex☐parte ad☐interim order of arrest of the defendant☐vessel. As held by the Supreme Court in case of S.P Chengalvaraya Naidu (supra), a litigant who approaches the Court is bound to produce all the documents executed by him which are relevant to the litigation, and if he withholds any vital document in order to gain advantage over the other side, then he would be guilty of playing fraud on the Court as well as on the opposite party. The legal position as to what is fraud on the Court, has also been elaborately discussed by the Supreme Court in case of Ram Chandra Singh versus Savitri Devi and Others reported in (2003) 8 SCC 319. The relevant observations made thereunder are reproduced herein below:

"22. Recently this Court by an order dated 3☐9☐2003 in Ram Preeti Yadav vs. U.P. Board of High School & Intermediate Education & Ors. reported in (2003) 8 SCC 311 held:

13. "Fraud is a conduct either by letter or words, which induces the other person, or authority to take a definite determinative stand as a response to the conduct of former either by words or letter. Although negligence is not fraud but it can be evidence on fraud. (See Derry vs. Peek [1889] 14 A.C. 337)

14. In Lazarus Estates Ltd. vs. Beasley [1956] 2 W.L.R. 502 the Court of Appeal stated the law thus:

"I cannot accede to this argument for a moment. No Court in this land will allow a person to keep an advantage which he has obtained by fraud. No judgment of a Court, no order of a Minister, can be allowed to stand if it has been obtained by fraud. Fraud unravels everything". The Court is careful not to find fraud unless it is distinctly pleaded and proved; but once it is proved it vitiates judgments, contracts and all transactions whatsoever."

15. In S.P. Chengalvaraya Naidu vs. Jagannath 1994 (1) SCC 1 this Court stated that fraud avoids all judicial acts, ecclesiastical or temporal."

23. An act of fraud on court is always viewed seriously. A collusion or conspiracy with a view to deprive the rights of the others in relation to a property would render the transaction void ab initio. Fraud and deception are synonymous.

24. ****

25. ****

26. ****

27. In S.P. Chengalvaraya Naidu vs. Jagannath this Court in no uncertain terms observed:

"The principles of "finality of litigation" cannot be pressed to the extent of such an absurdity that it becomes an engine of fraud in the hands of dishonest litigants. The Courts of law are meant for imparting justice between the parties. One who comes to the Court, must come with clean hands. We are constrained to say that more often than not process of the Court is being abused. Property□grabbers, tax□evaders, bank□loan dodgers and other unscrupulous persons from all walks of life find the court□process a convenient lever to retain the illegal gains indefinitely. We have no hesitation to say that a person whose case is based on falsehood, has no right to approach the Court. He can be summarily thrown out at any stage of the litigation.

A fraud is an act of deliberate deception with the design of securing something by taking unfair advantage of another. It is a deception in order to gain by another's loss. It is a cheating intended to get an advantage... A litigant, who approaches the Court, is bound to produce all the documents executed by him, which are relevant to the

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 257 of 337   Page ID
#:28712
Zatrix Limited vs Mv Nikiforos (Imo 9108116) ... on 6 March, 2020

litigation. If he withholds a vital document in order to gain advantage on the other
side then he would be guilty of playing fraud on the Court as well as on the opposite
party."

28. In Indian Bank vs. Satyam Fibres (India) Pvt. Ltd. [ 1996 (5) SCC 550, this Court after referring
to Lazarus Estates (supra) and other cases observed that 'since fraud affects the solemnity,
regularity and orderliness of the proceedings of the Court it also amounts to an abuse of the process
of the Court, that the Courts have inherent power to set aside an order obtained by practising fraud
upon the Court, and that where the Court is misled by a party or the Court itself commits a mistake
which prejudices a party, the Court has the inherent power to recall its order". It was further held:

> "22. The judiciary in India also possesses inherent power, specially under Section 151
> CPC, to recall its judgment or order if it is obtained by fraud on Court. In the case of
> fraud on a party to the suit or proceedings, the Court may direct the affected party to
> file a separate suit for setting aside the decree obtained by fraud. Inherent powers are
> powers, which are resident in all Courts, especially of superior jurisdiction. These
> powers spring not from legislation but from the nature and the constitution of the
> tribunals or Courts themselves so as to enable them to maintain their dignity, secure
> obedience to its process and rules, protect its officers from indignity and wrong and
> to punish unseemly behaviour. This power is necessary for the orderly administration
> of the Court's business."

13. The aforestated legal position aptly applies to the facts of the present case. The Court therefore is
of the opinion that by withholding the vital documents and not disclosing the correct facts in the
plaint, the appellant☐plaintiff had suppressed material facts from the Court and had also committed
fraud on the Court as also on the other side. The submission of Mr. Soparkar that the erstwhile
owners having not fully complied with the terms of the settlement agreement entered into with the
plaintiff and the e☐mails dated 06.12.2016 addressed by the plaintiff and their attorney to the
Buyers being "without prejudice", the consent given by the plaintiff for the sale of the defendant
vessel was of no significance, has no force. If there were disputes pending between the plaintiff and
the erstwhile owners, in respect of fulfillment of the settlement and release agreement executed
between them, that would not justify the act of plaintiff in withholding the material documents/e☐
mails from the Court, while seeking ex☐parte order of arrest of the vessel, already purchased by the
Buyers from the erstwhile owners with the consent of the plaintiff one year prior to the order of
arrest. The decision of the Supreme Court in case of Chairman and M.D., N.T.P.C. Ltd (supra) relied
upon by the learned Senior Advocate Mr. Soparkar for the purpose of interpretation of the words
"without prejudice" has no relevance to the facts of the present case.

14. It is pertinent to note that the appellant - plaintiff had challenged the action of the erstwhile
owners in terminating the settlement agreement dated 06.12.2016 by initiating the proceedings in
the month of June, 2017 before the Multi Member Court of First Instance of Piraeus in which the
respondent☐defendant was also made a party. In June, 2017 when the defendant vessel called
Cotonou Port in Benin near Nigeria, the appellant - plaintiff had made an application for the arrest
of the defendant vessel, and defendant vessel was arrested by the concerned Court at Cotonou.

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 258 of 337   Page ID
#:28713
Zatrix Limited vs Mv Nikiforos (Imo 9108116) ... on 6 March, 2020

Subsequently, the Poseidon Navigation Corporation having made an application before the Cotonou Court for the release of the vessel, the same was allowed by the concerned Court. It appears that the Appeal filed against the said order was also dismissed by the concerned Cotonou Court. It is not disputed that the proceedings filed by the appellant ⬜plaintiff in respect of their disputes with the erstwhile owners of the defendant vessel are pending in the concerned Court in Piraeus. The present proceedings have been initiated by the appellant

- plaintiff by filing the Admirality Suit on the ground that the plaintiff has maritime claim over the defendant vessel. In this regard, it would be relevant to refer to the provisions contained in the International Convention on Arrest of Ships, 1999 as applicable at the relevant time of filing of the suit. Ofcourse, in the meantime the Admirality (Jurisdiction and Settlement of Maritime Claims) Act, 2017 has come into force with effect from 01.04.2018. The provisions of the Convention, 1999 and of the Act, 2017 are in pari materia, and therefore it would be more convenient to refer to the provisions contained in the Act. The relevant provisions contained in Section 5 pertaining to the 'Arrest of Vessel in Rem' reads as under:

> "5. Arrest of vessel in rem.⬜(1) The High Court may order arrest of any vessel which is within its jurisdiction for the purpose of providing security against a maritime claim which is subject of an admirality proceeding, where the Court has reason to believe that⬜
>
> (a) the person who owned the vessel at the time when the maritime claim arose is liable for the claim and is the owner of the vessel when the arrest is effected; or
>
> (b) ***
>
> (c) the claim is based on a mortgage or a charge of the similar nature on the vessel; or"

15. The Supreme Court in case of Chrisomar Corporation versus MJR Steels Private Limited reported in (2017) SCC Online Supreme Court 1104 has succinctly dealt with the history of the admirality law while considering the issue as to when the Maritime Claim could be enforced, whether at the stage of institution of the suit or at the stage of arrest of the vessel, it was held in para. Nos. 29⬜31 as under:

> "29. The next important aspect that was argued was that the ownership of the vessel to enforce a maritime claim has to be seen at the stage of institution of the suit and not at the stage of arrest. The general rule that is contained in our country as to what crystallises on the date of a suit is reflected in Rameshwar and others v. Jot Ram and others, (1976) 1 SCC 194 :(1976) 1 SCR 847 at 851⬜52. This Court held:⬜"In P. Venkateswarlu v. Motor & General Traders [(1975) 1 SCC 770, 772 : AIR 1975 SC 1409, 1410] this Court dealt with the adjectival activism relating to post⬜institution circumstances. Two propositions were laid down. Firstly, it was held that [SCC p. 772, para 4] 'it is basic to our processual jurisprudence that the right to relief must be

judged to exist as on the date a suitor institutes the legal proceeding.' This is an emphatic statement that the right of a party is determined by the facts as they exist on the date the action is instituted. Granting the presence of such facts, then he is entitled to its enforcement. Later developments cannot defeat his right because, as explained earlier, had the court found his facts to be true the day he sued he would have got his decree. The Court's procedural delays cannot deprive him of legal justice or rights crystallised in the initial cause of action. This position finds support in Bhajan Lal v. State of Punjab [(1971) 1 SCC 34].

The impact of subsequent happenings may now be spelt out. First, its bearing on the right of action, second, on the nature of the relief and third, on its impotence to create or destroy substantive rights. Where the nature of the relief, as originally sought, has become obsolete or unserviceable or a new form of relief will be more efficacious on account of developments subsequent to the suit or even during the appellate stage, it is but fair that the relief is moulded, varied or reshaped in the light of updated facts. Patterson [Patterson v. State of Alabama, (1934) 294 US 600, 607] illustrates this position. It is important that the party claiming the relief or change of relief must have the same right from which either the first or the modified remedy may flow. Subsequent events in the course of the case cannot be constitutive of substantive rights enforceable in that very litigation except in a narrow category (later spelt out) but may influence the equitable jurisdiction to mould reliefs. Conversely, where rights have already vested in a party, they cannot be nullified or negated by subsequent events save where there is a change in the law and it is made applicable at any stage. Lachmeshwar Prasad Shukul v. Keshwar Lal Chaudhuri [1940 FCR 84 : AIR 1941 FC 5] falls in this category. Courts of justice may, when the compelling equities of a case oblige them, shape reliefs

-- cannot deny rights -- to make them justly relevant in the updated circumstances. Where the relief is discretionary, courts may exercise this jurisdiction to avoid injustice. Likewise, where the right to the remedy depends, under the statute itself, on the presence or absence of certain basic facts at the time the relief is to be ultimately granted, the Court, even in appeal, can take note of such supervening facts with fundamental impact. Venkateswarlu, read in its statutory setting, falls in this category.

30. However, the International Convention on the Arrest of Ships, 1999, in which India participated, states as follows:□'Article 3: Exercise of right of arrest

1. Arrest is permissible of any ship in respect of which a maritime claim is asserted if:

(a) the person who owned the ship at the time when the maritime claim arose is liable for the claim and is owner of the ship when the arrest is effected; or

(b) - (e) xxx xxx xxx (2) xxx xxx xxx

3. Notwithstanding the provisions of paragraphs 1 and 2 of this article, the arrest of a ship which is not owned by the person liable for the claim shall be permissible only if, under the law of the State where the arrest is applied for, a judgment in respect of that claim can be enforced against that ship by judicial or forced sale of that ship."

31. India is not a signatory to the aforesaid Convention, yet following M.V. Elisabeth (supra), this Convention becomes part of our national law and must, therefore, be followed by this Court. Article 3(1)(a) is in two parts. First, arrest is only permissible of any ship if a maritime claim is asserted against the person who owned the ship at a time when the maritime claim arose for which the owner is liable, and second, that the same ship owner should be the owner of the ship when the arrest is effected. Thus, article 3(1)(a) sets the controversy at rest because a maritime claim can be asserted only at the time the arrest is effected and not at the time of the institution of the suit. This being so, Shri Divan's reliance on English judgments to the contrary, namely Monica S. (1967) 2 Lloyd's Rep. 113 as followed in Re, Aro Co Limited 1980 1 All ER 1067, cannot be followed. Both judgments were prior to the 1999 Convention and it is this Convention that must be followed. It is, therefore, clear that the relevant date on which ownership of the vessel is to be determined is the date of arrest and not the date of institution of the suit. "

16. In view of the above, there cannot be any disagreement to the proposition of law that the High Court may order arrest of any vessel which is within its jurisdiction for the purpose of providing security against the Maritime claim in the admirality proceedings, where the High Court has reason to believe that the person who owned the vessel at the time when the maritime claim arose, is liable for the claim and is the owner of the vessel when the arrest is effected, or where the Court has reason to believe that the claim is based on a mortgage or a charge of similar nature on the vessel. So far as facts of the present case are concerned, the Poseidon Navigation Corporation had become the owner of the vessel one year prior to institution of the suit, within the knowledge of the plaintiff and no Maritime claim as contemplated in the Convention of 1999 or in Section 4 of the Act existed either at the time of the filing of the suit or the arrest of the vessel. Mr. Soparkar had also failed to prima facie satisfy the Court about the existence of any mortgage or charge of similar nature on the vessel, on the basis of which the appellant☐plaintiff could have based their claim. As transpiring from the Share Holders' Agreement dated 27.05.2015, the appellant☐plaintiff along with the erstwhile owners had agreed to jointly acquire three vessels including the defendant vessel, further deciding the share holding structure of each of the holding companies, according to which, the appellant☐plaintiff had 26% share holding. There is nothing on record to remotely suggest that the plaintiff's claim was based on the mortgage or a charge on the defendant vessel, which could be said to be a Maritime claim entitling the plaintiff to obtain an order of arrest of the vessel in question.

17. In that view of the matter, the Court does not find any merit in the present appeal. However, the Court is of the opinion that when the Single Bench had found that the appellant -plaintiff had suppressed material facts from the Court while obtaining the ex☐parte ad☐interim order of arrest of the vessel in question, the Single Bench ought to have set aside the said order imposing cost on the plaintiff while allowing the application of the defendant. Since this Court agrees with the findings recorded by the Single Bench and further finds that such suppression of material facts would tantamount to fraud on the Court and on the other side, the present Appeal is required to be

Zatrix Limited vs Mv Nikiforos (Imo 9108116) ... on 6 March, 2020

dismissed with cost, with clarification that it would be open for the Single Bench to determine the loss or damage if any incurred by the respondent☐defendant as a result of the arrest of the vessel. The Appeal is therefore dismissed with cost of Rs.2,00,000/☐(Rupees Two Lakhs Only) to be deposited by the appellant within two weeks from today, on such deposit being made it shall be open to the respondent to withdraw the same. Appeal stands dismissed accordingly.

(BELA M. TRIVEDI, J) (A. C. RAO, J) SINDHU NAIR FURTHER ORDER The request made by learned Advocate Ms. Paurami Sheth appearing for the appellant☐plaintiff to continue the interim relief in order to approach the higher forum, is rejected for the reasons stated in the judgment.

(BELA M. TRIVEDI, J) (A. C. RAO, J) SINDHU NAIR

# EXHIBIT L

Supreme Court of India

Ritesh Tewari & Anr vs State Of U.P.& Ors on 21 September, 2010

Author: . B Chauhan

Bench: P. Sathasivam, B.S. Chauhan

```
                                                          REPORTABLE

                     IN THE SUPREME COURT OF INDIA
                      CIVIL APPELLATE JURISDICTION

                          CIVIL APPEAL NO.8178/2010
                      (Arising out of S.L.P.(C) NO. 2786/2009)


     Ritesh Tewari & Anr.                                .. Appellants

                                    Versus

     State of U.P. & Ors.                            ...Respondents



                             JUDGMENT
```

Dr. B.S. CHAUHAN, J.

1. Leave granted.

2. This appeal has been preferred against the judgment and order dated 20th January, 2009, passed by the High Court of judicature at Allahabad in Civil Misc. Writ Petition No. 45169 of 2008 by which the prayer of the appellants to quash certain inter-departmental communications has been rejected.

Facts:

3. One Mawasi, resident of Saraivega Hemlet of village Kakratha, Tehsil and District Agra, had two sons, namely, Sukha and Shyama. Shyama has only one son namely, Rammo. Descendents of Sukha have been Ballo, Radhe Ram, Babu and Sohan Singh. They were having certain land in Gata Nos. 870, 258, 192, 258/2 and 258/5 measuring 9 Bighas 14 Biswas situate in the revenue estate of Village Kakratha Pragana, Tehsil and District Agra. The Urban Land (Ceiling and Regulation) Act, 1976 (hereinafter called `the Act 1976') came into force in the State of Uttar Pradesh with effect from 17th February, 1976. The aforesaid tenure holders were subjected to the provisions of the aforesaid Act 1976. They had filed their respective declaration as required under the Act 1976, however, the record reveals that ex-parte assessment orders had been passed against all of them under Section 8(4) of the Act 1976 on 30th January, 1981, 31st January, 1981, 30th March, 1981, 8th May, 1981 and 25th May, 1981, declaring an area of land as surplus.

4. The original tenure holders did not challenge the said assessment orders in appeal or writ jurisdiction, thus they attained finality. It is stated that the said tenure holders transferred the major part of land so declared as surplus with them on 20th April, 1982 in favour of Mayur Sahkari Awas

Ritesh Tewari & Anr vs State Of U.P.& Ors on 21 September, 2010

Samiti. The authorities under the Act 1976 proceeded against those tenure holders under Section 10 (3) publishing a Notification dated 6.7.1993 which effectuated the deemed vesting of such land in the State. Notices under Section 10(5) were issued on 31st March, 1993; 13th September, 1993; and 18th February, 1994, directing the said tenure holders to hand over the possession to the statutory authority, however, there is nothing on record to show that actual physical possession was taken by the statutory authorities in exercise of their power under Section 10(6) of the Act of 1976.

5. The pleadings in this appeal reveal that certain members of Mayur Sahkari Awas Samiti had sold their land to M/s Savy Homes (P) Ltd. who in turn further sold the land to the present appellants vide sale deed dated 15th June, 2006. Appellants further claim to have applied for sanction of plan for construction of buildings and the same was accorded by the statutory authorities under the Municipal Law. Appellants also claim to have developed the land.

6. The Act 1976 was repealed with effect from 18th March, 1999 vide Urban Land (Ceiling and Regulation) Repeal Act, 1999 (hereinafter called the Act 1999). The appellants apprehended that they could be dispossessed by the authorities in view of certain inter-departmental communications contained in letters dated 30th June, 2008 and 18th July, 2008, and thus, preferred Civil Miscellaneous Writ Petition No. 45169 of 2008 before the High Court of Judicature at Allahabad for quashing of the same and for a direction restraining the respondents to interfere with the actual and physical possession of the land of the appellants. The said writ petition has been dismissed by the impugned judgment and order dated 20th January, 2009. Hence, this appeal.

Rival claims of the Parties:

7. Shri Jayant Bhushan, learned senior counsel appearing for the appellants, has submitted that the authorities under the Act 1976 have never exercised the power under Section 10(6) of the Act 1976 and, thus, possession of the land in dispute had never been taken by the State and after commencement of the Act 1999, the proceedings stood abated. Therefore, the question of interference with the land in dispute does not arise. The High Court erred in taking into consideration the locus-standi of the appellants and holding that the transfer in favour of the appellants was consequential to the void transaction in favour of Mayur Sahkari Awas Samiti. Hence, the appeal deserves to be allowed.

8. On the contrary, Shri S.R. Singh, learned senior counsel appearing for the respondents, has vehemently opposed the appeal contending that once the assessment had been made under Section 8(4) of the Act 1976, against the original tenure holders, the sale in favour of Mayur Sahkari Awas Samiti was void. Further, the transfer in favour of M/s Savy Homes (P) Ltd. and the subsequent transfer in favour of the appellants being consequential remained inexecutable and unenforceable, thus, a nullity. Once an order in inception is bad, it cannot have sanctity at a subsequent stage by other subsequent orders/developments. The original tenure holders are nowhere involved and none of them has been impleaded in these proceedings. No evidence has been placed on record to show that the sale deed in favour of Mayur Sahkari Awas Samiti was genuine. More so, the writ petition was filed for quashing the inter-departmental communications, thus, the writ petition itself was not maintainable. The appellants had never received any show cause notice from the statutory

authorities. No proceedings have ever been initiated against them or their predecessors-in- interest. The appeal lacks merit and is liable to be dismissed.

9. We have considered the rival submissions made by the learned counsel for the parties and perused the record.

Case on merits:

10. The appellants had not approached the High Court for quashing an order passed by the authority under the Act 1976. The relevant reliefs claimed by the appellants-writ petitioners have been as under :

> "(i) to issue a suitable writ, order or direction in the nature of mandamus directing the respondents not to interfere in the actual physical peaceful possession and construction of the petitioners' multi storied building known as `Ganpat Green Apartment' situated at Khasra Plot No. 258, Village Kakraitha, Tehsil Sadar, District Agra.

> (ii) To issue a suitable writ, order or direction in the nature of certiorari and to quash the directions contained in the letters dated 30th June, 2008 and 18th July, 2008 (Annexures 19 & 20 to the writ petition).

(iii) To issue suitable writ, order or direction constituting an enquiry committee to enquire into the role of and to fix responsibility on the erring respondents for the illegal and undue harassment of the petitioners in respect of the construction in question as also for the publication of the press reports dated 26.08.2008 (Annexure 21 to the writ petition) damaging irredeemably the business, reputation as well as goodwill of the petitioners and to direct such authority found responsible for the said illegal acts to compensate the petitioners for the aforesaid damage caused to their business, reputation and goodwill."

11. The letters referred to hereinabove are part of the record. The said letters are communications from the Deputy Collector (Sadar), Agra to Additional District Collector, (A), Prescribed Authority, Urban Land, Agra dated 30th June, 2008; and from Additional District Collector, (A), Prescribed Authority, Urban Land, Agra to Secretary, Agra Development Authority dated 18th July, 2008.

We fail to understand as to how the contents of such a communication between two officers of the departments of the government can be the subject matter of the writ petition. The appellants could not have approached the High Court for the aforesaid relief sought by them. The writ petition was certainly not maintainable.

12. Be that as it may, in view of the fact that the High Court has decided the case on merit and we have also heard the case on merit, the issue of the maintainability of writ petition remains merely academic.

Ritesh Tewari & Anr vs State Of U.P.& Ors on 21 September, 2010

Shri Jayant Bhushan, learned senior counsel appearing for the appellants has submitted that as the State Government had not taken possession of the land in exercise of its powers under Section 10(6) of the Act 1976, on commencement of the Act 1999 into force, the proceedings stood abated and the respondents have no business to interfere with the peaceful possession and enjoyment of the property.

13. We find full force in the submissions so made by Shri Jayant Bhushan to a certain extent, and hold that all proceedings pending before any court/authority under the Act 1976, stood abated automatically on com- mencement of the Act 1999 in force, provided the possession of the land involved in a particular case had not been taken by the State. Such a view is in consonance with the law laid down by this court in Pt. Madan Swaroop Shrotiya Public Charitable Trust Vs. State of U.P. & Ors., (2000) 6 SCC 325; Ghasitey Lal Sahu & Anr. Vs. Competent Authority, (2004) 13 SCC 452; Mukarram Ali Khan Vs. State of Uttar Pradesh & Ors., (2007) 11 SCC 90; and Smt. Sulochana Chandrakant Galande Vs. Pune Municipal Transport & Ors., JT (2010)C 298.

14. The aforesaid conclusion leads us further to the question as to whether the appellants have any justifiable cause to approach the court. Firstly, no proceedings had ever been initiated against the appellants by the authorities under the Act 1976. Secondly, the State authorities, the respondent herein, failed miserably to perform their statutory duties and it appears that they could not muster the courage to take the actual physical possession of the land in dispute in spite of issuance of notice under Section 10(5) of the Act 1976 in the year 1993. More so, the so-called authorities could issue notices under Section 10 of the Act 1976 after a lapse of twelve years as the assessment of surplus land became final in 1981 itself. Such an indifferent attitude on the part of the authorities is not commendable rather it is condemnable, but that does not mean that court should decide only the effect of repealing Act 1999 in these proceedings at the behest of the appellants in absence of the original tenure holders and subsequent transferees inasmuch as in the fact-situation of this case where the appellants, for the reasons best known to them, did not consider it proper to place either of the sale deeds on record.

15. The ex-parte orders of assessment of surplus land against the original tenure holders have been placed on record. Admittedly, the said assessment orders had not been challenged by them and attained finality. In view of provisions of Sections 5 and 10 of the Act of 1976, transfer of such land by them in favour of anyone was not only prohibited but null and void. Section 5 (1) of the Act 1976 provided that transfer of vacant land in excess of the ceiling limit at any time during the period commencing on the appointed day and ending with the commencement of this Act, by way of sale, mortgage gift, lease or otherwise, the extent of the land so transferred shall also be taken into account in calculating the extent of vacant land held by such person.

Section 5(3) provided that transfer of vacant land or part thereof effected by a recorded tenure holder having land in excess of the ceiling limit subsequent to the commencement of Act of 1976 by way of sale, mortgage or lease until he had furnished a statement under Section 6, and a Notification under Section 10(1) has been published would be deemed to be null and void.

16. Section 10 (4) of the Act 1976 reads as follows:

Ritesh Tewari & Anr vs State Of U.P.& Ors on 21 September, 2010

"10. Acquisition of vacant land in excess of ceiling limit.

(4) During the period commencing on the date of publication of the Notification under sub-section (1) and ending with the date specified in the declaration made under sub-section (3).

(i) no person shall transfer by way of sale, mortgage, gift, lease or otherwise any excess vacant land (including any part thereof) specified in the Notification aforesaid and any such transfer made in contravention of this provision shall be deemed to be null and void; and

(ii) no person shall after or cause to be altered the use of such excess vacant land." (Emphasis added)

17. The High Court after considering the said statutory provisions and taking note of the fact that the appellants did not disclose the date of notification under Section 10(1) of the Act 1976, nor annexed the copy of the same and further presuming that the said notice must have preceded the notice under Section 10(3) of the Act 1976, reached the conclusion that the transfer which had been effected by the recorded tenure holders in favour of Mayur Sahkari Awas Samiti on 20th April, 1982 was deemed to be null and void by operation of law under Sections 5(3) and 10(4) of the Act 1976. We do not see any cogent reason to take a contrary view. More so, a further examination of the correctness of the aforesaid finding at the behest of the appellants is not desirable for the reasons that they did not disclose even the date of notification issued under Section 10(1) of the Act 1976. More so, the user of the land could not be changed in view of the provisions of Section 10(4) of the Act 1976. The alleged transfer by the recorded tenure holders in favour of Mayur Sahkari Awas Samiti for the purpose of construction of residential houses was totally illegal.

18. The sale deed in favour of Mayur Sahkari Awas Samiti dated 20th April, 1982 is not on record. There is nothing to establish whether the sale deed was a genuine, forged or fabricated document. Merely making a statement that it was a registered sale deed and, therefore, it was genuine, cannot be accepted. There is no such presumption in law. There is nothing to ascertain who had been the transferors and who were the transferees therein. None of the subsequent sale deeds is on record. Therefore, the genuineness of either of the alleged sale deeds can be tested. There are no pleadings as under what circumstances the sale deeds have been executed and as to whether the original tenure holders have received any consideration.

19. It is a settled proposition of law that a party has to plead the case and produce/adduce sufficient evidence to substantiate his submissions made in the petition and in case the pleadings are not complete, the Court is under no obligation to entertain the pleas. In Bharat Singh & Ors. Vs. State of Haryana & Ors., AIR 1988 SC 2181, this Court has observed as under:-

"In our opinion, when a point, which is ostensibly a point of law is required to be substantiated by facts, the party raising the point, if he is the writ petitioner, must plead and prove such facts by evidence which must appear from the writ petition and if he is the respondent, from the counter affidavit. If the facts are not pleaded or the

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 268 of 337   Page ID
#:28723
Ritesh Tewari & Anr vs State Of U.P.& Ors on 21 September, 2010

evidence in support of such facts is not annexed to the writ petition or the counter-affidavit, as the case may be, the Court will not entertain the point. There is a distinction between a hearing under the Code of Civil Procedure and a writ petition or a counter-

affidavit. While in a pleading, i.e. a plaint or written statement, the facts and not the evidence are required to be pleaded. In a writ petition or in the counter affidavit, not only the facts but also the evidence in proof of such facts have to be pleaded and annexed to it." (Emphasis added) (See also Vithal N. Shetti & Anr. Vs. Prakash N. Rudrakar & Ors., (2003) 1 SCC 18; Devasahayam (Dead) by LRs. Vs. P. Savithramma & Ors., (2005) 7 SCC 653; Sait Nagjee Purushotham & Co. Ltd. Vs. Vimalabai Prabhulal & Ors., (2005) 8 SCC 252; and Rajasthan Pradesh V.S. Sardarshahar & Anr. Vs. Union of India & Ors., AIR 2010 SC 2221).

The present appeal definitely does not contain pleadings required for proper adjudication of the case. A party is bound to plead and prove the facts properly. In absence of the same, the court should not entertain the point.

20. The power under Article 226 of the Constitution is discretionary and supervisory in nature. It is not issued merely because it is lawful to do so. The extraordinary power in writ jurisdiction does not exist to set right mere errors of law which do not occasion any substantial injustice. A writ can be issued only in case of a grave miscarriage of justice or where there has been a flagrant violation of law. The writ court has not only to protect a person from being subjected to a violation of law but also to advance justice and not to thwart it. The Constitution does not place any fetter on the power of the extraordinary jurisdiction but leaves it to the discretion of the court. However, being that the power is discretionary, the court has to balance competing interests, keeping in mind that the interests of justice and public interest are coalesce generally. A court of equity, when exercising its equitable jurisdiction must act so as to prevent perpetration of a legal fraud and promote good faith and equity. An order in equity is one which is equitable to all the parties concerned. Petition can be entertained only after being fully satisfied about the factual statements and not in a casual and cavalier manner. (Vide Champalal Binani Vs. The Commissioner of Income Tax, West Bengal & Ors., AIR 1970 SC 645; Chimajirao Kanhojirao Shrike & Anr. v. Oriental Fire and General Insurance Co. Ltd., AIR 2000 SC 2532; LIC of India v. Smt. Asha Goel & Anr., AIR 2001 SC 549; The State Financial Corporation & Anr. v. M/s. Jagdamba Oil Mills & Anr., AIR 2002 SC 834; Chandra Singh v. State of Rajasthan & Anr., AIR 2003 SC 2889; and Punjab Roadways, Moga through its General Manager v. Punja Sahib Bus and Transport Co. & Ors, (2010) 5 SCC 235).

21. Where a party's claim is not founded on valid grounds, the party cannot claim equity. A party that claims equity must come before the court with clean hands as equities have to be properly worked out between parties to ensure that no one is allowed to have their pound of flesh vis-`-vis the others unjustly. (vide: Sikkim Subba Associates v. State of Sikkim (2001) 5 SCC 629).

22. In Andhra Pradesh State Financial Corporation v. M/s. GAR Re- Rolling Mills & Anr., AIR 1994 SC 2151, this Court observed:-

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 269 of 337   Page ID
#:28724
Ritesh Tewari & Anr vs State Of U.P.& Ors on 21 September, 2010

"Equity is always known to defend the law from clefty evasions and new subtelities
invented to evade law."

23. In M.P. Mittal v. State of Haryana & Ors., AIR 1984 SC, 1888, this Court held:

"........it is open to the High Court to consider whether, in the exercise of its undoubted
discretionary jurisdiction, it should decline relief to such petitioner if the grant of
relief would defeat the interests of justice. The Court always has power to refuse relief
where the petitioner seeks to invoke its writ jurisdiction in order to secure a
dishonest advantage or perpetrate an unjust gain."

24. This Court in State of Maharashtra & Ors. v. Prabhu, (1994) 2 SCC 481 considered the scope of
equity jurisdiction of the High Court under Article 226 of the Constitution and pointed out as
follows:

"It is the responsibility of the High Court as custodian of the Constitution to maintain
the social balance by interfering where necessary for sake of justice and refusing to
interfere where it is against the social interest and public good."

25. The present appeal does not present any special feature warranting exercise of equitable
discretionary jurisdiction in favour of the appellants. The equity jurisdiction is exercised to promote
honesty and not to frustrate the legitimate rights of the other parties.

26. It is settled legal proposition that if an order is bad in its inception, it does not get sanctified at a
later stage. A subsequent action/development cannot validate an action which was not lawful at its
inception, for the reason that the illegality strikes at the root of the order. It would be beyond the
competence of any authority to validate such an order. It would be ironical to permit a person to rely
upon a law, in violation of which he has obtained the benefits. (Vide Upen Chandra Gogoi Vs. State
of Assam & Ors., (1998) 3 SCC 381; Satchidananda Misra Vs. State of Orissa & Ors., (2004) 8 SCC
599; and Regional Manager, SBI Vs. Rakesh Kumar Tewari, (2006) 1 SCC 530).

27. In C. Albert Morris Vs. K. Chandrasekaran & Ors., (2006) 1 SCC 228, this Court held that a right
in law exists only and only when it has a lawful origin.

28. In Mangal Prasad Tamoli (dead) by LRs. Vs. Narvadeshwar Mishra (dead) by LRs. & Ors.,
(2005) 3 SCC 422, this Court held that if an order at the initial stage is bad in law, then all further
proceedings consequent thereto will be non-est and have to be necessarily set aside.

29. In the instant case, as we have observed that the alleged sale deed dated 20th April, 1982 in
favour of Mayur Sahkari Avas Samiti has been a void transaction, all subsequent transactions have
merely to be ignored.

30. While hearing this appeal, we made a futile exercise to ascertain the true facts and find out the
bona fides of the appellants. For that purpose, we put certain questions to the learned counsel for

the appellants. Shri Jayant Bhushan, learned Senior counsel persistently answered that the facts, the court wanted to ascertain were not in issue.

Section 165 of the Evidence Act, 1872 empowers the Court to ask questions relevant, irrelevant, related or unrelated to the case to the party to ascertain the true facts. The party may not answer the question but it is not permitted to tell the Court that the question put to him is irrelevant or the facts the court wants to ascertain are not in issue. Exercise of such a power is necessary for the reason that the judgment of the court is to be based on relevant facts which have been duly proved. A court in any case cannot admit illegal or inadmissible evidence for basing its decision. It is an extraordinary power conferred upon the court to elicit the truth and to act in the interest of justice. A wide discretion has been conferred on the court to act as the exigencies of justice require. Thus, in order to discover or obtain proper proof of the relevant facts, the court can ask the question to the parties concerned at any time and in any form. "Every trial is voyage of discovery in which truth is the quest". Therefore, power is to be exercised with an object to subserve the cause of justice and public interest, and for getting the evidence in aid of a just decision and to uphold the truth. The purpose being to secure justice by full discovery of truth and an accurate knowledge of facts, the court can put questions to the parties, except those which fall within exceptions contained in the said provision itself. (Vide : Jamatraj Kewalji Govani Vs. State of Maharashtra, AIR 1968 SC 178; and Zahira Habibulla H. Sheikh & Anr. Vs. State of Gujarat & Ors. (2004) 4 SCC 158.

31. In the instant case, in spite of all our sincere efforts, we could not succeed in eliciting the true facts.

32. In view of above, we do not find any force in the appeal on merit and it is, accordingly, dismissed. No order as to costs.

...................................J.

(P. SATHASIVAM) ..................................J.

    New Delhi,                      (Dr. B.S. CHAUHAN)
    September 21, 2010

# EXHIBIT  M

Delhi High Court

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

Author: J.R. Midha

```
        *        IN THE HIGH COURT OF DELHI AT NEW DELHI


                 +      RFA No.83/2007


        %                              Date of decision : 8th March, 2013


             VED PARKASH KHARBANDA           ..... Appellant
                         Through: Mr. Rajesh Katyal and
                                  Mr. S.S. Katyal, Advs.

                 versus


             VIMAL BINDAL                            ..... Respondent
                               Through:      Mr. Sanjay Jain, Sr. Adv.
                                             with Mr. R.N. Oberoi, Ms.
                                             Ruchi Jain and Mr. Sarfaraz
                                             Ahmad, Advs.


             CORAM :-
             HON'BLE MR. JUSTICE J.R. MIDHA


                               JUDGMENT
```

1. The appellant has challenged the judgment and decree for specific performance passed by the learned Trial Court. The appellant was the defendant and respondent was the plaintiff before the learned Trial Court. For the sake of convenience, the appellant and the respondent shall be referred to as per their ranks in the plaint as the defendant and plaintiff respectively.

2. Plaintiff's case - The plaintiff instituted a suit for specific performance, declaration and permanent injunction against the defendant on 21st August, 1997. The case set-up by the plaintiff in the plaint is as under:-

2.1 On 5th July, 1996, the plaintiff entered into an agreement with the defendant to purchase the property bearing No.53, New Krishna Nagar, Delhi - 110051 built over land ad- measuring 133.25 Sq. yds., hereinafter referred to as the suit property' for a total sale consideration of `13,95,000/-. The plaintiff paid a sum of `1,50,000/- to the defendant as earnest money which was recorded in the agreement dated 5th July, 1996. 2.2 On 22nd August, 1996, the defendant in continuation of the agreement dated 5th July, 1996, executed another agreement relating to the suit property in favour of the plaintiff on the same terms and conditions except that further payment of `50,000/- to be made by the plaintiff to the defendant.

2.3 On 22nd August, 1996, the plaintiff made further payment of `1,70,000/- (instead of `50,000/- mentioned in the agreement dated 22nd August, 1996) to the defendant who extended the date of the agreement up to 17th October, 1996 which was recorded by the defendant on the back of page 1' of the agreement dated 22nd August, 1996.

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

2.4 On 16th October, 1996, the defendant extended the date of completion of the agreement up to 30th October, 1996 which was recorded by the defendant in his own hand writing on the back of page 1' of the agreement dated 22nd August, 1996. 2.5 The plaintiff informed the defendant to be present in the office of Sub-Registrar for execution and registration of the sale deed on 30th October, 1996.

2.6 On 30th October, 1996 at 10:00 am, the plaintiff visited the office of the Sub-Registrar along with the balance sale consideration, partly in the form of bank drafts and partly in cash and waited for the defendant throughout the day. The plaintiff obtained the receipt about her presence from the office of the Sub- Registrar on 30th October, 1996.

2.7 The plaintiff had been requesting the defendant to receive the balance sale consideration, execute and register the sale deed, and hand over the vacant and peaceful possession of the suit property.

2.8 The defendant had been falsely promising to complete the sale in terms of the agreement to sell but later his intention became dishonest and he started giving threats to the plaintiff and her family members.

2.9 On 23rd June, 1997, the husband of the plaintiff lodged a complaint with the SHO, Police Station, Krishna Nagar. 2.10 On 31st July, 1997, the defendant issued a legal notice to the plaintiff wrongly repudiating the agreement to sell and falsely contending that the agreement stood cancelled and the earnest money stood forfeited.

2.11 The plaintiff has always been ready and willing and is still ready and willing to perform her part of the contract. 2.12 The defendant has no right to cancel the agreement or to forfeit the earnest money.

3. Defendant's case - The defence set-up by the defendant in the written statement is as under:- 3.1 The defendant agreed to sell the suit property to the plaintiff vide agreement to sell dated 5th July, 1996 as he had to simultaneously purchase another property for his residence from the sale proceeds of the suit property. The defendant entered into an agreement dated 7th September, 1996 to purchase property No.F-1, Radhey Puri, Khureji Khas, Delhi-51 for a total consideration of `10,10,000/- against which he paid `1,00,000/- out of the earnest money received by him from the plaintiff. As such, the time was of the essence of the agreement dated 5 th July, 1996.

3.2 The plaintiff was not having the entire sale consideration and, therefore, she requested the defendant to accept additional amount of `50,000/- on 22nd August, 1996 and to extend the payment of the balance sale consideration. The plaintiff's husband prepared another agreement dated 22nd August, 1996 and requested the defendant to sign the same and agreed to pay `50,000/- by the evening. The defendant bonafidely signed the said agreement. Neither the plaintiff nor her husband turned up in the evening with the payment of `50,000/-. The plaintiff defaulted in making the payment of `50,000/- in terms of the agreement dated 22nd August, 1996 whereupon the defendant informed the plaintiff on telephone that the agreement dated 22nd August, 1996 stood

cancelled.

3.3 The plaintiff again approached the defendant on 6th September, 1996 and promised to make the payment of the entire sale consideration by 5th October, 1996 whereupon the defendant entered into an agreement dated 7th September, 1996 to purchase property bearing No.F-1, Radhey Puri, Khureji Khas, Delhi-

110051. The defendant made the payment of `1,00,000/- as earnest money to the seller of the suit property and agreed to pay the balance sale consideration by 9th October, 1996. The defendant made further payment of `50,000/- to the seller and extended the date of completion of sale up to 20th October, 1996. 3.4 The plaintiff failed to make the payment of the balance sale consideration to the defendant in terms of the agreement dated 5th July, 1996 and, therefore, the agreement dated 5th July, 1996 stood cancelled which was informed by the defendant to the plaintiff.

3.5 On 16th October, 1996, the defendant was called by the police at Police Station, Krishna Nagar where he was threatened that he would be implicated in a false case at the instance of the plaintiff. The defendant being a bank employee, got afraid and under police pressure and threats, made some writing on the back of the agreement as per the dictation of the police and the husband of the plaintiff. The defendant never received any amount from the plaintiff after execution of the agreement dated 5 th July, 1996.

3.6 The agreement dated 5th July, 1996 stood cancelled due to the failure of the plaintiff to make the payment of the balance sale consideration within the stipulated period. The endorsement on the back side of the agreement was made under police pressure and no payment was received as endorsed on the back of the agreement dated 22nd August, 1996. However, in order to avoid any controversy, the date of completion of the agreement, namely 5th July, 1996 was extended up to 30th October, 1996 on telephone on the condition that the entire balance sale consideration shall be paid by means of bank draft/pay order and the same shall be shown to the defendant at his house and then the defendant would accompany the plaintiff for execution/registration of sale deed. The plaintiff did not turn up on 30 th October, 1996 and, therefore, the agreement stood cancelled and earnest money stood forfeited which was informed to the plaintiff on telephone. 3.7 The agreement to sell dated 5th July, 1996 stood cancelled and the earnest money stood forfeited due to the failure of the defendant to make the payment of the balance sale consideration within the stipulated period. 3.8 The defendant entered into an agreement dated 7th September, 1996 to purchase property bearing No.F-1, Radhey Puri, Khureji Khas, Delhi-110051 and paid the earnest money of `1,50,000/- to the seller. The said agreement was cancelled due to the breach of the plaintiff resulting in forfeiture of earnest money. 3.9 The plaintiff was never ready and willing to perform his part of contract. The plaintiff was not having sufficient funds to make the payment of the balance sale consideration.

4. Issues The following issues were framed by the learned Trial Court on 12th February, 2000:

    1. Whether the plaintiff was ready and willing to perform her part of the contract? OPP.

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

2. Whether the plaintiff is entitled to decree under Specific Performance and Possession? OPP.

3. Whether agreement dated 5th July, 1996 and 22nd August, 1996 stood cancelled and earnest money stood forfeited? OPD.

4. Whether the defendant did not receive additional amount of Rs.1,70,000/- from the plaintiff as alleged in the written statement? OPD.

5. Whether time was not extended to perform agreement dated 22-8-1996? OPD.

6. Relief.

5. Plaintiff's evidence 5.1 The plaintiff appeared in the witness box as PW-1 and reiterated the case set-up in the plaint. She deposed with respect to the agreement to sell dated 5th July, 1996 (Ex.P-1), agreement to sell dated 22nd August, 1996 (Ex.P-2), receipts dated 30th October, 1996 from the office of the Sub-Registrar (Ex.P-3 and Ex.P-3A), complaint dated 23rd June, 1997 to the police (Ex.P-4) and legal notice dated 31st July, 1997 (Ex.P-5). In cross-examination, PW-1 admitted that the defendant had shown the registered sale deed of the suit property to her as well as her husband. She also admitted that the defendant had to simultaneously purchase another property after entering into the agreement to sell with the plaintiff. However, she denied that the defendant actually entered into an agreement to purchase a property in Radhey Puri and made the payment of the earnest money to the vendor of that property. 5.2 The plaintiff's husband appeared in the witness box as PW-10 and also reiterated the case set-up in the plaint. In cross- examination, he admitted that neither he nor his wife was having entire sale consideration in their bank account. He stated that he had arranged the sale consideration from his father-in-law. He deposed that his brother-in-law brought the demand drafts from Punjab to Delhi on 30th October, 1996. He admitted that the plaintiff had not purchased any stamp paper for execution of the sale deed. He further admitted that the plaintiff had not shown any bank draft or cheque for the balance sale consideration to the defendant. He deposed that the defendant had told the plaintiff that he would give the title documents to the plaintiff in Court on 30 th October, 1996. He admitted having not replied to the legal notice dated 30th July, 1997 before filing the case. 5.3 PW-3, father of the plaintiff appeared in the witness box and deposed that he prepared five demand drafts totaling `10,25,000/- as per the details given hereinbelow from State Bank of Patiala and State Bank of India, all favouring the defendant and he gave the same to the plaintiff for purchase of the suit property from the defendant:-

| D.D.No. | Dated | Amount | Bank |
|---------|-------|--------|------|
| 099082 | 14.10.96 | `40,000/- | State Bank of |
| 099083 | 14.10.96 | `40,000/- | Patiala, |
| 099084 | 14.10.96 | `40,000/- | Baghapurana, Distt. |
| 099085 | 14.10.96 | `30,000/- | Moga, Punjab |
| TC 118381 | 29.10.96 | `8,75,000/- | State Bank of India, |
|  |  |  | Baghapurana, Distt. |
|  |  |  | Moga, Punjab |

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

5.4          PW-5, Sub-Inspector from Police Station Krishna

Nagar deposed with respect to the receipt of complaint from the plaintiff against the defendant on 23rd June, 1997. 5.5 PW-6 from State Bank of Patiala deposed with respect to the certificate (Ex.PW-6/1) issued by Manager, State Bank of Patiala regarding four drafts prepared on 14th October, 1996 and cancelled on 5th November, 1996.

5.6 PW-7 from State Bank of India deposed with respect to draft for `8,75,000/- prepared on 29th October, 1996 and cancelled by PW-3 on 8th November, 1996. He also deposed with respect to the certificates issued by the Branch Manager (Ex.PW7/1 and Ex.PW7/2).

5.7 PW-8 from the Sub-Registrar's office, Seelampur deposed with respect to the receipts (Ex.PW-8/1 and PW-8/2) issued from the book maintained in their office. He deposed that the receipts were issued from their office.

6. Defendant's evidence 6.1 The defendant appeared in the witness box as DW-1 and reiterated the case set-up in the written statement. The defendant deposed with respect to the legal notice dated 31st July, 1997 (Ex.DW-1/1). The photocopy of agreement dated 7th September, 1996 to purchase property no. F-1, Radhey Puri, Khureji Khas, Delhi was marked as Mark A'. In cross- examination, he admitted that he did not give any notice in writing to the plaintiff regarding agreement to purchase property no.F-1, Radhey Puri, Khureji Khas, Delhi. He further admitted that he neither lodged any complaint against the police officers nor issued any notice to protest the endorsement on the back of agreement - Ex.P-2. He also admitted that he did not approach any senior police officer. He also admitted that he did not challenge the endorsement dated 16th October, 1996 in any Court. 6.2 DW-2, brother-in-law of the defendant deposed that he was present at the time of the execution of the agreement - Ex.P-1. DW-2 further deposed that he was aware of the intention of the defendant to purchase another property in Radhey Puri and that the defendant went ahead with this transaction by paying the earnest money received from the plaintiff towards the execution of an agreement to purchase the property in Radhey Puri. He deposed that this agreement to sell was only entered into after receiving assurances from the plaintiff. DW-2 further stated that he personally visited the plaintiff's house before the due date but the plaintiff along with her husband avoided the transaction, as they were not having balance sale consideration. He further stated that the defendant faced harassment from the police at the behest of the husband of the Plaintiff and thereafter the defendant wrote something under duress. DW-2 reiterated that the defendant had received only `1,50,000/- as earnest money which was used to execute an agreement to purchase another property, and no further payments were made by the plaintiff who breached the agreement.

7. Findings of the Trial Court The learned Trial Court granted the decree of specific performance of the agreements - Ex.P-1 and Ex.P-2 to the plaintiff against the defendant and directed the defendant to execute the sale deed of property bearing no.53, New Krishna Nagar, Delhi-110051 and get the same registered in the office of concerned Sub-Registrar within a period of one month failing which plaintiff would be entitled to get it executed and registered through process of the Court. The learned Trial Court directed the plaintiff to deposit the balance sale consideration of `10,75,000/- in Court within 30 days. The vacant and peaceful possession of the suit property was also directed to

be handed over to the plaintiff at the time of registration of the sale deed. The learned Trial Court declared the agreements - Ex.P-1 and Ex.P-2 to be valid and enforceable and further that the defendant had no right to cancel the same and to forfeit the earnest money. The learned Trial Court restrained the defendant from transferring, selling, creating any interest or disposing of the suit property. The findings of the learned Trial Court are as under:- 7.1 The plaintiff paid a sum of `1,50,000/- to the defendant at the time of execution of the agreement - Ex.P-1 dated 5th July, 1996.

7.2 The plaintiff made a further payment of `1,70,000/- to the defendant on 22nd August, 1996 in terms of the endorsement made by the defendant on the back of Ex.P-2.

7.3 The endorsements made on the back of the agreement dated 22nd August, 1996 - Ex.P-2 whereby the defendant acknowledged the receipt of `1,70,000/- and extended the agreement up to 30th October, 1996, were voluntary. The learned Trial Court rejected the defendant's averment that he signed the same under police pressure.

7.4 The plaintiff was ready and willing to perform her part of the contract. The plaintiff had sufficient means and funds available with her as on 30th October, 1996 to make the payment of the balance sale consideration of `10,75,000/- out of which the plaintiff has proved the five demand drafts totaling `10,25,000/-. 7.5 The defendant has not shown any ground due to which he would suffer great hardship by the decree of specific performance.

7.6 The defendant has failed to prove the agreement dated 7th September, 1996 for purchase of another property No.F-1, Radhey Puri, Khureji Khas, Delhi-110051. The original of the said agreement was not produced. The defendant has not issued any notice to the plaintiff informing her about entering into another agreement with the third party. The plaintiff cannot, therefore, be blamed for frustration of the agreement between the defendant and the third party.

7.7 The plaintiff had not purchased the stamp papers for execution of the sale deed as the defendant had not delivered the title deeds of the property to the plaintiff and had assured to bring the same on the date of execution of sale deed. Otherwise, also no proof is shown by the defendant that the stamp papers were required to be purchased beforehand and could not have been available there and then.

7.8 The plea of the defendant that the drafts of balance sale consideration were to be shown at the defendant's house and then he would accompany the plaintiff to the office of the Sub- Registrar was not contained in the agreement and no evidence was brought on record by the defendant regarding the understanding of this condition.

8. Grounds of appeal The learned counsel for the appellant - defendant has urged the following grounds at the time of hearing of this appeal:-

8.1 The plaintiff was not ready with the balance sale consideration on 30th October, 1996. The continuous readiness and willingness on the part of the plaintiff is a condition precedent to the grant of specific performance. The learned counsel referred to N.P. Thirugnanam v. Dr. R. Jagan Mohan Rao, (1995) 5 SCC 115 in support of this proposition.

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

8.2 Even assuming that the plaintiff was ready with the balance sale consideration on 30th October, 1996, she was not willing to make the payment of the same to the defendant.

8.3 The plaintiff never informed the defendant that she had made arrangement for the balance sale consideration and would be visiting the office of the Sub-Registrar on 30th October, 1996.

8.4 The plaintiff committed breach of agreement by failing to make the payment of the balance sale consideration to the defendant by 30th October, 1996 and therefore, the agreement stood cancelled and the earnest money stood forfeited. The learned counsel referred to and relied upon Mohan v. Dalel Singh, 78 (1999) DLT 419 in which this Court declined specific performance to the purchaser who neither brought the typed sale deed nor the sale consideration before the Sub-Registrar on the stipulated date.

8.5 The unwillingness of the plaintiff can be inferred from the following facts:-

> (a) The plaintiff neither drafted the sale deed nor sought the approval thereof from the defendant.

> (b) The plaintiff did not even purchase the stamp papers for `1,12,000/- for the sale deed and had no arrangement for the subject amount.

> (c) No notice whatsoever was issued by the plaintiff to the defendant on 30th October, 1996 or at any time thereafter.

> (d) The demand drafts for `10,25,000/- were cancelled within one week without even informing the defendant.

8.6 The defendant issued a legal notice dated 31 st July, 1997 to the plaintiff to notify the cancellation of the agreement and forfeiture of the earnest money to which the plaintiff did not reply.

8.7 Time was the essence of the contract as the defendant had to purchase another property from the sale proceeds of the suit property. The learned counsel referred to and relied upon Chand Rani v. Kamal Rani, (1993) 1 SCC 519 in which the Supreme Court held time to be the essence of the contract in view of the express term of the contract and the specific performance was declined to the plaintiff.

8.8 The defendant had entered into an agreement to purchase property no. F-1, Radhey Puri, Khureji Khas, Delhi- 110051 for `10,10,000/- against payment of earnest money of `1,00,000/-and further payment of `50,000/-. The defendant could not make the payment of the balance sale consideration and therefore, the earnest money paid in that transaction stood forfeited.

8.9 The plaintiff is not entitled to the decree of specific performance on the ground of undue delay of more than nine months in filing the suit for specific performance.

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

8.10 The specific performance of the agreement would cause great hardship to the defendant as the property prices have gone up and it is impossible for the defendant to purchase any property from the sale consideration of the agreement in question. The learned counsel referred to and relied upon A.C. Arulappan v. Ahalya Naik, (2001) 6 SCC 600 in which the Supreme Court held that the specific performance may not be granted if the defendant would be put to undue hardship which he did not foresee at the time of the agreement.

8.11 The appellant was a retired person aged about 68 years having responsibility of a mentally disabled son under treatment. The appellant and his family members have no property other than the suit property and they would be rendered homeless in the event of specific performance. The appellant has referred to and relied upon Ranganayakamma v. N. Govinda Narayan, AIR 1982 Kar 264 in which the specific performance was declined by the Division Bench of the Karnataka High Court on the ground that the appellant was a widow with no children and could not buy a similar house in Mysore city out of the balance sale consideration payable under the agreement.

8.12 The plaintiff made a police complaint dated 23rd June, 1997 to pressurize the defendant to return the earnest money and thereby gave up the right to specific performance.

8.13 At the time of the final hearing of the appeal, the learned counsel for the defendant offered to return the earnest money to the plaintiff which was rejected by the plaintiff who submitted that he has deposited the balance sale consideration of `10,75,000/- with the learned Trial Court as back as 15th December, 2006 in terms of the impugned judgment and decree.

9. Response of the Plaintiff to the Grounds of Appeal 9.1 The plaintiff paid the earnest money of `1,50,000/- to the defendant recorded in the sale agreement, Ex.P-1 and `1,70,000/- recorded on the back of agreement, Ex.P-2. The plaintiff was ready and willing to make the payment of the balance sale consideration of `10,75,000/- to the defendant on 30th October, 1996 and she intimated the same to the defendant and requested him to reach the office of the Sub-Registrar for execution of the Sale Deed.

9.2 The defendant committed breach of the agreements Ex.P-1 and Ex.P-2 by failing to reach the office of the Sub-

Registrar on 30th October, 1996 to receive the balance sale consideration of `10,75,000/- and to execute the Sale Deed. 9.3 The plaintiff had not purchased the stamp papers and had also not drafted the Sale Deed because the defendant had not given the title documents to the defendant. The plaintiff had promised to give the title documents to the defendant before the Sub-Registrar on 30th October, 1996.

9.4 The defendant issued a legal notice to the plaintiff on 31st July, 1997 i.e. nine months after the stipulated date for completion of sale. The defendant has not explained the said delay.

9.5 The defendant did not mention the frustration of the agreement to purchase another property in Radhey Puri in the legal notice dated 31st July, 1997.

9.6 The defendant also did not mention the execution of the two endorsements on the back of the agreement - Ex.P-2 under police pressure in the legal notice dated 31st July, 1997.

9.7 The defendant also did not dispute the two endorsements on the back of the agreement - Ex.P-2 in the legal notice dated 31st July, 1997.

9.8 The defendant did not challenge the two endorsements on the back of agreement - Ex.P-2 in any Court of law.

9.9 The defendant admitted having extended the date of completion of sale up to 30th October, 1996 on telephone, meaning thereby that the defendant admitted telephonic communication with the plaintiff.

9.10 If the defendant had to pay the sale consideration for Radhey Puri property by 9th October, 1996, why did the defendant extend the date of completion of sale in the present case up to 30 th October, 1996.

9.11 The plaintiff did not waive the right to specific performance by filing the police complaint dated 23rd June, 1997.

9.12 The defendant referred to and relied upon Faquir Chand v. Sudesh Kumari, (2006) 12 SCC 146; Motilal Jain v. Ramdasi Devi, (2000) 6 SCC 420; Razik Ram v. J.S. Chouhan, (1975) 4 SCC 769 and Bachhaj Nahar v. Nilima Mandal, (2008) 17 SCC 491.

9.13 During the course of final hearing, the learned senior counsel for the plaintiff, on instructions, offered to pay the market price of the suit property according to the circle rates in terms of the judgment of the Supreme Court in Satya Jain v. Anis Ahmed Rushdie, 2012 (11) SCALE 570 which was rejected by the defendant.

10. It is the fundamental duty of the Court to ascertain the truth and do justice on the basis of truth. The law in this regard is well settled. However, the Trial Court has made no effort to discover the truth. Noting what Nobel Laureate and French Thinker, Andre Gide, once said, Everything has been said already, but as no one listens, we must always begin again, this Court considers it necessary to reiterate the principles relating to the discovery of truth for the guidance of the Trial Courts.

11. Truth should be the Guiding Star in the Entire Judicial Process 11.1 Truth is the foundation of justice. Dispensation of justice, based on truth, is an essential feature in the justice delivery system. People would have faith in Courts when truth alone triumphs. The justice based on truth would establish peace in the society.

11.2 Krishna Iyer J. in Jasraj Inder Singh v. Hemraj Multanchand, (1977) 2 SCC 155 described truth and justice as under:

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

> 8. ...Truth, like song, is whole, and half-truth can be noise! Justice is truth, is beauty
> and the strategy of healing injustice is discovery of the whole truth and harmonising
> human relations. Law's finest hour is not in meditating on abstractions but in being
> the delivery agent of full fairness.

This divagation is justified by the need to remind ourselves that the grammar of justice according to
law is not little litigative solution of isolated problems but resolving the conflict in its wider bearings.
11.3 In Union Carbide Corporation v. Union of India, (1989) 3 SCC 38, the Supreme Court described
justice and truth to mean the same. The observations of the Supreme Court are as under:

> 30. ...when one speaks of justice and truth, these words mean the same thing to all
> men whose judgment is uncommitted. Of Truth and Justice, Anatole France said :
>
> Truth passes within herself a penetrating force unknown alike to error and falsehood.
> I say truth and you must understand my meaning. For the beautiful words Truth and
> Justice need not be defined in order to be understood in their true sense. They bear
> within them a shining beauty and a heavenly light. I firmly believe in the triumph of
> truth and justice. That is what upholds me in times of trial.... 11.4 In Mohanlal Shamji
> Soni v. Union of India, 1991 Supp (1) SCC 271, the Supreme Court observed that the
> presiding officer of a Court should not simply sit as a mere umpire at a contest
> between two parties and declare at the end of the combat who has won and who has
> lost and that there is a legal duty of his own, independent of the parties, to take an
> active role in the proceedings in finding the truth and administering justice.
>
> 11.5 In Chandra Shashi v. Anil Kumar Verma, (1995) 1 SCC 421, the Supreme Court
> observed that to enable the Courts to ward off unjustified interference in their
> working, those who indulge in immoral acts like perjury, pre-variation and motivated
> falsehoods have to be appropriately dealt with, without which it would not be
> possible for any Court to administer justice in the true sense and to the satisfaction of
> those who approach it in the hope that truth would ultimately prevail. People would
> have faith in Courts when they would find that truth alone triumphs in Courts.

11.6 In A.S. Narayana Deekshitulu v. State of A.P., (1996) 9 SCC 548, the Supreme Court observed
that from the ancient times, the constitutional system depends on the foundation of truth. The
Supreme Court referred to Upanishads, Valmiki Ramayana and Rig Veda.

11.7 In Mohan Singh v. State of M.P., (1999) 2 SCC 428 the Supreme Court held that effort should be
made to find the truth; this is the very object for which Courts are created. To search it out, the
Court has to remove chaff from the grain. It has to disperse the suspicious, cloud and dust out the
smear of dust as all these things clog the very truth. So long chaff, cloud and dust remains, the
criminals are clothed with this protective layer to receive the benefit of doubt. So it is a solemn duty
of the Courts, not to merely conclude and leave the case the moment suspicions are created. It is
onerous duty of the Court, within permissible limit to find out the truth. It means, on one hand no
innocent man should be punished but on the other hand to see no person committing an offence

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

should get scot free. There is no mathematical formula through which the truthfulness of a prosecution or a defence case could be concretised. It would depend on the evidence of each case including the manner of deposition and his demeans, clarity, corroboration of witnesses and overall, the conscience of a judge evoked by the evidence on record. So Courts have to proceed further and make genuine efforts within judicial sphere to search out the truth and not stop at the threshold of creation of doubt to confer benefit of doubt.

11.8 In Zahira Habibullah Sheikh v. State of Gujarat, (2006) 3 SCC 374, the Supreme Court observed that right from the inception of the judicial system it has been accepted that discovery, vindication and establishment of truth are the main purposes underlying existence of Courts of justice.

11.9 In Himanshu Singh Sabharwal v. State of Madhya Pradesh, (2008) 3 SCC 602, the Supreme Court held that the trial should be a search for the truth and not a bout over technicalities. The Supreme Court's observation are as under:

> 5. ... 31. In 1846, in a judgment which Lord Chancellor Selborne would later describe as one of the ablest judgments of one of the ablest judges who ever sat in this Court', Vice- Chancellor Knight Bruce said [Pearse v. Pearse, (1846) 1 De G&Sm. 12 : 16 LJ Ch 153 : 63 ER 950 : 18 Digest (Repl.) 91, 748] : (De G&Sm. pp. 28-29):

> 31. The discovery and vindication and establishment of truth are main purposes certainly of the existence of courts of justice; still, for the obtaining of these objects, which, however valuable and important, cannot be usefully pursued without moderation, cannot be either usefully or creditably pursued unfairly or gained by unfair means, not every channel is or ought to be open to them. The practical inefficacy of torture is not, I suppose, the most weighty objection to that mode of examination,... Truth, like all other good things, may be loved unwisely--may be pursued too keenly--may cost too much.

> xxx xxx xxx

> 35. Courts have always been considered to have an overriding duty to maintain public confidence in the administration of justice--often referred to as the duty to vindicate and uphold the majesty of the law'.

> xxx xxx xxx

> 38. Since the object is to mete out justice and to convict the guilty and protect the innocent, the trial should be a search for the truth and not a bout over technicalities, and must be conducted under such rules as will protect the innocent, and punish the guilty. (Emphasis Supplied) 11.10 In Ritesh Tewari v. State of U.P., (2010) 10 SCC 677, the Supreme Court reproduced often quoted quotation: Every trial is voyage of discovery in which truth is the quest' 11.11 In Maria Margarida Sequeria Fernandes v. Erasmo Jack de Sequeria, (2012) 5 SCC 370, the Supreme Court again highlighted the

significance of truth and observed that the truth should be the guiding star in the entire legal process and it is the duty of the Judge to discover truth to do complete justice. The Supreme Court stressed that Judge has to play an active role to discover the truth and he should explore all avenues open to him in order to discover the truth. The Supreme Court observed as under:

32. In this unfortunate litigation, the Court's serious endeavour has to be to find out where in fact the truth lies.

33. The truth should be the guiding star in the entire judicial process.Truth alone has to be the foundation of justice. The entire judicial system has been created only to discern and find out the real truth. Judges at all levels have to seriously engage themselves in the journey of discovering the truth. That is their mandate, obligation and bounden duty. Justice system will acquire credibility only when people will be convinced that justice is based on the foundation of the truth.

xxx xxx xxx

35. What people expect is that the Court should discharge its obligation to find out where in fact the truth lies. Right from inception of the judicial system it has been accepted that discovery, vindication and establishment of truth are the main purposes underlying the existence of the courts of justice.

xxx xxx xxx

52. Truth is the foundation of justice. It must be the endeavour of all the judicial officers and judges to ascertain truth in every matter and no stone should be left unturned in achieving this object. Courts must give greater emphasis on the veracity of pleadings and documents in order to ascertain the truth. (Emphasis supplied) 11.12 In A. Shanmugam v. Ariya Kshatriya, (2012) 6 SCC 430, the Supreme Court held that the entire journey of a judge is to discern the truth from the pleadings, documents and arguments of the parties. Truth is the basis of justice delivery system. The Supreme Court laid down the following principles:

43. On the facts of the present case, following principles emerge:

43.1. It is the bounden duty of the Court to uphold the truth and do justice.

43.2. Every litigant is expected to state truth before the law court whether it is pleadings, affidavits or evidence. Dishonest and unscrupulous litigants have no place in law courts.

43.3. The ultimate object of the judicial proceedings is to discern the truth and do justice. It is imperative that pleadings and all other presentations before the court

should be truthful. 43.4. Once the court discovers falsehood, concealment, distortion, obstruction or confusion in pleadings and documents, the court should in addition to full restitution impose appropriate costs. The court must ensure that there is no incentive for wrong doer in the temple of justice. Truth is the foundation of justice and it has to be the common endeavour of all to uphold the truth and no one should be permitted to pollute the stream of justice.

43.5. It is the bounden obligation of the Court to neutralize any unjust and/or undeserved benefit or advantage obtained by abusing the judicial process. (Emphasis supplied) 11.13 In Ramesh Harijan v. State of Uttar Pradesh, (2012) 5 SCC 777, the Supreme Court emphasized that it is the duty of the Court to unravel the truth under all circumstances.

11.14 In Bhimanna v. State of Karnataka, (2012) 9 SCC 650, the Supreme Court again stressed that the Court must endeavour to find the truth. The observations of the Supreme Court are as under:

"28. The court must endeavour to find the truth. There would be "failure of justice" not only by unjust conviction but also by acquittal of the guilty, as a result of unjust failure to produce requisite evidence. Of course, the rights of the accused have to be kept in mind and safeguarded but they should not be overemphasised to the extent of forgetting that the victims also have rights."

11.15 In the recent pronouncement in Kishore Samrite v. State of U.P., MANU/SC/0892/2012, the Supreme Court observed that truth should become the ideal to inspire the Courts to pursue. This can be achieved by statutorily mandating the Courts to become active seekers of truth. The observations of Supreme Court are as under:

"31. It has been consistently stated by this Court that the entire journey of a Judge is to discern the truth from the pleadings, documents and arguments of the parties, as truth is the basis of the Justice Delivery System.

32. With the passage of time, it has been realised that people used to feel proud to tell the truth in the Courts, irrespective of the consequences but that practice no longer proves true, in all cases. The Court does not sit simply as an umpire in a contest between two parties and declare at the end of the combat as to who has won and who has lost but it has a legal duty of its own, independent of parties, to take active role in the proceedings and reach at the truth, which is the foundation of administration of justice. Therefore, the truth should become the ideal to inspire the courts to pursue. This can be achieved by statutorily mandating the Courts to become active seekers of truth. To enable the courts to ward off unjustified interference in their working, those who indulge in immoral acts like perjury, prevarication and motivated falsehood, must be appropriately dealt with. The parties must state forthwith sufficient factual details to the extent that it reduces the ability to put forward false and exaggerated claims and a litigant must approach the Court with clean hands. It is the bounden duty of the Court to ensure that dishonesty and any attempt to surpass the legal process must be effectively curbed and the Court must ensure that there is no wrongful,

unauthorised or unjust gain to anyone as a result of abuse of the process of the Court. One way to curb this tendency is to impose realistic or punitive costs. (Emphasis supplied) 11.16 Malimath Committee on Judicial Reforms discussed the paramount duty of Courts to search for truth. The relevant observations of the Committee are as under:-

- The Indian ethos accords the highest importance to truth. The motto Satyameva Jayate (Truth alone succeeds) is inscribed in our National Emblem Ashoka Sthambha. Our epics extol the virtue of truth.

-For the common man truth and justice are synonymous. So when truth fails, justice fails. Those who know that the acquitted accused was in fact the offender, lose faith in the system.

-In practice however we find that the Judge, in his anxiety to demonstrate his neutrality opts to remain passive and truth often becomes a casualty.

-Truth being the cherished ideal and ethos of India, pursuit of truth should be the guiding star of the Justice System. For justice to be done truth must prevail. It is truth that must protect the innocent and it is truth that must be the basis to punish the guilty. Truth is the very soul of justice. Therefore truth should become the ideal to inspire the courts to pursue.

-Many countries which have Inquisitorial model have inscribed in their Parliamentary Acts a duty to find the truth in the case. In Germany Section 139 of the so called Majna Charta', a breach of the Judges' duty to actively discover truth would promulgate a procedural error which may provide grounds for an appeal.

-For Courts of justice there cannot be any better or higher ideal than quest for truth.

12. What is Truth' and how to discover it 12.1 The next question which arises for consideration is, what is the meaning of Truth and how to discover it. The judgments referred to hereinabove do not contain the answer to these twin questions.

12.2 Eminent scholar Prof. G. Mohan Gopal, former Director, National Judicial Academy, has done remarkable work on the approach of law to truth. He has defined the Law's Truth and has also explained the method of discovering Law's Truth. He has described Law's truth as synonymous with facts established in accordance with the procedure prescribed by law. The existence of facts have to be established strictly on the basis of relevant and admissible evidence, judicial notice and legally permitted presumptions based on reason, rationality and justification. The views of Prof. G. Mohan Gopal in his unpublished article -Courts and Truth contain summary of discussions at National Judicial Academy which are reproduced hereunder:-

Justice Gajendragadkar, one of India's greatest jurists, says in the 69th Report of the Law Commission of India on the Evidence Act (1977) that [the judge's] object, above

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

all, is to find out the truth... (para 100.21). The Report adds, Rules of evidence are intended ultimately to ensure that truth shall come before the Court in a manner which secures justice and which is in conformity with the general principles of jurisprudence and the content and spirit of the legal system.(para 100.15). These sentiments are widely echoed in a large number of judgments and also in academic literature on the law.

In the same Report, Justice Gajendragadkar underscores the limitation of the ability of the judicial process in finding the truth. He says, Rules of evidence, however perfect they may be, cannot guarantee that truth will be known at the end of the trial. He says, The [Evidence] Act recognizes that the truth need not be pursued at too high a cost. The caveat that courts cannot guarantee that their decisions will be based on truth is widely shared by judges and academicians. It should be a matter of concern that, while giving such central importance to the idea of truth, judges have not yet articulated clearly their concept of truth in their judgments. Nor do statutes give us a definition of truth to be used in the judicial process. In fact, the word truth is barely used in statutes. For example, the Evidence Act and the IPC refer to truth only in three or four sections, mainly in the context of the obligation of parties/witnesses to say the truth, and as a defence against defamation.

Another source of concern is that judgments erroneously refer to truth as if it were an axiomatic, well-understood and commonly accepted concept, whereas truth is a highly contested and controversial idea with multiple and diverse definitions that are often mutually opposed. It is therefore most important to clarify the meaning of truth and the method of finding it in the context of judicial proceedings. This is necessary to preserve and strengthen the confidence of people in the judicial system especially because courts are quite explicitly saying (as referred to earlier) that they cannot guarantee that their decisions would be based on the truth.

What is truth? Literally, truth is a quality of trustworthiness/faithfulness and consistency with fact. The contentious part of the concept of truth is the quality of trustworthiness. How is it defined? What is the source of trustworthiness? How is it determined? How is it verified? Clarity on these questions is necessary for any claim based on truth to be accepted.

The issue of truth comes up in the judicial process in the following manner. Every law sets out a hypothetical fact pattern, which it may prohibit or permit. It also prescribes consequences should the hypothetical fact pattern occur in real life. For example, the law on murder sets out a prohibited fact pattern: a person (a hypothetical fact) intentionally (a hypothetical fact) kills (a hypothetical fact) another person (a hypothetical fact). It also sets out the consequence of conduct that falls within a prohibited fact pattern -in this case life imprisonment or, in the rarest of rare cases, the death penalty. The purpose of the judicial process is to determine whether, in truth, the prohibited fact pattern actually occurred in real life, and if so, to assign

consequences. In ancient times, evidence could be extracted in virtually any manner: ritual, religion, ordeal, torture, or confession. Whatever was believed to be true by the judge (or "panchs") was the truth. Law's truth was traditionally subjective truth, a concept that arbitrarily varied from judge to judge and jury to jury, and was fraught with uncertainty and unpredictability.

A number of factors resulted in the development of a new, more objective approach to the judicial idea of truth. As industrialization, colonialism and a global economy spread in the 19th century, a new goal of the judicial system became predictability, consistency and certainty, irrespective of the judge. This new goal was articulated some 180 years ago by Thomas Macaulay when he told the British House of Commons on 10 July, 1833 that the objective of codification [of criminal law in India] is to secure uniformity where you can have it, diversity where you must have it, but in all cases, certainty.

There was another important factor that favoured a more objective and less arbitrary approach to the concept of truth - the growth, starting in Europe and the US in the late 18 th/19th century, of a jurisprudence of individual rights. Criminal punishment consists of the deprivation of liberty. Therefore limiting criminal punishment is one of the most essential pre- requisites for broadening individual rights and liberty. A system that provides for arbitrary criminal punishment based on unguided and subjective belief in undefined concepts of truth is a great threat to individual human liberty. Therefore, a new, more objective concept of truth emerged in Indian legislation starting in the 19 th century, distinct from the divine and subjective concepts that had dominated the justice system until then.

The new concept was derived from scientific approaches to the discovery of truth. Under this new concept, truth was to be discovered by individual judges not from holy books or an inner voice, but from things observable and observed by the senses whose existence would be proved in an objective and verifiable manner (using approaches borrowed from science). Under this approach, fact, proved or established in accordance with the law, became truth. Through this new approach, truth acquired an objective and empirical character that it did not have before. This was a revolutionary and democratic change in the approach of the legal system.

The new approach is set out in the Evidence Act as follows. Section 3 of the Evidence Act says that "fact" means and includes (1) any thing, state of things, or relation of things, capable of being perceived by the senses; and (2) any mental condition of which any person is conscious. In turn, a thing may be understood as any occurrence/entity, material or non- material, that exists in human cognition, which is capable of being perceived by human senses (directly or by deduction, for example, when taking cognition of the mental condition of any person).

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

A fact is said to be proved under the Evidence Act (Section 3) when, after considering the matters before it, the Court either believes it to exist, or considers its existence so probable that a prudent man ought under the circumstances of the particular case, to act upon the supposition that it exists.

The existence of a fact (the truth) is based on the belief of a jury or a judge (now in India, only the judge) in its existence. Belief means the mental acceptance of something as true"(i.e., has the quality of trustworthiness).Belief may be of two kinds: evidence-based or faith-based. Science uses evidence-based belief systems. These systems seek to nullify bias that arises from faith-based and subjective beliefs by following strict procedures of demonstration and verification of evidence. On the other hand, faith-based belief systems do not rely on evidence. They tend to be highly subjective. The Evidence Act brought in a radical change to the concept of belief as the basis of truth applied by Indian courts from faith-based belief (as was the case in traditional judicial systems in India) to evidence-based (scientific) belief. This change was essential to achieve the then new goal of the legal system of consistency, uniformity and certainty, and to reduce arbitrariness. The plain language of the statute clearly supports the view that the nature of belief required by law had been radically changed. The Act requires that the belief of the judge must be based on objective material (after considering the matters before it).

This very important change has, unfortunately however, received very little attention in judgments or academic discourse. As a consequence, many judges and academics appear to still labour under the misunderstanding that the truth to be determined by courts continues to be the subjective belief of each judge based on his/her individual conscience and trained instinct, inevitably influenced by religious doctrine or traditional belief and varying from one judge to another.

To satisfy the standard of belief required under the Evidence Act, a Court should come to evidence-based belief through reasoning and rationality. Reasoning is a process of structured thinking. Rationality provides a clear objective for reasoned thought. The belief must be justified. Justification is a process of ensuring that the process and content of reasoning meets an adequate standard, which is objective and not subjective. Reasoning should be based on common principles and methods by which the Court considers the matters before it. The use of common methods and principles for determining the existence of facts is required, across all fact-finders. Examples of such common approaches are found for example in model instructions given to juries (see, for example, model instructions to be given to juries by Massachusetts judges). Law's Truth is derived from developments in scientific reasoning. It is a unique and distinct idea of truth, entirely different from God's Truth (the absolute truth), or Subjective Truth. It is anchored in the concept of fact. It is to be derived through well-defined processes of reasoning. Its purpose is to establish the existence, non-existence, nature or extent of right, liability or disability under law, not to establish either God's Truth (the absolute truth) or Subjective Truth.

This approach of law of equating truth with fact established through law is consistent with some of the most widely accepted philosophical definitions of truth. For example, under the correspondence theory of truth a proposition is true if it corresponds to facts. The identity theory of truth says that a true proposition is identical to a fact. It has been pointed out that under the correspondence theory, truth is a content- to-world or word-to-world relation: what we say or think is true or false depending on the way the world turns out to be. Another theory of truth that links the idea of truth to facts is the coherence theory. Aristotle's Metaphysics says, to say of what is that it is, or of what is not that it is not, is true. What is' and what is not' is a fact.

The advantage of the reasoned and rational approach to fact finding (as against subjective approaches) is that judicial error will be limited to use and application of accepted methodologies and standards (which can be debated and discussed objectively). Reversals of finding of fact by superior courts can and must be justified on the basis of lack of objectivity in the courts below and their failure to follow required methods of reasoning and rationality, rather than by the substitution of the subjective judgment of judges of lower courts by the subjective judgment of judges of higher courts. The following conclusions emerge from the above: (1) The law's approach to truth is to be distinguished form the approach of religion, spirituality and subjective ideas of truth.

(2) For the judicial system, truth is nothing more than fact established in accordance with procedures prescribed by law.

(3) The purpose of judicial inquiry is to establish the existence of facts through reasoning and rationality and in accordance with law, not to establish the truth in the absolute, divine or subjective sense.

(4) Facts are proved through lawfully prescribed methods and standards.

(5) The belief of Courts that facts exist must be based on reason, rationality and justification, strictly on the basis of relevant and admissible evidence, judicial notice or legally permitted presumptions. It must be based on a prescribed methodology of proof. It must be objective and verifiable. (Emphasis Supplied) 12.3 This Court has gone through various articles to find out further clarity on truth'. The views expressed are divergent and do not add to the clarity of the thought as expressed by Prof. Mohan Gopal and therefore, the same are not extracted herein. However, the list of the articles are noted for future reference which is as under:

Allen, Ronald J., Common Sense, Rationality and the Legal Process, 22 Cardozo Law Review 1417 (2000-2001); Ayer, A.J., Language, Truth and Logic, Penguin Books, London, 2001;

Bhushan J., Ashok, Values of Ethics in Dispensation of Justice, AIR 2010 Jour 1; Bingham, Lisa Blomgren, When We Hold No Truths to be Self-Evident: Truth, Belief, Trust and the Decline in

Trials, 2006 The University of Missouri Journal of Dispute Resolution 131; Feigenson, Neal, Law's Common Senses, 30 Quinnipiac Law Review 459 (2011-2012); Fernandez, Joseph M, An Exploration of the Meaning of Truth in Philosophy and Law, 11 The University of Notre Dame Australia Law Review 53 (2009); Haack, Susan, The Whole Truth and Nothing but the Truth, University of Miami School of Law; Kelsen, Hans, What is Justice, What Is Justice: Justice, Law, and Politics in the Mirror of Science Collected Essays, The Lawbook Exchange, Ltd., New Jersey, 2000; Lord Brooke J, Access to Justice and Judicial Review, Judicial Review, 11 (1), 2006 (March): p.1.; Marshall, William P., In Defense of the Search for Truth as a First Amendment Justification, 30 Georgia Law Review 1 (1995-1996); Richard H., Common Sense and Fact- Finding: Cultural Reason in Judicial Decisions, 19 Legal Studies Forum 119 (1995); Riga, Peter J., The Nature of Truth and Dissent, 40 The American Journal Jurisprudence 71 (1995); Schmeiser , D.A., Common Sense and the Law, 26 The Saskatchewan Bar Review & Law Society's Gazette 101 (1961); Steffen, Thomas L., Truth as Second Fiddle: Reevaluating the Place of Truth in the Adversarial Trial Ensemble, 1988 Utah Law Review 799 and Zukeran, Patrick, Truth:Absolute or Relative?

12.4 Indian Evidence Act does not define truth'. It defines what facts are relevant and admissible; and how to prove them. The proviso to Section 165 provides that the judgment must be based on duly proved relevant facts. Sections 3, 114 and 165 of the Indian Evidence Act lay down the important principles to aid the Court in its quest for duly proved relevant facts and the same are discussed hereunder.

13. Section 3 of the Indian Evidence Act, 1872 13.1 Proof : A fact is said to be proved when, after considering the matters before it, the Court either believes it to exist, or considers its existence so probable that a prudent man ought, under the circumstances of the particular case, to act upon the supposition that it exists. Evidence of a fact and proof of a fact are not synonymous terms. Proof, in the strict sense, means the effect of evidence.

13.2 Section 3 defines the expressions proved', disproved', and not proved' as under:-

> Proved - A fact is said to be proved when, after considering the matters before it, the Court either believes it to exist, or considers its existence so probable that a prudent man ought, under the circumstances of the particular case, to act upon the supposition that it exists.

> Disproved - A fact is said to be disproved when, after considering the matters before it, the Court either believes that it does not exist, or considers its non-existence so probable that a prudent man ought, under the circumstances of the particular case, to act upon the supposition that it does not exist.

> Not proved - A fact is said not to be proved when it is neither proved nor disproved.

13.3 Meaning of term the matters before it The expression the matters before it in the definition of proof are wide enough to cover matters which are not evidence as defined in the Act. For instance, a fact may be orally admitted in the Court. The admission would not come within the definition of the

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 291 of 337   Page ID
#:28746
Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

word evidence' as given in this Act, but still it is a matter which the Court would have to take into consideration in order to determine whether the particular fact was proved or not. The Court is thus entitled to take into consideration all the matters before it which shall include the statement of the witnesses, admissions of the parties, confession of the accused, documents proved in evidence, judicial notice, demeanour of witnesses, local inspections and presumptions.

13.4 Meaning of term believes it to exist The expression believes in the definition of proof is a judicial belief of the Judge based on logical/rational thinking and power of reason, and the Court is required to give reasons for the belief. The reasons are live links between the mind of the decision maker and the belief formed. Reasons convey judicial idea in words and sentences. Reasons are rational explanation of the conclusion. Reasons are the very life of law. It is the heart beat of every belief and without it, law becomes lifeless. Reasons also ensure transparency and fairness in the decision making process. The reasons substitute subjectivity by objectivity. Recording of reasons also acts as a vital restraint on possible arbitrary use of the judicial power. The recording of reasons serve the following four purposes:-

```
-     To clarify the thought process.
-     To explain the decision to the parties.
-     To communicate the reasons to the public.
-     To provide the reasons for an appellate Court to consider.
```

Non-recording of reasons would cause prejudice to the litigant who would be unable to know the ground which weighed with the Court and also cause impediment in his taking adequate grounds before the appellate Court in the event of challenge.

13.5 Nothing can be said to be proved, however much material there may be available, until the Court believes the fact to exist or considers its existence so probable that a prudent man will act under the supposition that it exists. For example, ten witnesses may say that they saw the sun rising from the West and all the witnesses may withstand the cross-examination, the Court would not believe it to be true being against the law of nature and, therefore, the fact is disproved'. In mathematical terms, the entire evidence is multiplied with zero and, therefore, it is not required to be put on judicial scales. Where the Court believes the case of both the parties, their respective case is to be put on judicial scales to apply the test of preponderance.

13.6 Section 3 of the Indian Evidence Act refers to the degree of certainty which is required to treat fact as proved and is so worded to provide for two conditions of mind; first, that in which a man feels absolutely certain of a fact, in other words, believes it to exist, and second, that in which, though he may not feel absolutely certain of a fact, he thinks so extremely probable that a prudent man would, under the circumstances, act on assumption of its existence.

13.7 The test of whether a fact is proved is such degree of probability as would satisfy the mind of a reasonable man as to its existence. The standard of certainty required is that of a prudent man. Except where artificial probative value is assigned to certain facts by presumptions, the Act affords no guidance on the question whether one fact is or is not sufficient to prove another fact. On this point, the Judge like a prudent man has to use its own judgment and experience and cannot be bound by any rule except his own judicial discretion. No hard and fast rule can be laid down as to what inference can be drawn from certain circumstances. The cumulative effect of all the circumstances established by evidence and the nature of these circumstances has to be taken into consideration.

13.8 The rules of evidence may provide tests, the value of which has been proved by long experience, by which Judges may be satisfied that the quality of the material upon which their judgments are to proceed is not open to certain obvious objections; but they do not profess to enable the Judges to know whether or not a particular witness tells the truth or what inference is to be drawn from a particular fact. The correctness with which this is done must depend upon the natural sagacity, the logical power, and the practical experience of the Judge and not only upon his acquaintance with the law of evidence.

13.9 Cross-examination supplies a test to a certain extent, but those who have seen most of its application will be disposed to trust at least as a proof that a man is not shaken by it, ought to be believed. A cool, steady liar who happens not to be open to contradiction will baffle the most skilful cross-examiner in the absence of accidents, which are not so common in practice as persons who take their notions on the subject from anecdotes or fiction would suppose.

13.10 The grounds for believing or disbelieving statements made by people can be brought under following three heads; namely those which affect the power of the witness to speak the truth; those which affect his will to do so ; and those which arise from the nature of the statement itself and from surrounding circumstances:-

13.10.1 Power - A man's power to speak the truth depends upon his knowledge and his power of expression. His knowledge depends partly on his accuracy in observation, partly on his memory, partly on his presence of mind; his power of expression depends upon an infinite number of circumstances, and varies in relation to the subject on which he has to speak.

13.10.2 Will - A man's will to speak the truth depends upon his education, his character, his courage, his sense of duty, his relation to the particular facts as to which he is to testify and a thousand other circumstances, as to the presence or absence of which in any particular case it is often difficult to form a true opinion.

13.10.3 Probability of Statement - The third set of reasons is those which depend upon the probability of the statement.

13.11 All events are connected to each other as cause and effect. The connection may be traced in either direction, from effect to cause or from cause to effect; and if these two words were taken in

their widest acceptation it would be correct to say that when any theory has been formed which alleges the existence of any fact, all facts are relevant which, if that theory was true, would stand to the fact alleged to exist either in the relation of cause or in the relation of effect.

13.12 M. Monir, J. in his commentary Principles and Digest of the Law of Evidence, 13th Edition, opined that no rule of evidence can guide a judge on the fundamental question whether the evidence as to the relevant facts should be believed or not. He observed that the best guide of a judge is to ascertain the truth by his own common sense and experience of human nature. The observations of the author are reproduced hereunder:

> ...There is in almost every trial the question whether evidence as to a fact should be believed or not, and if believed what is its effect on the main question. Does this elaborately framed Code of the Law of Evidence give any assistance to the Judge on this question? The answer, of course, must be in the negative. First, however carefully and with whatever detail the rules of relevancy may be framed, no rule of evidence can guide the Judge on the fundamental question whether evidence as to a relevant fact should be believed or not. Secondly, assuming that the Judge believes very few cases, guide him on the question what inference he should draw from it as to assist a Judge in the very smallest degree in determining the master question of the whole subject - whether and how far he ought to believe what the witnesses say? Again, rules of evidence are not, and do not profess to be, rules of logic. They throw no inference ought the Judge to draw from the facts in which, after considering the statements made to him, he believes. In every judicial proceeding whatever these two questions

> - Is this true, and, if it is true what then? - ought to be constantly present to the mind of the Judge, and it must be admitted, both that the rules of evidence do not throw the smallest portion of light upon them and that persons who are absolutely ignorant of those rules may give a much better answer to each of these questions than men to whom every rule of evidence is perfectly familiar. The best shoes in the world will not make a man walk, nor will the best glasses make him see; and in just the same way, the best rules of evidence will not supply the place of natural sagacity or of a taste for and training in logic.

> The first of these questions, viz., whether a witness should or should not be believed is one peculiar difficulty owing to the perjury that pervades the atmosphere of law Courts in this country. What is the Judge to do where, as it came to the experience of the writer, in answer to true charge of murder the accused is able to support a plea of alibi by proof of an actual conviction of an offence of cattle-lifting alleged to have been committed by him at the time of murder at a place not connected by rail, fifty miles away from the place of murder, and witnesses are prepared to swear to the arrest of the accused and his detention in custody at and since the alleged time of the murder? In another case of murder, the writer again speaks from experience, a conviction of an offence under the Motor Vehicles Act said to have been committed at

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

a place some 200 miles away from the place of murder, where it was physically impossible for the accused to be after committing the murder, was given in evidence, and though the murder resulted in conviction, the difficulty of the Court in coming to a decision to convict can well be judged.

Questions of this nature can never be solved by any artificial rules of evidence, and the best guide of the Judge on such questions is his own common sense and experience of human nature. Again, though the law may declare that a certain fact may be given in evidence to prove another fact, it is impossible for the law to say, except in very rare cases, that the Judge should consider the latter fact to be proved on proof of the former fact. No rules of law can impart to the Judge a knowledge of the ordinary rules of ratiocination, and here again the accuracy of his decision will depend upon his general education, on the development of his intellectual faculties, and his experience of men and the world. (Emphasis supplied) 13.13 The relevant judgments relating to Section 3 are as under:-

13.13.1 In Garib Singh v. State of Punjab, 1972 (3) SCC 418, the Supreme Court approved the following tests laid down by the Himachal Pradesh High Court in Chet Ram v. State, (1971) 1 Sim LJ 153, 157:

8. ...Courts, in search of the core of truth, have to beware of being misled by half truths or individually defective pieces of evidence. Firstly, undeniable facts and circumstances should be examined. Secondly, the pattern of the case thus revealed, in the context of a whole sequence of proved facts, must be scrutinized to determine whether a natural, or probable and, therefore, a credible course of events is disclosed. Thirdly, the minutes of evidence, including established discrepancies, should be put in the crucible of the whole context of an alleged crime or occurrence and tested, particularly with reference to the proved circumstances which generally provide a more reliable indication of truth than the faulty human testimony, so that the process of separating the grain from the chaff may take place. Fourthly, in arriving at an assessment of credibility of individual witnesses, regard must be had to the possible motives for either deliberate mendacity or subconscious bias. Lastly, the demeanour and bearing of a witness in Court should be carefully noticed and an appellate Court should remember that a trial Court has had, in this respect, an advantage which it does not possess. (Emphasis supplied) 13.13.2 In M. Narsinga Rao v. State of Andhra Pradesh, (2001) 1 SCC 691, the Supreme Court held as under:

15. The word proof need be understood in the sense in which it is defined in the Evidence Act because proof depends upon the admissibility of evidence. A fact is said to be proved when, after considering the matters before it, the court either believes it to exist, or consider its existence so probable that a prudent man ought, under the circumstances of the particular case, to act upon the supposition that it exists. This is the definition given for the word "proved" in the Evidence Act. What is required is production of such materials on which the court can reasonably act to reach the supposition that a fact exists. Proof of the fact depends upon the degree of probability of its having existed. The standard required for reaching the supposition is that of a

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 295 of 337   Page ID
#:28750
Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

prudent man acting in any important matter concerning him. Fletcher Moulton L.J. in Hawkins v. Powells Tillery Steam Coal Co.Ltd., (1911) 1 K.B. 988 observed like this:

Proof does not mean proof to rigid mathematical demonstration, because that is impossible; it must mean such evidence as would induce a reasonable man to come to a particular conclusion.'

16. The said observation has stood the test of time and can now be followed as the standard of proof. In reaching the conclusion the court can use the process of inferences to be drawn from facts produced or proved. Such inferences are akin to presumptions in law. Law gives absolute discretion to the court to presume the existence of any fact which it thinks likely to have happened. In that process the court may have regard to common course of natural events, human conduct, public or private business vis-a-vis the facts of the particular case. The discretion is clearly envisaged in Section 114 of the Evidence Act. (Emphasis supplied) 13.13.3 In R. Puthunainar Alhithan v. P.H. Pandian, (1996) 3 SCC 624, the Supreme Court held that an inference from the proved facts must be so probable that if the Court believes, from the proved facts, that the facts do exist, it must be held that the fact has been proved. The inference of proof of that fact could be drawn from the given objective facts, direct or circumstantial.

13.13.4 In Vijayee Singh v. State of U.P, (1990) 3 SCC 190, the Supreme Court explained the principle of Section 3 as under:

28. ...Section 3 while explaining the meaning of the words "proved", "disproved" and "not proved" lays down the standard of proof, namely, about the existence or non-

existence of the circumstances from the point of view of a prudent man. The Section is so worded as to provide for two conditions of mind, first, that in which a man feels absolutely certain of a fact, in other words, "believe it to exist" and secondly in which though he may not feel absolutely certain of a fact, he thinks it so extremely probable that a prudent man would under the circumstances act on the assumption of its existence. The Act while adopting the requirement of the prudent man as an appropriate concrete standard by which to measure proof at the same time contemplates of giving full effect to be given to circumstances or condition of probability or improbability. It is this degree of certainty to be arrived where the circumstances before a fact can be said to be proved. A fact is said to be disproved when the Court believes that it does not exist or considers its non-existence so probable in the view of a prudent man and now we come to the third stage where in the view of a prudent man the fact is not proved i.e. neither proved nor disproved. It is this doubt which occurs to a reasonable man, has legal recognition in the field of criminal disputes. It is something different from moral conviction and it is also different from a suspicion. It is the result of a process of keen examination of the entire material on record by a prudent man. (Emphasis supplied) 13.13.5 In State of U.P. v. M.K. Anthony, (1985) 1 SCC 505, the Supreme Court held that the approach of the Court should be to find out whether the evidence of a witness has a ring of truth. The Supreme Court held as under:-

10. While appreciating the evidence of a witness, the approach must be whether the evidence of the witness read as a whole appears to have a ring of truth. Once that impression is formed, it is undoubtedly necessary for the court to scrutinise the evidence more particularly keeping in view the deficiencies, draw-backs and infirmities pointed out in the evidence as a whole and evaluate them to find out whether it is against the general tenor of the evidence given by the witness and whether the earlier evaluation of the evidence is shaken as to render it unworthy of belief... (Emphasis supplied) 13.13.6 In Bundhoo Lall v. Joy Coomar, MANU/WB/0198/1882, the Calcutta High Court explained the intention of the Legislature in using the words matters before it instead of evidence in Section 3 as under:

12. It would appear, therefore, that the Legislature intentionally refrained from using the word evidence in this definition, but used instead the words, matters before it. For instance, a fact may be orally admitted in Court. The admission would not come within the definition of the word evidence as given in this Act, but still it is a matter which the Court before whom the admission was made would have to take into consideration in order to determine whether the particular fact was proved or not. 13.13.7 In Johnson Scaria v. State of Kerala, MANU/KE /0367/2006, the Kerala High Court held that the use of presumptions and the doctrine of burden of proof are certainly of crucial assistance in the adjudication of guilt. Who will fail if a fact is not established? Who will fail if the presumption is not drawn?

Who will suffer if the presumption once drawn is not rebutted?

These questions will certainly have to be considered in the factual scenario in each case. The Court summarised the law on this aspect as under:

27. ...The expression 'proved' is defined Under Section 3 of the Indian Evidence Act and that definition applies to civil and criminal cases. Any 'prudent man' whose standards the courts are under Section 3 of the Evidence Act directed to follow, shall and the court must hence, insist on a higher degree of probability, in a criminal case (where the consequence of deprivation of life, liberty and property ensues) before the prosecutor's burden is held to be discharged. This and this alone is directed by law by the axiomatic insistence on proof beyond doubt - which is at times romanticised and called proof beyond reasonable doubt and proof beyond the shadow of a reasonable doubt. The purpose of such insistence is only to caution courts that they must be able to enter a conclusion of guilt "without hesitation" on the materials available. 13.13.8 In Bipin Kumar Mondal v. State of West Bengal, (2010) 12 SCC 91, the Supreme Court observed as under:

31. ...In fact, it is not the number, the quantity, but the quality that is material. The time-honoured principle is that evidence has to be weighed and not counted. The test is whether the evidence has a ring of truth, is cogent, credible and trustworthy, or otherwise. 13.14 The Model Civil Jury instructions in USA and Canada contain

important guidelines for appreciation of evidence by the Jury. The same are reproduced as under:-

13.14.1 Civil Jury Instructions for the District Courts of Philadelphia, United States (2010).

1.5 Preliminary Instructions -- Evidence You should use your common sense in weighing the evidence.

Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion. xxx xxx xxx 1.11 Preliminary Instructions -- Clear and Convincing Evidence Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction that the allegations sought to be proved by the evidence are true. Clear and convincing evidence involves a higher degree of persuasion than is necessary to meet the preponderance of the evidence standard. But it does not require proof beyond a reasonable doubt, the standard applied in criminal cases. 13.14.2 Federal Civil Jury Instructions, State of Chicago, United States (2013).

1.11 Weighing the Evidence You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this inference. A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case. xxx xxx xxx 1.13 Testimony of Witnesses (Deciding What to Believe) You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You also must decide what weight, if any, you give to the testimony of each witness. In evaluating the testimony of any witness, [including any party to the case,] you may consider, among other things:

- the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

- the witness's memory;

- any interest, bias, or prejudice the witness may have;

- the witness's intelligence;

- the manner of the witness while testifying;

- [the witness's age];

- the reasonableness of the witness's testimony in light of all the evidence in the case. 13.14.3 Civil Jury Instructions, State of Connecticut, United States (2008).

2.5-1 Credibility of Witnesses The credibility of witnesses and the weight to be given to their testimony are matters for you as jurors to determine. However, there are some principles that you should keep in mind. No fact is, of course, to be determined merely by the number of witnesses who testify for or against it; it is the quality and not the quantity of testimony that controls. In weighing the testimony of each witness you should consider the witness's appearance on the stand and whether the witness has an interest of whatever sort in the outcome of the trial. You should consider a witness's opportunity and ability to observe facts correctly and to remember them truly and accurately, and you should test the evidence each witness gives you by your own knowledge of human nature and the motives that influence and control human actions. You may consider the reasonableness of what the witness says and the consistency or inconsistency of (his/her) testimony. You may consider (his/her) testimony in relation to facts that you find to have been otherwise proven. You may believe all of what a witness tells you, some of what a witness tells you, or none of what a particular witness tells you. You need not believe any particular number of witnesses and you may reject uncontradicted testimony if you find it reasonable to do so. In short, you are to apply the same considerations and use the same sound judgment and common sense that you use for questions of truth and veracity in your daily life. 13.14.4 Civil Jury Instructions, Canadian Judicial Council (2012).

9.4 Assessment of Evidence [1] To make your decision, you should consider carefully, and with an open mind, all the evidence presented during the trial. It will be up to you to decide how much or little of the testimony of any witness you will believe or rely on. You may believe some, none or all of the evidence given by a witness.

[2] When you go to the jury room to consider the case, use your collective common sense to decide whether the witnesses know what they are talking about and whether they are telling the truth. There is no magic formula for deciding how much or how little to believe of a witness's testimony or how much to rely on it in deciding this case. But here are a few questions you might keep in mind during your discussions. [3] Did the witness seem honest? Is there any reason why the witness would not be telling the truth?

[4] Does the witness have any reason to give evidence that is more favourable to one side than to the other? [5] Was the witness in a position to make accurate and complete observations about the event? Did s/he have a good opportunity to do so? What were the circumstances in which the observation was made? What was the condition of the witness? Was the event itself unusual or routine? [6] Did the witness seem to have a good memory? Does the witness have any reason to remember the things about which s/he testified? Did any inability or difficulty that the witness had in remembering events seem genuine, or did it seem made up as an excuse to avoid answering questions? [7] Did the witness seem to be reporting to you what he or she saw or heard, or simply putting together an account based on information obtained from other sources, rather than personal observation?

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

[8] Did the witness's testimony seem reasonable and consistent? Is it similar to or different from what other witnesses said about the same events? Did the witness say or do something different on an earlier occasion? [9] Do any inconsistencies in the witness's evidence make the main points of the testimony more or less believable and reliable? Is the inconsistency about something important, or a minor detail? Does it seem like an honest mistake? Is it a deliberate lie? Is the inconsistency because the witness said something different, or because s/he failed to mention something? Is there any explanation for it? Does the explanation make sense?

[10] What was the witness's manner when he or she testified? Do not jump to conclusions, however, based entirely on how a witness has testified. Looks can be deceiving. Giving evidence in a trial is not a common experience for many witnesses. People react and appear differently. Witnesses come from different backgrounds. They have different abilities, values and life experiences. There are simply too many variables to make the manner in which a witness testifies the only or most important factor in your decision. [11] These are only some of the factors that you might keep in mind when you go to your jury-room to make your decision. These factors might help you decide how much or little of a witness's evidence you will believe or rely on. You may consider other factors as well.

[12] In making your decision, do not consider only the testimony of the witnesses. Take into account, as well, any exhibits that have been filed and decide how much or little you will rely on them to help you decide this case. I will be telling (or, have already told) you about how you use admissions in making your decision.

14. Section 114 of the Indian Evidence Act, 1872 14.1 Section 114 of the Indian Evidence Act deals with the rebuttable presumptions. Section 114 recognizes the general power of the Court to raise inferences as to the existence or non-existence of unknown facts on proof or admission of other facts. The source of such presumptions is the common course of natural events, human conduct and public or private business, and the Section proceeds on the assumption that just as in nature, there prevails a fixed order of things, so the volitional acts of men placed in similar circumstances exhibits, on the whole, a distinct uniformity which is traceable to the impulses of human nature, customs and habits of society.

14.2 Section 114 of the Indian Evidence Act is reproduced hereunder:

      Section 114. Court may presume existence of certain facts.-

The Court may presume the existence of any fact which it thinks likely to have happened, regard being had to the common course of natural events, human conduct and public and private business, in their relation to the facts of the particular case. 14.3 The Section merely states the principle, and the several illustrations appended to it are taken from the important presumptions relating to innocence, regularity and continuity, which were recognized at common law. The illustrations are by no means exhaustive; nor are the presumptions illustrated therein obligatory in the sense that the Court must raise them or conclusive in the sense that no evidence in rebuttal is admissible. The illustrations to Section 114 provide that the Court may presume the following facts:-

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

(a) That a man who is in possession of stolen goods after the theft is either the thief or has received the goods knowing them to be stolen, unless he can account for his possession;

(b) That an accomplice is unworthy of credit, unless he is corroborated in material particular;

(c) That a bill of exchange, accepted or endorsed, was accepted or endorsed for good consideration;

(d) That a thing or state of things which has been shown to be in existence within a period shorter than that within which such things or state of things usually cease to exist, is still in existence;

(e) That judicial and official acts have been regularly performed;

(f) That the common course of business had been followed in particular cases;

(g) That evidence which could be and is not produced would, if produced be unfavourable to the person who withholds it;

(h) That if a man refuses to answer a question which he is not compelled to answer by law, the answer, if given, would be unfavourable to him;

(i) That when a document creating an obligation is in the hands of the obligor, the obligation has been discharged. 14.4 The above illustrations are followed by the following caveat:-

The Court shall also have regard to such facts as the following, in considering whether such maxims do or do not apply to the particular case before it. The above caveat is illustrated by following explanatory comments which can be conveniently called counter illustrations:-

As to illustration (a)--A shop-keeper has in his till a marked rupee soon after it was stolen, and cannot account for its possession specifically, but is continually receiving rupees in the course of his business; As to illustration (b)--A, a person of the highest character, is tried for causing a man's death by an act of negligence in arranging certain machinery. B, a person of equally good character, who also took part in the arrangement, describes precisely what was done, and admits and explains the common carelessness of A and himself; As to illustration (b)--A crime is committed by several persons. A, B and C, three of the criminals, are captured on the spot and kept apart from each other. Each gives an account of the crime implicating D, and the accounts corroborate each other in such a manner as to render previous concert highly improbable; As to illustration (c)--A, the drawer of a bill of exchange, was a man of business. B, the acceptor, was young and ignorant person, completely under

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

A's influence; As to illustration (d)--It is proved that a river ran in a certain course five years ago, but it is known that there have been floods since that time which might change its course; As to illustration (e)--A judicial act, the regularity of which is in question, was performed under exceptional circumstances; As to illustration (f)--The question is, whether a letter was received. It is shown to have been posted, but the usual course of the post was interrupted by disturbances; As to illustration (g)--A man refuses to produce a document which would bear on a contract of small importance on which he is sued, but which might also injure the feelings and reputation of his family; As to illustration (h)--A man refuses to answer a question which he is not by law to answer, but the answer to it might cause loss to him in matters unconnected with the matter in relation to which it is asked; As to illustration (i)--A bond is in possession of the obligor, but the circumstances of the case are such that he may have stolen it. 14.5 Sir James Fitzjames Stephen, while introducing the Bill relating to the Indian Evidence Act, stated, in regard to Section 114 as follows:-

The effect of this provision is to make it perfectly clear that Courts of Justice are to use their own common sense and experience in judging the effect of particular facts, and that they are to be subject to no particular rules whatever on the subject. (Emphasis supplied) 14.6 Section 114 uses the words may presume'. Thus, it is for the Court to raise the presumption or not. The presumption, even if drawn, is rebuttable. Once a presumption is satisfactorily rebutted, it simply vanishes. It cannot come back once again. In Mackowik v. Kansas City St. James & CBR Co., 94. S.W. 256, 262 = 196 MO. 550, Lamm, J. observed that presumptions are like bats, flitting in the twilight but disappearing in the sunshine of facts 14.7 The word common course' in Section 114 qualifies not only natural events but also the words human conduct' and public and private businesses'. As to what is common course of natural events, human conduct and public and private business' depends upon the common sense of the Judge acquired from experience of worldly and human affairs.

14.8 The subject of presumptions is closely allied to the subject of burden of proof. All rules relating to burden of proof may be stated in terms of presumptions, and all presumptions may be stated in terms of rules of burden of proof. When the burden of proof of a fact is on a party, it may be said that there is a presumption as to the non-existence of that fact and where there is a presumption as to the existence of a fact, the burden of proving the non-existence of that fact is on the party who asserts its non- existence. When a presumption operates in favour of a party, the burden of proof is on the opponent, and when the burden of proof is on a party, there is a presumption operating in favour of the opponent. In other systems of evidence, several rules which occur in the Act as rules of burden of proof are stated in the form of presumptions, whereas several other rules which are stated in the Act in the form of presumptions occur in other systems as rules of burden of proof.

14.9 The grounds of sources of presumptions of fact are obviously innumerable, they are co-extensive with the facts, both physical and psychological, which may under any circumstances whatever becomes evidentiary in Courts; but, in a general view, such presumptions may be said to

relate to things, persons, and the acts and thoughts of intelligent agents. With respect to the first of these it is an established principle that conformity with the ordinary course of nature ought always to be presumed. Thus, the order and changes of the seasons, the rising setting and course of the heavenly bodies, and the known properties of matter, give rise to very important presumptions relative to physical facts or things. The same rule extends to persons. Thus, the absence of those natural qualities, power and faculties which are incident to the human race in general will never be presumed in any individual; such as the impossibility of living long without food, the possession of the reasoning faculties, the common and ordinary understanding of man etc. To this head are reducible the presumptions relating to the duration of human life, the time of gestation, etc. Under the third class - namely, the acts and thought of intelligent agents - come among others, all psychological facts; and the most important inference are drawn from the ordinary conduct of mankind, and the natural feelings or impulses of human nature. Thus, no man will ever be presumed to throw away his property, as for instance, by paying money not due; and so it is a maxim that everyone must be taken to love his own offspring more than that of another person.

14.10 Presumptions of fact are always rebuttable. In other words, the party against which a presumption may operate can and must lead evidence to show why the presumption should not be given effect to. If, for example, the party which initiates a proceeding or comes with a case to Court offers no evidence to support it, the presumption is that such evidence does not exist. And if some evidence is shown to exist on a question in issue, but the party which has it within its power, does not produce it, despite notice to it to do so, the natural presumption is that it would, if produced, have gone against it. Similarly, a presumption arises from failure to discharge a special or particular onus. 14.11 The Judge has to call in aid not only his training and wisdom but also the experience of life to adjudge which set of evidence is more probable and which evidence is to be believed. The Judge decides who is to be believed and how much and if not, why so. He also visualises what, in ordinary course, should have been the evidence but was not produced, wherefore an adverse inference ought to be drawn.

14.12 The presentation of evidence and the inferences that flow from it are placed by the Judge in his (judicial) scales. The task of a Judge is to first assess the weight of the evidence including presumptions, and then place it into the respective pan (scale) hanging from the two ends of the equal arm of judicial balance.

14.13 The relevant judgments relating to Section 114 of the Indian Evidence Act are as under:

14.13.1 In Izhar Ahmad Khan v. Union of India, AIR 1962 SC 1052, the Supreme Court defined presumptions to be an inference, affirmative or disaffirmative of the truth of falsehood of a doubtful fact or proposition drawn by a process of probable reasoning from something proved or taken for granted.

14.13.2 In Garib Singh v. State of Punjab, (1972) 3 SCC 418, the Supreme Court held that the standards employed in judging each version are those of a reasonable and prudent man.

14.13.3 In Kali Ram v. State of Himachal Pradesh, (1973) 2 SCC 808, the Supreme Court held that the illustrations to Section 114, though taken from different spheres of human activity, are not exhaustive. They are based upon human experience and have to be applied in the context of the facts of each case. The illustrations are merely examples of circumstances in which certain presumptions may be made. Other presumptions of a similar kind in similar circumstances can be made under the provisions of the section itself. Whether or not a presumption can be drawn under the section in a particular case depends ultimately upon the facts and circumstances of each case. No hard and fast rule can be laid down. Human behaviour is so complex that room must be left for play in the joints. It is not possible to formulate a series of exact propositions and con-flue human behaviour within straitjackets. The raw material here is far too complex to be susceptible of precise and exact propositions for exactness here is a fake.

14.13.4 Krishna Iyer, J. in Tukaram Ganpat Pandare v. State of Maharashtra, (1974) 4 SCC 544 held that Section 114 of the Evidence Act enables the Court to use common sense as judicial tool. Section 114 thus is a useful device to aid the Court in its quest for truth. While care and caution need to be exercised in drawing any presumption under Section 114, its scope is wide and it has the potential to lend a helping hand in myriad situations.

14.13.5 In Narayan Govind Gavate v. State of Maharashtra, (1977) 1 SCC 133, the Supreme Court held that function of a presumption is to fill a gap in evidence. Section 114 of the Evidence Act covers a wide range of presumptions of fact which can be used by Courts in the course of administration of justice to remove lacunae in the chain of direct evidence before it.

14.13.6 In Syad Akbar v. State of Karnataka, (1980) 1 SCC 30, the Supreme Court held that presumptions are inferences of certain fact patterns drawn from the experience and observation of the common course of nature, the constitution of the human mind, the springs of human action, the usages and habits of society and ordinary course of human affairs.

14.13.7 In Sodhi Transport Co. v. State of U.P., (1986) 2 SCC 486, the Supreme Court held that the rules of presumption are deduced from enlightened human knowledge and experience and are drawn from the connection, relation and coincidence of facts, and circumstances.

14.13.8 In State of W.B. v. Mir Mohammad Omar, (2000) 8 SCC 382, the Supreme Court held that presumption of fact is an inference as to the existence of one fact from the existence of some other facts, unless the truth of such inference is disproved. Presumption of fact is a rule in law of evidence that a fact otherwise doubtful may be inferred from certain other proved facts. When inferring the existence of a fact from other set of proved facts, the Court exercises a process of reasoning and reaches a logical conclusion as the most probable position. Section 114 empowers the Court to presume the existence of any fact which it thinks likely to have happened. In that process, the Court shall have regard to the common course of natural events, human conduct etc. in relation to the facts of the case.

14.13.9 In M. Narsinga Rao v. State of Andhra Pradesh, (2001) 1 SCC 691, the Supreme Court held that presumption is an inference of a certain fact drawn from other proved facts. While inferring the

existence of a fact from another, the Court is only applying a process of intelligent reasoning which the mind of a prudent man would do under similar circumstances. Presumption is not the final conclusion to be drawn from other facts. But it could as well be final if it remains undisturbed later. Presumption in Law of Evidence is a rule indicating the stage of shifting the burden of proof. From a certain fact or facts the Court can draw an inference and that would remain until such inference is either disproved or dispelled.

14.13.10 In Limbaji v. State of Maharashtra, (2001) 10 SCC 340, the Supreme Court held that a presumption of fact is a type of circumstantial evidence which in the absence of direct evidence becomes a valuable tool in the hands of the Court to reach the truth without unduly diluting the presumption in favour of the innocence of the accused which is the foundation of our criminal law. It is an inference of fact drawn from another proved fact taking due note of common experience and common course of events. Section 114 of the Evidence Act shows the way to the Court in its endeavour to discern the truth and to arrive at a finding with reasonable certainty. The Supreme Court further held that having due regard to the germane considerations set out in the section, certain presumptions which the Court can draw are illustratively set out. They are not exhaustive or comprehensive. The presumption under Section 114 is, of course, rebuttable. When once the presumption is drawn, the duty of producing evidence to the contra so as to rebut the presumption is cast on the party who is subjected to the rigour of that presumption. Before drawing the presumption as to the existence of a fact on which there is no direct evidence, the facts of the particular case should remain uppermost in the mind of the Judge. These facts should be looked into from the angle of common sense, common experience of men and matters and then a conscious decision has to be arrived at whether to draw the presumption or not.

14.13.11 In Hiten P. Dalal v. Bratindranath Banerjee, (2001) 6 SCC 16, the Supreme Court held as under:

> 22....Presumptions are rules of evidence and do not conflict with the presumption of innocence, because by the latter all that is meant is that the prosecution is obliged to prove the case against the accused beyond reasonable doubt. The obligation on the prosecution may be discharged with the help of presumptions of law or fact unless the accused adduces evidence showing the reasonable possibility of the non-existence of the presumed fact. (Emphasis supplied) 14.13.12 In Bhoora Singh v. State of U.P., 1992 Cri LJ 2294, the Division Bench of the Allahabad High Court held as under:

> 42. The term 'presumption' in its largest and most comprehensive signification may be defined, where in the absence of actual certainty of the truth of a fact or proposition, an inference affirmative of that truth is drawn by a process of probable reasoning from something which is taken for granted... (Emphasis supplied) 14.13.13 In Ramachandran v. State of Kerala, 2009 Cri LJ 168, the Kerala High Court held as under:

> 10. ...A 'presumption' is a probable consequence drawn from facts as to the truth of a fact alleged. 'Presumption of fact' is an inference as to existence of one fact drawn

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

from facts (either certain, or proved by direct testimony) as to the truth of a fact alleged... 14.14 Charles C. Moore's book titled A Treatise on Facts or the Weight of the Value of Evidence, 1908 contains a very exhaustive discussion on the presumptions of fact. Some of the presumptions mentioned in the said book are as under:-

14.14.1 Testimony contrary to natural laws - There are well-settled and accepted natural laws, a recognition of which is justified by the long experience of men, the knowledge of everyday life, as well as by the studies and experiments of ages. The natural laws that Courts take cognizance of are the laws of gravitation, cohesion, optics, electricity, etc. Testimony which is directly contrary and in opposition to such laws should be ignored even without contradiction. For example, a fire which was observed in the grass at a specified place adjoining a railroad right of way could not have originated a quarter of a mile distant if the intervening space showed no traces whatever of fire. Courts are not so deaf to the voice of nature, or so blind to the law of physics, that every utterance of a witness in derogation of those laws will be treated as testimony of probative value simply because of its utterance.

14.14.2 Mathematical impossibilities - A verdict cannot be sustained if it involves a finding that a part is equal to the whole; for example, where the jury evidently believed testimony that it would cost as much to clear a tract of land after the trees were felled and the logs removed as it would when the trees were standing. Testimony of a so-called expert that while an ordinary man can lift two hundred pounds, it would take sixteen section hands to lift a six-hundred-pound rail was struck out by the Court as manifestly absurd.

14.14.3 Improbable stories - The Court is not bound to give credit to a witness who is interested in the result of the action, and whose evidence is improbable and discredited by circumstances, or is against common experience and observation.

14.14.4 Payment without taking receipt - The average man would not pay and take no receipt or memorandum to insure himself against loss in case of the death of the other party, or his forgetfulness, or something even worse. No person of ordinary prudence, making payments of principal from time to time on a bond and mortgage, would omit to take receipts, if the papers were not at hand so that the payments could be entered thereon.

14.14.5 Improbable testimony contradicted by circumstances - In a case of conviction for murdering a woman by cutting her throat with a razor, the theory that the killing was the result of an accident, occasioned by the defendant supposing that he was drawing the back of the razor across the throat of his victim, was so utterly preposterous that there could be no rational expectation that any Judge would give it the least consideration.

14.14.6 Numerical equality or preponderance of witness testimony to improbabilities -Suppose that a small child tells that he saw a large wolf run away with an unusually small lamb. As against this, ten adults testified that this was not the case at all, but that the real fact was that this very small lamb was actually running away with the large wolf. It would not take a Judge very long to determine where the truth lies, notwithstanding ten against one.

14.14.7 Relative value of direct and circumstantial evidence - In the Webster case, Chief Justice Shaw, speaking of direct or positive evidence and circumstantial evidence, said: Each of these modes of proof has its advantages and disadvantages; it is not easy to compare their relative value. The advantage of positive evidence is that it is the direct testimony of a witness to the fact to be proved, who, if he speaks the truth, saw it done; and the only question is whether he is entitled to belief. The disadvantage is that the witness may be false and corrupt, and that the case may not afford the means of detecting his falsehood. But, in a case of circumstantial evidence where no witness can testify directly to the fact to be proved, it is arrived at by a series of other facts, which by experience have been found so associated with the fact in question, that in the relation of cause and effect they lead to a satisfactory and certain conclusion; as when footprints are discovered after a recent snow, it is certain that some animated being has passed over the snow since it fell ; and, from the form and number of the footprints, it can be determined with equal certainty, whether they are those of a man, a bird, or a quadruped. Circumstantial evidence, therefore, is founded on experience and observed facts and coincidences, establishing a connection between the known and proved facts and the fact sought to be proved.

15. Section 165 of the Indian Evidence Act, 1872 15.1 Section 165 of the Indian Evidence Act, 1872 invests the Judge with plenary powers to put any question to any witness or party; in any form, at any time, about any fact relevant or irrelevant. Section 165 is intended to arm the Judge with the most extensive power possible for the purpose of getting at the truth.

The effect of this section is that in order to get to the bottom of the matter before it, the Court will be able to look at and inquire into every fact and thus possibly acquire valuable indicative evidence which may lead to other evidence strictly relevant and admissible. The Court is not, however, permitted to found its judgment on any but relevant statements.

15.2 Section 165 of the Indian Evidence Act, 1872 reads as under:

Section 165. Judge's power to put questions or order production.-

The Judge may, in order to discover or obtain proper proof of relevant facts, ask any question he pleases, in any form, at any time, of any witness, or of the parties, about any fact relevant or irrelevant; and may order the production of any document or thing; and neither the parties nor their agents shall be entitled to make any objection

to any such question or order, nor, without the leave of the Court, to cross-examine any witness upon any answer given in reply to any such question:

Provided that the judgment must be based upon facts declared by this Act to be relevant, and duly proved:

Provided also that this section shall not authorize any Judge to compel any witness to answer any question or to produce any document which such witness would be entitled to refuse to answer or produce under Sections 121 to 131, both inclusive, if the question were asked or the document were called for by the adverse party; nor shall the Judge ask any question which it would be improper for any other person to ask under Section 148 or 149 ; nor shall he dispense with primary evidence of any document, except in the cases herein before excepted. 15.3 The object of a trial is, first to ascertain truth by the light of reason, and then, do justice upon the basis of the truth and the Judge is not only justified but required to elicit a fact, wherever the interest of truth and justice would suffer, if he did not.

15.4 The Judge contemplated by Section 165 is not a mere umpire at a wit-combat between the lawyers for the parties whose only duty is to enforce the rules of the game and declare at the end of the combat who has won and who has lost. He is expected, and indeed it is his duty, to explore all avenues open to him in order to discover the truth and to that end, question witnesses on points which the lawyers for the parties have either overlooked or left obscure or willfully avoided. A Judge, who at the trial merely sits and records evidence without caring so to conduct the examination of the witnesses that every point is brought out, is not fulfilling his duty.

15.5 The framers of the Act, in the Report of the Select Committee published on 31st March, 1871 along with the Bill settled by them, observed:

In many cases, the Judge has to get at the truth, or as near to it as he can by the aid of collateral inquiries, which may incidentally tend to something relevant; and it is most unlikely that he should ever wish to push an inquiry needlessly, or to go into matters not really connected with it. We have accordingly thought it right to arm Judges with a general power to ask any questions upon any facts, of any witnesses, at any stage of the proceedings, irrespectively of the rules of evidence binding on the parties and their agents, and we have inserted in the Bill a distinct declaration that it is the duty of the Judge, especially in criminal cases, not merely to listen to the evidence put before him but to inquire to the utmost into the truth of the matter. 15.6 Cunningham, Secretary to the Council of the Governor - General for making Laws and Regulations at the time of the passing of the Indian Evidence Act stated:

It is highly important that the Judge should be armed with full power enabling him to get at the facts. He may, accordingly, subject to conditions to be immediately noticed, ask any question he pleases, in any form, at any stage of the proceedings, about any matter relevant or irrelevant, and he may order the production of any document or

thing. No objection can be taken to any such question or order, nor are the parties entitled, without Court's permission to cross-

examine on the answers given. 15.7 The relevant judgments relating to Section 165 of the Indian Evidence Act, 1872 are as under:-

15.7.1 The Supreme Court in Ram Chander v. State of Haryana, (1981) 3 SCC 191 observed that under Section 165, the Court has ample power and discretion to control the trial effectively. While conducting trial, the Court is not required to sit as a silent spectator or umpire but to take active part within the boundaries of law by putting questions to witnesses in order to elicit the truth and to protect the weak and the innocent. It is the duty of a Judge to discover the truth and for that purpose he may "ask any question, in any form, at any time, of any witness, or of the parties, about any fact, relevant or irrelevant".

15.7.2 In Ritesh Tewari v. State of Uttar Pradesh, (2010) 10 SCC 677, the Supreme Court held that every trial is a voyage of discovery in which truth is the quest. The power under Section 165 is to be exercised with the object of subserving the cause of justice and public interest, and for getting the evidence in aid of a just decision and to uphold the truth. It is an extraordinary power conferred upon the Court to elicit the truth and to act in the interest of justice. The purpose being to secure justice by full discovery of truth and an accurate knowledge of facts, the Court can put questions to the parties, except those which fall within exceptions contained in the said provision itself.

15.7.3 In Zahira Habibulla H. Sheikh v. State of Gujarat, (2004) 4 SCC 158, the Supreme Court held that Section 165 of the Indian Evidence Act and Section 311 of the Code of Criminal Procedure confer vast and wide powers on Presiding Officers of Court to elicit all necessary materials by playing an active role in the evidence collecting process. The Judge can control the proceedings effectively so that ultimate objective i.e. truth is arrived at. The power of the Court under Section 165 of the Evidence Act is in a way complementary to its power under Section 311 of the Code. The Section consists of two parts i.e. (i) giving a discretion to the Court to examine the witness at any stage and (ii) the mandatory portion which compels the Courts to examine a witness if his evidence appears to be essential to the just decision of the Court. The second part of the section does not allow any discretion but obligates and binds the Court to take necessary steps if the fresh evidence to be obtained is essential to the just decision of the case, essential to an active and alert mind and not to one which is bent to abandon or abdicate. Object of the Section is to enable the Court to arrive at the truth irrespective of the fact that the prosecution or the defence has failed to produce some evidence which is necessary for a just and proper disposal of the case. Though justice is depicted to be blind-folded, as popularly said, it is only a veil not to see who the party before it is while pronouncing judgment on the cause brought before it by enforcing law and administering justice and not to ignore or turn the mind/attention of the Court away from the truth of the cause or lis before it, in disregard of its duty to prevent miscarriage of justice. Doing justice is the paramount consideration and that duty cannot be abdicated or diluted and diverted by manipulative red herrings.

15.7.4 In State of Rajasthan v. Ani, (1997) 6 SCC162, the Supreme Court held that Section 165 of the Indian Evidence Act confers vast and unrestricted powers on the Court to elicit truth. Reticence may be good in many circumstances, but a Judge remaining mute during trial is not an ideal situation. A taciturn Judge may be the model caricatured in public mind. But there is nothing wrong in his becoming active or dynamic during trial so that criminal justice being the end could be achieved. A Judge is expected to actively participate in the trial to elicit necessary materials from witnesses in the appropriate context which he feels necessary for reaching the correct conclusion.

15.7.5 In Mohanlal Shamji Soni v. Union of India, 1991 Supp. (1) SCC 271, referring to Section 165 of the Indian Evidence Act and Section 311 of the Code of Criminal Procedure, the Supreme Court stated that the said two sections are complementary to each other and between them, they confer jurisdiction on the Judge to act in aid of justice. It is a well-accepted and settled principle that a Court must discharge its statutory functions - whether discretionary or obligatory - according to law in dispensing justice because it is the duty of a Court not only to do justice but also to ensure that justice is being done.

15.7.6 In Jamatraj Kewalji Govani v. State of Maharashtra, AIR 1968 SC 178, the Supreme Court held that Section 165 of the Indian Evidence Act and Section 540 of the Code of Criminal Procedure, 1898 confer jurisdiction on the Judge to act in aid of justice. In criminal jurisdiction, statutory law confers a power in absolute terms to be exercised at any stage of the trial to summon a witness or examine one present in Court or to recall a witness already examined, and makes this the duty and obligation of the Court provided the just decision of the case demands it.

15.7.7 In Sessions Judge Nellore Referring Officer v. Intha Ramana Reddy, 1972 CriLJ 1485, the Andhra Pradesh High Court held that every trial is a voyage of discovery in which truth is the quest. It is the duty of a presiding Judge to explore every avenue open to him in order to discover the truth and to advance the cause of justice. For that purpose he is expressly invested by Section 165 of the Evidence Act with the right to put questions to witnesses. Indeed the right given to a Judge is so wide that he may ask any question he pleases, in any form at any time, of any witness, or of the parties about any fact, relevant or irrelevant.

16. Importance of Trial Courts The Law Commission of India headed by H.R. Khanna, J. in its Seventy Seventh Report relating to the Delays and Arrears in Trial Courts' dealt with the importance of Trial Courts in the justice delivery system. The relevant portion of the said Report is reproduced as under:

> -If an evaluation were made of the importance of the role of the different functionaries who play their part in the administration of justice, the top position would necessarily have to be assigned to the Trial Court Judge. He is the key- man in our judicial system, the most important and influential participant in the dispensation of justice. It is mostly with the Trial Judge rather than with the appellate Judge that the members of the general public come in contact, whether as parties or as witnesses. The image of the judiciary for the common man is projected by the Trial Court Judges and this, in turn depends upon their intellectual, moral and

personal qualities.

- Personality of Trial Court Judges Errors committed by the Trial Judge who is not of the right caliber can sometimes be so crucial that they change the entire course of the trial and thus result in irreparable miscarriage of justice. Apart from that, a rectification of the error by the appellate Court which must necessarily be after lapse of a long time, can hardly compensate for the mischief which resulted from the error committed by the Trial Judge.

-The Upper Court' Myth The notion about the provisional nature of the Trial Court decisions being subject to correction in appeal, or what has been called the upper-Court myth ignores the realities of the situation. In spite of the right of appeal, there are many cases in which appeals are not filed. This apart, the appellate Courts having only the written record before them are normally reluctant to interfere with the appraisement of evidence of witnesses by the Trial Judges who have had the advantage of looking at the demeanour of the witnesses.

The appellate Court, it has been said, operates in the partial vacuum of the printed record. A stenographic transcript fails to reproduce tones of voice and hesitations of speech that often make a sentence mean the reverse of what the mere words signify. The best and most accurate record of oral testimony is like a dehydrated peach; it has neither the substance nor the flavor of the peach before it was dried.

17. False claims and defences 17.1 In Maria Margarida Sequeria Fernandes v. Erasmo Jack de Sequeria (supra), the Supreme Court held that false claims and defences are serious problems with real estate litigation, predominantly because of ever escalating prices of the real estate. The Supreme Court held as under:-

False claims and false defences

81. False claims and defences are really serious problems with real estate litigation, predominantly because of ever escalating prices of the real estate. Litigation pertaining to valuable real estate properties is dragged on by unscrupulous litigants in the hope that the other party will tire out and ultimately would settle with them by paying a huge amount. This happens because of the enormous delay in adjudication of cases in our Courts. If pragmatic approach is adopted, then this problem can be minimized to a large extent. 17.2 In Dalip Singh v. State of U.P., (2010) 2 SCC 114, the Supreme Court observed that a new creed of litigants have cropped up in the last 40 years who do not have any respect for truth and shamelessly resort to falsehood and unethical means for achieving their goals. The observations of the Supreme Court are as under:-

1. For many centuries, Indian society cherished two basic values of life i.e., 'Satya' (truth) and 'Ahimsa' (non-violence). Mahavir, Gautam Buddha and Mahatma Gandhi

guided the people to ingrain these values in their daily life. Truth constituted an integral part of the justice-delivery system which was in vogue in the pre-Independence era and the people used to feel proud to tell truth in the courts irrespective of the consequences. However, post-Independence period has seen drastic changes in our value system. The materialism has over shadowed the old ethos and the quest for personal gain has become so intense that those involved in litigation do not hesitate to take shelter of falsehood, misrepresentation and suppression of facts in the court proceedings.

2. In last 40 years, a new creed of litigants has cropped up. Those who belong to this creed do not have any respect for truth. They shamelessly resort to falsehood and unethical means for achieving their goals. In order to meet the challenge posed by this new creed of litigants, the courts have, from time to time, evolved new rules and it is now well established that a litigant, who attempts to pollute the stream of justice or who touches the pure fountain of justice with tainted hands, is not entitled to any relief, interim or final. (Emphasis supplied) 17.3 In Satyender Singh v. Gulab Singh, 2012 (129) DRJ 128, the Division Bench of this Court following Dalip Singh v. State of U.P. (supra) observed that the Courts are flooded with litigation with false and incoherent pleas and tainted evidence led by the parties due to which the judicial system in the country is choked and such litigants are consuming Court's time for a wrong cause.

The observations of this Court are as under:-

2. As rightly observed by the Supreme Court, Satya is a basic value of life which was required to be followed by everybody and is recognized since many centuries. In spite of caution, courts are continued to be flooded with litigation with false and incoherent pleas and tainted evidence led by the parties. The judicial system in the country is choked and such litigants are consuming courts time for a wrong cause. Efforts are made by the parties to steal a march over their rivals by resorting to false and incoherent statements made before the Court. Indeed, it is a nightmare faced by a Trier of Facts; required to stitch a garment, when confronted with a fabric where the weft, shuttling back and forth across the warp in weaving, is nothing but lies. As the threads of the weft fall, the yarn of the warp also collapses; and there is no fabric left. (Emphasis supplied)

18. Imposition of costs 18.1 In Ramrameshwari Devi v. Nirmala Devi, (2011) 8 SCC 249, the Supreme Court has held that the Courts have to take into consideration pragmatic realities and have to be realistic in imposing the costs. The relevant paragraphs of the said judgment are reproduced hereunder:-

43. ...We are clearly of the view that unless we ensure that wrongdoers are denied profit or undue benefit from the frivolous litigation, it would be difficult to control frivolous and uncalled for litigations. In order to curb uncalled for and frivolous

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 312 of 337   Page ID
#:28767
Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

litigation, the courts have to ensure that there is no incentive or motive for uncalled for litigation. It is a matter of common experience that court's otherwise scarce and valuable time is consumed or more appropriately wasted in a large number of uncalled for cases.

xxx xxx xxx

52. The main question which arises for our consideration is whether the prevailing delay in civil litigation can be curbed? In our considered opinion the existing system can be drastically changed or improved if the following steps are taken by the trial courts while dealing with the civil trials.

xxx xxx xxx C. Imposition of actual, realistic or proper costs and or ordering prosecution would go a long way in controlling the tendency of introducing false pleadings and forged and fabricated documents by the litigants. Imposition of heavy costs would also control unnecessary adjournments by the parties. In appropriate cases the courts may consider ordering prosecution otherwise it may not be possible to maintain purity and sanctity of judicial proceedings...

xxx xxx xxx

54. While imposing costs we have to take into consideration pragmatic realities and be realistic what the Defendants or the Respondents had to actually incur in contesting the litigation before different courts. We have to also broadly take into consideration the prevalent fee structure of the lawyers and other miscellaneous expenses which have to be incurred towards drafting and filing of the counter affidavit, miscellaneous charges towards typing, photocopying, court fee etc.

55. The other factor which should not be forgotten while imposing costs is for how long the Defendants or Respondents were compelled to contest and defend the litigation in various courts. The Appellants in the instant case have harassed the Respondents to the hilt for four decades in a totally frivolous and dishonest litigation in various courts. The Appellants have also wasted judicial time of the various courts for the last 40 years.

56. On consideration of totality of the facts and circumstances of this case, we do not find any infirmity in the well reasoned impugned order/judgment. These appeals are consequently dismissed with costs, which we quantify as Rs. 2,00,000/-

(Rupees Two Lakhs only). We are imposing the costs not out of anguish but by following the fundamental principle that wrongdoers should not get benefit out of frivolous litigation.... (Emphasis supplied) 18.2 In Maria Margarida Sequeria Fernandes v. Erasmo Jack de Sequeria (supra) the Supreme Court held that heavy costs and prosecution should be ordered in cases of false claims and defences. The Supreme Court held as under:-

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

82. This Court in a recent judgment in Ramrameshwari Devi and Ors. (supra) aptly observed at page 266, para 43 that unless wrongdoers are denied profit from frivolous litigation, it would be difficult to prevent it. In order to curb uncalled for and frivolous litigation, the Courts have to ensure that there is no incentive or motive for uncalled for litigation. It is a matter of common experience that Court's otherwise scarce time is consumed or more appropriately, wasted in a large number of uncalled for cases. In this very judgment, the Court provided that this problem can be solved or at least be minimized if exemplary cost is imposed for instituting frivolous litigation.

The Court observed at pages 267-268 that imposition of actual, realistic or proper costs and/or ordering prosecution in appropriate cases would go a long way in controlling the tendency of introducing false pleadings and forged and fabricated documents by the litigants. Imposition of heavy costs would also control unnecessary adjournments by the parties. In appropriate cases, the Courts may consider ordering prosecution otherwise it may not be possible to maintain purity and sanctity of judicial proceedings. 18.3 In Padmawati v. Harijan Sewak Sangh, 154 (2008) DLT 411, this Court imposed cost of `15.1 lakhs and noted as under:

6. The case at hand shows that frivolous defences and frivolous litigation is a calculated venture involving no risks situation. You have only to engage professionals to prolong the litigation so as to deprive the rights of a person and enjoy the fruits of illegalities. I consider that in such cases where Court finds that using the Courts as a tool, a litigant has perpetuated illegalities or has perpetuated an illegal possession, the Court must impose costs on such litigants which should be equal to the benefits derived by the litigant and harm and deprivation suffered by the rightful person so as to check the frivolous litigation and prevent the people from reaping a rich harvest of illegal acts through the Courts. One of the aim of every judicial system has to be to discourage unjust enrichment using Courts as a tool. The costs imposed by the Courts must in all cases should be the real costs equal to deprivation suffered by the rightful person.

xxx xxx xxx

9. Before parting with this case, I consider it necessary to pen down that one of the reasons for over-flowing of court dockets is the frivolous litigation in which the Courts are engaged by the litigants and which is dragged as long as possible. Even if these litigants ultimately lose the lis, they become the real victors and have the last laugh. This class of people who perpetuate illegal acts by obtaining stays and injunctions from the Courts must be made to pay the sufferer not only the entire illegal gains made by them as costs to the person deprived of his right and also must be burdened with exemplary costs. Faith of people in judiciary can only be sustained if the persons on the right side of the law do not feel that even if they keep fighting for justice in the Court and ultimately win, they would turn out to be a fool since winning a case after 20 or 30 years would make wrong doer as real gainer, who had reaped the

benefits for all those years. Thus, it becomes the duty of the Courts to see that such wrong doers are discouraged at every step and even if they succeed in prolonging the litigation due to their money power, ultimately they must suffer the costs of all these years long litigation. Despite settled legal positions, the obvious wrong doers, use one after another tier of judicial review mechanism as a gamble, knowing fully well that dice is always loaded in their favour, since even if they lose, the time gained is the real gain. This situation must be redeemed by the Courts. (Emphasis supplied)

19. Section 16(c) of the Specific Relief Act, 1963 19.1 In a suit for specific performance, the plaintiff has to prove a valid sale agreement; the breach of the contract by the defendant; and readiness and willingness of the plaintiff to perform his part of the contract.

19.2 Section 16(c) of the Specific Relief Act mandates readiness and willingness on the part of the plaintiff as a condition precedent to seek specific performance. Section 16 (c) is reproduced hereunder:-

Section 16. Personal bars to relief.-

Specific performance of a contract cannot be enforced in favour of a person-

xxx xxx xxx

(c) who fails to aver and prove that he has performed or has always been ready and willing to perform the essential terms of the contract which are to be performed by him, other than terms the performance of which has been prevented or waived by the defendant.

Explanation.- For the purposes of clause (c),-

(i) where a contract involves the payment of money, it is not essential for the plaintiff to actually tender to the defendant or to deposit in court any money except when so directed by the court;

(ii) the plaintiff must aver performance of, or readiness and willingness to perform, the contract according to its true construction. 19.3 The readiness and willingness are two separate issues.

The former depends on the availability of requisite funds whereas the latter depends on the intention of the purchaser. 19.4 The readiness has to be proved by the purchaser by leading evidence relating to the availability of the funds whereas the intention has to be inferred from the various circumstances on record.

19.5 If there is no availability of funds with the purchaser, he can be non-suited on the ground of non-readiness alone. 19.6 If the plaintiff is able to prove the availability of the balance sale

consideration with him at the time fixed for performance in the agreement, it is an indication of his readiness but his willingness/intention to perform cannot be inferred from readiness alone.

19.7 When the parties enter into an agreement relating to an immovable property, they amicably agree on the sale consideration, earnest money as well as the payment of the balance sale consideration. If both the parties are ready and willing, they usually complete the transaction within the stipulated time in the following manner:-

19.7.1 The purchaser makes arrangement for the balance sale consideration within the stipulated time.

19.7.2 The purchaser informs the seller about the arrangement having been made.

19.7.3 The purchaser drafts the sale deed and sends the draft sale deed to the seller for approval.

19.7.4 The seller approves the draft sale deed and returns it back to the purchaser.

19.7.5 The purchaser purchases the requisite stamp duty for the sale deed.

19.7.6 The purchaser prepares the sale deed on the requisite stamp papers.

19.7.7 Both the parties fix the date, time and place for payment of balance sale consideration, execution of sale deed, registration of the sale deed and handing over of the possession. 19.7.8 The parties complete the sale transaction on the agreed date, time and place.

19.7.9 In normal parlance, both the parties remain in touch either personally or through the property dealer. 19.8 The problem arises when one of the two parties turn dishonest. However, the party in breach purports to be ready and willing and creates evidence to that effect. At times, both the parties visit the office of Sub-Registrar on the last day of performance for obtaining a receipt of having attended the office of the Sub-Registrar to later on contend that they were ready and willing to perform and were waiting for other party. If the seller is in breach, he creates false evidence of readiness to avoid specific performance by the purchaser and to illegally forfeit the earnest money. On the other hand, if the purchaser is in breach, he creates false evidence of readiness and willingness to file a case of specific performance.

19.9 It is the duty of the Court to find out which party has not performed and is trying to wriggle out.

19.10 The Court has to take into consideration the human probabilities, ordinary course of human conduct and common sense to draw necessary inference. Drawing presumptions is the backbone of the judicial process.

19.11 The silence or absence of correspondence by any party may be indicative of his dishonest intention. The dishonest intention of the seller can be inferred where the purchaser repeatedly contacts the seller for providing copies of the title documents or approval of the draft sale deed or

fixing time for payment of balance sale consideration or execution/ registration of the sale deed but the seller does not respond or avoids contact. On the other hand, the dishonest intention of the purchaser can be inferred where the purchaser does not contact the seller for approval of the sale deed and fixing date, time and place for payment of balance sale consideration and execution/registration of the sale deed and unilaterally visits the office of the Sub-Registrar to prepare a false ground that he was ready and willing to complete the sale. By the time the suit is finally decreed, the purchaser would get the property at the price fixed in the agreement although the prices would have increased manifold. The Court has to minutely examine the conduct of the parties in order to ascertain the truth. The purchaser would not be entitled to a decree merely because he had the sale consideration with him and had visited the office of the Sub-Registrar before the time fixed in the agreement.

19.12 Upon refusal of the seller to complete the sale in terms of the agreement, the purchaser is expected to issue a notice to place on record the refusal on the part of the seller to furnish copies of the documents or giving a response to the draft sale deed or fixing the schedule for execution and registration of sale deed. The purchaser can also notify the date and time for visiting the office of the Sub- Registrar along with the proof of the balance sale consideration to the seller. The purchaser is also expected to immediately file a suit for specific performance. Any delay in this regard may indicate his intention that he was not ready and willing and the Court may refuse to grant specific performance.

19.13 In a rising market, the purchaser makes a profit by the delay. He may tie down a seller by creating false excuses and use the money for buying some other property. If the purchaser is in a property trade, he may tie down several properties and then decide on which one he can make more profit on. These factors have to be taken into consideration by the Court for deciding the readiness' and willingness'.

19.14 Once a seller has entered into an agreement to sell an immovable property, he is looking for the sale consideration within the period stipulated in the agreement. If he does not get the money within the stipulated period, his plan to use the money for whatever purpose he has intended would get frustrated. He may have a plan to buy some other property or for some other purpose. Secondly, the delay in completion of sale also causes injustice to the seller as the property prices keep on increasing in normal parlance. As such more the delay, the seller may suffer loss due to rise in property price and greater is the profit which the purchaser would derive by tying down a property and not paying the sale consideration within the stipulated period. 19.15 The relevant judgments relating to Section 16(c) of the Specific Relief Act, 1963 are as under:-

19.15.1 In J.P. Builders v. A. Ramadas Rao, (2011) 1 SCC 429, the Supreme Court explained the distinction between readiness and willingness. The former refers to financial capacity and the latter to the conduct of the plaintiff wanting performance.

19.15.2 In N.P. Thirugnanam v. Dr. R. Jagan Mohan Rao, (1995) 5 SCC 115, the Supreme Court held that the Court must take into consideration the conduct of the plaintiff prior and subsequent to the filing of the suit along with other attending circumstances to adjudge the readiness and willingness

of the plaintiff. The amount of balance sale consideration must be proved to be available with the purchaser right from the date of execution till the date of decree. The Court upheld the dismissal of the suit for specific performance on various grounds inter alia that the plaintiff was dabbing in real estate business without means to purchase the suit property and the very contract was speculative in nature.

19.15.3 In R.C. Chandiok v. Chuni Lal Sabharwal, (1970) 3 SCC 140, the Supreme Court held that readiness and willingness cannot be treated as a straitjacket formula. It has to be determined from the entirety of facts and circumstances relevant to the intention and conduct of the party concerned.

20. Section 20 of the Specific Relief Act, 1963 20.1 Section 20 of the Specific Relief Act, 1963 provides that the jurisdiction to decree specific performance is discretionary and the Court is not bound to grant such relief merely because it is lawful to do so. Section 20 is reproduced hereunder:-

> Section 20. Discretion as to decreeing specific performance.-
>
> (1) The jurisdiction to decree specific performance is discretionary, and the court is not bound to grant such relief merely because it is lawful to do so; but the discretion of the court is not arbitrary but sound and reasonable, guided by judicial principles and capable of correction by a court of appeal.
>
> (2) The following are cases in which the court may property exercise discretion not to decree specific performance:-
>
> (a) Where the terms of the contract or the conduct of the parties at the time of entering into the contract or the other circumstances under which the -contract was entered into are such that the contract, though not void able, gives the plaintiff an unfair advantage over the defendant; or
>
> (b) Where the performance of the contract would involve some hardship on the defendant which he did not foresee, whereas its non-performance would involve no such hardship on the plaintiff, or
>
> (c) Where the defendant entered into the contract under circumstances, which though not rendering the contract void able, makes it inequitable to enforce specific performance.
>
> (3) The court may properly exercise discretion to decree specific performance in any case where the plaintiff has done substantial acts or suffered losses in consequence of a contract capable of specific performance.
>
> (4) The court shall not refuse to any party specific performance of a contract merely on the ground that the contract is not enforceable at the instance of the party.

20.2 The specific performance is an equitable relief. Section 20 of the Specific Relief Act, 1963 preserves judicial discretion. The Court is not bound to grant specific relief merely because it is lawful to do so. The relief sought under Section 20 is not automatic as the Court is required to see the totality of the circumstances which are to be assessed by the Court in the light of facts and circumstances of each case.

20.3 The specific performance is usually granted where substantial sale consideration has been paid and the possession of the property has been delivered to the purchaser. 20.4 In the event of any delay/inaction on the part of the purchaser, it would be inequitable to give the relief of specific performance to the purchaser. The rationale behind refusal of the Court to grant the specific performance where long time has gone by is that the prices of the property may have increased many times with the passage of time and it would be injustice to a person who has not received the sale consideration within the time stipulated in the agreement.

20.5 If under the terms of the contract, the plaintiff gets an unfair advantage over the defendant, the Court may not exercise its discretion in favour of the plaintiff. So also specific relief may not be granted if the defendant would be put to undue hardship which he did not foresee at the time of agreement. If it is inequitable to grant specific relief, then also the Court would desist from granting a decree to the plaintiff.

20.6 If the sale consideration fixed under the agreement is given to the seller years after the agreement, great prejudice may be caused to a seller who may have intended to purchase another property with the sale consideration.

20.7 While a purchaser cannot be made to suffer because of Court delays, one cannot lose sight of the fact that he retained the sale consideration with him and the seller could not use the money when he wanted. The Court also has to consider that whereas the value of the property may have risen manifold with the passage of time, the value of the sale consideration would have reduced due to inflation. These factors have to be taken into consideration by the Court.

20.8 The party who seeks specific performance being an equitable relief, must come to the Court with clean hands. In other words, the party who makes false allegations does not come with clean hands and is not entitled to the equitable relief.

20.9 While exercising the discretion, the Court would take into consideration the circumstances of the case, the conduct of parties, and the motive behind the litigation.

20.10 The relevant judgments relating to Section 20 of the Specific Relief Act, 1963 are as under:-

20.10.1 In K.S. Vidyanadam v. Vairavan, (1997) 3 SCC 1, the Supreme Court held that in case of delay/inaction on the part of the plaintiff for two and a half years, it would be inequitable to give a relief of specific performance to the plaintiff. The finding of the Supreme Court is reproduced hereunder:

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

13. In the case before us, it is not mere delay. It is a case of total inaction on the part of the plaintiff for 2 ½ years in clear violation of the terms of agreement which required him to pay the balance, purchase the stamp papers and then ask for execution of sale deed within six months. Further, the delay is coupled with substantial rise in prices - according to the defendants, three times - between the date of agreement and the date of suit notice. The delay has brought about a situation where it would be inequitable to give the relief of specific performance to the plaintiff. (Emphasis supplied) 20.10.2 In Saradamani Kandappan v. S. Rajalakshmi, (2011) 12 SCC 18, the Supreme Court declined to grant the discretionary relief of specific performance to the purchaser who had made payment of nominal advance to the seller. The finding of the Supreme Court is reproduced hereunder:-

36....The third quarter of the twentieth century saw a very slow but steady increase in prices. But a drastic change occurred from the beginning of the last quarter of the twentieth century. There has been a galloping inflation and prices of immovable properties have increased steeply, by leaps and bounds. Market values of properties are no longer stable or steady. We can take judicial notice of the comparative purchase power of a rupee in the year 1975 and now, as also the steep increase in the value of the immovable properties between then and now. It is no exaggeration to say that properties in cities, worth a lakh or so in or about 1975 to 1980, may cost a crore or more now.

37. The reality arising from this economic change cannot continue to be ignored in deciding cases relating to specific performance. The steep increase in prices is a circumstance which makes it inequitable to grant the relief of specific performance where the purchaser does not take steps to complete the sale within the agreed period, and the vendor has not been responsible for any delay or non-performance. A purchaser can no longer take shelter under the principle that time is not of essence in performance of contracts relating to immovable property, to cover his delays, laches, breaches and 'non-readiness'. The precedents from an era, when high inflation was unknown, holding that time is not of the essence of the contract in regard to immovable properties, may no longer apply, not because the principle laid down therein is unsound or erroneous, but the circumstances that existed when the said principle was evolved, no longer exist. In these days of galloping increases in prices of immovable properties, to hold that a vendor who took an earnest money of say about 10% of the sale price and agreed for three months or four months as the period for performance, did not intend that time should be the essence, will be a cruel joke on him, and will result in injustice. Adding to the misery is the delay in disposal of cases relating to specific performance, as suits and appeals therefrom routinely take two to three decades to attain finality. As a result, an owner agreeing to sell a property for rupees one lakh and received rupees ten thousand as advance may be required to execute a sale deed a quarter century later by receiving the remaining rupees ninety thousand, when the property value has risen to a crore of rupees.

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

xxx xxx xxx

43. Till the issue is considered in an appropriate case, we can only reiterate what has been suggested in K.S. Vidyanadam [(1997) 3 SCC 1]:

(i) The courts, while exercising discretion in suits for specific performance, should bear in mind that when the parties prescribe a time/period, for taking certain steps or for completion of the transaction, that must have some significance and therefore time/period prescribed cannot be ignored.

(ii) The courts will apply greater scrutiny and strictness when considering whether the purchaser was ready and willing to perform his part of the contract.

(iii) Every suit for specific performance need not be decreed merely because it is filed within the period of limitation by ignoring the time-limits stipulated in the agreement. The courts will also frown upon suits which are not filed immediately after the breach/refusal. The fact that limitation is three years does not mean that a purchaser can wait for 1 or 2 years to file a suit and obtain specific performance. The three-year period is intended to assist the purchasers in special cases, as for example, where the major part of the consideration has been paid to the vendor and possession has been delivered in part-

performance, where equity shifts in favour of the purchaser. (Emphasis supplied) 20.10.3 In Parakunnan Veetill Joseph's Son Mathew v.

Nedumbara Kuruvila's Son, 1987 Supp SCC 340, the Supreme Court held that the motive behind the litigation should also enter into the judicial verdict. The Court should take care to see that it is not used as an instrument of oppression to have an unfair advantage to the plaintiff.

20.10.4 In Lourdu Mari David v. Louis Chinnaya Arogiaswamy, (1996) 5 SCC 589, the Supreme Court held that the party who seeks to avail of the equitable jurisdiction of a Court and specific performance being equitable relief, must come to the Court with clean hands. In other words the party who makes false allegations does not come with clean hands and is not entitled to the equitable relief.

20.10.5 In K. Narendra v. Riviera Apartments (P) Ltd., (1999) 5 SCC 77, the Supreme Court held that the performance of the contract involving some hardship on the defendant which he did not foresee while non-performance involving no such hardship on the plaintiff, is one of the circumstances in which the Court may properly exercise discretion not to decree specific performance. However, mere inadequacy of consideration or the mere fact that the contract is onerous to the defendant or improvident in its nature, shall not constitute an unfair advantage to the plaintiff over the defendant or unforeseeable hardship on the defendant. 20.10.6 In A.C. Arulappan v. Ahalya Naik (smt), (2001) 6 SCC 600, the Supreme Court held that if under the terms of the contract the plaintiff gets an unfair advantage over the defendant, the Court may not exercise

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 321 of 337   Page ID
#:28776
Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

its discretion in favour of the plaintiff. Also, specific relief may not be granted if the defendant would be put to undue hardship which he did not foresee at the time of agreement. If it is inequitable to grant specific relief, then also the Court would desist from granting a decree to the plaintiff. 20.10.7 In Bal Krishna v. Bhagwan Das, (2008) 12 SCC 145, the Supreme Court held that while exercising the discretion, the Court would take into consideration the circumstances of the case, the conduct of parties, and their respective interests under the contract. No specific performance of a contract, though it is not vitiated by fraud or misrepresentation, can be granted if it would give an unfair advantage to the plaintiff and where the performance of the contract would involve some hardship on the defendant, which he did not foresee.

20.10.8 In G. Jayashree v. Bhagwandas S. Patel, (2009) 3 SCC 141, the Supreme Court held that the plaintiff is expected to approach the Court with clean hands. His conduct plays an important role in the matter of exercise of discretionary jurisdiction by a Court of law. The Courts ordinarily would not grant any relief in favour of the person who approaches the Court with a pair of dirty hands.

20.10.9 In Krishna Sweet House v. Gurbhej Singh, MANU/DE/2851/2012, this Court held that in certain cases where substantial consideration i.e. at least 50% of the consideration is paid, or possession of the property is delivered under the agreement to sell in addition to paying advance price, the proposed buyer is vigilant for his rights and he files the suit soon after entering into the agreement to sell, then in accordance with totality of facts and circumstances, Courts may decree specific performance.

20.10.10 In Laxmi Devi v. Mahavir Singh, MANU/DE/1930/2012, this Court held that unless substantial consideration is paid out of the total amount of sale consideration, the Courts would lean against granting the specific performance inasmuch as by the loss of time, the balance sale consideration which is granted at a much later date, is not sufficient to enable the proposed seller to buy an equivalent property which could have been bought from the balance sale consideration if the same was paid on the due date.

20.10.11 In Jinesh Kumar Jain v. Iris Paintal, MANU/DE/3387/2012, this Court held that the plaintiff is entitled to decree of specific performance where the plaintiff has done substantial acts in consequence of a contract/agreement to sell. Substantial acts obviously would mean and include payment of substantial amounts of money. The plaintiff may have paid 50% or more of the consideration or having paid a lesser consideration he could be in possession pursuant to the agreement to sell or otherwise is in the possession of the subject property or other substantial acts have been performed by the plaintiff, and acts which can be said to be substantial acts under Section 20(3). However, where the acts are not substantial i.e. merely 5% or 10% etc of the consideration is paid i.e. less than substantial consideration is paid, (and for which a rough benchmark can be taken as 50% of the consideration), and/or plaintiff is not in possession of the subject land, the plaintiff is not entitled to the discretionary relief of specific performance. 20.10.12 In Sushil Jain v. Meharban Singh, 2012 (131) DRJ 421, this Court held that the plaintiff cannot be held entitled to the discretionary relief of specific performance inter alia for the reasons that not only the prices would have gone up about 20 to 30 times during this period but also that the plaintiff has taken benefit of the balance of about 87% of the consideration which he would have wisely invested in any other

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 322 of 337   Page ID
#:28777
Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

assets including in an immovable property.

21. Summary of Principles 21.1 Truth should be the Guiding Star in the Entire Judicial Process Truth is foundation of Justice. Dispensation of justice, based on truth, is an essential and inevitable feature in the justice delivery system. Justice is truth in action.

It is the duty of the Judge to discover truth to do complete justice. The entire judicial system has been created only to discern and find out the real truth.

The justice based on truth would establish peace in the society. For the common man truth and justice are synonymous. So when truth fails, justice fails. People would have faith in Courts when truth alone triumphs.

Every trial is voyage of discovery in which truth is the quest. Truth should be reigning objective of every trial. Judge has to play an active role to discover the truth and he should explore all avenues open to him in order to discover the truth.

The Trial Judge is the key-man in the judicial system and he is in a unique position to strongly impact the quality of a trial to affect system's capacity to produce and assimilate truth. The Trial Judge should explore all avenues open to him in order to discover the truth. Trial Judge has the advantage of looking at the demeanour of the witnesses. In spite of the right of appeal, there are many cases in which appeals are not filed. It is mostly with the Trial Judge rather than with the appellate Judge that the members of the general public come in contact, whether as parties or as witnesses.

21.2 What is Truth' and how to discover it Law's Truth is synonymous with facts established in accordance with the procedure prescribed by law.

The purpose of judicial inquiry is to establish the existence of facts in accordance with law.

Facts are proved through lawfully prescribed methods and standards.

The belief of Courts about existence of facts must be based on reason, rationality and justification, strictly on the basis of relevant and admissible evidence, judicial notice or legally permitted presumptions. It must be based on a prescribed methodology of proof. It must be objective and verifiable.

21.3 Section 3 of Indian Evidence Act, 1872 Evidence of a fact and proof of a fact are not synonymous terms. Proof in the strict sense means the effect of evidence. A fact is said to be proved when, after considering the matters before it, the Court either believes it to exist, or considers its existence so probable that a prudent man ought, under the circumstances of the particular case, to act upon the supposition that it exists.

The term after considering the matters before it in Section 3 of the Evidence Act means that for judging whether a fact is or not proved, the Court is entitled to take into consideration all matters before it which shall include the statement of the witnesses, admissions of the parties, confession of the accused, documents proved in evidence, judicial notice, demeanour of witnesses, local inspections and presumptions.

The term believes it to exist in the definition of proof is a judicial belief of the Judge based on logical/rational thinking and the power of reason, and the Court is required to give reasons for the belief. The reasons are live links between the mind of the decision maker and the belief formed. Reasons convey judicial idea in words and sentences. Reasons are rational explanation of the conclusion. Reason is the very life of law. It is the heart beat of every belief and without it, law becomes lifeless. Reasons also ensure transparency and fairness in the decision making process. The reasons substitute subjectivity by objectivity. Recording of reasons also play as a vital restraint on possible arbitrary use of the judicial power. The recording of reasons serve the following four purposes:-

- To clarify the thought process.

- To explain the decision to the parties.

- To communicate the reasons to the public.

- To provide the reasons for an appellate Court to consider. Non-recording of reasons would cause prejudice to the litigant who would be unable to know the ground which weighed with the Court and also cause impediment in his taking adequate grounds before the appellate Court in the event of challenge. Nothing can be said to be proved, however much material there may be available, until the Court believes the fact to exist or considers its existence so probable that a prudent man will act under the supposition that it exists. For example, ten witnesses may say that they saw the sun rising from the West and all the witnesses may withstand the cross-examination, the Court would not believe it to be true being against the law of nature and, therefore, the fact is disproved'. In mathematical terms, the entire evidence is multiplied with zero and, therefore, it is not required to be put on judicial scales. Where the Court believes the case of both the parties, their respective case is to be put on judicial scales to apply the test of preponderance.

The approach of the Trial Court has to be as under:- If on consideration of all the matters before it, the Court believes a fact to exist or considers its existence probable, the fact is said to be proved'. On the other hand, if the Court does not believe a fact either to exist or probable, such fact is said to be disproved'. A fact is said to be not proved' if it is neither proved nor disproved. The test whether a fact is proved is such degree of probability as would satisfy the mind of a reasonable man as to its existence. The standard of certainty required is of a prudent man. The Judge like a prudent man has to use its own judgment and experience and is not bound by any rule except his own judicial discretion, human experience, and judicial sense.

21.4 Section 114 of the Indian Evidence Act, 1872 Section 114 is a useful device to aid the Court in its quest for truth by using common sense as a judicial tool. Section 114 recognizes the general power of the Court to raise inferences as to the existence or non-existence of unknown facts on proof or admission of other facts.

Presumption of fact is a rule in law of evidence that a fact otherwise doubtful may be inferred from certain other proved facts. The source of presumptions is the common course of natural events, human conduct and public or private business, and the Section proceeds on the assumption that just as in nature there prevails a fixed order of things, so the volitional acts of men placed in similar circumstances exhibits, on the whole, a distinct uniformity which is traceable to the impulses of human nature, customs and habits of society.

The illustrations though taken from different spheres of human activity, are not exhaustive. They are based upon human experience and have to be applied in the context of the facts of each case. The illustrations are merely examples of circumstances in which certain presumptions may be made. Other presumptions of a similar kind in similar circumstances can be made under the provisions of the section itself.

Presumption in law of evidence is a rule indicating the stage of shifting the burden of proof. From a certain fact or facts the Court can draw an inference and that would remain until such inference is either disproved or dispelled.

Presumptions of fact can be used by the Courts in the course of administration of justice to remove lacunae in the chain of direct evidence before it. The function of a presumption is to fill a gap in evidence.

Section 114 of the Indian Evidence Act applies to both civil and criminal proceedings.

Whether or not a presumption can be drawn under the section in a particular case depends ultimately upon the facts and circumstances of each case. No hard and fast rule can be laid down. Human behaviour is so complex and room must be left for play in the joints. It is not possible to formulate a series of exact propositions and con-flue human behaviour within straitjackets. No rule of evidence can guide the Judge on the fundamental question whether evidence as to a relevant fact should be believed or not. Secondly, assuming that the Judge believes very few cases, guide him on the question what inference he should draw from it as to assist a Judge in the very smallest degree in determining the master question of the whole subject - whether and how far he ought to believe what the witnesses say? The rules of evidence do not guide what inference the Judge ought to draw from the facts in which, after considering the statements made to him, he believes. In every judicial proceeding whatever these two questions - Is this true, and, if it is true what then? - ought to be constantly present in the mind of the Judge, and the rules of evidence do not throw the smallest portion of light upon them.

21.5 Section 165 of the Indian Evidence Act, 1872 Section 165 of the Indian Evidence Act, 1872 invests the Judge with plenary powers to put any question to any witness or party; in any form, at

Case 2:20-cv-08819-CBM-AS   Document 177   Filed 08/24/22   Page 325 of 337   Page ID
#:28780
Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

any time, about any fact relevant or irrelevant. Section 165 is intended to arm the Judge with the
most extensive power possible for the purpose of getting at the truth. The effect of this Section is
that in order to get to the bottom of the matter before it, the Court will be able to look at and inquire
into every fact and thus possibly acquire valuable indicative evidence which may lead to other
evidence strictly relevant and admissible. The Court is not, however, permitted to found its
judgment on any but relevant statements.

The object of a trial is, first to ascertain truth by the light of reason, and then, do justice upon the
basis of the truth and the Judge is not only justified but required to elicit a fact, wherever the
interest of truth and justice would suffer, if he did not.

The Judge contemplated by Section 165 is not a mere umpire at a wit-combat between the lawyers
for the parties whose only duty is to enforce the rules of the game and declare at the end of the
combat who has won and who has lost. He is expected, and indeed it is his duty, to explore all
avenues open to him in order to discover the truth and to that end, question witnesses on points
which the lawyers for the parties have either overlooked or left obscure or willfully avoided. A Judge,
who at the trial merely sits and records evidence without caring so to conduct the examination of the
witnesses that every point is brought out, is not fulfilling his duty.

21.6 False claims and defences In the last 40 years, a new creed of litigants have cropped up who do
not have any respect for truth. They shamelessly resort to falsehood and unethical means for
achieving their goals. In order to meet the challenge posed by this new creed of litigants, the Courts
have, from time to time, evolved new rules and it is now well established that a litigant, who
attempts to pollute the stream of justice or who touches the pure fountain of justice with tainted
hands, is not entitled to any relief, interim or final.

False claims and defences are serious problems with real estate litigation, predominantly because of
ever escalating prices of the real estate. Litigation pertaining to valuable real estate properties is
dragged on by unscrupulous litigants in the hope that the other party will tire out and ultimately
would settle with them by paying a huge amount. This happens because of the enormous delay in
adjudication of cases in our Courts. If pragmatic approach is adopted, then this problem can be
minimized to a large extent. It is a matter of common experience that Court's otherwise scarce time
is consumed or more appropriately, wasted in a large number of uncalled for cases.

Dishonest and unnecessary litigations are a huge strain on the judicial system. The Courts continue
to be flooded with litigation with false and incoherent pleas and tainted evidence led by the parties.
The judicial system in the country is choked and such litigants are consuming Courts' time for a
wrong cause. Efforts are made by the parties to steal a march over their rivals by resorting to false
and incoherent statements made before the Court.

21.7 Imposition of Costs Imposition of actual, realistic or proper costs and or ordering prosecution
would go a long way in controlling the tendency of introducing false pleadings and forged and
fabricated documents by the litigants. The cost should be equal to the benefits derived by the
litigants, and the harm and deprivation suffered by the rightful person so as to check the frivolous

litigations and prevent the people from reaping a rich harvest of illegal acts through Court. The costs imposed by the Courts must be the real costs equal to the deprivation suffered by the rightful person and also considering how long they have compelled the other side to contest and defend the litigation in various courts. In appropriate cases, the Courts may consider ordering prosecution otherwise it may not be possible to maintain purity and sanctity of judicial proceedings. The parties raise fanciful claims and contests because the Courts are reluctant to order prosecution.

It is the duty of the Courts to see that such wrongdoers are discouraged at every step and even if they succeed in prolonging the litigation, ultimately they must suffer the costs for prolonging the litigation. Imposition of actual, realistic or proper costs and/or ordering prosecution in appropriate cases would go a long way in controlling the tendency of filing false cases. 21.8 Section 16 (c) of the Specific Relief Act, 1963 In a suit for specific performance, the plaintiff has to prove a valid agreement of sale; the breach of the contract by the defendant; and readiness and willingness of the plaintiff to perform his part of the contract.

Section 16(c) of the Specific Relief Act mandates readiness and willingness on the part of the plaintiff as a condition precedent to seek specific performance.

The readiness and willingness are two separate issues. The former refers to financial capacity whereas the latter depends upon the intention of the purchaser.

Readiness and willingness cannot be treated as a straitjacket formula. It has to be determined from the entirety of facts and circumstances relevant to the intention and conduct of the party concerned.

The Court must take into consideration the conduct of the plaintiff prior and subsequent to the filing of the suit along with other attending circumstances to adjudge the readiness and willingness of the plaintiff.

When the parties enter into an agreement relating to an immovable property, they amicably agree on the total sale consideration, earnest money as well as the payment of the balance sale consideration. If both the parties are ready and willing, they usually complete the transaction within the stipulated time in the following manner:-

- The purchaser makes arrangement for the balance sale consideration within the stipulated time.

- The purchaser informs the seller about the arrangement having been made.

- The purchaser drafts the sale deed and sends the draft sale deed to the seller for approval.

- The seller approves the draft sale deed and returns it back to the purchaser.

- The purchaser prepares the sale deed on the requisite stamp papers.

- Both the parties fix the date, time and place for payment of balance sale consideration, execution of sale deed, registration of the sale deed and handing over of the possession.

- The parties complete the sale transaction on the agreed date, time and place.

In normal parlance, both the parties remain in touch either personally or through the property dealer.

The problem arises when one of the two parties turn dishonest. However, the party in breach purports to be ready and willing and creates evidence to that effect. At times, both the parties visit the office of Sub-Registrar on the last day of performance for obtaining a receipt of having attended the office of the Sub- Registrar to later on contend that they were ready and willing to perform and were waiting for other party. If the seller is in breach, he creates false evidence of readiness to avoid specific performance by the purchaser and to illegally forfeit the earnest money. On the other hand, if the purchaser is in breach, he creates false evidence of readiness and willingness to file a case of specific performance.

It is the duty of the court to find out which party has not performed and is trying to wriggle out.

The Court has to take into consideration the human probabilities, ordinary course of human conduct and common sense to draw necessary inference. Drawing presumptions is the backbone of the judicial process.

The silence or absence of correspondence by any party may be indicative of his dishonest intention. The dishonest intention of the seller can be inferred where the purchaser repeatedly contacts the seller for approval of the draft sale deed and for fixing time for payment of balance sale consideration and execution/registration of the sale deed but the seller does not respond or avoids contact. On the other hand, the dishonest intention of the purchaser can be inferred where the purchaser does not contact the seller for approval of the sale deed and fixing date, time and place for payment of balance sale consideration and execution/registration of the sale deed.

Upon refusal of the seller to complete the agreement, the purchaser is expected to issue a notice and immediately file a suit for specific performance. Any delay in this regard may indicate his intention that he was not ready and willing and the Court may refuse to grant specific performance.

21.9 Section 20 of the Specific Relief Act, 1963 The specific performance is an equitable relief. Section 20 of the Specific Relief Act preserves judicial discretion. The Court is not bound to grant specific relief merely because it is lawful to do so. The relief sought under Section 20 is not automatic as the Court is required to see the totality of the circumstances which are to be assessed by the Court in the light of facts and circumstances of each case.

The specific performance is usually granted where substantial sale consideration has been paid and the possession of the property has been delivered to the purchaser.

In the event of any delay/inaction on the part of the purchaser, it would be inequitable to give the relief of specific performance to the purchaser. The rationale behind refusal of the Court to grant the specific performance where long time has gone by is that the prices of the property may have increased many times with the passage of time and it would be injustice to a person who has not received the sale consideration within the time stipulated in the agreement.

If under the terms of the contract, the plaintiff gets an unfair advantage over the defendant, the Court may not exercise its discretion in favour of the plaintiff. So also specific relief may not be granted if the defendant would be put to undue hardship which he did not foresee at the time of agreement. If it is inequitable to grant specific relief, then also the Court would desist from granting a decree to the plaintiff.

The party who seeks specific performance being an equitable relief must come to the Court with clean hands. In other words, the party who makes false allegations does not come with clean hands and is not entitled to the equitable relief.

The Court has to consider whether it would be fair, just and equitable. The Court is guided by the principles of justice, equity and good conscience.

While exercising the discretion, the Court would take into consideration the circumstances of the case, the conduct of parties, and the motive behind the litigation.

22. Admitted facts in the present case 22.1 Agreement to sell dated 5th July, 1996 (Ex.P-1) for sale of the suit property No.53, New Krishna Nagar, Delhi-110051 by the defendant to the plaintiff for a total consideration of `13,95,000/-. Payment of earnest money of `1,50,000/- by the plaintiff to the defendant on 5th July, 1996 at the time of execution of Ex.P-1. Balance sale consideration agreed to be paid by 5th October, 1996.

22.2 Agreement to sell dated 22nd August, 1996 (Ex.P-2) on the same terms and conditions except that further payment of `50,000/- to be made by the plaintiff to the defendant.

22.3 Extension of the date of completion of sale from 5 th October, 1996 to 30th October, 1996.

22.4 The plaintiff did not make the payment of entire sale consideration to the defendant by 30th October, 1996.

22.5 The Plaintiff made a complaint to the police on 23rd June, 1997 (Ex.P-4) in which she stated that the defendant is not returning the earnest money with penalty and interest.

22.6 The defendant issued a legal notice to the plaintiff on 31st July, 1997 (Ex.P-5) intimating her that she has committed breach and therefore, the agreement stood cancelled and the earnest money was forfeited.

22.7 The plaintiff did not reply to the aforesaid notice.

22.8 The plaintiff neither drafted the sale deed nor sought the approval thereof from the defendant.

22.9 The plaintiff did not purchase the requisite stamp papers for preparation of the sale deed.

22.10 The plaintiff did not issue any notice whatsoever to the defendant to demand the title documents or for fixing date for execution/registration of the sale deed.

22.11 The plaintiff did not issue any notice whatsoever to intimate the defendant that she was ready with the balance sale consideration on 30th October, 1996 and that the defendant was in breach.

22.12 The plaintiff did not issue any notice to the defendant to demand performance of the agreements, Ex.P-1 and Ex.P-2.

22.13 The plaintiff was aware that the defendant had to purchase another property from the sale proceeds of the suit property. (Admitted by PW-1 in cross-examination) 22.14 The defendant had shown the original title deed of the suit property to the plaintiff as well as her husband (Admitted by PW-1 in her cross-examination) 22.15 The plaintiff instituted the suit for specific performance on 21st August, 1997 i.e. after more than nine months of the alleged breach.

23. Disputed Facts 23.1 The defendant has denied the two endorsements made on the back of page 1' of the agreement - Ex.P-2. The defendant has also denied the receipt of `1,70,000/- mentioned in the first endorsement. The defendant's case is that he signed the endorsements under pressure and threats from the police at the instance of the plaintiff.

23.2 The defendant has disputed that the plaintiff was ready and willing to make the payment of balance sale consideration to the defendant on 30th October, 1996 and that she intimated the plaintiff to visit the office of Sub-Registrar on 30th October, 1996 for execution of the sale deed. According to the defendant, the plaintiff was never ready and willing to perform her part of the contract and she never intimated the defendant about her visit to the office of the sub-Registrar on 30th October, 1996.

23.3 The plaintiff has disputed that the defendant agreed to sell the said property to purchase another property for his residence and he entered into an agreement dated 7th September, 1996 to purchase property no. F-1, Radhey Puri, Delhi for a consideration of `10,10,000/-. The defendant claims to have made the payment of `1,50,000/- to the vendor of Radhey Puri property and the balance sale consideration had to be paid by 20th October, 1996. The defendant further claims that the said agreement got frustrated due to the breach by the plaintiff to make the balance sale consideration by 30th October, 1996 and the defendant has lost `1,50,000/- in that transaction.

24. Findings of this Court Applying the aforesaid principles of law to the facts of the present case, the findings of this Court are as under:-

24.1 Findings on the Disputed Facts 24.1.1 Disputed Fact The defendant has denied the two endorsements made on the back of page 1' of the agreement - Ex.P-2. The defendant has also denied

the receipt of `1,70,000/- mentioned in the first endorsement. The defendant's case is that he signed the endorsements under pressure and threats from the police at the instance of the plaintiff.

Finding On consideration of all the matters before the Court as defined in Section 3 of the Indian Evidence Act, including the statement of the witnesses, the admission of the parties, the documents proved in evidence and the presumptions, this Court believes to be true that the plaintiff made the payment of `1,70,000/- to the defendant on 20th August, 1996 and both the endorsements made on the back of agreement - Ex.P-2 are voluntary. The Court believes that the denial of the payment of `1,70,000/- and two endorsements on the back of Ex.P-2 by the defendant to be false.

The payment of `1,70,000/- by the plaintiff to the defendant and the two endorsements on the back of Ex.P-2 therefore stand proved within the meaning of Section 3 of the Indian Evidence Act.

Reasons for the aforesaid finding The defendant has admitted the extension of date of the agreement up to 30th October, 1996 in the written statement as well as the evidence.

The plaintiff has deposed on oath that both the endorsements on the back of Ex.P-2 were made by the defendant in his own handwriting and signed by the defendant in her presence.

The defendant has admitted his handwriting on the endorsements on the back of Ex.P-2. The defendant's contention that he wrote and signed the endorsements on the back of Ex.P-2 under police pressure is not believable as the defendant has not made any complaint whatsoever against any police officer at any stage.

It is not the defendant's case that the police pressure continued after making of the endorsement. The defendant could have lodged the complaint after the police pressure was over.

The defendant has not named any person who exerted pressure on him.

The defendant has also not disclosed what pressure was exerted on him.

The defendant has also not challenged the endorsements made on the back of Ex.P-2 in any Court of law.

The defendant has not mentioned the execution of endorsements on the back of Ex.P-2 under police pressure in his legal notice dated 31st July, 1997.

This plea was set up by the defendant for the first time in his written statement filed on 5th February, 1998 which is almost 1 year and 5 months after the alleged incident. A prudent seller would not behave in this manner.

The averments made by the defendant do not satisfy the test of common course of natural events, human conduct and public/private business in relation to the facts of this case and do not appear to have the ring of truth.

24.1.2 Disputed fact The defendant has disputed that the plaintiff was ready and willing to make the payment of balance sale consideration to the defendant on 30th October, 1996 and she intimated the plaintiff to visit the office of Sub-Registrar on 30th October, 1996 for execution of the sale deed.

Finding On consideration of all the matters before the Court as defined in Section 3 of the Indian Evidence Act, including the statement of witness, admission of parties, the documents proved in evidence and the presumptions, this Court believes it to be true that the plaintiff was ready with the balance sale consideration. However, this Court does not believe it to be true that the plaintiff was willing to make the payment thereon to the defendant on 30th October, 1996. It is therefore proved that the plaintiff was ready with the balance sale consideration on 30th October, 1996. However, it is disproved that the plaintiff was willing to make the payment of the balance sale consideration to the defendant on 30th October, 1996. Reasons The plaintiff has proved availability of `10,25,000/- with her on 30th October, 1996 by five demand drafts (Ex.PW-6/1 and PW-7/1 and PW-7/2). The plaintiff's contention that remaining `50,000/- was available with her in cash is also believable. As such, the plaintiff was ready to perform on 30th October, 1996.

The defendant's contention that the balance sale consideration was not available with the plaintiff because she had borrowed the money from her father has no merit. The finding of the Trial Court based on the judgment of this Court in Raghunath Rai v. Jageshwar Prashad Sharma, AIR 1999 Delhi 383 that if the buyer is in a position to borrow money to make the payment of the balance sale consideration, it would be sufficient to prove her readiness to make the payment, is correct and is upheld.

The plaintiff has proved to have visited the office of the Sub-

> Registrar on 30th October, 1996 by receipts Ex.P-3 and P-3A issued by the office of the Sub-Registrar. However, the plaintiff's claim that she intimated the defendant about the visit to the office of Sub-Registrar does not appear to be true because the plaintiff did not issue any notice to the defendant on 30th October, 1996 or at any point thereafter. If the plaintiff had fixed the visit to the office of Sub-Registrar with the defendant, she would have certainly contacted the defendant to find out why the defendant did not visit and would have also issued a telegram/notice in the evening on 30th October, 1996 itself to notify the breach to the defendant.

As per the addresses given in the memo of parties, both the parties are residing in close vicinity in the same locality. The plaintiff is the resident of 29, Ram Nagar, Delhi-110051 whereas the defendant is the resident of 53, New Krishna Nagar, Delhi-110051. The plaintiff claims to have visited the office of the Sub-Registrar, Seelampur on 30th October, 1996 at 10:00 am and waited the whole day for the defendant. Since there was no dispute between the parties on 30th October, 1996, the plaintiff ought to have visited the defendant who was staying in the close vicinity of the plaintiff and they could have together visited the office of the Sub-Registrar. It is quite strange and unnatural that after waiting for the whole day on 30th October, 1996 in the office of the Sub-Registrar, the plaintiff still chose not to visit the defendant to inquire as to why he did not visit the office of the Sub-Registrar. It is also unnatural that the plaintiff cancelled the demand drafts for `10,25,000/-

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

within a week without even contacting the defendant. There was no dispute between the parties at that time. Applying the test of common course of natural events and human conduct, it can be presumed that the plaintiff had unilaterally visited the office of the Sub-Registrar on 30th October, 1996 without informing the defendant with the dishonest intention of creating the false evidence of willingness. That is why the plaintiff did not contact the defendant and rushed to get the drafts cancelled within a week.

The plaintiff, in her cross-examination, admitted that she never contacted the defendant before 30th October, 1996. If the defendant had agreed to visit the office of Sub-

> Registrar on 30th October, 1996, the plaintiff as an ordinary prudent person was unlikely to have not issued a notice to the defendant to notify the default and remained inactive, silent, dumb and mute unless he had any compelling reason. No such reason is revealed. The conduct offers indication about truth. The plaintiff's plea is inherently unconvincing and cannot be accepted. The plaintiff's conduct appears to be improbable, artificial, indifferent, irresponsible and inconsistent.

The plea of the plaintiff that she had fixed the date and time for visiting the office of the Sub-Registrar with the defendant on telephone does not appear to be true. Had it been true, the plaintiff would have certainly issued a telegram/notice in the evening of 30th October, 1996 itself to notify the defendant. It appears that the plaintiff deliberately did not issue any notice to the defendant on 30th October, 1996 or at any point thereafter because she was apprehensive that the defendant may still be willing to perform. The natural inference which can be drawn under Section 114 is that the plaintiff wanted to build-up a false plea of readiness and willingness to institute a suit for specific performance. In the plaint, the plaintiff has averred that she visited the office of the Sub-Registrar on 30th October, 1996 for execution of the sale deed whereas in cross-examination she deposed that the defendant told her that he would give the title deeds to her in the office of Sub-Registrar on 30th October, 1996 which is not believable and contrary to the common course of natural events. A seller ordinarily never parts with the original title deed till receipt of the balance sale consideration. The plaintiff also would not have parted with the balance sale consideration just against delivery of original title deeds. Secondly, if the defendant was ready to part with the original title deed, there was no need to visit the office of the Sub-Register. The plaintiff had admitted in her cross-examination that she had seen the original title deed of the subject property. The plaintiff had never demanded the title documents from the defendant and this plea was set for the first time in the plaint. The plaintiff's conduct appears to be improbable, artificial, indifferent and inconsistent.

The willingness of the purchaser has to be inferred from his conduct. If the purchaser would have been willing, he would have drafted the sale deed and sent the draft sale deed to the defendant for approval and thereafter procured the stamp papers to prepare the sale deed. The plea of the plaintiff that she did not purchase the stamp papers or draft the sale deed because the defendant has not handed over the original sale deed is not believable by applying the test of common sense and normal human conduct as no seller would hand over the original sale deed before receiving the complete sale consideration.

Ved Parkash Kharbanda vs Vimal Bindal on 8 March, 2013

Whereas the plaintiff never issued any notice to demand performance to the defendant, the defendant issued a legal notice dated 31st July, 1997 to the plaintiff to notify the forfeiture of the earnest money to which the plaintiff chose not to send any reply, may be because the plaintiff had nothing to controvert.

The plaintiff made police complaint dated 23rd June, 1997. The contention of the plaintiff about police complaint that the defendant was giving threats does not appear to be true. If the defendant had refused to sell the property and had forfeited the earnest money, there was no occasion for the defendant to give any threat to the plaintiff. It appears that the plaintiff made the police complaint with an intention of putting pressure on the defendant to refund the earnest money. The plaintiff's unwillingness can be inferred from her complaint dated 23rd June, 1997 to the police in which she stated that the defendant has not refunded the consideration along with the penalty and interest despite repeated demands. There is no reference either to the non- supply of title documents by the defendant or the willingness of the plaintiff to buy the suit property.

Even during the course of the hearing, the defendant could not give any justification as to why the plaintiff did not issue any notice to the defendant on 30th October, 1996 to notify that she was waiting for whole day in the office of the Sub- Registrar and to find out why the defendant defaulted; why no notice was issued by the plaintiff to notify that the defendant was in breach and to demand performance; why the plaintiff did not demand performance in the police complaint dated 23rd June, 1997; why the plaintiff did not send reply to the legal notice dated 31st July, 1997 and why the plaintiff waited for more than nine months to file the suit. A prudent purchaser would not behave in this manner and applying the test of common course of natural events and human conduct, it is presumed that the plaintiff was not willing to perform her part of the contract. The silence in the period after agreement and absence of correspondence is a strong indication of the intention of the plaintiff that she was not willing to perform her part of the contract.

The finding of the Trial Court that the defendant would not suffer any hardship if the decree of specific performance is passed is clearly erroneous inasmuch as the plaintiff was aware that the defendant has to purchase another property after selling the suit property. The property prices have risen manifold since 1996 and the defendant would not be in a position to buy any alternative property with the balance sale consideration. The specific performance would therefore, certainly cause great hardship to the defendant.

The finding of the Trial Court that no adverse inference can be drawn against the plaintiff for not purchasing the stamp papers is also erroneous. Applying the test of common course of natural events and human conduct provided in Section 114 of the Indian Evidence Act, it can be presumed that the plaintiff had to purchase the stamp papers in advance and prepare the sale deed thereon before visiting the office of the Sub-Registrar. It is the plaintiff's case that she visited the office of the Sub-Registrar on 30th October, 1996 for execution of the sale deed which was not possible unless stamp papers were purchased in advance.

The plaintiff has referred to and relied upon Motilal Jain v. Ramdasi Devi (supra) and Faquir Chand v. Sudesh Kumari (supra) in which the specific performance was granted to the purchaser who was

found to be ever ready and willing whereas in the present case, the plaintiff has been found to be in breach of the contract because she was not willing to make the payment of the balance sale consideration to the defendant. In that view of the matter, the aforesaid judgments do not help the plaintiff.

The plaintiff has relied upon the Satya Jain v. Anis Ahmed Rushdie (supra) in support of the contention that specific performance may be allowed by the payment of market price according to circle rates. In Satya Jain v. Anis Ahmed Rushdie (supra), the Supreme Court granted specific performance because the purchaser was found to be ready and willing whereas the seller was in breach. In the present case, the plaintiff has been found to be unwilling to perform her part of the contract and therefore, the relief for specific performance is not available to the plaintiff.

The Trial Court has gravely erred in not even applying its mind on the question of willingness which was the main bone of contention between the parties. It appears that the learned Trial Court did not differentiate between the readiness and willingness. Whereas the readiness relates to the financial capacity of the purchaser, willingness relates to the intention of the purchaser. The finding of the learned Trial Court that the plaintiff was willing to make the payment of the balance sale consideration to the defendant on 30th October, 1996 is perverse and is set aside.

24.1.3 Disputed fact The plaintiff has disputed that the defendant agreed to sell the said property to purchase another property for his residence and he entered into an agreement dated 7th September, 1996 to purchase property no. F-1, Radhey Puri, Delhi for a consideration of `10,10,000/-.The defendant claims to have made the payment of `1,50,000/- to the vendor of Radhey Puri property and the balance sale consideration had to be paid by 20th October, 1996. The defendant further claims that the said agreement got frustrated due to the breach by the plaintiff to make the balance sale consideration by 30th October, 1996 and the defendant has lost `1,50,000/- in that transaction. Finding The agreement dated 7th September, 1996 set up by the defendant is not proved. The frustration of the alleged agreement dated 7th September, 1996 and the loss of `1,50,000/- by the defendant is also not proved. However, it is proved that the defendant had agreed to sell the suit property to the plaintiff to purchase some other property for his residence from the sale consideration since the plaintiff has admitted the same in her cross-examination.

Reasons The defendant has not placed the original agreement dated 7th September, 1996 on record. However, the defendant has placed the photocopy of the same on record which has not been proved and therefore, marked as Mark A'. The defendant has withheld the best evidence in the form of original agreement dated 7th September, 1996. The defendant has pleaded the frustration of the agreement dated 7th September, 1996 and the loss of `1,50,000/- in that transaction. However, the plaintiff has not placed on record the relevant documents relating to the said transaction. The oral testimony of DW1 and DW2 are not sufficient to prove this plea. The defendant has withheld the evidence relating to the frustration of the alleged agreement dated 7 th September, 1996 and the loss of `1,50,000/- in that transaction.

The defendant has deposed on oath that he wanted to sell the suit property to purchase another property for his residence which has been admitted by the plaintiff in her cross- examination.

24.2 Findings on Issues 24.2.1 Findings on Issues no.1, 2 and 3 1. Whether the plaintiff was ready and willing to perform her part of the contract?

2. Whether the plaintiff is entitled to decree under Specific Performance and Possession?

3. Whether agreement dated 5th July, 1996 and 22nd August, 1996 stood cancelled and earnest money stood forfeited? The plaintiff was ready with the balance sale consideration of `10,75,000/- on 30th October, 1996. However, the plaintiff was not willing to make the payment of the balance sale consideration to the defendant and she unilaterally visited the office of the Sub-Registrar along with the balance sale consideration with the dishonest intention of creating false evidence of willingness.

The plaintiff has committed the breach of the agreements Ex.P-1 and P-2 and therefore is not entitled to the decree of specific performance against the defendant. Even assuming for the sake of argument that the plaintiff was willing to perform, still she is not entitled to the discretionary relief under Section 20 of the Specific Relief Act for the following reasons:

(i) It would be inequitable and would put undue hardship on the defendant who agreed to sell the suit property to the plaintiff to purchase another property for his residence. With the enormous rise in the prices of the property, the defendant would not be in a position to buy any property from the balance sale consideration. The prices of immovable properties in Delhi have risen about 25 to 30 times in the last 15 years and therefore, the balance sale consideration of `10,75,000/- is not sufficient to enable the defendant to buy an equivalent property which he could have purchased if the payment would have been made on 30th October, 1996. If money is paid after years, what alternative property can the defendant purchase with that money. Constant rise in prices have been recognized by the Courts to refuse exercise of discretion under Section 20 of the Specific Relief Act.

(ii) The plaintiff has not approached the Court with clean hands and has made false claim and is therefore disentitled to the equitable relief on this ground also.

(iii) Delay of more than nine months on the part of the plaintiff in filing the suit. Merely because there is limitation for filing a suit for specific performance does not mean that a suit which is filed much after the alleged breach, such a suit for specific performance ought to be decreed.

The detailed reasons are given in the para 24.1.2 above which are not repeated herein for the sake of brevity. The contrary findings of the learned Trial Court with respect to Issue nos.1, 2 and 3 are erroneous and are set aside. 24.2.2 Findings on Issues no.4 and 5 4. Whether the Defendant did not receive additional amount of `1,70,000/- from the plaintiff as alleged in the written statement?

5. Whether time was not extended to perform agreement dated 22.08.1996? The plaintiff made additional payment of `1,70,000/- to the defendant on 22nd August, 1996.

The defendant made two endorsements on the back of Ex.P-2 - agreement dated 22 August, 1996 and extended the date of the agreement upto 30th October, 1996.

The detailed reasons are given in the para 24.1.1 above which are not repeated herein for the sake of brevity. The findings of the learned Trial Court with respect to Issue nos.4 and 5 are correct and are upheld.

25. Conclusion 25.1 The plaintiff is not entitled to the relief of specific performance against the defendant as the plaintiff has committed the breach of the agreements Ex.P-1 and P-2.

25.2 The plaintiff has paid a sum of `3,20,000/- to the defendant out of which the earnest money amount is `1,50,000/-. The agreements - Ex.P-1 and Ex.P-2 provide for forfeiture of earnest money of `1,50,000/- by the defendant in the event of breach by the plaintiff. As such, the remaining sale consideration of `1,70,000/- is refundable to the plaintiff under the terms of agreements - Ex.P-1 and Ex.P-2. However, during the course of final hearing of this appeal, the plaintiff offered to refund the earnest money to the plaintiff .

25.3 This Court is of the view that both the parties have shamelessly resorted to falsehood and unethical means for achieving their goals. It appears that the plaintiff was not willing to purchase the suit property and she approached the defendant for refund of `3,20,000/- and even filed a police complaint to pressurize the defendant. The defendant was entitled to forfeit the earnest money of `1,50,000/- in terms of the agreement - Ex.P-1 and Ex.P-2 and the matter may have been closed if the defendant would have shown the grace to refund at least the refundable amount of `1,70,000/-. However, the defendant out of greed, declined to refund even the refundable amount of `1,70,000/- to the plaintiff whereupon the plaintiff filed a suit for specific performance raising false claim of willingness. The defendant had a good defense but he backed it up with a dishonest and false evidence by denying the two endorsements on the back of Ex.P-2 and the payment of `1,70,000/- which were ultimately proved before the Trial Court. Since the relief of specific performance is being denied to the plaintiff, this Court is of the view that to balance the equities, the defendant should refund the entire amount of `3,20,000/- along with interest thereon @ 12% per annum from the date of filing of the suit till realization to the plaintiff. The plaintiff has deposited the balance sale consideration of `10,75,000/- with the Trial Court in terms of the impugned judgment and decree for specific performance which is to be refunded back to the plaintiff.

25.4 Consequently, the appeal is allowed, the impugned judgment is set aside and the plaintiff's suit relating to the prayers of specific performance and possession is dismissed. However, a decree for `3,20,000/- along with interest thereon at the rate of 12% per annum with effect from the date of filing of the suit upto the date of payment is passed in favour of the plaintiff and against the defendant. The defendant shall maintain status quo with respect to the suit property till the aforesaid refund is made to the plaintiff.

25.5 The defendant is not entitled to any costs of this appeal in view of the false defense raised relating to the endorsements made on the back of the agreement (Ex.P-2) and the payment of `1,70,000/- mentioned therein.

25.6 The amount deposited by the plaintiff in the Trial Court in terms of the impugned judgment be refunded to the plaintiff along with interest, if any, accrued thereon.

J.R. MIDHA, J MARCH 08, 2013