**Justice B.N. Srikrishna Opinion Letter**

I.      INTRODUCTION ................................................................................................1

II.     SUMMARY OF ANALYSIS ..............................................................................3

III.    INDIAN EVIDENTIARY PRIVILEGES .........................................................7

IV.   ENTRY OF CONSENT TERMS ....................................................................36

V.     INTERNATIONAL COMITY ........................................................................39

VI.   APPLICATION OF THE WITHOUT PREJUDICE PRIVILEGE TO THE ARCGATE-COSTAR SETTLEMENT NEGOTIATIONS ...............................43

VII.  CONCLUSION................................................................................................52

Hon. Consuelo B. Marshall
District Judge
First Street Courthouse
350 W. 1st Street, Courtroom 8D, 8th Floor
Los Angeles, California 90012

Hon. Alka Sagar
Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 540, 5th Floor
Los Angeles, California 90012

To the Hons. Consuelo Marshall and Alka Sagar

I, B.N. Srikrishna, declare as follows:

## I.    INTRODUCTION

1.    I am a former Justice of the Supreme Court of India.  I served on that Court from 2002 to 2006.  I started my career as an advocate in the Bombay High Court (Bombay's highest appellate court) in 1962, sixty years ago.  In 1990, I was appointed to the Bombay High Court, where I served until 2001.  In 2001, I was appointed as the Chief Justice of the High Court of Kerala.  I have argued cases in several courts throughout India, including multiple State High Courts and the Supreme Court.  Since retiring from the Supreme Court of India, I have headed several high-profile national commissions, including the Committee of Experts on a Data Protection Framework for India, the High Level Committee to Review the Institutionalisation of Arbitration Mechanism in India, the Financial Sector Legislative Reforms Commission, the Sixth Pay Commission, and the Committee for Consultations on the Situation in Andhra Pradesh.  My curriculum vitae is attached as Attachment A.

2.    As an Indian Judge and Supreme Court Justice, I routinely and regularly have interpreted and applied various Indian and English case law to cases before me, including on privilege issues.

3.      I have previously presented opinions and offered testimony on Indian law in United
States and international courts and before arbitral bodies, including the High Court of
England and Wales and the Singapore International Arbitration Centre.  In 2012, Judge
Kent Jordan of the Third Circuit Court of Appeals of the United States, sitting by
designation, appointed me a special master in *Shire Development LLC v. Cadila
Healthcare*, 10-cv-581 (D. Del.) to determine whether Indian law recognised the
attorney-client privilege for in-house counsel.  I concluded that it did not.  I also provided
an initial opinion and supplemental opinions in the Central District Court of California in
the case *Amit K. Pandey v. GBGI Ltd.*, 20-cv-01055-FLA-JDE (C.D. Cal.) relating to
Indian corporate law.

4.      I was retained by Latham & Watkins LLP, counsel of record for CoStar Group, Inc., and
CoStar Realty Information, Inc. ("CoStar"), to provide an opinion regarding the
application of Indian privilege law to the settlement communications between CoStar and
Arcgate Teleservices Private Limited ("Arcgate") related to the Decree and Consent
Terms ordered by the High Court of Rajasthan. My compensation for providing this
opinion is $1,500 USD an hour.  My compensation is not contingent on any particular
conclusions or opinions I may offer.

5.      I have been provided with the final Judgment and Order of the High Court of Rajasthan
of D.B. Civil Misc. Appeal No. 384/2021 concerning the litigation between CoStar and
Arcgate, CoStar's plaint against Arcgate and the related pleadings, the correspondence
between CoStar and Commercial Real Estate Exchange, Inc. ("CREXi") regarding
CREXi's requests for production 92 to 115 and the Consent Terms and the supporting
affidavit offered by Arcgate's Chief Executive Officer, Kunal Bagla, CREXi's motion to

compel, the declaration from CREXi's Vice President of Operations Lawson Dees purporting to challenge Mr. Bagla's testimony (referred to herein as the "Dees Declaration"), and the declaration from CREXi's counsel Rohan K. George opining on Indian law (referred to herein as the "George Declaration"). From a review of these materials, I believe that I understand the basis of the litigation between CoStar and Arcgate. And I understand that CREXi is seeking discovery of documents related to that litigation, including settlement communications and drafts of the settlement agreement and supporting documents.

6.      Specifically, I was asked to address the following questions:

(1)      What is the Indian "without prejudice" privilege?

(2)      Can a party waive its right to challenge an Indian court's entry of consent terms?

(3)      Does India recognise and defer to the judgments and orders of foreign courts?

(4)      How do the "without prejudice" privilege and these principles apply to CREXi's discovery requests to CoStar from an Indian legal perspective?

Additionally, I was asked to comment on Mr. George's analysis of the "without prejudice" privilege, and its application to this dispute, which I do in the course of answering the above questions. Attachment B contains an index of the cases I cite herein, and the cases are attached as exhibits.

## II.      SUMMARY OF ANALYSIS

7.      **Opinion 1**: The Indian without prejudice privilege is an evidentiary privilege that is articulated in the Indian Evidence Act and at Indian common law, derived from English common law. It broadly protects from discovery or admission in evidence all written and oral communications that are made for the purpose of settling a legal dispute, and is rooted in the public-policy concern that parties to legal disputes should be encouraged to

3

settle such disputes, and should be encouraged to participate frankly in settlement discussions.  The privilege is jointly held by the parties to such settlement discussions. The privilege is notable for its breadth:  it covers all settlement communications, acknowledging that such communications "may contain a mixture of admissions and half-admissions against a party's interest, more or less confident assertions of a party's case, offers, counter-offers, and statements (which might be characterised as threats, or as thinking aloud) about future plans and possibilities." *Unilever Plc v. Procter & Gamble Co.* [2000] 1 WLR 2436 at 2444 (Eng.) (Exhibit 1).  Common law courts have held that the rule must be "generous in its application" because it "removes the inhibiting effect" that would attend judicial scrutiny of statements made in settlement negotiations. *Ofulue v. Bossert* [2009] UKHL 16, [2009] 1 A.C. 990 (appeal taken from Eng.), ¶ 12 (Exhibit 2).  Such policy interests may "not . . . be defeated by other considerations of public policy which may emerge later." *Id.*

8.    The without prejudice privilege continues to apply after a settlement has been reached. The privilege applies to protect settlement communications from discovery, including by third parties, even when the communications are sought for purposes other than obtaining substantive admissions on the issues in dispute.

9.    The without prejudice privilege is subject to exceptions, including where there is a dispute as to whether the parties to the settlement agreement actually concluded such settlement, where a party to a settlement agreement can show that the agreement should be set aside on the ground of fraud, misrepresentation, or undue influence, or where an assertion of the privilege would mask an "unambiguous impropriety."  But these exceptions are exceedingly narrow, and where the existence and validity of the settlement

agreement has been definitively established, and there is no substantiated showing of unambiguous impropriety in connection with the settlement negotiations, the without prejudice privilege generally applies and cannot be disregarded.

10. In assessing whether a party seeking to circumvent the without prejudice privilege has made a substantiated showing of unambiguous impropriety justifying an exception to the privilege, it is not sufficient for that party to establish only "a good arguable case (or a plausible evidential basis)." *Motorola Sols., Inc. v. Hytera Commc'n's Corp. Ltd.* [2021] EWCA (Civ) 11, [¶ 60], [2021] QB 744 (Eng.) (Exhibit 3). Courts should avoid accepting "at face value" an argument for an exception to the privilege, and should "rigorously scrutinize[ ]" any arguments or evidence brought forth by a party seeking to evade the privilege. *Id.* ¶ 31. That is because application of an exception to the privilege requires a clear and substantiated showing of "unambiguous impropriety. Nothing less will do." *Id.* ¶ 64. And such impropriety must be truly unambiguous: "even . . . where [an] 'improper' interpretation of what was said at a without prejudice meeting is possible, or even probable, that is not sufficient to satisfy the demanding test that there is no ambiguity." *Id.* ¶ 31.

11. **Opinion 2:** The settlement negotiations between CoStar and Arcgate resulted in a concluded settlement agreement that was scrutinised by the High Court of Rajasthan and ultimately reflected in a final judgment of that court. The High Court of Rajasthan had an independent duty under Indian law, and in particular Order 23 of the Indian Code of Civil Procedure, to determine that the settlement was entered into lawfully and that the terms of the settlement were lawful.

12.     By entering the settlement and supporting declaration as part of the Consent Terms in the final judgment, the High Court of Rajasthan determined as a matter of Indian law that the settlement, which includes that declaration was valid and lawful, and not void or voidable.

13.     Indian law provides interested third parties the opportunity to intervene in litigation.  A party waives its right to challenge the outcome of any proceeding in which it could have, but did not, intervene, including an outcome which results in an Indian court's entry of consent terms (for example, the High Court of Rajasthan's entry of the CoStar-Arcgate Consent Terms).

14.     **Opinion 3:** Indian law recognises as a matter of international comity that the judgments of foreign courts should be respected, and Indian law forbids abuses of domestic legal process that would seek to undermine the judgment of a foreign court.

15.     **Opinion 4:** CoStar and Arcgate's settlement communications, including drafts of any settlement-related materials, are protected by the without prejudice privilege, and no exception applies.  These communications led to a settlement, incorporating testimony that was reviewed and approved as valid and lawful by an Indian court, and— moreover—CREXi failed to challenge such findings and has thereby waived that right. CREXi's *ex post facto* correspondence with CoStar does not make a showing sufficient under any recognised exception to the privilege.

16.     In particular, CREXi's assertions that the offering of testimony as part of the judicially-approved settlement, and/or the fact that CoStar had the leverage of a pending suit for damages, or settled without demanding a monetary payment, renders the settlement improper or supports an exception to the privilege are unavailing.  Testimony is not

uncommonly offered in connection with settlements in India, and this testimony was reviewed and approved by the High Court of Rajasthan in connection with this settlement.  And if CREXi has or had any issue with either the fact that testimony was offered, or any particular aspect of the testimony, it could have, but did not, intervene to challenge the testimony or any aspect thereof before the High Court, and thus waived that argument.  Moreover, that CoStar had brought a claim for damages that was hanging over Arcgate, and settled based on terms that included, for example, broad injunctive relief but not a damages payment, is hardly uncommon—the settlement negotiations were only happening because CoStar had asserted a claim, and parties often compromise in settling.  These unremarkable facts provide no basis to challenge the settlement or invalidate the privilege.

17.   **Additional Response to Mr. George:**  Finally, Mr. George's declaration reflects a misunderstanding of Indian privilege law and related English law.  His errors include incorrectly describing or mischaracterising the without prejudice privilege, the Indian Evidence Act, and Indian and English case law.  Mr. George also has misapplied Indian law to reach the conclusion that an Indian court would order production of the CoStar-Arcgate settlement communications.

## III.   INDIAN EVIDENTIARY PRIVILEGES

### A.   Sources of Indian Evidentiary Law

18.   India has two sources of evidentiary privileges.  The first source is the Indian Evidence Act of 1872.  The Parliament of the United Kingdom passed the Indian Evidence Act to "consolidate, define and amend the law of Evidence" in India.  The Indian Evidence Act, 1872, pmbl.  In doing so, Parliament intended to codify the English common law as stated in John Pitt Taylor's treatise, A TREATISE ON THE LAW OF EVIDENCE.  *See State of*

7

*Punjab v. Sodhi Sukhdev Singh*, AIR 1961 SC 493, ¶ 93 (Exhibit 4).  Because the Indian

Evidence Act is based on English common law, the Indian Supreme Court has instructed

that, "[i]n case of doubt or ambiguity over the interpretation of any of the sections of the

Evidence Act[,] we can with profit look to the relevant English common law for

ascertaining their true meaning."  *Id.*

19.   The second source is the general Indian common law, which also draws on English

common law.  Indian courts apply common law privileges even if the Evidence Act does

not explicitly provide for the privilege.  For example, the Calcutta High Court has applied

the common law without prejudice privilege to determine an arbitration dispute even

though the Evidence Act was inapplicable.  *See Howard v. Wilson* 1878 ILR Cal 231, 236

(Exhibit 5) (citing JOHN PITT TAYLOR, A TREATISE ON THE LAW OF EVIDENCE (7th ed.

1878)).  As when determining whether to apply a privilege under the Evidence Act,

Indian courts also turn to English common law when determining the scope of India's

common law privileges.  *See Peacock Plywood Pvt. LTD v. Oriental Ins. Co.*, (2006) 12

SCC 673, ¶ 43 (Exhibit 6).

20.   Mr. George's flawed analysis of the without prejudice privilege flows from the fact that

he disregards the importance of English case law in the Indian judicial system.  *See*

George Declaration ¶¶ 11-15.  The jurisprudence followed in India is almost the same as

the one prevalent in England, though it has been influenced by Indian values.  Indian

courts regularly cite and follow the opinions of English courts.  The High Court of

Karnataka has held that, "except to the extent that the common law of England has been

abrogated or is inapplicable to Indian conditions, its rules are part of the law of our

country."  *Muniswamy v. State of Mysore*, (1963) SCC Online Kar 55, ¶ 29 (Exhibit 7).

That is why the Supreme Court and lower courts have looked to and applied English case law when describing India's law of privilege under the Indian Evidence Act, *see Sodhi Sukhdev Singh,* ¶ 93; *Larsen & Toubro Ltd. v. Prime Displays Pvt. Ltd.*, 2002 SCC Online Bom 267, ¶ 25 (Exhibit 8), and common law, *see* Ex. 6, *Peacock,* 12 SCC 673, ¶ 43.  The default is that English case law applies unless an Indian rule or decision has explicitly abrogated that law, or there is a showing that the law does not apply to Indian conditions.

### B.     "Without Prejudice" Privilege

21.     Under Indian law, the without prejudice privilege governs both the discoverability and admissibility of documents and communications related to settlement.  This privilege is founded on two independent justifications.  The first justification is the public policy of encouraging litigants to settle their differences rather than engage in litigation.  The second justification is the implied contractual agreement between parties to without prejudice communications that the parties will not use those communications against each other.  Importantly, the privilege is held by both parties to the settlement and one party cannot waive the privilege without the consent of the other party.

22.     The Indian Evidence Act of 1872 codified the without prejudice privilege as to the admissibility of settlement communications.  Section 23 of that Act states: "*In civil cases no admission is relevant, if it is made either upon an express condition that evidence of it is not to be given, or under circumstances from which the Court can infer that the parties agreed together that evidence of it should not be given.*"  *Id.*

23.     By its terms, Section 23 applies in two instances.  First, Section 23 applies when one party expressly states that the admission is made without prejudice against the party making the statement.  Second, Section 23 applies when an admission is made "under

circumstances from which the Court can infer that the parties agreed together that evidence of it should not be given." *Id.*

24. The Indian without prejudice privilege also exists independently, and in broader form, as part of Indian common law. Mr. George is thus incorrect that "the without prejudice rule is inseparable from Section 23 of the Indian Evidence Act." George Declaration ¶ 16. Indian courts have applied the without prejudice privilege even where the Evidence Act does not apply. *See* Ex. 5, *Wilson* at 495 (citing JOHN PITT TAYLOR, A TREATISE ON THE LAW OF EVIDENCE (7th ed. 1878)) (applying common law without prejudice privilege in arbitration dispute to which the Evidence Act did not apply). The Supreme Court of India, in *Peacock*, 12 SCC 673, without any discussion of Section 23, offered a clear statement of the common law privilege.

25. In *Peacock*, the Supreme Court first observed that the privilege applies to protect communications if they are "written for the purpose of a genuine attempt to compromise a dispute between the parties." Ex. 6, *Peacock*, 12 SCC 673, ¶ 43. And like the statutory privilege of Section 23, the Court recognised that the common law privilege may attach if "it is clear from the surrounding circumstances that the parties were seeking to compromise the action." *Id.* (recognizing that it is "not a precondition that the correspondence bears the heading without prejudice"). Unlike other forms of privilege, which can be waived by the beneficiary of a privilege, the "[w]ithout prejudice privilege can only normally be waived with the consent of both parties to the correspondence." *Id.*[1] The privilege attaches to settlement communications, depending on the specific facts

---

[1] The principle that the privilege is jointly held has been applied by the Supreme Court of India in subsequent cases and by other Indian courts. *See, e.g.*, *Superintendent (Tech. I) Central Excise, I.D.D. Jabalpur v. Pratap Rai*, (1978) 3 SCC 113, ¶ 6  (Exhibit 9) (quoting J. J. S.

of each case, "even when a letter is sent as the 'opening shot' in negotiations, and is not

preceded by any previous correspondence." *Id.* (explaining that there "is no reason why

every letter for which without prejudice is claimed should contain an offer or

consideration of an offer, so long as the without prejudice correspondence is part of a

body of negotiation correspondence").

26.     The existence and application of the without prejudice privilege in India is beyond

dispute.  Many other Indian opinions, issued by courts across the country, have

recognised the privilege, including *Chairman & M.D., N.T.P.C. Ltd. v. Reshmi Constrs.,*

*Builders & Contractors*, (2004) 2 SCC 663 (Exhibit 10); *Agarwal v. Cent. Bank of India*,

2016 SCC Online Bom 10368 (Exhibit 11); *Delhi Baroda Rd. Carrier Pvt. Ltd. v.*

*Mahindra & Mahindra Fin. Servs. Pvt. Ltd.*, MANU/Bom/3786/2018 (Exhibit 12);

*Lucent Techs. Inc. v. ICICI Bank Ltd.* MANU/Del/2717/2009 (Exhibit 13); *G. Premjee*

*Trading Priv. Ltd. v. Noormohammed*, MANU/Bom/1392/2021 (Exhibit 14); *Lindsay*

*Int'l Priv. Ltd. v. Laxmi Niwas Mittal*, AIR 2021 Cal 24 (Exhibit 15), among others.

### 1.     Application to Discovery Sought Subsequently by Third Parties

27.     The "without prejudice privilege" is not simply a rule of admissibility, as Mr. George

claims.  George Declaration ¶ 16.  It protects without prejudice communications from

discovery by non-parties to the settlement, after the settlement has concluded, in

subsequent litigation.

28.     Discovery disputes involving the without prejudice privilege rarely arise because in a

regular two-party case, involving only the parties to the settlement negotiations, both

parties already possess the settlement communications.  *See* Competition Comm'n of

---

WHARTON, WHARTON'S LAW LEXICON) ("The rule is that nothing written or said 'without
prejudice' can be considered at the trial without the *consent of both parties*.") (emphasis added).

India, *Matrimony.com Ltd. v. Google LLC*, Case Nos. 07 & 30 of 2012, ¶ 160 (Decided Feb. 8, 2018) (Exhibit 16) (citing *Rush & Tompkins Ltd. v. Greater London Council*, [1988] 3 All ER 737, [1989] AC (HL) 1280) (appeal taken from Eng.).  The question of whether without prejudice communications are subject to discovery typically arises in three-party cases where the third party was not part of settlement negotiations between the other two parties.  In such cases, the privilege protects those settlement communications from discovery by the third party.  *See* Ex. 6, *Peacock*, 12 SCC 673, ¶ 43.  That principle was best articulated by the House of Lords (the precursor to the U.K. Supreme Court) in *Rush & Tompkins Ltd. v. Greater London Council*, [1989] AC (HL) 1280 (appeal taken from Eng.) (Exhibit 17) and has since been recognised by Indian and English legal authorities.  I am not aware of any Indian cases contradicting *Rush* or any reason why it is inapplicable to Indian conditions and, thus, the default presumption that it is part of the law of India applies.  *See* Ex. 7, *Muniswamy*, (1963) SCC Online Kar 55, ¶ 29.

29.   *Rush* concerned a request for discovery of documents created during negotiations between two parties in a multiparty dispute.  The documents at issue contained valuations of the third party's claims in the action, and the third party sought discovery of those documents to learn how the other parties had valued the third party's claim.  Lord Griffiths gave the main opinion in that case and made several rulings on the scope of the without prejudice privilege, including that (1) the purpose of the privilege is to promote settlement, (2) the privilege applies against third parties even after settlement has been achieved, and (3) the privilege shields without prejudice communications from discovery (i.e., the privilege is not limited to the issue of admissibility into evidence).

30.     First, Lord Griffiths recognised that the purpose of the without prejudice privilege is to promote and encourage settlement.  Lord Griffiths explained that the privilege is "founded upon the public policy of encouraging litigants to settle their differences rather than litigate them to a finish."  Ex. 17, *Rush*, [1989] AC (HL) 1280, 1299.  That is, the basis of the privilege is "that parties should be encouraged so far as possible to settle their disputes without resort to litigation and should not be discouraged by the knowledge that anything that is said in the course of such negotiations (and that includes, of course, as much the failure to reply to an offer as an actual reply) may be used to their prejudice in the course of the proceedings." *Id.* at 1299 (citing *Cutts v. Head*, [1984] Ch 290 at 306 (Eng.) (Exhibit 18)).

31.     Similar to the Indian Supreme Court's description in *Peacock*, Lord Griffiths explained that the privilege "applies to exclude all negotiations genuinely aimed at settlement whether oral or in writing from being given in evidence." Ex. 17, *Rush*, [1989] AC (HL) 1280, 1299.  And Lord Griffiths also stated that "the application of the rule is not dependent upon the use of the phrase 'without prejudice' and if it is clear from the surrounding circumstances that the parties were seeking to compromise the action, evidence of the content of those negotiations will, as a general rule, not be admissible at the trial and cannot be used to establish an admission or partial admission." *Id.* at 1299-300.  Lord Griffiths also identified certain exceptions to the privilege which I will address below.

32.     Second, Lord Griffiths held that the privilege applies to shield without prejudice communications even after the settlement was concluded.  In so ruling, he observed that if "admissions made to achieve settlement of a piece of minor litigation could be held

13

against [a party] in a subsequent major litigation it would actively discourage settlement of the minor litigation and run counter to the whole underlying purpose of the 'without prejudice' rule." *Id.* at 1301.  He then held that "as a general rule the 'without prejudice' rule renders inadmissible in any subsequent litigation connected with the same subject matter proof of any admissions made in a genuine attempt to reach a settlement." *Id.* at 1301.  It therefore went "without saying that admissions made to reach settlement with a different party within the same litigation are also inadmissible whether or not settlement was reached with that party." *Id.* at 1301.

33.  Third, Lord Griffiths held that the without prejudice privilege protects communications from discovery, and was not confined to questions of admissibility.  He noted that, prior to the lower court's opinion in the case, "the general understanding of the profession was that 'without prejudice' negotiations between parties to litigation would not be discoverable to other parties and that admissibility and discoverability went together." *Id.* at 1304 (citing JACK I.H. JACOB, *Discovery and Inspection of Documents*, *in* THE SUPREME COURT PRACTICE 1988, Note 24/5/17 ("It follows that documents containing such material are themselves privileged from production.")).  After surveying the case law, Lord Griffiths concluded that "even as between the parties to 'without prejudice' correspondence they are not entitled to discovery against one another." Ex. 17, *Rush*, [1989] AC (HL) 1280, 1304.  And in holding that without prejudice communications between two parties should be protected from discovery by a third party, Lord Griffiths reasoned that failure to recognise such protection would "place a serious fetter on negotiations between other parties if they knew that everything that passed between them would ultimately have to be revealed to the one obdurate litigant.  What would in fact

happen would be that nothing would be put on paper but this is in itself a recipe for disaster in difficult negotiations which are far better spelt out with precision in writing." *Id.* at 1305.  For that reason, he held that "the general public policy that applies to protect genuine negotiations from being admissible in evidence should also be extended to protect those negotiations from being discoverable to third parties."  *Id.*

34.    While, as an opinion from the precursor to the U.K. Supreme Court, the *Rush* opinion is on its face good law in India (given the absence of an Indian rule or decision that has explicitly abrogated that decision, or any particular condition in India that would suggest otherwise), at least one prominent Indian authority has expressly recognised Lord Griffiths' ruling in *Rush*.  The Indian Competition Commission's decision in *Matrimony.com* recognised and broadly applied the privilege in the context of a fact-finding investigation, akin to civil discovery.  Ex. 16, Competition Comm'n of India, *Matrimony.com*, Case Nos. 07 & 30 of 2012.  While Mr. George observes, correctly, that the Commission's decision is not binding on Indian courts, George Declaration ¶ 27, the Commission, a quasi-judicial body that investigates and adjudicates competition violations, *see Mahindra Elec. Mobility Ltd. v. CCI*, 2019 SCC Online Del 8032, ¶ 83 (Exhibit 19), is bound by Indian Supreme Court and High Court precedent, *see Kalyani Packaging Indus. v. Union of India*, (2004) 6 SCC 719, ¶ 6 (Exhibit 20); *Flipkart Internet Pvt. Ltd. v. Competition Comm'n of India*, MANU/KA/3124/2021, ¶ 3.40 (Exhibit 21), and its decisions reflect the content of Indian law.  Notably, because the Commission is a quasi-judicial body, every bench adjudicating a dispute must have at least one judicial member, and the *Matrimony.com* case was no exception: Justice Gian Parkash Mittal, formerly of the Delhi High Court, sat on the bench.  Though he dissented as to a portion

15

of the Commission's opinion, he did not dissent from its application of the without prejudice privilege, another strong indication that the Commission's decision is consistent with the law articulated and applied by the Indian courts.

35.  The Commission's application of the without prejudice privilege in *Matrimony.com* involved the Commission's appointment of a Director General ("DG") to investigate Google for potential violations of India's antitrust laws.  Ex. 16, Competition Comm'n of India, *Matrimony.com*, Case Nos. 07 & 30 of 2012, ¶ 12.  As part of its objections to the DG's findings, Google argued that the DG was inappropriately influenced by "the draft voluntary commitments made by Google before various authorities globally." *Id.* ¶ 155.  The Commission held that "reliance by the DG upon voluntary commitments given by Google elsewhere was against law and public policy.  "It may be observed that if voluntary concessions offered by the parties in separate proceedings and different jurisdictions in different settings are referred to and relied upon by the investigators in another jurisdictions to base findings of contraventions, the consequences would be enormous." *Id.* ¶ 156.  This was because on "the one hand, it may unduly prejudice the cause of such party and thereby may have the potential to vitiate the findings.  And on the other hand, such an approach would run contrary to public policy as the parties would be deterred from making even reasonable concessions to avoid a costly and protracted litigation." *Id.* ¶ 156.

36.  In support of that holding, the Commission cited Indian case law and Lord Griffiths' decision in *Rush*.  The Commission observed that, in *Rush*, "the House of Lords was considering the settlement negotiations between two parties wherein one of the parties sought discovery of documents that came into existence for the purpose of settling the

dispute between the parties." *Id.* ¶ 160.  Thus, the Commission held that "no reference

can be made or reliance placed upon the voluntary draft commitments given by the

parties in different jurisdictions and in different statutory architecture to base conclusions

of contraventions in the instant matter lest the same prejudice or vitiate the final

determination.  Accordingly, any reference or reliance made by the DG to such draft

voluntary commitments given by Google before different Authorities or Agencies or

Courts in the Investigation Report shall stand deleted from records."  *Id.* ¶ 161.

37.  Mr. George mischaracterises the holdings in two Indian Supreme Court decisions,

*Peacock* (discussed above), and *Chairman & M.D. N.T.P.C. Ltd. v. Reshmi Constrs.*

*Builders & Contractors*, (2004) 2 SCC 663, which quotes the lower Court of Appeal's

opinion in *Rush* that the House of Lords reversed while discussing the without prejudice

privilege.  Mr. George claims that these decisions (1) did not adopt Lord Griffiths'

decision in *Rush* as it relates to discoverability (as opposed to admissibility) of settlement

communications and, in the case of *Chairman*, even rejected Lord Griffiths' opinion, and

(2) stand for the proposition that the privilege does not apply once the parties to a

settlement reach a final agreement.  George Declaration ¶¶ 21-25.  Neither interpretation

of these decisions is correct.

38.  First, as discussed above, the *Peacock* Court clearly recognised that the privilege applies

to protect settlement communications from discovery, including by third parties.[2]  Mr.

---

[2] *Peacock* held that in a "three party situation," i.e. when a third party to a settlement seeks
discovery of settlement communications between two other parties, the privilege protects those
communications from discovery "where a public policy justification can be provided, namely,
where the issue is whether admissions were made."  Ex. 6, *Peacock*, 12 SCC 673, ¶ 43.  Mr.
George reads this to state a rule that the privilege only protects settlement communications from
third parties where they seek the communications to obtain admissions.  That reading is directly
at odds with the Indian Supreme Court's recognition that India's public policy in favour of

George misinterprets *Peacock* as stating that the without prejudice privilege is "a rule of admissibility only."  George Declaration ¶ 26.  The *Peacock* Court, consistent with its recognition that the privilege applies in the context of third-party discovery requests, stated that the privilege is "*generally* a rule of admissibility" (emphasis added), but did not take the position that it is exclusively a rule of admissibility.  Moreover, Mr. George's suggestion that in *Chairman* the Supreme Court of India repudiated Lord Griffiths' opinion when it quoted the definition of without prejudice privilege from the Court of Appeal opinion, which the House of Lords overturned, *see* George Declaration ¶¶ 22-23, is incorrect.  *Chairman* cited the Court of Appeal decision for the uncontroversial principle that "[t]he rule which gives the protection of privilege to 'without prejudice correspondence' depends partly on public policy, namely, the need to facilitate compromise, and partly on 'implied agreement.'" Ex. 10, *Chairman* ¶ 34.  This principle was upheld in Lord Griffiths' opinion, and it does not follow that *Chairman's* citation to this succinct summary from the Court of Appeal suggests disapproval of any aspect of Lord Griffiths' opinion on the discoverability of without prejudice communications.

39. Second, Mr. George reads *Chairman* to suggest the without prejudice privilege no longer applies once the parties to a settlement reach agreement. George Declaration ¶¶ 22-23. This is mistaken.  As *Chairman* recognised, the point of the privilege is to "facilitate compromise," a purpose that would be gravely impaired if the privilege applied only to *failed* compromise efforts.  Ex. 10, *Chairman* ¶ 34 ; *see also* Ex. 11, *Rush* at 1301 (noting

---

"facilitat[ing] compromise" justifies the without prejudice privilege—not just the policy of protecting admissions.  *Chairman* ¶ 34.  That is why the *Peacock* Court confirmed that the privilege applies to all settlement communications, regardless of their content.  Ex. 6, *Peacock*, 12 SCC 673, ¶ 43.

that it goes "without saying that admissions made to reach settlement . . . are . . . inadmissible whether or not settlement was reached").  Mr. George selectively quotes *Chairman*'s statement that "the parties must be taken to have intended and agreed that the privilege will cease if and when the negotiations 'without prejudice' come to fruition in a concluded agreement." George Declaration ¶ 22.  But this language, and similar language in the *Peacock* case, stands only for the proposition that the privilege does not apply to communications that occur *after* a settlement is concluded.

40.    In sum, these authorities demonstrate that India recognises and applies the without prejudice privilege, which generally shields settlement negotiations from discovery by third parties even after such negotiations have concluded, unless both parties to the communications have consented to disclosure of the communications.

## 2.    Exceptions To The Without Prejudice Privilege

41.    Courts have recognised certain narrow exceptions to the without prejudice privilege.  As Lord Griffiths' opinion in *Rush* explained, these limited and narrow exceptions allow admission of without prejudice material if:  (1) "the issue is whether or not the negotiations resulted in an agreed settlement"; (2) a party tries to use the privilege to exclude a declaration of bankruptcy; (3) a party tries to use the privilege to "suppress a threat" of blackmail if the offer is not accepted (citing *Kitcat v. Sharp*, [1882] 48 LT 64 (Eng.) (Exhibit 24); (4) the parties agreed to allow admission to determine a question of costs after judgment, and (5) to establish "an 'independent fact' in no way connected with the merits of the cause.  Ex. 17, *Rush*, [1989] AC (HL) 1280, 1300.  Lord Griffiths emphasised that the last exception was for "an exceptional case and it should not be allowed to whittle down the protection given to the parties to speak freely about all issues

in the litigation both factual and legal when seeking compromise and, for the purpose of establishing a basis of compromise, admitting certain facts." *Id.* at 1300.

42. Related to *Rush's* "independent fact" exception, Mr. George cites *Havels India Ltd. v. Electrium Sales Ltd.*, MANU/Del/939/2013 (Exhibit 22), in support of the proposition that without prejudice communications can be admitted for reasons independent of the dispute being negotiated in the communication.  George Declaration ¶ 29. But *Havels* dealt with a unique fact pattern and set of policy concerns arising in the context of arbitration escalation clauses.  There, after the defendant instituted an arbitration proceeding in the International Chamber of Commerce (ICC), the plaintiff sought a declaration from the Indian court that there was no arbitration agreement and an injunction restraining the defendant from pursuing arbitration before the ICC.  Ex. 22, *Havels India Ltd.*, MANU/Del/939/2013.  The agreement underlying the parties' dispute contained an escalation clause requiring the parties to mediate any disputes before engaging in arbitration.  The plaintiff had written multiple letters to the defendant agreeing to mediation, and had also submitted mediation papers.  *Id.* ¶¶ 2, 5, 18.  The defendant argued that the plaintiff's mediation submissions indicated the plaintiff had consented to the dispute resolution mechanism in the supply agreement.  The plaintiff argued in response that those communications could not be admitted into evidence because they were written on a without prejudice basis.  *Id.* ¶ 19.  The High Court rejected the plaintiff's argument, recognising that the plaintiff could not use the without prejudice privilege to cloak its "invocation of the arbitration."  *Id.* ¶ 20.  Otherwise, the High Court noted, "multi-tier dispute resolution clauses, also known as escalation clauses can be frustrated by one party claiming that its participation in the preceding mediation

proceedings cannot be used to trigger the arbitration clause, merely because it used the term 'without prejudice' in the communications." *Id.*

43. The High Court's narrow decision in *Havels* is closely tied to that case's fact pattern, involving an arbitration escalation clause. Litigants in India often attempt to avoid arbitration by claiming that they agreed to arbitrate on a "without prejudice basis" and thus reserved their right to avoid arbitration. Indian courts regularly reject that argument. The Calcutta High Court put the issue plainly: "[r]ights cannot be 'kept in the sleeve' for being used as per the whim and fancy of a party" in the arbitration context because the "complete primacy given to an arbitration under the 1996 [Arbitration] Act" means that "a Defendant cannot be allowed to blow hot and cold or be a fence sitter." Ex. 15, *Lindsay* ¶ 50. Therefore, *Havels* does not contradict the general rule, recognised in *Rush*, that the privilege "renders inadmissible in any subsequent litigation connected with the same subject matter proof of any admissions made in a genuine attempt to reach a settlement." Ex. 17, *Rush*, [1989] AC (HL) 1280, 1301.

44. A more recent decision from the English Court of Appeal in *Unilever plc v. Procter & Gamble Co.* further discusses the exceptions to the without prejudice privilege, including the exception for use of the privilege to "suppress a threat." Ex. 1, *Unilever*, 1 WLR 2436. I understand that CREXi and Mr. George, *see* George Declaration ¶ 33, have cited *Unilever* in connection with this case. As I have noted, the Supreme Court of India has held that English common law is persuasive authority to determine questions of Indian evidentiary law. Because *Unilever* is an application of English common law, it is relevant to the application of the without prejudice privilege under Indian law. I also note that at least one Indian court has cited *Unilever* to determine whether without prejudice

21

correspondence could be admitted into evidence, and concluded that it could not. *See Sifandros Carrier Ltd. v. Lmj Int'l Ltd.*, 2018 SCC Online Cal 7146, ¶ 61 (noting correspondence "was a 'without prejudice' correspondence, which is inadmissible in evidence") (Exhibit 23).

45.    The question before the Court of Appeal in *Unilever* was whether *Unilever* could include in its pleadings the content of communications made during a settlement meeting in Frankfurt with Procter & Gamble ("P&G").  *Unilever* asserted that P&G had issued a threat of legal action at this meeting, and that such threat vitiated the without prejudice privilege that otherwise would have attached to the settlement communications.

46.    The Court of Appeal unanimously rejected *Unilever's* argument, and held that the contents of the parties' settlement communications were protected by the without prejudice privilege.  Lord Justice Walker of the Court of Appeal issued the main opinion.

47.    First, Lord Justice Walker recognised that the privilege attaches to all communications made during settlement negotiations (and not just, for example, admissions, and not excluding, for example, threats to sue).  The breadth of the protection has a "wide and compelling effect," especially where "the discussions between the parties' representative may contain a mixture of admissions and half-admissions against a party's interest, more or less confident assertions of a party's case, offers, counter-offers, and statements (which might be characterised as threats or as thinking aloud) about future plans and possibilities."  Ex. 1, *Unilever*, 1 WLR 2436, 2443-44.  In such instances, "a threat of [a lawsuit] may be deeply embedded in negotiations for a compromise solution."  *Id.* at 2444.  Culling out certain communications from other communications during negotiations was, in Lord Justice Walker's terms, "as implausible as the curate's egg

(which was good in parts)." *Id.* Indeed, "to dissect out identifiable admissions and withhold protection from the rest of without prejudice communications (except for a special reason) would not only create huge practical difficulties but would be contrary to the underlying objective of giving protection to the parties." *Id.* at 2449 (citing Ex. 17, *Rush*, [1989] AC (HL) 1280, 1300). This is because "[p]arties cannot speak freely at a without prejudice meeting if they must constantly monitor every sentence, with lawyers or patent agents sitting at their shoulders as minders." Ex. 1, *Unilever*, 1 WLR 2436, 2449.

48.     Second, Lord Justice Walker determined that making a legal threat during negotiations does not trigger any exceptions to the without prejudice rule. In so ruling, Lord Justice Walker identified the following exceptional circumstances in which the without prejudice rule does not apply.

(1)     The privilege does not apply "when the issue is whether without prejudice communications have resulted in a concluded compromise agreement." *Id.* at 2444. This is the same exception Lord Griffiths identified in *Rush* (Ex. 17, *Rush*, [1989] AC (HL) 1280, 1300).[3]

(2)     The privilege does not apply to evidence showing that "an agreement apparently concluded between the parties during the negotiations should be set aside on the ground of misrepresentation, fraud or undue influence." Ex. 1, *Unilever*, 1 WLR 2436, 2444 (citing *Underwood v. Cox*, (1912) 4 D.L.R. 66 (Can.)).

---

[3] The existence of this exception, and the other exceptions, directly refute Mr. George's claim that the without prejudice privilege does not apply after the parties reach a settlement. If it did, this "concluded compromise" exception, and several of the other exceptions, would be unnecessary.

(3)     The privilege does not apply to "a clear statement which is made by one party to negotiations and on which the other party is intended to act and does in fact act" to prove estoppel.  Ex. 1, *Unilever*, 1 WLR 2436, 2444.

(4)     The privilege does not apply so "one party may be allowed to give evidence of what the other said or wrote in without prejudice negotiations if the exclusion of the evidence would act as a cloak for perjury, blackmail or other 'unambiguous impropriety' . . . the exception should be applied only in the clearest cases of abuse of a privileged occasion." *Id.* at 2444.  This narrow exception is the same exception Lord Griffiths identified in *Rush* for which he cited as an example, *Kitcat v. Sharp*, a case involving threat of blackmail.  *See* Ex. 24, *Kitcat*, [1882] 48 LT 64.  The exception reflects the principle in Indian law that the privilege attaches only to communications made "for the purpose of a genuine attempt to compromise a dispute between the parties." Ex. 6, *Peacock*, 12 SCC 673, ¶ 43.

(5)     The privilege does not apply where a party wishes to give evidence "in order to explain delay or apparent acquiescence." Ex. 1, *Unilever*, 1 WLR 2436, 2444. But this exception is limited to "the fact that such letters have been written and the dates at which they were written." *Id.*  This exception is similar to the exception Lord Griffiths identified in *Rush* related to an "'independent fact' in no way connected with the merits of the case." Ex. 17, *Rush*, [1989] AC (HL) 1280, 1300.

(6)     The privilege does not apply where the issue is whether a party acted reasonably to mitigate his loss in his conduct in a suit against his former solicitors. Ex. 1, *Unilever*, 1 WLR 2436, 2444 (citing *Muller v. Linsley*, [1996] 1 PNLR 74

24

(Exhibit 25)).  The *Unilever* court noted that, in *Muller*, the mitigation issue was "unconnected with the truth or falsity of anything stated in the negotiations," and so the court held they were discoverable.  Ex. 1, *Unilever*, 1 WLR 2436, 2444. Lord Justice Walker noted that the majority of the court agreed with that holding, "but would also have based their decision on waiver" of the privilege.  *Id.* However, English courts have since cast doubt on the *Muller* case, noting that its reasoning has since been overruled, and *Berkeley* infers that the outcome in *Muller* now has "no visible means of support."  *See Berkeley Square Holdings v. Lancer Prop. Asset Mgmt. Ltd.*, [2021] EWCA (Civ) 551, ¶ 59 (Exhibit 26).

(7)     The privilege does not apply where the parties have agreed it does not apply.  For example, if an offer is made "without prejudice except as to costs," the privilege would not apply to admissible or discoverable evidence related to the issue of costs.  Absent such agreement, as the Indian Supreme Court recognised in *Chairman*, without prejudice communications cannot be considered "without the consent of both parties – not even by a Judge in determining whether or not there is good cause for depriving a successful litigant of costs."  *Chairman* ¶ 35.

(8)     Finally, there is a "hybrid species of privilege" that applies in matrimonial cases similar to the without prejudice privilege.  Ex. 1, *Unilever*, 1 WLR 2436, 2444.

49.     In light of those exceptions, and assuming under the relevant standard that P&G made the alleged threats of legal action, Lord Justice Walker confronted *Unilever's* main arguments: (1) that Parliament had attached particular legal consequences to the issuance of a threat, and (2) the threat constituted a statutory tort and so must be assumed to be wrongful and undeserving of the without prejudice protection.

50.     Lord Justice Walker rejected both arguments.  Lord Justice Walker refused to set aside
the without prejudice protection because there was "nothing (beyond the bare and
unembroidered pleading of a threat) to suggest that P&G's representatives at the meeting
acted in any way that was oppressive, or dishonest, or dishonourable." *Id.* at 2449.  The
negotiation fell under the normal public policy rule of encouraging settlements and the
pleading of the threat did not fall within any exception. *Id.* at 2449.  And, just as Lord
Griffiths in *Rush* stated that the exceptions to the privilege should "not be allowed to
whittle down the protection given to the parties to speak freely about all issues in the
litigation both factual and legal when seeking compromise," Ex. 17, *Rush*, [1989] AC
(HL) 1280, 1300, Lord Justice Walker held that the "expansion of exceptions should not
be encouraged" in view of the policy preference that "those who are in dispute [should]
engage in frank discussions before they resort to litigation," Ex. 1, *Unilever*, 1 WLR
2436, 2449.

51.     Concurring, Lord Justice Simon Brown likewise assumed that P&G had made legal
threats during the course of negotiations, but still "nevertheless unhesitatingly
conclude[d] that it did not thereby unequivocally abuse the protection afforded by the
without prejudice rule." *Id.* at 2453.

52.     The English Court of Appeal's decision in *Unilever* thus stands unambiguously for the
proposition that an allegation that one party to settlement negotiations issued legal threats
during such negotiations does not bring those negotiations outside the scope of the
without prejudice privilege.  In reaching that conclusion, the *Unilever* court elaborated on
the exception identified in *Rush*—that "threats" during negotiations are not privileged—
and explained that such exception covers only "perjury, blackmail or other 'unambiguous

impropriety'" and "should be applied only in the clearest cases of abuse of a privileged occasion." Ex. 1, *Unilever*, 1 WLR 2436, 2444.

53.    That is a sensible and necessary result of the policy interests that the without prejudice privilege is meant to protect.  Thus, if Party A tells Party B that failure to agree on settlement terms will result in continued litigation, or will give rise to additional litigation (such as the assertion of counterclaims), neither Party B nor any other party can use that legal threat to subject the settlement negotiations to outside scrutiny and publicity.  A contrary rule would unduly restrict the parties' ability to "speak freely about all issues in the litigation when seeking compromise." Ex. 17, *Rush*, [1989] AC (HL) 1280, 1300.  Similarly, an assertion that Party A made a misstatement of fact in the midst of negotiations would not allow Party B or a third party to bring the negotiations outside the scope of the without prejudice privilege.  Rather, the party seeking to evade the privilege would have to show some kind of "unambiguous impropriety" that would establish a "clear[ ] . . . abuse" of the privilege protecting settlement negotiations. Ex. 1, *Unilever*, 1 WLR 2436, 2444.

54.    The English Court of Appeal, in a case decided just last year, has reaffirmed that the "unambiguous impropriety" exception imposes a demanding standard.  In *Motorola Solutions*, the Court of Appeal held that one party's threats during settlement negotiations to move its assets through different jurisdictions to hinder the opposing party's ability to enforce a judgment did not provide grounds to admit those without prejudice communications. Ex. 3, *Motorola*, [2021] EWCA (Civ) 11.  The Court of Appeal rejected the lower court's ruling that a party need only establish "a good arguable case (or a plausible evidential basis)" to invoke the "unambiguous impropriety" exception. *Id.*

¶ 60.  Instead, the Court of Appeal confirmed that cases in which courts have applied the impropriety exception "have been truly exceptional," *Id.* ¶ 57, and that the exception requires showing "unambiguous impropriety. Nothing less will do." *Id.* ¶ 64.  This is so, "even if that means that some statements disclosing or constituting impropriety, albeit not unambiguously so, retain the protection of the rule.  The policy choice is that the public interest in the settlement of litigation generally outweighs the risk of abuse of the privilege in individual cases."  *Id.* ¶ 62.

55.    *Motorola* thus stands for the principle that "the without prejudice rule must be 'scrupulously and jealously protected' so that it does not become eroded." *Id.* ¶ 31.  To that end, a party claiming an exception must *substantiate* its claim that the exception applies because the privilege is "inconsistent . . . with an approach which simply takes at face value the evidence of a party seeking to disapply the without prejudice rule."  *Id.*

56.    To be sure, a party that seeks to avoid a settlement agreement is not prohibited from introducing compelling evidence of misrepresentations or material omissions that would *vitiate* that agreement.  Under the second exception identified in *Unilever*, the without prejudice privilege does not apply where one party to a settlement agreement can establish that the agreement "should be set aside on the ground of misrepresentation, fraud or undue influence."  Ex. 1, *Unilever*, 1 WLR 2436, 2444 (citing *Underwood v. Cox*, (1912) 4 D.L.R. 66 (Can.)).  A more recent English Court of Appeal case, *Berkeley*, discusses this exception and, as far as I am aware, was the first decision ever applying the exception.  Ex. 26, *Berkeley*, [2021] EWCA (Civ) 551.

57.    The claimants in *Berkeley* owned a portfolio of properties in London that were managed by the defendant, Lancer Property Asset Management Limited ("Lancer").  *Id.* ¶ 3.  The

claimants' agent and representative, Dr. Mubarak Al Ahbabi, held powers of attorney for the claimants.  Through a variety of agreements executed by Lancer and Dr. Al Ahbabi (on behalf of the claimants), Lancer agreed to send payments to third parties, including two companies owned by Dr. Al Ahbabi.  The claimants alleged that Dr. Al Ahbabi had no authority as their agent to enter into those self-dealing agreements without disclosing the self-dealing to the claimants.

58.    In litigation, Lancer asserted that the claimants had long since been aware of the arrangement between Dr. Al Ahbabi and Lancer.  In particular, Lancer claimed that it had disclosed its payments to third parties during a 2012 mediation that resulted in a settlement agreement.  The claimants sought to strike those allegations from the Lancer's pleadings because they reflected without prejudice material.

59.    Lord Justice David Richards authored the opinion for the Court of Appeal in *Berkeley*, with which the other Court of Appeal judges agreed.  His opinion made the following points: (1) the without prejudice privilege is strong and generous in its application; (2) the exception identified in *Unilever* to set aside an agreement on the grounds of misrepresentation, fraud or undue influence reflects the principle that settlements, like other contracts, must be lawfully made; and (3) no roving general "justice" exception exists, even where the without prejudice material would help a party prosecute their case.

60.    First, Lord Justice David Richards emphasised the strength and breadth of the without prejudice privilege.  In support, he cited *Rush* and another English House of Lords case, *Ofulue*.  Quoting *Ofulue*, Lord Justice David Richards asserted that "Far from being mechanistic, the [without prejudice] rule is generous in its application.  It recognises that unseen dangers may lurk behind things said or written during this period, and it removes

the inhibiting effect that this may have in the interests of promoting attempts to achieve a settlement.  It is not to be defeated by other considerations of public policy which may emerge later."  Ex. 26, *Berkeley*, [2021] EWCA (Civ) 551, ¶ 24 (citing Ex. 2, *Ofulue*, UKHL 16, ¶ 12).

61.     Indeed, the privilege is so strong, Lord Justice David Richards observed, that the court in *Savings & Investment Bank Ltd. v. Fincken* [2003] EWCA (Civ) 1630 (Exhibit 27) refused to permit amendment of a pleading to include statements made by the defendant at a without prejudice meeting that showed he had perjured himself in an earlier affidavit of means, which was the central issue in that claim.  Ex. 26, *Berkeley*, [2021] EWCA (Civ) 551, ¶ 25 (citing Ex. 27, *Fincken*, EWCA (Civ) 1630, ¶ 62).[4]

62.     Lord Justice David Richards also reaffirmed the principle that the "exclusion of without prejudice material is not confined to particular categories of statements but applies to everything that is communicated in the course of without prejudice communications or negotiations."  Ex. 26, *Berkeley*, [2021] EWCA (Civ) 551, ¶¶ 38, 40.  This is because "it is very difficult to extract particular statements from their context and much more than the particular statements may need to be admitted in evidence to ensure that those statements do not give a misleading impression.  This is especially true of oral discussions, but it is true also of documents."  *Id.* ¶ 40.  Thus, in *Ofulue* the House of

---

[4] The *Fincken* holding demonstrates how narrowly courts construe the "unambiguous impropriety" exception.  In *Fincken* (cited by both the *Motorola* and *Berkeley* courts), the Court of Appeal held that settlement communications showing that one party had committed perjury could not be admitted into evidence.  Ex. 27, *Fincken*, EWCA (Civ) 1630.  The *Fincken* court explained that the "cloak of perjury" exception is a very narrow exception that does not reach statements that contradict or are inconsistent with sworn statements; rather, the exception applies when a party seeks to hide a "blackmailing *threat* of perjury" under the guise of a genuine settlement communication—i.e., a threat that one party will give perjured evidence if the other party does not drop their lawsuit.  *Id.* ¶ 57 (emphasis added).

Lords rejected the proposition that "the without prejudice rule applies only to admissions." *Id.* ¶ 40.  And Lord Justice David Richards further observed that the privilege, as in India, "is a joint privilege which can be waived only with the consent of all parties." *Id.* ¶¶ 38, 40.

63.  Second, Lord Justice David Richards explained the purpose and function of the second *Unilever* exception.  He did so by contrasting the second exception with the fourth exception.  The second exception applies to allow evidence showing that an agreement should be set aside for misrepresentation, fraud or undue influence.  The fourth exception allows one party to give evidence of what the other party said if exclusion of the evidence would act as a cloak for perjury, blackmail or other "unambiguous impropriety."  Ex. 26, *Berkeley*, [2021] EWCA (Civ) 551, ¶¶ 41-42.

64.  These exceptions are distinct and they deal with different issues.  The second exception, unlike the fourth, is directed at whether evidence that a contract has been lawfully made is protected by the privilege.  *Id.* ¶ 43.  Because a settlement contract is no different than any other contract, it may be set aside as void or voidable like any other contract.  *Id.* ¶¶ 45, 47.  The reasons for voiding a settlement agreement include fraud, misrepresentation, undue influence, duress, or, as in the *Berkeley* case, lack of authority to enter into the contract.  *Id.* ¶¶ 47-48.

65.  Because the main issue in the case was whether Dr. Al Ahbabi had authority to enter into the self-dealing agreements on behalf of the claimants, which Lancer claimed it had disclosed in the 2012 mediation statements, vitiating the allegation that Lancer had misrepresented the facts, Lord Justice David Richards held that the "without prejudice mediation statements are directly relevant" to the second *Unilever* exception.  Ex. 26,

*Berkeley*, [2021] EWCA (Civ) 551, ¶ 49.  And because those specific agreements would not be binding if they were made without authority, Lord Justice David Richards held the without prejudice communications could be admitted for the purpose of demonstrating that the contracts at issue were valid.  *Id.* ¶ 54.  In so holding, however, Lord Justice David Richards emphasised that the ruling did "not affect the principle that, outside very limited exceptions, evidence of without prejudice negotiations may not be adduced in existing or future proceedings, even if such evidence undermines a case run by one of the parties."  *Id.* ¶ 53 (citing Ex. 27, *Fincken*, EWCA (Civ) 1630).

66.     Finally, Lord Justice David Richards considered the argument whether there is a general "exception to the without prejudice rule where justice requires it," *Id.* ¶ 75, or where an issue allegedly "cannot fairly . . . be decided without recourse to evidence of without prejudice negotiations or communications," *Id.* ¶ 84.  Lord Justice David Richards declined to recognise such an exception, noting that it was "not necessary to the resolution of this appeal," and that if such an exception were to be entertained, a court would have to carefully weigh "whether this exception would involve an unacceptable interference with the public policy of encouraging compromises which is the reason for the without prejudice rule."  *Id.* ¶¶ 89-90.  Lord Justice David Richards also noted that such an exception would be open to the objection that it "would be in danger of consuming the without prejudice rule itself.  It appears to turn on the degree of relevance of the evidence to any issue raised by the resisting party and the resulting risk of injustice.  But the without prejudice rule cannot to my mind depend on shades of relevance or centrality."  *Id.* ¶¶ 73, 85.

67.     Mr. George suggests that Indian law has recognised an additional exception (not articulated in *Rush* or *Unilever*) that applies to prevent a party from submitting a false or misleading document to a court.  George Declaration ¶ 34. But the case Mr. George cites to support his argument, *Zatrix Ltd. v. MV Nikoforos*, MANU/GJ/0621/2020 (Exhibit 28), did not involve any without prejudice communications (and thus had no need to recognise exceptions to the without prejudice privilege).  In *Zatrix*, one party had sought injunctive relief to seize a vessel, arguing that the vessel's sale was unlawful.  That party had failed to include in its pleadings emails that it had sent *after* reaching a settlement agreement allowing sale of the vessel a year earlier indicating that the party consented to the sale.  Because the withheld emails were not settlement communications, the court held that the without prejudice privilege case law had "no relevance to the facts of the present case."  Ex. 28, *Zatrix*, MANU/GJ/0621/2020, ¶ 13.

68.     To conclude, the without prejudice privilege exists in India as part of its statutory law and its common law.  The privilege is informed by English common law.  It is jointly held by the parties to the settlement communication.  And it applies to *all* aspects of a settlement negotiation to protect those materials from admission and from discovery.  Indian cases have incorporated English common law to describe and apply the privilege, including the *Rush* and *Unilever* cases.  While the decisions describing the scope of the common law privilege have recognised some exceptions to the privilege, those privileges are construed narrowly, and a party invoking such exceptions must satisfy high evidentiary thresholds in order to defeat the privilege.  In particular, the "impropriety" exception is very narrowly construed and applies only in circumstances that are "truly exceptional" where there has been a substantiated showing of "unambiguous impropriety"; the exception

concerning the validity of a settlement agreement is applied only where the party seeking to defeat the privilege makes a similar substantiated showing, e.g., identifies specific documents that establish that the disputed agreement is void or voidable; and the English Court of Appeal recently considered but declined to recognise the concept of a general justice exception  Ex. 26, *Berkeley*, [2021] EWCA (Civ) 551, ¶¶ 89-90.

### C.    Section 165 of the Indian Evidence Act

69.    Finally, I understand that Mr. George asserts that an Indian court could order production of without prejudice documents if this case were in India pursuant to Section 165 of the Indian Evidence Act.  George Declaration ¶ 36.  This understanding is incorrect.  Section 165 applies only during trial, and even under its broad grant of powers, a court cannot compel testimony or documents if the information at issue is protected by the without prejudice privilege.  *See Bhatia v. Parimala*, 2006 (3) ALD 415, ¶ 24 (Exhibit 29) ("[T]hat unbridled power even has certain limitations.  The party can object for the production of the documents claiming privilege.").

70.    Section 165 authorises a judge to elicit testimony or obtain evidence during trial.  The section states:  "*The Judge may, in order to discover or to obtain proper proof of relevant facts, ask any question he pleases, in any form, at any time, of any witness, or of the parties, about any fact relevant or irrelevant; and may order the production of any document or thing: and neither the parties nor their agents shall be entitled to make any objection to any such question or order, nor, without the leave of the Court, to cross-examine any witness upon any answer given in reply to any such question: Provided that the judgment must be based upon facts declared by this Act to be relevant, and duly proved: Provided also that this section shall not authorise any Judge to compel any witness to answer any question, or to produce any document which such witness would*

34

*be entitled to refuse to answer or produce under sections one hundred and twenty-one to*

*one hundred and thirty-one both inclusive, if the question were asked or the document*

*were called for by the adverse party; not shall the Judge ask any question which it would*

*be improper for any other person to ask under sections one hundred and forty-eight or*

*one hundred and forty-nine; nor shall he dispense with primary evidence of any*

*document, except in the cases hereinbefore excepted.*"  *See* The Indian Evidence Act,

1872, sec. 165.

71.     First, Section 165 does not apply after a court has issued a final judgment involving

review of a settlement agreement.  Such a judgment necessarily incorporates a

determination that the settlement terms were lawful under Order 23 and the Indian

Contract Act.  A court may exercise its powers under Section 165 to make any inquiries

necessary to reach such a determination.  But once such determination is made, Section

165 can no longer apply.  *See Sharma v. State of Maharashtra¸* 1992 SCC Online Bom

413, ¶ 3 (Exhibit 30) (reversing lower court for applying Section 165 after final

judgment).

72.     Here, the High Court of Rajasthan has already approved the consent terms and entered a

final judgment.  In so doing, it saw no need to exercise its powers under Section 165.

Because final judgment has been entered, Section 165 no longer applies.  *See* Ex. 30,

*Sharma*, 1992 SCC Online Bom 413, ¶ 3.

73.     Second, even if Section 165 applied, the Indian Supreme Court has explained that Section

165 empowers the Court to ask questions during trial to ascertain the true facts, and a

party or his agent may not object to those questions on the basis of relevance (although he

may refuse to answer).  *Tewari v. State of U.P.*, (2010) 10 SCC 677, ¶ 37 (Exhibit 31).

But a Court cannot compel a witness to answer a question that seeks illegal, inadmissible, or protected answers.  *See id.*

74.     As the Supreme Court of India has recognised, a party does not have to answer inquiries from the Court.  Indeed, Section 165 has enumerated exceptions and restrictions on the Court's power, including that it cannot compel "inadmissible evidence."  Thus, the Section does not authorise a judge to compel testimony or documents protected by Sections 121 to 131 of the Indian Evidence Act.

75.     Specifically, Section 165 prohibits questions calling for production of without prejudice communications because of the exception under Section 131.  The Indian Evidence Act, 1872, sec. 165.  Section 131 states "*No one shall be compelled to produce documents in his possession or electronic records under his control, which any other person would be entitled to refuse to produce if they were in his possession or control, unless such last-mentioned person consents to their production*."  *Id.,* sec. 131.  Because the without prejudice privilege is jointly held, both parties holding the privilege must consent.

76.     Relatedly, the case law also recognises that Section 165 does not authorise a judge to compel an answer or document from a witness if the "witness would be entitled to refuse to answer or produce . . .  if the question were asked or the document were called for by the adverse party."  *Sharma v. Chander*, 2013 SCC Online Del 767, ¶ 13 (Exhibit 32).  That is consistent with the Supreme Court of India's ruling that the judge cannot seek to enter into evidence testimony or documents that would otherwise be inadmissible.

## IV.     ENTRY OF CONSENT TERMS

77.     For purposes of this case, in which CREXi seeks to obtain communications underlying a settlement that was entered by an Indian Court, I believe it is important to discuss Order 23 of the Indian Code of Civil Procedure, which is the provision authorising entry of

consent terms, and the Indian Contract Act.[5]  This is relevant because the High Court of Rajasthan entered the CoStar-Arcgate Consent Terms and settlement pursuant to Order 23 and the Indian Contract Act.

78.     Order 23, Rule 3 of the Indian Code of Civil Procedure states: "*Where it is proved to the satisfaction of the Court that a suit has been adjusted wholly or in part by any lawful agreement or compromise in writing and signed by the parties, or where the defendant satisfies the plaintiff in respect of the whole or any part of the subject-matter of the suit, the Court shall order such agreement, compromise or satisfaction to be recorded, and shall pass a decree in accordance therewith so far as it relates to the parties to the suit, whether or not the subject matter of the agreement, compromise, or satisfaction is the same as the subject matter of the suit: Provided that where it is alleged by one party and denied by the other that an adjustment or satisfaction has been arrived at, the Court shall decide the question; but no adjournment shall be granted for the purpose of deciding the question, unless the Court, for reasons to be recorded, thinks fit to grant such adjournment.  Explanation -- An agreement or compromise which is void or voidable under the Indian Contract Act, 1872 (9 of 1872), shall not be deemed to be lawful within the meaning of this Rule.*"  *See* Indian Code of Civil Procedure, 1908, Order 23, R. 3. The purpose of this rule is to authorise a court to enter a consent decree containing a settlement when it determines the settlement and consent terms were lawfully entered into, and are lawful.

---

[5] The Indian Contract Act states that a contract is valid if "made by the free consent of parties competent to contract, for a lawful consideration and with a lawful object, and are not hereby expressly declared to be void."  Contract Act ¶ 10.

79.     This rule reflects the general common law principles of contract formation and enforceability.  English courts recognise these same principles; for example, the *Unilever* court's second exception allows setting aside the without prejudice privilege if a party substantiates its allegations that a settlement is void or voidable for reason of fraud, misrepresentation or undue influence, or duress (per the English Court of Appeal in *Berkeley*), or lack of authority (per the English High Court in *Berkeley*).

80.     To assess whether to enter consent terms under Order 23, a judge will consider the pleadings of the parties, the claims, the relative positions of the parties, and anything else the judge considers relevant to determining whether a settlement is lawful.  As part of the Order 23 analysis, judges will regularly consider affidavits submitted by the parties in support of compromise.  *See, e.g.*, *Singh v. Devi*, *AIR* 2019 All 2569, ¶ 2 (Exhibit 33); *Gopal Das Estates & Housing Pvt. Ltd. v. Nat'l Ins. Com. Ltd.*, 2009 SCC Online Del 1179, ¶ 3 (Exhibit 34); *Chopra v. Fountainhead Motels Pvt Ltd.*, MANU/DE/2415/2015, ¶ 4(e) (Exhibit 35); *Sehgal v. State*, MANU/DE/0254/2002, ¶ 18 (Exhibit 36); *see also Nambiar v. Kurup*, 2013 SCC Online Ker 21991 (Exhibit 37) (recognizing that parties to a settlement have wide latitude to determine the form and substance of a proposed consent decree so long as it reflects "the terms of the compromise.").

81.     The High Court of Rajasthan entered the CoStar-Arcgate Consent Terms and Decree, including the supporting Kunal Bagla declaration, under Order 23.  The declaration, by order of the court, is part of the Consent Terms, and therefore part of the judgment.  *See* Consent Terms ¶ 6.  When entering consent terms under Order 23, the court "put[s] its imprimatur upon the consent terms and ma[kes] it a decree of the Court."  *Bank of Baroda v. Daya*, (2004) 1 SCC 360, ¶ 14 (Exhibit 38).

82.   As a matter of Indian law, the High Court of Rajasthan could not have approved the Consent Terms and entered its judgment before first concluding that the Consent Terms (including the declaration) were lawful, that the entire settlement agreement was not void or voidable, and that the settlement agreement reflected the free consent of the parties.  If the High Court had determined otherwise, it could not have entered its decree.

83.   Although a third party can intervene in a proceeding to determine whether to approve consent terms between other parties, once a court enters consent terms (which then have the force and effect of a final judgment), no party can challenge the decree as unlawful by instituting a new lawsuit.  Order 23 Rule 3A states that "No suit shall lie to set aside a decree on the ground that the compromise on which the decree is passed was not lawful." The Supreme Court has affirmed that this rule extends to third parties.  *See Singh v. Singh*, 2020 SCC Online SC 444, ¶ 23 (Exhibit 39) (holding successor-in-interest of party to consent terms was barred from challenging consent terms on the basis of alleged fraud).

84.   The High Court's entry of a decree resolving the litigation between Arcgate and CoStar under Order 23 is significant because it reflects a final determination of Indian law that the settlement agreement between Arcgate and CoStar is valid and enforceable, and not void or voidable.

## V.    INTERNATIONAL COMITY

85.   I must also discuss the importance of international comity in Indian law.  Indian courts recognise that the principle of comity of courts (in the international context, "comity of nations"), informed by English and American authorities, refers "to the concept that the courts should not act in a way that demeans or in any way undermines the jurisdictions, laws or judicial decisions of another jurisdiction."  *Varghese v. Tower Vision Ltd.*, 2012

SCC Online Del 5728, ¶ 47 (Exhibit 40).  Derived from English, American, and Indian

common law, the rule "requires that the court should gauge the effect of the proceedings

instituted in a foreign court on the proceedings instituted before itself and let the decision

in a previously instituted suit in a foreign country determine the effect on the proceedings

before it."  *Id.* ¶ 49.  Because of this principle, the Supreme Court of India has held that

raising an issue already litigated in another court is "an abuse of the process of the court

and contrary to the principles of justice and public policy."  *K.K. Modi v. K. N. Modi*,

AIR 1998 SC 1297 ¶ 44 (Exhibit 41).

86.     The rule is practical, not formalistic.  For example, "if the plaintiff has chosen to put his

case in one way, he cannot thereafter bring the same transaction before the court, put his

case in another way and say that he is relying on a new cause of action."  Ex. 40,

*Varghese*, 2012 SCC Online Del 5728, ¶ 44.  And it is not dependent on the party

claiming abuse to satisfy the "strict rule of res judicata or the requirement of issue

estoppel."  *Id.* ¶ 45.  The important public policy the rule vindicates is that "the decisions

pronounced by courts of competent jurisdiction should be final, unless they are modified

or reversed by appellate authorities; and the other principle is that no one should be made

to face the same kind of litigation twice over, because such a process would be contrary

to considerations of fair play and justice."  *Id.* ¶ 51 (quoting *Nagabhushana v. State of

Karnataka*, AIR 2011 SC 1113, ¶ 19 (Exhibit 42)).  For that reason, the rule's application

"is not confined to the issues which the court is actually asked to decide, but [] it covers

the issues or facts which are so clearly part of the subject-matter of the litigation and so

clearly could have been raised that it would be an abuse of the process of the court to

allow a new proceeding to be started in respect of them."  Ex. 40, *Varghese*, 2012 SCC

Online Del 5728, ¶ 51 (quoting Ex. 42, *Nagabhushana v. State of Karnataka*, AIR 2011 SC 1113, ¶ 20).

87.    International comity would prevent an Indian court from allowing a party to challenge any determination underlying a foreign court's final judgment when that party had opportunity to participate in the foreign court's proceedings.  To use the CoStar-Arcgate litigation as an example, the High Court of Rajasthan determined that the Consent Terms, including the Kunal Bagla declaration, were lawful under Indian law.  The entry of those terms constitutes a final judgment of an Indian court.  In making that order, the High Court adjudged as a matter of law that the consent terms were not a product of fraud, misrepresentation, undue influence or any other legal impropriety.  Any attempt to undo or discredit the Indian court's order would therefore be a violation of the principle of comity; which comity an Indian court would extend to a foreign court were the relative positions of the courts reversed.  *See*, *e.g.*, *Alcon Elecs. Pvt. Ltd. v. Celem S.A. of France*, (2017) 2 SCC 253, 262 ("The principles of comity of nations demand us to respect the order of English Court") (Exhibit 43); Ex. 40, *Varghese*, 2012 SCC Online Del 5728, ¶ 53 (declining to interfere with an order of the Supreme Court of Israel).  And any attempt to obtain CoStar and Arcgate's settlement correspondence would run afoul of comity principles because that effort would undermine the laws of India.

88.    The principle thus prevents a party from choosing not to engage in an original proceeding in one court but nevertheless attack the outcome of that proceeding in another court.  *See* Ex. 40, *Varghese*, 2012 SCC Online Del 5728, ¶ 47 ("The court has to give thus due credit to the justice dispensation of the court of another jurisdiction.").  Indian courts allow interested third parties to intervene in an action by filing an application for

intervention.  A party's knowing failure to intervene in a proceeding prevents that party from raising any natural or due process arguments because knowing failure to intervene constitutes waiver of that party's right to object to the outcome of the adjudication.  *See Bd. of Directors, Himachal Pradesh Transport Corp. v. Rahi*, (2008) 11 SCC 502, ¶ 8 (Exhibit 44); *see also  Mitra v. Yule & Co. Ltd.*, (1997) 10 SCC 386 (Exhibit 45); Ex. 15, *Lindsay*, AIR 2021 Cal 24, ¶¶ 39, 41 (party waived right to participate in arbitration proceeding).  That rule is especially salient here because CREXi's contentions about the propriety of the consent terms "so clearly could have been raised [before the High Court] that it would be an abuse of the process of the court to allow a new proceeding to be started in respect of them."  Ex. 40, *Varghese*, 2012 SCC Online Del 5728, ¶ 51.

89.    An Indian court would not allow a party to stand silent with respect to an action in one jurisdiction and, if unhappy with the result, challenge the basis for that result in *a different* jurisdiction.  *Id.* ¶ 53 ("Any indulgence by this court will result in causing serious interference with the process of justice of the foreign court.").  To allow a party to do so would constitute such an abuse of process that the principle of comity would bar that party's request.  Granting such relief would undermine the authority and judgment of the original court.  *See id.* ¶ 53 (denying requested relief because it could be "in serious conflict with the orders passed by the Israel courts and such a situation would be in clear transgression of the principle of comity of courts and will result in creating anomalies and irreconcilable situation because of the continuation of two parallel proceedings before two competent courts of jurisdiction of two sovereign states.").  For apparent reasons, the principle of comity is relevant to the question of CREXi's ability to challenge the basis of

the High Court's final judgment and to obtain privilege correspondence and work product related to that judgment.

## VI.   APPLICATION OF THE WITHOUT PREJUDICE PRIVILEGE TO THE ARCGATE-COSTAR SETTLEMENT NEGOTIATIONS

90.   I recognise that, in evaluating the content and application of foreign law, it is ultimately this Court's responsibility to "determin[e] foreign law" as a matter of law by reference to "any relevant material or source."  Fed. R. Civ. P. 44.1.  Thus far, I have limited my discussion of Indian law to a statement of those legal principles that I understand to be relevant to this case.  In an effort to more fully assist this Court, however, I set forth below my view of the proper application of those legal principles to the facts of this case. *See, e.g.*, *Universe Sales Co. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th Cir. 1999) (holding that district court should have credited declaration that applied Japanese law to the facts of the case); *Fabricant v. Elavon, Inc.*, No. 20-cv-02960, 2021 WL 1593238, at *3 (C.D. Cal. Mar. 8, 2021) ("[A] court is free to consider a foreign law expert's opinion even on ultimate legal conclusions."); *Winn v. Schafer*, 499 F. Supp. 2d 390, 396 n.28 (S.D.N.Y. 2007) (rejecting argument that foreign-law expert "may not opine as to the 'ultimate application of the (foreign) law to the facts of the case'").

91.   I understand that CREXi seeks discovery of settlement correspondence and documents exchanged between CoStar and Arcgate, an Indian entity, during settlement negotiations. For the reasons that follow, my opinion is that those communications and documents are protected from discovery by the without prejudice privilege.

92.   As a threshold matter, the without prejudice privilege applies to CoStar and Arcgate's settlement communications.  As the Supreme Court of India has held, the privilege applies to communications "written for the purpose of a genuine attempt to compromise a

dispute between the parties." Ex. 6, *Peacock*, 12 SCC 673, ¶ 43. As evidenced by the Consent Terms, the parties entered into a settlement agreement following good-faith settlement negotiations. The agreement confirms that each party to the agreement "(a) was represented by legal counsel of such Party's choice in connection with the execution of these Consent Terms; (b) has read and understood all aspects of these Consent Terms and all of its effects; and (c) has executed these as free and voluntary act of his or its own free will and without any threat, force, fraud, duress, or coercion of any kind." Consent Terms ¶ 3.

93.     Because the without prejudice privilege applies, it shields all of CoStar and Arcgate's settlement communications and related documents from discovery. Indian law recognises that the privilege applies to *all* settlement materials so long as those materials are "part of a body of negotiation correspondence." Ex. 6, *Peacock*, 12 SCC 673, ¶ 43; *see also* Ex. 1, *Unilever*, 1 WLR 2436, 2443–44 (holding that the privilege protects all settlement communications). All communications and documents created for purposes of settlement negotiations, therefore, are protected by the privilege.

94.     CREXi has advanced an argument for circumventing the without prejudice privilege that is legally flawed and rests on unsubstantiated allegations. CREXi and Mr. George have argued that discovery of the settlement correspondence is appropriate under a "justice of the case" exception because CREXi purportedly seeks to uncover whether CoStar engaged in unethical or illegal behavior in settling the Arcgate suit or obtaining testimony from Arcgate's CEO Mr. Bagla in connection therewith. CREXi Mot. Section III.B.2; George Declaration ¶ 32; 29 April 2022 Letter from Ms. McCloskey to Ms. Greenwald. CREXi appears to assert that Mr. Bagla's testimony is "misleading" or "false" and that

CoStar acted improperly in offering to release its claims against Arcgate in the course of the parties' settlement negotiations.  CREXi Mot. Section III.A.2.  That argument is misguided for several reasons.

95. First, there is no general "justice of the case" or "necessity" exception to the without prejudice privilege.  To the contrary, the Court of Appeal in *Berkeley*—a case CREXi has cited in its correspondence with CoStar—recently declined to recognise such an exception, noting that it risked an "unacceptable interference with the public policy" embodied by the without prejudice rule.  Ex. 26, *Berkeley*, [2021] EWCA (Civ) 551, ¶ 89.  And though the House of Lords used that phrase in *Rush & Tompkins*, Lord Griffiths associated it with distinct exceptions to the privilege (which I described above). None of those exceptions apply here:  there is no question that the parties reached a settlement; there is no claim of bankruptcy; no alleged threat of blackmail; no question of costs after judgment; and CREXi does not seek the communications to establish an "independent fact" unrelated to the litigation.  And the House of Lords has likewise cautioned against expanding the list of without prejudice privilege exceptions to serve the ambiguous notion of the "justice of the case."  *See* Ex. 2, *Ofulue*, [2009] UKHL 16, ¶ 43 (declining to create a new exception based on the "justice of the case").

96. Second, CREXi's mere allegation of impropriety is insufficient to invoke the "unambiguous impropriety" exception the Court of Appeal identified in *Unilever*.  As the Court of Appeal held in *Motorola*, a party seeking to invoke the "unambiguous impropriety" exception must establish more than a "plausible evidential basis"; rather, the party must show an "unambiguous impropriety.  Nothing less will do."  Ex. 3, *Motorola*, [2021] EWCA (Civ) 11, ¶¶ 60, 64.  In other words, courts should be wary of "tak[ing] at

45

face value the evidence of a party seeking to disapply the without prejudice rule," and should require the party claiming an exception to the privilege to substantiate their argument unambiguously.  *Id.* ¶ 31.  This principle requires not only that any evidence introduced in order to defeat the privilege must be "rigorously scrutinised," but also that the benefit of the doubt be given to the party asserting the privilege:  even where it is "possible, or even probable," that the privilege is being used to cover up an impropriety, the court should not disapply the privilege unless there is simply "no ambiguity" on the matter.  *Id.*  Mr. George fails to acknowledge this demanding standard.  *See* George Declaration ¶¶ 32-35.

97.    CREXi does not establish a "plausible evidential basis," much less substantiate an "unambiguous impropriety" that would support an exception to the without prejudice privilege.  CREXi asserts that Mr. Bagla was pressured into signing the declaration that was offered in support of, and incorporated into, the Consent Terms.  CREXi Mot. III.A.2; 8 April 2022 Letter from W. Braunig to N. Boyle at 5.  CREXi has not offered or referred to any evidentiary support for that assertion.  To the extent that CREXi's argument rests, as it appears to, on the notion that the existence of CoStar's case and CoStar's indication of its willingness to settle that case against Arcgate "pressured" Mr. Bagla into agreeing to the Consent Terms, such argument is obviously defective as a matter of law.  The whole purpose of the without prejudice privilege is to protect the integrity of the settlement process, a process that necessarily involves an offer from one party to give the other a release from actual or potential liability.

98.    As noted above, CREXi also seeks to uncover any improper attempt by CoStar to interfere with a witness and to uncover the bias or prejudice of Mr. Bagla. CREXi Mot.

III.B.1; 29 April 2022 Letter from E. McCloskey to E. Greenwald at 3.  And it has argued that CoStar has "improperly compensated Arcgate . . . in exchange for Arcgate's testimony," 17 February 2022 Letter from W. Braunig to N. Boyle at 1; engaged in "unethical and potentially unlawful actions in compensating Arcgate for Mr. Bagla's testimony," 29 April 2022 Letter from E. McCloskey to E. Greenwald at 2; and that "CoStar released significant damages claims against Arcgate, and dropped the seizure order CoStar had obtained for Arcgate's servers, in exchange for the content of Mr. Bagla's testimony," 8 April 2022 Letter from W. Braunig to N. Boyle at 2.  These assertions fail for similar reasons.  As an initial (and dispositive) matter, that CREXi states that it is seeking to "uncover" facts underscores that it does not now have the required evidentiary basis (a substantiated showing of "unambiguous impropriety") to support this "truly exceptional" exception.  Moreover, CREXi does not explain what CoStar did beyond seeking testimony as part of a settlement, which is not uncommon in India, and was reviewed and decreed by the High Court.  The potential bias of a witness provides no basis to circumvent the privilege either – such an (nonexistent) exception would threaten to swallow the rule.  And CREXi's unadorned claims of potential perjury are unsubstantiated (despite the Consent Terms now being eight months old) and difficult to credit on their face (for Mr. Bagla's testimony repeatedly quotes and relies upon written statements by, and correspondence with, CREXi).  Moreover, CREXi submitted a declaration from Vice President Lawson Dees purporting to challenge Mr. Bagla's testimony, but Mr. Dees does not dispute the central thrust of Mr. Bagla's declaration— that Arcgate accessed CoStar websites, and copied and verified content on those sites, at the direction of and on behalf of CREXi—or Mr. Bagla's factual descriptions of work

47

done by Arcgate on CREXi's behalf.  Rather, Mr. Dees' declaration focuses only on two
(of many) incidents described in Mr. Bagla's testimony and offers a different
interpretation of the *purpose* of particular assignments CREXi gave to Arcgate—not the
fact that they occurred.  Dees Declaration ¶¶ 7–12.  Mr. Dees does not contradict Mr.
Bagla so much as provide his own gloss on events—as he is entitled to do.  His testimony
does not demonstrate that Mr. Bagla's testimony is "misleading," much less false.
CREXi's claim that Mr. Bagla's testimony was "perjured" is inconsistent with the facts,
as described by Mr. Bagla and Mr. Dees, the High Court's approval of Mr. Bagla's
testimony, and CREXi's failure to challenge it before that court, and moreover does not
fit with any of the recognised exceptions to the privilege.  As discussed above, the "cloak
of perjury" exception has been narrowly applied to settlement negotiations where a party
threatened to commit perjury if a lawsuit were not dropped—not the alleged circumstance
here.[6]

99.     CREXi's failure to provide evidence justifying applying the "unambiguous impropriety"
        exception is even more striking because CREXi has not identified anything in the
        Consent Terms that is improper.  On their face they were negotiated between experienced
        counsel, and Arcgate specifically represented that they were executed "without any

------

[6] Here, the invocation of that exception makes no sense on its face for an additional reason.  In a
case where a party, in the course of settlement talks, threatened to perjure itself, it stands to
reason that—if the person challenging the privilege could substantiate that occurrence—they
would need access to the settlement communications to prove the allegation.  But here, if there
truly was perjury, CREXi already has the testimony.  The (alleged) perjury is in no way
"cloaked" by the settlement discussions—it is out in the open, in a public filing.  If CREXi's
response is that it would like to see how that alleged perjury came to pass, that attenuated and
speculation-based desire to engage in what would amount to a fishing expedition is even further
removed from the exception, and underscores just how far CREXi is from being able to
substantiate "unambiguous impropriety."

threat, force, fraud, duress, or coercion of any kind." Consent Terms ¶ 3. To the extent that CREXi believes that Mr. Bagla's declaration or any of the recitals in the Consent Terms misrepresented the nature of the relationship between CREXi and Arcgate, CREXi is well positioned to adduce evidence to that effect. For its own reasons CREXi declined to do so before the decree was entered by the High Court incorporating the Consent Terms. I am not aware of any efforts by CREXi to do so, which reinforces my conclusion that CREXi's unsubstantiated allegations cannot justify application of the "unambiguous impropriety" exception.

100. The second *Unilever* exception—concerning challenges to the validity of a settlement agreement on the basis of misrepresentation, fraud, or undue influence—also does not apply here. That exception simply ensures that a party to a voidable settlement may provide evidence that the settlement is void. To my knowledge, English courts have applied the exception only once, in the *Berkeley* case. As explained above, that case involved a dispute over whether an agreement made after mediation was valid. The issue was whether one party made a disclosure to the other party during the mediation. The claimants argued that no such disclosure occurred, and the defendants argued that it did. Because the validity of the settlement turned on whether the disclosure had been made, and both parties had put the existence of the disclosure at issue, the Court of Appeal held, over objection by the claimants, that the evidence was admissible. But the Court of Appeal's decision in *Berkeley* makes clear that the second *Unilever* exception is "directed to the [] issue as to whether an apparent agreement has been made with the necessary consent of the parties to it." Ex. 26, *Berkeley*, [2021] EWCA (Civ) 551, ¶ 47.

101.    Those circumstances do not obtain here.  CREXi was not a party to the settlement

agreement between Arcgate and CoStar.  And neither Arcgate nor CoStar have claimed

that the settlement agreement is legally defective.  To the contrary, when entering into the

agreement, they represented and warranted that each party was represented by counsel,

understood the settlement terms, and freely entered into the settlement without any threat,

force, fraud, duress, or coercion of any kind.  Moreover, the High Court of Rajasthan

examined the Consent Terms, found that the terms of the settlement were lawful, and

determined that the agreement was a valid contract as a matter of law.  CREXi did not

seek to intervene to argue otherwise and thus waived that argument, and in any event

even now has not provided any reason to believe otherwise.

102.    CREXi's bare allegations are thus insufficient for any number of reasons to invoke the

second *Unilever* exception.  As the *Motorola* court recognised, the protection the law

provides to without prejudice communications is "inconsistent . . .  with an approach

which simply takes at face value the evidence of a party seeking to disapply the without

prejudice rule."  Ex. 3, *Motorola*, [2021] EWCA (Civ) 11, ¶ 31.  And, unlike the

defendants in *Berkeley*, CREXi has not identified any communication evidencing that the

settlement—contrary to CoStar and Arcgate's representations and the High Court's

judgment—is unlawful.  CREXi has offered no basis (setting aside speculation) for

asserting that the settlement agreement between CoStar and Arcgate should be set aside.

103.    Furthermore, at this date, the settlement agreement *may not* be set aside on the basis of

CREXi's allegations because the agreement has been incorporated into a High Court

judgment with the force of law.  That constitutes a legal ruling that the agreement is valid

and lawful, and not void or voidable.  Moreover, CREXi chose not to intervene in the

Arcgate litigation to challenge entry of the Consent Terms and thus has waived its right to challenge the agreement.  And, in any case, Order 23 precludes CREXi from challenging the Consent Terms after the fact.

104.    Based on the foregoing, I conclude that the without prejudice privilege protects all settlement communications between CoStar and Arcgate that are included within the scope of the following CREXi discovery requests:

(1)    Request No. 92.  "All COMMUNICATIONS with ARCGATE, including, but not limited to, COMMUNICATIONS with any counsel or representative for ARCGATE."  All communications and documents generated as part of settlement correspondence between CoStar and Arcgate are protected by the without prejudice privilege.

(2)    Request No. 93.  "All DOCUMENTS and COMMUNICATIONS RELATING TO the November 24, 2021 Consent Terms and Permanent Injunction executed by ARCGATE and COSTAR, including any drafts of that document and any COMMUNICATIONS RELATING TO that document."  These documents and communications are protected by the without prejudice privilege because they are part of the body of settlement correspondence.

(3)    Request No. 94.  "All DOCUMENTS and COMMUNICATIONS RELATING TO the declaration executed by Kunal Bagla on November 24, 2021, including any drafts of that declaration and any COMMUNICATIONS RELATING TO that declaration."  These documents and communications are protected by the without prejudice privilege because they are part of the body of settlement correspondence.

(4)     Request No. 97.  "All DOCUMENTS and COMMUNICATIONS RELATING

TO any claim for damages or other relief YOU demanded or requested from

ARCGATE."  These documents and communications are protected by the without

prejudice privilege because they are part of the body of settlement

correspondence.

(5)     Request No. 98.  "All DOCUMENTS RELATING TO ARCGATE."  All

documents relating to Arcgate that are part of the Arcgate settlement

correspondence are protected by the without prejudice privilege.

## VII.   CONCLUSION

105.   Based on the foregoing, I conclude that:

(1)     The Indian without prejudice privilege protects all settlement communications

and related documents from discovery, even after a settlement is reached.  There

are narrow exceptions for cases involving an extraordinary showing of

unambiguous improprieties during settlement, or where a party is able to

substantiate an allegation that a settlement is void or voidable.  To determine

whether a party has sufficiently substantiated its claim for an exception, the law

has rejected "an approach which simply takes at face value the evidence of a party

seeking to disapply the without prejudice rule."  Ex. 3, *Motorola*, [2021] EWCA

(Civ) 11, ¶ 31.  For that reason, the necessary conditions to find that those narrow

exceptions apply are rarely met.  The privilege is also jointly held by the parties to

the settlement and one party cannot unilaterally waive the privilege without the

other party's consent.

(2)     The High Court of Rajasthan issued a binding final judgment pursuant to Order

23 of the Indian Code of Civil Procedure that held, as a matter of Indian law, that

the settlement agreement between CoStar and Arcgate was valid and lawful, and not void or voidable.

(3)     Under Indian law, an interested third party, such as CREXi, may intervene to challenge a court's entry of consent terms, such as those entered by the High Court of Rajasthan in its final judgment resolving the dispute between CoStar and Arcgate.  Under Indian law, a third party's failure to intervene constitutes a waiver of that party's right to object to the outcome of the adjudication.

(4)     CREXi's attempt to avoid the without prejudice privilege by drawing into doubt the validity or propriety of the consent terms entered by the High Court of Rajasthan pursuant to its binding judgment must fail as a matter of Indian law for two reasons:  first, because such terms have been adjudged as valid and enforceable under Indian law by the High Court of Rajasthan; and second, because any objections that CREXi might now raise in respect to the consent terms or the settlement proceedings as a whole are waived.

(5)     Moreover, for the reasons discussed above, CREXi has been unable to show that any exception to the without prejudice privilege applies.  CREXi's requested discovery to "uncover" evidence of impropriety is inconsistent with the law's zealous protection of the without prejudice privilege.  To benefit from the exception, CREXi must establish that an "unambiguous impropriety" occurred during settlement, and all it has alleged is that CoStar released Arcgate from liability as part of a compromise that included representations made under oath in support of the Consent Terms.  That utterly unremarkable and wholly common fact pattern does not establish (or even imply) any impropriety.  Moreover,

53

CREXi's unadorned claims of potential perjury by Mr. Bagla are unsubstantiated, and the "cloak of perjury" exception, in any event, is only applied in narrow circumstances, not present here, in which it is alleged that a party threatened to commit perjury if a lawsuit were not dropped.

(6)   Further, CREXi has not met its burden to apply the second *Unilever* exception to set aside the Consent Terms.  CREXi has not identified the without prejudice communication it seeks to obtain that would show the Consent Terms are unlawful.  More importantly, CREXi is precluded from raising this exception because it is directed toward setting aside an agreement, and CREXi has not demonstrated it wants to set aside the Consent Terms.  Its stated purpose for discovery into the Arcgate negotiations is to obtain evidence to further its unsubstantiated claim of Mr. Bagla's "bias or prejudice."  That is not a proper end justifying application of the second *Unilever* exception.

(7)   Indian courts recognise and abide by the principle of comity of courts.  That principle restrains Indian courts from entering any order that could interfere with the order of another court or undermine the laws of another jurisdiction.  Indian courts extend that same comity to foreign courts under the principle of comity of nations.

(8)   Under those principles, Indian courts would recognise that CREXi's attempts to challenge or undermine the settlement and Consent Terms between CoStar and Arcgate is an abuse of process.  This is because CREXi did not intervene in the Arcgate litigation and instead chose to file a post-judgment discovery request in a foreign jurisdiction to obtain materials it could not have obtained in the Arcgate

54

litigation.  CREXi's actions, if successful, would undermine the judgment of the

High Court of Rajasthan and violate the principle of comity of courts.  Indian

courts would not facilitate such an abuse of process if a party attempted to use

Indian courts to undermine a foreign judgment.

(9)    Mr. George's interpretation and application of Indian and English law is incorrect.

His ultimate conclusion that the without prejudice privilege does not protect the

CoStar-Arcgate settlement communications from discovery from CREXi for any

purpose is, in my view, wrong.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on: _August, 17, 2002_

Justice B.N. Srikrishna

55

# ATTACHMENT A

## JUSTICE BELLUR NARAYANASWAMY SRIKRISHNA

Born on 21st May 1941.

## Educational

Bachelor of Science, Bachelor of laws and Master of Laws from Bombay University
Master of Arts in Sanskrit from the Mysore University
Diploma in Urdu, and a post-graduate Diploma in Indian Aesthetics from Mumbai University.

## Professional

Enrolled as an advocate of the Bombay High Court on 23.12.1962 and specialised in the field of Labour and Industrial Law.
Designated as a Senior Advocate of the Bombay High Court on 17.6.1987. Counsel for a large number of employers both in the public and private sector and appeared in a number of cases in the High Courts and the Supreme Court, which laid down fundamental principles of labour law.

Additional Judge of the Bombay High Court on 30th July 1990 and was made a Permanent Judge from 3rd October 1991.

Chief Justice of Kerala High Court from 6th September 2001
Judge of the Supreme Court of India from 3rd October 2002, which office he demitted on21st May 2006.

Doing Chamber practice and also practising as an Arbitrator since 2006 till date.

## Commissions and Committees

One man Commission of Inquiry to investigate into the riots and violent incidents that shook Mumbai in December 1992/January 1993. The report submitted in February 1998 has generated wide debate in India and abroad.

1

Invited by the United Nations High Commissioner for Refugees to attend a seminar on refugee laws at Delhi and to attend an international conference on the subject in Geneva and Berne in October 2000.

Invited by the Universities of Berkeley and Stanford, U.S.A., Bar Ilan, Israel and Oxford, U.K. to deliver lectures on Socio-legal subjects.

Chairman of the Sixth Central Pay Commission [5th October 2006-March 2008].

Chairperson of the Citizens' Committee for monitoring Security Issues in Mumbai by the High Court of Bombay.

Appointed by the Supreme Court of India in February/March 2009 to enquire into the incidents of violent clashes between lawyers and police in the premises of the Madras High Court, Chennai.

Chairperson of the Committee for Consultations on the situation in Andhra Pradesh to consider the demand for bifurcation of the State of Andhra Pradesh [3rd February 2010-30th December 2010].

Chairperson of the Financial Sector Legislative Reforms Commission appointed by the Government of India [24th March 2011-22nd March 2013].

Chairman of the High Level Committee to Review Institutionalization of Arbitration Mechanism in India [29th December 2016-3rd August 2017].

Chairperson of the Committee of Experts of Data Protection Framework for India to identify key data protection issues in India and recommend methods of addressing them.[31st July 2017-27th July 2018].

Chairperson of the Advisory Committee on Individual Insolvency & Bankruptcy from 15th September 2017.

## **Publications**

"Maxwell vs Mimamsa", paper published in 2004 (6) SCC Journal page 49.

"Skinning a Cat", paper published in 2005 (8) SCC Journal page 3.

2

"Pre-British Human Rights Jurisprudence", paper published in April-June, 2010, NUJS Law Review page 129.

Chapter on "Conflict and Harmony: A genesis of Legal and Social Science; in The History and Philosophy of Science.

Chapter on "Judicial Independence" in The Oxford Handbook of the Indian Constitution, 2016

"A Conscious Practice: Ethics and the Practice of Law', in 'A Legacy of Law, published by Bombay Bar Association, 2016

 "Foundations of Ancient Indian Society" in "Courts of India Past and Present" published under aegis of the Supreme Court of India, 2016-2017.


***************

# ATTACHMENT B

## Index of Exhibits to Justice B.N. Srikrishna Opinion Letter

| Exhibit No. | Case Name |
| --- | --- |
| 1. | *Unilever Plc v. Procter & Gamble Co.,*<br>[2000] 1 WLR 2436 (Eng.) |
| 2. | *Ofulue v. Bossert,*<br>[2009] UKHL 16, [2009] 1 A.C. 990 (appeal taken from Eng.) |
| 3. | *Motorola Sols., Inc. v. Hytera Commc'n's Corp. Ltd.,*<br>[2021] EWCA (Civ) 11, [2021] QB 744 (Eng.) |
| 4. | *State of Punjab v. Sodhi Sukhdev Singh,*<br>AIR 1961 SC 493 |
| 5. | *Howard v. Wilson,*<br>1878 ILR Cal 231 |
| 6. | *Peacock Plywood Pvt. LTD v. Oriental Ins. Co.,*<br>(2006) 12 SCC 673 |
| 7. | *Muniswamy v. State of Mysore,*<br>(1963) SCC Online Kar 55 |
| 8. | *Larsen & Toubro Ltd. v. Prime Displays Pvt. Ltd.,*<br>2002 SCC Online Bom 267 |
| 9. | *Superintendent (Tech. I) Central Excise, I.D.D. Jabalpur v. Pratap Rai,*<br>(1978) 3 SCC 113 |
| 10. | *Chairman & M.D., N.T.P.C. Ltd. v. Reshmi Constrs., Builders & Contractors,*<br>(2004) 2 SCC 663 |
| 11. | *Agarwal v. Cent. Bank of India,*<br>2016 SCC Online Bom 10368 |
| 12. | *Delhi Baroda Rd. Carrier Pvt. Ltd. v. Mahindra & Mahindra*<br>*Fin. Servs. Pvt. Ltd.,*<br>MANU/Bom/3786/2018 |
| 13. | *Lucent Techs. Inc. v. ICICI Bank Ltd.,*<br>MANU/Del/2717/2009 |
| 14. | *G. Premjee Trading Priv. Ltd. v. Noormohammed,*<br>MANU/Bom/1392/2021 |
| 15. | *Lindsay Int'l Priv. Ltd. v. Laxmi Niwas Mittal,*<br>AIR 2021 Cal 24 |
| 16. | Competition Comm'n of India, *Matrimony.com Ltd. v. Google LLC,*<br>Case Nos. 07 & 30 of 2012 (Decided Feb. 8, 2018) |
| 17. | *Rush & Tompkins Ltd. v. Greater London Council,*<br>[1989] AC (HL) 1280 (appeal taken from Eng.) |
| 18. | *Cutts v. Head,*<br>[1984] Ch 290 (Eng.) |
| 19. | *Mahindra Elec. Mobility Ltd. v. CCI,*<br>2019 SCC Online Del 8032 |
| 20. | *Kalyani Packaging Indus. v. Union of India,*<br>(2004) 6 SCC 719 |
| 21. | *Flipkart Internet Pvt. Ltd. v. Competition Comm'n of India,*<br>MANU/KA/3124/2021 |

| Exhibit No. | Case Name |
|---|---|
| 22. | *Havels India Ltd. v. Electrium Sales Ltd.*, MANU/Del/939/2013 |
| 23. | *Sifandros Carrier Ltd. v. Lmj Int'l Ltd.*, 2018 SCC Online Cal 7146 |
| 24. | *Kitcat v. Sharp*, [1882] 48 LT 64 (Eng.) |
| 25. | *Muller v. Linsley*, [1996] 1 PNLR 74 |
| 26. | *Berkeley Square Holdings v. Lancer Prop. Asset Mgmt. Ltd.*, [2021] EWCA (Civ) 551 |
| 27. | *Savings & Investment Bank Ltd. v. Fincken*, [2003] EWCA (Civ) 1630 |
| 28. | *Zatrix Ltd. v. MV Nikoforos*, MANU/GJ/0621/2020 |
| 29. | *Bhatia v. Parimala*, 2006 (3) ALD 415 |
| 30. | *Sharma v. State of Maharashtra*, 1992 SCC Online Bom 413 |
| 31. | *Tewari v. State of U.P.*, (2010) 10 SCC 677 |
| 32. | *Sharma v. Chander*, 2013 SCC Online Del 767 |
| 33. | *Singh v. Devi*, AIR 2019 All 2569 |
| 34. | *Gopal Das Estates & Housing Pvt. Ltd. v. Nat'l Ins. Com. Ltd.*, 2009 SCC Online Del 1179 |
| 35. | *Chopra v. Fountainhead Motels Pvt Ltd.*, MANU/DE/2415/2015 |
| 36. | *Sehgal v. State*, MANU/DE/0254/2002 |
| 37. | *Nambiar v. Kurup*, 2013 SCC Online Ker 21991 |
| 38. | *Bank of Baroda v. Daya*, (2004) 1 SCC 360 |
| 39. | *Singh v. Singh*, 2020 SCC Online SC 444 |
| 40. | *Varghese v. Tower Vision Ltd.*, 2012 SCC Online Del 5728 |
| 41. | *K.K. Modi v. K. N. Modi*, AIR 1998 SC 1297 |
| 42. | *Nagabhushana v. State of Karnataka*, AIR 2011 SC 1113 |
| 43. | *Alcon Elecs. Pvt. Ltd. v. Celem S.A. of France*, (2017) 2 SCC 253 |

2

| Exhibit No. | Case Name |
|---|---|
| 44. | *Bd. of Directors, Himachal Pradesh Transport Corp. v. Rahi*, (2008) 11 SCC 502 |
| 45. | *Mitra v. Yule & Co. Ltd.*, (1997) 10 SCC 386 |

3