JESSICA STEBBINS BINA (BAR NO. 248485)
jessica.stebbinsbina@lw.com
ELYSE M. GREENWALD (BAR NO. 268050)
elyse.greenwald@lw.com
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5500
Fax: 424.653.5501

*Attorneys for Plaintiffs and Counterdefendants*
*CoStar Group, Inc., and CoStar Realty Information, Inc.*

[Additional Counsel Listed on the Next Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> COMMERCIAL REAL ESTATE EXCHANGE, INC., <br><br> Defendant. | CASE NO. 2:20-cv-8819-CBM-AS <br><br> **COSTAR'S NOTICE OF MOTION AND MOTION TO DISMISS CREXI'S AMENDED COUNTERCLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |
| COMMERCIAL REAL ESTATE EXCHANGE, INC., <br><br> Counterclaimant, <br><br> v. <br><br> COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., <br><br> Counterdefendants. | Date: December 6, 2022 <br> Time: 10:00 a.m. <br> Courtroom: 8D <br> Before: Hon. Consuelo B. Marshall <br><br> Trial Date: October 3, 2023 |

1 │ BELINDA S LEE (BAR NO. 199635)
2 │ belinda.lee@lw.com
   │ LATHAM & WATKINS LLP
3 │ 505 Montgomery Street
4 │ Suite 2000
   │ San Francisco, CA 94111
5 │ Tel: 415.391.0600
6 │ Fax: 415.395.8095

7 │ NICHOLAS J. BOYLE*
8 │ nicholas.boyle@lw.com
   │ SARAH A. TOMKOWIAK*
9 │ sarah.tomkowiak@lw.com
   │ DAVID L. JOHNSON**
10 │ david.johnson@lw.com
11 │ LATHAM & WATKINS LLP
12 │ 555 Eleventh Street, NW
   │ Suite 1000
13 │ Washington, D.C. 20004
   │ Tel: 202.637.2200
14 │ Fax: 202.637.2201
15 │
16 │ *Admitted pro hac vice
   │ **Pro hac vice forthcoming
17 │

**TO DEFENDANT AND COUNTERCLAIMANT AND ITS ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that on December 6, 2022, at 10:00 AM, or as soon thereafter as this matter can be heard, in the courtroom of the Honorable Consuelo B. Marshall, located at the First Street Courthouse, 350 W. 1st Street, Los Angeles, CA 90012, Courtroom 8D, Plaintiffs and Counterdefendants CoStar Group, Inc., and CoStar Realty Information, Inc. (collectively "CoStar") will move for an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing with prejudice Defendant and Counterclaimant Commercial Real Estate Exchange, Inc.'s ("CREXi") First Amended Counterclaims (Dkt. 171-1), including CREXi's antitrust claims brought under Sections 1 and 2 of the Sherman Act and California's Cartwright Act; its claims for intentional interference with contractual relations and prospective economic advantage; its state law claims for unlawful and unfair competition; and its request for declaratory relief.

This Motion is made on the following grounds:

1.     All of CREXi's antitrust claims, whether brought under the Sherman Act or California's Cartwright Act, should be dismissed because CREXi has not cured the deficiencies the Court identified in its Order dismissing CREXi's original claims. *See* June 17, 2022 Order re: Counterclaim Defendants' 12(b)(6) Mot. to Dismiss Counterclaim [82] ("Or." or the "Order") at 3-14 (Dkt. 146).

2.     CREXi's antitrust claims remain legally deficient because CREXi has not plausibly alleged any anticompetitive conduct by CoStar.  CREXi simply repackages the same unsuccessful theories, including its allegations that CoStar blocks CREXi from accessing webpages hosted by CoStar's LoopLink service, applies its watermark to images and modifies property listings on its websites, infringes CREXi's trademark in a few old Ten-X internet ads, and that CoStar's facially non-exclusive terms of use are allegedly "*de facto*" exclusive.  The Court already addressed each of these allegations and found that they did not plausibly

allege any anticompetitive conduct by CoStar. *Id.*

3. The only "new" allegations in CREXi's counterclaims relate to CoStar's efforts, as part of this litigation, to encourage CREXi to curb its industrial-scale infringement of CoStar's copyrighted images. CREXi alleges that, after this litigation began, CoStar suggested CREXi use a third-party image filter to limit its ongoing infringement of CoStar's copyrighted images, and that the filter flagged some images as owned by CoStar when they are allegedly not, which allegedly prompted CREXi to send notices to some customers (of its choosing) informing them of CoStar's claims of infringement. According to CREXi, CREXi's sending of these notices "disrupted" CREXi's relationships with those customers. This newly manufactured argument, however, does nothing to correct the deficiencies identified in the Court's Order. CREXi's own decision to use a third-party filter, and its complaints regarding the efficacy of that third-party filter, are not anticompetitive conduct that can be attributed *to CoStar*. Moreover, CREXi's decision to install the filter took place in the context of this litigation. The *Noerr-Pennington* doctrine protects communications incidental to litigation—especially communications enforcing intellectual property rights—and prevents CREXi from basing its antitrust claims on these new allegations. *See EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1081-84 (C.D. Cal. 2010).

4. CREXi's antitrust claims should also be dismissed because CREXi's amended allegations of market power remain insufficient to state a claim. CREXi's counterclaims include no new allegations regarding CoStar's supposed market power in the auction or information services markets. And, in the listing services market, CREXi provides only purported "estimated market share" calculations that are meaningless. Those "calculations" divide the value of CoStar's *listings* by the value of closed CRE *sales* by brokers. The apples-to-oranges percentage that results is entirely uninformative and cannot plausibly allege that CoStar has market power in any relevant market. *See Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d

963, 972-73 (9th Cir. 2008); *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *7-9 (C.D. Cal. Oct. 16, 2015).

5.     CREXi's new claims for intentional interference with contractual relations and prospective economic advantage also should be dismissed because CREXi has not alleged any conduct by CoStar "substantially certain" to interfere with any contractual or prospective relationship of CREXi's that CoStar was aware of, nor has CREXi pled any actual disruption or interference. *See United Artists Corp. v. United Artist Studios LLC*, 2019 WL 8221088, at *4-5 (C.D. Cal. Aug. 2, 2019). CREXi's intentional interference with prospective economic advantage claim also fails because CREXi has not plausibly alleged any independently wrongful conduct by CoStar. *Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *10-11 (N.D. Cal. Jan. 9, 2012). And, both claims are precluded by the *Noerr-Pennington* doctrine and the California litigation privilege because they are predicated on CoStar's cease and desist letters. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006-09 (9th Cir. 2008).

6.     CREXi's unlawful and unfair competition claims brought under California Business & Professional Code § 17200 are derivative of its antitrust, trademark, and intentional interference claims and fail for the same reasons. There can be no claim for unlawful competition without a violation of any other law. *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1028 (N.D. Cal. 2012). And, CREXi cannot state a claim for unfair competition because it has not plausibly alleged any conduct that "significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

7.     Finally, CREXi's request for declaratory relief, which seeks a declaration that CoStar may not block CREXi from accessing its websites, should be dismissed because the relief CREXi seeks is foreclosed by the Court's Order, which held that CoStar may block CREXi's access to its websites. Or. at 6-8.

This Motion is based on this Notice of Motion and Motion to Dismiss, the accompanying Memorandum of Points and Authorities, CREXi's Counterclaims (Dkt. 74), and First Amended Counterclaims (Dkt. 171-1), the Court's June 17, 2022 Order (Dkt. 146), the record on this matter, the arguments of counsel, and other evidence and argument that may be presented prior to the Court's decision on this Motion.

**Compliance with Local Rule 7-3**.   CoStar's counsel contacted CREXi's counsel to schedule a meet and confer to discuss its motion to dismiss CREXi's amended counterclaims on September 7, 2022 and offered to meet and confer on September 9, 2022.  CREXi's counsel stated that it was unavailable on September 9, 2022, and proposed that the parties meet and confer on September 12, 2022.  The parties met and conferred on September 12, 2022, and were unable to resolve the issues raised by this Motion.

Respectfully submitted,

Dated:  September 16, 2022

**LATHAM & WATKINS LLP**

By:  */s/ Nicholas J. Boyle*
(admitted *pro hac vice*)

Sarah A. Tomkowiak
(admitted *pro hac vice*)
David L. Johnson
(*pro hac vice* forthcoming)
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201
Email: nicholas.boyle@lw.com
        sarah.tomkowiak@lw.com
        david.johnson@lw.com

Jessica Stebbins Bina
(Bar No. 248485)
Elyse M. Greenwald
(Bar No. 268050)
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5500
Fax: 424.653.5501

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Email: jessica.stebbinsbina@lw.com
      elyse.greenwald@lw.com

Belinda S Lee
(Bar. No. 199635)
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Tel: 415.391.0600
Fax: 415.395.8095
Email: belinda.lee@lw.com

*Attorneys for Plaintiffs and
Counterdefendants CoStar Group, Inc.,
and CoStar Realty Information, Inc.*

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................. 1

LEGAL STANDARD ........................................................... 4

CREXI'S AMENDED ALLEGATIONS ................................ 4

ARGUMENT ....................................................................... 7

I.   THE COURT SHOULD DISMISS CREXI'S ANTITRUST CLAIMS ............................................................................. 7

    A.   CREXI Has Still Not Pled Any Anticompetitive Conduct ................. 8

        1.   CREXi's Allegations Are Foreclosed By The Court's Order ................................................................. 8

            (a)   The Court Already Held That CoStar's Alleged Blocking Of LoopLink-Hosted Webpages Is Not Anticompetitive ................................. 8

            (b)   The Court Also Already Rejected CREXi's Allegations Of "De Facto" Exclusivity ........................ 12

            (c)   CREXi's "False Ownership" Claims Recycle Dismissed Allegations ..................................... 14

            (d)   The Court Already Held That CoStar's Alleged Trademark Infringement Is Not Anticompetitive .............................................................. 14

        2.   CREXi's "New" Allegations Are Manufactured Conduct That Is Protected By The *Noerr-Pennington* Doctrine .................................................. 15

    B.   CREXi's Market Power Allegations Also Remain Deficient .......................................................................... 17

II.   CREXI'S OTHER CLAIMS ARE EQUALLY DEFICIENT ..................... 20

    A.   CREXi's Interference Claims Fail As A Matter Of Law ................. 20

    B.   CREXi's Unlawful And Unfair Competition Claims Also Fail .......... 24

    C.   The Court's Order Forecloses CREXi's Request For Declaratory Relief ................................................................ 25

CONCLUSION ................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .......................................................................... 13

*Ascon Props., Inc. v. Mobil Oil Co.*,
866 F.2d 1149 (9th Cir. 1989) ............................................................................ 4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................ 4

*Balistereri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1990) .............................................................................. 4

*Byrd v. Bank of Am.*,
2015 WL 13919187 (C.D. Cal. Apr. 22, 2015) .................................................. 9

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ...................................................................................... 24

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) .............................................................................. 24

*City of L.A. v. Santa Monica BayKeeper*,
254 F.3d 882 (9th Cir. 2001) ............................................................................ 25

*Cullen v. Netflix, Inc.*,
880 F. Supp. 2d 1017 (N.D. Cal. 2012) ............................................................ 24

*DeLeon v. Wells Fargo Bank, N.A.*,
2010 WL 4285006 (N.D. Cal. Oct. 22, 2010) .................................................. 21

*Distance Learning Co. v. Maynard*,
2020 WL 2995529 (N.D. Cal. June 4, 2020) .................................................... 18

*EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*,
711 F. Supp. 2d 1074 (C.D. Cal. 2010) ............................................................ 16

*Enttech Media Grp. LLC v. Okularity, Inc.*,
2020 WL 6888722 (C.D. Cal. Oct. 2, 2020) .................................................... 17

*Gonzalez v. Planned Parenthood*,
   759 F.3d 1112 (9th Cir. 2014)........................................................................ 14

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................... 3

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018)........................................................................ 24

*Hip Hop Bev. Corp. v. Monster Energy Co.*,
   733 F. App'x 380 (9th Cir. 2018)................................................................... 13

*hiQ Labs. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022)........................................................................ 25

*Image Online Design, Inc. v. Internet Corp. for Assigned Names &*
   *Numbers*,
   2013 WL 489899 (C.D. Cal. Feb. 7, 2013) ................................................... 23

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008).......................................................................... 4

*Little Rock Cardiology Clinic v. Baptist Health*,
   573 F. Supp. 2d 1125 (E.D. Ark. 2008) ........................................................ 19

*Manwin Licensing Int'l S.A.R.L. v. ICM Registry, LLC*,
   2013 WL 12123772 (C.D. Cal. Feb. 26, 2013)............................................. 23

*Mercer Publ'g, Inc. v. Smart Cookie Ink, LLC*,
   2012 WL 12863934 (W.D. Wash. July 25, 2012)................................... 17, 18

*Nexsales Corp. v. Salebuild, Inc.*,
   2012 WL 216260 (N.D. Cal. Jan. 24, 2012) ................................................. 22

*Niantic Inc. v. Global++*,
   2020 WL 1548465 (N.D. Cal. Jan. 30, 2020) ................................................. 7

*Omega Envt'l Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997)........................................................................ 13

*Pantoja v. Countrywide Home Loans, Inc.*,
   640 F. Supp. 2d 1177 (N.D. Cal. 2009) ........................................................ 24

*PNY Techs., Inc. v. SanDisk Corp.*,
   2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) .............................................. 13

*Power Analytics Corp. v. Operation Tech., Inc.*,
   2017 WL 5479638 (C.D. Cal. May 10, 2017)..................................................... 13

*Pro Water Sol., Inc. v. Angie's List, Inc.*,
   457 F. Supp. 3d 845 (C.D. Cal. 2020)..........................................................21, 23

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995).......................................................................... 18

*Reilly v. Apple Inc.*,
   2022 WL 1215305 (N.D. Cal. Apr. 25, 2022) .................................................. 24

*Rick-Mik Enters. Inc. v. Equilon Enters. LLC*,
   532 F.3d 963 (9th Cir. 2008) ..................................................................... 19, 20

*Rubin v. Green*,
   4 Cal. 4th 1187 (1993)................................................................................... 22

*Safeway Inc. v. Abbott Labs.*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011) ............................................................ 18

*Simi Surgical Ctr., Inc. v. Conn. Gen. Life Ins. Co.*,
   2018 WL 6332285 (C.D. Cal. Jan. 4, 2018)..................................................... 23

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) .......................................................................... 16

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) .......................................................................... 22

*Top Rank, Inc. v. Haymon*,
   2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) .................................................. 20

*U.S. Wholesale Outlet & Distrib., Inc. v. Living Essentials*,
   2021 WL 3418584 (C.D. Cal. Aug. 5, 2021) ................................................... 24

*UMG Recordings, Inc. v. Global Eagle Ent.*,
   117 F. Supp. 3d 1092 (C.D. Cal. 2015).......................................................21, 22

*UMG Recordings, Inc. v. Global Eagle Ent., Inc.*,
   2015 WL 12746208 (C.D. Cal. Oct. 30, 2015) ................................................ 16

*United Artists Corp. v. United Artist Studios LLC*,
   2019 WL 8221088 (C.D. Cal. Aug. 2, 2019) ...............................................21, 22

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ................................................................. 7

*Universal Grading Serv. v. eBay, Inc.*,
   2012 WL 70644 (N.D. Cal. Jan. 9, 2012) ........................................... 23

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ................................................................... 1, 11

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
   42 Cal. App. 4th 507 (1996) ............................................................ 23

## STATUTES

Cal. Bus. & Prof. Code § 17200 ............................................................ 24

California's Cartwright Act ............................................................. 7, 8

Lanham Act ........................................................................................ 7

Sections 1 and 2 of the Sherman Act ................................................. 7, 8

## RULES

Fed. R. Civ. P 12(b)(6) ...................................................................... 4

## OTHER AUTHORITIES

Areeda, Hovenkamp, & Solow, Antitrust Law ¶ 565a (3d ed. 2007) ..................... 19

# **INTRODUCTION**

Three months ago, this Court dismissed CREXi's counterclaims based upon the fundamental principle that the "antitrust laws do not compel CoStar to provide . . . assistance to a competitor." Or. at 4-9.[1]  In fact, as the Court noted, "a market participant's right to refuse to deal with competitors generally serves procompetitive purposes, and [] restricting that right can have anticompetitive effects." *Id.* at 5 (citation omitted).  Chief among the harmful effects of "forced sharing" is that it "may lessen the incentive" of a rival firm to invest in "economically beneficial facilities" for itself. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004).  Obstinately, CREXi's amended counterclaims continue to ignore this controlling Supreme Court precedent.  This Court gave CREXi the opportunity to amend its claims "to correct the deficiencies identified in [its] Order," Or. at 19, but CREXi again asks the Court to compel CoStar to provide CREXi with access to commercial real estate ("CRE") listings and information that CoStar hosts and to aid CREXi in competing.  The Court rightly rejected CREXi's claims the first time and should do so again.

CREXi's amended counterclaims remain legally deficient because:

1.      CREXi still has not alleged any anticompetitive conduct by CoStar. CREXi simply repackages its previously dismissed theories, including its allegations that CoStar blocks CREXi from accessing webpages hosted by CoStar's LoopLink service, applies its watermark to images and modifies listings on its websites, infringes CREXi's trademark in a few old Ten-X ads, and offers facially non-exclusive terms of use that are allegedly "*de facto*" exclusive.  But the Court already addressed and rejected these allegations because CoStar is under no obligation to "provide free aid and assistance to its competitor," Or. at 6, and "brokers expressly retain the rights to the original information and photographs they provide to CoStar"

---

[1]  "Or." or "Order" refers to the June 17, 2022 Order re: Counterclaim Defs.' 12(b)(6) Mot. to Dismiss Counterclaim [82] (Dkt. 146).

and are free to provide that same information to CoStar's competitors. *Id.* at 8.

    2.    The only "new" allegations in CREXi's counterclaims relate to CoStar's efforts, as part of this litigation, to encourage CREXi to curb its industrial-scale infringement of CoStar's copyrighted images. CREXi alleges that after this litigation began, CoStar sent CREXi letters "demanding" that CREXi stop its ongoing infringement and install a third-party filter, and that when CREXi eventually did so, the filter flagged some small fraction of images as owned by CoStar when they allegedly are not. CREXi alleges that, after discovering these purported flaws in the filter, it sent notices to some brokers (it selected) whose images were flagged by the filter and told them that CREXi would be removing their images from its website. According to CREXi, its decision to send these notices "disrupted" CREXi's business and "confused" some brokers who disputed some of the allegations of infringement. These allegations, however, are based on conduct CREXi undertook only ***after*** the Court dismissed CREXi's counterclaims. This newly manufactured argument does nothing to correct the deficiencies identified in the Court's Order. CREXi's choice to use a third-party filter, its complaints regarding the efficacy of that third-party filter (which CREXi is free to stop using), and its decision to send some notices to some (unidentified) brokers are not anticompetitive conduct ***by CoStar.*** Moreover, CREXi's communications about, and installation of, the third-party filter, and its sending of notices, took place in the context of this litigation. The *Noerr-Pennington* doctrine protects communications incidental to litigation—especially communications enforcing intellectual property rights—and prevents CREXi from basing its antitrust claims on these new and desperate allegations.[2]



3.      CREXi's amended allegations of market power also remain deficient. CREXi's counterclaims include no new allegations regarding CoStar's supposed market power in the auction or information services markets.  And, in the listing services market, CREXi provides only purported "estimated market share" calculations that are meaningless.  Those "calculations" assume, baselessly, that only one company can advertise a CRE property (a premise contradicted by CREXi's own allegations), and divide the value of CoStar's *listings* by the value of closed CRE *sales* by brokers.  But the apples-to-oranges ratio of the price of CoStar-*listed* properties to closed CRE *sales* by brokers is uninformative and cannot plausibly allege that CoStar has market power in any relevant market.

4.      CREXi's amended state law claims fare no better.  CREXi repackages its antitrust allegations into claims for tortious interference but those also fail because CREXi has not alleged any conduct by CoStar "substantially certain" to interfere with any relationship of CREXi's that CoStar was aware of, nor has CREXi pled any actual interference with a relationship known to CoStar.  CREXi's derivative claims of unlawful and unfair competition fail for the same reason as the claims on which they are based.  And CREXi's request for declaratory relief, which seeks a declaration that CREXi may access CoStar's websites, is foreclosed by the Court's Order, which held that CoStar may block CREXi's access to its websites.

The Court granted very limited leave to amend "to correct the deficiencies it identified in [its] Order."  Or. at 19.  CREXi's amendments cannot fix the legal deficiencies in its counterclaims, and they should be dismissed, this time with prejudice.[3]

---

[3]  CoStar seeks dismissal of all of CREXi's counterclaims except for CREXi's claim of trademark infringement and its unlawful competition claim predicated on CoStar's alleged trademark infringement, as the Court previously held that CREXi's

## LEGAL STANDARD

A court may dismiss a complaint under Federal Rule 12(b)(6) for "either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Or. at 2 (quoting *Balistereri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). To survive dismissal, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim . . . that is plausible on its face.'" Or. at 2-3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A "formulaic recitation of the elements of a cause of action will not suffice," Or. at 3, nor will "labels and conclusions." *Id.* A plaintiff must allege "factual allegations" that "raise a right to relief above the speculative level." *Id.* The Court may dismiss a claim with prejudice where leave to amend would be futile, including when a plaintiff has already been granted leave to amend and has been unable to plausibly allege a claim. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051-52 (9th Cir. 2008); *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

## CREXI'S AMENDED ALLEGATIONS

CREXi's amended counterclaims, like its original counterclaims, perpetuate the false narrative that CREXi, which has accessed CoStar's websites more than one million times (at least) and infringed (likely far) more than 11,000 of CoStar's copyrighted images, is a victim of an "anticompetitive scheme" that CoStar deploys to maintain its alleged monopolies in the internet CRE listing, information, and auction services markets in 50 metropolitan areas ("MSAs").[4] First Am. Countercls. ("FACC") ¶¶ 1-15, 28-29, 160 (Dkt. 171-1). The latest incarnation of CREXi's "scheme" has four prongs, but each merely recycles theories of anticompetitive conduct that the Court already rejected.

---

allegations plausibly stated a claim. CoStar, however, preserves for appeal its arguments that CREXi has failed to plead a viable trademark infringement claim or an unlawful competition claim predicated on the same alleged conduct.

[4] CoStar recently learned through discovery that the scale of CREXi's infringement of its images is even larger than initially suspected. CREXi may have more than *80,000* of CoStar's copyrighted images on its system.

*First*, CREXi alleges that CoStar blocks competitors from accessing pages on brokers' websites hosted by CoStar's LoopLink service, which has the supposed effect of "locking" brokers into an "exclusive relationship" with CoStar.  FACC ¶¶ 4-5, 39-49. [5]   The Court already considered and rejected this allegation in CREXi's original counterclaims when the Court held that "it is not anticompetitive conduct for CoStar to block its competitors from accessing CRE listing information hosted on its own websites," *including LoopLink-hosted pages*.  Or. at 6-8; *see also* Countercls. ("CC") ¶¶ 10-11, 137-46 (Dkt. 74).  CREXi's allegation that some brokers prefer to update their listings on those pages (and supposedly nowhere else), FACC ¶¶ 41, 45, is a decision not attributable to CoStar, does not stop brokers from sending updates to CREXi through other means, and in any event, does not impact the Court's conclusion that CoStar has the right to limit access to its own page-hosting service.  Or. at 6-8.  Moreover, CREXi's allegations of exclusivity and foreclosure are implausible and contradicted by CREXi's other allegations, which confirm that brokers use both CoStar's and CREXi's services, FACC ¶¶ 88, 99-100, 108, 257, and CoStar's terms of use, which only grant CoStar a "non-exclusive" license to broker-submitted content.  *See, e.g.*, *id.* Ex. F at 4 (LoopNet terms).

*Second*, CREXi again tries to avoid the fact that CoStar's terms of use are expressly "non-exclusive" by repeating its prior argument that CoStar imposes other contractual provisions that prevent brokers from sharing their property listings with competitors and result in a "*de facto*" exclusive arrangement.  FACC ¶¶ 6, 50-69; *see also* CC ¶¶ 9, 130-36, 175-76, 186.  CREXi again alleges that CoStar conditions access to its websites, including LoopLink-hosted pages, on brokers' agreement "not to transmit their listings to CoStar's competitors," FACC ¶ 58, and prohibits brokers

---

[5]   In reality, CoStar does not intentionally block competitors from accessing LoopLink-hosted pages.  CoStar employs technological blocks that prevent entities, like CREXi, which impermissibly access LoopNet for competitive purposes, from accessing LoopNet.  Occasionally, those blocks may lead to issues accessing LoopLink-hosted pages.  CoStar promptly resolves these glitches when they are brought to its attention (even though it is under no obligation to do so).

from sharing the "same listing information and photographs with competitors of CoStar." *Id.* ¶ 62; *see also id.* ¶¶ 55-63. But CoStar's terms of use, which CREXi attaches to its counterclaims, include no such restrictions. *See id.* Exs. F-J. The contractual provisions to which CREXi points only prevent **competitors** from accessing CoStar's websites, *see id.* ¶ 57 (citing Ex. J at 3), and prohibit users from copying or sharing content obtained **directly from CoStar's websites**, including LoopLink-hosted pages, for competitive purposes. *Id.* ¶¶ 56, 58-59, 61 (citing Exs. F, H, and I). The Court considered these exact provisions in dismissing CREXi's counterclaims and held there could be no "substantial foreclosure" or "exclusivity" because CREXi is free to obtain listing information "directly from [] brokers or **any other source besides CoStar's websites**." Or. at 8 (emphasis added).

**Third**, CREXi again alleges that CoStar falsely claims ownership over CRE information and photographs by "modifying brokers' listings and photographs" that CoStar hosts, which allegedly causes confusion in the marketplace regarding the ownership of CRE information and deters brokers from using competing platforms. FACC ¶¶ 7, 29(iii), 70-90.[6] CREXi made these same allegations in its original counterclaims, CC ¶¶ 13, 109(ii), 171-89, and the Court correctly held that CoStar may apply its watermark to photographs or modify CRE information on its websites because CoStar does not need to share such information with CREXi. Or. at 8-9.

CREXi tries to bolster this theory by alleging that, after this litigation began, CoStar sent letters to CREXi "demand[ing]" that CREXi stop its ongoing infringement and recommending that CREXi use a third-party filter to identify CoStar's copyrighted images. FACC ¶ 92.[7] CREXi allegedly decided to employ a

---

[6] Again, in reality, CoStar does not intentionally apply its watermark to photographs that it does not own and does not currently "seed" brokers' property listings. CREXi still has not identified a single listing that CoStar has supposedly inaccurately modified or any broker image to which CoStar has applied its star logo (as opposed to its stylized name, which CoStar does not allege signifies its copyright).

[7] CREXi's counterclaims do not attach, but refer to, letters that CoStar sent CREXi on, among other dates, March 26, 2021, June 25, 2021, and April 1, 2022. FACC

third-party filter but subsequently learned that the filter included a few images that CoStar allegedly does not own and produced some "false positive" hits for infringement. *Id.* ¶¶ 94-95. Despite claiming to know the filter was "faulty," CREXi decided to send take-down notices to brokers based on the filter's hits and informed brokers that ***CoStar*** was claiming ownership of images they were trying to use. *Id.* ¶¶ 96-109. CREXi's notices allegedly caused brokers to become "confused and displeased" with CREXi and "disrupted" CREXi's relationships with brokers. *Id.* ¶¶ 97-98. But the fact that CREXi ***voluntarily*** decided to use a ***third-party*** filter to attempt to limit its industrial-scale infringement is not anticompetitive conduct ***by CoStar***. Moreover, CoStar's attempts to enforce its copyrights and limit CREXi's ongoing infringement are immune from antitrust challenge.

***Fourth***, CREXi recycles its allegations that CoStar has infringed CREXi's trademark in a handful of old Google advertisements for its Ten-X auction product. *Id.* ¶¶ 11, 118-35. But the Court already rejected these same allegations. Or. at 9.

CREXi alleges that this four-pronged "scheme" gives rise to antitrust claims under Sections 1 and 2 of the Sherman Act and California's Cartwright Act, a trademark infringement claim under the Lanham Act, and state law claims for intentional interference with contractual relations and prospective economic advantage, and unlawful and unfair competition. CREXi also seeks a declaratory judgment that it has not engaged in unlawful conduct by accessing CoStar's websites. Each of these claims remains legally deficient and should be dismissed.

## ARGUMENT

## I.   THE COURT SHOULD DISMISS CREXI'S ANTITRUST CLAIMS

All of CREXi's antitrust claims remain legally deficient because CREXi still

---

¶¶ 92-93, 95. The Court may consider those letters because CREXi has incorporated such letters by reference by referring to them and basing claims on their content. *Niantic Inc. v. Global++*, 2020 WL 1548465, at *1 n.1 (N.D. Cal. Jan. 30, 2020) (cease and desist letters were "incorporated by reference" into counterclaims because defendants "refer extensively to the document and the document forms the basis of defendants' claims") (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)). CoStar's cease and desist letters are attached hereto as Exhibit B.

has not pled any anticompetitive conduct by CoStar or plausibly alleged that CoStar has market power.  CREXi failed to cure the deficiencies the Court identified in its Order, and CREXi's antitrust claims should be dismissed with prejudice.

## A.   CREXi Has Still Not Pled Any Anticompetitive Conduct

To state an antitrust claim under the Sherman Act or California Cartwright Act, CREXi must plausibly allege that CoStar has "engaged in anticompetitive conduct."  Or. at 3-4 (conducting a "single analysis" because "[a]ll of CREXi's antitrust claims require . . . anticompetitive conduct").  CREXi's amended "scheme" alleges no such conduct.  CREXi repackages the same theories of supposedly "anticompetitive" conduct that the Court already held are deficient, and its "new" allegations are manufactured conduct **by CREXi** that is immune from challenge.[8]

### 1.   CREXi's Allegations Are Foreclosed By The Court's Order

#### (a)   The Court Already Held That CoStar's Alleged Blocking Of LoopLink-Hosted Webpages Is Not Anticompetitive

CREXi repeats its complaint that CoStar blocks it from accessing CRE listings on LoopLink-hosted pages on brokers' websites. FACC ¶¶ 39-49. But CREXi made the same allegation in its original counterclaims, *see* CC ¶¶ 10-11, 137-46, and the Court rejected CREXi's theory.  Or. at 6-8.  The Court held that CoStar may block CREXi from "accessing CRE listing information hosted on its own websites," including CRE listings hosted by CoStar's LoopLink service, and that "CoStar blocking CREXi from its own websites does not forbid brokers from hiring CREXi or . . . stop brokers from sharing the exact same information [with] both CREXi and

---

[8]   CREXi again has brought separate antitrust claims focused on three different product markets (and 50 geographic markets).  FACC ¶¶ 140-65.  While CREXi talks of a "scheme" to try to tie together its claims of anticompetitive conduct, that conduct has to be assessed in a relevant market. *See* Or. at 4 n.3.  For example, that CoStar supposedly blocks competitor access to LoopLink-hosted pages or modifies LoopNet listings has no relevance to the antitrust claims relating to the auction or information services markets.  The allegations of exclusionary conduct are deficient in the aggregate, but are even more so when they are viewed in the context of each alleged relevant market.  Exhibit A, attached hereto, details CREXi's allegations of anticompetitive conduct and the alleged relevant markets to which they apply.

CoStar." Or. at 7-8.[9]  CREXi's repackaged allegations do not alter the Court's holding.

LoopLink is a CoStar service that allows brokers to link their websites to CoStar's LoopNet site and use its search functionality. FACC ¶ 39; CC ¶ 31 ("LoopLink is a fully hosted listing management solution that seamlessly connects brokers' websites and listings with the LoopNet database . . . ." (brackets omitted)).[10] The LoopLink-hosted portion of a broker's website, *i.e.*, the portion of a brokers' website that links to LoopNet, is ***operated*** and ***hosted by*** CoStar. FACC ¶ 39; Ex. J at 2 ("This site, [] which is part of another web site, is operated by LoopNet, Inc.") (LoopLink terms of use); *see also* Or. at 6 n.4 (noting that it is "undisputed" that whether CRE listing information is located on CoStar, LoopNet, Ten-X or the LoopLink hosted portion of a broker's website, it is "ultimately hosted by CoStar"). When a broker uses LoopLink to power certain pages on its website, those pages link directly to CoStar's LoopNet site and are populated with listing information from LoopNet's database. FACC ¶ 39. LoopLink-hosted pages are thus another avenue for accessing LoopNet, and CoStar is not obligated to provide CREXi with access to its website and database.[11] Or. at 8.

Moreover, CREXi's allegations that CoStar's alleged blocking of its access to

---

[9] While the Court suggested there might be differences in what CoStar may "do ***contractually***" when CRE information is located on a broker's webpage that is hosted by CoStar, Or. at 6 n.4 (emphasis added), that does not alter the Court's holding that CoStar is free to block competitors from accessing CRE listings on websites that CoStar hosts, including LoopLink-hosted pages. *Id.* at 6-8. CREXi does not allege, nor would it have standing to allege, that CoStar is breaching any contract with brokers who use LoopLink (and it is not).

[10] The Court may consider allegations in CREXi's original counterclaims that CREXi has omitted from its amended pleading. *See, e.g., Byrd v. Bank of Am.*, 2015 WL 13919187, at *2 n.3 (C.D. Cal. Apr. 22, 2015) (considering allegations "omit[ted]" in amended complaint in granting motion to dismiss).

[11] While CREXi complains that CoStar "[l]everage[s] LoopLink to force customer use of LoopNet," FACC ¶ 270(i), that allegation is both unsubstantiated and nonsensical. As CREXi admits, the reason brokers use LoopLink is so they can populate their websites with information from LoopNet. *See, e.g., id.* ¶¶ 4, 39. There is no reason brokers could not, as most do, host their listings on their own website, and CREXi articulates none.

LoopLink-hosted pages prevents brokers from working with CREXi and "lock[s]"
brokers into an "exclusive relationship with CoStar," FACC ¶¶ 5, 44, 49, are
implausible and contradicted by CREXi's other allegations and CoStar's terms of
use.  Brokers are under no obligation to use LoopLink, and, as the Court correctly
recognized, CoStar's terms of use are "non-exclusive" and "brokers expressly retain
the rights to the original information and photographs they provide[] to CoStar."  Or.
at 8; *see also* FACC ¶¶ 52-54, Ex. F at 6 (requiring that brokers "retain[] back-up
copies" of CRE information they provide to LoopNet).  There is nothing in CoStar's
terms of use (or anywhere else) that prevents brokers—even  those that use
LoopLink—from sharing their CRE listing information directly with CREXi.

Indeed, as CREXi admits, brokers can, and do, retain listing information,
including photographs, and CREXi and other competitors can obtain that
information directly from brokers.  CREXi repeatedly alleges that brokers upload
CRE images to CoStar, FACC ¶¶ 39, 41, 82, 84-85, 89, that brokers also upload
CRE images to CREXi, *id.* ¶¶ 88, 99, 100, 108, and that, when CREXi asks, brokers
can quickly provide copies of their original images.  *Id.* ¶¶ 97, 99-102, 105, 236; *see
also id.* ¶ 260 ("Many . . . brokers provided CREXi with evidence that they owned
the image at issue . . . .").  Of course, brokers who use LoopLink to host listings by
definition have to generate (and later update) those listings, and they are free to share
that same listing information with CREXi.  Indeed, CREXi alleges that 500 of the
roughly "1,000" LoopLink customers also market their listings on CREXi.  *Id.* ¶¶
40, 257.   CoStar allegedly blocking CREXi's access to webpages that "link" to
LoopNet only prevents CREXi, as this Court has already held, "from accessing
broker information **through CoStar's own websites**," which is not foreclosure as a
matter of law.  Or. at 7-8 (emphasis added).

CREXi also alleges that some fraction of the limited number of brokers
nationwide who use LoopLink (in unspecified geographic markets) are "dependent
on LoopNet as a repository" and do not maintain their original information

1   elsewhere, and that if CREXi is not able to access those brokers' Loop-Link hosted

2   pages, it is "unfeasible" for CREXi to compete.   FACC ¶ 41.   These limited

3   allegations, however, do not save CREXi's claims.   What CREXi seeks is access to

4   CoStar-hosted content as an alternative to persuading brokers to provide their

5   information directly to CREXi.   But that is assistance the Court already held CoStar

6   is not obligated to provide.   Or. at 8.   If CoStar did not exist, CREXi would have to

7   obtain information directly from brokers (like CoStar does).   Just because CoStar

8   does exist and devotes significant resources to sourcing and hosting CRE

9   information, does not mean CREXi has the right to free ride on CoStar's efforts.[12]

10  CREXi must "invest" in its own facilities rather than seek to compel CoStar to

11  "share." *Trinko*, 540 U.S. at 407-08.

12          Moreover, brokers' "unwillingness" to undertake additional efforts to share

13  their listing information with CREXi is not ***anticompetitive conduct by CoStar***."

14  Or. at 7 (emphasis added); *see also* FACC ¶ 45 (purporting to quote a broker who

15  did not use CREXi because she did not "have the ***extra time*** to keep track [of her

16  listings] on multiple platforms") (emphasis added); CC ¶ 118 (brokers do not want

17  to undertake the additional "time and effort" to share their listings with CREXi).   At

18  most, CREXi alleges that a fraction of a fraction of brokers, as a practice (not

19  required by CoStar) update their listings only on LoopNet (with their own

20  information that they generate).   CREXi does not plausibly allege that brokers are

21  precluded from also updating their listings on CREXi with that same information,

22  they just prefer not to do so.   But broker preference is not anticompetitive conduct

23  that can be imputed to CoStar.

24

25

26  ――――――――――――――

27  [12]   In essence, CREXi argues that the webpages hosted by CoStar's LoopLink
    service are an "essential facility" that CREXi should be allowed to access, FACC ¶
    41, but CREXi expressly disclaims that it wants access to CoStar's products or

28  services.   *Id.* ¶ 12; *see also* Or. at 5.   Nor has CREXi even attempted to plead the
    elements for the essential facility exception.   Or. at 5-6.

**(b)** **The Court Also Already Rejected CREXi's Allegations Of "De Facto" Exclusivity**

CREXi alleges that CoStar's websites' terms of use, despite being expressly "non-exclusive," include other contractual provisions that prevent brokers from sharing their CRE listing information with CoStar's competitors and result in "*de facto*" exclusivity.  FACC ¶¶ 6, 50-69.  Such allegations of "*de facto* exclusivity" are implausible, contradicted by the actual terms of CoStar's terms of use, and foreclosed by the Court's Order.

CREXi alleges that CoStar conditions access to its websites, including access to LoopLink-hosted webpages, on users' commitment "not to transmit their listings to CoStar's competitors," *id.* ¶ 58, and that LoopNet's terms of use "forbid[] brokers from using [the] same listing information and photographs [that they upload to LoopNet] with competitors of CoStar."  *Id.* ¶ 62.  Not so.  In reality, CoStar's terms of use do not include any such restrictions.  The contractual provisions that CREXi cites only prohibit competitors from accessing CoStar's websites, including LoopLink-hosted webpages, *see id.* ¶ 57 (quoting Ex. J at 3), and prevent users from copying or sharing information ***directly from CoStar's websites, including LoopLink-hosted pages***, with CoStar's competitors or for a competitive purpose. *See id.* ¶ 56 (Ex. F at 7), ¶ 58 (Ex. H at 7), ¶ 59 (Ex. I at 5), ¶ 61 (Ex. F at 6-7).[13] CREXi raised these same contractual provisions in its original counterclaims, CC ¶¶ 130-36, 175-76, 186, and the Court correctly concluded that CoStar's terms of use only "stop CREXi [and other competitors] from accessing broker information ***through CoStar's own websites***" and did not preclude brokers "from hiring CREXi

---

[13]  CREXi alleges that, by restricting the use of "Content," LoopNet's terms of use prevent brokers from sharing their listing information with CoStar's competitors. FACC ¶¶ 61-62.  "Content," however, is defined as "[i]nformation obtained from the Service," *i.e.*, obtained ***from LoopNet***.  FACC Ex. F at 6.  Information that brokers submit is defined as "Submitted Content," and all rights in "Submitted Content" remain with the broker.  FACC ¶ 53; Ex. F at 4.  Contrary to CREXi's claim, LoopNet's terms of use plainly do not prevent brokers from sharing the "same listing information and photographs with competitors of CoStar."  *Id.* ¶ 62.

or . . . stop brokers from sharing the exact same information [with] both CREXi and CoStar." Or. at 7 (emphasis added).   As the Court already recognized, "because brokers expressly retain the rights to the original information and photographs they provide[] to CoStar," and can provide their original information directly to CREXi, the alleged "*de facto* exclusivity clause[s]" do not "increase or otherwise impact CREXi's costs," and there can be no substantial foreclosure.  Or. at 8; *see also Hip Hop Bev. Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (affirming dismissal of exclusive dealing claim where plaintiff failed to allege that the allegedly exclusive arrangement "foreclosed competition in a substantial share of the line of commerce affected").[14]

CREXi's allegations also fail because courts will only recognize claims premised on *de facto* exclusivity where the terms of an agreement create powerful incentives for customers to behave as though their contracts are exclusive even when they are not.  *See, e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016) ("In certain limited situations, discounts and rebates conditioned on a promise of exclusivity . . . may be understood as 'de facto' exclusive dealing . . . .").  CREXi has pointed to no such terms in CoStar's terms of use, and there are none.  *See Power Analytics Corp. v. Operation Tech., Inc.*, 2017 WL 5479638, at *9-11 (C.D. Cal. May 10, 2017) (dismissing allegations of *de facto* exclusivity where plaintiff did not plausibly allege that any terms in the challenged agreements had the practical effect of foreclosing competition).  Instead, CREXi

---

[14]  CREXi also has not plausibly alleged any "substantial foreclosure" because it has not, and cannot, plead that CoStar's terms of use—its allegedly "*de facto* exclusive" agreements—are for a long duration or not easily terminable.  In fact, even if all of CREXi's allegations regarding CoStar's terms of use were true (and they are not), the exclusivity about which CREXi complains would attach only to a **single listing**. CREXi points to no provision in CoStar's terms of use that lock brokers into using CoStar exclusively for any period of time or that would prevent a broker from using CREXi for any future listings.   That too is fatal to CREXi's allegations of exclusivity.  *See Omega Envt'l Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) (holding that where contracts could be terminated on 60 days' notice, there could not be substantial foreclosure as a matter of law); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *5 (N.D. Cal. Apr. 25, 2014) (dismissing claim where allegedly exclusive agreements were of short duration and easily terminable).

misreads CoStar's terms of use and pretends they include exclusivity provisions when they do not. That is not "*de facto*" exclusivity.

CREXi also cannot ignore the actual terms of CoStar's terms of use or manufacture a factual dispute by alleging that "CoStar's contractual restrictions are widely understood by brokers to foreclose their ability to work with competing platforms, including CREXi." FACC ¶ 65; *see Gonzalez v. Planned Parenthood*, 759 F.3d 1112, 1116 (9th Cir. 2014) (a court is not required to accept as true allegations that are contradicted by agreements attached to or referenced in a complaint). A few brokers' alleged misunderstanding about the terms of their agreements with CoStar does not transform those expressly non-exclusive agreements into *de facto* exclusive arrangements and cannot constitute anticompetitive conduct by CoStar.

### (c) CREXi's "False Ownership" Claims Recycle Dismissed Allegations

CREXi also repeats its allegation that CoStar's "practice of unilaterally modifying brokers' listings and photographs" on CoStar's websites makes it harder for CREXi to copy those listings, even though the Court already rejected that theory. FACC ¶¶ 29(iii), 70-90; Or. at 8-9. CREXi previously alleged the same thing, word-for-word, *see* CC ¶¶ 13, 109(ii), 171-89, and the Court rightly found that those allegations fail as a matter of law because "CoStar is under no obligation to provide information or photographs to CREXi at all, so its decision in some cases to add watermarks or logos to the information [it] hosts [on its websites] is not anticompetitive conduct." Or. at 9. That holding forecloses CREXi's previously dismissed allegations.

### (d) The Court Already Held That CoStar's Alleged Trademark Infringement Is Not Anticompetitive

Finally, CREXi recycles its allegations of CoStar's alleged trademark infringement and again claims that such conduct is part of CoStar's "anticompetitive

scheme." FACC ¶¶ 11, 118-35. But in dismissing CREXi's original counterclaims, the Court rejected CREXi's theory that CoStar's alleged trademark infringement was anticompetitive. Or. at 9. CREXi's allegations are unchanged, *compare* FACC ¶¶ 118-35 *with* CC ¶¶ 190-206, and CREXi's attempts to fold its trademark allegations into its "anticompetitive scheme" are foreclosed by the Court's Order. Or. at 9.

### 2. CREXi's "New" Allegations Are Manufactured Conduct That Is Protected By The *Noerr-Pennington* Doctrine

To try to bolster its deficient allegations, CREXi complains about actions that **CREXi** took to attempt to limit its significant ongoing infringement of CoStar's copyrighted images. CREXi alleges that, after this litigation began, CoStar sent it letters demanding that CREXi stop its ongoing copyright infringement, and recommended that it use a third-party filter. FACC ¶ 92; *see also* Exhibit B at 31, 34, 36. CREXi complains that, based on CoStar's representation that the filter included only CoStar's copyrighted images, CREXi decided to install a filter but subsequently learned that the filter flags some images that CoStar allegedly does not own. FACC ¶¶ 93-94. After the Court dismissed its antitrust counterclaims, and without informing CoStar, CREXi decided to send letters to some undisclosed subset of brokers, selected by CREXi, whose images were flagged by the filter and told those brokers that CREXi would be removing their images from its websites because CoStar claimed ownership over the images they were trying to use. *Id.* ¶¶ 96, 260 (discussing July 2022 take-down notices). CREXi alleges that those unidentified brokers were "confused and displeased" by CREXi's notices and that some small fraction of those brokers disputed the infringement claim. *Id.* ¶¶ 97, 260. These new allegations of voluntary conduct undertaken **by CREXi** cannot constitute anticompetitive conduct that can be attributed **to CoStar**.

While CREXi alleges that CoStar "demanded" and "insisted" that CREXi employ a filter to limit its infringement, *id.* ¶ 92, CREXi does not, and cannot, allege that CoStar somehow forced CREXi to do so. Nor can CREXi's complaints about

the efficacy of the third-party-operated filter (supposedly a "false positive" rate of around 11 percent, *id*. ¶ 94) be attributed to CoStar. If CREXi is dissatisfied with the filter, it is free to cease using it and to find an alternative method of limiting its ongoing, industrial-scale infringement—for example, as CoStar suggested, CREXi could take its own photographs, as CoStar does. *See* Exhibit B at 36 ("The filter is just one [] tool that [CREXi] can choose to use . . . .").[15] CREXi's voluntary decision to use a third-party filter is not "anticompetitive conduct ***by CoStar***." Or. at 7 (emphasis added).

As a matter of law, CREXi also may not base its antitrust claims on CoStar's efforts to protect its intellectual property. The *Noerr-Pennington* doctrine shields from liability, including antitrust liability, conduct that "implicates the protections afforded by the Petition Clause." *Sosa v. DIRECTV*, *Inc.*, 437 F.3d 923, 931 (9th Cir. 2006). The doctrine applies not only to petitions sent directly to a court but to conduct incidental to the prosecution of a lawsuit, including "all communications between private parties related to litigation." *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp*., 711 F. Supp. 2d 1074, 1082 (C.D. Cal. 2010) (holding that defendant's cease and desist letters, and efforts to protect its intellectual property, were protected petitioning conduct under *Noerr-Pennington*); *UMG Recordings, Inc. v. Global Eagle Ent., Inc.*, 2015 WL 12746208, at *57 (C.D. Cal. Oct. 30, 2015) (cease and desist letter fell "within the protection of the *Noerr-Pennington* doctrine"). CoStar's cease and desist letters, sent during the pendency of this litigation, demanding that CREXi stop its ongoing copyright infringement, are protected by the *Noerr-Pennington* doctrine and cannot constitute anticompetitive conduct. *See EcoDisc Tech*, 711 F. Supp. 2d at 1082; *UMG*

---

[15] CREXi's allegations only confirm that the filter is working and helping to stop CREXi from displaying thousands of CoStar's copyrighted images each month. CREXi alleges that in just one "sample" the filter flagged ***over 2,300*** instances of infringement of CoStar's copyrighted images. FACC ¶ 94. That "sample," however, is from a ***single*** month. While CREXi complains about a false positive rate of around 11 percent, *id.*, one would think that CREXi would prefer that the filter be slightly overinclusive rather than underinclusive.

*Recordings*, 2015 WL 12746208, at *19-20; *see also* Exhibit B (CoStar's cease and desist letters).

The notices that CREXi decided to send to brokers after the Court dismissed its counterclaims also cannot constitute anticompetitive conduct by CoStar. CoStar had no advance warning that CREXi was sending those letters, did not draft them, and does not even know the identity of the brokers to whom they were sent, or how CREXi chose that subset. *See* FACC ¶¶ 96, 260. Nor does CoStar know which images the filter flagged and form the basis of CREXi's claims of infringement, purportedly on CoStar's behalf. But, even if CoStar could somehow be blamed for ***CREXi's*** notices, and the subsequent "confusion" they allegedly engendered, such communications would be protected by the *Noerr-Pennington* doctrine too. *See Enttech Media Grp. LLC v. Okularity, Inc.*, 2020 WL 6888722, at *2 (C.D. Cal. Oct. 2, 2020) (holding that DMCA take-down notices constitute protected activity under *Noerr-Pennington*); *Mercer Publ'g, Inc. v. Smart Cookie Ink, LLC*, 2012 WL 12863934, at *4 (W.D. Wash. July 25, 2012) (holding that counterclaim defendant's "right to use judicial and pre-litigation procedures to resolve purported copyright disputes is protected activity").

CREXi's complaints regarding its decision to employ a third-party filter, the take-down notices that CREXi sent to selected brokers based on the filter's hits, and the alleged "confusion" that resulted, cannot constitute anticompetitive by CoStar.[16]

## B. CREXi's Market Power Allegations Also Remain Deficient

All of CREXi's antitrust claims should also be dismissed for another, independent reason: CREXi again fails to plausibly allege that CoStar has market

---

[16] To the extent CREXi alleges that CoStar's lawsuits are themselves anticompetitive, FACC ¶¶ 112-17, that too is squarely protected conduct under *Noerr-Pennington*. *See, e.g.*, *Enttech Media*, 2020 WL 6888722, at *3 ("[T]he *Noerr-Pennington* protections apply to petitions to courts . . . .); *see also* Feb. 18, 2022 Order 4 & n.2 (Dkt. 111) (holding that "the fact that [CoStar] has filed lawsuits against other companies for infringement and obtained judgments . . . cannot be the basis for antitrust violations," and noting that CREXi's argument that CoStar's lawsuit against Xceligent constituted anticompetitive conduct was "meritless").

power in any relevant market.  In dismissing CREXi's counterclaims, the Court found that CREXi's allegations of "direct evidence" of market power were "largely conclusory, anecdotal, implausible, or legally insufficient," Or. at 12, and that CREXi's allegations of circumstantial evidence were also deficient because the Court could not "evaluate the plausibility" of CREXi's market share allegations "in the absence of a properly defined geographic market" and CREXi had failed to allege that CoStar's competitors "lack[ed] the capacity to increase their output in the short run." *Id.* at 12-13.  CREXi's amendment does not cure its market power allegations.

CREXi's allegations of "direct evidence" of market power remain unchanged and are deficient for the same reasons.  CREXi nowhere alleges that CoStar has the ability to raise prices above competitive levels for a sustained period of time in any relevant product market (let alone across the 50 alleged geographic markets).  CREXi recycles its same complaints about price increases in 2012 for CoStar's information and listing services products after CoStar acquired LoopNet, FACC ¶ 215, and another supposed price increase in 2017 for an unidentified product after Xceligent's demise.  *Id.* ¶ 217.  But its amended allegations still say nothing about CoStar's pricing since 2017 (or its pricing in any of the 50 alleged geographic markets).[17]  And, nowhere does CREXi allege, as it must, that CoStar can restrict "marketwide output" by "restricting its ***own output***."  *Distance Learning Co. v. Maynard*, 2020 WL 2995529, at *6 (N.D. Cal. June 4, 2020) (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)) (emphasis added).  Instead, CREXi focuses incorrectly on CoStar's competitors' supposedly reduced output, FACC ¶¶ 177, 226, which is legally irrelevant.  *See Distance Learning,* at *6.  CREXi thus has not plausibly alleged both "restricted output and supracompetitive prices" and its allegations of "direct evidence" of market power remain "conclusory,

---

[17] Nor has CREXi alleged that CoStar's allegedly "supracompetitive" prices are the result of its alleged market power as opposed to a superior product.  *See Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011) ("[S]upracompetitive pricing, on its own, is not direct evidence of monopoly power.").

1    anecdotal, implausible, [and] legally insufficient . . . ."  Or. at 12.

2          CREXi's amended allegations of "circumstantial evidence" of market power

3    fare no better.  CREXi purports to allege CoStar's "estimated market shares" for the

4    *listing* services market in each of the 50 alleged geographic markets, *see* FACC ¶

5    223 and FACC Ex. B, but CREXi still does not even attempt to provide any

6    "estimated market shares" for CoStar's information and auction services products in

7    any relevant geographic market (let alone all 50).  CREXi argues that it does not

8    need to because auction and information services are supposedly "complementary"

9    to listing services, FACC ¶¶ 224-25, but that is wrong.  Even crediting CREXi's

10   allegations that those services are "complements," CREXi must allege market power

11   in *each* of the relevant product markets.  *See Little Rock Cardiology Clinic v. Baptist*

12   *Health*, 573 F. Supp. 2d 1125, 1143 (E.D. Ark. 2008) (even "when the goods at issue

13   are complements, the presence of market power in one [market] says virtually

14   nothing about the presence of market power in the other [market]") (quoting Areeda,

15   Hovenkamp, & Solow, Antitrust Law ¶ 565a (3d ed. 2007)); *see also Rick-Mik*

16   *Enters. Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (plaintiff

17   must plead market power in its alleged relevant market).  CREXi's market power

18   allegations remain deficient because it has not plausibly alleged, with facts, that

19   CoStar has a dominant share of the auction or information services markets in any

20   relevant geographic market.

21         CREXi's allegations of CoStar's "estimated market shares" in the listing

22   services market also remain insufficient.  Indeed, there are no plausible market share

23   allegations for this market.  The new "calculations" that CREXi calls "estimated

24   market shares for internet CRE listings in the metropolitan areas," FACC ¶ 223,

25   provide no information about CoStar's share of listing services in any geographic

26   market.  CREXi inexplicably defines the CRE internet *listings* market (*i.e.*, the

27   denominator of its market share calculation) based on "the total value of closed CRE

28   *sales* transactions in each MSA," *id.* (emphasis added), even though CoStar does not

sell any commercial real estate.  CREXi then defines CoStar's "share" (*i.e.*, the numerator of its calculation) as the value of properties in CoStar's **listings** at some unidentified time.  *Id.* (emphasis added).  But the ratio of the price of CoStar-**listed** properties to closed property **sales** by brokers is meaningless.  It tells you nothing about CoStar's market share in the listing services market because, among other reasons, (i) multiple websites can advertise the same listing, (ii) not all listings are for sales at all, some are for leases, *see* FACC ¶¶ 27, 141-42, and (iii) not all listings result in a sale.[18]  Indeed, CREXi concedes that "over 500" brokers simultaneously advertise properties on CREXi and CoStar, *id.* ¶ 257, but each property can only be sold (if at all) once.  CREXi cannot allege circumstantial evidence of market power in the listings market by including meaningless calculations and labeling them "market shares."  *See Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *8 (C.D. Cal. Oct. 16, 2015) (dismissing claim where alleged market shares were "confusing allegations" rather than "facts or figures" actually concerning the market alleged).

Finally, while CREXi pleads the same conclusory allegations regarding alleged barriers to entry, CREXi still fails to allege that "competitors lack the capacity to increase their output in the short run."  Or. at 13.  While free access to CoStar's intellectual property may be CREXi's preferred method for growth— assistance "CoStar is not obligated to provide," *id.* at 8—CREXi does not allege that it or other competitors could not otherwise grow through lawful means.  That, too, forecloses CREXi's claims.

## II.   CREXI'S OTHER CLAIMS ARE EQUALLY DEFICIENT

### A.   CREXi's Interference Claims Fail As A Matter Of Law

CREXi tries to recast its antitrust theories as new claims for intentional

---

[18]  For example, if two websites each advertised only the same $1 million property, and the property sold at that price, both websites would have a market share of 100% (and a combined market share of 200%).  If one website advertised two $1 million properties, and only one property sold, that website would have a 200% market share.  And, if CREXi calculated its own "market share" using the same formula, its "market share" combined with CoStar's would far exceed 100%.

interference with contractual relations ("IICR") and intentional interference with prospective economic advantage ("IIPEA").[19]  CREXi fails to plead a viable theory under either claim for at least four reasons.

*First*, CREXi has not plausibly alleged an "intentional act" *by CoStar* through which "interference is certain or substantially certain." *United Artists Corp. v. United Artist Studios LLC*, 2019 WL 8221088, at *4 (C.D. Cal. Aug. 2, 2019) (internal quotation marks omitted).[20]  To the extent CREXi's claims are predicated on CoStar's supposedly anticompetitive conduct (*i.e.*, blocking CREXi's access to LoopLink-hosted pages, claiming ownership over brokers' photographs, and locking brokers into "*de facto*" exclusive agreements, FACC ¶¶ 361-62), this Court already held that none of those allegations constitute conduct by CoStar that disrupts CREXi's ability to do business with brokers.  Or. at 6-9.  CREXi's reliance on CoStar's "demands" that CREXi use a third-party filter to curb its mass infringement is also unavailing.  FACC ¶ 362.  **CREXi's** voluntary decision to use a filter and to send some CREXi-selected subset of its customers notice that **CREXi** had removed certain images from its website, *id.* ¶¶ 96-98, is not conduct **by CoStar**.[21]  In fact, to

---

[19]  The Court granted CREXi leave to amend to "correct the deficiencies identified," Or. at 19, not to add new claims.  CoStar informed CREXi that, if it wished to add new claims, it would need to seek leave to amend.  CREXi refused to do so, and these new claims should be dismissed on that basis alone.  *See DeLeon v. Wells Fargo Bank, N.A.*, 2010 WL 4285006, at *3 (N.D. Cal. Oct. 22, 2010) ("[W]here leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken.").

[20]  To state an IICR claim, a plaintiff must allege "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *UMG Recordings, Inc. v. Global Eagle Ent.*, 117 F. Supp. 3d 1092, 1115 (C.D. Cal. 2015).  The elements of an IIPEA claim are similar, but rather than plead an existing contract, a plaintiff must allege a "specific economic relationship" "containing the probability of future economic benefit to the plaintiff." *Id*.  In addition, to state an IIPEA claim, the plaintiff must allege that the defendant's conduct was independently wrongful.  *See Pro Water Sol., Inc. v. Angie's List, Inc.*, 457 F. Supp. 3d 845, 852-53 (C.D. Cal. 2020).

[21]  CREXi cherry-picked these 71 customers, out of thousands, without any request from CoStar.  FACC ¶¶ 96, 359.  Discovery has revealed tens of thousands of

the extent CREXi's interference claims are based on CoStar's cease and desist letter
"demands," they are barred by the *Noerr-Pennington* doctrine and California's
litigation privilege. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d
991, 1007-09 (9th Cir. 2008) (*Noerr-Pennington* precludes liability for intentional
interference claims based on litigation letters); *UMG Recordings*, 117 F. Supp. 3d at
1115 (dismissing interference claims based on cease and desist letters under *Noerr-Pennington* and litigation privilege); *Rubin v. Green*, 4 Cal. 4th 1187, 1193 (1993)
(litigation communications are "absolutely immune from tort liability").

**Second**, CREXi has not plausibly alleged that CoStar knew of CREXi's
specific contracts or prospective economic relationships. *See United Artist Corp.*,
2019 WL 8221088, at *4-5 (a plaintiff "must identify the third party or third parties
with whom they contracted, and the nature and extent of their relationship with that
party or parties" as well as "**how** [the defendant] would have known about those
contracts"). CREXi's allegations that CoStar is aware "of CREXi's operations in
the CRE marketplace," and that CoStar purportedly monitors CREXi's website,
FACC ¶¶ 360, 368, do not show how CoStar actually knew of CREXi's contracts or
prospective relationships with any of the 71 unidentified brokers. *See supra* note
21; *Nexsales Corp. v. Salebuild, Inc.*, 2012 WL 216260, at *4 (N.D. Cal. Jan. 24,
2012) (dismissing IICR claim where plaintiff alleged a contract existed "but fail[ed]
to identify . . . **how** Defendant would have known of the contract") (emphasis added).

**Third**, CREXi's allegations of disruption and harm are conclusory and
speculative. CREXi alleges that CoStar's conduct led to "breach," "termination,"
and/or "substantial interference" with CREXi's contracts and relationships, FACC
¶¶ 362, 370, but does not identify any particular service that CREXi was
contractually obligated, but unable, to provide due to CoStar's "disruption," any

potential CoStar images on CREXi's website, including several thousand identified
by the third-party filter. It is telling that CREXi sent "takedown notices" to only a
miniscule subset of its customers.

contract that was terminated, or any broker whose "promised" business CREXi lost.[22]  *See Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996) (IIPEA protects the "***promise** of future economic advantage," namely, "the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will eventually arise") (emphasis added); *Pro Water Sol.*, 457 F. Supp. 3d at 852-53 (dismissing IIPEA claim that failed to allege "actual disruption to its relationships with customers, such as a lost contract or failed negotiation"); *Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers*, 2013 WL 489899, at *9 (C.D. Cal. Feb. 7, 2013) (a plaintiff "must allege actual interference with actual contracts, such that a result is a specific breach, not merely general damage to the business"). CREXi's allegations that certain unidentified brokers "declined" to work with CREXi are insufficient (FACC ¶ 261); rather, "it must be reasonably probable that the prospective economic advantage would have been realized but for defendant's interference." *Westside Ctr. Assocs.*, 42 Cal. App. 4th at 522.[23]

***Fourth***, CREXi's IIPEA claim fails because CREXi does not allege that CoStar's conduct was "independently wrongful," *i.e.*, "proscribed by some constitutional, statutory, common law, or other determinable legal standard." *Pro Water Sol.*, 457 F. Supp. 3d at 852-53. This provides an independent basis for dismissing CREXi's IIPEA claim.  *See Manwin Licensing Int'l S.A.R.L. v. ICM Registry, LLC*, 2013 WL 12123772, at *9 (C.D. Cal. Feb. 26, 2013) (dismissing IIPEA claim where plaintiff "failed to plead independently wrongful conduct");

---

[22]  CREXi's allegation that CoStar's conduct "impedes, disrupts, and otherwise hampers CREXi's ability to provide services," FACC ¶ 256, is foreclosed by the Court's Order, which found that nothing "forbid[s] brokers from hiring CREXi or . . . stop[s] brokers from sharing the exact same information" with CREXi.  Or. at 7.

[23]  CREXi's mere "expectation" that "Broker 65 would list CRE properties on CREXi's website," FACC ¶ 261(i), is also insufficient. *See Simi Surgical Ctr., Inc. v. Conn. Gen. Life Ins. Co.*, 2018 WL 6332285, at *6 (C.D. Cal. Jan. 4, 2018) ("Allegations that a defendant interfered with a relationship with a 'potential' customer will not suffice.").

1   *Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at \*11 (N.D. Cal. Jan. 9,

2   2012) (same).

3       **B.     CREXi's Unlawful And Unfair Competition Claims Also Fail**

4       CREXi's claims for "unlawful" and "unfair" competition under California

5   law, Cal. Bus. & Prof. Code § 17200, are derivative of its antitrust, trademark, and

6   tortious interference claims, and fail for the same reasons as those claims.  *See, e.g.*,

7   *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123-24 (9th Cir. 2018).  CREXi cannot

8   state a claim for "unlawful" competition predicated on its antitrust or tortious

9   interference claims because it has not plausibly alleged any of those claims.  *See,*

10  *e,g.*, *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1028 (N.D. Cal. 2012) (dismissing

11  claim for "unlawful" competition because all predicate claims had been dismissed);

12  *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1190 (N.D. Cal.

13  2009) (same).  And, CREXi, as CoStar's competitor, cannot state a claim for "unfair"

14  competition where it has not plausibly alleged any conduct that "significantly

15  threatens or harms competition."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,

16  20 Cal. 4th 163, 187 (1999); *see also Reilly v. Apple Inc.*, 2022 WL 1215305, at \*8

17  (N.D. Cal. Apr. 25, 2022) (dismissing unfair competition claim for failure to allege

18  anticompetitive conduct to support antitrust claim).

19      While CREXi previously argued that it could state a claim for "unfair"

20  competition even if failed to plead an antitrust claim, Opp. to CoStar's Mot. to

21  Dismiss Countercls. at 31-32 (Dkt. 86), that is wrong.  As a matter of law, "[i]f the

22  same conduct is alleged to be both an antitrust violation and an 'unfair' business act

23  . . . for the same reason . . . the determination that the conduct is not an unreasonable

24  restraint of trade necessarily implies that conduct is not 'unfair'."  *Hicks*, 897 F.3d

25  at 1124 (quoting *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001)); *U.S.*

26  *Wholesale Outlet & Distrib., Inc. v. Living Essentials*, 2021 WL 3418584, at \*5

27  (C.D. Cal. Aug. 5, 2021) (J. Marshall) (same).  That is because "permitting a separate

28

1  inquiry" into "essentially the same question under the UCL" would "only invite[]

2  conflict and uncertainty . . . ." *U.S. Wholesale Outlet*, 2021 WL 3418584, at *5.

3  Moreover, as the Court correctly concluded in dismissing CREXi's original

4  unfair competition claim, CREXi has not, and cannot, allege that being "blocked"

5  from CoStar's websites has "completely excluded it from accessing public

6  information" or threatened to "put it out of business," and in fact, "has allege[d] the

7  opposite." Or. at 18-19 (rejecting CREXi's reliance on *hiQ Labs. v. LinkedIn Corp.*,

8  31 F.4th 1180, 1194 (9th Cir. 2022)).  Those same conclusions hold and foreclose

9  CREXi's claim for unfair competition.

10  **C.    The Court's Order Forecloses CREXi's Request For Declaratory**
         **Relief**
11

12  CREXi again seeks a declaratory judgment that (i) finds that CREXi is not

13  engaging in unlawful conduct by accessing CoStar's websites, (ii) prohibits CoStar

14  from taking steps to block CREXi's access to its websites, and (iii) finds that CoStar

15  has engaged in unlawful conduct by blocking CREXi's access to CoStar's websites.

16  FACC ¶ 386.  This claim should be dismissed because the relief that CREXi seeks

17  is foreclosed by the Court's Order, which held that CoStar may block CREXi from

18  accessing CRE information hosted on CoStar's websites.  Or. at 8.[24]

19                                    **CONCLUSION**

20  For the foregoing reasons, CoStar requests that the Court dismiss CREXi's

21  amended counterclaims with prejudice.  The Court already afforded CREXi the

22  opportunity to amend its counterclaims once and CREXi has been able to cure the

23  deficiencies the Court identified and thus leave to amend would be futile.

24

25  _____

26  [24]  In denying CoStar's motion to dismiss CREXi's request for declaratory relief, the
    Court found that "the surviving claims are sufficient for CREXi to state a request for
27  declaratory relief." Or. at 19.  CoStar respectfully requests that the Court revisit that
    ruling. *City of L.A. v. Santa Monica BayKeeper*, 254 F.3d 882, 885 (9th Cir. 2001)
28  (district courts have inherent authority to reconsider non-final orders).  CREXi's
    trademark infringement-related claims were the only surviving claims and they
    provide no basis to support the declaratory relief CREXi seeks.

1

2                                          Respectfully submitted,

3    Dated:  September 16, 2022            **LATHAM & WATKINS LLP**

4                                          By:  */s/ Nicholas J. Boyle*
                                               (admitted *pro hac vice*)
5

6                                          Sarah A. Tomkowiak
                                           (admitted *pro hac vice*)
7                                          David L. Johnson
                                           (*pro hac vice* forthcoming)
8                                          555 Eleventh Street, NW
                                           Suite 1000
9                                          Washington, D.C. 20004
                                           Tel: 202.637.2200
10                                         Fax: 202.637.2201
                                           Email: nicholas.boyle@lw.com
11                                                sarah.tomkowiak@lw.com
                                                  david.johnson@lw.com
12
                                           Jessica Stebbins Bina
13                                         (Bar No. 248485)
                                           Elyse M. Greenwald
14                                         (Bar No. 268050)
                                           10250 Constellation Boulevard
15                                         Suite 1100
                                           Los Angeles, CA 90067
16                                         Tel: 424.653.5500
                                           Fax: 424.653.5501
17                                         Email: jessica.stebbinsbina@lw.com
                                                  elyse.greenwald@lw.com
18
                                           Belinda S Lee (Bar. No. 199635)
19                                         505 Montgomery Street
                                           Suite 2000
20                                         San Francisco, CA 94111
                                           Tel: 415.391.0600
21                                         Fax: 415.395.8095
                                           Email: belinda.lee@lw.com
22
                                           *Attorneys for Plaintiffs and*
23                                         *Counterdefendants CoStar Group, Inc.,*
                                           *and CoStar Realty Information, Inc.*

24

25

26

27

28

# EXHIBIT A

| Internet CRE Information Services Market | Internet CRE Auction Services Market | Internet CRE Listing Services Market |
|---|---|---|
| • CoStar's websites' terms of use are facially non-exclusive but include provisions that give rise to *de facto* exclusivity (FACC ¶¶ 50-69) | • CoStar's websites' terms of use are facially non-exclusive but include provisions that give rise to *de facto* exclusivity (FACC ¶¶ 50-69)<br><br>• Trademark infringement through Google AdWords ads for Ten-X (FACC ¶¶ 118-135) | • CoStar's terms of use are facially non-exclusive but include provisions that give rise to *de facto* exclusivity (FACC ¶¶ 50-69)<br><br>• Blocking of competitors' access to listing information appearing on webpages hosted by CoStar's LoopLink service (FACC ¶¶ 39-49)<br><br>• Modifying broker listing information and adding watermark to broker photographs (FACC ¶¶ 71-90)<br><br>• Claiming ownership of broker photographs through use of a third-party image filter and "disrupting" CREXi's relationships with brokers (FACC ¶¶ 91-111) |

# EXHIBIT B

**Nicholas J. Boyle**
Direct Dial: 202-637-2339
nicholas.boyle@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

March 26, 2021

**VIA E-MAIL**

Elizabeth K. McCloskey
KEKER, VAN NEST & PETER LLP
633 Battery Street
San Francisco, CA 94111-1809
emccloskey@keker.com

Re:   CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc.,
2:20-cv-8819 (C.D. Cal.)

Dear Ms. McCloskey,

I write in response to your letter of March 23, 2021.  Although CREXi purports to "respect[] the intellectual property rights of others," CREXi's willful, continuing infringement of CoStar's images on an industrial scale—even after the filing of two complaints—demonstrates the contrary.

As a threshold matter, the safe harbor protections under the Digital Millennium Copyright Act ("DMCA") do not provide CREXi refuge.  First, the safe harbor protects service providers from liability "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider . . . ."  *See* 17 U.S.C. § 512(c)(1).  But the evidence in this case demonstrates that CREXi is not simply a passive forum that stores CoStar's copyrighted images "at the direction" of users.  Rather, the evidence shows that CREXi itself is actively involved in copying and posting CoStar's copyrighted images.  As detailed in CoStar's First Amended Complaint, CREXi has hit CoStar's websites more than a million times (at least),[1] *see* First Am. Compl. ¶¶ 4, 32, 143, and many brokers whose listings have appeared on CREXi (with CoStar's copyrighted images) have never heard of CREXi or did not authorize CREXi to post their listings.  *See id.* ¶¶ 155–162.  Thus, even before discovery, the record reflects that CREXi *itself* is accessing CoStar's websites and copying CoStar's images without broker involvement.  The DMCA provides no safe harbor for such conduct.

Second, even assuming CREXi did post some images at the direction of users, the safe harbor would still not apply.  The safe harbor requires service providers to "play[] no role" in

---

[1] This fact is undisputed; indeed, CREXi's position is that it is permitted to access CoStar's websites despite CoStar's unambiguous terms of use prohibiting competitive access.  *See* Mem. in Supp. of CREXi's Mot. to Dismiss First Am. Compl. at 9–11 (ECF No. 55-1) ("Mem.").

**LATHAM&WATKINS**LLP

making the infringing material accessible beyond narrow activities designed to enhance the accessibility of a user's post. *See Mavrix Photographs, Ltd. Liab. Co. v. LiveJournal, Inc.*, 873 F.3d 1045, 1056 (9th Cir. 2017); *see also UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1020 (9th Cir. 2013) (referring to accessibility-enhancing activities as those where the service provider did "not actively participate in or supervise file uploading"). But here, the evidence shows that CREXi does actively participate in posting the infringing material. As described in the First Amended Complaint, CREXi trumpets the fact that it is actively involved in creating and adding the listings on the site, and even tells brokers that CREXi will "build your listings for you." First Am. Compl. ¶ 173. CREXi's active role in making the infringing content available on its website disqualifies CREXi from the safe harbor's protections. In any event, if CREXi is taking the position that some images identified to date were uploaded to CREXi's website by third-party users without any involvement from CREXi, please let us know. For each infringing image we have identified (in the First Amended Complaint and by letter) provide the identity of the person who uploaded the image (and specify whether they are affiliated with CREXi or a third party), the relevant URL, and the date of the upload.

Third, even assuming, for the sake of argument, that third-party users uploaded every CoStar-copyrighted image on CREXi's website without CREXi's participation or supervision, the safe harbor would still not protect CREXi because CREXi has failed to reasonably implement a DMCA policy. As CREXi is well aware, the DMCA's safe harbor provisions only apply if CREXI "has adopted and *reasonably implemented* . . . a policy that provides for the termination . . . of subscribers and account holders . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A) (emphasis added). Given the continued presence of CoStar's copyrighted images on CREXi's website—even after CoStar previously identified the photographs to CREXi and CREXi purportedly removed the images at issue—at best that would suggest that CREXi has failed to take steps to ensure that the third-party users who are purportedly uploading these images are not continuing to infringe. Turning a blind eye to repeat infringers once put on notice is wholly insufficient and strongly suggests that CREXi has not implemented a valid safe harbor policy and thus may not avail itself of the DMCA's safe-harbor protections. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (describing that a DMCA policy is "reasonably implemented" only if "the service provider terminates users who repeatedly or blatantly infringe copyright"). And to the extent that any new infringers are posting CoStar's copyrighted materials on CREXi's website, including with images that bear CoStar's logo, CREXi has done nothing about them either. Moreover, even *if* CREXi had a reasonable DMCA policy, and it plainly does not, courts will step in to issue injunctive relief beyond the DMCA where appropriate. This is all the more likely where, as here, there is repeat infringement, evidence that the purported service provider will enforce no more than what it perceives to be the absolute minimum, and existing technology readily available to counter the infringement.

In a vain attempt to divert attention from CREXi's wrongdoing, you argue that CREXi suffered from a lack of pre-suit notice of its mass infringement. CoStar sends cease-and-desist letters to infringers when notice is required. But CREXi unquestionably knew of its own infringing activities; indeed, as detailed in the First Amended Complaint, CREXi went to great lengths to conceal its infringement. A company like CREXi that hits CoStar's websites more than a million times, disguises its access using IP anonymizers and fake identities, co-opts other customers'

LATHAM&WATKINSLLP

passwords to gain access to CoStar's databases, and publishes in excess of 10,000 CoStar images—many with the CoStar logo—does not require notice. It requires an injunction to stop its willful infringement.

Indeed, CREXi has demonstrated that an injunction is essential by continuing to publish CoStar's copyrighted images notwithstanding the lawsuit, including images with CoStar's logo. You state that CREXi contracts with a third-party vendor to identify images that include the CoStar logo. The fact that images with CoStar's logo continue to appear on CREXi's website indicates that CREXi's purported approach is, at best, not working.[2] Given CREXi's access to functional copyright filters, the obvious conclusion is that the use of the ineffectual vendor is a fig leaf, and that CREXi does not in fact want to remove the copyrighted images. This is because, when it comes to real estate listings, in the words of CREXi's Eli Randel, "images matter." First Am. Compl. ¶ 108. You also state that "CoStar routinely adds its logo to images uploaded to its website by users . . . ." In fact, CoStar adds its logo to CoStar-owned images. *See id*. ¶ 65. As you know, all of the images that CoStar has identified to CREXi to date have included the copyright registration number of the image and the name of the CoStar photographer. If CREXi has images owned by third parties to which CoStar has affixed its logo, please provide them.

Moreover, even if CREXi's vendor was actually doing its job and locating all of the images on CREXi.com featuring CoStar's logo—and we know it is not—that would of course not suffice. That knowingly ineffective approach ignores the thousands of CoStar-copyrighted photographs appearing on CREXi's website that have been cropped to remove CoStar's logo. As stated in CoStar's March 18 letter, CREXi has failed to take the obvious step of setting up a readily-available filter to remove these cropped images and prevent continued infringement. Worse still, CREXi has continued to publish or has republished nearly 1,000 images that CoStar *already told* CREXi are copyrighted. It is difficult to fathom what more CREXi requires to stop those images from appearing on its website.[3]

Your assertion that some of these images may have been republished on a different URL is a non sequitur. CoStar is not responsible for policing CREXi's website and playing whac-a-mole every time CREXi publishes images that CoStar has already identified as infringing. Again, CoStar has identified copyrighted images to CREXi and provided copyright registration information. It is CREXi's responsibility to not publish those photographs on its website. It is no

---

[2] Your letter asserts that CoStar's logo is not CMI. But in the very same paragraph, you state that CREXi is using the presence of the logo to identify infringing content (just like other companies have done, *see* First Am. Compl. ¶ 66). By definition, that means that CoStar's logo is CMI. As CREXi has argued to the Court, "the point of CMI is to inform the public that something is copyrighted and to prevent infringement." Mem. at 20 (citing *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, No. 11 C 5177, 2012 WL 414803, at *6 (N.D. Ill. Feb. 8, 2012). According to your own letter, that is how the CoStar logo is functioning.

[3] Even if CREXi could substantiate its (untenable) position that every one of those images was uploaded by a third-party user (and, as noted above, we have specifically asked you to do so), CREXi must concede that it has permitted the reposting of these images. That underscores that CREXi has not implemented a reasonable repeat infringer policy.

LATHAM&WATKINS LLP

excuse to argue that they appeared on a different URL when CREXi is itself "build[ing]" listings (and when there are effective filtering solutions to prevent user uploads of CoStar copyrighted images).  Infringement on a new URL remains infringement.

Likewise, CREXi's suggestion that CoStar is playing a game of "gotcha" is just silly. CoStar never undertook an exercise to identify definitively every single URL where a copyrighted image was located, nor is CoStar required to.  CoStar identified thousands of copyrighted images to CREXi, and those images are still being published on CREXi's website.  What is truly "troubling" is that CREXi apparently only looked at the 10,000 URLs that CoStar identified and evidently did not even take the common sense step of searching for other instances of those images on its website.  Even before discovery, CoStar identified more than 10,000 specific instances of infringement.  Rather than remedy the wrongdoing, CREXi is attempting to blame CoStar for not identifying even more infringement!  CREXi must put its own house in order.

The steps that CREXi can and must take to stop its unlawful conduct are simple: comply with the requests set forth in CoStar's March 18 letter.  For clarity, they are set forth again below:

1.  Undertake in writing not to commit any further acts of infringement of CoStar intellectual property.

2.  Immediately remove from its website all CoStar-copyrighted images that CoStar has identified to CREXi to date.

3.  Employ an effective filter to identify and remove any other CoStar images on CREXi.com, and to prevent CoStar-copyrighted images from being published on CREXi's website in the future.

4.  Institute a block on CREXi employees' and agents' computers to prevent them from accessing CoStar's websites.

5.  Disclose to CoStar the full extent of CREXi's infringement and associated wrongdoing.

6.  Agree to pay damages for past infringement, including for the copyrighted images identified by CoStar, and any others identified by the filter as having been published by CREXi.

CREXi's failure to implement such measures underscores CREXi's willful infringement and indifference to CoStar's rights.

Indeed, the theme underlying your letter is that CREXi is somehow at the mercy of circumstance: brokers are the ones infringing, and CREXi doesn't know how to make them stop. This is simply nonsense.  CREXi knows how to operate a legitimate business:  Don't harvest CoStar's competing content.  Don't hack into CoStar's services using passwords issued to other companies.  Admit and remedy its past misconduct, including by purging improperly derived content and paying damages.  And don't publish LoopNet listings or CoStar's copyrighted content

March 26, 2021
Page 5

**LATHAM&WATKINS**LLP

going forward.  If CREXi were interested in operating within the law, doing so would not be difficult.  CREXi has easy access to vendors that can identify CoStar images and avoid their publication.[4]  CREXi does not need CoStar's guidance in order to stop deliberately infringing CoStar's rights.  CREXi is fully responsible for continuing down its path of wrongdoing, even after being sued.

Your letter concludes with a request to meet and confer.  We are happy to confer, despite the fact that the topics you identify in your letter do not appear to require discussion.  To make any conference meaningful, we ask that you first provide the information requested in this letter, including the information requested regarding the persons who posted the infringing images identified to date.  We look forward to your prompt response.

Sincerely,

*/s/ Nicholas J. Boyle*

Nicholas J. Boyle

---

[4] As CREXi well knows, courts have ordered the use of filters that exclude CoStar copyrighted images.  For example, it is a matter of public record that RealMassive was ordered to use such a filter, and that CoStar identified PicScout (now owned by Getty) as an acceptable vendor.  *See* Am. Consent Decree*, CoStar Realty Information, Inc. v. RealMassive, Inc., et al.*, No 1:15-cv-440-RP (W.D. Tex.) (ECF No. 46).  And the FTC, which needless to say does not operate a CRE marketplace, was able to hire TinEye to identify tens of thousands of CoStar images in Xceligent's database.  To imply that CREXi is somehow ignorant regarding effective filtering options, and needs to meet and confer to learn about them, is not credible.

**Nicholas J. Boyle**
Direct Dial: 202-637-2339
nicholas.boyle@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

June 25, 2021

<u>**VIA E-MAIL**</u>

Elliot R. Peters
Elizabeth K. McCloskey
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
epeters@keker.com
emccloskey@keker.com

   Re: <u>CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc.,</u>
     <u>2:20-cv-8819 (C.D. Cal.)</u>

Dear Mr. Peters and Ms. McCloskey,

   I write, once again, on behalf of Plaintiffs CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar") concerning Defendant Commercial Real Estate Exchange Inc.'s ("CREXi") continuing willful infringement of CoStar's copyrighted photographs during the pendency of the above-captioned lawsuit.

   As you are well aware, CoStar has—to date—identified over 11,180 instances of CoStar-copyrighted images displayed on CREXi's website without permission, including 10,000 images identified in our Amended Complaint, 1,000 images identified in our March 18, 2021 Letter, 100 images in our April 23, 2021 Letter, and an additional 80 images in our May 24, 2021 letter. *See Am. Compl.* Ex. C, D*; Mar. 18 Ltr. from N. Boyle to E. Peters*, Ex. A; *Apr. 23 Ltr. from N. Boyle to E. Peters,* Ex. A; *May 24 Ltr. from N. Boyle to E. Peters*, Ex. A. In each instance, CoStar provided the physical address of the photographed property, the photographer's name, the copyright registration information, and the URL where the infringing image was found on CREXi's website. *See id.*

   Separately, CoStar has identified to CREXi over 1,700 CoStar-copyrighted photographs which continued to appear on the CREXi website notwithstanding the fact that CoStar previously identified these photographs to CREXi. *See Mar. 18, 2021 Ltr. from N. Boyle to E. Peters*, Ex. B; *Apr. 23 Ltr. from N. Boyle to E. Peters,* Ex. B, *May 24 Ltr. from N. Boyle to E. Peters*, Ex. B.

   Despite the lawsuit and CoStar's three previous letters, CREXi continues to willfully infringe CoStar's copyright photographs. Based on our review of a sampling of listings on CREXi with a "Date Added" occurring after CoStar sent its May 24, 2021 letter, CoStar has identified 85 ***additional*** CoStar-copyrighted images that have been added to CREXi's website without CoStar's

**LATHAM&WATKINS**LLP

authorization in just the last few weeks. Copies of these infringing images, their copyright registration information, and their URLs are attached as Exhibit A. As with before, many of these recently-identified images contain CoStar's watermark (in full or in part).

And further, of the previously identified CoStar-copyrighted photographs appearing on CREXi's website, 160 continue to appear on CREXi's website, as shown in Exhibit B. CREXi's continued refusal to remove (or block the republishing of) CoStar-copyrighted images, even after CoStar provided detailed information of the specific instances of infringement, further underscores CREXi's disregard of CoStar's rights, and demonstrates why injunctive relief is needed. CREXi has clearly ***still not*** taken obvious steps, such as setting up a filter or blocking its employees' and agents' computers from accessing CoStar's websites, to prevent further mass infringement of CoStar's copyrighted photographs. CREXi's failure to do so demonstrates the continued willfulness of CREXi's infringement of CoStar's intellectual property.

As explained in our previous letters, CREXi's continued infringement of CoStar's photographs throughout this lawsuit, including images that CoStar has specifically and clearly identified during the litigation, will more than support a request for enhanced statutory damages. *See Mar. 18, 2021 Ltr. from N. Boyle to E. Peters* at 2-3.

The steps that CREXi can and must take to address its unlawful conduct remain the same as set forth in Costar's previous letters. Those steps are:

1.    Undertake in writing not to commit any further acts of infringement of CoStar intellectual property.

2.    Immediately remove from its website all CoStar-copyrighted images that CoStar has identified to CREXi to date.

3.    Employ an effective filter to identify and remove any other CoStar images on CREXi.com, and to prevent CoStar-copyrighted images from being published on CREXi's website in the future, such as the filter offered by Getty Images/PicScout.

4.    Institute a block on CREXi employees' and agents' computers to prevent them from accessing CoStar's websites.

5.    Disclose to CoStar the full extent of CREXi's infringement and associated wrongdoing.

6.    Agree to pay damages for past infringement, including for the copyrighted images identified by CoStar, and any others identified by the filter as having been published by CREXi.

In addition, as requested in our March 26, May 11, and May 24, 2021 letters, to the extent CREXi takes the position that each of the over 11,200 identified images were uploaded without any involvement from CREXi, please provide the identity of the person who uploaded each image (and specify whether they are affiliated with CREXi or a third party), the relevant URL, and the

June 25, 2021
Page 3

**LATHAM&WATKINS** LLP

date of the upload. CREXi's failure to provide this basic information that CREXi has already gathered, or to implement the measures requested by CoStar, particularly in the face of repeated, reasonable requests, reemphasizes the intentional nature of CREXi's misconduct.

Please confirm no later than close of business on July 2, 2021 that CREXi will cease its campaign of infringement and comply with CoStar's requests. CoStar reserves all rights with respect to the initial and continuing publication of its copyrighted photographs. We look forward to hearing from CREXi promptly.

Sincerely,

*/s/ Nicholas J. Boyle*

Nicholas J. Boyle

3

**Nicholas J. Boyle**
Direct Dial: 202.637.2339
nicholas.boyle@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

April 1, 2022

**<u>VIA E-MAIL</u>**

Elizabeth McCloskey
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
emccloskey@keker.com

Re:   *CoStar Group, Inc., et al. v. Commercial Real Estate Exchange, Inc.,*
      *2:20-cv-8819 (C.D. Cal.)*

Dear Counsel:

I write on behalf of CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar" or "Plaintiffs") in response to CREXi's letters regarding its implementation of the Getty filter.

As you know, CREXi has thousands, and likely tens of thousands, of CoStar's copyrighted images in its system. Based on CREXi's supplemental interrogatory responses, most of that mass infringement is directly attributable to CREXi's employees and agents. Of the 10,000 CoStar images we identified in our complaint, about two thirds were uploaded into CREXi's systems by CREXi employees or companies hired by CREXi. And based on CREXi's million plus hits on CoStar's sites, and its core counterclaim argument that CoStar should open up those sites to let CREXi continue with its business practice of mass harvesting listings, we know that CREXi obtains CoStar images by copying them from CoStar sites. In short, CREXi knowingly infringes. And it must pay damages for doing so, and stop that misconduct going forward. That's CREXi's responsibility.

CoStar has never suggested that the Getty filter alone could remedy CREXi's conduct or perfectly eliminate infringement, but merely suggested that CREXi implement a filter as one step to mitigate CREXi's continuing and repeat infringing behavior. Of course, CoStar is not responsible for policing CREXi's mass infringement, or for the Getty filtering technology. It is CREXi's responsibility alone to ensure that CoStar's copyrighted-photographs do not appear on its website. The filter is just one technological tool that it can choose to use to attempt to fulfill that responsibility. CREXi could, as an alternative, use its own images. It has chosen not to do so, because that would cost money. But CREXi cannot be heard to complain about the consequences of its decision to try to compete on the cheap.

LATHAM&WATKINS LLP

     In any event, based on your recent correspondence, the Getty filter is successfully catching a huge amount of ongoing (publication) infringement by CREXi.  Your March 3 and 24 letters represent that the Getty filter identified over 2,000 CoStar-owned images in CREXi's system in December 2021, and nearly 3,000 in January 2022.[1]  That is approximately 5,000 images flagged in *two months alone*, over *a year* after CoStar filed this lawsuit.  If CREXi is sincere in its claim that it "has zero interest in utilizing copyrighted CoStar photographs," some "false positives" seems a small price for CREXi to pay for a system that operates at approximately 90% (at least, and likely higher) efficacy[2] and prevents CREXi from displaying thousands of infringing images on its website each month.  Would CREXi prefer that the filter had a significant number of "false negatives" such that CREXi continued to display scores or hundreds or even thousands of additional CoStar copyrighted images every month, at a potential liability of tens of thousands of dollars per image based on that display?[3]  Or that the filter instead leaned toward false positives that could be weeded out?  Please advise.

     CREXi is already facing huge liability for its mass infringement, and its continuing disregard of CoStar's intellectual property rights is causing significant additional harm to CoStar's business, and the decades of hard work and expense that have gone into building a voluminous, copyrighted image library.  Against this backdrop, CREXi's bare and unsupported assertion that the Getty filter is "causing significant harm to CREXi's business" is risible.  The Getty filter works to prevent infringement, in contrast to the flagging process utilized by CREXi's first choice, Restb, which according to CREXi, has been operating since February 2019 to identify "photographs on the CREXi platform that contain the logo of a third party."  *See* Mar. 9, 2022 Supp. Resp. to Interrog. No. 5 at 29.  While CREXi represented to the Court recently that it employs Restb in a "good faith effort to prevent infringement," Joint. Stip. Dkt. 116 at 5, that effort is plainly not good enough, because Restb failed to prevent CREXi from displaying thousands and thousands of CoStar's images.[4]  It is disingenuous for CREXi to now feign concern or "significant harm" to its business from  operating the Getty filter when its own so-called "effort to prevent infringement"

---

[1] CREXi's March 24, 2022 letter states that the filter identified 412 false positives, resulting in a 13% false positive rate, in January 2022.  While the March 24 letter conspicuously does not identify the total number of images flagged by the filter, CoStar calculates the total number of images flagged to be approximately 3,169 based on the numbers provided.

[2] The efficacy rate is understated: many of CREXi's "false-positive flagged images" in Exs. C and D appear to be duplicates.  *See, e.g.*, Ex. C at 13-15, 17, 19-21, 23-25, 26-37, 39-50, 52-55.

[3] While the filter appears to be reducing CREXi's additional liability for the display of CoStar copyrighted images, we are not clear whether the images that are being filtered are nonetheless being copied onto CREXi's systems, and then maintained there.  Please advise.

[4] Please advise as to the costs associated with the retention of Restb, how that compares with the cost of using the Getty filter, whether there were any issues with the Restb flagging process (false positives, false negatives or otherwise), whether CREXi has complained to Restb about such issues, and whether CREXi has faced (or claimed to face) any financial consequences or business disruption as a result of any such issues, including this lawsuit.  We note that, like the Getty filter, we are not clear whether the photographs flagged by Restb as containing CoStar's star logo are nonetheless being copied onto CREXi's systems, and then maintained there.  Please advise as well.

LATHAM&WATKINS LLP

(for which it presumably paid, and which presumably had some business impact) spectacularly flopped.  Likely that was CREXi's intent all along, given the inherent limitations of the Restb technology.  It is CREXi's own lackluster effort to prevent infringement that contributed to this lawsuit and the massive damages that CREXi now faces.  *That* is significant harm.

Unsurprisingly, then, CREXi's contrived claim of harm from using the Getty filter is unsubstantiated.  Notwithstanding our repeated requests, CREXi has not identified even a single listing that it was unable to post because of a "false positive" image match in the Getty filter.  It appears that, at most, CREXi has been somewhat inconvenienced by using this screening technology that is catching huge amounts of additional infringement every month, unlike the Restb filter (which of course, can only catch, at most, images with CoStar's star logo and not CoStar-copyrighted images that have been manually altered, including to crop out CoStar's star logo).  Certainly that inconvenience comes nowhere close to "stifled competition" or "severe harm."  Again, if CREXi does not want to use a filter, and does not want to incur yet more liability, why doesn't it compete based on a business model that is not built on harvesting listings from CoStar sites or using CoStar copyrighted images?

CoStar's representation in July 2021 that it provides Getty with a database of CoStar-copyrighted images taken by CoStar's photographers was and remains true.  That CREXi has potentially identified a handful of images[5] not owned by CoStar that are inadvertently included in the source set does not make CoStar's representation false, nor does it support CREXi's unsupported, sweeping assertion that CoStar is "misusing images and copyrights."[6]

In any event, CoStar has been working diligently with Getty to comprehensively investigate the minor issues raised by CREXi in its January and March correspondence, and CoStar now turns to those:

*First*, CoStar has investigated CREXi's claims that "CoStar does not appear to own" 19 unique images.  *See* Jan. 6, Mar. 3, and Mar. 24, 2022 Ltrs. (listing 19 unique URLs).  Those claims are flawed.  Five of these images are photographs of commercial property signs.[7]  CoStar has already matched two of the image URLs provided by CREXi to CoStar-owned photographs in its image library.  CoStar's matching process with respect to the remaining three URLs provided by CREXi is ongoing, but CoStar has no reason to believe that these photographs are not likewise owned by CoStar.  One image (*see* https://gettyirccatalog.s3.amazonaws.com/Images/10174/1a0b

---

[5] As discussed below, CoStar has been unable to verify that these images exist in its source set.

[6] In its Dec. 17, 2021 letter, CoStar identified one rendering that was inadvertently included in source set (image A.4, attached to CREXi's Sept. 17, 2021 letter).  That rendering was in the Getty filter due to a manual tagging error, discussed in CoStar's First Supp. Resp. to Rogg. No. 3.

[7] *See* https://getty-irc-catalog.s3.amazonaws.com/Images/20813/a174b4e4-5ec9-4ec5-b139-99fb83a93f00.jpg; https:// getty-irc-catalog.s3.amazonaws.com/Images/20813/ede4c5ee-0c40-42f9-b65a-57604577e503; https://getty-irc-catalog.s3.amazonaws.com/Images/20813/cd505483-af31-4517-84f8a50b05fd 00.jpg;  https://getty-irccatalog.s3.amazonaws.com/Images/20813/e967d78-91a2-4085-921e-a7082027b517.jpg; https://gettyirccatalog.s3.amazonaws.com/Images 20813/8ffd03f7-33d1-41be-a64e-2c1882740765.jpg.

**LATHAM&WATKINS**LLP

1b68-4673-409ca031-515e81bf60df.jpg), is not in fact in the Getty source set and appears to have been inadvertently matched by Getty due to a technical glitch on Getty's end.  CoStar has asked Getty to remove this image from the filter.

For the remainder of the 13 images, CREXi's failure to timely provide any of CoStar's originally requested information about these images has made CoStar's investigation into the source of these images difficult.  These 13 images appear to be graphics of corporate logos.  To date, CoStar has been unable to identify these graphics in its own image library, and thus, CoStar cannot confirm how they came to be in the Getty source set or otherwise included in the Getty filter.  CoStar's investigation into these images is ongoing.  But in any event, due to CREXi's representations that these graphics are in the source set, and because CoStar does not claim ownership over these graphics, CoStar has asked Getty to remove these graphics from the filter.

*Second*, CREXi's concerns about erroneous false matches are misplaced.  As an initial matter, several of the "false-positive hits" identified by CREXi are not actually false-positive hits, but rather, are matches where the flagged image has been altered from the original.  For example, the very first image in Exhibit D to CREXi's March 3, 2022 letter is indeed a CoStar photograph (taken by a CoStar field researcher in 2011) that appears to have been cropped.  Similarly, the last image in Exhibit D is also an edited version of a CoStar photograph (taken by a CoStar field researcher in 2010).  The Getty filter's ability to detect manipulations of CoStar's photographs (including cropping) is essential to the filter's effectiveness, and further demonstrates the need for CREXi to use a filter (beyond Restb) on its systems.

*Third*, the fact that the filter's sensitivity results in some false hits on CREXi images containing corporate logos (like Dunkin Donuts, Dairy Queen, Subway, etc.) or enhanced skies does nothing to undermine CoStar's valid copyright interests in the photographs included in the source set containing those third-party logos or enhanced skies.

We remain very concerned that, despite this lawsuit, CREXi's business practices still involve the apparent copying of thousands of additional CoStar-copyrighted images every month.  That is the real issue here, not CREXi's transparent attempt to manufacture some leverage by complaining about a filter that is effective in catching this ongoing wrongdoing.  CREXi should instead be focused on building a legitimate business that does not involve piggybacking on CoStar's efforts and infringing its intellectual property.  Assuming CREXi chooses to continue to use the (proven effective) Getty filter, please continue to advise us on the amount of CoStar-copyrighted photographs that are being identified by the filter each month.  To the extent the filtering process undercovers any other images in the Getty source set that may not be owned by CoStar, CoStar remains willing to investigate and remove such images as needed.   Ultimately, though, it remains CREXi's responsibility—not Getty's and not CoStar's—to refrain from infringing CoStar's copyrighted images.

Sincerely,

*/s/ Nicholas J. Boyle*

Nicholas J. Boyle

Exhibit B, Page 39