**FILED**
**CLERK, U.S. DISTRICT COURT**

FEBRUARY 14, 2023

**CENTRAL DISTRICT OF CALIFORNIA**
**BY: _____ YS _____ DEPUTY**

1  JESSICA STEBBINS BINA (BAR NO. 248485)
2  jessica.stebbinsbina@lw.com
   ELYSE M. GREENWALD (BAR NO. 268050)
3  elyse.greenwald@lw.com
4  LATHAM & WATKINS LLP
   10250 Constellation Boulevard
5  Suite 1100
6  Los Angeles, CA 90067
   Tel: 424.653.5500
7  Fax: 424.653.5501

8
   *Attorneys for Plaintiffs and Counterdefendants*
9  *CoStar Group, Inc. and CoStar Realty Information, Inc.*

10
   [Additional Counsel Listed on the Next Page]
11

12              **UNITED STATES DISTRICT COURT**
13              **CENTRAL DISTRICT OF CALIFORNIA**

14  COSTAR GROUP, INC., and COSTAR          Case No. 2:20-cv-08819-CBM-AS
15  REALTY INFORMATION, INC.,
                                            Hon. Consuelo B. Marshall
16              Plaintiffs,
                                            **SECOND AMENDED**
17        v.                                **COMPLAINT**

18  COMMERCIAL REAL ESTATE
    EXCHANGE, INC.,
19                                          **DEMAND FOR JURY TRIAL**
                Defendant.
20
    COMMERCIAL REAL ESTATE
21  EXCHANGE, INC.,

22              Counterclaimant,

23        v.

24  COSTAR GROUP, INC., and COSTAR
    REALTY INFORMATION, INC.,
25
                Counterdefendants.
26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

1  BELINDA S LEE (BAR NO. 199635)
   belinda.lee@lw.com
2  LATHAM & WATKINS LLP
   505 Montgomery Street, Suite 2000
3  San Francisco, CA 94111
   Tel: 415.391.0600
4  Fax: 415.395.8095

5  NICHOLAS J. BOYLE*
   nicholas.boyle@lw.com
6  SARAH A. TOMKOWIAK*
   sarah.tomkowiak@lw.com
7  ANNE C. MALINEE*
   anne.malinee@lw.com
8  DAVID L. JOHNSON*
   david.johnson@lw.com
9  LATHAM & WATKINS LLP
   555 Eleventh Street, NW, Suite 1000
10 Washington, D.C. 20004
   Tel: 202.637.2200
11 Fax: 202.637.2201

12 ELIZABETH A. PARVIS*
   elizabeth.parvis@lw.com
13 LATHAM & WATKINS LLP
   1271 Avenue of the Americas
14 New York, NY 10020
   Tel: 212.906.1200
15 Fax: 212.751.4864

16 CAITLIN E. DAHL*
   caitlin.dahl@lw.com
17 LATHAM AND WATKINS LLP
   330 North Wabash Avenue, Suite 2800
18 Chicago, IL 60611
   Tel: 312.876.7700
19 Fax: 312.993.9767

20 Attorneys for Plaintiffs and Counterdefendants
   * Admitted pro hac vice

21

22

23

24

25

26

27

28

1

2

**TABLE OF CONTENTS**

3

**Page**

4

PRELIMINARY STATEMENT ............................................................... 1

5

BACKGROUND ...................................................................................... 19

6

JURISDICTION AND VENUE ............................................................... 32

7

THE PARTIES ......................................................................................... 33

8

RELEVANT NONPARTIES ................................................................... 34

9

FACTUAL ALLEGATIONS .................................................................. 36

10

11      A.    CoStar Invests Significant Time and Money to Maintain the Nation's Most Comprehensive and Most Visited

12      Commercial Real Estate Services ....................................... 36

13      B.    CoStar Goes to Significant Lengths to Protect Its Intellectual Property And the Content That It Presents to

14

15      Consumers .......................................................................... 41

16          1.    Copyright Protection ................................................ 41

17          2.    Terms of Use Protection .......................................... 43

18          3.    Technological Protection ......................................... 52

19      C.    CREXi Has Grown at CoStar's Expense By Free-Riding on CoStar's Investment and Misappropriating CoStar

20

21      Content .............................................................................. 54

22      D.    CREXi is Repeatedly Accessing and Repackaging CoStar's Content to Unfairly Compete With CoStar, in

23      Violation of the Terms of Use Associated with CoStar's

24      Services ............................................................................. 62

25          1.    CREXi Employees Unlawfully Access CoStar's Subscription Database Using Log-In Credentials

26      Issued to Other Companies in Order to Obtain

27      Content to Compete Against CoStar ....................... 62

28

i

1

2

**TABLE OF CONTENTS**

3

Page

4

2.   CREXi Repeatedly Accesses LoopNet Using Multiple IP Addresses to Evade Anti-Piracy Efforts—Sometimes Using Fake Identities or Through Offshore Agents—for Competitive Purposes ................................................... 66

3.   CREXi's Offshore Agents Also Covertly Access and Use LoopNet Without Authorization ............................... 72

4.   CREXi's LoopNet Access And Use Violates LoopNet's Terms and Conditions ......................................... 74

5.   CREXi Steals Copyrighted Photographs from CoStar and its Licensees and Publishes Them on Its Competing Website and In Its Subscription Product ..................................................................... 76

6.   CREXi Copies Real Estate Listings from LoopNet and Posts Them on CREXi.com without Authorization and without Broker Knowledge ...................... 81

7.   CREXi Knows Full Well That CoStar Does Not Permit Competitors to Copy Content from Its Website .................................................................. 94

8.   CoStar's Multiple Lawsuits In India Against CREXi's Agents Have Lifted the Veil on CREXi's Willful Misconduct Against CoStar ......................................... 97

9.   CREXi's Investors Also Unlawfully Access CoStar's Subscription Database to Compete Against CoStar, In Violation of CoStar' Terms of Use ......................................................................... 108

10.  CREXi Knows Full Well That CoStar's Star Logo Signals Its Copyright Ownership........................... 110

E.   CREXi Actively Participates in Creating Listings For Brokers, Including Uploading Infringing Images To CREXi's Platform .................................................. 112

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

F.   CREXi Is Ineligible for the DMCA Safe Harbor Defense in 17 U.S.C. § 512 ............................................................................ 115

1.   CREXi Failed to Properly Designate a DMCA Agent ........................................................................................ 115

2.   CREXi Knew or Should Have Known of Infringing Activity on Its Platform and Failed to Expeditiously Remove Claimed Infringing Images .............. 116

3.   CREXi Failed to Design and Reasonably Implement a Repeat Infringer Policy ................................... 117

G.   CREXi's Wrongdoing Is Consistent with Its Prior Willful Misconduct ........................................................................... 117

FIRST CLAIM FOR RELIEF ................................................................. 119

SECOND CLAIM FOR RELIEF .......................................................... 121

THIRD CLAIM FOR RELIEF ............................................................... 122

FOURTH CLAIM FOR RELIEF .......................................................... 123

FIFTH CLAIM FOR RELIEF ................................................................ 125

SIXTH CLAIM FOR RELIEF ............................................................... 126

SEVENTH CLAIM FOR RELIEF ........................................................ 127

PRAYER FOR RELIEF ......................................................................... 129

JURY DEMAND .................................................................................... 132

Plaintiffs CoStar Group, Inc. ("CoStar Group") and CoStar Realty
Information, Inc. ("CoStar Realty") (collectively, "CoStar"), by and through its
undersigned counsel, bring this Second Amended Complaint against Commercial
Real Estate Exchange, Inc. ("CREXi") and allege as follows:

**PRELIMINARY STATEMENT**

1.     CoStar brings this suit to redress CREXi's flagrant and widespread
theft of CoStar's intellectual property and its unlawful scheme to build a
competing business on the back of that stolen content, and through the
unauthorized use of CoStar's services.

2.     The scale of CREXi's wrongdoing is breathtaking.  To date, CoStar
has identified ***more than 50,000*** CoStar-copyrighted photographs copied,
displayed, or reproduced by CREXi without permission.  This figure far surpasses
the number of copyrighted images that resulted in CoStar's record-setting $500
million judgment against Xceligent.

3.     Worse still, despite being sued in federal court, CREXi remains
defiant, and its wrongdoing continues.  Of the 50,000 infringing images, CREXi
infringed over ***25,000*** of them ***after*** CoStar filed its original complaint in 2020.
And CREXi and its agents have, similarly, continued to hammer CoStar's websites
to harvest content, hitting them half a million times since CoStar initiated this
lawsuit in September 2020.

4.     CREXi's ongoing scheme is, moreover, international in nature.  Like
Xceligent, CREXi has offshored much of its theft to agents abroad.  Discovery in
this case and litigation against four of those CREXi agents in courts around India
has lifted the veil on CREXi's illicit operations.

5.     CREXi tells its offshore agents to copy CoStar-copyrighted images
and associated listing details from CoStar websites and from property brochures,
crop out the CoStar logo, and then upload the content to CREXi.com.  One leading
Indian newspaper covering the litigations against CREXi's agents (also known as

"BPOs," or business process outsourcing companies) summed up CREXi's scheme as follows:



Courtesy of *Economic Times* – Copyright © 2022 Bennett, Coleman & Co. Ltd.

6.     The cropping out of CoStar's watermark—before uploading the image to CREXi.com—is a vain attempt to cover-up CREXi's industrial-scale infringement by seeking to obscure CoStar's ownership of these photographs.  The instructions from CREXi are shamelessly direct.  One CREXi manager, in all caps, ordered an Indian agent to "NOT ADD WATERMARKED PICTURES, PLEASE CROP."  Orders like these from CREXi lead to the following:

**CoStar-Copyrighted Photograph on LoopNet**

**Cropped Image on CREXi**




7.     This compelling evidence of wrongdoing is repeated across thousands of images and years of misconduct, and is found in the hands of a slew of CREXi managers, employees and the aforementioned agents.  And as CoStar has sought to vindicate its rights, some of those individuals are now coming clean about their role in CREXi's scheme.  One BPO line manager told a court-appointed commissioner that while working for CREXi he was "instructed to download pictures from various websites (including [CoStar's] loopnet [site and Moody's] cat[y]list [site] . . . ), and then subsequently, edit those pictures by cropping the logo/watermark on those pictures, and then upload those pictures along with listing details on[to] crexi.com."

8.     Court-appointed commissioners in another action found evidence of widespread misconduct in the offices of a different CREXi agent, including copies of listings on CREXi's website that include CoStar-copyrighted images, brochures containing CoStar-watermarked images, and evidence of covert access to CoStar's websites and mass copyright infringement.  That evidence ranges from WhatsApp messages discussing copying from CoStar sites and cropping CoStar logos, to a draft email addressed to CREXi discussing hundreds of copyright violations.  Even worse, that same court-appointed commissioner found evidence of the "mass deletion" of records relating to CREXi and CoStar.

9.     Another set of court-appointed commissioners recently found perhaps the most damning evidence yet at the home of the CEO of two of CREXi's agents.  That evidence reflects instructions from multiple CREXi employees to copy and crop CoStar images, a showing that the CREXi agents in question were harvesting from LoopNet more than half a year into this litigation, a finding that evidence relating to CoStar and CREXi was destroyed as recently as last month, and a written confession by the Indian CEO that he had been pressured by CREXi into signing a CREXi-drafted declaration for this case (i.e., this U.S. lawsuit) that was, according to the court commissioners, contrary to fact.  The CEO did so because

1   he was told by CREXi that he "had to," and because he was receiving significant

2   payments from CREXi for his companies' services.

3       10.     Little wonder then that three separate Indian high courts have issued

4   injunctions in CoStar's litigation against CREXi's agents, prohibiting their access

5   to CoStar's websites and precluding further contributory infringement on behalf of

6   CREXi.  Those same courts, based on their factual findings—including a finding

7   of "*prima facie* evidence of large scale infringement and piracy" by a CREXi agent

8   on CREXi's behalf—have also authorized the aforementioned *ex parte* seizures of

9   evidence.

10      11.     CoStar knew CREXi's theft was brazen when CoStar initially filed

11  suit, having already identified 10,000 CoStar copyrighted images.  That number, it

12  turns out, was the tip of the proverbial iceberg.  And in the more than two years

13  since CoStar initially sued CREXi, CREXi has done almost nothing to curb its

14  misconduct, with infringement and unauthorized access to CoStar's sites

15  continuing apace since this lawsuit was filed.  This is a wrongdoer that has decided

16  to thumb its nose at both CoStar and the legal system.

17      12.     Over the past thirty-five years, thousands of CoStar employees have

18  worked hard to build a business that serves the needs of the real estate industry and

19  beyond.  CoStar is committed to protecting the work of those who have helped

20  make CoStar's success possible.  CREXi's shameless and ongoing free-riding on

21  those efforts, and the billions of dollars invested by CoStar, must be redressed.

22                              * * *

23      13.     CoStar is the nation's leading provider of commercial real estate

24  (a.k.a. "CRE") information, analytics, and online property marketplaces.  CoStar

25  offers a password-protected database subscription service used by brokers and

26  other entities that require comprehensive commercial real estate data.  CoStar also

27  owns a number of digital marketplaces containing listings of real estate for sale and

28  for lease.  CoStar's LoopNet.com website ("LoopNet") is the leading digital

marketplace for commercial real estate in the United States.  Listings on LoopNet contain CoStar-copyrighted images, data from the CoStar database, and edits made by CoStar researchers to improve marketability.  Everyday buyers, sellers, lessors, lessees, owners, and brokers access and use the marketplace at www.loopnet.com in order to list, buy, sell, lease, rent, or browse commercial real estate.  In addition, CoStar runs a commercial real estate auction platform, known as Ten-X.com ("Ten-X").

14.    CREXi is attempting to build its own online commercial real estate marketplace and auction platform by free-riding on CoStar's billions of dollars of investments and the thirty-plus years of hard work by CoStar's employees.  CREXi covertly harvests content, including broker directories, from CoStar's subscription database without authorization by using passwords issued to other companies.  With the aid of approximately 40 third-party agents working at CREXi's direction and on its behalf, including multiple offshore BPOs (collectively, "Agents"), CREXi also accesses LoopNet on a systematic basis to steal content, including property listing data (both lister-submitted and CoStar-created or derived), new listing alerts, and CoStar-copyrighted photographs, all in breach of contract and in violation of state and federal law.[1]  After copying content from multiple CoStar sources, CREXi proudly and knowingly displays the stolen content on its rival platform (including the parts of its platform accessible only to users of CREXi's paid subscription service, Intelligence), and misleads the marketplace by claiming that it is organically growing a successful business at warp speed.  Put simply, CREXi is ripping off CoStar, CoStar's employees, and CoStar's shareholders, and lying to its customers and the industry.

---

[1] For the avoidance of doubt, CoStar's allegations related to LoopNet in this case refer solely to CoStar's LoopNet marketplace and not to broker websites powered by CoStar's LoopLink service, a service that allows brokers to "link" their websites to "LoopNet" (with the LoopLink-hosted portion of a broker's website then operated and hosted by CoStar).  IP Addresses associated with CREXi continue to access Looplink without difficulty, including as recently as in the last few weeks.

15.     CREXi's wrongdoing is remarkable in its scope.  User accounts and IP addresses affiliated with CREXi and its Agents have impermissibly hit LoopNet *over two million times*—at least—even though such high-volume competitor access is forbidden by CoStar's terms of use.  CREXi's unauthorized access continued even after CoStar implemented blocking technology and sent CREXi thousands of notices stating that its access was unauthorized.  Undeterred, CREXi switched IP addresses and continued using CoStar's services to build a competitive product, and continued harvesting CoStar's content on a mass scale.

16.     Even after CoStar filed its original complaint in September 2020, CREXi's IP addresses continued to access CoStar's LoopNet website, and have done so as recently as this month (December 2022).  This is despite the efforts of CoStar's abuse monitor, which this year automatically blocked IP addresses associated with https://crexi.lightning.force.com/ after they hit CoStar's website *tens of thousands* of times.  CREXi's lightning force page nevertheless has been heavily utilized to harvest content from CoStar during the pendency of this case.  For example, in April 2021 (more than half a year after CoStar initiated this lawsuit), an IP address associated with that page scraped LoopNet, hitting CoStar's site *100,000 times* while using sophisticated evasion efforts, rotating through *70,000* IP addresses around the globe to hinder CoStar's blocking efforts.

17.     Given CREXi's continuing widespread access to CoStar's websites, it is unsurprising that CREXi's infringement of CoStar's photographs also continues at full tilt.  Based on a review of CREXi's website, as well as an analysis of images produced by CREXi through October 2022, CoStar has so far identified *50,395* copyrighted CoStar photographs copied, displayed, or reproduced by CREXi without permission, including over *25,000* that CREXi infringed *after* CoStar filed its original Complaint.  (To give a sense of the harm inflicted and scale of wrongdoing, federal judgments have placed a value of $50,000 on each CoStar image infringed.)  These photographs almost certainly constitute a mere fraction of

the total infringement present in CREXi's systems, as CREXi's public-facing website only displays photographs associated with active listings CREXi has decided to publish on that public-facing website; CREXi has failed to conduct a thorough search for CoStar-owned images in its back-end image library.

18.     CREXi is a sizeable and well-funded company, and could compete fairly with CoStar if it so chose.  As of early 2020, CREXi had purportedly already raised approximately $60 million, including (i) a $4.3 million Seed funding announced in February 2016, (ii) an $11 million Series A funding announced in May 2018, and (iii) a $30 million Series B funding announced in January 2020.  CREXi has also received significant investments from multiple venture capital backers, including Jackson Square Ventures, Freestyle Capital, Lerer Hippeau Ventures, Leon Capital Group LLC ("Leon Capital"), Industry Ventures, and TenOneTen Ventures.  Indeed, TenOneTen Ventures appears to have invested roughly $8.7 million, separate and apart from its involvement in CREXi's initial Seed and Series A funding.  And, these aforementioned investors merely account for the largest stakeholders; CREXi has garnered the financial support of a number of additional investors, including (but not limited to) Clark Landry, Manifest Investment Partners, Hack VC, Beta Bridge Capital, Prudence Holdings, Mitsubishi Estate Company, Wonder Ventures, and KohFounders.  With those resources, CREXi could have grown its business legitimately; it does not need to harvest content from CoStar to survive.  But CREXi has made the strategic choice to take a shortcut and build out its business on the cheap by stealing from CoStar.

19.     As the *Economic Times* of India noted in its CREXi coverage, CoStar's approach, which involves "taking nearly 1 million photographs annually . . . can be an expensive affair," whereas CREXi's Agents can "lift" CoStar's photographs for minimal fees.  "Businesses [ ] who do not want to spend much on creating original content, find this an easy, quick, and cheap shortcut."

1  Easy, quick, and cheap, but unethical and in knowing violation of CoStar's

2  intellectual property rights.

3       20.    At CREXi, the rot permeates the company.  CREXi's former account

4  executives, including Samuel Hamlin and Ross Padfield, hacked into CoStar's

5  password-protected database by using passwords issued to CoStar customers, and

6  then downloaded CoStar's broker directories to build a clone directory on CREXi,

7  using the stolen data to generate customer leads.[2]  Meanwhile, CREXi's current

8  and former employees—as well its Agents in India, the Philippines, and Pakistan—

9  routinely access LoopNet.  Once there, they copy CoStar's content, including

10  copyrighted photographs, real estate listing data, and broker information, to

11  populate its website.  They also copy CoStar-copyrighted photographs by

12  extracting them from property brochures, and then cropping out the CoStar logo

13  when visible—on the instructions of CREXi senior managers such as James

14  Burton—before creating CREXi brochures or uploading the images to CREXi.  As

15  CREXi is well aware, CoStar is a leading licensor of copyrighted real estate

16  photographs for use in brochures.

17       21.    Multiple CREXi managers, employees, and Agents have also created

18  accounts on CoStar's LoopNet site.  For example, CREXi's BPO Neptune

19  Business Solutions Private Limited ("Neptune") created a LoopNet account using

20  an email address with the domain "neptune24x7.com."  Others used pseudonyms

21  to cover their tracks.  For instance, Nick Hanna, CREXi's former senior product

22  manager, created a LoopNet account registered to "Hank Mardukus" at

23  itsnotnick08@aol.com.  Hank Mardukas is a fictional character from the 2009

24  movie, "I Love You, Man."  The use of fake names and non-CREXi email

25  addresses helps CREXi employees and Agents make use of LoopNet, in violation

26

27  [2] CREXi's founding investor, Leon Capital, has engaged in the same conduct, i.e., hacking into CoStar's database with passwords obtained from its employees' former employers.  *See CoStar*

28  *Group, Inc. & CoStar Realty Information, Inc. v. Leon Capital Group, LLC*, Civil Action No. 1:21-cv-02227 (D.D.C. Aug. 20, 2021).

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

of the terms of use barring competitive access, without being caught.  And despite notice of this lawsuit and clear knowledge that LoopNet's Terms of Use prohibit competitive access, CREXi's agents continue to create LoopNet accounts: as recently as October 2022, a CREXi agent from the Philippines created an account with the email veronikacrexi@gmail.com to access LoopNet's website.

22.    Beyond the improper use of CoStar's subscription service to generate broker directories, the direct theft of content from LoopNet, and the harvesting and cropping of CoStar-copyrighted images from brochures, senior employees at CREXi unabashedly use LoopNet as a key tool to compete against CoStar.  Several CREXi employees have set up "saved searches" on LoopNet so that they receive an email notification at a non-CREXi address whenever LoopNet publishes a listing that matches their identified criteria.  For example, Michael Rosenfeld, a former CREXi account executive for the mid-Atlantic region and current CREXi regional director, has created saved searches that send notifications to "Mike Rose" at his personal gmail account whenever LoopNet posts certain property listings in that region.  CREXi is using the efforts of a competing online marketplace, LoopNet, in order to identify new listings to add to its site, rather than relying solely on its own efforts.

23.    CREXi's attempt to clone CoStar's business is brazen.  It has gone so far as to infringe CoStar's copyrighted photographs in the marketing materials it uses to promote itself.  Senior CREXi leadership—including Mr. Rosenfeld and Paul Cohen, CREXi's National Sales Director—have hosted a number of virtual presentations to introduce CREXi in markets across the country.  During the presentations, CREXi fraudulently and misleadingly claims that it has legitimately obtained more listings than its competitors.  What CREXi does not advertise, however, is that it is harvesting a significant amount of listing content from CoStar.  Indeed, even the sample listings shown in these virtual marketing campaigns contain infringing content copied from CoStar.

24.     There is no question that CREXi knows that its conduct is wrongful. It is widely known that CoStar, in accordance with industry norms, does not permit competitors to piggyback on its business.  CoStar's subscription service is password-protected (as is CREXi's).  And CoStar has sent thousands of notices to CREXi specifically stating that it may not access LoopNet.  CREXi itself has admitted in the ordinary course that it is ***not*** allowed to copy CoStar's listing content from LoopNet, even telling its Agents as much (mostly ***after*** CREXi was sued).

25.     Moreover, CREXi claims to have engaged a vendor, Restb.ai, LLC ("Restb"), since February 2019 to identify photographs on the CREXi platform that contain the logos of third parties, including CoStar, so that CREXi supposedly can remove such photographs from display.  While discovery will reveal why CREXi first engaged Restb nearly four years after CREXi was founded, the engagement demonstrates that CREXi is aware that unlawful copying of CoStar's photographs would expose CREXi to potential copyright claims.  Restb, whose website states that one purpose of its technology is to "[p]rotect your company from copyright lawsuits,"[3] purports to use "artificial intelligence to quickly recognize photographs that contain company logos or watermarks."  The purpose of that review of logos is to flag copyright ownership.  According to Restb, "CREXi utilizes Restb's services in order to identify photographs in the real estate listings it receives from brokers that might be copyright protected."  The belated use of ineffective fig leaves like Restb, a filter that does little to curb infringement (CREXi has used the filter since 2019, yet CoStar has found tens of thousands of infringing images on CREXI.com), nevertheless demonstrates that CREXi has for years known definitively that its site is replete with CoStar-owned photographs.

26.     That can hardly be a surprise.  The evidence shows that copying CoStar's copyrighted photographs, and piggybacking on CoStar more generally, is

---

[3] Restb.ai, https://restb.ai/solutions/watermark-detection/ (last visited December 16, 2022).

at the core of CREXi's business model.  CREXi accesses a property listing on one of CoStar's marketplaces (e.g., LoopNet or CityFeet).  Shortly thereafter, the same property listing is added *by CREXi* to its website with CoStar's copyrighted photographs.  And, in order to hide its copying of CoStar images, CREXi specifically instructs its Agents to crop out the CoStar watermark from CoStar-copyrighted photographs before adding them to CREXi's website.  As noted above, that was an instruction given to CREXi's Agents by multiple CREXi managers and employees.  Even worse, CREXi often goes a step further and adds its own watermark to CoStar-copyrighted photographs, affirmatively passing them off as its own.

27.    There is also no question that CREXi and its Agents are responsible for uploading a substantial amount of stolen CoStar content—including CoStar's copyrighted images—onto CREXi's site and into its backend systems.  That is the reason CREXi harvests the content from LoopNet, and copies CoStar photographs from brochures.  Indeed, in many cases, the brokers whose listings CREXi has swiped have never even heard of CREXi—they contact CoStar to ask why their listings are appearing on CREXi's site.  And even when CREXi does contact a listing broker, CREXi offers to post the listing itself, without revealing that it is copying the listing from CoStar.  CREXi explicitly advertises to brokers "Want Us to Add the Listing For you?"  It often does add listings, directly uploading CoStar images (many with CoStar's watermark) to CREXi's website.

28.    CREXi's deception indeed runs so deep that it hid relevant facts from its own worldwide web of Agents in order to obscure its wrongdoing.  The director of one CREXi BPO testified in a sworn affidavit that CREXi did not even mention the existence of CoStar's lawsuit until February 2022, and CREXi did not explain until *March 2022*—eighteen months after CoStar filed its original complaint—that the lawsuit involved CREXi's mass infringement of CoStar's copyrights.  And another CREXi BPO admonished CREXi in February 2022 for not disclosing the

1  details of CoStar's lawsuit and allowing the BPO to continue its work for CREXi

2  under the misimpression that its work for CREXi was lawful.

3      29.    If CREXi's objective were to grow a real estate marketplace

4  legitimately, it could rely on brokers and property owners to provide their listings

5  directly, as opposed to copying curated listings wholesale from a competitor.  The

6  legitimate approach would comply with the law, and also reflect industry norms.

7  Commercial real estate marketplace sites typically bar competing firms from using

8  their websites for competitive purposes and do not permit rivals to freely copy the

9  website content.

10      30.    The law, and those industry norms, benefit competition.  Consumers

11  and the market are better off when innovators have the incentive to create valuable

12  services and products, as CoStar has done, because the innovators know their hard

13  work and intellectual property will be protected.  Value creation in this industry

14  flows from the investment of time, money, and energy to collect, research, and

15  generate data, and the years-long process of cultivating relationships of trust and

16  reliance with brokers and consumers.  CREXi's alternative modus operandi—

17  copying wholesale and repackaging content from a competitor—does nothing to

18  benefit consumers, competition, or the market.  CoStar is, of course, not obligated

19  to help CREXi build out its rival business.  And given CoStar's ability to cultivate

20  this same content and these same relationships by *legitimate* means, CREXi's

21  method is also not necessary.  CREXi could grow the right way, by investing its

22  own resources and building its own relationships, and obtaining non-infringing

23  content directly from brokers, but it has chosen not to.[4]

24

25

_____

[4] To try to evade responsibility, CREXi has tried at various times to invoke the so-called "safe harbor defense" afforded to certain online service providers that comply with the requirements of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.  For multiple independent reasons, however, that safe harbor is not available to CREXi, including CREXi's active participation in creating, uploading, and displaying the infringing content; CREXi's manipulation of that content (including instructions to its BPOs to crop out the CoStar logo); and CREXi's failure to comply with any of the threshold DMCA safe harbor requirements.

31.    CREXi's piggybacking on a competitor is all the more troubling in light of CREXi's repeated misleading public statements suggesting that it is growing and gaining market share as a result of broker uploads, its relationships with brokerage firms, and its purportedly innovative products, services, and technology.  The truth is that CREXi is growing by cheating: harvesting content from CoStar, including broker directories, copyrighted images, and other content researched or created by CoStar.

32.    As CREXi knows, CoStar has brought several successful lawsuits against rivals who have sought, like CREXi, to compete unfairly by covertly accessing CoStar's websites, copying listings, and stealing CoStar's copyrighted photographs.  As CREXi does now, Xceligent copied real estate listings, including tens of thousands of CoStar's copyrighted images and other CoStar content, from LoopNet and from property brochures.  Also like CREXi, Xceligent used data from CoStar's password-protected subscription service to build and expand its rival business.  Xceligent—like CREXi—likewise ignored LoopNet's "access denied" notices and rotated the IP addresses that it used in order to circumvent CoStar's technological protections.  And, like CREXi, rather than pay photographers to create their own library of images, Xceligent utilized low-paid labor in India and the Philippines so that it could access LoopNet on the cheap and around the clock.  In a highly publicized lawsuit, CoStar sued Xceligent for copyright infringement and unfair competition, leading to a permanent injunction and a $500 million judgment, the largest in history for the infringement of copyrighted photographs.  That judgment valued each unlawfully copied real estate listing and each infringed CoStar image at $50,000.

33.    Even putting the large judgment aside, there is no question that Xceligent was a bad actor.  After CoStar presented evidence that Xceligent had copied listings from LoopNet (using the same methods as CREXi), a monitor appointed by the Federal Trade Commission ("FTC") independently concluded

that 38,489 images in Xceligent's systems were "derived improperly by Xceligent from the Database of CoStar." A key Xceligent contractor stipulated to a multi-count federal judgment in Pittsburgh after admitting that "with Xceligent's knowledge and at Xceligent's direction, [the contractor and an affiliate] used measures to circumvent CoStar's security measures and thereby hack into CoStar sites [primarily LoopNet] in order to populate the Xceligent databases with content copied from CoStar." Some of those circumvention measures reflect those employed by CREXi, including the use of multiple IP addresses to evade detection. The same contractor conceded that "it was improper to use LoopNet . . . in its work for Xceligent" and that it "was wrong to copy content from [CoStar's] sites into Xceligent's database." Another affiliated Xceligent contractor agreed to be enjoined in India based on the same unauthorized copying from LoopNet, and was barred by court order from accessing CoStar-owned websites and databases for competitive purposes and from copying CoStar content without consent. And the officers and directors of a third contractor in the Philippines were indicted for violations of the Cybercrime Prevention Act of 2012. In recommending criminal charges, the Philippines Department of Justice observed that "accessing LoopNet in order to copy [CoStar's] photographs before transmitting them to Xceligent" for "widespread infringement" was the "classic example of a computer crime."[5]

34.    Xceligent acted unlawfully and paid the price—yet CREXi was undeterred. Rather, it adopted Xceligent's playbook (while claiming, incredibly, that Xceligent was unfairly targeted by CoStar). Thus, as in the Xceligent matter, CoStar has been forced to litigate, not just against the direct infringer, but also against the Agents that contributed to the infringement. In March 2021, July 2022, and November 2022, CoStar brought independent suits against four of CREXi's BPOs in India, and they have shed light on the extent of CREXi's wrongdoing.

---

[5] The evidence gathered from that contractor by CoStar also featured in the indictment of another of the contractor's clients in the United States.

One of CREXi's BPOs, Arcgate Teleservices Private Limited or M/s Arcgate ("Arcgate"), stipulated to a consent judgment and agreed to be enjoined by the Rajasthan High Court after admitting that "even after acknowledging that competing sites should not be used as a resource," CREXi directed the BPO "to access, use as a competitive resource, and to copy content, including, without limitation, broker-related information and auction-listing information, from websites owned by CREXi's competitor CoStar (including LoopNet.com, Ten-X.com and Cityfeet.com)."

35.    In an action brought by CoStar against another of CREXi's Indian BPOs, Neptune, the High Court of Madras entered an interim injunction and authorized a civil seizure of evidence from CREXi's Agent based on its finding that CoStar presented "prima facie evidence of large scale infringement and piracy." Evidence recovered in the court-authorized civil seizure and an affidavit submitted by the director of the BPO show that CREXi instructed the BPO "to download, crop and upload images" from multiple sites, including from LoopNet and Ten-X. The civil seizure also recovered evidence showing that 200 brochures with CoStar logos had been uploaded by the BPO into CREXi's system and that CREXi "asked [the BPO] to use a snipping tool" to copy images. Of significant concern, the court-appointed commissioners also uncovered "[m]ass deletion of data relating to CoStar and [CREXi]."

36.    In yet a third CoStar lawsuit against two more CREXi BPOs in India, Yansh Technologies ("Yansh") and sister company 247 Web Support ("247 Web"), the evidence has revealed that the BPOs, at the direction of CREXi, obtained property information and images from brochures and websites, including CoStar's websites, and then used that information and those images to create and upload property listings directly onto CREXi.com. The High Court of Delhi found that CoStar had "made out a prima facie case" sufficient to grant an interim injunction prohibiting access to CoStar's websites and copying CoStar images and

authorized two further civil seizures of relevant evidence.  The first, executed against a former Yansh line manager, uncovered additional evidence that the CREXi BPO's employees were instructed to (i) "download pictures from various websites . . . *including [CoStar's] loopnet, [Moody's] cat[y]l[i]st, etc.* . . . and then subsequently, edit those pictures by cropping the logo/watermark on those pictures, and then upload those pictures along with listing details on crexi.com;" and (ii) "crop any logos/watermarks of any companies if found on the images, and . . . not upload any pictures on [CREXi] without removing the logos/watermarks."[6]

37.     The second seizure, executed at the home of the founder and CEO of Yansh and 247 Web, uncovered a massive trove of damning evidence.  The CEO admitted that CREXi's Agents had "*accessed Co[S]tar's website and downloaded property images/photographs and then used the same for preparing the property listings to be uploaded on [CREXi's] website*."  He confirmed that he had continued to engage in those activities for a significant period *after* this lawsuit was filed; indeed he was not told by CREXi to stop until April 2021.  And he admitted that multiple CREXi employees and managers had specifically instructed its offshore agents to copy and crop CoStar photographs.  One communication between two CREXi managers uncovered by the commissioners reads: "*Some of the photos have CoStar branding so please advise offshore to crop out*."

38.     Further, as in the Madras case, the commissioners found traces of the "mass deletion" of evidence.  Indeed, when the CEO's laptop was searched, its "trash" folders contained "multiple files" containing the keywords "CoStar, LoopNet and Crexi."  Some those deletions had occurred as recently as a few days before the seizure.  Devices used by longtime 247 Web and Yansh employees involved in creating property listings for CREXi mysteriously "did not have any

---

[6] Catylist is a marketing and listing platform for commercial real estate brokers, acquired by Moody's Corporation in January 2021, suggesting that CREXi's misconduct is not limited to harvesting content from CoStar.  CREXi also instructed another BPO to scrape from Catylist and even gave that BPO Catylist log-in credentials belonging to a CREXi employee in order to accomplish the task.

files or data in them apart from system files." The CEO also confirmed that Yansh and 247 Web destroyed materials relating to the seven months of CREXi listings his companies created after this lawsuit was filed. While the CEO had received a written preservation notice from CREXi in October 2020 directing the agents to "preserve records relating to your work for CREXi," including paper and electronic files, the CEO stated that "on a call," CREXi's Lawson Dees had walked back these written directions, instructing him that he need "only retain email communications between 247 [Web] / Yansh and CREXi."

39.     While the commissioners' findings regarding deliberate copying from CoStar and evidence destruction are compelling on their own, perhaps the most troubling aspects of the commissioners' reports concern a declaration containing sworn testimony signed by the CEO in February of this year. The declaration contained so many statements contradicted by the evidence uncovered by the commissioners that the court-appointed advocate commissioner confronted the CEO. (The commissioner wrote: "[I]n light of the . . . declaration which goes completely contrary to the findings made herein . . . with respect to the use of Co[S]tar/Loop[N]et property photographs and the communication between the Defendants and CREXi, I deemed it fit to call [the CEO] Mr. Ritesh Jaiswal . . . to pose some questions in this regard.").

40.     When confronted, the CEO confessed that the statements were indeed not supported, and he implicated CREXi. To take just one example, the declaration asserts that "[w]hen we encountered CoStar's logo on a broker-provided image, our policy was not to utilize that image or to ask for another image without a logo." The CEO admitted that, to the contrary, CREXi, through multiple named managers and employees, actually sent him "photos contain[ing] [the] COSTAR logo." He was then "***instructed by these [CREXi] employees to crop/ snip[ ]***" the "***COST[A]R logos and then create a listing to be uploaded on [CREXi's] website***." He further confirmed that these actions were ***solely*** at the

direction of CREXi: "It was only on the instruction of [CREXi that] we download[ed], cropped photographs with logo of COSTAR and then uploaded it on [CREXi's] website." Thus, contrary to his testimony, CREXi's actual policy and practice was to copy, crop, and upload CoStar's photographs.

41.   The CEO explained to the court commissioner why he had signed a declaration that was contrary to fact: He did not write it, and he was told by CREXi he ***had to*** sign it. The declaration was drafted by CREXi's lawyers and he "was specifically told by" CREXi's outside counsel at Keker Van Nest & Peters LLP and CREXi's Vice President of Operations "that ***I had to sign this undertaking because of the lawsuit which was fil[l]ed by . . . COSTAR against [CREXi]***." The CEO felt he had no choice because of the money that his company was receiving from CREXi: "I signed the undertaking as [CREXi] was an important client." In short, the CEO reported that he was pressured by CREXi into signing a document that CREXi wrote specifically for use in this (i.e., the U.S.) case, the CEO was given no other option (he was told he "had to sign"), and the money CREXi paid his companies sealed his agreement to sign CREXi-drafted testimony that was contrary to fact. He admitted that "if he w[ere] asked to sign the same declaration" today "he would be hesitant to do so, as ***he did not fully agree to all the statements in the said declaration shared [i.e., drafted and sent to him] by the lawyers of CREXi***." CREXi's efforts to try to evade responsibility for its actions truly know no bounds.

42.   Unsurprisingly, particularly in light of the foregoing revelations, CREXi is a repeat offender. CREXi's co-founder and CEO, Michael DeGiorgio, and co-founder, Luke Morris, both of whom previously worked for Ten-X—the commercial real estate auction site that is now part of CoStar—were caught red-handed with customer lists they took from Ten-X to establish CREXi. In 2016, a California state court entered a preliminary injunction prohibiting CREXi from using the customer lists that it had misappropriated from Ten-X. To end the

litigation, CREXi made a seven-figure damages payment, and Mr. DeGiorgio stated: "I regret my conduct at the time I departed Ten-X." Clearly not. Mr. DeGiorgio, CREXi, and its employees have continued to steal to get ahead, now on an even greater scale.

43. As a consequence of CREXi's misconduct, CoStar is entitled to millions of dollars in damages as well as injunctive relief to prevent continued irreparable harm to its business.

## **BACKGROUND**

44. Founded in 1987, CoStar employs more than five thousand people worldwide. As a result of these employees' diligent efforts—and the investment of over $5 billion over the last three decades—CoStar has developed the most comprehensive database of commercial real estate in the world, which includes painstakingly researched and verified data about commercial real estate properties and transactions, integrated with millions of copyrighted photographs. CoStar and its affiliates expend enormous time and resources to populate and maintain the CoStar database, including averaging thousands of phone calls *per day* to brokers, owners, developers, and other real estate professionals, supporting an inventory of over 7 million properties globally, and taking nearly 1 million photographs annually. CoStar's marketing research operations make millions of data changes to the CoStar database each day. CoStar works continuously to verify that the data contained in its database are up-to-date and reliable.

45. CoStar's database is the engine that drives CoStar's business, attracting paying subscribers, licensees, and users, and powering its various information services, analytical tools, and digital marketplaces, including LoopNet.

46. CoStar offers a password-protected subscription service that brokers and other industry participants use to obtain comprehensive commercial real estate data, news, and analytics, as well as copyrighted photographs of commercial real estate properties. Although CoStar licenses its copyrighted images, brokers and

other CoStar customers are prohibited from providing those images to competitors. This license limitation makes sense, given that CoStar invested significant resources to create high-quality images for its subscribers and has no incentive (or obligation) to make them available to rivals for use in competing against CoStar.

47.    CoStar also owns and operates a number of digital marketplaces with listings of real estate for sale and for lease.  LoopNet is the nation's leading digital marketplace for commercial real estate.  Brokers and property owners use CoStar's marketplaces, including LoopNet, to market their listings.  CoStar also owns and operates CityFeet and Showcase, similar digital marketplaces for leasing and selling commercial real estate.  CoStar's marketplaces leverage the powerful CoStar database to build and enhance listings.  For instance, if a broker or property owner wants to market a listing on LoopNet relating to a property that is in CoStar's database, he or she can populate the LoopNet listing with CoStar's copyrighted photographs (which brokers may license from CoStar) and a variety of data that CoStar has added to the database through its various research efforts. Listings are reviewed by CoStar employees, who may rewrite portions of the text and add CoStar-researched or CoStar-generated data.  Although the broker or property owner may upload his or her own photographs to the listing, this is not a requirement.  Listers can, and often do, rely solely on CoStar's copyrighted photographs.  None of the photographs at issue in this litigation originated with brokers or property owners; rather, this lawsuit concerns CREXi's infringement of photographs created, and copyrighted, by CoStar.

48.    CoStar goes to significant lengths to protect the copyrighted photographs and data that it makes available.  For instance, use of both CoStar's subscription service and LoopNet are subject to binding terms of use that prohibit high-volume competitive use by rivals, such as CREXi, and any unauthorized copying of content.  This restriction is industry standard.  Many other commercial real estate marketplaces—such as those operated by 42Floors, Inc., Catylist Real

Estate Software, Inc., Yardi Systems, Inc., and Brevitas, Inc.—prohibit competitive use of their websites.

49.     CREXi was founded in 2015 by Michael DeGiorgio, Luke Morris, Erek Benz, and Ben Widhelm.  The founders had all worked at Ten-X, the auction site that is now part of CoStar.  CREXi describes itself on its website as "revolutionizing the way commercial real estate professionals transact by accelerating deal velocity and democratizing access to both properties and industry data.  In 2015, CREXi embarked on a journey to transform the CRE industry: to create a single-source hub for stakeholders to market, analyze, and trade commercial property."  CREXi's website (www.crexi.com) allows users to view commercial real estate listings in markets across the country.  CREXi also runs an online auction marketplace, similar to Ten-X, and its auction marketing materials trumpet over $100 billion in closed deals.

50.     CREXi also offers a number of subscription options to its users. CREXi.com users can upgrade from free listings to the "Pro" service, which provides a suite of services to CREXi users.  *See* https://www.crexi.com/broker-plans.  In addition, CREXi offers a product called "Intelligence," which provides paying subscribers with access to comparable property transactions ("comps"), reports, and information about the commercial real estate market.  CREXi touts that Intelligence includes 48 million property records and 13 million comps, including records and comps that are available only to subscribers and that include property images, including pilfered CoStar-copyrighted photographs.

51.     Since CREXi's inception, it has engaged a vast offshore network of BPOs and other Agents, who—behind the scenes—play a critical role in CREXi's business model.  At CREXi's contractual (and actual) direction, these BPOs and other Agents work within CREXi's platform to identify broker leads, source and build commercial real estate listings, make information accessible on CREXI.com, and upload property images.  Indeed, of the 10,000 exemplar infringing images

that CoStar identified in its First Amended Complaint, CREXi's Agents were responsible for uploading nearly two-thirds of them.  The BPOs use proxy servers and virtual private networks ("VPNs") to access CoStar's U.S. websites.  As described in detail below, CREXi directs, inspects, and performs quality control over the work performed by its BPOs and other Agents, who act at CREXi's direction and with CREXi's authority.

52.      CREXi claims to be rapidly expanding under its own steam and gaining market share from rivals like LoopNet to become the biggest commercial real estate marketplace in the industry.  During marketing presentations, CREXi claims that it is now the "number one commercial marketplace in the country," "really the place where all the listings are," and that it has "far more listings than the competitors out there."  CREXi proclaims in its marketing emails that it is already "the most active CRE platform," while simultaneously claiming to be "the fastest growing CRE marketplace."  In a May 4, 2020 podcast, CREXi boasted that it is adding "thousands of properties a week" to its website with the goal of "building up the whole marketplace side of things."  Along similar lines, CREXi describes its broker directory as "the only place" with "every commercial broker in the country."  All of these statements mislead customers, including brokers, and the ultimate consumers—e.g., buyers, sellers, owners, and tenants—regarding the way in which CREXi is really facilitating its growth, attracting them to a business that is falsely portraying itself as legitimate and self-sustainable, thereby harming CoStar by diverting revenue and taking market share.

53.      Rapid growth by virtue of its own efforts is a common CREXi refrain. In a June 2020 marketing video, Paul Cohen bragged that "we're the site where all the listings are.  The reason for that is quite simple: we're a free to list platform." CREXi thus misleads customers into believing CREXi is succeeding because brokers and property owners are taking advantage of their "free to list" platform by

uploading listings, when in reality, a huge number of listings are just copied from CoStar by CREXi and posted with no broker involvement at all.

54.    In the same marketing presentation, CREXi also attributed its exponential growth to its relationships with other industry players, telling customers that CREXi has "really taken off through partnerships."  This statement misleads customers into believing that CREXi's growth is due to its wider integration in the commercial real estate market.  In reality, CREXi has "taken off" by copying from competitors—most significantly CoStar.

55.    Indeed, to the extent CREXi has grown in the past seven years, purportedly to become "the number one" in the industry, it has not grown by investing the time (decades) or money (billions) that CoStar has.  Instead, CREXi's growth is attributable, at least in significant part, to CREXi willfully and systematically accessing CoStar's products and services without authorization, stealing CoStar's intellectual property and data, and using them to compete unfairly against CoStar.

56.    For instance, CREXi account executives unlawfully accessed CoStar's password-protected subscription database on behalf of, and while employed by, CREXi using log-in credentials they received while working at other companies who are CoStar clients.  They did so in order to copy CoStar's data, including thousands of broker directory and property records from CoStar's systems.  Upon information and belief, CREXi has used these directory records to build its rival directory and find potential customers for CREXi's marketplace.

57.    Sam Hamlin, for example, quit his job at Colliers in 2019, then joined CREXi as an account executive.  While employed by CREXi, he used his Colliers account credentials without authorization to access CoStar's subscription service more than a hundred times.  Indeed, he accumulated over fifty thousand product hits and downloaded nearly four thousand CoStar Professional Directory records, which would assist CREXi in generating customer leads.

58.    This competitive access and use of unauthorized credentials is a breach of CoStar's Terms of Use, which Mr. Hamlin (and fellow CREXi account executive Ross Padfield) assented to on behalf of, and while employed by, CREXi. CREXi's disregard for CoStar's data fits a pattern: as noted above, CREXi made a seven-figure payment to Ten-X in 2017 after it had been caught misappropriating substantially similar customer information.  CREXi could compete fairly and survive based on its own efforts, but time and again it chooses not to.

59.    At the same time it was accessing CoStar's subscription service without authorization, CREXi's employees, and Agents working on behalf of, and for the benefit of, CREXi, have hit LoopNet more than ***two million*** times (at least) in breach of binding terms and conditions.  Once there, CREXi has copied, en masse, property listings containing CoStar's copyrighted photographs and listing data.  CREXi IP addresses have continued to hit CoStar's marketplaces despite CoStar's technological blocking efforts and repeated, swift written notice—displayed to CREXi literally thousands of times—that such conduct is contractually prohibited.

60.    CREXi employees (and Agents) have also created accounts on LoopNet—often using non-CREXi email addresses and pseudonyms to mask their work on behalf of their current employer (CREXi).  They set up "saved searches" to track when LoopNet adds property listings fitting specified criteria.  When CREXi misleadingly claims that it is "building up the whole marketplace side of things," CREXi really means that it is monitoring LoopNet for new listings to copy and pass off as the fruit of CREXi's own labor.

61.    Despite publicly claiming that its growth is based on broker uploads and industry relationships, CREXi often simply copies listings from LoopNet without any contact with the broker representing the property listed on LoopNet. Other times, CREXi contacts the listing broker and asks vaguely whether the broker would like the listing to appear for free on CREXi, without specifying

where CREXi will obtain the relevant listing information.  Then, rather than generate its own listing (which would take time, effort, and resources that CREXi has and chooses not to deploy), CREXi copies and uploads the listing from LoopNet.  As discussed in more detail below, listings on LoopNet typically contain CoStar-copyrighted images, data from the CoStar database, and edits made by CoStar researchers.  CREXi takes them anyway.

62.    For example, and as discussed in Section D.6, *infra*, on May 14, 2020, CREXi viewed a listing for an Alabama property on LoopNet, and the next day the same property appeared on CREXi's website with a CoStar copyrighted photograph:

# LoopNet Listing

## (accessed by CREXi on May 14, 2020)



# CREXi Listing

## (posted by CREXi on May 15, 2020)



63.     Likewise, on May 15, 2020, CREXi viewed a LoopNet listing for a property in Nevada, and only three days later the same property appeared on CREXi with a CoStar copyrighted photograph:

## **LoopNet Listing**

(accessed by CREXi on May 15, 2020)



1

2          **<u>CREXi Listing</u>**

3          (posted by CREXi on May 18, 2020)



15          64.     Many brokers are not even aware that their listings appear on CREXi.

16   And even *if* CREXi had asked the brokers for permission to copy the listings from

17   LoopNet, or from a property brochure, brokers cannot provide permission to

18   infringe CoStar's copyrighted images, or to breach the terms and conditions

19   applicable to CoStar's services, which prohibit the type of high-volume

20   competitive use seen here.  CREXi knows this, and is also well aware that the

21   harvesting of content from CoStar also cuts against industry norms.  Indeed, as

22   described in more detail below, when CREXi talks with brokers, CREXi is careful

23   not to mention LoopNet.  And if CoStar's site comes up in conversation, CREXi

24   maintains appearances and admits that it is not permitted to copy from LoopNet.

25   But behind closed doors, it does so anyway.

26          65.     Recognizing the unlawful nature of its scheme, CREXi has taken

27   numerous steps to attempt to conceal its actions.  These include rotating its IP

28   addresses to avoid technological blocking measures imposed by CoStar, using

passwords issued to other companies in order to access CoStar's subscription service, and adopting fake identities when registering for accounts on LoopNet. CREXi also has instructed its BPOs and Agents to delete in CREXi's backend systems references to using CoStar websites as the source of listing information. And in order to hide its copying of CoStar images, CREXi has instructed the BPOs and Agents to remove the CoStar watermark from CoStar-copyrighted photographs before adding those photographs to CREXi listings, as seen here:

| **CoStar Copyrighted Photograph on LoopNet** | **CoStar Copyrighted Photograph on CREXi** |
|---|---|
|  |  |
|  |  |

| **CoStar Copyrighted Photograph on LoopNet** | **CoStar Copyrighted Photograph on CREXi** |
|---|---|



66.    As if the removal of watermarks were not enough, CREXi cannot help but take credit in an even more explicit manner.  CREXi takes some of the CoStar-copyrighted cropped images and adds its own CREXi watermark to them, as the examples below demonstrate:

| **CoStar Copyrighted Photograph on LoopNet** | **CoStar Copyrighted Photograph on CREXi** |
|---|---|

 

| CoStar Copyrighted Photograph on LoopNet | CoStar Copyrighted Photograph on CREXi |
|---|---|



67.    However, CREXi is not always careful in making sure that CoStar's watermark has been removed before adding the CREXi watermark.  These images taken from CREXi's website show that CREXi's watermark even appears on images that still have the CoStar watermark:







68.     CREXi's violations of law are willful, egregious, and in bad faith. CREXi's unlawful theft has harmed CoStar in ways that cannot be measured or remedied fully by monetary damages.  As a consequence of CREXi's unlawful and unfair conduct, CoStar is entitled to millions of dollars in damages as well as injunctive relief to prevent continued irreparable harm to its business.

## JURISDICTION AND VENUE

69.     This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the DMCA, 17 U.S.C. § 1201, *et seq.*  The Court has federal question

jurisdiction over claims arising under those statutes pursuant to 28 U.S.C. §§ 1331 and 1338(a). The Court has supplemental jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367 because these claims are so related to the federal-law claims that they form part of the same case or controversy.

70. The Court has personal jurisdiction over CREXi because, among other reasons, CREXi is headquartered and has its principal place of business in Los Angeles, California. The business transacted by CREXi bears a substantial nexus to CoStar's claims. Through its acts, CREXi has invoked the benefits and protections of California's laws and purposefully availed itself of the privilege of conducting activities with California.

71. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because CREXi resides in this judicial district, and a substantial part of the events or omissions giving rise to CoStar's claims occurred in this judicial district.

## **THE PARTIES**

72. Plaintiff CoStar Group, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia, 20005.

73. Plaintiff CoStar Realty Information, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia, 20005. It is a wholly owned subsidiary of CoStar Group.

74. Defendant CREXi is a corporation organized and existing under the laws of the state of Delaware with its principal place of business and corporate offices located at 5510 Lincoln Blvd, Suite 400, Los Angeles, California, 90094. CREXi's California Registration Statement lists its Entity Address as 13360 Beach Avenue, Marina Del Rey, CA 90292.

**RELEVANT NONPARTIES**

75.     Nonparty 247 Web is a BPO engaged by CREXi from at least January 2017 through September 2019 and from December 2020 through the present. 247 Web is a proprietorship organized and existing under the law of India with its principal place of business located at H. No. 309, 3rd Floor, Pocket-2, Sector-22, Rohini North West Delhi, Delhi, 110086, India. 247 Web creates listings for CREXi by copying information and images from third-party websites, including CoStar websites, and from brochures that include third-party images, including CoStar's copyrighted images. 247 Web uploads that information and those images to CREXi's website on CREXi's behalf. In November 2022, CoStar filed a lawsuit against 247 Web in the Indian High Court of Delhi for contributory copyright infringement and other claims. The High Court entered a preliminary injunction and appointed court commissioners to seize and preserve evidence of 247 Web's work for CREXi.

76.     Nonparty Arcgate is a BPO engaged by CREXi from at least October 2017 through August 2021. Arcgate is a private company organized and existing under the law of India with its registered office located at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan: 313001, India. As part of its work for CREXi, Arcgate sourced broker information from CoStar websites and uploaded that information to CREXi's website. Arcgate also copied and uploaded CoStar-copyrighted images into CREXi's internal systems. In March 2021, CoStar filed a lawsuit against Arcgate in the Learned Commercial Court at Udaipur, India, for contributory copyright infringement and other claims that ultimately resulted in an order from the High Court of Rajasthan appointing court commissioners to seize and preserve evidence of Arcgate's work for CREXi. In December 2021, the High Court entered Consent Terms that granted CoStar its requested permanent injunctive relief.

77.     Nonparty Neptune is a BPO engaged by CREXi from at least 2017 through fall 2020 and from September 2021 through the present.  Neptune is a private company organized and existing under the law of India with its registered place of business located at Door No. SP-7A Guindy Industrial Estate, Guindy, Chennai, Tamil Nadu, 600032, India.  Neptune creates listings and broker profiles for CREXi by copying information and images from third-party websites, including CoStar websites, and from brochures that include third-party images, including CoStar's copyrighted images.  Neptune uploads that information and those images to CREXi's website on CREXi's behalf.  In addition to copying property information, Neptune sources broker information from CoStar websites, including LoopNet and Ten-X.  In July 2022, CoStar filed a lawsuit against Neptune in the Indian High Court of Judicature at Madras for contributory copyright infringement and other claims.  The High Court entered a preliminary injunction and appointed court commissioners to seize and preserve evidence of Neptune's work for CREXi.

78.     Nonparty Yansh is a BPO engaged by CREXi from at least September 2019 through December 2020 (documents produced to date and statements by the CEO of Yansh and 247 Web in Indian litigation confirm that Yansh and 247 Web are closely connected entities).  Yansh is a proprietorship organized and existing under the law of India with its principal place of business located at Plot No. 309 and 310, Left Portion, Ground Floor, Pocket-2, Sector-22, Rohini, North West Delhi, Delhi, 110086, India.  Yansh creates listings for CREXi by copying information and images from third-party websites, including CoStar websites, and from brochures that include third-party images, including CoStar's copyrighted images.  Yansh uploads that information and those images to CREXi's website on CREXi's behalf.  In November 2022, CoStar filed a lawsuit against Yansh in the Indian High Court of Delhi for contributory copyright infringement and other

claims.  The High Court entered a preliminary injunction and appointed court commissioners to seize and preserve evidence of Yansh's work for CREXi.

79.    In addition to the four above-listed entities, CREXi's network of BPOs and other Agents includes at least 35 other entities and individuals around the world, working on behalf and at the direction of CREXi.[7]

## FACTUAL ALLEGATIONS

A.    **CoStar Invests Significant Time and Money to Maintain the Nation's Most Comprehensive and Most Visited Commercial Real Estate Services**

80.    Like many innovative technology companies, CoStar's business began in its founder's basement with a simple idea: empower commercial real estate brokers with professionally researched, unbiased commercial property information. Since its founding, and as a result of investments in excess of $5 billion and the efforts of thousands of employees to execute its business plan, CoStar and its affiliates have become the leading provider of commercial real estate information.

81.    CoStar's core product is its CoStar-branded subscription database of real estate information, which includes verified data about commercial real estate properties, integrated with millions of CoStar's copyrighted photographs.  The database is part of a suite of online services that include resources and tools for the real estate industry.

82.    CoStar generates, updates, and curates the database's content at a cost of hundreds of millions of dollars each year.  CoStar's research organization has more than 1,400 trained professionals who populate and maintain the database every minute of every working day and beyond.  These professionals spend

---

[7] CREXi's other known BPOs and Agents include: Smarna Anuj, Vinit Anuj, Lubna Basha, Slavica Sofija, Sofija Sofija, Fanica Sofija, Dayakar 247Headhunting, Trajce Sofija, Blagojce Sofija, Detriana Miguel, Tanvi Anuj, Supriya Anuj, Agent Anuj, Kruti Raystech, Jawad Ahmed, Mahaboob Basha Shaik, Abdul Basha, Pradhyuman Raystech, Apeksha Raystech, Raysoft Aarthi, Jeanmary Miguel, Priyanka 247Headhunting, bulbul bulbul, Ghazanfar Xavia360, Xavia Xavia360 / Xavia360 Xavia 360, Raysoft, SOPHI, Raystech, Anitha Anitha / Anitha2 Anitha, Anitha, 247Digitize LLC, Mobius Knowledge Services, 247 Headhunting, and Ricielle Zuleta.

considerable time and effort proactively canvassing commercial properties, taking photographs, and gathering granular data about the properties to add to the database, even for properties that are not listed for sale or lease on one of CoStar's marketplaces.  CoStar's research effort deploys a number of labor-intensive methods to generate this data, including scouring assessment records, SEC filings, and state and local reports; communicating extensively with brokers, owners, and other real estate professionals; and collecting information, from both public and non-public sources, about property specifications, such as sizes of lots, floors, suites, and details on various feature and amenities.  CoStar researchers also employ proprietary CoStar software tools to gather detailed information about property dimensions and specifications that CoStar includes in the database.

83.    Beyond property-level data, CoStar also gathers data on individual spaces within commercial properties, including whether the space is available for lease or for sale, the lease or sale price, and other such information.  Again, this research includes public and non-public sources.  CoStar's database also includes various real estate valuation measures that are difficult to obtain and extremely valuable to all types of commercial real estate professionals.  Specific sales conditions, buyer and seller motivations, and capitalization rates are painstakingly collected item-by-item and added to the database.  For CoStar, this is a time-consuming and costly process.  CoStar researches the identities of and contact information for the owners, buyers, and sellers involved in sale and lease transactions.  Most of these owners, buyers, and sellers are anonymous partnerships or limited liability corporations, but through individualized research and interviews, CoStar uncovers and reports the identities of the individuals behind these transactions.  This information is displayed within many CoStar products, including in CoStar's Professional Directory product.  In total, CoStar's researchers make millions of changes to the database each year, and CoStar has taken, on average, over 1 million photographs annually in recent years.

84.     CoStar licenses its subscription database content for a monthly fee. Those fees, which vary according to the scope of access the user seeks, generate significant revenue for CoStar.

85.     CoStar provides this comprehensive commercial real estate intelligence to professionals throughout the economy, including real estate brokers and brokerage firms, owners and investors, property managers, lenders, developers, valuation professionals, as well as retailers, vendors, and corporations. The leading commercial real estate brokerages in the United States, as well as a significant number of smaller brokerages, property owners, banks, retailers, real estate investment trusts ("REITs"), and other professionals are subscribers.  For example, brokers and brokerages use CoStar in their day-to-day business to identify available spaces for lease and evaluate potential sales.  Pursuant to licenses, these users utilize CoStar's professional, copyrighted photographs to market their listings.

86.     Federal, state, and local government agencies rely on CoStar's data for a variety of purposes.  For example, government agencies use CoStar's data to value commercial properties for tax purposes.  CoStar's investment in accurate information also benefits the banking sector.  CoStar's forecasts, risk modeling, or advisory services are used by nearly all of the top twenty "Systemically Important Financial Institutions," as well as federal regulators involved in stress testing those banks.  CoStar's census of the commercial real estate environment and daily data updates allow these banks and regulators to better manage the systemic risks that led to the 2008 financial crisis, thereby benefitting the economy.

87.     CoStar's database powers digital marketplaces owned and operated by CoStar.  One such marketplace is LoopNet.  LoopNet is a digital platform where users can easily prepare and search commercial real estate listings.  LoopNet provides information on more than 700,000 for-lease and for-sale listings at any

point in time and is a key revenue generator for CoStar.  LoopNet's users rely on the platform's content being up-to-date, unbiased, and trustworthy.

88.    LoopNet, like CoStar's other marketplaces, leverages CoStar's vast commercial real estate database to help market property listings.  To add a listing on LoopNet, a lister (whether a broker or property owner) can start by simply typing in the property address.  If the property is in the CoStar database, the lister can, and typically does, populate the LoopNet listing with CoStar's copyrighted photographs and with a variety of data that CoStar researchers have added to the database using the techniques described above, from analyzing a variety of filings, to using proprietary tools, to conducting interviews with market participants.

89.    The listers can also pay LoopNet for varying levels of marketing services.  LoopNet's premium services, called Signature Ads, include labor-intensive contributions by CoStar marketing research professionals, including, among other things, custom professional photos, listing curation, and generation or revision of narrative property descriptions to increase marketability.  The curation process involves reviewing, editing, and populating multiple data fields, including with data from the CoStar database.  For other listings on LoopNet, a marketing researcher will likewise conduct a curation of the listing and may also help generate or revise a narrative property description to increase marketability.  Thus, property listings on LoopNet reflect input by CoStar.

90.    Together, CoStar's subscription database, LoopNet, and CoStar's other digital marketplaces provide broad access to vast commercial real estate data, helping to level the playing field in a $43 trillion per year U.S. industry.  Ultimately, CoStar's investment in its services provides enormous benefits to CoStar's customers, other participants in the commercial real estate market, and the economy at large.  CoStar delivers value not only by bringing together parties that are looking to transact, but also by ensuring the reliability of the information that is shared across its services.  By supplying comprehensive data to the

marketplace, CoStar helps reduce transaction- and search-related costs, leading to efficiency gains that benefit potential buyers, sellers, lessees, and lessors, as well as third-party consumers of CoStar's information, such as banks and government agencies.  And because one of the key drivers of CoStar's value is ensuring that its services are trusted and up-to-date, CoStar is incentivized to invest in creating and updating in real time a highly reliable database.

91.    The important role that CoStar plays in the commercial real estate market is demonstrated by the extent to which its users interact with its services. Users conduct millions of searches for commercial real estate using CoStar services.  CoStar estimates that its services play a part in supporting trillions of dollars of commercial real estate transactions in the United States each year.

92.    Although CoStar has a number of competitors in each of its businesses, including its digital marketplaces, it has outworked and outperformed the competition through constant innovation and reinvestment over three decades. More than thirteen thousand CoStar researchers have contributed to the CoStar subscription database since its creation, adding millions of properties, shooting millions of professional photos and drone videos, and driving and flying millions of miles per year.

93.    The benefits that CoStar's services provide to its customers and the economy at large, and CoStar's ability to continue generating job opportunities, are a direct result of the company's relentless efforts to research, collect, and create content.  The protection of that content, including CoStar's intellectual property— and CoStar's ability to vindicate its rights therein—is therefore critically important. If CoStar were somehow required to open its products to competitors and help them compete, its incentive to invest, to innovate, and to provide the benefits set forth above would disappear.

**B.** **CoStar Goes to Significant Lengths to Protect Its Intellectual Property And the Content That It Presents to Consumers**

94.     CoStar's intellectual property, and the other content that it gathers, curates, and generates, is at the root of CoStar's products and therefore is central to its business.  CoStar protects that content in three primary ways.  ***First***, CoStar registers its photographs with the United States Copyright Office.  ***Second***, users must assent to CoStar's binding terms in order to use any of CoStar's services.  And ***third***, CoStar employs anti-piracy technology.

**1.** **Copyright Protection**

95.     A key element of CoStar's intellectual property is its repository of photographs of commercial real estate properties.  CoStar owns the largest library of commercial real estate images in the world, including millions of photographs of commercial real estate properties taken by professional photographers employed by CoStar.  As discussed above, these copyrighted photographs are used in CoStar's services, including its subscription database and LoopNet marketplace.

96.     As CoStar obtains new photographs of commercial real estate properties, it routinely registers them with the Copyright Office.  CoStar is currently registering tens of thousands of photographs per month.

97.     CoStar watermarks the images it owns with a logo in the bottom right hand corner, as shown in multiple examples above.  This watermark consists of five polygons that are arranged in a circular fashion so that the inner figure forms a five-pointed star—a play on "CoStar."

98.     The watermark, which is present on six separate registered CoStar trademarks and appears as the favicon next to the title of every browser tab opened to any CoStar webpage, is widely recognized in the industry and identifies CoStar as the owner of the images.

99.     CoStar watermarks its copyrighted photographs to police infringement and has used its watermarks to identify infringers in the past, including rivals such

1  as Xceligent.  Moreover, the presence of watermarks helps third parties, including

2  other companies in the commercial real estate industry, recognize and remove

3  infringing images.  Indeed, at one time, Xceligent retained a vendor to review and

4  reject images bearing CoStar's watermark in an effort to avoid copyright

5  infringement.

6      100.  CREXi's own actions demonstrate that CREXi itself recognizes that

7  this watermark signals CoStar's ownership of a copyrighted work.  Like Xceligent,

8  after several years operating with no filter, CREXi eventually (in 2019) engaged a

9  vendor, Restb, "for the purpose of identifying photographs on the CREXi platform

10  that contain the logo of a third party."  Similarly, Restb states that it uses "artificial

11  intelligence to quickly recognize photographs that contain company logos or

12  watermarks."  The purpose of that review of logos is to flag copyright ownership.

13  According to Restb, "CREXi utilizes Restb's services in order to identify

14  photographs in the real estate listings it receives from brokers *that might be*

15  *copyright protected*."  Even CREXi itself characterizes its use of Restb to find

16  logos, including CoStar logos, as part of its (supposed, and belated) "effort to

17  *prevent infringement*."

18      101.  Users may provide their own photographs to CoStar for use on their

19  listings in all CoStar services.  CoStar does not claim ownership or copyright in

20  user-uploaded photos.  Indeed, LoopNet's Terms of Use explicitly confirm that

21  users "retain any applicable ownership rights that [users] may have with respect

22  to" content submitted to CoStar, including "property descriptions, photographs,

23  images, videos (which may include sound and/or music), graphics and financial,

24  contact or other information."  CoStar's practice of watermarking is reserved for its

25  copyrighted photographs and does not include watermarking photographs that are

26  user-uploaded.

27

28

## 2.      Terms of Use Protection

102.   CoStar requires users of its services, including CoStar's subscription database and LoopNet, to agree to binding terms and conditions.

103.   Use of CoStar's websites, including its subscription database, is subject to CoStar's Terms of Use ("CoStar's Terms of Use").  A genuine copy of CoStar's Terms of Use applicable from January 1, 2021, is attached as **Exhibit A**. The language relevant to CoStar's claims herein has remained unchanged since 2016.

104.   In order to log into the CoStar subscription database, users must enter their username and password on a login page.  Below the "Log In" button, users are reminded that "By clicking 'Log In', I accept CoStar's Terms of Use."  The text includes a conspicuous hyperlink to CoStar's Terms of Use:



105.   In addition, before users first log into CoStar's subscription database, CoStar sends them an email reminding them that their use of Costar's database is subject to CoStar's Terms of Use.  The email states, "Use is subject to the CoStar Terms of Use.  By logging in, you agree to be bound by such terms."

106.   Further, after initially logging into CoStar's database, users are periodically required to agree (again) to CoStar's Terms of Use.  Every 30 days, a pop-up window appears that displays CoStar's Terms of Use and requires the user to affirmatively agree to the terms before proceeding to the database.  Thus, for

example, if a user has not logged into CoStar's database for 45 days, the next time the user logs in and tries to access information, the pop-up window will appear, and the user must re-accept the terms in order to gain access.  The text at the top of the pop-up window states: "YOUR USE OF THIS WEBSITE CONSTITUTES YOUR AGREEMENT TO BE BOUND BY THESE TERMS OF USE."  Users who decline are redirected to the homepage.

107.   CoStar's users are also reminded of their obligation to abide by CoStar's Terms of Use throughout their interactions with the database.  For example, when a user attempts to export data from the database, text above the "Export" button informs users: "Exported data subject to restrictions.  See Terms of Use."  As with the login page, clicking the words "Terms of Use" displays Costar's Terms of Use.

| Please select desired Export File Type | Microsoft Excel File |
|---|---|
| *Exported data subject to restrictions. See Terms of Use* | |
| | Export   Save   Delete   Cancel |

108.   Moreover, when users view results in the subscription database, the bottom of results pages advises: "By using this site, you agree to our Terms of Use."  This text also includes a hyperlink to CoStar's Terms of Use.

109.   As a result of these numerous and conspicuous notices, CREXi, its employees, and its Agents had actual and constructive notice that their use of CoStar's subscription database is (and was) subject to CoStar's Terms of Use.

110.   Likewise, CREXi, its employees, and its Agents are aware that CoStar's Terms of Use form a binding contract.  CoStar's Terms of Use make clear that they form a binding contract, stating: "By accessing or using this Site (or any part thereof), you agree to be legally bound by the terms and conditions that follow . . . . They constitute a legal contract between you and CoStar . . . ."

111. CoStar's Terms of Use, provided to and made available to users on multiple occasions as they interact with the database, provide that only "Authorized Users" may access CoStar's password protected services. "Authorized User" is defined as:

> [A]n individual (a) employed by a CoStar Client or an Exclusive Contractor (as defined below) of a CoStar Client at a site identified in the License Agreement, and (b) who is specified in the License Agreement as a user of a specific Passcode Protected Service and represented by the Client to be an employee or Exclusive Contractor of the Client. An "Exclusive Contractor" is defined as an individual person working solely for the CoStar Client and not another company with real estate information needs or for themselves and performing substantially the same services for such CoStar Client as an employee of such CoStar Client.

112. Under CoStar's Terms of Use, an Authorized User "may not share his/her Passcodes with any other person, nor may an Authorized User allow any other person to use or have access to his/her Passcodes."

113. Further, CoStar's Terms of Use expressly forbid competitors from accessing, using, or transmitting any portion of CoStar's content in the subscription database service:

> [Y]ou shall not . . . (2) Access or use any portion of the Product if you are a direct or indirect competitor of CoStar, nor shall you provide, disclose or transmit any portion of the Product to any direct or indirect competitor of CoStar (by way of example, a "direct or indirect competitor" of CoStar includes, but is not limited to, Internet listing services or other real estate information services and employees, independent contractors and agents of such services)

114.   In other words, an individual may not use CoStar log-in credentials obtained through a previous employer to access or use the CoStar subscription product once that person has left the employer (because they are no longer "employed by a CoStar Client") or if they are acting as a "direct or indirect competitor of CoStar" (even if also employed simultaneously by a CoStar Client). Nor may the person use those credentials (even of a current employer) at any time to "provide, disclose, or transmit" information to CoStar's competitors.

115.   CoStar's Terms of Use also specifically outline the permissible (and non-permissible) uses of CoStar's product:

> You shall not, except (i) as may be expressly set forth above under "Permitted Uses" and (ii) to the extent necessary to integrate commercial property listings within CoStar's commercial real estate marketing website available through CoStar Showcase®, (a) distribute, disclose, copy, reproduce, communicate to the public by telecommunication, make available, display, publish, transmit, assign, sublicense, transfer, provide access to, use, rent or sell, directly or indirectly (including in electronic form) any portion of the Product, or (b) modify, adapt or create derivative works of any portion of the Product.

116.   Similarly, use of LoopNet is subject to LoopNet's Terms and Conditions ("LoopNet's Terms and Conditions").  A genuine copy of LoopNet's Terms and Conditions applicable from July 7, 2021, is attached hereto as **Exhibit B**.  The terms relevant to CoStar's claims herein have remained unchanged since 2016.

117.   As discussed below, CREXi, its employees, and its Agents have assented to LoopNet's Terms and Conditions many times in the past years.  During this period, CoStar has occasionally updated LoopNet's Terms and Conditions. However, during the period that CREXi, its employees, and its Agents have

1    accessed LoopNet, all the relevant terms at issue in this litigation—relating to
2    contract formation and competitive access and use—have remained consistent
3    across the various updates.

4        118.   LoopNet's Terms and Conditions are available to all users and are
5    accessible via a hyperlink displayed on the landing page and, as shown below, at
6    the bottom of every subsequent page of LoopNet's website:



10       119.   As shown at Paragraph 133 below, users, like CREXi, that
11   excessively access LoopNet are also served with notices that prominently state that
12   use of LoopNet is subject to those terms and conditions, which again are
13   hyperlinked.

14       120.   In addition, CoStar sends an email to users who sign up for a LoopNet
15   account, as many CREXi executives have done, before they first log into their
16   account, which also contains references to LoopNet's Terms and Conditions.

17       121.   Furthermore, in order to log into their LoopNet account, users enter
18   their username and password on a login page.  Below the "Log In" button, users
19   are reminded that "By clicking 'Log In', I agree to LoopNet's Terms of Use."  The
20   text includes a conspicuous hyperlink to the terms.



122.   Prior to the filing of the original Complaint, LoopNet account holders at CREXi logged into LoopNet using the process described above—i.e., by entering their email addresses, passwords, and clicking "Log In."  As of August 13, 2020, users may also login to LoopNet via the "Connect with Google" option.  "Connect with Google" allows users to utilize their Google credentials to log into LoopNet without creating a separate LoopNet username and password.[8]  CREXi and its Agents also utilize this login process.

123.   The initial screen seen by the user is below:

---

[8] LoopNet subsequently added a similar log-in option, "Connect with LinkedIn" on October 15, 2020, after CoStar filed its original Complaint.  CoStar is not aware of any LoopNet account holders at CREXi that have logged onto LoopNet using the "Connect with LinkedIn" feature.

124.   When an individual clicks "Connect with Google" either via the sign up or log in screen, before logging in to their Google account to access LoopNet, they receive a popup that reads: "Before using this app, you can review costargroup.com's privacy policy and terms of service."  The terms of service are conspicuously hyperlinked:



125.   As a result of these numerous and conspicuous notices, CREXi and its employees and Agents had actual and constructive notice that their use of LoopNet's website is subject to LoopNet's Terms and Conditions.  Moreover, CREXi and its employees and Agents have had actual notice of these Terms and Conditions since the filing of CoStar's original complaint, based on the contents of that complaint.

126.   As is standard in the industry, LoopNet's Terms and Conditions make clear that they form a binding contract with those who use the website, stating: "By viewing, using, or accessing the Service, You agree that these Terms and Conditions are a binding legal agreement between You and LoopNet."

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

127. LoopNet's Terms and Conditions also expressly prohibit competitors from accessing and using the website.  Specifically, LoopNet's Terms and Conditions state, in part:

> No employee, independent contractor, agent, or affiliate of any competing real estate information, analytics or listings service is permitted to be a User or a Customer or to view, use, or access the LoopNet website without express written permission from LoopNet.  By viewing, using, or accessing the Service, You represent and warrant that You are not a competitor of LoopNet, CoStar Realty Information, Inc. or any of its affiliates, including, without limitation, any company owned or operated by CoStar Group, Inc. (collectively, "LoopNet" or the "Company") or acting on behalf of a competitor of LoopNet in registering for or accessing the Service.

128. LoopNet's Terms and Conditions also strictly prohibit competitive use of the LoopNet content, including reproducing any information copied from LoopNet:

> You . . . shall not use any information obtained from the Service for further distribution, publication, public display, or preparation of derivative works or facilitate any of these activities in any way.  You shall not use or reproduce any Content that is obtained from the Service, or that is otherwise made available to You in the Service, for or in connection with any other listing service or device.  You further shall not use the Service in any other manner for or in connection with any o ther listing service or device.  You shall not use the LoopNet Service as part of any effort to compete with LoopNet, including, without limitation, using the LoopNet Service to provide, alone or in combination with any other product or service, any database services to any third party or any use that causes a reduction or loss from an existing or potential LoopNet

customer, nor shall You remove, erase, or tamper with any copyright or other proprietary notice printed or stamped on, affixed to, or encoded or recorded in the LoopNet Service.  You shall not use any robot, spider or other automated process to submit listings, monitor, data mine or copy LoopNet products, services or information; decompile, decode or reverse engineer LoopNet software; or use LoopNet products or services in an unlawful manner, such as for offensive, abusive, tortious, libelous, defamatory or other illegal purposes.

129.   CoStar protects the content on LoopNet through binding terms and conditions in part because the market for commercial real estate information is intensely competitive.  Competitors to CoStar spring up on a regular basis, and CoStar's terms and conditions help ensure that CoStar is able to protect the fruits of its labors from unscrupulous competitors and continue to make the large investments that benefit its customers.

130.   As set forth below, CREXi's misconduct against CoStar involves a significant number of its employees, including those in management roles, as well as CREXi's Agents, engaging in a pattern of wrongdoing consistent across time and around the country, including repeated use of the CoStar database and LoopNet, and repeated assent to, and notice of, the applicable terms and conditions.  These are not isolated incidents, or the actions of rogue employees.[9] All actions alleged to be taken by employees of CREXi, including their entry into these contracts with CoStar, are alleged, on information and belief, to have been taken on behalf of, at the direction of, or for the benefit of CREXi, and authorized or ratified by CREXi.

---

[9] Indeed, in this very lawsuit, CREXi argues that the misconduct is normal and lawful, arguing that "listing information . . . flows between . . . CRE platforms, which is perfectly legal."  The "flowing" occurs when CREXi employees access CoStar and LoopNet, accede to the terms of use, nevertheless copy content without permission, and then upload it to CREXi's rival site.

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

131.    In addition to the terms governing the CoStar database and LoopNet, CoStar separately licenses its copyrighted photographs and content to commercial real estate brokerages for use on their own websites and in their own marketing material.  Such use, however, is subject to various contractual restrictions that, among other things, preclude those brokerages from providing CoStar-copyrighted photographs or other CoStar-owned content to platforms that compete with CoStar. Brokerages may, of course, provide their own photographs and information to such competing platforms.

### 3.    Technological Protection

132.    In addition to protecting its intellectual property and other content through copyright registration and binding terms and conditions, CoStar takes proactive and prompt technological steps to protect against unauthorized access to CoStar's services for competitive purposes.

133.    First, CoStar services, including LoopNet, employ an abuse monitor. If a single IP address views an excessive number of listings or executes an excessive number of searches on the site—consistent with data or content mining operations, automated bots, or other illegitimate users—that IP address is temporarily blocked from accessing the site.  On LoopNet, for example, if this abuse monitor is tripped, the user immediately receives an unauthorized access notice, also known as an "Error & Abuse" notice.  The notice provides a conspicuous hyperlink to LoopNet's Terms and Conditions, and explains that use of LoopNet is subject to such terms, and that use that does not comply with the terms is unauthorized:

134.   Second, CoStar's services, including LoopNet, use firewall blocking, which enables CoStar to prevent certain IP addresses from accessing the content on CoStar's websites.  When this type of block is triggered, the user receives the following notice:

135.   Third, CoStar services, including LoopNet, employ third-party bot managers to identify and swiftly block bots, a type of automated software program, from accessing CoStar's services.

136.   Fourth, CoStar's services, including LoopNet, employ a number of other third-party protections to guard against improper use, including firewalls and IP reputation blocking, as well as anti-virus and anti-malware programs.

137.   CoStar employs these technical measures to help protect the information that it has spent significant time and resources to collect, curate, and generate from unscrupulous competitors—like CREXi—who seek to copy CoStar's work and compete with CoStar without investing their own time and effort.

## C.   CREXi Has Grown at CoStar's Expense By Free-Riding on CoStar's Investment and Misappropriating CoStar Content

138.   CREXi's business model is founded on adding large numbers of listings to its commercial real estate marketplace.  CREXi recognizes that having a large supply of listings allows it to attract buyers, sellers, and brokers, which in turn facilitates its ability to sell advertisements, conduct successful auctions, and generate revenue.  During a May 15, 2020 virtual marketing event called, "The Baltimore Market Report," Paul Cohen, CREXi's National Sales Director, boasted that CREXi has "more listings in most markets across the USA" than CREXi's competitors, which include LoopNet.  And during a June 19, 2020 virtual marketing event called, "Welcome to CREXi: Richmond's New CRE Marketplace," Mr. Cohen claimed that CREXi was the "place where all the listings are."  That same day, during another virtual event, "Welcome to CREXi: Tampa's New CRE Marketplace," Mr. Cohen stated, "We have all the listings for the market—they're already in there."

139.   CREXi's purported meteoric rise to become the "place where all the listings are" on its face raises serious questions, given that it does not appear that CREXi has invested a fraction of the time or resources into developing its commercial real estate database that CoStar has.  For instance, CREXi employs approximately 225 individuals and has stated that it has raised "just under 60 million" dollars from investors.  By contrast, CoStar currently employs over five thousand individuals and invests hundreds of millions of dollars *annually* just to maintain its comprehensive database and marketplaces.

140.   Yet from the very beginning, CREXi has misleadingly touted its ability to grow quickly and add listings using legitimate means, based on its own efforts.  In a March 2016 public Q&A, Michael DeGiorgio, CREXi's co-founder and CEO, described how the previous month they "had 73 properties in the marketplace, and now we have over 350."  He surmised that CREXi was "proving out" that CREXi's business offerings "really benefit[] the people on the site."  But all CREXi is proving is that it can grow exponentially fast by simply copying from CoStar, while at the same time, misleading its customers into believing that this growth is attributable to the quality of its products and services.

141.   CREXi has repeatedly misled customers about its exponential growth. In a podcast interview on September 8, 2020, Eli Randel, CREXi's Chief Operating Officer (and former Director of Capital Markets at Cohen Financial), explained why CREXi needs to collect and publish real estate listings: "[s]upply begets demand, and then the second half of that recipe or equation is that demand begets monetization.  So first and foremost, nobody wants to shop in an empty store, so you better stock the shelves with supply."  CREXi's desire to avoid an "empty store" underscores why it must keep copying from CoStar.  But CREXi is misleading its customers as to how CREXi is stocking its shelves.  In this same podcast interview, Mr. Randel claimed that CREXi is doing so "by befriending our customer, the broker," giving listeners the (false) impression that CREXi is growing through relationship-based, organic means, on the back of broker uploads, instead of widespread copying from CoStar.

142.   CREXi touts both the current volume of its listings vis-à-vis its competitors and its ability to add thousands of new listings each week.  For instance, in a May 4, 2020 podcast, Matthew Cors, CREXi's Regional Director for the Western United States Sales Team, represented to listeners that CREXi had "over 100,000 for-sale properties" and "over 200,000 for-lease properties" active on the CREXi website on that day, and that CREXi is adding "thousands of

properties a week on here on both sides of the marketplace." Mr. Cors stated that CREXi's "whole goal is to continue just building up the whole marketplace side of things." What Mr. Cors failed to tell listeners is that CREXi is adding "thousands of properties a week" by, in significant part, copying from CoStar.

143. In a separate podcast on June 24, 2020, Mr. DeGiorgio echoed these sentiments with the telling comment that by driving "the supply side," i.e., adding large numbers of listings for free, CREXi would necessarily get the "demand for free too." The listings are "free" however, not because brokers do not pay to list, but because it costs CREXi nothing to take them en masse from CoStar.

144. By adding CoStar's supply to its website without disclosing that fact to consumers, and misleading those same consumers regarding its business model and (lack of) prowess in the commercial real estate market, CREXi has illegitimately generated demand, resulting in lost revenues, lost market share and lost opportunities for competitors, like CoStar, who undertake the expensive and labor-intensive task of building up the supply side lawfully.

145. In short, CREXi purports to have used a broker-driven business model to become the "number one commercial marketplace in the country," thereby displacing LoopNet. But what CREXi omits from its marketing materials, videos, and podcasts is that its purported expansion and rapid accretion of market share is made possible not just by investing its own resources, but by repeatedly accessing CoStar's products and stealing CoStar's content, using its own employees and its offshore Agents.

146. Indeed, in the very promotional videos in which CREXi brags that it has more listings than its competitors, CREXi displays CoStar-copyrighted photographs in the listings it touts. The screenshots below contain examples of the copyrighted photographs, along with an image of the CREXi presenter, Paul Cohen, in the top right corner of the first example:

## CREXi Marketing Video



## CoStar's Copyrighted Photograph



## **CREXi Marketing Video**



## **CoStar's Copyrighted Photograph**



147.    In other words, rather than making its own investments and competing fairly (which CREXi is capable of doing), CREXi is displaying and thereby infringing CoStar's intellectual property to market itself to brokers and claim superiority over CoStar.  And in the process, CREXi is misleading customers as to not only the way in which it is achieving that growth, but also its ability to convert that growth into value for its customers.

148.    By way of further example, in a July 19, 2020 *Los Angeles Business Journal* article, Mr. DeGiorgio proclaimed that CREXi wanted to "be able to offer a better free version than you would pay for on other sites."  But what Mr. DeGiorgio omitted is that it is far easier to offer a "free" service when you do not have to invest the hundreds of millions or billions of dollars it takes to generate and sustain that service.  Consumers believe they are receiving a free, or lower cost, product because CREXi is somehow able to operate more efficiently, more precisely, or less expensively than their competition; in reality, CREXi can offer services or products for free because it has significantly reduced its costs by taking content that CoStar invested the time and money to gather, curate, and generate.

149.    Copying and publishing content from CoStar benefits CREXi by making it easier for CREXi to reach a critical mass of listings and thereby attract buyers, sellers, and brokers to its free website.  This enables CREXi to sell advertisements in competition with CoStar and "upsell" its customers to paid services such as CREXi "Pro," "Elite," and "Fuse"—which diverts revenue streams and growth opportunities from CoStar and reduces CoStar's market share—all while avoiding the hard work and resources that CoStar has invested over the past three decades.

150.    CREXi knows that listings—and real estate images specifically—are critical to attracting users.  Indeed, as Eli Randel, CREXi's Chief Operating Officer, has admitted, "images matter."  This helps explain why CREXi is infringing on such a widespread scale.  Rather than spend the time and effort to

develop an image library of its own, CREXi steals CoStar's photographs, crops out the CoStar watermark, and uses them to attract buyers, sellers, and brokers.  And in order to ensure that the buyers, sellers, and brokers attribute the high-quality images to CREXi's efforts, CREXi goes so far as to add its own watermark to some of those CoStar-copyrighted images.

151.   Brokers and other industry participants also readily rely on companies like CoStar and CREXi to provide "comps"—i.e., comparisons of similar properties in order to determine, for example, the market rate for rent.  The provision of comps is a much sought-after and highly valued service in the world of real estate.  CREXi places this valuable service behind a password as part of its Intelligence subscription product (comps are also included in CREXi's paid "Pro" service).  However, based upon publicly available information, CoStar has learned that CREXi is also using CoStar's copyrighted images in its comps product.  For example, the following CoStar images appear in a preview of the types of "comps" available in CREXi's Intelligence subscription product:



152.   CREXi has not only piggybacked on CoStar to build out listings, but also to generate comps and market its more lucrative subscription offerings.

153.   CREXi's misuse of CoStar products and misappropriation of CoStar intellectual property and content has also enabled CREXi's auction platform to

grow at the expense of, divert revenue from, and compete unfairly with Ten-X, now part of CoStar.  By stealing content from CoStar, including CoStar's copyrighted images, in order to attract potential buyers and other customers, CREXi is able to drive interest in its auctions and divert opportunities and income from Ten-X.  CREXi thereby dilutes Ten-X's market share through lost transaction opportunities and diminishes the value of Ten-X's auction business.

**D.  CREXi is Repeatedly Accessing and Repackaging CoStar's Content to Unfairly Compete With CoStar, in Violation of the Terms of Use Associated with CoStar's Services**

154.  Although the full breadth of CREXi's unlawful misconduct cannot be known until discovery is complete, CoStar already has evidence that CREXi, through its authorized employees and Agents, is repeatedly accessing CoStar services to steal vast quantities of copyrighted photographs and real estate information.  CREXi's employees and Agents then repackage and integrate that content into CREXi's competing listings platform and use it to build out CREXi's broker directory and customer lead lists.  Such access of CoStar's services is in direct violation of the services' respective terms of use and (to state the obvious) occurs without ever receiving CoStar's permission.

**1.  CREXi Employees Unlawfully Access CoStar's Subscription Database Using Log-In Credentials Issued to Other Companies in Order to Obtain Content to Compete Against CoStar**

155.  CREXi routinely hires its employees from CoStar's customers.  Some CREXi employees, like Sam Hamlin, stop working for the CoStar customer, but take with them to CREXi, without permission, CoStar credentials issued under their ex-employer's CoStar license, in order to perform their job duties on behalf of CREXi.  In other instances, CREXi employees, like Ross Padfield, maintain their

employment with the CoStar customer but use their employer's CoStar login credentials to benefit CREXi, again without CoStar's authorization.

156. Mr. Hamlin was employed by CREXi as an account executive between June 2019 and October 2020. In November 2019, CoStar discovered that Mr. Hamlin was employed by CREXi and logging into CoStar's subscription database on behalf of CREXi using credentials issued to Colliers International, his former employer and a current CoStar client. Mr. Hamlin had left Colliers months before, in May 2019.

157. Between June 2019, when he joined CREXi, and November 2019, Mr. Hamlin used Colliers credentials to conduct more than a hundred sessions on CoStar's subscription database, logging ***tens of thousands*** of hits without authorization, including from CREXi IP addresses. Some of Mr. Hamlin's logins were also from IP addresses used by one or more WeWork locations in New York City that were housing CREXi operations, further leading CoStar to conclude that Mr. Hamlin was working on behalf of CREXi and with CREXi's authorization, while abusing Colliers's CoStar license. Several of the property listings that Mr. Hamlin viewed in CoStar subsequently began to appear on CREXi's website with CoStar's copyrighted photographs.

158. After discovering Mr. Hamlin's misuse of Colliers's license and unauthorized access to the CoStar subscription database, CoStar terminated Mr. Hamlin's account on December 3, 2019. Later that day, Mr. Hamlin called CoStar customer support, which informed him that he would need to speak with someone in CoStar's legal department. He declined. Instead, CoStar initiated several attempts to contact Mr. Hamlin to discuss his account status. When CoStar finally connected with Mr. Hamlin and inquired about the status of his employment with Colliers, Mr. Hamlin abruptly hung up.

159. Mr. Padfield, one of Mr. Hamlin's colleagues, has worked as a CREXi account executive and regional director since February 2020. Mr. Padfield

also simultaneously leads commercial brokerage efforts for Rubin [+] Morr at Douglas Elliman Real Estate.  Between April and June 2020, Mr. Padfield exported 1,561 broker directory records from the CoStar subscription database using his Douglas Elliman account.  As explained in Paragraph 107, before Mr. Padfield exported the data, CoStar reminded him that the exports were subject to CoStar's Terms of Use.  Prior to joining CREXi, Mr. Padfield had **never** exported these types of records.  Nearly all of the broker contacts he exported are located in South Florida, the market he covers in his role at CREXi.  Thus, it is clear that Mr. Padfield's access and downloading of these records was as an agent for, on behalf of, and for the benefit of, CREXi.

160.   Between October and November 2019, during and in the course of his employment with CREXi, Mr. Hamlin also exported **thousands** of CoStar broker directory records for brokers across the country while logged in using IP addresses affiliated with CREXi.  As explained in Paragraph 107, before Mr. Hamlin exported the data, CoStar reminded him that exporting the data was subject to CoStar's Terms of Use.  Paul Cohen, CREXi's National Sales Director, subsequently boasted in a CREXi marketing video that CREXi had "created a broker directory with all brokers in America."  "Created" would appear to be a euphemism, but his statement underscores that the access to and use of the CoStar database by CREXi employees, and their entry into contracts (Terms of Use) with CoStar as part of that process, was in their capacity as agents for CREXi, and that these actions were undertaken with CREXi's knowledge and for CREXi's benefit.

161.   Mr. Hamlin and Mr. Padfield had actual notice of CoStar's Terms of Use when they made use of the CoStar database on behalf of CREXi, and agreed to be bound by those terms on CREXi's behalf.  CoStar has reasonably concluded that each of these executives, while employed by and using IP addresses associated with CREXi or WeWork locations that were housing CREXi operations, had authority to act on CREXi's behalf.  Both Mr. Hamlin and Mr. Padfield

affirmatively accepted and assented to the Terms when gathering information for CREXi.  As described in Paragraph 106, the Terms appeared in a pop-up window every 30 days, and Mr. Hamlin and Mr. Padfield were required to affirmatively assent to the Terms before they could continue using the product.  CoStar's records indicate that Mr. Hamlin last accepted the Terms on November 4, 2019, and Mr. Padfield accepted the Terms on September 20, 2020.  Those Terms provide that any user of the service "shall not: . . . (2) [a]ccess or use any portion of the Product if you are a direct or indirect competitor of CoStar, nor shall you provide, disclose or transmit any portion of the Product to any direct or indirect competitor of CoStar."

162.    As CREXi employees, working on behalf of CREXi, Mr. Hamlin and Mr. Padfield are both "direct or indirect competitor[s]" of CoStar.  CREXi thus violated CoStar's Terms of Use by accessing and using CoStar's subscription database though these employees for its benefit.  CoStar also never gave CREXi, Mr. Hamlin, or Mr. Padfield permission to utilize its services.

163.    Furthermore, CoStar's Terms of Use clearly state that an "authorized user" is an individual who is "employed by a CoStar Client."  Although both Mr. Hamlin and Mr. Padfield may have been authorized users while working for CoStar clients, they were both unauthorized when using CoStar in furtherance of their CREXi work.  CREXi, through these employees, directly violated CoStar's Terms of Use provisions relating to authorized users.

164.    Mr. Hamlin's wrongdoing was not limited to misusing his former employer's credentials and mass downloading CoStar records to unfairly compete.  Once Mr. Hamlin joined CREXi, he shared the Colliers CoStar credentials with at least one senior colleague, Zachary Zlotnick, who at the time was the head of CREXi's New York office.  In doing so, Mr. Hamlin separately violated the strict prohibition on sharing passcodes contained in CoStar's Terms of Use.

### 2. CREXi Repeatedly Accesses LoopNet Using Multiple IP Addresses to Evade Anti-Piracy Efforts—Sometimes Using Fake Identities or Through Offshore Agents—for Competitive Purposes

165.   CREXi's unauthorized access is not limited to CoStar's subscription database.  Rather, direct evidence shows that CREXi employees and its BPOs, acting as Agents of CREXi, also repeatedly access and use CoStar's LoopNet website, for CREXi's benefit and on CREXi's behalf, without ever receiving permission from CoStar to do so.  IP addresses and user accounts affiliated with CREXi have impermissibly hit LoopNet more than *two million* times (at least), which has benefitted CREXi by, among other things, providing CREXi with leads on property listings and brokers, and allowing CREXi to copy the listings from LoopNet.

166.   For example, Paul Cohen, CREXi's National Sales Director, immediately began accessing LoopNet after he joined CREXi.  Mr. Cohen also retained the services of an agent located outside of the United States, Ricielle Zuleta, to assist with this unauthorized access.  Mr. Cohen and Ms. Zuleta accessed LoopNet using a variety of IP addresses routed through third-party services—such as Hurricane Electric, Digital Ocean, LeaseWeb, and the aptly named "IPVanish"—which anonymized their activity.  Remarkably, just one month after joining CREXi, Mr. Cohen (and Ms. Zuleta) had accessed LoopNet using at least *eighty* different IP addresses and had already received more than *ninety* Error & Abuse notices from LoopNet blocking that access and reminding them that such use of LoopNet was subject to LoopNet's Terms and Conditions.  That initial activity set the course for Mr. Cohen's covert efforts to access LoopNet.  During the entirety of his time at CREXi, he has accessed LoopNet using (at least) *more than two hundred* different IP addresses, most of which are associated with third-party anonymizer services, including those reportedly associated with high levels

of unlawful activity.  Mr. Cohen knew this access—done for purposes of unlawful copying of LoopNet's data—was illicit.  Indeed, in a May 2020 marketing video, Cohen publicly represented that he does not "log into the other sites."  CoStar's server records indicate otherwise.

167.   CREXi employees also access LoopNet using IP addresses registered specifically to CREXi.  Just one such IP address, 76.81.37.146 (the "76. IP address"), accessed LoopNet in stunningly high volume.  After the 76. IP address first tripped the LoopNet abuse monitor, it was temporarily blocked from accessing LoopNet, and CoStar displayed the Error & Abuse notice described above.  The notice provides a hyperlink to LoopNet's Terms and Conditions and warns the user that use that does not comply with the terms of use is unauthorized.  Despite this warning, CREXi continued to access LoopNet.  Indeed, from January 1, 2019, through November 13, 2019, the 76. IP address registered ***hundreds of thousands*** of hits on LoopNet.

168.   On November 14, 2019, upon learning of this continued and repeated access, CoStar implemented a permanent LoopNet abuse monitor block on the 76. IP address, which again displayed the Error & Abuse notice.

169.   CREXi, yet again, was undeterred.  On November 14, 2019—the very same day that CoStar implemented the abuse monitor block on the 76. IP address—CREXi switched to using a variety of third-party IP addresses from LeaseWeb, one of the IP address anonymizers utilized by Mr. Cohen.  In the first month after CoStar implemented the block, CREXi logged hundreds of hits on the LoopNet website using the LeaseWeb IP addresses, despite knowing that such access was prohibited.  This tactic to circumvent blocking, known as "rotating" IP addresses, is a hallmark of online piracy.  Xceligent, for example, also rotated IP addresses as part of its unlawful scheme to harvest real estate listings and copyrighted images from CoStar.  Meanwhile, CREXi continued periodically to test LoopNet's defenses by attempting to access LoopNet using the blocked 76. IP

address.  Indeed, after CoStar implemented the permanent LoopNet abuse monitor block on November 14, 2019, the 76. IP address triggered the Error & Abuse notice almost one thousand more times.  On December 16, 2019, CoStar implemented a permanent firewall block on CREXi's 76. IP address, which implements a wider block of CoStar's services.  This block generates an "Access Denied" message, as shown above at Paragraph 134.  The 76. address triggered four hundred such "Access Denied" notices.

170.   In response, CREXi simply stepped up its circumvention efforts. After CoStar had permanently blocked CREXi's 76. IP address at the firewall level, CREXi registered a new IP address, and continued accessing LoopNet without authorization.  This new address, 45.59.255.42 (the "45. IP address"), was registered to CREXi's headquarters at 4086 Del Rey Avenue, Marina Del Rey, California.  Between March 11 and August 12, 2020, the 45. IP address accumulated over *one hundred thousand* hits to LoopNet alone.

171.   CREXi remains undeterred.  Despite this lawsuit, CREXi's Agents continue to employ sophisticated techniques to avoid detection, including relying on IP address rotation to harvest content from LoopNet.  For example, in April 2021, an IP address associated with https://crexi.lightning.force.com/ conducted a mass scrape of LoopNet.  The single session generated *over 100,000 hits* to LoopNet.  In order to evade CoStar's abuse monitor, the Agent rotated through over *70,000* IP Addresses around the globe.

172.   And, nearly two years after CoStar filed its lawsuit, IP addresses associated with CREXi and its Agents continue to trigger the LoopNet abuse monitor.  In June, July, and August 2022, IP addresses associated with https://crexi.lightning.force.com were automatically blocked after hitting the LoopNet website tens of thousands of times.

173.   The more than two million hits—at least—on LoopNet from IP addresses associated with CREXi and its Agents is just one of the indicia of

CREXi's misuse of LoopNet and harvesting of LoopNet content.  In addition, several CREXi employees have registered for LoopNet accounts using thinly veiled pseudonyms or personal email addresses.  Those CREXi employees accessed LoopNet on behalf of CREXi on a regular basis, including, not coincidentally, prior to those same employees participating in public marketing videos for CREXi in which they brag about the extent of CREXi's efforts to "build out" certain geographical markets.  This pattern confirms that the LoopNet access was in their capacity as agents for CREXi, and that CREXi was aware of and/or ratified their acts.

174.  For instance, CREXi's then-mid-Atlantic account executive, Michael Rosenfeld, repeatedly visited LoopNet in June 2020 under the account name "Mike Rose" with the personal email address "rosenfeldm911@gmail.com."  He used the LoopNet website for competitive purposes, specifically to identify real estate listings in the mid-Atlantic area.  On June 19, 2020, Mr. Rosenfeld appeared in marketing videos focused on markets in that area, specifically Baltimore and Richmond.  In the Richmond presentation, Mr. Rosenfeld explained that CREXi's "Paul [Cohen], I, and a few others are building out the East Coast for CREXi."

175.  Unsurprisingly, therefore, Mr. Cohen also has and uses a LoopNet account registered to a non-CREXi email address: pcohen@cohenfinancial.com.  Cohen Financial is a real estate capital services company whose leadership team includes Brent Hansen, a former executive at Xceligent who was instrumental in Xceligent's scheme to steal intellectual property from CoStar.[10]

---

[10] According to a lawsuit filed by Xceligent's bankruptcy trustee, Brent Hansen, who was Xceligent's Vice President of Marketing Research, "instruct[ed] Xceligent employees to use TOR browsers (which anonymize an Internet user) as part of the 'game plan to get Xceligent's [IP] address hidden in order that the [marketing researchers] can update listings' when rival Costar's website 'LoopNet blocked them.'"  Similarly, according to the Xceligent trustee, Hansen allegedly "worked directly with Xceligent's IT department to set up a VPN for [Xceligent's offshore] marketing researchers to use to circumvent CoStar's security and access CoStar websites."

176.   Mr. Cohen's current relationship with Cohen Financial is unclear, but in 2020, he used his pcohen@cohenfinancial.com LoopNet account as part of his work for CREXi.  For example, Mr. Cohen accessed LoopNet on multiple occasions in late May 2020 to run searches for "for-sale" properties in Florida, North Carolina, and Ohio.  Shortly thereafter, in June 2020, Mr. Cohen appeared in several CREXi promotional videos boasting about CREXi's coverage in the same three states.  The Florida marketing video, described in Paragraph 146 above, contained multiple CoStar-copyrighted images.

177.   Similar to Mr. Rosenfeld and Mr. Cohen, CREXi's Sam Hamlin created a LoopNet account registered to "Sam H" with the personal email address sdhamlin08@yahoo.com.[11]  He did so on June 27, 2019, immediately after he began working at CREXi.  Like Messrs. Rosenfeld and Cohen, Mr. Hamlin used this account to access LoopNet listings.  Despite the use of personal email addresses, CoStar has reasonably concluded that Messrs. Rosenfeld, Cohen, and Hamlin (and the other CREXi employees who tried to mask their identities, described herein) were acting within the scope of their authority as agents of CREXi, and for the benefit of CREXi.  Indeed, many of these individuals were senior executives at CREXi and spoke publicly on CREXi's behalf in several of the marketing videos described herein.

178.   As well as registering LoopNet accounts to non-CREXi email addresses, CREXi employees also use fake identities to mask their work on behalf of CREXi.  For example, Nick Hanna, CREXi's former senior product manager, signed up for two LoopNet accounts under false names.  One account is registered to "Hank Mardukous" at hankmardukus@gmail.com.  The other is registered to "Hank Mardukus" at itsnotnick08@aol.com.  Hank Mardukas is a fictional character from the 2009 movie, "I Love You, Man."  As another example, Mr.

---

[11] Other CREXi employees to register for LoopNet accounts using personal email addresses include Courtney Gaylord, CREXi's then-Senior Product Designer, who registered using cgaylord11@yahoo.com.

1   Zlotnick, the former head of CREXi's New York office, registered a LoopNet

2   account under the name "Michael Korenthough" at zackdz11@gmail.com.

3       179.   Despite notice of this lawsuit, CREXi's employees and Agents

4   continue to use LoopNet accounts.  In November 2020, CREXi account executive

5   Connor Broome logged into LoopNet via his gmail address,

6   cjbroomer15@gmail.com.  In January 2021, someone using the same IP address

7   navigated from admin.crexi.com to LoopNet and conducted sessions on LoopNet,

8   visiting multiple Broker Directory Profiles and LoopNet listings.

9       180.   One of the many ways in which CREXi executives use LoopNet for

10  competitive purposes is to set up "saved searches" for property listings.  This

11  enables CREXi to use LoopNet to identify new property listings as they come on

12  the market, rather than spending time and money conducting their own research.

13  LoopNet allows users to save property search criteria, and new property listings

14  that match the saved criteria automatically appear whenever the user logs into

15  LoopNet.  Users can also opt to receive email notifications whenever LoopNet has

16  new listings that fit the saved search criteria.  However, at no point did CoStar give

17  any CREXi employee permission to utilize these services for competitive purposes.

18      181.   For example, Mr. Rosenfeld (a.k.a. "Mike Rose"), the former CREXi

19  account executive for the mid-Atlantic region and current regional director, has

20  created a variety of saved searches for properties in the mid-Atlantic states of

21  Delaware, Maryland, Virginia, and the District of Columbia.  He receives instant

22  email notifications to his personal gmail account whenever new property listings

23  matching his search criteria appear on LoopNet.

24      182.   Likewise, Mr. Cohen has created several saved searches on LoopNet,

25  including properties for sale and for lease in Florida and Georgia.  Mr. Cohen also

26  created a saved search for industrial properties for lease in all states, and he

27  receives instant notifications to his pcohen@cohenfinancial.com email address

28  whenever new property listings matching the search criteria are added to LoopNet.

183.   Similarly, Mr. Hamlin has created saved searches for LoopNet property listings across the northeast United States, including Connecticut, Maine, New Hampshire, New Jersey, Rhode Island, and Vermont, consistent with CREXi's national expansion efforts.

### 3.   CREXi's Offshore Agents Also Covertly Access and Use LoopNet Without Authorization

184.   The unauthorized use of LoopNet to compete against CoStar is not confined to CREXi senior managers and employees.  CREXi also accesses LoopNet through its BPOs and other Agents.  According to CREXi, its BPOs and Agents use "proxy server[s] to access [U.S.] websites, including LoopNet." Indeed, IP addresses and user accounts affiliated with CREXi and its BPOs have impermissibly hit LoopNet more than *two million* times.  Furthermore, documents produced in this litigation and information learned in the course of CoStar's lawsuits filed against CREXi's offshore BPOs (which are discussed more fully below) have shown that CREXi advised its BPOs to use a VPN to routinely access CoStar's websites on CREXi's behalf to view, verify, and copy the content.

185.   For example, Consent Terms executed by one of CREXi's BPOs, Arcgate, to resolve CoStar's lawsuit against Arcgate in India reveal that CREXi instructed Arcgate "to copy content, including, without limitation, broker-related information and auction-listing information, from websites owned by CREXi's competitior CoStar (including LoopNet.com, Ten-X.com and Cityfeet.com)."  One specific Indian IP address associated with Arcgate—115.178.100.18 (the "115. IP address")—accessed LoopNet tens of thousands of times between April 2016 and January 2021.

186.   Just like Arcgate, another of CREXi's Indian BPOs, Neptune, accessed LoopNet without authorization and for competitive purposes on behalf of CREXi.  Neptune employees have accessed LoopNet at least tens of thousands of times from hundreds of unique IP addresses since 2016, at times even directly from

CREXi's internal Salesforce system.  They have done so by logging into CoStar's websites using neptune24x7.com email addresses.  Neptune employees have also used the same VPN anonymizing services, including Hurricane Electric, that CREXi has used to access CoStar's websites, and the same IP addresses CREXi has itself used directly to unlawfully access CoStar's sites.  Like CREXi, Neptune rotated IP addresses to hide evidence of its access and evade CoStar's abuse monitor.

187.   Similarly, CREXi's Indian BPOs 247 Web and Yansh have accessed LoopNet without authorization as part of their work for CREXi.  247 Web and Yansh have accessed LoopNet for years, at times using the same range of IP addresses that they have used to upload and modify content in CREXi's backend system.  Moreover, 247 Web and Yansh deliberately accessed LoopNet from www.google.com, www.google.co.in, and CREXi's internal systems, which include admin.crexi.com, admin-lease.crexi.com, and crexi.atlassian.net.

188.   To protect its intellectual property rights, CoStar filed lawsuits in India against Arcgate, Neptune, Yansh, and 247 Web for, among other claims, engaging in contributory infringement in violation of the Indian Copyright Act of 1957.  Indian courts either enjoined or restricted all four BPOs from accessing CoStar's websites and copying CoStar-copyrighted images.  Arcgate ultimately admitted its wrongdoing and agreed to entry of Consent Terms and permanent injunctive relief.  A certified copy of the Arcgate Consent Terms and Permanent Injunction, entered into on November 24, 2021, is attached as **Exhibit E**.  CoStar's litigation against the other three BPOs is ongoing.

189.   Nor is CREXi's unauthorized LoopNet access and use limited to its Indian BPOs.  As Indian BPOs have become increasingly aware of the risk of working with CREXi, CREXi appears to be shifting to using low-cost labor in other countries, like the Philippines.  CoStar's investigation has identified Philippines-registered IP addresses associated with employees of CREXi's Filipino

BPO SOPHI that have accessed LoopNet in 2021 and 2022.  SOPHI employees have at times accessed LoopNet from https://crexi.lightning.force.com and using @sophi-inc.com email addresses.

190.   CREXi's use of offshore contractors that access LoopNet and "collect" and "clean" data is reminiscent of Xceligent's mass piracy scheme.  In CoStar's lawsuit against Xceligent, discovery revealed that Xceligent used an Indian BPO to access LoopNet and copy content, while trying to hide the wrongdoing.

191.   CREXi's LoopNet access is repeated, widespread, and ongoing.  Indeed, it is consistent with automated scraping emanating from both India and the United States.  Just since the end of 2019, IP addresses affiliated with CREXi's main office in California, CREXi's temporary space at WeWork locations in New York and Miami, and CREXi's subcontractor in India, have triggered thousands upon thousands of "bot warnings" from a third-party security application that monitors activity on CoStar sites, including LoopNet.  These warnings are indicative of systematic access to LoopNet to harvest content en masse.  Moreover, CoStar has evidence that CREXi's BPOs in India and the Philippines continue to access LoopNet without authorization.

### 4.   CREXi's LoopNet Access And Use Violates LoopNet's Terms and Conditions

192.   CREXi is prohibited from repeatedly accessing and using CoStar's websites to compete.  That is plain from the industry-standard LoopNet Terms and Conditions.[12]  The type of widespread competitive LoopNet access in which CREXi has engaged has also been permanently enjoined by multiple federal courts, including in CoStar's cases against Xceligent in Kansas City and RE Back Office in Pittsburgh.  This kind of misconduct also strikes at the heart of the

---

[12] All of CoStar's websites prohibit competitive use, including CoStar, Ten-X, Showcase, and CityFeet.

competition that is central to the commercial real estate information market functioning properly, both for brokers and customers.

193.   By hitting LoopNet more than two million times and using the website for competitive purposes despite this bar, CREXi was simultaneously entering into and violating a binding contract with CoStar.

194.   CREXi had actual notice that use of LoopNet was subject to LoopNet's Terms and Conditions because CREXi, through its Agents and employees acting within the scope of their authority, accessed LoopNet's Terms and Conditions, which specifically prohibit competitive access.  CREXi was also on notice that use of LoopNet was subject to LoopNet's Terms and Conditions because IP addresses and user accounts affiliated with CREXi have triggered thousands of Error & Abuse notices that contain a conspicuous hyperlink to LoopNet's Terms and Conditions and warn that use of LoopNet that does not comply with the terms is prohibited.  There is no doubt whatsoever that CREXi and its senior management are on notice of their repeated contractual breaches. Indeed, CoStar has served Mr. Cohen, CREXi's National Sales Director, an Error & Abuse notice with the hyperlink to LoopNet's Terms and Conditions no fewer than 94 times.

195.   In addition to violating CoStar's contractual prohibition on competitor access, when CREXi routinely accessed and used LoopNet, it falsely warranted that it was not a competitor of CoStar.

196.   Nor is CREXi permitted to access LoopNet through its offshore BPOs.  LoopNet's Terms and Conditions expressly prohibit access by competitors like CREXi, as well as "any company . . . acting on behalf of a competitor of LoopNet."

## 5.     CREXi Steals Copyrighted Photographs from CoStar and its Licensees and Publishes Them on Its Competing Website and in Its Subscription Product

197.   CREXi's wrongdoing is not limited to covertly accessing CoStar's services using passwords issued to other companies, or setting up saved searches on LoopNet under fake names in lieu of conducting research, or downloading CoStar's broker directory information to create customer lead lists and a cloned directory product, or hand selecting and copying a few CoStar photographs to improve its marketing presentations or upsell its customers to Intelligence.  Rather, CREXi is infringing CoStar's copyrighted photographs on a massive scale.

198.   A preliminary review by CoStar in 2020 revealed more than *ten thousand* copyrighted CoStar images on CREXi's website.  As CoStar suspected at the time, these instances of infringement were just the tip of the iceberg.  As a result of CoStar's ongoing investigation, and discovery produced by CREXi, CoStar has identified *50,395* CoStar-copyrighted images in CREXi's possession, as set forth in **Exhibit C**.  Attached as **Exhibit D** is a chart summarizing information about those infringing images.  Many thousands (at least) of these photographs were uploaded at CREXi's direction and on CREXi's behalf, and for its benefit, by CREXi's offshore BPOs, including Yansh, 247 Web, Neptune, Mobius, and 247Digitize.

199.   Notably, CREXi identified over 25,000 images flagged by Restb as containing CoStar's logo *before* CoStar filed its original complaint in this action.  As explained above, Restb describes itself as "specializ[ing] in using artificial intelligence to quickly recognize photographs that contain company logos or watermarks."  Even if CREXi had not deliberately infringed CoStar's photographs—and built a business around that practice—that Restb's technology identified tens of thousands of images with CoStar's star logo in CREXi's possession independently put CREXi on notice that it had a mass infringement

problem (and that is without accounting for the limitations on Restb's technology to detect CoStar images where CoStar's watermark has been cropped out, in whole or in part).

200.   CoStar's lawsuit has, nevertheless, failed to curb CREXi's infringing activity.  Over 25,000 of the CoStar images identified in **Exhibit C** were uploaded or displayed by CREXi *after* CoStar filed its Complaint.  CoStar repeatedly alerted CREXi to its continuing infringement after filing its Complaint, but CREXi has failed to change its business model and failed to expeditiously remove infringing material from its website.

201.   In many cases, CREXi facilitates its mass infringement scheme through its BPOs and other Agents, who (along with CREXi employees, and at the direction and control of CREXi employees), snip, crop, and upload commercial real estate images from real estate brochures into CREXi's listing template via its internal platforms, including Salesforce.  The Agents snip and crop such images to remove the CoStar watermark without regard to copyright ownership.  Indeed, they have received no training from CREXi on the importance of complying with copyright laws, despite CREXi's knowledge that CoStar is a large, if not the largest, licensor of such images to brokers, and despite the presence of CoStar's star logo watermark on many of these brochures and the images in such brochures.  These CREXi employees, BPOs, and other Agents then upload these images on CREXi's external platform, after confirming the images are of sufficient quality to do so.

202.   In many other cases, CREXi facilitates this mass infringement through its employees and Agents who harvest images directly from CoStar's websites, including LoopNet, CityFeet, and Showcase.  And there may be additional ways in which CREXi facilitates the misappropriation of CoStar-copyrighted photographs beyond snipping brochures and accessing CoStar's webpages that will be revealed through discovery.

203.   To be sure, the 50,395 CoStar-copyrighted images identified by CoStar to date on **Exhibit C** still do not reveal the full size of this Titanic-scale iceberg.  By way of example, CoStar does not have access to CREXi's Intelligence subscription product, though from publicly available information, CoStar has identified many CoStar-copyrighted images displayed in Intelligence.  Nor does CoStar have access to images in CREXi's possession that CREXi copied, in violation of CoStar's copyrights, but that are not currently, or were never, published on CREXi's website (i.e., "offline" images in CREXi's image library or other backend systems).  (CoStar's understanding is that CREXi has not effectively reviewed its "offline" images to identify potential additional instances of infringement.)  And given CREXi's industrial-sized infringement scheme, it seems unlikely that its offline library does not include additional CoStar-copyrighted images, including those associated with inactive listings that pre-date CoStar's investigation into CREXi's public-facing website and this litigation.

204.   Set forth below are some of the images CREXi has infringed, as they appear(ed) on LoopNet.com and as they appear(ed) on CREXI.com.  The photographs have been produced side-by-side for purposes of comparison:

**CoStar Copyrighted Photograph**     **CREXi Listing Photograph**









CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

 

205.   As the images above show, CoStar's copyrighted images displayed on CREXi's website have been cropped to remove the CoStar watermark.  In an effort to conceal and disguise its copying, CREXi removes (or directs its BPOs and Agents to remove) the watermarks from CoStar's images and generated cropped images—thereby improperly creating derivative works—to publish and display on its competing website without CoStar's permission.

206.   As described in more detail below, CREXi routinely accessed the copyrighted photographs on LoopNet only a few days before the infringing photographs appeared—without watermarks—on CREXi's website.

207.   CoStar's watermarks on its copyrighted photographs undoubtedly served as a red flag that put CREXi on notice that these images belonged to CoStar.  The removal or alteration of CoStar's watermark conceals CREXi's infringement of CoStar's copyrighted images.  Indeed, CoStar has used the presence of the watermark to identify infringement in prior lawsuits, such as the Xceligent litigation.  And CREXi hired Restb, a company that "specializes in using artificial intelligence to quickly recognize photographs that contain company logos or watermarks," to identify CoStar-watermarked images on its website.  Restb even markets its technology as helping to "protect compan[ies]" from "copyright lawsuits."  CREXi must also have been aware, simply as a matter of common sense, that removing the watermark would enable, facilitate, and indeed induce the

infringement of CoStar's copyrighted materials because it was publishing sought-after copyrighted photographs to the world with the indicia of copyright ownership removed.

208.   The extent and consistency of the cropping, and the specific watermark-cropping instructions that CREXi gave to its BPOs and Agents, reflected in discovery produced by CREXi and admissions by its Agents, demonstrates that CREXi is responsible for this deliberate attempt to hide its infringement.

**6.     CREXi Copies Real Estate Listings from LoopNet and Posts Them on CREXi.com without Authorization and without Broker Knowledge**

209.   CREXi has admitted that it is not allowed to copy listings from LoopNet.  But that is exactly what it does, often without contacting the relevant broker.  And even when it does contact the listing broker, CREXi is careful not to discuss copying from LoopNet, other than to acknowledge its impermissibility.

210.   CoStar has been contacted by bewildered brokers, asking whether CoStar was in business with CREXi because the brokers' listings—including CoStar's copyrighted materials—were appearing without the brokers' authorization on CREXi's site.

211.   For example, one brokerage alerted CoStar after noticing that one of its Florida property listings appeared on CREXi with CoStar's images.  The broker confirmed that it never gave CREXi authorization to list the property on CREXi's website, and that the broker did not upload CoStar's photographs to CREXi.

212.   CREXi's listing of the broker's Florida property contained several copyrighted CoStar photographs.  The photographs had been cropped, but poorly, as CoStar's watermark was still partially visible on a number of the infringing photographs:

### CREXi Listing Photographs





213.   This same story played out across the country.  Brokers who learned that their listings were posted on CREXi were puzzled because they had never even heard of CREXi or sent CREXi any information about their properties, much less given CREXi any permission to copy their property listings from LoopNet.

214.   By way of another example, a broker who listed a Nevada property on LoopNet was surprised to learn that her listing also appeared on CREXi.  She had

never heard of CREXi and never gave CREXi permission to post her listing. Nevertheless, CREXi posted her property on its website and infringed CoStar's copyrighted photographs in the process:

**LoopNet Listing Photograph**          **CREXi Listing Photograph**

 

215.   Notably, CREXi added this Nevada broker's listing on May 19, 2020. On May 15, 2020—only four days earlier—an IP address attributable to CREXi viewed the same property on LoopNet.  In other words, CREXi accessed LoopNet without authorization, viewed the individual's LoopNet listing, and then four days later, the individual's listing appeared without her permission and with CoStar's copyrighted photographs on CREXi's website.  The obvious explanation: deliberate copying and publication by CREXi.

216.   CREXi's practice of copying listings wholesale without broker involvement is causing havoc in the marketplace.  A representative property owner in Long Island started to receive multiple calls inquiring about the potential purchase of a property that had already sold.  When she questioned a caller, it turned out that the property was listed for sale on CREXi.  The owner-representative tracked down the listing broker featured on CREXi.  The broker was unaware that the listing was even on CREXi, and said that he had certainly not posted it.

217.   This pattern repeated across the country.  In Arkansas, a brokerage received multiple calls about a property that had already sold.  One of the callers revealed that the property was listed as for sale on CREXi.  As in the New York example above, the brokerage had not added the listing to CREXi and was unaware that the listing was even on CREXi.  The brokerage contacted CoStar asking if CREXi was a CoStar subsidiary and if CoStar would remove the listing. The upshot: CREXi obtains and posts listings without broker involvement, and causes confusion for buyers, sellers, and brokers.

218.   In some instances, CREXi did at least contact the listing broker and offer to place the listing on CREXi free of charge.  But CREXi was deliberately vague regarding how CREXi planned to obtain the listing and did not disclose that it intended to copy from LoopNet.  For example, a CREXi representative, Nick DeGiorgio—CEO Michael DeGiorgio's cousin—contacted a marketing manager at a brokerage and offered to post one of the brokerage's property listings in Maryland.  The brokerage accepted, but was not asked to provide, and did not provide, CREXi with any information, photographs, or marketing material for the property.  Neither did the brokerage upload any CoStar images to CREXi. Nevertheless, CREXi posted the listing on its website.

219.   Subsequently, CREXi's Mr. Rosenfeld called the marketing manager and tried to sell him a subscription to CREXi's platform.  The manager asked Mr. Rosenfeld where CREXi had obtained the marketing material that it used to list the property on its website, since the brokerage never provided CREXi with any such material.  Mr. Rosenfeld replied vaguely that CREXi had various partnerships with companies that allowed CREXi to get the information.  When the manager asked which companies, Mr. Rosenfeld would not provide that information.

220.   The marketing manager then contacted Mr. Rosenfeld again, asking whether CREXi had a partnership with CoStar, because the CREXi listing contained exactly the same information as the brokerage's listing on LoopNet.  Mr.

Rosenfeld admitted that CREXi did not have a partnership with CoStar.  He stated that once CREXi received the brokerage's permission to post their listing, CREXi copied the information "off the internet."

221.   The manager notified CoStar of Mr. Rosenfeld's suspicious statements and provided a side-by-side comparison of photographs from the CoStar and CREXi listings.  As the manager pointed out, the photograph that CREXi posted exactly matches CoStar's copyrighted photograph, with the exception that CoStar's watermark had been fully cropped out of the lower right-hand portion of the photograph.  The side-by-side comparison that the manager sent to CoStar appears below:



222.   These photographs make clear that when Mr. Rosenfeld told the manager that CREXi pulled the listing "off the internet," he really meant that CREXi copied the listing—including the copyrighted photograph—from LoopNet, even though CREXi was not authorized to do so.  (Of course, had CREXi's Mr. Rosenfeld believed that CREXi was permitted to copy from LoopNet, then he would have readily admitted that LoopNet, and not "the internet," was the source.) Once the brokerage indicated it was interested in seeing the listing on CREXi, CREXi simply lifted the relevant information and copyrighted photograph from LoopNet, rather than spend the time and money to take its own photographs of the

property and conduct its own research (or even ask the brokerage to send its own information).  When the brokerage learned that pulling the information "off the internet" meant copying from LoopNet, the brokerage ended its relationship with CREXi.

223.   As another example, on June 17, 2020, Mr. Rosenfeld accessed LoopNet and viewed another property listing in Maryland, as well as the listing broker's profile on LoopNet.  CREXi subsequently contacted the broker and offered to post the listing for free on CREXi.  The broker agreed.  However, there was no discussion of where CREXi would obtain the listing information.  The broker never gave CREXi permission to copy from LoopNet.  On June 19, 2020— only two days after Mr. Rosenfeld viewed the broker's listing on LoopNet—the listing appeared on CREXi with CoStar's copyrighted photograph:

| **LoopNet Listing Photograph** | **CREXi Listing Photograph** |
|---|---|

 

224.   Similarly, on April 2, 2020, Mr. Rosenfeld accessed LoopNet and created a saved search for properties in Washington, D.C., that met certain criteria, including a minimum price of $1 million.  Mr. Rosenfeld named the search "DC 1M+."  That same day, Mr. Rosenfeld viewed two listings on LoopNet that met the search criteria.

225.   Unsurprisingly, shortly after Mr. Rosenfeld accessed these two listings on LoopNet, they appeared on CREXi with CoStar's copyrighted

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

photographs.  Indeed, one of the photographs on CREXi still featured CoStar's watermark:

**LoopNet Listing Photograph**     **CREXi Listing Photograph**

 

 

226.  Although brokers can list their properties anywhere, brokers know—not least because of industry knowledge about CoStar's efforts to protect its intellectual property—that they do not have the right to permit CREXi to copy from a CoStar site.  There is no norm, standard, rule, or understanding that this kind of rampant copying by a competitor is permissible—indeed it is standard for commercial real estate marketplace sites to expressly prohibit the use of the marketplace, or the copying of listings, for competitive purposes.  This is common

knowledge.  For instance, CREXi contacted a brokerage in Alabama and offered to list its properties on CREXi for free.  The brokerage agreed.  But the brokerage and CREXi never discussed where the information for the listings would come from, and there was no mention of CREXi copying from LoopNet.  The broker later acknowledged that he would not have the right to give CREXi permission to use CoStar's copyrighted content.  Nevertheless, the CREXi listing of the brokerage's property contains CoStar's copyrighted photographs, cropped to remove the CoStar watermark:

**LoopNet Listing Photograph**              **CREXi Listing Photograph**

 

227.   CREXi posted the brokerage's listing on its website on May 15, 2020. The day before the listing appeared on CREXi, an IP address associated with CREXi visited the same listing on LoopNet.  In other words, CREXi visited a listing on LoopNet, and then one day later, the listing appeared on CREXi's website with CoStar's copyrighted material.  Again, the obvious explanation is that CREXi copied the listing from LoopNet, without authorization.

228.   As can be seen, there is no question that even when it is not simply copying and pasting from LoopNet without broker involvement, CREXi routinely posts listings, rather than simply being a passive forum for uploads, when it makes contact with brokers.  Indeed, CREXi trumpets the fact that it is actively involved in creating the listings on its site.  Eli Randel, CREXi's Chief Strategy Officer,

explained during a webinar that CREXi users can send property information to CREXi, and CREXi will "build your listings for you." And during a June 19, 2020 video conference titled, "Welcome to CREXi: Richmond's New CRE Marketplace," CREXi's Paul Cohen stated to his broker audience: "If we don't have your listings on CREXi, send them to us today, and *we'll add them*."

229. Given CREXi's active role in "build[ing]" or "add[ing]" listings, it is unsurprising there are CREXi listings that display CoStar-copyrighted photographs that do not appear anywhere in the listing broker's marketing materials. There would be no reason for brokers to upload their CoStar-copyrighted photographs to CREXi—an action that CoStar prohibits—while excluding those photographs from their own marketing materials—a use that CoStar permits. The obvious explanation (and the one consistent with CREXi's offers to build listings on behalf of brokers) is that CREXi *itself* is taking the CoStar-copyrighted photographs directly from LoopNet—not from the broker's marketing materials—and adding those copyrighted photographs to CREXi.

230. For example, a cropped version of the CoStar-copyrighted photograph of the commercial property shown below appears on CREXi. However, the broker's marketing brochure contains different, non-CoStar copyrighted photographs, indicating that CREXi took this image directly from CoStar.

**CoStar's Copyrighted Photograph**   **CREXi Listing Photograph**

 

**Photographs from Broker's Marketing Brochure**

 

   

231.   CREXi fully understood that copying the images from LoopNet infringed on CoStar's intellectual property rights, and that copying content from a CoStar site was also improper.  In one instance, a broker who agreed to list properties on CREXi's website asked if CREXi could pull the listing information from LoopNet.  Tellingly, CREXi said no and explained that it was not allowed to pull information from LoopNet.  Relatedly, CREXi explained in a February 12, 2019, YouTube video titled, "Add Listings, Dispositions, View Leads on CREXi," that brokers can send their property fliers directly to CREXi for uploads "***as long as they are not CoStar or LoopNet branded***."

232.   But time and again, CREXi nevertheless did copy CoStar's copyrighted photographs and real estate information from LoopNet, despite knowing that it was not permitted to do so.  And many of the property reports provided by brokers were directly generated through the CoStar subscription product:

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

## Subject Property

### 1830 NW 23rd Pl

★★★★★

Portland, Oregon - Uptown Portland Neighborhood



| PROPERTY | | PROPERTY MANAGER |
|---|---|---|
| No. of Units: | 12 | - |
| Stories: | 3 | - |
| Avg. Unit Size: | - | |
| Type: | Apartments - All | |
| Rent Type: | Market | OWNER |
| Year Built: | 1904 | - |
| Parking: | - | |
| Distance to Transit: | 7 Minute Walk | |

| ASKING RENTS PER UNIT/SF | | | VACANCY | | | 12 MONTH NET ABSORPTION | |
|---|---|---|---|---|---|---|---|
| Current: | - | - | Current: | 8.3% | 1 Unit | Current: | 0 Units |
| Last Quarter: | - | - | Last Quarter: | 8.3% | 1 Unit | Competitor Total: | 0 Units |
| Year Ago: | - | - | Year Ago: | 8.3% | 1 Unit | Competitor Avg: | 0.0 Units |
| Competitors: | $1,205 | $2.18 /SF | Competitors: | 5.1% | 6 Units | Submarket Total: | 678 Units |
| Submarket: | $1,295 | $2.11 /SF | Submarket: | 6.8% | 828 Units | Submarket Avg: | 1.4 Units |

### UNIT BREAKDOWN

| Bed | Bath | Avg SF | Unit Mix | | Availability | | Avg Asking Rent | | Avg Effective Rent | | Concessions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Units | Mix % | Units | Percent | Per Unit | Per SF | Per Unit | Per SF | |
| Studio | - | - | - | - | - | - | - | - | - | - | - |
| **Totals** | | **Avg SF** | **Units** | **Mix %** | **Units** | **Percent** | **Per Unit** | **Per SF** | **Per Unit** | **Per SF** | **Concessions** |
| **Totals** | | **-** | **12** | **100%** | **1** | **8.3%** | **-** | **-** | **-** | **-** | **-** |

—— Estimate    Updated December 19, 2018

COMMERCIAL NORTHWEST

Copyrighted report licensed to Commercial Northwest - 671556.

 CoStar

1/22/2019
Page 2

CONFIDENTIAL

CREXI-CS-00230345

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

233.   As a matter of routine, CREXi specifically instructed its Agents to *remove* indications of CoStar's ownership by cropping images with CoStar's watermark.  For example, in an August 11, 2020, email, senior manager James Burton instructed CREXi's primary contact at both 247 Web and Yansh: "PLEASE ADD ASAP AND PLEASE CREATE CREXI FLYERS, DO NOT ADD WATERMARKED PICTURES, PLEASE CROP."  The instructions in Mr. Burton's email directly concerned CoStar images, and were passed on to a junior employee at CREXi's Agents to execute.

234.   CREXi's Agents followed CREXi's instructions.  For example, Neptune accessed LoopNet on September 7, 2020, and viewed a property listing at 4229 Lafayette Center Drive, Chantilly, Virginia.  That same day, details of that property—including cropped versions of CoStar-copyrighted images published on LoopNet—appeared on CREXi:

**CoStar-Copyrighted Photograph on LoopNet**

**Cropped Image on CREXi**

 

235.   CREXi also acknowledged that its BPOs should "refrain from using any site that is, or could be considered, a direct competitor of CREXi" and that "complying with any website's terms is important."  Notwithstanding that acknowledgment, CREXi continued to instruct its BPOs to access and use CoStar websites as a resource, and to collect and provide content copied or derived from CoStar websites to CREXi; time and time again IP addresses associated with

CREXi's BPOs accessed property listings on LoopNet containing CoStar-copyrighted images.  Shortly thereafter, including in some cases mere hours later, listings for those very same properties began appearing on CREXi's platforms with CoStar's copyrighted photographs.  In almost all cases, CoStar's image was cropped to exclude CoStar's watermark.

236.   Likewise, 247 Web and Yansh accessed LoopNet on February 15, 2020, and viewed a property listing at 1575 20th Street NW, Fairbault, Minnesota. Two days later, a cropped and distorted version of CoStar's-copyrighted image appeared on CREXi's website with CoStar's watermark still visible in the lower-right section of the image:

**CoStar-Copyrighted Photograph on LoopNet**     **Cropped and Distorted Image on CREXi**



237.   Civil seizures of evidence by court-appointed commissioners revealed that this conduct was standard practice for 247 Web and Yansh.  The CEO, Ritesh Jaiswal, told the commissioners that, at CREXi's instruction, 247 Web and Yansh "accessed Costar's website and downloaded property images/photographs and then used the same for preparing the property listings to be uploaded on Crexi's website."  A certified copy of the Yansh / Jaiswal Commissioner's Report is attached as **Exhibit F**.  A former Yansh line manager likewise told the commissioners that Yansh employees "were instructed to visit

third-party websites online (which dealt in real estate) and copy images and details from those websites, remove the logos and watermarks, get the images and details reviewed . . . and then upload the said image and details on websites like [CREXI.com] and other sites dealing in real estate."  The commissioner also found evidence that 247 Web and Yansh employees "got instructions to access websites like LoopNet, Cat[y]l[i]st Properties, etc., and to copy and download photographs and other details from those websites, remove the logos and watermarks from the said downloaded images and upload the same on different websites, including [CREXI.com]."  A certified copy of the Yansh / Saxena Commissioner's Report is attached as **Exhibit G**.

238.   In short, CREXi knowingly and willfully infringed on CoStar's copyrights to build out its own business and compete unfairly with CoStar.

### 7.   CREXi Knows Full Well That CoStar Does Not Permit Competitors to Copy Content from Its Website

239.   Even putting aside CREXi's conversations with brokers and instructions to its BPOs described above—including the acknowledged prohibition on copying from LoopNet—there can be no doubt that CREXi is aware that CoStar does not permit competitors to use its websites or subscription database, or to infringe its copyrighted photographs, and that CoStar protects and vindicates its intellectual property and contractual rights though many methods, including—when the copying is on a huge scale and clearly deliberate—litigation.

240.   The trade and national press have extensively covered CoStar's prior lawsuits against infringers and content thieves, such as Xceligent, Apartment Hunters, and RealMassive, and against those who access its databases without authorization, or enable others to do so.[13]  CoStar has litigated across the country,

---

[13] *See e.g.*, CoStar Takes Off the Gloves in Battle Against Xceligent Over Alleged Data Theft (available at https://www.wsj.com/articles/costar-takes-off-the-gloves-in-battle-against-xceligent-over-alleged-data-theft-1513080000); Real Estate Data Dispute Yields $500 Million Judgment (available at https://finance-commerce.com/2020/01/real-estate-data-dispute-yields-

from New Jersey to Kansas City, from Austin to Los Angeles, to protect its intellectual property, and has obtained judgments and injunctions that value its copyrighted images and real estate listings most recently at $50,000 per photograph, and $50,000 per real estate listing.

241. CREXi is well aware of CoStar's judgments protecting its intellectual property and contractual rights, including the record-breaking half-billion dollar judgment against Xceligent based on harvesting content from LoopNet. Indeed, CREXi replaced Xceligent as the National Association of Realtors ("NAR") commercial technology partner following Xceligent's highly publicized bankruptcy during that case.

242. Xceligent's wrongdoing was acknowledged and condemned by multiple bodies. In addition to the federal judgment and injunction against Xceligent itself in its hometown of Kansas City, Xceligent's contractor in Pittsburgh was likewise enjoined and consented to entry of judgment after admitting its involvement in the unauthorized copying of content from LoopNet, a related contractor was enjoined in India on the same basis, and the directors and officers of a third contractor in the Philippines were indicted for accessing LoopNet without authorization and copying listings. In addition, after an extensive audit, an FTC-appointed monitor concluded that the tens of thousands of CoStar photographs in Xceligent's systems, which the court cases had shown were copied from LoopNet, had been "derived improperly by Xceligent" from CoStar's systems.

243. Nevertheless, CREXi has engaged in the very same illegal behavior as Xceligent: appropriating tens of thousands of images and listings from LoopNet

---

500-million-judgment/); Apartment Hunters Found Liable in CoStar Copyright Infringement Dispute (available at https://therealdeal.com/la/2017/03/29/apartmenthunterz-com-found-liable-in-costar-copyright-infringement-dispute/); CoStar Starts Going After Password-Sharing Users in Latest Legal Blitz (available at https://www.bisnow.com/national/news/technology/costar-starts-going-after-password-sharing-users-in-latest-legal-blitz-93586).

with help from offshore agents, free-riding on CoStar's investment in order to build a competing service, and accessing CoStar's services without authorization.

244.   CREXi is, or should be, aware that federal courts around the country have issued injunctions barring competitors from merely accessing LoopNet, CoStar's website.  For example, and as referenced above, the Western District of Missouri permanently enjoined Xceligent from "accessing CoStar Websites or CoStar Databases for the purposes of competitive use, including without limitation for the purposes of copying CoStar Data, verifying broker-sourced data using CoStar Data, or generating leads from CoStar Data."  Judgment and Permanent Injunction, *CoStar Group Inc. v. Xceligent*, Case 4:16-cv-01288-FJG  (W.D. Mo. Dec. 3, 2019) (ECF No. 204).

245.   This Court required another CoStar competitor, Apartment Hunters, specifically to "abide by the terms of use applicable to . . . LoopNet.com" which, as explained above, expressly prohibit competitor access.  Judgment at 5, *CoStar Realty Information, Inc, v. Apartment Hunters, Inc.*, Case No. 8:15-cv-02111-JLS-KES (C.D. Cal. Mar. 27, 2017) (ECF No. 62).  CREXi and its Agents, undeterred, have hit LoopNet more than two million times.

246.   Similarly, federal courts have vindicated CoStar's right to prohibit unauthorized persons from accessing its subscription service or facilitating such unauthorized access.  For example, the District of New Jersey permanently enjoined a brokerage from "sharing any username, password, passcode or other access credential for any CoStar Database with any individual or entity that is not authorized by CoStar to utilize such username."  Amended Judgment and Permanent Injunction, *CoStar Group Inc. v. SandBox Real Estate and Development LLC,* No. 2:18-cv-14611-JLL-SCM (D. N.J. Jan. 1, 2019) (ECF No. 13).  CREXi employees, nevertheless, used credentials issued to other companies in order to access CoStar's subscription service on a widespread basis, collect data, and use them to compete against CoStar.

247.   Furthermore, the fact that CoStar brought independent suits against four of CREXi's BPOs in India related to CREXi's unlawful conduct underscores that CREXi is, or should be aware, that CoStar undertakes significant efforts to protect its proprietary information.

**8.     CoStar's Multiple Lawsuits In India Against CREXi's Agents Have Lifted the Veil on CREXi's Willful Misconduct Against CoStar**

248.   CoStar sued Arcgate in March 2021 after discovering that Arcgate was accessing LoopNet and misappropriating content on behalf of CREXi.  In November 2021, Arcgate consented to the entry of judgment and agreed to be enjoined after acknowledging its misconduct on behalf of CREXi.  As a result, the High Court of Rajasthan entered judgment and a permanent injunction against Arcgate, prohibiting it from accessing CoStar's websites for competitive purposes or infringing CoStar's photographs.

249.   In support of the case resolution and injunction, Arcgate produced to CoStar its communications with CREXi.  Those documents showed that Arcgate raised "red flags" in response to instructions from CREXi to obtain broker information from CoStar websites given that CoStar was CREXi's competitor, but that nevertheless CREXi instructed Arcgate to access and use "any website" (e.g., including CoStar websites), with no regard to whether that activity violated CoStar's Terms of Use.  In those communications, CREXi also acknowledged to Arcgate that "complying with any website's terms is important to [CREXi]"—but CREXi instructed Arcgate to violate them anyway.  For example, the documents Arcgate produced showed that in April 2020, CREXi directed Arcgate to access Ten-X, which was acquired by CoStar two months later, to mass-harvest data about real estate auctions and brokers, in violation of Ten-X's terms of use.  That mass scraping of data echoes the misappropriation for which CREXi was previously enjoined in connection with the Ten-X litigation.

250.   Astoundingly, CREXi did not promptly inform Arcgate about the details of CoStar's lawsuit against CREXi or CoStar's allegations that CREXi was using Arcgate to further CREXi's scheme of piggybacking on CoStar's success. Left in the dark, Arcgate continued to work for CREXi until late 2021 "on the assumption that CREXi's instructions . . . were lawfully given" since CREXi had disregarded the "red flags" Arcgate had raised about accessing CoStar websites on CREXi's behalf.

251.   CoStar sued Neptune in July 2022 after similarly discovering that Neptune had accessed CoStar's websites tens of thousands of times without authorization since 2016.  The Indian court entered a preliminary injunction against Neptune and authorized a civil seizure of evidence based on its finding that CoStar presented "prima facie evidence of large scale infringement and piracy."  A certified copy of the Madras High Court's orders dated July 14, 2022, granting an *ad-interim ex-parte* injunction against Neptune and the *ex-parte* appointment of commissioners to take evidence related to CoStar's claims is attached as **Exhibit H**.

252.   A civil seizure by court-appointed commissioners in July 2022 revealed a slew of evidence of misconduct, including listings uploaded onto CREXi's website that include CoStar-copyrighted images and brochures containing CoStar-watermarked images and covert accessing of CoStar's websites to verify information for CREXi listings and broker profiles even though the terms of CoStar's websites are clear that access for competitive use is prohibited.  The commissioners also discovered a draft email on the topic of "copyright violations" from Neptune's managing director, which identified 200 property brochures featuring CoStar's logo that Neptune had uploaded into CREXi's system.  That draft email noted that CREXi first instructed Neptune to avoid copying from LoopNet only in 2021 (i.e., well after CoStar's lawsuit was filed in 2020), even though Neptune first began working for CREXi in late 2016.  The draft email also

noted that CREXi did not inform Neptune of the risks of copyright infringement inherent in Neptune's work until March 2022.  A true and correct copy of the Neptune Expert Commissioner's Report is attached as **Exhibit I**.  CoStar has applied for an order authorizing a full forensic application of the recovered materials.  The Neptune proceeding is thus ongoing.

253.   As with Arcgate, CREXi delayed telling Neptune about CoStar's litigation against CREXi for copyright infringement.  CREXi only informed Neptune about the existence of this lawsuit in February 2022 and, even then, still waited until March 2022 to provide substantive details about CoStar's claims—a year and a half after CoStar originally filed suit.  During that conversation, CREXi finally told Neptune that CoStar applies its watermark to images to "indicate its ownership."

254.   CoStar's lawsuits against Arcgate and Neptune have revealed the destruction of evidence as well as CREXi's failure to ensure that evidence relevant to this litigation is preserved.[14]  For example, CREXi failed to ensure that Arcgate preserved server logs showing Arcgate's access to CoStar's websites.  Documents collected during the Neptune seizure similarly showed that CREXi not only failed to notify Neptune of its duty to preserve relevant evidence, it did not even tell Neptune about the existence of CoStar's September 2020 lawsuit until early 2022.  Even worse, the court-appointed Expert Commissioner in the Neptune litigation uncovered evidence of "[m]ass deletion of data relating to CoStar and CREXi" by Neptune, including folders and files with "CoStar" in their title and server logs that would have evidence of Neptune's access to CoStar sites.  The Expert Commissioner also recovered evidence reflecting "an internal audit check with respect to attempts to sanitise or delete CoStar-related data."

---

[14] CoStar does not yet know the details of the communications between CREXi's counsel and Arcgate or Neptune, and thus refrains at this time from accusing CREXi's counsel of colluding in Arcgate's or Neptune's reported mass deletion of evidence regarding CoStar and CREXi. CoStar will continue to pursue these issues.

255.   CoStar brought suit against two more of CREXi's BPOs, 247 Web and Yansh, in November 2022, after discovering that they were unlawfully accessing CoStar's website and infringing CoStar's copyrighted images to benefit CREXi.  And that has been confirmed by discovery in this case: over 3,700 of the CoStar images identified in **Exhibit C** were uploaded by 247 Web and Yansh. Although CoStar's litigation in India against 247 Web and Yansh is just beginning, the Delhi High Court found that CoStar had "made out a prima facie case" sufficient to grant an interim injunction prohibiting access to CoStar's websites and copying CoStar images and authorized two civil seizures of relevant evidence.  A true and correct copy of the Delhi High Court's orders dated November 11, 2022, granting an *ad-interim ex-parte* injunction against 247 Web and Yansh employees, and the *ex-parte* appointment of commissioners to take evidence related to CoStar's claims is attached as **Exhibit J**.  These seziures, executed by court-appointed commissioners in November 2022, revealed extensive further evidence of deliberate misconduct.

256.   For example, the court commissioner overseeing the seizure of evidence from Ajit Saxena, a former Yansh line manager, found that when working for CREXi, 247 Web and Yansh employees were instructed to (i) "download pictures from various websites . . . ***including loopnet, cat[y]l[i]st, etc.*** . . . and then subsequently, edit those pictures by cropping the logo/watermark on those pictures, and then upload those pictures along with listing details on crexi.com;" and (ii) "crop any logos/watermarks of any companies if found on the images, and . . . not upload any pictures on [CREXI.com] without removing the logos/watermarks."

257.   The court commissioners' reports regarding the other seizure, executed against Yansh and 247 Web, as well as CEO and joint owner Ritesh Jaiswal, was far more comprehensive, and even more damning.

258.   ***CREXi's Agents harvested photographs and content from CoStar for use on CREXi, and the activities continued for more than half a year after CoStar sued CREXi***.  Mr. Jaiswal told the commissioners that CREXi's Agents had "***accessed Co[S]tar's website and downloaded property images/photographs and then used the same for preparing the property listings to be uploaded on [CREXi's] website***."[15]  CREXi knew that this activity was wrongful.  For example, a commissioner noted that CREXi's Nick DeGiorgio told a broker customer that for "***legality [sic] reasons, I am unable to pull anything from L\*\*pnet [sic]***."[16] Stunningly, it was not until ***April 2021***, more than half a year after CoStar sued CREXi, that "[CREXi] communicated through [Z]oom call and e-mail to stop" those activities, "as a result of the lawsuit which was filed in the United [S]tates by the Co[S]tar Group."  In a written statement Mr. Jaiswal provided to the advocate commissioner, he confirmed that "***from[ ] October 2020 till [sic] April 2021, I was uploading listing[s] on CREXi['s] website which included COSTAR photographs, property***."  The evidence collected by the commissioners corroborates this statement; in a March 2021 WhatsApp chat, Mr. Jaiswal instructed an employee to use a VPN to access LoopNet, as well as other sites.

---

[15] The evidence gathered showed that this was a common occurrence.  For example, the Local Commissioner's Report included an email from Mr. Jaiswal to CREXi's James Burton on January 31, 2020, where Mr. Jaiswal noted that he had downloaded a listing from LoopNet, and provided the link, as well as a WhatsApp chat in Hindi between Mr. Jaiswal and an employee, translated as "***[C]lick on the address, it will open the property website, both belonging to Loopnet.  Use them to make crexi flyers***.  Lot[s] of properties can be made" using that same method.

[16] Even though CREXi occasionally communicated a written policy of not copying from LoopNet, as Mr. Jasiwal admitted, and as the evidence uncovered by the commissioners demonstrates, CREXi's actual policy and practice was to the contrary.  These policy statements constitute yet more evidence that CREXi was engaging in knowing wrongdoing.  This conclusion is further supported by CREXi's use, when written communications were required, of "L\*\*pnet" for LoopNet and "Co\*\*\*r" for CoStar, and by the instructions from CREXi to its Agents to discuss the misconduct only on the phone rather than in writing.  For example, Mr. Jaiswal "further ***warned his team against contacting an individual named 'James' (understood to be Mr. James Burton, an employee of CREXi) using email or Slack about these [CoStar] websites, stating that 'We only have to call him***.  Let me know and I will call him.'"").

259.  ***Multiple CREXi managers and employees directly instructed CREXi's Agents to crop out the CoStar watermark before uploading masses of CoStar images to CREXi's website***.  For example, as shown in the image below, in an email dated September 18, 2019, Nick DeGiorgio, CREXi's Supply Growth Manager, directed James Burton, CREXi's Project Manager, to tell CREXi's "offshore" Agents to copy CoStar photographs, crop out the CoStar logo and create listings for use on CREXI.com.  He wrote "Can we have offshore buildout the attached [file of listings] for a new Pro broker?  It is multiple listings in a combined file.  ***Some of the photos have CoStar branding so please advise offshore to crop out***."  As directed, Burton then passed on the instructions to Mr. Jaiswal, including the statement: "***Some of the photos have Co\*\*\*r branding so please advise offshore to crop out***."  That one email alone attached 42 properties accompanied by CoStar-owned images.[17]  A day later, Mr. Jaiswal confirmed that the instructions had been followed ("It's done"), i.e., a significant number of CoStar images had been copied, cropped and uploaded to CREXi's website all at CREXi's direction.

---

[17] This type of volume was apparently not unusual.  For example, the court commissioner also asked Mr. Jaiswal about a communication from CREXi's Ethan Morris who sent "around 25 properties" to Mr. Jaiswal.  All of the documents "were LoopNet flyers and included CoStar branded images."  Mr. Jaiswal elsewhere noted that "at the peak" of the Agents' work for CREXi creating listings "he used to get as many as ***6,000*** listings on [ ] average every month."

From: Nick DeGiorgio <nickd@crexi com>
Sent: Wednesday, September 18, 2019 2:20 PM
To: James Burton <james@crexi.com>
Subject: New Pro

JB!!!

22-11-2022, 21:1

igh Priority ND                                    https://mail.google.com/mail/u/1/?ik=69f1ea5945&view=pt&search=al.

Can we have offshore buildout the attached for a new Pro broker?

It is multiple listings in a combined file. Some of the photos have CoStar branding so please advise offshore to crop out.

Thank you Sir.

Nick DeGiorgio
Nickd@crexi com
213.986.2292

260.   According to further evidence uncovered by the commissioners, similar instructions from CREXi—to copy CoStar images and crop out the CoStar watermark—were routinely passed on to the line employees at CREXi's Agents. For example, in a WhatsApp chat, Mr. Jaiswal instructed an employee named "Ved" to "crop" out "the loopnet logo."  By way of further example, on August 11, 2020, CREXi's James Burton instructed Mr. Jaiswal to add listings on CREXI.com but to "PLEASE CROP" the CoStar logo from the relevant photographs before uploading them.  The evidence discovered by the court commissioners revealed that on that same day, Mr. Jaiswal passed on Burton's instruction to one of his employees.

261.   ***CREXi's accessing of CoStar's websites via its Agents was a routine occurrence***.  The court-appointed advocate commissioner noted that the technical commissioner had, after reviewing Mr. Jaiswal's mobile device, found "multiple instances indicating access of CoStar / LoopNet and affiliated websites by the employees of" CREXi's Agents.  The commissioner reported that CREXi's Agents used VPNs to circumvent blocks placed on CoStar's websites: "Mr. [Jaiswal] . . .

mentioned that some of the websites (such as CoStar LoopNet, Ten-X, Looplink, HomeSnap, etc.) hosted in the United States were inaccessible or would block access to Indian IP addresses and hence, they would use . . . Virtual Private Network ('VPN') services . . . ."

262. ***CREXi instructed its Agents to delete references to CoStar sites from CREXi's systems***.  The court commissioner reported that "in the year 2020, there was a particular request from a [CREXi] employee – Mr. James Burton, where [Yansh and 247 Web were] required to logon to the admin login of CREXi and look for keywords such as [']CoStar', 'LoopNet', 'Ten-x' and 'Looplink' [and] delete these words."  Mr. Jaiswal, in his written statement to the commissioner confirmed that in "April 2020, James Burton instructed me to search on CREXI.com keywords such as COSTAR, LOOPNET, [TENX] and LOOPLINK. If they appeared on the website then I was instructed to remove the keywords from description and link."

263. ***CREXi's Agents initially denied, but later admitted, to having created accounts on CoStar sites***.  For example, the commissioners noted: "When we had asked Mr. [Jaiswal] on 12 November 2022 if he or any of his employees have login credentials to CoStar or LoopNet websites, Mr. [Jaiswal] had denied [that].  But, later at [the offices of the technical expert commissioners], Mr. [Jaiswal] informed [us] that there was a login on his own name and [that] there is a high probability that [a] few of his employees may also have their own credentials to login to website [sic] of CoStar and its affiliates."

264. ***Cloud accounts associated with CREXi's Agents contained a slew of evidence relating to CoStar***.  "Multiple files" on DropBox "had references to keywords such as CoStar and LoopNet."

265. ***Brokers confronted CREXi when their listings from CoStar were copied onto CREXi.com without their knowledge or permission***.  For example, the commissioners found that in 2020 a senior broker at the brokerage firm Equity

emailed CREXi's James Burton and Michael Lindman to complain that her listing had been copied.  She told Burton and Lindman "that she had recently updated a listing on the CoStar website but had not done the same on CREXi" and asked "Where did you get that?  I did not update your site."  She asked "Is CREXi affiliated with [CoStar]?"  As with the brokers noted in Section D.6, *supra*, CREXi had copied a listing from CoStar's website without this broker's knowledge, leading her to ask whether CREXi was "affiliated" with CoStar.  Of course, the opposite is true.

266.  ***Masses of relevant evidence were deleted, including last month***.  The commissioners found traces of the "***mass deletion***" of evidence.  For example, when Mr. Jaiswal's laptop was searched, its "trash" folders contained "multiple files" containing the keywords "CoStar, LoopNet and Crexi indicating mass deletion of files pertaining to parties to the lawsuit."  "***Some files . . . were deleted were as late[ ] as November 2022***."[18]  Moreover, the commissioners discovered that devices used by longtime 247 Web and Yansh employees involved in creating property listings for CREXi, inexplicably, did not have any files or data in them apart from system files.

267.  The commissioners further determined that months of evidence of the Agents' work creating listings for CREXi during the pendency of this (the U.S.) case were destroyed.  Mr. Jaiswal informed the commissioners that he received a memo from CREXi in October 2020 instructing 247 Web and Yansh to retain records "relating to [their] work for CREXi" including by suspending automatic document deletion policies or programs and preserving paper and electronic files.  But in a phone call, CREXi's Lawson Dees "had instructed Mr. [Jaiswal] to only retain email communications between 247 [Web] / Yansh and CREXi,"

---

[18] In addition to this brazen destruction of evidence, the commissioners expressed concern about other nefarious activities.  For example, while the seizure was ongoing, a relevant email account was accessed and a password was changed.  The commissioners were, understandably, very concerned about such developments and were unable to "confirm if the data on th[is] email account was compromised or deleted during the course of the commission."

notwithstanding the language of the written notices.  Based on this oral advice, which was limited to emails between CREXi and its Agents, Mr. Jaiswal admitted that months of relevant and recent evidence was destroyed by CREXi's Agents: "247 [Web] / Yansh continued to work on property listings from October 2020 to April 2021, and these listings at times did include references or photographs from CoStar or LoopNet.  Mr. [Jaiswal] also confirmed that the data and materials that 247 [Web] / Yansh would have received from CREXi to create property listings between October 2020 to April 2021[ ] would also have been deleted by him since there were space and storage constraints with 247 [Web] / Yansh."

268.  ***CREXi drafted and pressured Mr. Jaiswal to sign a misleading declaration***.  The commissioners discovered that in February 2022, just after CoStar filed the Arcgate judgment in this Court, CREXi drafted and pressed Mr. Jaiswal to sign a declaration that contains multiple statements contradicted by the evidence that the commissioners uncovered.  For example, the declaration asserts that "[w]hen we encountered CoStar's logo on a broker-provided image, our policy was not to utilize that image or to ask for another image without a logo."  But as noted above, CREXi, through multiple managers and employees, in fact had a contrary policy and practice: CREXi sent images with CoStar logos to its Agents and told its Agents to crop out the CoStar watermark and upload the image.  The declaration further states that "[a]ll of the information and images we used to create or update listings came from either the broker directly, from the broker's flyer, or from listings on the broker's website."  Of course, that was not accurate either.  In fact, as noted above, Mr. Jaiswal stated, and the evidence shows, that CREXi Agents harvested listings from LoopNet and other CoStar sites before uploading them to CREXi, being careful to first crop out the CoStar watermark (as directed by multiple CRXi employees).  By way of another example, the declaration states that neither Mr. Jaiswal "nor anyone working on our team

created a user account on CoStar or LoopNet."  But as Mr. Jaiswal ultimately admitted, he did, and there was a "high probability" that his team did too.

269.  The court-appointed advocate commissioner, unsurprisingly, decided to confront Mr. Jaiswal: "*[I]n light of the . . . declaration which goes completely contrary to the findings made herein . . . with respect to the use of Co[S]tar/Loop[N]et property photographs and the communication between the Defendants and CREXi*, I deemed it fit to call Mr. Ritesh Jaiswal . . . to pose some questions in this regard."

270.  *When confronted about his CREXi-drafted declaration, Mr. Jaiswal, the CEO of two of CREXi's Agents, confessed to wrongdoing and blamed CREXi*.  When asked about the fact that his declaration contained multiple statements that were, in the words of the court commissioner, "completely contrary" to the evidence, Mr. Jaiswal made a number of statements confirming that the declaration was indeed misleading and contrary to fact.  These statements also directly implicated CREXi.  For example, while Mr. Jaiswal testified that there was a policy about not using CoStar-watermarked images, he admitted to the court commissioner that multiple named CREXi managers and employees, including Nick DeGiorgio, James Burton and Alexa Smith sent him "photos contain[ing] [the] COSTAR logo."  Mr. Jaiswal "*was instructed by these [CREXi] employees to crop/ snip[ ]*" the "*COST[A]R logos and then create a listing to be uploaded on [CREXi's] website*."

271.  Mr. Jaiswal further confirmed that CREXi at all times directed the improper accessing, copying, and cropping: "I or my employees have never acted independently to access COSTAR property photographs for creating listing[s] for uploading on [CREXi's] website.  *It was only on the instruction of [CREXi that] we download[ed], cropped photographs with logo of COSTAR and then uploaded it on [CREXi's] website*."

272.   Mr. Jaiswal also shed light on why he had signed a declaration that was contrary to fact.  He did not write the declaration, and he was told by CREXi he had to sign it.  The declaration was drafted by CREXi's U.S lawyers and he "was specifically told by" CREXi's outside counsel at Keker Van Nest & Peters LLP and by CREXi's Vice President of Operations Lawson Dees "that *I had to sign this undertaking because of the lawsuit which was fil[]ed by . . . COSTAR against [CREXi]*."  Mr. Jaiswal reportedly felt he had no choice because of the money that his company was receiving from CREXi, stating: "I signed the undertaking as [CREXi] was an important client."[19]

273.   In short, Mr. Jaiswal told the court commissioner that he was pressured by CREXi into signing a document that CREXi wrote for him for use in this (i.e., the U.S.) case, he was given no other option (he was told he "had to sign"), and the money CREXi was paying sealed his agreement to execute a declaration that was contrary to fact.  No wonder then that Mr. Jasiwal stated that "if he was asked to sign the same declaration" again "he would be hesitant to do so, as *he did not fully agree to all the statements in the said declaration shared by the lawyers of CREXi*."  Indeed.

### 9.   CREXi's Investors Also Unlawfully Access CoStar's Subscription Database to Compete Against CoStar, in Violation of CoStar' Terms of Use

274.   In addition to its employees and BPOs, CREXi's investors also use credentials issued to legitimate subscribers in order to improperly access CoStar's content.

275.   Leon Capital, one of CREXi's more significant investors, was founded by Fernando De Leon, who also touts himself as a "co-founder" of

---

[19] Mr. Jaiswal further "informed [the commissioners] that he had signed the declaration without consulting anyone or taking a legal opinion on the same, since CREXi was an important client to him."  Mr. Jaiswal "several times repeated that the declaration was signed by him to retain CREXi as a client as the same was important to him for his business."

CREXi.  Despite the fact that this made Leon Capital a competitor (at least indirectly) of CoStar's, Leon Capital utilized CoStar's subscription database in violation of its terms and conditions, resulting in CoStar terminating its subscription agreement with Leon Capital in April 2021 and filing a lawsuit against Leon Capital in August 2021.  *See CoStar Group Inc. et al., vs. Leon Capital Group, LLC*, Case No. 1:21-cv-02227 (D.D.C. August 20, 2021).

276.   After the termination, Leon Capital continued, covertly, to access and use CoStar's password-protected product.  Specifically, Leon Capital's Managing Director Sean Wood, continued to access CoStar's subscription database and servers without authorization, using credentials issued to Dalfen Industrial, his previous employer.  Mr. Wood improperly and without authorization logged into the CoStar database, accumulated nearly 30,000 hits, and exported over five hundred records.  Mr. Wood continued to access CoStar's database without authorization through June 2021, accumulating over 20,000 hits in June 2021 alone.

277.   Another Leon Capital employee, Corbin Stall, similarly utilized credentials issued to a prior employer to access the CoStar database, after CoStar terminated its agreement with Leon Capital.

278.   Worse still, Leon Capital employees continued to access CoStar products, specifically LoopNet, to the near present-day, including in or around June of 2022, almost a full year after CoStar sued Leon Capital, and even after the Court in that matter ruled that the vast majority of CoStar's allegations survived Leon Capital's motion to dismiss.  *See CoStar Group Inc. et al., vs. Leon Capital Group, LLC*, Case No. 1:21-cv-02227 (D.D.C. August 20, 2021).

279.   Leon Capital's unlawful behavior reflects the same rotten culture and business practices that persist at CREXi.

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

**10.     CREXi Knows Full Well That CoStar's Star Logo Signals Its Copyright Ownership**

280.   CREXi knows that CoStar's star logo signals CoStar's copyright ownership over a photograph.  As noted above, in February 2019, years after it was founded, CREXi engaged a third-party vendor, Restb, for purposes of identifying photographs on the CREXi platform containing the logo of a third party, including CoStar's star logo.  Restb uses "artificial intelligence to quickly recognize photographs that contain company logos or watermarks."  According to Restb, its logo-detection technology is designed to protect companies from copyright lawsuits, and in particular, "CREXi utilizes Restb's services in order to identify photographs in the real estate listings it receives from brokers that might be copyright protected."

281.   According to CREXi, since February 2019, Restb has identified more than 48,000 images with CoStar's watermark on CREXi's website.  CREXi has further represented that photographs flagged by Restb as containing the logo of a third party are then removed from CREXi.com (although it has not represented what then happens to those images, which remain indisputably infringing).

282.   Independent of Restb's filtering technology, it is apparent to CREXi's customer base, and thus to CREXi, that CoStar's watermark signifies ownership of its photographs.  For example, on information and belief, the below image was licensed from CoStar by a broker, and it appears that the broker added the "Photo Courtesy of CoStar Group" language.  The addition of that language evidences that the broker clearly knew CoStar's watermark signified ownership.  The image with the added language subsequently was displayed on CREXI.com.  Thus, CREXi's own website reflects industry knowledge—and CREXi's knowledge—that the CoStar logo signifies copyright ownership.

PHOTO COURTESY OF COSTAR GROUP

283.   In addition, even though its actual practice was to the contrary, CREXi acknowledged in writing that its BPOs should not be publishing photographs bearing the watermark or logo of a third party, including CoStar, specifically because those are "indicat[ors] of copyright protection."  For example, CREXi's contracts with Arcgate, Neptune, and Yansh (which CREXi foisted on its Agents *after* CoStar filed its original complaint in 2020) contain nearly identical language stating that "[CREXi] does not re-post images over which another entity has indicated copyright protection."  Those contracts thus directed that the BPOs should "not publish or provide to [CREXi] any photographs bearing the watermark or symbol of another company" or "crop, edit or otherwise modify any photos to remove a watermark or symbol of another company;" rather, the contracts commanded that the BPOs "shall only publish or provide to [CREXi] photographs that do not contain a watermark or symbol of another company."  In short, CREXi's own contracts acknowledge that logos on commercial real estate photograph denote copyright ownership.

284.   Consistent with those contracts, after CoStar filed its original complaint for copyright infringement against CREXi, CREXi held regular videoconference trainings with its third-party Agents and BPOs in which it communicated a similar policy (again, a policy contrary to actual practice)—that photographs specifically containing the CoStar logo should not be copied (or

cropped)—yet another acknowledgement that CREXi is well aware that the CoStar logo in particular evidences CoStar ownership.  Indeed, Neptune's Director testified that CREXi told him that CoStar uses its star "logo as a watermark, which is generally found on the bottom right corner in a photograph *to indicate its ownership*."  Similarly, the CEO of Yansh and 247 Web stated in his declaration (drafted by CREXi's U.S. lawyers) that "[i]n the fall of 2020, we were informed by CREXi that CoStar claimed that all images with its logo on them are the copyrighted property of CoStar."

### E.   CREXi Actively Participates in Creating Listings For Brokers, Including Uploading Infringing Images to CREXi's Platform

285.   CREXi is not a passive internet service provider for user-driven and submitted content.  Rather, CREXi actively participates—and indeed touts its role—in creating listings for its customers, including from broker brochures or other marketing materials.  CREXi's active involvement in image uploading and displaying renders CREXi liable for copyright infringement.

286.   CREXi actively participates in gathering and displaying the images on its website in at least two ways.  *First*, and as detailed above, CREXi instructs its BPOs and Agents to create listings from images and data in property brochures.  CREXi instructs its BPOs and Agents to manually obtain listing information and associated images from such brochures and from websites owned by CoStar and by third parties.  The BPOs and Agents then create and upload property listings to CREXi's platform using that content, including thousands of CoStar-copyrighted images.  CREXi also made decisions on when to display uploaded images, even at times giving its BPOs discretion on when to time CREXi's marketing e-blasts containing listings.

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

287.  **Second**, even when it works directly with brokers, CREXi is still actively involved in selecting, curating, and displaying images.  CREXi advertises its ability to curate listings directly to brokers: "Want Us to Add the Listing For you?  Get stated by uploading a flyer, offering memorandum, or brochure and our team will **do the rest**."  *See* https://www.crexi.com/add-properties:



288.  "Do[ing] the rest" means that CREXi curates and controls the broker's listing, including adding data and photographs and determining how that information should be displayed.

289.  CREXi performs quality control review of the images submitted to CREXi and selects high resolution images for display on its website, sometimes directing its Agents to "update the pictures [from brochures]" with "ones from the website" if the pictures provided by a broker are low-quality.  For example, Nick DeGiorgio instructed James Burton to "[p]lease have offshore go through this team . . . and do their best to do the following: . . . Attempt to remove any

pixilated, or blurry photos (high res ones can be found on their site)."  Burton then instructed the Neptune team to "Follow the steps below to find the high quality pictures to add to the listings . . . please check on the front-end of CREXi to ensure they look high quality."

290.   CREXi refers to this entire process as a "white glove" service it provides to brokers.  *See* https://learn.crexi.com/hc/en-us/articles/360057618493-Listing-Properties-on-Crexi ("You can utilize Crexi's [sic] white glove service where one of our skilled Crexi [sic] professionals can help you with the process.").

291.   Customer reviews confirm that brokers utilize this service, relying on CREXi—and its Agents—to enter listing information and images (without regard to copyright ownership) directly to its platform:

292.   CREXi trained its BPOs and Agents to create property listings on CREXi's website.  That training included instructions on taking property brochures and copying their contents into CREXi's system, including directions to copy "as many photos as possible" of the real estate properties.

**F.     CREXi is Ineligible for the DMCA Safe Harbor Defense in 17 U.S.C. § 512**

293.   CREXi has at various points attempted to disclaim the full extent of its infringement by relying on the so-called "safe harbor defense" afforded to certain online service providers that comply with the requirements of the DMCA, 17 U.S.C. § 512.  Specifically, CREXi has asserted that it is merely a "service provider" storing material "at the direction of a user." 17 U.S.C. § 512(c).  As an initial matter, CREXi cannot claim the protections of the DMCA at all for the reasons described above—it is not a passive entity storing images at the direction of users.  Instead, CREXi has actively sought out and displayed CoStar's copyrighted images.  Moreover, as described above, CREXi has instructed its Agents to crop out CoStar's watermark from CoStar-copyrighted photographs.  The intentional and systematic cropping out of CoStar's watermark constitutes deliberate modifications to the content of CoStar's copyrighted images, rendering CREXi ineligible for the protections of the DMCA safe harbor as a matter of law.

294.   In any event, even if CREXi had a passive role in storing the infringing images at issue in this case, and it does not, it would still not be entitled to the DMCA safe harbor defense because it has failed to comply with any of the threshold requirements for that defense.  CREXi claims that it complies with the requirements of the "safe harbors" of the DMCA, that it respects content owners' intellectual property rights, and that it has adopted a policy of terminating users who are deemed to be repeat infringers.  *See* CREXi Terms of Service § 5.2.  None of that is true.

**1.     CREXi Failed to Properly Designate a DMCA Agent**

295.   At the time of the infringing activities at issue, CREXi either did not have a designated DMCA agent or it failed to appropriately maintain and publish contact information for its designated DMCA agent with the U.S. Copyright Office and on its website, as required by the DMCA and relevant regulations.  *See*

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

17 U.S.C. § 512(c)(2); 37 C.F.R. 201.38(b)(3); 81 Fed. Reg. 75695 (Nov. 1, 2016) (Copyright Office final rule).  CREXi's omission of this information, and its publication of inconsistent information, makes it needlessly cumbersome for copyright owners to find accurate information for CREXi's designated DMCA agent and submit notices of claimed infringement to CREXi.

## 2. CREXi Knew or Should Have Known of Infringing Activity on Its Platform and Failed to Expeditiously Remove Claimed Infringing Images

296.   Additionally, CREXi knew or should have known of infringing activity on its platform, but failed to expeditiously remove infringing images, as required by 17 U.S.C. § 512(c)—despite repeated notices from CoStar after the filing of this lawsuit that such infringing images remained on CREXi's website for months.  These notices stated that CoStar-copyrighted images had been added to CREXi's website without CoStar's authorization and provided CREXi with information about each copyrighted image, including the copyright registration, the photographer, copies of the CoStar-copyrighted and infringing images, and their URLs on CREXi's website.  The notices also contained the signature and the contact information of CoStar's counsel, who is authorized to act on behalf of CoStar, the owner of the infringed copyrights.

297.   Specifically, between March and July 2021, CoStar identified over 2,100 CoStar-copyrighted photographs that continued to appear on the CREXi website without CoStar's authorization, notwithstanding the fact that CoStar previously identified these CoStar-copyrighted photographs to CREXi.

298.   The continued appearance of CoStar-copyrighted material on CREXi's website—and CREXi's refusal to remove thousands of CoStar-copyrighted images even after CoStar provided detailed information of the specific instances of infringement—demonstrates CREXi's knowledge of (and failure to expeditiously remove or disable access to) infringing material from its platform.

299.   Furthermore, the allegations herein demonstrate that CREXi receives a financial benefit directly attributable to the infringing activity and had the right and ability to control that infringing activity, beyond its mere technical ability to remove or disable access to infringing materials.  Among other activities, CREXi and its Agents *actively participate* in creating listings for CREXi users, including by obtaining, selecting, and uploading images.  Further underscoring its active participation, CREXi has affirmatively modified CoStar-copyrighted images by cropping out CoStar's watermark.

### 3.   CREXi Failed to Design and Reasonably Implement a Repeat Infringer Policy

300.   CREXi claims that it has designed and adopted a policy of terminating, in appropriate circumstances, users who are deemed to be repeat infringers, pursuant to the DMCA.  *See* CREXi Terms of Service § 5.2.  Not so.

301.   Even assuming that CREXi has had an established written *policy* for terminating repeat infringers, CREXi failed to terminate, or persistently turned a blind eye toward, repeat infringers when their identities were made known to CREXi.  As detailed above, between March and July 2021, CoStar identified over 2,100 instances of repeat infringements to CREXi.  Several of these repeat infringments were associated with users with listings on CREXI.com that contained infringing images identified in CoStar's original Complaint.

### G.   CREXi's Wrongdoing is Consistent with Its Prior Willful Misconduct

302.   This is not the first time that CREXi has improperly profited from another company's investment and intellectual property.  Indeed, CREXi sought to establish itself based on content misappropriated from Ten-X, now part of CoStar.

303.   CREXi's co-founder and CEO, Michael DeGiorgio, and co-founder Luke Morris previously worked for Ten-X and were engaged in a scheme to misappropriate highly confidential trade-secret customer lists from Ten-X to

launch CREXi.  Ten-X uncovered the theft and brought suit against CREXi and
Mr. DeGiorgio, immediately securing a preliminary injunction.  In the course of
litigation, CREXi admitted that that it used Ten-X customer reports to create a
master list of customer contacts, and used the master customer list to market its
website and services.

304.    The California state court that entered the preliminary injunction
against CREXi found that Ten-X was highly likely to succeed on the merits of its
claims for misappropriation of trade secrets, breach of the duty of loyalty, breach
of a proprietary information and inventions agreement, and breach of a
confidentiality agreement.  The court barred the operation of CREXi to the extent
it operated online real estate auctions, and prohibited CREXi's use of Ten-X's
customer lists and all documents and information derived therefrom.  The court
also ordered that the misappropriated materials be returned or purged.

305.    Seeing the writing on the wall, CREXi paid $1.6 million in damages,
issued a public apology, and—according to a press release issued by CREXi—
agreed to certain ongoing restrictions, including a prohibition on any further use of
the misappropriated information.  In a public statement, Michael DeGiorgio
"apologize[d] to Ten-X for the actions which led to this lawsuit" and stated, "I
regret my conduct at the time I departed Ten-X."

306.    Despite the payment and (hollow) apology, CREXi and Mr.
DeGiorgio have picked up where they left off.  In an article published by the *Los
Angeles Business Journal* on July 19, 2020, Mr. DeGiorgio claimed that CREXi
could overtake CoStar Group as the "go-to" source for information in the
commercial real estate sector, insisting that CREXi wants to "offer a better
product, more accurate data, more usable data."  But in fact, CREXi is trying to
clone CoStar's service, using content stolen from CoStar, while publicly boasting
that it can do "better."  In its quest to take market share from and "overtake"
CoStar, CREXi continues to engage in unlawful and unfair business practices,

including accessing CoStar's services without authorization and misappropriating CoStar's copyrighted photographs and real estate data.

307.   Ironically, Ten-X, CREXi's initial victim, is now part of the CoStar Group.  CoStar must defend itself from the recidivism of CREXi, Mr. DeGiorgio, and other CREXi executives, and safeguard CoStar's decades of innovation, investment, and hard work.  CoStar's access records—and information uncovered as part of CoStar's independent litigation against CREXi's BPOs—confirm that CREXi continues to surreptitiously access and scrape content from Ten-X, mass harvesting data using its agent Arcgate in 2020 and continuing to access the site via its agent Neptune as recently as this year.

## **FIRST CLAIM FOR RELIEF**

### **Copyright Infringement**

308.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

309.   Each of CoStar's photographs constitutes an original work of authorship and copyrightable subject matter under the laws of the United States.

310.   CoStar owns or has exclusive rights to all rights, title, and interest in and to the photographs.

311.   CREXi had and has access to CoStar photographs through the internet or other means.

312.   CREXi has copied, reproduced, distributed to the public, and/or displayed publicly on CREXI.com CoStar's copyrighted photographs—including without limitation those copyrighted works identified in **Exhibit C** hereto—without the consent or authority of CoStar, thereby infringing CoStar's copyrights.

313.   Further, CREXi has created derivative works based on CoStar's copyrighted images by cropping and manipulating CoStar's registered images. Examples appear on **Exhibit C**.  CREXi has gone as far as to add its own

1  watermark to some of the cropped CoStar-registered images in order to re-brand

2  them as their own.  Examples appear at Section D.6, *supra*.

3      314.  CoStar owns the exclusive rights in each of the photographs detailed

4  in **Exhibit C**.  Prior to the filing of this suit, CoStar has validly registered each of

5  the photographs detailed in **Exhibit C** with the United States Copyright Office.

6  CREXi copied, reproduced, distributed, or publicly displayed on CREXi's website

7  without authorization each of the copyrighted photographs detailed in **Exhibit C**.

8      315.  Upon information and belief, CREXi's unlawful copying,

9  reproducing, distributing, and public displaying of these CoStar photographs

10  occurred on or around April 21, 2020, to April 18, 2022, as set forth in **Exhibit C**.

11  On information and belief, a valid registration was obtained by CoStar for each

12  photograph detailed in **Exhibit C** prior to CREXi's first infringement of the

13  photograph.

14      316.  CREXi's copies, reproductions, distributions, and displays are

15  identical and/or substantially similar to CoStar's photographs.  Further, CoStar,

16  which owns an exclusive right to prepare derivative works of its copyrighted

17  images, did not give CREXi permission to create any derivative works.

18      317.  CREXi is directly liable for these acts of infringement in violation of

19  17 U.S.C. §§ 106 and 501.

20      318.  The infringement of CoStar's rights in each of its copyrighted

21  photographs constitutes a separate and distinct act of infringement.

22      319.  CREXi's acts of infringement have been willful, intentional,

23  purposeful, and in disregard of CoStar's rights under the Copyright Act.  CREXi

24  knew its acts were infringing and intentionally or recklessly disregarded the law by

25  its conduct.

26      320.  CoStar did not authorize CREXi's acts.

27      321.  CoStar believes that additional instances of CREXi's infringement of

28  its copyrighted photographs will be revealed during the discovery process.

322.   As a result of CREXi's willful copyright infringement, CoStar has been and will continue to be damaged as a direct and proximate result of the infringing acts set forth above, and CREXi has profited and will continue to profit as a result of its unlawful infringement of CoStar's copyrighted photographs in an amount to be proven at trial.

323.   CREXi's conduct also has caused irreparable and incalculable harm and injuries to CoStar and is ongoing.  Unless enjoined, CREXi's conduct will cause further irreparable and incalculable injury, for which CoStar has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Violation of the Digital Millennium Copyright Act ("DMCA")

### Removal of Copyright Management Information, 17 U.S.C. §§ 1202(b)(1)

324.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

325.   With respect to the 50,395 copyrighted CoStar images identified in CREXi's possession, CoStar's watermark constitutes copyright management information ("CMI"), as it identifies CoStar as the copyright owner of such photographs.  As described above, CREXi has engaged a third-party vendor, Restb, for purposes of identifying photographs on the CREXi platform containing the logo of a third party, including CoStar's logo, on the basis that the logo denotes copyright ownership.  Furthermore, CREXi itself has acknowledged that the CoStar logo evidences CoStar copyright ownership, as evidenced by, for example, its explicit instructions to its BPOs to crop out CoStar's watermark prior to uploading to the CREXi platform.

326.   In many such photographs, including several specifically identified above as examples, CREXi intentionally and systematically cropped out (or instructed its Agents to crop out) CoStar's watermark from CoStar-copyrighted photographs.

327.   CREXi removed CoStar's CMI while knowing, having reasonable grounds to know, and with the intent that it would induce, enable, facilitate, and/or conceal infringement of CoStar's copyrights, in violation of 17 U.S.C. § 1202(b).

328.   CREXi's removal and alteration of CoStar's CMI was made without the knowledge or authority of CoStar.

329.   CoStar has suffered damage and loss as a result of these violations.

330.   CoStar has suffered and will continue to suffer irreparable harm as a result of CREXi's continued removal of CoStar CMI on CoStar-copyrighted photographs, and, as such, CoStar has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

**Violation of the Digital Millennium Copyright Act ("DMCA")**

**Distribution of Works with Removed or Altered Copyright Management Information, 17 U.S.C. §§ 1202(b)(3)**

331.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

332.   CoStar's watermark constitutes CoStar's protected CMI.  As described above, CREXi has engaged a third-party vendor, Restb, for purposes of identifying photographs on the CREXi platform containing the logo of a third party, including CoStar's star logo, on the basis that the logo designates copyright ownership.  Furthermore, CREXi itself has acknowledged that the CoStar logo evidences CoStar copyright ownership, as evidenced by, for example, its explicit instructions to its BPOs to crop out CoStar's watermark prior to uploading to the CREXi platform.

333.   CREXi has distributed and is distributing CoStar's protected works, or copies of works, knowing that protected CMI has been removed or altered without CoStar's authority.

334.   CREXi distributed CoStar's CMI while knowing, having reasonable grounds to know, and with the intent that it would induce, enable, facilitate, and/or

conceal infringement of CoStar's copyrights, in violation of 17 U.S.C. § 1202(b)(3).

335.  CoStar has suffered damage and loss as a result of these violations.

336.  CoStar has suffered and will continue to suffer irreparable harm as a result of CREXi's continued distribution of CoStar's protected works, or copies of works, knowing that protected CMI has been removed or altered without CoStar's authority, and, as such, CoStar has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

### Common Law Misappropriation

337.  CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

338.  CoStar has invested substantial time, labor, skill, and financial resources into the creation and maintenance of CoStar's services, its computer systems and servers, including system and server capacity, as well as the content on CoStar's database, subscription service, and the LoopNet website.  This includes CoStar's substantial efforts to assist brokers in building out their listings on LoopNet by adding copyrighted photographs and data from CoStar's database and by curating brokers' LoopNet listings to increase marketability, including editing broker-submitted content.  CoStar goes to great lengths, in terms of time, number of research and marketing personnel, and invested dollars, to manage, update, and curate its verified listings and provide a seamless, up-to-date user experience that constitutes a substantial portion of CoStar's value proposition.

339.  Without authorization, CREXi wrongfully accessed and appropriated CoStar's services, computer systems and servers, and its content without having to make the substantial investment in time, labor, skill, and financial resources made by CoStar.  CREXi is in direct competition with CoStar and has made CoStar's content available to CREXi's users.  As such, CREXi's use of CoStar's computer systems and servers, including system and server capacity, as well as CoStar's

content, constitutes free-riding on CoStar's substantial investment of time, effort, and expense.

340.   CoStar has also invested substantial time, labor, skill, and financial resources into the creation and maintenance of CoStar's Professional Directory records.  CoStar goes to great lengths, in terms of time, number of research personnel, and invested dollars, to manage and update these broker directory records to ensure accurate customer leads and provide the value users expect when engaging with CoStar's services.

341.   Without authorization, CREXi wrongfully accessed and appropriated CoStar's Professional Directory records without having to make the substantial investment in time, labor, skill, and financial resources made by CoStar.  CREXi is in direct competition with CoStar and, upon information and belief, CREXi has used these directory records to build its rival directory and find potential customers for CREXi's marketplace.  As such, CREXi's use of CoStar's Professional Directory records constitutes free-riding on CoStar's substantial investment of time, effort, and expense.  CREXi is reaping where it has not sown.

342.   As a result of this misappropriation, CREXi wrongfully competes and/or enables others to compete, with CoStar, and CoStar has been forced to expend additional time and resources, including but not limited to, investigating CREXi's activities and attempting to prevent such misappropriation by technological means.

343.   CoStar has been and will continue to be damaged as a result of CREXi's misappropriation of CoStar's valuable information and property.  If permitted to continue, the ability of CREXi and other parties to free-ride on CoStar's substantial investment would so reduce CoStar's incentive to produce products or services such as LoopNet that the existence or quality of these products or services would be substantially threatened.

344. CoStar has suffered and will continue to suffer irreparable injury, and its remedy at law is not itself adequate to compensate for injuries inflicted by CREXi.

## **FIFTH CLAIM FOR RELIEF**

### **California Unfair Competition**

345. CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

346. By the acts described herein, CREXi has engaged in unlawful business practices.  It has done so by misappropriating CoStar's property, as set forth in Count Four.

347. Separately, by the acts described herein, CREXi has also engaged in false advertising.  To induce brokers, consumers, and the public to use its services, it has disseminated untrue and misleading statements about its growth, success, and prowess in the commercial real estate industry, thereby misleading brokers and the public.

348. CREXi knew or should have known by the exercise of reasonable care that its advertising and promotion of its services was untrue and misleading.

349. CREXi's unlawful business practices and false advertising has injured and will continue to injure CoStar in its business and property, in violation of California Business and Professions Code Sections 17200, *et seq.* and 17500, *et seq*.

350. CREXi's acts alleged herein have injured CoStar.  CoStar has suffered lost transaction opportunities, lost business opportunities, lost market share, and present and future diminishing of business value.

351. CREXi's acts alleged herein have also caused, and will continue to cause, irreparable injury to CoStar, unless and until CREXi is permanently enjoined and ordered to pay appropriate restitution.

## SIXTH CLAIM FOR RELIEF

### California False Advertising Law

352.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

353.   By the acts described herein, CREXi has engaged in false advertising. To induce the public to use its services, it has disseminated untrue and misleading statements about its products, growth, success, and prowess in the commercial real estate industry, thereby misleading consumers.  As described above, CREXi has made misleading public statements suggesting that it is organically growing and gaining market share as a result of broker uploads, its relationships with brokerage firms, and its purportedly innovative products, services and technology.  Moreover, CREXi has boasted that its broker directory is "the only place" with "every commercial broker in the country."  These statements, and the others alleged herein, mislead customers—including brokers—and the ultimate consumers—such as buyers, sellers, owners, and tenants—regarding the way in which CREXi is facilitating its growth, attracting them to a business that is falsely portraying itself as legitimate and self-sustainable, when in reality, CREXi is stealing content from CoStar.

354.   CREXi knew or should have known by the exercise of reasonable care that its advertising and promotion of its services was untrue and misleading.

355.   CREXi's false advertising has injured and will continue to injure CoStar in its business and property, in violation of California Business and Professions Code Section 17500, *et seq.*

356.   CREXi's acts alleged herein have injured CoStar.  CoStar has suffered lost transaction opportunities, lost business opportunities, lost market share, and present and future diminishing of business value.

357.   CREXi's acts alleged herein have also caused, and will continue to cause, irreparable injury to CoStar, unless and until CREXi is permanently enjoined and ordered to pay appropriate restitution.

**SEVENTH CLAIM FOR RELIEF**

**Breach of Contract**

358.   CoStar repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

359.   Use of CoStar's subscription database and the LoopNet website is subject to contractually binding terms and conditions.  Such terms are common in the industry, and as a sophisticated business entity, CREXi and its employees would be well aware of both the presence and binding nature of the terms and conditions.

360.   CREXi had actual and/or constructive knowledge that access to the CoStar database is subject to CoStar's Terms of Use.  As described above, CREXi employees, acting within the course and scope of their employment for CREXi, and for CREXi's benefit, affirmatively accepted CoStar's Terms of Use that appear in a pop-up window every 30 days.  Additionally, CREXi was on notice of CoStar's Terms of Use because references to CoStar's Terms of Use appear: directly below the log-in button for the CoStar database; in an email to users before they log into the database for the first time; whenever users export data from CoStar's database; and at the bottom of each results page.

361.   CoStar's Terms of Use prohibit competitors from accessing, using, or transmitting any portion of CoStar's content in the subscription database.

362.   CoStar's Terms of Use prohibit competitors from disclosing or transmitting any portion of the Service to any direct or indirect competitor of CoStar.

363.   CoStar's Terms of Use prohibit users from sharing passcodes with any other person.

364.   In direct violation of CoStar's Terms of Use, CREXi, through its authorized agents and employees, accessed CoStar's subscription database despite being its competitor, in order to steal the content therein, including broker directory information, and to use that content to benefit CREXi's business.

365.   Further, in direct violation of CoStar's Terms of Use, CREXi's employee and agent, Mr. Hamlin, allowed at least one unauthorized person—namely, the head of CREXi's New York office—to use his CoStar credentials.

366.   CREXi also had actual and/or constructive knowledge that access to LoopNet was subject to LoopNet's Terms and Conditions.  As described above, CREXi employees, acting within the course and scope of their employment for CREXi, and for CREXi's benefit, have accessed LoopNet's Terms and Conditions that specifically prohibit competitive access.  Furthermore, actual knowledge can be imputed to CREXi based on CREXi's repeated visits to LoopNet.  CREXi was also on notice of LoopNet's Terms and Conditions because CREXi received ***thousands*** of Error & Abuse notices that all contained a conspicuous hyperlink to LoopNet's Terms and Conditions and explained that use of LoopNet was subject to the terms.  Conspicuous hyperlinks to LoopNet's Terms and Conditions were displayed on every page of the LoopNet website and directly below the log-in button for the LoopNet website.  CREXi employees who registered for LoopNet accounts also received an email before signing in for the first time that contained multiple references to the Terms and Conditions.

367.   LoopNet's Terms and Conditions prohibit competitors from viewing, using, or accessing LoopNet, including using LoopNet for or in connection with any other listing service.

368.   LoopNet's Terms and Conditions prohibit using or reproducing any content obtained from LoopNet for or in connection with any other listing service.

369.   In direct violation of LoopNet's Terms and Conditions, CREXi, through its authorized agents and employees, accessed LoopNet despite being its

competitor, in order to steal intellectual property, data, and other content, including copyrighted photographs, and use such content on CREXi.com, a listing service. The actions alleged herein by CREXi employees were undertaken by those employees in the course of their employment, and were done on behalf of, and for the benefit of, CREXi.

370. CREXi's breaches of these terms have been material, willful, repeated, and systematic.

371. CREXi caused damage and continues to cause irreparable harm to CoStar by building databases and selling data based, at least in part, on CoStar content derived as a result of contractual breaches.

372. CoStar is therefore entitled to damages in an amount to be proven at trial, injunctive relief, and other relief as the Court deems appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, CoStar prays for relief as follows:

1. For an order pursuant to 17 U.S.C. § 502 permanently enjoining and restraining CREXi and its officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the infringements of CoStar's exclusive rights under the Copyright Act, or from authorizing any other person to do the same;

2. For an award pursuant to 17 U.S.C. § 504 of CoStar's actual damages and CREXi's profits or, alternatively at CoStar's election, for statutory damages for CREXi's infringement and willful infringement—including without limitation for the instances of infringement identified in **Exhibit C**, and other instances of infringement subsequently disclosed or uncovered during discovery— in the maximum amount allowable by law;

3.    For a finding that CREXi has willfully infringed CoStar's federally
      registered copyrights;

4.    For an award pursuant to 17 U.S.C. § 1203 of CoStar's actual
      damages and CREXi's profits, or alternatively at CoStar's election,
      for statutory damages for CREXi's violations of the DMCA in the
      maximum amount allowable by law;

5.    For an order permanently enjoining and restraining CREXi and its
      officers, agents, servants, and employees from accessing CoStar
      websites and the databases that power them;

6.    For a finding that CREXi's access to CoStar's websites and databases
      is unauthorized;

7.    For an award of damages arising from CREXi's breaches of CoStar's
      and LoopNet's binding terms and conditions;

8.    For an order permanently enjoining and restraining CREXi and its
      officers, agents, servants, and employees and all those in active
      concert or participation with them from breaching CoStar's and
      LoopNet's binding terms of service;

9.    For an award of damages arising from CREXi's misappropriation of
      data and content from CoStar's computers and servers;

10.   For an order permanently enjoining and restraining CREXi and its
      officers, agents, servants, and employees and all those in active
      concert or participation with them from directly committing, aiding,
      encouraging, enabling, inducing, causing, materially contributing to,
      or otherwise facilitating the misappropriation of CoStar data and
      information;

11.   For an order granting all available relief under California Business
      and Professions Code Sections 17203 and 17535, including without
      limitation restitution for CREXi's wrongful gains for its unfair

competition and false advertising;

12.    For an order permanently enjoining and restraining CREXi and its officers, agents, servants, and employees and all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating CREXi's unfair competition and false advertising;

13.    For further permanent injunctive relief as deemed necessary by the Court, including without limitation for an order pursuant to 17 U.S.C. § 503(b) or otherwise requiring the purging and destruction of all CoStar content from CREXi's database(s) and system(s) by an independent source that reports to CoStar and the Court and monitors CREXi's future compliance with the Court's orders;

14.    For an award of CoStar's costs, including its reasonable attorneys' fees;

15.    For pre-judgment and post-judgment interest according to law;

16.    For exemplary and punitive damages to the extent available; and

17.    For such further and additional relief as the Court may deem just and proper.

1

## **JURY DEMAND**

2    Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Civil L.R.

3    38-1, CoStar hereby demands a trial by jury.

4

5

6                                        Respectfully submitted,

7    Dated:  December 19, 2022          **LATHAM & WATKINS LLP**

8                                        By: */s/ Jessica Stebbins Bina*
                                           Jessica Stebbins Bina
9                                          (Bar No. 248485)
                                           Elyse M. Greenwald
10                                         (Bar No. 268050)
                                           10250 Constellation Boulevard
11                                         Suite 1100
                                           Los Angeles, CA 90067
12                                         Tel: 424.653.5525
                                           Fax: 424.653.5501
13                                         Email: jessica.stebbinsbina@lw.com
                                                  elyse.greenwald@lw.com
14
                                           Belinda S Lee (Bar. No. 199635)
15                                         505 Montgomery Street, Suite 2000
                                           San Francisco, CA 94111
16                                         Tel: 415.391.0600
                                           Fax: 415.395.8095
17                                         Email: belinda.lee@lw.com

18                                         Nicholas J. Boyle
                                           (admitted *pro hac vice*)
19                                         Sarah A. Tomkowiak
                                           (admitted *pro hac vice*)
20                                         555 Eleventh Street, NW, Suite 1000
                                           Washington, D.C. 20004
21                                         Tel: 202.637.2200
                                           Fax: 202.637.2201
22                                         Email: nicholas.boyle@lw.com
                                                  sarah.tomkowiak@lw.com
23
                                           Elizabeth A. Parvis
24                                         (admitted *pro hac vice*)
                                           elizabeth.parvis@lw.com
25                                         1271 Avenue of the Americas
                                           New York, NY 10020
26                                         Tel: 212.906.1200
                                           Fax: 212.751.4864
27

28

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Caitlin E. Dahl
(admitted *pro hac vice*)
caitlin.dahl@lw.com
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767

*Counsel for CoStar Group, Inc., and
CoStar Realty Information, Inc.*

CASE NO. 2:20-cv-08819-CBM-AS
SECOND AMENDED COMPLAINT