**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CoStar Group, Inc., *et al.*,<br><br>　　　Plaintiff,<br>v.<br>Commercial Real Estate Exchange Inc.,<br><br>　　　Defendant. | Case No.:  2:20-cv-08819-CBM-AS<br><br>**ORDER RE: COUNTERCLAIM DEFENDANTS' 12(B)(6) MOTION TO DISMISS AMENDED COUNTERCLAIM [198]** |

　　The matter before the Court is Plaintiffs and Counterclaim Defendants CoStar Group, Inc. and CoStar Realty Information, Inc.'s (collectively "CoStar") Motion to Dismiss the Amended Counterclaims brought by Defendant and Counterclaimant Commercial Real Estate Exchange, Inc. ("CREXi").  (Dkt. No. 198.)

## I.　BACKGROUND

　　The background for this case is set forth in the Court's June 17, 2022 Order granting CoStar's Motion to Dismiss CREXi's Counterclaims.  (*See* Dkt. No. 146.)  The original Counterclaims asserted fourteen causes of action against CoStar: monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, for each of the three (3) relevant markets where CREXi and CoStar compete (Claims 1–6); use of exclusionary contract provisions

1

under Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, B&P § 16720, respectively (Claims 7–8); trademark infringement under 15 U.S.C. § 1114 (Claim 9); false advertising under 15 U.S.C. § 1125(a)(1)(B) (Claim 10); false advertising under California's False Advertising Law, B&P § 17500 (Claim 11); unfair competition based on the anticompetitive conduct under California's Unfair Competition Law ("UCL"), B&P § 17200 (Claim 12); unlawful competition under the UCL based on the antitrust, trademark, or false advertising claims (Claim 13); and declaratory relief (Claim 14). (Dkt. No. 74 – Counterclaims and Demand for Jury Trial.) The Court denied CoStar's Motion to Dismiss CREXi's Counterclaims as to the ninth claim for trademark infringement, thirteenth claim for unlawful violations of the UCL, and the fourteenth claim for declaratory judgment, and granted the Motion to Dismiss as to all other claims with leave to amend to correct the deficiencies identified in the Court's Order. (Dkt. No. 146.)

The First Amended Counterclaims asserts the same causes of action with the addition of two new claims. (Dkt. No. 162.) In place of its false advertising counterclaims (Claims 10 and 11), CREXi added intentional interference with contract and intentional interference with prospective economic advantage causes of action. (*Id.*) CoStar moves to dismiss CREXi's amended counterclaims. (Dkt. No. 198.) CoStar's motion is directed at all of CREXi's counterclaims, with the exception of CREXi's claim for trademark infringement and its unlawful competition claim predicated on CoStar's alleged trademark infringement, as the Court previously held that CREXi's allegations as to those claims plausibly stated a claim. (*See* Dkt. No. 146.)

## II. LEGAL STANDARD

To survive a motion to dismiss, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations and punctuation omitted). When considering motions to dismiss, courts accept all facts alleged in the complaint as true, construe the pleadings in the light most favorable to the nonmoving party, and draws all reasonable inferences in favor of the plaintiff. *Ass'n for Los Angeles Deputy Sheriffs v. Cty. of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011).

### III. DISCUSSION

**A.  Antitrust Claims**

CREXi reintroduces its eight antitrust claims against CoStar. CREXi asserts six claims under Section 2 of the Sherman Act for monopolization and attempted monopolization in each of the three markets in which they compete; one claim under Section 1 of the Sherman Act; and one claim under California's Cartwright Act for CoStar's use of exclusionary contractual provisions. (First Amended Counterclaims ("FACC") ¶¶ 265-349.) All of CREXi's antitrust claims require CoStar to have engaged in concerted or independent anticompetitive conduct under Section 1 and Section 2 of the Sherman Act, respectively. *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 989-90 (9th Cir. 2020) ("*Qualcomm*"); *Cty. Of Tuloumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (explaining that the analysis under the Cartwright Act mirrors the Sherman Act). The Court will therefore conduct a single analysis of the alleged anticompetitive conduct in this case instead of a separate analysis for each statutory provision. *Qualcomm*, 969 F.3d at 991.

The Court starts its analysis of CREXi's antitrust claims by evaluating the alleged conduct in light of the recognition in antitrust law that a business generally has the right to refuse to deal with its competitors. The Court then evaluates CoStar's alleged market power, a required element for all of CREXi's antitrust claims, based on the allegations of CoStar's market dominance in the geographic

3

markets where its anticompetitive conduct occurred.

### 1. Alleged Anticompetitive Conduct

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ("Linkline"). Likewise, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (alteration in original) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). "[T]he U.S. Supreme Court has recognized that a market participant's right to refuse to deal with competitors generally serves procompetitive purposes, and that restricting that right can have anticompetitive effects." *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-CV-07182-JCS, 2021 WL 3885981, at *7 (N.D. Cal. Aug. 31, 2021) (quoting *Trinko*, 540 U.S. at 407–08). "This is because the antitrust laws, including the Sherman Act, were enacted for the protection of competition, not competitors." *Qualcomm*, 969 F.3d at 993 (9th Cir. 2020) (quotation omitted).

CREXi alleges that CoStar engaged in anticompetitive conduct in the relevant markets of Commercial Real Estate ("CRE") listing services, CRE information services, and CRE auction services in the following ways: blocking other users from working with CREXi, utilizing exclusionary contractual terms to prevent brokers from using CRE services, falsely claiming ownership over brokers' CRE information and photographs, and infringing on CREXi's trademarked name. (FACC ¶¶ 39-135.) CREXi also alleges that these exclusionary practices have substantially foreclosed competition in the relevant markets. *Id.* at ¶¶ 136-139. The Court reviews CoStar's alleged conduct to determine whether it was anticompetitive or merely a business's legitimate refusal

to provide free aid and assistance to a competitor.

### a. CoStar Blocks Access to Webpages hosted by CoStar

CREXi realleges that "CoStar imposes technological blocks" that "prevent CREXi from accessing brokers' CRE listings on brokers' own websites," which imposes a "restraint to interfere with economic relationships between brokers and CREXi." (FACC ¶¶ 39-43.) CREXi alleges CoStar does this by integrating its LoopNet search technology to display brokers' CRE listings on their publicly available website by utilizing database functionality offered by a webtool called LoopLink. (*Id.*) Therefore, when brokers utilize the LoopLink widget to show their CRE listings, CoStar integrates this with its LoopNet search technology so that the listings automatically get listed on LoopNet.com. CoStar's LoopNet.com website contains CoStar's copyrighted images, data from the CoStar database, and edits made by CoStar to "improve marketability" of brokers' listings. (*Id.*) CREXi alleges CoStar's "intended purpose" for this is to "lock-in brokers to exclusive relationships with CoStar, deprive brokers of the effective use of their own CRE listings, and to prevent competition in the marketplace." (*Id.* at ¶ 49.) CREXi further alleges that "many brokerages have become dependent on LoopNet as a repository for their broker-owned listings" and if such information is not available to competitors, "it is often unfeasible for any competitor to compete with CoStar for those brokers because . . . the only original copies the brokers have of their listings are on the broker's LoopLink-powered website." (*Id.* at ¶ 41.) Thus, CREXi alleges that the practical effect of these technological measures is to "lock-in" brokers into exclusive dealing relationships with CoStar and prevent competition in the CRE marketplace. (*Id.* at ¶ 49.)

LoopLink allows brokers to link their websites to CoStar's LoopNet suite and use its search function. LoopLink is operated and hosted by CoStar, and as the Court found in its previous Order, CoStar is not obligated to provide CREXi with access to its websites and database. The main addition to CREXi's

allegations is that rather than seeking to deal with or utilize CoStar's websites directly, CREXi demands access to websites that utilize CoStar's platforms—LoopLink and LoopNet—linked on brokers' public websites. Brokers are not obligated to utilize LoopLink, and if they do, they are still free to utilize CREXi's services as well. Brokers are still free to hire CREXi or share the same information to both CREXi and CoStar. In fact, CREXi's allegations confirm that over 500 existing brokers utilize *both* CoStar and CREXi's services. (*See* FACC ¶¶ 99-100, 108, 257.) If CoStar did not exist, CREXi would still need to perform the same actions it needs to engage in today to conduct business: go to the individual brokers and request listings for CREXi's platform. (*See* Order at 7) ("CoStar blocking CREXi from its own websites does not forbid brokers from hiring CREXi or even stop brokers from sharing the exact same information to both CREXi and CoStar—it only appears to stop CREXi from accessing broker information through CoStar's own websites.") Whether brokers have become dependent on LoopNet and thus choose not to maintain additional copies of listings apart from what is on LoopNet is not anticompetitive conduct by CoStar.

Thus, the use of innovative technology to produce a link to a repository of CRE listings hosted by CoStar and from which CREXi is blocked from accessing is not anticompetitive conduct.

**b. CoStar's Alleged *De Facto* Exclusivity Provisions**

CREXi alleges that CoStar utilizes contractual provisions to create a "de facto" exclusivity agreement between CoStar and brokers that impacts "access and use of CoStar's publicly accessible websites, and brokers' own websites hosted by LoopLink." (FACC ¶¶ 55-69.) CREXi further alleges that CoStar "lures" brokers into using its services with promising assurances that brokers will maintain rights and ownership of their listing and photographs, but that ultimately prevents brokers from using or share information obtained through LoopNet and other services. (*Id.* at ¶¶ 52-60.) Put another way, CREXi alleges that CoStar asks

6

1 | brokers to give the company their data and then turns around and claims that data
2 | as its own without allowing brokers to use or distribute that data.  (*Id*. at ¶ 64.)
3 | CREXi identifies terms in CoStar's contracts that allegedly "prohibit or limit
4 | customers' ability to use or reproduce content posted on CoStar's platforms."  (*Id*.
5 | at ¶¶ 56-61.)  CREXi includes testimony of brokers who allegedly did not engage
6 | CREXi because of CoStar terms of agreement that "deter" brokers from sharing
7 | equivalent data with CoStar's competitors.  (*Id*. at ¶¶ 60-68.)
8 |      When CoStar obtains images from brokers, it adds a watermark or some
9 | other information to the listing, and posts the image to its own LoopNet website.
10 | (*Id.* at ¶¶ 71, 76, 79.)  Notably however, brokers still maintain the rights to their
11 | original images and can give those images or listings to CREXi or any other third-
12 | party listing service, so long as that they do not take the images or information
13 | directly from LoopNet or LoopLink.  Thus, the practical effect of these contractual
14 | provisions is that the public and brokers are free to access listings through
15 | LoopNet, LoopLink, or the brokers' own websites, but cannot copy and reuse the
16 | modified images.  While CREXi provides examples of brokers refusing to list
17 | CRE properties on CREXi's website out of fear of violating CoStar's contractual
18 | provisions, the terms of use only pertain to images that are modified and located
19 | on LoopNet, not the brokers' website separable from LoopLink, nor original
20 | images maintained by brokers.  If CREXi wishes to do business with brokers,
21 | CREXi can advise brokers to use their own images, not the modified images listed
22 | on LoopNet or linked through LoopLink.
23 |      Accordingly, CoStar's contractual provisions prohibiting use of CoStar-
24 | modified images do not constitute anticompetitive conduct.
25 |      **c.  CoStar's Alleged False Claims of Ownership**
26 |      CREXi alleges that CoStar falsely claimed intellectual property ownership
27 | over customers' CRE information and photographs to stifle competition.  To do
28 | this, CREXi alleges, CoStar "demanded that CREXi hire a vendor to install an

image filter" to "screen for CoStar's copyrighted images" on CREXi's website and "filter out such images." (*Id.* at ¶ 92.) Thereafter, CREXi employed Getty Images ("Getty"), a third-party vendor that provides image recognition technology to filter CoStar's copyrighted photographs on CREXi's website. CoStar "represented" that the Getty filter would flag "only CoStar's copyrighted images." (*Id.* at ¶ 93.) The Getty filter ultimately identified a number of images—one out of every nine images flagged—over which CoStar does not have a copyright, including images submitted to CREXi by brokers. (*Id.* at ¶¶ 93-95.) Consequently, in the course of scanning CREXi's website and upon receiving notification of the flagged images, CREXi sent copyright notices to brokers informing them that CoStar claimed ownership over their images on CREXi's website, which CREXI alleges, disrupted its relationships with those brokers. (*Id.* at ¶¶ 96-109.)

      As a preliminary point, CoStar contests CREXi's characterization that CoStar "demanded" CREXi engage Getty Images to screen for CoStar's copyrighted images. CoStar contends CREXi was not obligated to employ this vendor, or any vendor for that matter. CoStar also contends that the "false positive" flagging by the Getty filter cannot be attributed solely to CoStar, if at all. CREXi alleges that CoStar falsely assured CREXi that the filter would scan only for CoStar's copyrighted images and populated the filter repository with images it does not own. (FACC at ¶¶ 92-93.) CREXi further alleges it "engaged CoStar's *proposed* vendor" to implement on its website, "at CREXi's own expense". (*Id.* at ¶ 93) (emphasis added.) CoStar argues it cannot be responsible for Getty Images producing inaccurate flagged results or for actions CREXi took as a result of Getty Images' "false-positive" flagging. CoStar further argues that CREXi could have reviewed and disputed the flagged results prior to sending copyright notices to brokers and "disrupting" those relationships.

      The false-positive flagging of images on CREXi's website by Getty Images

and the subsequent actions CREXi took as a result are not sufficient to constitute anticompetitive conduct by CoStar.

### d. CoStar's Alleged Infringement of CREXi's Trademark

CREXi alleges that CoStar engaged in anticompetitive conduct by purchasing "CREXi" as a Google AdWord and explicitly infringed the CREXI® mark in the header and text of CoStar's advertisements. (FACC ¶ 128.) For example, a search for "crexi" on Google yielded an advertisement for "Commercial Buildings For Sale – Crexi" at the top of the results page that was actually purchased by CoStar and links to CoStar's Ten-X website. (*Id.*) CREXi cites to two cases for support which the Court previously determined do not support a finding of anticompetitive conduct by CoStar. *See Church & Dwight Co. v. Mayer Labs., Inc.*, 2011 WL 1225912, at *16 (N.D. Cal. Apr. 1, 2011) and *Dodge Data & Analytics LLC v. iSqFt, Inc.*, 183 F. Supp. 3d 855, 868 (S.D. Ohio 2016). Upon revisiting those cases, the Court's opinion remains the same. As the Court noted in its previous Order, those cases apply a different standard for analyzing a claim for anticompetitive conduct. The Court in *Church* cited to extensive allegations establishing anticompetitive conduct and the foreclosure of competition in a substantial share of the relevant market. *Church & Dwight Co.*, 2011 WL 1225912 at *14. Here, however, CREXi alleges a relatively limited number of instances of trademark infringement in ads for a CoStar subsidiary. (FACC ¶¶118-35.) As for *Dodge,* there the Court applied the Sixth Circuit test for determining whether a defendant possessed sufficient market power. 183 F. Supp. 3d at 865 (citing *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir.1982). Although the Court previously found that CREXi stated a claim for trademark infringement, such conduct is not enough to constitute anticompetitive conduct. Accordingly, CREXi's trademark infringement allegations are insufficient to constitute anticompetitive conduct.

### 2. Allegations of Market Power

"Market power is the ability to raise price profitably by restricting output." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (emphasis removed) (quoting Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 5.01 (4th ed. 2017)). "A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *Qualcomm*, 969 F.3d at 992 (citing *Am. Express Co.,* 138 S. Ct. at 2285). Under Section 1 and Section 2 of the Sherman Act "the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Off. Sol.,* 513 F.3d 1038, 1044, 1044 n.3 (9th Cir. 2008). "The relevant market must include both a geographic market and a product market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). Such allegations need not be pled with specificity. *Newcal Indus., Inc.*, 513 F.3d at 1045. Although the "validity of the 'relevant market' is typically a factual element rather than a legal one," an antitrust complaint may be dismissed under Rule 12(b)(6) "if the complaint's 'relevant market' definition is facially unsustainable." *Id*. In addition, "failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

CREXi alleges the relevant product markets for its antitrust claims are "Internet CRE listing services, Internet CRE information services, and Internet CRE auction services," (FACC ¶ 140) and the relevant geographic markets are "Individual Metropolitan Statistical Areas ("MSAs"). (*Id.* at ¶ 158.) CREXi provided a list of 50 MSAs at issue. (*Id.* 165, Ex. B.) CoStar does not challenge CREXi's identification of the relevant product markets or the relevant geographic markets, but does challenge its dominance in those markets.

### a. Market Dominance

The Ninth Circuit has indicated that "[m]arket power may be demonstrated

through either of two types of proof." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). The first type of proof is "direct evidence of the injurious exercise of market power." *Id*. That is "evidence of restricted output and supracompetitive prices." *Id*. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition." *Am. Express Co.*, 138 S. Ct. at 2284 (quotation and citation omitted). The second and "more common type of proof is circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co.*, 51 F.3d at 1434. "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id*. (citing *Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215, 1232 (8th Cir.1987), *cert. denied*, 484 U.S. 1026 (1988).

In support of direct evidence of market dominance, CREXi alleges the following: (1) the FTC intervened to block a number of CoStar's anticompetitive acquisitions, including LoopNet and RentPath; (2) nearly 90% of all CRE activity occurs on a CoStar Network; and (3) CoStar drastically increased its prices for informational services and listing services following the acquisition of LoopNet. (*Id.* at ¶¶186-27, 21-212, 215.) However, CREXi does not make any allegations regarding restricted output. In *Rebel Oil* the Ninth Circuit defined "direct evidence" as "evidence of restricted output ***and*** supracompetitive prices." 51 F.3d at 1434 (emphasis added). Therefore, CREXi's allegations are insufficient to support direct evidence of CoStar's market dominance.

In support of circumstantial evidence of market dominance, CREXi alleges that CoStar holds greater than 90% market share in the internet CRE listing services market.[1] With respect to listing services, CREXi's allegations include

---

[1] CREXi does not allege facts regarding CoStar's estimated market shares with respect to CoStar's Internet CRE information services and Internet CRE auction services products.

1  internal market analysis of CoStar's market share in 50 MSAs and determined the
2  following: in 12 MSAs, CoStar's market share is at least 90%; in 31 MSAs, it is at
3  least 80%; in 38 MSAs, it is at least 70%; in 46 MSAs, it is at least 60%; and
4  CoStar's market share exceeds 57% in all 50 MSAs. (FACC ¶¶ 220-23.) CREXi
5  alleges that it determined these market shares using 2021 data on the dollar value
6  of sale listings in relation to the total value of closed CRE sales transactions in
7  each MSA. (*Id.*) However, CoStar is not in the business of selling property so the
8  total value of closed CRE sales to the dollar value of properties in CoStar's
9  listings does not represent CoStar's market share in the *listing services* market.
10 Accordingly, CREXi's allegations do not plausibly demonstrate monopoly power
11 in the relevant market—the CRE listing services market.

### b. Entry Barriers

The Ninth Circuit has defined entry barriers as "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir.1993). "The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preference; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." *Rebel Oil*, 51 F.3d at 1439. "To justify a finding that a defendant has the power to control prices" sufficient to warrant judicial intervention, "entry barriers must be ... capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting." *Id*. (citing *United States v. Syufy Enters.*, 903 F.2d

---

Instead, CREXi alleges that the markets for information and auction services are complementary to listing services and thus, market level monopoly power in CRE listing services translates to market-level monopoly power in CRE information and CRE auction services. (FACC ¶¶ 224-25.) The Court does not reach this issue given that CREXi's allegations of market power for the listing services market are insufficient to state a claim.

659, 663 (9th Cir.1990)).

CREXi alleges that competitors cannot increase output in the short run to bring CoStar's prices down due to "their inability to put any downward pressure on CoStar's inflated prices." (FACC ¶ 226.) CREXi also alleges the following barriers to entry: "sunk cost of developing CRE services and software, network effects that favor well-entrenched players, high switching costs, and other barriers created by CoStar's practices." *Id.* at ¶¶ 166-78. Having found the allegations insufficient to support CoStar's dominant share of the relevant markets, this cause of action does not survive.

Based on the foregoing deficiencies, Claims 1–8 in the Amended Counterclaim for antitrust violations under Section 1 and Section 2 of the Sherman Act and the Cartwright Act fail to state a claim.

**B.  Intentional Interference with Contract and Prospective Economic Advantage (Claims 10-11)**

CREXi alleges two new claims in its amended counterclaims: intentional interference with contract and interference with prospective economic advantage. CoStar takes issue with CREXi's new claims and argues that it is outside the scope of the Court's Order granting leave to amend. Pursuant to Federal Rule of Civil Procedure 15, CREXi may bring new claims "only with the opposing party's written consent or the court's leave." Moreover, "where leave to amend is given to cure deficiencies in certain *specified claims*, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken." *DeLeon v. Wells Fargo Bank, N.A.*, 2010 WL 4285006, at *3 (N.D. Cal. 2010). In its Order, the Court identified CREXi's deficiencies as to each claim alleged in its Counterclaims and granted leave to amend as to those claims. Therefore, CREXI's new claims are not permitted. Nonetheless, the Court finds CREXi's new claims do not survive as a matter of law.

To prove intentional interference with contractual relations under California

law, CREXi must show: (1) that there was a valid contract between CREXi and third parties; (2) that CoStar knew of these contracts; (3) that CoStar took intentional acts designed to induce a breach or disruption of these contractual relationships; (4) that an actual breach or disruption of the contractual relationships occurred; and (5) that this conduct resulted in damage to CREXi. *United Nat. Maintenance, Inc. v. San Diego Convention Center, Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014). To prove intentional interference with prospective economic advantage, CREXi must demonstrate an economic relationship between CREXi and a third party, with a probability of future economic benefit to CREXi, in addition to the elements of CoStar's knowledge, CoStar's intentional acts, CoStar's actual disruption of economic relationships, and damage to CREXi. *O'Connor v. Uber Technologies, Inc.*, 58 F. Supp. 3d 989, 996 (N.D. Cal. 2014).

CREXi alleges that CoStar's conduct impeded, disrupted, and hampered CREXi's ability to provide services to its clients. CREXi cites to the following conduct as disrupting its contractual and economic relationships with its customers: (1) blocking CREXi from brokers' websites hosted by LoopLink; (2) CoStar's alleged claims of copyright ownership over photos flagged by a third-party vendor employed by CREXi; and (3) CoStar's exclusionary contracts leading users to "balk" at continuing to use or invest in CREXi's services. (FACC ¶ 256-261.) CREXi's arguments rest on its underlying claims of anticompetitive conduct. (*See id.* at ¶¶ 257-264.) Moreover, CREXi's reliance on conduct of a third-party vendor cannot be attributed to CoStar for purposes of alleging that CoStar intentionally engaged in conduct that induced a breach or disruption in CREXi's relationship with its customers. CoStar's conduct has only prevented its competitors including CREXi, from accessing CoStar's own website and services. CREXi's fundamental issue that brokers do not want to spend time re-creating listings is not intentional conduct by CoStar. Accordingly, CREXi's claims for tortious interference with contractual relations and prospective economic

1 advantage fail to state a claim.

2 **C.     Unfair and Unlawful Competition Claims**

3   CREXi alleges that CoStar engaged in unfair and unlawful competition under Cal. Bus. & Prof. Code § 17200 based on its underlying antitrust and tortious interference claims. (FCC ¶¶ 373-278.) CREXi alleges that CoStar engaged in unfair business practices by (1) leveraging LoopLink to force customer use of LoopNet and surreptitiously blocking competitors' access to brokers' own listings on brokers' own websites, to prevent brokers from working with competitors; (2) imposing exclusionary contractual restrictions to prevent brokers from using competitors' services; (3) falsely claiming intellectual property ownership over customers' CRE information and photographs to stifle competition; and (4) infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi. (*Id.* at ¶ 375.)

  Having failed to allege sufficient facts to support the underlying antitrust and tortious interference claims, there can be no unfair competition under the UCL. "If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act . . . for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that conduct is not 'unfair'." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1124 (9th Cir. 2018) (quoting *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001)). Accordingly, CREXi's unfair and unlawful competition claims fail to state a claim.

**D. Declaratory Relief**

  CREXi seeks a declaratory judgment that (i) finds that CREXi is not engaging in unlawful conduct by accessing CoStar's websites, (ii) prohibits CoStar from taking steps to block CREXi's access to its websites, and (iii) finds that CoStar has engaged in unlawful conduct by blocking CREXi's access to CoStar's websites. (FACC ¶ 386.) CREXi's claim for declaratory relief is based upon its antitrust violation claims, and therefore, its request for declaratory relief

15

fails.

## IV.  CONCLUSION

Accordingly, the Court **GRANTS** CoStar's Motion to Dismiss the First Amended Counterclaims with prejudice.  CREXi's ninth claim for trademark infringement and thirteenth claim for unlawful violations of the UCL predicated on CoStar's alleged trademark infringement, which are not the subject of CoStar's Motion or this Order, remain to be adjudicated.

**IT IS SO ORDERED.**

DATED:  FEBRUARY 23, 2023.

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE