1  ELYSE M. GREENWALD (BAR NO. 268050)
   elyse.greenwald@lw.com
2  LATHAM & WATKINS LLP
   10250 Constellation Boulevard
3  Suite 1100
   Los Angeles, CA 90067
4  Tel: 424.653.5500
   Fax: 424.653.5501
5
   *Attorneys for Plaintiffs and Counterdefendants*
6  *CoStar Group, Inc. and CoStar Realty Information, Inc.*

7  [Additional Counsel Listed on the Next Page]

8           **UNITED STATES DISTRICT COURT**
            **CENTRAL DISTRICT OF CALIFORNIA**
9

10  COSTAR GROUP, INC., and              CASE NO. 2:20-cv-08819-CBM-AS
    COSTAR REALTY INFORMATION,
11  INC.,                                Assigned to Hon. Consuelo B. Marshall
                                         Hon. Alka Sagar, Magistrate Judge
12              Plaintiffs,

13        v.                             **DECLARATION OF SARAH A.**
                                         **TOMKOWIAK IN SUPPORT OF**
14  COMMERCIAL REAL ESTATE               **COSTAR'S OPPOSITION TO**
    EXCHANGE, INC.,                      **CREXI'S MOTION FOR LEAVE TO**
15                                       **AMEND**
                Defendant.
16                                       Date Filed:    September 25, 2020
    COMMERCIAL REAL ESTATE               Trial Date:    March 11, 2025
17  EXCHANGE, INC.,

18              Counterclaimant,

19        v.

20  COSTAR GROUP, INC., and
    COSTAR REALTY INFORMATION,
21  INC.,

22              Counterdefendants.

23

24

25

26

27

28

1    NICHOLAS J. BOYLE*
     nicholas.boyle@lw.com
2    SARAH A. TOMKOWIAK*
     sarah.tomkowiak@lw.com
3    ANNE C. MALINEE*
     Anne.malinee@lw.com
4    ROBERTO J. BORGERT*
     roberto.borgert@lw.com
5    KATHERINE L. GRIFFITTS*
     katherine.griffitts@lw.com
6    LATHAM & WATKINS LLP
     555 Eleventh Street, NW
7    Suite 1000
     Washington, D.C. 20004
8    Tel: 202.637.2200
     Fax: 202.637.2201
9

10   CAITLIN E. DAHL*
     caitlin.dahl@lw.com
11   LATHAM & WATKINS LLP
     330 North Wabash Avenue
12   Suite 2800
     Chicago, IL 60611
13   Tel: 312.876.7700
     Fax: 312.993.9767
14

15

16   *Admitted pro hac vice*

17

18

19

20

21

22

23

24

25

26

27

28

I, Sarah A. Tomkowiak, declare as follows:

1.     I am a partner at Latham & Watkins LLP, located at 555 Eleventh Street, NW, Suite 1000, Washington, D.C. 20004, counsel for Plaintiffs and Counterdefendants CoStar Group, Inc., and CoStar Realty Information, Inc. (together, "CoStar") in the above-captioned case against Commercial Real Estate Exchange, Inc. ("CREXi"). I am licensed to practice law in Illinois and Washington, D.C. I have personal knowledge of the facts set forth below, and if called upon, can and will testify competently thereto.

2.     I submit this declaration in connection with and in support of CoStar's Opposition to CREXi's Motion for Leave to Amend.

3.     CoStar initially produced to CREXi documents related to CoStar's scrape of CREXi in November 2022. CoStar produced additional documents relating to this topic in September 2023.

4.     From November 2023 to March 2024, CREXi took 20 fact depositions, and questioned over half of these witnesses regarding CoStar's scrape of CREXi's website, including former CoStar employee Max Linnington, the first witness to be deposed by CREXi.

5.     Attached as **Exhibit A** is a true and correct copy of email correspondence between counsel for CREXi and counsel for CoStar, ranging from September 14, 2023 to October 31, 2023.

6.     Attached as **Exhibit B** is a true and correct copy of an excerpt of CREXi's Notice of Rule 30(b)(6) Deposition, which was served on November 2, 2023, and includes as Topic No. 2: "CoStar's access to, use of, and scraping of third-party websites, including the CREXi platform to obtain . . . broker information."

7.     CoStar designated CoStar's Vice President of Research, Brad McGetrick, to testify as a corporate designee on a number of topics, including CREXi's Topic No. 2. CREXi deposed Mr. McGetrick on January 16, 2024, in both his personal and corporate capacity. The deposition, which I defended, lasted for

over eight and half hours on the record.  Around half of Mr. McGetrick's testimony in his capacity as CoStar's corporate designee (a little over an hour of the two hours of record time used for corporate testimony) related to CoStar's scrape of CREXi's website.  Attached as **Exhibit C** is a true and correct copy of an excerpt of the transcript of the deposition of Brad McGetrick, dated January 16, 2024.

8.     CoStar voluntarily produced Mr. McGetrick again on March 26, 2024, for another two-and-a-half hours of testimony (a half hour over the agreed-upon two hours) on CoStar's scrape of CREXi's website.  Attached as **Exhibit D** is a true and correct copy of an excerpt of the transcript of the deposition of Brad McGetrick, dated March 26, 2024.

9.     On May 16, 2024, counsel for CREXi first notified counsel for CoStar that CREXi would be seeking to add two new additional counterclaims.  Attached as **Exhibit E** is an excerpt of CREXi's draft Second Amended Counterclaims, provided to me by CREXi's counsel on May 16, 2024, which stated: "Although CREXi's Fifteenth and Sixteenth Claims for Relief are in fact theories of relief under a broader, existing UCL cause of action, CREXi lists them as separate 'Claims for Relief' for ease of identification."

10.     On May 20, 2024, my colleagues and I met and conferred with counsel for CREXi.  During that meet and confer, I informed counsel for CREXi that CoStar opposed CREXi's request for leave to amend, in part because CREXi sought to improperly amend claims currently on appeal.

11.     Attached as **Exhibit F** is a true and correct copy of an excerpt of the Supplemental Expert Report of Daniel Roffman, dated May 24, 2024.

12.     On May 31, 2024, CoStar made a supplemental production of discovery related to the images it seeks to add via CoStar's Motion for Leave to File A Third Amended Complaint.

1        13.    Attached as **Exhibit G** is a true and correct copy of an excerpt of the

2   transcript of the Informal Discovery Conference held before the Special Master on

3   February 16, 2024.

4        14.    In letters from CREXi's counsel to CoStar's counsel dated May 18,

5   2022 and October 7, 2022, CREXi confirmed its refusal to produce documents

6   directly relevant to its proposed new claims, including—for example—documents

7   reflecting or concerning (1) CREXi's own acceptance and compliance with the terms

8   of use of competing websites, and (2) CREXi's purported anti-scraping technology.

9        15.    In September 2023, I informed counsel for CREXi that CoStar intended

10  to seek leave to amend its complaint to conform the set of alleged infringements to

11  the facts elicited through discovery.

12

13  I declare under penalty of perjury that the foregoing is true and correct.

14

15  Executed on June 4, 2024 in Washington, D.C.

16

17                        *Sarah A. Tomkowiak*

18                        Sarah A. Tomkowiak

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

| | |
|---|---|
| **From:** | Niall M. Frizzell <NFrizzell@keker.com> |
| **Sent:** | Tuesday, October 31, 2023 7:02 PM |
| **To:** | Greenwald, Elyse (CC); #C-M COSTAR - CREXI - LW TEAM |
| **Cc:** | CREXSTAR |
| **Subject:** | RE: CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc., No. 2:20-cv-8819 (C.D. Cal.) |

Counsel:

CREXi's question is about documents CoStar has not produced — specifically documents regarding 33,000 CREXi broker contacts scraped by CoStar.  Please intelligibly state CoStar's position.  Does CoStar contend that no responsive documents exist?  Or does CoStar contend that it does not need to produce them — and if so, on what grounds?  We suspect Judge Segal will not appreciate hearing that, in response to CREXi's attempt to resolve this issue between the parties, CoStar's response was to "decline[]" emails about it.

Regards

**Niall M. Frizzell**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 962 8843 direct | 415 391 5400 main
nfrizzell@keker.com | [he/him/his] | vcard | keker.com

**From:** Elyse.Greenwald@lw.com <Elyse.Greenwald@lw.com>
**Sent:** Friday, October 27, 2023 08:39
**To:** Niall M. Frizzell <NFrizzell@keker.com>; COSTARCREXI.LWTEAM@lw.com
**Cc:** CREXSTAR <CREXSTAR@keker.com>
**Subject:** RE: CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc., No. 2:20-cv-8819 (C.D. Cal.)

**[EXTERNAL]**

Counsel:

CoStar investigated the issues raised in your email and, as stated previously, conducted a reasonable search to respond to RFP No. 39 and has produced the responsive documents it identified.  CoStar has not "failed" to produce any information.  To the extent that CREXi is asking questions regarding documents that CoStar has produced, CoStar declines to conduct discovery by email.

**Elyse M. Greenwald**

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100
Los Angeles, CA 90067
Direct Dial: +1.424.653.5695
Email: elyse.greenwald@lw.com
https://www.lw.com

**Exhibit A, Page 5**

**From:** Niall M. Frizzell <NFrizzell@keker.com>
**Sent:** Friday, October 20, 2023 2:57 PM
**To:** Greenwald, Elyse (CC) <Elyse.Greenwald@lw.com>; #C-M COSTAR - CREXI - LW TEAM <COSTARCREXI.LWTEAM@lw.com>
**Cc:** CREXSTAR <CREXSTAR@keker.com>
**Subject:** RE: CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc., No. 2:20-cv-8819 (C.D. Cal.)

Counsel:

It has been over a month since we sent our earlier email on this issue.  Has CoStar taken any steps to investigate this issue in that time?  What is CoStar's explanation for failing to produce documents regarding the 33,000 CREXi broker contacts discussed at the Bates number we cited?

Regards

---

**Niall M. Frizzell**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 962 8843 direct | 415 391 5400 main
nfrizzell@keker.com | [he/him/his] | vcard | keker.com

---

**From:** Elyse.Greenwald@lw.com <Elyse.Greenwald@lw.com>
**Sent:** Friday, October 20, 2023 14:01
**To:** Niall M. Frizzell <NFrizzell@keker.com>; COSTARCREXI.LWTEAM@lw.com
**Cc:** CREXSTAR <CREXSTAR@keker.com>
**Subject:** RE: CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc., No. 2:20-cv-8819 (C.D. Cal.)

[EXTERNAL]

Counsel,

In response to RFP No. 39, CoStar agreed to undertake a reasonable search and produce the non-privileged responsive documents it identified, to the extent any such documents exist.  CoStar did just that and has produced the responsive documents it identified.

**Elyse M. Greenwald**

**LATHAM & WATKINS LLP**
10250 Constellation Blvd. Suite 1100
Los Angeles, CA 90067
Direct Dial: +1.424.653.5695
Email: elyse.greenwald@lw.com
https://www.lw.com

**Exhibit A, Page 6**

**From:** Niall M. Frizzell <NFrizzell@keker.com>
**Sent:** Tuesday, October 17, 2023 4:19 PM
**To:** #C-M COSTAR - CREXI - LW TEAM <COSTARCREXI.LWTEAM@lw.com>
**Cc:** CREXSTAR <CREXSTAR@keker.com>
**Subject:** RE: CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc., No. 2:20-cv-8819 (C.D. Cal.)

Counsel:

We have not received a response to this correspondence.

Regards

**Niall M. Frizzell**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 962 8843 direct | 415 391 5400 main
nfrizzell@keker.com | [he/him/his] | vcard | keker.com

**From:** Niall M. Frizzell <NFrizzell@keker.com>
**Sent:** Thursday, September 14, 2023 16:47
**To:** costarcrexi.lwteam@lw.com
**Cc:** CREXSTAR <CREXSTAR@keker.com>
**Subject:** CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc., No. 2:20-cv-8819 (C.D. Cal.)

Counsel:

In its response to RFP 39, CoStar agreed to produce documents regarding access, use, and scraping of CREXi's website.  We are aware of CoStar having broker contacts for over 33,000 CREXi listings, but have not yet seen these lists of broker contacts.  *See, e.g.*, CoStar00130976.  Please explain why this material has not yet been produced and confirm that it will appear in CoStar's next production.

Regards

**Niall M. Frizzell**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 962 8843 direct | 415 391 5400 main
nfrizzell@keker.com | [he/him/his] | vcard | keker.com

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

**Exhibit A, Page 7**

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

**Exhibit A, Page 8**

# EXHIBIT B

1 | KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS #158708
2 | epeters@keker.com
WARREN A. BRAUNIG #243884
3 | wbraunig@keker.com
NICHOLAS S. GOLDBERG #273614
4 | ngoldberg@keker.com
KATIE LYNN JOYCE #308263
5 | kjoyce@keker.com
633 Battery Street
6 | San Francisco, CA 94111-1809
Telephone:  415 391 5400
7 | Facsimile:   415 397 7188

8 | Attorneys for Defendant and Counterclaimant
COMMERCIAL REAL ESTATE EXCHANGE, INC.
9 |

10 | UNITED STATES DISTRICT COURT

11 | CENTRAL DISTRICT OF CALIFORNIA

12 | WESTERN DIVISION

13 |

14 | COSTAR GROUP, INC., AND
COSTAR REALTY INFORMATION,
INC., | Case No. 2:20-CV-8819 CBM (ASx)

15 | | **DEFENDANT AND
COUNTERCLAIMANT**

16 | Plaintiff, | **COMMERCIAL REAL ESTATE
EXCHANGE, INC.'S NOTICE OF
RULE 30(B)(6) DEPOSITION OF**

17 | v. | **PLAINTIFFS AND
COUNTERDEFENDANTS COSTAR**

18 | COMMERCIAL REAL ESTATE
EXCHANGE, INC., | **GROUP, INC. AND COSTAR
REALTY INFORMATION, INC.**

19 | Defendant. | Ctrm:        8B

20 | | Judge:       Hon. Consuelo B. Marshall

21 | | Date Filed:  September 25, 2020

22 | COMMERCIAL REAL ESTATE
EXCHANGE, INC., | Discovery Cutoff:  November 30, 2023

23 | Counterclaimant, | Pre-Trial Conf.:      September 24, 2024
Trial Date:            October 22, 2024

24 | v. |

25 | COSTAR GROUP, INC., AND
COSTAR REALTY INFORMATION,
INC., |

26 | Counterdefendants |

27 |

28 |

limit the scope of these topics.

19.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

20.     Pronouns shall be construed to refer to any and all genders as in each case is most appropriate and inclusive.

21.     The terms "including" or "includes" shall be construed without limitation to mean "including, but not limited to."

## **TOPICS**

1.     COSTAR's use of CREXi's brand name in COSTAR online advertising campaigns, including COSTAR's justification for doing so, the manner in which such campaigns were executed, and the costs and results of such advertising, including views, clicks, revenues, and other metrics or data RELATING TO the effects of such advertising.

2.     COSTAR's access to, use of, and scraping of third-party websites, including the CREXI platform, to obtain commercial real estate listing information, broker information, or images.

3.     COSTAR's efforts to prevent third parties, including other commercial real estate listing platforms, from accessing COSTAR's platforms (including its public websites).

4.     COSTAR's knowledge of, and any actions taken in response to, CREXI's alleged use of COSTAR data or images.

5.     COSTAR's efforts to scan, analyze, or filter images to identify instances of alleged infringement, including COSTAR's use of GETTY or TINEYE services, and including COSTAR's COMMUNICATIONS with and relationship to such entities.

6.     COSTAR's policies and practices RELATING TO copyright registration, including the registration of any images identified or at issue in THIS

CREXI'S NOTICE OF RULE 30(B)(6) DEPOSITION OF PLAINTIFF COSTAR GROUP, INC.
Case No. 2:20-CV-8819 CBM (ASx)   **Exhibit B, Page 11**

2373627

involvement in the work of, any "commissioners" or "experts" in such litigation.

Dated:  November 2, 2023                    KEKER, VAN NEST & PETERS LLP


                                    By:  */s/Warren A. Braunig*
                                         ELLIOT R. PETERS
                                         WARREN A. BRAUNIG
                                         NICHOLAS S. GOLDBERG
                                         KATIE LYNN JOYCE

                                         Attorneys for Defendant and Counterclaimant
                                         COMMERCIAL REAL ESTATE
                                         EXCHANGE, INC.

8

# PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made.  I am over the age of eighteen years and not a party to the within action. My business address is Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111-1809.

On November 2, 2023, I served the following document(s):

**DEFENDANT AND COUNTERCLAIMANT COMMERCIAL REAL ESTATE EXCHANGE, INC.'S NOTICE OF RULE 30(B)(6) DEPOSITION OF PLAINTIFFS AND COUNTERDEFENDANTS COSTAR GROUP, INC. AND COSTAR REALTY INFORMATION, INC.**

X   by **E-MAIL VIA PDF FILE:**  by transmitting on this date via e-mail a true and correct copy into an electronic file in Adobe "pdf" format.  The transmission was reported as complete and without error.

Nicholas J. Boyle
Sarah A. Tomkowiak
Anne C. Malinee
Charles A. Berdahl
David L. Johnson
Roberto Borgert
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel.:  202-637-2200
Fax:   202-637-2201
costarcrexi.lwteam@lw.com

Elyse M. Greenwald
Jessica Stebbins Bina
Latham & Watkins LLP
10250 Constellation Blvd.
Suite 1100
Los Angeles, CA 90067
Tel.:  424-653-5500
Fax:   424-653-5501

Belinda S. Lee
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel.:  415-391-0600
Fax:  415-395-8095

Elizabeth A. Parvis
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Tel.:  212-906-1200
Fax:   212-751-4864

Executed on November 2, 2023, at San Francisco, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____

Jennifer Gray

CREXI'S NOTICE OF RULE 30(B)(6) DEPOSITION OF PLAINTIFF COSTAR GROUP, INC.
Case No. 2:20-CV-8819 CBM (ASx)   **Exhibit B, Page 14**

2373627

# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4   - - - - - - - - - - - - - x

 5   COSTAR GROUP INC., AND     :
     COSTAR REALTY INFORMATION,:
 6   INC.,                      :
                                :
 7            Plaintiff,        :
                                :
 8   v.                         :
                                :
 9   COMMERCIAL REAL ESTATE     :
     EXCHANGE, INC.,            :
10          Defendant.          :
     - - - - - - - - - - - - - x   CASE NO.
11   COMMERCIAL REAL ESTATE     :   2:20-CV-08819-CVM-ASX
     EXCHANGE, INC.,            :
12            Counter claimant, :
                                :
13   v.                         :
                                :
14   CoStar GROUP INC., AND     :
     CoStar REALTY INFORMATION,:
15   INC.,                      :
                                :
16          Counter defendants.:
     - - - - - - - - - - - - - x

17     VIDEOTAPED DEPOSITION OF BRAD MCGETRICK - PMK

18              Tuesday, January 16, 2024

19                    9:05 a.m.

20

21   JOB NO.  825684

22   Pages 1 through 382

23   Reported by:  Cassandra E. Ellis, CSR-CA #14448,

24   CSR-HI #475, CCR-WA #3484, RPR, RMR, RDR, CRR,

25   Realtime Systems Administrator #823848
```

Exhibit C, Page 16

| | | |
|---|---|---|
| 18:05:14 | 1 | 30(b)(6) portion? |
| 18:05:17 | 2 | MS. TOMKOWIAK:  Jason, I actually |
| 18:05:19 | 3 | have a couple redirect questions.  Do you want |
| 18:05:21 | 4 | me to -- they're in his individual capacity, so |
| 18:05:25 | 5 | do you want me to do that now? |
| 18:05:26 | 6 | MR. GEORGE:  Can we save them until |
| 18:05:28 | 7 | the end or -- |
| 18:05:29 | 8 | MS. TOMKOWIAK:  Sure. |
| 18:05:29 | 9 | MR. GEORGE:  Okay. |
| 18:05:30 | 10 | MS. TOMKOWIAK:  Yeah. |
| | 11 | BY MR. GEORGE: |
| 18:05:33 | 12 | Q.  So we discussed, earlier today, |
| 18:05:35 | 13 | that you've been designated to testify on topics |
| 18:05:39 | 14 | 2, 10, 13, 14 and 19, in Exhibit 548, which is |
| 18:05:47 | 15 | that 30(b)(6) notice -- |
| 18:05:48 | 16 | A.  Correct. |
| 18:05:48 | 17 | Q.  -- I showed you; right? |
| 18:05:59 | 18 | Would your -- any of your testimony |
| 18:06:00 | 19 | change regarding scraping of broker websites and |
| 18:06:05 | 20 | retailers based on being a corporate |
| 18:06:11 | 21 | representative witness as opposed to testifying |
| 18:06:13 | 22 | from your personal knowledge? |
| 18:06:15 | 23 | A.  No. |
| 18:06:15 | 24 | Q.  Okay.  In your capacity as a |
| 18:06:23 | 25 | corporate witness, are -- are you aware that |

18:06:25  1   CoStar scraped Crexi's website?

18:06:28  2        A.   Yes.

18:06:29  3        Q.   And you first became aware of

18:06:34  4   CoStar scraping Crexi's website through your

18:06:37  5   preparations to testify today?

18:06:38  6        A.   Correct.

18:06:39  7        Q.   When did CoStar first scrape

18:06:42  8   Crexi's website?

18:06:43  9        A.   Oh, I want to -- I don't remember

18:06:48  10  the exact date.  I looked at it, but I don't

18:06:51  11  recall.

18:06:51  12       Q.   Okay.  How did that come to pass,

18:06:55  13  that CoStar scraped Crexi's website?

18:06:59  14       A.   Sales had given feedback to

18:07:06  15  research that in certain markets the sales

18:07:10  16  people felt that they were losing or potentially

18:07:15  17  losing clients because the broker said that

18:07:20  18  Crexi had more listings than CoStar did in those

18:07:24  19  markets.

18:07:28  20            To do a competitive analysis, a

18:07:30  21  scrape was done to see if that story bore out on

18:07:35  22  what the sales people were saying.

18:07:38  23       Q.   And what information was scraped

18:07:43  24  from Crexi's website?

18:07:45  25       A.   Listings and contacts.

| 18:07:46 | 1 | Q. And who made the decision to scrape |
| 18:07:52 | 2 | Crexi's website? |
| 18:07:54 | 3 | A. That was done -- the -- the |
| 18:08:02 | 4 | stakeholder in that was Lisa Ruggles. |
| 18:08:04 | 5 | Q. Was -- did she have the original |
| 18:08:07 | 6 | idea to do that? |
| 18:08:08 | 7 | A. From my knowledge, in preparing for |
| 18:08:16 | 8 | this, it was -- I -- I honestly don't know if it |
| 18:08:23 | 9 | was sales or somebody in research or technology. |
| 18:08:26 | 10 | Q. Who in sales would it have been? |
| 18:08:28 | 11 | A. It would have been Max Limington |
| 18:08:32 | 12 | (phonetic). |
| 18:08:32 | 13 | Q. And -- and who in technology |
| 18:08:43 | 14 | would -- would it have been? |
| 18:08:45 | 15 | A. Jason Butler heads up the |
| 18:08:49 | 16 | technology group. |
| 18:08:49 | 17 | Q. And then what did CoStar do with |
| 18:09:00 | 18 | the information that it scraped from Crexi? |
| 18:09:01 | 19 | A. It was evaluated by Jason to see if |
| 18:09:05 | 20 | this story bore out that sales was saying. He |
| 18:09:10 | 21 | determined that it was not, so he didn't share |
| 18:09:14 | 22 | the results with Lisa and it didn't go forward. |
| 18:09:17 | 23 | Q. By: The story didn't bear out, |
| 18:09:22 | 24 | what do you mean? |
| 18:09:22 | 25 | A. That there was a large delta |

18:09:25  1   between listings between Crexi and CoStar.

18:09:29  2        Q.   So Crexi, according to Mr. Butler,

18:09:35  3   didn't have more listings than CoStar in these

18:09:40  4   locations; is that the conclusion?

18:09:45  5            MS. TOMKOWIAK:   Objection,

18:09:46  6   mischaracterizes the testimony.

         7   BY MR. GEORGE:

18:09:51  8        Q.   What -- what do you mean by --

18:09:52  9   sorry, let me strike the question.

18:09:53  10           What do you mean that the -- that

18:09:55  11  there was not a large delta between listings

18:09:58  12  between Crexi and CoStar?

18:10:00  13       A.   Not a significant enough difference

18:10:03  14  that that should be a reason that sales people

18:10:07  15  are not able to compete.

18:10:09  16       Q.   Does CoStar think that scraping

18:10:21  17  Crexi's website is fair play?

18:10:23  18           MS. TOMKOWIAK:   Objection, vague.

18:10:28  19       A.   We don't scrape competitors'

18:10:30  20  websites for the purposes of data collection or

18:10:32  21  ingestion, and this was done under the approach

18:10:37  22  of a competitive analysis.

18:10:39  23       Q.   And so CoStar doesn't see anything

18:10:43  24  wrong with scraping a website of a competitor

18:10:45  25  for a competitive analysis?

BRAD MCGETRICK - PMK
JANUARY 16, 2024

JOB NO. 825684

| | | |
|---|---|---|
| 18:41:02 | 1 | the prior presentation, you're not aware of |
| 18:41:05 | 2 | where this was stored in CoStar's system and so |
| 18:41:08 | 3 | you don't know who has access to it; right? |
| 18:41:10 | 4 | A. That is correct. |
| 18:41:11 | 5 | Q. Okay. Was this presentation |
| 18:41:15 | 6 | created in the regular course of CoStar's |
| 18:41:19 | 7 | business? |
| 18:41:20 | 8 | A. Yes. |
| 18:41:21 | 9 | Q. Do you understand why there was |
| 18:41:27 | 10 | a -- the prior presentation was March 2020, do |
| 18:41:30 | 11 | you understand why there was a -- an additional |
| 18:41:33 | 12 | presentation a month later, in April 2020? |
| 18:41:35 | 13 | A. This is just a very high-level |
| 18:41:40 | 14 | analysis, without knowing who this was sent to, |
| 18:41:46 | 15 | I really couldn't say. |
| 18:41:47 | 16 | Q. Did you investigate that as part of |
| 18:41:51 | 17 | your preparation for today's deposition? |
| 18:41:54 | 18 | A. I did not. |
| 18:41:55 | 19 | Q. It says: What was captured a |
| 18:41:59 | 20 | hundred thousand -- on the second page, it says: |
| 18:42:02 | 21 | What was captured, 100,000 for sale listings, |
| 18:42:06 | 22 | 100,000 for lease listings, and 33,000 distinct |
| 18:42:10 | 23 | broker contacts at over 11,000 brokerages; |
| 18:42:15 | 24 | right? |
| 18:42:15 | 25 | A. I see that. |

| | | |
|---|---|---|
| 18:42:16 | 1 | Q.   Do you understand that to be the |
| 18:42:21 | 2 | summary of what was captured? |
| 18:42:23 | 3 | A.   Yes. |
| 18:42:23 | 4 | Q.   Do you recall that in the prior |
| 18:42:26 | 5 | spreadsheet that we were discussing it had |
| 18:42:29 | 6 | indicated that 200,000 lease listings were |
| 18:42:35 | 7 | gathered? |
| 18:42:35 | 8 | A.   I do. |
| 18:42:36 | 9 | Q.   Do you understand why this one says |
| 18:42:38 | 10 | 100,000? |
| 18:42:39 | 11 | A.   I do. |
| 18:42:39 | 12 | Q.   Why? |
| 18:42:40 | 13 | A.   These are, as it says, clustered |
| 18:42:42 | 14 | listings. |
| 18:42:43 | 15 | Q.   Okay. |
| 18:42:43 | 16 | A.   Lease listings, that would include |
| 18:42:46 | 17 | each individual space as a listing. |
| 18:42:48 | 18 | Q.   Okay.  And then, on the final page |
| 18:42:58 | 19 | of the presentation, it says:  Useful resources, |
| 18:43:01 | 20 | for sale raw data, for lease raw data? |
| 18:43:04 | 21 | A.   Yes. |
| 18:43:04 | 22 | Q.   And do you understand that |
| 18:43:09 | 23 | spreadsheets were attached to this with the raw |
| 18:43:11 | 24 | data from the scrape? |
| 18:43:12 | 25 | A.   Yes, as previous links to the raw |

1          CERTIFICATE OF SHORTHAND REPORTER

2                    I, Cassandra E. Ellis, Registered

3     Professional Reporter, the officer before whom

4     the foregoing proceedings were taken, do hereby

5     certify that the foregoing transcript is a true

6     and correct record of the proceedings; that said

7     proceedings were taken by me stenographically

8     and thereafter reduced to typewriting under my

9     supervision; and that I am neither counsel for,

10    related to, nor employed by any of the parties

11    to this case and have no interest, financial or

12    otherwise, in its outcome.

13                   IN WITNESS WHEREOF, I have hereunto

14    set my hand this 2nd day of February 2024.

15

16

17

18    _____

19    CASSANDRA E. ELLIS, CSR-CA #14448, CCR-WA #3484,

20                        CSR-HI #475, RPR, RMR, RDR,

21                        CRR, REALTIME SYSTEMS

22                        ADMINISTRATOR #823848

23

24

25

# EXHIBIT D

```
 1                UNITED STATES DISTRICT COURT
 2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
 3
 4   COSTAR GROUP, INC., AND          )
     COSTAR REALTY INFORMATION,       ) Case No.
 5   INC.,                            ) 2:20-CV-8819 CBM
                                      ) (ASx)
 6            Plaintiff,              )
                                      )
 7            v.                      )
                                      )
 8   COMMERCIAL REAL ESTATE           )
     EXCHANGE, INC.,                  )
 9                                    )
              Defendant.              )
10   _____   )
                                      )
11   COMMERCIAL REAL ESTATE           )
     EXCHANGE, INC.,                  )
12                                    )
              Counterclaimant,        )
13                                    )
              v.                      )
14                                    )
     COSTAR GROUP, INC., AND          )
15   COSTAR REALTY INFORMATION,       )
     INC.,                            )
16                                    )
              Counterdefendants.      )
17   _____   )
18   VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
19                    BRAD MCGETRICK
20              Tuesday, March 26, 2024
21        Remotely Testifying from Richmond, Virginia
22
23   Stenographically Reported By:
24   Hanna Kim, CLR, CSR No. 13083
25   Job No. 6613138
```

                                                    Page 1

```
1        A.   Using technology.

2        Q.   Using computer technology?

3        A.   Yes.

4        Q.   Not manual tools?

5        A.   That's correct.                          01:20:01

6        Q.   You were previously deposed on

7   January 16th of 2024; correct?

8        A.   That date sounds correct, yes.

9        Q.   And that testimony you gave in your prior

10  deposition in this case was under oath; correct?   01:20:18

11       A.   That is correct.

12       Q.   And at that prior deposition, you

13  testified truthfully and accurately to the best of

14  your ability; correct?

15       A.   I did.                                    01:20:28

16       Q.   Let's talk about what you did to prepare

17  for today's deposition.  Okay?

18       A.   Sure.

19       Q.   Are you fully prepared to offer testimony

20  on behalf of CoStar today?                         01:20:38

21       A.   Yes, I am.

22       Q.   I understand from your previous deposition

23  that you were not personally involved in CoStar's

24  scraping of CREXI.

25            Do I have that right?                     01:20:51
```

                                                  Page 12

Exhibit D, Page 26

```
 1    Mitchell, and, you know, I'm -- I'm sure they worked

 2    on it -- they worked on it together, but Zach was

 3    doing the actual work.

 4         Q.   Okay.  And we'll get into some details

 5    about that in a moment.  But just to circle back to      01:30:37

 6    what else you were told, what was the -- preparing

 7    the results, what did that consist of, to your

 8    understanding?

 9         A.   So after the data was received, Zach went

10    through a process of matching properties to             01:31:00

11    properties and CoStar listings to listings in CoStar

12    and contacts to contacts in CoStar.

13         Q.   Who -- who asked Mr. Carter to perform

14    that matching analysis?

15         A.   Mr. Butler.                                    01:31:21

16         Q.   What was the purpose that you understood

17    for that matching analysis?

18         A.   That I understood from my meeting with the

19    three of them or just in -- overall?

20         Q.   As CoStar's designated witness on this --     01:31:36

21         A.   Oh, sure.

22         Q.   Yeah.

23         A.   So there was a meeting, and, again, I

24    don't have the date, I couldn't find a record of a

25    date, between Jason Butler, Lisa Ruggles and Jaye       01:31:48
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Campbell to discuss doing a competitive analysis of

2    Crexi's listings to determine if marketing claims

3    that CREXI had more listings in markets was correct

4    or not.  And -- and also to see if the feedback that

5    was received from CoStar sales representatives that     01:32:27

6    they were hearing from brokers that they were only

7    listed on CREXI and not on CoStar, to see if that

8    was true or not.

9         Q.   Okay.  And who -- who gave you that

10   information that you just testified about?              01:32:46

11        A.   That was Jason Butler.

12        Q.   Any other source of information you're

13   relying on there?

14        A.   No.

15        Q.   Have you seen any written records relating    01:32:55

16   to that meeting that you just testified about?

17        A.   I have not.

18        Q.   Did this feedback that CoStar sales

19   representatives received relate to CoStar's concern

20   about losing customers in the Omaha market starting     01:33:26

21   in February and March of 2020?

22             MS. TOMKOWIAK:  Objection to the form of

23   the question.

24             THE WITNESS:  There was -- in -- in my

25   education on the topic and talking to folks, there      01:33:41

                                                  Page 21

Exhibit D, Page 28

```
 1   was no discussion of specific markets.  There was

 2   mention that they wanted to be able to break it down

 3   by market.  But that -- Omaha specifically never

 4   came up.

 5   BY MR. GOLDBERG:                              01:34:01

 6        Q.  You mentioned in your prior testimony

 7   marketing claims by CREXI.

 8            What marketing claims?

 9        A.  That CREXI had more listings -- or had all

10   the listings in their markets.                01:34:15

11        Q.  Are you -- have you seen any such

12   marketing claim by CREXI?

13        A.  I have seen some YouTube videos that seem

14   to claim that.

15        Q.  When were those You- -- what YouTube       01:34:32

16   videos have you seen that seem to claim that?

17        A.  There was -- the only one I can recall is

18   one that was focused on my own market here in

19   Richmond.

20        Q.  When did you see that YouTube video?       01:34:42

21        A.  I -- I really can't recall a date.  It was

22   months ago.

23        Q.  But in 2024?

24        A.  Don't think it was in 20 -- I don't

25   think -- well, honestly, I don't -- I don't know.   01:34:56
```

Page 22

1      Q.   As CoStar's designated witness, based on

2    what you know, what was the purpose of Ms. Ruggles

3    asking Mr. Carter to share the information with an

4    individual on CoStar's marketing team?

5      A.   Ms. Ruggles -- the -- the -- the result of    01:44:52

6    the presentation for its orig- -- original intent of

7    looking at, you know, listings, et cetera, it was

8    determined there really wasn't anything, you know,

9    to come of that.  And she felt that the listing

10   contact information may be of some value to          01:45:17

11   marketing.

12           Ms. Ruggles doesn't run marketing or, you

13   know, deal with that but thought it might be useful

14   for them to know.

15      Q.   Useful in their capacity as marketing        01:45:31

16   professionals for CoStar?

17      A.   Yes.

18      Q.   And then you testified earlier that after

19   Ms. Borders got a look at the scraped contact data

20   from CREXI, she asked Mr. Carter for additional      01:45:49

21   information; correct?

22      A.   Yes, that's correct.

23      Q.   When did that occur?

24      A.   That would have occurred in that

25   conversation on April 3rd.                           01:46:03

Page 30

1       Q.   And I believe you testified that based on

2    the feedback from Ms. Borders, Mr. Carter initiated

3    another scrape of the CREXI platform; correct?

4       A.   Yes.

5       Q.   When did that second scrape occur?        01:46:18

6       A.   That second scrape occurred on, I want to

7    say, April 8th.

8       Q.   Okay.  What was scraped from the CREXI

9    platform on April 8th, 2020?

10      A.   Per Amanda Borders' request, it included    01:46:38

11   all of the listing contacts on a particular listing,

12   instead of just the first contact, as well as some

13   additional information on the broker, their -- I

14   guess their tier of their listing or their

15   subscription status.                               01:47:02

16      Q.   Okay.  So back when Mr. Carter had

17   initiated the first scrape of CREXI on March 23rd,

18   2020, CoStar had originally only scraped the first

19   contact associated with the listing on CREXI;

20   correct?                                           01:47:25

21      A.   That's correct.

22      Q.   And Ms. Borders wanted all of the brokers'

23   listing information -- all of bro- -- strike that.

24          Ms. Borders wanted all of the brokers'

25   contact information associated with a particular    01:47:39

                                                    Page 31

```
 1    listing on CREXI; correct?
 2         A.   I wouldn't say all of the brokers' contact
 3    information.  But all of the brokers that were
 4    associated with those listings, yes.
 5         Q.   Not just the first one?                    01:47:54
 6         A.   Correct.
 7         Q.   And so, she asked Mr. Carter to determine
 8    and execute a scrape so that CoStar could obtain all
 9    of the brokers that were associated with a listing
10    on CREXI?                                            01:48:11
11         MS. TOMKOWIAK:  Objection.  Vague.
12    BY MR. GOLDBERG:
13         Q.   Do I have that right?
14         A.   I think it's what I just answered.  But
15    the request was to scrape all of the brokers         01:48:21
16    associated with the listings.
17         Q.   And Mr. Carter executed that scrape?
18         A.   That's correct.
19         Q.   And your understanding is that second
20    scrape occurred on or about April 8th, 2020?         01:48:37
21         A.   Yes.
22         Q.   You mentioned earlier that there was other
23    information associated with brokers that Ms. Borders
24    wanted Mr. Carter to scrape.
25              What other information?                     01:48:52
```

Page 32

1   understanding as -- as -- you're there designated

2   witness.  What is your understanding as CoStar's

3   designated witness for how CoStar scraped CREXI?

4           MS. TOMKOWIAK:  Again, I guess I'm just

5   going to object to this as outside of the scope.      02:31:06

6           THE WITNESS:  I couldn't even begin to

7   tell you what the tool is or the -- I know there's

8   an API involved.  That's -- might be the extent of

9   my knowledge.

10  BY MR. GOLDBERG:                                      02:31:21

11      Q.   Okay.  And -- and do you understand that

12  API stands for application programming interface?

13      A.   That sounds familiar.  I couldn't have

14  told you that without you mentioning it.

15      Q.   And -- and I take it, you learned through   02:31:34

16  your conversations that CoStar gained access to

17  Crexi's API to execute the scraping?

18      A.   Yeah, I mean, that's -- that's what my

19  understanding is.

20      Q.   Okay.  And you understand that the CREXI    02:31:52

21  API is not the same thing as Crexi's public-facing

22  website?

23          MS. TOMKOWIAK:  Objection.  Outside the

24  scope.

25          THE WITNESS:  I have no knowledge of that.    02:32:08

Page 50

```
 1    BY MR. GOLDBERG:

 2         Q.   Other than IP rotation technology, did

 3    CoStar use any technology designed to mask CoStar's

 4    identity in scraping CREXI?

 5              MS. TOMKOWIAK:  Objection.  Outside the      02:37:30

 6    scope.  Calls for a speculation.

 7              THE WITNESS:  I'm not aware of any, no.

 8    BY MR. GOLDBERG:

 9         Q.   Okay.  You testified earlier about some

10    matching and use of the scraped CREXI data.  I just    02:37:52

11    want to ask are you some followup questions about

12    that; okay?

13         A.   Okay.

14         Q.   Other than matching that you described

15    earlier, did CoStar make any other use of the data     02:38:13

16    that CoStar scraped from CREXI?

17         A.   Other than the matching that we -- no,

18    there was -- I -- can you be more specific?

19         Q.   I can't because I'm trying to ask a broad

20    question that will elicit any use that CoStar made     02:38:35

21    of the scraped data.  So I'll ask it broadly, and

22    then I'll try to na- -- narrow it down.

23         A.   Okay.

24         Q.   What did --

25         A.   Beyond -- beyond the --                      02:38:47
```

                                                    Page 56

**Exhibit D, Page 34**

```
 1        Q.   Let me just ask the question, and then you
 2   can get out the answer so it's a clean transcript.
 3             What use did CoStar make of the scraped
 4   CREXI data?
 5        A.   Matching for the purposes of a competitive    02:38:58
 6   analysis on the listings and properties that were in
 7   the CoStar database, as well as contacts.  And also
 8   to validate whether our set of contacts used for
 9   marketing campaigns included the matched CREXI
10   listing contacts.                                       02:39:27
11        Q.   Any other use that CoStar made of the
12   scraped CREXI data beyond that?
13        A.   None that I'm aware of.
14        Q.   Did CoStar ever send any communications to
15   contacts that CoStar scraped from CREXI?                02:39:47
16             MS. TOMKOWIAK:  Objection.  Vague.
17             THE WITNESS:  We share a lot of contacts.
18   So did CoStar send e-mails to people that CREXI also
19   has their e-mail, then yes.
20   BY MR. GOLDBERG:                                        02:40:10
21        Q.   Did CoStar ever send any communications to
22   contacts that CoStar scraped from CREXI that were
23   not in the CoStar system?
24        A.   No.
25        Q.   And your basis for that is your discussion    02:40:23
```

Page 57

```
 1        Q.    Okay.  And focusing on that e-mail from

 2   Ms. Borders to Mr. Florance on April 11th, 2020, at

 3   11:50 a.m.; do you see that?

 4        A.    I do.

 5        Q.    What is the third thing that Ms. Borders    04:01:12

 6   lists in her e-mail?

 7        A.    She lists a proposed marketing campaign

 8   that is ready to be deployed, if approved.  It says,

 9   "Competitive advantage campaign targeting CREXI

10   advertisers."                                          04:01:29

11        Q.    And is this -- you mentioned a proposed

12   campaign.  Is this a proposed campaign that

13   Ms. Borders was proposing to Mr. Florance that would

14   target CREXI advertisers?

15        A.    Based on what's available here and not      04:01:43

16   speaking to Ms. Borders, that does appear what it

17   is.

18        Q.    In information you gleaned as CoStar's

19   designated witness on this topic, was Mr. Florance

20   aware of CoStar's scraping data from CREXI?           04:01:59

21        A.    Based on his testimony that I reviewed, he

22   was not.

23        Q.    Was Mr. Linnington aware of CoStar

24   scraping data from CREXI?

25        A.    I have not spoken to Mr. Linnington.        04:02:13
```

Page 105

1          Q.    You don't know, one way or the other?

2          A.    I don't.

3          Q.    Okay.  Did this proposed competitive

4    advantage campaign targeting Crexi's advertisers

5    occur?                                              04:02:29

6          A.    To the best of my knowledge and everything

7    that I've looked at, it does not appear to have

8    occurred.

9          Q.    It's unrelated, in your view, to the

10   May 2020 LoopNet campaign?                          04:02:42

11         A.    Yes, the May 2020 LoopNet campaign

12   occurred.  There's no evidence that this one

13   occurred and it was proposed.

14         Q.    Okay.  And do you have any understanding

15   of why Ms. Borders was proposing a competitive      04:02:59

16   advantage campaign targeting CREXI advertisers?

17         A.    I do not know what her motivations were to

18   propose that.

19         Q.    And -- and she wouldn't speak with you

20   about it?                                           04:03:16

21         A.    That's correct.

22         Q.    Was Mr. Blocher aware of anything related

23   to this competitive advantage campaign targeting

24   CREXI advertisers?

25         A.    In speaking to him, he did not have a     04:03:28

                                                  Page 106

**Exhibit D, Page 37**

```
 1                  CERTIFICATE OF REPORTER

 2          I, Hanna Kim, a Certified Shorthand

 3   Reporter, do hereby certify:

 4          That prior to being examined, the witness

 5   in the foregoing proceedings was by me duly sworn to

 6   testify to the truth, the whole truth, and nothing

 7   but the truth;

 8          That said proceedings were taken before me

 9   at the time and place therein set forth remotely via

10   videoconference and were taken down by me in

11   shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13          I further certify that I am neither

14   counsel for, nor related to, any party to said

15   proceedings, not in anywise interested in the

16   outcome thereof.

17          Further, that if the foregoing pertains to

18   the original transcript of a deposition in a federal

19   case, before completion of the proceedings, review

20   of the transcript [X] was [ ] was not requested.

21          In witness whereof, I have hereunto

22   subscribed my name.

23   Dated:  2nd day of April, 2024

24                  Hanna Kim

25                  CLR, CSR No. 13083

                                        Page 127
```

# EXHIBIT E

KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS #158708
epeters@keker.com
WARREN A. BRAUNIG #243884
wbraunig@keker.com
NICHOLAS S. GOLDBERG #273614
ngoldberg@keker.com
KATIE LYNN JOYCE #308263
kjoyce@keker.com
633 Battery Street
San Francisco, California 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Attorneys for Defendant and Counterclaimant
COMMERCIAL REAL ESTATE EXCHANGE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., | Case No. 2:20-CV-8819 CBM (ASx) |
| Plaintiffs, | **COMMERCIAL REAL ESTATE EXCHANGE, INC.'S SECOND AMENDED COUNTERCLAIMS** |
| v. | **DEMAND FOR JURY TRIAL** |
| COMMERCIAL REAL ESTATE EXCHANGE, INC., | Ctrm: 8B<br>Judge: Hon. Consuelo B. Marshall |
| Defendant. | Date filed: September 25, 2020<br>Trial date: October 22, 2024 |
| COMMERCIAL REAL ESTATE EXCHANGE, INC., | |
| Counterclaimant, | |
| v. | |
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION, INC., | |
| Counterdefendants. | |

an improper, anticompetitive purpose and to give itself an unfair competitive advantage.

412.   CREXi maintains that it is lawful for CREXi to access publicly available information on CoStar's websites, including LoopNet.  CREXi further maintains that it is unlawful for CoStar to selectively block its competitor, CREXi, from accessing publicly available information on CoStar's websites, including LoopNet.

413.   Accordingly, CREXi seeks a declaration that it has not and will not engage in unlawful conduct by accessing publicly available information on CoStar's websites.  CREXi further seeks a declaration that CoStar may not enforce purported contractual terms of service, technological measures, or take any other steps to block CREXi's access to publicly available information on CoStar's websites.  CREXi also seeks a declaration that CoStar has engaged in unlawful conduct by blocking CREXi's access to publicly available information on CoStar's websites.

## FIFTEENTH CLAIM FOR RELIEF

### (Unfair Competition — Cal. Bus. & Prof. Code § 17200)[56]

414.   CREXi incorporates by reference all previous paragraphs as though fully set forth herein.

415.   CoStar engages in unfair competition by hacking and scraping CREXi's platform to take listing and business information, despite knowing such hacking and scraping is not permitted by CREXi, and then unfairly using that information to target CREXi's subscribers, divert business from CREXi to CoStar, and otherwise unfairly compete with CREXi.

416.   CoStar's acts and practices are immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and offend California public

---

[56] Although CREXi's Fifteenth and Sixteenth Claims for Relief are in fact theories of relief under a broader, existing UCL cause of action, CREXi lists them as separate "Claims for Relief" for ease of identification.

1   Dated: **[DATE]**                    KEKER, VAN NEST & PETERS LLP

2

3                                By:   *DRAFT*
                                      _____
4                                     Elliot R. Peters
                                      Warren A. Braunig
5                                     Nicholas S. Goldberg
                                      Katie Lynn Joyce
6
                                      Attorneys for Defendant and Counterclaimant
7                                     COMMERCIAL REAL ESTATE
                                      EXCHANGE, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT F



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

COSTAR GROUP, INC., and
COSTAR REALTY
INFORMATION, INC.,

            Plaintiffs,

    v.

COMMERCIAL REAL ESTATE
EXCHANGE, INC.,

            Defendant.

COMMERCIAL REAL ESTATE
EXCHANGE, INC.,

            Counterclaimant,

    v.

COSTAR GROUP, INC., and COSTAR
REALTY INFORMATION, INC.,

            Counter defendants.

CASE NO. 2:20-cv-08819-CBM-AS

Assigned to Hon. Consuelo B. Marshall
Hon. Alka Sagar, Magistrate Judge

**SUPPLEMENTAL EXPERT REPORT OF DANIEL ROFFMAN**

Date Filed: September 25, 2020
Pre-Trial Conference: September 24, 2024
Trial Date: October 22, 2024

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

marketing claims that it had all the listings in certain markets was correct; and (2) test feedback that CoStar's sales representatives were hearing from brokers, that brokers were only listed on CREXi and not on CoStar.[94] In order to evaluate whether it was possible to do that competitive analysis by scraping CREXi's website, one of CoStar's software engineers performed a "test" scrape of CREXi, by accessing CREXi's API.

59. An API, or Application Programming Interface, "is a set of rules or protocols that enables software applications to communicate with each other to exchange data, features and functionality."[95] I understand through conversations with CoStar's software engineer that in order to gain access to CREXi's API, CoStar navigated to CREXi's website, inspected the network traffic in Google Chrome while browsing through listings, and discovered a URL request that returned text-based data about the listing in json format. This URL request was different for listings that were for sale, "https://api.crexi.com/assets/," versus those that were for lease, "https://api-lease.crexi.com/assets/."[96] These requests were entirely public facing, as were the results displayed from them. You do not need a username and password, or a token of any kind in order to make the requests, as this is a public facing API and can be seen upon inspecting the network traffic associated with requests on CREXi's public website. Once this was determined, CoStar's software engineer wrote a script to extract the data returned from those requests on CREXi's website and output the data to a csv file. I understand from a conversation with this software engineer that he utilized a service called ProxyMesh when running the scripts because it is a standard practice within the company. ProxyMesh is a service that allows for use of rotating IP addresses.[97] I understand that CoStar's engineer manually set his computer's proxy to only one of the provided proxy servers, which means that his computer could have reflected up to two different IP addresses in a given day.

60. When writing a script, it is standard to test the script's efficacy throughout the process, ensuring the script works as intended and produces the desired outcome. According to

---

[94] Deposition of Brad McGetrick (March 26, 2024) (hereafter, *3/26/2024 McGetrick Deposition*), p. 21:1-8.

[95] "What is an API (application programming interface)?" IBM, accessed May 21, 2024, https://www.ibm.com/topics/api.

[96] Conversation with CoStar employee Zachary Carter on May 22, 2024.

[97] "Rotating Anonymous HTTP Proxy Servers," ProxyMesh, accessed May 21, 2024, https://proxymesh.com/.

**Exhibit F, Page 45**

CoStar's software engineer, the testing on his scripts occurred on March 19, 2020 and March 20, 2020. The "test" scrape resulted in three output csv files. Based on a conversation I had with CoStar's software engineer, I understand that the software engineer did not share the results from this "test" scrape to anyone at CoStar and was never used.

61. Accordingly, on March 22-23, CoStar's software engineer performed a scrape of CREXi's website. CoStar scraped approximately 300,000 listings from CREXi's platform. For each listing, CoStar scraped 60-70 unique categories of information, including the first broker's contact information.[98]

62. To determine whether this information was publicly available on CREXi's website, I asked my team to go to CREXi's website. Once there, my team searched for lease properties and sales properties separately, clicked one of the returned results for both, reviewed the network traffic associated with the presented webpage, and identified requests that appeared to be similar to the columns in the csv files from 2020. I then reviewed the results.

63. Based on these results, I determined that all of the columns in the csv files were returned from my testing of CREXI's APIs except for ten fields that are missing, including broker phone and broker email.[99] My understanding is that CREXi's API, at the time of the scrape in 2020, provided these fields publicly and that these fields were not protected by authentication or other means to restrict the information from public accessibility.[100]

64. Based on these results, I was able to determine that the scraped information was publicly available on CREXi's website. Further, I reviewed the contents of CREXi's historical robots.txt file, a file on a website that restricts web crawlers and search engine indexers from

---

[98] *3/26/2024 McGetrick Deposition*, Exhibit 567 (CoStar00411080).

[99] The ten fields from the output CSVs from CoStar's scrape on CREXi that I was unable to find in the current API's on CREXi's website are: broker_email, broker_index, broker_phone, buildings, lease_expiration, lease_options, nth_broker, office_available, permitted_zoning, and remaining_term. The rest were found in the network traffic from at least one of the following URLs: https://www.crexi.com/properties/1522069/south-carolina-4.6-acre-lot-off-geer-hwy; https://www.crexi.com/properties/1542372/wisconsin-3830-s-moorland-rd; https://www.crexi.com/lease/properties/475087/wisconsin-shops-at-highland-plaza; https://www.crexi.com/lease/properties/543316/colorado-eckhart-elementary-school.

[100] During my conversation with the CoStar software engineer who performed the scrape, he noted that there was no authentication needed and that the APIs used, and data returned, were publicly available.

accessing parts of their website.[101] As of March 17, 2020 and on April 8, 2020, there was no indication in the robots.txt file that CREXi disallowed any access to its API or website pages.[102] In other words, CREXi did not indicate to programmatic visitors, such as web crawlers, that they should not access CREXi's API or cache the data on its website.

65. I specifically reviewed the following 3 fields, which were discussed in the deposition of CoStar's designated 30(b)(6) witness: "PRO Subscription", "yearly rate", and "monthly rate", and determined the following: "PRO Subscription" is a field regarding the broker specifically, not the listing, and is publicly visible on CREXi's website next to the broker's name via a blue icon that says "pro." Upon viewing the network traffic associated with a specific listing, this field has the name of "hasProSubscription" with a value of either true or false. See below for a screenshot of this on CREXI's website and in the response body of the request from the network traffic.



The "yearly rate" and "monthly rate" fields are only associated with lease listings and do not appear to be related to the broker(s) on the listing. Upon inspecting the network traffic, the "yearly rate" field has the name of "rateYearly" and is publicly visible on CREXi's website

[101] "Introduction to robots.txt," Google, accessed May 21, 2024, https://developers.google.com/search/docs/crawling-indexing/robots/intro.

[102] "Robots.txt," CREXi, March 17, 2020, https://web.archive.org/web/20200317154941/https://www.crexi.com/robots.txt; "Robots.txt," CREXi, April 8, 2020, https://web.archive.org/web/20200408174440/https://www.crexi.com/robots.txt.

CoStar's scrape of CREXi, however the company associated with that Aaron Evans in the scraped data was Texas Restaurant Advisors LLC. Upon further investigation, I determined that all three of these Aaron Evans are different people, and none of them ever worked at an overlap of those locations.[115] See below for the Enterprise output where the contact name value is Aaron Evans.

| ContactName | LocationName |
|---|---|
| Aaron Evans | NewOption Partners |
| Aaron Evans | Del Mar Realty & Investments |

Below is the output for the broker name of Aaron Evans in the output files from CoStar's scrape of CREXi:

| broker_first_name | broker_last_name | broker_company |
|---|---|---|
| Aaron | Evans | Texas Restaurant Advisors LLC |

As you can see in the above, the recipients of the May 5, 2020 email and the scraped Aaron Evans are not the same person. Therefore, comparing on name alone is not effective.

73. Mr. Crain asserted that "The CSV files that CoStar produced, however, show that CoStar scraped contact information for 45,094 unique individuals from CREXi's platform."[116] However, I note that after deduplication, I observed only 33,891 unique email addresses.[117] I attempted to match these 33,891 scraped email addresses to CoStar's intended marketing email from May 5 and 8, 2020. To do so, I obtained three email address lists generated from CoStar's SalesForce system that I understand to be a cumulative list of 81,259 unique email recipients intended for CoStar's May 5 and 8, 2020 marketing emails.[118] Next, I compared the 81,259 email addresses to the email addresses contained in the scraped data from CREXi. I determined that only 15,203 of these email addresses exist in the scraped CREXi

---

[115] "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaron-evans-0222a920/; "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaron-evans-0222a920/details/experience/; "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaron-evans-aug1977/; "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaron-evans-aug1977/details/experience/; "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaroncevans/.

[116] Crain ¶ 93.

[117] Distinct values in the broker_email field from CoStar00463905, CoStar00463906, CoStar00463907, CoStar00463908, CoStar00463909, CoStar00463910, CoStar00463911, CoStar00463912, CoStar00463913, CoStar00463914, CoStar00463915, CoStar00463916, CoStar00463917, CoStar00463918, CoStar00463919, CoStar00463920, CoStar00463921, and CoStar00463922

[118] I deduplicated the values in the EmailAddress field from CoStar00463286, CoStar00463287, and CoStar00463288 to arrive at 81,259 distinct email addresses.

data.[119] This suggests to me that CoStar did not even attempt to send their marketing emails to 55.14% of the email addresses that they had already scraped from CREXi.

74. In addition, Mr. Crain failed to consider whether CoStar already possessed the email addresses that they scraped. To do so, I took the 15,203 scraped email addresses that were part of the May 5 and 8, 2020 marketing emails and compared them to the competitive analysis performed by CoStar's Research Data Management team. This allowed me to identify contacts already in CoStar's system at the time of the scrape. I observed that 9,241 of the 15,203 email addresses existed in CoStar's competitive analysis.[120] I note that Mr. Crain had all of this data available to him but did not perform this analysis. In order to get further clarity on the remaining 5,962 broker email addresses scraped from CREXi, I provided the list to CoStar and requested additional details. Appendix D contains the list of 5,962 emails as well as the created date associated with the email in CoStar's system.

75. The results show that at least 5,926 of the 5,962 CREXi listing broker email addresses existed in CoStar's system as of March 21, 2020, the day of the first scrape.[121] The remaining 36 users were added to CoStar's system across several days from March 23, 2020 through April 22, 2020 and indicate no bulk loading of a list.[122]

76. The totality of this analysis confirms that all but 36 of the email addresses CoStar intended to receive the May 5 and 8, 2020 marketing emails already existed in CoStar's systems prior to the scrape of CREXi. Further, this confirms that CoStar did not rely upon the scraped

---

[119] Id. I then compared this list to the distinct list of values in the broker_email field from CoStar00463905, CoStar00463906, CoStar00463907, CoStar00463908, CoStar00463909, CoStar00463910, CoStar00463911, CoStar00463912, CoStar00463913, CoStar00463914, CoStar00463915, CoStar00463916, CoStar00463917, CoStar00463918, CoStar00463919, CoStar00463920, CoStar00463921, and CoStar00463922. This comparison reveals that 15,203 email addresses from the May 5, 2020 email exist in the scraped data from CREXi.

[120] Id. Compared to the unique values from the EmailAddress field in CoStar00411082: "Contact on CoStar" tab, CoStar00411083: "Contact on CoStar" tab, CoStar00411082: "Contact on CoStar and Listing" tab, and CoStar00411083: "Contact on CoStar and Listing" tab to the 15,203 emails from the scraped data.

[121] Appendix D. Group by "EmailAddress" to get the minimum "CreatedDate" for the email and compare to when that date is less than March 21, 2020. As I previously noted, based on a conversation I had with CoStar's software engineer, I understand that the software engineer did not share the results from the "test" scrapes to anyone at CoStar and was never used, therefore the first real scrape date I am using for comparison of the minimum "CreatedDate" is March 21, 2020.

[122] Id. The 15,203 scraped email addresses that were part of the marketing emails minus 36 email addresses that were not in CoStar's system, divided by the 15,203 scraped email addresses that were part of the marketing emails = 99.76%.

**Exhibit F, Page 49**

broker contact information for at least 99.76% of the scraped email addresses that were associated with the marketing emails on May 5 and 8, 2020. My findings are consistent with the testimony of CoStar's 30(b)(6) designee, Vice President of Research Brad McGetrick, that listing contacts scraped from CREXi were not ingested into CoStar's Enterprise database.[123]

**Flaws in Mr. Crain's Analysis of Scraped Data**

77. I have reviewed the .CSV files provided by CoStar that were analyzed by Mr. Crain, who concludes that "across at least five scraping sessions, CoStar scraped 70 million pieces of data from CREXi,"[124] including contact information for 45,094 unique individuals from CREXi's platform.[125]

78. I understand through conversations with CoStar's software engineer that he performed three tests to refine his code, and then ran the code 15 times. Mr. Crain defines this as five scrapes but really CoStar only collected data on two different instances. Prior to running the two scrapes, the engineer ran testing scrapes on March 19, 2020 and March 20, 2020 to get the code working. Then, the first real scrape was done between March 21, 2020 and March 23, 2020, and the next (and last) scrape was done April 7, 2020 and April 8, 2020.[126] I also understand from the same conversations that the engineer broke each scrape into two, and sometimes even three, separate requests to decrease the possibility of errors, which is reflected in the original file names with "_part_one" or "_part_two." I also understand that the scrape on April 8, 2020 occurred due to a flaw the engineer found in his code for lease data after he reviewed the output from April 7, 2020, and therefore reran once the flaw was fixed.[127] CoStar's software engineer shared a screenshot of the scraped files in his OneDrive folder, reflecting the last modified dates for each file:

---

[123] *3/26/2024 McGetrick Deposition*, pp. 45:15-48:2; 57:21-58:10.

[124] Crain Report ¶ 89.

[125] Crain Report ¶ 93.

[126] Conversation with CoStar employee Zachary Carter on May 22, 2024.

[127] The flaw discovered was with recording the individual broker information for each listing. The original requests would only save the information for the first broker on the listing, rather than for all brokers, however, it would save the same first brokers information as many times as there were brokers. For example, if a listing had three brokers associated, the output csv file would contain three rows for that listing, and the broker name in each row would not change, instead it would contain the information of the first broker in the list three times.

**Reason 2: Duplication of Listing Information Details**

84. Another flaw in Mr. Crain's report is his use of the term "pieces of data" to inflate CoStar's actions. For example, he wrote that CoStar scraped "70 million pieces of data" but he included every field in every spreadsheet as a "piece of data," despite CoStar making far fewer actual data requests and obtaining largely duplicative data.

85. In my review of the scraped data, I observed repetitive listings that contained ancillary additional details, such as additional brokers. In this example, the same listing details were duplicated but with an additional broker. Mr. Crain has quantified every listing detail as a "piece of data," and counted it each time it appeared in a CSV file along with a different broker's information. This had the effect of inflating the count of "pieces of data" in his report.[133] For example, Mr. Crain stated that CoStar returned "again on April 8, scraping 7.4 million pieces of data across 155,283 CREXi listings for lease,"[134] citing the files CoStar00463921 and CoStar00463912. In CoStar00463921, there are 48 total columns and a total of 77,649 rows, summing to 3,727,152 "pieces of data" according to Mr. Crain's methodology. Within those 77,649 rows, I observed only 50,435 distinct values in the "id" field – one of which (136925) had eight corresponding rows in the file. Reviewing these eight rows, I observed that seven out of the 48 columns differed across the rows, which contained brokers information associated with the listing. Therefore, 41 columns contained the same information across all eight rows, returning the same duplicated information about the lease listing itself. Mr. Crain's methodology counts these as 384 "pieces of data," despite the fact that only seven columns contain different data points. A more accurate accounting of the unique data points within these eight rows would be 97 pieces of data.[135] That is 287 date pieces, or 75%, that Mr. Crain would have overcounted for one specific property listing.

86. Mr. Crain ultimately concluded that "CoStar took far more data from CREXi, by many orders of magnitude, than Mr. Roffman asserts CREXi ever took from CoStar."[136] However,

---

[133] Crain Report ¶ 92; Crain Report Appendix S.

[134] Crain Report ¶ 90.

[135] CoStar00463921; This number was derived by the summation of:
- multiplying the number of rows by the number of columns that contain different data for each of the eight rows where the id was 136925 = 8 * 7 = 56
- multiplying the number of rows by the number of columns whose data are the same across all rows where the id was 136925 = 1 * 41 = 41

[136] Crain Report ¶ 92.

CASE NO. 2:20-cv-08819-CBM-AS
SUPPL. EXPERT REPORT OF D. ROFFMAN

**Exhibit F, Page 51**

# EXHIBIT G

```
                                                          1

 1                 UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
 3
 4   COSTAR GROUP, INC., AND COSTAR   ) CASE NO.
     REALTY INFORMATION, INC.,        ) 2:20-CV-08819-CBM
 5                                    ) ASX
            PLAINTIFFS,               )
 6                                    )
            VS.                       )
 7                                    )
     COMMERCIAL REAL ESTATE           )
 8   EXCHANGE, INC.,                  )
                                      )
 9          DEFENDANTS.               )
                                      )
10
11
12
                         REPORTER'S REMOTE
13
                     TRANSCRIPT OF PROCEEDINGS
14
                        FEBRUARY 16, 2024
15
16
17
18
19
20
21
22
23   TECKLA CLAY, CSR 13125
     STENOGRAPHIC COURT REPORTER
24
25
```

11

1   are scraping your website that's publically available

2   or is it that they are using the scraped information on

3   their own website to, to, you know, change the data on

4   your website for similar listings.

5           What is, can you articulate what the

6   concern is?  Because again I don't really remember how

7   it's been described.  But it seems to me if it's a

8   publically available website, you know, scraping it may

9   or may not be a problem.  It's the use of the

10  information that really triggers.

11          MR. GOLDBERG:  Your Honor, you're putting your

12  finger on the critical piece of evidence in this case,

13  a critical fact.  The LoopNet website which is is a

14  CoStar website is a publically available website as

15  well.  CoStar has a claim in this case that CREXi

16  breached it's contract.  We don't think we have a

17  contract with LoopNet.  I'm not aware of any such

18  contract.

19          But they say we breached a contract with

20  LoopNet when brokers directed CREXi employees to look

21  at listings on their publically available website.

22  They say we violated their terms of service.  Well we

23  have a publically available website.  We also have

24  terms of service that prohibit scraping.  And they

25  breached that.

12

1                    And so it's relevant to unclean hands.

2     They have a claim that, they have a claim that we

3     copied photographs from their website willfully,

4     intentionally and they're going to seek damages and

5     whatever, you know, massive sums of money from CREXi

6     for that conduct.  Meanwhile they're copying

7     photographs from the CREXi website.

8             THE COURT:  I see, I see.

9             MR. GOLDBERG:  That's clearly relevant to

10    unclean hands and a number of other critical defenses

11    and misconduct as it appears.

12            THE COURT:  I understand.  Thank you.

13            MR. GOLDBERG:  Sure.  It's a key foundational

14    question and I should not have skipped over it.  So

15    thank you for asking.  So they, so they then compare

16    not just the listings but then the brokers, the brokers

17    that are associated with the listings on CREXi.

18                    And they try to locate whether they have

19    the brokers in the CoStar database.  And this becomes

20    crucial because as we'll see in the next slide they use

21    the 33,000 brokers that they scraped from the CREXi

22    website in an e-mail marketing campaign.

23                    And this is an e-mail from Amanda Borders

24    who's in the CoStar marketing department to Andy

25    Florence the CEO, Matthew Blocker and Max Linnington, 2

49

1

2                    UNITED STATES DISTRICT COURT.

3                    CENTRAL DISTRICT OF CALIFORNIA

4

5    COSTAR GROUP, INC., AND COSTAR    ) CASE NO.
     REALTY INFORMATION, INC.,         ) 2:20-CV-08819-CBM
6                                      ) ASX
           PLAINTIFFS,                 )
7                                      )
           VS.                         )
8                                      )
     COMMERCIAL REAL ESTATE            )
9    EXCHANGE, INC.,                   )
                                       )
10         DEFENDANTS.                 )
                                       )
11

12                I, TECKLA CLAY, CSR NO. 13125, OFFICIAL

13   REPORTER OF THE SUPERIOR COURT OF THE STATE OF

14   CALIFORNIA, FOR THE COUNTY OF LOS ANGELES, DO HEREBY

15   CERTIFY THAT THE FOREGOING PAGES, 1 THROUGH 46

16   COMPRISE A FULL, TRUE AND CORRECT REMOTE TRANSCRIPT OF

17   THE PROCEEDINGS TAKEN IN THE ABOVE ENTITLED

18   CAUSE ON FEBRUARY 16, 2024 THIS 23RD DAY OF JUNE,

19   2024.

20

21

22

23                TECKLA CLAY, CSR NO. 13125

24

25

Exhibit G, Page 56