1  ELYSE M. GREENWALD (BAR NO. 268050)
   elyse.greenwald@lw.com
2  LATHAM & WATKINS LLP
   10250 Constellation Boulevard
3  Suite 1100
   Los Angeles, CA 90067
4  Tel: 424.653.5500
   Fax: 424.653.5501
5
   *Attorneys for Plaintiffs and Counterdefendants*
6  *CoStar Group, Inc. and CoStar Realty Information, Inc.*

7  [Additional Counsel Listed on the Next Page]

8              **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
9

10 COSTAR GROUP, INC., and            CASE NO. 2:20-cv-08819-CBM-AS
   COSTAR REALTY INFORMATION,
11 INC.,

12           Plaintiffs,             **COSTAR'S NOTICE OF MOTION
                                     AND MOTION TO EXCLUDE
13      v.                           OPINIONS OF CATE ELSTEN;
                                     MEMORANDUM OF POINTS AND
14 COMMERCIAL REAL ESTATE            AUTHORITIES IN SUPPORT
   EXCHANGE, INC.,                   THEREOF**
15
             Defendant.             Date:      January 7, 2025
16                                  Time:      10:00 a.m.
   COMMERCIAL REAL ESTATE           Courtroom: 8D
17 EXCHANGE, INC.,                  Before:    Hon. Consuelo Marshall
18           Counterclaimant,       Trial Date: March 11, 2025
19      v.
                                    **REDACTED VERSION OF
20 COSTAR GROUP, INC., and          DOCUMENT PROPOSED TO BE
   COSTAR REALTY INFORMATION,       FILED UNDER SEAL**
21 INC.,
22           Counterdefendants.
23
24
25
26
27
28

NICHOLAS J. BOYLE*
nicholas.boyle@lw.com
SARAH A. TOMKOWIAK*
sarah.tomkowiak@lw.com
ANNE C. MALINEE*
anne.malinee@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201

CAITLIN E. DAHL*
caitlin.dahl@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767

*Admitted pro hac vice

1    **TO DEFENDANT AND ITS ATTORNEYS OF RECORD:**

2          PLEASE TAKE NOTICE that on January 7, 2025, at 10:00 a.m., or as soon

3    thereafter as this matter can be heard, in the courtroom of the Honorable Consuelo

4    B. Marshall, located at the First Street Courthouse, 350 W. 1st Street, Los Angeles,

5    CA 90012, Courtroom 8D, Plaintiffs CoStar Group, Inc., and CoStar Realty

6    Information, Inc. (collectively "CoStar") will move for an order to exclude expert

7    testimony from defendant Commercial Real Estate Exchange, Inc.'s ("CREXi")

8    Expert Witness Cate Elsten.

9          This Motion is supported by the accompanying Memorandum of Points and

10   Authorities, Declaration, and Exhibits filed herewith, along with the arguments of

11   counsel, the Court's record on this matter, including all pleadings filed to date, and

12   any other evidence or argument that the Court may consider in deciding this Motion.

13         **Compliance with Local Rule 7-3.**  This Motion is made following a meet-

14   and-confer discussion with counsel on August 29, 2024.  CREXi opposes CoStar's

15   Motion.

16

17                                             Respectfully submitted,

18   Dated:  September 9, 2024              LATHAM & WATKINS LLP

19                                          By: _/s/ *Nicholas J. Boyle*_____
                                               Nicholas J. Boyle
20                                             (admitted *pro hac vice*)
                                               Sarah A. Tomkowiak
21                                             (admitted *pro hac vice*)
                                               Anne C. Malinee
22                                             (admitted *pro hac vice*)
                                               555 Eleventh Street, NW
23                                             Suite 1000
                                               Washington, D.C. 20004
24                                             Tel: 202.637.2200
                                               Fax: 202.637.2201
25                                             Email: nicholas.boyle@lw.com
                                                   sarah.tomkowiak@lw.com
26                                                 anne.malinee@lw.com

27
                                               Elyse M. Greenwald
28                                             (Bar No. 268050)

10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525
Fax: 424.653.5501
Email:  elyse.greenwald@lw.com

Caitlin E. Dahl
(admitted *pro hac vice*)
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767
Email: caitlin.dahl@lw.com

*Attorneys for Plaintiffs and
Counterdefendants CoStar Group, Inc., and
CoStar Realty Information, Inc.*

1

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

SUMMARY OF ELSTEN'S RELEVANT OPINIONS ...................................... 1

    A.    Elsten's Report Regarding CREXi's Alleged Damages ...................... 1

    B.    Elsten's Rebuttal To CoStar's Expert Louis Dudney .......................... 3

    C.    Elsten's Rebuttal To CoStar's Expert Thea Vaughan ......................... 4

LEGAL STANDARD ......................................................................................... 5

ARGUMENT ...................................................................................................... 5

I.    ELSTEN'S AFFIRMATIVE OPINIONS SHOULD BE EXCLUDED ........ 5

    A.    Elsten Is Unqualified To Opine On Keyword Advertising Issues ................................................................................................... 6

    B.    Elsten's Lost Profits Are Based On An Unreasonable Assumption ......................................................................................... 7

    C.    Elsten's "Cost-Savings" Opinion Should Also Be Excluded ............................................................................................ 8

II.    ELSTEN'S REBUTTAL OPINIONS SHOULD ALSO BE EXCLUDED . 10

    A.    Many of Elsten's Rebuttal Opinions To Dudney Are Inadmissible ..................................................................................... 10

        1.    Elsten's Opinions On The Parties' Business Models Are Unreliable And Unhelpful .................................. 10

        2.    Elsten's Opinion On Alternative Methods CREXi Could Have Used To Procure Photos Is Not Based On Expertise Or Supported By Facts ..................................... 12

        3.    Elsten's Opinions That CREXi Has Not Benefitted From Its Infringement Are Also Inadmissible ......................... 15

        4.    Elsten's "Legal" Opinions Are Improper And Wrong ................................................................................. 16

    B.    Elsten's Attempts to Rebut Vaughan's Opinions Are Inadmissible ..................................................................................... 16

        1.    Elsten Is Not Qualified To Opine On Image Licenses Or Watermarks ................................................. 16

        2.    Elsten's Opinion Regarding Vaughan's "Construction" Of A Hypothetical License Is An Impermissible Legal Opinion .................................... 17

1
2
        3.    Elsten's Opinion Regarding "Quantifiable Data" Is
Irrelevant And Relies On An Unreliable
Methodology ...................................................................... 17

3
        4.    Elsten's Opinion Regarding Vaughan's Use Of
Getty Images Is Unreliable .............................................. 18

4
5
        5.    Elsten's Opinion Regarding Vaughan's Use Of
Multipliers Is Also An Improper Legal Opinion
And Unreliable .................................................................. 19

6
7
        6.    Elsten's Rebuttal To Vaughan's Opinion On Harm
Purports To Recite Facts Without Applying
Expertise ........................................................................... 20

8
9
        7.    Elsten's Opinion Regarding Judgments Is
Unreliable ......................................................................... 21

10
CONCLUSION ........................................................................................ 21

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CASE NO. 2:20-cv-08819-CBM-AS
COSTAR'S MOTION TO EXCLUDE
OPINIONS OF CATE  ELSTEN

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co.*,
  2017 WL 3528606 (D. Del. Aug. 26, 2017) ................................................... 7, 12

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
  2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) ..................................................... 13

*Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*,
  923 F. Supp. 2d 1245 (S.D. Cal. 2013) ............................................................. 7, 8

*CFM Commc'ns, LLC v. Mitts Telecasting Co.*,
  424 F. Supp. 2d 1229 (E.D. Cal. 2005) ............................................................... 16

*Cholakyan v. Mercedes-Benz, USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) ........................................................................ 18

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*,
  2020 WL 60351 (D.N.H. Jan. 6, 2020) ............................................................... 20

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ........................................................................................... 2, 5

*Deckers Outdoor Corp. v. Wal-Mart Stores, Inc.*,
  2024 WL 2208099 (C.D. Cal. Apr. 9, 2024) .......................................................... 5

*Edwards Lifesciences Crop. v. Meril Life Scis. Pvt., Ltd.*,
  2021 WL 5407316 (N.D. Cal. Nov. 18, 2021) ................................................. 9, 16

*In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab.
  Litig.*,
  2021 WL 3168224 (C.D. Cal. July 22, 2021) ............................................... 12, 15

*Freeman v. Ethicon, Inc.*,
  2022 WL 4601661 (C.D. Cal. Aug. 26, 2022) (Marshall, J.) ............................. 17

*Gilbert-Daniels v. Lions Gate Ent. Corp.*,
  2023 WL 8938403 (C.D. Cal. Dec. 7, 2023), *appeal filed*, No. 24-
  153 (9th Cir. Jan. 9, 2024) .................................................................................. 6

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003), *aff'd sub nom. Mortensen*
    *v. Snavely*, 145 F. App'x 218 (9th Cir. 2005) ........................ 14, 18, 19

*Innovative Fabrication Sch., Inc. v. Am. Fabrication Acad., Inc.*,
    2023 WL 6787808 (C.D. Cal. June 7, 2023) ................................... 9

*United States ex rel. Kelly v. Serco, Inc.*,
    846 F.3d 325 (9th Cir. 2017) ............................................. 20

*Kitsch LLC v. Deejayzoo, LLC*,
    2021 WL 9734859 (C.D. Cal. Sept. 29, 2021) .............................. 9

*Lindy Pen Co. v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993) ........................................... 8, 9

*Mass Engineered Design, Inc. v. Planar Sys., Inc.*,
    2017 WL 2642277 (D. Or. June 19, 2017) ............................... 17

*Messick v. Novartis Pharms. Corp.*,
    747 F.3d 1193 (9th Cir. 2014) ............................................. 5

*Mission Viejo Florist, Inc. v. Orchard Supply Co.*,
    2019 WL 13045054 (C.D. Cal. Feb. 28, 2019) ............................ 9

*Nationwide Transp. Fin. v. Cass. Info. Sys., Inc.*,
    523 F.3d 1051 (9th Cir. 2008) ........................................... 20

*Tate v. Smith*,
    2020 WL 999758 (W.D. Wash. Mar. 2, 2020) .......................... 11, 16

*Under a Foot Plant, Co. v. Exterior Design, Inc.*,
    2017 WL 3593014 (D. MD. Aug. 21, 2017) ............................. 20

*United States v. Chavez*,
    2021 WL 5810298 (N.D. Cal. Dec. 7, 2021) ............................. 19

*Watson v. K2 Design Grp., Inc.*,
    2016 WL 11783284 (S.D. Fla. Aug. 9, 2016) ........................... 17

*Waymo LLC v. Uber Techs., Inc*,
    2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ................... 10, 15, 20, 21

1

## **OTHER AUTHORITIES**

2

Fed. R. Evid. 702 ........................................................................................................ 5

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **INTRODUCTION**

CREXi retained Cate Elsten, an accounting and finance expert, as a catchall expert to opine on a potpourri of issues relating to every claim and counterclaim in the case.  Initially, Elsten submitted a report offering opinions related to CREXi's purported damages from CoStar's alleged use of CREXi's name in certain Google keyword ads.  Elsten is not qualified to offer several of those opinions; and she bases others on unreasonable assumptions and unreliable methodologies that render her calculations speculative and inadmissible.  Elsten then submitted a report that purports to rebut opinions offered by CoStar's experts relating to (1) CoStar's copyright infringement claim, which is based on CREXi's mass infringement of CoStar images, and (2) CoStar's claims under the Digital Millennium Copyright Act, which are based on CREXi's policy and practice to crop out CoStar's watermark from images before displaying them on CREXi.com.  Specifically, Elsten purports to rebut opinions from (1) Louis Dudney, a forensic accountant with more than 30 years of experience as a financial expert in litigation, who analyzed CoStar's costs to grow and maintain its library of commercial real estate ("CRE") images; and (2) Thea Vaughan, who has decades of experience negotiating thousands of image licenses and managing copyrighted images, who offered opinions regarding the value of the license CREXi granted itself to use CoStar's images, and on the harm CoStar suffered as a result of CREXi's watermark-cropping policy.  But those purported rebuttals fall far outside Elsten's expertise, and they separately require exclusion because they do nothing more than (mis)interpret case law, parrot the (separately inadmissible) opinions of another CREXi expert, Gary Elsner, summarize documents, or regurgitate CREXi's legal theories without applying expertise.

## **SUMMARY OF ELSTEN'S RELEVANT OPINIONS**

### **A.    Elsten's Report Regarding CREXi's Alleged Damages**

Between September 2020 and June 2021, two CoStar brands—Ten-X and

CityFeet—inadvertently used "CREXi" in some of their Google keyword ads that were triggered by "CREXi" keywords as a result of the use of a feature known as dynamic keyword insertion ("DKI") (the "allegedly infringing ads"). *See* Dkt. 367, Answer to Am. Countercls. ¶ 128. When an advertiser utilizes DKI, Google automatically inserts the keyword triggered by the searcher's query (here, "CREXi") into the text of the advertiser's ad. *See id.* CREXi alleges that CoStar infringed its trademark by using "CREXi" in (a tiny percentage) of Ten-X and CityFeet's keyword ads. *See* Dkt. 162, Am. Countercls. ¶¶ 118-35.

To address its purported damages from CoStar's alleged infringement, CREXi put forward an expert report from Elsten. Dahl Decl.[1] ¶ 3 & Ex. 1.[2] Despite having no expertise in search engine marketing ("SEM") or keyword advertising, Elsten purports to explain the purpose of keyword advertising, industry practices regarding keyword advertising, and CoStar's SEM strategies, among other topics.[3] Ex. 1 at 13-17, 26-31, 52-54. She also opines that, because of CoStar's alleged infringement, CREXi lost between approximately $2.4 and $9.7 million. *Id.* at 37-48. To calculate CREXi's supposed lost profits, Elsten assumes that each of the 16,549 clicks on the allegedly infringing ads is a click that CREXi "lost," and that but-for the alleged infringement, there would have been 16,549 clicks on CREXi's website. *Id.* at 33-35, 39. Elsten thus assumes that all searchers who were supposedly looking for CREXi gave up their search once they clicked on the allegedly infringing ads. Elsten also opines that CoStar realized $2.3 million in "cost-savings" as a result of the

---

[1] Exhibits cited herein are to the Declaration of Caitlin E. Dahl in Support of CoStar's Motion to Exclude Opinions of Cate Elsten (Sept. 9, 2024) ("Dahl Decl.").

[2] Elsten served her "further" amended report on September 3, 2024, more than a month after her deposition and less than a week before the *Daubert* deadline. CoStar understands that CREXi intends to move to strike Vaughan's supplemental report for being untimely. CoStar disagrees, and intends to oppose CREXi's motion; however, if Vaughan's supplemental report is found to be untimely, the Court must also exclude Elsten's "further" amended report, which was served even later.

[3] Keyword advertising refers to ads that are displayed on the search results page of a search engine, like Google, in response to a searcher's query. CoStar refers to its keyword advertising as "search engine marketing" ("SEM"), and those terms are used interchangeably herein.

1    allegedly infringing ads.  *Id.* at 52-54.

2        **B.**    **Elsten's Rebuttal To CoStar's Expert Louis Dudney**

3        In support of its claim for statutory damages for copyright infringement,

4    CoStar offered the opinions of forensic accountant Louis Dudney.  Dudney analyzed

5    costs, extracted from CoStar's financial reporting system, covering CoStar's CRE

6    business in the United States.  Ex. 2 ¶ 37.  He tested the accuracy of CoStar's costs

7    data by reconciling the data with the total cost of revenue reported by CoStar in its

8    filings with the SEC, and then made adjustments to isolate costs associated with

9    CoStar-owned images.  *Id.* ¶¶ 40-42.  He concluded that the adjusted costs CoStar

10   incurred related to CRE photography from 2017 to 2023 (the period of infringement

11   for which data was available) were at least $90 million.  *Id.* ¶ 43.

12

13       *Id.* ¶¶ 45-48.

14       Elsten, who admits she is not an expert on either the CRE industry or

15   commercial photography, *see* Ex. 8 at 166:25-168:7, 171:21-172:5, offers

16   scattershot rebuttals to Dudney's opinions that go far beyond her purported expertise

17   in accounting and finance.  *Id.* at 22:7-24:7.  First, Elsten opines that Dudney

18   assumes CREXi would have had to build an owned image library and ignores

19   CREXi's purported approach of relying on user-supplied photos, which Elsten—

20   without acknowledging CREXi's official policy of copying and cropping CoStar

21   photographs—argues is a superior business model.  Ex. 4 at 21-27, 53-55.  Second,

22   Elsten opines that CREXi could have procured photos for listings comparable to the

23   CoStar photos CREXi infringed (the "Infringed Images") in a "but for" world using

24   less costly means than building its own library.  *Id.* at 35-49.  Third, Elsten offers

25   two opinions to suggest that CREXi did not benefit from its infringement.  *Id.* at 28-

26   32.  Finally, Elsten opines that Dudney's analysis does not comport with Ninth

27   Circuit law.  *Id.* at 32-35, 66-67.

28

### C.    Elsten's Rebuttal To CoStar's Expert Thea Vaughan

CoStar also put forward expert opinions from Thea Vaughan.  Dahl Decl. ¶ 8 & Ex. 3.  Vaughan determined the fair market value of the licenses CREXi granted itself when it misappropriated the nearly 50,000 Infringed Images.  *See* Ex. 3 ¶ 2. She did this by (1) reviewing each of those images (twice); (2) determining the benchmark value for the images based on an analysis of comparable images; and (3) applying multipliers to account for the rarity and scarcity of the images as well as CREXi's competitive use of them.  *See id.* ¶¶ 48-79.  Based on her experience founding two image libraries that managed copyrights of approximately 2.4 million images—including through the application of watermarks—Vaughan also opined that CoStar's star watermark is consistent with watermarks that are intended to reflect ownership, *see id.* ¶¶ 2, 80-86; and that CREXi's policy and practice of cropping CoStar's watermark harmed CoStar.  *Id.* ¶¶ 87-94.

Elsten admits she has no experience licensing images in the last decade, has never been qualified as an image licensing expert, and has no experience with the use of watermarks to protect intellectual property.  Ex. 8 at 287:20-25, 293:18-24, 298:24-299:2.  CREXi's reliance on Elsten is curious given that it retained an expert in stock image photography, Elsner, to opine on the license value of the images, on whether CoStar's watermark could be considered copyright management information, and to rebut Vaughan's opinions on those topics.  And unlike Elsten, Elsner holds himself out to be an "industry expert in the field of commercial photography" with experience regarding "watermarking policies for digital photographs." Ex. 6 ¶¶ 1, 29.[4]

Nevertheless, Elsten proffers six rebuttals to Vaughan's opinions.  Ex. 4 at 68-81.  First, Elsten contends that Vaughan constructed a hypothetical license that is inconsistent with "guidelines used by intellectual property … damages

---

[4] For the reasons set forth in a contemporaneous motion, Elsner's opinions also are inadmissible.

professionals." *Id.* at 68.  Second, she claims that Vaughan "bypasse[d] … available and relevant quantifiable data" when valuing licenses for the Infringed Images.  *Id.* at 70.  Third, Elsten takes issue with Vaughan's reliance on a Getty Images Holdings, Inc. ("Getty") Calculator to determine a benchmark license value.  *Id.* at 71-73.  Fourth, Elsten attempts to rebut Vaughan's reliance on multipliers to determine license value.  *Id.* at 73-79.  Fifth, Elsten asserts that Vaughan's opinion that CREXi's cropping policy harmed CoStar "lack[ed] evidentiary … support." *Id.* at 79-81.  Lastly, Elsten critiques Vaughan's reliance on "stipulations in prior CoStar litigations" because they supposedly "do not reflect the license amounts anyone actually paid to CoStar." *Id.* at 81.

## LEGAL STANDARD

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if …: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-94 (1993).  To verify that expert testimony abides by Rule 702's requirements, district courts play a "gatekeeping role," *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014), to "ensure that any and all [expert] testimony … is not only relevant, but reliable." *Deckers Outdoor Corp. v. Wal-Mart Stores, Inc.*, 2024 WL 2208099, at *8 (C.D. Cal. Apr. 9, 2024) (citation omitted).

## ARGUMENT

## I.    ELSTEN'S AFFIRMATIVE OPINIONS SHOULD BE EXCLUDED

Elsten is unqualified to offer any opinions regarding SEM, and her damages opinions are unreliable and unhelpful, and should be excluded.

**A.      Elsten Is Unqualified To Opine On Keyword Advertising Issues**

Elsten is admittedly not an expert in keyword advertising, and her lack of expertise is fatal to multiple opinions she proffers.  Elsten has never professionally worked in SEM or had responsibilities for keyword advertising.  Ex. 8 at 26:14-18, 27:8-22.  She has never published any papers, taught any courses, or received any training related to keyword advertising.  *Id.* at 32:14-22.  She obtained her knowledge regarding DKI—a feature central to CRExi's allegations—from her work on this case and from reviewing the "Google AdWords site" and doing "Google searches." *Id.* at 29:4-30:5.  She has testified in approximately 85 cases over the last 35 years, but has never been qualified by any court as an expert in SEM. *Id.* at 31:7-21.  When asked whether she considers herself to be an expert in SEM, Elsten testified "No....  I wouldn't tell someone, 'Hire me as your expert on this.'" *Id.* at 24:16-20.

Despite her lack of expertise, Elsten offers numerous opinions regarding keyword advertising, including:  the "industry practice of purchasing competitors' search engine keywords" (Ex. 1 at 13-14); what DKI is, and why and how advertisers use it (*id.* at 14-16); whether CoStar's use of CRExi's name in its keyword ads was intentional (*id.* at 26-31, 52-54); the value CoStar attributed to SEM and how CoStar used SEM to "hurt" CRExi (*id.* at 26-31); and how CoStar's SEM strategies changed (*id.* at 26-28, 52-54).[5]  Elsten should be precluded from explaining these issues to the jury because she lacks any specialized knowledge to do so.  *See, e.g.*, *Gilbert-Daniels v. Lions Gate Ent. Corp.*, 2023 WL 8938403, at *6 (C.D. Cal. Dec. 7, 2023) (excluding testimony from unqualified expert), *appeal filed*, No. 24-153 (9th Cir. Jan. 9, 2024).

This is not the first time that Elsten's opinions have veered outside of her expertise.  In *American Cruise Lines, Inc. v. HMS American Queen Steamboat Co.*,

---

[5] Elsten's opinion that CoStar wanted to "hurt" CRExi through its SEM is also not a proper expert opinion, as it is based solely on Elsten's interpretation of a handful of CoStar emails.  Ex. 1 at 28-31.

1   the court found that Elsten's opinions "drift[ed]" outside her expertise, including her

2   opinions "analyz[ing] product differentiation" between two cruise ship companies,

3   on "how consumers make purchasing decisions," or in interpreting "survey results,"

4   and excluded those opinions.  2017 WL 3528606, at *5 (D. Del. Aug. 26, 2017).

5   The Court should do the same here.

6           **B.    Elsten's Lost Profits Are Based On An Unreasonable Assumption**

7           While lost profits need not be calculated with "absolute exactness," a plaintiff

8   must have a "reasonable basis for the computation," and the calculation cannot be

9   based on "speculation or guesswork." *Brighton Collectibles, Inc. v. RK Tex. Leather*

10  *Mfg.*, 923 F. Supp. 2d 1245, 1254 (S.D. Cal. 2013) (citations omitted).  Elsten's

11  opinions that the allegedly infringing ads caused CREXi to lose somewhere between

12  $2.4 and $9.7 million in lost profits are based on an unreasonable assumption that

13  renders all of her calculations speculative and inadmissible. Ex. 1 at 47-48.

14          The starting point for all of Elsten's lost profits calculations is the assumption

15  that every click on the allegedly infringing ads represents a "lost" click for CREXi.

16  Ex. 1 at 33-35, 39.  Elsten assumes that searchers who supposedly set out looking

17  for CREXi's website, but mistakenly clicked on the allegedly infringing ads, were

18  "diverted" and that none of them would have back-clicked to the search results page

19  or run a new search to find CREXi's website. *See id.*  Elsten's assumption is at odds

20  with common experience and is unsupported by any facts or research.[6]  Elsten did

21  not test whether searchers who clicked on the allegedly infringing ads were likely to

22  end their search without attempting to find CREXi's website, Ex. 8 at 100:21-101:6,

23  104:16-105:3, nor does Elsten point to any research regarding internet searching

24  behavior that supports her assumption that searchers who were looking for CREXi's

25

26  [6] Elsten attempts (but fails) to disavow this assumption in her "further" amended
    report.  Ex. 1 at 33-35 n.165.  And, her latest "alternative" lost profits calculations
27  of $7.4 and $9.7 million, which would mean that CREXi lost around ▆▆▆▆▆▆▆▆
    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ due to a few keyword ads,
28  further confirms that her calculations are entirely speculative and unreliable.  *Id.* at
    47-48; Ex. 17.

website would have stopped looking just because they clicked on one of the allegedly infringing ads. *See* Ex. 1 at 33-35. And, Elsten acknowledged at her deposition that in her own internet searching, when she has clicked on a search result and been taken to a website she did not intend to visit, she is generally able to back-click or run a new search to find what she is looking for. Ex. 8 at 98:10-22. She also testified that there is no reason that searchers who were looking for CREXi would be unable to visit CREXi's website, yet inexplicably, she did not account for that reality in her lost profits calculation; instead she assumed no one who clicked on the allegedly infringing ads visited CREXi.com. *Id.* at 98:23-99:5, 102:22-103:4; Ex. 1 at 33-35. Elsten's assumption is not grounded in anything but her say-so and it renders her lost profits calculation speculative and inadmissible. *See Brighton*, 923 F. Supp. 2d at 1255 (expert's assumption that "every woman who bought a $20 or $50 knockoff would have paid over $200 for an authentic handbag" was unreasonable and rendered lost profits calculation inadmissible).

### C.    Elsten's "Cost-Savings" Opinion Should Also Be Excluded

Recognizing that CoStar realized no revenue (or profits) from the allegedly infringing ads, Elsten attempts to manufacture a theory of damages based on CoStar's supposed "cost-savings." Ex. 1 at 52-54. She opines that in early 2021, CoStar changed its SEM strategy to focus on "optimizing" its keyword advertising spend, and that strategy, which supposedly included bidding on CREXi keywords, resulted in approximately $2.3 million in "cost-savings" for CoStar. *Id.* Elsten is not qualified to offer any opinions regarding CoStar's SEM strategies, but even if she were, her "cost-savings" opinion is irrelevant and unreliable.

A plaintiff who proves that its trademark was infringed may recover its lost profits, or ***any profits*** the defendant realized as result of the infringement on a theory of disgorgement. *See Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993). There is no evidence that CoStar realized ***any profits*** from the allegedly infringing ads, and Elsten's opinions regarding CoStar's purported "cost-savings"

1  are irrelevant because CoStar's "cost-savings" are not recoverable.  *See Innovative*

2  *Fabrication Sch., Inc. v. Am. Fabrication Acad., Inc.*, 2023 WL 6787808, at *6 (C.D.

3  Cal. June 7, 2023) (plaintiff only entitled to disgorgement if it can "make at least a

4  prima facie showing of [defendant's ***profits*** from the allegedly infringing activity"

5  (emphasis added)).

6         Moreover, even if CoStar's "cost-savings" could be recovered, Elsten has not

7  demonstrated that the $2.3 million in "cost-savings" resulted from CoStar's alleged

8  infringement; indeed, Elsten admits that other (non-infringing) SEM strategies

9  contributed to the "cost-savings," and she did not even attempt to determine what

10 proportion of the $2.3 million was attributable to CoStar's alleged infringement.  Ex.

11 1 at 54 ("I have not attempted to calculate the portion of the $2.3 million benefit that

12 is attributable to infringement."); Ex. 8 at 80:7-21.  That failure renders her opinion

13 entirely unhelpful and irrelevant.  *See, e.g.*, *Lindy Pen*, 982 F.2d at 1408 (affirming

14 exclusion of disgorgement calculation based on defendant's "total sales" and not

15 sales stemming from the alleged infringement); *Kitsch LLC v. Deejayzoo, LLC*, 2021

16 WL 9734859, at *15-16 (C.D. Cal. Sept. 29, 2021) (similar).[7]

17        Elsten's opinion that CoStar realized "cost-savings" should also be excluded

18 because it is not the product of any specialized knowledge.  Instead, Elsten's opinion

19 is based on her interpretation of a single CoStar-produced document—an April 2021

20 presentation discussing CoStar's SEM efforts.  *See* Ex. 1 at 52-54 (interpreting and

21 summarizing the April 2021 presentation).  That presentation does not lend support

22 to Elsten's opinion, but more importantly, interpreting CoStar's documents is not a

23 reliable methodology for calculating damages.  *See Edwards Lifesciences Crop. v.*

24 *Meril Life Scis. Pvt., Ltd.*, 2021 WL 5407316, at *2-3 (N.D. Cal. Nov. 18, 2021)

25

26 [7] Elsten also testified that CoStar realized "cost-savings," not from the use of DKI and incorporating "CREXi" (inadvertently) into its keyword ads, but from bidding

27 on CREXi keywords.  Ex. 8 at 79:25-80:21.  But the commonplace tactic of bidding on a competitor's name as a keyword is not the allegedly infringing conduct, and Elsten thus has not connected any purported "cost-savings" to the alleged

28 infringement, which is also fatal to her opinion.  *See Mission Viejo Florist, Inc. v. Orchard Supply Co.*, 2019 WL 13045054, at *3 (C.D. Cal. Feb. 28, 2019).

(preventing expert from "summariz[ing] evidence"); *Waymo LLC v. Uber Techs., Inc*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017) (excluding expert's interpretation of documents because his "only contribution would be to pile on a misleading façade of expertise").

## II.    ELSTEN'S REBUTTAL OPINIONS SHOULD ALSO BE EXCLUDED

Many of Elsten's rebuttal opinions are also inadmissible.  Elsten offers opinions outside of her expertise, and even if she were qualified to offer them, her opinions are unhelpful and unreliable because she summarizes documents or internet research, improperly parrots opinions proffered by *another* expert, and does not apply any expertise to the facts of this case.

### A.    Many of Elsten's Rebuttal Opinions To Dudney Are Inadmissible[8]

#### 1.    Elsten's Opinions On The Parties' Business Models Are Unreliable And Unhelpful

Elsten opines that Dudney's analysis of CREXi's avoided costs ignores CoStar's and CREXi's different business models—specifically, CoStar's approach of building a library of owned CRE images, and CREXi's purported approach of relying on user-submitted information and photos for listings.  Ex. 4 at 5-12, 21-27, 35-37, 53-55.  Her opinion is unreliable and not the product of any expertise.

***First***, Elsten takes CREXi's assertion that it relies exclusively on user-generated content at face value, notwithstanding ample evidence that CREXi and its agents copied listings, including photos, from LoopNet.  Elsten's report completely ignores documents, *see, e.g.*, Ex. 10, and testimony from CREXi's corporate representative and others, *see, e.g.*, Ex. 14 at 175:12-176:8, that it was CREXi's practice and policy to copy listings, including photos, from LoopNet, which CREXi acknowledges was the only source of listings for certain properties.  "[W]here, as here, the expert has [formed an opinion] by ignoring evidence that is significant in

---

[8] CoStar does not move to exclude Ms. Elsten's analyses at pages 27-28 (Op. A.1.c), 44-49 (Op. A.2.b.2), 49-51 (Op. A.2.c), 52-53 (Op. A.2.d), 56-58 (Op.A.2.f) or 60-66 (Op. A.3.b) of her Amended Rebuttal Report.

both amount and relevance, [her] conclusion falls outside the realm of reliability and should not be presented to the jury." *Tate v. Smith*, 2020 WL 999758, at *2 (W.D. Wash. Mar. 2, 2020).

**Second**, Elsten's opinions on the merits of CoStar's and CREXi's models[9] are not based on specialized knowledge of the CRE industry or any other apparent expertise. *See, e.g.*, Ex. 4 at 5-8 (citing internet articles and blogs comparing "Web 1.0" and "2.0" (site-generated versus user-generated) approaches to content generation); *id.* at 6, 9 (characterizing CREXi's model as "modern" and "cost-efficient" and opining that it has allowed CREXi to "grow quickly"); *id.* at 8 (opining that CoStar's investment in photography operations "may no longer be necessary"); *id.* at 26 (criticizing CoStar's approach as "outdated" and "expensive"); *id.* at 36 (claiming a CRE image library may "even [be] a potential detriment" to CREXi in light of its user-generated business model).

Elsten admits she has no training in CRE, Ex. 8 at 162:13-17, and has never worked in the industry, *id.* at 162:18-163:20.  Prior to this case, she had never used (or even heard of) CoStar or CREXi, or any other online CRE marketplace.  *Id.* at 164:24-166:3.  Her knowledge of purported business practices of competing CRE platforms comes "[p]rimarily from online research." *Id.* at 179:5-23.  She has never been qualified to opine on any aspect of "Web 1.0" or "2.0" approaches to content generation or the advantages of those models. *Id.* at 181:11-20.  She does not have any relevant expertise that would allow her to opine on the merits of CoStar's decision to invest in a library of owned CRE images (or the appropriateness of its costs) and CREXi's supposed model of relying on user-generated content, and thus

---

[9] Elsten expends significant effort rebutting an opinion Dudney does not offer: Dudney does **not** opine that CREXi has to adopt CoStar's business model or build its own image library to compete with CoStar.  He opines that CoStar's costs of maintaining the library that CREXi infringed represents "**one way** of assessing" costs CREXi saved (and benefits it gained), assuming liability. Ex. 2 ¶¶ 9, 49; Ex. 9 at 112:17-118:16.

these opinions, which again drift off course, should be excluded. *See, e.g.*, *Am. Cruise Lines*, 2017 WL 3528606, at *5.

**Third**, her opinions regarding brokers' purported views of CoStar's and CREXi's businesses should be excluded. Elsten did not speak with any CRE brokers in connection with this case (or conduct any survey or focus group), and has never spoken with a broker regarding the process of listing CRE for sale or obtaining photos for listings. Ex. 8 at 177:9-179:4. Her opinions regarding brokers' views of CoStar and CREXi are based purely on Elsten's interpretation of cherry-picked online reviews and produced documents. *See, e.g.*, Ex. 4 at 9, 22-23 (citing reviews on "trustpilot.com" and "g.2.com"); *id.* at 30-32 (copying quotes from alleged customer "complaints"). Because any layperson can read online reviews and form his or her own opinion, an "expert" is not needed. *See, e.g.*, *In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab. Litig.*, 2021 WL 3168224, at *3 (C.D. Cal. July 22, 2021) (excluding supposed "expert" testimony where "evidence … can be readily understood by a jury" and the "jury can readily perform its duty unaided by purported expertise").

### 2. Elsten's Opinion On Alternative Methods CREXi Could Have Used To Procure Photos Is Not Based On Expertise Or Supported By Facts

Elsten's opinion that in "a hypothetical scenario" in which CREXi "would have needed to generate images of equivalent utility and quality to the [Infringed Images] in a 'timely manner,'" CREXi could have done so using various means short of developing an owned image library, Ex. 4 at 35-44, is not based on any expertise in either photography or the CRE industry (*see supra* at 5-6). Moreover, her opinion that CREXi could have obtained photos from professional photographers, freelancers, or Google Street View for listings, rather than infringing, is based on

unsupported factual assumptions and therefore is speculative and inadmissible.[10]
*Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *20 (C.D. Cal. Mar. 7, 2011) (excluding expert testimony "based on factual assumptions … entirely unsupported in the record").

**First**, Elsten admits she has no expertise that would allow her to assess whether photos "comparable" in quality to the Infringed Images are available from alternative sources. She has studied photography only as a "personal hobby;" she is not an expert of commercial photography. Ex. 8 at 168:18-169:25, 171:24-172:5. She is not qualified to offer opinions on the quality (or saleability) of CoStar's images and relies on another CREXi expert, Elsner, for those opinions. *Id.* at 172:7-173:5; Ex. 4 at 38, 43, 45. She admits she relied on "general visual knowledge"—nothing more—to conclude that freelancers on "gigwork" platforms like TaskRabbit, Upwork, and Thumbtack can provide photos of equivalent quality to the Infringed Images. Ex. 8 at 213:19-214:3, 214:22-216:8.

Elsten also admits that she relies "primarily" on Internet research for her conclusion that photos can be obtained from the sources she cites in a timely fashion. *Id.* at 206:10-207:9. Elsten, for example, cites a blog post for her understanding that "commercial photographers can create professional quality photos in a matter of a day or two."[11] Ex. 4 at 37-38, n.232. But Elsten admits she has never commissioned or licensed photos for use in online CRE listings, Ex. 8 at 177:3-8, or investigated brokers' process of obtaining photos for CRE listings, *id.* at 178:5-8, and thus has no basis to opine that photos could be timely obtained by CREXi from the sources she cites.

---

[10] Elsten's opinion that CREXi could have "do[ne] without" images or asked brokers "to provide ***different*** images" instead of infringing, Ex. 4 at 58-60, also should be excluded as counterfactual and irrelevant. If the jury finds CREXi liable for infringement, it is no answer to say CREXi could have chosen not to infringe and, therefore, its avoided costs from infringement are $0.

[11] When confronted at her deposition with the post—which, read in its entirety, suggests the process of obtaining professional CRE photos can take weeks—Elsten disavowed this source and pivoted to reliance on other internet research. Ex. 8 at 202:8-207:9.

***Second***, Elsten took no steps to determine whether it would have been feasible for CREXi to rely on the alternative photo sources she cites. Elsten devotes pages of her rebuttal report to summarizing packages and pricing offered by photography companies, Ex. 4 at 38-39, but admits she is not aware of any evidence that CREXi has ever used these companies to commission photos for *listings*. Ex. 8 at 208:22-211:22 ("I didn't investigate what [CREXi] has done in actual practice."). (They did not.) Critically, she did not even discuss with CREXi whether it would have been practical to use professional photography companies to secure photos for listings on the timeline required by brokers (*i.e.*, within days)—she simply assumed it would be "doable." *Id.* at 211:23-212:25. Elsten likewise admits that she is not aware of any evidence that CREXi (or any other CRE marketplace) has used "gigwork" platforms to hire freelancers to take photos for listings. *Id.* at 213:24-214:21.

Elsten repeats Elsner's opinion, which his own testimony undermined, that CREXi could have used Google Street View images for listings, Ex. 4 at 43-44, but this does not constitute proper expert testimony. *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003) (the "[federal] rules do not permit an expert to rely upon … opinions developed by another expert for the purposes of litigation"), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005). Elsten admits that, like Elsner, Ex. 7 at 280:20-281:4, she did not analyze whether Google Street View images are actually available for the properties at issue in this case, Ex. 8 at 220:3-221:18, does not know whether still images (as opposed to Google Maps or Street View API) are available for use in listings, *id.* at 222:6-227:21, and does not know whether CREXi had or could have obtained a contract with Google during the period of infringement that would have allowed it to use Google's images in listings, *id.* at 227:22-229:19. (It did not and could not.) Her opinions are speculative and should be excluded.

### 3.    Elsten's Opinions That CREXi Has Not Benefitted From Its Infringement Are Also Inadmissible

Elsten offers two opinions to suggest that CREXi did not derive a benefit from its infringement of CoStar's photos, both of which are inadmissible.

*First*, Elsten opines that Dudney does not consider CREXi's efforts to remove Infringed Images from its website or prevent further infringement of CoStar images (*e.g.*, by using image filters), which she asserts "had no discernible impact on CREXi's operations" and thus shows that "CREXi's business did not depend on" its use of CoStar images. Ex. 4 at 28-30. This "opinion" that the presence (or absence) of infringement did not affect CREXi's business is not based on any analysis. *Id.* at 29. And Elsten again ignores evidence that CREXi had a practice and policy of copying from LoopNet, that CREXi acknowledges some listings could only be found on LoopNet, *see supra* at 12, and that CREXi thus necessarily could only achieve its goal of having "all" the listings on its platform, *see, e.g.*, Ex. 11 at 4, 40, by copying from LoopNet. She also ignores evidence that CREXi acknowledges photos are essential for listings, Ex. 15 at 233:8-9 ("[A] listing with pictures is always better"), and listings are essential for growing CREXi's business, *see, e.g.*, Ex. 12 at -799-800 (█████████████████████████████████████████████████████████████ █████████████████████████). Instead, Elsten simply recites CREXi talking points based on a one-sided review of (disputed) evidence, which is improper. *See Waymo*, 2017 WL 5148390, at *4; *In re Ford*, 2021 WL 3168224, at *3.

*Second*, Elsten opines that Dudney "ignores evidence" that brokers "place little value on CoStar's static library of pre-existing images" based on her interpretation of a handful of communications with customers produced by CoStar and CREXi, and claims that these communications "undermine[]" Dudney's "assumption" that CRE marketplaces "must" have pre-existing libraries of CRE images.[12] Ex. 4 at 30-32. But it is ***Elsten*** who ignores evidence that brokers license

---

[12] This is not Dudney's opinion. *See supra* n.9.

millions of CoStar images for use in marketing their properties, *see, e.g.*, Ex. 13 at -769–771; Ex. 16 at 59:21-25.  Elsten's one-sided review of the record is unreliable, *Tate*, 2020 WL 999758, at *2, and will not assist the jury, which is well-positioned to evaluate the (complete) record, *see Edwards Lifesciences*, 2021 WL 5407316, at *2.

### 4.    Elsten's "Legal" Opinions Are Improper And Wrong

Elsten devotes pages of her rebuttal report to argue that Dudney's analysis of CoStar's costs does not comport with Ninth Circuit law, Ex. 4 at 32-35, or the Ninth Circuit's Model Jury Instruction regarding statutory damages, *id.* at 66-67.  Elsten's (wrong) opinions on the application of Ninth Circuit law are improper.  *See, e.g.*, *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1233 (E.D. Cal. 2005) ("[E]xpert testimony consisting of legal conclusions is generally inappropriate.").

### B.    Elsten's Attempts to Rebut Vaughan's Opinions Are Inadmissible

### 1.    Elsten Is Not Qualified To Opine On Image Licenses Or Watermarks

Elsten admits she is "not presented here as an expert in commercial photography." Ex. 4 at 68.  Outside of "*four* instances in which [she has] negotiated or consulted on licensing involving photographs" from "approximately 5 and 15 years ago," Elsten has *no* experience in image licensing; she has never been qualified as an expert to opine on an "affirmative model" to "construct a hypothetical negotiation to determine a reasonable royalty for a license of the CoStar images;" she has not "handle[d] issues related to watermarking images in any of [her] professional roles;" she has not "consulted with a business on issues related to watermarking images;" and she has never been qualified to provide an expert opinion on the use of watermarks to manage copyrighted content.  Ex. 8 at 287:20-25, 293:10-17, 298:17-299:2.  Rather, she was drafted in to offer image-related opinions far beyond her expertise in the wake of the deposition of CREXi's stock

image licensing expert, in which he conceded, among other things, that he had not even looked at 98% of the Infringed Images, had no idea if CREXi had used any such images, and was unaware of the terms on which CoStar licensed them.  Ex. 7 at 120:13-18, 187:9-188:2, 240:10-12, 250:4-6.  Because Elsten does not herself "possess[] the requisite knowledge in the area of copyright licensing," her last-minute rebuttals to Vaughan's opinions are inadmissible.  *Watson v. K2 Design Grp., Inc.*, 2016 WL 11783284, at *3-4 (S.D. Fla. Aug. 9, 2016); *see also Freeman v. Ethicon, Inc.*, 2022 WL 4601661, at *1-2 (C.D. Cal. Aug. 26, 2022) (Marshall, J.) (striking opinion where expert "does not have the requisite training and education").

### 2.    Elsten's Opinion Regarding Vaughan's "Construction" Of A Hypothetical License Is An Impermissible Legal Opinion

Elsten's rebuttal regarding Vaughan's "construction" of a hypothetical license is an impermissible legal opinion, as the entire rebuttal is based on Elsten's summary of one *patent* case and two "copyright infringement cases."  Ex. 4 at 68-69, App. A. She selectively quotes (some of the) factors those courts considered when evaluating hypothetical license values, asserts that, "[i]n [her] experience, … these factors are consistent with those considered by negotiators for IP licenses," then claims (falsely) that Vaughan did not consider "many" such factors.  *Id.* at 69-70.  But Elsten does not explain what experience informs that opinion, or even attempt to use her "expertise" by applying those factors to the record evidence.  Because Elsten's rebuttal "reads more like a legal memorandum to the Court" than an expert report, her opinions should be excluded.  *Mass Engineered Design, Inc. v. Planar Sys., Inc.*, 2017 WL 2642277, at *14 (D. Or. June 19, 2017).

### 3.    Elsten's Opinion Regarding "Quantifiable Data" Is Irrelevant And Relies On An Unreliable Methodology

Elsten also opines that Vaughan's failure to categorize images based on their quality or whether they are interior or exterior images artificially inflated Vaughan's license valuations because, according to Elsten, (1) such categorizations affect

license value, and (2) the "majority" of Infringed Images fall into categories that should have depressed their license value. Ex. 4 at 70. That rebuttal is inadmissible for two separate reasons.

**First**, Elsten's assumption that these categorizations impact license value is based solely on Elsner's (separately unsupported) opinions, including Elsner's counterfactual conclusion that images used by CREXi were not "saleable." *Id.* But Elsten is not permitted to rely upon Elsner's opinions developed for purposes of litigation, *Imperial Credit*, 252 F. Supp. 2d at 1012, and certainly not when those opinions were undermined in that other expert's deposition. *See* Ex. 7 at 106:20-112:9.

**Second**, Elsten's claim that the "majority" of Infringed Images fall into categories that depress license value is based exclusively on extrapolations from Elsten's flawed image analysis. Elsten did "not examine all 50,000 images" at issue. Ex. 8 at 272:23. She relied on Elsner's categorization of 1,000 Infringed Images without independently verifying the accuracy of his categorizations. *Id.* at 271:7-16. She then assumed, without support, that Elsner's analysis of 2% of Infringed Images was representative of all Infringed Images and extrapolated Elsner's categorizations across all Infringed Images. *See* Ex. 4 at 70. Elsten's failure to "conduct[] [any] independent [analysis]" of the Infringed Images "casts doubt on the reliability of [her] opinions, as does the notion that [she] replicated large portions of [Elsner's] expert opinions and adopted them as [her] own," rendering the rebuttal inadmissible. *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 545 (C.D. Cal. 2012).

### 4. Elsten's Opinion Regarding Vaughan's Use Of Getty Images Is Unreliable

To determine the benchmark license value for the Infringed Images, Vaughan identified comparable images in Getty's image library—the largest image licensing library in the world—then relied on the Getty Calculator to determine the base

license value.  Ex. 3 ¶¶ 61-67.  Elsten offers two rebuttals to Vaughan's opinions, both of which run afoul of Rule 702.  *See* Ex. 4 at 71.

*First*, Elsten recycles "several fact-based critiques" regarding Vaughan's use of Getty from the "[t]he Elsner Rebuttal Report."  *Id.*  As discussed, however, an expert may not parrot the opinions of another expert in this way.  *Imperial Credit*, 252 F. Supp. 2d at 1012.

*Second*, Elsten faults Vaughan for not discounting the license value based on the average number of days that CREXi displayed the Infringed Images on CREXi.com.  Ex. 4 at 72.  That average was determined using a basic Excel function to calculate the number of days between the date an image was displayed on CREXi.com to when it was purportedly taken down.  *See id.*  That calculation is not "beyond the common knowledge of the average layperson," and thus reflects no special expertise.  *United States v. Chavez*, 2021 WL 5810298, at *2 (N.D. Cal. Dec. 7, 2021) (excluding expert testimony "on a lay issue" as it would "invade the province of the jury").[13]

### 5.  Elsten's Opinion Regarding Vaughan's Use Of Multipliers Is Also An Improper Legal Opinion And Unreliable

After determining the benchmark license value for the Infringed Images, Vaughan applied multipliers to account for the scarcity of the images (CREXi purportedly only copied when it had no other source) as well as the way in which CREXi used them (*i.e.*, to compete with CoStar).  Ex. 3 ¶¶ 70-75; Ex. 5 ¶¶ 11-36.  None of Elsten's rebuttals to Vaughan's use of multipliers are admissible.

*First*, Elsten purports to summarize what "courts hold" vis-à-vis multipliers to conclude that Vaughan's use of them is impermissible.[14]  Ex. 4 at 73.  Yet as

---

[13] Elsten's assumption that license value is driven by the time CREXi displayed the Infringed Images also is an improper legal opinion because it is based on Elsten's interpretation of (out-of-circuit) case law.  Ex. 4 at 72-73; *see supra* at 19.

[14] For instance, Elsten claims that courts would "reject" Vaughan's use of multipliers because, according to Elsten, Vaughan "provides no objective evidence to support" her use of them.  Ex. 4 at 73.  That assertion is false, thus separately misleading and

discussed, "instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin. v. Cass. Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (citation omitted); *see also United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 337 (9th Cir. 2017) (similar).[15]

**Second**, Elsten avers that Vaughan's multipliers result in a license value that "no reasonable licensee could agree to … or that any prudent licensor would require or expect" because, in her opinion, there are "several, far less expensive alternatives." Ex. 4 at 77-78. As discussed, however, those (unavailable) "alternatives" are based on an unreliable methodology that separately doom her rebuttal. *Supra* at 14-16.

### 6.   Elsten's Rebuttal To Vaughan's Opinion On Harm Purports To Recite Facts Without Applying Expertise

Elsten faults Vaughan for not "cit[ing] any evidence, … studies, surveys, articles, or other reasonably reliable sources" in support of Vaughan's opinion that CREXi's watermark-cropping policy harmed CoStar. Ex. 4 at 79. As a result, and as though Elsten is the factfinder, she proffers that Vaughan "fail[ed] to prove" that CREXi's watermark-cropping policy will continue to harm Costar "in the future." *Id.* at 80. Yet again, this rebuttal merely echoes lawyer argument with the gloss of an expert, which is misleading and unhelpful to the trier of fact. *See, e.g., Waymo*, 2017 WL 5148390, at *4.

---

inadmissible. *Waymo*, 2017 WL 5148390, at *5. For example, Vaughan relied on invoices reflecting the application of multipliers, Ex. 5 ¶ 31, and she spoke with Nancy Wolff—Past President of the Copyright Society of the USA, a member of the ABA IP Task Force on Copyright Reform, and counsel for the Digital Media Licensing Association—who reinforced Vaughan's use of multipliers. *Id.* ¶¶ 33-35. Indeed, consistent with Vaughan's opinions, Ms. Wolff agreed that multipliers are "tools to determine the market value of a license based on specific factors." *Id.* ¶ 34; *see also id.* at Ex. B.

[15] Elsten's (impermissible) legal analysis also is misleading as she **ignored** two cases she **considered** in forming her opinions but did not cite in her report, both of which **approved** the use of multipliers "to properly account for fair market value," as Vaughan does. *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 2020 WL 60351, at *8 (D.N.H. Jan. 6, 2020); *Under a Foot Plant, Co. v. Exterior Design, Inc.*, 2017 WL 3593014, at *5 (D. MD. Aug. 21, 2017).

1  **7.    Elsten's Opinion Regarding Judgments Is Unreliable**

2      In support of her opinion regarding hypothetical license value, Vaughan noted

3  that CoStar has obtained multiple judgments that corroborate her license valuation.

4  Ex. 3 at 13 n.40; Ex. 5 ¶¶ 37-39.  In rebuttal, Elsten asserts that those judgment

5  amounts "do not reflect the license amounts anyone actually paid to CoStar."  Ex. 4

6  at 81.  She reaches that (factually erroneous) conclusion by dividing the settlement

7  amount from just one case by the number of infringements in that case to conclude

8  that the settlement payment was less than the court-ordered judgment.  *Id.*  Putting

9  aside that Elsten *ignored* record evidence undermining her conclusion, *see* Ex. 5

10  ¶ 39, Elsten offers nothing more than "grade-school arithmetic counsel can do on an

11  easel," which does not require any expertise.  *Waymo*, 2017 WL 5148390, at *5.

12  <u>**CONCLUSION**</u>

13      For the foregoing reasons, the Court should grant CoStar's motion.

14

15  Dated:  September 9, 2024                Respectfully submitted,

16                                          **LATHAM & WATKINS LLP**

17                                          By:  */s/ Nicholas J. Boyle*
                                                 Nicholas J. Boyle
18                                               (admitted *pro hac vice*)
                                                 Sarah A. Tomkowiak
19                                               (admitted *pro hac vice*)
                                                 Anne C. Malinee
20                                               (admitted *pro hac vice*)
                                                 555 Eleventh Street, NW
21                                               Suite 1000
                                                 Washington, D.C. 20004
22                                               Tel: 202.637.2200
                                                 Fax: 202.637.2201
23                                               Email: nicholas.boyle@lw.com
                                                        sarah.tomkowiak@lw.com
24                                                      anne.malinee@lw.com

25
                                                 Elyse M. Greenwald
26                                               (Bar No. 268050)
                                                 10250 Constellation Boulevard
27                                               Suite 1100
                                                 Los Angeles, CA 90067
28                                               Tel: 424.653.5525

Fax: 424.653.5501
Email: elyse.greenwald@lw.com

Caitlin E. Dahl
(admitted *pro hac vice*)
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767
Email: caitlin.dahl@lw.com


*Attorneys for Plaintiffs and
Counterdefendants CoStar Group, Inc.,
and CoStar Realty Information, Inc.*

CASE NO. 2:20-cv-08819-CBM-AS
COSTAR'S MOTION TO EXCLUDE
OPINIONS OF CATE ELSTEN

1

## **CERTIFICATE OF COMPLIANCE**

2      The undersigned, counsel of record for Plaintiffs and Counterdefendants

3   CoStar Group, Inc. and CoStar Realty Information, Inc., certifies that this brief

4   contains 6,997 words, which complies with the word limit of L.R. 11-6.1.

5

6   Dated:  September 9, 2024      By:  */s/ Nicholas J. Boyle*

7                                         Nicholas J. Boyle

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28