1  ELYSE M. GREENWALD (BAR NO. 268050)
   elyse.greenwald@lw.com
2  LATHAM & WATKINS LLP
   10250 Constellation Boulevard
3  Suite 1100
   Los Angeles, CA 90067
4  Tel: 424.653.5500
   Fax: 424.653.5501
5
   *Attorneys for Plaintiffs and Counterdefendants*
6  *CoStar Group, Inc. and CoStar Realty Information, Inc.*

7  [Additional Counsel Listed on the Next Page]

8            **UNITED STATES DISTRICT COURT**
             **CENTRAL DISTRICT OF CALIFORNIA**
9

10 COSTAR GROUP, INC., and            CASE NO. 2:20-cv-08819-CBM-AS
   COSTAR REALTY INFORMATION,
11 INC.,

12        Plaintiffs,                  Assigned to Hon. Consuelo B. Marshall
                                       Hon. Alka Sagar, Magistrate Judge
13        v.
                                       **COSTAR'S NOTICE OF MOTION**
14 COMMERCIAL REAL ESTATE             **AND MOTION TO EXCLUDE**
   EXCHANGE, INC.,                     **OPINION FIVE OF ANDREW**
15                                     **CRAIN; MEMORANDUM OF**
          Defendant.                   **POINTS AND AUTHORITIES IN**
16                                     **SUPPORT THEREOF**
   COMMERCIAL REAL ESTATE
17 EXCHANGE, INC.,                     Date:   January 7, 2025
                                       Time:   10:00 a.m.
18        Counterclaimant,             Place:  8D
                                       Judge:  Hon. Consuelo B. Marshall
19        v.
                                       Trial Date:   March 11, 2025
20 COSTAR GROUP, INC., and
   COSTAR REALTY INFORMATION,
21 INC.,

22        Counterdefendants.

23

24

25

26

27

28

NICHOLAS J. BOYLE*
nicholas.boyle@lw.com
SARAH A. TOMKOWIAK*
sarah.tomkowiak@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201


CAITLIN E. DAHL*
caitlin.dahl@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767


* Admitted pro hac vice

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that on January 7, 2025, at 10:00 a.m., or as soon thereafter as this matter can be heard, in the courtroom of the Honorable Consuelo B. Marshall, located at the First Street Courthouse, 350 W. 1st Street, Los Angeles, CA 90012, Courtroom 8B, Plaintiffs and Counterdefendants CoStar Group, Inc., and CoStar Realty Information, Inc. (collectively "CoStar") will move for an order to exclude expert opinion number five and related testimony of Andrew Crain, a witness for Defendant and Counterclaimant Commercial Real Estate Exchange, Inc. ("CREXi").  CoStar respectfully requests such an order pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-94 (1993).

This Motion is supported by the accompanying Memorandum of Points and Authorities, the Declaration of Carly Grimes, Exhibits filed herewith, along with the arguments of counsel, the Court's record on this matter, including all pleadings filed to date, and any other evidence or argument that the Court may consider in deciding this Motion.

**Compliance with Local Rule 7-3.**  This Motion is made following a meet-and-confer discussion with counsel on August 29, 2024.  The parties were unable to resolve the issues raised by this Motion.

Respectfully submitted,

Dated:  September 9, 2024          **LATHAM & WATKINS LLP**

By:  */s/ Nicholas J. Boyle*
Nicholas J. Boyle
(admitted *pro hac vice*)
Sarah A. Tomkowiak
(admitted *pro hac vice*)
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201
Email: nicholas.boyle@lw.com

sarah.tomkowiak@lw.com

Elyse M. Greenwald
(Bar No. 268050)
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525
Fax: 424.653.5501
Email: elyse.greenwald@lw.com

Caitlin E. Dahl
(admitted *pro hac vice*)
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767
Email: caitlin.dahl@lw.com

*Counsel for CoStar Group, Inc., and
CoStar Realty Information, Inc.*

# **TABLE OF CONTENTS**

I.    INTRODUCTION..................................................................................1

II.   BACKGROUND AND SUMMARY OF OPINION 5 ...................................3

III.  LEGAL STANDARD............................................................................7

IV.   ARGUMENT .....................................................................................9

      A.    The Court's Denial Of CREXi's Request To Add
            Counterclaims Underscores That Mr. Crain's Opinion 5
            Is Irrelevant ...........................................................................10

      B.    Mr. Crain Does Not Apply His Expertise In Digital
            Forensics, Or Independently Verify Any Data, To Reach
            Opinion 5................................................................................11

            1.    Mr. Crain Improperly Parrots Numbers From The
                  CoStar Outbound Log Spreadsheet Without
                  Applying His Expertise .................................................11

            2.    Mr. Crain Did Not Independently Verify The
                  CREXi Mixpanel Spreadsheet Or Apply His
                  Expertise To It ............................................................13

            3.    Mr. Crain's Analysis Of The Data Scraped From
                  CREXi Is Basic Math With No Added Expertise ..................17

V.    CONCLUSION ..................................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Baker v. Firstcom Music*,
   2018 WL 2676636 (C.D. Cal. May 8, 2018).........................................................15

*Call Delivery Sys., LLC v. Morgan*,
   2022 WL 1252412 (C.D. Cal. Mar. 7, 2022) ...............................................8, 15

*Cholakyan v. Mercedes-Benz, USA, LLC*,
   281 F.R.D. 534 (C.D. Cal. Mar. 28, 2012).....................................................8, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ...............................................................................................8

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
   2021 WL 5407316 (N.D. Cal. Nov. 18, 2021)....................................................11

*Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*,
   2018 WL 5793479 (N.D. Cal. Nov. 2, 2018)f .....................................................12

*Fosmire v. Progressive Max Ins. Co.*,
   277 F.R.D. 625 (W.D. Wash. Oct. 11, 2011)................................................8, 15

*Garcia v. Los Banos Unified Sch. Dist.*,
   2007 WL 715526 (E.D. Cal. Mar. 8, 2007) ........................................................15

*In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab.
Litig.*,
   2019 WL 7177984 (C.D. Cal. Dec. 2, 2019) ......................................................9

*Messick v. Novartis Pharms. Corp.*,
   747 F.3d 1193 (9th Cir. 2014)...............................................................................8

*Pakootas v. Teck Cominco Metals, Ltd.*,
   2012 WL 1833397 (E.D. Wash. Apr. 4, 2012) ....................................................9

*R&O Constr. Co. v. Rox Pro Int'l Grp., Ltd.*,
   2011 WL 2923703 (D. Nev. July 18, 2011).......................................................10

*ReBath LLC v. HD Sols. LLC*,
   2022 WL 2527113 (D. Ariz. July 7, 2022) ....................................................9, 17

*Stop Staring! Designs v. Tatyana, LLC*,
  2011 WL 13124123 (C.D. Cal. Aug. 11, 2011) .................................................. 10

*Think20 Labs LLC v. Perkinelmer Health Scis., Inc.*,
  2023 WL 9005633 (C.D. Cal. Nov. 30, 2023) ...................................................... 9

*United States v. Chavez*,
  2021 WL 5810298 (N.D. Cal. Dec. 7, 2021) ...................................................... 12

*United States v. Morales*,
  108 F.3d 1031 (9th Cir. 1997) ............................................................................... 8

*Waymo LLC v. Uber Technologies, Inc.*,
  2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ......................................... 9, 12, 17

**RULES**

Fed. R. Civ. P. 26(a)(2)(D)(ii) ................................................................................ 10

Fed. R. Evid. 702 ...................................................................................................... 8

# I.    INTRODUCTION

In this litigation, CoStar alleges that CREXi committed mass copyright infringement by harvesting tens of thousands of CoStar-copyrighted photographs of commercial properties from CoStar's LoopNet platform, in order to build CREXi's competing property-listing website. Dkt. 841 ¶ 2. Documents and testimony produced by CREXi have confirmed the willfulness of this infringement, revealing that CREXi and its agents frequently accessed CoStar's LoopNet website to obtain commercial real estate photographs whenever they deemed necessary, and then cropped out CoStar's watermark to cover their tracks, pursuant to a company-wide "copy and crop" policy. *See, e.g.*, *id.* ¶¶ 10-12.

To further assist the trier of fact in understanding the extent of CREXi's access of LoopNet, CoStar proffered an expert witness, Daniel Roffman—who has over 20 years of digital forensics experience—to identify and analyze records in CoStar's LoopNet access logs that could be attributed to CREXi or its agents. Ex. 2 ¶¶ 1, 7.[1] Based on his review and analysis of these LoopNet logs (which are so voluminous that they require a specialized program to even open them), and using an IP address identification technique, among other methodologies, Mr. Roffman opines that CREXi associated sessions accounted for over 8 million hits to LoopNet between January 1, 2016 and April 28, 2023, and that indicators of CREXi are present in over 31,000 LoopNet sessions. *Id.* ¶¶ 103, 105; Grimes Decl. ¶ 3.

CREXi proffered Andrew Crain as a rebuttal expert to Mr. Roffman. CoStar does not dispute that Mr. Crain is generally qualified as an expert in digital forensics, and does not seek to exclude Mr. Crain's Opinions 1-4, which consist of purported critiques of Mr. Roffman's methodology and conclusions. *See generally*, Ex. 1. However, Mr. Crain's fifth opinion—ostensibly a "rebuttal," but in reality an affirmative opinion—should be excluded as irrelevant, unreliable, and unhelpful to the factfinder. Mr. Crain's Opinion 5 attempts to quantify CoStar's activity on

---

[1] All exhibits cited herein are exhibits to the supporting declaration of Carly Grimes.

CREXi's platform (a topic rendered even more irrelevant by the Court's recent denial of CREXi's motion for leave to amend to add counterclaims based on CoStar's competitive intelligence scrape of publicly available content on CREXi's website). *Id.* This opinion consists entirely of content inappropriate for an expert report.

Specifically, Opinion 5 cites three data sources that purport to reflect access by CoStar to CREXi, yet Mr. Crain did not rely on any expertise to analyze, verify, or even interpret these sources—rather, Mr. Crain simply reports straightforward information about, for instance, the number of rows and the titles of columns in these spreadsheets. Each of these sources was compiled by CoStar or CREXi with no involvement from (and certainly not any verification by) Mr. Crain. In fact, Mr. Crain was unable to answer simple questions at his deposition about how these data sources were culled, why the access was attributable to CoStar, and whether any deduplication methods were applied to the data. Worse still, Mr. Crain admitted at his deposition that a fourth source of data—CREXi's inbound access logs (*i.e.*, logs comparable to the LoopNet logs analyzed by Mr. Roffman)—would be forensic evidence of CoStar's access to CREXi's website, yet he did not (i) consider that data, (ii) know whether it exists, or (iii) even think to ask for it. Ex. 6, Crain Dep. Tr. at 170:12-171:2.

Mr. Crain's Opinion 5 is nothing more than lawyer argument about party-produced documents dressed up as an expert opinion. Even if it was somehow relevant to CoStar's infringement claims, Opinion 5 would cause confusion by giving the spreadsheets, about which Mr. Crain reports basic information, unmerited credibility through their presentation via an expert. For these reasons, CoStar respectfully requests that the Court exclude Mr. Crain's Opinion 5 and related testimony.

## II.    BACKGROUND AND SUMMARY OF OPINION 5

On March 19, 2024, CoStar served Mr. Roffman's expert report.[2]  On April 19, 2024, CREXi served Mr. Crain's rebuttal report, which Mr. Crain subsequently amended on May 6, 2024.  Ex. 1 ("Crain Report").  On May 24, 2024, Mr. Roffman served a supplemental report to address Mr. Crain's Opinion 5, because the subject matter of Opinion 5 was outside the scope of Mr. Roffman's affirmative report.  On August 6, 2024, CoStar served amended versions of Mr. Roffman's affirmative report, Ex. 2 ("Roffman Report"), and supplemental report, Ex. 3 ("Roffman Supplemental Report") to address additional factual developments.  CoStar deposed Mr. Crain on July 26, 2024.

The Roffman Report analyzes CoStar's LoopNet logs (voluminous, customized inbound access logs that track access to CoStar's LoopNet website) to determine what records may be attributable to CREXi.  Mr. Roffman applied his digital forensics expertise, an IP address identification methodology, and other investigative techniques and systematic processes to quantify the number of LoopNet sessions and "hits" (or records) that indicate access to LoopNet by CREXi or its agents.  He also used various methodologies to attempt to eliminate from his conclusions any records relating to CoStar's own access to LoopNet, third-party broker access to LoopNet, or indirect access through a LoopNet linked plugin that can appear on third-party websites.  *See* Ex. 2, Roffman Report app. C (explaining Mr. Roffman's methodology for requesting, analyzing, and culling access data).  Mr. Roffman opined that the activity in the LoopNet sessions he associated with CREXi supports a conclusion that CREXi conducted an anonymous online campaign, and that it is highly likely that CREXi and its agents have accessed LoopNet beyond the activity highlighted in Mr. Roffman's report. *See, e.g.*, *id.* ¶¶ 117-18, 133 (explaining use of VPNs supports conclusion that CREXi tried to make its LoopNet

---

[2] CoStar served an amended version of this report on March 27, 2024, which corrected some minor errors on Mr. Roffman's list of materials considered.

access difficult to trace), ¶¶ 128-133 (identifying LoopNet user accounts likely used by CREXi with hits to LoopNet not included in Mr. Roffman's quantification of CREXi access to LoopNet).

The Crain Report's Opinions 1-4 constitute attempted rebuttal to the Roffman Report. In Opinions 1-4, Mr. Crain uses his own expertise in digital forensics to analyze the same data considered by Mr. Roffman and attempts to undermine attribution of LoopNet access to CREXi through analysis including IP address investigation and deduplication. *See, e.g.*, Ex. 1, Crain Report ¶ 22 (using an IP address investigation tool to isolate mobile IP addresses). Mr. Crain also uses his expertise to explain the use of different technology used to access LoopNet, as reflected in the LoopNet logs, such as the use of VPNs and proxy servers. *See, e.g.*, *id.* ¶ 70. Though CoStar disagrees with aspects of Mr. Crain's methodology and his conclusions in Opinions 1-4, CoStar is not seeking to exclude these opinions under Rule 702 or *Daubert* precedent.

It is in Opinion 5 that Mr. Crain's analysis becomes irrelevant and ceases to qualify as expert. In this opinion, Mr. Crain concludes that "<u>Mr. Roffman fails to consider in his opinion CoStar's own activity on CREXi's platform, which was equally, if not more, extensive than the activity on LoopNet that he attributes to CREXi</u>." *Id.* ¶ 18. To start, the subject matter of Opinion 5 is irrelevant and not actually a rebuttal to Mr. Roffman's opinions quantifying CREXi access to LoopNet. But more critically, Opinion 5 is not a conclusion that Mr. Crain reached by applying his expertise. Instead, Opinion 5 consists of straightforward recitals of numbers in three types of spreadsheets produced by the parties in this litigation.

<u>CoStar Outbound Logs Spreadsheet</u>. Mr. Crain relies on a spreadsheet reflecting data from CoStar's outbound access logs that was compiled and produced by CoStar in response to an interrogatory in this litigation. *Id.* ¶ 78 (citing Ex. 5, CoStar App. G). This spreadsheet reflects CoStar's records of access to CREXi from the CoStar network for an approximately three-month period in 2020, listing access

date, web domain (e.g., crexi.com), and employee name. *Id.* ¶ 76. Mr. Crain summarizes this information as follows, without analysis: "The outbound information that CoStar produced shows 7,418 instances of access to CREXi, by almost 800 different CoStar employees, in the span of 90 days, between July 8, 2020, and October 5, 2020. Over that approximately three-month period, CoStar employees accessed CREXi from CoStar's network an average of 82 times per day." *Id.* ¶ 78.[3] Mr. Crain qualifies this summary by claiming that he "cannot generate a complete analysis of CoStar's activity on CREXi's platform, comparable to Mr. Roffman's analysis of CREXi's activity." *Id.* ¶ 76. At his deposition, Mr. Crain acknowledged that CREXi's inbound access logs would be digital forensic evidence of CoStar's access to CREXi's website (and presumably, would be comparable to CoStar's LoopNet logs analyzed by Mr. Roffman, which are a customized form of inbound access log). Ex. 6, Crain Dep. Tr. at 165:13-25, 167:16-21, 168:17-19. But Mr. Crain went on to testify that he did not (i) consider the CREXi inbound access logs, (ii) know whether they exist, or (iii) even think to ask for them. *Id.* at 170:12-171:2. When asked why not, Mr. Crain testified that "I guess I don't recall, really. There was not some reason to not ask," and "I don't know. We just didn't ask for that." *Id.* at 164:25-165:7, 167:16-21. As a result, he, in his own words, "cannot generate a complete analysis … comparable to Mr. Roffman's[.]" Ex. 1, Crain Report ¶ 76.

CREXi Mixpanel Spreadsheet. Mr. Crain next relies on a spreadsheet reflecting data from an application called Mixpanel that was compiled and produced by CREXi in response to an interrogatory in this litigation. *Id.* ¶ 80 (citing Ex. 4, CREXi's App. G). When asked at his deposition what Mixpanel is, Mr. Crain

---

[3] Mr. Crain also summarizes a similar spreadsheet produced by CoStar that reflects access from the CoStar network to other third-party websites. In that summary, Mr. Crain simply filters one column in the Excel spreadsheet to de-select two website domains and then reports the remaining number of entries reflected in that spreadsheet. Ex.1, Crain Report ¶ 79. As with the CoStar Outbound Log Spreadsheet, any layperson with Microsoft Excel software can do the same.

testified that "it's logging from a third-party product that CREXi uses to sort of gain insights about sort of user experience on their platform.... I don't think I've worked with their data before.... It's tracking, like, user events on the platform." Ex. 6, Crain Dep. Tr. at 171:22-172:22. The Mixpanel spreadsheet shows certain events that took place on CREXi's website, which were selected and filtered from a larger data set. When asked who culled the underlying Mixpanel data to create the Mixpanel spreadsheet, Mr. Crain testified that he "believe[d]" CREXi did so but "I just don't know." *Id.* at 175:5-13.

Notwithstanding his unfamiliarity with the software that generated the data, or the way in which the data was compiled, Mr. Crain claims that this spreadsheet reflects "access on CREXi by individuals affiliated with CoStar, or from IP addresses that CoStar has identified as ones that it used, between January 6, 2016, and January 13, 2024" and that this data "shows that at least 117 CoStar-affiliated users visited CREXi on hundreds of occasions, and that their actions triggered more than 57,287 events on CREXi's platform." Ex. 1, Crain Report ¶ 80.

When asked whether Mr. Crain did "anything to independently verify that [the Mixpanel spreadsheet], in fact, reflects access by CoStar people on the CREXi platform," Mr. Crain testified that "I worked off of [the Mixpanel spreadsheet], as provided to me. So you are correct; I didn't do independent verification of that." Ex. 6, Crain Dep. Tr. at 186:2-8. Mr. Crain testified that he did not look at Mixpanel itself or perform any analysis on the full underlying Mixpanel data which he never saw, instead relying solely on the Mixpanel spreadsheet compiled by CREXi. *Id.* at 174:18-175:9. Further, Mr. Crain did not know how many events CREXi tracks through Mixpanel for each visit to a single CREXi webpage (meaning he does not know whether a user visiting a single CREXi page would trigger one, five, or twenty events tracked by CREXi in Mixpanel). *Id.* at 173:10-174:7. Mr. Crain did not know what specific events logged in the Mixpanel spreadsheet meant and had not reviewed any Mixpanel documents explaining the meaning of events, despite

1    "hazarding a guess" that Mixpanel "probably has some documentation that goes with

2    it." *Id.* at 193:11-194:10.  Mr. Crain testified that he did not need to know what

3    specific events logged by Mixpanel meant because "the purpose of what I discuss

4    about Mixpanel in my report is not at this level of granularity." *Id.* at 193:20-195:3.

5        <u>CoStar Scrape Output Spreadsheets</u>.  Finally, Mr. Crain relies on a set of

6    spreadsheets produced by CoStar reflecting the output of CoStar's scrape of CREXi.

7    Ex. 3, Roffman Supplemental Report ¶ 57.  In March and April 2020, CoStar scraped

8    CREXi's website as part of a one-off competitive intelligence effort aimed at

9    verifying public claims CREXi was making in its marketing materials.  *Id.* ¶ 59.

10   CoStar performed this scrape by making requests to CREXi's public API, receiving

11   the data returned from those requests on CREXi's website, and outputting the data

12   to spreadsheets, which CoStar produced to CREXi.  *Id.*  Mr. Crain opines that these

13   spreadsheets indicate, cumulatively, that CoStar "scraped 70 million pieces of data

14   from CREXi." Ex. 1, Crain Report ¶ 89.  During his deposition, Mr. Crain testified

15   that he reached that value by performing arithmetic: multiplying the number of rows

16   by the number of columns in each spreadsheet and adding up the results.  Ex. 6,

17   Crain Dep. Tr. at 209:1-6 ("It's just rows times columns times [spreadsheets]").  He

18   performed no analysis of the scraped data, and made no effort to deduplicate across

19   spreadsheets.  *Id.* at 209:7-14.  Mr. Crain admitted at his deposition that he has not

20   "really assessed" whether the data scraped was publicly available at the time of the

21   scrape. *Id.* at 198:6-10, 198:20-199:8.

22       Aside from these three sources, Mr. Crain's Opinion 5 cites to testimony and

23   documents from this litigation.  He does not purport to apply expertise in describing

24   these documents.  *See, e.g.*, Ex. 1, Crain Report ¶¶ 81 nn.117-18, 82 nn.120-22, 83

25   nn.123-26, 85 nn.127-29, 86 n.130, 87 nn.131-32 (stating what deponents said).

26   **III.   LEGAL STANDARD**

27       "A witness who is qualified as an expert by knowledge, skill, experience,

28   training, or education may testify in the form of an opinion or otherwise if: (a) the

expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-94 (1993). CREXi bears the burden of proving admissibility of Mr. Crain's expert opinion by a preponderance of the evidence. *Call Delivery Sys., LLC v. Morgan*, 2022 WL 1252412, at *1 (C.D. Cal. Mar. 7, 2022).

To ensure that expert testimony will be helpful to jurors and abides by the reliability requirements of Rule 702, district courts play a "gatekeeping role." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014). While experts may rely upon data collected by another, that "relaxation of the usual requirement of firsthand knowledge… is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 591. Relying on analysis or data collected by someone else is appropriate only when "the expert conducted an independent evaluation of that evidence." *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. Mar. 28, 2012) (excluding expert declaration as unreliable due to lack of validation of data by expert himself). An expert's opinion becomes unreliable when "there is nothing in the record to indicate [the expert] has tested [the] underlying data to ensure its reliability or that [the expert] even has access to [the] underlying data." *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 629 (W.D. Wash. Oct. 11, 2011) (granting motion to exclude report as failing to meet reliability standard).

Expert testimony must utilize an expert's specialized knowledge in order to help the factfinder understand a subject matter "beyond the common knowledge of the average layman." *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997). Experts may not present evidence that "can speak for itself" in order to make "the

same arguments that the lawyers can make based on other evidence in the case" as then the "only contribution would be to pile on a misleading façade of expertise." *Waymo LLC v. Uber Technologies, Inc.*, 2017 WL 5148390, at *4 (N.D. Cal. Nov. 6, 2017) (excluding expert testimony under Federal Rules of Evidence 403 and 702). And while performing basic math in the process of reaching an opinion does not automatically disqualify an expert, "courts regularly exclude expert testimony where the expert engages in arithmetic, not expert analysis." *Think20 Labs LLC v. Perkinelmer Health Scis., Inc.*, 2023 WL 9005633, at *4 (C.D. Cal. Nov. 30, 2023) (citation omitted) (excluding opinion as "simple arithmetic for which no expertise is required"); *see also ReBath LLC v. HD Sols. LLC*, 2022 WL 2527113, at *5 (D. Ariz. July 7, 2022) (excluding expert testimony on basic multiplication and noting "[c]ourts have repeatedly excluded expert testimony that involves nothing more than 'simple math'").

Like layperson testimony, expert opinions must pass the basic threshold test of relevancy. When an expert opinion relates to a claim or defense not at issue in litigation, courts strike the opinion as irrelevant. *See, e.g.*, *In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab. Litig.*, 2019 WL 7177984, at *2 (C.D. Cal. Dec. 2, 2019) (reiterating concern that "expert testimony must pertain only to matters relevant to [active] claims and must not delve into matters rendered irrelevant by the dismissal of [other] claims"); *Pakootas v. Teck Cominco Metals, Ltd.*, 2012 WL 1833397, at *1 (E.D. Wash. Apr. 4, 2012) (finding expert opinions "have been rendered irrelevant as they relate to [a] … defense which the court has dismissed").

## IV.   ARGUMENT

There are myriad reasons for the Court to exclude Mr. Crain's Opinion 5. As a threshold matter, while of dubious relevance to begin with, Opinion 5 was rendered even more irrelevant by the Court's recent denial of CREXi's motion to add counterclaims based on CoStar's access to and scrape of CREXi's website. Even if

the Court finds that Opinion 5 continues to have some minimal relevance to CoStar's claims or CREXi's defenses, the opinion is unreliable and unhelpful to the factfinder due to Mr. Crain's failure to verify the data he relies upon and his failure to actually apply any digital forensics expertise to provide analysis beyond summarizing the contents of data produced by the parties in this litigation which can be easily understood by a layperson.

A.    **The Court's Denial Of CREXi's Request To Add Counterclaims Underscores That Mr. Crain's Opinion 5 Is Irrelevant**

Mr. Crain's Opinion 5 is not really a rebuttal opinion at all, as it does not "rebut" any evidence or opinions regarding CREXi's access to LoopNet, the subject matter of Mr. Roffman's report, which is relevant to CREXi's infringement of CoStar copyrighted photographs.[4]  Instead, it is an affirmative opinion regarding CoStar's access to CREXi's website, including CoStar's one-time competitive intelligence scrape of CREXi's API in 2020.  Ex. 1, Crain Report ¶¶ 77-96.  For numerous reasons, CoStar's access to CREXi's website has no bearing whatsoever on whether and to what extent CREXi infringed CoStar's copyrighted images— CoStar's core claim in this lawsuit.  And given the Court's recent denial of CREXi's motion for leave to add new counterclaims based on this exact conduct, *see* Dkt. 829 at 4, 10, Mr. Crain's Opinion 5 cannot be relevant to any of *CREXi's* claims in this litigation[5] either, and should be excluded.  *See, e.g.*, *Stop Staring! Designs v. Tatyana, LLC*, 2011 WL 13124123, at *1 (C.D. Cal. Aug. 11, 2011) (holding that

---

[4] Rebuttal testimony must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  A rebuttal report is meant to "support[] the opposite conclusion" of the affirmative opinion.  *R&O Constr. Co. v. Rox Pro Int'l Grp., Ltd.*, 2011 WL 2923703, at *2 (D. Nev. July 18, 2011) (citation omitted).  Here, the opposite conclusion to the Roffman Report is that CREXi did *not* access CoStar at the rate Mr. Roffman opines, not that CoStar accessed CREXi as well, as Mr. Crain's Opinion 5 states.

[5] To the extent that CREXi intends to argue that the scrape is still relevant to its "unclean hands" defense, the scrape cannot form the premise of that defense as a matter of law.  *See* Dkt. 833 at 19-21.  Thus, Mr. Crain's Opinion 5 is also irrelevant to CREXi's defenses.

where "expert report was apparently produced prior to the dismissal of [relevant] claims," expert could testify only regarding opinions relevant to "claims that are still in the case").

## B. Mr. Crain Does Not Apply His Expertise In Digital Forensics, Or Independently Verify Any Data, To Reach Opinion 5

Further, Mr. Crain's Opinion 5 should be excluded under Rule 702, *Daubert*, and Ninth Circuit case law because Mr. Crain did not apply his expertise in digital forensics to reach it. As set forth herein, Mr. Crain opines on three types of spreadsheets produced by the parties, which contain output from three sources: CoStar's outbound access logs, Mixpanel, and CoStar's scrape of CREXi's API.[6] But Mr. Crain had no role in compiling this information, and did not conduct an independent analysis to test or verify it. Opinion 5 consists solely of Mr. Crain summarizing the contents of these spreadsheets or performing basic arithmetic that any layperson with a calculator could do. Thus, Mr. Crain's Opinion 5 is not only unhelpful to the factfinder who could understand the same information from the underlying documents, but is also confusing as it improperly gives an expert's stamp of approval to party-produced spreadsheets.

### 1. Mr. Crain Improperly Parrots Numbers From The CoStar Outbound Log Spreadsheet Without Applying His Expertise

As noted above, Mr. Crain's Opinion 5 includes the following summary of the CoStar Outbound Log Spreadsheet: "The outbound information that CoStar produced shows 7,418 instances of access to CREXi, by almost 800 different CoStar employees, in the span of 90 days, between July 8, 2020, and October 5, 2020. Over

---

[6] The remainder of Mr. Crain's Opinion 5 relies on Mr. Crain's review of deposition evidence and non-forensic data documents produced in this litigation and should be excluded as it is not proper for an expert to "simply parrot[] deposition evidence and exhibits produced during the pretrial process." *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2021 WL 5407316, at *2-3 (N.D. Cal. Nov. 18, 2021) (citation omitted) (explaining further that this risks putting "'the imprimatur of [his] expertise' on the statements of other witnesses").

1    that approximately three-month period, CoStar employees accessed CREXi from

2    CoStar's network an average of 82 times per day." Ex. 1, Crain Report ¶ 78.

3          Mr. Crain in no way analyzed or scrutinized this data.  The entirety of his

4    opinion is visible on the face of the spreadsheet or can be calculated using basic

5    division.  The date range covered is plainly visible in the "Date" column.  The total

6    number of instances of access (7,418) is simply the number of rows in the

7    spreadsheet. The number of CoStar employees in the spreadsheet (almost 800) is

8    easily calculated by counting the number of names available to filter in the "Name"

9    column. And, the average number of site visits per day (82) is reached by dividing

10   the number of rows (7,418) by the number of days (90) the spreadsheet covers.  *Id.*

11   ¶¶ 78-79.  No expertise, even in Excel (and let alone in digital forensics), is required

12   to reach the same conclusions as Mr. Crain about this spreadsheet.

13         Because none of the information described by Mr. Crain goes beyond what a

14   layperson can see or calculate by looking at the CoStar Outbound Log Spreadsheet,

15   Mr. Crain's statements are improper as expert testimony.  *See, e.g.*, *United States v.*

16   *Chavez*, 2021 WL 5810298, at *1-2 (N.D. Cal. Dec. 7, 2021) (barring testimony

17   from "an expert on a lay issue that is *not* beyond the common knowledge of the

18   average layperson"); *Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*, 2018 WL

19   5793479, at *3 (N.D. Cal. Nov. 2, 2018) (striking expert testimony in which expert

20   "simply summarizes documents" produced in litigation because "those documents

21   can speak for themselves").  Allowing CREXi to present this information to the

22   factfinders vis-à-vis Mr. Crain would improperly give the spreadsheet's basic

23   contents the façade of "expert" approval.  *Waymo*, 2017 WL 5148390, at *6

24   (rejecting expert's attempt to report information easily understandable from case

25   documents as experts "'analysis' would not only fail to improve on the probative

26   value of the evidence he cited but also actually muddy the uncomplicated facts with

27   his façade of expertise").

28

Moreover, Mr. Crain attempts to qualify the lack of analysis in his Opinion 5 by claiming that due to the limited time period of existing CoStar outbound logs, he "cannot generate a complete analysis of CoStar's activity on CREXi's platform, comparable to Mr. Roffman's analysis of CREXi's activity." Ex. 1, Crain Report ¶ 76. But during his deposition, Mr. Crain acknowledged that **CREXi's** inbound access logs (*i.e.*, logs comparable to LoopNet logs, which are just customized inbound access logs) would be digital forensic evidence of CoStar's access to CREXi's website, Ex. 6, Crain Dep. Tr. at 165:13-23, 167:16-21, 168:17-19—and, presumably, could be used to generate a complete analysis of CoStar's activity on CREXi's platform. However, Mr. Crain went on to testify that he did not (i) consider CREXi's inbound access logs, (ii) know whether they even exist,[7] or (iii) even think to ask for this source of digital forensic evidence, despite its obvious relevance to Mr. Crain's Opinion 5. *Id.* at 170:12-171:2. Mr. Crain's choice to parrot a document from CoStar that "speaks for itself," while not asking CREXi for the comparable evidence to which he could actually apply his expertise in digital forensics, further underscores why Mr. Crain's Opinion 5 should be excluded.[8]

2.  <u>Mr. Crain Did Not Independently Verify The CREXi Mixpanel Spreadsheet Or Apply His Expertise To It</u>

Mr. Crain's reliance on the spreadsheet purportedly reflecting data from Mixpanel, produced by CREXi in response to an interrogatory propounded by CoStar, is even more problematic. As set forth above, Mr. Crain claims that this

---

[7] CoStar has inquired several times regarding the existence of these inbound access logs, and CREXi has refused to answer. CREXi's silence speaks volumes. At this point, without an answer from CREXi (and the implausible testimony from Mr. Crain that he did not think to ask for such logs), CoStar is forced to conclude that CREXi failed to preserve its inbound access logs from the relevant time period and that they no longer exist.

[8] As noted above, Mr. Crain also summarizes—in similar fashion—a spreadsheet produced by CoStar that reflects access from the CoStar network to other third-party websites. There too, his reporting and summarizations do not require digital forensics expertise and are improper material to present through an expert. *See also supra* n.3.

1    spreadsheet reflects "access on CREXi by individuals affiliated with CoStar, or from
2    IP addresses that CoStar has identified as ones that it used, between January 6, 2016,
3    and January 13, 2024" and that this data "shows that at least 117 CoStar-affiliated
4    users visited CREXi on hundreds of occasions, and that their actions triggered more
5    than 57,287 events on CREXi's platform." Ex. 1, Crain Report ¶ 80.

6          During his deposition, Mr. Crain acknowledged that he has not worked with
7    Mixpanel before, Ex. 6, Crain Dep. Tr. at 171:22-172:22, and could not answer basic
8    questions about its functionality. *Id.* at 172:23-173:9 (testifying that he was unaware
9    of whether CREXi chooses which "events" to track in Mixpanel). CREXi, not Mr.
10   Crain, selected which Mixpanel events to include in this spreadsheet and made the
11   determination that the individuals in this spreadsheet were "affiliated with CoStar."
12   Ex. 1, Crain Report ¶ 80. When asked if he knew whether specific individuals
13   named in the Mixpanel spreadsheet were "actually affiliated with CoStar," Mr. Crain
14   responded "I don't." Ex. 6, Crain Dep. Tr. at 182:7-9, 185:6-8. Mr. Crain testified
15   that he did not view data in Mixpanel itself, instead only viewing the selective
16   Mixpanel data curated into this spreadsheet by some unknown person believed to
17   work at CREXi. *Id.* at 173:21-175:13 (testifying that while he "believe[d]" CREXi
18   culled the Mixpanel data to create this spreadsheet, "I just don't know").

19         Not only did Mr. Crain do nothing to verify or test the accuracy of the
20   Mixpanel data, he appeared to disagree with the methodology of whomever at
21   CREXi compiled it. During his deposition, when asked questions about whether the
22   Mixpanel spreadsheet excluded access from individuals who worked for Ten-X
23   *before* CoStar acquired Ten-X (and thus were not CoStar employees at the time of
24   the access shown in the spreadsheet, and whose web traffic could not qualify as
25   access on CREXi by individuals "affiliated with" CoStar), Mr. Crain testified that "I
26   can't speak for CREXi in compiling Appendix G, but I didn't do that.... Whether
27   they applied a date cut for, like, the acquisition, I have no idea." *Id.* at 178:18-179:3.
28   Despite not doing such analysis, Mr. Crain agreed that there would be a "basis of –

1  of doing that date cut." *Id.* at 179:13-20.  Such reliance on data that Mr. Crain has

2  not verified or independently analyzed (and does not really understand, or—

3  apparently—even fully agree with) is improper.  Mr. Crain's opinion on the

4  Mixpanel Spreadsheet should be excluded.  *See, e.g.*, *Call Delivery Sys.*, 2022 WL

5  1252412, at *1 (excluding report where expert "failed to conduct an independent

6  evaluation of the evidence and independently verify the underlying facts").

7      The Court's opinion in *Fosmire* is instructive.  277 F.R.D. 625.  There, an

8  expert based opinions on data collected by someone else for use in different

9  litigation.  *Id.* at 629-30.  Even though that data was found reliable in another case,

10  the *Fosmire* expert's opinion was excluded because the expert had not tested the data

11  themselves, independently verified it in any way, and did not have access to the

12  entire dataset.  *Id.*  The same is true for Mr. Crain with respect to the Mixpanel

13  Spreadsheet.  Even worse here, Mr. Crain *could* have gained verifying information

14  from CREXi but did not.  He also could have, but did not, ask to view CREXi's

15  entire Mixpanel dataset.  In fact, Mr. Crain testified that he did not speak to anyone

16  at CREXi, for any purpose, in preparing his report.  Ex. 6, Crain Dep. Tr. at 104:12-

17  17.  Mr. Crain's blind reliance on data collected by another is particularly

18  inappropriate where, as here, the data was collected by an interested party—CREXi.

19  *See, e.g.*, *Baker v. Firstcom Music*, 2018 WL 2676636, at *2 (C.D. Cal. May 8, 2018)

20  (excluding expert declaration as unreliable when the expert "failed to verify the

21  underlying data at the core of her expert opinion independently, and simply adopted

22  the position of [plaintiff,] an interested party" that a control group of signatures were

23  authentic); *Garcia v. Los Banos Unified Sch. Dist.*, 2007 WL 715526, at *15 (E.D.

24  Cal. Mar. 8, 2007) (excluding expert opinion where expert "merely assumed that

25  Plaintiff is credible" and "assumed the truth of Plaintiff's representations").

26      Furthermore, as with CoStar's Outbound Access Log Spreadsheet, Mr. Crain

27  does not apply his digital forensics expertise in reporting information about the

28  Mixpanel Spreadsheet.  In fact, Mr. Crain provides no more information about the

spreadsheet than CREXi did in its relevant interrogatory response.  The remarkable similarity in the language of CREXi's interrogatory response and Mr. Crain's expert report underscore that Opinion 5 is not proper expert opinion:

| Ex. 1, Crain Report ¶ 80 | Ex. 7, CREXi's Supplemental Responses and Objections to Plaintiff's Interrogatory No. 15, at 21 |
|---|---|
| "CREXi also produced Mixpanel data, [Appendix G,] which I've reviewed, reflecting access on CREXi by individuals affiliated with CoStar… between January 6, 2016, and January 13, 2024.  That data shows that at least 117 CoStar-affiliated users visited CREXi on hundreds of occasions, and that their actions triggered more than 57,287 tracked events on CREXi's platform." | "Appendix G confirms ongoing and regular usage of CREXi by CoStar employees between 2016 and 2024.  The at least 117 CoStar-affiliated users reflected in Appendix G visited CREXi on hundreds of occasions, and their actions triggered more than 57,000 tracked events on CREXi's website." |

Mr. Crain's copying of CREXi's interrogatory response language resembles the expert's mirroring of a party-affiliate's declaration in *Cholakyan*.  There, this Court excluded an expert's opinion in part because the expert copy-and-pasted statements from another's declaration, failing to demonstrate that the expert "exercised independent judgment."  281 F.R.D. at 546.  So too here, Mr. Crain's presentation of evidence that speaks for itself without utilizing his expertise or performing any independent analysis is improper and should be excluded.

3.    Mr. Crain's Analysis Of The Data Scraped From CREXi Is Basic Math With No Added Expertise

Finally, Mr. Crain relies in Opinion 5 on a set of spreadsheets produced by CoStar in this litigation reflecting the output of CoStar's one-off competitive intelligence scrape of CREXi in 2020.  Ex. 1, Crain Report ¶ 88.  Mr. Crain opines that these spreadsheets indicate, cumulatively, that CoStar "scraped 70 million pieces of data from CREXi." *Id.* ¶ 89.  During his deposition, Mr. Crain testified that he reached that value using arithmetic: by multiplying the number of rows by the number of columns in each spreadsheet and adding up the results.  Ex. 6, Crain Dep. Tr. at 209:1-6 ("I think that's right.  It's just rows times columns....").  In other words, Mr. Crain did nothing other than report the total number of cells in the Excel files produced by CoStar.  Mr. Crain did not apply his expertise in digital forensics (to the extent needed) to attempt to deduplicate the data and report the number of unique pieces of data scraped (a figure that is much lower than 70 million).  *Id.* at 209:7-14 ("No, we didn't try to deduplicate that.").  The entirety of his analysis ends with performing basic math.

Courts routinely exclude expert opinions like this one based on simple arithmetic.  In *ReBath*, the court excluded an expert's opinion as to disgorgement value because the number "is merely [Plaintiff's] royalty percentage rate multiplied by the total lost revenue figure he calculated."  2022 WL 2527113, at *5 (holding further that "[w]hile this calculation is fair game for counsel to argue," expert testimony on it must be excluded).  Counsel for CREXi may try to convince the factfinder that it is proper to quantify the "pieces of data" CoStar scraped from CREXi by, without deduplication, multiplying the number of columns by the number of rows in each spreadsheet, but that rudimentary (and misleading) quantification cannot be given the imprimatur of an expert.  *See Waymo*, 2017 WL 5148390, at *5 (excluding expert quantification resulting from "grade-school

1  arithmetic counsel can do on an easel… [because the expert's] only contribution
2  would be to pile on a misleading façade of expertise").

3  **V.      CONCLUSION**

4          For the foregoing reasons, CoStar respectfully requests that the Court exclude
5  Mr. Crain's Opinion 5 and related testimony in its entirety.

6

7   Dated:  September 9, 2024                    Respectfully submitted,

8                                                **LATHAM & WATKINS LLP**

9                                                By:  */s/ Nicholas J. Boyle*
10                                                    Nicholas J. Boyle
                                                     (admitted *pro hac vice*)
                                                     Sarah A. Tomkowiak
11                                                    (admitted *pro hac vice*)
                                                     555 Eleventh Street, NW
12                                                    Suite 1000
                                                     Washington, D.C. 20004
13                                                    Tel: 202.637.2200
                                                     Fax: 202.637.2201
14                                                    Email: nicholas.boyle@lw.com
                                                          sarah.tomkowiak@lw.com
15

16                                                   Elyse M. Greenwald
                                                     (Bar No. 268050)
17                                                    10250 Constellation Boulevard
                                                     Suite 1100
18                                                    Los Angeles, CA 90067
                                                     Tel: 424.653.5500
19                                                    Fax: 424.653.5501
                                                     Email: elyse.greenwald@lw.com

20                                                   Caitlin E. Dahl
                                                     (admitted *pro hac vice*)
21                                                    330 North Wabash Avenue
                                                     Suite 2800
22                                                    Chicago, IL 60611
                                                     Tel: 312.876.7700
23                                                    Fax: 312.993.9767
                                                     Email: caitlin.dahl@lw.com

24

25                                                   *Attorneys for Plaintiffs and*
                                                     *Counterdefendants CoStar Group, Inc.*
26                                                    *and CoStar Realty Information, Inc.*

27

28

1    ## **CERTIFICATE OF COMPLIANCE**

2         The undersigned, counsel of record for Plaintiffs and Counterdefendants

3    CoStar Group, Inc. and CoStar Realty Information, Inc., certifies that this brief

4    contains 5,892 words, which complies with the word limit of L.R. 11-6.1.

5

6     Dated:  September 9, 2024                    By:   */s/ Nicholas J. Boyle*
                                                         Nicholas J. Boyle
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28