ELYSE M. GREENWALD (BAR NO. 268050)
elyse.greenwald@lw.com
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525
Fax: 424.653.5501

*Attorneys for Plaintiffs and Counterdefendants*
*CoStar Group, Inc. and CoStar Realty Information, Inc.*

[Additional Counsel Listed on the Next Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>Defendant. | CASE NO. 2:20-cv-08819-CBM-AS<br><br>**COSTAR'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS OF GARY ELSNER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC.,<br><br>Counterdefendants. | Date:        January 7, 2025<br>Time:        10:00 AM<br>Courtroom:  8D<br>Before:      Hon. Consuelo B. Marshall<br><br>Date Filed:  September 25, 2020<br>Trial Date:  March 11, 2025 |

1    NICHOLAS J. BOYLE*
     nicholas.boyle@lw.com
2    SARAH A. TOMKOWIAK*
     sarah.tomkowiak@lw.com
3    ANNE C. MALINEE*
     anne.malinee@lw.com
4    KATHERINE L. GRIFFITTS*
     katherine.griffitts@lw.com
5    LATHAM & WATKINS LLP
     555 Eleventh Street, NW
6    Suite 1000
     Washington, D.C. 20004
7    Tel: 202.637.2200
     Fax: 202.637.2201
8

9    CAITLIN E. DAHL*
     caitlin.dahl@lw.com
10   LATHAM AND WATKINS LLP
     330 North Wabash Avenue
11   Suite 2800
     Chicago, IL 60611
12   Tel: 312.876.7700
     Fax: 312.993.9767
13

14   * Admitted pro hac vice

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that on January 7, 2025, at 10:00 AM, or as soon thereafter as this matter can be heard, in the courtroom of the Honorable Consuelo B. Marshall, located at the First Street Courthouse, 350 W. 1st Street, Los Angeles, CA 90012, Courtroom 8D, Plaintiffs and Counterdefendants CoStar Group, Inc., and CoStar Realty Information, Inc. (collectively "CoStar") will move for an order to exclude the expert opinions and testimony of Gary Elsner, a witness for Defendant and Counterclaimant Commercial Real Estate Exchange, Inc. ("CREXi"), and any other expert opinions or testimony which may rely on Mr. Elsner's reports. This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Katherine L. Griffitts, the pleadings on file in this matter, and such argument as the Court may consider.

CoStar respectfully requests an order pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993), to exclude the expert reports and testimony of Gary Elsner and any other reports that may rely on his opinions.

**Compliance with Local Rule 7-3**. This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on August 29, 2024. The parties were unable to resolve the issues raised by this Motion.

Respectfully submitted,

Dated: September 9, 2024

**LATHAM & WATKINS LLP**

By: */s/ Nicholas J. Boyle*

Nicholas J. Boyle
(admitted *pro hac vice*)
Sarah A. Tomkowiak
(admitted *pro hac vice*)
Anne C. Malinee
(admitted *pro hac vice*)
Katherine L. Griffitts
(admitted *pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

Tel: 202.637.2200
Fax: 202.637.2201
Email: nicholas.boyle@lw.com
       sarah.tomkowiak@lw.com
       anne.malinee@lw.com
       katherine.griffitts@lw.com

Elyse M. Greenwald
(Bar No. 268050)
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525
Fax: 424.653.5501
Email:  elyse.greenwald@lw.com

Caitlin E. Dahl
(admitted *pro hac vice*)
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767
Email: caitlin.dahl@lw.com

*Counsel for CoStar Group, Inc., and
CoStar Realty Information, Inc.*

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 2:20-cv-08819-CBM-AS
COSTAR'S MOTION TO EXCLUDE
THE OPINIONS OF GARY ELSNER

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................... 2

    A.    CoStar Licenses—And Brokers Use—CoStar Images of
        CRE ............................................................................................. 2

    B.    CREXi Copies, Crops, and Uses CoStar Copyrighted
        Images Without A License.......................................................... 3

    C.    CREXi's Expert Elsner Offers Affirmative Opinions on
        the Value of CoStar's Images .................................................... 4

    D.    CREXi Offers Elsner To Rebut CoStar's Licensing
        Expert, Thea Vaughan ............................................................... 9

III.   LEGAL STANDARD ......................................................................... 10

IV.    ARGUMENT ...................................................................................... 11

    A.    Elsner Is Unqualified To Offer Any Opinions Regarding
        CRE Photography .................................................................... 11

    B.    Elsner Did Not Know the Basic Facts of the Case .................12

    C.    Elsner's Opinions Regarding The Hypothetical License
        Value of CoStar's Images Are Improper ................................. 14

        1.    Elsner Improperly Applied the Hypothetical-
            License Framework ..................................................... 15

        2.    Elsner Failed to Consider Comparable Licenses
            And Settlements, Contrary To His Own Prior
            Expert Work................................................................ 16

        3.    Elsner's Opinions on Specific License Types Are
            Unreliable .................................................................. 17

    D.    Elsner Lacks The Requisite Knowledge To Opine On
        CoStar's Copyright Management Information ................................. 18

    E.    Elsner's Rebuttal Opinions Regarding Multipliers Are
        Inconsistent With Industry Practice And Unreliable ......................... 19

V.     CONCLUSION .................................................................................. 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Adasa Inc. v. Avery Dennison Corp.*,
2023 WL 3775332 (D. Or. June 2, 2023) ........................................................... 10

*Al Otro Lado v. Mayorkas*,
2021 WL 3929673 (S.D. Cal. Sept. 2, 2021) ............................................... 10, 19

*Avila v. Willits Envtl. Remediation Tr.*,
633 F.3d 828 (9th Cir. 2011) ............................................................................ 11

*Call Delivery Sys. LLC v. Morgan*,
2022 WL 1252412 (C.D. Cal. Mar. 7, 2022) (J. Marshall) ........................... 10, 12

*Colibri Heart Valve LLC v. Medtronic CoreValve LLC*,
2021 WL 7285995 (C.D. Cal. Nov. 16, 2021) ............................................... 14, 16

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*,
2020 WL 60351 (D.N.H. Jan. 6, 2020) .............................................................. 20

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................................................................... 10

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........................................................................................... 10

*Leonard v. Stemtech Int'l Inc.*,
834 F.3d 376 (3d Cir. 2016) ............................................................................... 20

*Nolan v. Calello*,
2021 WL 4621945 (C.D. Cal. July 8, 2021) ............................................... 14, 18

*Ollier v. Sweetwater Union High Sch. Dist.*,
267 F.R.D. 339 (S.D. Cal. 2010), *aff'd*, 768 F.3d 843 (9th Cir.
2014) .................................................................................................................. 12

*On Davis v. Gap, Inc.*,
246 F.3d 152 (2d Cir. 2001) ............................................................................... 15

*Open Text S.A. v. Box, Inc.*,
2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ...................................................... 17

*Oracle Corp. v. SAP AG*,
765 F.3d 1081 (9th Cir. 2014) ............................................................... 14, 15, 18

*Pelican Int'l, Inc. v. Hobie Cat Co.*,
655 F. Supp. 3d 1002 .......................................................................................... 17

*Tate v. Smith*,
2020 WL 999758 (W.D. Wash. Mar. 2, 2020) ................................................... 13

*Taylor v. Lemus*,
  2015 WL 12698306 (C.D. Cal. June 17, 2015).................................................. 13

*United States v. Diaz*,
  876 F.3d 1194 (9th Cir. 2017) .......................................................................... 19

## OTHER AUTHORITIES

1 Weinstein's Evid. Manual § 13.02 ...................................................................... 11

7 Annotated Patent Digest § 44:43.200 ............................................................... 10

# I.    INTRODUCTION

CREXi has engaged in mass copyright infringement, pursuing a copy-and-crop policy to copy CoStar's photographs, crop out CoStar's star watermark, and populate its rival website with CoStar's intellectual property.  Caught red-handed, CREXi now claims that CoStar's photographs have virtually no value by relying on an expert in generic (stock) photography, Gary Elsner, who lacks relevant experience in the real estate photography at issue, who CREXi kept in the dark about the relevant facts, and who did not undertake any efforts to educate himself.  Under these circumstances, Elsner is merely acting as an uninformed mouthpiece for CREXi, and has no reliable independent expert testimony to offer.

As a threshold matter, Elsner lacks the expertise necessary to offer an opinion here.  Elsner admits that he has no experience in commercial real estate ("CRE") or CRE photography.  And, by his own admission, the stock photography in which he does have expertise *cannot be used* in CRE listings.  The difference is critical, because the images at issue are valuable in large part because they are of specific properties and *not* generic imagery.

Elsner's opinions also lack sufficient foundation to be reliable.  Based on a review of just 2% of the images at issue, Elsner's core opinion is that *all* the infringing images are low quality and thus unusable (or, as he sometimes states, unsaleable).  Yet, as he admitted under oath, he had no idea—and so did not consider—that every one of the images *was in fact used* by CoStar's broker users, and most by his client, CREXi.

Elsner's unfounded counterfactual undercuts each of his opinions, and his testimony should be excluded on that basis alone.  But that is not the only basic fact that Elsner did not know or consider.  For example, despite offering opinions on the type of license that would be appropriate, Elsner did not know the license terms under which CoStar licenses its images to law-abiding users.  Similarly, Elsner offers opinions on the costs CoStar incurred to obtain the images at issue, and the price

CoStar could have charged its customers to commission images, but lacks basic knowledge of CoStar's photography cost information.  Nor did he have any knowledge regarding CoStar's existing watermarking practices, or about CREXi's use of a copyright filter that relied on the presence of the CoStar watermark, despite opining as to whether CoStar's watermark could be considered copyright management information ("CMI").  Put simply, Elsner did not know the facts, did not properly evaluate the evidence, and where he did review evidence, it was a one-sided selection prepared by CREXi, omitting a slew of relevant discovery responses and factual information in the record.

Elsner's affirmative and rebuttal opinions, testimony, and any other opinion they support are flawed and unreliable.  The Court should exclude Elsner's opinions in full.

## II.    FACTUAL BACKGROUND

### A.    CoStar Licenses—And Brokers Use—CoStar Images of CRE

CoStar is the leading provider of CRE information, analytics, and online property marketplaces.  Distinct from its competitors, CoStar takes, copyrights, and licenses millions of photographs of CRE each year for its broker subscribers to use in their listings on CoStar's marketplace, LoopNet.  CoStar has made significant investments to obtain these images. Dkt. 833-21 ¶¶ 9-11.  To protect that investment and ensure CoStar's ownership is clear, CoStar marks each of its copyrighted images—and its images alone—with CoStar's star watermark.  Ex. 1.

Broker subscribers use existing images from the CoStar database in their LoopNet listings, Dkt. 833-21 ¶ 11, and, if they buy a certain ad package, can commission a CoStar photoshoot of their property.  Ex. 2 at 71:4-11.[1]  These photographs allow brokers to market their properties, and potential buyers to obtain an accurate depiction of the offered property.  When CoStar's users market their

---

[1] All exhibits are exhibits to the supporting declaration of Katherine L. Griffitts.

properties with CoStar-owned images, they do so subject to license agreements with CoStar. Ex. 3 at -770-771, -774. Those licenses include multiple restrictions, including that the user (typically a broker) must represent the property depicted, all use must cease upon termination of the license, the image may not be posted on a competing marketplace, and the watermark must always appear on the image. *Id.* CoStar's images are regularly used by brokers consistent with these restrictions. Dkt. 833-21 ¶ 11.

**B.    CREXi Copies, Crops, and Uses CoStar Copyrighted Images Without A License**

For decades, CoStar competitors have attempted to capitalize on CoStar's investments through infringement. CoStar has sued, and ultimately settled cases against, competitors who admitted to infringing CoStar's copyrighted images. Exs. 4-8. Indeed, two such competitors, RealMassive and Xceligent, agreed to stipulated judgments governing some of the same specific images at issue here. Dkt. 833-21 ¶ 12; *compare* Ex. 9, *with* Ex. 10. These case resolutions were arms-length-negotiated and court-approved evaluations of the value of the competitive use of CoStar-owned images; each included forward-looking provisions that provided for payments for continued use of CoStar's images, much like a license. *See* Exs. 4-8.

Now CREXi is seeking to profit from CoStar's long-term investment in its intellectual property. CREXi, a rival listing platform, has mimicked RealMassive and Xceligent by copying and cropping CoStar images and placing them on its competing website. *See* Exs. 9, 11; Dkt. 833-20, Ex. 244. Each image at issue in this case was first published in a listing on LoopNet and then most appeared on CREXi.com, either on a listing or in CREXi's subscription product, many with CoStar's star logo cropped out pursuant to CREXi's corporate policy. Exs. 9, 11. As of last count, CREXi has infringed almost 50,000 CoStar images (the "CoStar Images"). *Id.*

**C.    CREXi's Expert Elsner Offers Affirmative Opinions on the Value of CoStar's Images**

Hoping to drive down the damages that it owes CoStar, CREXi served the initial report of its licensing expert, Gary Elsner, on March 19, 2024.  Griffitts Decl. ¶ 3.  By his own admission, Elsner is an expert in stock (i.e., generic) image licensing, and not the licensing of non-generic images such as the CRE photography at issue.  Ex. 12 at 28:9-16, 33:9-12.  Elsner nonetheless offered six affirmative opinions that relate to the alleged value of the CoStar Images, each of which depends on his flawed (or lack of) understanding of the nature of the CoStar Images, how they were licensed, and, most importantly, how they were used.  Indeed, Elsner did not know that the CoStar Images were licensed and used by brokers, and by CREXi.  This fatal flaw undercuts each of his opinions.

***Affirmative Opinion 1:***  Elsner opines that the "overwhelming majority of the [CoStar] Images do not satisfy industry standards for quality photographs and are not saleable in the commercial photography marketplace."  Ex. 13 ¶ 57.  Setting aside that Elsner could not definitively identify the "industry" he was referencing, by "not salable" he meant that (1) the images that "could not be either sold or licensed" (even though they were all licensed by brokers from CoStar) and (2) that "they would not be ***used***."  Ex. 12 at 106:12-18.[2]  Despite the centrality of ***use*** to Elsner's opinion, he testified that he did not in fact know whether CREXi or brokers used the images (they did).  *Id.* at 105:3-8, 236:21-23, 240:10-12; *see* Exs. 9, 11.

To reach his conclusion that the infringed images would not be licensed or used, Elsner first conducted a so-called "general" review of such images.  Ex. 13 ¶¶ 33, 50.  While his report does not disclose what this "general" review entailed, Elsner testified that he reviewed, in some fashion, a limited number of images in batches of 500.  Ex. 12 at 118:19-120:18.  Although he admits having no expertise

---

[2] All emphasis and alterations added, and all citations and quotations omitted unless otherwise noted.

in CRE, *id.* at 22:17-19, Elsner notes that the CoStar Images "contain images of empty field, parking lots, signs, and other subject matter that [Elsner] would not characterize as commercial real estate," Ex. 13 ¶ 34, despite the fact they were used by CRE brokers.  Based on his assessment of some images and the style guides given to CoStar photographers, Elsner concluded that CoStar's photographers were "amateur photographers," who "did not appear to have formal training in the creation of commercial imagery." *Id.* ¶¶ 38-42.

Having completed this "general overall assessment," Elsner then conducted an explicit review of only 1,000 of the CoStar Images—about 2% of the images at issue. *Id.* ¶ 50.  In conducting that review, he applied fifteen subjective criteria derived from his experience in stock photography. *Id.* ¶¶ 51-52.  These criteria are purportedly designed to measure the "quality" of a generic stock image, where the goal is often to enhance the photograph's advertising or promotional value through selective framing or other techniques. *Id.*  By contrast, CRE images for use in CRE listings—which by their nature are intended to be used by experienced CRE industry professionals—have informational value based on their providing an accurate (rather than idealized) portrayal of a property. Ex. 2 at 136:13-16.  Elsner could not articulate why his stock criteria had any bearing on the quality (and ultimately the use) of CRE images, a disconnect that became clear when Elsner deemed images currently used on CREXi's website to be of insufficient quality to use. Ex. 12 at 126:10-129:20.  Perhaps unsurprisingly, given his ill-suited criteria, Elsner determined that the CoStar Images were also poor quality, based largely on their inclusion of accurate information such as the presence of "excessive utility lines" or a driveway in "disrepair." Ex. 13 ¶ 52.

**Affirmative Opinion 2:**  Elsner next opines that the value of the CoStar Images should be assessed on a per-property basis—i.e., that multiple images of the same property should be valued as a set, rather than individually—because, in Elsner's view, CRE property sellers use multiple images "to tell a single 'picture

story.'" *Id.* ¶ 58. But Elsner is not an expert in the CRE field or selling practices. *Supra* at 4. Nor was he informed on whether the parties to this case considered images individually, or on a per property basis; Elsner testified that he did not know whether CREXi copied or used the images "on a property-by-property basis" (they did not, instead copying on average 1.4 images per property instead of a set of images for each property, Ex. 15 ¶ 32), and specifically added "***I don't know how [the CoStar Images] were used or which ones were used or anything about that***." Ex. 12 at 239:6-240:12. He likewise did not know whether any of the CoStar Images were subject to a license on a property-by-property basis (they are not). *Id.* at 236:8-23; *see* Ex. 3.

**Fair Market Value Opinions (Affirmative Opinions 3-5):** Elsner's next three affirmative opinions concern the alleged fair market value of the CoStar Images. Each of these analyses is informed by Elsner's assessment of the value of the images, based on four factors: (1) technical quality (e.g., focus); (2) professionalism (e.g., staging); (3) salability (e.g., whether he believes the image would be licensed or used); and (4) whether the image would pass the scrutiny of the seller and listing agent based on, for example, its age, quality and content. Ex. 13 ¶ 69.

**Affirmative Opinion 3:** With those factors in mind, Elsner's first fair market opinion purports to determine the costs to CoStar to obtain the images at issue. *Id.* ¶ 70. But Elsner did not examine the costs associated with images taken by independent contractor photographers hired by *CoStar*; nor did he consider the detailed spreadsheet of actual photography costs that CoStar produced to CREXi. Ex. 12 at 263:1-4. Instead, Elsner looked to a single January 2020 contract between a then-separate company, Ten-X (a niche business that specializes in auctions of distressed real estate, not then owned by CoStar) and Field Cameras, Inc. Ex. 13 ¶ 73; *see generally* Ex. 14. Elsner then applied the Ten-X contract rates to the number of images taken by just two of CoStar's hundreds of employee photographers, as reflected in a single internal production "scorecard" for a one-

month period. *Id.* ¶¶ 73-85. Based on this purported "analysis," Elsner opines that CoStar incurred a "conservative" cost of $7.09 per image. *Id.* ¶ 89.

**Affirmative Opinion 4:** In his second estimation of fair market value, Elsner opines on the amount CoStar could have charged customers to obtain images through photoshoots, which he calculates as $25 dollars per image. *Id.* ¶ 99. Elsner based this calculation on only *two* documents, neither of which concerned the platform at issue—LoopNet—and which instead relate to CoStar's loss-leader photoshoot rates for residential property listings. *Id.* ¶ 93. While stating in his report that he understood that a large number of the CoStar Images were not commissioned, *id.* ¶ 96, he testified that he had no basis to so opine. Ex. 12 at 217:11-218:20.

**Affirmative Opinion 5:** As the last method for ascertaining fair market value, Elsner purports to engage in a hypothetical license negotiation using four types of image license: Rights-Managed, Traditional Royalty-Free, Microstock Royalty-Free, and Subscription. Ex. 13 ¶ 101. In analyzing these models, Elsner assumed the license would be largely unrestricted in use, scope, and term. Ex. 12 at 87:12-23. With respect to a hypothetical Rights-Managed License, Elsner determined that a volume discount would be appropriate, despite having no knowledge as to whether CoStar has ever offered such discounts. *Id.* at 256:14-22; Ex. 13 ¶ 109. Similarly, Elsner admitted that he did not know of CoStar's license terms, and so has no basis to know whether a Traditional Royalty-Free or Microstock Royalty-Free license was applicable. Ex. 12 at 187:9-188:2, 250:4-6.

Having (improperly) ruled out the other licensing models, Elsner opined that the Subscription Licensing model is most appropriate. According to Elsner, Subscription Licensing is where a "licensee purchases the right to download any image from all imagery offered on a website for an agreed-upon time." Ex. 13 ¶ 123. Subscription Licensing is commonly used by stock image libraries, like Shutterstock, but Elsner was unaware of any instance where generic stock images were licensed under a Subscription Licensing model and then used in a real estate

listing. Ex. 12 at 37:10-16. Nonetheless, Elsner opined that this model was appropriate, based (again) on his flawed opinions on the quality and non-usability of the CoStar Images. Ex. 13 ¶ 124. To value of the CoStar Images under a hypothetical subscription license model, Elsner looked to the pricing used by a stock image library. *Id.* ¶¶ 128-130. Accordingly, he opined that the appropriate value range is from $0.18-$0.22 per image (notably far less than his value calculations for each of the other hypothetical license negotiations, which ranged from $50 to $150 per image). *Id.* ¶ 132.

Nowhere in his analysis of the fair market value of the CoStar Images did Elsner consider the image values suggested by CoStar's prior settlements, even though those settlements involved some of the very same CoStar Images at issue here.

***Affirmative Opinion 6:*** Elsner's final opinion is an impermissible legal one: that CoStar's watermark does not qualify as CMI, a question of law. To reach that legal conclusion, Elsner opined that: (i) it is not industry practice to use bare logos as CMI, (ii) CoStar's use of its star watermark is inconsistent with industry practice, and (iii) the watermark would not be recognized as CMI in the industry. Ex. 13 ¶¶ 134-165.

In doing so, Elsner reviewed deposition testimony from CREXi's witnesses, but not from any CoStar witness. Ex. 12 at 71:13-75:24. In particular, Elsner did not consider the deposition testimony of Dariush Edalatkhah, CoStar's corporate designee on this very topic, though he did review the testimony of CREXi's corporate designee on the same subject. *Id.*

### D.    CREXi Offers Elsner To Rebut CoStar's Licensing Expert, Thea Vaughan

CoStar served the amended expert report of Thea Vaughan on March 27, 2024.[3]  In her report, Vaughan evaluates the fair market value of the CoStar Images, and determines that the value of the infringed use would range between $5,625 and $18,750.  Ex. 16 ¶ 79.  She did this by (1) reviewing each of those 50,000 images (twice); (2) determining the benchmark value for the images based on an analysis of comparable images licensed under a Royalty Free licensing model; and (3) applying multipliers to account for the rarity and scarcity of the images as well as CREXi's competitive use of them.  *Id.* ¶¶ 48-79.  In response to Vaughan's report, Elsner served an Amended Rebuttal Report on May 2, 2024.  Griffitts Decl. ¶ 5.

***Rebuttal Opinion 1:***  Elsner claims that there is no basis for Vaughan's use of a scarcity multiplier.  Ex. 17 ¶ 67.  In offering this rebuttal opinion, he ignores CREXi's own policy that it would only copy CoStar images when there were no other options, which necessarily indicates CoStar's Images were copied only when scarce (i.e., when not immediately available for license from any other source).  Ex. 12 at 203:22-204:10.  Instead, Elsner argues that Google StreetView images (taken by a passing vehicle) are acceptable substitutes and therefore CoStar's Images are not scarce.  Ex. 17 ¶ 72.  Elsner does not explain why, if ready substitutes were available from Google, CREXi deliberately subjected itself to legal jeopardy by instead copying the CoStar Images rather than rely on Google StreetView.

***Rebuttal Opinion 2:***  Elsner also tries to attack Vaughan's competitive use multiplier by suggesting that all multipliers are punitive as a matter of law and thus not used in the CRE industry.  *Id.* ¶ 89.  Elsner relies on a decades-old statement (that he could not identify) by Nancy Wolff, general counsel of the Picture Agency Council of America (now the Digital Media Licensing Association), which he

---

[3] Vaughan served a supplemental expert report on August 9, 2024.  Griffitts Decl. at 4.

interprets as supposedly advising association members about the impact of a 2004 lawsuit called *Stehrenberger v. J.R. Reynolds Tobacco Holdings Inc*.  *Id.* ¶ 101. Elsner opines that as a result of *Stehrenberger*, and as amplified by Wolff's advice, modern image licensing contracts "rarely" use multipliers.  *Id.* ¶¶ 101-102.  But Elsner later admitted that he was unfamiliar with either caselaw on multipliers after 2004 or with actual statements by Ms. Wolff on the use of multipliers.  Ex. 12 at 137:13-138:10, 142:17-144:1.  Even worse, Elsner could not explain why, contrary to his opinion, DesignPics, the company with which he has been affiliated for decades, uses a multiplier in its standard license, as do several other major image libraries.  *Id.* at 145:2-152:1.

## III.   LEGAL STANDARD

Rule 702 imposes a special "gatekeeping" obligation upon trial courts to ensure that expert testimony is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 & n.7 (1993).  Where an expert witness' "factual basis, data, principles, methods, or their application are called sufficiently into question … the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).  "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts or contrary to the facts of the case." *Al Otro Lado v. Mayorkas*, 2021 WL 3929673, at *2 (S.D. Cal. Sept. 2, 2021). Moreover, an expert "must not be acting as a mouthpiece for a party by merely parroting the party's factual narrative and/or theory of the case." 7 Annotated Patent Digest § 44:43.200; *see also Adasa Inc. v. Avery Dennison Corp.*, 2023 WL 3775332, at *6 (D. Or. June 2, 2023) (excluding an expert for acting "as a mere mouthpiece").

As the proponent of the expert testimony, CREXi has the burden of satisfying Rule 702's admissibility requirements by a preponderance of the evidence.  *Call*

*Delivery Sys. LLC v. Morgan*, 2022 WL 1252412, at *1 (C.D. Cal. Mar. 7, 2022) (J. Marshall).

## IV.    ARGUMENT

Elsner's opinions are fundamentally unreliable and should be excluded. *First*, Elsner lacks the specific expertise to opine on the quality and thus the value of non-stock CRE images. *Second*, Elsner's opinions contradict the key facts of the case or are devoid of facts entirely, indicating that he is impermissibly acting as a "mere mouthpiece" for CREXi. *Third*, Elsner does not properly engage in a hypothetical license negotiation under the governing law and instead bases his findings on contradicted factual assumptions. *Fourth*, Elsner lacks the necessary expertise or factual understanding to opine on CoStar's star logo. *Finally*, Elsner's rebuttal opinions on the use of multipliers are unsupported by the facts and the law.

### A.    Elsner Is Unqualified To Offer Any Opinions Regarding CRE Photography

While a lack of specialization in expertise often goes to the weight of an expert's opinion, there are instances, such as here, where "it will be appropriate for the trial court to insist that a proposed expert have ***specific*** expertise. Thus, when a witness admittedly possessing qualifications in a specific field attempts to testify to matters beyond his or her expertise, it is appropriate for the trial court to exclude the testimony." 1 Weinstein's Evid. Manual § 13.02; *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011). This is such a case because the generic imagery with which Elsner has experience has no bearing on the non-generic imagery at issue, as his counterfactual conclusions confirm.

By his own admission, Elsner is not an expert in CRE. *Supra* at 4. As a result, his subjective determination of the quality (and, by extension, usability and salability) of the CoStar Images is informed not by criteria relevant to assessing CRE imagery, but instead by his experience evaluating stock photography, the goals and techniques of which are very different. *Supra* at 4-8  Elsner's lack of CRE

experience is evident in his suggestion that the CoStar Images should have been taken or edited in a particular manner to disguise the true nature of the property, *see* Ex. 13 ¶ 54, an act that would violate brokers' ethical obligations to "present a true picture in their advertising." Ex. 18, at art. 12.  Elsner's lack of familiarity with CRE quality standards is confirmed by his testimony that CRE images used by CREXi on its own website similarly did not meet his quality criteria, *supra* at 5, and thus— these used images were ***not*** usable.  That his stock image expertise leads him to conclusions that are contrary to reality illustrates why that expertise is inapplicable here (and would confuse a jury).  Because Elsner lacks the necessary expertise concerning non-generic CRE images, his Affirmative Opinions 1-6 should be excluded.

## B.    Elsner Did Not Know the Basic Facts of the Case

While Elsner opined that the CoStar Images were not "usable," in fact ***they were used***, first by listing brokers on LoopNet, and then by CREXi, which obtained and stored them all, and displayed most of them.  *Supra* at 3-4.  It would be affirmatively unhelpful and confusing to the factfinder to allow Elsner to opine that specific images would not ever be licensed or used in a CRE listing when those same images ***were in fact used in CRE listings***.  *Id.*; *Call Delivery*, 2022 WL 1252412, at *1 (excluding expert opinion where expert "failed to … verify the underlying facts of the case").

Beyond his counterfactual conclusion on non-usability, Elsner lacked basic knowledge of the facts in this case.  He did not know how CREXi's used images, Ex. 12 at 22:17-24:19, how CoStar's website works, *id.* at 26:18-27:5, or how CoStar typically licenses its images and under what terms, *supra* at 7.  Purported expert testimony that lacks a rudimentary understanding of the fundamental facts of a case is inherently unreliable.  *See Ollier v. Sweetwater Union High Sch. Dist.*, 267 F.R.D. 339, 341 (S.D. Cal. 2010) ("[A]n expert [must] know of facts which enable him to express a reasonably accurate conclusion."), *aff'd*, 768 F.3d 843 (9th Cir. 2014).

Worse, where Elsner did engage with the factual record of this case, he did so in a one-sided manner.  "Where, as here, the expert has [formed an opinion] by ignoring evidence that is significant in both amount and relevance, his conclusion falls outside the realm of reliability and should not be presented to the jury." *Tate v. Smith*, 2020 WL 999758, at *6 (W.D. Wash. Mar. 2, 2020).  Elsner did not consider the deposition testimony of key CoStar witnesses with respect to several of his opinions.  For example, Elsner considered the deposition testimony of CREXi's CEO Michael DeGiorgio but not that of CoStar's CEO Andrew Florance, even though Florance testified about CoStar's watermark (relevant to Elsner's Affirmative Opinion 6 on watermarks).  Ex. 13 at Ex. 2; Ex. 19 at 208:3-10, 212:11-21.  Neither did Elsner consider the testimony of Jonathan Aceves, the only broker customer of CREXi to be deposed.  Ex. 13 at Ex. 2.  Aceves testified on multiple topics related to Elsner's Affirmative Opinions 1-6, such as the quality of CoStar's images and commission images.  Ex. 20 at 220:22-221:912, 278:17-279:25. Similar examples of Elsner's partial review of the record abound.  *See* Ex. 13 at Ex. 2.  "[S]uch a one-sided review of the available evidence undermines the reliability of those opinions because they are not based upon a more 'complete [and available] picture of what happened.'"  *Taylor v. Lemus*, 2015 WL 12698306, at * 7 (C.D. Cal. June 17, 2015) (excluding expert for reviewing only one party's discovery).

Elsner's failure to consider a balanced record warrants exclusion of his entire affirmative report, but is particularly egregious with respect to his Affirmative Opinions 2-4.  For Affirmative Opinion 2, Elsner opines that images should be licensed on a per-property basis.  *Supra* at 5.  But Elsner has no knowledge of real estate photography and no basis to offer this opinion: Elsner did not know whether CREXi copied images on a per-property basis (CREXi did not), *supra* at 5-6.  In Affirmative Opinion 3, he opines that after years of investments, it would have cost CoStar $7.09 to obtain each CoStar Image.  *Supra* at 7.  CoStar produced hundreds of documents relevant to the costs it expends to obtain images, including a

comprehensive spreadsheet that was the subject of an entire Rule 30(b)(6) deposition. Griffitts Decl. ¶ 7. Without explanation, Elsner did not rely on that spreadsheet or any other relevant evidence in forming his opinion about CoStar's costs, instead basing his opinion on a contract between another company, Ten-X, and a third party photographer. *Supra* at 6-7. Elsner later testified that he did not know that this contract was entered into before CoStar acquired Ten-X (thus not a CoStar contract) and did not know whether any of the CoStar Images were taken under that agreement (they were not). Ex. 12 at 263:7-21. Likewise, Elsner relies on only two documents to support his Affirmative Opinion 4, regarding what CoStar charges its customers to capture images. *Supra* at 7. As noted above, *id.*, neither document had anything to do with LoopNet.

## C. Elsner's Opinions Regarding The Hypothetical License Value of CoStar's Images Are Improper

In cases like this one, where one party willfully infringes another's intellectual property, the hypothetical-negotiation construct is a well-established framework for calculating damages. To calculate "the injury to [CoStar] based on a hypothetical-license theory, [one] look[s] to 'the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by [CREXi] of [CoStar's] work.'" *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087-88 (9th Cir. 2014). Fair market value can be determined through "objective evidence of benchmark transactions, such as licenses previously negotiated for comparable use of the infringed work." *Nolan v. Calello*, 2021 WL 4621945, at *5 (C.D. Cal. July 8, 2021). Settlement agreements can be used in that analysis, particularly "when 'the most reliable license in [the] record arose out of litigation.'" *Colibri Heart Valve LLC v. Medtronic CoreValve LLC*, 2021 WL 7285995, at *10 (C.D. Cal. Nov. 16, 2021) (collecting cases).

Elsner's hypothetical negotiation assumed non-competitive use of generic images that could be licensed without limitation on a subscription basis, disregarding

the actual use made of such images, the terms on which such images are licensed, and benchmark valuations of the very images at issue in the form of settlements that put a price on future use of those images by competitors. *See supra* at 7-8. In doing so, Elsner failed to conduct the hypothetical license negotiation in a manner that conforms with governing Ninth Circuit law, and omitted highly relevant information. Ex. 12 at 86:16-89:24. For either or both these reasons, his Affirmative Opinion 5 is unreliable and should be excluded.

### 1. Elsner Improperly Applied the Hypothetical-License Framework

In the Ninth Circuit, a hypothetical license analysis must consider the "actual use made by [the infringer] of the plaintiff's work." *Oracle*, 765 F.3d at 1087-88. While an objective test, an hypothetical license must reflect "the actual use made," which in turn requires an understanding of the facts. For example, use of a Mickey Mouse image in a school play would not result in the same fee as use of that image in a national advertising campaign. *See On Davis v. Gap, Inc.*, 246 F.3d 152, 166 n.5 (2d Cir. 2001).

Despite this edict, Elsner testified that in his hypothetical license negotiation, "I wasn't thinking about use by CREXi, I wasn't thinking about use by CoStar, I wasn't thinking about use by another realty firm. But I was thinking about could this be used by somebody that needed an image." Ex. 12 at 231:11-19. As a result, Elsner opined that a "willing buyer would not consider [certain CoStar Images]" because of the quality. *Id.* at 165:12-20. This is completely contrary to the actual use made by CREXi and CRE brokers of the CoStar Images at issue: it is ***undisputed*** that ***every single image at issue*** was licensed and used by at least one broker, and obtained and stored by CREXi, and in most cases published by CREXi. *Supra* at 3-4.

Even worse, not only did Elsner conduct his hypothetical license negotiation without the actual use of the CoStar Images in mind, he appears not to have known about their actual use by CREXi *at all*. Elsner testified that he "not provided with any documentation that would allow [him] to testify specifically to Crexi's use of the images." Ex. 12 at 240:10-12.

### 2.    Elsner Failed to Consider Comparable Licenses And Settlements, Contrary To His Own Prior Expert Work

Elsner likewise overlooked what courts in this Circuit have deemed the "most reliable" license models for the type of use CREXi made: post-infringement licenses for competitive use in the form of settlements. *Colibri*, 2021 WL 7285995, at *4. As noted above, CoStar has entered into five different court-approved settlements valuing post-infringement, competitive use of its images. Ex. 16 ¶ 32 n.40. These settlements are of particular significance because they accounted for future payments if the competing defendants used the images again. *See* Exs. 4-8. And two of those settlements (RealMassive and Xceligent) cover hundreds of the CoStar Images at issue here. *See* Exs. 4-5.

Elsner did not consider any of these settlements for his fair market value calculations. Ex. 12 at 50:7-12. That is not because he is unaware of their import and relevance; in prior engagements, Elsner has relied on settlement agreements to calculate fair market value. Ex. 21 at 10, 12-13. But here, Elsner neither sought to learn, nor was provided by CREXi, with information about CoStar's resolution of multiple copyright infringement lawsuits, including suits concerning some of the very same CoStar Images. Ex. 12 at 50:7-12.

When asked why he did not analyze the prior CoStar settlements, Elsner vaguely offered only that "the images shouted out for [him] to use the methodology" that he applied. *Id*. at 51:18-52:1. Courts exclude expert reports as inadmissible when the justification for the expert's approach is "an abstraction not visible to the

eyes of the Court, the jury, and opposing counsel." *Open Text S.A. v. Box, Inc.*, 2015
WL 349197, at *6 (N.D. Cal. Jan. 23, 2015).  This Court should likewise do so here.

### 3.    Elsner's Opinions on Specific License Types Are Unreliable

In his Affirmative Opinion 5, Elsner purports to evaluate which type of license
would be appropriate to use in the hypothetical valuation of CREXi's use of CoStar's
images: Rights Managed, Traditional Royalty Free, Microstock Royalty Free or
Subscription Licensing.  *Supra* at 7-8.  Per Elsner's report, each of these licenses is
applicable depending on the type of terms governing the license (i.e., more
restrictive versus not).  *Id.*  But Elsner did not know the terms of CoStar's existing
licensing agreements or CoStar's practices for enforcing those licenses.    For
example, Elsner did not know whether CoStar's license restricted the use of an image
to a broker representing a particular property, whether competitive use was
permitted, or whether the license allowed brokers to select images to use in their
listings.  *Supra* at 7.  Elsner also portrayed a fundamental lack of knowledge as to
the applicability of each of the license models he considered.  *See Pelican Int'l, Inc.
v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1043 ("[T]o be admissible, expert testimony
opining on a reasonable royalty must sufficiently tie the expert testimony on
damages to the facts of the case.").

***Rights-Managed & Royalty Free Licenses.***  Elsner opined that a Rights-
Managed license was inappropriate because he believed that "CoStar does not have
any system in place to track and record specific licenses."  Ex. 13 ¶ 106.  But Elsner
later testified that he had no idea whether that was the case: "Q. Again, do you know
the ***system that CoStar has in place to track compliance with its licenses***? A. ***No,
sir.***"[4]  Ex. 12 at 250:4-6.  Similarly, he rejects the possibility of a Royalty-Free
license without any knowledge of CoStar's existing license terms, *id.* at 187:9-19,

---

[4] Elsner—working for a client that has accused CoStar of excessively tracking and
pursing breaches—also testified that he did not know if CoStar tracks breaches of
its licenses, the identity of its licensees, or the price of its licenses.  Ex. 13 at 243:6-
244:6.

despite that being a relevant consideration to the hypothetical negotiation. *See Nolan*, 2021 WL 4621945, at *5.

Elsner further attempts to devalue CoStar's images by suggesting a volume discount would have applied to a Rights Managed license. *Supra* at 7. But again, Elsner applied his experience in valuing stock photography without knowledge as to whether CoStar has *ever* offered a volume discount for its non-generic imagery, much less to a competitor (it has not). Ex. 12 at 256:14-22.

***Subscription License.*** Elsner ultimately opines that a Subscription License of the type used for stock imagery is the appropriate basis for his hypothetical negotiation. *Supra* at 7-8. Here, again, Elsner's opinion is baseless. For example, Elsner asserts, without investigation, that the images were taken by uncredentialed photographers Ex. 12 at 115:13-18. Moreover, the supposedly "comparable" stock licenses offered by Shutterstock and iStock allow users to download an unlimited number of images. Ex. 13 ¶¶ 126-130. But CoStar's license only permits use of a tiny fraction of its library: images of properties represented by the specific broker user, Ex. 3 at -771, a fact of which Elsner was unaware. Ex. 12 at 187:9-19. As a result, stock image subscriptions are not appropriate "comparable licenses" for the hypothetical negotiation analysis. *See Oracle*, 847 F. Supp. 2d at 1187 (excluding reliance on non-comparable licenses). For this reason, as well as for any of the reasons outlined above, Elsner's Affirmative Opinion 5 should be excluded.

## D. Elsner Lacks The Requisite Knowledge To Opine On CoStar's Copyright Management Information

Elsner begins his Affirmative Opinion 6 on CMI by opining it is not industry practice to use a bare logo as CMI. *Supra* at 8-9. As established above, Elsner does not have any expertise in CRE images. *Supra at* 4. In reality, libraries of architectural images use bare logos regularly, a fact Elsner did not consider. Ex. 22 ¶ 47. Elsner was also unaware that major CRE brokerages and companies use copyright filters to detect CoStar's "bare" star logo, the very same CoStar-

watermark-focused copyright filter used CREXi.  Ex. 12 at 270:4-272:14.  Finally, there is ample legal precedent showing that bare images in multiple industries constitute CMI.  Dkt. 406 at 5-6 (summarizing cases); Elsner was likewise unaware of this precedent, Ex. 12 at 273:8-274:16, underscoring why courts reject legal opinions offered by experts.  *See, e.g.*, *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017).  As a result, Elsner's Affirmative Opinion 6 lacks the necessary expertise and foundation, and should not be presented to the jury.

### E. Elsner's Rebuttal Opinions Regarding Multipliers Are Inconsistent With Industry Practice And Unreliable

Elsner's Rebuttal Opinions 1 and 2 regarding Vaughan's use of multipliers are inadmissible for multiple independent reasons.  *First*, Elsner's Rebuttal Opinions are counterfactual and thus unreliable.  *Al Otro Lado*, 2021 WL 3929673, at *2 ("Expert testimony is inadmissible if it is … contrary to the facts of the case.").  Specifically, he opines that "[n]o such multipliers exist in the licensing contracts for … any of the major photo agencies I have worked with in the past twenty years."  Ex. 17 ¶ 102.  In fact, multipliers are commonly used by industry participants, including by the stock photograph library with which Elsner is most closely associated.  Elsner is a consultant to, and was Vice President of, Design Pics, Inc.  Ex. 13 at Ex. 1.  Design Pics' standard license provides for a five times multiplier.  Ex. 23 at 2.  Amazingly, Elsner testified that he was aware of this fact when he opined to the contrary. Ex. 12 at 151:7-11.  And Design Pics is not an outlier; several other significant image library licenses include multipliers.  Exs. 24-25.  Elsner ultimately acknowledged that his opinions on the use of multipliers were speculative, as he did not conduct "any research as to who was doing what at the present time."  Ex. 12 at 151:23-152:1.

*Second*, Elsner relied on a twenty-year-old case to suggest that multipliers are always impermissibly punitive and therefore not used in the industry.  Not only is this an impermissible legal opinion, it is wrong.  Ex. 17 ¶ 101.  Multipliers are an

accepted method of adjusting the fair market value of an image to account for unique aspects of the case. *See, e.g.*, *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 393 (3d Cir. 2016); *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 2020 WL 60351, at *6-8 (D.N.H. Jan. 6, 2020).  Indeed, the only support Elsner offers for his (erroneous and improper) legal conclusion is an alleged two-decade-old statement by Nancy Wolff, counsel for the Digital Media Licensing Association, that member agencies should cease to use multipliers in light of a contemporaneous case. *Supra* at 9-10.  But when pressed, Elsner could not identify that supposed statement by Wolff on which he relied. *Id.*  In any event, Ms. Wolff herself has testified to the contrary that multipliers are a valid, rational and common way to account for factors that influence the value of an image license, including scarcity, exclusivity and competitive use.  Ex. 22 at Ex. B; *see also* Ex. 26 at 41:3-42:6.

**Third**, Elsner's Rebuttal Opinion 1, regarding the scarcity multiplier, is independently unreliable because it is contrary to the facts of this case.  Elsner asserts that photographs "depicting the same properties [as the CoStar Images], are widely and inexpensively available." Ex. 17 ¶ 67.  And he suggests that brokers or CREXi could commission and substitute photos. *Id.* ¶ 70.  But these positions ignore that CREXi's self-avowed policy was only to use CoStar Images when comparable images were *not* available elsewhere. *Supra* at 9.  Elsner also acknowledged that commissioning photos would delay a listing in an industry where timing is key.  Ex. 12 at 168:23-169:12.  Nor did CREXi make use of the alternative image source that Elsner identified, Google StreetView, despite knowing that it faced legal jeopardy if it copied from LoopNet—presumably because Google images were not interchangeable with CoStar Images. *Supra* at 9.  Indeed, when presented with an images of the same property, one from CoStar and one from Google, Elsner agreed

1   the CoStar Image was more up to date.[5]  Ex. 12 at 283:19-286:2.  And Elsner

2   admitted that he would not use a Google image to sell his own property "because

3   [he] would certainly want to have good images."  *Id.* at 281:23-282:2.  He also

4   testified that he did not believe that Google offered a subscription license for its

5   StreetView images.  *Id.* at 257:23-258:3.  Without a viable alternative license option,

6   Google StreetView images cannot be an adequate substitute for the CoStar Images.

7   Because Elsner's Rebuttal Opinion 1 lacks factual or analytical support, it runs afoul

8   of Rule 702.

9       ***Fourth***, Elsner's Rebuttal Opinion 2, which rejects competitive use

10  multipliers, independently fails because, it is divorced from both practice and the

11  facts.  Elsner claims that competitive use multipliers have no basis in practice,

12  ignoring the fact that he was unaware of any commercial company licensing images

13  to a competitor. Ex. 17 ¶ 104; Ex. 12 at 82:14-18.  Despite this acknowledgement,

14  his value assessments offer no adjustment to capture the value lost when licensing

15  to a rival.  He also claims that a competitive use multiplier would be inconsistent

16  with CoStar's license because "any customer with a subscription to CoStar's

17  database is permitted to use photos from CoStar's service for marketing purposes,

18  'in connection with the ordinary course of … business.'" Ex. 17 ¶ 94.  False: CoStar

19  limits licensing to the representatives of a property, and specifically *prohibits* use on

20  competing sites. Ex. 3 at -771.  Last, Elsner suggests that no one would pay a higher

21  fee for competitive use when Google StreetView offers substitute images.  Ex. 17

22  ¶ 98.  But as discussed, there is no readily available substitute for the CoStar Images.

23  Divorced from reality and the facts, Elsner's opinion holds no value to the jury.

24  **V.    CONCLUSION**

25      For the foregoing reasons, CoStar's Motion should be granted.

26

27

28

---

[5] Neither did Elsner conduct any investigation to determine whether there were Google StreetView Images available to replace the CoStar Images at issue, Ex. 12 at 280:20-281:4.

1
2
3                                          Respectfully submitted,
4   Dated:  September 9, 2024              **LATHAM & WATKINS LLP**
5                                          By:  _/s/ Nicholas J. Boyle_
6                                          Nicholas J. Boyle
                                           (admitted *pro hac vice*)
7                                          Sarah A. Tomkowiak
                                           (admitted *pro hac vice*)
8                                          Anne C. Malinee
                                           (admitted *pro hac vice*)
9                                          Katherine L. Griffitts
                                           (admitted *pro hac vice*)
10                                         555 Eleventh Street, NW, Suite 1000
                                           Washington, D.C. 20004
11                                         Tel: 202.637.2200
                                           Fax: 202.637.2201
12                                         Email: nicholas.boyle@lw.com
                                                  sarah.tomkowiak@lw.com
13                                                anne.malinee@lw.com
                                                  katherine.griffitts@lw.com
14
                                           Elyse M. Greenwald
15                                         (Bar No. 268050)
                                           10250 Constellation Boulevard
16                                         Suite 1100
                                           Los Angeles, CA 90067
17                                         Tel: 424.653.5525
                                           Fax: 424.653.5501
18                                         Email:  elyse.greenwald@lw.com
19                                         Caitlin E. Dahl
                                           (admitted *pro hac vice*)
20                                         330 North Wabash Avenue
                                           Suite 2800
21                                         Chicago, IL 60611
                                           Tel: 312.876.7700
22                                         Fax: 312.993.9767
                                           Email: caitlin.dahl@lw.com
23
24                                         *Counsel for CoStar Group, Inc., and*
                                           *CoStar Realty Information, Inc.*
25
26
27
28

1

## **CERTIFICATE OF COMPLIANCE**

2      The undersigned, counsel of record for Plaintiffs and Counterdefendants

3  CoStar Group, Inc. and CoStar Realty Information, Inc., certifies that this brief

4  contains 6,970 words, which complies with the word limit of L.R. 11-6.1.

5

6   Dated:  September 9, 2024                    */s/ Nicholas J. Boyle*
                                                  Nicholas J. Boyle
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 2:20-cv-08819-CBM-AS
COSTAR'S MOTION TO EXCLUDE
THE OPINIONS OF GARY ELSNER