KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS #158708
epeters@keker.com
WARREN A. BRAUNIG #243884
wbraunig@keker.com
NICHOLAS S. GOLDBERG #273614
ngoldberg@keker.com
KATIE LYNN JOYCE #308263
kjoyce@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Attorneys for Defendant and Counterclaimant
COMMERCIAL REAL ESTATE EXCHANGE, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION INC.,<br><br>Plaintiffs,<br><br>v.<br><br>COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>Defendant. | Case No. 2:20-CV-08819 CBM (ASx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF COMMERCIAL REAL ESTATE EXCHANGE, INC.'S MOTION TO STRIKE SUPPLEMENTAL EXPERT REPORT OF THEA VAUGHAN**<br><br>Date:         October 29, 2024<br>Time:         10:00 a.m.<br>Ctrm:        8D, 8th Floor<br>Judge:       Hon. Consuelo B. Marshall |
| COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>COSTAR GROUP, INC. AND COSTAR REALTY INFORMATION, INC.,<br><br>Counterdefendants. | Date Filed:         September 25, 2020<br><br>Pre-Trial Conf.:   February 11, 2025<br>Trial Date:          March 11, 2025 |

2779621

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ..................................................................... 2

    A.    Ms. Vaughan's Opinions Were Eviscerated at Deposition ................. 2

    B.    The Scheduling Order Does Not Permit "Reply" or "Sur-Rebuttal" Reports ................................................................................. 7

    C.    Ms. Vaughan Submits a Supplemental Report in An Attempt to Revive and Bolster Her Opinions ...................................................... 7

        1.    Microstock and Subscription Licenses ..................................... 7

        2.    Use of Multipliers ..................................................................... 8

        3.    Alternatives to Licensing Images from CoStar ......................... 9

        4.    New Explanations about Watermarks ...................................... 10

III.  ARGUMENT ........................................................................................... 10

    A.    The Supplemental Report is not permitted under the scheduling order. .............................................................................. 12

    B.    The Supplemental Report is not a proper supplement. ...................... 12

        1.    The Supplemental Report is not based on new information. ............................................................................... 12

        2.    The Supplemental Report is an improper attempt to bolster Ms. Vaughan's opinions. ............................................... 14

    C.    The Supplemental Report is neither substantially justified nor harmless. ............................................................................................ 16

IV.   CONCLUSION ........................................................................................ 18

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CREXI'S MOTION TO STRIKE SUPPLEMENTAL EXPERT REPORT OF THEA VAUGHAN
Case No. 2:20-CV-08819 CBM (ASx)

2779621

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bessler v. City of Tempe*,
    2021 WL 3089104 (D. Ariz. July 22) .................................................... 11, 16, 17

*Federal Deposit Insurance Corp. v. Van Dellen*,
    2012 WL 12886825, at *2 (C.D. Cal. Nov. 6, 2012) ........................................ 13

*Lo v. United States*,
    2021 WL 5121745 (W.D. Wash. Nov. 3, 2021) ................................................. 16

*Luke v. Fam. Care & Urgent Med. Clinics*,
    323 F. App'x 496 (9th Cir. 2009)................................................................. 11, 16

*Mariscal v. Graco, Inc.*,
    52 F. Supp. 3d 973 (N.D. Cal. 2014)........................................................... 12, 13

*Martinez v. Costco Wholesale Corp.*,
    336 F.R.D. 183 (S.D. Cal. July 22, 2020) .................................................... 13, 17

*Sherwin-Williams Co. v. JB Collision Servs., Inc.*,
    2015 WL 1119406 (S.D. Cal. Mar. 11, 2015)................................. 11, 12, 13, 16

*Wong v. Regents of Univ. of Cal.*,
    410 F.3d 1052 (9th Cir. 2005)........................................................................ 17

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001)........................................................................ 11

**Rules**

Fed. R. Civ. P. 26.....................................................................10, 11, 13, 16

Fed. R. Civ. P. 37.................................................................................... 11

2779621

## I.    INTRODUCTION

On August 9, 2024, CoStar served a 39-page "Supplemental Expert Report" for its purported expert, Thea Vaughan. Ms. Vaughan served her initial expert report on March 19, 2024 (amended on March 27 to correct typographical errors) and was deposed on June 7. In her opening report, Ms. Vaughan, a self-employed "marketing and brand consultant" and acquaintance of CoStar's head of photography, who has never been qualified as an expert, offered the remarkable opinion that the "fair market value of a hypothetical license CoStar would issue to CREXi to use and publish a CoStar image is between $5,625 and $18,750 per image." Ms. Vaughan reached that conclusion by calculating a benchmark licensing fee of $375 per image, then applying a series of "multipliers" in order to enhance the hypothetical license value to astronomical levels that nobody would ever pay for images of parking lots, strip malls, and apartment buildings (and 1000x more than CoStar paid per image to create them). Ms. Vaughan also offered opinions about the supposed "purpose" of a content owner's watermark.

Not surprisingly, Ms. Vaughan was unable to defend these opinions. At her deposition, Ms. Vaughan acknowledged that her benchmark license was inflated: the very images she pointed to in order to justify a $375 per image baseline license could in fact be licensed for $7 per image. And she was forced to admit that her multipliers were unsupported by any record evidence. Indeed, she created them "in her head" based on "pure knowledge." Ms. Vaughan's opinions are unreliable and are the subject of a *Daubert* motion to exclude that is being filed separately.

The Supplemental Vaughan Report is just a second bite at the apple. It does not turn on newly produced evidence or information unavailable to her at the time of her initial report or her deposition. Instead, it offers both new opinions and old opinions with new factual support, including a third-party declaration that Ms. Vaughan (or CoStar's lawyers) obtained, new baseline licenses, and customer-support communications with image licensors that took place after her deposition. It

1

2779621

also responds to two rebuttal reports CREXi served that attack various aspects of Ms. Vaughan's methodology. But the scheduling order does not contemplate "reply reports" or "sur-rebuttal reports." And the significant changes to her methodology and factual support would require reopening expert discovery for a new deposition and new rebuttal reports—when trial is barely six months away, when *Daubert* motions have already been filed, and when this Court recently held that "re-opening discovery would [cause] prejudice" at this juncture. ECF No. 829 at 9.

CoStar is not allowed to move the goalposts in this manner, and CREXi should not be required to bear the prejudice. The Supplemental Vaughan Report should be stricken.

## II.    FACTUAL BACKGROUND

### A.    Ms. Vaughan's Opinions Were Eviscerated at Deposition

Ms. Vaughan's initial report, served on March 19, 2024 and amended on March 27 to correct a few typographical errors, included three opinions.

First, Ms. Vaughan opined that the "value" of a "hypothetical license" to the approximately 48,000 Asserted Images in this case would be in the range of $5,625 - $18,750 *per image*. Declaration of Warren A. Braunig in Support of CREXi's Motion to Strike Supplemental Vaughan Report ("Braunig Decl."), Ex. 1 (Amended Expert Report of Thea Vaughan) ("Initial Rpt.") ¶ 79. To reach those astounding numbers, Ms. Vaughan located images similar to the CoStar Images on the website of Getty Images, which is "the largest image licensing library in the world[.]" Initial Rpt. ¶ 51. She then assumed that a particular type of license, a "Royalty Free" license, would have hypothetically been used. Using a tool on the Getty Images website, the "Getty Calculator," she selected the price for a Royalty-Free license to a medium-sized image, to establish a benchmark licensing fee of $375 for each of the Asserted Images. *Id.* ¶¶ 52-56. Ms. Vaughan then applied two multipliers to this benchmark license:  a "scarcity multiplier" of 3–5X, because "the images are unique to the creator and there are no exact images like them in the

2779621

marketplace" (*id.* ¶ 70); and then a "competitive multiplier" of 5–10X, which she opined should be applied "when the licensee is a direct competitor of the content owner" (*id.* ¶ 75). These multipliers—the basis for which is not disclosed in her report—transformed the $375 benchmark license into a license of $5,625 - $18,750 per image. In other words, Ms. Vaughan posited that a rational third-party would pay as much as $18,750 per image to license photographs like the following images asserted by CoStar in this case:








2779621

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28















4

2779621

Braunig Decl., Ex. 2.

The flaws in Ms. Vaughan's "hypothetical license" analysis became readily apparent during her June 7, 2024 deposition. Ms. Vaughan acknowledged her complete lack of experience in negotiating licenses for commercial real estate listings. Braunig Decl., Ex. 3 (Transcript of June 7, 2024 Deposition of Thea Vaughan) ("Vaughan Dep. Tr.") at 65:12-67:21. She confirmed that her report evaluated only two types of licenses—Royalty Free and Rights Managed—but not others like microstock and subscription models. *Id*. at 97:3-17. She admitted that the type of license she chose for her benchmark—Royalty Free licensing—does not match the way CoStar actually licenses images, *id*. at 135:8-14, and does not "fit" this case. *Id*. at 134:12-20. And she was forced to acknowledge that the same images she used to establish her $375 benchmark license are in fact available for only $7. *Id*. at 169:9-170:3.

With respect to the gratuitous "scarcity" and "competitive use" multipliers that she stacked on top of each other, Ms. Vaughan testified that, as far as she is aware, such stacked-multiplier licensing has "never been done." *Id*. at 200:3-8, 202:23-203:9. She offered no examples of a license, from CoStar or any other entity, that has a documented scarcity multiplier. *Id.* at 200:20-201:22; 202:14-203:1. And she testified that she had made no effort to determine if the images in question were actually scarce (for example by looking for them in a reverse image search or looking on broker websites for comparable pictures). *Id*. at 247:6-15, 253:22-254:1. Similarly, for her competitive-use multiplier, Ms. Vaughan conceded that a license containing a multiplier for competitive use was "unheard of" and has "never been done." *Id*. at 201:23-202:11, 203:2-9. She also could not explain why a competitive use multiplier should apply to CREXi when CoStar actually licenses photographs to brokerages that it considers competitors, without a multiplier. *Id*. at 262:7–264:1. While she testified that she was confident she had seen 5-15x multipliers in her career, she could not point to any specific ones. *Id*. at 189:5-

5

2779621

192:17, 195:4-19. And she was unable to explain how she had come to the precise multipliers that she chose in this case, claiming that her analysis was done "in [her] head" based on "pure knowledge." *Id*. at 202:14-22.

Finally, she admitted she was not aware of any buyer offering to license CoStar images for the price she suggests (*id*. at 131:6-11) and admitted that she had failed to consider the possibility that a "hypothetical licensee" confronted with an $18,000 price tag for a picture of a toilet or an empty field might choose to forego the license altogether or invest in a replacement image at a far lower cost (*id*. at 245:6-247:4).

Ms. Vaughan's second opinion was that "based on [her] extensive experience . . . CoStar's practice of watermarking images with its logo is consistent with an intent…to reflect its ownership of digital assets." Initial Rpt. ¶¶ 4, 80-86. At her deposition, she took the striking position that any watermark on an image beyond a pencil-dot is intended to convey ownership of the image. Vaughan Dep. Tr. at 295:16-297:1. But, putting aside the issue of whether Ms. Vaughan's interpretation of a copyright owner's mental state is a proper subject for expert opinion (it is not), when confronted with images bearing non-CoStar third-party watermarks, Ms. Vaughan admitted she was unable to determine whether any particular watermark meant ownership unless it carried the © copyright symbol. *Id*. at 369:13-372:19. Ms. Vaughan was also forced to acknowledge CoStar's own history of using watermarks on images that are not owned by CoStar. *Id*. at 314:11-317:2, 317:17-20, 318:19-319:11, 320:13-324:3, 333:1-334:4, 335:10-18.

Ms. Vaughan's third opinion was that CoStar has been harmed in multiple ways when its watermark is altered or removed, although "[t]hese impacts are difficult to quantify[.]" Initial Rpt. ¶ 93. At her deposition, however, Ms. Vaughan admitted that her theories of harm were not based on any evidence in the record. Vaughan Dep. Tr. at 337:3-16, 339:1-11, 343:12-344:25, 355:9-358:7, 358:23-360:2.

2779621

**B.    The Scheduling Order Does Not Permit "Reply" or "Sur-Rebuttal" Reports**

The Court's scheduling order set three critical dates for expert discovery:

- March 19, 2024:  Opening Expert Reports
- April 19, 2024:  Rebuttal Expert Reports
- May 10, 2024:  Close of Expert Discovery

ECF No. 792. By agreement of the parties, certain depositions carried over into the summer, and the rebuttal expert report of Cate Elsten was served on May 20, 2024, due to a medical procedure. The scheduling order did not contemplate or authorize "reply reports" or "sur-rebuttals" of any kind.

Ms. Vaughan was deposed on June 7, 2024, after CoStar initially postponed her deposition.

**C.    Ms. Vaughan Submits a Supplemental Report in An Attempt to Revive and Bolster Her Opinions**

On August 9, two months after her deposition and three months after the close of expert discovery, Ms. Vaughan submitted a 39-page "Supplemental Expert Report" that is chock full of new "evidence," new analysis, and new opinions. Braunig Decl., Ex. 4 (Supplemental Expert Report of Thea Vaughan) ("Supp. Rpt."). Ms. Vaughan claims that the purposes of her Supplemental Report are "to respond to the May 20, 2024 expert rebuttal report submitted by Cate Elsten" and to address "additional evidence that is relevant to my opinions." *Id.* ¶¶ 4-5. Notably, as discussed below, none of this is new evidence produced by the parties. Instead, it is evidence that Ms. Vaughan belatedly chose to rely on or developed to try to resuscitate her opinions. And, in each case, Ms. Vaughan is attempting to work around admissions made in her deposition.

**1.    Microstock and Subscription Licenses**

At her deposition, Ms. Vaughan conceded that her report failed to address or discuss microstock or subscription licenses, even though CoStar only licenses its images on a subscription basis. Vaughan Dep. Tr. at 96:15-98:3. The word

7

2779621

"microstock" literally does not appear in Ms. Vaughan's initial report; and the only discussion of subscriptions is her acknowledgment that CoStar actually licenses photographs on a subscription basis. Initial Rpt. ¶¶ 22, 34. In her Supplemental Report, however, Ms. Vaughan dedicates 8 of the 49 paragraphs to explaining why she rejected using microstock or subscription licenses. Supp. Rpt. ¶¶ 17-25. In support of this new opinion, Ms. Vaughan relies on her experience at Corbis, which ended years before her Initial Report was written (*id*. ¶ 18); communications between CoStar and a company called Pixsy from January 2020 that were produced in this case in 2023 (*id*. ¶ 20); communications that she had with representatives from Getty Images that took place both before and "[f]ollowing [her] deposition" (*id*. ¶ 21); and public information about CREXi's relationship with the National Association of Realtors from 2019 (*id*. ¶ 25). All of this information was available to Ms. Vaughan before her Initial Report was due, but none was included.

### 2. Use of Multipliers

In an attempt to justify her use of multipliers, Ms. Vaughan manufactured additional new evidence, this time in the form of a hearsay declaration from a copyright lawyer in New York, Nancy Wolff. Braunig Decl., Ex. 5 (Ex. B to Supp. Rpt.). At her deposition, Ms. Vaughan reported that she had spoken with Ms. Wolff on May 23, a conversation arranged by CoStar's counsel at Latham & Watkins. Vaughan Dep. Tr. at 41:3-7, 44:7-12. Ms. Vaughan testified that Ms. Wolff had told her that "multipliers in the context of contracts for stock agencies, image licensing agencies had somewhat disappeared" since a 2004 case but that "in practice they are still in play and still occur within image libraries and photo agencies." *Id*. at 41:15-25. Ms. Vaughan stated that she did not "have any new opinions based on this one call with Nancy Wolff." *Id*. at 45:5-46:3.

With her Supplemental Report, Ms. Vaughan submitted an August 8, 2024[1]

---

[1] August 8, 2024 is one day before Ms. Vaughan submitted her supplemental report.

8

2779621

declaration from Ms. Wolff that repeats and attempts to bolster numerous aspects of Ms. Vaughan's report. *See* Ex. 5. Ms. Wolff, of course, is not a designated expert in this case and has not been disclosed as a witness or cross-examined. There is no record of what exactly Ms. Vaughan or the lawyers from Latham told Ms. Wolff, what information she was (or wasn't provided), or who drafted the declaration. But Ms. Vaughan repeatedly relies on Ms. Wolff's opinions to bolster her own and repeats portions of Ms. Wolff's declaration verbatim in her supplemental report. *See, e.g.*, Supp. Rpt. ¶ 34.

The Supplemental Report also returns at length to issues from Ms. Vaughan's deposition concerning her testimony about CoStar's settlements and judgments from prior cases, even though she states that these settlements "did not affect [her] opinion." *Id*. ¶ 38. Nonetheless, Ms. Vaughan proceeds to detail "two additional settlement agreements between CoStar and its competitors," settlement agreements that were not relied upon by her in her Initial Report and were not the subject of cross-examination. *Id*. ¶ 39. And Ms. Vaughan now opines that those settlements "corroborate the hypothetical license values that I independently reached[.]" *Id*. ¶ 37.

### 3.    Alternatives to Licensing Images from CoStar

As discussed above, at her deposition, Ms. Vaughan clearly disclaimed any opinions about the alternatives to licensing for a potential buyer as part of her hypothetical negotiation. She did not "consider any costs to CoStar" to take the Asserted Images. Vaughan Dep. Tr. at 243:3-244:7. Nor did she consider the "alternative cost that a buyer could chose to pay if they wanted to hire someone to take a replacement image" for the Asserted Images. *Id*. at 246:5-247:4; *see also* Supp. Rpt. ¶ 40 ("I was not asked to consider alternatives to licensing."). CREXi's expert Cate Elsten did address that issue though in her rebuttal report, noting that it was a deficiency in Ms. Vaughan's hypothetical negotiation analysis. Braunig Decl., Ex. 6 (Elsten Rebuttal Report) at 75-77. Now Ms. Vaughan makes a 180-

9

2779621

degree turn and offers four sur-rebuttal opinions attacking Ms. Elsten. *See* Supp. Rpt. ¶¶ 41-46. Ms. Vaughan even conducted a brand-new analysis in which she cherry-picked 65 CoStar images that she claims do not have an equivalent image on Google Street View. *Id*. ¶ 44; Braunig Decl., Ex. 7 (Ex. C to Supp. Rpt). This analysis was not previously disclosed and CREXi had no opportunity to evaluate or challenge it.

### 4.    New Explanations about Watermarks

In an effort to evade her extraordinary claim that every watermark conveys ownership (Vaughan Dep. Tr. at 296:5-297:1) and her subsequent admission that she could not know which third-party watermarks actually did so—except for one that properly used the © symbol (*id*. at 369:13-372:19)—Ms. Vaughan just revisits her testimony and offers new answers. She tries to explain that regardless of her testimony, "I still understood that the watermark reflected that the image was owned and could not be copied without authorization[.]" Supp. Rpt. ¶ 47. She revisits her testimony about the image with the © copyright symbol and relies once more on Ms. Wolff's declaration for the legal-conclusion claim "that CMI 'is defined very broadly and can include a variety of watermarks,' including 'bare watermarks.'" *Id*. ¶ 48. She then says that she has since reviewed "additional evidence since [her] deposition"—namely, documents long ago produced by CREXi concerning direction it gave to its vendors about CoStar's logo watermark ***after this litigation was filed*** and CoStar had asserted that its pinwheel-logo was a marker of copyright ownership. Ms. Vaughan uses this evidence to assert that "CREXi thus understands that CoStar's bare watermark reflects copyright ownership." *Id*. ¶ 49.

## III.    ARGUMENT

The Supplemental Vaughan Report is improper and prejudicial. Under Rule 26, a party's expert witness must disclose via written report "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" Fed.

10

2779621

R. Civ. P. 26(a)(2)(B)(i). This information must be disclosed "at the times and in the sequence that the court orders." *Id*. at (a)(2)(D). Parties must supplement or correct these disclosures "in a timely manner if the party learns that in some material respect the disclosure" is either incomplete or incorrect. Fed. R. Civ. P. 26(e)(1)(A). "Supplementation under the [Federal Rules of Civil Procedure] means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Luke v. Fam. Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009). "In determining whether a supplement under Rule 26(e) is appropriate, the court considers (1) whether the supplemental information corresponds to a prior Rule 26(a) disclosure and, if so, (2) whether the supplemental information was available at the time set for the initial disclosure." *Sherwin-Williams Co. v. JB Collision Servs., Inc.*, 2015 WL 1119406, at *7 (S.D. Cal. Mar. 11, 2015).

If a party fails to provide the information as required under Rule 26(a) or (e), then "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). "Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). The burden to prove the failure was substantially justified or is harmless falls on the party facing exclusion, and courts may consider factors like "prejudice or surprise to the party against whom the evidence is offered" and the "likelihood of disruption of the trial[.]" *Bessler v. City of Tempe*, 2021 WL 3089104, at *13 (D. Ariz. July 22), *amend. on recons. in part*, 2021 WL 4122247 (D. Ariz. Sept. 9, 2021).

The Supplemental Vaughan Report should be stricken for three reasons. First, the scheduling order does not permit reply reports or sur-rebuttal reports. Second, the Supplemental Report is an improper supplement to Ms. Vaughan's

11

2779621

prior reports. Third, the Supplemental Report is neither substantially justified nor harmless. Allowing it to stand would be highly prejudicial and unfair to CREXi.

### A.    The Supplemental Report is not permitted under the scheduling order.

Ms. Vaughan admits that she submitted her Supplemental Report to "respond to the May 20, 2024 expert rebuttal report submitted by Cate Elsten[.]" Supp. Rpt. ¶ 4. However, the scheduling order in this case addressing expert discovery does not authorize parties to serve reply reports or sur-rebuttal reports. ECF No. 792. Allowing CoStar to serve an unauthorized expert report would encourage "a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports." *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 983-84 (N.D. Cal. 2014). If CoStar may "construe supplementation to apply whenever [it] wants to bolster or submit additional expert opinions," that "would wreak havoc in docket control and amount to unlimited expert opinion preparation." *Sherwin-Williams Co.*, 2015 WL 1119406 at *7. Ms. Vaughan's Supplemental Report should be stricken on this basis alone.

### B.    The Supplemental Report is not a proper supplement.

#### 1.    The Supplemental Report is not based on new information.

While Ms. Vaughan states that she is supplementing her initial and rebuttal reports after reviewing "new" evidence purportedly relevant to her opinions, the supposed evidence she relies on is not new at all and was previously available to Ms. Vaughan to include in her prior reports. Supp. Rpt. ¶ 5. The purportedly "new" evidence addressed in the Supplemental Report includes correspondence from January 2020 (*id*. ¶ 20), an October 21, 2020 agreement (*id*. ¶ 49), an October 27, 2020 email and memorandum (*id*.), articles from 2019 and 2022 (*id*. ¶ 25), a declaration CoStar's lawyers obtained from a copyright lawyer in New York that Ms. Vaughan had spoken to before her deposition (*id*. ¶ 33), and an analysis Ms. Vaughan conducted evaluating Google Street View images for "addresses

2779621

associated with CoStar Images" (Supp. Rpt. ¶ 44, Ex. 7). All of this information was either produced prior to her March 19 report and her June 7 deposition or could have been gathered by Ms. Vaughan from public sources before then.

Instead, Ms. Vaughan is improperly attempting to bolster her expert opinions using materials that were available to her but that she failed to include in her prior reports. *See Sherwin-Williams Co.*, 2015 WL 1119406 at *7 (recognizing that courts have rejected supplemental expert reports that attempted to deepen or strengthen the expert's prior reports). Ms. Vaughan could and should have included this evidence and her accompanying opinions in the expert disclosures permitted under the scheduling order. In *Martinez v. Costco Wholesale Corp.*, the court granted the defendant's motion to strike a supplemental expert report that attempted to "enrich[]" the expert's initial report with "detail that was admittedly available to [the plaintiff's] expert at the time she drafted the initial expert report." 336 F.R.D. 183, 189 (S.D. Cal. July 22, 2020). Similarly, in *Federal Deposit Insurance Corp. v. Van Dellen*, another judge in this district struck a supplemental report because it was not based on "amended or newly discovered loan data" but instead presented a "new and deeper analysis aimed at strengthening the opinions expressed in the original expert report." 2012 WL 12886825, at *2 (C.D. Cal. Nov. 6, 2012) (Fischer, J.). "Although Rule 26(e) obliges a party to supplement or correct its disclosures upon information later acquired, this does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness report[.]" *Mariscal*, 52 F. Supp. 3d at 983-84 (internal quotations omitted).

Ms. Vaughan's supplemental report is of a completely different character than the amended reports served by other CoStar and CREXi witnesses in this case. Last month, CoStar also submitted amended reports from two of its other designated witnesses, Louis Dudney and Peter Kent. Those reports, while probably unnecessary under Rule 26, were confined to elaborating on the subsequent

testimony of CREXi expert Cate Elsten and some newly produced CREXi data. Likewise, Ms. Elsten twice amended her opening expert report concerning CREXi's affirmative trademark damages, after CoStar produced entirely new data about its use of CREXi's mark in search engine advertising and supplemented its interrogatory responses. Ms. Elsten's further amended report, served last week, addressed the amended report and testimony of Mr. Kent, who was relying on his own new conversations with CoStar employees to testify about the meaning and interpretation of newly produced CoStar documents. CoStar will no doubt try to raise a false equivalence to these other amended reports, but Ms. Vaughan's *39 pages* of new material and opinions, and her extensive reliance on previously available materials and entirely new analyses, are qualitatively different from the minor amendments of other experts in this case.

> **2.    The Supplemental Report is an improper attempt to bolster Ms. Vaughan's opinions.**

Ms. Vaughan improperly uses the Supplemental Report to try to strengthen her prior disclosures and sidestep her problematic deposition testimony. Ms. Vaughan was unable to support her expert opinions at her June 7 deposition, admitting that she had not addressed microstock or subscription licenses (Vaughan Dep. Tr. at 97:3-17); acknowledging that her 15-50x multipliers were not based on any specific licenses or industry guidelines but rather things that she calculated in "[her] head" (*id*. at 195:4-196:4, 200:15-19, 201:9-202:11, 202:14-203:9); admitting that she did not consider alternatives to licensing from CoStar (*id*. at 246:5-247:4); and making the extraordinary claim that every watermark under the sun conveys copyright ownership (*id*. at 296:5-297:1). Now, Ms. Vaughan admits to conducting additional research, such as speaking with a Getty Images representative and re-reviewing license terms, *after* her deposition in an attempt to salvage her opinions. *See, e.g.*, Supp. Rpt. ¶ 21 ("Since I issued my Rebuttal Report, I have re-reviewed additional license terms and understand that microstock

14

2779621

libraries, such as iStock, include an exception that appears to allow for employers to sublicense licenses to their employees . . . Following my deposition, I communicated with another representative for Getty on June 12, 2024… Accordingly, based on my communications with these representatives, it seems as though a corporation would need to negotiate with the image library regarding the terms of a multi-seat licensing agreement, even for subscription-based licensing."); *see also id.* ¶ 20 (describing review of correspondence between CoStar and Pixsy); *id.* ¶ 25 ("[S]ince submitting my Rebuttal Report, I have seen evidence showing that CREXi sublicenses images on its website."); *id.* ¶ 29 (identifying and relying on additional Master Services Agreement reviewed "following [her] deposition"); *id.* ¶ 31 (identifying new examples of exclusivity licenses); *id.* ¶ 39 ("I reviewed two additional settlement agreements between CoStar and its competitors").

Ms. Vaughan similarly attempts to use a brand-new declaration from Nancy Wolff, no doubt secured and drafted by CoStar's counsel, to bolster her unsubstantiated multiplier analysis. Ms. Vaughan claims in the Supplemental Report that Ms. Wolff "reinforced the way in which multipliers can be and are used in practice" and that Ms. Wolff "stated that image licenses, in practice, often apply multipliers to account for various factors." *Id.* ¶ 34. This is in stark contrast to Ms. Vaughan's deposition, where Ms. Vaughan testified that Ms. Wolff had told her "multipliers in the context of contracts for stock agencies, image licensing agencies, had somewhat disappeared[.]" Vaughan Dep. Tr. at 41:15-25. Ms. Vaughan also testified at her June 7 deposition, which was taken after Ms. Elsten served her May 20 rebuttal report, that she "[did not] have any new opinions" based on her May 23 call with Ms. Wolff, *id.* at 45:5-46:3, demonstrating that Ms. Vaughan is improperly using the Wolff Declaration in a futile attempt to resuscitate the multiplier opinions that imploded during her deposition.

Ms. Vaughan cannot use the Supplemental Report to "cover failures of omission because [she] did an inadequate or incomplete preparation" for her prior

disclosures and her deposition. *Sherwin-Williams Co.*, 2015 WL 1119406 at *7. Rule 26 does not "create a loophole through which a party who submits partial expert witness disclosures, or who wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline for doing so has passed." *Luke*, 323 F. App'x at 500. The Court should strike the Supplemental Report as an improper attempt to bolster Ms. Vaughan's opinions. *See Lo v. United States*, 2021 WL 5121745, at *2 (W.D. Wash. Nov. 3, 2021) (striking the expert's supplemental report in its entirety because the report "was an effort to address the inadequacies [the expert] perceived in his report based upon" deposition questioning) (internal quotations omitted).

### C.    The Supplemental Report is neither substantially justified nor harmless.

For the reasons discussed above, the Supplemental Report is not substantially justified. The allegedly "new" material cited in the Supplemental Report was previously available to Ms. Vaughan to include and address in her prior reports. In *Bessler v. City of Tempe*, the court held that the defendant's untimely disclosure of an expert declaration was not substantially justified given that "all the information in [the] declaration was previously available and there is no reason why it could not have been included in the [initial disclosure]." 2021 WL 3089104 at *13. The fact that CREXi identified weaknesses in Ms. Vaughan's opinions, whether through its own experts' rebuttal reports or through deposing Ms. Vaughan, similarly does not provide sufficient justification for an untimely disclosure. *See id.* (holding that "[a]ttempting to cure a deficiency in a prior expert report is not sufficient justification for a later, untimely disclosure").

Moreover, the untimely disclosure of the Supplemental Report is not harmless. On the contrary, it is prejudicial. The Supplemental Report was served after Ms. Vaughan's June 7 deposition, preventing CREXi from questioning Ms.

2779621

Vaughan on it. That prejudice cannot be overcome by, for example, granting another deposition. "[R]eopening discovery, even for the limited purpose of allowing [a party] to depose [an expert] a second time or present rebuttal expert testimony…will not eliminate the prejudice resulting from the untimely disclosure," which "is true even when trial is not imminent." *Id.*, *see also Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005) (holding that "[d]isruption to the schedule of the court and other parties…is not harmless," even when "the ultimate trial date was still some months away"); *Martinez*, 336 F.R.D. at 190-91 ("If [the Court] were inclined to set an additional rebuttal expert report deadline, which it is not, the Court would effectively be imposing further unnecessary litigation costs and expense[s] on Defendant, all in an effort to accommodate Plaintiff's non-compliance."). Here, the trial date *is* imminent—just six months away, on March 11, 2025—and the parties are already heavily engaged in pretrial briefing. Opening summary judgment motions were filed on August 20; *Daubert* motions are being filed on September 9; and motions in limine are due on December 17. The timeline would not easily accommodate another expert deposition and potential rebuttal reports, nor should CREXi have to bear the expense of that process, simply because CoStar's expert decided to re-do her report.

Indeed, less than one month ago, the Court denied CREXi's motion for leave to amend its counterclaims on the basis that *CoStar* would be prejudiced because "granting the motion will likely require re-opening discovery to allow the parties to conduct full discovery" on CREXi's amended counterclaims. ECF No. 829 at 9. As the Court explained, this "prejudice factor" "carries the most weight" and counseled in favor of denying leave to amend. *Id.* The same reasoning applies here—with even greater strength. If Ms. Vaughan's Supplemental Report is permitted to stand, CREXi will need extensive and time-consuming discovery to rebut it. CREXi will need another round of document requests and written discovery to understand the bases for Ms. Vaughan's untimely opinions; the documents regarding her

2779621

discussions with Ms. Wolff and the drafting of Ms. Wolff's declaration; the documents underlying her new analysis related to Google Street View images; and more. CREXi would also insist on depositions of Ms. Vaughan and Ms. Wolff. But CREXi does not wish to conduct this eleventh-hour discovery, and it would be severely prejudiced by having to do so. Allowing Ms. Vaughan to supplement her report would severely prejudice CREXi for the exact same reasons the Court recognized when it denied CREXi's motion for leave to amend.

CoStar should not be allowed to disrupt the case schedule by serving an untimely and unauthorized expert disclosure.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant CREXi's motion and strike the Supplemental Vaughan Report in its entirety.

Dated: September 9, 2024                      KEKER, VAN NEST & PETERS LLP


                                              By:  */s/ Warren A. Braunig*
                                                   Elliot R. Peters
                                                   Warren A. Braunig
                                                   Nicholas S. Goldberg
                                                   Katie Lynn Joyce

                                                   Attorneys for Defendant and Counterclaimant
                                                   COMMERCIAL REAL ESTATE
                                                   EXCHANGE, INC.

18

2779621

<u>**LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**</u>

The undersigned, counsel of record for Defendant and Counterclaimant Commercial Real Estate Exchange, Inc., certifies that this brief contains 5,188 words, which complies with the word limit of Local Rule 11-6.1.

Dated:  September 9, 2024                    KEKER, VAN NEST & PETERS LLP

                                            By:  */s/ Warren A. Braunig*
                                                 Warren A. Braunig

                                                 Attorneys for Defendant and Counterclaimant
                                                 COMMERCIAL REAL ESTATE
                                                 EXCHANGE, INC.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CREXI'S MOTION TO STRIKE
SUPPLEMENTAL EXPERT REPORT OF THEA VAUGHAN
Case No. 2:20-CV-08819 CBM (ASx)

2779621