# EXHIBIT 2

```
 1               UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4     _____
                                        )
 5     COSTAR GROUP, INC., and COSTAR   )
       REALTY INFORMATION, INC.,        )
 6                                       )
                Plaintiffs,             )
 7                                       )
            vs.                          )
 8                                       ) Case No.
       COMMERCIAL REAL ESTATE EXCHANGE, ) 2:20-cv-08819
 9     INC.,                             ) CBM(ASx)
                                         )
10              Defendant.              )
       _____)
11                                       )
       COMMERCIAL REAL ESTATE EXCHANGE, )
12     INC.                              )
                                         )
13          vs.                          )
                Counterclaimant,        )
14                                       )
       COSTAR GROUP, INC., and COSTAR   )
15     REALTY INFORMATION, INC.,         )
                                         )
16              Counter Defendants.     )
       _____ )
17

18

19               DEPOSITION OF THEA VAUGHAN

20                  Friday, June 7, 2024

21                        Volume I

22

23     Reported by:
       KATHLEEN E. BARNEY
24     CSR No. 5698, RPR
       Steno, Inc. Job No. 1015095
25     PAGES 1 - 390
```

THEA VAUGHAN
JUNE 07, 2024                                                              JOB NO. 1015095

```
           1      A   Correct.

           2      Q   And you're not offering expert opinions on

           3   anything having to do with CREXi's affirmative

           4   claims against CoStar, correct?

09:37:49   5      A   Correct.

           6      Q   Okay.  And let me see if I have anything

           7   else.

           8          Okay.  We can leave it there.  Thank you.

           9      A   Okay.

09:38:03  10      Q   When were you first contacted about this

          11   case?

          12      A   It was at the very end of last year.  I don't

          13   know precisely when.  Maybe November.

          14      Q   Roughly November of 20 --

09:38:17  15      A   Of '23.

          16      Q   Okay.  Who contacted you?

          17      A   Roberto.

          18      Q   Roberto Borgert at Latham & Watkins?

          19      A   Yes, thank you.

09:38:28  20      Q   And before you were retained by Latham &

          21   Watkins, had you heard of this case?

          22      A   No.  Mason Adams had put my name forward to

          23   Roberto.  So Mason called me and said, "There's a

          24   case with copyright infringement, I'd love to put

09:38:47  25   your name forward for usage and copyright
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    infringement and licensing fees."  He didn't say

2    who.  He didn't say anything more.  And then Roberto

3    contacted me.  But no, I had not heard of the case.

4        Q    Okay.  And Mason Adams, you know, is an

09:39:02    5    employee at CoStar?

6        A    Yes.

7        Q    And what is your understanding generally of

8    his job function?

9        A    He is head of photography there.

09:39:12  10        Q    At CoStar?

11        A    Yes.

12        Q    And you knew Mr. Adams how?

13        A    I knew his wife, who is a photographer.  And

14    I had met him years ago.  I had met him twice.  And

09:39:25  15    then he was a studio manager for one of the

16    photographers that I represented at OTTO Archive.

17        Q    And you said you knew Mr. Adams's wife, who

18    is a photographer.  Are you friendly with

19    Mr. Adams's wife?

09:39:44  20        A    No.

21        Q    Just a professional acquaintance?

22        A    Yes.

23        Q    And then through Mr. Adams's wife, you became

24    professional acquaintances with Mr. Adams?

09:39:54  25        A    Yeah.  I met him twice.

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1        Q    Prior to your involvement in this case, had
 2   you ever heard of Latham & Watkins?
 3        A    No.
 4        Q    Prior to your involvement in this case, had
 5   you ever heard of Gary Elsner?
 6        A    No.
 7        Q    Have you ever heard of an individual named
 8   Jeff Sedlik?
 9        A    I don't think so.
10        Q    You don't --
11        A    I don't recall that name.
12        Q    Have you ever had any communications with
13   Jeff Sedlik that you can recall?
14        A    No.
15        Q    I'd like to ask you some questions about your
16   expert witness experience.
17             I understand you have never been an expert
18   witness before this engagement.  Am I right about
19   that?
20        A    You are correct.
21        Q    Okay.  This should go quickly.
22             So you've never served as an expert witness
23   in any capacity, right?
24        A    Correct.
25        Q    You've never testified as an expert in any
```

09:47:09    5
09:47:24    10
09:47:35    15
09:47:45    20
09:47:52    25

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1    time --
 2        A   Sure.
 3        Q   -- which is no knock on you at all.
 4            Exhibit A to your opening report,
 5    Exhibit 1462, is your resume; am I right about that?
 6        A   Yes.
 7        Q   You live in Bend, Oregon?
 8        A   I do.
 9        Q   Beautiful place.
10        A   Yes.
11        Q   Is everything in your resume, Exhibit A,
12    complete, accurate to the best of your
13    understanding?
14        A   Yes.
15        Q   Nothing in here that is misleading?
16        A   No.
17        Q   Okay.  And I think you mentioned this, but
18    you don't have experience working in the commercial
19    real estate industry, correct?
20        A   Correct.
21        Q   And you don't have any formal training in
22    commercial real estate?
23        A   Correct.
24        Q   You don't have any formal training in real
25    estate at all?
```

09:48:55  5
09:49:03 10
09:49:12 15
09:49:21 20
09:49:30 25

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    A    Correct.

2    Q    And I didn't see it, but I take it you

3    haven't authored any publications relating to real

4    estate?

09:49:41    5    A    No.

6    Q    Do you hold any real estate licenses?

7    A    No.

8    Q    And you don't consider yourself to be an

9    expert in the field of commercial real estate,

09:49:50    10    correct?

11    A    Correct.

12    Q    Have you ever worked for an entity that its

13    primary business is licensing images of commercial

14    real estate listings?

09:50:02    15    A    Worked at a company?

16    Q    Yeah.

17    A    No.

18    Q    Have you ever consulted for a company whose

19    primary business was dedicated to licensing of

09:50:16    20    images of commercial real estate listings?

21    A    No.

22    Q    I understand from your report, you've

23    provided a couple of examples of images you've been

24    involved with that depict commercial real estate.

09:50:25    25    And I just want to make clear, I'm drawing a

1  case, correct?

2      A    Correct.

3      Q    And what about this other image of this

4  building in paragraph 62, who was that licensed to?

09:51:44  5      A    I would have --

6      Q    If you recall.

7      A    I don't recall.  I'd have to look at the

8  invoice.  I don't recall.

9      Q    Fair enough.  It was a long time ago.

09:51:53 10      A    Yeah.

11      Q    But, again, not in connection --

12      A    Not --

13      Q    -- with a commercial real estate listing?

14      A    Correct.

09:51:59 15      Q    And just again for the benefit of the court

16  reporter -- and we're both doing it.  I'll try to

17  let you finish and you can let me finish.

18          Have you ever participated in negotiating a

19  license for an image in a commercial real estate

09:52:19 20  listing context?

21      A    Not in a listing context.

22      Q    And are you a member of the Association of

23  Real Estate Photographers?

24      A    No.

09:52:40 25      Q    Have you had involvement in licensing

1  BY MR. GOLDBERG:

2    Q   Okay.  Perfect.  Then maybe this is helpful.

3        To your understanding, what is copyright

4  management information?

10:02:03  5        MS. DAHL:  Objection.  Asked and answered.

6        THE WITNESS:  I did answer the question.  It

7  is a watermark associated with the creator of that

8  image.

9  BY MR. GOLDBERG:

10:02:17  10    Q   Okay.

11    A   We can go into --

12    Q   So any watermark that is associated in any

13  way with the creator of an image is copyright

14  management information, in your view?

10:02:29  15        MS. DAHL:  Objection.  Asked and answered.

16  Argumentative.

17        THE WITNESS:  Yes.

18  BY MR. GOLDBERG:

19    Q   I asked you about publications.  I didn't see

10:02:39  20  it in your resume, but have you published any

21  articles on any subject?

22    A   At this point, I cannot recall.  No.

23    Q   Okay.  You --

24    A   I'm just thinking.

10:02:55  25    Q   Yeah.  Fair enough.

1    Q    Okay.  And do you know what that definition

2  is?

3    A    That it's presented by one party and accepted

4  by the second party.

10:15:38  5    Q    That's your understanding?

6    A    That's my understanding.

7    Q    Okay.  Have you never understood that fair

8  market value is a price agreed on between a willing

9  buyer and a willing seller with neither being

10:15:51  10  required to act and both having reasonable knowledge

11  of the relevant facts?

12        MS. DAHL:  Objection.  Confusing.

13        THE WITNESS:  Say the last part again so --

14  BY MR. GOLDBERG:

10:16:04  15    Q    I can repeat it.

16    A    Sure.  Thank you.

17    Q    Fair market value is the price that would be

18  agreed on between a willing buyer and a willing

19  seller with neither being required to act and both

10:16:17  20  having knowledge of the relevant facts.

21    A    Okay.

22        MS. DAHL:  What is the question?

23  BY MR. GOLDBERG:

24    Q    Have you ever understood that to be the

10:16:26  25  definition of fair market value?

THEA VAUGHAN
JUNE 07, 2024
JOB NO. 1015095

```
 1      A   So if I can paraphrase, it would be an
 2   estimate is presented, someone accepts it or
 3   declines it, correct?
 4      Q   I'm asking -- you're the --
10:16:40  5      A   I'm just -- I'm just paraphrasing.  I'm
 6   trying to figure out what that says, but that's how
 7   I understand it.
 8      Q   Okay.  If that's your understanding.
 9      A   Yeah.
10:16:46 10      Q   You're the expert --
11      A   Yeah.
12      Q   -- so I'm trying to get your understanding of
13   fair market value.
14          MS. DAHL:  Objection.  She testified as to
10:16:54 15   her understanding of fair market value.  It sounds
16   like you're reading a definition and asking if
17   she --
18          MR. GOLDBERG:  If she understands it.  Yeah,
19   that's right.
10:17:02 20          THE WITNESS:  I do understand it.
21   BY MR GOLDBERG:
22      Q   And is that the definition that you applied
23   for fair market value, or did you apply your own
24   definition for that?
10:17:09 25      A   I didn't look at that literal definition and
```

1    apply that.

2       Q    And what, in your opinion, is a hypothetical

3    license?

4       A    Looking at the terms of how the images are

10:17:32  5    used, looking at both parties, the licensor and the

6    licensee, and coming up with a number that is -- a

7    number that associates with those usages and those

8    parties.

9       Q    You mentioned looking at both parties.  What

10:17:54 10    do you mean by that?

11       A    For example, CoStar and CREXi.  CREXi is a

12    direct competitor of CoStar, so that consideration

13    definitely comes into play when you come up with a

14    price point for licensing images --

10:18:12 15       Q    Okay.

16       A    -- from one party to another.  If it's a

17    competitor, it's definitely going to impact the

18    bottom line of the pricing.

19       Q    Got it.  So in forming your opinions

10:18:22 20    regarding hypothetical license in this case, the

21    identity of the parties was an important factor in

22    your analysis?

23       A    If it's a competitor, absolutely that impacts

24    the fee for sure.

10:18:37 25       Q    And so in this case -- you mentioned this

```
 1   CREXi?

 2        MS. DAHL:  Objection.  Asked and answered.

 3   BY MR. GOLDBERG:

 4        Q    And if you do, maybe you can point me to it

 5   in your report, because I haven't seen it.

 6        A    No.

 7        Q    I've read your report, but can you summarize

 8   for me the methodology that you used for developing

 9   your opinion regarding the fair market value of the

10   hypothetical license of the CoStar images?

11        A    Per image?  The per-image rate?

12        Q    Yeah.

13        A    So I looked at rights managed, royalty free.

14   I looked at microstock and subscription platforms as

15   well.

16             I landed on the Getty calculator as a fair

17   starting place of 375 per image based on the size of

18   the images that were used -- are used, excuse me, on

19   the CREXi website by pixels.  And I landed on the

20   medium resolution size where the basis of the

21   whole -- the even playing field is 375 per image,

22   because royalty free does not take into account

23   quality.  It is -- they're all even, evenly priced

24   the same.

25             From that point I multiplied three to five
```

Timestamps (left margin): 10:22:42 (line 5), 10:23:03 (line 10), 10:23:28 (line 15), 10:23:50 (line 20), 10:24:12 (line 25)

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1  times for scarcity and rarity for precise addresses,
 2  locations, properties.  And from that point I
 3  multiplied further for the nature of it being a
 4  direct competitor.
10:24:32  5      Q   Do you remember what that second multiplier
 6  you applied was?
 7      A   Three to five.
 8      Q   Thank you for that.
 9          Do you -- well, first of all, who developed
10:24:50 10  that methodology?
11      A   Me.
12      Q   That is something you came up with?
13      A   Yes.
14      Q   Did you rely on any literature or
10:24:56 15  peer-reviewed research to develop that methodology?
16      A   Sorry, it's five to ten.  I apologize.
17          I relied on my past experience of multipliers
18  in both August and OTTO.  And that seemed like a
19  fair multiplier because I have done multipliers from
10:25:22 20  five to 35 times original price.
21      Q   And I'm not talking about your past
22  experience.
23      A   Oh, sure.
24      Q   I understand that.  My question was a little
10:25:32 25  more narrow.
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1           Are you relying on any literature or studies

2    to support that methodology?  And the reason I ask

3    is I didn't see any cited in your report.

4         A   No, no.

10:25:42  5         Q   So your methodology is based on your

6    experience in the industry?

7         A   Correct.

8         Q   Got it.  And you corrected yourself midstream

9    there, but the second multiplier you applied for

10:25:58  10   what you call competitive use is actually not three

11   to five times, correct?

12        A   Uh-huh.

13        Q   What is it?

14        A   Five to ten.

10:26:05  15        Q   You mentioned in your answer a moment ago

16   that you considered microstock and subscription

17   models, correct?

18        A   Uh-huh, yes.

19        Q   I didn't see the words "microstock" or

10:26:23  20   "subscription models" in your opening report.  I

21   didn't see them addressed there.  Am I -- did I miss

22   it?

23        A   I didn't write it into the report.  I looked

24   at companies like Shutterstock and Alamy, and in my

10:26:40  25   opinion, the images did not seem to be equivalent to

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
      1   what I was looking at in the body of work of
      2   CoStar's images.
      3       Q   And so you just didn't address it -- those
      4   microstock or subscription models in your opening
10:27:00  5   report?
      6       A   I did not.
      7       Q   And the only two models that you addressed in
      8   your opening report were royalty free and rights
      9   managed?
10:27:09 10       A   Mostly because the use -- the CoStar images
     11   fall within the realm of rights managed and royalty
     12   free.  They fall closer to rights managed, so --
     13       Q   I understand your opinion.  I had a slightly
     14   simpler question, which was that the only two models
10:27:31 15   that you addressed in your opening report were
     16   royalty free and rights managed models, correct?
     17       A   Yes.
     18           MS. DAHL:  Objection.  Asked and answered.
     19   BY MR. GOLDBERG:
10:27:38 20       Q   In your opening report, you did not address a
     21   subscription model, correct?
     22           MS. DAHL:  Asked and answered.
     23           THE WITNESS:  Yes.
     24   BY MR. GOLDBERG:
10:27:45 25       Q   And you did not address a microstock model,
```

```
          1   you somewhat of a thread of what that property has

          2   and how -- the size of it, if there's parking, if

          3   there's not parking, things like that.

          4       Q   And so taking the properties you lease, for

11:03:20  5   example, a potential client can go on a website and

          6   look at all the pictures of the property together

          7   and get a sense of what the property looks like as a

          8   set?

          9       A   Yes.

11:03:34 10           MS. DAHL:  Objection.  Confusing.

         11           THE WITNESS:  Yeah, they can get a sense of

         12   the property, yes.

         13   BY MR. GOLDBERG:

         14       Q   And, for example, the image of the inside of

11:03:44 15   the building, of the bathroom, you know, standing

         16   alone, doesn't tell you a lot about the overall

         17   property.  It goes in the set of images that tell a

         18   story?

         19           MS. DAHL:  Objection.  Confusing.  And

11:04:00 20   compound.

         21           THE WITNESS:  Yes.

         22   BY MR. GOLDBERG:

         23       Q   In the way that, in your opinion, the CoStar

         24   images are utilitarian in their purpose, does the

11:04:21 25   quality of the image matter one way or the other in
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    determining the fair market value?

2        A    In this case, the quality is not important.

3        Q    So in your opinion, a low-quality CoStar

4    image has the same value as a high-quality CoStar

11:04:40  5    image?

6        A    Yes, because it's showing a unique property,

7    specific location --

8        Q    So --

9        A    -- and has value.

11:04:53  10        Q    Oh, sorry.

11        A    No.  And has value.

12        Q    And has not just value, the same value?

13        A    Yes.

14        Q    And so in determining the fair market value

11:05:00  15    of the CoStar images, is it your opinion that the

16    lowest-quality image in the bunch has the same value

17    as the highest-quality image?

18            MS. DAHL:  Objection.  Asked and answered.

19            THE WITNESS:  Yes.  Because it could be a

11:05:16  20    very remote location where no one has been.  It

21    could be the only picture of that building and it

22    could be the only illustration of that property that

23    is available.

24    BY MR. GOLDBERG:

11:05:31  25        Q    And so the quality of the images does not

THEA VAUGHAN                                              JOB NO. 1015095
JUNE 07, 2024

```
        1            And so in your experience in the commercial

        2     photography industry generally, setting aside this

        3     case, you would expect a high-quality image to fetch

        4     a higher licensing value than a low-quality image,

11:07:05 5     right.

        6        A   Correct.

        7        Q   And so in your experience in the commercial

        8     photography image, the quality of the image is

        9     typically one of the important factors in

11:07:16 10    determining its value?

        11           MS. DAHL:  Objection.  Asked and answered.

        12           THE WITNESS:  Yes.

        13           MR. GOLDBERG:  Yeah, and just for the court

        14    reporter, I said "in your experience in the

11:07:27 15    commercial photography industry," not "in the

        16    commercial photography image."  And if I didn't --

        17           THE COURT REPORTER:  You did say "image."

        18           MR. GOLDBERG:  Okay.  I'm so sorry.  Let me

        19    ask the correct question then and you can repeat

11:07:38 20    your answer.

        21    BY MR. GOLDBERG:

        22       Q   In your experience in the commercial

        23    photography industry, the quality of the image is

        24    typically one of the important factors in

11:07:48 25    determining its value, correct?
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1           MS. DAHL:  Objection.  Asked and answered a

 2    few times.

 3           THE WITNESS:  Yes.

 4    BY MR. GOLDBERG:

11:07:53  5     Q   Thanks.

 6           Turning back to your opening report,

 7    Exhibit C.  Tell me when you're there.

 8           I'm sorry.  It's an exhibit to your opening

 9    report so it's in the little lettered Tab C,

11:08:13 10    Exhibit 1462.

11           And I understand that this is a sample of a

12    couple hundred images where on the top you see a

13    CoStar image and then on the bottom you see what you

14    call a comparable Getty image.

11:08:28 15           Do I have that right?

16     A   Yes.

17     Q   Who selected the images that you used in

18    Exhibit C to your opening report?

19     A   From CoStar?

11:08:45 20     Q   From your report.  In other words, how were

21    the two --

22     A   How did I get --

23     Q   I'm so sorry.  Yeah, I understand your

24    clarification.

11:08:48 25           Who selected the CoStar images that you
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1    $375 in a medium size?
 2       A    You can.
 3       Q    And, again, you're not aware of CoStar
 4    licensing this CoStar image for any amount, correct?
11:23:58  5       A    Correct.
 6       Q    You're not aware of any buyer that has said
 7    they're willing to license this CoStar image for any
 8    amount, correct?
 9       A    Correct.
11:24:06 10       Q    And we can go through --
11       A    All --
12       Q    -- all these, but I'll just ask you the
13    question.  You're not aware of CoStar licensing any
14    of the CoStar images for any amount, correct?
11:24:13 15       A    No, because CoStar is not in the business of
16    licensing images.
17       Q    And you're not aware of any buyer who has
18    said that they would pay any price to license any of
19    the CoStar images, correct?
11:24:25 20            MS. DAHL:  Objection.  Asked and answered.
21            THE WITNESS:  No, because they're not in the
22    business of licensing images.
23    BY MR. GOLDBERG:
24       Q    So for any of the CoStar images, if I asked
11:24:33 25    you are you aware of a buyer who has said they will
```

```
 1   pay $5600 for this image, you would say no?

 2          MS. DAHL:  Objection.  Asked and answered.

 3          THE WITNESS:  Yes.  Correct.

 4   BY MR. GOLDBERG:

 5     Q   And same thing, if I said are you aware of

 6   any buyer that would pay $18,000 for this CoStar

 7   image, the answer to that question would be what?

 8          MS. DAHL:  Objection.  Asked and answered.

 9          THE WITNESS:  I'm not aware.

10   BY MR. GOLDBERG:

11     Q   Thank you for humoring me on that.

12          So in your report -- in your opening report,

13   you talked about this earlier, but you talked about

14   the rights managed and royalty free approaches to

15   licensing, correct?

16     A   Yes.

17     Q   And you concluded that CoStar's images do not

18   fit neatly in either of those two categories,

19   correct?

20     A   Correct.

21     Q   And then you employed the royalty free

22   licensing approach as the base value, because I

23   think I heard you say earlier it was -- I think you

24   said closer to the CoStar images.  But tell me if

25   I'm wrong about that.
```

11:24:44   5
11:24:56  10
11:25:13  15
11:25:26  20
11:25:37  25

THEA VAUGHAN                                           JOB NO. 1015095
JUNE 07, 2024

```
            1      A    It is more about evening the playing field.

            2    And quality does not matter in the royalty free

            3    pricing.

            4      Q    Okay.  So that's why you selected royalty

11:25:51    5    free even though they -- in your opinion, the CoStar

            6    images don't fit neatly into either category?

            7      A    Yes.

            8      Q    And I think you -- well, let me just ask the

            9    question.  Are you aware of CoStar licensing any

11:26:08   10    image under a rights managed approach?

           11      A    Not that I know of.

           12      Q    Are you aware of CoStar licensing any image

           13    under a royalty free approach?

           14      A    No.

11:26:21   15      Q    In forming your opinion regarding the -- what

           16    you call the base value of CoStar images, did you

           17    consider how CoStar actually licenses their images?

           18      A    They have a subscription model for their

           19    clients, enabling that specific client to utilize

11:26:44   20    images that are taken of a specific property that is

           21    their property and utilizing those images on their

           22    website and in marketing material.

           23           These are preferred clients.  Let me preface

           24    it by saying that.  And that is how they use the

11:27:01   25    images --
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1      Q    Okay.

2      A    -- with their clients.  With the licensing --

3   with any kind of licensing, applicable licensing.

4      Q    What do you mean by "preferred clients"?

11:27:12   5      A    They want to work with them.

6      Q    Isn't it -- I mean, I don't want to -- let me

7   ask it in an open-ended way.

8      A    Sure.

9      Q    The terms you've just described for use of

11:27:26  10   CoStar's photographs apply to any subscriber to

11   CoStar, correct?

12      A    Correct.

13      Q    So preferred clients, you just mean CoStar

14   customers?

11:27:38  15      A    I mean CoStar customers.

16      Q    And were you aware when you wrote your

17   opening report that CoStar licenses its images on a

18   subscription basis?

19      A    Yes.

11:27:50  20      Q    And yet you chose, when you wrote your

21   opening report, not even to mention the subscription

22   model as a model that you considered?

23      A    No, because it's not really relevant to my

24   pricing per image.

11:28:05  25      Q    The way that CoStar actually licenses its

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1    actually charges its customers for a subscription?
 2        A    Again, I'm looking at these images similar to
 3    how I would look at something between a rights
 4    managed and royalty free price point, so a
11:32:20  5    subscription basis was not how I was considering it.
 6        Q    Okay.  So when you came up with your opinions
 7    in this case, you weren't considering how much
 8    CoStar actually charges its customers for a
 9    subscription to its service?
11:32:33 10            MS. DAHL:  Objection.  That was the exact
11    question you just asked, and she answered it.
12            THE WITNESS:  I did answer it.
13    BY MR. GOLDBERG:
14        Q    I don't think your answer was responsive, but
11:32:41 15    we can -- there's no judge here to rule on that, so
16    I, unfortunately, get to ask you again.  You can
17    choose to answer it --
18        A    Sure.
19        Q    -- the same way if you want to.
11:32:50 20        A    Sure.
21        Q    I don't think it's responsive, so I'll ask
22    again.
23            When you came up with your opinions in this
24    case, you did not consider how much CoStar actually
11:33:01 25    charges its customers for its subscription, correct?
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1        MS. DAHL:  Objection.  Asked and answered.
 2        THE WITNESS:  It was not part of my
 3   factoring.
 4   BY MR. GOLDBERG:
 5      Q   Do you know how much CoStar charges customers
 6   for a subscription that includes access to LoopNet,
 7   commercial real estate information, forecasts,
 8   assessments of evaluations of properties, market
 9   reports, and photographs?
10      A   The price of about $400 a month is coming to
11   mind, but I'm not sure.  I might not be remembering
12   that correctly.
13      Q   So your -- as you sit here today, your
14   recollection is that for about $400 a month, you can
15   get a subscription to CoStar's entire service?
16      A   Correct.
17      Q   Do you know whether, as part of that $400 a
18   month, CoStar separately itemizes a fee or license
19   for imagery?
20      A   As far as I know, no.
21      Q   You haven't seen any evidence in the case
22   that CoStar separately breaks out a fee or license
23   amount for photographs?
24      A   No.
25      Q   You testified to this earlier, and I think
```

11:33:12 (line 5)
11:33:29 (line 10)
11:33:46 (line 15)
11:34:00 (line 20)
11:34:13 (line 25)

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1              MS. DAHL:  Objection.  Asked and answered.
 2              THE WITNESS:  Yes, it does.
 3     BY MR. GOLDBERG:
 4        Q    Okay.  I may have already asked you that, and
 5     I apologize.
 6              But your understanding is that the CoStar
 7     subscription product allows a customer to post
 8     CoStar's images on their own website?
 9        A    As I understand it, yes.
10        Q    Okay.  Thank you.
11              You mentioned microstock companies earlier.
12     Can I ask you some questions about that?
13        A    Sure.
14        Q    You're familiar with microstock companies?
15        A    Yes.
16        Q    What are -- what is microstock generally?
17        A    Microstock is a version, like a lower-tier
18     version of royalty free that is lower in price point
19     usually -- per my conversations with a few people,
20     usually for smaller projects and for smaller
21     businesses to use for image licensing.
22        Q    Okay.  And when we talk about a subscription
23     model, what does that mean in your -- in your view?
24        A    A subscription model is -- I think you pay a
25     monthly or an annual fee, and then you have
```

Timestamps:
11:35:22  line 5
11:35:36  line 10
11:35:48  line 15
11:36:07  line 20
11:36:32  line 25

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
      1   downloads, the capability of a certain number of

      2   downloads of images.  It is for a single seat user,

      3   or like a single human and nontransferable.  That

      4   license is nontransferable to anyone else.

11:36:53  5      Q   And iStock, I think you said that was -- that

      6   was your understanding of iStock's terms.  Am I

      7   right about that?

      8      A   And Shutterstock.

      9      Q   And Shutterstock.

11:37:01 10      A   Correct.

     11      Q   Okay.  And that was based on a conversation

     12   you had with somebody?

     13      A   Yeah.  And also the subscription model also,

     14   it says it on the terms on Shutterstock that it is

11:37:13 15   nontransferable.

     16      Q   Right, the seat, that's your --

     17      A   Yeah, the single seat user.

     18      Q   You looked at the terms -- you looked at the

     19   terms for iStock and Shutterstock as part of your

11:37:27 20   analysis?

     21      A   Yes.

     22      Q   Okay.  This -- correct me if I'm wrong, but

     23   you can have access to images on microstock

     24   libraries without a subscription, correct?

11:37:39 25      A   You can have access -- yes.
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1        Q    Like Nick Goldberg could go onto iStock and
 2   download an image without a subscription?
 3        A    Yes.
 4        Q    And so a subscription is just one form of
11:37:57  5   pricing that you can get when you engage with
 6   microstock libraries, correct?
 7        A    Correct.
 8        Q    And am I right that -- well, strike that.
 9             I think in your rebuttal report, you have a
11:38:17 10   series of paragraphs and some examples where the
11   same images are available in microstock libraries as
12   in Getty, correct?
13        A    Correct.
14        Q    So some of the same images that are in Getty
11:38:29 15   that are comparable to the CoStar images are also
16   available in microstock libraries, true?
17        A    Correct.
18        Q    You mentioned iStock and Shutterstock.  There
19   are other microstock libraries, correct?
11:38:45 20        A    I believe so.  I just can't think of any
21   right now.  Those are the main ones.  Those are the
22   big ones.
23        Q    Alamy?  Did you mention --
24        A    Yes, Alamy.
11:38:56 25        Q    Alamy, I'm sorry.  What is Alamy?
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    photography, which largely has been around rights

2    managed photos, that you have knowledge of

3    microstock libraries, but your experience is

4    generally not in that area?

11:40:14    5        A    Generally not.

6        Q    Your -- I'm trying to put this directly.  But

7    your experience is in more higher-end photography

8    than what we're dealing with in this case?

9            MS. DAHL:  Objection.  Vague.

11:40:26    10            THE WITNESS:  Rights managed work is what I

11    would say I have more experience handling than

12    royalty free and microstock, yeah.

13    BY MR. GOLDBERG:

14        Q    And what is your sort of -- this is a broad

11:40:42    15    question, but what is your level of familiarity with

16    iStock and Shutterstock?  Is it you've seen their

17    websites, you go on there from time to time?

18        A    Well, I knew a lot of people who started

19    working at Alamy when it started.  I was aware of it

11:40:59    20    when it began.  IStock is --  was acquired by Getty

21    as a way of housing more brands.

22            And generally speaking royalty free and below

23    are generic images, generic libraries, and what they

24    care about is selling as many as they can.  It's

11:41:20    25    about selling -- getting as much off the shelf as

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1   could get to that price over a course of a number of
 2   years.  If they paid a monthly fee, they could get
 3   to that price that I've quoted in my report.
 4   BY MR. GOLDBERG:
 5       Q   Is it your view that, since we're talking
 6   about the parties to this case, that CREXi had an
 7   unlimited license to CoStar's images for all time,
 8   for all purposes?
 9       A   I know that they had a period of time where
10   they used the images.
11       Q   Exactly, a period of time.
12       A   And I know they took them down.  And I know
13   they were also in their repository.  And I know they
14   also repopulated their site with images later.  They
15   had access to them.
16       Q   And so -- well, when you talk about
17   repopulating images to CREXi's platform, your basis
18   is counsel for Latham -- counsel at Latham, right?
19           MS. DAHL:  Objection.  Argumentative.
20   BY MR. GOLDBERG:
21       Q   I'm just wondering maybe if you -- if you
22   have done some independent analysis --
23       A   No.  There's -- I can't recall where I have
24   read it in a deposition or a document, but I'm
25   referring to that.
```

11:53:19  (line 5)
11:53:34  (line 10)
11:53:48  (line 15)
11:54:05  (line 20)
11:54:17  (line 25)

```
 1      Q   Okay.

 2      A   I can't refer to it because I've read

 3   thousands of pages.

 4      Q   Is it your understanding that all of the

 5   images that CoStar alleges have been infringed were

 6   all repopulated to CREXi's website after being taken

 7   down?

 8      A   No, I don't believe they were.  But they were

 9   housed at CREXi, at least to my knowledge.

10      Q   And so in forming your opinions in this case,

11   you looked at a model that assumes that CREXi has an

12   unlimited license to CoStar's images for unlimited

13   uses of those CoStar images?

14          MS. DAHL:  Objection.  Confusing.

15          THE WITNESS:  The boilerplate of the 375 is

16   for the unlimited use, unlimited time.

17   BY MR. GOLDBERG:

18      Q   Okay.  And that's the model you applied as it

19   applies to CREXi in this case?

20      A   Correct.

21      Q   And we can agree that that is not the model

22   that CoStar uses for its customers?

23      A   Correct.

24      Q   Let's look at the iStock terms since you --

25   since you mentioned them.
```

Timestamps in left margin:
11:54:25 — line 5
11:54:40 — line 10
11:55:02 — line 15
11:55:14 — line 20
11:55:28 — line 25

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1          A    Okay.

 2          Q    You've read paragraph 4?

 3          A    I have.

 4          Q    Paragraph 4 says:

11:59:51 5               "The rights granted to you are

 6               nontransferable and non-sublicensable,

 7               meaning that you cannot transfer or

 8               sublicense them to anyone else,"

 9               period.

12:00:02 10         And then it says there are two exceptions.

11          Do you see that?

12          A    Uh-huh.

13          Q    Were you aware of these exceptions when you

14     formed your opinions in the rebuttal report

12:00:12 15     regarding the scope of the iStock license?

16          A    I really think we're going -- okay.  I did

17     not consider microstock as a price point.  So almost

18     this becomes irrelevant because I didn't consider it

19     in my pricing.

12:00:33 20         Q    Understood.

21              I also understand that it is a part of your

22     rebuttal report in this case, so I'm --

23          A    Sure.

24          Q    -- I'm just asking you questions about it.

12:00:44 25         A    Sure.
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    can get this image for $7, correct?

2       A    Yes, but this is -- again, this is -- okay.

3    Yes.

4       Q    And if you don't have a subscription -- even

12:05:43  5    if you don't have a subscription to iStock, you can

6    still obtain this image for $33 on iStock, correct?

7       A    Okay.

8       Q    Do you agree?

9       A    I do.

12:05:56  10      Q    In forming your opinion regarding the base

11    value of CoStar's images, did you factor in that

12    comparable images to the CoStar images were

13    available for $7 or $33?

14      A    I received conflicting information about

12:06:19  15    single seat user, nontransferable single seat user,

16    so microstock was not where I considered -- what I

17    considered at all.

18      Q    So I understand -- so you didn't consider the

19    $7 price because you, in your view, got conflicting

12:06:40  20    information about --

21      A    Correct.

22      Q    -- whether you could even get a subscription,

23    right?

24      A    Correct.

12:06:43  25      Q    So you didn't consider the $7?

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1      A    Correct.

 2      Q    Why didn't you consider the $33 price?

 3      A    Because, again, my understanding was that you

 4    could not transfer the single seat user to multiple

12:07:01  5    people.

 6      Q    You don't have to have a subscription to

 7    iStock to download this image for $33, do you?

 8      A    If you -- you have to have a user -- you have

 9    to sign up, yes.

12:07:18 10    BY MR. GOLDBERG:

11      Q    Right, but anybody can sign up.

12      A    You can't transfer it.  It's nontransferable.

13      Q    I don't -- okay.  So I guess your view is

14    that even without a subscription to iStock, you

12:07:30 15    didn't consider the $33 price point at all because

16    why?

17      A    Because the images fall more towards the

18    rights managed pendulum.  In my report, I state that

19    multiple times.

12:07:46 20      Q    You don't even apply a rights managed

21    approach in your opening report.

22      A    I could.

23        MS. DAHL:  Hold on.  Is there a question?

24    Now you're testifying and being argumentative with

12:07:56 25    the witness.
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1              THE WITNESS:  I don't understand what you're

 2      asking.

 3      BY MR. GOLDBERG:

 4          Q    Every time you answer, you say it depends on

 5      whether the buyer would know the information, how

 6      much time would they spend looking, right?

 7          A    Right.

 8          Q    So in your opinion, fair market value doesn't

 9      assume the buyer has complete relevant knowledge?

10              MS. DAHL:  Objection.  Mischaracterizes the

11      witness's testimony.

12              THE WITNESS:  Complete relevant knowledge?

13              MS. DAHL:  And vague as to "complete relevant

14      knowledge."

15              THE WITNESS:  Meaning comparative knowledge

16      to the two agencies?

17      BY MR. GOLDBERG:

18          Q    I mean, I'll tell you what I understand fair

19      market value to be.

20          A    Okay.

21          Q    A willing buyer and a willing seller, with

22      neither being required to act and both having

23      reasonable knowledge of the relevant facts.

24              So if you have a willing buyer and willing

25      seller and both have knowledge -- reasonable
```

12:13:56    5
12:14:16   10
12:14:40   15
12:14:48   20
12:15:04   25

1    knowledge of the relevant facts, would you agree

2    that a willing buyer would not pay $375 when the

3    exact same image is available for $7?

4         MS. DAHL:  Objection.  Asked and answered.

12:15:21  5         This is becoming abusive.  I think this is

6    the fifth time you've asked the exact same question.

7    She has given you an answer every single time.  If

8    you want to end at a reasonable time today, I think

9    it would speed things up if you didn't ask the same

12:15:36  10   questions seven times.

11        MR. GOLDBERG:  Please stop the speaking

12   objections.

13        You may answer.

14        MS. DAHL:  This is becoming abusive.  Asked

12:15:41  15   and answered.

16        THE WITNESS:  You're assuming that a buyer is

17   going to do the due diligence and research multiple

18   agencies to look for an image and they have the

19   knowledge to do so.  That is not necessarily the

12:15:52  20   case.  So, yes, they might buy the 375 right off the

21   bat.  They might find it, get it, done, move on.

22   BY MR. GOLDBERG:

23        Q    Assuming that they don't have knowledge of

24   the $7?

12:16:09  25        MS. DAHL:  Objection.  Asked and answered.

THEA VAUGHAN                                          JOB NO. 1015095
JUNE 07, 2024

```
 1    BY MR. GOLDBERG:
 2        Q    Okay.  So you've never in your career been
 3    involved in any transaction where two distinct sets
 4    of multipliers were used and then multiplied on top
 5    of each other, correct?
 6            MS. DAHL:  Objection.  Mischaracterizes the
 7    witness's testimony.  And asked and answered.
 8            THE WITNESS:  I have not done that myself.
 9    BY MR. GOLDBERG:
10        Q    Okay.  And you mentioned in your reports
11    that -- and earlier today that you have been
12    involved in transactions that used multipliers.
13            Do I have that right?
14        A    Correct.
15        Q    I didn't see any of those transactions cited
16    in your report.  Did I miss it?
17            MS. DAHL:  Argumentative.
18            THE WITNESS:  Have you seen the invoices
19    for -- I mean, they're not technically multipliers,
20    so I can't -- the OTTO invoices and the
21    August invoices, have you seen those?
22    BY MR. GOLDBERG:
23        Q    We saw an invoice.  And I've seen your report
24    that talks about exclusivity.
25        A    Yes, which is very similar to competitive
```

01:12:51  (line 5)
01:13:00  (line 10)
01:13:10  (line 15)
01:13:25  (line 20)
01:13:37  (line 25)

1    of thing within my head because of my knowledge and

2    long time in the industry where I would get to a

3    point of where -- what's the right -- what is the

4    proper rights managed price point.

01:27:12    5         So if you're in a royalty free zone, you have

6    to get to the rights managed price point, or similar

7    or even below it, to get to where the images are

8    used by CREXi.

9    Q    Okay.  I have a slightly different question.

01:27:33   10    And this doesn't relate to your calculation in this

11    case.  It relates to your experience in the

12    commercial photography industry, okay?

13    A    Uh-huh.

14    Q    Have you ever been involved in any licensing

01:27:46   15    transaction in commercial photography where a

16    multiplier was applied for scarcity?

17    A    That was always done based on a per-image

18    basis.  The scarcity was not -- I didn't have a

19    multiplier table that I would refer to.  I did not

01:28:08   20    have a multiplier table.

21    Q    It was baked into the rights managed fee?

22    A    Yes.

23    Q    Okay.  In your career in commercial

24    photography, in that industry, have you ever been

01:28:23   25    involved in a licensing transaction where a

THEA VAUGHAN                                                                      JOB NO. 1015095
JUNE 07, 2024

1    multiplier was applied for competitive use?

2       A    I have not done a competitive use license.

3    That is extremely rare.  I've done exclusivity.  And

4    exclusivity is, I would say, a tier below

01:28:43  5    competitive use.  Competitive use is even higher.

6       Q    Okay.  But you've never been involved in a

7    transaction that you said was a competitive use

8    license?

9       A    It's a bit --

01:28:53  10         MS. DAHL:  Objection.  Asked and answered.

11         THE WITNESS:  It's a bit unheard of.

12         MS. DAHL:  Asked and answered.

13    BY MR. GOLDBERG:

14       Q    And in the transactions where you bake the

01:29:09  15    rights managed fee by, in your mind, thinking

16    through considerations of scarcity, is there

17    anything in the contract or in writing that starts

18    with a base fee and then includes a multiplication

19    by some amount?

01:29:32  20       A    It's pure knowledge.

21       Q    It's just done in your head?

22       A    Pure knowledge.

23       Q    Okay.  So we're not going to find a contract

24    that you've been involved in that says here's a

01:29:45  25    multiplier for scarcity?

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
1        A    Correct.
2        Q    And we're not going to find a licensing
3   agreement that you've been involved in that says
4   here is a multiplier for competitive use?
01:29:56  5   A    Correct.  As I've said, there's not a
6   competitive use example.  It's not -- it's not been
7   done.
8        Q    It's novel, to your understanding?
9        A    It's never been done.
01:30:07 10   Q    Okay.  You come up -- I'm just turning back
11  to page -- the top of page 35, which you're on.  You
12  come up with a range between $5,625 and $18,750 per
13  image, right?
14       A    Yes.
01:30:29 15   Q    And you say that the hypothetical license of
16  each image to CREXi from CoStar would be somewhere
17  in that range, correct?
18       A    Somewhere in that range, correct.
19       Q    Do you have an opinion on the fair market
01:30:44 20  value within that range?
21       A    I think it would just depend on the image and
22  the length of time and -- no, I don't have an
23  opinion.
24       Q    Would each CoStar image at issue in this case
01:31:14 25  have a different value within that range, or would
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    BY MR. GOLDBERG:

2        Q    Ms. Vaughan, for any particular image

3    associated with commercial real estate at issue in

4    this case, did you perform any analysis to determine

02:22:37  5    whether CoStar has the only image available of that

6    property?

7        A    I did not do that.

8        Q    Did you speak to any commercial real estate

9    brokers?

02:22:56  10    A    I did not.

11        Q    So you don't know one way or the other

12    whether commercial real estate brokers have images

13    of some of the properties at issue in this case?

14        A    I do not know.  I did not want to discuss the

02:23:11  15    case with anyone, so hence, not calling anyone.

16        Q    And have you done any analysis to determine

17    where the CoStar images were shot?

18            MS. DAHL:  Objection.  Vague.

19            THE WITNESS:  Reviewing the spreadsheet, yes,

02:23:33  20    in terms of all over the country.  I did scan that.

21    BY MR. GOLDBERG:

22        Q    Okay.  Do you know how many of them were shot

23    in rural areas versus metropolitan areas?

24        A    Percentage-wise, I don't have that

02:23:46  25    percentage, no.

1       Q   But do you know it somewhere else, or there's

2   no analysis that you've done to --

3       A   I did not do an analysis, no.

4       Q   Do you know how many of the CoStar images at

02:23:55  5   issue in this case were shot indoors versus

6   outdoors?

7       A   I don't have that analysis, no.

8       Q   We looked at a couple of images earlier, and

9   you testified that if it was taken in a public

02:24:14  10   place, that you could capture certain trademarks.

11           Do you remember that?

12       A   Yes.

13       Q   Do you know how many images at issue in this

14   case were taken from public places?

02:24:20  15       A   Not off the top of my head, no.

16       Q   Anywhere else?

17       A   No.

18       Q   You haven't analyzed that as part of your

19   work?

02:24:27  20       A   No.

21       Q   Would you agree that if an image was taken

22   from a public place, they could be recaptured by

23   another photographer going to that same public

24   place?

02:24:40  25       A   Many people could take an image of a

THEA VAUGHAN
JUNE 07, 2024                                                                                    JOB NO. 1015095

```
              1   building, sure.  But these images were taken by a

              2   specific photographer at a specific time within a

              3   repository that was commercially available, key

              4   worded, available for the picking.

02:25:05      5       Q   Understood.  But I think you said this, but

              6   there's nothing stopping Nick Goldberg or Thea

              7   Vaughan from going to a public place and taking a

              8   picture of the outside of a property?

              9       A   No, there's no one stopping, no.

02:25:26     10       Q   And you understand from your review of

             11   documents in this case that CoStar hired in some

             12   cases independent contractors to go out and engage

             13   in reshoots of properties, right?

             14       A   Correct.

02:25:39     15       Q   And that's when an independent contractor

             16   would go out and take a photo of the exterior of the

             17   property on a contract basis for CoStar, correct?

             18       A   Correct.

             19       Q   And when CoStar paid those photographers, it

02:25:59     20   paid them $15 or $30 an image, more or less, right?

             21       A   I don't --

             22           MS. DAHL:  Objection to the extent it

             23   mischaracterizes evidence in the case.

             24           THE WITNESS:  I don't have that price exactly

02:26:11     25   in my head, so...
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    BY MR. GOLDBERG:

2        Q    Fair enough.

3             And I think I saw this in your report, but as

4    part of your analysis, you didn't consider any costs

02:26:19  5    to CoStar in taking the images at issue in this

6    case, right?

7        A    No, it's not what I -- in my history of

8    working in the image licensing business, the cost to

9    produce the images, create the images is not

02:26:36  10    reflective in the licensing pricing.

11        Q    Right.  And so as part of your analysis, you

12    did not consider CoStar's actual costs in capturing

13    the images at issue in this case?

14             MS. DAHL:  Objection.  Just asked and just

02:26:50  15    answered.

16             THE WITNESS:  Again, in production of images,

17    that is not -- does not inform the licensing fees

18    that are -- that are put forward and agreed upon.

19    BY MR. GOLDBERG:

02:27:02  20        Q    I understand that that's your opinion.  And

21    then my question is slightly different, which is you

22    did not consider the cost that CoStar incurred to

23    take the images as part of your opinion?

24             MS. DAHL:  Objection.  Asked now --

25    ////

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    BY MR. GOLDBERG:

2        Q    For whatever -- for whatever reason.

3            MS. DAHL:  Objection.  Asked and answered.

4            THE WITNESS:  I reviewed all the costs.  I

02:27:23  5    reviewed all -- it didn't inform the pricing, but I

6    reviewed all of that, yes.  It did not inform the

7    pricing, though.

8    BY MR. GOLDBERG:

9        Q    Okay.  So you didn't --

02:27:34  10       A    And let me clarify another thing.  I own --

11       Q    Sure.

12       A    I own three different companies.  One did

13    production of images, two were image licensing

14    companies.  The production of images, that company

02:27:49  15    never informed what the licensing fees would be for

16    August and OTTO.

17       Q    Great.  Thank you.

18            But in this case, wouldn't a -- wouldn't a

19    buyer on the side of the equation in the fair market

02:28:14  20    value analysis consider whether, instead of

21    licensing a photo for between $5,600 and $18,000,

22    consider whether they could hire somebody to go out

23    and take a similar photo for $15?

24       A    But CREXi didn't.  CREXi didn't.  So that's

02:28:40  25    sort of moot here.

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1        Q    Because your opinion depends on the specific
 2   analysis being tied to CREXi?
 3        A    I reviewed this -- this is based on CoStar
 4   and CREXi licensing.  Would I apply this to other
 5   companies?  Is that what you're asking or --
 6        Q    No.  My question was actually a lot, I
 7   thought, simpler, which is in considering fair
 8   market value --
 9        A    Yeah.
10        Q    -- wouldn't, in your opinion, a buyer
11   consider the license fee that I'm being offered is
12   $5,600 to $18,000 or I could go out and have a
13   photographer from Thumbtack take the same photo for
14   $15?
15             MS. DAHL:  Objection.  Asked and answered.
16             THE WITNESS:  And I'm saying CREXi didn't do
17   that.  They took the images.
18   BY MR. GOLDBERG:
19        Q    And I'm -- yeah.
20        A    And I'm also saying that given time, need for
21   getting to a location, specific turnaround to get
22   the images published, a lot of times licensing is
23   the quickest and most efficient, effective way to
24   show the work.
25        Q    And so in your opinion, the amount of money
```

02:29:04  (line 5)
02:29:15  (line 10)
02:29:36  (line 15)
02:29:42  (line 20)
02:30:00  (line 25)

THEA VAUGHAN
JUNE 07, 2024                                                    JOB NO. 1015095

```
              1        A    Correct.

              2        Q    And the Google Streetview image is comparable

              3   to the CoStar image, correct?

              4        A    Correct.

02:41:15      5        Q    Okay.  Let's look at another one.  This will

              6   be 1468.

              7             (Exhibit 1468 was marked for identification

              8        and is attached hereto.)

              9   BY MR. GOLDBERG:

02:41:34     10        Q    The court reporter has handed you

             11   Exhibit 1468, which is the CoStar image on the left,

             12   correct?

             13        A    Correct.

             14        Q    And a comparable Google Streetview image on

02:41:44     15   the right, correct?

             16        A    Correct.

             17        Q    And you would agree that those two images are

             18   comparable, correct?

             19        A    Correct.

02:41:49     20        Q    CoStar doesn't have the only one of Image

             21   CoStar 00314481, correct?

             22        A    Correct.  There is a photographer that took

             23   these pictures.

             24        Q    Indeed there was.

02:42:07     25        A    There is a citing for that photographer's
```

THEA VAUGHAN                                          JOB NO. 1015095
JUNE 07, 2024

```
 1           THE WITNESS:  Finding them -- locating them
 2      is another story.
 3      BY MR. GOLDBERG:
 4           Q    If you know the address of the image, you can
02:43:17  5   type it into Google, right?
 6           A    Yeah.  I'm talking about finding the
 7      photographer, negotiating --
 8           Q    Oh, I see.  I see what you're saying.
 9           A    Negotiating with them, getting the image
02:43:28 10   delivered.  It takes time.
11           Q    Yup.  Understood.
12               Exhibit 1469, the CoStar image is on the
13      left, correct?
14           A    I see it.
02:43:35 15       Q    And would you consider the image on right
16      from Google to be comparable?
17           A    Yes.
18           Q    CoStar does not have a unique version of the
19      image on the left in 1469?
02:43:49 20           MS. DAHL:  Object to the form of the
21      question.
22               THE WITNESS:  I see it.
23      BY MR. GOLDBERG:
24           Q    Correct?
02:43:53 25       A    I see two different pictures that are of the
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1   same location, yes.

2       Q    Okay.  You can set those aside.

3            And just so the record is clear, we looked at

4   three examples from Google, and you didn't consider

02:44:16  5   Google or Google Streetview as part of your analysis

6   in setting fair market value?

7            MS. DAHL:  Objection.  Asked and answered.

8   Mischaracterizes the witness's testimony.

9            THE WITNESS:  As I've said, when I reviewed

02:44:29  10   what you're capable of doing with Google, you are

11   not able to produce still images and utilize them on

12   a commercial real estate site.

13   BY MR. GOLDBERG:

14       Q    But as you just testified, you could license

02:44:41  15   them from these individual photographers?

16       A    You could try and track them down.

17       Q    So you could?

18       A    Potentially.  But maybe.  Maybe not.  I don't

19   know.

02:44:50  20       Q    Okay.

21       A    You'd have to find them.  You'd have to

22   negotiate with them.  If you want 50,000

23   photographers you want to call, then it would be a

24   project to do that -- to do so.

02:45:01  25       Q    But not something you considered?

1    competitors in its 10-K?

2        A    Maybe you could show that to me.

3        Q    Sure, absolutely.  It's an excerpt

4    because it's their 10-K, but I excerpted the page

02:47:58  5    where they list out their competitors.

6        A    Okay.

7        Q    And I'll represent for the record that this

8    is an excerpt -- Exhibit 1470 is an excerpt of

9    CoStar's Form 10-K filed with the Securities and

02:48:43  10    Exchange Commission for the fiscal year ended

11    December 31, 2020.  And the excerpt includes the

12    cover page and page 15, specifically a heading

13    entitled "Competition."

14        (Exhibit 1470 was marked for identification

02:48:55  15        and is attached hereto.)

16    BY MR. GOLDBERG:

17        Q    Do you have that in front of you?

18        A    I do, yes.

19        Q    And do you see under the section

02:49:01  20    "Competition" and under the first set of bullet

21    points, it says:

22                "We compete directly and

23            indirectly for customers with the

24            following categories of companies."

02:49:10  25            Do you see that?

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1        A    Yes.

 2        Q    Have you seen this before?

 3        A    I don't believe I have.

 4        Q    Did you inquire with anyone at CoStar whether

 5   CoStar has a subscription agreement with any

 6   entities listed here on Exhibit 1470?

 7        A    I do -- I'm not aware.

 8        Q    Are you aware CBRE is one of CoStar's

 9   customers?

10        A    No, I did not know that.

11        Q    Are you aware of CoStar ever charging a

12   competitive use multiplier to CBRE?

13        A    I don't know the -- I don't know the context

14   of how -- how are they licensing?  I mean, I don't

15   know anything about this arrangement.

16        Q    It's fine.  If you don't know, that's fine.

17             But are you aware of CoStar ever charging a

18   competitive use multiplier to CBRE?

19        A    No.  But I don't know the context of how they

20   work together.

21        Q    Okay.  Are you aware of CoStar charging a

22   competitive use multiplier to any entity that's

23   listed on here for which it has an agreement?

24             MS. DAHL:  Asked and answered.

25             THE WITNESS:  I am not aware, but I don't
```

02:49:26 (line 5)
02:49:51 (line 10)
02:50:08 (line 15)
02:50:22 (line 20)
02:50:33 (line 25)

```
 1    know the context of how they work together.
 2    BY MR. GOLDBERG:
 3        Q    Okay.  Your report talks about exclusivity
 4    multipliers.  Let me just ask you a few questions
 5    about that.
 6            What is an exclusivity multiplier?
 7        A    That is when an image is licensed within a
 8    market to another -- to somebody within a market who
 9    wants to hold exclusivity on that image so that no
10    one else in that market can have access to it.
11            For example, health care.  Images licensed to
12    a health care provider or health care entity and
13    they want exclusively within the health care market.
14    No one else in health care can license that image
15    during that period of time when they're licensing
16    it.
17        Q    That's helpful.  Thank you for that.
18            So as I understand it, the exclusivity
19    license would prohibit the content owner from
20    licensing that same image to any other licensee
21    within whatever market is covered by the
22    exclusivity?  Do I have that right?
23        A    Yes.
24        Q    Are you aware of any evidence in this case
25    that CREXi had exclusive rights to use CoStar images
```

02:50:45  5
02:51:08  10
02:51:25  15
02:51:37  20
02:51:56  25

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1   in any market?

 2       A    No.

 3       Q    Are you aware that CoStar was permitted to

 4   continue licensing its images even if they were

 5   displayed on CREXi?

 6       A    Well, CREXi took the images, so...

 7       Q    Not my question.

 8            Are you aware that CoStar had the right to

 9   continue to license its images even if they were

10   displayed on CREXi?

11       A    Yeah.  Yes.

12       Q    Nothing prohibited CoStar from licensing

13   those same images to another customer if that image

14   was displayed on CREXi, correct?

15       A    Correct.

16       Q    And, in fact, you know that CoStar continued

17   to license the CoStar images at issue in this case

18   even while they were displayed on CREXi's platform,

19   correct?

20       A    Yes, but there's been no exchange of funds,

21   so there's no licensing that's been agreed upon.  So

22   yes.

23       Q    Understood.

24       A    Yes.

25       Q    Understood.  I understand that's part of the
```

02:52:20    5
02:52:36   10
02:52:50   15
02:53:05   20
02:53:14   25

```
 1        Q    Okay.  And we've -- and we've established

 2   that this is not a situation where CREXi used the

 3   CoStar images exclusively or CoStar was barred from

 4   using them or licensing them to other entities,

 5   correct?

 6        A    But I really need to make this really clear,

 7   that they're a competitor.  So I'm not saying that

 8   they are using it exclusively.  I'm saying that they

 9   are competitor.  And because I don't have experience

10   or anyone I know has experience from one competitor

11   licensing to another competitor, the closest

12   parallel you can come up with is exclusivity.

13        Q    Okay.

14        A    Does that make sense?

15        Q    Sure.  Yeah, no, that's helpful.

16        A    Okay.

17        Q    Thank you for that.

18             But we would agree that exclusivity is not a

19   fit for the facts of this case?

20        A    It's not a fit.

21        Q    Okay.  Let me -- the court reporter has

22   handed you Exhibit 1471, which is a CoStar image in

23   this case.

24             Do you have that in front of you?

25        A    I do.
```

02:55:55 — line 5
02:56:14 — line 10
02:56:30 — line 15
02:56:40 — line 20
02:57:35 — line 25

THEA VAUGHAN                                                        JOB NO. 1015095
JUNE 07, 2024

             1       A    I think that's a fair price if someone needs

             2    something turned around immediately based on a

             3    property that is very specific and an address that

             4    is very specific.

02:58:53     5       Q    Based on those factors you just mentioned?

             6       A    Yeah.

             7       Q    Okay.  Wouldn't another option that CREXi

             8    would have is to just not display an image --

             9       A    Sure.

02:59:12    10       Q    And that would be something that a buyer

            11    might factor in to the analysis of whether or not to

            12    license an image for $5,600 to $18,000?

            13       A    Oh, they could --

            14          MS. DAHL:  Objection.  Compound.  And

02:59:26    15    confusing.

            16    BY MR. GOLDBERG:

            17       Q    Go ahead.

            18       A    Sure, they could not publish it.  But they

            19    did.

02:59:32    20       Q    Understood.  That is --

            21       A    So I mean --

            22       Q    CoStar is alleging that this image was

            23    displayed on the CREXi platform.  Understood that's

            24    an allegation in the case.

02:59:46    25          My question is slightly different, which is

1    wouldn't you expect that a willing buyer would

2    factor in to his or her analysis of whether or not

3    to license the image, the option of simply not

4    licensing the image if the asking price was so high?

03:00:05   5            MS. DAHL:  Objection.  Asked and answered.

6            THE WITNESS:  They could choose to do so.

7    BY MR. GOLDBERG:

8        Q    Would you agree that images like Exhibit 1471

9    are available on microstock sites?

03:00:20  10        A    I don't know.  It's a very specific address

11   property, as we've kind of covered already.

12        Q    Okay.  Sure.  Why don't we look at the next

13   one.  I think this one is going to be 1472.

14            (Exhibit 1472 was marked for identification

03:01:04  15       and is attached hereto.)

16   BY MR. GOLDBERG:

17        Q    The court reporter has handed you

18   Exhibit 1472, which is another CoStar image at issue

19   in this case.

03:01:04  20            Do you remember reviewing this image?

21        A    I do.

22        Q    Is this a high-quality or low-quality image

23   in your view?

24        A    I would not call this a high-quality image,

03:01:13  25   no.

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    Q    Thank you for that.

2         When I say "basis," I mean are you relying on

3    your professional experience?  Are you relying on

4    empirical analysis?  Are you relying on literature?

03:39:22  5    That's what I'm getting at.

6         A    Professional experience.

7         Q    Okay.  Anything other than your professional

8    experience in the commercial photography industry

9    that you're relying on for your opinion about

03:39:33 10    watermarking?

11        A    No.

12        Q    I didn't see any literature cited in your

13    opening report when it came to watermarking, so I'll

14    ask, are you aware of any literature that supports

03:39:48 15    your opinion about watermarking?

16        A    Meaning publications or --

17        Q    Yeah, industry publications, peer-reviewed

18    literature, journals.

19        A    Not that I think of at this moment.

03:40:13 20        Q    And not that you've cited?

21        A    Not that I've cited, no.

22        Q    And not that you can think of as you sit

23    here?

24        A    Yeah.

03:40:19 25        Q    You say in paragraph 4 that:

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1              "CoStar's practice of
 2          watermarking images with its logo is
 3          consistent with an intent by a content
 4          owner to reflect its ownership of
03:40:35  5          digital assets."
 6          When you refer to intent, whose intent are
 7   you referring to?
 8      A   The owner of the image.
 9      Q   The content owner's intent?
03:40:48 10      A   Yes.
11      Q   And by "intent," when I think of intent, I
12   think of state of mind.  Do you have something else
13   that you mean by "intent"?
14      A   Purposeful decision-making.
03:41:00 15      Q   What's going through the content owner's mind
16   when they do something?
17      A   Yes.
18      Q   So is it your opinion that every time a
19   watermark appears on an image, the person or entity
03:41:26 20   that added that watermark intended to convey
21   ownership over the image?
22          MS. DAHL:  Objection to the extent it
23   mischaracterizes the witness's report.
24   BY MR. GOLDBERG:
03:41:38 25      Q   And I apologize if I -- I'm not intending to.
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1    I'm just trying to ask.
 2       A   Yeah, yeah.  Well, I would say that sometimes
 3    there's systematic copyrighting that happens.
 4            For example, at August and OTTO,
 5    systematically the images were watermarked each time
 6    they were put into the archive.  So there's not
 7    really -- every image doesn't have a person thinking
 8    it through, putting that watermark on.
 9       Q   Okay.
10       A   Yeah.
11       Q   And when you -- when you talked about, in
12    your opinion, the intent of content owners, did you
13    do anything to test your opinion about whether
14    content owners intend for their watermarks to convey
15    ownership?
16       A   Did I do anything --
17       Q   To test that?
18       A   Oh, to test it?
19            MS. DAHL:  Objection.  Confusing.
20    BY MR. GOLDBERG:
21       Q   And if you're confused, let me know.  I
22    don't --
23       A   Maybe we could say it a different way?
24       Q   Sure, yeah.  I mean, like did you survey
25    content owners?  Did you interview them in some
```

Timestamps (left margin):
03:41:51 (line 5)
03:42:03 (line 10)
03:42:25 (line 15)
03:42:35 (line 20)
03:42:42 (line 25)

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    methodologically sound way?  Did you do anything at

2    all to sort of test the opinion that when a content

3    owner puts a watermark on an image, they

4    subjectively intend to convey ownership?

03:43:03  5      A   I did not do statistics on it.  I just know

6    from being in the industry.

7      Q   Yeah, aside from running statistics, you

8    didn't survey any content owners?

9      A   No.

03:43:17  10     Q   You didn't interview them methodologically

11   and keep notes and ask them questions that had been

12   vetted, so on and so forth?

13     A   No.

14     Q   And in connection with this case, other than

03:43:32  15   CoStar, did you speak to any content owners about

16   their intent?

17     A   Of watermarking?

18     Q   Yeah.

19     A   No.  But I've also done watermarking for so

03:43:48  20   long in terms of, you know, the several million

21   images at August and OTTO, they've all been

22   watermarked, and knowing that Corbis's are all

23   watermarked.

24     Q   And certainly your intent may be one thing --

03:44:03  25     A   Sure, sure.  No, I did not do any interviews.

THEA VAUGHAN
JUNE 07, 2024                                                    JOB NO. 1015095

1        Q    Yeah.  Fair enough.  All I'm trying to

2    understand is --

3        A    Yeah.

4        Q    -- whether, when you're talking about the

03:44:11  5    intent of content owners, that your opinion for that

6    is based on your professional experience writ large

7    or whether you've done some sort of analysis,

8    empirical or otherwise, to inform that opinion.

9        A    I see.

03:44:26 10      Q    So my question is, have you done any sort of

11   analysis, empirical interviews, surveys, et cetera,

12   to test your opinion about content owners' intent?

13           MS. DAHL:  Objection.  Asked and answered.

14           THE WITNESS:  I have not.

03:44:43 15  BY MR. GOLDBERG:

16      Q    And am I right -- I think I have this right,

17   but am I right that in your view, every watermark

18   that is applied to a photograph by a content owner

19   is intended to convey copyright ownership?

03:45:03 20      A    Correct.

21      Q    Your opinion does not depend on what the

22   watermark is?

23           MS. DAHL:  Objection to the extent it

24   mischaracterizes the report.

25   ////

THEA VAUGHAN
JUNE 07, 2024                                                    JOB NO. 1015095

```
        1   BY MR. GOLDBERG:
        2      Q   Or does it?
        3      A   Meaning it -- what do you mean?
        4      Q   Totally fair question.
03:45:19 5          I'm trying to say the watermark could be
        6   anything, and as long as it's watermarked by the
        7   content owner, your opinion is that it's intended to
        8   convey ownership?
        9          MS. DAHL:  Objection to the extent it
03:45:34 10  mischaracterizes the witness's report.
       11          THE WITNESS:  There is -- it is intended to
       12   convey ownership.
       13   BY MR. GOLDBERG:
       14      Q   Right.  Regardless of what the watermark is?
03:45:48 15         MS. DAHL:  Same objection to the extent it
       16   mischaracterizes the witness's report.
       17          THE WITNESS:  I mean, if it's a pencil dot,
       18   that might be questionable, but yes.
       19   BY MR. GOLDBERG:
03:45:59 20     Q   Fair enough.
       21          In the extreme where somebody just puts a pen
       22   mark on an image, maybe that's one extreme?
       23      A   Yeah.
       24      Q   But if it's something more substantial than
03:46:09 25  that, it wouldn't change your opinions?
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1        A    Correct.

 2             MS. DAHL:   Same objections.

 3   BY MR. GOLDBERG:

 4        Q    And I take it from your opinion, you were

03:46:14  5   focused on the intent of the content owner in

 6   watermarking, correct?

 7             MS. DAHL:   Objection to the extent it

 8   mischaracterizes the witness's report.

 9             THE WITNESS:   Content owner, yes.

03:46:28 10   BY MR. GOLDBERG:

11        Q    And you didn't do anything empirically or

12   otherwise to determine whether, in fact, someone

13   viewing the image understood the watermark to mean

14   copyright ownership, branding, or nothing at all?

03:46:46 15   That wasn't part of what you did?

16        A    No.

17        Q    Okay.  Are you aware of anything, legally or

18   otherwise, that prevents a company or person from

19   stamping an image with their logo for branding

03:47:11 20   purposes and not for copyright purposes?

21        A    Am I aware of an example?  Is that --

22        Q    Not an example.  I said anything legally or

23   otherwise that would prevent someone --

24        A    Oh.

03:47:24 25   Q    -- from doing that.
```

THEA VAUGHAN                                                          JOB NO. 1015095
JUNE 07, 2024

```
          1      Q   --  correct?

          2      A    Correct.

          3      Q   And you've read the interrogatory response

          4   where they explain the stylized logo in CoStar says,

03:59:14  5   "We do not claim it as ownership," right?

          6      A    Correct.

          7      Q    And that is not consistent with your opinion

          8   that every watermark on an image is intended to

          9   convey ownership, right?

03:59:27 10           MS. DAHL:  Objection.  Asked and answered a

         11   couple of times.

         12           THE WITNESS:  Okay.  That, again, is a

         13   historical stamp, and I'm going with what is current

         14   day, which is the stylized -- which is the pinwheel.

03:59:49 15   BY MR. GOLDBERG:

         16      Q   And CoStar's historical practice is not

         17   consistent with what you say is industry standard,

         18   which is that every watermark on an image is

         19   intended to convey ownership, right?

04:00:03 20           MS. DAHL:  Same objections.  Asked and

         21   answered.

         22           THE WITNESS:  If we define it as a watermark,

         23   I mean, yes.

         24   BY MR. GOLDBERG:

04:00:11 25      Q   We talked about the MLS.  I'll just show you
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    quickly an image of an MLS property.

2          We're on Exhibit 1476, which is an image with

3    the CRMLS watermark or logo in the center right

4    bottom of the image.

04:01:01  5          Do you see that?

6      A   I do.

7          (Exhibit 1476 was marked for identification

8      and is attached hereto.)

9    BY MR. GOLDBERG:

04:01:03 10     Q   Are you familiar with the California Regional

11   Multiple Listing Service?

12     A   I'm familiar, yes.

13     Q   Would you consider the CRMLS logo on this

14   image to be a watermark?

04:01:17 15     A   I'm actually not sure.

16     Q   Okay.  Did -- in your opinion, did the

17   California Regional Multiple Listing Service add its

18   watermark to these images -- or to this image with

19   the intent to reflect its ownership over the image?

04:01:42 20        MS. DAHL:  Objection.  Foundation.

21        THE WITNESS:  I don't -- as I said, I don't

22   know if this is a watermark or not.

23   BY MR. GOLDBERG:

24     Q   What is the difference, looking at it,

04:01:51 25   between a watermark and a logo?

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1    A    What I know is that a logo or a -- a logo, if

2    it's just a logo, there is usage that enables

3    whoever has this image to be able to use it.  So

4    there is some sort of temporary license that might

04:02:25  5    be happening with that image.

6    Q    Do you know, by looking at this image, who

7    owns it?

8    A    Who owns -- who is the copyright holder?

9    Q    Yup.

04:02:39 10    A    I can't definitively say, no.

11    Q    So the presence of the CRMLS logo or

12    watermark on this image does not communicate to you

13    who holds the copyright in this image, correct?

14    A    I'm not -- I can't a hundred percent say that

04:02:56 15    it's them that owns the copyright.

16    Q    Okay.  Are you familiar with somebody named

17    Mark Osborn?

18    A    I'm -- I'm racking my brain.  I'm not sure.

19    Q    He was a witness for CoStar designated to

04:03:14 20    testify in his corporate capacity on behalf of

21    CoStar.

22        Do you recall if --

23    A    Yeah.

24    Q    -- you read his deposition?

04:03:20 25    A    I know the name, but I can't recall sitting

THEA VAUGHAN                                                JOB NO. 1015095
JUNE 07, 2024

```
          1   you're saying.  Okay?

          2      A   Yes.

          3      Q   In paragraph 88, your opinion there is that:

          4           "CREXi usurped CoStar's right to

04:51:12  5           control the distribution of its

          6           copyrighted works."

          7           Do you see that?

          8      A   Yes.

          9      Q   And you don't cite anything in paragraph 88.

04:51:21 10   Am I missing anything there?

         11      A   No.

         12      Q   Have you seen any indication or evidence in

         13   the record that supports your opinion that CoStar's

         14   ability to control the distribution of its

04:51:40 15   copyrighted works was impacted by cropping?

         16      A   No.  I'm relying purely on experience.

         17      Q   Okay.  Are you aware of any image that was

         18   allegedly cropped by CREXi that was further

         19   distributed to anyone else beyond CREXi?

04:52:07 20           MS. DAHL:  I'll object to the form of the

         21   question.

         22           THE WITNESS:  Not that I'm aware of.

         23   BY MR. GOLDBERG:

         24      Q   Okay.

04:52:16 25      A   Not that I'm aware of.
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
          1      Q   And just so it's clear, and I think I've done
          2   this list, but in any part of your opinion regarding
          3   harm --
          4      A   Yeah.
04:52:23  5      Q   -- you do not attempt to quantify any harm,
          6   correct?
          7      A   Correct.
          8      Q   These are theoretical theories of harm or
          9   potential harm, correct?
04:52:32 10         MS. DAHL:  Object to the form of the
         11   question.
         12   BY MR. GOLDBERG:
         13      Q   Correct?
         14      A   This is based on my experience with
04:52:39 15   watermarking.
         16      Q   Okay.  But you're not in paragraph 88, 89,
         17   90, 91, 92, or 93, in forming opinions about harm,
         18   purporting to say that CoStar has actually suffered
         19   monetary harm in any way?
04:53:00 20         MS. DAHL:  Object to the extent it
         21   mischaracterizes the witness's report.
         22   BY MR. GOLDBERG:
         23      Q   And I'm asking, I'm not intending to
         24   mischaracterize, so please --
04:53:09 25      A   I'm not quantifying it, no.
```

THEA VAUGHAN
JUNE 07, 2024                                              JOB NO. 1015095

```
          1        A    Correct.

          2        Q    And it would not wait two years, three years,

          3    five years before serving a takedown notice?

          4        A    As I can recall, yes, it would not.

04:58:08  5        Q    Are you aware of any evidence you've seen

          6    related to this case that supports your opinion that

          7    CoStar actually was harmed in its ability to police

          8    infringement due to alleged cropping of its

          9    watermark?

04:58:31 10        A    I don't have a monetary amount or a number or

         11    any kind of quantitative information on that.

         12        Q    Okay.  Let's look at paragraph 93rd.  It

         13    says:

         14               "CREXi's use of CoStar's cropped

04:58:51 15             images also likely created confusion

         16             in the marketplace."

         17        Do you see that?

         18        A    Uh-huh.  I do.

         19        Q    What did you mean by your opinion there in

04:58:59 20    paragraph 93?

         21        A    One could see CoStar's image published in

         22    multiple places, and that could be confusing as to

         23    who owns the image and where the source is for that

         24    image, who's the source of that image.

04:59:21 25        Q    And as I read it, that confusion, in your
```

```
          1   view, would only apply if the cropping did not

          2   result in complete cropping of CoStar's watermark

          3   because otherwise nobody would -- viewing the image

          4   would know that it was associated with CoStar in

04:59:43  5   some way.  But am I wrong about that?

          6        MS. DAHL:  Object to the extent it

          7   mischaracterizes the witness's report.

          8        THE WITNESS:  Partial cropping, yes.  But you

          9   could have an instance where a potential client is

05:00:00 10   looking up an address and sees two images side by

         11   side from CREXi and CoStar and doesn't know who the

         12   source is.  So that could be confusing.

         13   BY MR. GOLDBERG:

         14      Q   Okay.  And are you aware of any evidence in

05:00:12 15   the case that that sort of fact scenario you just

         16   described occurred?

         17      A   No.  But I know that any time -- any time

         18   that a watermark is cropped out or is not existent,

         19   it takes away the ability to police and enforce

05:00:27 20   against infringement.

         21      Q   Fair enough.

         22        And I'm just trying to understand whether

         23   you've actually seen evidence in this case of that

         24   occurring?

05:00:40 25      A   I have not seen --
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
 1      A    Correct.
 2      Q    Can you tell me a single customer that CoStar
 3  has whose relationship with CoStar has been
 4  undermined by cropping of images by CREXi allegedly?
05:14:39  5      A    I don't have a customer in mind, no.
 6      Q    Are you aware of any customer who has asked
 7  for lower license fees from CoStar as a result of
 8  the allegations in this case?
 9      A    No.
05:14:51  10     Q    Are you aware of any customer who has asked
11  for the right to crop out any watermarks based on
12  the allegations in this case?
13      A    No.
14      Q    Are you aware of any customer of CoStar
05:15:05  15  seeking more favorable licensing terms from CoStar
16  as a result of the alleged cropping in this case?
17      A    No.
18      Q    Fifth -- I'm at paragraph 92:
19           "CREXi's policy and practice of
05:15:20  20       cropping out CoStar's watermark from
21       images reduces the quality of the
22       image and thus negatively affects
23       CoStar's goodwill in the marketplace."
24       Do you see that?
05:15:35  25     A    Yes.
```

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

```
        1      A    Yes.

        2      Q    What is your understanding of goodwill in the

        3   marketplace?

        4      A    Promoting to its potential clients that it

05:17:08 5   captures all of its own photography.

        6      Q    Do you have any professional experience or

        7   training in valuing a business's goodwill?

        8      A    No.

        9      Q    Have you attempted to value CoStar's

05:17:26 10  goodwill?

       11      A    No.

       12      Q    Have you looked at or analyzed in any way

       13   CoStar's goodwill prior to any instance of alleged

       14   cropping in this case?

05:17:39 15     A    No.

       16      Q    Have you attempted to value or analyze

       17   CoStar's goodwill after any instance of alleged

       18   cropping or after all of the alleged instances of

       19   cropping in this case?

05:17:52 20     A    No.

       21      Q    Have you conducted any analysis at all

       22   related to CoStar's goodwill?

       23      A    No.

       24      Q    Are you aware of any evidence in this case of

05:18:04 25  an actual loss of goodwill by CoStar due to
```

1    allegations related to cropping?

2        A    No.

3        Q    Okay.  I have a few exhibits to show you at

4    the very end here.

05:18:17  5        A    Okay.

6        Q    And I know we have a few minutes left, so I

7    think we'll be able to get through them.

8            MS. DAHL:  Do you know how much time has been

9    on the record?

05:18:27 10            MR. GOLDBERG:  We can go off if you'd like a

11   clock.

12            Okay.  Let's take a break.

13            THE VIDEOGRAPHER:  The time is 5:18.  We're

14   off the record.

05:18:35 15            (Recess.)

16            THE VIDEOGRAPHER:  The time is 5:27.  We're

17   on the record.

18   BY MR. GOLDBERG:

19        Q    Ms. Vaughan, I've handed you a series of

05:27:18 20   premarked exhibits that are images of commercial

21   real estate photography.

22            Do you have those in front of you?

23        A    I do.

24        Q    And the first one you should have in front of

05:27:28 25   you is Exhibit 1478.

THEA VAUGHAN
JUNE 07, 2024

JOB NO. 1015095

1

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6               That the foregoing proceedings were taken

7    before me at the time and place herein set forth;

8    that any witnesses in the foregoing proceedings,

9    prior to testifying, were placed under oath; that a

10   record of the proceedings was made by me using

11   machine shorthand which was thereafter transcribed

12   under my direction; further, that the foregoing is

13   an accurate transcription thereof.

14               I further certify that I am neither

15   financially interested in the action nor a relative

16   or employee of any attorney of any of the parties.

17               IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: June 16th, 2024

21

22

23                         *KATHLEEN E. BARNEY* (signature)

                           KATHLEEN E. BARNEY
24                         CSR No. 5698

25