ELYSE M. GREENWALD (BAR NO. 268050)
elyse.greenwald@lw.com
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5500
Fax: 424.653.5501

*Attorneys for Plaintiffs and Counterdefendants*
*CoStar Group, Inc. and CoStar Realty Information, Inc.*

[Additional Counsel Listed on the Next Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC., | Case No. 2:20-cv-08819-CBM-AS |
| Plaintiffs, | Hon. Consuelo B. Marshall |
| v. | **THIRD AMENDED COMPLAINT** |
| COMMERCIAL REAL ESTATE EXCHANGE, INC., | |
| Defendant. | **DEMAND FOR JURY TRIAL** |
| COMMERCIAL REAL ESTATE EXCHANGE, INC., | **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |
| Counterclaimant, | |
| v. | |
| COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC., | |
| Counterdefendants. | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

NICHOLAS J. BOYLE*
nicholas.boyle@lw.com
SARAH A. TOMKOWIAK*
sarah.tomkowiak@lw.com
ANNE C. MALINEE*
anne.malinee@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201


CAITLIN E. DAHL*
caitlin.dahl@lw.com
LATHAM AND WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767

Attorneys for Plaintiffs and Counterdefendants
*Admitted pro hac vice

1

# TABLE OF CONTENTS

2                                                                                                       **Page**

3    PRELIMINARY STATEMENT ................................................................................ 1

4    BACKGROUND ................................................................................................... 17

5
     JURISDICTION AND VENUE ............................................................................... 27
6
7    THE PARTIES ...................................................................................................... 28

8    RELEVANT NONPARTIES ................................................................................. 28

9    FACTUAL ALLEGATIONS ................................................................................. 29

10        A.    CoStar Invests Significant Time and Money to Maintain
11              the Nation's Most Comprehensive and Most Visited
12              Commercial Real Estate Services ..................................................... 29

13        B.    CoStar Goes to Significant Lengths to Protect Its
                Intellectual Property ......................................................................... 32
14
15              1.    Copyright Protection ............................................................. 32

16              2.    License Limitations ............................................................... 34

17              3.    Technological Protection ....................................................... 34

18        C.    CREXi Has Grown at CoStar's Expense By Free-Riding
19              on CoStar's Investment and Misappropriating CoStar
20              Content .............................................................................................. 35

21        D.    CREXi Mass Infringes CoStar's Copyrighted
                Photographs, And Removes the CoStar Watermark .......................... 42
22
23              1.    CREXi Steals Copyrighted Photographs from
                      CoStar and Its Licensees and Publishes Them on
24                    Its Competing Website and in Its Subscription
                      Product ................................................................................. 42
25
26              2.    CREXi Copies Real Estate Listings from LoopNet
                      That Include CoStar-Copyrighted Images and
27                    Posts Them on CREXi.com without Broker
                      Knowledge, Knowing It Is Violating Copyright
28                    Law ....................................................................................... 48

3.   Discovery of Communications with CREXi's Agents in India Has Revealed The Details of CREXi's Global Scheme ........................................................... 59

4.   CREXi Is Well Aware That CoStar Does Not Permit Competitors to Copy Content from Its Website ........................................................................ 64

5.   CREXi Knows Full Well That CoStar's Star Logo Signals Its Copyright Ownership ............................................. 65

E.   CREXi Actively Participates in Creating Listings, Including Uploading Infringing Images to CREXi's Platform ..................................................................................... 67

F.   CREXi is Ineligible for the DMCA Safe Harbor Defense in 17 U.S.C. § 512 ................................................................ 72

1.   CREXi Failed to Properly Designate a DMCA Agent ........................................................................................... 73

2.   CREXi Knew or Should Have Known of Infringing Activity on Its Platform and Failed to Expeditiously Remove Claimed Infringing Images ................ 73

3.   CREXi Failed to Design and Reasonably Implement a Repeat Infringer Policy ..................................... 75

G.   CREXi's Wrongdoing is Consistent with Its Prior Willful Misconduct .................................................................................. 77

FIRST CLAIM FOR RELIEF ............................................................................. 78

SECOND CLAIM FOR RELIEF ......................................................................... 80

THIRD CLAIM FOR RELIEF .............................................................................. 81

PRAYER FOR RELIEF ....................................................................................... 81

JURY DEMAND ................................................................................................... 83

Plaintiffs CoStar Group, Inc. ("CoStar Group") and CoStar Realty Information, Inc. ("CoStar Realty") (collectively, "CoStar"), by and through its undersigned counsel, bring this Third Amended Complaint against Commercial Real Estate Exchange, Inc. ("CREXi") and allege as follows:

## **PRELIMINARY STATEMENT**

1.      CoStar brings this suit to redress CREXi's flagrant and widespread theft of CoStar's intellectual property and its unlawful scheme to build a competing business on the back of that stolen content.

2.      The scale of CREXi's wrongdoing is breathtaking.  To date, CoStar has identified **48,649** CoStar-copyrighted photographs copied, displayed, or reproduced by CREXi without permission.  This figure far surpasses the number of copyrighted images that resulted in CoStar's record-setting $500 million judgment against Xceligent.

3.      Worse still, despite being sued in federal court, CREXi remains defiant, and its wrongdoing continues.  Of the nearly 50,000 infringing images, CREXi infringed over **25,000** of them *after* CoStar filed its original complaint in 2020, and its infringement has continued through 2024.

4.      CREXi has built its competing commercial real estate marketplace and data business by infringing CoStar's content, and has refused to stop.  To populate its marketplace and subsciption database with property listings and records, it has copied them en masse from CoStar.  And such property listings and records include, indeed require, property images—which are critical to attracting users.  As Eli Randel, CREXi's Chief Operating Officer, has admitted, when it comes to commercial property, "images matter."  Lacking any comprehensive image library of its own, CREXi—as a matter of company policy—harvests images from CoStar, including from CoStar's competing LoopNet marketplace, knowing that such photographs are copyrighted.

5.    CREXi plotted to eliminate CoStar entirely, so that it could take over the industry and become a monopoly globally.  In the midst of CREXi's scheme to steal CoStar's intellectual property, CREXi CEO Mike DeGiorgio crowed to a key investor and his fellow CREXi executives that they were close to achieving their goal of industry domination: "CREXi will dominate listings, transactions, leasing, CRM, lending, portfolio management, data/comps both in the usa and internationally and ***literally soon be the one and only platform of the industry***."

6.    CREXi's quest to eliminate all competition, by all means necessary, became a consuming passion at the company.  Speaking of rival marketplace Brevitas, CREXi's Chief Operating Officer Eli Randel wrote to the CREXi executive team: "Fuck them . . . Let's not let them get their footing."  He nicknamed CREXi's competitor "Breastytas" and asked his colleagues to come up with more derogatory nicknames.  CREXi's no-holds-barred attacks has led to it becoming a pariah in the industry.

7.    For example, CREXi competitor BiProxi issued a press release railing against CREXi's mass theft from BiProxi's website: "Biproxi has recently discovered what it believes to be actions by [CREXi] compromising the integrity of the online commercial real estate listing industry . . . the copying or 'scraping' of listings from other sites without authorization undermines the integrity of the industry and devalues consumer confidence . . .."  BiProxi's CEO, Gordon Smith, stated further that "it appears that CREXi attempted to copy our online data in an attempt to create content at no cost to enhance their own listings, bypassing the established channels necessary to develop beneficial syndication partnerships" and that CREXi's actions forced BiProxi to take "proactive measures" to "preserve the integrity of our industry."

8.    Reflecting CREXi's goal of worldwide industry domination, CREXi's ongoing scheme of mass infringement is global in nature.  Like Xceligent before it, CREXi has offshored much of its theft to agents abroad.  CREXi used cheap offshore

labor to manually scrape LoopNet.  From CREXi's earliest days, CREXi executive Paul Cohen instructed his fellow CREXi executives, including Doug Shankman and Eli Randel, to employ "girls" located abroad to systematically copy from LoopNet, warning his colleagues to direct the offshore workers to use proxy servers (like "hide.me") and fake (or what he called "BS") accounts to avoid being caught by CoStar.  In their internal emails just a few days prior, Shankman and Randel admitted that CREXi's business strategy "*revolves around taking listings from LoopNet*," an "approach" that had been "use[d] very effectively."

9.    Recently produced communications between CREXi and its agents abroad have further lifted the veil on CREXi's illicit operations, demonstrating the systematic way in which CREXi copied CoStar's intellectual property at scale.

10.    As a matter of policy, and for years, CREXi has directed its offshore agents to copy CoStar-copyrighted images and associated listing details from LoopNet (and other CoStar websites) and from property brochures; to crop out the CoStar watermark from the copyrighted images; and to upload the cropped images and listing content to CREXi.com.  These were the orders laid down by CREXi management, and followed by CREXi employees and agents.

11.    For example, following CREXi's written policy, then-CREXi Business Development Representative Christian Vien repeatedly sent CREXi's Indian agents Dropbox links containing photographs with the CoStar watermark, and screenshots he had taken of listings on CoStar's LoopNet site, for the purpose of creating CREXi listings.  At the direction of CREXi management, Vien instructed the offshore agents to "*[e]xclude/cropout any LoopNet watermarks found in photos*" and use his screenshots of LoopNet listings to build out listings on CREXi's competing marketplace site.

12.    As another example, CREXi Customer Success Manager Austin Maddox repeatedly directed CREXi's Indian team to "create listings from . . .

LoopNet" and to "[p]lease use photos from [a LoopNet] flyer but **make sure to crop out the watermarked LoopNet logo** on the bottom right of them."

13.     By way of further example, fellow CREXi Customer Success Manager Steven Son sent listing materials to CREXi's India-based Head of Deal Management over CREXi's internal Slack messaging platform noting that there were "a few **LN [LoopNet]/CoStar watermarks** on some of the photos.  **Please make sure to remove them before uploading**."

14.     Similarly, in a recorded training session, CREXi's Manager of Business Operations warned CREXi's Indian agents that, when they built listings, they needed to look for the "**CoStar logo in the bottom right**" of the images used to create CREXi listings and to "**crop [the CoStar logo] out of the picture.  You can still use the picture but we need to make sure the watermark is removed**."  The examples of blatant wrongdoing go on and on.

15.     CREXi's practice of cropping out the CoStar watermark—before uploading the image to CREXi.com—is a vain attempt to cover-up CREXi's industrial-scale infringement by seeking to obscure CoStar's ownership of these photographs.  The instructions from CREXi are shamelessly direct.  One CREXi manager, in all caps, ordered an Indian agent to "**NOT ADD WATERMARKED PICTURES, PLEASE CROP**."  Orders like these from CREXi lead to the following:

<u>**CoStar-Copyrighted Photograph on LoopNet**</u>         <u>**Cropped Image on CREXi**</u>

 

16.    This compelling evidence of wrongdoing is repeated across thousands of images and years of misconduct, and is found in the hands of a slew of CREXi managers, employees, and the aforementioned Indian agents.

17.    Little wonder then that discovery has revealed that CREXi management instructed its entire "business development" (i.e., mass copying-and-cropping) team specifically to engage in such wrongdoing *as a matter of policy*.  Nick DeGiorgio, the CREXi CEO's cousin and close associate, copying a Regional Director of Sales, a manager on the Customer Support Team, and a third senior CREXi manager, emailed the CREXi Business Development team group e-mail acknowledging that it was improper to copy from CoStar sites such as LoopNet, and thus when they did so they should cover their tracks: "**TAKE A SCREENSHOT OF THE PHOTOS … TO ENSURE THAT THE WATERMARK LOGO IS REMOVED**."  The CREXi employees were further instructed to send the cropped CoStar photographs and associated LoopNet listing information to CREXi's Indian agents to create listings on CREXi.com.

18.    Thus—while CREXi's refrain has been that it is merely a passive platform, and that the mass infringement was inadvertent—its own documents are to the contrary.  Copying images from LoopNet, when deemed necessary by CREXi, and cropping out the CoStar logo from those images is CREXi's written policy.

19.    In testimony, a former CREXi Business Development Representative admitted that in accordance with this policy he accessed LoopNet listings from his home computer, copied listings containing CoStar-copyrighted images, and sent those listings to his CREXi work email to be forwarded to CREXi's agents in India, so that they could crop the copyrighted images and use them to create CREXi listings.  In that same testimony, the former CREXi employee confirmed that CREXi's practice was to "*copy [a] listing from LoopNet, crop out the watermark, and build the listing on CREXi*" with the help of CREXi's Indian agents.

20.    CREXi was of course well aware that CoStar's watermark indicated that CoStar owned a copyright in a photograph. CREXi's Head of Deal Management recounted to James Burton, CREXi's Manager of Business Operations, that his team's practice was to "crop" logos from images "to *avoid any copyright issue*." That practice was, in accordance with CREXi's policy, widespread. Nick DeGiorgio, the CEO's cousin, instructed his team that "[i]f you are submitting L**pnet/Co* flyers" to be built by CREXi's Deal Management team, they should issue instructions to "PLEASE BE SURE TO REMOVE/CROP OUT ANY WATERMARKS ON ANY PHOTOGRAPHS." Another team leader emphasized that it was important to follow Mr. Nick DeGiorgio's instructions because failing to do so "*puts us at risk for a potential legal issue*." And when Mr. Burton asked Lawson Dees, CREXi's Vice President of Operations, if CREXi could do anything to identify "L[oop]N[et] pictures" on CREXi's site because there was "a bunch of stuff" that—euphemistically—needed to be "cleaned up," Mr. Dees responded that CREXi was "working on a tech solution to identify photos with *potentially harmful watermarks*," i.e. *CoStar's watermark*.

21.    That "tech solution" was to hire a copyright vendor tasked with running software that *specifically looked for the CoStar watermark* (and only the CoStar watermark) on photographs in CREXi's system, just in case CREXi's cropping efforts were not 100% successful. The vendor stated in court documents that it was hired to "identify photographs in the real estate listings [CREXi] receives from brokers that might be *copyright protected*, so that those photographs can be removed from CREXi's website." After CREXi hired that vendor, Mr. Burton confirmed to a Customer Success manager that CREXi had hired a company to go "through the listings and delete[] everything that has a L[oop]N[et] watermark" for CREXi's "*safety*." But then Mr. Burton knowingly uploaded a photo that had been "cropped" to remove the CoStar watermark.

22.    In other words, CREXi and its vendor affirmatively relied on the presence of the CoStar watermark to identify CoStar-copyrighted images.  All while CREXi was cropping out that watermark and copying and posting the cropped images.  There can hardly be better evidence of CREXi's willful infringement.

23.    CREXi's mass cropping, in an effort to hide its wrongdoing, has been mirrored by its obfuscatory tactics in this case.  CREXi failed to disclose the names, or even the existence, of many of the CREXi employees who provided listings to CREXi's Indian agents and who issued the direct orders to copy phtographs from LoopNet listings and crop out CoStar's watermark—individuals like Mr. Vien and his former colleague Mr. Maddox.  CoStar had to independently uncover their identities.  And it was not until CoStar raised CREXi's failure to disclose those CREXi employees to the Court that CREXi finally agreed to search and produce their communications.

24.    Likewise, CREXi has served discovery responses, verified under penalty of perjury, that also try to hide the ball.  For example, CoStar asked CREXi to explain how it sourced listings and whether it cropped photographs.  CREXi's written response does not disclose that it copies from LoopNet, and says nothing about the mass cropping of CoStar's watermark.  In fact, the response indicates that if a suggestion was made that CREXi copy a listing from LoopNet, CREXi would pursue an alternative source.  Not a word about the detailed instructions CREXi management issued on exactly how to copy (screenshot) a LoopNet listing, not a mention of the slew of instructions on cropping the CoStar watermark, just misdirection.

25.    In depositions, CREXi's own witnesses were later forced to concede, in light of CREXi's voluminous emails and Slack messages discussing the mass-copying and cropping, that for years there was a ***policy*** dictating that CREXi would crop CoStar's watermarks, and a ***policy*** determining that CREXi would copy entire listings, including photographs, from LoopNet when CREXi deemed it warranted.

Yet CREXi's under-oath, fully vetted, written discovery responses do not acknowledge that reality. The cover up has thus continued.

26. CoStar knew CREXi's theft was brazen when CoStar initially filed suit, having already identified 10,000 CoStar copyrighted images. That number, it turns out, was the tip of the proverbial iceberg. And in the more than three years since CoStar initially sued CREXi, CREXi has done almost nothing to curb its misconduct, with infringement continuing apace since this lawsuit was filed. CREXi is a wrongdoer that has decided to thumb its nose at both CoStar and the legal system.

27. In fact, even after being sued, CREXi's campaign to take down CoStar didn't miss a beat. In January 2021, four months after this lawsuit was originally filed, CREXi's Chief Marketing Officer Courtney Ettus wrote: "**Costar loopnet . . . OBVIOUSLY HERE TO FUCK THEM UP**."

28. Over the past thirty-five years, thousands of CoStar employees, including hundreds of photographers, have worked hard to build a business that serves the needs of the real estate industry and beyond. CoStar is committed to protecting the work of those who have helped make CoStar's success possible. CREXi's shameless and ongoing free-riding on those efforts, and the billions of dollars invested by CoStar, must be redressed.

\* \* \*

29. CoStar is the nation's leading provider of commercial real estate (a.k.a. "CRE") information, analytics, and online property marketplaces. CoStar offers a password-protected database subscription service used by brokers and other entities that require comprehensive commercial real estate data. CoStar also owns a number of digital marketplaces containing listings of real estate for sale and for lease. CoStar's LoopNet.com website is the leading digital marketplace for commercial real estate in the United States.[1] Listings on LoopNet contain CoStar-copyrighted

---

[1] For the avoidance of doubt, CoStar's allegations related to LoopNet in this case refer solely to CoStar's LoopNet marketplace and not to broker websites powered by CoStar's LoopLink service,

images, data from the CoStar database, and edits made by CoStar researchers to improve marketability. Everyday, buyers, sellers, lessors, lessees, owners, and brokers access and use the marketplace at www.loopnet.com in order to list, buy, sell, lease, rent, or browse commercial real estate. In addition, CoStar runs a commercial real estate auction platform, known as Ten-X.com.

30. CREXi is building its own online commercial real estate marketplace and auction platform by free-riding on CoStar's billions of dollars of investments and the thirty-plus years of hard work by CoStar's employees. With the aid of approximately 40 offshore companies working at CREXi's direction and on its behalf, including multiple Indian business process outsourcing organizations ("BPOs") (and collectively, "Agents"), CREXi engages in mass infringement of CoStar-copyrighted photographs to populate its rival marketplace and paid subscription service, Intelligence.

31. Based on a review of CREXi's website, as well as an analysis of images produced by CREXi through October 2022, CoStar has so far identified *48,649* copyrighted CoStar photographs copied, displayed, or reproduced by CREXi without permission, including over *25,000* that CREXi infringed *after* CoStar filed its original Complaint. (To give a sense of the harm inflicted and scale of wrongdoing, federal judgments have placed a value of $50,000 on each CoStar image infringed.) These photographs almost certainly constitute a mere fraction of the total infringement present in CREXi's systems, as CREXi's public-facing website displays only photographs associated with active listings CREXi has decided to publish on that public-facing website; CREXi has failed to conduct a thorough search for CoStar-owned images in its back-end image library.

32. CREXi is a sizeable and well-funded company, and could compete fairly with CoStar if it so chose. As of early 2020, CREXi had purportedly already

---

a service that allows brokers to "link" their websites to "LoopNet" (with the LoopLink-hosted portion of a broker's website then operated and hosted by CoStar). IP Addresses associated with CREXi have accessed LoopLink without difficulty during this lawsuit.

raised approximately $60 million, including (i) a $4.3 million Seed funding announced in February 2016, (ii) an $11 million Series A funding announced in May 2018, and (iii) a $30 million Series B funding announced in January 2020. CREXi has received significant investments from multiple venture capital backers, including Jackson Square Ventures, Freestyle Capital, Lerer Hippeau Ventures, Leon Capital Group LLC, Industry Ventures, and TenOneTen Ventures. Indeed, TenOneTen Ventures appears to have invested roughly $8.7 million, separate and apart from its involvement in CREXi's initial Seed and Series A funding. And, these aforementioned investors merely account for the largest stakeholders; CREXi has garnered the financial support of a number of additional investors, including (but not limited to) Clark Landry, Manifest Investment Partners, Hack VC, Beta Bridge Capital, Prudence Holdings, Mitsubishi Estate Company, Wonder Ventures, and KohFounders. With those resources, CREXi could have grown its business legitimately; it does not need to harvest content from CoStar to survive. But CREXi has made the strategic choice to take a shortcut and build out its business on the cheap by stealing from CoStar.

33. CREXi's current and former employees—as well its Agents in India, the Philippines, and Pakistan—have routinely accessed LoopNet in order to copy CoStar's copyrighted photographs to populate CREXi's website, once the images have been cropped. They also copy CoStar-copyrighted photographs by extracting them from property brochures, and then cropping out the CoStar watermark when visible—on the instructions of CREXi senior managers such as James Burton—before creating CREXi brochures or uploading the images to CREXi. As CREXi is well aware, CoStar is a leading licensor of copyrighted real estate photographs for use in brochures.

34. CREXi's attempt to clone CoStar's business is as brazen as it is widespread. CREXi has gone so far as to infringe CoStar's copyrighted photographs in the marketing materials it uses to promote itself. Senior CREXi leadership—

including Mike Rosenfeld and Paul Cohen, CREXi's National Sales Director—have hosted a number of virtual presentations to introduce CREXi in markets across the country. Incredibly, the sample listings specifically chosen for these marketing campaigns contain infringing content copied from CoStar.

35. There is no question that CREXi knows that its conduct is wrongful. CREXi's internal correspondence acknowledges that it may not copy listings from LoopNet or other CoStar websites, and that its practice of removing the CoStar watermark from the photographs it copies is done for "copyright" and "safety" reasons. In a candid internal exchange, CREXi's Vice President of Operations admitted that CREXi was working on a solution to identify photos with "potentially harmful watermarks." And at his deposition, he admitted that CREXi did not want images on its website with "specifically a CoStar logo" because CREXi did not want to "attract CoStar's attention and draw their ire."

36. Moreover, CREXi engaged a copyright vendor, Restb.ai, LLC, in February 2019 to identify photographs on the CREXi platform that contain the CoStar watermark. That engagement alone demonstrates that CREXi is aware that unlawful copying of CoStar's watermarked photographs would expose CREXi to potential copyright claims. Restb, whose website states that one purpose of its technology is to "[p]rotect your company from copyright lawsuits,"[2] purports to use "artificial intelligence to quickly recognize photographs that contain company logos or watermarks." The purpose of that review of logos is to flag copyright ownership. According to Restb, "CREXi utilizes Restb's services in order to identify photographs in the real estate listings it receives from brokers that might be copyright protected." In order to do so, Restb looks for the CoStar watermark, the very same watermark that CREXi systematically seeks to crop out pursuant to a company-wide policy.

---

[2] Restb.ai, https://restb.ai/solutions/watermark-detection/ (last visited December 16, 2022).

37.    CREXi belatedly applied ineffective fig leaves like Restb, a filter that does little to curb infringement.  CREXi has used the filter since 2019, yet CoStar has found tens of thousands of infringing images on CREXi.com, not least because the Restb filter was not designed to find cropped images.  Nevertheless, that CREXi hired a copyright vendor specifically to find CoStar-watermarked images demonstrates that CREXi's copying and cropping of those very images constituted knowing, willful infringement.

38.    That comes as no suprise.  The evidence shows that copying CoStar's copyrighted photographs is at the core of CREXi's business model.  CREXi accesses a property listing on one of CoStar's marketplaces (e.g., LoopNet or CityFeet). Shortly thereafter, the same property listing is added *by CREXi* to its website with CoStar's copyrighted photographs.  And, in order to hide its copying of CoStar images, CREXi specifically instructs its Agents to crop out the CoStar watermark from CoStar-copyrighted photographs before adding them to CREXi's website.  As noted above, that was an instruction given to CREXi's Agents by multiple CREXi managers and employees pursuant to CREXi's official company policy.

39.    There is also no question that CREXi and its Agents are responsible for copying a substantial number of CoStar's copyrighted images without the involvement of any customer.  Indeed, in many cases, the brokers whose listings feature CoStar's copyrighted images have never even heard of CREXi—they contact CoStar to ask why their listings are appearing on CREXi's site.

40.    Copying without broker consent is central to CREXi's business model—when one business development representative asked CREXi's Vice President of Operations Lawson Dees whether he could copy multiple listings from LoopNet (for uploading to CREXi.com) even though he had never heard from the broker at issue about those listings, Dees succinctly replied: "*All day*."

41.    And even when CREXi does contact a listing broker, CREXi offers to post the listing itself, without revealing that it is copying the listing and its

CASE NO. 2:20-cv-08819-CBM-AS
THIRD AMENDED COMPLAINT

copyrighted images from CoStar.  CREXi explicitly advertises to brokers "Want Us to Add the Listing For You?"  Indeed, a former CREXi employee testified that it was uncommon for brokers to build listings on CREXi's site because brokers would rather have CREXi build listings for them.  And when CREXi builds those listings, it does so by copying and uploading CoStar-copyrighted images to CREXi's website.

42.    Brokers do, sometimes, build their own listings on CREXi.  But, CREXi knows that listings built by brokers (many of whom license their photographs from CoStar) are another source by which CREXi can obtain CoStar-copyrighted photographs.  When CREXi launched its "Build Your Own" listing feature in October 2016, it was internally aware that brokers were using that feature to add CoStar-watermarked photographs.  Upon discovering this, one senior employee brought it to the attention of Mr. Dees and another founding employee, Bryan Barajas, flagging that a broker had "dragged his photos str8 from loopnet" and that similar behavior "could be a serious issue going forward."  Mr. Dees testified that he was not aware of any changes or guardrails CREXi put in place in response to that internal red flag.

43.    Discovery has shown that whether CREXi or a broker uploads a CoStar-copyrighted image to CREXi.com, CREXi itself plays a very active role in the infringement.  When CREXi is posting a listing, it selects which images to copy and rejects others.  For example, when Nick DeGiorgio instructed the entire CREXi "business development" team on precisely CREXi's policy regarding how to copy from LoopNet, using screenshots and cropping, he directed CREXi's employees to select only specific images—a primary external picture and an aerial view.  CREXi senior manager James Burton also testified that CREXi would select a certain number of images (at most ten) when asked by a broker to build a listing.

44.    When a broker itself attempts to upload a listing, both Mr. DeGiorgio and Mr. Burton confirmed, under oath, that CREXi would take an active role in

reviewing the listing, including the images, as it was to appear on CREXi.com.  For example, when asked what oversight CREXi performed of listings, Mr. Burton testified that "it was always our process to QC listings for quality control, for all purposes."  That "QC" for broker-created listings included a "basic listing data review" that CREXi conducted to identify whether "something looked off," such as "the price or the square footage."  If there was an error, CREXi would "fix it," and "give [the broker] the listing back."  CREXi's QC process also required CREXi employees to "Make sure all photos are clear and no loopnet/costar tags," to "Check Marketing Description to make sure it looks clean and correct spacing/spelling" to "Check the OM/Flyer to make sure its not a loopnet/costar," and to "make sure Brokerage Logo, License, Team Name etc. is filled out on admin."  Nick DeGiorgio testified that he personally removed images that were "blurry, upside down," or "pixelated."  Consistent with its desire to maintain "high quality" listings, CREXi employees scoured CREXi.com to identify "fake deals" and "goofy looking" listings.  Thus there is no question that CREXi exercises active editorial control over listings, and specifically the (copyrighted) images they contain, even those where brokers are involved.  CREXi's claim to be a passive platform could not be further from the truth.

45.    As CREXi knows, CoStar has brought several successful lawsuits against rivals who have sought, like CREXi, to compete unfairly by stealing CoStar's copyrighted photographs.  As CREXi does now, Xceligent copied tens of thousands of CoStar's copyrighted images from LoopNet and from property brochures.  Xceligent—like CREXi—likewise ignored LoopNet's "access denied" notices and rotated the IP addresses that it used in order to circumvent CoStar's technological protections and maintain access to the copyrighted photographs it wanted for its site.  And, like CREXi, rather than pay photographers to create their own library of images, Xceligent utilized low-paid labor in India and the Philippines so that it could harvest CoStar-copyrighted images on the cheap and around the

clock.  In a highly publicized lawsuit, CoStar sued Xceligent for mass infringement, leading to a permanent injunction and a $500 million judgment, the largest in history for the infringement of copyrighted photographs.  That judgment valued each unlawfully copied real estate listing and each infringed CoStar image at $50,000.

46.    Even putting the large judgment aside, there is no question that Xceligent was a bad actor.  After CoStar presented evidence that Xceligent had copied listings from LoopNet (using the same methods as CREXi), a monitor appointed by the Federal Trade Commission ("FTC") independently concluded that 38,489 images in Xceligent's systems were "derived improperly by Xceligent from the Database of CoStar."  A key Xceligent contractor stipulated to a multi-count federal judgment in Pittsburgh after admitting that "with Xceligent's knowledge and at Xceligent's direction, [the contractor and an affiliate] used measures to circumvent CoStar's security measures and thereby hack into CoStar sites [primarily LoopNet] in order to populate the Xceligent databases with content copied from CoStar."  Another affiliated Xceligent contractor agreed to be enjoined in India based on the same type of infringement, and was barred by court order from accessing CoStar-owned websites and databases for competitive purposes and from copying CoStar content without consent.  And the officers and directors of a third contractor in the Philippines were indicted for violations of the Cybercrime Prevention Act of 2012.  In recommending criminal charges, the Philippines Department of Justice observed that "accessing LoopNet in order to copy [CoStar's] photographs before transmitting them to Xceligent" for "widespread infringement" was the "classic example of a computer crime."[3]

47.    Xceligent acted unlawfully and paid the price—yet CREXi was undeterred.  Rather, it adopted Xceligent's playbook (while claiming, incredibly,

---

[3] The evidence gathered from that contractor by CoStar also featured in the indictment of another of the contractor's clients in the United States.

that Xceligent was unfairly targeted by CoStar). Thus, as in the Xceligent matter, CoStar has been forced to litigate.

48.    Unsurprisingly, particularly in light of the foregoing revelations, CREXi is a repeat offender. CREXi's co-founder and CEO, Michael DeGiorgio, and co-founder, Luke Morris, both of whom previously worked for Ten-X—the commercial real estate auction site that is now part of CoStar—were caught red-handed with content they took from rival Ten-X to establish CREXi. In 2016, a California state court entered a preliminary injunction prohibiting CREXi from using the content that it had misappropriated from Ten-X. To end the litigation, CREXi made a seven-figure damages payment, and Mr. DeGiorgio stated: "I regret my conduct at the time I departed Ten-X." Clearly not. Mr. DeGiorgio, CREXi, and its employees have continued to steal to get ahead, now on an even greater scale.

49.    Moreover, Mr. DeGiorgio has lashed out when he suspected that *CREXi* was the victim of mass theft by a rival. In July 2020, Mr. DeGiorgio sent a panicked email to CREXi's senior team suggesting that a competitor with a recent uptick in listings had copied—or as Mr. DeGiorgio described such conduct—"stole[n]" those listings from CREXi. Without a hint of irony, Mr. DeGiorgio emphasized that brokers were angry their listings were appearing on a marketplace without their knowledge. Mr. DeGiorgio then instructed his team to "threaten the shit out of [the competitor], do things to our site/product to prevent this from happening, everything and everything to end this now." Strong action was needed immediately because a rival copying CREXi's listings was incredibly damaging. Mr. DeGiorgio wrote: "The longer this goes on, the worse it will be for" CREXi.

50.    The hypocrisy is breathtaking: CREXi's CEO was prepared to go on the warpath, threaten action against a competitor, take electronic countermeasures to protect CREXi's listings, and trumpet the imminent and significant harm to CREXi and its customers caused by listings theft, when he thought that a rival was

copying listings from CREXi and posting them on a competing marketplace—exactly what CREXi does to CoStar on an industrial scale.

51.    As a consequence of CREXi's misconduct, CoStar is entitled to millions of dollars in damages as well as injunctive relief to prevent continued irreparable harm to its business.

## BACKGROUND

52.    Founded in 1987, CoStar employs more than six thousand people worldwide.  As a result of these employees' diligent efforts—and the investment of approximately $6 billion over the last three decades—CoStar has developed the most comprehensive database of commercial real estate in the world, which includes painstakingly researched and verified data about commercial real estate properties and transactions, integrated with millions of copyrighted photographs.  CoStar and its affiliates expend enormous time and resources to populate and maintain the CoStar database, including averaging thousands of phone calls *per day* to brokers, owners, developers, and other real estate professionals, supporting an inventory of over 7 million properties globally, and taking nearly 1 million photographs annually.  CoStar's marketing research operations make millions of data changes to the CoStar database each day.  CoStar works continuously to verify that the data contained in its database are up-to-date and reliable.

53.    CoStar's database is the engine that drives CoStar's business, attracting paying subscribers, licensees, and users, and powering its various information services, analytical tools, and digital marketplaces, including LoopNet.

54.    CoStar offers a password-protected subscription service that brokers and other industry participants use to obtain comprehensive commercial real estate data, news, and analytics, as well as copyrighted photographs of commercial real estate properties.  Although CoStar licenses its copyrighted images, brokers and other CoStar customers are prohibited from providing those images to competitors.  This license limitation makes sense, given that CoStar invested significant resources

to create high-quality images for its subscribers and has no incentive (or obligation) to make them available to rivals for use in competing against CoStar.

55.    CoStar also owns and operates a number of digital marketplaces with listings of real estate for sale and for lease.  LoopNet is the nation's leading digital marketplace for commercial real estate.  Brokers and property owners use CoStar's marketplaces, including LoopNet, to market their listings.  CoStar also owns and operates CityFeet and Showcase, similar digital marketplaces for leasing and selling commercial real estate.  CoStar's marketplaces leverage the powerful CoStar database to build and enhance listings.  For instance, if a broker or property owner wants to market a listing on LoopNet relating to a property that is in CoStar's database, he or she can populate the LoopNet listing with CoStar's copyrighted photographs (which brokers may license from CoStar) and a variety of data that CoStar has added to the database through its various research efforts.  Listings are reviewed by CoStar employees, who may rewrite portions of the text and add CoStar-researched or CoStar-generated data.

56.    Although the broker or property owner may upload his or her own photographs to the listing, this is not a requirement.  Listers can, and often do, rely solely on CoStar's copyrighted photographs.  None of the photographs at issue in this litigation originated with brokers or property owners; rather, this lawsuit concerns CREXi's infringement of photographs created, and copyrighted, by CoStar.

57.    CREXi was founded in 2015 by Michael DeGiorgio, Luke Morris, Erek Benz, and Ben Widhelm.  The founders had all worked at Ten-X, the auction site that is now part of CoStar.  CREXi has described itself on its website as "revolutionizing the way commercial real estate professionals transact by accelerating deal velocity and democratizing access to both properties and industry data.  In 2015, CREXi embarked on a journey to transform the CRE industry: to create a single-source hub for stakeholders to market, analyze, and trade commercial

property." CREXi's website (www.crexi.com) allows users to view commercial real estate listings in markets across the country. CREXi also runs an online auction marketplace similar to Ten-X, and its auction marketing materials trumpet over $100 billion in closed deals.

58. CREXi also offers a number of subscription options to its users. CREXi.com users can upgrade from free listings to the "Pro" service, which provides a suite of services to CREXi users. *See* https://www.crexi.com/broker-plans. In addition, CREXi offers a product called "Intelligence," which provides paying subscribers with access to comparable property transactions ("comps"), reports, and information about the commercial real estate market. CREXi touts that Intelligence includes 153 million property records and 13 million comps, including records and comps that are available only to subscribers and that include property images, including CoStar-copyrighted photographs that CREXi has infringed.

59. Since CREXi's inception, it has engaged a vast offshore network of BPOs and other Agents, who—behind the scenes—play a critical role in CREXi's business model, including the mass infringement on which it relies. At CREXi's contractual (and actual) direction, these BPOs and other Agents work within CREXi's platform to source and build commercial real estate listings, make information accessible on CREXi.com, and copy, crop, and upload property images. Indeed, of the 10,000 exemplar infringing images that CoStar identified in its First Amended Complaint, CREXi's Agents were responsible for uploading nearly two-thirds of them. The BPOs and other offshore Agents use proxy servers and virtual private networks ("VPNs") to access CoStar's U.S. websites. For example, CREXi executive Paul Cohen instructed fellow executives to employ offshore "girls" to manually scrape LoopNet. Those instructions included directing those workers to use a proxy server like "hide.me/en/proxy," to give the CREXi executives' "girls" "two logins for loopnet. [And to] create BS [LoopNet] accounts so it doesn't get traced back to you." As described in detail below, CREXi directs, inspects, and

1   performs quality control over the work performed by its BPOs and other Agents,

2   who act at CREXi's direction and with CREXi's authority.

3       60.   CREXi often simply copies listings from LoopNet, including their

4   associated copyrighted photographs, without ever hearing from the broker

5   representing the property at issue.  Indeed, CREXi's Director of Operations

6   instructed a business development representative to copy listings from LoopNet

7   without broker permission "[a]ll day."  Other times, CREXi contacts the listing

8   broker and asks vaguely whether the broker would like the listing to appear for free

9   on CREXi, without specifying where CREXi will obtain the listing.  Then, rather

10  than generate its own listing (which would take time, effort, and resources that

11  CREXi has and chooses not to deploy), CREXi copies and uploads the relevant

12  photographs and other listing content from LoopNet.  As discussed in more detail

13  below, listings on LoopNet typically contain CoStar-copyrighted images.  CREXi

14  takes them anyway.

15      61.   For example, and as discussed in Section D.2, *infra*, on May 14, 2020,

16  CREXi viewed a listing for an Alabama property on LoopNet, and the next day the

17  same property appeared on CREXi's website with a CoStar copyrighted photograph:

18

19

20

21

22

23

24

25

26

27

28

# **LoopNet Listing**

## (accessed by CREXi on May 14, 2020)





# **CREXi Listing**

## (posted by CREXi on May 15, 2020)



62.    Likewise, on May 15, 2020, CREXi viewed a LoopNet listing for a property in Nevada, and only three days later the same property appeared on CREXi with a CoStar copyrighted photograph:

### **LoopNet Listing**

(accessed by CREXi on May 15, 2020)



1

2  **<u>CREXi Listing</u>**

3  (posted by CREXi on May 18, 2020)

4



5

6

7

8

9

10

11

12

13

14

15    63.    Many brokers are not even aware that their listings appear on CREXi.

16  And even *if* CREXi had asked the brokers for permission to copy the listings from

17  LoopNet or from a property brochure, brokers cannot provide permission to infringe

18  CoStar's copyrighted images.  CREXi knows this.  Indeed, as described in more

19  detail below, often when CREXi talks with brokers, CREXi does not mention

20  LoopNet.  And if CoStar's site comes up in conversation, CREXi will in many cases

21  admit that it is not permitted to copy from LoopNet.  But behind closed doors, it

22  does so anyway.

23    64.    Recognizing the unlawful nature of its infringement scheme, CREXi

24  has taken numerous steps to attempt to conceal its actions.  These include rotating

25  its IP addresses to avoid technological blocking measures imposed by CoStar, and

26  instructing its BPOs and Agents to delete in CREXi's backend systems references

27  to using CoStar websites.  And specifically in order to hide its copying of CoStar

28  images, CREXi has instructed the BPOs and Agents to remove, or crop, the CoStar

watermark from CoStar-copyrighted photographs before adding those photographs to CREXi listings, as seen here:

**<u>CoStar Copyrighted Photograph on LoopNet</u>**   **<u>CoStar Copyrighted Photograph on CREXi</u>**

 

 

 

65.    As if the removal of watermarks were not enough, CREXi sometimes publishes *CoStar*-copyrighted cropped images featuring a *CREXi* watermark, as the examples below demonstrate:

1

2

**CoStar Copyrighted Photograph on LoopNet**   **CoStar Copyrighted Photograph on CREXi**

3

4

5

6

7

8

9

10

   

11

12

13

14

15

16

17

   

18

19    66.    However, CREXi is not always careful in making sure that CoStar's

20    watermark has been removed from these images that feature CREXi's watermark.

21    These images taken from CREXi's website show that CREXi's watermark even

22    appears on images that still have the CoStar watermark:

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20



21
22
23
24
25
26
27
28

26

67.    CREXi's violations of law are willful, egregious, and in bad faith. CREXi's industrial-scale infringement has harmed CoStar in ways that cannot be measured or remedied fully by monetary damages.  As a consequence of CREXi's misconduct, CoStar is entitled to millions of dollars in damages as well as injunctive relief to prevent continued irreparable harm to its business.

## JURISDICTION AND VENUE

68.    This action arises under the Copyright Act, 17 U.S.C. § 101, *et seq.*, and the DMCA, 17 U.S.C. § 1201, *et seq.*  The Court has federal question jurisdiction over claims arising under those statutes pursuant to 28 U.S.C. §§ 1331 and 1338(a).

69.    The Court has personal jurisdiction over CREXi because, among other reasons, CREXi is headquartered and has its principal place of business in Los Angeles, California.  The business transacted by CREXi bears a substantial nexus to CoStar's claims.  Through its acts, CREXi has invoked the benefits and protections of California's laws and purposefully availed itself of the privilege of conducting activities within California.

70.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because CREXi resides in this judicial district, and a substantial part of the events or omissions giving rise to CoStar's claims occurred in this judicial district.

CASE NO. 2:20-cv-08819-CBM-AS
THIRD AMENDED COMPLAINT

1

## **THE PARTIES**

2      71.     Plaintiff CoStar Group, Inc. is a corporation organized and existing

3   under the laws of the State of Delaware with its principal place of business and

4   corporate offices located at 1331 L Street, NW, Washington, District of Columbia,

5   20005.

6      72.     Plaintiff CoStar Realty Information, Inc. is a corporation organized and

7   existing under the laws of the State of Delaware with its principal place of business

8   and corporate offices located at 1331 L Street, NW, Washington, District of

9   Columbia, 20005.  It is a wholly owned subsidiary of CoStar Group.

10      73.     Defendant CREXi is a corporation organized and existing under the

11   laws of the state of Delaware with its principal place of business and corporate

12   offices located at 5510 Lincoln Blvd, Suite 400, Playa Vista, California, 90094.

13   CREXi's California Registration Statement lists its Entity Address as 5510 Lincoln

14   Blvd, Suite 400, Los Angeles, California, 90094.

15

## **RELEVANT NONPARTIES**

16      74.     Nonparty 247 Web Support ("247 Web") and its sister entity, Yansh

17   Technologies ("Yansh"), are BPOs engaged by CREXi from at least January 2017

18   to early 2023.  247 Web and Yansh were proprietorships organized and existing

19   under the law of India with their principal place of business located at H. No. 309,

20   3rd Floor, Pocket-2, Sector-22, Rohini North West Delhi, Delhi, 110086, India.  Both

21   BPOs worked under the supervision of CREXi's "Head of Deal Management,"

22   Ritesh Jaiswal, and created listings for CREXi by copying information and images

23   from third-party websites, including CoStar websites, and from brochures that

24   include third-party images, including CoStar's copyrighted images.  After following

25   CREXi's directions to do so, including cropping out CoStar's watermark from

26   CoStar's copyrighted images, 247 Web and Yansh uploaded that information and

27   those images to CREXi's website on CREXi's behalf.

28

75.     Nonparty Arcgate is a BPO engaged by CREXi from at least October 2017 through August 2021.  Arcgate is a private company organized and existing under the law of India with its registered office located at G1-10 I.T. Park, Madri Industrial Area, Udaipur, Rajasthan: 313001, India.  As part of its work for CREXi, Arcgate sourced listing information from CoStar websites and uploaded that information to CREXi's website.

76.     Nonparty Neptune is a BPO engaged by CREXi from at least 2017 through October 2020 and from September 2021 through July 2022.  Neptune is a private company organized and existing under the law of India with its registered place of business located at Door No. SP-7A Guindy Industrial Estate, Guindy, Chennai, Tamil Nadu, 600032, India.  Neptune created listings on CREXi.com by copying information and images from third-party websites, including CoStar websites, and from brochures that include third-party images, including CoStar's copyrighted images.  Neptune uploaded that information and those images to CREXi's website on CREXi's behalf.

77.     In addition to the four above-listed entities, CREXi's network of BPOs and other Agents includes at least 35 other entities and individuals around the world, working on behalf and at the direction of CREXi.[4]

## **FACTUAL ALLEGATIONS**

**A.     CoStar Invests Significant Time and Money to Maintain the Nation's Most Comprehensive and Most Visited Commercial Real Estate Services**

78.     Like many innovative technology companies, CoStar's business began in its founder's basement with a simple idea: empower commercial real estate

---

[4] CREXi's other known BPOs and Agents include: Smarna Anuj, Vinit Anuj, Lubna Basha, Slavica Sofija, Sofija Sofija, Fanica Sofija, Dayakar 247Headhunting, Trajce Sofija, Blagojce Sofija, Detriana Miguel, Tanvi Anuj, Supriya Anuj, Agent Anuj, Kruti Raystech, Jawad Ahmed, Mahaboob Basha Shaik, Abdul Basha, Pradhyuman Raystech, Apeksha Raystech, Raysoft Aarthi, Jeanmary Miguel, Priyanka 247Headhunting, bulbul bulbul, Ghazanfar Xavia360, Xavia Xavia360 / Xavia360 Xavia 360, Raysoft, SOPHI, Raystech, Anitha Anitha / Anitha2 Anitha, Anitha, 247Digitize LLC, Mobius Knowledge Services, 247 Headhunting, and Ricielle Zuleta.

brokers with professionally researched, unbiased commercial property information. Since its founding, and as a result of investments of almost $6 billion and the efforts of thousands of employees to execute its business plan, CoStar and its affiliates have become the leading provider of commercial real estate information.

79.    CoStar's core product is its CoStar-branded subscription database of real estate information, which includes millions of CoStar's copyrighted photographs, integrated with verified data about commercial real estate properties. The database is part of a suite of online services that include resources and tools for the real estate industry.

80.    CoStar generates, updates, and curates the database's content at a cost of hundreds of millions of dollars each year.  CoStar's research organization has more than 2,000 trained professionals who populate and maintain the database every minute of every working day and beyond.  These professionals spend considerable time and effort proactively canvassing commercial properties, taking photographs, and gathering granular data about the properties to add to the database, even for properties that are not listed for sale or lease on one of CoStar's marketplaces.  In total, CoStar's researchers make millions of changes to the database each year, and CoStar has taken, on average, over 1 million photographs annually in recent years.

81.    CoStar licenses its subscription database content for a monthly fee. Those fees, which vary according to the scope of access the user seeks, generate significant revenue for CoStar.

82.    CoStar provides this comprehensive commercial real estate intelligence to professionals throughout the economy, including real estate brokers and brokerage firms, owners and investors, property managers, lenders, developers, valuation professionals, as well as retailers, vendors, and corporations.  The leading commercial real estate brokerages in the United States, as well as a significant number of smaller brokerages, property owners, banks, retailers, real estate investment trusts, and other professionals are subscribers.  For example, brokers and

brokerages use CoStar in their day-to-day business to identify available spaces for lease and evaluate potential sales.  Pursuant to licenses, these users utilize CoStar's professional, copyrighted photographs to market their listings.

83.    CoStar's database, including its library of copyrighted images, powers digital marketplaces owned and operated by CoStar.  One such marketplace is LoopNet.  LoopNet is a digital platform where users can easily prepare and search commercial real estate listings.  LoopNet provides information on more than 700,000 for-lease and for-sale listings at any point in time and is a key revenue generator for CoStar.  LoopNet's users rely on the platform's content being up-to-date, unbiased, and trustworthy.

84.    LoopNet, like CoStar's other marketplaces, leverages CoStar's vast commercial real estate database to help market property listings.  To add a listing on LoopNet, a lister (whether a broker or property owner) can start by simply typing in the property address.  If the property is in the CoStar database, the lister can, and typically does, populate the LoopNet listing with CoStar's copyrighted photographs and with a variety of data that CoStar researchers have added to the database.

85.    Together, CoStar's subscription database, LoopNet, and CoStar's other digital marketplaces provide broad access to vast commercial real estate data, helping to level the playing field in a $43 trillion per year U.S. industry.  Although CoStar has a number of competitors in each of its businesses, including its digital marketplaces, it has outworked and outperformed the competition through constant innovation and reinvestment over three decades.  More than fourteen thousand CoStar researchers have contributed to the CoStar subscription database since its creation, adding millions of properties, shooting millions of professional photos and drone videos, and driving and flying millions of miles per year.

86.    The benefits that CoStar's services provide to its customers and the economy at large, and CoStar's ability to continue generating job opportunities, are a direct result of the company's relentless efforts to research, collect, and create

content.  The protection of that content, including CoStar's intellectual property—and CoStar's ability to vindicate its rights therein—is therefore critically important. If CoStar were somehow required to license its photographs, or open its products, to competitors and help them compete, its incentive to invest, to innovate, and to provide the benefits set forth above would disappear.

**B.    CoStar Goes to Significant Lengths to Protect Its Intellectual Property**

87.    CoStar protects its copyrighted photographs in three primary ways. ***First***, CoStar registers its photographs with the United States Copyright Office, and displays those images publicly with a watermark of CoStar's star logo in the bottom right hand corner, as described below.  ***Second***, CoStar's licenses that encompass its copyrighted photographs contain restrictions that preclude sublicensing and preclude providing CoStar-copyrighted photographs to platforms that compete with CoStar.  And ***third***, CoStar employs anti-piracy technology.

**1.    Copyright Protection**

88.    CoStar owns the largest library of commercial real estate images in the world, including millions of photographs of commercial real estate properties taken by professional photographers employed by CoStar.  As discussed above, these copyrighted photographs are used in CoStar's services, including its subscription database and LoopNet marketplace.

89.    As CoStar obtains new photographs of commercial real estate properties, it routinely registers them with the Copyright Office.  CoStar is currently registering tens of thousands of commercial real estate photographs per month.

90.    CoStar watermarks the images it owns with a logo in the bottom right hand corner, as shown in multiple examples above.  This watermark consists of five polygons (representing map pins) that are arranged in a circular fashion so that the inner figure forms a five-pointed star—a play on "CoStar."

91.     The watermark, which is present on six separate registered CoStar trademarks and appears as the favicon next to the title of every browser tab opened to any CoStar webpage, is widely recognized in the industry and identifies CoStar as the owner of the images.

92.     CoStar watermarks its copyrighted photographs to police infringement and has used its watermarks to identify infringers in the past, including rivals such as Xceligent.  Moreover, the presence of watermarks helps third parties, including other companies in the commercial real estate industry, recognize and remove infringing images.  Indeed, at one time, Xceligent retained a vendor to review and reject images bearing CoStar's watermark in an effort to avoid copyright infringement.

93.     CREXi's own actions demonstrate that CREXi itself recognizes that this watermark signals CoStar's ownership of a copyrighted work.  Like Xceligent, after several years operating with no filter, CREXi eventually (in 2019) engaged a vendor, Restb, "for the purpose of identifying photographs on the CREXi platform that contain the logo of a third party."  That third party was CoStar.  Restb states that it uses "artificial intelligence to quickly recognize photographs that contain company logos or watermarks."  The purpose of that review of logos is to flag copyright ownership.  According to Restb, "CREXi utilizes Restb's services in order to identify photographs in the real estate listings it receives from brokers *that might be copyright protected*."  It does so by looking for the CoStar watermark.  Even CREXi itself characterizes its use of Restb as part of its (supposed, and belated) "effort to *prevent infringement*."

94.     In turn, Restb's CoStar-watermark review software is used by major companies in the real estate industry, including brokerages, a data provider, and a major marketplace, to try to avoid infringing CoStar-owned photographs, further demonstrating that the CoStar watermark on images is synonymous in the industry with CoStar ownership.

95.     Users may provide their own photographs to CoStar for use on their listings in all CoStar services.  CoStar does not claim ownership or copyright in user-uploaded photos.  Indeed, LoopNet's Terms of Use explicitly confirm that users "retain any applicable ownership rights that [users] may have with respect to" content submitted to CoStar, including "property descriptions, photographs, images, videos (which may include sound and/or music), graphics and financial, contact or other information."  CoStar's practice of watermarking is reserved for its own copyrighted photographs and does not include watermarking photographs that are user-uploaded.

## 2.     License Limitations

96.     CoStar licenses its copyrighted photographs and content to commercial real estate brokerages (and other customers) for use on their own websites and in their own marketing material.

97.     Such use, however, is subject to various contractual restrictions that, among other things, preclude those brokerages from providing CoStar-copyrighted photographs or other CoStar-owned content to platforms that compete with CoStar. Brokerages may, of course, provide their own photographs and information to such competing platforms.

## 3.     Technological Protection

98.     In addition to protecting its intellectual property and other content through copyright registration and limited licenses, CoStar takes proactive and prompt technological steps to protect against access to CoStar's services consistent with mass infringement.

99.     First, CoStar services, including LoopNet, employ an abuse monitor.  If a single IP address views an excessive number of listings or executes an excessive number of searches on the site—consistent with mass infringement—that IP address is temporarily blocked from accessing the site.  Second, CoStar's services, including

LoopNet, use firewall blocking, which enables CoStar to prevent certain IP addresses from accessing the content on CoStar's websites.

100. Third, CoStar's services, including LoopNet, employ a number of other third-party protections to guard against improper use, including IP reputation blocking, as well as anti-virus and anti-malware programs.

101. CoStar employs these technical measures to help protect its intellectual property from unscrupulous competitors—like CREXi—who seek to copy CoStar's work and compete with CoStar without investing their own time and effort.

## C. CREXi Has Grown at CoStar's Expense By Free-Riding on CoStar's Investment and Misappropriating CoStar Content

102. Since its founding, CREXi's goal has been to "dominate" the industry and destroy all competitors. CREXi's CEO Mike DeGiorgio pitched CREXi's plan to a key investor by promising that "CREXi will dominate listings, transactions, leasing, CRM, lending, portfolio management, data/comps both in the usa and internationally and *literally soon be the one and only platform of the industry*."

103. CREXi's intention to establish global dominance of the industry, by all means necessary, drove CREXi's business practices and ethos. When CREXi's Chief Operating Officer, Eli Randel, learned of a marketing campaign by Brevitas, a rival marketplace firm, Randel wrote to the CREXi executive team: ""Fuck them . . . Let's not let them get their footing." Randel went further, attempting to denigrate CREXi's competitor with the nickname "Breastytas" and even offered a cash award to CREXi employees for thinking of other offensive and derogatory nicknames for Brevitas.

104. This no-holds-barred approach to business, and more specifically CREXi's reliance on stealing from from its rivals, has led it to become a pariah in the industry. For example, in 2023, another competitor, BiProxi, issued a press release announcing that it had discovered "actions by Commercial Real Estate Exchange, Inc. (CREXi) compromising the integrity of the online commercial real

estate listing industry." BiProxi had learned that CREXi was "copying" and "scraping" BiProxi's "online data in an attempt to create content at no cost to enhance their own listings." In marked contrast to CREXi's strategy of stealing from competitors to establish global "dominat[ion]," BiProxi committed itself to "preserve the integrity of our industry" by taking the necessary "proactive measures to prevent" falling prey to CREXi's unethical business practices.

105. CREXi's business model is founded on adding large numbers of listings, and their associated photographs, to its commercial real estate marketplace, by any means necessary. CREXi recognizes that having a large supply of listings allows it to attract buyers, sellers, and brokers, which in turn facilitates its ability to sell advertisements, conduct successful auctions, and generate revenue. During a May 15, 2020 virtual marketing event called "The Baltimore Market Report," Paul Cohen, CREXi's National Sales Director, boasted that CREXi has "more listings in most markets across the USA" than CREXi's competitors, which include LoopNet. And during a June 19, 2020 virtual marketing event called "Welcome to CREXi: Richmond's New CRE Marketplace," Mr. Cohen claimed that CREXi was the "place where all the listings are." That same day, during another virtual event called "Welcome to CREXi: Tampa's New CRE Marketplace," Mr. Cohen stated, "We have all the listings for the market—they're already in there." Mr. Cohen again claimed CREXi to be "the site where all the listings are."

106. In short, CREXi needed listings, and their associated photographs, in order to build its business. In a podcast interview on September 8, 2020, Eli Randel, CREXi's Chief Operating Officer, explained why CREXi needs to collect and publish real estate listings: "[s]upply begets demand, and then the second half of that recipe or equation is that demand begets monetization. So first and foremost, nobody wants to shop in an empty store, so you better stock the shelves with supply." CREXi's desire to avoid an "empty store" underscores why it keeps copying from CoStar.

107. Indeed, documentation of what CREXi employees were doing to build out listings in specific markets confirms that the growth it has touted was the result of piggybacking on CoStar's intellectual property (as well as copying from other rivals). Just three weeks before Mr. Cohen described CREXi as "Richmond's new CRE Marketplace," a CREXi Business Development Representative emailed his manager to explain how he was increasing Richmond listings on CREXi. He was using LoopNet and other rival websites. He noted that for Richmond, CREXi had contacted "the majority of the leasing brokers…. When I say that, I am referring primarily to the leasing brokers found on LoopNet, Realestatebook, and 42 Floors." CREXi also manually copied listings from LoopNet and other competing websites like Brevitas, RealNex, and 42Floors through its "Listing Sync", i.e., cross-referencing, service.

108. To drive business, CREXi trumpets both the current volume of its listings vis-à-vis its competitors and its ability to add thousands of new listings each week. For instance, in a May 4, 2020 podcast, Matthew Cors, CREXi's Regional Director for the Western United States Sales Team, represented to listeners that CREXi had "over 100,000 for-sale properties" and "over 200,000 for-lease properties" active on the CREXi website on that day, and that CREXi is adding "thousands of properties a week on here on both sides of the marketplace." Mr. Cors stated that CREXi's "whole goal is to continue just building up the whole marketplace side of things." In a separate podcast on June 24, 2020, Mike DeGiorgio echoed these sentiments with the telling comment that by driving "the supply side," i.e., adding large numbers of listings for free, CREXi would necessarily get the "demand for free too."

109. But what Mr. Cors and Mr. DeGiorgio do not say is that the means used to build up CREXi, or drive the supply side, involves infringement. Yet in the very promotional videos in which CREXi brags that it has more listings than its competitors, CREXi displays CoStar-copyrighted photographs in the listings it touts.

The screenshots below contain examples of the copyrighted photographs, along with an image of the CREXi presenter, Mr. Cohen, in the top right corner of the first example:

### **CREXi Marketing Video**



### **CoStar's Copyrighted Photograph**



**CREXi Marketing Video**



**CoStar's Copyrighted Photograph**



110.   In other words, rather than making its own investments and competing fairly (which CREXi is capable of doing), CREXi is displaying and thereby infringing CoStar's intellectual property to market itself to brokers and claim superiority over CoStar.  In an email to CREXi's Chief Operating Officer, CREXi's former Senior Vice President of Revenue admitted that CREXi's business strategy

"***revolves around taking listing from LoopNet***," an "approach" that had been "use[d] very effectively," including by CREXi's Vice President of Sales, Steve Narish.

111.    Copying from LoopNet and publishing CoStar's intellectual property benefits CREXi by making it easier for CREXi to reach a critical mass of listings and thereby attract buyers, sellers, and brokers to its free website.  This enables CREXi to sell advertisements in competition with CoStar and "upsell" its customers to paid services such as CREXi "Pro," "Elite," and "Fuse"—which diverts revenue streams and growth opportunities from CoStar and reduces CoStar's market share—all while avoiding the hard work and resources that CoStar has invested over the past three decades.

112.    CREXi knows that listings—and real estate images specifically—are critical to attracting users.  Indeed, as Eli Randel, CREXi's Chief Operating Officer, has admitted, "images matter."  This helps explain why CREXi is infringing on such a widespread scale.  Rather than spend the time and effort to develop an image library of its own, CREXi steals CoStar's photographs, crops out the CoStar watermark, and uses them to attract buyers, sellers, and brokers.

113.    Brokers and other industry participants also readily rely on companies like CoStar and CREXi to provide "comps"—i.e., comparisons of similar properties in order to determine, for example, the market rate for rent.  The provision of comps is a much sought-after and highly valued service in the world of real estate.  CREXi places this valuable service behind a password as part of its Intelligence subscription product (comps are also included in CREXi's paid "Pro" service).  CREXi has admitted that multiple CoStar-copyrighted photographs at issue in this lawsuit were, in fact, displayed in Intelligence prior to this lawsuit.

114.    But CREXi's use of CoStar-copyrighted photographs in its "Comps" and "Intelligence" products did not stop when CoStar originally filed this lawsuit in 2020.  CREXi continues to display through this year CoStar-owned photographs—

including photographs at issue in this lawsuit—on "inactive" or "closed" CREXi

listings that invite viewers to "subscribe" to CREXi's Comps and Intelligence

products. CREXi's disregard for CoStar's intellectual property rights is so brazen

that CREXi unabashedly displays CoStar photographs bearing CoStar's watermark

to promote its own database products.





115. Thus, CREXi has not only piggybacked on CoStar to build out listings,

but also to generate comps and market its lucrative subscription offerings.

116. CREXi's wrongdoing has also enabled CREXi's auction platform to

grow at the expense of, divert revenue from, and compete unfairly with Ten-X, now

part of CoStar. By stealing content from CoStar, including CoStar's copyrighted

images, in order to attract potential buyers and other customers, CREXi is able to

drive interest in its auctions and divert opportunities and income from Ten-X.

1 CREXi thereby dilutes Ten-X's market share through lost transaction opportunities
2 and diminishes the value of Ten-X's auction business.

3    **D.    CREXi Mass Infringes CoStar's Copyrighted Photographs, And**
4    **Removes the CoStar Watermark**

5    **1.    CREXi Steals Copyrighted Photographs from CoStar and Its**
6    **Licensees and Publishes Them on Its Competing Website and**
7    **in Its Subscription Product**

8    117.    CREXi is infringing CoStar's copyrighted photographs on a massive
9 scale.  A preliminary review by CoStar in 2020 revealed more than **ten thousand**
10 copyrighted CoStar images on CREXi's website.  As CoStar suspected at the time,
11 these instances of infringement were just the tip of the iceberg.  As a result of
12 CoStar's ongoing investigation, and discovery produced by CREXi, CoStar has
13 identified **48,649** CoStar-copyrighted images in CREXi's possession, as set forth in
14 **Exhibit A**, which summarizes certain information about those infringing images.
15 Many thousands (at least) of these photographs were uploaded at CREXi's direction
16 and on CREXi's behalf, and for its benefit, by CREXi's offshore BPOs, including
17 Yansh, 247 Web, Neptune, Mobius, and 247Digitize.

18    118.    Notably, CREXi identified over 25,000 images flagged by Restb as
19 containing CoStar's logo **before** CoStar filed its original complaint in this action.
20 Restb describes itself as "specializ[ing] in using artificial intelligence to quickly
21 recognize photographs that contain company logos or watermarks."  Even if CREXi
22 had not deliberately infringed CoStar's photographs—and built a business around
23 that practice—that Restb's technology identified tens of thousands of images with
24 CoStar's star logo in CREXi's possession independently put CREXi on notice that
25 it had a mass infringement problem (and that is without accounting for the
26 limitations on Restb's technology to detect CoStar images where CoStar's
27 watermark has been cropped out, in whole or in part).

28

119. CoStar's lawsuit has, nevertheless, failed to curb CREXi's infringing activity. Over 25,000 of the CoStar images identified in **Exhibit A** were uploaded or displayed by CREXi *after* CoStar filed its Complaint. CoStar has repeatedly alerted CREXi to its continuing infringement after filing its Complaint, including as recently as May 20, 2024, but CREXi has failed to change its business model and failed to expeditiously remove infringing material from its website. Indeed, just a few months after CoStar filed this lawsuit, CREXi's Chief Marketing Officer, Courtney Ettus, doubled down on CREXi's burn-it-all down ethos, writing that the industry was "[f]illed by several shitty companies and one behemoth . . . NO NAMING NAMES – Costar loopnet RCA RCA . . . WE ARE WAY BETTER – OBVIOUSLY HERE TO FUCK THEM UP . . . ."

120. Starting in May 2023, over two years after CoStar commenced this lawsuit, CREXi began flooding CoStar's registered DMCA agent with emails informing CoStar that potentially infringing images in CREXi's possession had been flagged by a third-party image filter. CREXi informed CoStar that, even though the images were flagged as potentially owned by CoStar and even though hundreds of these images *had CoStar's star watermark on them*, CREXi would continue to display those images on its website until and unless CoStar sent CREXi a formal "takedown notice" under the DMCA to remove the images from its website.

121. Some of these images were, astonishingly, identified as infringing in CoStar's First and Second Amended Complaints. Nonetheless, CREXi continued with this tactic for months, ignoring CoStar's repeated, direct requests to cease and desist publishing CoStar-watermarked images on CREXi's website. Left with no choice, CoStar ultimately sent CREXi multiple DMCA "takedown notices," and is now adding hundreds of these images (included in Exhibit A) to this lawsuit. CREXi's recent wanton infringement not only constitutes new claims under the Copyright Act, but also underscores the willfulness of CREXi's conduct during the entire relevant time period.

122.   CREXi facilitates its scheme of willful mass infringement through its BPOs and other Agents, who (along with CREXi employees, and at the direction and control of CREXi employees), snip, crop, and upload commercial real estate images from real estate brochures into CREXi's listing template via its internal platforms, including Salesforce.  The Agents snip and crop such images to remove the CoStar watermark without regard to copyright ownership.  Indeed, there is no evidence that they received adequate training from CREXi on the importance of complying with copyright laws, despite CREXi's knowledge that CoStar is a large, if not the largest, licensor of such images to brokers, and despite the presence of CoStar's star logo watermark on many of these brochures and the images in such brochures.  These CREXi employees, BPOs, and other Agents then upload these images on CREXi's external platform, after confirming the images are of sufficient quality to do so.

123.   This knowing infringement was part of CREXi's corporate policy.  In an email issuing detailed directions to its entire team of "Business Development Representatives" responsible for recruiting brokers and sourcing listings, CREXi acknowledged that it was impermissible for CREXi to copy listings from LoopNet and other CoStar sites yet simultaneously provided step-by-step instructions for doing so.  The CREXi team was told how exactly to surreptitiously copy LoopNet listings, using screenshots of CoStar's website to "ENSURE THAT THE WATERMARK LOGO IS REMOVED."  Management instructed the Business Development Representative team to provide these screenshots of LoopNet listings and photos to CREXi's offshore agents in India for uploading to CREXi.com.

124.   A former CREXi Business Development Representative testified that he followed the instructions in this email, sending CREXi's agents in India DropBox links containing screenshots of LoopNet listings and instructing those offshore agents to copy the information contained and ensure the CoStar logo was cropped out of photos before creating a listing on CREXi.com.

125.   Unfortunately, it is plain that the 48,649 CoStar-copyrighted images identified by CoStar to date on **Exhibit A** still do not reveal the full size of this Titanic-scale iceberg.  By way of example, CoStar does not have access to CREXi's Intelligence subscription product, though as noted above, from publicly available information and certain information provided by CREXi in discovery, CoStar has identified many CoStar-copyrighted images displayed in Intelligence, including images at issue in this case that CREXi continues to display through 2024.  Nor does CoStar have access to images in CREXi's possession that CREXi copied, in violation of CoStar's copyrights, but that are not currently, or were never, published on CREXi's website (i.e., "offline" images in CREXi's image library or other backend systems).  (CoStar's understanding is that CREXi has not effectively reviewed any "offline" images to identify potential additional instances of infringement.)

126.   Set forth below are some of the images CREXi has infringed, as they appear(ed) on LoopNet.com and as they appear(ed) on CREXi.com.   The photographs have been produced side-by-side for purposes of comparison:

CASE NO. 2:20-cv-08819-CBM-AS
THIRD AMENDED COMPLAINT

**CoStar Copyrighted Photograph**          **CREXi Listing Photograph**












CASE NO. 2:20-cv-08819-CBM-AS
THIRD AMENDED COMPLAINT

127.   As the images above show, CoStar's copyrighted images displayed on CREXi's website have been cropped to remove the CoStar watermark.  In an effort to conceal and disguise its copying, CREXi removes (or directs its BPOs and Agents to remove) the watermarks from CoStar's images and generates cropped images—thereby improperly removing CoStar's copyright management information and creating derivative works—to publish and display on its competing website without CoStar's permission.

128.   As described in more detail below, CREXi routinely accessed the copyrighted photographs on LoopNet only a few days before the infringing photographs appeared—without watermarks—on CREXi's website.  For example, a former Business Development Representative accessed LoopNet listings from his home computer for the purpose of photographing the LoopNet listings and sending the associated CoStar-watermarked photographs to his CREXi work email before forwarding the photographs to the CREXi listing creation team to India.  He testified that he was "not necessarily" surprised that on multiple occasions, within days of doing so, listings from LoopNet appeared on CREXi.com, displaying CoStar copyrighted photographs with the CoStar watermark cropped out.  He further testified that the reason this timing did not surprise him was because it was "***the practice at CREXi to copy the listing from LoopNet, crop out the watermark, and build the listing on CREXi***."

129.   CoStar's watermarks on its copyrighted photographs undoubtedly served as a red flag that put CREXi on notice that these images belong to CoStar. The removal or alteration of CoStar's watermark conceals CREXi's infringement of CoStar's copyrighted images, and violates the DMCA's prohibition on removing copyright management information.  Indeed, CoStar has used the presence of the watermark to identify infringement in prior lawsuits, such as the Xceligent litigation. And CREXi hired Restb, a company that "specializes in using artificial intelligence to quickly recognize photographs that contain company logos or watermarks," to

identify CoStar-watermarked images on its website. Restb even markets its technology as helping to "protect compan[ies]" from "copyright lawsuits." CREXi must also have been aware, simply as a matter of common sense, that removing the watermark would enable, facilitate, and indeed induce the infringement of CoStar's copyrighted materials because it was publishing sought-after copyrighted photographs to the world with the indicia of copyright ownership removed.

130. The extent and consistency of the cropping, and the specific watermark-cropping instructions that CREXi gave to its BPOs and Agents, reflected in discovery, demonstrates that CREXi is responsible for this deliberate attempt to hide its infringement.

### 2. CREXi Copies Real Estate Listings from LoopNet That Include CoStar-Copyrighted Images and Posts Them on CREXi.com without Broker Knowledge, Knowing It Is Violating Copyright Law

131. CREXi has admitted that it is not allowed to copy listings, with their copyrighted CoStar photographs, from LoopNet, due to "copyright" reasons, and because that would be "illegal."

132. For example, in an email chain instructing the CREXi Business Development Team to take screenshots of photos on LoopNet in order to remove the CoStar logo, senior CREXi manager James Burton stated "anything owned by C*/LN is a no go" and Nick DeGiorgio called LoopNet a "WEBSITE[ ] WE CANNOT ACCESS." CREXi's deal building team also worked to ensure that property photos did not contain "loopnet/costar tags" to avoid drawing CoStar's "ire." Likewise, during initial training of CREXi's Indian Agents, Mr. Burton admitted that it would be impermissible to access websites owned by CoStar "*due to copyright legality issues*" and noted that while "some" "competitor websites" allowed CREXi to access their sites, the Agents should not touch "anything owned by" LoopNet or CoStar and that, notwithstanding CREXi's practices for sourcing

broker information, "we are not supposed to pull from our competitors' websites, which is against the law."

133.   Mr. Burton put it bluntly, saying "**no competing websites.  It's illegal. We can't upload anything from competing websites**" and specifically, to "NEVER go on [LoopNet], we do not have permission and its illegal."  CREXi's Paul Cohen said the same to a broker, explaining that "[w]e don't take [listings] off loopnet/costar for legal reasons," and "I know a couple of the sites are in legal disputes with them for that."  But that is exactly what CREXi does, accessing LoopNet and copying CoStar-copyrighted photographs and their associated listings, often without contacting the relevant broker.  And even when it does contact the listing broker, CREXi is careful not to discuss copying from LoopNet, other than to acknowledge its impermissibility.

134.   CoStar has been contacted by bewildered brokers, asking whether CoStar was in business with CREXi because the brokers' listings—including CoStar's copyrighted materials—were appearing without the brokers' authorization on CREXi's site.

135.   For example, one brokerage alerted CoStar after noticing that one of its Florida property listings appeared on CREXi with CoStar's photographs.  The broker confirmed that it never gave CREXi authorization to list the property on CREXi's website, and that the broker did not upload CoStar's photographs to CREXi.

136.   CREXi's listing of the broker's Florida property contained several copyrighted CoStar photographs.  The photographs had been cropped, but poorly, as CoStar's watermark was still partially visible on a number of the infringing photographs:

## **CREXi Listing Photographs**





137.   This same story played out across the country.  Brokers who learned that their listings were posted on CREXi were puzzled because they had never even heard of CREXi or sent CREXi any information about their properties, much less given CREXi any purported permission to copy CoStar copyrighted photographs associated with their property listings from LoopNet (or the listings as a whole).

138.   By way of another example, a broker who listed a Nevada property on LoopNet was surprised to learn that her listing also appeared on CREXi.  She had never heard of CREXi and never gave CREXi permission to post her listing (or, necessarily the photographs in it).  Nevertheless, CREXi posted her property on its website and infringed CoStar's copyrighted photographs in the process:

**LoopNet Listing Photograph**            **CREXi Listing Photograph**



139.   Notably, CREXi added this Nevada broker's listing on May 19, 2020.  On May 15, 2020—only four days earlier—an IP address attributable to CREXi viewed the same property on LoopNet.  In other words, CREXi accessed LoopNet without authorization, viewed the individual's LoopNet listing, and then four days later, the individual's listing appeared without her permission and with CoStar's copyrighted photographs on CREXi's website.  The obvious explanation: deliberate copying and publication by CREXi.

140.   CREXi's practice of copying listings wholesale without broker involvement is causing havoc in the marketplace.  A representative property owner in Long Island started to receive multiple calls inquiring about the potential purchase of a property that had already sold.  When she questioned a caller, it turned out that the property was listed for sale on CREXi.  The owner-representative tracked down the listing broker featured on CREXi.  The broker was unaware that the listing was even on CREXi, and said that he had certainly not posted it.

141. This pattern repeated across the country.  In Arkansas, a brokerage received multiple calls about a property that had already sold.  One of the callers revealed that the property was listed as for sale on CREXi.  As in the New York example above, the brokerage had not added the listing to CREXi and was unaware that the listing was even on CREXi.  The brokerage contacted CoStar asking if CREXi was a CoStar subsidiary and if CoStar would remove the listing.

142. In another example, a brokerage contacted CREXi demanding that CREXi remove 127 listings from CREXi's site.  Days later, the same brokerage emailed CREXi's CEO to complain that the brokerage was "still having listings uploaded" by CREXi and noted that "We never authorized Crexi to upload our listings in the first place."  The upshot: CREXi obtains and posts listings without broker involvement, and causes confusion for buyers, sellers, and brokers.

143. Though CREXi now claims that it always gets broker permission to add listings, documents produced by CREXi and testimony from CREXi's corporate designee revealed that the "permission" is often based on nothing more than a pre-existing "relationship."  When asked to explain how CREXi determined it had obtained permission from a broker to add a listing when there was no written evidence of the broker ever instructing CREXi to add his or her listings, CREXi's corporate designee explained that CREXi concluded it *must* have received *oral permission* because CREXi only added listings once it received permission from brokers.  That explanation, however, is tautologically self-defeating and contradicted by mountains of CREXi-produced evidence showing that CREXi routinely copied broker listings and created listings on CREXi without any permission at all.

144. In some instances, CREXi did at least contact the listing broker and offer to place the listing on CREXi free of charge.  But CREXi was deliberately vague regarding how CREXi planned to obtain the listing and its associated photographs, and did not disclose that it intended to copy from LoopNet.  For example, CREXi's Nick DeGiorgio—CEO Michael DeGiorgio's cousin—contacted

a marketing manager at a brokerage and offered to post one of the brokerage's property listings in Maryland. The brokerage accepted, but was not asked to provide, and did not provide, CREXi with any information, photographs, or marketing material for the property. Neither did the brokerage upload any CoStar images to CREXi. Nevertheless, CREXi posted the listing on its website.

145. Subsequently, CREXi's Mr. Rosenfeld called the marketing manager and tried to sell him a subscription to CREXi's platform. The manager asked Mr. Rosenfeld where CREXi had obtained the marketing material that it used to list the property on its website, since the brokerage never provided CREXi with any such material. Mr. Rosenfeld replied vaguely that CREXi had various partnerships with companies that allowed CREXi to get the information. When the manager asked which companies, Mr. Rosenfeld would not provide that information.

146. The marketing manager then contacted Mr. Rosenfeld again, asking whether CREXi had a partnership with CoStar, because the CREXi listing contained exactly the same information as the brokerage's listing on LoopNet. Mr. Rosenfeld admitted that CREXi did not have a partnership with CoStar. He stated that once CREXi received the brokerage's permission to post their listing, CREXi copied the listing "off the internet."

147. The manager notified CoStar of Mr. Rosenfeld's suspicious statements and provided a side-by-side comparison of photographs from the CoStar and CREXi listings. As the manager pointed out, the photograph that CREXi posted exactly matches CoStar's copyrighted photograph, with the exception that CoStar's watermark had been fully cropped out of the lower right-hand portion of the photograph. The side-by-side comparison that the manager sent to CoStar appears below:

CASE NO. 2:20-cv-08819-CBM-AS
THIRD AMENDED COMPLAINT

148.  These photographs make clear that when Mr. Rosenfeld told the manager that CREXi pulled the listing "off the internet," he really meant that CREXi copied the listing—including the copyrighted photograph—from LoopNet, even though CREXi was not authorized to do so.  (Of course, had CREXi's Mr. Rosenfeld believed that CREXi was permitted to copy from LoopNet, then he would have readily admitted that LoopNet, and not "the internet," was the source.)

149.  Once the brokerage indicated it was interested in seeing the listing on CREXi, CREXi simply copied the relevant information and copyrighted photograph from LoopNet, rather than spend the time and money to take its own photographs of the property and conduct its own research (or even ask the brokerage to send its own information).  When the brokerage learned that pulling the information "off the internet" meant copying from LoopNet, the brokerage ended its relationship with CREXi.

150.  As another example, on June 17, 2020, Mr. Rosenfeld accessed LoopNet and viewed another property listing in Maryland, as well as the listing broker's profile on LoopNet.  CREXi subsequently contacted the broker and offered to post the listing for free on CREXi.  The broker agreed.  However, there was no discussion of where CREXi would obtain the property photographs or associated listing information.  The broker never gave CREXi permission to copy from

LoopNet.  On June 19, 2020—only two days after Mr. Rosenfeld viewed the broker's listing on LoopNet—the listing appeared on CREXi with CoStar's copyrighted photograph:

**LoopNet Listing Photograph**      **CREXi Listing Photograph**

  

151.  Similarly, on April 2, 2020, Mr. Rosenfeld accessed LoopNet and created a saved search for properties in Washington, D.C., that met certain criteria, including a minimum price of $1 million.  Mr. Rosenfeld named the search "DC 1M+."  That same day, Mr. Rosenfeld viewed two listings on LoopNet that met the search criteria.

152.  Unsurprisingly, shortly after Mr. Rosenfeld accessed these two listings on LoopNet, they appeared on CREXi with CoStar's copyrighted photographs. Indeed, one of the photographs on CREXi still featured CoStar's watermark:

**LoopNet Listing Photograph**    **CREXi Listing Photograph**

 

 

153.   Although brokers can list their properties anywhere, brokers know—not least because of industry knowledge about CoStar's efforts to protect its intellectual property—that they do not have the right to permit CREXi to copy from a CoStar site.  For instance, CREXi contacted a brokerage in Alabama and offered to list its properties on CREXi for free.  The brokerage agreed.  But the brokerage and CREXi never discussed where the information for the listings would come from, and there was no mention of CREXi copying from LoopNet.  The broker later acknowledged that he would not have the right to give CREXi permission to use CoStar's copyrighted content.  Nevertheless, the CREXi listing of the brokerage's

property contains CoStar's copyrighted photographs, cropped to remove the CoStar watermark:

**LoopNet Listing Photograph**           **CREXi Listing Photograph**

 

154.   CREXi posted the brokerage's listing on its website on May 15, 2020. The day before the listing appeared on CREXi, an IP address associated with CREXi visited the same listing on LoopNet.  In other words, CREXi visited a listing on LoopNet, and then one day later, the listing appeared on CREXi's website with CoStar's copyrighted material.  Again, the obvious explanation is that CREXi copied the copyrighted photograph and associated listing from LoopNet, without authorization.

155.   As can be seen, there is no question that even when it is not simply copying and pasting copyrighted images and their listings from LoopNet without broker involvement, CREXi routinely posts listings, rather than simply being a passive forum for uploads, when it makes contact with brokers.  Indeed, CREXi trumpets the fact that it is actively involved in creating the listings, complete with photographs, on its site.  Eli Randel, CREXi's Chief Strategy Officer, explained during a webinar that CREXi users can send property information to CREXi, and CREXi will "build your listings for you."  And during a June 19, 2020 video conference titled, "Welcome to CREXi: Richmond's New CRE Marketplace," CREXi's Paul Cohen stated to his broker audience: "If we don't have your listings

on CREXi, send them to us today, and *we'll add them*."  Additionally, former
CREXi Business Development Representative Christian Vien testified that when
contacting brokers offering to put their listings on CREXi, he made a practice of
telling brokers that CREXi would undertake the task of building their listings.  Vien
further testified that it was in fact uncommon for a broker to build a listing on their
own, rather than have CREXi build the listing for them.

156.  Given CREXi's active role in "build[ing]" or "add[ing]" listings, it is
unsurprising there are CREXi listings that display CoStar-copyrighted photographs
that do not appear anywhere in the listing broker's marketing materials.  There would
be no reason for brokers to upload their CoStar-copyrighted photographs to
CREXi—an action that CoStar prohibits—while excluding those photographs from
their own marketing materials—a use that CoStar permits.  The obvious explanation
(and the one consistent with CREXi's offers to build listings on behalf of brokers)
is that CREXi *itself* is taking the CoStar-copyrighted photographs directly from
LoopNet—not from the broker's marketing materials—and adding those
copyrighted photographs to CREXi.

157.  For example, a cropped version of the CoStar-copyrighted photograph
of the commercial property shown below appears on CREXi.  However, the broker's
marketing brochure contains different, non-CoStar copyrighted photographs,
indicating that CREXi took this image directly from CoStar.

**CoStar's Copyrighted Photograph**      **CREXi Listing Photograph**

 

**Photographs from Broker's Marketing Brochure**

 

   

158. As discussed above, CREXi fully understood that copying the images from LoopNet infringed on CoStar's intellectual property rights. In one instance, a broker who agreed to list properties on CREXi's website asked if CREXi could pull the listing information from LoopNet. Tellingly, CREXi said no and explained that it was not allowed to pull information from LoopNet. Relatedly, CREXi explained in a February 12, 2019, YouTube video titled, "Add Listings, Dispositions, View Leads on CREXi," that brokers can send their property fliers directly to CREXi for uploads "***as long as they are not CoStar or LoopNet branded***."

159. But time and again, CREXi nevertheless did copy CoStar's copyrighted photographs and associated real estate information from LoopNet, despite knowing that it was not permitted to do so.

### 3. Discovery of Communications with CREXi's Agents in India Has Revealed The Details of CREXi's Global Scheme

160. As a matter of routine, CREXi specifically instructed its Agents in India—whom CREXi management described as part of CREXi's "staff" and "the face of the company"—to copy listings from LoopNet, or brochures or flyers

sourced from LoopNet, being careful to hide the source, and to **remove** indications of CoStar's ownership by cropping images with CoStar's watermark. CREXi instructed its agents not to use flyers or photographs to build listings "if there is a watermark from our competitors like CoStar/LoopNet," but CREXi's workaround to use those flyers and images to build CREXi listings was simply to *crop out* CoStar's watermark.

161. For example, in an email dated September 18, 2019, Nick DeGiorgio, CREXi's Supply Growth Manager, directed James Burton, CREXi's Project Manager, to tell CREXi's "offshore" Agents to copy CoStar photographs, crop out the CoStar logo, and create listings for use on CREXi.com. He wrote "Can we have offshore buildout the attached [file of listings] for a new Pro broker? It is multiple listings in a combined file. **Some of the photos have CoStar branding so please advise offshore to crop out**." As directed, Burton then passed on the instructions to CREXi Agents in India, including the statement: "**Some of the photos have Co\*\*\*r branding so please advise offshore to crop out**." That one email alone attached 42 properties accompanied by CoStar-owned images.

162. Those directions to CREXi's Indian Agents were in accordance with CREXi's written policy regarding copying and cropping CoStar photographs, as discussed in an email from Nick DeGiorgio, CREXi's Supply Growth Manager, instructing employees to "manually submit[ ]" listing information and images obtained from LoopNet and other CoStar websites to CREXi's Indian Agents. CREXi employees were further instructed in bolded, all capital letters, as follows: "**YOU MUST TAKE A SCREENSHOT OF THE PHOTOS . . . TO ENSURE THAT THE WATERMARK LOGO IS REMOVED.**"

163. A few weeks later, Mr. DeGiorgio sent a "Friendly reminder" about "L\*\*pnet flyers" to CREXi employees with the instructions "If you are submitting L\*\*pnet/Co\* flyers to JIRA [to be built by CREXi's offshore workforce], please ensure you are providing language to "**GENERATE A CREXI FLYER BASED**

**OFF THE** [LoopNet] **INFO PROVIDED**." He added that, "[a]s an extra precaution" CREXi employees should instruct the offshore team to "**PLEASE BE SURE TO REMOVE/CROP OUT ANY WATERMARKS ON ANY PHOTOGRAPHS."**

164. CREXi's then-Head of Business and Sales Development Representatives responded "Nick – thanks for sending this to everyone" and explained to CREXi's employees that following Mr. DeGiorgio's instructions was important because "***Things like this puts us at risk for a potential legal issue***" and the "entire company" was aware CREXi was building listings using LoopNet flyers. These communications show CREXi's policy and practice laid bare: knowing intellectual property infringement, using offshore Agents, all directed by CREXi management.

165. CREXi's instructions to its Agents to use LoopNet flyers and CoStar images to create CREXi listings were repeatedly issued and confirmed. The same month Mr. DeGiorgio instructed CREXi's U.S. employees to "**REMOVE/CROP OUT ANY WATERMARKS**" from CoStar-copyrighted images, CREXi's Head of Deal Management (based in India) emailed Mr. Burton with concerns, explaining that his team had "been getting [a] few loopnet deals (information/images in dropbox) from some [] crexi guys . . . We need to build these deals..right?" Mr. Burton emphatically confirmed that Mr. Jaiswal's team in India should build those deals but to "make sure you ALWAYS use a CREXi flyer and ***please make sure that you don't use any images with a watermark, you can crop over those***. Anything from our competitors it is extremely important we use a CREXi flyer!"

166. When training another group of Indian Agents, Mr. Burton explained that the Agents "cannot add anything from our competitors" and that "with pictures it is pretty simple to tell, but we always need to be looking in this bottom right hand corner [] for a watermark logo." But rather than instruct the Agents not to use CoStar-copyrighted images, CREXi told them to go ahead and do so, but to be

careful to hide the infringement.  Mr. Burton explained that the Agents "***will see a CoStar logo in the bottom right***" of an image and that "***we would just need to crop that out of the picture.  You can still use the picture but we need to make sure the watermark is removed***."

167.   Later that summer Mr. Burton again issued the same instructions to CREXi's Head of Deal Management, based in India: "PLEASE ADD ASAP AND PLEASE CREATE CREXI FLYERS, DO NOT ADD WATERMARKED PICTURES, **PLEASE CROP**."  The instructions in Mr. Burton's email directly concerned CoStar images contained in LoopNet brochures.

168.   The use of CoStar-copyrighted images was critical.  When CREXi's Agents in India failed to add CoStar photographs to CREXi.com, CREXi employees ensured that the issue was addressed and that the Agents did so.  For example, in June 2020, CREXi's Austin Maddox wrote to the manager of CREXi's Customer Support Services, Roger Smith, and to Mr. Burton, asking why the Agents "didn't pull any of the photos from the LoopNet listings I sent them.  Do they not pull those anymore?"  Cognizant of the risks, Mr. Smith noted the Agents "could potentially screen shot [the images] and not include the LN [LoopNet] watermark" as long as Mr. Burton agreed.  Mr. Burton replied "Yessir!"

169.   Mr. Maddox took those instructions from CREXi management and asked CREXi's Agents: "Can you please also use the photos from the LoopNet Listings?  **Make sure to exclude the LoopNet Water mark at the bottom right when you screen shot them**."  A week later, another CREXi employee issued the exact same instructions to the Agents and also circled CoStar's star watermark in an example image to make even clearer to the Agents what to crop (CoStar's watermark).

170. CREXi's Agents followed CREXi's direct instructions. For example, Neptune accessed LoopNet on September 7, 2020, and viewed a property listing at 4229 Lafayette Center Drive, Chantilly, Virginia. That same day, details of that property—including cropped versions of CoStar-copyrighted images published on LoopNet—appeared on CREXi:

**CoStar-Copyrighted Photograph on LoopNet**



**Cropped Image on CREXi**



171. CREXi knew that it was engaging in, and directing its Indian Agents to facilitate, wrongdoing. Its practice was to do so, even as it repeatedly admitted in writing that its actions were wrongful. For example, CREXi acknowledged that its Indian BPOs should "refrain from using any site that is, or could be considered, a direct competitor of CREXi." And CREXi told its customers that it could not copy from CoStar's sites. CREXi's Nick DeGiorgio told a broker that for "*legality reasons, we cannot pull anything off L\*\*pnet.*" CREXi's Paul Cohen, a Director in Sales, repeatedly told brokers that he could not access LoopNet "*for legal reasons.*" Nevertheless, CREXi continued to instruct its offshore Agents to copy and crop CoStar-copyrighted photographs and associated listing information. Time and time again, IP addresses associated with CREXi's BPOs accessed property listings on LoopNet containing CoStar-copyrighted images. Shortly thereafter, including in some cases mere hours later, listings for those very same properties began appearing on CREXi's platforms with CoStar's copyrighted photographs. In almost all cases, CoStar's image was cropped to exclude CoStar's watermark.

172.   When a former CREXi employee was presented with similar evidence showing that, after CREXi's offshore agents received LoopNet listings from CREXi's U.S. employees, those listings would appear on CREXi containing cropped CoStar-copyrighted images, that former employee agreed that sequence of events was not surprising because it was CREXi's "***practice***" to "***copy the listing from LoopNet, crop out the watermark, and build the listing on CREXi.***"

173.   In short, CREXi knowingly and willfully infringed on CoStar's copyrights, using Agents in India, to build its business and compete with CoStar, the owner of the intellectual property at issue.

### 4.    CREXi Is Well Aware That CoStar Does Not Permit Competitors to Copy Content from Its Website

174.   Even putting aside CREXi's conversations with brokers and instructions to its BPOs described above—including the acknowledged prohibition on copying from LoopNet—there can be no doubt that CREXi is aware that CoStar does not permit competitors to infringe its copyrighted photographs, and that CoStar protects and vindicates its intellectual property though many methods, including—when the copying is on a huge scale and clearly deliberate—litigation.

175.   The trade and national press have extensively covered CoStar's prior lawsuits against those who have infringed its copyrighted photographs, such as Xceligent, Apartment Hunters, and RealMassive.[5]  CoStar has litigated across the country, from New Jersey to Kansas City, from Austin to Los Angeles, to protect its intellectual property, and has obtained judgments and injunctions that value its copyrighted images and real estate listings most recently at $50,000 per photograph, and $50,000 per real estate listing.

---

[5] *See e.g.*, Real Estate Data Dispute Yields $500 Million Judgment (available at https://finance-commerce.com/2020/01/real-estate-data-dispute-yields-500-million-judgment/); Apartment Hunters Found Liable in CoStar Copyright Infringement Dispute (available at https://therealdeal.com/la/2017/03/29/apartmenthunterz-com-found-liable-in-costar-copyright-infringement-dispute/).

CASE NO. 2:20-cv-08819-CBM-AS
THIRD AMENDED COMPLAINT

176.   CREXi is well aware of CoStar's judgments protecting its intellectual property and contractual rights, including the record-breaking half-billion dollar judgment against Xceligent, the result of copying copyrighted CoStar photographs and other content from LoopNet.  Publicly available news articles covering the Xceligent case were circulated internally at CREXi and discussed among CREXi's executives, with one executive cautioning the others to continue to "be smart."

177.   Xceligent's wrongdoing was acknowledged and condemned by multiple bodies.  In addition to the federal judgment and injunction against Xceligent itself in its hometown of Kansas City, Xceligent's contractor in Pittsburgh was likewise enjoined and consented to entry of judgment after admitting its involvement in the unauthorized copying of content from LoopNet; a related contractor was enjoined in India on the same basis; and the directors and officers of a third contractor in the Philippines were indicted for accessing LoopNet without authorization and copying listings.  In addition, after an extensive audit, an FTC-appointed monitor concluded that the tens of thousands of CoStar photographs in Xceligent's systems, which the court cases had shown were copied from LoopNet, had been "derived improperly by Xceligent" from CoStar's systems.

178.   Nevertheless, CREXi has engaged in the same misconduct as Xceligent, including infringing tens of thousands of copyrighted images with the help from offshore agents.

## 5.    CREXi Knows Full Well That CoStar's Star Logo Signals Its Copyright Ownership

179.   CREXi knows that CoStar's star logo signals CoStar's copyright ownership over a photograph.  As noted above, in February 2019, CREXi engaged a copyright vendor, Restb, for purposes of identifying photographs on the CREXi platform containing CoStar's star logo.  Restb uses "artificial intelligence to quickly recognize photographs that contain company logos or watermarks."  According to Restb, its logo-detection technology is designed to protect companies from copyright

lawsuits, and in particular, "CREXi utilizes Restb's services in order to identify photographs in the real estate listings it receives from brokers that might be copyright protected."

180.   According to CREXi, since February 2019, Restb has identified more than 48,000 images with CoStar's watermark in CREXi's possession.  CREXi has further represented that photographs flagged by Restb as containing the watermark are then removed from CREXi.com or prevented from ever publicly appearing on a CREXi listing (although Mr. Dees testified that "images that Restb flagged as having a true positive result of the CoStar watermark" would still be "maintained in CREXi's image library," which continues CREXi's infringement).

181.   Restb's filtering technology, and its bespoke CoStar logo solution in particular, is widely used by many of the largest players in the industry, including by CREXi's own customer base, from national brokerages like ██████ and ████████ to real estate marketplaces like ████████ to CRE data companies like ████████   It is apparent to the industry, and thus to CREXi, that CoStar's watermark signifies ownership of its photographs.

182.   In addition, even though its actual practice was to the contrary, CREXi acknowledged in writing that its BPOs should not be publishing photographs bearing the watermark or logo of a third party, including CoStar, specifically because those are "indicat[ors] of copyright protection."  For example, CREXi's contracts with Arcgate, Neptune, and Yansh (which CREXi foisted on its Agents *after* CoStar filed its original complaint in 2020) contain nearly identical language stating that "[CREXi] does not re-post images over which another entity has indicated copyright protection."  Those contracts thus directed that the BPOs should "not publish or provide to [CREXi] any photographs bearing the watermark or symbol of another company" or "crop, edit or otherwise modify any photos to remove a watermark or symbol of another company;" rather, the contracts commanded that the BPOs "shall only publish or provide to [CREXi] photographs that do not contain a watermark or

symbol of another company." In short, ***CREXi's own contracts acknowledge that logos on commercial real estate photograph denote copyright ownership***.

183.    Consistent with those contracts, after CoStar filed its original complaint for copyright infringement against CREXi, CREXi held regular videoconference trainings with its third-party Agents and BPOs in which it communicated a similar policy (again, a policy contrary to actual practice, and indeed contrary to its prior written policy)—that photographs specifically containing the CoStar logo should not be copied (or cropped)—yet another acknowledgement that CREXi is well aware that the CoStar logo in particular evidences CoStar ownership. And in post-lawsuit training materials provided to CREXi employees, CREXi instructed its employees on how to deal with photographs that contain a "third-party logo, watermark or CMI." CREXi instructed its employees that "watermarks on the photos" were "reason to believe" that those photos were "owned by a third party." Those instructions also directed employees to "not add the [watermarked] photos to the Crexi platform," "not crop or otherwise modify the photo," and "not instruct others to crop or modify the photo."

### E.    CREXi Actively Participates in Creating Listings, Including Uploading Infringing Images to CREXi's Platform

184.    CREXi is not a passive internet service provider for user-driven and submitted content. Rather, CREXi actively participates—and indeed touts its role—in creating listings for its customers. Indeed, a former CREXi Business Development Representative confirmed in his testimony that it was uncommon for brokers to build their own listings on CREXi. As CREXi's Manager of Business Operations has explained, brokers "send [CREXi] all the listings" to build because brokers "don't want to log into their CREXi account" to build or update the listings themselves, including the images incorporated therein. CREXi's active involvement in image uploading and displaying renders CREXi liable for copyright infringement.

185.   CREXi actively participates in gathering and displaying the images on its website in multiple ways.  As detailed above, CREXi instructs its offshore team to create listings from images and data in property brochures and from listings on LoopNet.   CREXi instructs its offshore Agents to manually obtain listing information and associated images from such brochures and from websites owned by CoStar and by third parties.  The offshore team then creates and uploads property listings to CREXi's platform using that content, including thousands of CoStar-copyrighted images.  CREXi also makes decisions on how and when to display uploaded images, even at times giving its offshore team discretion on which broker-provided images to upload, how to arrange their position in listing "galleries," and when to time CREXi's marketing e-blasts containing listings.

186.   CREXi's U.S. employees also actively participate in creating listings using images and data sourced from LoopNet.  In one illustrative example, when a CREXi employee asked CREXi's Vice President of Operations Lawson Dees whether the employee could copy multiple listings from LoopNet (for uploading to CREXi.com) even though CREXi had had no contact with, let alone a direction from, the relevant broker about those listings, Dees replied: "***All day***."  CREXi's role in such circumstances could, therefore, hardly be less passive; it was copying and uploadings listings and their associated images with zero third party input.

187.   And just a few months before CoStar filed this lawsuit, CREXi management provided detailed instructions to its U.S. business development team to proactively copy (certain) images and data from LoopNet so CREXi's offshore Agents could upload that LoopNet content onto CREXi.com.  For example, CREXi management specifically instructed CREXi's U.S. employees to "SCREENSHOT" LoopNet listings and to "only us[e] the main photo and aerial/overview photo" while "ENSUR[ING] THAT THE WATERMARK LOGO IS REMOVED."

188.   Even when CREXi works directly with brokers to create listings on CREXi, CREXi is still actively involved in selecting, curating, and displaying images.  CREXi advertises its ability to curate listings to brokers: "Want Us to Add the Listing For you?  Get started by uploading a flyer, offering memorandum, or brochure and our team will ***do the rest***."  *See* https://www.crexi.com/add-properties:

189.   "Do[ing] the rest" means that CREXi curates and controls the broker's listing, including adding photographs and data and determining how that content, and specifically the images, should be displayed.  For example, when training CREXi's Agents on CREXi's listing-building processes, Mr. Burton instructed the Agents to "just take the most relevant photos" and to "be creative" in deciding which images to upload to CREXi's website.  In other words, CREXi was actively selecting which photographs to display on its site.  And as a general rule of thumb to ensure that CREXi could create listings in a timely manner, CREXi instructed its agents to take "the first 10 images" from a listing brochure or existing online listing, no matter

1    how many images the broker provided.

2        190.   When building listings for brokers, CREXi also controls the order in

3    which images and videos are displayed on specific listings and pays particular

4    attention to ensure that a front-facing image—i.e., an image that "highlights the

5    property"—is set as the cover photo for a listing.   And CREXi will disobey a

6    broker's instructions to create a listing on either CREXi's sale or lease marketplace

7    if CREXi believes the broker "messed up" by submitting the listing to the wrong

8    part of CREXi's website.  In those cases, CREXi will create the listing on the "right

9    platform."

10       191.   CREXi also rejects listings (and associated images) if they don't meet

11   certain criteria—for example, they showcase residential, rather than commercial,

12   properties—and prioritizes which listings, with their associated images, to create

13   first, depending on whether the broker submitting the listing is a VIP paying user or

14   a broker who uses CREXi for free.

15       192.   CREXi's active role in selecting (and rejecting), and displaying, images

16   does not stop there.   CREXi specifically performs quality control review of the

17   images uploaded to CREXi on behalf of brokers and selects high resolution images

18   for display on its website, directing its Agents to "update the pictures [from

19   brochures]" with "ones from the website" if the pictures provided by a broker are

20   low-quality.  For example, Nick DeGiorgio instructed James Burton to "[p]lease

21   have offshore go through this team . . . and do their best to do the following: . . .

22   Attempt to remove any pixilated, or blurry photos (high res ones can be found on

23   their site)."  Burton then instructed the Neptune offshore team to "Follow the steps

24   below to find the high quality pictures to add to the listings . . . please check on the

25   front-end of CREXi to ensure they look high quality."

26       193.   All of this work to find, select, and display only certain images is done,

27   according to Mr. Burton, because CREXi wants images that are the "highest quality

28   as possible."  And CREXi "want[s] the listing to just ultimately look really really

good on the site" because "[t]hat's what makes [CREXi's] website." Nick DeGiorgio also testified that when he "was the one uploading listings on behalf of brokers" he would use his judgment to "[m]ake sure" images were not "pixilated [sic]," "blurry, sideways, [or] upside down."

194.   CREXi refers to this entire process as a "white glove" service it provides to brokers. *See* https://learn.crexi.com/en/articles/6535337-listing-properties-on-crexi ("You can utilize Crexi's white glove service where one of our skilled Crexi professionals can help you with the process.").

195.   Customer reviews confirm that brokers utilize this service, relying on CREXi—and its Agents—to enter listing information and images (without regard to copyright ownership) directly to its platform:



196.   Moreover, even when brokers build their own listings, CREXi's team applies many of the same principles (or quality control checks) described above to its review of broker-built listings. That review includes making "sure all photos are clear and no loopnet/costar tags," making "sure Map View / Street View is accurate," checking "Property Details to make sure its [sic] accurate," checking "Marketing Description to make sure it looks clean and correct spacing/spelling," and checking "the OM/Flyer to make sure its not a loopnet/costar." If listings and their associated

1  photographs met CREXi's criteria, they would be designated "All Good."  If not,

2  CREXi would put the listing "On Hold"—and off the active marketplace—until

3  CREXi or the broker fixed the issues.

4    197.  In short, whether CREXi is building a listing itself, or reviewing a

5  listing submitted by a broker, its role is extremely active.  CREXi.com is the opposite

6  of a passive platform.

7  **F.  CREXi is Ineligible for the DMCA Safe Harbor Defense in**

8  **17 U.S.C. § 512**

9    198.  CREXi has at various points attempted to disclaim the full extent of its

10  infringement by relying on the so-called "safe harbor defense" afforded to certain

11  online service providers that comply with the requirements of the DMCA, 17 U.S.C.

12  § 512.  Specifically, CREXi has asserted that it is merely a "service provider" storing

13  material "at the direction of a user."  17 U.S.C. § 512(c).  As an initial matter, CREXi

14  cannot claim the protections of the DMCA at all for the reasons described above—

15  it is not a passive entity storing images at the direction of users.  Instead, CREXi has

16  actively sought out, copied, and displayed CoStar's copyrighted images.  And it has

17  done so pursuant to a belatedly-admitted policy.

18    199.  Moreover, as described above, CREXi has instructed its Agents to crop

19  out CoStar's watermark from CoStar-copyrighted photographs even as it employed

20  a copyright vendor that identified copyrighted images by looking for that very same

21  watermark.  The intentional and systematic cropping out of CoStar's watermark

22  constitutes deliberate modifications to the content of CoStar's copyrighted images,

23  rendering CREXi ineligible for the protections of the DMCA safe harbor as a matter

24  of law.

25    200.  In any event, even if CREXi had a passive role in storing the infringing

26  images at issue in this case, and it does not, it would still not be entitled to the DMCA

27  safe harbor defense because it has failed to comply with any of the threshold

28  requirements for that defense.  CREXi claims that it complies with the requirements

of the "safe harbors" of the DMCA, that it respects content owners' intellectual property rights, and that it has adopted a policy of terminating users who are deemed to be repeat infringers. *See* CREXi Terms of Service § 5.2. None of that is true.

### 1. CREXi Failed to Properly Designate a DMCA Agent

201. At the time of the infringing activities at issue, CREXi either did not have a designated DMCA agent or it failed to appropriately maintain and publish contact information for its designated DMCA agent with the U.S. Copyright Office and on its website, as required by the DMCA and relevant regulations. *See* 17 U.S.C. § 512(c)(2); 37 C.F.R. § 201.38(b)(3); 81 Fed. Reg. 75695 (Nov. 1, 2016) (Copyright Office final rule). CREXi's omission of this information, and its publication of inconsistent information, makes it needlessly cumbersome for copyright owners to find accurate information for CREXi's designated DMCA agent and submit notices of claimed infringement to CREXi.

### 2. CREXi Knew or Should Have Known of Infringing Activity on Its Platform and Failed to Expeditiously Remove Claimed Infringing Images

202. Additionally, CREXi knew or should have known of infringing activity on its platform, but failed to expeditiously remove infringing images, as required by 17 U.S.C. § 512(c)—despite repeated notices from CoStar after the filing of this lawsuit that such infringing images remained on CREXi's website for months. These notices stated that CoStar-copyrighted images had been added to CREXi's website without CoStar's authorization and provided CREXi with information about each copyrighted image, including the copyright registration, the photographer, copies of the CoStar-copyrighted and infringing images, and their URLs on CREXi's website. The notices also contained the signature and the contact information of CoStar's counsel, who is authorized to act on behalf of CoStar, the owner of the infringed copyrights.

203.  Specifically, between March and July 2021, CoStar identified over 2,100 CoStar-copyrighted photographs that continued to appear on the CREXi website without CoStar's authorization, notwithstanding the fact that CoStar previously identified these CoStar-copyrighted photographs to CREXi.

204.  Then, starting in May 2023 (over two years after CoStar commenced this lawsuit), CREXi began flooding CoStar's registered DMCA agent with emails informing CoStar that potential CoStar-owned images in CREXi's possession had been flagged by a third-party image filter.  CREXi informed CoStar that, even though the images were flagged as potentially owned by CoStar and even though hundreds of these images *had CoStar's star watermark on them*, CREXi would continue to display those images on its website until and unless CoStar sent CREXi a formal "takedown notice" under the DMCA to remove the images from its website. Some of these images were, astonishingly, identified as infringing in CoStar's first and second amended complaints.  Nonetheless, CREXi continued with this tactic for months, ignoring CoStar's repeated, direct requests to cease and desist publishing CoStar-watermarked images on CREXi's website.

205.  Left with no choice, CoStar ultimately sent CREXi multiple DMCA "takedown notices," and now seeks to add hundreds of these images (included in Exhibit A) to the TAC.  And for its part, CREXi ultimately realized the foolishness of its conduct and purported to return to its prior practice of removing filter-flagged images with CoStar's watermark from its website.

206.  CREXi's infringement of CoStar photographs has continued unabated through this year (2024), including images that CoStar flagged to CREXi through DMCA takedown notices.  CREXi has continued to display—and thus, infringe— scores of CoStar photographs *at issue in this case* on its listing marketplace and throughout its Intelligence product.

207.  CREXi's retort has been that its continuing infringement is excusable because some of the images it has continued to infringe are associated with

"inactive" listings that are harder to find on CREXi's website, and it has used new URLs and "Content IDs" that are different than the URLs and Content IDs CREXi originally used to infringe CoStar's images.  CREXi knows those arguments are foreclosed by law, and its insistence that it is doing nothing wrong by continuing its mass infringement demonstrates that it remains undeterred—almost four years into this lawsuit—from ceasing its infringing activities.

208.   The continued appearance of CoStar-copyrighted material on CREXi's website—and CREXi's refusal to remove thousands of CoStar-copyrighted images even after CoStar provided detailed information of the specific instances of infringement, and even when the images displayed CoStar's star watermark—demonstrates CREXi's knowledge of (and failure to expeditiously remove or disable access to) infringing material from its platform, and underscores the willfulness of its conduct throughout the relevant time period.

209.   Furthermore, the allegations herein demonstrate that CREXi receives a financial benefit directly attributable to the infringing activity and had the right and ability to control that infringing activity, beyond its mere technical ability to remove or disable access to infringing materials.  Among other activities, CREXi and its Agents *actively participate* in creating listings for CREXi users, including by obtaining, selecting, and uploading images.  Further underscoring its active participation, CREXi has affirmatively modified CoStar-copyrighted images by cropping out CoStar's watermark.

### 3.    CREXi Failed to Design and Reasonably Implement a Repeat Infringer Policy

210.   CREXi claims that it has designed and adopted a policy of terminating, in appropriate circumstances, users who are deemed to be repeat infringers, pursuant to the DMCA.  *See* CREXi Terms of Service § 5.2.  Not so.

211.   Even assuming that CREXi has had an established written *policy* for terminating repeat infringers, CREXi failed to terminate, or persistently turned a

blind eye toward, repeat infringers when their identities were made known to CREXi. As detailed above, between March and July 2021, CoStar identified over 2,100 instances of repeat infringements to CREXi. Several of these repeat infringments were associated with users with listings on CREXi.com that contained infringing images identified in CoStar's original Complaint. And as also set forth above, from approximately May 2023 to September 2023, CREXi identified to CoStar hundreds of filter-flagged images with CoStar's watermark on them, and continued to publish those images on CREXi's website until and unless CoStar sent CREXi a formal "takedown notice," despite that fact that some of those images were also repeat infringments (i.e., images identified in CoStar's first and second amended complaints in this lawsuit). When CREXi's executives—including CREXi's Chief Operating Officer, Managing Director of Auctions, and Vice President of Engineering—were asked under oath whether they had ever seen CREXi's policy for dealing with repeat infringers, the executives said "No."

212. CREXi has produced a purported Repeat Infringer policy through discovery in this case. But it is intentionally refusing to implement that policy. CREXi has been on notice of tens of thousands of infringing uploads by CREXi's employees and its users for years but waited until April 2023 to issue any strikes to users who submitted CoStar-copyrighted photographs to CREXi. And even then, CREXi gave brokers only a single strike regardless of the number of listings they submitted that contained one or more of CoStar's photographs identified in CoStar's Second Amended Complaint.

213. When asked why CREXi issued just one strike to a user who (according to CREXi) uploaded over 100 CoStar photographs to various listings on CREXi.com, CREXi's Vice President of Operations testified that CREXi made that decision because of its "business perspective." It is no wonder how CREXi's "business perspective" influenced its implementation of its repeat infringer policy— if a user receives six strikes, CREXi's written policy requires CREXi to terminate

the user. In all its years as a company facilitating and participating in infringement, CREXi has never terminated a paying or free user pursuant to its Repeat Infringer policy.

### G.    CREXi's Wrongdoing is Consistent with Its Prior Willful Misconduct

214.    This is not the first time that CREXi has improperly profited from another company's investment and intellectual property. Indeed, CREXi sought to establish itself based on content misappropriated from Ten-X, now part of CoStar.

215.    CREXi's co-founder and CEO, Michael DeGiorgio, and co-founder Luke Morris previously worked for Ten-X and were engaged in a scheme to misappropriate highly confidential trade-secret customer lists from Ten-X to launch CREXi. Ten-X uncovered the theft and brought suit against CREXi and Mr. DeGiorgio, immediately securing a preliminary injunction.

216.    The California state court that entered the preliminary injunction against CREXi found that Ten-X was highly likely to succeed on the merits of its claims for misappropriation of trade secrets, breach of the duty of loyalty, breach of a proprietary information and inventions agreement, and breach of a confidentiality agreement. The court barred the operation of CREXi to the extent it operated online real estate auctions, and prohibited CREXi's use of Ten-X's customer lists and all documents and information derived therefrom. The court also ordered that the misappropriated materials be returned or purged.

217.    Seeing the writing on the wall, CREXi paid $1.6 million in damages, issued a public apology, and—according to a press release issued by CREXi—agreed to certain ongoing restrictions, including a prohibition on any further use of the misappropriated information. In a public statement, Michael DeGiorgio "apologize[d] to Ten-X for the actions which led to this lawsuit" and stated, "I regret my conduct at the time I departed Ten-X."

218.   Despite the payment and (hollow) apology, CREXi and Mr. DeGiorgio have picked up where they left off.

## FIRST CLAIM FOR RELIEF

### Copyright Infringement

219.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

220.   Each of CoStar's photographs constitutes an original work of authorship and copyrightable subject matter under the laws of the United States.

221.   CoStar owns or has exclusive rights to all rights, title, and interest in and to the photographs.

222.   CREXi had and has access to CoStar photographs through the internet or other means.

223.   CREXi has copied, reproduced, distributed to the public, and/or displayed publicly on CREXi.com CoStar's copyrighted photographs—including without limitation those copyrighted works identified in **Exhibit A** hereto—without the consent or authority of CoStar, thereby infringing CoStar's copyrights.

224.   Further, CREXi has created derivative works based on CoStar's copyrighted images by cropping and manipulating CoStar's registered images. Examples appear on **Exhibit A.**  CREXi sometimes publishes *CoStar*-copyrighted cropped images featuring a *CREXi* watermark.  Examples appear at ¶¶ 65-66, *supra*.

225.   CoStar owns the exclusive rights in each of the photographs detailed in **Exhibit A**.  Prior to the filing of this Third Amended Complaint, for each image CoStar is pursuing an infringement claim over, CoStar has validly registered each of the photographs detailed in **Exhibit A** with the United States Copyright Office. CREXi copied, reproduced, distributed, or publicly displayed on CREXi's website without authorization each of the copyrighted photographs detailed in **Exhibit A.**

226.   Upon information and belief, CREXi's unlawful copying, reproducing, distributing, and public displaying of these CoStar photographs occurred on or

around April 21, 2020, to May 20, 2024, as set forth in **Exhibit A**. On information and belief, a valid registration was obtained by CoStar for each photograph CoStar asserts an infringement claim over detailed in **Exhibit A** prior to CREXi's first infringement of the photograph.

227. CREXi's copies, reproductions, distributions, and displays are identical and/or substantially similar to CoStar's photographs. Further, CoStar, which owns an exclusive right to prepare derivative works of its copyrighted images, did not give CREXi permission to create any derivative works.

228. CREXi is directly liable for these acts of infringement in violation of 17 U.S.C. §§ 106 and 501.

229. The infringement of CoStar's rights in each of its copyrighted photographs constitutes a separate and distinct act of infringement.

230. CREXi's acts of infringement have been willful, intentional, purposeful, and in disregard of CoStar's rights under the Copyright Act. CREXi knew its acts were infringing and intentionally or recklessly disregarded the law by its conduct.

231. CoStar did not authorize CREXi's acts.

232. CoStar believes that additional instances of CREXi's infringement of its copyrighted photographs will be revealed during the discovery process.

233. As a result of CREXi's willful copyright infringement, CoStar has been and will continue to be damaged as a direct and proximate result of the infringing acts set forth above, and CREXi has profited and will continue to profit as a result of its unlawful infringement of CoStar's copyrighted photographs in an amount to be proven at trial.

234. CREXi's conduct also has caused irreparable and incalculable harm and injuries to CoStar and is ongoing. Unless enjoined, CREXi's conduct will cause further irreparable and incalculable injury, for which CoStar has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Violation of the Digital Millennium Copyright Act ("DMCA")

### Removal of Copyright Management Information, 17 U.S.C. § 1202(b)(1)

235.    CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

236.    With respect to the 48,649 copyrighted CoStar images identified in CREXi's possession, CoStar's watermark constitutes copyright management information ("CMI"), as it identifies CoStar as the copyright owner of such photographs.  As described above, CREXi has engaged a third-party vendor, Restb, for purposes of identifying photographs on the CREXi platform containing the logo of a third party, including CoStar's logo, on the basis that the logo denotes copyright ownership.  Furthermore, CREXi itself has acknowledged that the CoStar logo evidences CoStar copyright ownership, as evidenced by, for example, its explicit instructions to its BPOs to crop out CoStar's watermark prior to uploading to the CREXi platform.

237.    In many such photographs, including several specifically identified above as examples, CREXi intentionally and systematically cropped out (or instructed its Agents to crop out) CoStar's watermark from CoStar-copyrighted photographs.

238.    CREXi removed CoStar's CMI while knowing, having reasonable grounds to know, and with the intent that it would induce, enable, facilitate, and/or conceal infringement of CoStar's copyrights, in violation of 17 U.S.C. § 1202(b).

239.    CREXi's removal and alteration of CoStar's CMI was made without the knowledge or authority of CoStar.

240.    CoStar has suffered damage and loss as a result of these violations.

241.    CoStar has suffered and will continue to suffer irreparable harm as a result of CREXi's continued removal of CoStar CMI on CoStar-copyrighted photographs, and, as such, CoStar has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### Violation of the Digital Millennium Copyright Act ("DMCA")

### Distribution of Works with Removed or Altered Copyright Management Information, 17 U.S.C. § 1202(b)(3)

242.   CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

243.   CoStar's watermark constitutes CoStar's protected CMI.  As described above, CREXi has engaged a third-party vendor, Restb, for purposes of identifying photographs on the CREXi platform containing the logo of a third party, including CoStar's star logo, on the basis that the logo designates copyright ownership. Furthermore, CREXi itself has acknowledged that the CoStar logo evidences CoStar copyright ownership, as evidenced by, for example, its explicit instructions to its BPOs to crop out CoStar's watermark prior to uploading to the CREXi platform.

244.   CREXi has distributed and is distributing CoStar's protected works, or copies of works, knowing that protected CMI has been removed or altered without CoStar's authority.

245.   CREXi distributed CoStar's CMI while knowing, having reasonable grounds to know, and with the intent that it would induce, enable, facilitate, and/or conceal infringement of CoStar's copyrights, in violation of 17 U.S.C. § 1202(b)(3).

246.   CoStar has suffered damage and loss as a result of these violations.

247.   CoStar has suffered and will continue to suffer irreparable harm as a result of CREXi's continued distribution of CoStar's protected works, or copies of works, knowing that protected CMI has been removed or altered without CoStar's authority, and, as such, CoStar has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, CoStar prays for relief as follows:

1.      For an order pursuant to 17 U.S.C. § 502 permanently enjoining and restraining CREXi and its officers, agents, servants, and employees and

all those in active concert or participation with them from directly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the infringements of CoStar's exclusive rights under the Copyright Act, or from authorizing any other person to do the same;

2.   For an award pursuant to 17 U.S.C. § 504 of CoStar's actual damages and CREXi's profits or, alternatively at CoStar's election, for statutory damages for CREXi's infringement and willful infringement— including without limitation for the instances of infringement identified in **Exhibit A**, and other instances of infringement subsequently disclosed or uncovered during discovery—in the maximum amount allowable by law;

3.   For a finding that CREXi has willfully infringed CoStar's federally registered copyrights;

4.   For an award pursuant to 17 U.S.C. § 1203 of CoStar's actual damages and CREXi's profits, or alternatively at CoStar's election, for statutory damages for CREXi's violations of the DMCA in the maximum amount allowable by law;

5.   For further permanent injunctive relief as deemed necessary by the Court, including without limitation for an order pursuant to 17 U.S.C. § 503(b) or otherwise requiring the purging and destruction of all CoStar copyrighted photographs from CREXi's database(s) and system(s) by an independent source that reports to CoStar and the Court and monitors CREXi's future compliance with the Court's orders;

6.   For an award of CoStar's costs, including its reasonable attorneys' fees;

7.   For pre-judgment and post-judgment interest according to law;

8.   For exemplary and punitive damages to the extent available; and

9.    For such further and additional relief as the Court may deem just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Civil L.R. 38-1, CoStar hereby demands a trial by jury.

Respectfully submitted,

Dated:  August 22, 2024                **LATHAM & WATKINS LLP**

By:  */s/ Nicholas J. Boyle*
Nicholas J. Boyle
(admitted *pro hac vice*)
Sarah A. Tomkowiak
(admitted *pro hac vice*)
Anne C. Malinee
(admitted *pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201
Email: nicholas.boyle@lw.com
       sarah.tomkowiak@lw.com
       anne.malinee@lw.com

Elyse M. Greenwald
(Bar No. 268050)
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5525
Fax: 424.653.5501
Email: elyse.greenwald@lw.com

Caitlin E. Dahl
(admitted *pro hac vice*)
caitlin.dahl@lw.com
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767

*Counsel for CoStar Group, Inc., and CoStar Realty Information, Inc.*