# EXHIBIT A

1
2

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

3
4
5
6
7
8
9

COSTAR GROUP, INC., and
COSTAR REALTY
INFORMATION, INC.,

          Plaintiffs,

   v.

COMMERCIAL REAL ESTATE
EXCHANGE, INC.,

          Defendant.

CASE NO. 2:20-cv-08819-CBM-AS

Assigned to Hon. Consuelo B. Marshall
Hon. Alka Sagar, Magistrate Judge

10
11
12
13
14
15

COMMERCIAL REAL ESTATE
EXCHANGE, INC.,

          Counterclaimant,

   v.

COSTAR GROUP, INC., and COSTAR
REALTY INFORMATION, INC.,

          Counter defendants.

16

**AMENDED SUPPLEMENTAL EXPERT REPORT OF DANIEL ROFFMAN**

17
18
19

Date Filed: September 25, 2020
Pre-Trial Conference: September 24, 2024
Trial Date: October 22, 2024

20
21
22
23
24
25
26
27
28

1

**CONTENTS**

2 I.SCOPE OF SUPPLEMENTAL REPORT ................................................................. 1

3 II.SUMMARY OF SUPPLEMENTAL OPINION 6 .................................................. 2

4  
5 III.OPINION 6: COSTAR'S ACCESS TO CREXI IS DE MINIMIS IN VOLUME AND QUALITATIVELY AND QUANTITATIVELY DIFFERENT WHEN COMPARED TO CREXI'S EXPANSION CAMPAIGN ................................................................. 3

6   a.  CoStar's Browsing of CREXi's Website ............................................. 4

7   b.  CoStar's Scrape of CREXi ................................................................ 25

8 IV.APPENDIX A – CV OF DANIEL ROFFMAN ..................................................... 42

9 V.APPENDIX B – LIST OF ADDITIONAL DOCUMENTS CONSIDERED ........ 43

10 VI.APPENDIX C – MIXPANEL TRACKED EVENTS ......................................... 47

11  
12 VII.APPENDIX D – ADDITIONAL DATA FROM COSTAR REGARDING 33,891 SCRAPED EMAIL ADDRESSES ................................................................. 50

13 VIII.APPENDIX E – ADDITIONAL DATA FROM COSTAR REGARDING 33,891 SCRAPED EMAIL ADDRESSES – FILTERED DOWN ................................. 51

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      SCOPE OF SUPPLEMENTAL REPORT

1.  CRA was engaged by counsel for Plaintiffs CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar") to identify and analyze records in CoStar's LoopNet logs that can be attributed to Defendant Commercial Real Estate Exchange, Inc. ("CREXi") or its representatives. In my expert report dated March 19, 2024 (as amended on March 27, 2024 and amended a second time on August 6, 2024) (hereafter, the "Roffman Report"), I summarized my findings and opinions regarding CREXi's access to LoopNet based on those LoopNet logs.[1]

2.  Subsequently, CREXi submitted a rebuttal report from Andrew Crain on April 19, 2024. In Mr. Crain's Amended Expert Rebuttal Report dated May 6, 2024 (hereafter, the "Crain Report"), he opines that I failed to consider relevant evidence of CoStar's access of CREXi's website as detailed in Mr. Crain's Opinion 5.[2] This subject matter was outside the scope of the Roffman Report. Accordingly, I have been asked by CoStar's counsel to review and evaluate Mr. Crain's Opinion 5 and supplement my report to include my findings and opinions regarding the available evidence of CoStar's access of CREXi's website and Mr. Crain's Opinion 5.

3.  In preparing this supplemental report, I have considered the Crain Report and the materials cited therein in support of Mr. Crain's Opinion 5, as well as other materials pertaining to this same subject matter. A complete list of materials reviewed, in addition to those cited in the Roffman Report, is attached as Appendix B to this report. My credentials and compensation are presented in the Roffman Report. An updated CV is attached as Appendix A to this report.

4.  My supplemental report (hereafter, "Supplemental Report") has been prepared by me, with assistance from my staff at CRA working under my direction. As before, my compensation is not dependent on the outcome of the matter.

5.  I understand that on May 23, 2024, CREXi filed a motion in this case seeking to add counterclaims against CoStar relating to CoStar's scrape of CREXi's website. Should the court allow those claims to proceed, I understand that additional discovery will be sought by CoStar. That additional discovery could include data that I requested for the purpose of

---

[1] Second Amended Expert of Daniel Roffman (August 6, 2024) (hereafter, "Roffman Report").
[2] Amended Expert Rebuttal of Andrew Crain (May 6, 2024) (hereafter, "Crain Report") ¶ 75-97.

providing my expert opinions but was not made available to me because CREXi has not produced it, including CREXi's inbound data logs (the equivalent of the LoopNet inbound data logs which I analyzed for the Roffman Report), Salesforce tickets through which CREXi instructed its offshore agents to create listings using LoopNet content, CREXi's Mixpanel lexicon containing its self-drafted definitions of the "events" it chooses to log through Mixpanel, and more. I have further amended my supplemental report in part due to CREXi providing the Mixpanel lexicon after the May 24, 2024 Supplemental Expert Report was filed.[3] Should CREXi produce additional data relevant to the opinions I offer in this case, I reserve the right to amend my opinions.

## II.    SUMMARY OF SUPPLEMENTAL OPINION 6

6.    CoStar's access to CREXi is qualitatively and quantitatively different than CREXi's access to CoStar and does not impact my original opinions. There are two types of activity that Mr. Crain discussed in his report – CoStar employees browsing CREXi's website and conducting activity there, and data scraping from CREXi's API. I address these both in this report, as well as flaws in Mr. Crain's analysis that grossly overstate CoStar's access of CREXi's website.

7.    First, the evidence reviewed indicates that CoStar employees' browsing of CREXi's website was de minimis and showed no evidence of mass manual data harvesting. To demonstrate this point, I have determined that CoStar, an organization that is roughly 16 times the size of CREXi, visited less than 1% of the number of CREXi property listings as compared to the number of LoopNet listings that CREXi viewed over an eight-year period of time from January 2016 until January 2024. Another example that illustrates my point is that during a three-month period in 2020, 58.8% of the 786 CoStar employees who browsed the CREXi website did so only on a one single day. Of those single day visits, 25.3% of those occurred on the day the lawsuit was filed. This suggests that CoStar employees did relatively little browsing activity on CREXi's website. Further, this access is not consistent with the level of activity one would expect from a party seeking to manually harvest listing information or copyrighted photographs. CREXi's traffic during these three months was significantly higher based on my analysis, as I will describe in more detail below.

---

[3]CREXI-CS-00741740 contains CREXi's Mixpanel lexicon.

**8.** Second, CoStar's scrape of CREXi's publicly available website API occurred only twice, once in March 2020 and a second time in April 2020, to conduct a competitive analysis of property listings, as opposed to CREXi's use of CoStar's listings and copyrighted photographs to expand their business. CoStar's scrape was carried out by a single employee, while CREXi's anonymous campaign involved numerous employees and several foreign BPOs. Mr. Crain's analysis in arriving at 70 million "pieces of data" counts numerous types of duplicate entries, counts each column of each row of data as a "piece of data" when a single API request queried an entire listing (e.g. an entire row with many columns) at once, suffers from the same time boxing issues that Mr. Crain critiqued about my methodology, and counts false positive activity by individuals who are not associated with CoStar. Each of these flaws is detailed in this report. Finally, my analysis suggests that 99.72% of the scraped email addresses that were part of the May 5 and 8, 2020 marketing emails already existed in CoStar's systems at the time of CoStar's scrape. This would suggest that the data obtained in the scrape was not used to mass populate CoStar's marketing or Enterprise databases.

## III.    OPINION 6: COSTAR'S ACCESS TO CREXI IS DE MINIMIS IN VOLUME AND QUALITATIVELY AND QUANTITATIVELY DIFFERENT WHEN COMPARED TO CREXI'S EXPANSION CAMPAIGN

9. According to Mr. Crain, I ignored the "substantial evidence in the record that CoStar employees repeatedly accessed CREXi's website to review property listings and broker profiles," and "the fact that CoStar scraped at least 70 million points of data from CREXi as part of a 'competitive analysis' that was then sent to CoStar's marketing department."[4] This evidence is irrelevant to, and does not change, my affirmative opinions. However, I address these additional sets of evidence and Mr. Crain's analysis of them below.

10. I conclude that the available data indicates limited access of CREXi's website by CoStar employees, which is not comparable to the indicators of CREXi and activity in the CREXi Sessions and CREXi Associated Sessions set forth in the Roffman Report. I further conclude that CoStar's scrape of publicly available information from CREXi's website in March and April 2020 is consistent with a limited competitive intelligence effort used only internally, not a years-long "anonymous campaign" to use the harvested data on its own platform like

---

[4] Crain Report ¶ 75.

the one employed by CREXi on LoopNet. Also, there is no evidence that CoStar used any of the scraped information to add or update property listings on LoopNet, much less scraped any photographs from CREXi.

### a. CoStar's Browsing of CREXi's Website

**CoStar's Outbound Access Logs**

11. I have reviewed the outbound access logs produced by CoStar in this case, which shows 7,097[5] records of CoStar employees' access to CREXi. This access occurred across 786 CoStar employees, between July 8, 2020 and October 5, 2020.[6] According to Mr. Crain, "over that approximately three-month period, CoStar employees accessed CREXi from CoStar's network an average of 82 times per day. Again, I am unable to evaluate CoStar's outbound logs before July 2020 because CoStar destroyed those logs."[7] My understanding is that in ordinary course, CoStar maintains outbound server logs for one year in order to comply with industry-established credit card security rules. CoStar suspended the automatic deletion of those logs in July 2021.[8] At that time, CoStar had logs dating back one year, i.e., to July 2020.[9] What Mr. Crain describes as "destruction" is more precisely described as an automatic deletion in ordinary course in compliance with relevant security standards, which is extremely common for outbound logs due to their volume and the cost of maintaining

---

[5] I removed access to email-links as defined in CoStar's Eighth Supplemental Objections And Responses to Crexi's First Set of Interrogatories (Nos. 2, 3, 4, 9, 14, 15, 16, 18) (February 13, 2024) (hereafter, *2/13/2024 CoStar's Interrogatory Responses*), No.18 and *2/13/2024 CoStar's Interrogatory Responses,* Appendix G. This "access" does not reflect access to any part of CREXi's website; rather, it reflects access to an email generated by CREXi's product without requiring that the viewer click any links within that email. Access via the CoStar network that originated from these emails is notated by "email-links.crexinc.com" or "email-links.crexi.com" in the Webpage column of Appendix G. Crain Report ¶ 78. It appears Mr. Crain included redacted records in his analysis as attributable to CoStar accessing CREXi.com. I understand from conversations with CoStar's counsel that these records are redacted due to being associated with CoStar's internal investigation into CREXi's alleged copyright infringements and are therefore removed from my analysis and quantifications.

[6] *2/13/2024 CoStar's Interrogatory Responses,* No. 18, and *2/13/2024 CoStar's Interrogatory Responses,* Appendix G. To arrive at 786, I took the distinct name and username values from the Employee field and deduplicated them. This number can be reached once you have ungrouped records with multiple employees listed in the employee field and deduplicated that list.

[7] Crain Report ¶ 78.

[8] *2/13/2024 CoStar's Interrogatory Responses,* No. 18.

[9] *Id.*

them. I also understand that in October 2020, CoStar installed a block of CREXi's website from the CoStar network.[10]

12. Mr. Crain concludes that this limited data indicates that CoStar employees were on CREXi at a volume similar to (if not greater than) the activity on LoopNet that I attribute to CREXi.[11]

13. In his analysis, Mr. Crain fails to consider that on September 25, 2020 CoStar filed this lawsuit against CREXi, which likely caused a significant increase in volume to CREXi's website from CoStar employees. In fact, the day the lawsuit was filed was the single highest volume day within the data set, with over 800 hits to CREXi by 181 employees. The next highest volume date had only 235 hits to CREXi.[12] Of these 181 CoStar employees that generated the 800 plus hits to CREXi the day this lawsuit was filed, 116 of them only ever visited CREXi on September 25, 2020, representing 480 of the total hits to CREXi's website.[13] Put simply, roughly 15% of the CoStar employees that visited CREXi, did so only on the day CoStar filed a lawsuit against CREXi, which brought publicity about the case.[14] A reasonable assumption—given that these employees did not otherwise visit crexi.com—is that these two events are related—i.e., that such employees were curious about the company CoStar had just publicly sued. If we remove this outlier day and consider the days with no CoStar traffic within the three-month period of logs, the average is closer to 70 hits per day across a company that has over 6,000 employees.[15]

14. During the three-month period, the highest number of hits to CREXi by any one employee was 75 hits spread over 16 distinct days. Similarly, the largest number of distinct days any

---

[10] *Id.*

[11] Crain Report ¶ 78.

[12] *2/13/2024 CoStar's Interrogatory Responses,* No. 18; *2/13/2024 CoStar's Interrogatory Responses,* Appendix G. There are 3 records that have multiple employee names in the employee field. I broke these out into separate records in my analysis.

[13] *2/13/2024 CoStar's Interrogatory Responses,* No. 18; *2/13/2024 CoStar's Interrogatory Responses*, Appendix G. Filtered to records where crexi.com is the webpage and accessed date is September 25, 2020.

[14] *2/13/2024 CoStar's Interrogatory Responses,* No. 18; *2/13/2024 CoStar's Interrogatory Responses*, Appendix G. There are a total of 786 distinct employee name and username combinations that accessed crexi.com website. 116/786 = .1476 ~ 15%.

[15] For the reasons mentioned above, I removed the crexi.com traffic from September 25, 2020 from my analysis and added in days with zero visits. See page 19 of the filing at: CoStar Group 2023 Form 10-K, February 22, 2024, https://investors.costargroup.com/static-files/ac43156d-e799-4559-b464-9f96b83a1c77

one CoStar employee visited CREXi is 19 days, constituting 67 hits, an average of only 3.5 times a day across those 19 days during a 90-day period. The chart below summarizes the number of distinct days a CoStar employee accessed CREXi's webpage during this three-month period and the number of CoStar employees that fall into each category of distinct days.[16]

| Days On CREXi | Employee Count |
|---|---|
| 1 | 462 |
| 2 | 150 |
| 3 | 58 |
| 4 | 40 |
| 5 | 18 |
| 6 | 20 |
| 7 | 14 |
| 8 | 5 |
| 9 | 3 |
| 10 | 7 |
| 11 | 3 |
| 12 | 1 |
| 13 | 1 |
| 14 | 1 |
| 15 | 1 |
| 16 | 1 |
| 19 | 1 |

15. I further reviewed the number of distinct days a CoStar employee accessed CREXi and determined that 90% of CoStar's employees accessed CREXi on four or less distinct days during the three-month period.[17] And as reflected in the chart above, 462 of the 786 (58.8%) CoStar employees only accessed CREXi on one single day during this three-month period, and 117 (25.3%) of those were on the day the lawsuit was filed. These facts alone indicate that the CoStar activity on CREXi is very limited and not indicative of usage as part of the normal course of business. Further, this is not consistent with the level of activity one would

---

[16] *2/13/2024 CoStar's Interrogatory Responses,* No. 18; *2/13/2024 CoStar's Interrogatory Responses*, Appendix G. Group by employee and days active. Group by the days active on CREXi and count the number of employes that were active for that number of days.

[17] I added the first four rows of the chart to get 710 of the 786, which equals 90%.

1    expect for mass manual information harvesting or mass copying of photos, i.e. the type of

2    activity exhibited by the CREXi Representatives who accessed LoopNet.

3    16. I reviewed the CREXi Representatives' activity on LoopNet identified in my CREXi

4    Associated Sessions for the same three month period from July 8, 2020 through October 6,

5    2020.[18] During this three month time-period, I determined that 21,263 sessions occurred,

6    generating 441,155 hits that accessed listings 63,227 times on LoopNet.[19] Given that there

7    was LoopNet traffic in the CREXi Associated Sessions every day during this time-period, I

8    observe that CREXi Representatives hit LoopNet on average during this time-period with

9    approximately 244 **daily sessions** consisting of 4,901 hits each day accessing listings on

10    average 702 times each day.[20] During the same three month time period, the logs indicate

11    that CREXi employees accessed LoopNet 4,901 times each day on average while CoStar

12    employees only accessed CREXi on average 70 times per day.[21] The volume of CREXi

13    activity on LoopNet is significantly more pervasive than CoStar's employees accessing

14    CREXi, 68 times more, a difference even more dramatic when considering that CREXi has

15    only 318 employees and CoStar has over 6,000 employees.[22]

16    17. Mr. Crain claims that there is "no information that would allow a direct comparison of

17    employees' activity on each platform."[23] However, CREXi's inbound web server logs, i.e.,

18    the equivalent of CoStar's LoopNet logs, would allow for such a direct comparison, based

19    on IP address matching. CREXi, however, has failed or refused to produce those logs. I

20    reserve the right to further supplement my report to the extent CREXi produces those logs.

21    18. I understand that Mr. Crain reviewed outbound access records of CoStar employees' access

22    of other competitors' platforms from the CoStar network from January 1, 2021, to June 23,

---

[18] Roffman Report. Filter table CREXi Comprehensive IP Session Details to distinct records where the sessioninfoID field contains a CREXi Associated Session for the time period July 8, 2020 through October 6, 2020.

[19] *Id.* Listings are identified in the LoopNet logs as a request starting with either "/listing/" or "/portfolio-property/."

[20] *Id.* Group the population by day and take the averages across the daily population. Bold and italics added for emphasis.

[21] *Id. 2/13/2024 CoStar's Interrogatory Responses,* No. 18; *2/13/2024 CoStar's Interrogatory Responses,* Appendix G, removing the crexi.com traffic from September 25, 2020 from the analysis as described previously in my report and adding in the days with 0 traffic.

[22] Crain Report ¶ 28; See page 19 of the filing at: CoStar Group 2023 Form 10-K, February 22, 2024, https://investors.costargroup.com/static-files/ac43156d-e799-4559-b464-9f96b83a1c77.

[23] Crain Report ¶ 78.

2021. Mr. Crain claims that the data analyzed indicates that "CoStar employees were on other competitors' platforms at a volume similar to the volume that CREXi employees were on CoStar's platform."[24] I have not analyzed this data set simply because this point is irrelevant to the allegations being discussed for this case.

**Mixpanel**

19. I have also reviewed the "Mixpanel" data produced by CREXi in this case, which purportedly reflects access on CREXi by individuals affiliated with CoStar, or from IP addresses that CoStar has identified as ones that it used, between January 6, 2016 and January 13, 2024.[25]

20. Mixpanel is "an event-based data model."[26] Mixpanel's product website further describes their products as being "an analytics tool to help you understand customer behavior so you can build better user experiences and drive higher conversions."[27] Mixpanel also supports the incorporation of ad-network data from any and all platforms, including clicks and impressions that enable performance marketing metrics.[28]

21. In fact, Mixpanel logs are designed to capture details necessary to understand an end user's experience on a website, including the use of advertising analytics that track certain user events and behaviors such as clicking on pop-ups, navigating areas or tabs of a website, and interactions with buttons, objects and modals.[29] The volume of records in the Mixpanel logs associated with a user visiting one listing page can be higher than what would be observed in the LoopNet or IIS logs.

22. Mixpanel logs are not directly comparable to the LoopNet logs. The LoopNet logs contain request logs for LoopNet data and include similar but additional data points about these

---

[24] Crain Report ¶ 79.
[25] Defendant and Counterclaimant's Supplemental Responses And Objections to Plaintiff's Interrogatories (No. 15) (February 9, 2024) (hereafter, *2/9/2024 CREXi's Interrogatory Responses*), No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.
[26] "Mixpanel," Mixpanel, accessed May 21, 2024, https://Mixpanel.com/about.
[27] "Why marketers should choose Mixpanel over Google Analytics 4 (GA4)," Mixpanel, accessed May 21, 2024, https://Mixpanel.com/blog/Mixpanel-marketing-analytics-vs-google-analytics/; "Events and Properties," Mixpanel, accessed May 21, 2024, https://docs.Mixpanel.com/docs/data-structure/events-and-properties.
[28] *Id.*
[29] *Id.*

requests that you may find in IIS Logs.[30] These logs contain session details of an end user's actions on LoopNet, but do not record the granularity of actions recorded in Mixpanel. Mixpanel provides additional details regarding the use of the website by the end user, since the purpose of this third-party product is for generating analytics to understand customers' behaviors. These two log sources differ not only in their purpose, but also in their contents. For example, the Mixpanel logs contain events that may not render additional calls for data such as "Detail - Gallery - Selection changed, " "Home Page - Tab Switched," "Intelligence Aggregate Tile Impression," "Details - Broker – Logo," and "Suggested Search – Shown" to name a few.[31] These Mixpanel records are generated when the user visits different parts of the same webpage, populating the logs with additional records when no new data is requested. For example, the event "Detail - Gallery - Selection changed" is described as "triggered when a user scrolls to a new photo in a pdp gallery" in the Mixpanel lexicon for sales listings.[32] LoopNet on the other hand may only log one record for a session that loads the webpage and allows a user to interact with several areas and download information while not generating additional hits. For example, I observed in the CREXi Sessions a CREXi Representative navigating to the LoopNet listing for "2266 W Oak St, Denton, TX 76201," a property CREXi obtained copyright protected photos from, via the CREXi internal referring website "https://api.crexi.com/assets/281536/offering-memorandum?..." on January 23, 2020.[33] Not only does this indicate that CREXi's website contained a link to LoopNet, this session only generated one hit in the LoopNet logs. There are several other sessions in the LoopNet logs where a CREXi Representative starts a session from a CREXi internal referring website and only ever generates one log to a listing page. A CREXi Representative could have screenshot photos, navigated through the listing and downloaded flyers, etc. and none of those actions would have been tracked in the LoopNet logs.

23. To further understand what kind of events and substantive actions constitute the records logged in the Mixpanel logs, I observed all user activity and events occurring across a single

---

[30] Roffman Report ¶ 37.

[31] Defendant and Counterclaimant's Supplemental Responses And Objections to Plaintiff's Interrogatories (No. 15) (February. 9, 2024) (hereafter, *2/9/2024 CREXi's Suppl. Resp. & Obj. to CoStar Interrogatory Responses*). No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix. G.

[32] See CREXI-CS-00741740 that contains the Mixpanel lexicon and event descriptions.

[33] Roffman Report. Filter table CREXi Comprehensive IP Session Details to distinct records where the sessioninfoID field contains '13524062324.'

day for several accounts on CREXi's website that CREXi attributed to CoStar. My review indicates that there are a high volume of non-substantive events tracked that inflate a CREXi website user's record count in the Mixpanel logs. For example, I reviewed all records in the Mixpanel logs from October 31, 2017 for the email account "walterf@football.com" identified as "Orchid Property Management Inc."[34] It is not clear to me why CREXi included this account as associated with CoStar, as no traffic originates from CoStar IP addresses. However, I analyzed the activity for that particular day and observed that this user generated 235 Mixpanel records across 42 tracked events viewing only three distinct property webpages from 9:48 AM to 1:10 PM.[35] Of note, this user was only active for 39 minutes during this timeframe. That is to say for every minute active, this user triggered over six records in the Mixpanel logs, even though they only visited three property webpages over 39 minutes.[36] Specifically, I observed nine records being generated within the first 45 seconds, including the first three events ("Sign In - Regular success," "General - New User Account," and "Sign Up - Regular success") happening at the exact same second. I reviewed the Mixpanel lexicon descriptions for these three events that suggest to me that a user was prompted a sign-in/sign-up modal and clicked "sign up" to register an account with CREXi. This single action of registering an account triggered the logging of these three events described in the table below.[37]

---

[34] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

[35] *Id.* Filtered to records containing walterf@football.com in the email field for October 31, 2017.

[36] *Id.* I identify a property web page by filtering the field "MP_RESERVED_CURRENT_URL" to distinct values that contain any of the following text crexi.com/property, crexi.com/properties/, crexi.com/lease/properties/, or (crexi.com/widgets/ and /properties/). I understand this will contain duplicates.

[37] CREXI-CS-00741740 was used to provide the three event descriptions.

| Event | Sales Event Description | Lease Event Description |
|---|---|---|
| General - New User Account | triggers when a new user begins to create a new account | |
| Sign Up - Regular success | triggers when user successfully creates a profile and signs up the regular way | triggers when a user successfully signs up |
| Sign In - Regular success | triggers when an account is successfully logged in, triggered after sign up modal opened | triggers when a user successfully signs in to their crexi account |

24. According to Mr. Crain, this "Mixpanel" data shows that "at least 117 CoStar-affiliated users visited CREXi on hundreds of occasions, and that their actions triggered more than 57,287 tracked events on CREXi's platform."[38] Mr. Crain does not provide any logic as to how he determined these records are attributable to CoStar. Rather, his statement appears to be based on analysis performed by CREXi.[39] There is no component of his analysis that verifies CREXi's findings. Therefore, I can only surmise what steps were taken when CREXi took efforts to identify traffic from individuals affiliated with CoStar, or from IP addresses that CoStar has identified.

25. The entire dataset of the Mixpanel logs that are identified by CREXi as being associated with CoStar contain only 8,881 unique URLs, or webpages, that were visited across the eight-year time span of January 2016 through January 13, 2024.[40] Of these 8,881 webpages visited, there are only 5,330 distinct property URLs that account for a total of 25,730 records in the Mixpanel logs.[41] By comparison, the LoopNet logs filtered to the CREXi Associated Sessions that I discussed in the Roffman Report contain 1,610,954 hits to listing pages, which consists of 879,577 distinct listing web URLs.[42] See below a chart of the top 10 unique webpages visited from the Mixpanel logs that account for 22% of all records in the

---

[38] Crain Report ¶ 80.
[39] *2/9/2024 CREXi's Interrogatory Responses*, No. 15.
[40] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.
[41] *Id.* I determined a property URL in the provided Mixpanel logs as a URL that contained the following: "crexi.com/property," "crexi.com/properties/," "crexi.com/lease/properties/," "crexi.com/widgets/%/properties/."
[42] Roffman Report ¶ 115. Filter to CREXi Associated Sessions and dedupe for distinct listing pages and sum the hits to those listing pages.

Mixpanel logs that CREXi attributed to CoStar employees. Of note, none of these webpages are ones that I determine to be property listing webpages.[43] As shown below 7,268 (12%) of all records in the Mixpanel logs occur on the single URL for CREXi's landing page "https://www.crexi.com/."[44]

| Webpage Visited | Mixpanel Records |
|---|---|
| https://www.crexi.com/ | 7,268 |
| https://www.crexi.com/properties | 1,963 |
| https://www.crexi.com/comps | 788 |
| https://www.crexi.com/dashboard/buy | 614 |
| https://www.crexi.com/properties?tradingStatuses[]=Auction | 381 |
| https://www.crexi.com/dashboard/profile | 373 |
| https://www.crexi.com/dashboard/messages | 347 |
| https://www.crexi.com/broker-plans | 340 |
| https://www.crexi.com/404 | 329 |
| https://www.crexi.com/add-properties | 295 |
| Total Records | **12,698** |

26. Additionally, 383 distinct URLs in the Mixpanel logs reflect CREXi account profile pages or user dashboard profile pages, and those URLs account for 1,656 records in the Mixpanel logs.[45] There are several other non-property related CREXi webpages contained in the Mixpanel logs that make up a significant volume of the activity. Even if every page that was visited in the Mixpanel logs were attributable to CoStar employees, which it is not as I describe below, it would still not represent a comparable magnitude of access to CREXi's access of LoopNet.

27. When analyzing the tracked events, timestamps, email addresses, first and last names, and other data points in the Mixpanel logs, I identified several instances where Mixpanel records contain activity that is non-substantive or not attributable to CoStar.

---

[43] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G. Group on MP_RESERVED_CURRENT_URL.
[44] *Id.*
[45] *Id.* Where field MP_RESERVED_CURRENT_URL contains "https://www.crexi.com/dashboard/profile," "https://www.crexi.com/profile," or "https://www.crexi.com/lease/dashboard/profile."

**Reason 1: Mixpanel logs contain traffic that is not attributable to CoStar employees**

28. When attempting to validate the 57,287 tracked events, I first checked to see if IP addresses associated with CREXi traffic could be attributable to CoStar IP address ranges or employee email addresses. I identified that 39,122 event records occurred from either CoStar IP addresses or CoStar email addresses.[46] I note that using IP addresses and accounts associated with CoStar domains is consistent with how I attributed LoopNet activity to CREXi in the Roffman Report. While I generally agree with this methodology,[47] it is unclear to me how Mr. Crain attributed the remaining 18,165 records that do not contain CoStar email addresses nor originate from CoStar IP addresses.

29. I began researching the first name, last name, email address, and contact phone numbers for the users accessing CREXi on personal or non-CoStar related accounts and non-CoStar IP addresses in the Mixpanel logs. I observed an account tied to a user named Cameron George with the email address "csgeorge23@gmail.com." This email address is attributed to 2,410 Mixpanel records across the timespan of August 25, 2017 through October 20, 2023.[48] I identified a Cameron George that worked at CoStar as a Senior Research Associate from August 2017 through November 2019 and currently works at CWCaptial as a Senior Associate.[49] CWCapital is a "commercial real estate services company powered by data analytics and technology."[50] CREXi attributes 2,325 of the 2,410 records from Cameron George occurring in 2020 or after to CoStar, while he was only employed at CoStar until 2019.[51]

---

[46] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G. Filtered to only records that contain known, CoStar, or Ten-X email address domains "costar.com," "costargroup.com," or "ten-x.com," or who accessed CREXi from a CoStar IP address listed in CoStar's First Supplemental Objections and Responses to Crexi's First Set of Interrogatories (March 9, 2022) (hereafter, *3/9/2022 CoStar's Interrogatory Responses*), Appendix H.1.

[47] As I explain below, I would have considered the time frame in which CoStar acquired Ten-X to understand attribution to CoStar from those user accounts and office IP addresses.

[48] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

[49] "Cameron George," LinkedIn, accessed May 21, 2024, https://www.linkedin.com/in/cameron-george-9b143122/.

[50] "About CWCaptial," CWCaptital, accessed May 21, 2024, https://www.cwcapital.com/cwcapital/.

[51] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

30. I note that Mr. Crain criticized my report for not timeboxing my analysis and for including accounts that potentially could have belonged to others outside of CREXi. However, Mr. Crain appears to have used a similar methodology to mine when it comes to Mixpanel.

31. In another example, Mr. Crain did not consider the fact that CoStar acquired Ten-X in June 2020.[52] Mr. Crain attributed 53 records in the Mixpanel logs from the email address for Bill Wang "bill.wang@gmail.com" to CoStar.[53] I searched the internet for any sign of a Bill Wang working at Costar or Ten-X and observed that a Bill Wang worked at Ten-X from October 2015 to December 2017, prior to Ten-X being acquired by CoStar.[54] This shows that even if the personal Gmail account of bill.wang@gmail.com belonged to the Bill Wang that worked at Ten-X, it would not have been attributable to CoStar due to the timing of the acquisition.

32. Understanding that CoStar did not acquire Ten-X until June of 2020, I determined that of the 15 "@ten-x.com" accounts attributed to CoStar that make up 1,501 records in the Mixpanel logs, only five accessed CREXi on or after June 1, 2020, for a total of only 129 of the 1,501 records in the Mixpanel logs.[55] Put simply, at least 1,372 Mixpanel records from "@ten-x.com" users cannot be attributed to CoStar.[56] A similar analysis on Ten-X Office IP addresses identified that 415 records occurred before June 1, 2020, indicating that these records also cannot be attributed to Costar.[57]

33. I also observed other examples of Mixpanel activity that do not seem consistent with my understanding of CoStar accessing CREXi's website. For example, I observed 134 records

---

[52] "CoStar Group Closes Acquisition of Digital Auction Platform Ten-X Commercial," CoStar, accessed May 22, 2024, https://www.costar.com/article/1060610145/costar-group-closes-acquisition-of-digital-auction-platform-ten-x-commercial.

[53] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

[54] "Bill Wang," LinkedIn, accessed May 21, 2024, https://www.linkedin.com/in/ibillwang/.

[55] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

[56] User rgarrec@ten-x.com has activity from CoStar IP 50.209.184.193 in 2019, however CoStar identifies this IP address as added on December 30, 2020 as a Ten-X office.

[57] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G. Filtered data set to contain hits prior to June 1, 2020 where the IP address belonged to the following Ten-X office ranges: 4.71.107.224/28, 65.115.111.0/24, 50.205.153.176/29, 65.242.173.120/29, 184.74.198.32/29, 50.209.184.192/29, 3.133.167.128/25, 34.223.80.0/25.

relating to the URL https://www.crexi.com/build-listing.[58] I navigated to this page and observed that this page is designed to add listings to CREXi. I would not expect a CoStar employee would be adding listings to CREXi. See below for the screenshot of this page:



34. I further reviewed the three users that had visited the https://www.crexi.com/build-listing/ page and observed these users accessing other pages that appeared to be broker tools or other webpages for their listings on CREXi. I reviewed the tracked event names and lexicon descriptions, category, and URLs visited in the Mixpanel logs and determined that at least 92 tracked events present in the logs were associated with adding, managing, editing, or accessing listings that the user account was **hosting** on CREXi.[59] See Appendix C for a list of the 92 tracked events identified. I reviewed the users who had accessed CREXi via these events and observed 145 records for these events occurring on the

---

[58] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

[59] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

"boverman@slnusbaum.com" account.[60] Based on research performed, I conclude that this is not a CoStar employee but rather an employee of S.L. Nusbaum Realty Co. for over 14 years.[61] This account alone represents 1,075 records in the Mixpanel logs that CREXi has attributed to CoStar employees.

35. The above are just examples observed in the Mixpanel data and do not represent a complete set of accounts and records that are not attributable to CoStar employees accessing CREXi. Put together, Mr. Crain has failed to identify and remove non-CoStar employee related activity in the Mixpanel logs.

### Reason 2: Mixpanel logs indicate that navigation to CREXi originated from online advertising campaigns to the user

36. Mr. Crain further references deposition testimony in which four current and former CoStar employees "admit and describe their use of CREXi in the ordinary course of business."[62] He omits testimony from those same employees, however, admitting that such use was rare, in violation of CoStar's corporate policy, and – with respect to the lower-level employees – not shared with their supervisors.[63] This stands in contrast to CREXi's policy, described in the Roffman Report, of building a listing from a LoopNet flyer or accessing the listing

---

[60] *Id.*

[61] "Overman Joins S.L Nusbaum," CoStar, accessed May 23, 2024, https://www.costar.com/article/88497/overman-joins-sl-nusbaum; "Bill Overman, Multifamily Development/Investment Sales," LinkedIn, accessed May 21, 2024, https://www.linkedin.com/in/bill-overman-multifamily-development-investment-sales-7b7b0118/; "Bill Overman, CCIM," S.L. Nusbaum Realty Co., accessed May 21, 2024, https://slnusbaum.com/employee/bill-overman/

[62] Crain Report ¶ 83.

[63] Adrianna Carpenter testified that using the CREXi website "wouldn't have been [a CoStar researcher's] first choice or even your second or even your third[.]" Deposition of Adrianna Carpenter (November 20, 2023) (hereafter, *11/20/2023 Carpenter Deposition)* p. 98:5-10. Nathan Seeto testified that he only ever used CREXi to cross-reference listing information "infrequently." Deposition of Nathan Seeto (December 8, 2023) (hereafter, *12/8/2023 Seeto Deposition*) p. 50:14-20. Carpenter also admitted that during training, she was provided a printed copy of the CoStar Code of Conduct which she read and signed. *11/20/2023 Carpenter Deposition* pp. 177:6-178:3. She acknowledged that the Code contains a section on "CoStar's policy to respect the intellectual property rights of others" and that it prohibits researchers from making changes to listings without "conducting independent research[.]" *11/20/2023 Carpenter Deposition* p. 174:1-11; *11/20/2023 Carpenter Deposition* p.175:2-6. Victoria Quade testified that she had been to CREXi's website, but never for cross-referencing listing information. Deposition of Victoria Quade (February 7, 2024) (hereafter, *2/7/2024 Quade Deposition*) p. 99:12-15.

Docusign Envelope ID: 82F6E277-86D8-49B-B322-DB9214E06BA0

directly on LoopNet, if LoopNet was the only source of information.[64] Furthermore, almost 1/3 of the traffic in the Mixpanel logs occur from the user being successfully targeted for advertisements or emails to come to CREXi. A CoStar employee who navigates to a site via clicks from an advertisement, to me, would not be considered access in the ordinary course of their business.

37. I observed several instances of CoStar employee activity originating from email campaigns or advertisements. As noted above and described by CREXi, marketing channels associated with the records can be identified by "if the UTM_Medium_Last_Touch contains a specific marketing channel (e.g. pay-per-click—"ppc"—or adwords), this suggests the visitor accessed CREXi by clicking on a CREXi email campaign or ad."[65] Understanding this, I aggregated the traffic to understand who may have been lured to CREXi's website by an advertisement. My observation is that there is a specific marketing channel listed for 18,412 Mixpanel records. This suggests that over 32% of the records in the Mixpanel logs that CREXi attributes to CoStar are due to the user receiving an email campaign or advertisement that led them to CREXi. See below a chart of the Marketing Channels:[66]

| Category_UTM Last Touch | Mixpanel Records |
|---|---|
| No Marketing Channel | 38,875 |
| Ppc | 6,601 |
| Adwords | 4,307 |
| email | 3,661 |
| Other Channel | 2,744 |
| paidsearch | 1,099 |

**Reason 3: Mixpanel Logs Record Non-Substantive Events Likely Triggered by Automation or a Trivial User Action**

38. Mr. Crain criticized the Roffman Report stating that "he relies on 'hits,' 'requests,' and 'records' that do not necessarily indicate any user activity whatsoever. He counts activity even when the user received an error message or was denied access to CoStar's website. He

---

[64] Roffman Report ¶ 21(citing Deposition of Lawson Dees Corporate Designee (February 14, 2024) (hereafter, *2/14/2024 Dees Corporate Designee Deposition*) pp. 175:23-176:8).

[65] *2/9/2024 CREXi's Interrogatory Responses*, No. 15, p. 20.

[66] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G. I aggregated any value that was not "PPC," "adwords," "Email," or "paidsearch" into a category called "Other Channel" to simplify the chart.

counts activity when the user merely accessed LoopNet's public-facing homepage, without accessing any other pages. He counts activity when the user accessed third-party websites containing a 'widget' that independently called CoStar without any apparent user input."[67] However, Mr. Crain's reliance on the Mixpanel logs produces the same results.

39. I performed a review of the tracked events in Mixpanel to understand what user actions or website functionality was being recorded in the logs. I determined there are a total of 844 tracked events contained in the Mixpanel logs that CREXi attributes to CoStar.[68]

40. In reviewing the number of records associated with each event in aggregate, I observed that the sixth highest volume event out of all 844 types of tracked events is identified as "GTM-Identity Set".[69] I understand GTM to stand for Google Tag Manager and is defined by Google as "a tag management system (TMS) that allows you to quickly and easily update measurement codes and related code fragments collectively known as tags on your website or mobile app."[70] I further observed the event "GTM - Updated Gtm Data Layer" as the 21st highest volume event. These two events alone make up 2,125 records in the Mixpanel logs and appear to be related to code fragments, or tags on the website, indicating that these records are likely generated by automation.[71] After receiving the Mixpanel lexicon, I understand that "GTM-Identity Set" is described as "triggers every time a user refreshes their page" and "triggers when user successfully logins into their account and triggers their profile and their preferences."[72] This confirms that there are automated events triggered by other events, such as a "Sign In - Regular success" and the occurrence of the triggered "GTM-Identity Set" action.[73]

41. Another event that I observed in the Mixpanel logs was "Auctions - Connection Error," which accounted for 345 records that I surmise were generated due to a connection error rather than a user driven activity or action, which as previously mentioned, Mr. Crain

---

[67] Crain Report ¶ 43.
[68] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.
[69] *Id.*
[70] "Tag Manager Overview," Google, accessed May 21, 2024, https://support.google.com/tagmanager/answer/6102821?hl=en.
[71] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.
[72] CREXI-CS-00741740.
[73] *Id.*

criticizes the inclusion of in the Roffman Report.[74] This event was not described in the Mixpanel lexicon.[75]

42. The event with the highest number of records is the "Page Viewed" event that simply means a page was viewed.[76] The Mixpanel lexicon describes this event as "triggered on every page loaded."[77] This event occurred 15,141 times in the Mixpanel logs, 6,799 of which were to property listing URLs.[78] Even if I agreed that all of the Mixpanel logs are attributable to CoStar employees, which they are not, this would indicate that listing pages were viewed on average less than 3 times per day by any CoStar employees across the eight-year time-period of January 6, 2016 through January 13, 2024.[79]

43. Another set of events I observed were related to a third-party integration into the website called Appcues. Appcues allows for websites to create in app experiences such as quick start and how to pop-ups and flows, survey prompts and onboarding processes for new users.[80] Put another way, CREXi could prompt a user who is filling out a form to remember to fill in a required field – this prompting action was not the result of any data request by the end user. Yet Mr. Crain counted over 500 Appcues records in the Mixpanel logs.

44. I understand the Mixpanel log contains activity related to accessing CREXi's platform. However, upon further review of the Mixpanel records, I observed 298 records that contain no URL or website visited.[81] To better understand this activity, I reviewed those 298 records and aggregated the tracked events. Below is a chart showing the count of this per platform and event.

---

[74] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G. Crain Report ¶ 43.

[75] CREXI-CS-00741740.

[76] "Events and Properties," Mixpanel, accessed May 21, 2024, https://docs.Mixpanel.com/docs/data-structure/events-and-properties

[77] CREXI-CS-00741740.

[78] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

[79] *Id.* 6,799 requests in the Mixpanel logs divided by 2,929 days between January 6, 2016 and January 13, 2024.

[80] "How it works," Appcues, accessed May 21, 2024, https://www.appcues.com/how-it-works; "User Onboarding Software," Appcues, May 21, 2024, https://www.appcues.com/use-case/user-onboarding-software.

[81] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

Docusign Envelope ID: 83F6E277-8608-449D-B322-DB9214E96BA0

| Platform | Event | Mixpanel Records |
|----------|-------|------------------|
| Sale | emailOpen | 66 |
| Sale | emailSend | 172 |
| Sale | emailSubscribe | 33 |
| Sale | inAppSend | 25 |
| Sale | pushSend | 2 |

45. The chart above indicates that there may be email related activity for these CREXi users that are being tracked in the Mixpanel logs outside of CREXi.com as there is no webpage or URL associated with these requests. I searched the Mixpanel lexicon and observed the "pushSend" is described as "When a push notification is sent to a user," confirming that non-substantive events, such as push notifications are tracked in Mixpanel.[82] None of the other events in the chart above contained an event description in the provided Mixpanel lexicon.

46. I asked CoStar's Counsel to request descriptions of all of the events in the Mixpanel logs in order to get a better understanding of the events. As of the date of the amended report, CREXi has produced the lexicon from their Mixpanel platform. Unfortunately, the provided lexicon did not contain information on 679 out of the 844 tracked events in the provided Mixpanel logs and did not provide much clarity on events that contain a description. Therefore, there are likely other automated, third-party activities, or single user actions that trigger multiple log entry records in this data set that I have not quantified.

47. Another observation was the presence of potential third-party site widgets that link to CREXi, which as previously mentioned, Mr. Crain criticized the Roffman Report for.[83] There are 2,348 records in the Mixpanel logs that contain the word widget in the URL.[84] I reviewed these records and observed events such as 'Page Viewed" and "Placer_AI_Widget_Loaded," among other events. I navigated to some of the URLs for the widgets and observed a blank page that contained a map and a set of listings that all had the same logo for a realty group or brokerage. For example, I visited the URL "https://www.crexi.com/widgets/75/properties/185000" that was observed in the Mixpanel

---

[82] CREXI-CS-00741740.

[83] Crain Report ¶ 43.

[84] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G.

logs. This URL appears to contain just a specific property listing for Nichols Land & Investment. I then visited just the widget webpage at "https://www.crexi.com/widgets/75" and observed 11 properties for Nichols Land & Property. This indicates that the widgets being loaded and viewed could be triggered when loading on the broker's website or a third-party website, not CREXi's website.

**Reason 4: Mixpanel Logs Inflate the Quantification of User Access**

48. While reviewing the tracked event aggregate details, one observation I quickly made was that the top two high volume events ("Page Viewed" and "Property Detail View") account for 21,464 records combined in the Mixpanel logs.[85] The two events occur at the exact same timestamp for a given user and URL webpage 3,868 times.[86] This indicates to me that one user action may trigger multiple records to be logged in the Mixpanel logs. These events are respectfully described as "triggered on every page loaded" and "triggered when user clicks on a specific property."[87] This further confirms there are multiple tracked events in the logs that are generated by a single user action, such as clicking on a property link that loads a property page. To understand the scope of this potentially automated or multi event triggered logging, I analyzed timestamps that had two or more event records for a given user and URL.

49. I aggregated all records by the URL and timestamp of occurrence for each user and determined there are only 43,064 instances of a user logging a unique URL and timestamp, to the seconds, out of the total 57,287 records in the Mixpanel logs.[88] Put simply, there are 14,222 records in the tracked events that occur at the same exact time as at least one other tracked event for a given user. This indicates that almost 25% of the records in the Mixpanel logs occur at the exact same time a separate tracked event was triggered for that user on a CREXi URL.

50. I next analyzed the events surrounding timestamps in which multiple events occurred. When reviewing the events that occur at the same exact time for a user, I observed 349 of the 844

---

[85] *Id.*

[86] *Id.*

[87] CREXI-CS-00741740.

[88] *2/9/2024 CREXi's Interrogatory Responses* No. 15, and *2/9/2024 CREXi's Interrogatory Responses* Appendix G. Dedupe across first name, last name, email, URL, and timestamp.

total tracked events occur at the exact same timestamp for the same user and webpage as another event that was being logged for that user and webpage, inflating Mr. Crain's quantification.[89] This means that 41% of the tracked events in Mixpanel occur at the exact same time as another tracked event occurred for a given user and webpage.[90]

51. I analyzed one user's activity on October 14, 2019 that generated 411 records in the Mixpanel logs.[91] When I looked at the distinct timestamps and URL, the number of records dropped to 269. This activity generated 411 records across 22 unique events. The user, scottboddicker@gmail.com, exemplifies the inflation in Mixpanel log activity. The user simply arrived at crexi.com, performed searches for Texas based properties and viewed some of the resulting property listings. I observed the term "adwords" associated with these records, which I understand reveals the user navigated to CREXi from clicking on an email campaign or advertisement with links to CREXi's website.[92] See below a snippet of the activity for the scottboddicker@gmail.com user on October 14, 2019 for only a ten second time-period where 18 Mixpanel events are tracked across 4 webpage URLs.

---

[89] *2/9/2024 CREXi's Interrogatory Responses* No. 15, and *2/9/2024 CREXi's Interrogatory Responses* Appendix G.

[90] 349/844 = .4135.

[91] *2/9/2024 CREXi's Interrogatory Responses* No. 15, and *2/9/2024 CREXi's Interrogatory Responses* Appendix G. Filtered to October 14, 2019 for the email "scottboddicker@gmail.com."

[92] *2/9/2024 CREXi's Interrogatory Responses*, No. 15; *2/9/2024 CREXi's Interrogatory Responses*, Appendix G as "Specific marketing channels: if the UTM_Medium_Last_Touch contains a specific marketing channel (e.g. pay-per-click—"ppc"—or adwords), this suggests the visitor accessed CREXi by clicking on a CREXi email campaign or ad."

| Time | Mixpanel Records | WebPage URL | Events Occurring at Time |
|------|------------------|-------------|--------------------------|
| 9:32:24 AM | 1 | https://www.crexi.com/properties?cities[]=San Antonio, TX&page=4 | Aggregate - Property |
| 9:32:24 AM | 3 | https://www.crexi.com/properties/204963/texas-1114-w-commerce-st | GTM - Identity Set; Logged In Property Detail View; Property Detail View |
| 9:32:25 AM | 1 | https://www.crexi.com/properties/201359/texas-classen-road-convenience--gas-store | Page Viewed |
| 9:32:26 AM | 3 | https://www.crexi.com/properties/201359/texas-classen-road-convenience--gas-store | GTM - Identity Set; Logged In Property Detail View; Property Detail View |
| 9:32:30 AM | 1 | https://www.crexi.com/properties?cities[]=San Antonio, TX&page=4 | Aggregate - Property |
| 9:32:31 AM | 2 | https://www.crexi.com/properties/175539/texas-walgreens---4351-thousand-oaks-dr | Page Viewed; Property Detail View |
| 9:32:32 AM | 1 | https://www.crexi.com/properties?cities[]=San Antonio, TX&page=4 | Aggregate - Property |
| 9:32:32 AM | 2 | https://www.crexi.com/properties/175539/texas-walgreens---4351-thousand-oaks-dr | GTM - Identity Set; Logged In Property Detail View |
| 9:32:33 AM | 3 | https://www.crexi.com/properties/135358/texas-old-chicago-warehouse-office-building | Logged In Property Detail View; Page Viewed; Property Detail View |
| 9:32:34 AM | 1 | https://www.crexi.com/properties/135358/texas-old-chicago-warehouse-office-building | GTM - Identity Set |

52. In reviewing user events that occurred at the same exact time, I also observed other instances of one action being logged seconds after others that are likely related. You can see this example in the above chart in the last two records occurring at 9:32:33 AM and 9:32:34 AM for the "https://www.crexi.com/properties/135358/texas-old-chicago-warehouse-office-building" URL as the event "GTM- Identity Set" is likely automated and generated when the user viewed this page via the "Page Viewed" event.

53. Mr. Crain's report stated that "Joseph Albrecht, the interim President of LoopNet, accessed CREXi on numerous occasions using the fake name Dean Thompson and the email

Juicy360@gmail.com and downloaded flyers on multiple occasions."[93] I reviewed the activity for Juicy360@gmail.com to understand what numerous occasions of access exist in the Mixpanel logs. I observed only nine days of activity and only one day of more than six active minutes on the website.[94] During these nine days of activity, Mr. Albrecht was only active for a total of 86 minutes and viewed four distinct properties. During this time period Mr. Albrecht downloaded property flyers for three of the four properties visited. I would hardly classify the downloading of three flyers as "downloading flyers from CREXi on numerous occasions." Of note, the last two days of activity did not have a CREXi related URL and were only identified with an Event of "emailSend." Even after receiving the Mixpanel lexicon, I cannot determine what triggered this "emailSend" event because CREXi has failed to include this event description in its Mixpanel lexicon, which provides CREXi's self-written definitions for events.[95] See below for a summary of Mr. Albrecht's activity.

| Email | Date Visited | Active Minutes | Distinct Time-stamps | Total Records | Properties Visited | Downloaded Fliers |
|---|---|---|---|---|---|---|
| juicy360@gmail.com | 11/12/2019 | 4 | 36 | 53 | 1 | 1 |
| juicy360@gmail.com | 5/13/2020 | 68 | 200 | 275 | 3 | 2 |
| juicy360@gmail.com | 5/14/2020 | 6 | 15 | 19 | 0 | 0 |
| juicy360@gmail.com | 5/15/2020 | 2 | 7 | 10 | 0 | 0 |
| juicy360@gmail.com | 5/16/2020 | 2 | 11 | 17 | 0 | 0 |
| juicy360@gmail.com | 5/18/2020 | 1 | 2 | 3 | 0 | 0 |
| juicy360@gmail.com | 5/21/2020 | 1 | 2 | 3 | 0 | 0 |
| juicy360@gmail.com | 3/28/2022 | 1 | 1 | 1 | 0 | 0 |
| juicy360@gmail.com | 4/7/2022 | 1 | 1 | 1 | 0 | 0 |

54. The above examples show that several events are triggered for a user at the exact same time when the user visited CREXi. Thus, Mr. Crain's count attributing 57,287 events on CREXi to CoStar overstates how many CREXi webpages were actually viewed. It is also likely that records occurring at a nearby timestamp could have occurred from the same user event that occurred a few seconds before the nearby timestamp's other logged events.

---

[93] Crain Report ¶ 73.
[94] *2/9/2024 CREXi's Interrogatory Responses* No. 15, and *2/9/2024 CREXi's Interrogatory Responses* Appendix G.
[95] CREXI-CS-00741740.

55. Further support of Mixpanel's ability to log multiple events for a single action was found in CREXi's Mixpanel lexicon descriptions. For example, the Mixpanel events "Details - OM Clicked" and "General - OM Downloaded" are both described as "triggers when user clicks on Download OM on a listing" indicating that the "trigger" for both events is the same.[96]

56. In sum, the CoStar activity on CREXi is qualitatively and quantitatively different than CREXi's access to CoStar's LoopNet website. The activity from CoStar employees on CREXi's website is de minimis compared to that of CREXi's access to LoopNet. Most of the activity observed in the CoStar logs indicate only a single day of usage by the employee and the highest number of visitors was on the day CoStar filed suit against CREXi. The Mixpanel logs CREXi used to attribute activity to CoStar include non-CoStar related user activity and significantly overstate the volume of visits to CREXi webpages and properties by using user advertising analytics tracking data, clicks, and automation events in their aggregations. There are no indications of listing photographs being copied or taken. In fact, if I look at all of the Mixpanel logs CREXi attributes to CoStar, there are only 8,881 distinct webpages viewed, consisting of 5,330 distinct properties over an eight-year period.[97] CREXi's activity on LoopNet is pervasive and includes visits to over 879,577 distinct properties over the eight-year period. Put simply, CoStar, an organization that is roughly 16 times the size of CREXi, visited less than 1% of the number of property listings that CREXi visited over an eight-year period of time. During that eight-year period of time, CREXi grew through an expansion campaign that included taking copyright protected photographs from LoopNet listings, which is the subject of this litigation.

**b. CoStar's Scrape of CREXi**

57. While I did not consider this data for the Roffman Report, as it was not in scope, Mr. Crain heavily discussed the scrape carried out by CoStar on CREXi. Mr. Crain opines that CoStar engaged in a "massive scraping campaign against CREXi in 2020,"[98] which resulted in CoStar "scraping 70 million pieces of data from CREXi."[99] Mr. Crain further concludes that

---

[96] *Id.*

[97] *2/9/2024 CREXi's Interrogatory Responses* No. 15, and *2/9/2024 CREXi's Interrogatory Responses* Appendix G.

[98] Crain Report ¶ 85.

[99] Crain Report ¶ 89, Crain Exhibit S.

"CoStar took far more data from CREXi, by many orders of magnitude, than Mr. Roffman asserts CREXi ever took from CoStar,"[100] and that CoStar's access of CREXi was "more surreptitious" than what CoStar accuses CREXi of doing.[101] These opinions rely on inflated counts and overstate CoStar's actions. CoStar's scrape collected publicly available information from CREXi's website on two dates in March and April 2020. The evidence I have reviewed is consistent with this scrape being a limited competitive intelligence effort collecting data used only for internal comparisons, not a years-long "anonymous campaign" like the one employed by CREXi on LoopNet which collected data for the purpose of uploading that data to CREXi's own competing platform. There is no evidence in the record that the information CoStar scraped from CREXi was used to update property listings on LoopNet, though there is ample evidence that CREXi uploaded the data and photographs that it scraped from LoopNet to its own platform.

58. To start, Mr. Crain opines that web scraping "involves the use of an automated process to extract content and data from a website."[102] That definition of "web scraping," however, is too narrow. Web scraping, more broadly, is extracting data from any website and can be done automatically with the use of script or code, or manually by human beings.[103] Indeed, the CREXi Representatives' access to LoopNet described in the Roffman Report is a form of manual "web scraping." The information CREXi Representatives scraped from LoopNet was tracked and targeted according to Mr. Crain's Report, stating that CREXi's BPOs' listing-related work was performed "from 'tickets' posted in CREXi's Salesforce.com platform."[104] While this is not a set of code or automation, it is a programmatic, more targeted scrape, that when spread out over time and performed manually is quite surreptitious. I asked CoStar's counsel for all Salesforce tickets related to CREXi's scrape of CoStar, but my understanding is that CREXi has not produced all such tickets or conducted a comprehensive search of Salesforce in this litigation.

59. According to CoStar's designated 30(b)(6) witness, in March 2020, members of CoStar's Research Department approached CoStar's Research Data Management team to explore the

---

[100] Crain Report ¶ 92.
[101] Crain Report ¶ 76.
[102] Crain Report ¶ 85.
[103] "Web Scraping Techniques: How to Scrape Data from the Internet," ParseHub, accessed May 21, 2024, https://www.parsehub.com/blog/web-scraping-techniques/.
[104] CREXI-CS-00125680 ¶ 5; Crain Report ¶ 66.

possibility of doing a competitive analysis of CREXi's listings to (1) determine if CREXi's marketing claims that it had all the listings in certain markets was correct; and (2) test feedback that CoStar's sales representatives were hearing from brokers, that brokers were only listed on CREXi and not on CoStar.[105] In order to evaluate whether it was possible to do that competitive analysis by scraping CREXi's website, one of CoStar's software engineers performed a "test" scrape of CREXi, by accessing CREXi's API.

60. An API, or Application Programming Interface, "is a set of rules or protocols that enables software applications to communicate with each other to exchange data, features and functionality."[106] I understand through conversations with CoStar's software engineer that in order to gain access to CREXi's API, CoStar navigated to CREXi's website, inspected the network traffic in Google Chrome while browsing through listings, and discovered a URL request that returned text-based data about the listing in json format. This URL request was different for listings that were for sale, "https://api.crexi.com/assets/," versus those that were for lease, "https://api-lease.crexi.com/assets/."[107] These requests were entirely public facing, as were the results displayed from them. You do not need a username and password, or a token of any kind in order to make the requests, as this is a public facing API and can be seen upon inspecting the network traffic associated with requests on CREXi's public website. Once this was determined, CoStar's software engineer wrote a script to extract the data returned from those requests on CREXi's website and output the data to a csv file. I understand from a conversation with this software engineer that he utilized a service called ProxyMesh when running the scripts because it is a standard practice within the company. ProxyMesh is a service that allows for use of rotating IP addresses.[108] I understand that CoStar's engineer manually set his computer's proxy to only one of the provided proxy servers, which means that his computer could have reflected up to two different IP addresses in a given day.

---

[105] Deposition of Brad McGetrick (March 26, 2024) (hereafter, *3/26/2024 McGetrick Deposition*), p. 21:1-8.
[106] "What is an API (application programming interface)?" IBM, accessed May 21, 2024, https://www.ibm.com/topics/api.
[107] Conversation with CoStar employee Zachary Carter on May 22, 2024.
[108] "Rotating Anonymous HTTP Proxy Servers," ProxyMesh, accessed May 21, 2024, https://proxymesh.com/.

61. When writing a script, it is standard to test the script's efficacy throughout the process, ensuring the script works as intended and produces the desired outcome. According to CoStar's software engineer, the testing on his scripts occurred on March 19, 2020 and March 20, 2020. The "test" scrape resulted in three output csv files. Based on a conversation I had with CoStar's software engineer, I understand that the software engineer did not share the output files from this "test" scrape to anyone in CoStar's Marketing or Research department and was never used.

62. Accordingly, on March 22-23, CoStar's software engineer performed a scrape of CREXi's website. CoStar scraped approximately 300,000 listings from CREXi's platform. For each listing, CoStar scraped 60-70 unique categories of information, including the first broker's contact information.[109]

63. To determine whether this information was publicly available on CREXi's website, I asked my team to go to CREXi's website. Once there, my team searched for lease properties and sales properties separately, clicked one of the returned results for both, reviewed the network traffic associated with the presented webpage, and identified requests that appeared to be similar to the columns in the csv files from 2020. I then reviewed the results.

64. Based on these results, I determined that all of the columns in the csv files were returned from my testing of CREXI's APIs except for ten fields that are missing, including broker phone and broker email.[110] My understanding is that CREXi's API, at the time of the scrape in 2020, made these fields publicly available,[111] and that these fields were not protected by authentication or other means to restrict the information from public accessibility, as was demonstrated by a third party more recently than when CoStar scraped CREXi's website.[112]

---

[109] *3/26/2024 McGetrick Deposition*, Exhibit 567 (CoStar00411080).

[110] The ten fields from the output CSVs from CoStar's scrape on CREXi that I was unable to find in the current API's on CREXi's website are: broker_email, broker_index, broker_phone, buildings, lease_expiration, lease_options, nth_broker, office_available, permitted_zoning, and remaining_term. The rest were found in the network traffic from at least one of the following URLs: https://www.crexi.com/properties/1522069/south-carolina-4.6-acre-lot-off-geer-hwy; https://www.crexi.com/properties/1542372/wisconsin-3830-s-moorland-rd; https://www.crexi.com/lease/properties/475087/wisconsin-shops-at-highland-plaza; https://www.crexi.com/lease/properties/543316/colorado-eckhart-elementary-school.

[111] During my conversation with the CoStar software engineer who performed the scrape, he noted that there was no authentication needed and that the APIs used, and data returned, were publicly available.

[112] See "How I reverse engineered an API (crexi) and found all their brokers phone numbers," X, accessed August 06, 2024, https://x.com/adrian_horning_/status/1696639360748147129.

65. Based on these results, I was able to determine that the scraped information was publicly available on CREXi's website. Further, I reviewed the contents of CREXi's historical robots.txt file, a file on a website that restricts web crawlers and search engine indexers from accessing parts of their website.[113] As of March 17, 2020 and on April 8, 2020, there was no indication in the robots.txt file that CREXi disallowed any access to its API or website pages.[114] In other words, CREXi did not indicate to programmatic visitors, such as web crawlers, that they should not access CREXi's API or cache the data on its website.

66. I specifically reviewed the following 3 fields, which were discussed in the deposition of CoStar's designated 30(b)(6) witness: "PRO Subscription", "yearly rate", and "monthly rate", and determined the following: "PRO Subscription" is a field regarding the broker specifically, not the listing, and is publicly visible on CREXi's website next to the broker's name via a blue icon that says "pro." Upon viewing the network traffic associated with a specific listing, this field has the name of "hasProSubscription" with a value of either true or false. See below for a screenshot of this on CREXI's website and in the response body of the request from the network traffic.



---

113 "Introduction to robots.txt," Google, accessed May 21, 2024, https://developers.google.com/search/docs/crawling-indexing/robots/intro.

114 "Robots.txt," CREXi, March 17, 2020, https://web.archive.org/web/20200317154941/https://www.crexi.com/robots.txt; "Robots.txt," CREXi, April 8, 2020, https://web.archive.org/web/20200408174440/https://www.crexi.com/robots.txt.

The "yearly rate" and "monthly rate" fields are only associated with lease listings and do not appear to be related to the broker(s) on the listing. Upon inspecting the network traffic, the "yearly rate" field has the name of "rateYearly" and is publicly visible on CREXi's website next to the "For Lease" title, indicating how much the listing costs to lease per square foot per year. The "monthly rate" field has the name of "rateMonthly" and while we do not see the value visually displayed on the webpage itself, it is publicly returned in the network traffic and its value is simply the value of "rateYearly" divided by 12. See below for a screenshot of this on CREXi's website and in the response body of request from the network traffic.



**Competitive Analysis**

67. CoStar's Research Data Management team used the data scraped from CREXi in March 2020 to conduct a competitive analysis that consisted of matching the listings, properties, and contacts that were on CREXi with the listings, properties, and contacts that were in CoStar's database.[115] This competitive analysis resulted in two excel files that contained the scraped data side by side to the matching data from CoStar.[116] The results of that analysis were presented to members of the Research Department, who concluded that they had no

---

[115] *3/26/2024 McGetrick Deposition*, Exhibit 567 (CoStar00411080).

[116] CoStar00411082; CoStar00411083.

Docusign Envelope ID: 82F6E277-86D8-499D-B322-DB9214E06BA0

further need for this data, because it did not support CREXi's marketing statements or corroborate the feedback that CoStar's sales representatives were receiving in the field.[117]

68. Subsequently, a subset of the results of the scrape, specifically, the first listing contact on each listing, were also shared with Amanda Borders, CoStar's Senior Director of Product Marketing.[118]

69. Ms. Borders requested that CoStar's software engineer obtain additional information from CREXi's website, namely, the contact information for all of the brokers associated with each listing on CREXi's website (not just the first contact).[119] Mr. Carter performed that scrape, which took place on April 7, 2020 and April 8, 2020.

70. Following that scrape, on April 11, 2020, Ms. Borders informed CoStar's CEO, Andrew Florance, that a "competitive advantage campaign targeting Crexi advertisers" had been "developed and can be deployed."[120] I have been provided with no evidence showing that this marketing campaign was, in fact, deployed, and it is my understanding that neither CoStar's Marketing Department nor its Enterprise system has a record of it being deployed.

**PJ Campaign**

71. On May 5 and 8, 2020, CoStar sent a LoopNet marketing campaign, titled "Tenants are searching for their next space in their pajamas," (the "PJ campaign") that was intended to reach approximately 160,000 broker or owner contacts (excluding contacts that had "unsubscribed" from receiving these types of marketing communications).[121] An internal email regarding this campaign reflects that the lists of intended recipients "capture all CREXi listing contacts."[122]

---

[117] *3/26/2024 McGetrick Deposition*, p. 30:6-9 (explaining that the result of the scrape for its "original intent of looking at, you know, listings, et cetera, it was determined there really wasn't anything, you, to come of that.")
[118] *3/26/2024 McGetrick Deposition*, pp. 26-29.
[119] *3/26/2024 McGetrick Deposition*, pp. 31:1-32:21.
[120] CoStar00381685.
[121] CoStar00180749; see also *3/26/2024 McGetrick Deposition*, p. 41:17-22 (explaining that CoStar tracks contacts' "opt-out preferences" in its Enterprise database).
[122] CoStar00424130.

72. Mr. Crain opines that "CoStar sent its May 5 marketing email to 24,921 unique broker contacts that appear in the material scraped from CREXi."[123] Mr. Crain provided limited details as to how he compared the scraped data against any of the files produced by CoStar to identify the 24,921 in his deposition testimony[124], therefore I performed analysis in an attempt to recreate his findings. In doing so, I was unable to arrive at the same conclusion as Mr. Crain.

73. I compared the list provided by CoStar of the contacts in CoStar's Enterprise system that have an "activity" note reflecting that the contact received the PJ campaign on May 5 to the contact names collected by CoStar's scraping of CREXi and determined that 21,002 distinct contact names overlapped between the two subsets.[125] When I take a step further and compare the brokerage company or office location associated with the contacts provided by CoStar's marketing team to the broker company or office location information scraped by CoStar, this number drops to 14,665 distinct contact names that overlap.[126] I observed multiple examples where the brokerage name and working locations do not match, and further verified that the reviewed contacts did not work at all of the provided locations. For example, CoStar's marketing campaign sent emails to two different people with the name Aaron Evans, one of whom worked at the location NewOption Partners and the other of which had the location of Del Mar Realty & Investments.[127] This contact name was in fact found in one of the files generated from CoStar's scrape of CREXi, however the company associated with that Aaron Evans in the scraped data was Texas Restaurant Advisors LLC.

---

[123] Crain Report ¶ 95. Deposition of Andrew Crain (July 26, 2024) (hereafter, *7/26/2024 Crain Deposition*), p. 25:17-15.

[124] *7/26/2024 Crain Deposition,* pp. 204:9-207-22.

[125] This value was determined by taking the distinct "contactname" count after comparing the "contactname" field in CoStar00463289 to the combination of the fields "broker_first_name" and "broker_last_name", with a space in between, in the following documents: CoStar00463905; CoStar00463906; CoStar00463907; CoStar00463908; CoStar00463909; CoStar00463910; CoStar00463911; CoStar00463912; CoStar00463913; CoStar00463914; CoStar00463915; CoStar00463916; CoStar00463917; CoStar00463918.

[126] This value was determined by taking the distinct "contactname" count after comparing the "contactname" and "locationname" fields in CoStar00463289 to the combination of the fields "broker_first_name" and "broker_last_name", with a space in between, and "broker_company" in the following files: CoStar00463905; CoStar00463906; CoStar00463907; CoStar00463908; CoStar00463909; CoStar00463910; CoStar00463911; CoStar00463912; CoStar00463913; CoStar00463914; CoStar00463915; CoStar00463916; CoStar00463918. Note that the comparison of company was done so that if the location name was found inside the broker company that would be considered a match, and vice versa.

[127] CoStar00463289.

1   Upon further investigation, I determined that all three of these Aaron Evans are different

2   people, and none of them ever worked at an overlap of those locations.[128] See below for the

3   Enterprise output where the contact name value is Aaron Evans.

| ContactName | LocationName |
|---|---|
| Aaron Evans | NewOption Partners |
| Aaron Evans | Del Mar Realty & Investments |

Below is the output for the broker name of Aaron Evans in the output files from CoStar's

scrape of CREXi:

| broker_first_name | broker_last_name | broker_company |
|---|---|---|
| Aaron | Evans | Texas Restaurant Advisors LLC |

As you can see in the above, the recipients of the May 5, 2020 email and the scraped Aaron

Evans are not the same person. Therefore, comparing on name alone is not effective.

74. Mr. Crain asserted that "The CSV files that CoStar produced, however, show that CoStar

scraped contact information for 45,094 unique individuals from CREXi's platform."[129]

However, I note that after deduplication, I observed only 33,891 unique email addresses.[130]

75. I provided the list of 33,891 unique email addresses to CoStar and requested further

information on each from CoStar's Enterprise system. I understand CoStar's Enterprise

application is considered their Customer Relationship Management ("CRM") system and

contains CoStar's contact details.[131]  Appendix D contains the email addresses as well as

the created date associated with the email address in CoStar's Enterprise system. CoStar

was unable to identify a contact with 2,883 of the scraped broker email addresses in their

Enterprise system. Additionally, 29,086, or 93.8% of the email addresses scraped from

CREXi existed in CoStar's Enterprise system as of March 21, 2020, the day of the first

---

[128] "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaron-evans-0222a920/; "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaron-evans-0222a920/details/experience/; "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaron-evans-aug1977/; "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaron-evans-aug1977/details/experience/; "Aaron Evans," LinkedIn, accessed May 22, 2024, https://www.linkedin.com/in/aaroncevans/.

[129] Crain ¶ 93.

[130] Distinct values in the broker_email field from CoStar00463905, CoStar00463906, CoStar00463907, CoStar00463908, CoStar00463909, CoStar00463910, CoStar00463911, CoStar00463912, CoStar00463913, CoStar00463914, CoStar00463915, CoStar00463916, CoStar00463917, CoStar00463918, CoStar00463919, CoStar00463920, CoStar00463921, and CoStar00463922

[131] Conversation with CoStar employee David Castro on July 15, 2024.

scrape.[132] Out of the remaining 1,922 emails that were added to Enterprise after the first scrape, 1,525, or 79.93%, of them were added in the years 2021 through 2024, meaning they were added to Costar's Enterprise system at least eight months or more after the last scrape.[133] I reviewed the create dates for the remaining scraped 397 email addresses that were added to Enterprise after the first scrape and before 2021 and did not observe any indication of mass or bulk uploading to CoStar's Enterprise system on any given date or time range. In sum, my review of the email address details from CoStar's Enterprise system that matched to email addresses contained in the scraped CREXi data does not indicate that the scraped CREXi data is the provenance of the associated contact details in CoStar's Enterprise system.

76. Further, I attempted to match these 33,891 scraped email addresses to CoStar's intended marketing email from May 5 and 8, 2020. CoStar provided four historical email address lists from CoStar's Salesforce Marketing Cloud ("SMC") system[134] that were generated around the time the PJ campaign was emailed.[135] I understand these files to represent email address values of the original 159,493 intended recipients and subsequently the 137,479 email address values that SMC sent the PJ campaign email to after opt-out preferences and other email validations occurred.[136]

---

[132] 29,086 divided by the number of emails found in CoStar's Enterprise system (31,008). As I previously noted, based on a conversation I had with CoStar's software engineer, I understand that the software engineer did not share the output files from the "test" scrapes with anyone in CoStar's Marketing or Research department and was never used, therefore the first real scrape date I am using for comparison is March 21, 2020.

[133] Appendix D. Filter to where CreatedDate is greater than or equal to January 1, 2021.

[134] Conversation with CoStar employee David Castro on July 15, 2024. Salesforce Marketing Cloud system is used for marketing campaigns and is not a CRM. There are contact volume limits and contacts may be removed from this system during the normal course of business.

[135] See CoStar00464682 and CoStar00464684 understood to represent the intended list of recipients. See CoStar00464686 and CoStar00464687 understood to reflect the list that the PJ campaign was sent out to.

[136] Id. Conversation with CoStar employee David Castro on July 15, 2024. Files CoStar00464682 and CoStar00464684 were the original files of intended recipients. I deduplicated the EmailAddress and Email fields from these two files to arrive at 159,493 distinct email addresses. These files were then loaded into Salesforce Marketing Cloud where email validations, removal of opt-out intended recipients, and other removals occurred. The CoStar00464686 and CoStar00464687 files are the results of the email validation and removal and are the lists of email addresses that SMC sent the email to. I deduplicated the EmailAddress field from these two files to arrive at 137,479 distinct email addresses.

77. Next, I compared the 159,493 originally intended recipient email addresses to the email addresses contained in the scraped data from CREXi. I determined that only 25,967 of these email addresses exist in the scraped CREXi data.[137] This suggests to me that CoStar did not even intend to send their marketing emails to 23.38% of the email addresses that they had already scraped from CREXi.

78. In addition, Mr. Crain failed to consider whether CoStar already possessed the email addresses that they scraped. To do so, I took the 25,967 scraped email addresses that were part of the May 5 and 8, 2020 marketing emails and compared them to the competitive analysis performed by CoStar's Research Data Management team. This allowed me to identify contacts already in CoStar's system at the time of the scrape. I observed that 14,853 of the 25,967 email addresses existed in CoStar's competitive analysis.[138] I note that Mr. Crain had all of this competitive analysis data available to him but did not perform this analysis.

79. In order to get further clarity on the remaining 11,114 broker emails scraped from CREXi, I reviewed the additional data provided by CoStar, as referenced in Appendix D, and filtered to the 11,114 remaining broker email addresses and provided the results in Appendix E. The results show that at least 11,040 of the 11,114 CREXi listing broker email addresses, or 99.33%, existed in CoStar's system as of March 21, 2020, the day of the first scrape.[139] The remaining 74 users were added to CoStar's system across several days from March 22, 2020 through April 22, 2020 and indicate no bulk loading of a list.[140]

---

[137] Id. I then compared this list of 159,493 intended recipients to the distinct list of values in the broker_email field from CoStar00463905, CoStar00463906, CoStar00463907, CoStar00463908, CoStar00463909, CoStar00463910, CoStar00463911, CoStar00463912, CoStar00463913, CoStar00463914, CoStar00463915, CoStar00463916, CoStar00463917, CoStar00463918, CoStar00463919, CoStar00463920, CoStar00463921, and CoStar00463922. This comparison reveals that 25,967 email addresses from the May 5, 2020 and May 8, 3030 emails exist in the scraped data from CREXi.

[138] *Id.* Compared to the unique values from the EmailAddress field in CoStar00411082: "Contact on CoStar" tab, CoStar00411083: "Contact on CoStar" tab, CoStar00411082: "Contact on CoStar and Listing" tab, and CoStar00411083: "Contact on CoStar and Listing" tab to the 25,967 emails from the scraped data.

[139] Appendix E. Filter to where the "CreatedDate" is less then March 21, 2020. As I previously noted, based on a conversation I had with CoStar's software engineer, I understand that the software engineer did not share the output files from the "test" scrapes with anyone in CoStar's Marketing or Research department and was never used, therefore the first real scrape date I am using for comparison of the "CreatedDate" is March 21, 2020.

[140] *Id.*

80. The totality of this analysis confirms that all but 74 of the email addresses CoStar intended to receive the May 5 and 8, 2020 marketing emails already existed in CoStar's systems prior to the scrape of CREXi. Further, this confirms that CoStar did not rely upon the scraped broker contact information for at least 99.72% of the scraped email addresses that were associated with the marketing emails on May 5 and 8, 2020.[141] My findings are consistent with the testimony of CoStar's 30(b)(6) designee, Vice President of Research Brad McGetrick, that listing contacts scraped from CREXi were not ingested into CoStar's Enterprise database.[142]

**Flaws in Mr. Crain's Analysis of Scraped Data**

81. I have reviewed the .CSV files provided by CoStar that were analyzed by Mr. Crain, who concludes that "across at least five scraping sessions, CoStar scraped 70 million pieces of data from CREXi,"[143] including contact information for 45,094 unique individuals from CREXi's platform.[144]

82. I understand through conversations with CoStar's software engineer that he performed three tests to refine his code, and then ran the code 15 times. Mr. Crain defines this as five scrapes but really CoStar only collected data on two different instances. Prior to running the two scrapes, the engineer ran testing scrapes on March 19, 2020 and March 20, 2020 to get the code working. Then, the first real scrape was done between March 21, 2020 and March 23, 2020, and the next (and last) scrape was done April 7, 2020 and April 8, 2020.[145] I also understand from the same conversations that the engineer broke each scrape into two, and sometimes even three, separate requests to decrease the possibility of errors, which is reflected in the original file names with "_part_one" or "_part_two." I also understand that the scrape on April 8, 2020 occurred due to a flaw the engineer found in his code for lease data after he reviewed the output from April 7, 2020, and therefore reran once the flaw was

---

[141] The 25,967 scraped email addresses that were part of the marketing emails minus 74 email addresses that were not in CoStar's system, divided by the 25,967 scraped email addresses that were part of the marketing emails = 99.72%.

[142] *3/26/2024 McGetrick Deposition*, pp. 45:15-48:2; 57:21-58:10.

[143] Crain Report ¶ 89.

[144] Crain Report ¶ 93.

[145] Conversation with CoStar employee Zachary Carter on May 22, 2024.

fixed.[146] CoStar's software engineer shared a screenshot of the scraped files in his OneDrive folder, reflecting the last modified dates for each file:

| Name | Status | Date modified |
| --- | --- | --- |
| cx_data_for_lease_part_two_04_08_2020.csv | ⊘ ⅋ | 4/8/20 9:34 PM |
| cx_data_for_lease_part_one_04_08_2020.csv | ⊘ ⅋ | 4/8/20 9:28 PM |
| cx_data_for_lease_part_two_04_07_2020.csv | ⊘ ⅋ | 4/8/20 10:28 AM |
| cx_data_for_lease_part_one_04_07_2020.csv | ⊘ ⅋ | 4/8/20 10:20 AM |
| cx_data_for_sale_part_two_04_07_2020.csv | ⊘ ⅋ | 4/8/20 10:10 AM |
| cx_data_for_sale_part_one_04_07_2020.csv | ⊘ ⅋ | 4/8/20 9:43 AM |
| cx_data_for_sale_part_two_03_23_2020.csv | ⊘ ⅋ | 3/23/20 4:25 PM |
| cx_data_for_sale_part_one_03_23_2020.csv | ⊘ ⅋ | 3/23/20 4:15 PM |
| cx_data_for_lease_part_two_03_23_2020.csv | ⊘ ⅋ | 3/22/20 11:15 PM |
| cx_data_for_lease_part_one_03_23_2020.csv | ⊘ ⅋ | 3/22/20 11:13 PM |
| cx_data_for_lease_part_two_03_22_2020.csv | ⊘ ⅋ | 3/22/20 8:02 PM |
| cx_data_for_lease_part_one_03_22_2020.csv | ⊘ ⅋ | 3/22/20 8:00 PM |
| cx_data_for_lease_part_three.csv | ⊘ ⅋ | 3/22/20 9:12 AM |
| cx_data_for_lease_part_two.csv | ⊘ ⅋ | 3/22/20 9:08 AM |
| cx_data_for_lease_part_one.csv | ⊘ ⅋ | 3/21/20 10:02 PM |
| cx_data_for_lease_test.csv | ⊘ ⅋ | 3/20/20 6:02 PM |
| cx_data_for_sale.csv | ⊘ ⅋ | 3/20/20 9:22 AM |
| cx_data.csv | ⊘ ⅋ | 3/19/20 4:13 PM |

83. The last modified dates reflected in the screenshot above indicate only three separate instances the engineer ran the scrape, and the first was necessary for testing purposes in order to carry out the second two. I also understand that the scrapes had to be done separately for lease and sale listings. In total 18 csv files were produced based on the scrapes that

---

[146] The flaw discovered was with recording the individual broker information for each listing. The original requests would only save the information for the first broker on the listing, rather than for all brokers, however, it would save the same first brokers information as many times as there were brokers. For example, if a listing had three brokers associated, the output csv file would contain three rows for that listing, and the broker name in each row would not change, instead it would contain the information of the first broker in the list three times.

Docusign Envelope ID: 83F5E277-86D8-449D-B322-DB9214F065A0

occurred in the time periods mentioned above, including six for sales listings[147] and 12 for lease listings.[148]

84. Mr. Crain's report is flawed in how he derives his numbers regarding CoStar's scrape of CREXi and below I list out two reasons why.

**Reason 1: Direct Duplication of Rows Across Multiple Files**

85. First, Mr. Crain's count of pieces of data scraped includes entirely duplicative rows across multiple files that he is counting multiple times. For instance, in paragraph 40 Mr. Crain says, "[w]ith respect to CREXi listings for lease, on March 22, 2020, CoStar scraped 11.5 million pieces of data across 198,297 listings."[149] Mr. Crain's calculation of 198,297 listings comes from the row count in CoStar00463911 added to the row count in CoStar00463918. This methodology would count every single row in these two files as distinct listing. I combined the contents of both files and deduplicated the rows in order to determine there were 149,784 distinct rows between the two. Thus, Mr. Crain has included 48,513 exact duplicates in his count.

86. Further, I reviewed the deduplicated rows between these two files and determined that several have the same "id" value across multiple rows. Upon further review, I discovered that only a few columns differed across the rows with the same ids, however the information in all other columns were identical. For example, the id of "152527" appeared in 71 rows in CoStar00463911, and the values for 54 out of the 58 columns contained the same information across all rows. The only information that changed were the values in the columns "suite_id," "rentable_sqft," "rate_type," and "has_floor_plan." These 71 rows actually reflect only one listing. There are only 77,601 distinct listings based on this id value, 120,696 less than what Mr. Crain stated.[150] Mr. Crain has overstated the scale of CoStar's scrape.

---

[147] I determined the following files reflected sales listings based off of the original file names as well as the column names; CoStar00463906, CoStar00463907, CoStar00463913, CoStar00463919, CoStar00463917, CoStar00463908.

[148] I determined the following files reflected lease listings based off of the original file names as well as the column names; CoStar00463909, CoStar00463920, CoStar00463910, CoStar00463911, CoStar00463918, CoStar00463915, CoStar00463922, CoStar00463916, CoStar00463914, CoStar00463921, CoStar00463912.

[149] Crain Report ¶ 90.

[150] Crain Report ¶ 90; 198,297 – 77,601 = 120,696.

87. To further illustrate the duplication in the files Mr. Crain has relied on, I deduplicated the id values across all six sales listing csv files and determined that 93.59% (97,315 of 103,975 distinct ids) show up in more than one of the sales files. I did the same process for the lease listings and determined that 99.68% (105,317 of 105,648 distinct ids) show up in more than one of the lease files. Thus, the data Mr. Crain relies on is highly duplicative, resulting in an overreporting of data CoStar scraped.[151]

**Reason 2: Duplication of Listing Information Details**

88. Another flaw in Mr. Crain's report is his use of the term "pieces of data" to inflate CoStar's actions. For example, he wrote that CoStar scraped "70 million pieces of data" but he included every field in every spreadsheet as a "piece of data," despite CoStar making far fewer actual data requests and obtaining largely duplicative data.

89. In my review of the scraped data, I observed repetitive listings that contained ancillary additional details, such as additional brokers. In this example, the same listing details were duplicated but with an additional broker. Mr. Crain has quantified every listing detail as a "piece of data," and counted it each time it appeared in a CSV file along with a different broker's information. This had the effect of inflating the count of "pieces of data" in his report.[152] For example, Mr. Crain stated that CoStar returned "again on April 8, scraping 7.4 million pieces of data across 155,283 CREXi listings for lease,"[153] citing the files CoStar00463921 and CoStar00463912. In CoStar00463921, there are 48 total columns and a total of 77,649 rows, summing to 3,727,152 "pieces of data" according to Mr. Crain's methodology. Within those 77,649 rows, I observed only 50,435 distinct values in the "id" field – one of which (136925) had eight corresponding rows in the file. Reviewing these eight rows, I observed that seven out of the 48 columns differed across the rows, which contained brokers information associated with the listing. Therefore, 41 columns contained the same information across all eight rows, returning the same duplicated information about the lease listing itself. Mr. Crain's methodology counts these as 384 "pieces of data," despite the fact that only seven columns contain different data points. A more accurate accounting

---

[151] Not to mention, Mr. Crain includes the data within the three test scrapes in his "70 million pieces of data" count, but I understand that the software engineer did not share the results from this "test" scrape to anyone at CoStar and was never used.

[152] Crain Report ¶ 92; Crain Report Appendix S.

[153] Crain Report ¶ 90.

1    of the unique data points within these eight rows would be 97 pieces of data.[154] That is 287

2    date pieces, or 75%, that Mr. Crain would have overcounted for one specific property listing.

3    90. Mr. Crain ultimately concluded that "CoStar took far more data from CREXi, by many

4    orders of magnitude, than Mr. Roffman asserts CREXi ever took from CoStar."[155] However,

5    he misunderstood or misrepresented my findings, and inflated his own count of "pieces of

6    data" to arrive at this conclusion. I do not agree with Mr. Crain's methodology or

     conclusion.

7

8    91. My report reflects the number of hits, which I describe as one entry or record in the LoopNet

9    logs, not the number of individual pieces of data that could have been acquired upon

10   navigation to a URL. CREXi is able to quantify the number of times CoStar visited CREXi's

     website at specific times because CoStar retained logs of outbound web traffic. CREXi has

11  not done so, making it difficult to quantify the number of times CREXi visited CoStar's

12  website.

13  92. Upon navigating to a listing in CoStar, there are numerous data points that could be

14  attributed to that single hit reflected in the LoopNet logs. For example, I navigated to a

15  Boston office space listing on CoStar and observed information such as the address, square

     footage, year built, broker name and phone number, as well as many other points of data.[156]

16  These data points were not represented in my quantification of a hit. Therefore, it would be

17  improper to compare this count with the way that Mr. Crain has done so. Further, Mr.

18  Crain's count of 70 million "pieces of data" is similarly not comparable due to the multiple

19  forms of duplication that I listed above.

20  93. Mr. Crain does not cite any evidence, and I have been provided with none, that CoStar used

21  any of the scraped information to add or update property listings on LoopNet, much less

22  scraped any photographs from CREXi.

23

24

---

[154] CoStar00463921; This number was derived by the summation of:
- multiplying the number of rows by the number of columns that contain different data for each of the eight rows where the id was $136925 = 8 * 7 = 56$
- multiplying the number of rows by the number of columns whose data are the same across all rows where the id was $136925 = 1 * 41 = 41$

[155] Crain Report ¶ 92.

[156] "CIC Boston | 50 Mlk St," LoopNet, accessed May 21, 2024, https://www.loopnet.com/Listing/50-Milk-St-Boston-MA/21623429/.

94. I conclude that CoStar's scrape of publicly available information from CREXi's website in March and April 2020 is consistent with a limited competitive intelligence effort, not an "anonymous campaign" like the one employed by CREXi on LoopNet. CoStar's scrape was limited to a specific time period, performed by a single individual, was not designed in a way to intentionally obfuscate what CoStar was doing, did not result in the addition of listing records, and importantly, did not download any copyrighted photographs. Further, all but 36 scraped contacts who received CoStar's May 5 and 8, 2020 marketing emails were already in CoStar's Enterprise system before the scrape, suggesting that CoStar did not use at least 99.76% of the email addresses that they obtained.


SUBMITTED:

DATED: August 6, 2024


_Dan Roffman_
9D3E1DE694F0432...

Daniel Roffman, Vice President

Charles River Associates

# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4    - - - - - - - - - - - - x
                              :
 5    COSTAR GROUP, INC., and  :
      COSTAR REALTY            :
 6    INFORMATION, INC.,       :   CASE NO.
                               :
 7         Plaintiffs,         :   2:20-cv-08819 CBM (ASx)
                               :
 8    v.                       :
                               :
 9    COMMERCIAL REAL ESTATE   :
      EXCHANGE, INC.,          :
10         Defendant.          :
      - - - - - - - - - - - - x
11    COMMERCIAL REAL ESTATE   :
      EXCHANGE, INC.,          :
12         Counterclaimant.    :
                               :
13    v.                       :
                               :
14    COSTAR GROUP, INC., and  :
      COSTAR REALTY            :
15    INFORMATION, INC.,       :
                               :
16         Counter Defendants. :
      - - - - - - - - - - - - x
17

18          CONFIDENTIAL - ATTORNEYS EYES ONLY
          VIDEOTAPED DEPOSITION OF DANIEL ROFFMAN
19               Thursday, June 6, 2024
                     9:01 a.m.
20

21    JOB NO.:  1015094
      Pages 1 through 309
22    Reported By:  CASSANDRA E. ELLIS, CSR-CA #14448,
      CSR-HI #475, CCR-WA #3484, RPR, RMR, RDR, CRR,
23    Realtime Systems Administrator #823848

24

25
```

DANIEL ROFFMAN - CONFIDENTIAL - AEO                    JOB NO. 1015094
JUNE 06, 2024

```
         1    BY MS. JOYCE:
14:55:07  2            Q.   I can add, with the data
14:55:08  3        limitations that we've discussed?
14:55:10  4            A.   Correct.
14:55:10  5            Q.   Okay.
14:55:11  6                 MS. TOMKOWIAK:  Same objection.
14:55:12  7                 MS. JOYCE:  And let's look at --
14:55:23  8        let's go ahead and look at who some of these
14:55:26  9        people are.
14:55:27 10                 So let's start at the top, here, in
14:55:30 11        Appendix I there's an Avy Gonzalez.
14:55:42 12                 And we can mark this exhibit as,
14:55:44 13        oh, boy, does anyone know what number I'm on?
14:55:51 14                 MS. TOMKOWIAK:  1453.
14:55:53 15                 THE VIDEOGRAPHER:  1453.
14:55:55 16                 MS. JOYCE:  1453.
14:55:39 17                 (Exhibit No. 1453 was marked for
14:55:41 18        identification)
14:56:24 19                 THE WITNESS:  Thank you.
         20   BY MS. JOYCE:
14:56:26 21            Q.   This is a printout from LinkedIn
14:56:30 22        for an individual named Avy Gonzalez, who's
14:56:34 23        identified as a commercial manager for the
14:56:37 24        Americas at DPDHL; do you see that?
14:56:40 25            A.   I do.
```

DANIEL ROFFMAN - CONFIDENTIAL - AEO                    JOB NO. 1015094
JUNE 06, 2024

14:56:41    1              Q.    And your team reviewed LinkedIn and

14:56:46    2    similar sort of materials for the individuals in

14:56:53    3    Appendix I; does this look familiar to you?

14:56:54    4              A.    I don't believe I looked at this,

14:56:55    5    it's possible somebody on my team did, but --

14:56:58    6              Q.    And you see in your Appendix I, on

14:57:00    7    the first row, there's a person named Avy

14:57:02    8    Gonzalez, with an e-mail of

14:57:11    9    Avy.Gonzalez@DHL.com?

14:57:12   10              A.    I see that, yes.

14:57:21   11              Q.    You might want to leave Appendix I

14:57:23   12    open.

14:57:23   13              A.    Trying to flip back as much as I

14:57:26   14    can.

14:57:26   15              Q.    I know.  And you see that

14:57:29   16    Ms. Gonzalez, on this LinkedIn page, works at

14:57:33   17    DHL?

14:57:33   18              A.    I do.

14:57:34   19              Q.    At the top of her resumé?

14:57:35   20              A.    Yes.

14:57:36   21              Q.    And do you see in your Appendix I

14:57:38   22    that her e-mail address, Ms. Avy Gonzalez's

14:57:44   23    e-mail address has a domain of DHL.com?

14:57:48   24              A.    I see that.

14:57:49   25              Q.    You also see on Ms. Gonzalez's

DANIEL ROFFMAN - CONFIDENTIAL - AEO
JUNE 06, 2024                                                    JOB NO. 1015094

| | | |
|---|---|---|
| 14:57:52 | 1 | LinkedIn that she worked at CBRE; do you know |
| 14:57:55 | 2 | what that is? |
| 14:57:56 | 3 | A.    I do. |
| 14:57:57 | 4 | Q.    It's a commercial real estate |
| 14:57:58 | 5 | brokerage. |
| 14:58:00 | 6 | Would you agree that it's likely |
| 14:58:01 | 7 | that the Avy Gonzalez that we're looking at on |
| 14:58:07 | 8 | this LinkedIn page is the same Avy Gonzalez that |
| 14:58:12 | 9 | appears in your Appendix I? |
| 14:58:14 | 10 | MS. TOMKOWIAK:  Objection, calls |
| 14:58:14 | 11 | for speculation. |
| 14:58:15 | 12 | A.    There's nothing about this document |
| 14:58:19 | 13 | that suggests otherwise.  I would want to |
| 14:58:22 | 14 | confirm there's not another Avy Gonzalez. |
| 14:58:25 | 15 | Q.    But it would be extremely unlikely |
| 14:58:28 | 16 | for there to be another Avy Gonzalez, who also |
| 14:58:32 | 17 | works at DHL, and has experience in the |
| 14:58:34 | 18 | commercial real estate industry? |
| 14:58:36 | 19 | A.    I'll take your representation on |
| 14:58:38 | 20 | how unlikely it is. |
| 14:58:39 | 21 | Q.    Well, no, I'm asking you:  Do you |
| 14:58:41 | 22 | agree that it would be extremely unlikely for |
| 14:58:43 | 23 | there to be another Avy Gonzalez who works at |
| 14:58:47 | 24 | DHL and has experience in the commercial real |
| 14:58:50 | 25 | estate industry? |

DANIEL ROFFMAN - CONFIDENTIAL - AEO                    JOB NO. 1015094
JUNE 06, 2024

14:58:50   1            A.    I think that's a fair statement.

14:58:51   2            Q.    Okay.  And go ahead and take a look

14:58:53   3   at Ms. Gonzalez's LinkedIn profile, and tell me

14:58:56   4   if you see any indication of a relationship with

14:58:59   5   CREXi.

14:59:00   6            A.    I do not.

14:59:21   7            Q.    And she has listed her employment

14:59:23   8   from dating back to August 2009 to present, and

14:59:29   9   there is no indication that she ever worked at

14:59:32  10   CREXi; correct?

14:59:32  11            A.    That's correct.  I'd have to look

14:59:35  12   at the records, though, because clearly her

14:59:38  13   e-mail address or her account got swept in

14:59:41  14   through some other activity.

14:59:43  15            She could have been sharing a

14:59:45  16   laptop with somebody that was using -- that was,

14:59:49  17   you know, for example, she could have a spouse

14:59:51  18   or somebody that was accessing this, who could

14:59:55  19   have been associated with CREXi.

14:59:56  20            I don't know, like, there's -- I'd

14:59:59  21   have to look at the pattern of activity, is what

15:00:00  22   I'm trying to say.  And this doesn't give me the

15:00:02  23   pattern of activity, this just is a LinkedIn

15:00:05  24   account, and her name in an Appendix.

15:00:07  25            I would want to look at all of the

15:00:09    1    activity of why she was in Appendix 1, sorry, in

15:00:12    2    opinion one

15:00:12    3            Q.    But you did attribute traffic

15:00:14    4    related to her account to CREXi in both opinion

15:00:17    5    one and opinion two?

15:00:19    6            A.    She, for all I know, could have

15:00:22    7    walked into a CREXi -- like, into a CREXi office

15:00:24    8    for some reason.  I don't know, all right?

15:00:27    9                That's what I'm trying to tell you.

15:00:29   10    I would have to look at the LoopNet logs and try

15:00:31   11    to establish why she appears in there, which is

15:00:33   12    something I could do, but I just don't have all

15:00:35   13    of that data in front of me.

15:00:37   14            Q.    Understood.  My question is way

15:00:40   15    more basic:  You attributed traffic related to

15:00:43   16    her account to CREXi in both opinion one and

15:00:46   17    opinion two?

15:00:47   18            A.    As we went back and forth on a few

15:00:53   19    minutes ago, I did not attribute all activity

15:00:56   20    from Avy Gonzalez, I attributed activity that

15:01:00   21    had an indicator of CREXi.

15:01:02   22            Q.    Well, that's true for opinion one,

15:01:04   23    but then for opinion two you used whatever IP

15:01:06   24    address was related to her account activity in

15:01:11   25    the opinion one log and you looked for that IP

DANIEL ROFFMAN - CONFIDENTIAL - AEO                     JOB NO. 1015094
JUNE 06, 2024

| | | |
|---|---|---|
| 15:01:14 | 1 | address across all of CoStar's logs that you had |
| 15:01:17 | 2 | from 2016 to 2023, and you attributed that |
| 15:01:21 | 3 | traffic to CREXi; right? |
| 15:01:24 | 4 | A.   In opinion two I included activity |
| 15:01:26 | 5 | from IP addresses.  But again, we don't know why |
| 15:01:30 | 6 | Avy Gonzalez made it into the list in the first |
| 15:01:33 | 7 | place.  We would need to analyze that, and there |
| 15:01:35 | 8 | could be some explainable situation here. |
| 15:01:37 | 9 | MS. JOYCE:  Okay.  Let's look at |
| 15:01:38 | 10 | what I'll mark as Exhibit 1454. |
| 15:01:41 | 11 | (Exhibit No. 1454 was marked for |
| 15:01:43 | 12 | identification.) |
| | 13 | BY MS. JOYCE: |
| 15:02:08 | 14 | Q.   Do you have Exhibit 1454 in front |
| 15:02:10 | 15 | of you? |
| 15:02:11 | 16 | A.   I do, yes. |
| 15:02:14 | 17 | Q.   What is it? |
| 15:02:15 | 18 | A.   It looks to be some sort of |
| 15:02:19 | 19 | printout from LinkedIn for Ryan Christopher |
| 15:02:23 | 20 | Nunes. |
| 15:02:24 | 21 | Q.   And Mr. Nunes -- and your team |
| 15:02:28 | 22 | looked at LinkedIn-related materials for the |
| 15:02:31 | 23 | individuals identified in Appendix I.  So have |
| 15:02:35 | 24 | you or someone on your team reviewed this |
| 15:02:38 | 25 | before? |

DANIEL ROFFMAN - CONFIDENTIAL - AEO          JOB NO. 1015094
JUNE 06, 2024

| | | |
|--|--|--|
| 15:02:38 | 1 | A.    I don't know.  Like I said, it was |
| 15:02:40 | 2 | in context of looking at Mr. Crain's report, so |
| 15:02:44 | 3 | I just don't know. |
| 15:02:44 | 4 | Q.    And -- |
| 15:02:46 | 5 | A.    I didn't look at it. |
| 15:02:47 | 6 | Q.    And after doing that investigation, |
| 15:02:49 | 7 | you have not made any modifications to your |
| 15:02:53 | 8 | opinions; correct? |
| 15:02:53 | 9 | A.    No, I have not, but again, I would |
| 15:02:56 | 10 | want to see why Mr. Nunes appears in the opinion |
| 15:03:00 | 11 | one data.  There could be a very explainable |
| 15:03:03 | 12 | reason.  And once we understand what the reason |
| 15:03:06 | 13 | is, it would be easier to explain why he shows |
| 15:03:08 | 14 | up and what data of his got included. |
| 15:03:11 | 15 | Q.    And you did not do that |
| 15:03:13 | 16 | investigation particular to Mr. Nunes, to date; |
| 15:03:17 | 17 | correct? |
| 15:03:17 | 18 | A.    I have not, no. |
| 15:03:18 | 19 | Q.    And there is a Ryan Nunes in your |
| 15:03:23 | 20 | Appendix I, listed seven rows or so below |
| 15:03:29 | 21 | Ms. Gonzalez, with an e-mail address of |
| 15:03:32 | 22 | Ryan@lifechangingcapital.com; do you see that? |
| 15:03:34 | 23 | A.    I'm sorry, where is it? |
| 15:03:43 | 24 | Q.    In Appendix I, it's on the first |
| 15:03:45 | 25 | page of your Appendix I, about seven rows down. |

DANIEL ROFFMAN - CONFIDENTIAL - AEO                    JOB NO. 1015094
JUNE 06, 2024

15:03:49  1              A.    Okay.  I see that now.

15:03:50  2              Q.    It's Ryan Nunes, with an address of

15:03:55  3        Ryan@lifechangingcapital.com; correct?

15:03:58  4              A.    Yes, I see that.

15:03:58  5              Q.    Okay.  And you see that on Exhibit

15:04:02  6        1454 is the LinkedIn profile for Ryan

15:04:06  7        Christopher Nunes, he works at Life Changing

15:04:10  8        Capital?

15:04:11  9              A.    Yes, I see that.

15:04:12  10             Q.    You would agree with me that it

15:04:15  11       appears that the Ryan Christopher Nunes

15:04:19  12       reflected on the LinkedIn profile is the same

15:04:21  13       Ryan Nunes that's in your Appendix I?

15:04:26  14             MS. TOMKOWIAK:  Objection, calls

15:04:27  15       for speculation.

15:04:27  16             A.    I have no reason to doubt that.

15:04:29  17             Q.    And go ahead and take a look at

15:04:35  18       Exhibit 1454, and let me know if you see any

15:04:39  19       mention of CREXi across his employment dating

15:04:46  20       back to 20 -- 2006.

15:04:49  21             A.    No, I do not.

15:05:00  22             Q.    There's no mention of CREXi,

15:05:02  23       whatsoever; correct?

15:05:03  24             A.    No.

15:05:03  25             Q.    And he also, if you read about life

DANIEL ROFFMAN - CONFIDENTIAL - AEO                    JOB NO. 1015094
JUNE 06, 2024

15:05:08  1    changing capital, is involved in the commercial

15:05:11  2    real estate industry?

15:05:12  3              A.    I see that.

15:05:12  4              Q.    Okay.  And traffic attributed --

15:05:16  5    related to his account is attributed to CREXi in

15:05:20  6    both opinion one and opinion two; is that right?

15:05:22  7              MS. TOMKOWIAK:  Objection, to the

15:05:23  8    extent it mischaracterizes his opinions.

15:05:26  9              A.    So opinion one would contain

15:05:29  10   indicators of CREXi, and opinion two would

15:05:32  11   contain IP address-related -- related activity

15:05:36  12   from the same IP addresses as we've been

15:05:40  13   discussing all day.

15:05:40  14              Without doing further research, I

15:05:44  15   don't know why Ryan Christopher Nunes is in this

15:05:46  16   set, other than he hits on some IOC somewhere or

15:05:51  17   his sessions do.  As I described before, the

15:05:54  18   sessions could span multiple users.  It's

15:05:56  19   entirely possible that Mr. Nunes was using the

15:05:59  20   same computer as somebody at CREXi.  And then in

15:06:03  21   opinion one, then, it would only include the

15:06:05  22   indicators of CREXi.

15:06:06  23              So I -- that's best answer I can

15:06:08  24   give you, sitting here right now, without

15:06:10  25   researching this further.

DANIEL ROFFMAN - CONFIDENTIAL - AEO                    JOB NO. 1015094
JUNE 06, 2024

| | | |
|---|---|---|
| 15:06:11 | 1 | Q.   I'll simplify it, traffic |
| 15:06:13 | 2 | attributed to -- traffic related to his account |
| 15:06:16 | 3 | is attributed to CREXi in opinion one; correct? |
| 15:06:20 | 4 | MS. TOMKOWIAK:  Objection, |
| 15:06:21 | 5 | mischaracterizes his opinions. |
| 15:06:22 | 6 | A.   Some traffic, with his -- some |
| 15:06:35 | 7 | sessions that have IOCs, where he is a part of |
| 15:06:40 | 8 | the same sessions, is in opinion one, yes. |
| 15:06:42 | 9 | MS. JOYCE:  Okay.  Let's look at |
| 15:06:44 | 10 | what I'll mark as Exhibit 1455. |
| 15:06:49 | 11 | (Exhibit No. 1455 was marked for |
| 15:06:52 | 12 | identification.) |
| | 13 | BY MS. JOYCE: |
| 15:07:10 | 14 | Q.   You have Exhibit 1455 in front of |
| 15:07:13 | 15 | you? |
| 15:07:13 | 16 | A.   I do. |
| 15:07:14 | 17 | Q.   What is it? |
| 15:07:15 | 18 | A.   It appears to be another LinkedIn |
| 15:07:18 | 19 | printout of Shuo Feng Grimes, if I pronounced |
| 15:07:22 | 20 | that correctly. |
| 15:07:23 | 21 | Q.   And have you seen this before? |
| 15:07:28 | 22 | A.   I have not, no. |
| 15:07:30 | 23 | Q.   Someone on your team might have |
| 15:07:32 | 24 | analyzed this? |
| 15:07:34 | 25 | A.   I don't know. |

DANIEL ROFFMAN - CONFIDENTIAL - AEO
JUNE 06, 2024

JOB NO. 1015094

| | | |
|---|---|---|
| 15:07:34 | 1 | Q.   And on Appendix I there's a Shuo |
| 15:07:43 | 2 | Grimes, with an e-mail address of |
| 15:07:46 | 3 | Shuo@investonmainstreet.com, on the first page |
| 15:07:49 | 4 | of that appendix; do you see that? |
| 15:07:50 | 5 | A.   I do see that, yes. |
| 15:07:58 | 6 | Q.   And the name matches with the |
| 15:08:05 | 7 | LinkedIn profile 1455 that we're looking at; do |
| 15:08:09 | 8 | you see that? |
| 15:08:09 | 9 | A.   I do. |
| 15:08:10 | 10 | Q.   And you also see, under experience, |
| 15:08:12 | 11 | the second thing listed is:  Invest on Main |
| 15:08:14 | 12 | Street, which matches up to the e-mail address |
| 15:08:18 | 13 | reflected in Appendix I? |
| 15:08:19 | 14 | A.   I see that, yes. |
| 15:08:21 | 15 | Q.   It appears that the Shuo -- Shuo |
| 15:08:24 | 16 | Feng Grimes, reflected in Exhibit 1455, is the |
| 15:08:28 | 17 | same Shuo Grimes reflected in your Appendix I? |
| 15:08:31 | 18 | MS. TOMKOWIAK:  Objection, calls |
| 15:08:32 | 19 | for speculation. |
| 15:08:32 | 20 | A.   I have no reason to doubt that, but |
| 15:08:35 | 21 | I can't confirm. |
| 15:08:37 | 22 | Q.   Go ahead and take a look, and tell |
| 15:08:38 | 23 | me if you find anything related to CREXi in this |
| 15:08:42 | 24 | LinkedIn profile for Shuo Grimes, which has |
| 15:08:46 | 25 | material dating back to 2011. |

DANIEL ROFFMAN - CONFIDENTIAL - AEO                                    JOB NO. 1015094
JUNE 06, 2024

15:08:57    1            A.    I do not see anything relating to

15:08:58    2    CREXi on the LinkedIn profile but, again,

15:09:02    3    opinion one would have some indicator of CREXi

15:09:04    4    in the same session.   So we'd have to look at

15:09:07    5    the raw underlying data to better understand why

15:09:09    6    Shuo Feng is on the same session as somebody who

15:09:12    7    we've identified is either using an IP address

15:09:15    8    or a refer or is otherwise identified as an

15:09:20    9    account related to CREXi.

15:09:21   10            Q.    And traffic related to Shuo Grimes'

15:09:24   11    account is attributed to CREXi in opinion one;

15:09:27   12    correct?

15:09:28   13            MS. TOMKOWIAK:   Objection,

15:09:29   14    mischaracterizes his opinions.

15:09:30   15            A.    Traffic related to the session, I

15:09:35   16    don't know if it's necessary Shuo Feng.

15:09:39   17            Q.    Well --

15:09:41   18            A.    And I -- I think that's the same

15:09:42   19    for all three of these that you've shown me.   I

15:09:44   20    guess we should be clear, that session has

15:09:50   21    indicators of CREXi, but I don't know whether

15:09:53   22    Shuo Feng shared her credentials with somebody

15:09:55   23    from CREXi I don't know -- and then they could

15:09:58   24    have used it in an IP address that's associated

15:10:00   25    with CREXi.   There could be all kinds of

15:10:02  1      scenarios.

15:10:04  2                  So I'm sitting here on my feet,

15:10:06  3      like, thinking about this, and there could be

15:10:07  4      explainable reasons why these people show up as

15:10:10  5      being part of opinion one.

15:10:11  6                  Q.   I didn't ask for the reasons why.

15:10:13  7      I just asked if you attribute traffic related to

15:10:16  8      the Shuo Grimes account to CREXi in opinion one,

15:10:21  9      that's -- that's the whole question.

15:10:22  10                 A.   Traffic that is in those sessions,

15:10:29  11     where there's an indicator of CREXi, yes.

15:10:31  12                 Q.   Okay.  Where there's an indicator

15:10:34  13     of CREXi in that session, as well?

15:10:36  14                 A.   Correct.

15:10:36  15                 Q.   Yeah.  Okay.

15:10:38  16                 MS. JOYCE:  Let's mark Exhibit

15:10:40  17     1456.

15:10:41  18                 (Exhibit No. 1456 was marked for

15:10:46  19     identification.)

          20     BY MS. JOYCE:

15:11:08  21                 Q.   What is Exhibit 1456?

15:11:12  22                 A.   This is another LinkedIn profile

15:11:14  23     from Michael Lin.

15:11:16  24                 Q.   And your team might have reviewed

15:11:21  25     this profile?

DANIEL ROFFMAN - CONFIDENTIAL - AEO                    JOB NO. 1015094
JUNE 06, 2024

| | | |
|---|---|---|
| 15:11:23 | 1 | A.    Perhaps.  I don't know. |
| 15:11:25 | 2 | Q.    And Michael Lin is identified as a |
| 15:11:30 | 3 | managing partner at Honey Pot Investments on the |
| 15:11:33 | 4 | LinkedIn profile; do you see that? |
| 15:11:34 | 5 | A.    I do. |
| 15:11:35 | 6 | Q.    And a few rows below Shuo Grimes in |
| 15:11:38 | 7 | your Appendix I do you see an individual listed |
| 15:11:41 | 8 | as Michael Lin with an e-mail address of |
| 15:11:46 | 9 | MLin@honeypotinvest.com? |
| 15:11:48 | 10 | A.    I do. |
| 15:11:48 | 11 | Q.    Does it appear that the Michael Lin |
| 15:11:51 | 12 | reflected in Exhibit 1456 is the same Michael |
| 15:11:54 | 13 | Lin as appears in your Appendix I? |
| 15:11:57 | 14 | MS. TOMKOWIAK:  Objection, calls |
| 15:11:58 | 15 | for speculation. |
| 15:11:59 | 16 | A.    I have no reason to doubt it, based |
| 15:12:02 | 17 | on this document, but I couldn't say for sure. |
| 15:12:05 | 18 | Q.    And go ahead and take a look at Mr. |
| 15:12:09 | 19 | Lin's LinkedIn profile and let me know if you |
| 15:12:11 | 20 | see any reference to CREXi in his experience |
| 15:12:16 | 21 | dating back to 1998 onwards. |
| 15:12:25 | 22 | A.    I do not see any reference to CREXi |
| 15:12:26 | 23 | on here. |
| 15:12:27 | 24 | Q.    And where there's an indicator of |
| 15:12:35 | 25 | CREXi in a session, you attributed traffic |

DANIEL ROFFMAN - CONFIDENTIAL - AEO
JUNE 06, 2024                                                    JOB NO. 1015094

| | | |
|---|---|---|
| 15:12:41 | 1 | related to Mr. Lin's account to CREXi as part of |
| 15:12:47 | 2 | opinion one; is that accurate? |
| 15:12:50 | 3 | A.   Yes. |
| 15:12:54 | 4 | Q.   We've now reviewed four |
| 15:12:58 | 5 | individuals, just on the first page of your |
| 15:13:01 | 6 | Appendix I, who appear to have no relationship |
| 15:13:04 | 7 | with CREXi, but whose traffic you attributed to |
| 15:13:09 | 8 | CREXi as part of opinion one, so long as there |
| 15:13:12 | 9 | was some indicator of CREXi in that session; is |
| 15:13:15 | 10 | that correct? |
| 15:13:15 | 11 | A.   So I want to clarify something, |
| 15:13:18 | 12 | okay?  In opinion five I call these potentially |
| 15:13:24 | 13 | CREXi-related accounts, okay?  I don't |
| 15:13:27 | 14 | definitively say that they are, and I give some |
| 15:13:30 | 15 | examples of connections that I found. |
| 15:13:33 | 16 | I don't know whether Michael Lin or |
| 15:13:35 | 17 | Shuo Feng Grimes or Ryan Christopher Nunes or |
| 15:13:40 | 18 | Avy Gonzalez shared a password with anyone of |
| 15:13:44 | 19 | the employees at CREXi or their BPOs.  There |
| 15:13:48 | 20 | could be some other explainable situation. |
| 15:13:50 | 21 | The data in the LoopNet logs, where |
| 15:13:53 | 22 | there is an indicator of CREXi, does appear in |
| 15:13:56 | 23 | a -- in opinion one.  But otherwise, I'm sort of |
| 15:14:02 | 24 | listing these as potentially CREXi-related |
| 15:14:05 | 25 | accounts. |

DANIEL ROFFMAN - CONFIDENTIAL - AEO                    JOB NO. 1015094
JUNE 06, 2024

15:14:05  1          Q.   Well, you use these potentially
15:14:07  2   CREXi-related accounts to support your opinion
15:14:10  3   that it is highly likely that CREXi
15:14:12  4   representatives have access to LoopNet beyond
15:14:15  5   the activity highlighted in this report;
15:14:18  6   correct?
15:14:18  7          A.   That's correct.
15:14:19  8          Q.   And we've now gone through four
15:14:20  9   examples from your Appendix I that appear to
15:14:23 10   have no relationship with the CREXi
15:14:26 11   representative?
15:14:28 12          A.   Again, from your perspective,
15:14:30 13   looking at these LinkedIn profiles, I would
15:14:32 14   agree with you that there's no connection.  But
15:14:34 15   that doesn't mean that there's not some
15:14:36 16   connection that we don't know about, and we need
15:14:38 17   to look at the raw underlying logs to really try
15:14:41 18   and understand better why they're in opinion one
15:14:43 19   before we come to some conclusion on this.
15:14:45 20          Q.   But you didn't do that analysis,
15:14:47 21   and you, nonetheless, attributed the traffic
15:14:50 22   related to these individuals, that have nothing
15:14:52 23   to do with CREXi, to CREXi?
15:14:54 24          A.   Again, you keep stating that
15:14:55 25   there's nothing related to CREXi, and we just

| | | |
|---|---|---|
| 15:14:58 | 1 | don't know that, okay?  They're not on the |
| 15:15:01 | 2 | LinkedIn profile doesn't mean that they're not |
| 15:15:03 | 3 | married to somebody, doesn't mean that they're |
| 15:15:05 | 4 | not using the same password, doesn't mean that |
| 15:15:08 | 5 | they didn't walk into a CREXi office. |
| 15:15:10 | 6 | I give you three examples there, |
| 15:15:13 | 7 | there could be others.  Maybe they didn't update |
| 15:15:16 | 8 | their LinkedIn profile.  I don't know.  I don't |
| | 9 | want to speculate as to what they did or didn't |
| | 10 | do, I just call them potentially CREXi-related |
| 15:15:18 | 11 | accounts, and I gave examples of ones where I |
| 15:15:24 | 12 | think that there is a connection. |
| 15:15:25 | 13 | Q.   And you gave examples of three, and |
| 15:15:27 | 14 | now we looked at four where there is no |
| 15:15:29 | 15 | connection -- |
| 15:15:29 | 16 | MS. TOMKOWIAK:  Objection. |
| | 17 | BY MS. JOYCE: |
| | 18 | Q.   -- right? |
| 15:15:30 | 19 | MS. TOMKOWIAK:  Objection, |
| 15:15:31 | 20 | misstates testimony. |
| | 21 | BY MS. JOYCE: |
| 15:15:32 | 22 | Q.   As far as you know?  As far as you |
| 15:15:34 | 23 | know? |
| 15:15:34 | 24 | MS. TOMKOWIAK:  Same objection. |
| 15:15:35 | 25 | A.   We've looked at some examples where |

DANIEL ROFFMAN - CONFIDENTIAL - AEO                    JOB NO. 1015094
JUNE 06, 2024

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2                   I, Cassandra E. Ellis, Registered

 3         Professional Reporter, the officer before whom

 4         the foregoing proceedings were taken, do hereby

 5         certify that the foregoing transcript is a true

 6         and correct record of the proceedings; that said

 7         proceedings were taken by me stenographically

 8         and thereafter reduced to typewriting under my

 9         supervision; and that I am neither counsel for,

10         related to, nor employed by any of the parties

11         to this case and have no interest, financial or

12         otherwise, in its outcome.

13                   IN WITNESS WHEREOF, I have hereunto

14         set my hand this 24th day of June 2024.

15

16

17

18         _____

19         CASSANDRA E. ELLIS, CSR-CA #14448, CCR-WA #3484,

20                      CSR-HI #475, RPR, RMR, RDR,

21                      CRR, REALTIME SYSTEMS

22                      ADMINISTRATOR #823848

23

24

25
```

# EXHIBIT C

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     WESTERN DIVISION

4    COSTAR GROUP, INC., and     )
     COSTAR REALTY INFORMATION    )
5    INC.,                        )    Case No.:
                                  )    2:20-CV-08819 CBM (ASx)
6              Plaintiff,         )
                                  )
7     v.                          )
                                  )
8    COMMERCIAL REAL ESTATE       )
     EXCHANGE, INC.,              )
9                                 )
               Defendants.        )
10   _____  )

11

12

13

14        VIDEOTAPED DEPOSITION OF ANDREW CRAIN

15        CONFIDENTIAL: ATTORNEYS' EYES ONLY

16                  July 26, 2024

17                   9:04 a.m.

18

19

20

21

22

23   REPORTED BY:

24   Tammy Moon, CSR No. 13184, RDR, CRR

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew Crain
Conducted on July 26, 2024                          14

| | | |
|---|---|---|
| 1 | straightforwardly, a source who is interacting with | 09:11:01 |
| 2 | a particular website? | 09:11:03 |
| 3 | MS. KAUFMAN:  Objection.  Vague and | 09:11:04 |
| 4 | ambiguous. | 09:11:07 |
| 5 | THE WITNESS:  It varies.  There are some | 09:11:07 |
| 6 | where that's much more straightforward, other times | 09:11:09 |
| 7 | where it's a little bit more involved, and sometimes | 09:11:12 |
| 8 | where it's very difficult. | 09:11:15 |
| 9 | MS. TOMKOWIAK: | 09:11:18 |
| 10 | Q.  Do you consider yourself an expert in web | 09:11:19 |
| 11 | scraping? | 09:11:21 |
| 12 | A.  I've done cases before involving web | 09:11:26 |
| 13 | scraping, so I guess it would really depend on kind | 09:11:32 |
| 14 | of what aspect of the scraping we're talking about. | 09:11:36 |
| 15 | Q.  What aspect of web scraping do you consider | 09:11:39 |
| 16 | yourself to be an expert in? | 09:11:42 |
| 17 | A.  Well, like in this case, I feel qualified | 09:11:45 |
| 18 | to rebut Mr. Roffman and analyze CoStar's LoopNet | 09:11:47 |
| 19 | logs, things like that. | 09:11:54 |
| 20 | Q.  Okay.  But Mr. Roffman's original report | 09:11:58 |
| 21 | didn't have anything to do with -- well, strike | 09:12:01 |
| 22 | that. | 09:12:03 |
| 23 | What qualifies you to be an expert in web | 09:12:03 |
| 24 | scraping? | 09:12:15 |
| 25 | A.  Because, really, these LoopNet logs are not | 09:12:15 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew Crain
Conducted on July 26, 2024                    15

| | | |
|---|---|---|
| 1 | unlike lots of the other sources of evidence that we | 09:12:19 |
| 2 | look at in forensics, right?  We look at datasets, | 09:12:22 |
| 3 | often including logs, and are basically using | 09:12:25 |
| 4 | database techniques to interpret them. | 09:12:32 |
| 5 | Q.   Okay.  So is it your testimony that you are | 09:12:35 |
| 6 | using your expertise in web scraping to interpret | 09:12:36 |
| 7 | the LoopNet logs? | 09:12:41 |
| 8 | MS. KAUFMAN:  Objection.  Misstates prior | 09:12:43 |
| 9 | testimony. | 09:12:45 |
| 10 | THE WITNESS:  No, I don't -- I guess that's | 09:12:45 |
| 11 | not the question I thought you asked me. | 09:12:47 |
| 12 | MS. TOMKOWIAK: | 09:12:49 |
| 13 | Q.   Yeah.  I don't -- I'm trying to understand | 09:12:50 |
| 14 | why you keep tying your qualifications to be an | 09:12:51 |
| 15 | expert in web scraping to your review of the LoopNet | 09:12:56 |
| 16 | logs.  So how did you apply your expertise in web | 09:13:00 |
| 17 | scraping to your analysis of the LoopNet logs? | 09:13:03 |
| 18 | A.   I don't think I would call it "expertise in | 09:13:06 |
| 19 | web scraping."  Like, to me, that means you are a | 09:13:09 |
| 20 | person that has experienced going out and doing | 09:13:12 |
| 21 | scraping. | 09:13:15 |
| 22 | Q.   And you don't have that experience? | 09:13:17 |
| 23 | A.   That's not what I do, no. | 09:13:19 |
| 24 | Q.   Let me go back to my question.  I asked if | 09:13:21 |
| 25 | you were an expert in web scraping, right?  And then | 09:13:31 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew Crain
Conducted on July 26, 2024                                    16

| | | |
|---|---|---|
| 1 | I asked what qualifies you to be an expert in web | 09:13:46 |
| 2 | scraping, and I think that's what I'm still really | 09:13:49 |
| 3 | trying to understand.  So what qualifies you to be | 09:13:50 |
| 4 | an expert in web scraping? | 09:13:52 |
| 5 | MS. KAUFMAN:  Objection.  Vague and | 09:13:54 |
| 6 | ambiguous. | 09:13:55 |
| 7 | THE WITNESS:  Well, I'm not -- I don't | 09:13:55 |
| 8 | think I'm telling you that I'm an expert in web | 09:13:57 |
| 9 | scraping from the perspective of how to do it or the | 09:14:00 |
| 10 | best ways to do it.  What I -- what I'm answering is | 09:14:02 |
| 11 | why I'm qualified to rebut Mr. Roffman. | 09:14:08 |
| 12 | MS. TOMKOWIAK: | 09:14:11 |
| 13 | Q.   And why are you qualified to rebut | 09:14:15 |
| 14 | Mr. Roffman? | 09:14:17 |
| 15 | A.   Because that's where the analysis of the | 09:14:18 |
| 16 | LoopNet logs and the other evidence in this case is | 09:14:20 |
| 17 | quite similar to what I do all the time in forensics | 09:14:25 |
| 18 | matters. | 09:14:29 |
| 19 | Q.   You have no expertise in commercial real | 09:14:29 |
| 20 | estate, correct? | 09:14:43 |
| 21 | A.   Not from, like, an expert perspective or | 09:14:45 |
| 22 | professional, you know, occupational perspective. | 09:14:47 |
| 23 | Correct. | 09:14:51 |
| 24 | Q.   You also have no expertise in marketing? | 09:14:51 |
| 25 | MS. KAUFMAN:  Objection.  Vague and | 09:14:53 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew Crain
Conducted on July 26, 2024                                    212

```
1    STATE OF CALIFORNIA )
                         )
2    COUNTY OF SACRAMENTO)

3            I, TAMMY MOON, CSR No. 13184, Certified

4    Shorthand Reporter, do hereby certify:

5            That prior to being examined, the witness

6    in the foregoing proceedings was by me duly sworn to

7    testify to the truth, the whole truth, and nothing

8    but the truth;

9            That said proceedings were taken by me in

10   shorthand and thereafter transcribed into

11   typewriting under my direction and supervision;

12           That I am neither counsel for, nor related

13   to, any party to said proceedings, nor in any way

14   interested in the outcome thereof.

15           I further certify that I am not a party to

16   any stipulation, if made, that would waive my duties

17   mandated by the Court Reporters Board of California.

18           In witness whereof, I have hereunto

19   subscribed my name.

20           Dated:  30th of July, 2024

21

22           Tammy Moon

23           ------------------------

24   Tammy Moon, CSR No. 13184, RDR, CRR

25
```