1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COSTAR GROUP, INC., AND COSTAR REALTY INFORMATION INC., | Case No.: 2:20-cv-08819-CBM-AS |
| Plaintiffs, | **ORDER RE: CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| COMMERICAL REAL ESTATE EXCHANGE, INC., | |
| Defendant. | |

The matters before the Court are CoStar's Motion for Partial Summary Judgment (Dkt. No. 833 ("CoStar Motion")) and CREXi's Motion for Partial Summary Judgment (Dkt. No. 838 (CREXi Motion")).

## I.    BACKGROUND

This is a copyright infringement action filed by CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar") in September 2020 against Commercial Real Estate Exchange Inc. ("CREXi").  (Dkt. No. 1.)  CoStar alleges three claims in the Third Amended Complaint: (1) copyright infringement (17 U.S.C. §§ 106, 501); (2) removal of copyright management information in violation

of the Digital Millenium Copyright Act ("DMCA," 17 U.S.C. § 1202(b)(1)); and (3) distribution of works with removed or altered copyright management information (17 U.S.C. § 1202(b)(3)).  (*See* Dkt. No. 912 ("TAC"), ¶¶ 219-247.) CoStar alleges CREXi infringed on 48,756 images in total.  (*See* Ex. A, TAC.) CREXi denies all claims.[1]  (*See* Dkt. No. 923 ("Answer to TAC"), ¶¶ 219-247.)

**A.    Factual Background**

CoStar is a company that provides commercial real estate ("CRE") information, analytics, and online property listing marketplaces.  CoStar Statement of Undisputed Facts ("SUF") ¶ 2.  CoStar owns and operates LoopNet.com, a digital marketplace platform for CRE listings.  *Id.* ¶ 3.  CoStar hires photographers to take photos of CRE properties, takes "hundreds of thousands of images of CRE properties annually," and has expended "millions of dollars to populate and maintain its library of CRE photographs."  *Id.* ¶¶ 5-6, 8-9.  CoStar registers its photographs of CRE properties with the U.S. Copyright Office.  *Id.* ¶ 10.  CoStar also utilizes a watermark on photos, which consists of five polygons arranged in a circular fashion such that "the inner figure forms a five-pointed star."  *Id.* ¶¶ 11-12. CoStar contends that CREXi has engaged in "mass infringement" of CoStar's photographs.  *Id.* ¶¶ 29-35, 41, 70-76.

CREXi also operates a CRE listing platform that facilitates buying, selling, and leasing properties and is a competitor of CoStar.  CREXi SUF ¶¶ 27-29. CREXi's users can create listings and upload photographs onto CREXi's platform. *Id.* ¶¶ 28-29.  There are two ways for users to upload photographs "directly to CREXi's listing platform"—(1) through a webform provided by CREXi, or (2)

---

[1] Although CREXi has filed counterclaims against CoStar (*see* Dkt. No. 74), the subject of both parties' Motions are CoStar's claims for copyright infringement and violations of the DMCA in the operative TAC.  CREXi's counterclaims are not the subject of either party's Motions.

through an API feed.[2]  (Dees Decl.,[3] ¶¶ 6-7, 20.)  CREXi refers to these images as "User-Uploaded" images.  The API feed transmits data from the user's website to CREXi's website "without any human intervention" based on the user updating their own website with a listing.  (*Id*., ¶ 20; Reshetnikov Depo. Tr. at 36:19-37:5.) The webform allows users to create listings and upload images to use in their listings through an "Add Properties" and an "Add Photos" button, respectively.  (*Id*, ¶ 7.) The webform also allows users to add an "Offering Memorandum" or marketing flyer to the listing, which "may contain photographs."  (*Id*., ¶ 8.)  CREXi has offered this webform tool to users since around October 2016.  (*Id*., ¶ 10.)

In contrast to this user-upload method, users may also send listing information and photos to CREXi for CREXi to build listings and/or upload photos on their behalf.  (*Id*., ¶ 37.)  CREXi refers to these images as "User-Directed" images.  CREXi uses offshore, third-party vendors ("BPOs") to complete certain work for the company, including creating and updating listings for CREXi's platform, reviewing websites of certain CREXi brokers for purposes of creating or updating listings, assisting with creation of broker profiles, and performing quality control work for CREXi.  (CREXi Responses and Objections to Interrogatory No. 5.)

**B.    Partial Summary Judgment**

CoStar moves for partial summary judgment "as to liability only, on its claim for copyright infringement" of 46,506 of the 48,756 allegedly infringed images, including partial summary judgment as to CREXi's safe harbor and unclean hands defenses. (CoStar Mot. at 3.)  CREXi moves for summary judgment "on the entirety of CoStar's DMCA claims" and partial summary judgment on CoStar's copyright

---

[2] "API" stands for Application Programming Interface—CREXi's API feeds are "software intermediaries that connect CREXi's website to API-users' websites." CREXi SUF ¶ 41; Dkt. No. 838-8 ("Dees Decl. ISO CREXi Mot."), ¶ 20.
[3] (*See* Dkt. No. 838-8.)

infringement claim as to certain subsets of images—(1) images uploaded by CREXi's users, (2) certain of the images stored at the direction of a user, and (3) images that are time-barred by the applicable three-year statute of limitations—on the grounds that it did not engage in volitional conduct and that the safe harbor defense applies.[4]  (CREXi Mot. at 7–9.)  The parties disagree as to the number of images at issue in the lawsuit—CoStar contends there are 48,756 total images at issue, whereas CREXi contends the number is 44,339.  At the hearing on the Motions, both sides confirmed that the parties will be able to come to an agreement on the total number of images at issue in the case and images affected by this order. Thus, the Court leaves it to the parties to sort out the number of images affected by this Order.

## II.    STATEMENT OF THE LAW

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).  A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986), and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris,* 550 U.S. 372, 378 (2007).  A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

---

[4] CREXi argues that subset (1) contains 23,609 images in total, and subset (2) contains 36,637 images in total, which includes the 23,609 images in subset (1) plus an additional 13,028 images.  (CREXi Mot. at 8.)  Subset (3) contains 5,456 images in total, but it is unclear how many images in this subset overlap with subsets (1) or (2).  (*Id.* at 9.)

477 U.S. 242, 248 (1986).  In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Anderson*, 477 U.S. at 255.

Once the moving party satisfies its burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Celotex*, 477 U.S. at 322–23.  There must be more than a mere scintilla of contradictory evidence to survive summary judgment.  *Anderson*, 477 U.S. at 249; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Nor will "uncorroborated and self-serving" testimony create a genuine issue of material fact.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

The Court should grant summary judgment against a party who fails to demonstrate facts sufficient to establish an element essential to the case when that party will ultimately bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.

## III.    DISCUSSION

### A.    Evidentiary Objections

Both parties lodged several evidentiary objections to certain evidence submitted in support of the Motions.  (Dkt. Nos. 901-5; 895-1.)[5]  "In motions for

---

[5] CoStar's objections were lodged within its Statement of Genuine Disputes of Material Facts, and were not numbered, nor were the objections accompanied by a proposed order identifying all of its evidentiary objections.  This made it difficult for the Court to keep track of all of CoStar's objections.

summary judgment with numerous objections, it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." *Capitol Recs., LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n. 1 (C.D. Cal. 2010); *Seirafi v. City of Riverside*, 2022 WL 228152, at *1 (C.D. Cal. Jan. 26, 2022) (stating same). Further, many of the objections raised are as to form in which the evidence is presented. At the summary judgment stage, "the court is concerned only with the admissibility of the relevant *facts* at trial, and not the *form* of these facts as presented in the motions." *Hesselbrock v. I.Q. Data Sys.*, 2024 WL 4868261, at *3 (C.D. Cal. Sept. 3, 2024) (emphasis in original); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

The Court finds that, due to the number of objections made by the parties, it is impractical and unnecessary for the Court to rule on each objection separately. However, certain objections are well-taken and the Court hereby **SUSTAINS** them:

- CREXi's Objection No. 4 to the Declaration of Daniel McCallum, ¶ 5. *See* Fed. R. Evid. 1002; *United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004) (Federal Rule of Evidence 1002 "does apply when a witness seeks to testify about the contents of a writing . . . without producing the physical item itself—particularly when the witness was not privy to the events those contents describe"); *Clinton v. Adams*, 2014 WL 6896021, at *4 (C.D. Cal. Dec. 5, 2014) (finding the agreement itself "is required to establish its content").
- CREXi's Objection No. 5 to McCallum Decl., ¶ 7. *See* Fed. R. Evid. 602, 801; *Dish Network L.L.C. v. Jadoo TV, Inc.*, 2023 WL 4004115, at *6 (N.D. Cal. June 13, 2023) ("The Ninth Circuit has held that a defendant's declaration did not satisfy the requirements of Rule 56(e) where the defendant provided statements beginning with 'I believe' yet lacked personal knowledge of the statements' details") (citing *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525 (9th Cir. 1991)).

- CREXi's Objection No. 11 to the Declaration of Anne Malinee, ¶ 5. *See* Fed. R. Evid. 602, 801; *Maciel v. M.A.C. Cosms., Inc.*, 2022 WL 17340634, at *4 n. 1 (N.D. Cal. Nov. 30, 2022) ("The Court does not accept Ms. Gao's testimony because as MAC's outside counsel she has no personal knowledge of MAC's pricing and she would not be allowed to so testify at trial").
- CREXi's Objection No. 13 to Malinee Decl., ¶ 8. *See* Fed. R. Evid. 602, 801; *Maciel*, 2022 WL 17340634 at *4 n. 1.
- CREXi's Objection No. 15 to Malinee Decl., Exs. 257-58, 260-61, 263-64, 265-66, 268-70. *See* Fed. R. Evid. 901.
- CoStar's Objection to the Declaration of Lawson Dees (Dkt. No. 838-8), ¶¶ 11, 44. *See Yeager v. Bowlin*, 693 F.3d 1076, 1080 ("a district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember," but "[i]n order to trigger the sham affidavit rule . . . the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit") (internal quotations omitted).
- CoStar's Objection to the Declaration Eugene Reshetnikov, ¶¶ 9-10. *See Yeager*, 693 F.3d at 1080.
- CoStar's Objection to Opinion 5 of Andrew Crain. (*See* Dkt. No. 1150 (Order re Mot. to Exclude Opinion 5 of Andrew Crain).)

Otherwise, the parties' remaining objections are **OVERRULED** because the Court finds the evidence is relevant and admissible.

## B.    Copyright Infringement (Count One)

CoStar argues that there are no genuine disputes of fact as to its prima facie claim for copyright infringement. (CoStar Mot. at 19.) CREXi argues that as to the User-Uploaded images, CoStar cannot prove CREXi's volitional conduct, and as to a subset of the User-Directed images, genuine disputes of material fact preclude summary judgment. (CREXi Mot. at 17.)

"To establish a prima facie case of direct infringement, a plaintiff must show ownership of the allegedly infringed material and "demonstrate that the alleged infringers violated at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017)

(internal quotations omitted).  "In addition, direct infringement requires the plaintiff
to show causation (also referred to as 'volitional conduct') by the defendant."  *Id.*

### 1.    Ownership

17 U.S.C. § 410(c) states that "[i]n any judicial proceedings the certificate of
a registration made before or within five years after first publication of the work
shall constitute prima facie evidence of the validity of the copyright and of the facts
stated in the certificate.  The evidentiary weight to be accorded the certificate of a
registration made thereafter shall be within the discretion of the court."

The Court finds that the copyright registrations provided by CoStar, taken
together with the Edalatkhah Declaration, establishes that CoStar owns the images
for which it seeks partial summary judgment.  The Edalatkhah Declaration details
CoStar's copyright registration process and its record-keeping process for tracking
which images are covered by which registrations dating back to 2002.  (Edalatkhah
Decl., ¶ 7.)  Edalatkhah declares that for each of CoStar's copyright registrations,
CoStar has a "set of internal files that mirrors the copy sent to the Copyright Office
(which is referred to as a 'deposit copy'), and that the images stored within these
files have file names that "equate[] to CoStar's internal AttachmentMasterID," (*Id.*)
Edalatkhah then declares that he verified a copyright registration covers each of the
images at issue in this case by matching the "AttachmentMasterID" of the images
in CoStar's internal files with the AttachmentMasterID of the images listed in the
Master Image Spreadsheet.  (*Id.*, ¶¶ 13-18.)[6]

CREXi's evidence that CoStar has amended its "Master Image Spreadsheet"

---

[6] This distinguishes this case from *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp.
2d 1090 (W.D. Wash. 2004), where there was "no way to corroborate th[e] link"
shown in the spreadsheet connecting the photo at issue to a copyright registration.
*Seiler v. Lucasfilm, Ltd.*, which CREXi also cites, is inapposite because in that case,
the plaintiff attempted to claim infringement over certain original drawings, yet his
copyright registration only covered the reconstructions of those drawings.  808 F.2d
1316, 1322 (9th Cir. 1986).

multiple times and abandoned some of the alleged infringed images does not rebut CoStar's evidence that the images for which CoStar is *currently* claiming infringement are owned by CoStar.[7]  There is no evidence rebutting the showing of ownership CoStar has made on the remaining images at issue.  CREXi also argues that CoStar cannot establish ownership because CoStar has failed to provide evidence of the employment status for the photographers that took the images. (Opp. at 15.)  However, many of the certificates state that the work in question was a "work made for hire" and/or that CoStar was the "employer for hire" of the photographer.  (*See, e.g.*, Malinee Decl., Ex. 272, VA 2-060-770.)  The certificates are also clear that the author of the images is CoStar.  Thus, CoStar does not need to provide additional evidence establishing the employment status of the photographers who took the images—the certificates themselves are evidence that CoStar is the author and owns the rights to the works.[8]

Accordingly, there is no genuine dispute of fact that CoStar owns the images for which it seeks partial summary judgment.

  2.  *Volitional Conduct*

CoStar argues that its exclusive rights in reproduction (17 U.S.C. § 106(1)), display (17 U.S.C. § 106(5)), distribution (17 U.S.C. § 106(3)), and to create

_____

[7] CREXi also submits evidence indicating that certain images are not owned by CoStar.  (*See, e.g.*, Zaleski Decl., Exs. 2, 16, 43, 79, 88.)  At the hearing on the Motions, the parties confirmed that these images have since been removed from the Master Image Spreadsheet and are no longer at issue in the case.

[8] CREXi argues that many of the certificates postdate publication of the allegedly protected work by more than five years, which precludes a presumption of ownership.  (Opp. at 14 n. 3.)  However, "the registration of a copyright more than five years after first publication does not render the registration invalid"—instead, it "merely places within the discretion of this Court the 'evidentiary weight' due to the registration."  *McGucken v. Triton Elec. Vehicle LLC*, 2022 WL 2101725, at *4 (C.D. Cal. Mar. 21, 2022).  Because CoStar has provided the Edalatkhah Declaration stating that each image at issue is covered by one of the copyright registrations CoStar owns, this is sufficient to establish ownership "even without allowing the registration the presumption of validity."  *Id.*

derivative works (17 U.S.C. § 106(2)) have been violated. (CoStar Mot. at 20.) CREXi offers no response as to whether CoStar's exclusive rights have been violated—instead, it argues that CoStar cannot show CREXi engaged in volitional conduct in any alleged copyright infringement. (CREXi Mot. at 17–19; CREXi Opp. at 16–20.)

"'[V]olition' in this context does not really mean an 'act of willing or choosing' or an 'act of deciding.'" *Giganews*, 847 F.3d at 666. The volition requirement is not one of "intent or knowledge; it is a basic requirement of causation." *Id.* That is, "direct copyright liability for website owners arises when they are *actively involved* in the infringement." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 732 (9th Cir. 2019) (emphasis in original) (affirming summary judgment for defendant on direct copyright infringement claim for certain photos on Zillow's listing platform). "Thus, the distinction between active and passive participation [is] a central part of the analysis of an alleged infringement." *Giganews*, 847 F.3d at 667. "[T]here must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *VHT*, 918 F.3d at 732 (quoting *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004)). "By contrast, activities that fall on the other side of the line, such as automatic copying, storage, and transmission of copyrighted materials, when instigated by others, do not render an Internet service provider strictly liable for copyright infringement." *Id.* (internal quotations and brackets omitted). Thus, "to demonstrate volitional conduct, a party . . . must provide some evidence showing the alleged infringer exercised control (other than by general operation of its website); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution of its photos." *Id.* (internal quotations and brackets omitted). Importantly, "[w]hether [a defendant] intended to infringe [on the] copyright is ultimately immaterial—the innocent intent of the

10

defendant constitutes no defense to liability." *Bell v. Wilmott Storage Servs., LLC*, 12 F. 4th 1065, 1082 (9th Cir. 2021).

In *Princeton Univ. Press v. Michigan Document Servs., Inc.*, the Sixth Circuit found the plaintiff had made a prima facie case of copyright infringement against a copy shop where "[t]he physical production of coursepacks is typically handled by a commercial copyshop.  The professor gives the copyshop the materials of which the coursepack is to be made up, and the copyshop does the rest.  Adding a cover page and a table of contents, perhaps, the copyshop runs off as many sets as are needed, does the necessary binding, and sells the finished product to the professor's students."  99 F.3d 1381, 1384 (6th Cir. 1996).  Courts have since used this "copyshop" framework to draw comparisons to internet service providers ("ISPs").  "[A] copy machine owner who makes the machine available to the public to use for copying is not, without more, strictly liable under § 106 for illegal copying by a customer.  The ISP in this case is an analogue to the owner of a traditional copying machine whose customers pay a fixed amount per copy and operate the machine themselves to make copies." *CoStar*, 373 F.3d at 550; *see also VHT*, 918 F.3d at 738 ("courts have analogized online facilities, like Internet service providers, to a copy machine owner, who is not liable '[w]hen a customer duplicates an infringing work.'").  In this context, the ISP's conduct crosses the line of infringement when it moves from "mak[ing] photocopiers available to the public on its premises" to "operat[ing] the copying system to make the copy" when "customers request a copy from the copy shop's human employees." *Gardner v. CafePress Inc.*, 2014 WL 6890934, at *4 (S.D. Cal. Dec. 4, 2014) (denying summary judgment on direct infringement claim after finding the evidence showed defendant "does engage in at least some volitional conduct" because "a significant portion of the [copying] process is done by CafePress itself, namely the production and sale of the allegedly infringing items").

In contrast, courts have found that an ISP's conduct is not volitional where

1  "the materials posted are of a type and kind selected by the subscriber and at a time
2  initiated by the subscriber" and "users who wish to access a subscriber's
3  information may do so without intervention from [the ISP]." *CoStar*, 373 F.3d at
4  555 (finding ISPs "passively storing materials at the direction of users in order to
5  make that material available to other users upon their request, do not 'copy' the
6  material in direct violation of § 106 of the Copyright Act"); *see also VHT*, 918 F.3d
7  at 733 (finding Zillow's conduct was not volitional where the "content of the Listing
8  Platform is populated with data submitted by third-party sources" and "[t]he feed
9  providers themselves select and upload every photo . . . that wind up on the Listing
10 Platform"). Additionally, courts have held that conduct aimed at protecting against
11 copyright infringement does not demonstrate volition. In *CoStar*, a case with very
12 similar facts and involving the same Plaintiffs here, the Fourth Circuit held that the
13 defendant's review process to determine whether photos in fact depicted
14 commercial real estate and to "identify any obvious evidence . . . that the photo[]
15 may have been copyrighted by another" was not volitional conduct because the
16 review was "so cursory as to be insignificant," and that to the extent any review
17 went further than this, "it [was] because of CoStar's complaints about copyright
18 violations." 373 F.3d at 556. And in *VHT*, the Ninth Circuit found that Zillow's
19 conduct in managing its "Listing Platform" was not volitional because Zillow
20 required feed providers to "certify the extent of their rights to use each photo" and
21 then "classified each photo . . . and programmed its automated systems to treat each
22 photo consistently with that scope of use." *VHT*, 918 F.3d at 733. Thus, Zillow's
23 conduct did not constitute "exercis[ing] control" over photos "beyond the 'general
24 operation of [its website].'" *Id*.

25     Considering the above, the critical issues here are whether CREXi's users
26 "selected" every image at issue and whether CREXi exercised any control over
27 which images were displayed "beyond the general operation of its website." *VHT*,
28 918 F.3d at 733. Because the relevant facts differ depending on whether a user or

a CREXi employee uploaded the image onto CREXi's website, the Court analyzes volition for "User-Uploaded" and "User-Directed" images separately.

a)    <u>User-Uploaded Images</u>

For User-Uploaded images, it is undisputed that CREXi's users complete the webform to create a listing, including selecting the photos they want displayed in a listing. Similarly, it is undisputed that the API feed automatically transmits listing data (including photos) from a user's website to CREXi's website. Under both methods, the users select the photos. However, CoStar contends that CREXi actively participates and causes infringement based on its conduct *after* the photos are submitted by users.

First, CoStar argues that "CREXi decides *how* images will be sorted and displayed on its website" by "boosting listings (and associated images) from its paying "Pro" subscribers" in search results on its website and by "implementing an algorithm that promotes certain listings (and images) above others." (CoStar Mot. at 23.) However, CREXi's Vice President of Engineering describes how CREXi's search function works and declares that the search algorithms are "entirely automatic" and consider factors such as similarity of a listing to a user's prior search history, whether the property is associated with active brokers on the website, and the type of listing (*i.e.*, whether it is a "Pro" or "Auction" listing). (Reshetnikov Decl., ¶¶ 5, 8.) Reshetnikov declares that the search algorithms "never alter the images" or the order in which they appear within a listing, nor does the platform "provide any way for users to search for photographs of properties." (*Id.*, ¶ 6.) This evidence does not indicate that CREXi's search function selects which *images* are shown on the website—only *listings*. All CoStar's evidence shows is that CREXi's algorithm prioritizes Pro subscribers' listings. (*See* Malinee Decl., Exs. 104, 159.) There is no evidence suggesting that the algorithm is informed by the image content

13

within the listings.[9]  Without such evidence, CoStar has not shown that the search function constitutes volitional conduct.  *See VHT*, 918 F.3d at 733 (rejecting argument that by designing a system that caused "a reproduction, display, and adaptation" of photographs on its listing platform, Zillow engaged in volitional conduct); *Stross v. Twitter, Inc.*, 2022 WL 1843142, at *2 (C.D. Cal. Feb. 28, 2022) (granting motion to dismiss copyright infringement claim where there were no facts "indicating whether this is an active decision . . . or an algorithmic one").

Second, CoStar argues that CREXi includes "CoStar-owned images in its curated marketing materials that it blasts over the Internet," and that CREXi "selects, copies, and then distributes these images with no broker involvement." (CoStar Mot. at 23.)  However, there is no evidence of any e-blasts that included any of the 46,506 images at issue.  The only example e-blast CoStar offers contains no images.[10]  (*See* Malinee Decl., Exs. 6, 14, 25, 103, 105, 202-203.)  Accordingly, CoStar has not shown that the marketing blasts caused any infringement of the photos at issue here.

Next, CoStar argues that CREXi conducts a "rigorous" quality control

---

[9] CoStar's citations are inapposite.  In *Cook v. Meta Platforms Inc.*, the plaintiff alleged that through its targeted advertising process, Facebook "posts the advertisements and does so selectively, sending them to specific Facebook users and not others.  2023 WL 6370891, at *5 (N.D. Cal. Jan. 4, 2023).  Here, the user, not CREXi, determines which listings are returned when the user inputs a query into the search function.  In *Williams-Sonoma, Inc. v. Amazon.com, Inc.*, the plaintiff alleged facts supporting the inference that Amazon's "image-selection algorithm affirmatively selects the image that it deems 'most likely to make the sale'—Amazon makes an editorial, qualitative decision" about which photo to show.  627 F. Supp. 3d 1072, 1082 (N.D. Cal. 2020).  There is no evidence CREXi makes such a decision under its algorithm.

[10] CoStar argues that CREXi "refused" to produce evidence regarding the e-blasts and thus "any benefit from that gap should accrue to CoStar.  (CoStar Reply at 10; *see also* Dkt. No. 945-3 ("Griffitts Decl.") ¶ 8.)  However, it is unclear how the audit logs would provide evidence that CREXi used any of CoStar's photos in its e-blasts.

process of listings, which includes reviewing listings for any photo-related issues (such as blurry, upside down, pixelated, or inaccurate photos).  (CoStar Mot. at 24.) CoStar provides ample evidence indicating CREXi did conduct quality control over user listings, including the images therein.  (*See* Malinee Decl., Exs. 130, 135, 140, 157; Burton Depo. Tr. at 17:12-20, 19:17-20:6; N. DeGiorgio Depo. Tr. at 67:3-5; K. Khan Depo. Tr. at 173:20-174:5, 175:3-8.)   The evidence also indicates this review may have been more than "cursory."  (*See* N. DeGiorgio Depo. Tr. at 223:23–224:13; Malinee Decl., Ex. 134; Dahl Decl., Exs. 38-39.)  CREXi, however, provides evidence suggesting that at least for a period of time, it did not conduct quality control on listings, and that even in a quality control context, it does not reject images submitted with listings unless the images "contain third-party branding . . . or hit on a filter indicating a match to an image in a library of images that CoStar claims to own."  (Dees Resp. Decl., ¶ 15; *see also* Randel Depo. Tr. at 154:12-155:12, 158:6-9; N. DeGiorgio Depo. Tr. at 69:17-22, 100:24-102:24; M. DeGiorgio Tr. at 184:24-185:1; Malinee Decl. Ex. 49.)

Ultimately, the record currently before the Court regarding CREXi's quality control of images leaves material facts unresolved.  First, the nature and extent of CREXi's communications with its users about image submissions is unclear— there is conflicting evidence regarding whether, to the extent CREXi notified users of any issues, it *required* the user to change an image before the user's listing could be displayed, or merely alerted the user to the issue and left the ultimate decision up to the user.[11]  If CREXi conditioned the display of user listings upon the use of images

---

[11] CoStar's evidence indicating CREXi rejects listings that do not meet its criteria does not establish whether CREXi ever rejected a user-built listing because of quality issues with an *image*.  (*See* Malinee Decl., Exs. 46, 148.)  Further, because CoStar did not differentiate what evidence relates to User-Uploaded images versus User-Directed images, it is unclear whether certain evidence showing CREXi informed brokers it could not use certain images relates to both categories of images or only User-Directed images.

that satisfied CREXi's quality control criteria, this would indicate CREXi exerted some control over whether and when photos were posted.[12]  If, however, users were free to disregard CREXi's suggestions, CREXi's conduct was not volitional because the photos were "of a type and kind selected by the [user] and at a time initiated by the [user]."[13]  *CoStar*, 373 F.3d at 555.  Further, to the extent CREXi prevented users from using photos because there was some indication that others may have had a copyright over the photo, that conduct cannot support "volition." *See id*. at 556 ("turn[ing] away customers who are attempting to duplicate clearly copyrighted works" is not volitional conduct); *VHT*, 918 F.3d at 733 ("copyright-protective" systems for managing photos is not volitional).[14]

Second, it is unclear whether such communications caused any users to upload the infringing photos at issue in this case.  The evidence does not show whether CREXi's conduct caused users to upload the infringing photos at issue here, as opposed to non-infringing photos.  A user could have also initially uploaded a low-quality version of an infringing photo, but replaced the photo with a high-quality version of the same photo—in that scenario, the user, not CREXi, would have committed the infringement.  Because the volition requirement is "a basic

---

[12] CREXi's evidence that any image logged in its system as "User-Uploaded" necessarily must have been added by a user, not a CREXi employee or vendor, does not answer the question of whether CREXi caused its *users* to upload any of the infringing photos, which would still appear as "User-Uploaded" in its system.  (*See* Dees Resp. Decl., ¶ 12-14; Ex. 25.)

[13] CREXi provides evidence that its BPOs did not "exercise any editorial control over photographs at all" (Khan Depo. Tr. at 407:14-408:15), but another court in this district has found that quality checks for "blurry" photos can establish volition. *Sid Avery & Assocs., Inc. v. Pixels.com, LLC*, 479 F. Supp. 3d 859, 866 (C.D. Cal. 2020).

[14] For this reason, evidence that CREXi used third parties to scan and filter User-Uploaded images containing third-party logos does not show volition because to the extent this conduct went further than a "simple gatekeeping function," it was to detect potential copyright issues and due to "CoStar's complaints about copyright violations."  *CoStar*, 373 F.3d at 556.

requirement of causation," CoStar must prove that any quality control by CREXi actually *caused* infringement. *Giganews*, 847 F.3d at 666 ("infringement of the reproduction right requires copying *by* the defendant"). CoStar has not shown an absence of disputed fact that CREXi's "conduct [has a] nexus sufficiently close and causal to the illegal copying." *VHT*, 918 F.3d at 732; *see also CoStar*, 373 F.3d at 550. Likewise, CREXi has not shown beyond dispute that it did not engage in volitional conduct.[15]

Finally, CoStar argues that CREXi refuses to take down images even when it knows such material infringes upon CoStar's copyrights. (CoStar Mot. at 24.) CoStar provides letters to CREXi from CoStar's counsel in this case, alleging that CREXi has continued to infringe upon CoStar images. Because this evidence is inadmissible (*see* Fed. R. Evid. 901) and CoStar provides no other evidence to support its argument, CoStar has not shown that CREXi's purported refusal to take down images constitutes volitional conduct.

Accordingly, factual disputes preclude partial summary judgment on CoStar's copyright infringement claim based on the User-Uploaded images. (*See* Burton Depo. Tr. at 17:12-20, 19:17-20:6; N. DeGiorgio Depo. Tr. at 67:3-5, 69:17-22, 100:24-102:24; K. Khan Depo. Tr. at 173:20-174:5, 175:3-8; Randel Depo. Tr. at 154:12-155:12, 158:6-9; M. DeGiorgio Tr. at 184:24-185:1; Dees Resp. Decl., ¶ 15; Malinee Decl., Exs. 49, 130, 135, 140, 157.)

b)    User-Directed Images[16]

Unlike the User-Uploaded images, the evidence clearly shows that CREXi's involvement in User-Directed images is extensive and constitutes volition under the

---

[15] CREXi's evidence that it required all users uploading images to agree to its Terms of Service does not show beyond a disputed fact that CREXi itself did not engage in volitional conduct that caused infringement.

[16] As mentioned, CoStar did not distinguish between alleged volitional actions that were taken for User-Uploaded images and those taken for User-Directed images. To the extent those actions overlap, the Court does not discuss them again in this

law.  These images were included in listings that were actually built *by* CREXi employees and its BPOs.  There is ample evidence that CREXi and its BPOs copied listing information, including images, from LoopNet when a listing could only be found on LoopNet, and that CREXi would take screenshots of photos or otherwise crop out CoStar's watermarks from photos to build out listings on its website.  (*See* Malinee Decl., Exs. 46-47, 56-57, 64-72, 90-99, 138-139.)  There is also evidence that in some instances, CREXi may have posted listings on its website when the brokers for those listings had not given permission for CREXi to do so (although it is not clear whether any of these listings included the infringed images).  (*See* Malinee Decl., Exs. 32-33, 34, 44-45, 80, 132, 185-186.)  The evidence shows that when building out listings for its users, CREXi and its BPOs were involved to some extent in selecting the images used and endeavored to fix issues with and avoid blurry images.  (*See* Malinee Decl., Ex. 118; Ex. 175; N. DeGiorgio Depo. Tr. at 100:24-102:24; K. Kibran Depo. Tr. at 91:8-23, 101:23-103:8, 99:24-100:1, 102:25-103:8, 480:19-25.)

CREXi's evidence[17] raises questions of fact regarding the level of discretion CREXi and its BPOs had in building out listings for users, but this is largely immaterial because the relevant question is who is "operat[ing] the copying system to make the copy."  *Gardner*, 2014 WL 6890934 at *4.  In the User-Directed context, it is undisputed that CREXi employees and its BPOs operate the copying system.  Thus, CREXi's contention that it only added images at the direction of its users is irrelevant.  Other district courts have found volition in similar circumstances.  *See id.; Dish Network L.L.C. v. Jadoo TV, Inc.*, 2023 WL 4004115, at *10 (N.D. Cal. June 13, 2023) (finding volition where defendant's employee

---

section.

[17] (*See* Dees Decl., ¶ 37; Dees Resp. Decl., ¶ 16; Dees Depo. Tr. at 105:1-7, 149:7-15; Burton Depo. Tr. at 158:5-159:10; Khan Depo. Tr. at 461:2-462:16; Malinee Decl., Ex. 49.)

"uploaded and streamed the infringing content); *UMG Recording, Inc. v. Escape Media Grp., Inc.*, 2014 WL 5089743, at \*22 (S.D.N.Y. Sept. 29, 2014) (finding volition where "defendants instructed their employees to repeatedly upload substantial volumes of popular copyrighted music files to Grooveshark").

Further, it is clear from the evidence that the process by which CREXi and its BPOs built listings was not automated—on the contrary, the process was very manual and depended on human input of data and images, distinguishing this case from *VHT*. *See Gardner*, 2014 WL 6890934 at \*5 (finding evidence of volition where defendant did not contend its process was "completely automated and thus devoid of human employees"). This conduct is far from "cursory," and unlike the Fourth Circuit *CoStar* case, it cannot be compared to "station[ing] a guard by the door to turn away customers" to try and prevent copyright infringement. 373 F.3d at 556. Taken together with Exhibit 25 to the Dees Declaration, which identifies the infringed images that were uploaded "at the direction of [a] CREXi user," the evidence establishes there is no genuine dispute of fact as to whether CREXi engaged in volitional conduct as to the User-Directed images.

      c)   CREXi's BPOs

The parties dispute whether, to the extent the infringing conduct at issue was carried out by CREXi's BPOs, the BPOs were CREXi's agents and the conduct is therefore attributable to CREXi. "For an agency relationship to exist, an agent must have authority to act on behalf of the principal and the person represented must have a right to control the actions of the agent." *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017). "An agency relationship may be created through actual or apparent authority." *Id*. An agent's authority "may be proved by circumstantial evidence," but "unless only one conclusion may be drawn, existence of an agency and the extent of an agent's authority is a question of fact and should not be decided on summary judgment." *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 479–80 (9th Cir. 2000);

1  *Mavrix*, 873 F.3d at 1054 (holding genuine disputes of fact remained as to whether
2  social media platform's volunteer moderators were platform's agents when they
3  reviewed and deleted posts that failed to comply with certain rules).

4      There is no genuine dispute that CREXi retained the BPOs to build listings,
5  perform quality control, and make material available on CREXi's website based on
6  CREXi's specifications, or that CREXi supervised the BPO's work.  (*See* Malinee
7  Decl., Exs. 37, 247; R. Smith Depo. Tr. at 35:9-21, 64:8-21, 140:7-9; C. Vien Depo.
8  Tr. at 186:25-187:7; J Drapeau Depo. Tr. at 23:5-16.)  There is also no genuine
9  dispute that CREXi instructed its BPOs on how to build listings, including to
10  remove the watermark from any CoStar-watermarked images before using an image
11  in a listing.  (*See* Malinee Decl., Exs. 46-47, 64-72, 174, 107-109; 199, 243; J.
12  Burton Depo. Tr. at 64:3-12, 59:25-60:3.)  CREXi argues that there is a question of
13  fact regarding the scope of the BPOs' authority to use LoopNet/CoStar to build
14  CREXi listings and to crop out watermarks from images.  CREXi concedes that
15  CoStar's evidence shows CREXi instructed BPOs to crop out watermarks when
16  building listings, but argues that CoStar's evidence "reflects a limited date range
17  between October 2019 until the lawsuit was filed in September 2020."  (*See* Dkt.
18  No. 893-2, ¶ 68.)   First, evidence that CREXi told the BPOs not to visit
19  LoopNet/CoStar websites (*see* Dees. Decl., ¶ 30-31 & Ex. 24; Malinee Decl., Exs.
20  193, 195-198; Dees Resp. Decl., Exs. 2-4, 6-8; *id.*, ¶¶ 29-30) does not rebut the
21  evidence showing that CREXi told the BPOs they could use CoStar-watermarked
22  images as long as the watermarks were cropped out.  Second, there is no evidence
23  that CREXi prohibited its BPOs from using CoStar-watermarked images or
24  cropping out watermarks from images under any circumstances before this lawsuit
25  was filed.  Thus, CREXi's evidence only raises a question of fact regarding whether
26  the BPOs were authorized to use any infringed images (after removing the
27  watermarks) *after* this lawsuit was filed.  Based on the evidence, there is no genuine
28  dispute of fact that the BPOs were CREXi's agents in building listings, including

adding any infringed images that were uploaded by a BPO user, before this lawsuit was filed.

*                    *                    *

Accordingly, the Court finds that genuine disputes of fact remain on CoStar's copyright infringement claim as to the User-Uploaded images and on whether CREXi's BPOs exceeded the scope of their authority for any infringed images displayed on CREXi's website after this lawsuit was filed.  However, there is no genuine dispute of fact that CoStar has stated a prima facie case for copyright infringement as to the User-Directed images displayed before the lawsuit was filed.[18]

## C.    DMCA Claims (Counts Two and Three)

CREXi moves for summary judgment on both of CoStar's DMCA claims on the grounds that (1) CoStar cannot show that its watermark logo is cognizable copyright management information ("CMI"); and (2) CoStar cannot satisfy the requisite scienter elements as to CREXi.  (CREXi Mot. at 6.)  To defeat summary judgment, CoStar need only raise a dispute of material fact as to these factors.  *See Anderson*, 477 U.S. at 249; *Addisu*, 198 F.3d at 1134.  CoStar's DMCA claims are brought under brought under 17 U.S.C. §§ 1202(b)(1) and 1202(b)(3).  17 U.S.C. § 1202(b) states:

> No person shall, without the authority of the copyright owner or the law—
>> (1) intentionally remove or alter any copyright management information
>> . . .
>> (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without

---

[18] While CoStar has proven the elements of its copyright infringement claim for these images, CREXi's ultimate liability hinges on whether any of its affirmative defenses apply.  Those defenses are discussed below.

authority of the copyright owner or the law,
knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title."

17 U.S.C. § 1202(c) defines "copyright management information" to mean "any of the following information conveyed in connection with copies or . . . displays of a work, including in digital form . . . :

> (1) The title and other information identifying the work, including the information set forth on a notice of copyright.
> (2) The name of, and other identifying information about, the author of a work.
> (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.
> . . .
> (7) Identifying numbers or symbols referring to such information or links to such information.
> (8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work."[19]

1.    *CoStar's watermark*

As an initial matter, the Court is not persuaded by CREXi's arguments that CoStar's logo must be "plainly . . . understood by the public as indicating copyright ownership." (CREXi Mot. at 15.) This position is not supported by the statutory text of § 1202(c). While the Court recognizes that some district courts have interpreted the statute in this manner, other courts have found that "the meaning of CMI is broad" and can include watermarks that on their face, a member of the public would not immediately recognize as indicating copyright ownership. *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 137 (E.D.N.Y. 2019) ("[b]ecause a watermarked corporate name or symbol may refer to author or copyright owner when displayed on a copyrighted work . . . , such watermarks do

---

[19] §§ 1202(c)(4)-(5) and (6) are not applicable to the works at issue here.

constitute CMI for the purpose of stating a violation of [the DMCA]"); *see also Schneider v. YouTube, LLC*, 649 F. Supp. 3d 872, 890 (N.D. Cal. 2023) (recognizing "clfn" text in metadata as CMI); *McGucken v. Chive Media Grp., LLC*, 2018 WL 3410095, at *4 (C.D. Cal. July 11, 2018) (finding watermark icon with "45SURF" included was CMI on motion to dismiss because it "act[ed] to identify Plaintiff and his brand as the author and owner of the" photos); *Pac. Studios Inc. v. W. Coast Backing Inc.*, 2012 WL 12887637, at *2 (C.D. Cal. Apr. 18, 2012) (finding an alphanumeric designation qualified as a "title and other information identifying the work" on motion to dismiss and noting "there is 'nothing particularly difficult about the text of § 1202'" as it is "quite broad"); *Goldstein v. Metro. Reg'l Info. Sys., Inc.*, 2016 WL 4257457, at *7 (D. Md. Aug. 11, 2016) (observing that Senate Report on the DMCA, "like the statutory language, defines CMI broadly" and that "the plain language of the statute does not equate CMI with a notice of copyright"). The Court finds that the relevant question is whether CoStar's logo identified CoStar as the copyright owner of the infringed images. *See SellPoolSuppliesOnline.com, LLC v. Ugly Pools Arizona, Inc.*, 804 F. App'x 668 (9th Cir. 2020) (affirming summary judgment on DMCA claim because "[t]he information allegedly removed by Defendants did not identify Plaintiff as the owner or author of any content on the website").

On this question, factual disputes preclude summary judgment because CoStar's use of the logo (and what information the logo actually conveys) has changed over time. CREXi provides evidence suggesting CoStar used the logo on photos it did not own. (*See* Frizzell Decl., Exs. 21-22; *id.*, Ex. 51; Swartz Depo. Tr. at 365:2-366:2; Osborn Depo. Tr. at 14:2-15; CREXi SUF ¶ 19 (citing to exhibits); Frizzell Decl., Exs. 18, 20, 30, 47, 49 50; Carpenter Depo. Tr. at 121:10-123:5; 129:21-130:3; 132:21-133:22.) CoStar provides evidence explaining that its watermarking software can mistakenly watermark an image (or fail to mark an image) if the image is "tagged incorrectly" in its system. (*See* Osborn Depo. Tr. at

98:5-99:9, 108:24-109:6, 264:3-8; Quade Depo. Tr. at 174:10-175:4; Sept. 24, 2024 Edalatkhah Decl., ¶¶ 2-3; Malinee Decl., Ex. 152 (Response to Interrogatory No. 14); Mason Depo. Tr. at 142:22-143:2; Edalatkhah Depo. Tr. at 240:22-241:13; *see also* Frizzell Decl., Exs. 5, 12, 23.)  Therefore, there is a dispute of fact regarding whether CoStar actually used the logo to identify copyright ownership over images.

However, none of CoStar's evidence rebuts the evidence confirming that CoStar did not use its pinwheel logo to indicate copyright ownership before June 19, 2017—the date of CoStar's interrogatory response in a different case, *CoStar v. Xceligent, Inc.*, No. 16-cv-1288-FJG (W.D. Mo. Dec. 12, 2016). (*See* Frizzell Decl., Ex. 51.)  That response stated that CoStar "regularly watermarks photographs of commercial real estate that appear within its various products, including CoStar and LoopNet, for the purpose of protecting its own intellectual property *as well as the rights of third parties who upload photos to LoopNet*.  (*Id.* (emphasis added).) CoStar argues that its prior discovery response from the *Xceligent* case described its watermarking practices prior to 2014, but nothing in the response indicates that these practices were limited to before 2014, as opposed to CoStar's practices at the time of the response.  CoStar's own evidence further indicates that any change in the purpose of the pinwheel logo occurred sometime in or after 2017.  (*See* McMurtry Depo. Tr. at 69:8-72:4; 72:19-73:2; 76:23-78:9; 82:4-83:9; 260:11-24.) It follows that to the extent CREXi removed any watermarks from images before the 2017 integration, it did not violate 17 U.S.C. § 1202(b) because CoStar did not use its pinwheel logo to identify its copyright ownership over images at that time.[20] Although it is unclear when CREXi removed watermarks from each of the applicable images, the evidence at least indicates that a subset of infringed images were uploaded before June 19, 2017.  (*See* Dees Resp. Decl., Ex. 25.)  As to this

---

[20] Given that CoStar was not using the logo to identify copyright ownership at the time, CREXi could not possibly have had the requisite scienter to violate § 1202(b) at that time either.

1    subset of images, there is no dispute of fact that CREXi did not violate the DMCA
2    because during that time, CoStar's logo did not identify CoStar as a copyright owner
3    of images.

4        *2.    CREXi's scienter*

5        "[E]ach subsection [of section 1202(b)] requires that the defendant have some
6    culpable mental state (intent, for Section 1202(b)(1), and knowledge, for Sections
7    1202(b)(2) and (b)(3))." *Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 938
8    (C.D. Cal. 2018); *see also* 17 U.S.C. §§ 1202(b)(1) (prohibiting "intentional"
9    removal/altering of CMI), 1202(b)(3) (prohibiting distribution of works with
10   removed/altered CMI while "knowing" that CMI had been removed/altered without
11   owner's authority).  "[T]he statute by its plain text requires two forms of knowledge
12   (or intent): (1) knowledge of the *existence* of copyright management information,
13   and (2) knowledge that the copyright management information *has been removed
14   or altered*." *Id*. at 939 (emphasis in original).

15       Section 1202(b) further requires "knowing, or . . . having reasonable grounds
16   to know" that the defendant's conduct "will induce, enable, facilitate, or conceal"
17   copyright infringement.  17 U.S.C. § 1202(b).  To this end, the Ninth Circuit has
18   held that "a plaintiff bringing a Section 1202(b) claim must make an affirmative
19   showing, such as by demonstrating a past 'pattern of conduct' or 'modus operandi',
20   that the defendant was aware or had reasonable grounds to be aware of the probable
21   future impact of its actions." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th Cir.
22   2018).

23       Taken together, the evidence raises a genuine dispute of fact as to whether,
24   even if CoStar's logo is CMI, CREXi knew that removing the watermark logo from
25   photos would "induce, enable, facilitate, or conceal" copyright infringement.  *See
26   Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016)
27   (reversing summary judgment for defendant on DMCA claim because the question
28   "is whether the evidence as a whole permits a reasonable inference that Live Nation

knew of the removal of the CMI"). Some evidence indicates that CREXi considered CoStar's logo to be branding, not CMI, and treated it as such. (*See* Randel Depo. Tr. at 136:19-138:16; Smith Depo. Tr. at 72:7-18; Burton Depo. Tr. at 102:15-103:1, 172:4-173:24; M. DeGiorgio Depo. Tr. at 153:8-154:16, 239:1-16; N. DeGiorgio Depo. Tr. at 169:24-170:4; Dees Depo. Tr. at 187:8-16; Drapeau Depo. Tr. at 52:10-53:21.) Evidence also indicates that at one point, CoStar itself informed its users that "LoopNet may add digital watermarks to certain parts of your property listing, including, without limitation, adding digital watermarks to your photographs." (Frizzell Decl., Ex. 22.) But other evidence suggests that CREXi knew removing the logos from images before using on CREXi's website might raise legal copyright issues. (*See* Dahl Decl., Exs. 12, 57; Malinee Decl., Exs. 31, 48, 51, 55, 74, 116, 173; Padfield Depo. Tr. at 181:8-20; Khan Depo. Tr. at 223:5-20.) This evidence is sufficient to raise a genuine dispute of fact as to CREXi's knowledge that CMI had been removed from the images, and that CREXi was knowingly distributing the images without CMI on its platform.[21] *See Aardwolf Indus., LLC v. Abaco Machines USA, Inc.*, 2017 WL 10350547, at *11 (C.D. Cal. Nov. 13, 2017) (defendants could be liable under 1202(b)(3) "if they distributed [the copyrighted material] with knowledge that the CMI had been removed"). Evidence further indicates that before this litigation, CREXi instructed its employees and BPOs that, when photos were only available on CoStar, they should screenshot the photos and crop them to remove the watermark. (*See* Malinee Decl., Exs. 46, 142, 244; Dahl

---

[21] The cases CREXi cites are not to the contrary—in *Victor Elias Photography, LLC v. Ice Portal, Inc.*, 43 F.4th 1313, 1323 (11th Cir. 2022), the Eleventh Circuit affirmed summary judgment because "[t]here [was] no indication in the record that Shiji knew at the relevant time that copyright owners use CMI in this manner." Similarly, the court in *Harrington v. Pinterest, Inc.*, 2022 WL 4348460, at *4 (N.D. Cal. Sept. 19, 2022) found the plaintiff failed to allege sufficient facts as to defendant's knowledge because there were no allegations that "Pinterest was aware that Harrington's Works carried CMI." Here, there is evidence suggesting that CREXi knew CoStar's logo might be CMI.

Decl., Ex. 14.)  Finally, there is evidence that this was an established practice or policy at CREXi, at least before this lawsuit was filed.  (*See id*.; Dees Depo. Tr. at 127:14-25, CoStar SUF ¶¶ 71-72 (citing to emails and deposition testimony indicating CREXi's practice was to crop out CoStar's logo from photos before use in a CREXi listing).)

Accordingly, the Court finds that as to images uploaded to CREXi's website before June 19, 2017, CREXi did not violate the DMCA.  However, there are disputes of fact that preclude partial summary judgment as to images uploaded to CREXi's website after June 19, 2017.  (*See* Osborn Depo. Tr. at 98:5-99:9, 108:24-109:6, 264:3-8; Quade Depo. Tr. at 174:10-175:4; Sept. 24, 2024 Edalatkhah Decl., ¶¶ 2-3; Malinee Decl., Ex. 152 (Response to Interrogatory No. 14); Mason Depo. Tr. at 142:22-143:2; Edalatkhah Depo. Tr. at 240:22-241:13; Frizzell Decl., Exs. 5, 12, 23; Dahl Decl., Exs. 12, 57; Malinee Decl., Exs. 31, 48, 51, 55, 74, 116, 173; Padfield Depo. Tr. at 181:8-20; Khan Depo. Tr. at 223:5-20.)

## D.    Safe Harbor Defense

Both parties move for summary judgment on CREXi's safe harbor defense under the DMCA.[22]  "The burden of proof for an affirmative defense to a civil claim generally falls on the party asserting the defense.  This same principle holds true in copyright."  *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1078 (9th Cir. 2015).  "The DMCA's safe harbor provisions exempt Internet service providers from copyright liability under discrete statutory provisions; proponents who seek the safe harbor bear the burden of establishing that they meet the statutory requirements."  *Mavrix*, 873 F.3d at 1079 (internal quotations and brackets omitted).[23]  "Because

---

[22] CREXi argues that it satisfies the threshold requirements for safe harbor eligibility under both section 512(i) and section 512(c), as to 36,637 images.

[23] "The DMCA establishe[s] four safe harbors to provide protection from liability for: (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools."  *Id.* at 1052 (internal quotations omitted).

the § 512(c) safe harbor is an affirmative defense, [CREXi] must establish 'beyond controversy every essential element'" of the defense. *Id*. at 1052. Further, "[t]o be eligible for any of the four safe harbors at §§ 512(a)-(d), a service provider must first meet the threshold conditions set out in § 512(i)." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007).

    *1.    Requirements under 17 U.S.C. § 512(i)*

    17 U.S.C. § 512(i) requires service providers to meet certain conditions to be eligible for safe harbor protection:

> (1) Accommodation of technology.  The limitations on liability established by this section shall apply to a service provider only if the service provider—
>> (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and
>> (B) accommodates and does not interfere with standard technical measures.

    Section 512(i)(1)(A) "does not define 'reasonably implemented,'" but the Ninth Circuit has held that (1) "a service provider 'implements' a policy "if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications," and (2) "implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright." *CCBill LLC*, 488 F.3d at 1109.

    a)    <u>Repeat infringer policy</u>

    The evidence indicates that CREXi had a DMCA and repeat infringer policy but, because it never received a takedown notice before June 2023, never actually had to execute its policy to issue strikes before this lawsuit was filed or to terminate

any users to date.  (Benz Depo. Tr. at 258:23-259:7, 278:13-279:19, 280:4-14; 287:1-288:1; Dees Decl., ¶¶ 72-81, 83; Dees Depo. Tr. at 25:18-26:7, 43:17-44:20, 56:13-18, 57:13-23.)  Documents reflect that CREXi later developed step-by-step takedown processes and a written repeat infringer policy.  (*See* Malinee Decl., Exs. 32-37; Dees Resp. Decl., Ex. 25.)  CREXi's issuance of strikes upon receiving DMCA takedown notices in 2023 indicates that it had a "working notification system." *CCBill LLC*, 488 F.3d at 1109.  There is no evidence that CREXi "allowed notices . . . to fall into a vacuum and go unheeded." *Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004).

CoStar argues that even if CREXi implemented a policy, it did not do so reasonably because CREXi has never terminated any user from its website for being a repeat infringer "despite knowing of the infringement alleged in CoStar's pleading for years."  (CoStar Mot. at 27–28.)  But "[s]ection 512(i) itself does not clarify when it is 'appropriate' for service providers to act.  It only requires that a service provider terminate users who are 'repeat infringers.'" *CCBill*, 488 F.3d at 1111. "To identify and terminate repeat infringers, a service provider need not affirmatively police its users for evidence of repeat infringement." *Id*.  The Ninth Circuit has "import[ed] the knowledge standards of § 512(c) to the analysis of whether a service provider reasonably implemented its § 512(i) repeat infringer policy," including the "red flag" test under section 512(c)(1)(A)(ii). *Id*. at 1113–14.  "Red flag knowledge arises when a service provider is aware of facts that would have made the specific infringement objectively obvious to a reasonable person." *Mavrix*, 873 F.3d at 1057 (internal quotations omitted).  "The infringement must be immediately apparent to a non-expert." *Id*.  Thus, the "burden of determining whether photographs are actually illegal" is not on the service provider. *CCBill*, 488 F.3d at 1114; *see also* 17 U.S.C. § 512(m) (safe harbor protections shall not be "construed to condition the applicability of subsections (a) through (d) on (1) a service provider monitoring its service or affirmatively seeking facts indicating

1    infringing activity").

2         CoStar's "decision to forgo the DMCA notice protocol stripped it of the most

3    powerful evidence of a service provider's knowledge—actual notice of

4    infringement from the copyright holder." *UMG Recordings, Inc. v. Shelter Cap.*

5    *Partners LLC*, 718 F.3d 1006, 1020 (9th Cir. 2013) (affirming summary judgment

6    for defendant on safe harbor protection). CoStar argues that CREXi's failure to

7    terminate any users to date even after being on notice of alleged infringement after

8    CoStar filed this lawsuit renders CREXi's policy unreasonable. But the Ninth

9    Circuit is clear that notice of alleged infringement is not "apparent" infringement

10   by itself.[24] *See CCBill*, 488 F.3d at 1112 ("We therefore do not require a service

11   provider to start potentially invasive proceedings if the complainant is unwilling to

12   state under penalty of perjury that he is an authorized representative of the copyright

13   owner, and that he has a good-faith belief that the material is unlicensed").

14   Moreover, CREXi provides evidence that it has "issued 13,272 strikes pursuant to

15   its DMCA policy to 12,980 users" and that certain users have received up to five

16   strikes, but no user has reached six strikes (the number of strikes that would result

17   in termination from CREXi's website). (Dees Resp. Decl., ¶ 21.) "A policy is

18   unreasonable only if the service provider failed to respond when it had knowledge

19

20   [24] Nor does CREXi's use of automated filters to scan for CoStar's logo constitute
21   red flag knowledge. Courts have found that where a defendant "has no way of
     verifying the accuracy" of the results, use of such filters to detect potential
22   infringement is not sufficient to show red flag knowledge as it would place an
23   unreasonable burden on service providers. *UMG Recordings v. Veoh Networks*, 665
     F. Supp. 2d 1099, 1118 (C.D. Cal. 2009); *see also Viacom Int'l Inc. v. YouTube,*
24   *Inc.*, 718 F. Supp. 2d 514, 528 (S.D.N.Y. 2010), *aff'd in part, vacated in part on*
     *other grounds*, 676 F.3d 19 (2d Cir. 2012) (finding that "[r]equiring the rights-
25   holder" to "manually request[] the video [] be removed" before assigning a strike,
26   even though YouTube used a "fingerprinting tool" to remove potentially infringing
     video, "does not violate § 512(i)(1)(A)"). This is consistent with *CCBill*. 488 F.3d
27   at 1114 ("[w]e do not place the burden of determining whether photographs are
28   actually illegal on a service provider").

1   of the infringement." *CCBill*, 488 F.3d at 1113.[25]

2       CoStar argues that assigning a single strike to a user who has posted multiple

3   infringing photos is unreasonable.  This is unsupported by case law.  Another court

4   in this district has analyzed a similar argument and noted that there is "nothing in

5   the statute, legislative history, or case law establishing that such a policy is not

6   reasonable or appropriate," that "the key term, 'repeat infringer,' is not defined,"

7   and the "fact that Congress chose not to adopt such specific provisions when

8   defining a user policy indicates its intent to leave the policy requirements, and the

9   subsequent obligations of the service providers, loosely defined."  *Veoh*, 665 F.

10  Supp. 2d at 1118 (granting summary judgment for defendant on safe harbor

11  defense).  Further, CREXi's 2022 repeat infringer policy indicates that "[m]ultiple

12  valid DMCA notices or acts of infringement pertaining to related images (e.g.,

13  multiple images for a single listing) are presumptively aggregated as single event

14  where appropriate."  (Dees Decl., Ex. 34.)  Dees' testimony explains that the

15  rationale behind this policy is that for an infringing user "to stop, they would—they

16  would need to be notified at least once," and that "from a business perspective, to

17  issue multiple strikes when . . . a user is otherwise unaware, falls outside of the spirit

18  of our repeat infringer policy." (Dees Depo. Tr. at 48:9-18.)  CoStar cites to no case

19  law holding that such a rationale is not reasonable under section 512(i).[26]

20

21  [25] CoStar's authorities are inapposite.  *Ventura Content, Ltd. v. Motherless, Inc.*

22  noted that one factor that "cut[s] against" a service provider claiming safe harbor
    protection is "allowing terminated users to rejoin the site," but did not hold that such

23  evidence would preclude the safe harbor defense or warrant summary judgment.
    885 F.3d 597, 618 (9th Cir. 2018).  In *UMG Recordings, Inc. v. Grande Commc'ns*

24  *Networks, LLC*, the defendant "admitted that until 2017 it would not terminate a

25  user for infringement" regardless of the source, content, or volume of notices for a
    customer.  384 F. Supp. 3d 743, 757 (W.D. Tex. 2019).  There is no evidence that

26  CREXi would not terminate a user if termination was warranted under its policy or

27  that it would allow terminated users to rejoin the site.

28  [26] *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 303–04 (4th
    Cir. 2018) is out-of-circuit and inapposite.  There, the Fourth Circuit found that

However, the Ninth Circuit has held that a repeat infringer policy is not "implemented" if an ISP "prevents copyright holders from providing DMCA-compliant notifications." *CCBill*, 488 F.3d at 1110 (discussing *In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir.2003)). If CoStar's watermark identified CoStar's copyright ownership, CREXi arguably prevented CoStar from detecting infringement and sending takedown notices by cropping or having others crop the watermark out before images were copied onto CREXi's website. This could also support CREXi's red flag knowledge of infringement. *See Mavrix*, 873 F.3d at 1058 (where "[s]ome of the photographs at issue . . . contained either a generic watermark or a watermark containing Mavrix's website, 'Mavrixonline.com,'" fact finder should "assess if it would be objectively obvious to a reasonable person that material bearing a generic watermark or a watermark referring to a service provider's website was infringing" to determine LiveJournal's red flag knowledge). These are issues of fact that, based on the evidence before the Court, cannot be resolved at summary judgment.

       b)   <u>Interference with standard technical measures</u>

"Standard technical measures refers to a narrow group of technology-based solutions to online copyright infringement." *CCBill*, 488 F.3d at 115 (internal quotations omitted). Section 512(i)(2) defines standard technical measures as follows:

> As used in this subsection, the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and--
>
>     (A) have been developed pursuant to a broad consensus of

---

evidence that defendant "*always* reactivated subscribers after termination, regardless of its knowledge of the subscriber's infringement" rendered the repeat infringer policy unreasonable because the company's "unwritten semi-policy" was that after reactivation, "the DMCA 'counter' restarts." *Id*. (emphasis in original). There is no such evidence of "terminating customers as a symbolic gesture before indiscriminately reactivating them" here. *Id*. at 304.

copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

"[C]aselaw provides little guidance on how to know when a widely followed practice has evolved into a 'standard technical measure.'" *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42, 55 (2d Cir. 2019) (Walker, J., concurring) (surveying federal California and New York cases related to standard technical measures). Other courts have noted that "[a]n example of a party's failure to comply with standard technical measures may include conduct that 'advises or encourages' users to conceal a work's copyrighted status." *Obodai v. Demand Media, Inc.*, 2012 WL 2189740, at *5 (S.D.N.Y. June 13, 2012), *aff'd sub nom. Obodai v. Cracked Ent. Inc.*, 522 F. App'x 41 (2d Cir. 2013). There is evidence that CREXi advised its users to upload (or provide to CREXi to upload) un-watermarked versions of the photos at issue. (*See* Dahl Decl., Exs. 12, 57; Malinee Decl., Exs. 31, 48, 55, 74.) However, CoStar cites to no authority or evidence demonstrating that copyright watermarks are "standard technical measures,"[27] and the Court has identified no binding case law addressing the issue. Further, neither party has provided evidence in support of their positions. Thus, the Court is "unable to determine on this record whether accessing websites is a standard technical measure," which also precludes partial summary judgment on the safe harbor defense.

2.      *Requirements under 17 U.S.C. § 512(c)*

17 U.S.C. § 512(c) states:

---

[27] CoStar's only cite is to *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 745 (S.D.N.Y. 2012), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014), which did not discuss watermarks themselves but instead addressed "tools that allow users to . . . crop out the copyright watermarks on the electronic images uploaded," and found that such editing tools did *not* disqualify the defendant from safe harbor eligibility.

(1) In general.  A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

> (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
> (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(2) Designated agent.  The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

> (A) the name, address, phone number, and electronic mail address of the agent.
> (B) other contact information which the Register of Copyrights may deem appropriate.

"To be eligible . . . for the § 512(c) safe harbor, a service provider must show that the infringing material was stored 'at the direction of the user.'" *Mavrix*, 873 F.3d at 1052.  "If it meets that threshold requirement, the service provider must then show that (1) it lacked actual or red flag knowledge of the infringing material; and (2) it did not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control

1    such activity." *Id*. (internal quotations omitted).

2    "'Storage,' in th[e] context [of section 512(c)], has a unique meaning,"—in

3    addition to "providing server space for a user's web site, for a chatroom, or other

4    forum in which material may be posted at the direction of users," *Mavrix*, 873 F.3d

5    at 1052, "storage [also] encompasses the access-facilitating processes in addition to

6    storage itself." *Id*. "[R]ather than requiring 'that the infringing conduct *be* storage,'

7    the statutory language allows for infringement '*by reason of the storage* at the

8    direction of a user.'" *Id*. at 1052–53 (emphasis in original) (quoting *Shelter Capital*,

9    718 F.3d at 1016).  For example, "processes that automatically occur when a user

10   uploads a video to [a website]" are encompassed by section 512(c). *Shelter Capital*,

11   718 F.3d at 1016.  In short, "infringing material is stored at the direction of the user

12   if the service provider played no role in making that infringing material accessible

13   on its site or if the service provider carried out activities that were 'narrowly

14   directed' towards enhancing the accessibility of the posts." *Ventura Content*, 885

15   F.3d at 606.  Thus, this inquiry is similar to the question of "volition" for copyright

16   infringement claims against ISPs.

17   In *Mavrix*, the Ninth Circuit noted that LiveJournal's moderators "review the

18   substance of posts; only those posts relevant to new and exciting celebrity gossip

19   are approved," and that the "question for the fact finder is whether the moderators'

20   acts were merely accessibility-enhancing activities or whether instead their

21   extensive, manual, and substantive activities went beyond the automatic and limited

22   manual activities we have approved as accessibility-enhancing." 873 F.3d at 1056.

23   The Ninth Circuit later distinguished this from *Ventura Content*, where the

24   defendant's human review did not look at whether the content was "new and

25   exciting or meets any other discretionary standards," but instead followed a rule of

26   "anything legal stays."   885 F.3d at 607 (internal quotations omitted).   This

27   demonstrated that the defendant "does not exercise judgment in what to host" and

28   thus, the content was stored at the direction of the user. *Id*.

As discussed above, there are genuine disputes of fact regarding the nature and extent of CREXi's post-upload communications with users as to User-Uploaded images. These same facts preclude summary judgment as to whether those images were stored at the direction of CREXi's users. As for the User-Directed images, these were uploaded by CREXi and its BPOs, not by the users themselves. CREXi argues that it only uploaded images at the instruction of and with authorization from its users, and its "mechanical[] upload[ing]" of these photos constitutes "conduct narrowly directed towards enhancing the accessibility of" the photos. (CREXi Mot. at 22; *see also* Dees Decl., ¶¶ 50-55.) But the evidence indicates that (1) CREXi reviewed images for whether they were blurry, upside down, or contained watermarks, (2) CREXi cropped watermarks out of photos before listings were posted, (3) at least in some instances, CREXi exercised discretion regarding which photos to include in a listing, and (4) in some instances, CREXi may have built listings *without* permission from the brokers. *See supra*, III.B.2.(b). Unlike cases where courts have found material was stored at the direction of a user, either CREXi or its BPOs—not its users—uploaded the User-Directed images, and the evidence reflects that they exercise at least some judgment in which images to include in CREXI-built listings. This conduct is not "narrowly directed" at enhancing the accessibility of content *already* on CREXi's website, but instead done for the purpose of "making that infringing material accessible" on the site in the first instance. *Ventura Content*, 885 F.3d at 606.[28] Because there are disputed facts as

---

[28] CREXi's authorities are inapposite because those cases involved reviews of content that was already uploaded by a user (and, with the exception of *Ventura Content*, involved automated processes). *See Ventura Content*, 885 F.3d at 607; *Davis v. Pinterest, Inc.*, 2023 WL 5695992, at *1 (9th Cir. Sept. 5, 2023) (finding defendant was entitled to safe harbor protection because there was no genuine issue of fact that "Pinterest's algorithms and other processes for displaying content alter user-uploaded content to facilitate access); *Veoh*, 620 F. Supp. 2d at 1092 (finding "conversion of uploaded files into Flash format and the 'chunking' of uploaded files" were done to "make it easier for users to view and download movies, and

to the threshold question of whether the User-Uploaded images were "stored at the direction of the user," the Court does not reach the additional requirements for safe harbor protection under 17 U.S.C. § 512(c).

\*                    \*                    \*

Accordingly, disputed facts preclude partial summary judgment on whether safe harbor under 17 U.S.C. § 512(i) applies to the infringed images. Disputed facts also preclude a ruling on whether § 512(c)'s safe harbor applies to the User-Uploaded images. However, because there is no dispute of fact that the User-Directed images were not "stored at the direction of the user" as that phrase is used in 17 U.S.C. § 512(c), CREXi cannot "establish[] beyond controversy every essential element" of its safe harbor defense. *Mavrix*, 873 F.3d at 1052 (internal quotations and brackets omitted). Accordingly, the Court finds that § 512(c)'s safe harbor does not apply to the User-Directed images.

### E.    Time-Barred Images

CREXi moves for summary judgment on all of CoStar's claims as to 5,456 instances of infringement on the grounds that these claims are barred by the applicable three-year statute of limitations. (CREXi Mot. at 26.) 17 U.S.C. § 507(b) states that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." "A copyright infringement claim accrues—and the statute of limitations begins to run—when a party discovers, or reasonably should have discovered, the alleged infringement." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1047 (9th Cir. 2020) (brackets omitted). Actual or constructive knowledge suffices to trigger the statute of limitations. *See id*. "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the claim." *Id*.

---

affect only the form and not the content of the movies").

(brackets omitted). "[S]uspicion of copyright infringement places upon the plaintiff a duty to investigate further into possible infringements of its copyrights." *Id*. at 1048 (internal quotations and brackets omitted). With respect to whether a plaintiff conducted a "reasonably diligent" investigation, the Ninth Circuit has noted that "summary judgment is generally an inappropriate way to decide questions of reasonableness" unless "only one conclusion about the conduct's reasonableness is possible." *Id*.

First, the Court finds that CoStar's claims as to these images "commenced" on December 19, 2022—the date CoStar filed its motion for leave to amend, attaching the proposed Second Amended Complaint. (*See* Dkt. No. 289.) CoStar's position that the claims "commenced" when CREXi received a copy of the SAC, rather than when it attached the SAC to its motion for leave to amend, is unsupported by the cases it cites, which all hold that the statute of limitations begins to run from the date a party filed a copy of the proposed amended complaint attached to either a motion for leave to amend or a "pre-motion letter requesting leave to move to file an amended complaint" (a procedure that is specific to federal courts in New York).[29]

CoStar admits "that as early as late 2019, CoStar had knowledge that some CoStar-owned images were appearing on CREXi's website" (Frizzell Decl., Ex. 8), and a privilege log entry reflects a December 18, 2019 email between CoStar and its counsel that was "prepared in anticipation of litigation . . . rendering legal advice regarding enforcement of intellectual property rights in connection with CoStar v. Commercial Real Estate Exchange Inc. (CREXi)" (*id*., Ex. 11). CREXi provides evidence from which the Court can infer that CoStar has used third parties to

---

[29] *Bensinger v. Denbury Res. Inc.*, 31 F. Supp. 3d 503, 509 (E.D.N.Y. 2014); *Glatt v. Fox Searchlight Pictures Inc.*, 293 F.R.D. 516, 523 (S.D.N.Y. 2013); *Villamizar v. Senior Care Pharmacy Servs., Inc.*, 2021 WL 1667504, at *3 (E.D. Cal. Apr. 28, 2021); *Villanueva v. Liberty Acquisitions Servicing, LLC*, 215 F. Supp. 3d 1045, 1058 (D. Or. 2016).

"identify alleged copyright infringement through image-matching" as of 2018.[30] This evidence indicates that CoStar suspected CREXi's copyright infringement of at least some photos, which "place[d] upon [CoStar] a duty to investigate further into possible infringements of its copyrights." *Oracle*, 971 F.3d at 1047.

CoStar denies that it "knew the industrial scale and willfulness of CREXi's infringement of its images prior to April 2020" (Frizzell Decl., Ex. 8).  However, it is undisputed that CoStar knew at least some of its photos were on CREXi.com by late 2019, and CoStar provides no evidence of any investigation it undertook at that time to search for other "possible infringements." *Oracle*, 971 F.3d at 1047–49 (finding Oracle's investigation unreasonable where it failed "to use its contractual right to audit customers, despite knowing that Oracle customers were working with Terix").  The evidence indicates CoStar knew there was possible infringement of its photos on CREXi.com in late 2019, yet there is no evidence that CoStar used the image-matching technology at its disposal to investigate which images were displayed on CREXi before April 2020.  While it is unclear whether investigation would have revealed these instances of infringement, CoStar does not provide evidence of any attempts to investigate or "at minimum, represent to the Court that there was no reason to suspect [CREXi] of copyright infringement prior to 2021." *Bluprint Clothing Corp. v. Chico's Fas, Inc.*, 2024 WL 3914469, at *3 (C.D. Cal. July 23, 2024) (dismissing time-barred claims where plaintiff did "not describe the market searches it conducts to uncover copyright infringement, what companies it targets for those searches, and how it proceeds once it is suspicious of potential infringement").  This fails to meet the "summary judgment standard of having to adduce proof in support of its position."[31]  *Id*.

---

[30] (*See* Frizzell Reply Decl., Exs. 5-6; 8; *see also* Frizzell Decl., Ex. 3 (confirming CoStar has filed dozens of lawsuits against various defendants for copyright infringement, trademark infringement, and misappropriation claims, among others).)

[31] CoStar's single citation in support is inapposite.  In *Tresona Multimedia, LLC v.*

1    Accordingly, there is no dispute of fact that CoStar's claims based on
2    instances of infringement that occurred before December 19, 2019 are time-barred.

3    **F.    Unclean Hands Defense**

4    "Unclean hands bars relief to a plaintiff who has violated conscience, good
5    faith or other equitable principles in his prior conduct." *Certified Nutraceuticals,*
6    *Inc. v. Avicenna Nutraceutical, LLC*, 821 F. App'x 701, 703 (9th Cir. 2020) (internal
7    quotations omitted). "The application of the unclean hands doctrine is primarily a
8    question of fact." *Los Angeles News Serv. v. Tullo*, 973 F.2d 791, 799 (9th Cir.
9    1992). Unclean hands is "recognized only rarely" in copyright suits, when the
10   plaintiff's transgression is (1) "of serious proportions" and (2) "relates directly to
11   the subject matter of the infringement action." *Dream Games of Arizona, Inc. v.*
12   *PC Onsite*, 561 F.3d 983, 990–91 (9th Cir. 2009). It "is not applied where plaintiff's
13   misconduct is not directly related to the merits of the controversy between the
14   parties." *Id.* at 990.

15   To the extent CREXi's unclean hands defense is based on CoStar's alleged
16   mass-scraping of CREXi's website (CREXi Opp. at 27), such conduct "lack[s] the
17   necessary nexus to the merits of this case to satisfy the second prong of the
18   analysis." *Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co.*, 2023 WL
19   4142969, at *3 (N.D. Cal. June 21, 2023) (granting motion to strike unclean hands
20   defense where plaintiff's alleged submission of misleading DMCA takedown
21   requests did not "directly bear on the merits of the copyright infringement dispute
22   before the Court"). CoStar's mass-scraping of CREXi's data might give rise to a
23   separate claim by CREXi, but such claims would have no connection to the question

24   _____

25   *Burbank High Sch. Vocal Music Ass'n*, 2016 WL 9223889 (C.D. Cal. Dec. 22,
26   2016), the Court denied summary judgment on certain claims being time-barred
     because the plaintiff argued that even targeted searches on YouTube "reveal[ed] too
27   many results to reasonably find infringing activity." *Id.* at *4. Here, CoStar had
     the tools to search for and compare its exact images to those on CREXi.com, and it
28   used such tools to detect infringement on other websites.

of whether *CREXi* infringed on *CoStar's* copyrighted images. Thus, the alleged conduct is wholly unrelated to the merits of CoStar's claims. The Court previously denied CREXi's motion for leave to amend the Second Amended Counterclaims so that it could add new claims under the Unfair Competition Law ("UCL") and the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), explaining that these claims are based on new theories of liability and separate facts from those related to CoStar's claims or CREXi's remaining counterclaim. (Dkt. No. 829.) For the same reasons, CREXi's unclean hands defense based on CoStar's mass-scraping activity is not viable as a matter of law.[32] *See Dream Games*, 561 F.3d at 991–92 (finding a plaintiff's "illegal operation of an otherwise copyrightable work" was not a defense to infringement claim); *Evox Prods. LLC v. Yahoo Inc.*, 2023 WL 4850748, at \*5 (C.D. Cal. July 28, 2023) (granting motion in limine to exclude evidence that plaintiff's "investigation of alleged infringement—which relied on automated processes known as 'scraping' or 'crawling'" because "a purported breach of Autoblog's terms of service is far afield from the key issues in this case"); *Malibu Media, LLC v. Peterson*, 2017 WL 1550091, at \*4 (S.D. Cal. May 1, 2017) (finding "general violations of law . . . in monitoring Defendant's IP address" did not go to the merits of copyright infringement claim).

To the extent CREXi's unclean hands defense is based on CoStar including images in this lawsuit that it does not own (including third-party images improperly stamped with CoStar's logo), CoStar claiming its logo is CMI when LoopNet's terms and conditions previously stated something different, and CoStar insisting that CREXi implement a copyright filter that "improperly flagged tens of thousands of images CoStar did not own, at great cost and harm to CREXi's business" (CREXi

---

[32] CREXi's cases are not to the contrary. Those cases allowed an affirmative defense that was related to either facts giving rise to the claims at issue or facts demonstrating that in the course of pursuing those claims, the plaintiff engaged in unfair or fraudulent conduct. (*See* Opp. at 28 (citing cases).)

Opp. at 29), CREXi has raised disputed issues of fact that preclude summary judgment. (*See supra* at III.C.1; Frizzell Decl., Exs. 9-10, 12-13; Zaleski Decl., Exs. 79, 101-102, 103-104, 105-106, 107-108 (evidence that CoStar previously claimed ownership over images it does not actually own and amended the Master Image Spreadsheet multiple times, removing images and updating other images' information).) "The defense of unclean hands by virtue of copyright misuse prevents the copyright owner from asserting infringement and asking for damages when the infringement occurred by his dereliction of duty." *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1408 (9th Cir. 1986) (dismissal under unclean hands defense is proper "if defendant establishes that plaintiff's evidence was false and that plaintiff was involved in a scheme to defraud the public"). Accordingly, disputes of fact preclude summary judgment on CREXi's unclean hands defense. (*See supra* at III.C.1; Frizzell Decl., Exs. 9-10, 12-13; Zaleski Decl., Exs. 79, 101-102, 103-104, 105-106, 107-108). However, CREXi may not rely on CoStar's purported "mass-scraping" of CREXi's website to support this defense.

## G.     Other Affirmative Defenses

In its opposition to CoStar's Motion, CREXi argues that because CoStar has not addressed CREXi's affirmative defenses other than the safe harbor and unclean hands defenses, CoStar is precluded from obtaining partial summary judgment on liability for copyright infringement. (CREXi Opp. at 29.) However, "[t]he court should grant summary judgment against a party who fails to demonstrate facts sufficient to establish an element essential to the case when that party will ultimately bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. CREXi bears the burden of proof on their affirmative defenses. If CREXi wishes to avoid summary judgment based on one of its other affirmative defenses, it must provide evidence raising a dispute of fact as to whether these defenses could defeat CoStar's claims. It has not done so. Therefore, this is not a basis to deny partial summary judgment.

## IV.  CONCLUSION

Accordingly, the Court **DENIES** the parties' Motions, but makes the following findings:

- Any instances of infringement that occurred before December 19, 2022 are time-barred.
- CoStar owns the images for which it seeks partial summary judgment.
- CREXi's algorithm does not constitute volitional conduct.
- CREXi's marketing blasts do not constitute volitional conduct.
- There is no evidence that CREXi refused to take down images—therefore, this cannot support volitional conduct.
- CREXi engaged in volitional conduct as to the User-Directed images displayed before this lawsuit was filed.
- CREXi's BPOs were its agents and copied images based on CREXi's instructions before this lawsuit was filed.
- Any images uploaded to CREXi's website before June 19, 2017 cannot support CoStar's DMCA claims.
- Safe harbor protection under 17 U.S.C. § 512(c) does not apply to the User-Directed images.
- CoStar's "mass-scraping" of CREXi's website cannot support an unclean hands defense because such conduct is unrelated to the claims in this case.

**IT IS SO ORDERED.**

DATED: <u>June 25, 2025</u>.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE