MICHAEL LIFRAK (SBN 210846)
michaellifrak@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

*Attorneys for Defendant and Counterclaimant Commercial Real Estate Exchange, Inc.*

[Additional Counsel Listed on the Next Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>Defendant, | Case No.: 2:20-CV-08819-CBM-AS<br><br>**DEFENDANT AND COUNTERCLAIMANT COMMERCIAL REAL ESTATE EXCHANGE, INC.'S OPPOSITION TO COSTAR'S MOTION TO DISQUALIFY**<br><br>Date:  March 17, 2026<br>Time: 10:00 a.m.<br>Courtroom: 8D<br>Before: Hon. Consuelo B. Marshall |
| COMMERCIAL REAL ESTATE EXCHANGE, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>COSTAR GROUP, INC. AND COSTAR REALTY INFORMATION, INC.,<br><br>Counterdefendants. | |

ALEX SPIRO (admitted *pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN LLP
alexspiro@quinnemanuel.com
295 Fifth Avenue
New York, New York 10016
Telephone:  (212) 849-7000
Facsimile:   (212) 849-7100

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

    A.    CoStar Group Inc.'s Acquisition Of Matterport Inc. ............................. 3

    B.    Kutagula Sues Matterport Inc. And CoStar Group Inc. .......................... 4

    C.    CREXi Engages Quinn Emanuel And The Firm Implements A Wall ............................................................................................................ 5

    D.    CoStar's Claim That Quinn Emanuel Is Conflicted ............................... 6

LEGAL STANDARD .......................................................................................... 7

ARGUMENT ......................................................................................................... 8

I.    COSTAR GROUP IS BOUND BY THE ADVANCE WAIVER .................... 8

    A.    CoStar Group And Matterport Are United In Interest ........................... 8

    B.    CoStar Group Made An Informed Waiver Of Future Conflicts ........... 11

II.    COSTAR FAILS TO CARRY ITS HEAVY BURDEN TO IMPUTE ANY CONFLICT TO THE REST OF THE FIRM ......................................... 13

    A.    CoStar Applies The Wrong Legal Standard ........................................ 13

    B.    CoStar Can Prove No Grounds Necessitating Disqualification Of Quinn Emanuel ..................................................................................... 17

III.    THE EQUITIES COMPEL DENIAL OF COSTAR'S MOTION ................. 19

IV.    THE COURT SHOULD GRANT LIMITED DISCOVERY ........................ 21

CONCLUSION ................................................................................................... 21

# TABLE OF AUTHORITIES

**Page**

### Cases

*24-7 Bright Star Healthcare, LLC v. Res-Care, Inc.*,
2022 WL 1432439 (N.D. Ill. Mar. 24, 2022) ......................................................12

*Almont Ambulatory Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*,
2014 WL 12589658 (C.D. Cal. June 16, 2014)....................................................21

*Avocent Redmond Corp. v. Rose Elecs.*,
491 F. Supp. 2d 1000 (W.D. Wash. 2007) ..........................................................12

*Barajas v. City of Carlsbad*,
2022 WL 1509295 (S.D. Cal. Apr. 28, 2022) ......................................................19

*Brit. Int'l Ins. Co. v. Seguros La Republica, S.A.*,
2002 WL 987199 (S.D.N.Y. May 14, 2002)........................................................21

*Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*,
264 F. Supp. 2d 914 (N.D. Cal. 2003)...................................................................8

*In re Charles L.*,
63 Cal. App. 3d 760 (1976) ..................................................................................18

*City & Cnty. of San Francisco v. Cobra Sols., Inc.*,
38 Cal. 4th 839 (2006)..........................................................................................16

*In re Cnty. of Los Angeles*,
223 F.3d 990 (9th Cir. 2000) ................................................................................16

*CoStar Grp., Inc. et al. v. Great Atlanta Realty, Inc. et al.*,
1:18-cv-4626 (N.D. Ga.) .........................................................................................6

*CoStar Grp., Inc. et al. v. Mahoney & Assocs. Comm. Real Est. et al.*,
5:18-cv-6096 (N.D. Cal.)..........................................................................................6

*CoStar Grp., Inc. et al. v. NegotiateLease.com, Inc. et al.*,
2:18-cv-8530 (C.D. Cal.)...........................................................................................6

*CoStar Grp., Inc. et al. v. Xceligent, Inc.*,
4:16-cv-1288 (W.D. Mo.)...........................................................................................6

*CoStar Grp., Inc. v. RE BackOffice, Inc.*,
    2:17-cv-1354 (W.D. Pa.) ................................................................................ 6

*People ex rel. Dep't of Corporations v. SpeeDee Oil Change Sys., Inc.*,
    20 Cal. 4th 1135 (1999) .............................................................. 15, 17, 18

*Edwards v. CoreCivic of Tennessee, LLC*,
    2021 WL 5303406 (S.D. Cal. Nov. 15, 2021) ........................................ 19

*Est. of Adams v. City of San Bernardino*,
    658 F. Supp. 3d 784 (C.D. Cal. 2023) .................................................... 8

*Flatt v. Superior Court*,
    9 Cal. 4th 275 (1994) ............................................................... 14, 15

*FlatWorld Interactives LLC v. Apple Inc.*,
    2013 WL 4039799 (N.D. Cal. Aug. 7, 2013) ........................................ 20

*Francis v. Luna*,
    2025 WL 736584 (C.D. Cal. Jan. 31, 2025) .......................................... 7

*GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*,
    618 F.3d 204 (2d Cir. 2010) ................................................................ 10

*Kirk v. First Am. Title Ins. Co.*,
    183 Cal. App. 4th 776 (2010) ........................................ 8, 13, 14, 17

*Kutagula v. Matterport, Inc., et al.*,
    25-cv-05383-NC, Dkt. 1 (N.D. Cal. June 26, 2025) .......................... 4, 7, 10, 18

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
    105 F. Supp. 3d 1100 (E.D. Cal. 2015) .............................................. 8, 9

*In re Marvel*,
    251 B.R. 869 (N.D. Cal. 2000) ............................................................ 19

*Masimo Corp. v. Kiani*,
    2025 WL 2995035 (C.D. Cal. Sept. 24, 2025) .................................... 7

*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*,
    69 Cal. App. 4th 223 (1999) ................................................................ 9

*Motion Point Corp. v. McDermott, Will & Emery LLP*,
    2015 WL 4722326 (Cal. Super. July 09, 2015) .............................. 14, 17, 18

iii

*Openwave Sys. Inc. v. Myriad France S.A.S.*,
  2011 WL 1225978 (N.D. Cal. Mar. 31, 2011) ...................................................... 18

*Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.*,
  760 F.2d 1045 (9th Cir. 1985) ........................................................................ 7

*Riverside All of Us or None v. City of Riverside*,
  2025 WL 2091049 (C.D. Cal. June 17, 2025) .................................................... 7

*Santos Elecs. Inc. v. Homni Elecs. Co. Ltd.*,
  2024 WL 5439284 (C.D. Cal. Dec. 26, 2024) ............................................... 7, 8

*Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC*,
  2018 WL 3956430 (N.D. Cal. Aug. 17, 2018) ........................... 9, 10, 11, 12, 13

*Teradyne, Inc. v. Hewlett-Packard Co.*,
  1991 WL 239940 (N.D. Cal. June 6, 1991) ....................................................... 10

*UMG Recordings, Inc. v. MySpace, Inc.*,
  526 F. Supp. 2d 1046 (C.D. Cal. 2007) ............................................................. 19

*Union Pac. R.R. Co. v. Hill*,
  2023 WL 7440302 (N.D. Cal. Nov. 8, 2023) ........................................ 14, 16, 17

*Visa U.S.A., Inc. v. First Data Corp.*,
  241 F. Supp. 2d 1100 (N.D. Cal. 2003) ....................................................... 12, 18

*Watson v. Ocwen Loan Servicing, LLC*,
  2019 WL 4540117 (C.D. Cal. Feb. 19, 2019) ........................................ 7, 19, 21

iv

Defendant and Counterclaimant Commercial Real Estate Exchange, Inc. ("CREXi") submits this opposition to Plaintiffs and Counterdefendants CoStar Group, Inc. and CoStar Realty Information, Inc.'s (collectively, "CoStar") Motion to Disqualify. Dkt. 1272 ("Motion" or "Mot.").

## INTRODUCTION

CoStar's litigation gamesmanship is on full display in its attempt to disqualify CREXi's counsel of choice. CoStar acquired Matterport and took control of its legal affairs, including Quinn Emanuel's work in the *Kutagula* matter. That work was governed by an engagement letter signed pre-acquisition by Matterport, Inc. (the "Engagement Letter"), an entity that ceased to exist post-acquisition. Being in the driver's seat, CoStar had ample opportunity to amend, terminate, or re-sign the Engagement Letter had CoStar genuinely believed that it was not bound by it and its unambiguous advance waiver. CoStar did not. Instead, CoStar stepped into the shoes of Matterport Inc., quietly enjoying Quinn Emanuel's legal services (which were governed by the Engagement Letter) and paying Quinn Emanuel's fees (which were governed by the Engagement Letter) for months. CoStar is a frequent litigant and understands how engagement letters work. Yet, CoStar operated under the terms of the Engagement Letter until it became tactically advantageous for CoStar to disavow it.

CoStar now seeks to strip CREXi of its carefully chosen counsel and severely prejudice its ability to litigate this case even though there is no overlap between the Quinn Emanuel lawyers working on *Kutagula* and this case, zero similarity between the facts, claims, witnesses, and timelines of the two cases, and an ethical wall that Quinn Emanuel promptly erected. Ignoring the practical circumstances, CoStar makes a purely technical argument for disqualification and misstates the case law in doing so. For several independent reasons, CoStar cannot carry its "heavy burden" to deprive CREXi of its chosen counsel.

*First*, CoStar is bound by the waiver governing the Matterport engagement given that it controls Matterport's legal affairs.  CoStar acknowledges that Quinn Emanuel secured an advance conflict waiver from Matterport in July 2024 and does not challenge the validity of that waiver.  Nor can CoStar credibly dispute that, after acquiring Matterport in February 2025, CoStar's and Matterport's legal departments merged and CoStar, without objection (until now), requested and accepted Quinn Emanuel's services under the Engagement Letter and paid Quinn Emanuel's bills for both parties under the Engagement Letter.  This unity of interests makes the waiver binding on CoStar.  But CoStar—a multi-billion-dollar public company that has brought dozens of lawsuits—asks this Court to strain credulity and believe that it has been accepting Quinn Emanuel's services without any written agreement.  In reality, the fact that CoStar willingly proceeded under the terms of the Engagement Letter for months and disclaimed the Engagement Letter only when Quinn Emanuel appeared in this case underscores the tactical motivation inherent in CoStar's motion.

*Second*, California law does not mandate the automatic vicarious disqualification of an entire firm when a disqualification motion is based on an unrelated case in which no access to material confidential information possibly could have been gained.  Under the applicable legal standard, when two matters are not substantially related and when an ethical wall has been put in place, no grounds for vicarious disqualification exist.  Here, there is not a scintilla of connection between the two matters.

*Third*, in all instances, California law requires a careful balancing of relevant circumstances before ordering the drastic remedy of disqualification, including a party's right to counsel of its choice and the prejudice disqualification would cause, the risk of disclosure of confidential information, and the potential that tactical abuse is involved in seeking disqualification.  Here, the facts and equities overwhelmingly favor denying the motion.  CoStar has not alleged—nor could it—that the two litigations are substantially related or that any attorney worked on both matters.  Such

2

facts demonstrate that CoStar has filed this motion not to remedy any cognizable ethical concerns but rather to strip CREXi of its chosen trial counsel.  And depriving CREXi of its trial counsel would result in extreme prejudice as well as severe delays and costs.  CREXi carefully selected the right law firm and jury trial specialist for this phase of the case—and CREXi and Quinn Emanuel have since worked relentlessly in tandem to prepare for the next phase of the claims and counterclaims.  Returning to its prior counsel is not an option for CREXi; it would need to start its search for counsel anew and the substantial resources that both it and Quinn Emanuel have invested in this litigation would be wasted.

*Finally*, if any pertinent dispute exists over the facts underlying CoStar's disqualification motion, the Court should grant discovery, including into CoStar Group's understanding of and performance under the Engagement Letter, CoStar's history (or lack thereof) of engaging litigation counsel without a written engagement, and CoStar's conveniently-timed decision to disavow the Engagement Letter.

Quinn Emanuel takes its ethical obligations seriously.  The firm maintains advance waiver language in its engagement letters precisely to avoid claims of conflict in unrelated matters.  CoStar, Matterport, and their shared legal department were content to proceed under the Engagement Letter containing the advance waiver until it was no longer convenient to do so.  On this record, the Court should deny CoStar's effort to gain an advantage in this litigation through weaponization of the ethics rules.

## BACKGROUND

### A.    CoStar Group Inc.'s Acquisition Of Matterport Inc.

On April 21, 2024, CoStar Group Inc. and Matterport Inc., a then-publicly traded company with no corporate affiliation to CoStar, executed an Agreement and Plan of Merger and Reorganization.  Decl. of Michael Lifrak ("Lifrak Decl.") Ex. A.

Three months later, on July 30, 2024, Matterport Inc. retained Quinn Emanuel "in connection with defense of employment-related legal claims filed by former

3

executive Vinatha Kutagula."  Dkt. 1272-2 (Decl. of Stefanee Handon ("Handon Decl.")), Ex. A at 1.  Matterport's Chief Legal Officer, Matthew Zinn, signed the Engagement Letter, which contains the following clear and explicit waiver of future conflicts (*id*. at 4–5):

> We are undertaking this Engagement on condition that Matterport gives its express consent and agreement that we may represent other clients, including the parties adverse to you in this matter, in the future in other matters in which we do not represent Matterport even if the interests of the other clients are adverse to Matterport (including the appearance on behalf of another client adverse to Matterport in an unrelated negotiation, litigation or arbitration), provided that the other matter is not substantially related to our representation of Matterport....

On February 28, 2025, CoStar completed the merger of Matterport Inc., which merged into Matterport, LLC, a wholly owned subsidiary of CoStar, and then ceased to exist as an entity.  Mot. 3 n.1.  Matterport is now prominently listed as one of CoStar's "brands" on the CoStar website.  *See* Lifrak Decl. Ex. B.

**B.     Kutagula Sues Matterport Inc. And CoStar Group Inc.**

After the merger, CoStar "assumed responsibility for managing Matterport's litigation with Ms. Kutagula."  Lifrak Decl. Ex. C (Batter Decl.) ¶ 3.  CoStar "informed Quinn Emanuel that its legal department merged with Matterport's legal department, and CoStar began paying Quinn Emanuel under the Matterport engagement letter."  *Id*.  After "completing the integration of [the Matterport] legal team into CoStar's legal team," Mr. Zinn (who had signed the Engagement Letter) left the company.  Lifrak Decl. Ex. D.

On June 26, 2025, Kutagula sued Matterport Inc.—which by that time had ceased to exist—and CoStar Group Inc. in the Northern District of California. *Kutagula v. Matterport, Inc., et al.*, 25-cv-05383-NC, Dkt. 1 (N.D. Cal. June 26, 2025).  Kutagula alleges that, before her termination in March 2024, she reported "numerous violations of federal and state law by Matterport," including Sarbanes-Oxley Act violations, and was fired for reporting it, and was the target of racial

discrimination. *Id.*, Dkt. 24, Am. Compl. ¶¶ 4, 12–14, 52–56, 71. All of the illegal conduct Kutagula alleges occurred before CoStar acquired Matterport. *See id.* ¶ 6.

On August 15, 2025, Quinn Emanuel attorneys Diane Doolittle, Kyle Batter, and Austin Buscher from the firm's Silicon Valley office appeared in the *Kutagula* case on behalf of Matterport Inc. and CoStar Group Inc. *Id.*, Dkts. 8, 12, 13. After Kutagula amended her complaint, Quinn Emanuel filed a motion to dismiss. *Id.*, Dkt. 26.

## C. CREXi Engages Quinn Emanuel And The Firm Implements A Wall

On June 25, 2025, the Court denied summary judgment. Dkt. 1237. On September 5, 2025, the Ninth Circuit reversed the Court's earlier dismissal order, finding that "CREXi successfully states claims under §§ 1 and 2 of the Sherman Act and under California's Cartwright Act and UCL" against CoStar. Dkt. 1256 at 6. With a trial inevitable and CREXi's antitrust claims revived, CREXi sought to hire a law firm with experienced jury trial specialists and plaintiff-side antitrust specialists. From the outset, CREXi has understood that CoStar's goal in this case is to drive CREXi out of business with protracted litigation. That intent is illustrated by CoStar's attempt to claim damages that, by its own calculations, could approach $1 billion. *See* Dkt. 1240 at 3. CoStar's threatening and misleading comments in the press similarly reveal its anti-competitive goal. Lifrak Decl. Ex. E (stating "CREXi is a parasitic company" that "must pay the price").

For CoStar, this case fits within its litigation playbook. *See* Dkt. 776-3 (Third Am. Compl. ("TAC")) ¶ 45 ("CoStar has brought several successful lawsuits against rivals"). "Since 2015, CoStar has filed at least 37 separate lawsuits in the United States alleging claims of intellectual property infringement, false advertising, unfair competition, or breach of contract," not including "CoStar's threats of litigation, which are undoubtedly much more numerous." Dkt. 162 (First Am. Countercls.) ¶ 112. And before turning its sights on CREXi, CoStar had already made copyright litigation a cornerstone of its competitive strategy—filing suit after suit against rivals

5

to eliminate competition through the courthouse rather than the marketplace. *See, e.g.*, *CoStar Grp., Inc. et al. v. Xceligent, Inc.*, 4:16-cv-1288 (W.D. Mo.); *CoStar Grp., Inc. et al. v. Mahoney & Assocs. Comm. Real Est. et al.*, 5:18-cv-6096 (N.D. Cal.); *CoStar Grp., Inc. v. RE BackOffice, Inc.*, 2:17-cv-1354 (W.D. Pa.); *CoStar Grp., Inc. et al. v. Great Atlanta Realty, Inc. et al.*, 1:18-cv-4626 (N.D. Ga.).

CREXi accordingly set out to hire a top jury trial lawyer, and retained renowned jury trial lawyer Alex Spiro, described as a "one-in-a-generation talent in the courtroom." Decl. of Adam Greenberg ("Greenberg Decl.") ¶¶ 3–4. CREXi retained Mr. Spiro and his law firm, Quinn Emanuel, on September 16, 2025. *Id.* ¶ 5. On September 18, 2025, Quinn Emanuel implemented an ethical wall between the *Kutagula* and *CREXi* litigation teams, forbidding members of the *Kutagula* team from sharing any confidential information with members of the *CREXi* team and vice versa. Decl. of Harry Olivar ("Olivar Decl.") ¶¶ 4–5, 7.

After an orderly transition of case materials and institutional knowledge from CREXi's prior counsel, Quinn Emanuel filed a request to appear as substitute counsel for CREXi on December 3, 2025. Dkt. 1262; *see also* Dkt. 1264. The Court subsequently granted the substitution. Dkt. 1269.

**D.    CoStar's Claim That Quinn Emanuel Is Conflicted**

On December 15, 2025, Gene Boxer, CoStar Group's General Counsel, wrote to Quinn Emanuel attorney Diane Doolittle, stating that Quinn Emanuel had "not obtained CoStar's informed written consent to represent CREXi in the pending litigation between CoStar and CREXi, and CoStar will not provide such consent." Handon Decl. Ex. B at 1. On December 18, 2025, Doolittle responded that "[f]or about four months now, Quinn Emanuel has represented both Matterport and CoStar consistent with the engagement agreement Matterport signed (with which CoStar was familiar, as it was paying us under that agreement)." *Id.*, Ex. C at 1. "At no time," Doolittle continued, "did CoStar object to any of the terms of our engagement agreement, suggest the agreement did not apply to CoStar, or suggest that Quinn

6

Emanuel and CoStar needed to enter into a separate or different agreement." *Id*. Now, however, Doolittle wrote, "CoStar says it never agreed to any terms under which our firm would represent CoStar"; while not "a good faith position," the letter continued, "if CoStar believes it has not agreed to our terms of retention, and/or now objects to the terms of retention, then, respectfully, CoStar will need to find other counsel." *Id*. at 2.

On January 13, 2026, after CoStar Group continued to disclaim the Engagement Letter, Quinn Emanuel moved to withdraw as counsel in the *Kutagula* litigation. *Kutagula v. Matterport, Inc., et al.*, 25-cv-05383-NC, Dkt. 33 (N.D. Cal. Jan. 13, 2026).

## LEGAL STANDARD

"A motion for disqualification of counsel is a drastic measure which courts should hesitate to impose except when of absolute necessity. They are often tactically motivated; they tend to derail the efficient progress of litigation." *Watson v. Ocwen Loan Servicing, LLC,* 2019 WL 4540117, at *2 (C.D. Cal. Feb. 19, 2019) (quotations omitted). "Indeed, the Ninth Circuit 'has warned that a motion to disqualify a law firm can be a powerful litigation tactic to deny an opposing party's counsel of choice.'" *Riverside All of Us or None v. City of Riverside*, 2025 WL 2091049, at *2 (C.D. Cal. June 17, 2025). "Because of this potential for abuse, disqualification motions should be subjected to 'particularly strict judicial scrutiny.'" *Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985); *accord, e.g.*, *Francis v. Luna*, 2025 WL 736584, at *2 (C.D. Cal. Jan. 31, 2025). "The moving party carries a 'heavy burden and must satisfy a high standard of proof.'" *Masimo Corp. v. Kiani*, 2025 WL 2995035, at *3 (C.D. Cal. Sept. 24, 2025).

"In the Ninth Circuit, state law governs motions to disqualify." *Santos Elecs. Inc. v. Homni Elecs. Co. Ltd.*, 2024 WL 5439284, at *1 (C.D. Cal. Dec. 26, 2024). "Generally speaking, the California State Bar's Rules of Professional Conduct govern attorney discipline; they do not create standards for disqualification in the courts."

7

*Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 792 (2010). "A court must weigh 'factors such as the clients' right to counsel of their choice, the attorney's interest in representing a client, the financial burden on the client if required to replace disqualified counsel, and the potential that tactical abuse underlays the disqualification proceeding.'" *Est. of Adams v. City of San Bernardino*, 658 F. Supp. 3d 784, 789 (C.D. Cal. 2023) (cleaned up). "The decision to disqualify counsel is within the trial court's discretion and limited by applicable legal principles." *Santos Elecs. Inc.*, 2024 WL 5439284, at *2.

## ARGUMENT

## I.   COSTAR GROUP IS BOUND BY THE ADVANCE WAIVER

CoStar Group has not carried its "heavy burden" to show that it is not bound by the Engagement Letter and its advance waiver. CoStar's own conduct establishes that it was bound by the Engagement Letter and its implausible argument to the contrary contradicts California law and cannot be reconciled with CoStar's status as a multi-billion-dollar public company with a history of engaging large, multi-national law firms.

### A.   CoStar Group And Matterport Are United In Interest

"California law recognizes that a parent corporation and its subsidiary, even if wholly owned, are generally regarded as separate entities for conflicts purposes, unless an exception applies—where the relationship between the entities are such they have a 'unity of interests' so as to deserve being treated as one." *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914, 920–21 (N.D. Cal. 2003). A "parent and subsidiary may share a unity of interests if the parent controls the subsidiary's legal affairs or if the parent and subsidiary share a legal department." *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 105 F. Supp. 3d 1100, 1111 (E.D. Cal. 2015); *see also, e.g.*, *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223, 246 (1999) (considering that "the parent in this instance controls the legal affairs of the subsidiary"). The unity of interests test "is pragmatic" and

8

"does not require the two entities be alter egos." *Lennar Mare Island, LLC*, 105 F. Supp. 3d at 1111.

Here, a clear unity of interests exists between CoStar and Matterport such that the two entities should be treated as one for conflicts purposes. CoStar and Matterport share a legal department, and CoStar controls Matterport's legal affairs. Lifrak Decl. Ex. C (Batter Declaration) ¶ 3. Quinn Emanuel's work for CoStar in *Kutagula* "stems from" the previously executed Engagement Letter. *Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC*, 2018 WL 3956430, at *12 (N.D. Cal. Aug. 17, 2018). Indeed, it is not plausible that a company as sophisticated (and litigious) as CoStar would enter into an attorney-client relationship not governed by any agreed-upon terms.

The decision in *Simpson Strong-Tie Company* is instructive. There, Simpson Manufacturing signed an engagement agreement with a law firm in which it "agree[d] that [the law firm] may represent current or new clients in work directly adverse to Simpson Manufacturing." *Id*. at *3 (cleaned up). The agreement stated that it "creates an attorney/client relationship only between [the law firm] and Simpson Manufacturing" and "does not create an attorney/client relationship between [the law firm] and any business entities with which you [Simpson Manufacturing] are affiliated unless subject to separate engagement Agreement." *Id*. (cleaned up). The law firm, however, also represented one of Simpson Manufacturing's subsidiaries, Simpson Strong-Tie, in various labor and employment cases while Simpson Manufacturing paid the bills. *Id*. at *4.

After the law firm sued Simpson Strong-Tie on behalf of another client, Simpson Strong-Tie moved to disqualify. The law firm argued that Simpson Strong-Tie had waived the conflict based on the advance waiver its parent company, Simpson Manufacturing, had executed. *Id*. at *10. The court agreed, stating "there is absolutely a 'unity of interests'" based on the companies' shared operations and legal department and that the law firm was "providing services for Simpson Strong-Tie and Simpson Manufacturing [was] paying Simpson Strong-Tie's legal bills." *Id*. at *13.

9

The same is true here.  CoStar Group is bound by the Engagement Letter and its advance waiver.  "Matterport, Inc. ceased to exist" as a result of the merger, and the newly formed Matterport entity is a wholly owned subsidiary of CoStar.  Mot. 3 n.1.  "CoStar Group … assumed responsibility for managing Matterport's litigation with Ms. Kutagula," and "informed Quinn Emanuel that its legal department merged with Matterport's legal department, and CoStar began paying Quinn Emanuel under the Matterport engagement letter."  Lifrak Decl. Ex. C (Batter Declaration) ¶ 3; *see also id.*, Ex. D.  And CoStar and Matterport jointly moved to dismiss the complaint in the *Kutagula* action.  *See Kutagula*, 25-cv-05383-NC, Dkt. 26 (N.D. Cal. Oct. 20, 2025).  These facts establish that, for conflicts purposes, the two entities "deserve being treated as one."  *Simpson Strong-Tie Co.*, 2018 WL 3956430, at *10, *12–13 (quotations omitted); *see, e.g.*, *Teradyne, Inc. v. Hewlett-Packard Co.*, 1991 WL 239940, at *5 (N.D. Cal. June 6, 1991) (parent's "control and supervision of the legal affairs of" subsidiary significant to unity of interests); *see also GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 211 (2d Cir. 2010) ("[C]ourts have emphasized the extent to which affiliated entities share responsibility for both the provision and management of legal services.").

Because of this unity of interest, the terms of the Engagement Letter apply to CoStar, just as in *Simpson Strong-Tie Company*, which involved language virtually identical to the Engagement Letter here.  *Simpson Strong-Tie Co.*, 2018 WL 3956430, at *12–13.  This result makes sense, and precludes CoStar's "attempts to acknowledge its separate corporate status only when advantageous."  *Id.* at *13.  As in *Simpson Strong-Tie Company*, CoStar "aims to benefit from the Engagement Agreement,

CREXI'S OPPOSITION TO COSTAR'S MOTION TO DISQUALIFY
Case No. 2:20-CV-08819 CBM (AS)

while ignoring the conditions of the agreement." *Id*.[1] The Court should not "endorse this strategic positioning." *Id*. Indeed, CoStar's strategic invocation of corporate separateness extends to this case, in which CoStar Group seeks disqualification on behalf of its wholly owned subsidiary CoStar Realty Information when only CoStar Group was sued in the *Kutagula* matter. *See* Dkt. 1272. Although CoStar never explains what conflict exists with respect to CoStar Realty Information, CoStar repeatedly has treated the entities as one in this litigation, failing to even plead which entity owns the copyrights at issue. *See* TAC ¶¶ 87–95 (stating "CoStar registers its photographs with the United States Copyright Office" without distinguishing between the two entities). To stop CoStar's "attempts to acknowledge its separate corporate status only when advantageous," *Simpson Strong-Tie Co.*, 2018 WL 3956430, at *13, the Court must conclude that CoStar Group is bound by the Engagement Letter.

**B.    CoStar Group Made An Informed Waiver Of Future Conflicts**

CoStar Group cannot avoid application of the advance waiver here by arguing (Mot. 13–15) that it did not make an informed waiver of future conflicts.

"[W]hether full disclosure was made and the client made an informed waiver is obviously a fact-specific inquiry" that considers "the breadth of the waiver, the temporal scope of the waiver (whether it waived a current conflict or whether it was intended to waive all conflicts in the future), the quality of the conflicts discussion between the attorney and the client, the specificity of the waiver, the nature of the actual conflict (whether the attorney sought to represent both clients in the same dispute or in unrelated disputes), the sophistication of the client, and the interests of

---

[1]    CoStar's assertion that Quinn Emanuel elected not to "press[] the implicit assumption argument previously" Mot. 15, does not undermine this legal principle. And that Quinn Emanuel advised that it would need to withdraw if CoStar did not agree to the firm's standard engagement letter is not "internally incoherent," Mot. 13, with the position that the existing Engagement Letter binds CoStar because CoStar suddenly made a tactical about-face after proceeding (and paying the bills) under the Engagement Letter.

justice." *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1106 (N.D. Cal. 2003) (cleaned up).  These factors compel enforcement of the waiver.

*First*, CoStar Group does not argue that Matterport did not give informed consent in waiving future conflicts.  Given the unity of interest, that informed consent applies equally to CoStar Group.  *Supra* at 8–11; *Simpson Strong-Tie Co.*, 2018 WL 3956430, at *12–13.[2]

*Second*, the advance waiver does not apply to all future matters, but only those, like the *Kutagula* litigation here, that are unrelated.  *See* Handon Decl. Ex. A (Matterport Engagement Letter) at 4–5; *see, e.g., Simpson Strong-Tie Co.*, 2018 WL 3956430, at *16.  The alleged conflict here relates only to "unrelated disputes"—the employment action against Matterport arises from actions that pre-dated CoStar's acquisition.  *See id.*  In that regard, this case bears no resemblance to the decision in *Western Sugar Coop. v. Archer-Daniels-Midland Co.*, in which the lawsuit at issue was "substantially related," such that the court did not address the advance waiver provision, which "did not waive conflicts in matters that are substantially related." 98 F. Supp. 3d 1074, 1086 n.9 (C.D. Cal. 2015).

*Third*, CoStar is not only a sophisticated company but a serial litigator (*see* Dkt. 162 ¶ 112) and thus well-attuned to advance waivers.  CoStar has its own in-house legal department, *see* Handon Decl. ¶ 1, capable of understanding the advance waiver provision in a law firm engagement letter.  *See Visa*, 241 F. Supp. 2d at 1110 (finding client "knowledgeable and sophisticated user of legal services" and "expected to understand the full extent of what it waived").  CoStar already had signed the merger agreement with Matterport (but had not yet closed the transaction) when Matterport

---

[2]  CoStar's reliance on out-of-district cases offers no support for its arguments. *See* Mot. 14, citing *24-7 Bright Star Healthcare, LLC v. Res-Care, Inc.*, 2022 WL 1432439, at *6 (N.D. Ill. Mar. 24, 2022) (plaintiff waived argument that affiliate was bound by advance waiver provision in engagement letter); *Avocent Redmond Corp. v. Rose Elecs.*, 491 F. Supp. 2d 1000, 1004 n.3, 1006-07 (W.D. Wash. 2007) (no discussion of unity of interest after corporate merger that caused conflict).

signed the Engagement Letter on July 30, 2024. *Compare* Lifrak Decl. Ex. A, *with* Handon Decl. Ex. A. CoStar thus cannot credibly compare this case to *Western Sugar*, in which the client "did not understand or intend" to agree to waive future conflicts in a decade-old engagement letter. 98 F. Supp. 3d at 1083.

*Finally*, the interests of justice overwhelmingly favor denial of disqualification. As in *Simpson Strong-Tie Company*, any "conflict arose as the result of several moving pieces including a merger," and the Court should not be "convinced that a legitimate threat to the integrity of the bar outweighs [CREXi's] right to its chosen counsel and the resulting burden on it if this motion were to be granted." 2018 WL 3956430, at *18. CoStar's motion hardly implicates the preservation of public trust or the administration of justice, *see W. Sugar Coop.*, 98 F. Supp. 3d at 1091–92, but rather represents a tactical play intended to exploit a supposed "automatic" disqualification rule in two cases that have nothing to do with one another.

## II.   COSTAR FAILS TO CARRY ITS HEAVY BURDEN TO IMPUTE ANY CONFLICT TO THE REST OF THE FIRM

Independently, and even absent an advance waiver, CoStar has not demonstrated that every Quinn Emanuel attorney must be vicariously disqualified based on the *Kutagula* representation. CoStar ignores the applicable legal standard for vicarious disqualification when two matters are not substantially related. Under the correct legal standard, vicarious disqualification is not a proper remedy.

### A.   CoStar Applies The Wrong Legal Standard

At the threshold, CoStar is incorrect that a breach of the duty of loyalty must be imputed to an entire firm.

While CoStar claims (at 9) that the California Rules of Professional Conduct are reflective of "California common law," those rules "do not create standards for disqualification in the courts." *Kirk*, 183 Cal. App. 4th at 792. And California case law does not support the bright-line "automatic" disqualification standard that CoStar urges. Instead, the California Supreme Court has made clear that vicarious

13

disqualification must be assessed on a case-by-case basis in the trial court's discretion; where the law firm has adequately screened the attorneys at issue, disqualification should be denied.  Thus, "in the situation of concurrent clients, the individual attorney may be subject to disqualification pursuant to the duty of loyalty, but the standard for whether the entire law firm is vicariously disqualified is viewed in the context of the duty of confidentiality." *Motion Point Corp. v. McDermott, Will & Emery LLP*, 2015 WL 4722326, at *8 (Cal. Super. July 09, 2015).

Contrary to CoStar's assertion (Mot. 9), *Flatt v. Superior Court*, 9 Cal. 4th 275 (1994), does not mandate disqualification of Quinn Emanuel here.  In *Flatt*, the California Supreme Court granted review in a legal malpractice action to consider the scope of an attorney's duty to a new client once the attorney learned that the representation would conflict with the attorney's duty of loyalty to an existing client. 9 Cal. 4th at 278.  The Court noted that its "holding is narrow" and held that "the requirement of undivided loyalty to the first client negates any duty on the part of the attorney to" assist the second client.  *Id*.

The issues in *Flatt* therefore were limited, and the Supreme Court did not address directly the supposed rule of automatic, firmwide disqualification.  In its background discussion of California's conflicts case law, the Supreme Court remarked that where a "substantial relationship" exists between prior and current representations, disqualification follows and, "indeed, the disqualification extends vicariously to the entire firm." *Id*. at 283.  Not only have courts characterized that statement in *Flatt* as dicta, *see, e.g.*, *Union Pac. R.R. Co. v. Hill*, 2023 WL 7440302, at *11 (N.D. Cal. Nov. 8, 2023) (explaining "*Flatt*'s statement that automatic disqualification extends to the entire firm is dicta"); *Kirk*, 183 Cal. App. 4th at 797 ("The *Flatt* case, however, was not concerned with whether a tainted attorney's law firm was subject to vicarious disqualification."), but that statement specifically concerns a conflict arising from two cases that have a "substantial relationship."

14

CoStar does not (and could not) argue that any "substantial relationship" exists between the *Kutagula* wrongful termination case and this one.

*SpeeDee Oil*, on which CoStar relies (Mot. 12), likewise did not establish a "mandatory" vicarious disqualification rule. *People ex rel. Dep't of Corporations v. SpeeDee Oil Change Systems, Inc.*, 20 Cal. 4th 1135, 1139 (1999). There, franchisees of SpeeDee Oil hired a law firm as counsel of record in their action against Mobil Oil. *Id.* Meanwhile, Mobil had consulted and shared confidential information *about the same litigation* with an attorney who was "of counsel" to that *same law firm. Id.* Thus, because the counsel and other lawyers at the law firm represented adversaries "*in the same litigation*," the California Supreme Court held the "conflict of interest must inevitably lead to the … firm's vicarious disqualification from representing respondents to assure the preservation of Mobil's confidences and the integrity of the judicial process." *Id.* at 1156 (emphasis added). Thus, the California Supreme Court did not address vicarious disqualification in unrelated matters where no risk of breaching client confidences exists.

While the *SpeeDee Oil* court—citing *Flatt*—stated that "[w]hen a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm," *id.* at 1139 (citing *Flatt*, 9 Cal. 4th at 283), that statement did not go beyond the facts of that case, which involved "[t]he most egregious conflict of interest," namely the "representation of clients whose interests are directly adverse *in the same litigation*," *id.* at 1147 (citing *Flatt*, 9 Cal. 4th at 284 n.3) (emphasis added). The California Supreme Court nevertheless specified that it "need not consider whether an attorney can *rebut a presumption of shared confidences, and avoid disqualification*, by establishing that the firm imposed effective screening procedures," because, unlike here, the evidence "fail[ed] to demonstrate that any formal screening procedure" was implemented. *Id.* at 1151–52 (emphasis added). Although the California Supreme Court thus ultimately left that question unanswered, the Ninth Circuit has since "read *Speedee Oil* as

15

sending a signal that the California Supreme Court may well adopt a more flexible approach to vicarious disqualification." *In re Cnty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000).

When the California Supreme Court did address vicarious disqualification, the court divided over whether it was required in even the most egregious circumstances. In *City & Cnty. of San Francisco v. Cobra Sols., Inc.*, 38 Cal. 4th 839, 843 (2006), a majority of the California Supreme Court affirmed disqualification of a city attorney and his office and rejected ethical screening as a remedy. But the Court reached that conclusion because the matters were substantially related and because of the attorney's unique status as a public official and head of the city attorney's office. *Id.* at 853–54. Even that ruling prompted a dissent that an automatic disqualification rule should not be applied vicariously even as to a highly unified city attorney's office in a lawsuit substantially related to the city attorney's work in private practice. *Id.* at 854–55 (Corrigan, J., dissenting) (citing *In re Cnty. of Los Angeles*, 223 F.3d at 996) (noting that "[a]n ethical wall, when implemented in a timely and effective way, can rebut the presumption that a lawyer has contaminated the entire firm" and that "[t]he changing realities of law practice call for a more functional approach to disqualification" (cleaned up)).

Thus, the California Supreme Court repeatedly has suggested that vicarious disqualification can be avoided by proper ethical screening, such that "the presumption of shared confidences among attorneys at a law firm can be rebutted." *See, e.g.*, *Union Pac. R.R. Co.*, 2023 WL 7440302, at *11. And more recent decisions have concluded that "neither *Flatt* nor *SpeeDee Oil* addressed the issue of whether vicarious disqualification is absolute, and the state of the law is that as initially expressed by the appellate courts: (1) a case-by-case analysis based on the circumstances present in, and policy interests implicated by, the case; (2) tempered by the [ ] rule that vicarious disqualification should be automatic in cases of a tainted attorney *possessing actual confidential information* from a representation, who

16

*switches sides in the same case.*"  *Kirk*, 183 Cal. App. 4th at 800 (emphases added). As such, courts have recognized that any "general rule" of vicarious disqualification "is a rebuttable one, which can be refuted by evidence that ethical screening will effectively prevent the sharing of confidences in a particular case."  *Id*.; *see also, e.g.*, *Union Pac. R.R. Co.*, 2023 WL 7440302, at *11 (agreeing vicarious disqualification is rebuttable).

That is true even in the case of concurrent representations, and decisions like *Kirk* that post-date *Flatt* and *SpeeDee Oil* reflect a "practical paradigm shift: essentially, in the situation of concurrent clients, the individual attorney may be subject to disqualification pursuant to the duty of loyalty, but the standard for whether the entire law firm is vicariously disqualified is viewed in the context of the duty of confidentiality."  *Motion Point*, 2015 WL 4722326, at *8.  That is the rule that applies here.

CoStar thus is simply wrong that "Quinn's disqualification is mandatory under California's 'per se rule of disqualification,'" and its motion should be denied on this basis alone.  Mot. 12 (quoting *SpeeDee Oil*, 20 Cal. 4th at 1147).[3]

**B.    CoStar Can Prove No Grounds Necessitating Disqualification Of Quinn Emanuel**

When applying the correct legal standard, CoStar's motion to disqualify Quinn Emanuel must be denied.  As the California Court of Appeal has noted, *Flatt* "distinguished the duty of *loyalty,* which was at issue in that case, from the duty of client *confidentiality,* which is at issue in cases of vicarious disqualification."  *Kirk*, 183 Cal. App. 4th at 796 (emphasis in original).  Put differently, "[t]he premise upon

---

[3]    In *Western Sugar*, on which CoStar heavily relies (Mot 9–12), the law firm principally argued that the concurrent representation did not present a per se conflict because the client had agreed to an advance waiver and the law firm had withdrawn from the representation.  98 F. Supp. 3d at 1082–85.  The Court's decision thus understandably was limited to those issues and had no occasion to address the full context of the California Supreme Court's decisions in *Flatt* and its progeny.

17

which disqualification of law partners is based is that there is within the law partnership a free flow of information, so that knowledge of one member of the firm is knowledge to all." *In re Charles L.*, 63 Cal. App. 3d 760, 765 (1976) (internal quotations and citation omitted); *see also, e.g.*, *SpeeDee Oil*, 20 Cal. 4th at 1153–54 (similar). Thus, only the specific attorneys who appeared in the *Kutagula* case could be disqualified based upon a duty of loyalty, whereas CoStar must demonstrate a breach of the duty of confidentiality to vicariously disqualify the entire firm. *Motion Point Corp.*, 2015 WL 4722326, at *8. It cannot—and has not even attempted to— make that argument.

Here, the *Kutagula* litigation involves events that occurred entirely before CoStar acquired Matterport. *Supra* 4–5. And there is no overlap in the claims or facts between that litigation and this one. Within 48 hours after CREXi executed its engagement agreement with the firm, an ethical wall separating the two teams was implemented. Olivar Decl. ¶¶ 4–7; Lifrak Decl. ¶¶ 8–11; *Visa*, 241 F. Supp. 2d at 1110 (no breach of duty of confidentiality where firm "immediately put an ethical wall in place"); *Openwave Sys. Inc. v. Myriad France S.A.S.*, 2011 WL 1225978, at *5 (N.D. Cal. Mar. 31, 2011) (declining to apply automatic vicarious disqualification). Quinn Emanuel has over 1,300 attorneys working in over thirty offices worldwide, and, with respect to the specific matters at issue here, the attorneys working on the *Kutagula* litigation do not overlap with the attorneys working on this matter. Olivar Decl. ¶¶ 3, 6; Lifrak Decl. ¶ 11. "In a situation where the everyday reality is no longer that all attorneys in the same law firm actually work together, there would seem to be no place for a rule of law based on the premise that they do." *Kirk*, 183 Cal. App. 4th at 802 (cleaned up). On these facts, no disqualifying conflict exists—let alone one that should be applied firmwide and automatically without regard to the realities of the two matters and teams.

## III.    THE EQUITIES COMPEL DENIAL OF COSTAR'S MOTION

Finally, because "disqualification of counsel is a drastic measure" that "courts should hesitate to impose except when of absolute necessity," *Watson,* 2019 WL 4540117, at *2, courts exercise discretion to deny disqualification motions even if a conflict exists that has not been rebutted or waived. Here, the equities simply do not support disqualification in light of the severe prejudice that CREXi would suffer if CoStar's attempt to strip it of its chosen counsel succeeds.

"[E]ven when counsel has been shown to have committed an ethical rule infraction the court retains discretion to decline to order disqualification, and, in many cases, courts have done just that." *UMG Recordings, Inc. v. MySpace, Inc.*, 526 F. Supp. 2d 1046, 1063 (C.D. Cal. 2007) (citation omitted); *see also, e.g.*, *Barajas v. City of Carlsbad*, 2022 WL 1509295, at *3 (S.D. Cal. Apr. 28, 2022) ("Even a violation of the California Rules of Professional Conduct does not automatically compel disqualification."). "Since the purpose of a disqualification order must be prophylactic, not punitive, the significant question is whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court.'" *Edwards v. CoreCivic of Tennessee, LLC*, 2021 WL 5303406, at *2 (S.D. Cal. Nov. 15, 2021). "Disqualification is, therefore, inappropriate 'to punish a dereliction that will likely have no substantial continuing effect on future judicial proceedings.'" *Id*.

If Quinn Emanuel were disqualified, CREXi would be stripped of its carefully selected trial counsel and forced to start its search for representation anew. Greenberg Decl. ¶¶ 3–7. Quinn Emanuel, working hand-in-hand with CREXi, has invested hundreds of hours preparing this case for trial, developing litigation strategy, mastering the factual record, planning the prosecution of CREXi's now-revived antitrust claims, drafting a brief to the Supreme Court, and building a relationship of mutual trust and confidence with CREXi, its board of directors, and its employees that effective trial advocacy requires. *Id*. ¶ 6. By the same token, CREXi's small

19

team has worked tirelessly to integrate the Quinn Emanuel attorneys into this matter, endeavoring to share over five years of information, documents, context, and strategy. *Id*. Disqualification at this stage would mean those significant efforts would all be wasted. *See, e.g.*, *FlatWorld Interactives LLC v. Apple Inc.*, 2013 WL 4039799, at *9 (N.D. Cal. Aug. 7, 2013) (denying disqualification that would "impose a substantial hardship" in part because of "replication of expended efforts"). And forcing CREXi to find yet another law firm to represent it in this matter would itself impose a significant hardship and cost on the company. CREXi's General Counsel carefully selected Quinn Emanuel as the company's recommended counsel and presented that recommendation to CREXi's board of directors, which approved the engagement. Greenberg Decl. ¶ 6. Returning to its prior counsel is not an available option; rather, CREXi would need to start its search for counsel anew. *Id*. ¶ 7.

In contrast, CoStar faces no prospect of hardship or prejudice, and no threat to its confidential information, if its motion is denied. CoStar has not even attempted to make such an argument. Lacking any real claim of prejudice, CoStar tries to manufacture it by claiming that Quinn Emanuel sought a prejudicial "retroactive waiver." Mot. 7–8. Quinn Emanuel's desire to resolve CoStar's sudden claim that no meeting of the minds, and no terms of engagement, ever existed between the parties can hardly be said to prejudice CoStar. Quinn Emanuel's motion to withdraw from the *Kutagula* case also will not prejudice CoStar because Quinn Emanuel cannot withdraw unless and until the Court permits it. *See* N.D. Cal. L.R. 11-5. And CoStar cannot assert that Quinn Emanuel is not continuing to represent CoStar capably pending resolution of its withdrawal motion.

With no colorable prejudice resulting from Quinn Emanuel's representation of CREXi, the intent behind CoStar's disqualification motion becomes readily apparent: remove CREXi's chosen counsel for a leg up on a competitor in a complex, expensive, multi-year lawsuit. CoStar's pitch for disqualification smacks of the desire to gain a tactical advantage that California courts have repeatedly warned against. *See, e.g.*,

20

*Watson*, 2019 WL 4540117, at *2.  No principle of legal ethics would be served by granting CoStar's motion.

## IV.    THE COURT SHOULD GRANT LIMITED DISCOVERY

If the Court nevertheless is inclined not to deny the motion, it should first permit limited discovery.  *See, e.g.*, *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 2014 WL 12589658, at *1 (C.D. Cal. June 16, 2014) (ordering "limited *in camera* investigation into the alleged conflicts"); *Brit. Int'l Ins. Co. v. Seguros La Republica, S.A.*, 2002 WL 987199, at *1 (S.D.N.Y. May 14, 2002) (court has discretion to order discovery).

For instance, the Court should permit discovery into the unity of interest between CoStar and Matterport.  Discovery would reveal whom at CoStar had actual knowledge of the Engagement Letter's terms, when CoStar learned of the Engagement Letter, and the extent to which CoStar accepted the benefits and performed its obligations under the Engagement Letter before it attempted to disavow the advance waiver.  And discovery would uncover whether CoStar has a practice of engaging litigation counsel without a written agreement, and whether CoStar reviewed the Engagement Letter in diligence before it acquired Matterport.  Finally, discovery may also reveal that CoStar pursued this motion not for any legitimate reason but to deprive CREXi of its chosen counsel in this case.

The significant prejudice that disqualification would impose on CREXi merits such limited discovery to ensure that any ruling is made on a complete record.

## CONCLUSION

CoStar's motion should be denied.

DATED:  February 3, 2026         QUINN EMANUEL URQUHART & SULLIVAN, LLP


By */s/ Michael Lifrak*
    Alex Spiro (admitted *pro hac vice*)
    alexspiro@quinnemanuel.com
    295 Fifth Ave
    New York, New York 10016
    Telephone:  (212) 849-7000
    Facsimile:    (212) 849-7100

    Michael Lifrak (SBN: 210846)
    michaellifrak@quinnemanuel.com
    865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
    Telephone:  (213) 443-3000
    Facsimile:    (213) 443-3100

    *Attorneys for Defendant and Counterclaimant Commercial Real Estate Exchange, Inc.*

22

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant and Counterclaimant Commercial Real Estate Exchange, Inc., certifies that this brief is 6,981 words, which complies with the word limit of Local Rule 11-6.1.

DATED:  February 3, 2026        QUINN EMANUEL URQUHART &
                                SULLIVAN, LLP


                                 By /s/ Michael Lifrak
                                    Michael Lifrak

CREXI'S OPPOSITION TO COSTAR'S MOTION TO DISQUALIFY
Case No. 2:20-CV-08819 CBM (AS)